ORIGINAL

FILED 07 FEB -7 PM 5:21

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | SUPERSEDING INDICTMENT |
| Plaintiff, | ) | 3:06CR 719 |
| v. | ) | VIOLATIONS: 18 U.S.C. § 956(a)(1), 18 U.S.C. § 2339A, 18 U.S.C. § 842(p)(2)(A), 18 U.S.C. § 871, and 18 U.S.C. § 1001(a)(3) |
| MOHAMMAD ZAKI AMAWI, MARWAN OTHMAN EL-HINDI, WASSIM I. MAZLOUM, ZUBAIR A. AHMED, and KHALEEL AHMED, | ) | |
| Defendants. | ) | |

COUNT 1

The Grand Jury charges that:

1. At all times material to this Indictment, MOHAMMAD ZAKI AMAWI (AMAWI) was a citizen of Jordan as well as a citizen of the United States, residing, until August 2005, in Toledo, Ohio. AMAWI traveled to Jordan in October 2003, and returned to the United States in March 2004. While in Jordan, AMAWI unsuccessfully attempted to enter into Iraq to

wage violent jihad, or "holy war," against the United States and coalition forces. AMAWI returned to Jordan in August 2005.

2. At all times material to this Indictment, MARWAN OTHMAN EL-HINDI (EL-HINDI) was a naturalized United States citizen born in Amman, Jordan, and residing in Toledo, Ohio.

3. At all times material to this Indictment, WASSIM I. MAZLOUM (MAZLOUM) was a United States person, (i.e., legal permanent resident), who entered the United States in 2000 from Lebanon. MAZLOUM resided in Toledo, Ohio, with his brother, and operated a car business there.

4. At all times material to this Indictment, ZUBAIR A. AHMED (ZUBAIR) was a United States citizen, residing in Chicago, Illinois, his birthplace.

5. At all times material to this indictment, KHALEEL AHMED (KHALEEL) was a United States citizen, residing in Chicago, Illinois, and was ZUBAIR's cousin.

6. At all times material to this Indictment, "the Trainer" was a United States citizen, not named as a conspirator herein, whose identity is known to the Grand Jury. The Trainer has a U.S. military background and, in 2002, was solicited by EL-HINDI to assist in providing security and bodyguard training.

The Conspiracy

7. The Grand Jury realleges and incorporates by reference paragraphs 1 through 6 of this Indictment.

8. From at least as early as June 2004, to on or about February 19, 2006, in the Northern District of Ohio, Western Division, and elsewhere, defendants MOHAMMAD ZAKI

AMAWI, MARWAN OTHMAN EL-HINDI, WASSIM I. MAZLOUM, ZUBAIR A. AHMED, and KHALEEL AHMED, together with others known and unknown to the Grand Jury, did willfully combine, conspire, confederate and agree to kill or maim persons in locations outside of the United States, to include U.S. armed forces personnel serving in Iraq.

Manner and Means

9. It was a part of the conspiracy that one or more conspirators would recruit others to train for violent jihad against the United States and its allies in Iraq, and elsewhere, and would propose potential training sites for use in providing ongoing firearms, hand-to-hand combat, explosives, and other paramilitary training to prospective recruits.

10. It was a further part of the conspiracy that one or more conspirators would research and solicit potential funding sources for the jihad training. Such potential funding sources included government grants, from which funds would be diverted for training purposes, as well as private sponsors.

11. It was a further part of the conspiracy that one or more of the conspirators would view training materials, including those found on secure and exclusive web sites, and download and copy training videos and materials for use in jihad training sessions. Such training materials included videos on the production and use of improvised explosive devices (IEDs), and suicide bomb vests, among others.

12. It was a further part of the conspiracy that one or more of the conspirators would travel to a commercial shooting range for firearms training and practice.

Overt Acts

13. In furtherance of the conspiracy, and to affect the illegal objects thereof, one or more of the conspirators knowingly performed one or more overt acts, in the Northern District of Ohio, Western Division, and elsewhere within the United States, including, but not limited to the following:

14. On or about June 23, 2004, EL-HINDI advised the Trainer that there were two "brothers" who would like to train. EL-HINDI stated, in part and in substance, that these two brothers were young, and that they had a lot of energy.

15. On or about June 29, 2004, EL-HINDI, who stated that he was in Chicago, Illinois at the time, engaged in a telephone conversation with the Trainer, in Ohio, and stated, in part and in substance, that he planned to bring two brothers with him to meet the Trainer at a convention.

16. On or about July 3 and 4, 2004, ZUBAIR and KHALEEL traveled to the convention in Cleveland to meet the Trainer. ZUBAIR and KHALEEL discussed sniper tactics with the Trainer and their desire to receive training in, among other things, firearms and counter surveillance techniques. ZUBAIR explained his desire to learn to move with a .50 caliber machine gun, or Gatling gun. KHALEEL asked the Trainer whether it would be wise to purchase a 9 millimeter handgun. ZUBAIR advised the Trainer, in part and in substance, that he would communicate by encrypted e-mails. ZUBAIR stated, in part and in substance, to EL-HINDI, "Marwan, man, we've been waiting for this." EL-HINDI stated, in part and in substance, that he would bring ZUBAIR and KHALEEL to Toledo.

17. On or about July 15, 2004, EL-HINDI discussed ZUBAIR and KHALEEL with the Trainer. EL-HINDI informed the Trainer that ZUBAIR and KHALEEL had attempted to travel to Afghanistan or Iraq. EL-HINDI explained that he had stopped them, and how the two were not properly trained.

18. In or about September 2004, ZUBAIR and the Trainer exchanged telephone calls in an attempt to contact each other.

19. On or about October 2, 2004, ZUBAIR stated to the Trainer that he had prepared a written list of questions and provided them to EL-HINDI to be forwarded to the Trainer for responses. ZUBAIR explained to the Trainer that he was still interested in receiving training, but had been unable to come to Ohio. ZUBAIR stated, in part and in substance, "If you can come down here [Chicago], I'll hook you up with a hotel and everything." ZUBAIR further stated, in part and in substance, that he and KHALEEL needed to receive "knowledge" from the Trainer, so that they could continue to prepare on their own in Chicago and then "hook up" with the Trainer in the Spring. ZUBAIR advised the Trainer to obtain the questions from EL-HINDI.

20. On or about October 8, 2004, EL-HINDI and the Trainer discussed ZUBAIR and KHALEEL and again emphasized the need for ZUBAIR and KHALEEL to acquire discipline and training. Among other things, EL-HINDI and the Trainer discussed the importance of training the recruits in U.S. military methods. EL-HINDI stated, in part and in substance, that to fight your enemy is to know their strategy.

21. On or about November 17, 2004, AMAWI and MAZLOUM met with the Trainer to discuss and plan the violent jihad training.

22. On or about November 23, 2004, EL-HINDI solicited the Trainer to travel with him to the Middle East in connection with the establishment of a training facility which would include, among other things, firearms training. EL-HINDI advised the Trainer, in part and in substance, that he was in contact with individuals there who were in the process of putting together such a facility.

23. On or about November 23, 2004, AMAWI and the Trainer engaged in an instructional session on the construction and use of IEDs and timing devices. AMAWI stated, in part and in substance, that his aim was to target U.S. military assets. While AMAWI and the Trainer viewed a video on the computer, AMAWI sang along with the video, in a foreign language, words to the effect of: "Blow them up! Blow them up! Blow them up!"

24. On or about November 23, 2004, AMAWI gave the Trainer a computer disk which contained videos depicting jihadist activities, including attacks on Americans in Iraq.

25. On or about December 26, 2004, KHALEEL contacted the Trainer to explain why ZUBAIR and KHALEEL had been unable to train in Ohio, and advised that EL-HINDI had attempted to set up a meeting in Chicago for ZUBAIR, KHALEEL, EL-HINDI and the Trainer.

26. On or about January 10, 2005, AMAWI showed the Trainer a video, which he accessed from a jihadist internet site, on the construction of a suicide bomb vest, entitled "Martyrdom Operation Vest Preparation." The video demonstrated, step by step, how to assemble an explosive suicide vest and also displayed its destructive power.

27. On or about January 21, 2005, AMAWI, the Trainer, and others, practiced target shooting at an indoor shooting range in Swanton, Ohio.

28. On or about January 30, 2005, the Trainer and AMAWI discussed downloading the "Martyrdom Operation Vest Preparation" video onto a computer disk for the Trainer to use in the jihad training. AMAWI thereafter gave the Trainer a disk onto which the video had purportedly been copied.

29. On or about February 2, 2005, AMAWI, EL-HINDI, and the Trainer accessed at least one jihadist internet web site and discussed the use of plastic explosives and rockets while viewing on-line material. EL-HINDI and AMAWI also discussed the manufacturing of explosives. During this conversation, EL-HINDI and AMAWI discussed the government's ability to monitor their internet activity if they entered jihadist web sites.

30. On or about February 6, 2005, AMAWI described a plan to covertly smuggle a firearm into a Middle Eastern country by covering the weapon with a particular material in a carry-on bag to disguise and conceal it from x-ray detection at the airport, and solicited the Trainer's opinion regarding the plan's feasibility.

31. On or about February 8, 2005, EL-HINDI viewed a suicide bomb vest video from a jihadist web site. EL-HINDI proposed to the Trainer that the jihad training materials be downloaded onto disks and shown to ZUBAIR and KHALEEL.

32. On or about February 16, 2005, AMAWI, EL-HINDI, MAZLOUM and the Trainer met at EL-HINDI's residence to coordinate the jihad training exercises. The group made plans to conceal their training activities.

33. On or about February 16, 2005, MAZLOUM discussed joining the Lebanese army in order to learn military techniques. MAZLOUM also encouraged the Trainer to step up the pace of the training.

34. On or about February 16, 2005, MAZLOUM stated, in part and in substance, that he wanted to learn how to build small IEDs from household items, and explained that he could use his business, buying and selling automobiles, as a cover for traveling in and out of Iraq.

35. On or about February 18, 2005, EL-HINDI assisted the Trainer in registering for access to a secure jihadist web site on EL-HINDI's computer. They then registered the Trainer for a Basic Training course offered through the web site, which promised basic weapons training and physical training, among other topics. EL-HINDI indicated that he would like to register himself for the course. According to the site information, the Basic Training course was a pre-requisite for the Advanced Training course also being offered. EL-HINDI advised the Trainer that he did not think it was a good idea for too many individuals to register for this site.

36. On or about February 25, 2005, EL-HINDI electronically forwarded to the Trainer an e-mail communication EL-HINDI had received from an unspecified source which contained a series of photographs and a narrative of an ambush of apparent United States military vehicles and personnel, and displaying the detonation of IEDs.

37. On or about April 4, 2005, EL-HINDI met with an accountant in Dearborn, Michigan, to begin the process of creating a new non-profit organization that would be used to receive grant funds, under the guise of providing tax education services. EL-HINDI suggested that nominee names should be used for the incorporators of the organization. During the meeting, the online application was completed using the State of Michigan web site to register the new corporation, utilizing the names of one of the Trainer's children and one of the accountant's children as the alleged incorporators so that EL-HINDI would be permitted to receive compensation from the entity. The accountant did not submit the application.

38. On or about April 13, 2005, AMAWI and MAZLOUM participated in weapons training including the sight alignment of a handgun. AMAWI and MAZLOUM expressed an interest in instruction regarding explosives, including IEDs.

39. During the training exercise, on or about April 13, 2005, AMAWI practiced training others what he had learned by repeating the instruction to MAZLOUM in Arabic.

40. On or about April 20, 2005, AMAWI and MAZLOUM received additional instruction from the Trainer. AMAWI, MAZLOUM and the Trainer discussed obtaining army fatigues to place on dummies for staging attacks, and AMAWI and MAZLOUM each suggested where the group might acquire the uniforms. AMAWI and the Trainer also discussed videotaping future outdoor training exercises, covering their faces to protect their identities. MAZLOUM requested that the Trainer expedite the training, and advised that he was commencing physical fitness training.

41. On or about April 20, 2005, AMAWI and MAZLOUM practiced target shooting at an indoor shooting range, under the Trainer's supervision.

42. On or about April 29, 2005, AMAWI, MAZLOUM, and another individual practiced target shooting at an indoor range. AMAWI paid for the rental of two shooting lanes, and the rental of two handguns, a Beretta 9 mm pistol and a Glock 40 caliber pistol. AMAWI, MAZLOUM, the Trainer, and the other individual discussed the importance of keeping their training secret.

43. On or about April 29, 2005, the Trainer discussed with AMAWI and MAZLOUM training with real explosives during the upcoming Fourth of July holiday, when the sounds of the explosions would not raise undue suspicion.

44. On or about May 18, 2005, AMAWI requested to be trained to use a mortar.

In violation of Title 18, United States Code, Section 956(a)(1).

COUNT 2

The Grand Jury further charges that:

45. The allegations of paragraphs 1 through 3, and 6, of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

46. From at least as early as in or about June 2004, to on or about February 19, 2006, in the Northern District of Ohio, Western Division, and elsewhere, defendants MOHAMMAD ZAKI AMAWI (AMAWI), MARWAN OTHMAN EL-HINDI (EL-HINDI), and WASSIM I. MAZLOUM (MAZLOUM), did conspire, confederate and agree with others known and unknown to the Grand Jury to provide material support and resources, knowing and intending they were to be used in preparation for and in carrying out a violation of Title 18, United States Code, Section 2332 (killing of U.S. nationals).

Manner and Means

47. It was a part of the conspiracy that AMAWI would and did communicate with co-conspirators, including a co-conspirator in the Middle East, whose identity is partially known to the Grand Jury, using code words to disguise and conceal the true subject and purpose of the communications.

48. It was a further part of the conspiracy that AMAWI, EL-HINDI, and MAZLOUM would attempt to identify, locate, and provide various resources and materials requested by one or more co-conspirators overseas for use in waging jihad against the United States military and coalition forces in Iraq, and elsewhere. Such resources and materials included money, training,

explosives, communications equipment, computers or personnel, including the defendants, themselves.

Overt Acts

49. On or about January 27, 2005, AMAWI communicated, by computer, with an individual in the Middle East. From the communication, AMAWI learned that some "brothers" were preparing to cross the border into Iraq.

50. On or about February 16, 2005, AMAWI, EL-HINDI, and MAZLOUM debated what the Iraqi insurgency needed most: money, weapons, or manpower. They also discussed the effectiveness of snipers against the U.S. military.

51. On or about April 6, 2005, AMAWI in part and in substance, asked the Trainer if he had a source or contact overseas who could obtain a certain chemical explosive on behalf of a "brother" in the Middle East. AMAWI advised the Trainer that he had been communicating with this "brother" in the Middle East over the internet, using various code words to disguise and conceal the true subject and purpose of their communications.

52. On or about April 7, 2005, AMAWI gave the Trainer a paper napkin on which AMAWI had written a word representing the name of the requested chemical explosive.

53. On or about April 11, 2005, AMAWI sent a coded e-mail to a contact in the Middle East inquiring about the "pillows," (the code word for the chemical explosive), including in what form it was needed, i.e. "hard" (solid), or "soft" (liquid), and to where overseas it should be delivered.

54. On or about April 13, 2005, AMAWI communicated with a contact in the Middle East, by computer, regarding the chemical explosive. AMAWI discussed the delivery of the chemical explosive, and admonished his contact for being too open in the communications.

55. On or before August 22 , 2005, AMAWI and the Trainer went together to AMAWI's place of employment, a travel agency in Toledo, Ohio, and obtained, from AMAWI's employer, a letter, on business letterhead, falsely explaining that the laptop computers that AMAWI and the Trainer were carrying with them into Jordan were necessary to their employment responsibilities representing the travel agency in the "United States Diversity Immigrant Visa Program." The letter was prepared on a travel agency computer, signed by AMAWI's employer, and copied in duplicate.

56. On or about August 22, 2005, AMAWI and the Trainer boarded Royal Jordanian flight number 268 from Detroit, Michigan to Amman, Jordan. They took with them five laptop computers, which AMAWI intended to deliver to the mujahideen "brothers."

57. On or about August 23, 2005, upon arrival at the Amman, Jordan airport, AMAWI presented to Jordanian officials the letter written by his employer at the travel agency in Toledo, Ohio, claiming that the computers were to be used by the travel agency to facilitate the "United States Diversity Immigrant Visa Program," in which the travel agency was participating. AMAWI and the Trainer were thereafter permitted to retain possession of the laptop computers and transport them into Jordan.

58. On or about August 24, 2005, AMAWI communicated with an individual, whose identity is unknown to the Grand Jury, for the purpose of arranging to turn over the laptop computers to the mujahideen.

In violation of Title 18, United States Code, Section 2339A.

COUNT 3

The Grand Jury further charges that:

59. The allegations of paragraphs 1, 6, 26, and 28 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

60. Between on or about January 10 and on or about January 30, 2005, in the Northern District of Ohio, Western Division, the defendant, MOHAMMAD ZAKI AMAWI, did knowingly distribute to another person, that is the Trainer, information pertaining to, in whole or in part, the manufacture or use of an explosive or destructive device, with the intent that such information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence, in that the defendant accessed a secure mujahideen web site and opened, viewed, and discussed with the Trainer certain instructional materials and videos, including a video entitled "Martyrdom Operation Vest Preparation," which depicted the step-by-step construction and use of a suicide bomb vest, an "explosive" as defined in Title 18, United States Code, Section 844(I), and a "destructive device" as defined in Title 18, United States Code, Section 921(a)(4), and which suicide bomb vest video the defendant displayed and translated for the Trainer, with the intent that the Trainer use said instructional materials for training individuals in the construction and use of such bomb vests to commit and further a Federal crime of violence, as defined in Title

18, United States Code, Section 16, including but not limited to the killing of a national of the United States outside of the United States, a violation of Title 18, United States Code, Section 2332(a), and the killing of any officer or employee of the United States, a violation of Title 18, United States Code, Section 1114.

In violation of Title 18, United States Code, Section 842(p)(2)(A).

COUNT 4

The Grand Jury further charges that:

61. The allegations of paragraphs 1 and 6 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

62. On or about February 6, 2005, in the Northern District of Ohio, Western Division, the defendant, MOHAMMAD ZAKI AMAWI, did knowingly distribute to another person, that is the Trainer, information pertaining to, in whole or in part, the manufacture or use of an explosive or destructive device, with the intent that such information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence, in that the defendant distributed to the Trainer a digital copy of a six-page written guide describing the step-by-step process for manufacturing chemical explosive compounds, said compounds constituting an "explosive" as defined in Title 18, United States Code, Section 844(I), and which information the defendant provided to the Trainer, with the intent that the Trainer use said information for training individuals in the manufacture of explosives to commit and further a Federal crime of violence, as defined in Title 18, United States Code, Section 16, including but not limited to the killing of a national of the United States, outside of the United States, a violation of Title 18,

United States Code, Section 2332(a), and the killing of any officer or employee of the United States, a violation of Title 18, United States Code, Section 1114.

In violation of Title 18, United States Code, Section 842(p)(2)(A).

COUNT 5

The Grand Jury further charges that:

63. The allegations of paragraphs 2, 6, and 31 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

64. On or about February 8, 2005, in the Northern District of Ohio, Western Division, the defendant, MARWAN OTHMAN EL-HINDI, did knowingly distribute to another person, that is the Trainer, information pertaining to, in whole or in part, the manufacture or use of an explosive or destructive device, with the intent that such information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence, in that the defendant accessed a secure mujahideen web site and opened, viewed, and discussed with the Trainer certain instructional materials and videos, including a video entitled "Martyrdom Operation Vest Preparation," which depicted the step-by-step construction and use of a suicide bomb vest, an "explosive" as defined in Title 18, United States Code, Section 844(I), and a "destructive device" as defined in Title 18, United States Code, Section 921(a)(4), and which suicide bomb vest video the defendant displayed for and discussed with the Trainer, and further for which the defendant provided to web site address and his access password to the Trainer, with the intent that the Trainer use said instructional materials for training individuals in the construction and use of such bomb vests to commit and further a Federal crime of violence, as defined in Title 18, United States Code, Section 16, including but not limited to the killing of a national of the

United States outside of the United States, a violation of Title 18, United States Code, Section 2332(a), and the killing of any officer or employee of the United States, a violation of Title 18, United States Code, Section 1114.

In violation of Title 18, United States Code, Section 842(p)(2)(A).

COUNT 6

The Grand Jury further charges that:

65. The allegations of paragraphs 2, 6, and 36 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

66. On or about February 25, 2005, in the Northern District of Ohio, Western Division, the defendant, MARWAN OTHMAN EL-HINDI, did knowingly distribute to another person, that is the Trainer, information pertaining to, in whole or in part, the manufacture or use of an explosive or destructive device, with the intent that such information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence, in that the defendant electronically forwarded to the Trainer an e-mail message with an attachment which contained a photographic slide show, including a written narrative, demonstrating the preparation and use, against apparent United States military vehicles and personnel, of improvised explosive devices (IEDs), an "explosive" as defined in Title 18, United States Code, Section 844(I), and a "destructive device" as defined in Title 18, United States Code, Section 921(a)(4), and which photographic slide show the defendant provided to the Trainer, with the intent that the Trainer use said instructional materials for training individuals in the construction and use of such IEDs to commit and further a Federal crime of violence, as defined in Title 18, United States Code, Section 16, including but not limited to the killing of a national of the United States outside of


the United States, a violation of Title 18, United States Code, Section 2332(a), and the killing of any officer or employee of the United States, a violation of Title 18, United States Code, Section 1114.

In violation of Title 18, United States Code, Section 842(p)(2)(A).

COUNT 7

The Grand Jury further charges that:

67. On or about October 14, 2004, in the Northern District of Ohio, Western Division, the defendant, MOHAMMAD ZAKI AMAWI, knowingly and willfully did verbally threaten to kill or to inflict bodily harm upon the President of the United States, to and in the presence of another person.

In violation of Title 18, United States Code, Section 871.

COUNT 8

The Grand Jury further charges that:

68. On or about March 15, 2005, in the Northern District of Ohio, Western Division, the defendant, MOHAMMAD ZAKI AMAWI, knowingly and willfully did verbally threaten the President of the United States, to and in the presence of another person.

In violation of Title 18, United States Code, Section 871.

COUNT 9

The Grand Jury further charges:

69. The allegations of paragraphs 2 and 6 of Count One of this Indictment are realleged and incorporated as if fully set forth herein.

70. On or about February 17, 2004, in the Northern District of Ohio, Western Division, MARWAN OTHMAN EL-HINDI, the defendant herein, in a matter within the jurisdiction of the U.S. Department of Housing and Urban Development, an agency of the United States, did knowingly and willfully make and use a false writing or document, concerning material facts related to his receipt of benefits through the Lucas Metropolitan Housing Authority (LMHA), in that the defendant prepared a letter, dated February 11, 2004, which falsely claimed that the defendant was paying a non-family member, that is the Trainer, $175.00 weekly for childcare services for two of the defendant's children, and the defendant caused the letter to be delivered to the LMHA on or about February 17, 2004, at the time knowing that said letter was false, in that the defendant was not paying the Trainer for childcare services, and the Trainer was not providing the claimed childcare services.

In violation of Title 18, United States Code, Section 1001(a)(3).

A TRUE BILL.

Original document – Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.