1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3    UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                  -
4      Plaintiff,                 - Toledo, Ohio
                                  - April 1, 2008
5           v.                    - Trial
                                  -
6    MOHAMMAD ZAKI AMAWI, et al.,-
                                  -
7      Defendants.                -
     -------------------------------

8
                        VOLUME 19 TRANSCRIPT OF TRIAL
9                BEFORE THE HONORABLE JAMES G. CARR
           UNITED STATES DISTRICT CHIEF JUDGE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiffs:      United States Attorneys' Office
12                            By:  Thomas E. Getz
                                   Justin E. Herdman
13                            801 Superior Avenue, W
                              Cleveland, OH 44113
14                            (216) 622-3840

15                            U.S. Department of Justice
                              By:  Jerome J. Teresinski
16                                 David I. Miller
                              10th & Constitution Ave, NW
17                            Washington, DC 20530
                              (202) 353-3464
18
                              Office of the U.S. Attorney- Austin
19                            By:  Gregg N. Sofer
                              816 Congress Avenue
20                            Austin, TX 78701
                              (512) 916-5858
21

22

23

24

25

| | |
|---|---|
| 1 | For the Defendant Amawi: Office of the Federal Public Defender - Cleveland |
| 2 | By:  Amy B. Cleary<br>Jonathan P. Witmer-Rich |
| 3 | Edward G. Bryan<br>Timothy C. Ivey |
| 4 | 750 Skylight Office Tower<br>1660 West Second St. |
| 5 | Cleveland, OH 44113<br>(216) 522-4856 |
| 6 | |
| 7 | Muawad & Muawad<br>By:  Elias Muawad<br>36700 Woodward Avenue, Suite 209 |
| 8 | Bloomfield Hills, MI 48304<br>(248) 594-4700 |
| 9 | |
| 10 | For the Defendant El-Hindi:  Kerger & Kerger<br>By:  Stephen D. Hartman<br>Suite 201 |
| 11 | 33 South Michigan Street<br>Toledo, OH 43602 |
| 12 | (419) 255-5990 |
| 13 | Boss & Vitou<br>By:  Charles M. Boss |
| 14 | 111 West Dudley Street<br>Maumee, OH 43537-2140 |
| 15 | (419) 893-5555 |
| 16 | Raslan, El-Kamhawy & Pla<br>By:  Alek H. El-Kamhawy |
| 17 | Suite 3FE, 1700 East 13 Street<br>Cleveland, OH 44114 |
| 18 | (216) 928-1500 |
| 19 | For the Defendant Mazloum:  David L. Doughten<br>4403 St. Clair Avenue |
| 20 | Cleveland, OH 44103-1125<br>(216) 361-1112 |
| 21 | |
| 22 | Helmick & Hoolahan<br>By:  Jeffrey J. Helmick<br>2nd Floor |
| 23 | 1119 Adams Street<br>Toledo, OH 43624-1508 |
| 24 | (419) 243-3800 |
| 25 | |

1    Mohammed Abdrabboh
     1620 Ford Avenue
2    Wyandotte, MI 48192
     (734) 283-8405

3
         Court Reporter:        Tracy L. Spore, RMR, CRR
4        1716 Spielbusch Avenue
         Toledo, Ohio 43624
5        (419) 243-3607

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
         Proceedings recorded by mechanical stenography, transcript
24   produced by notereading.
25

**1**          (Portion of the record sealed by order of the

**2**  Court.)

**3**          (The jury is not present.)

**4**          MR. IVEY:  Between the government's conclusion of

**5**  their opening statement and the defense, before we begin ours

**6**  can we have five or ten minutes?

**7**          THE COURT:  Absolutely.

**8**          MR. IVEY:  I'm told we may need to make some

**9**  technical adjustments to the equipment.

**10**          MR. SOFER:  Also the last thing, Your Honor, I will

**11**  mention that here -- it's just to be first on my list.  We are

**12**  going to request a change in the seating arrangement in the

**13**  courtroom.   And I don't want it to be a surprise out there and

**14**  then have Your Honor be surprised by it.  We think in addition

**15**  to having the giant screen now that blocks all view among others

**16**  of Defendant Mazloum, that the way this is set up, I think could

**17**  potentially prejudice the government's case in the sense that

**18**  one of these defendants appears to be not like the others, and I

**19**  understand he is not like the others in the sense he is

**20**  presently out at liberty.   But the more we've thought about the

**21**  more you look at what's going on out there.   I'll note that

**22**  Counsel -- we've talked about this already.

**23**          THE COURT:  I understand.   I don't think -- this

**24**  has been all worked out through the marshals.

**25**          MR. SOFER:  Understood.   The only issue I think,

1 Your Honor, is it seems to me that there's a number of counsel

2 for Amawi that sit across that back area.   We're going to

3 recommend that at least you think about having Mr. Mazloum come

4 up with his counsel, and it is in that area because, as I said,

5 I think…

6 THE COURT:  I'd rather not.

7 MR. HARTMAN:  That screen will be gone.   It's only

8 for opening.

9 MR. BOSS:  We tested it Friday by sitting in the

10 jury chairs and every jury seat has been tested and you have a

11 line of sight to the Mazloum seats and you can see them.   So

12 they're not obstructed.

13 MR. HARTMAN:  That's why we put it up high like

14 that.

15 THE COURT:  Very good.  Anything else we have to

16 talk about outside?

17 If there's a request for this transcript it's

18 perfectly available to everybody except the part about the

19 juror.   In other words, if you get a request from the media

20 about what we did in here.   Tell them that you'll check with

21 the Judge but you understand it's generally available; there may

22 be a portion that's not.

09:13:23 23 THE COURT:  Before we begin.   I want to remind

09:24:09 24 Counsel now that the sound system is operational.   Whatever is

25 said can be heard elsewhere in the building.

09:24:17  **1**          MR. SOFER:  Your Honor, there were a few

09:24:19  **2**  preliminary matters I thought we'd take care of.

09:24:27  **3**          THE COURT:  I'm sorry, I'd forgotten that.

**4**          MR. SOFER:  Some of these certainly we can deal

**5**  with after opening statements if that's how Your Honor wants to

**6**  do it.   I just would -- if it's okay, I'd like to give you the

**7**  laundry list now.   To the extent that we need to.

**8**          THE COURT:  Why don't we cover those that you think

**9**  you ought to talk about now, if any.

09:24:49  **10**          MR. SOFER:  You know what, if Your Honor wants to

09:24:54  **11**  proceed, we'll wait.

09:24:56  **12**          THE COURT:  Thank you.

09:25:07  **13**          (Jury enters the courtroom.)

**14**          THE COURT:  Ladies and gentlemen, thank you for

**15**  your patience.   I'm James Carr.   I'm the Judge who will be

**16**  presiding at this case in which you've been selected to serve as

**17**  jurors.   Six of you will be designated as the alternate jurors,

**18**  assuming we still have 18 at the end of the trial.   One reason

09:27:42  **19**  we have so many alternates is because of the anticipated length

**20**  of the trial which we continue to hope will be in your hands by

**21**  the end of June or early July.   That's a hope, not a promise or

**22**  a prediction, but we all certainly will do everything we can to

**23**  move the case along.

**24**          That being said, I acknowledge the fact you waited

**25**  more than half an hour before being called downstairs.   It is

1  far from uncommon that we have things to talk about.

09:28:13  2  Particularly on the first day of trial.  We had a number of

09:28:16  3  loose odds and ends that we had to take care of.   I have done

4  so.   So we will be beginning.

5           And we will begin first with having you stand and

6  raise your right hands and either swear or affirm to perform

09:28:32  7  your duties faithfully as jurors.

09:28:34  8           (Jury sworn by the clerk).

09:29:02  9           THE COURT:  Ladies and gentlemen, just to give you

10  an idea of the timetable today, we will simply hear from

11  counsel -- actually, three sets of counsel with their opening

09:29:15  12  statements.   The opening statements are simply the attorneys'

09:29:20  13  expectation and description to you of what they believe the

14  evidence that you will hear and see will be.   They won't be

09:29:31  15  arguing inferences from the evidence.   They're simply going to

09:29:35  16  project to you what they think the evidence will be.

17           And oftentimes things happen during trial that

18  cause other evidence to come in, and some of the evidence the

19  lawyers tell you about at this point may not be offered or

20  perhaps even not be admitted by me.   So it's a general sort of

09:29:56  21  description of what the lawyers presently anticipate you'll be

22  hearing and seeing in the course of the trial.

23           And a couple things about what you're about to

24  hear:   It is not evidence, and you shouldn't base your decision

09:30:12  25  when the time comes for you to make a decision on whatever the

2062

1  lawyers tell you this morning.   As I say, it's simply -- it's

09:30:22  2  like a line-up at the start of a baseball game or the opening

3  credits in a movie or TV show.   It's what they presently

09:30:30  4  expect.

09:30:31  5          The government, which has the sole burden of proof

09:30:35  6  in this case, will present its opening statement first.  Two of

7  the defendants -- it's my understanding Mr. Amawi and

8  Mr. El-Hindi -- have elected to present an opening statement to

09:30:48  9  you at this time.   The defendants always have the right to

09:30:53  10  decide whether to present an opening statement at the outset of

09:30:56  11  the case or to wait until the government has presented its

09:31:01  12  evidence.

13          And Mr. Mazloum, the third defendant, has elected

14  to wait and present his opening statement later in the case.

09:31:10  15  Don't think anything about it.   It's just that the defendants

16  and their lawyers have chosen to proceed in that way, as they're

09:31:19  17  completely entitled to do so.

09:31:23  18          Evidence -- after the opening statements this

19  morning, I expect we'll be done by lunch time or shortly

20  thereafter, and we'll recess for the day.   Tomorrow morning we

21  will begin, I hope, at 9:30, go until about 4:30.   We'll take a

22  mid-morning, mid-afternoon break, lunch time break.   And

09:31:45  23  tomorrow when we start off I will give you some general

24  instructions about your service as jurors.   Some preliminary

09:31:53  25  instructions.   I will also instruct you on the specific crimes

1   with which the defendants are charged, and I will tell you what

2   it is as to each of those crimes it's my present understanding

3   that the government has to prove, so that as you begin the

09:32:11  4   trial, you have an understanding of the legal framework in which

09:32:16  5   the case is proceeding.

6           I will remind you tomorrow, I hope, before and

7   after I read you those instructions, that these are preliminary

8   instructions.   Only the final instructions may vary in some

9   details.   And to the extent that they do, it is the final

09:32:38  10   instructions, copies of which you will have with you in the jury

09:32:41  11   room when you begin your deliberations, that will control your

09:32:49  12   deliberations.   But as I say, I try to give you something in

13   the way of a road map at the outset so that you're not sitting

14   there kind of wondering:  Well, what's it all about and what

15   does the government have to prove?   But that is what we will

09:33:06  16   begin with tomorrow.

17           Quite candidly, I ran out of time due to several

09:33:12  18   other matters I had to attend to.   In fact, at this time

19   yesterday morning I was in Los Angeles and got back about 2:00

20   this morning.   So I simply didn't get to do my homework and I

09:33:24  21   apologize to you for that.   I'll be spending the afternoon

09:33:29  22   finishing that.

09:33:30  23           You've been given, I believe, notebooks and you'll

24   be given sheets of paper from time to time.  Obviously, if you

09:33:38  25   need more paper just let Amy know.   I encourage you to take

1   notes during the course of the trial.   In fact, I would

2   encourage you to take notes now, even though, as I indicated,

3   what you're about to hear today is not evidence.  We'll start

4   with the evidence tomorrow after I read you the instructions.

5          The case, as you're all well aware, is expected to

6   last for several weeks.   In fact, a matter of some months.   I

7   will be up here taking notes on the computer here.   And I urge

8   you to do likewise.   You don't have to, there's no requirement

9   that you have to.   You may have your notes with you when the

10  time comes for you to deliberate and, of course, you'll be

11  entirely free to refer to your notes and to use them as a means

12  of recalling your own individual recollection of the testimony

13  and the evidence that you heard and saw here in the courtroom.

14         One thing that I do want to mention, and I'll touch

15  upon this again tomorrow, is that quite frequently during

16  deliberations jurors will ask to have portions of testimony read

17  back to them by the court reporter.   That's a practice that we

18  generally do not follow and it certainly is not encouraged.

19  There are several reasons for that.   One is I think if you had

20  a sense that, hey, we're going to get a chance to get a

21  transcript of whatever, stuff read back to us at the end of the

22  trial, the likelihood might well be that you'd pay less

23  attention than you really have to throughout the course of the

24  trial.   So we don't want you sort of assuming, gee, at the end

25  of the day we're going to be able to hear it all over again or

09:35:28  1  parts of it all over again.   That's simply not the way it

2  usually works.

09:35:36  3          So pay attention throughout the entire proceedings,

4  and to that end, as I say, I would encourage you, if you find it

5  helpful, to take notes.   But, most importantly, simply pay

09:35:48  6  attention.

09:35:49  7          Another reason that we don't read testimony back or

09:35:53  8  replay things generally and typically is that, particularly in a

9  trial of this length, there's going to be a very large volume of

09:36:04  10  evidence.  It would be a concern that, by doing so, that might

09:36:09  11  give that segment or that portion of the evidence or witness or

12  witness's testimony some particular weight or emphasis in your

09:36:18  13  own deliberation.   And as I will tell you at great length

14  tomorrow morning, you have to consider all of the evidence in

15  the course of your deliberations, and that process might not

09:36:32  16  occur as completely as it should if various portions of the

09:36:41  17  evidence were, in a sense, replayed or re-presented to you.

09:36:47  18          I will try whenever we take a recess, and certainly

19  when we adjourn for the day, to remind you of a couple of

09:36:54  20  fundamental things that you have to give heed to.   First is it

21  avoid any media reports.   I know there was a report in The

09:37:04  22  Blade over the weekend about the case.   I hope that you avoided

23  it.   If for any reason you didn't, simply keep in mind it's not

24  evidence and set it entirely out of your mind and refrain

25  dutifully and diligently during the course of the trial from

1   paying any attention to any media reports. There may well be

09:37:23  2   something in the broadcast news this evening or whenever about

3   the case and from time to time. Whatever a newsman has to say

09:37:34  4   or whatever impressions a reporter gains or tries to give to the

5   public about the case, it's not evidence and it can play

6   absolutely no role in your decision whatsoever. And, most

09:37:44  7   importantly, just refrain completely from reading or watching or

8   listening to anything about the case.

09:37:51  9        Keep an open mind. We all -- I think it's sort of

10   human nature to start forming initial impressions and views

09:38:03  11  almost sort of at the outset. And one of your most important

09:38:07  12  duties as a juror and an obligation that you owe to the parties

13   and to the public, and every bit as importantly to each other,

14   is that you keep an open mind until you've heard all of the

15   evidence, and also until I have given you the final instructions

09:38:27  16  that will control your deliberations.

17        Even after you've heard all the evidence you can't

09:38:32  18  start to make up your mind because were you to do so, you'd be a

09:38:36  19  little like a ship that's sailing without a rudder or keel

09:38:40  20  because that's what the U.S. law is; the law is the rudder and

21   the keel will guide you in your deliberations. Keep an open

22   mind as well until the 12 of you who will decide the case have

23   gathered together in the jury room. And keep an open mind

09:38:55  24  during deliberations, listen to each other thoughtfully,

09:38:59  25  carefully and attentively and respectfully. And work together

1 to reach the unanimous verdict that you will be called upon to

2 reach at the end of the case.

09:39:09 3            And finally to that end, in addition to keeping an

09:39:13 4 open mind throughout the course of the case, in addition to

5 paying close and careful attention to everything that happens in

6 the courtroom and to all of the evidence, don't talk about the

7 case amongst yourselves because, if you do -- there are several

09:39:32 8 difficult challenges that jurors face.   You've already

09:39:38 9 experienced so far both during the voir dire process and even

10 this morning.  One of them is simply waiting to be called into

11 court.   And we apologize for that.

12            But another is that the 18 of you have nothing else

13 in common except what's happening here in the courtroom.   It

14 must be unimaginably difficult to follow this instruction, but

09:40:02 15 you really must, and that is:  Don't talk about the case.   Find

09:40:05 16 something else to talk about when you're waiting for court to

09:40:08 17 begin or during recesses.   Don't talk about it amongst

18 yourselves.   Because if you do, unavoidably you're going to

19 start making your mind up.   If a juror says, "boy, what do you

20 think about that witness or that's a surprise, or I don't think

21 the lawyer did that good a job about this or that, how come he

22 didn't ask about this," among other things you'd start

09:40:34 23 speculating about things that aren't evidence, then you'd start

09:40:38 24 unavoidably forming a judgment, reaching an opinion very

25 prematurely and absolutely unfairly to everybody by beginning

1  the process of deciding the case and ultimately that could

09:40:53  2  affect, adversely and unfairly, the ultimate verdict that is

09:40:58  3  reached.   So I instruct you and I urge you to refrain from

09:41:02  4  talking about anything to do with the case when you're together

09:41:08  5  outside the Court.

6  And also then finally in that same regard, you

09:41:14  7  absolutely must not talk about the case at any time until your

09:41:18  8  deliberations have been completed and you've returned a verdict.

9  Or if you're an alternate and are excused, once your jury

10  service is done.   You cannot talk about it with anybody outside

11  the courtroom.   I think during the voir dire process I tried

12  with each of you to make that clear and said, I think to each of

13  you, I try to do so regularly with each prospective juror, when

14  you go home tonight, when we recess for the weekend or whatever

09:41:46  15  and people are aware that you're on this jury and that's what

16  you're doing, and they ask you about it, simply tell them the

17  Judge has made it very clear I cannot talk about the case.   Use

09:42:00  18  that little phrase with whatever emphasis it takes and whatever

09:42:05  19  emphasis you take from my giving it to you to refrain from

20  talking about the case because there are two dangers in that

09:42:12  21  regard:  One is that something that somebody said during that

22  kind of conversation, idle conversation, could ultimately

23  influence your judgment, and by influencing your judgment that

24  of possibly the entire jury would not be based only on the

25  evidence that you saw and heard in the courtroom.   And again

09:42:31 **1**  during the voir dire I believe I mentioned to each of you that

09:42:34 **2**  that's the only basis on which you can decide this case, is the

**3**  evidence and nothing else.

**4**  So thank you, as always, for your patience and your

**5**  service.

**6**  And, Mr. Sofer, you may present your opening

09:42:46 **7**  statements.  Mr. Sofer.

09:42:48 **8**  MR. SOFER:  Mr. Getz, Your Honor.

**9**  THE COURT:  Mr. Getz, you may present your opening

09:42:52 **10**  statement for the government.

**11**  MR. GETZ:  Thank you, Your Honor.  May it please

**12**  the Court, Counsel.

09:43:06 **13**  THE COURT:  Have the defendants seen that, by the

**14**  way, Mr. Getz, that blow up?

09:43:09 **15**  MR. GETZ:  Yes, they've seen it.

**16**  THE COURT:  Go ahead, you may proceed.

**17**  MR. GETZ:  Thank you, Your Honor.

**18**  Good morning.  This is a terrorism case.  The

09:43:24 **19**  government's evidence in this case is going to allow you to see

**20**  and hear from the inside the development of a terrorist cell

**21**  here in Toledo, Ohio.  You're going to be in the unique

09:43:38 **22**  position to travel inside the minds of these defendants as they

**23**  actively create that cell.  Through their very own words, which

09:43:47 **24**  were secretly recorded over a two-year period by a man who

09:43:51 **25**  pretended to be one of them.

09:43:54    **1**    You're going to hear these defendants tell you

09:43:56    **2**    about their desire to cause the deaths of American soldiers

**3**    overseas, their serious intentions to prepare themselves and to

09:44:04    **4**    prepare others to commit violent Jihad, or holy war, in the

**5**    Middle East, and their concerns that the government was going to

**6**    uncover their plans before they had the opportunity to fully

**7**    carry them out.

09:44:20    **8**    You're going to see undercover videos where you

09:44:24    **9**    will observe these defendants participating in firearms training

**10**    sessions and recruiting other individuals for the cell. You're

**11**    going to view and hear violent and graphic videos, photographs,

**12**    manuals, other materials these defendants downloaded from the

09:44:44    **13**    internet, they copied, and they distributed for indoctrination

**14**    for recruitment before the violent Jihad training.

09:44:54    **15**    Now, the charges that the Court will explain to you

**16**    tomorrow in his grand jury indictment include a Count 1,

**17**    conspiracy to kill or maim persons overseas including our

09:45:09    **18**    servicemen and women serving in Iraq and Afghanistan. All

**19**    three defendants are charged in that Count 1 conspiracy.

09:45:18    **20**    Also all three are charged in Count 1 of the

09:45:21    **21**    indictment; with conspiring to provide material support and

**22**    resources to others intending that those resources be used to

**23**    kill Americans.

**24**    Now there are some other equally important charges

**25**    against two of the defendants that I will explain to you later.

1    They're charged individually in those counts.

09:45:39  2          Now, the evidence in this case is going to be that

09:45:43  3    you will learn that by 2002 the FBI was fully tasked with

09:45:50  4    gathering and analyzing information and intelligence about

09:45:55  5    potential domestic and international terrorist threats against

09:46:00  6    the United States and its citizens.  The FBI's job was to

7    identify and diffuse or eliminate potential serious threatening

09:46:09  8    situations or persons in the United States and elsewhere.   The

9    FBI's Job Number 1, in fact, was then and remains today

09:46:17  10    disruption.  That means identifying and preventing a terrorist

09:46:23  11    incident or attack before it occurs.  When you disrupt a

09:46:30  12    terrorist cell or a terrorist incident, you automatically lose

13    your opportunity to continue to gather information or

09:46:38  14    intelligence about that cell or about that activity.

15          So the FBI launched a narrow tightrope between

09:46:47  16    continuing to gather valuable intelligence and information and

17    yet still preventing harm to the United States and its citizens.

18    As you'll see was done in this case, the government balanced its

19    opportunity to continue to gather important and valuable

20    information against the risk of allowing harmful activity to

09:47:06  21    continue.

22          Now, you're going to learn in this case that the

23    FBI here in Toledo, Ohio, fortunately was able to utilize a

24    uniquely skilled individual.   Not an FBI agent in this case but

25    a civilian paid by the FBI to infiltrate and to investigate,

1 where appropriate, potential terrorist threats here in the

2 community. That person you will learn is a man named Darren

3 Griffin. He was also known to these defendants as Bilal

4 Griffin.

5 The evidence is going to show Darren Griffin is a

6 decorated veteran of the U.S. military. In his overseas

7 deployments he had the opportunity to have some exposure to the

8 Middle East, to its culture and practices, and he gained some

9 knowledge of Islam. As you'll learn, Sergeant Griffin sustained

10 a career-ending knee injury during an overseas operation. So

11 he received a medical discharge after 14 years of military

12 service. Now, you will also learn Darren Griffin's earlier

13 years were less than ideal. He enlisted at an early age in the

14 Army in order to move beyond that life. And as you're going to

15 hear, the Army turned out to be Darren Griffin's validation and

16 his sanctuary. So when he suffered this career-ending and

17 sudden injury to end his military career, Darren Griffin was

18 lost for a time. But under circumstances you're going to hear

19 about, he began working for the DEA, or the Drug Enforcement

20 Administration, and working dangerous undercover drug

21 investigations.

22 Now, in the wake of 9/11 the FBI and DEA joined

23 together in a task force. And it quickly became apparent to the

24 FBI and Darren Griffin that his Special Forces military

25 background, his exposure to the Middle East, his knowledge of

2073

1  Islam has all made him a very valuable asset to the FBI and an

09:49:20  2  antiterrorism asset.   Darren Griffin entered service into the

3  FBI working terrorism investigations.

09:49:29  4          Now, in that function Darren Griffin had to be

09:49:32  5  readily available, long-term, 24/7.   He had to be able to

09:49:37  6  travel anywhere, anytime, as-needed.   He also had to maintain

09:49:41  7  utmost secrecy about his activities for his security and the

09:49:50  8  safety of others.   His very own family had to believe he

09:49:54  9  abandoned his upbringing, his faith and converted to some

10  radical strain of Islam.  So Darren Griffin, as you will learn,

11  made himself visible in this community and this newly created

09:50:10  12  identity as a radicalized Muslim convert fresh out of the

13  Special Forces opposed to the U.S. involvement in Iraq.

14          As you'll learn, many in the community, they met

09:50:23  15  Darren Griffin; they heard his views, and they shunned him.

16  They turned away from him.   Others, as you will learn, that

17  associated with him, some of them even engaged in some

18  activities with him, but they never fully accepted or adopted

09:50:37  19  some of his radical beliefs.

20          The evidence is going to show, ladies and

09:50:45  21  gentlemen, these defendants quickly latched on to Darren Griffin

22  as a potential valuable resource to pull for use for their own

09:50:55  23  purposes, including the preparation for a violent Jihad, or holy

24  war.

25          Once approached and enlisted by the defendants,

2074

1 Darren Griffin maintained regular and ongoing contact and

09:51:07 2 interaction with them so he could basically keep track of what

3 they were up to, what they were doing, report that back to the

4 FBI. That was his job. He also attempted to access and

5 monitor the various resources and information and contacts which

6 these defendants accessed, so, again, he could report that

7 information back, it could be analyzed, possibly traced back to

09:51:30 8 other individuals and groups who would also pose a threat.

09:51:35 9 Meanwhile, the FBI was gathering evidence so that

09:51:42 10 if a disruption of this cell had to occur, they would be able to

11 charge a criminal case. Now, the hundreds of hours of

12 recorded -- secretly recorded conversations of these

09:51:54 13 defendants -- of Wassim Mazloum, Marwan El-Hindi, Mohammad

14 Amawi -- captured their actual thoughts, their beliefs, and

15 their intentions. There's no better evidence than the words

09:52:11 16 and actions of the defendants. But as you listen to these

09:52:15 17 recordings, what you'll also find is they are a testament to the

18 fact that Darren Griffin's military training, his ability to

19 think on his feet, his personality, his knowledge of Islam,

20 those all made him the perfect man to undertake this very

09:52:32 21 dangerous and challenging assignment.

09:52:36 22 But as you'll learn, Darren Griffin is just a man.

09:52:42 23 He readily admits his flaws and his failures. You'll find he's

09:52:47 24 traveled to the most dangerous parts of the world, put his life

25 on the line many times over for his country, but he's also made

09:52:54 **1** mistakes, just like all of us.   Darren Griffin surrendered to

**2** many of the temptations that you would expect that would

09:53:02 **3** accompany that kind of a rough life and that kind of a

09:53:05 **4** fast-paced, stressful, intense lifestyle that he's led.   Darren

09:53:10 **5** Griffin will readily admit his mistakes.   He's not going to

**6** hide from them.   Again, he's just a human being.

**7**              In the end, ladies and gentlemen, what really

09:53:19 **8** matters is the words and actions of these defendants and you're

**9** going to hear about those, not just as told by Darren Griffin,

**10** but from their own lips in those hundreds of hours of recorded

**11** conversations.

09:53:37 **12**              As you listen to those recordings, it's going to be

**13** clear to you that these defendants are not just talking about

**14** what's on their minds.   They will actually be revealing to you

**15** and telling you and explaining to you what they are actually

**16** doing to pursue their goals.   Now, the evidence is going to

**17** show that in 2003, Mohammad Amawi returned from an extended stay

09:54:04 **18** in Jordan to visit his family.   Witnesses will also testify

**19** when he came back to Toledo he was a very changed person:   More

09:54:11 **20** extreme in his appearance; more extreme in his beliefs; much

**21** more vocal and outspoken about his contempt for Western persons,

09:54:20 **22** particularly Americans.

09:54:24 **23**              You will actually hear Defendant Amawi boast that

09:54:28 **24** while he was over in Jordan, he attempted to cross over the

**25** border into Iraq.   The evidence is also going to show at this

1    time Defendant Amawi began accessing radical websites over the

09:54:41  2    internet, downloading violent and graphic Jihadist material,

09:54:46  3    videos that show beheadings of Westerners, American soldiers

4    being killed by snipers, blown apart by hidden explosives and

09:54:55  5    roadside bombs.   You will observe that Defendant Amawi has an

6    extensive knowledge of these sites, how to access them, how to

7    navigate between them.   You'll hear him singing along with the

09:55:11  8    Jihadist songs, humming along to the sound tracks of the violent

09:55:14  9    videos.   You're also going to hear and see how excited and

09:55:18  10   eager he is to share that vast knowledge and his extensive

09:55:23  11   collection of these materials to others whom he believes share

12   his extreme viewpoint and his violent agenda.

13           You're also going to hear just how important he

09:55:35  14   believed it was to make Darren Griffin aware of these materials

15   to use to train these defendants and others for that violent

16   Jihad, or holy war.

09:55:48  17           Now make no mistake, the evidence is going to show

09:55:51  18   Defendant Amawi didn't spend all of his time in front of the

09:55:54  19   computer screen.   You're going to actually observe him on

20   numerous occasions involved in firearms training sessions

21   preparing himself.   You'll hear him pushing Darren Griffin to

09:56:05  22   provide him with training in other areas like the use of mortars

23   or explosive destructive devices, or IEDs, sniper techniques,

24   and more.

09:56:20  25           But you are going to be viewing some of these

09:56:23 **1** graphic videos.   And, ladies and gentlemen, you're actually

09:56:28 **2** going to hear these defendants in these recordings as they are

09:56:32 **3** viewing these materials, they're showing them to each other,

09:56:37 **4** they're showing them to Darren Griffin, they're copying them.

09:56:41 **5** So it's important, in fact it's necessary for you to see these

09:56:45 **6** yourselves so that you know what it is that these defendants are

09:56:49 **7** actually looking at, what they're talking about, what they're

09:56:54 **8** sharing with other people, and what they are distributing for

**9** purposes of the violent Jihad.   So that you actually now

09:57:04 **10** understand and appreciate what it is that these defendants are

**11** viewing.

09:57:16 **12** Now, the evidence will show that Defendant Marwan

**13** El-Hindi is also equally familiar with these sites and many of

**14** the groups that create them and sponsor them.   Now, while it

**15** may appear that Defendant El-Hindi is more cautious or more

**16** security conscious in his computer activities than his

09:57:39 **17** co-defendant, Amawi, you'll find from the evidence that these

09:57:43 **18** equally -- that he's equally willing to share this information

**19** and his knowledge of it and to share these materials with those

**20** whom he trusts, like Darren Griffin.

09:57:53 **21** Now, the evidence is also going to show that

09:57:55 **22** Defendant El-Hindi is the self-proclaimed money man or grant

09:58:01 **23** specialist for this group.   And so he quickly identified Darren

09:58:04 **24** Griffin as a valuable resource that he could use in his various

**25** fund-raising and money-making activities that you'll hear about.

09:58:13 **1** One of these, for example, was a business idea; it was a

**2** proposal for security services that would contract with the

**3** Muslim organization here in Toledo to provide bodyguards for

09:58:25 **4** their visiting dignitaries.   Defendant El-Hindi sought to use

**5** Darren Griffin's military resumé and his background as a selling

**6** point for that business proposal.   And you'll hear about that.

09:58:38 **7** You'll also see evidence later in 2005, Defendant

09:58:45 **8** El-Hindi actually made and arranged a meeting with his former

09:58:50 **9** accountant in Dearborn, Michigan; a man named Jihad Dahabi.

**10** Now, the purpose of that meeting was to set out or establish a

**11** new non-profit organization that would be used to obtain

09:59:02 **12** government grants.   Defendant El-Hindi asked Darren Griffin to

09:59:07 **13** become involved in that organization because, once again, he

**14** wanted to use Darren Griffin's military training and resumé and

09:59:14 **15** background as a basis for obtaining some grants for activities

**16** such as providing martial arts training in the community.  So

**17** Defendant El-Hindi brought Darren Griffin to that meeting with

**18** the accountant in Dearborn, Michigan.

**19** As you will learn, Darren Griffin had the

**20** opportunity to secretly videotape that meeting.   You'll hear

09:59:38 **21** Defendant El-Hindi discuss instead of using themselves as the

09:59:44 **22** originators, incorporators for this new non-profit organization,

**23** to use the names of other people.   People lacking control, like

09:59:53 **24** their children, as the incorporator so if and when they received

**25** government grant funds through this organization, they could

1  take some of that money and pay themselves as officers or

10:00:02  2  employees.

10:00:03  3       You're going to hear on various occasions Defendant

10:00:07  4  El-Hindi talk about how some of these funds that would be

10:00:11  5  obtained for his various money-making enterprises would be used

6  to pay for some of the violent Jihad training expenses.

10:00:19  7       So what you'll learn is immediately after this

8  meeting with the accountant in Michigan, that accountant, Jihad

10:00:28  9  Dahabi, panicked, and he destroyed that paperwork rather than

10  file it with the State of Michigan.   And you're going to see

10:00:35  11  video testimony, prior testimony of Jihad Dahabi in this

12  courtroom, when he talks about that meeting.

10:00:47  13       You're going to hear about another business

10:00:52  14  enterprise of El-Hindi.   This is one where he would recruit

10:00:55  15  students for medical school, European Medical Studies and

10:00:59  16  Services, or EMSS for short.   The purpose of that company was

17  to recruit students to attend a medical school in eastern

18  Europe.   You're going to find from the evidence that Defendant

10:01:10  19  El-Hindi was the U.S. representative for that company which he

20  co-owned with his brother, Yousef.   And you'll find from the

21  evidence they received a commission for every student that they

10:01:22  22  recruited.

23       Now, the evidence is going to show that one of

24  those students, one of those recruits was a young girl from

10:01:28  25  Chicago, Illinois, named Yasmin Ahmed.   The evidence will show

1  that sometime after Yasmin was recruited for the medical school,

2  her brother, Zubair, and his cousin, Khaleel Ahmed, agreed to

10:01:43  3  secretly travel to the Middle East to fulfill their perceived

10:01:47  4  religious duty or obligation to engage in violent Jihad, or holy

5  war, against American and British forces in Iraq and

6  Afghanistan.

7         So as the evidence is going to show, on May 21,

10:02:01  8  2004, Zubair and Khaleel boarded a plane in Chicago, Illinois,

9  and flew to Egypt.   They didn't tell any of their immediate

10  family or their friends of their plans.   When Zubair's father

11  learned of their disappearance, he asked Defendant El-Hindi, who

12  had recruited his daughter Yasmin for the medical school, to

10:02:27  13  help him locate and retrieve Zubair and Khaleel before they hurt

10:02:31  14  themselves or got themselves killed.   The evidence will show

15  that Mohammad Ahmed, Zubair's father, flew Defendant El-Hindi

10:02:39  16  and his brother Yousef to Egypt where they, in fact, located

10:02:43  17  Zubair and Khaleel in a downtown Cairo hotel and quickly whisked

18  them away.

19         In the process, however, the evidence is going to

10:02:52  20  show Defendant El-Hindi was now aware of Zubair and Khaleel's

10:02:56  21  extreme religious beliefs and their commitment and their zeal,

22  and he was sympathetic with that.   So he took that opportunity,

10:03:06  23  unbeknownst to their parents, to secretly recruit them as well.

10:03:11  24  Not for the medical school, but Defendant El-Hindi convinced

10:03:14  25  them that in order to properly and successfully wage armed

10:03:18 **1** Jihad, they needed to be trained, better trained in weaponry and

10:03:25 **2** in military tactics.

**3** The evidence is going to show that just weeks later

**4** Defendant El-Hindi actually brought Zubair and Khaleel to Ohio

10:03:33 **5** to personally introduce them to the man who could give them that

**6** very necessary training, Darren Griffin.   Once again, you'll

**7** find Darren Griffin had the opportunity to secretly videotape

**8** that very important meeting.

10:03:53 **9** The evidence will also show -- by the way, Zubair

**10** and Khaleel are named as co-conspirators, as you will have

10:04:02 **11** explained to you.   They're named as co-conspirators in this

10:04:05 **12** grand jury indictment.   They're not on trial in this case.

10:04:08 **13** Now, the evidence will also show that in late 2004,

**14** Defendant Wassim Mazloum was recruited by Defendant Amawi into

**15** the group.   You're going to find that he was recruited because

**16** he expressed a shared -- similar ideas and beliefs about the

**17** U.S. involvement in Iraq.   You will observe Defendant Mazloum

**18** engaged on numerous occasions in the firearms training sessions.

**19** In turn, Defendant Mazloum introduced his own brother, Bilal, as

**20** a potential recruit for the cell.   And you'll hear about that.

10:04:46 **21** Now, the evidence will be that there are hundreds

**22** of hours of these undercover secret recordings of these

10:04:56 **23** conversations.   It would take weeks to listen to all of them.

**24** So we're not going to play them all for you, but, we're going to

**25** ask you to focus on the key parts of those that are most

1 important for you to hear to understand and clearly appreciate

10:05:12 2 the activities of these defendants relative to the charges in

3 the indictment.

10:05:20 4 As you listen to these recordings, you'll hear

5 these defendants repeatedly discuss the need for secrecy, their

10:05:28 6 concerns about the government's ability to monitor their

10:05:31 7 activities. You're going to hear all three of these defendants

10:05:36 8 in a very vigorous discussion about how they can best support

10:05:41 9 the Mujahideen, or holy war, over in the Middle East. They also

10:05:49 10 discuss the appropriate and permissible targets of their own

11 jihad, the proposal of their jihad according to the radical

12 sheiks and religious scholars that they follow.

13 Ladies and gentlemen, you're going to hear what all

14 three of these defendants, Wassim Mazloum, Marwan El-Hindi,

10:06:05 15 Mohammad Amawi -- you'll hear them all agree an appropriate and

10:06:10 16 permissible target of their violent Jihad is American soldiers.

17 And that's what they prepared themselves for.

10:06:19 18 Now, I'm going to discuss much of what the

19 evidence -- the government's evidence we expect will show with

20 regards to Count 1 of the indictment. That is the conspiracy

21 to kill and maim persons overseas. But in summary, by mid

10:06:36 22 2004, Defendants Amawi and El-Hindi were already actively

10:06:41 23 engaged in acquiring the knowledge and resources to pursue their

10:06:47 24 intentions to engage in violent Jihad overseas and to help

25 others or assist others in doing the same thing. They were

1    both familiar with and accessing these radical websites and

10:07:02   2    downloading violent Jihadist materials. And they had both

10:07:06   3    asked Darren Griffin to become involved in their activities and

4    to assist them.

10:07:19   5         I believe, as the Court may explain to you, most

6    conspiracies are very secret affairs. They're cloaked in

10:07:28   7    darkness and silence. We rarely have the opportunity to hear

10:07:32   8    conspirators discuss their plans and discuss their agreement.

9    But in this case, ladies and gentlemen, you're going to have the

10    opportunity to hear a recording of a very lengthy meeting on

10:07:42   11    February 16, 2005, that took place at Defendant El-Hindi's home.

12    All three defendants, Mazloum, El-Hindi, and Amawi, were

10:07:52   13    assembled there at El-Hindi's home along with Darren Griffin.

14    The very purpose of that meeting, as you'll learn, was for them

15    to complete their plans for their violent Jihad training,

10:08:03   16    discuss their ultimate goals, how to avoid detection, and

10:08:07   17    potential recruits for the cell.

10:08:10   18         Now, as I've indicated, they did recruit others.

19    Defendant Amawi recruited Defendant Mazloum for the group. And

10:08:19   20    Defendant Mazloum introduced his own brother, Bilal. You'll

21    see his brother participate in at least one firearms training

22    session that was recorded. As stated, Defendant El-Hindi

10:08:31   23    recruited Zubair and Khaleel Ahmed into the group. And when

10:08:37   24    Khaleel and Zubair expressed some difficulty in traveling to

25    Ohio to participate in some of the violent Jihad training

10:08:46 **1** activities, Defendant El-Hindi suggested that the group download

10:08:50 **2** some of the training materials from the internet, copy them on

10:08:54 **3** to CDs and actually take them to Zubair and Khaleel in Chicago.

10:09:00 **4** Now, at the same time that this activity was going

**5** on in regards to the conspiracy in Count 1 of the indictment, in

10:09:08 **6** roughly June of 2004 through mid February of 2006, the

**7** defendants were also agreeing to provide support and to supply

10:09:18 **8** the Mujahideen, or holy war, in the Middle East.  The evidence

**9** is going to show in April of 2005 Defendant Amawi was

10:09:29 **10** communicating over the internet with an associate in Syria.   He

**11** asked Darren Griffin to help him locate and obtain a particular

10:09:39 **12** explosive that this Syrian associate wanted to obtain.   Of

**13** course, Darren Griffin played along, not only because it was an

10:09:47 **14** opportunity to attempt to gain information or intelligence about

10:09:52 **15** Syria and any other contacts overseas that may have been in the

**16** chain, but also to delay or prevent them from obtaining this

10:10:01 **17** explosive from some other source.

10:10:05 **18** You'll actually see the paper napkin on which

**19** Defendant Amawi wrote the name of the explosive that his Syrian

**20** contact was asking for.   The evidence will show that he gave

**21** that napkin to Darren Griffin and asked Darren Griffin if he had

**22** a military contact or an associate in the Middle East that could

10:10:24 **23** help him acquire this explosive.   You'll actually hear

**24** Defendant Amawi discuss the very secretive communications he had

**25** with his Syrian associate where they used code words and phrases

1  in an attempt to conceal the true meaning and intention.  Of

2  course, neither the FBI nor Darren Griffin actually intended to

3  help Amawi and his Syrian friend obtain this explosive.

4  Now, the evidence is also going to show in 2005

10:10:57  5  Defendant Amawi was also attempting to deliver five laptop

6  computers overseas.   You'll hear a discussion between Defendant

7  Amawi and Darren Griffin where they talk about how the

8  Mujahideen, or the holy warriors, use these laptop computers for

10:11:16  9  confidential communications.   So the evidence will show in 2005

10:11:20  10  Defendant Amawi was planning another visit over to his family in

10:11:24  11  Jordan for, again, an extended trip.   Darren Griffin seized on

12  this as an opportunity to perhaps gather more information about

10:11:32  13  Amawi's overseas contacts with the FBI.   So he made

10:11:37  14  arrangements to travel over there at the same time.   And Darren

15  Griffin and Amawi agreed they would attempt to deliver these

16  five laptop computers to the Mujahideen while they were over in

17  Jordan.   As you'll see from the evidence they did, in fact,

18  take these five laptop computers overseas, they were able to get

19  them into Jordan, but for reasons that will be explained to you,

10:11:59  20  they were unable to complete the delivery of those laptops.

10:12:22  21  Many of these videos and other items are going to

10:12:26  22  show these defendants downloaded and allowed Darren Griffin to

23  use them for the violent Jihadist training.   Most of these were

10:12:35  24  in Arabic so they weren't easily understood by Darren Griffin

10:12:40  25  without the defendant's help.   The evidence is going to show

1 the defendants not only located these and provided them to

2 Darren Griffin so he could obtain these materials, but they

3 translated or interpreted them into English for him.

10:12:53 4     One of these, for example, you'll hear about is a

10:12:57 5 video that has step-by-step instructions on the manufacture and

10:13:02 6 use of a suicide bomb vest.   Now, the evidence is going to show

10:13:08 7 that -- in fact, you will hear Defendant Amawi not only showing

8 that bomb vest video to Darren Griffin, but then translating the

9 Arabic narration into English for Darren Griffin.   And then

10:13:22 10 further discussing providing a copy of that bomb vest video to

11 Darren Griffin for use and training these defendants and others

12 in how to manufacture that bomb vest.

10:13:36 13     Now, that distribution of that bomb vest video to

10:13:40 14 Darren Griffin in January of 2005 is the subject of Count 3 of

15 the grand jury indictment which charges Defendant Amawi with

10:13:49 16 distributing information regarding explosives or destructive

10:13:55 17 devices intending that that information be used to further a

18 crime of violence, of killing U.S. nationals.   The evidence is

19 also going to show that Defendant El-Hindi showed this very same

20 bomb vest video to Darren Griffin on another occasion, and then

10:14:10 21 demonstrated for Darren Griffin how he could obtain a copy again

22 to use for the violent Jihad training.

10:14:17 23     The distribution of the bomb vest video by

24 Defendant El-Hindi on that occasion is the basis for Count 5 of

25 the grand jury indictment.   It charges Defendant El-Hindi with

1 distributing information regarding explosive or destructive

2 devices, as you'll hear.

3       The evidence is going to show that just weeks after

4 Defendant Amawi showed the bomb vest video to Darren Griffin, he

5 gave Darren Griffin a copy of a Mujahideen explosive cookbook,

6 or manual, that gave detailed instructions of how to manufacture

10:14:53 7 various kinds of explosives.   He provided that to Darren

10:14:57 8 Griffin so Darren Griffin could use it to train these defendants

10:15:00 9 and others on how to manufacture explosives.   That provision to

10:15:08 10 Darren Griffin of that explosives manual in February of 2005 is

11 the subject of Count 4 of the grand jury indictment, again

10:15:16 12 charging Defendant Amawi with distributing information regarding

10:15:20 13 explosives or an explosive or destructive device.

14       The evidence is going to show around that same

15 time, February 2005, again, just weeks after Defendant El-Hindi

16 had shown and had instructed Darren Griffin on how he could

17 obtain a copy of that bomb vest video, he sent Darren Griffin a

18 photographic display or presentation on the placement and use of

10:15:52 19 improvised explosive devices, a roadside bomb, against American

10:15:56 20 troops in Iraq.   Again, as the evidence will show, for use by

10:16:00 21 Darren Griffin in violent Jihad training.

22       Defendant El-Hindi's distribution of that

10:16:07 23 photographic slide show about the IED placement and use, that is

24 the subject of Count 6 of the grand jury indictment charging

25 Defendant El-Hindi with distributing information regarding

10:16:20 **1** explosives.

10:16:22 **2**  Now, I believe the Court has instructed some of you

**3** previously, and may instruct you again, that the mere possession

**4** of those kinds of materials in and of itself is not illegal,

10:16:33 **5** unlike, for example, possessing child pornography.  But, ladies

**6** and gentlemen, in this case, the evidence is going to clearly

10:16:41 **7** demonstrate that these defendants distributed this information

10:16:47 **8** specifically intending that Darren Griffin use it to train them

10:16:51 **9** and to train others to help manufacture these explosives and

10:16:56 **10** destructive devices ultimately for using against American

10:17:00 **11** troops.

10:17:03 **12**  Now again, ladies and gentlemen, this is a

10:17:07 **13** terrorism case.   It's not a case about Islam.   It's not about

**14** the FBI.   It's not about Darren Griffin.   It's a case about

**15** the development of a terrorist cell.   The government's evidence

**16** is going to show that individuals, these individuals here in

10:17:26 **17** Toledo, Ohio, had that desire and the intent to cause the deaths

**18** of American troops overseas.   And they were steadily working

10:17:37 **19** towards the opportunity.

**20**  The evidence is going to show they searched for and

**21** they used every resource available in order to further that

**22** goal; whether it was downloading violent Jihadist training

**23** materials and radical websites, whether it was obtaining

**24** government grants to pay for the Jihad training exercises, or

10:18:01 **25** whether it was using the skills and the background of an Army

10:18:05 **1** veteran recently converted to Islam in order to teach them

10:18:10 **2** specifically how to kill American troops.

10:18:22 **3**            As you listen to the undercover recordings in this

**4** case, these defendants are going to tell you what was in their

10:18:34 **5** minds and in their hearts as they carried out their actions.

**6** And the evidence is going to show that they recruited others to

**7** join them in that violent scheme.   As you listen to these

10:18:49 **8** recordings, you're going to hear these defendants request from

**9** Darren Griffin specific kinds of training or instruction; again,

**10** how to use a mortar, how to provide explosive destructive

**11** devices, sniper technique, military tactics.   You're going to

**12** hear these defendants push Darren Griffin to accelerate or speed

10:19:09 **13** up the training.   You're going to hear them suggest potential

**14** new recruits for the cell.   You're going to hear these

10:19:19 **15** defendants proclaim solidarity with the Mujahideen and the Iraqi

10:19:25 **16** insurgency.  Ladies and gentlemen, you are going to hear these

**17** defendants on more than one occasion celebrate the deaths of

**18** American soldiers.

10:19:39 **19**            The most compelling and indisputable evidence of

**20** the guilt of these three defendants is going to come from their

**21** own eager, exuberant, inquisitive and angry mouths in those

10:19:56 **22** recorded candid, conspiratorial conversations.   Conversations

**23** that they never intended you to hear.   Please, listen carefully

10:20:09 **24** to what they tell you.

10:20:24 **25**            THE COURT:  Counsel, would you like a brief recess?

1          MR. HARTMAN:  Ten minutes?

2          THE COURT:  We'll take a brief recess until about

3      10:30.  Keep an open mind.  Don't talk about the case.  We'll

4      see you then.

10:32:31  5          (Recess taken.)

6          THE COURT:  When we excuse the juror, we'll turn to

10:34:38  7  the items that need discussing.  We'll deal with the other issue

8      that came up.  Then we'll spend some time with the sound

10:34:45  9  system.

10         MR. HARTMAN:  That's fine.

10:34:47 11         THE COURT:  Then we'll get together, maybe take our

10:34:52 12  own break, depending how long this is, then get together on the

13     jury instructions.

10:38:56 14         (Jury enters the courtroom.)

10:38:56 15         THE COURT:  Mr. Ivey, you may proceed.

16         Mr. Ivey is one of the attorneys for Mr. Amawi.

17     He will present the opening statement on behalf of his client.

18     What you are about to hear is not evidence; it's simply his

19     prediction of what the evidence may be.

20         MR. IVEY:  Good morning, everyone.  The evidence

21     in this case will show that Mr. Amawi is not guilty of

10:39:21 22  conspiring to maim or kill United States troops in Iraq.  He's

23     not guilty of trying to provide material support to any

10:39:31 24  insurgents in Iraq, to maim or kill United States soldiers.

10:39:35 25  And he's not guilty of distributing explosive or violent

10:39:40 1 material for the purpose of training others to commit a federal

2 crime of violence.

3        The events of 9/11 caused, understandably,

4 widespread fear in this country.   Prior to this tragedy,

10:39:58 5 terrorist attacks were something that was confined for us to be

6 on news clips in lands thousands of miles away.   But the horror

7 of that day caused us to confront the possibility and reality of

10:40:14 8 terror on our own soil which led to fear.   Fear of Muslims, and

10:40:22 9 mistaken fear of their religion.   And we believe that it

10:40:30 10 promoted terrorism.

10:40:35 11        Now, the evidence will show that this case is born

12 out of that fear in this country.   The evidence will show that

13 this case is very much about Islam and very much about political

14 views because the evidence will show that Mr. Amawi and these

15 other defendants were targeted because of their religious and

16 political and cultural background and their views in those

17 areas.   And I cannot emphasize this to you more:  We are not

10:41:16 18 here because legitimate and effective lawyer enforcement

10:41:20 19 techniques found Mr. Amawi or either of these defendants

20 involved in any criminal activity whatsoever.

10:41:29 21        The evidence will show that we are not here because

22 Mr. Amawi was discovered by Mr. Griffin or any other federal or

23 state law enforcement agency that found that he was in the

24 process of committing a terrorist act of any type.   The

25 evidence will show that legitimate law enforcement investigation

10:41:52 1 did not find Mr. Amawi or any of these other defendants in the

2 process of plotting any type of terrorist act anywhere on the

10:42:02 3 globe.   The evidence would show that legitimate law enforcement

10:42:08 4 investigation did not find Mr. Amawi or any of these defendants

10:42:14 5 with conspiring together in any form of criminal activity at any

6 time.

7 This case is about, the evidence will show, a

10:42:26 8 contrived and misplaced effort on the part of the government to

10:42:31 9 go out and find terror cells in this country and create such a

10 cell if you can't find it.

10:42:43 11 Now, this misplaced search for a terrorist bogeyman

12 that did not exist on the part of the government led, the

13 evidence will show, to the two key bad decisions.   The first

14 one was in assigning the FBI agents to be in charge of this

10:43:09 15 investigation.   The evidence will show one of the key agents in

10:43:13 16 charge of this investigation had only been a year out of the FBI

17 academy before it began.   This agent had no experience in

10:43:25 18 investigating terror as the lead investigator or supervisor

10:43:32 19 investigator or handling investigator of any type prior to this

10:43:37 20 investigation.   This agent did not speak Arabic and did not

21 have a well enough ground in Arabic culture or the Islamic

10:43:49 22 religion, and this played key problems in this case.

10:43:59 23 This inexperience led to the second key problem in

24 this case or bad decision, and that was the selection of the

25 worst possible operative to go out and search for the

10:44:13 1 terrorists, find a cell. And that was in the form of Darren

10:44:20 2 Griffin. Darren Griffin, the evidence will show, as Mr. Getz

3 said to you in his opening remarks, has a sordid past and the

4 evidence will show these problems in his past, the government

10:44:42 5 indicates were in his past, and he learned from it in his

6 association with this case, and he'll readily admit to it.

10:44:52 7 The problem is, the evidence will show that these

8 problems affected this case and the investigation in this case

9 because, although the government indicates the evidence would

10 show that Mr. Griffin will readily admit to them, the evidence

11 will show what he didn't readily admit to them when he provided

10:45:12 12 his application to become an operative of this type with the

10:45:16 13 FBI. He didn't readily admit it until after the fact, after he

10:45:22 14 had got involved in this investigation.

10:45:25 15 Now, Mr. Hartman, who is representing Mr. El-Hindi,

16 will go into these problems in a little more detail and how they

17 affect his case in his presentation. But one of the biggest

18 problems, the evidence will show, were the payments that Mr.

19 Griffin received from the government to be the operative, to be

20 the infiltrator in this particular case.

10:45:50 21 Now, the evidence will show it is not uncommon for

10:45:55 22 operatives to be paid for their time. But the problem in this

10:45:59 23 case is Mr. Griffin was, the evidence will show, received

10:46:05 24 350,000-plus dollars for his work as an operative in this case.

25 But beyond the payment, and what Hartman will go into in more

1   detail with you, is the fact that Mr. Griffin had financial

10:46:20  2   problems and strains that went along with this payment.   He

3   blew through this money, the evidence will show, and caused

4   numerous overdrafts, for whatever his problem was, on his bank

10:46:32  5   account.   And the evidence will show that the only way for him

6   to keep this money train going was to do two things -- because

10:46:45  7   the evidence will show that there was no preexisting terrorist

10:46:50  8   cell involving any of these defendants prior to Mr. Griffin's

10:46:56  9   investigation.   And I cannot emphasize that to you enough.

10         This will not be the evidence will show that Mr.

11   Griffin discovered that I found Mr. Amawi and he's planning to

12   commit violent Jihad or provide bomb-making videos to -- or to

10:47:15  13   train.   That didn't happen.   The evidence will show that Mr.

10:47:21  14   Griffin did not find in his investigation, my God, I found

15   Mr. El-Hindi and he's planning to set up terrorist camps and

10:47:31  16   he's planning to recruit people for Jihad training and going to

10:47:35  17   use as a smoke screen for this -- some medical school

10:47:40  18   recruitment.   That didn't happen.   Because the evidence will

19   show that if Mr. Griffin had never been involved in this case,

10:47:52  20   none of this violent Jihad activity would have ever taken place.

10:48:00  21         But to get back to what I'm talking about, Mr.

22   Griffin, in order to keep this money train going, has to make

23   his inexperienced handlers feel that he has found such a

24   situation because as long as he is convincing them that this

25   situation's going on, then the payments keep coming.   If he

10:48:25 **1** says to them, you know I've checked these guys out, but there's

**2** nothing really going on here, the payment stops.

10:48:36 **3**           Another big problem with Mr. Griffin is he is not

10:48:41 **4** very versed, the evidence will show, in the Islamic faith.

**5** He's going to say he joined it, but he doesn't know a lot of

10:48:51 **6** tenets of it. That's going to be very important when you

**7** listen to this tape.

**8**           The second important thing is that Mr. Griffin,

**9** like his handlers, does not speak Arabic. He's not bilingual

**10** like the defendants are in this case. And you will see, the

**11** evidence will show, that throughout this process in Arabic, the

**12** defendants make several comments and statements that are

10:49:16 **13** completely exculpatory to their true intentions in this case,

**14** but Mr. Griffin doesn't know it because he doesn't speak Arabic,

**15** the evidence will show, and his handlers don't know it because

**16** they don't speak it either.

10:49:33 **17**           Now, more of that in a moment.

10:49:36 **18**           So how does Mr. Griffin concoct this? As I've

**19** told you, the evidence will show that this was not an existing

10:49:46 **20** terrorist cell before Mr. Griffin. In fact, the defendant,

**21** many of them didn't even know each other and would not have

10:49:55 **22** known each other had it not been for introductions by Mr.

10:50:03 **23** Griffin. This is how we believe the evidence will show this

**24** happened: Mr. Griffin concocted a situation, a scenario.

**25** That is that because of his experience in the military, that he

10:50:20  1   knows how to do training, training in firearms, training in

10:50:29  2   protection, training in explosives.   But the key thing about it

10:50:34  3   is Mr. Griffin tells individuals that he's starting what's

10:50:40  4   called the VIP Security Service where he will provide bodyguard

10:50:47  5   training to individuals.   And you will hear tapes that we'll

6   play out, too, of the 150 hours of tape where Mr. Griffin goes

7   to the Mosque here in Toledo and begins telling individuals,

8   hey, I'm a recently converted Muslim; I'm one of you; I have

9   this VIP business that I'm training individuals for my security

10:51:18  10   business.  And he even goes so far, the evidence will show, to

11   lie to individuals and say he already has security contracts

10:51:28  12   from the State Department to provide security training and he's

10:51:36  13   looking for individuals to get involved to learn to become

14   bodyguards and security officers for his VIP training.   That's

15   part one of his scheme.

10:51:46  16          The second part of it is that Mr. Griffin knows

17   that he's got to produce the -- the evidence will show, for his

10:51:57  18   handlers, that he's really looking for terrorist cells.   And so

10:52:03  19   he knows, the evidence will show, that by talking about I'm

20   recruiting you for my security service, that's going to engender

21   conversation about the use of firearms, the use of tactics

22   because you've got to be able to know these things and execute

23   these things in order to be in the security business.   He also

24   knows another thing.   He's talking to Muslims.

25          And it is true throughout these tapes you'll hear

10:52:29 1 discussions about security and discussions about keeping our

10:52:35 2 training, you know, undercover or, so to speak, out of the eye

10:52:42 3 of the general public. But the reason being for that is that

10:52:47 4 because of the fear in this country post 9/11 and because of the

10:52:54 5 concern about people of the Muslim faith, Muslim appearance.

6 They have a concern about when they are out at Cleland's in

10:53:04 7 public shooting guns. And they take no effort, the evidence

8 will show -- you saw the big photo down here, they're not trying

9 to hide, by their beards or whatever, who they are. But it's

10:53:16 10 going to be misinterpreted. That if we're out there shooting

11 they're going to think something exists that doesn't exist.

12 That's what these defendants say to Mr. Griffin on

13 these tape, that we don't want to be mistook; the evidence will

14 show that our intentions aren't anything other than to train for

10:53:38 15 your security business.

10:53:42 16 Now, the third part of this effort by Mr. Griffin

17 is to create the illusion that he's found a terrorist cell. The

10:53:53 18 evidence will be clear in this case, and I want you to pay

19 attention when it comes up. Mr. Griffin does not suggest to the

10:54:02 20 defendants that they do a domestic terrorist act in this

21 country. And the evidence will show because if he does that,

10:54:13 22 the brakes are going to be pushed by these defendants, wait a

23 minute. Whoa, this isn't what we signed up for.

24 So he talks about waging Jihad, or whatever you

10:54:25 25 want to call it, terrorist acts, in Iraq. And that's

10:54:31  1   important.   Mr. Getz told you in his opening statement that

2   these defendants have radical views.   Well, that's both true,

3   the evidence will show, and untrue.   And I'll show you what I

10:54:45  4   mean.

10:54:59  5            John, can you run it to Toledo?  I'm sure we're all

10:55:24  6   familiar with Toledo.   And we all are familiar with the fact

7   that Toledo is in the United States.   And in the United States,

8   we support our troops.   The evidence will show when we turn on

9   the TV, the newsreels, see news clips, and you see TV shows,

10   there's frequently at the end of shows pictures of U.S.

10:55:54  11   servicemen who have died in Iraq.

10:55:56  12            THE COURT:  Mr. Ivey, I'm sorry to interrupt but

13   what is marked as an exhibit number just so the record shows

14   what you're referring to?

10:56:06  15            MR. IVEY:  I'm referring to a globe, which is a

16   map.   At this point it's focusing on Toledo.

17            THE COURT:  I do apologize.

10:56:13  18            MR. IVEY:  No problem.

10:56:15  19            The evidence will show that when we look at news

20   and we look at TV shows, we're in support of our troops, which

21   we should be.   And we see clips where U.S. servicemen have

22   died.   Our news programs here, the evidence will show, show us

10:56:41  23   things from the American perspective.   And so that anyone, the

24   evidence will show, in America would take it if you are against

25   our troops, you have a radical view.   It's not that way, the

1    evidence will show, in the Middle East.

2         Can we go to Jordan?   Now for the record I'm

3    pointing to it on the globe.  We now show Jordan, Irbid, Israel,

10:57:22    4    and Iraq.   In the Middle East it's a different view.   As you

5    can see, here is Jordan, and this is Irbid, where Mr. Amawi is

10:57:35    6    from.   This is Syria here.   But the border to Iraq is here.

10:57:39    7    Jordan is between Iraq and  Syria.   The conflict and fighting

10:57:48    8    and dying and killing is going on right next door, in the

10:57:56    9    backyard of Jordan, Syria, and this whole region here.

10:58:03    10        And in that area of the country (sic), the evidence

11    will show that it is a common viewpoint against the U.S.

10:58:14    12    occupancy of Iraq.   And the news media in the Middle East, the

10:58:25    13    evidence will show, shows clippings and news from a different

10:58:30    14    perspective and a different type than we have in this country.

10:58:35    15    And so the evidence will show that when you talk about support

10:58:43    16    for the Iraqi insurgency, that is not a radical view in this

10:58:50    17    area of the world.   It is not difficult, the evidence will

18    show, to find anyone in this region that wishes the United

10:59:02    19    States wasn't in Iraq and this fighting wasn't going on.

10:59:07    20        The evidence will show that the news, Aljazeera and

21    other types of news agencies, do not have restrictions that we

10:59:18    22    have in country on newsreels.  And their news clippings and

23    newsreels are a lot more graphic, and they show it from a

24    different perspective.  They show it where citizens are dying at

10:59:29    25    the hands -- Iraqi citizens and Middle Eastern citizens are

10:59:35  1  dying at the hands of actions from the militaries from U.S. and

10:59:42  2  allies.

3          So what does this mean?   Mr. Amawi and the

10:59:46  4  co-defendants are from this region of the world.   And so to say

10:59:51  5  that you support the insurgency is not a radical viewpoint in

6  that area.   And that's important.   Because Mr. Griffin knows

7  this.  And he knows that by -- the evidence will show he knows

8  that by creating this security business sham and recruiting

11:00:15  9  Muslims into this recruiting business, he can then talk about

10  the use of firearms, they're training for security purposes.   I

11  should also say that the Islamic faith, one of the tenets of it

12  is self-defense.   When you are occupied by another country, you

13  have the right to protect your land and to fight back.  Not

11:00:41  14  offensively, as some true radicals use it.   But that's a tenet.

15  And he knows that since this has happened next door to the

11:00:54  16  region where Mr. Amawi's from, and Mr. Amawi goes back there,

17  this is following one of the tenets of religion, number one.

18          And Number 2, training for security he can talk

11:01:08  19  about the use of firearms.  The evidence will show the use of

11:01:12  20  explosives.  The evidence will show.   And then knowing that

21  since this is going to take place in this country, in America,

22  and those who have a history or a culture, family from this

23  region are going to be concerned with how Americans are going to

24  perceive this, that we're going to talk about we don't want any

25  misunderstandings when we're out here at Cleland's shooting.

1    And, thirdly, to know that you can have discussions

2  where individuals from this area of the country are going to be

3  in support of the Iraqi insurgency and not necessarily of the

4  U.S. occupation of that.   When you take it and spin it around,

5  you can create the impression on a recording that only you know

6  you're making that this is something that it's not.   Now, when

7  you look at it from that perspective, Mr. Amawi then becomes the

11:02:21  8  perfect flop, fly, the evidence will show, to snare into this

11:02:27  9  web of deception that Mr. Griffin is weaving.

11:02:33  10    Mr. Amawi is 28 years old now.   He was about 24

11:02:37  11  years old at the time of the inception of this case, 23, 24

12  years old.   He was born in the United States and was originally

13  a United States citizen.   In fact, he's a dual citizen.   He

11:02:49  14  owns citizenship in the United States and in Jordan.   He was

15  here in this country because his father was a military liaison

16  between the Jordanian military and the U.S. military.   Mr.

17  Amawi's family moved back to Jordan where he was raised, went

18  through high school here, and he would return here, and he

11:03:12  19  studied various subjects.   The most primary subject that he

11:03:19  20  studied, both here and in Jordan, was computer science.   He

11:03:24  21  received a computer science certification in Jordan.   And he

22  has a good understanding of both cultures, both American and

23  Middle Eastern, particularly in Jordan.

11:03:39  24    Now, Mr. Amawi, the evidence will show, has deep

11:03:43  25  thirst and hunger for information.   And he collects information

1   of all types.   And he's very strong in his beliefs religiously.

11:03:56   2   He's a devout Muslim.   But he can be -- he likes to debate.

3   He likes to debate, the evidence will show, anybody at any time

11:04:06   4   about matters involving religion, matters involving politics, at

11:04:12   5   any time.   He's not hostile, the evidence will show.   He

11:04:16   6   engages and he likes to debate Jewish people about their

11:04:20   7   religion, Christians about their religion.   And discuss views

11:04:25   8   and political views.   And he can be just as likely to be found

9   with a Bible, the evidence will show, and studying that and

11:04:34   10   debating that as he would with the Koran.

11:04:39   11          Now, Mr. Amawi can be very brazen and abrupt and

11:04:46   12   direct in expressing his viewpoints, the evidence will show.

13   None of which, the evidence will show, is illegal.  The evidence

11:04:59   14   will show it is not, I anticipate the Judge will instruct you,

11:05:03   15   against the law to be a Muslim.   It is not against the law to

11:05:06   16   oppose the U.S. policies in Iraq.  It is not against the law to

11:05:15   17   cheerlead for the Iraqi insurgency.   And it is not against the

18   law in this country to express your viewpoints.

11:05:29   19          Now, again, Mr. Amawi's willingness to debate, his

11:05:34   20   willingness to express his views, his willingness to be brazen

11:05:39   21   and outspoken made him attractive to Mr. Griffin.   And Mr.

11:05:53   22   Amawi's thirst for knowledge and his computer skill, the

11:05:58   23   evidence will show he would spend  hours of a day in front of a

11:06:03   24   computer screen on the internet searching many things.   And

11:06:07   25   yes, there will be things related to this case, but also the

11:06:12   **1**   evidence will show Mr. Amawi collected information on many other

**2**   topics and many other subjects as to that were part of his...

11:06:26   **3**   (? )

**4**          Now, this made Mr. Amawi attractive to Mr. Griffin

**5**   to keep this going.   The evidence will show, as I indicated

**6**   before, Mr. Amawi was not engaging in illegal conduct.   He met

11:06:39   **7**   Mr. Griffin and one thing that is true, that I do want to clear

**8**   up, I believe the evidence will be -- Mr. Getz put up a chart

**9**   where he said Mr. Amawi returned from Jordan.   Mr. Amawi

11:06:51   **10**   actually returned from Jordan, and we have the passport and

11:06:54   **11**   things to show, in 2004, not in 2003.   And when Mr. Amawi

11:07:01   **12**   returned from Jordan, the evidence will show that he went to the

11:07:06   **13**   Mosque here to worship and to interact, as most Muslims do in

11:07:15   **14**   this city.   And when he was there, the evidence will show he

**15**   saw Mr. Griffin, who had had a run-in with the Imam, or the head

11:07:26   **16**   spiritual leaders, so to speak, at the Mosque about some

11:07:33   **17**   viewpoints he had against Mr. Griffin, to put Mr. Griffin out of

11:07:37   **18**   the Mosque.   Mr. Amawi asked him what's going on.   And in this

**19**   course of this conversation, Mr. Griffin assessed Mr. Amawi, and

**20**   then it began.

**21**          The evidence will show that Mr. Griffin gave Mr.

11:07:49   **22**   Amawi a card for VIP Security Service and said look, if you're

11:07:54   **23**   interested in this type of thing, becoming trained in my VIP

**24**   service, give me a call.

11:08:03   **25**          The evidence will show Mr. Amawi didn't come and

1 say, hey, I'm starting a terrorist cell and could you come train

2 us and we can go and commit violent Jihad. That's not the

3 evidence. And once Mr. Griffin had Mr. Amawi ensnared in this,

4 it began.

11:08:27 5 Now, one of the things that I want you to pay

11:08:33 6 attention to carefully when you hear the government's case, you

7 note that when Mr. Getz in his opening remarks had coming up on

8 the screen for you different dates and different events that

11:08:49 9 took place. But they didn't come up in chronological order.

10 And I want you to pay careful attention when you hear this

11 evidence as to when these events actually occurred because Mr.

12 Getz talked about that Mr. El-Hindi recruited a medical student

11:09:10 13 or supposed medical student's brothers to join the conspiracy,

14 to come in and be trained.

11:09:17 15 Well, the evidence will show there was no

16 conspiracy at that time. It couldn't have been because at that

11:09:25 17 particular time, when Zubair and Khaleel came to the United

11:09:31 18 States, Mr. El-Hindi hadn't even met Mr. Amawi yet. They

19 didn't know each other. And the evidence will show that Mr.

20 Zubair and Mr. Khaleel don't even know Mr. Amawi to this day,

21 other than, of course, his association with this case. But, of

22 course, the evidence will show they never got together, viewed

11:09:50 23 videos together, trained together, or what have you in any type

24 of nefarious plot.

11:09:59 25 Now, Mr. Getz correctly indicated that the

11:10:03 **1** government's case is primarily going to rely on these audiotapes

11:10:07 **2** that Mr. Griffin made unbeknownst, at least for the most part,

**3** to the defendants. And there are approximately 150 hours.

**4** And I'm not going to take the time, nor do I think the Court

**5** would let me take time, to address everything that comes up

11:10:27 **6** during the 150 hours of tape; I would be talking here for days.

**7** But there are some things that I think the evidence will show

**8** that I want you to keep in mind.

11:10:37 **9** There will not be on these tapes an agreement

11:10:46 **10** stated between any of these three defendants that we are doing

**11** this so that we can go into Iraq and kill and maim American

11:10:57 **12** soldiers or we can send this information to the Iraqi insurgency

11:11:03 **13** or the Mujahideen so that they can do it, or that we're going to

**14** download this information and provide it to somebody so that

11:11:11 **15** they can use it to do any of those acts. And you've got two

**16** different versions about that. You're going to have to listen

**17** to that and make your decision about that. But we think that

11:11:26 **18** will not be the evidence.

**19** What we think the evidence will be is this, and

11:11:30 **20** pay careful attention. When you hear these tapes, when you

**21** hear words like Jihad and you hear words like this is what we're

11:11:39 **22** going to do, this is what we're going to plan, this is why we're

**23** doing this, I want you to pay attention to who is saying these

**24** words. And I can't speak for 150 hours' worth of tape with any

11:11:57 **25** degree of certainty. I think you're going to find the

11:12:00 **1** overwhelming majority of the time that these words that come out

11:12:03 **2** on the tape, they're not going to be said by Mr. Amawi, they're

**3** not going to be said by Mr. El-Hindi.   They are not going to be

**4** said by Mr. Mazloum.   They're going to be said, the evidence

**5** will show, by Mr. Griffin.

11:12:19 **6** And this is where you have to, we're hoping you

**7** will, and we believe you will, and -- what we want you to do is

**8** to be very circumspect when you listen to this evidence.

**9** Because Mr. Griffin is the key planner to these conversations.

**10** He's the one taping and he decides when to turn the tape on and

11:12:47 **11** when to turn the tape off.   And he did not tape all of his

11:12:52 **12** contacts with the defendants.   Not only that, the evidence will

11:12:58 **13** show, but there are gaps in time between these conversations.

11:13:03 **14** Sometimes significant gaps of time between the conversations

**15** that Mr. Griffin taped.   And you will find that there will be a

11:13:15 **16** lack of follow-up to what was discussed before.

**17** By way of example, if they're looking at a video

**18** and Mr. Griffin says, not the defendants, this is what we're

**19** going to learn to do, this is what we're going to train for,

**20** when the gap of time comes when there's another contact, guess

**21** what, they haven't made a bomb vest.   They haven't obtained

**22** materials for a bomb vest.   They haven't shipped the bomb vest

**23** or distributed it to any known terrorist groups, and then we

**24** move on to another topic.

11:14:01 **25** And Mr. Hartman will be discussing with you a lot

11:14:06   **1**   of the manipulative techniques that Mr. Griffin used in these

  **2**   tapes. And keep in mind he's the only one that knows he is

11:14:14   **3**   recording.

11:14:16   **4**           Now, another part of the context of this is you

  **5**   will recall, for instance, is how something is said. At the

  **6**   beginning of my remarks I told you what I believe very

  **7**   forcefully that Mr. Amawi is -- the evidence will show is not

11:14:34   **8**   guilty. If I had said, Mr. Amawi's not guilty, or if I was to

11:14:46   **9**   say Mr. Amawi's not guilty, he's not dangerous, the transcript

  **10**   of all three of those conversations would appear the same. But

11:14:58   **11**   the context and the meaning says something different. And I

  **12**   want you to keep that in mind when you're listening to these

11:15:07   **13**   tapes, because the context, when the government tells you they

  **14**   met and they planned and they conspired and they decide, I think

  **15**   you're going to see in that case there's also going to be visual

  **16**   evidence of some of these conversations. This is what you're

11:15:25   **17**   not going to see. You're not going to see a situation where

11:15:31   **18**   co-conspirators are around plotting, this is how we're going to

  **19**   get this video, and this is how we're going to ship it overseas,

  **20**   or this is how we're going to train so we can go over there and

11:15:42   **21**   kill.

  **22**           What you're going to see is a very relaxed

11:15:46   **23**   atmosphere, and you're going to see on several occasions Mr.

  **24**   Amawi sitting at his computer in sweats, casual, listening to

  **25**   things on the computer. Not all these horrific things but

1   political things, cartoons, what have you, and Mr. Griffin is

11:16:06  2   positioned behind him, and Mr. Amawi will say on various

11:16:10  3   occasions, you, look what I found, look at this.   Man, look at

11:16:14  4   this, this is people shooting people in Iraq or people doing

5   this.   And Mr. Griffin behind, you can tell this, the evidence

6   will show, because he's got the camera, will say yeah, yeah,

11:16:27  7   that's what we're going to do in our training sessions.

11:16:34  8           Some of these are very light-hearted conversations

11:16:40  9   about various topics.   They're not serious with purpose in mind

10   and destruction in mind, as the accusation may create a visual

11   in your mind, the evidence will show.   Keep in mind the

11:16:55  12   context.  We're in court, we are in a formal setting, a serious

11:17:00  13   setting, a professional setting.   I'm going to talk to you in

14   that manner, I hope.   I may talk differently, the evidence will

15   support, or if I'm talking to my counsel back in the hotel, or

16   if I'm talking to my family or best friend.   I may use language

17   I don't use.   And that's the type of situation these defendants

18   think they're in.   And so they use language, they make fun,

19   they say things because they think they're in a very casual,

11:17:38  20   friendly-type environment.   And they don't feel, the evidence

21   will show, they're doing anything wrong.   And listen on these

22   tapes because on these tapes on several occasions they say we're

23   not doing anything wrong.  We don't want to be misinterpreted.

24   All we're doing --  Guys, we're young, show us how to shoot, at

11:18:01  25   Cleland's.

1    The evidence is not going to be they snuck off to

2    some remote location and set up a terrorist training camp in the

3    woods somewhere and did all this stuff.   They went out here to

11:18:12    4    Cleland's, a public place, and shot, and learned to do that.

5    And none of these defendants are prohibited by law from learning

11:18:23    6    to shoot a gun.

11:18:27    7    Now, you're going to see some horrific videos that

8    contain violence.   The evidence will show that none of the

9    defendants produced any of these videos.   The evidence will

10    show that none of the Defendants appears in these videos.  And

11    the evidence will show that the defendants never utilized any of

11:18:52    12    these videos.  And most importantly, the evidence will show that

11:18:55    13    none of these videos were provided to any known terrorists

14    locally, internationally, or anywhere.   They were not e-mailed

15    to any of them, they were not shipped to any of them, and none

16    of these individuals had either gone to and met with, the

17    evidence will show, or came here and met with them.

18    So we would ask you to view that for what it's

19    worth and not let the horrific nature of it knock you off your

20    course of scrupulously evaluating this evidence.   And I think

11:19:36    21    you'll find that none of these videos, the evidence will show,

11:19:41    22    prove any type of agreement among these individuals to go to

11:19:45    23    Iraq and kill these soldiers.

11:19:51    24    Now, the language barrier is going to be key in

25    this case because remember, as I told you, the evidence will

11:19:59 **1** show that Mr. Griffin does not speak Arabic. And this also

11:20:07 **2** relates to the context of these tapes. During these tapes the

**3** defendants at various times, or alone, were looking at these

**4** computers and speak in Arabic. And what they say is very

11:20:23 **5** enlightening to what the true situation is. The problem is that

11:20:28 **6** Griffin does not understand. Mr. Getz referred to a meeting in

**7** February when they got together, and that is when their plot

**8** hatched to finally get together and go to Iraq and do all this

11:20:44 **9** horrible terrorism stuff. Well, we think the evidence would

**10** show that that meeting was actually everyone being invited over

**11** to Mr. El-Hindi's for dinner to try out some of his recipes, and

**12** that during this dinner they're eating, it's a relaxing time.

11:21:05 **13** There's a video of it. You'll be able to see this.

**14** On the way to this meeting, Mr. Amawi is in the car

**15** with Mr. Mazloum, and they begin to talk to each other in the

**16** presence of Griffin, and Griffin is taping this and doesn't know

**17** what he's hearing. And Mr. Mazloum is telling Mr. Amawi about

**18** Rogaine and how Rogaine can help solve his balding problem.

**19** This is a discussion on the way to the terrorist cell, the

**20** evidence will show.

**21** When they get to the meeting they have had a meal

**22** and Mr. Griffin chooses not to tape a lot of portions of this

**23** meal. Until he decides he's going to get everyone together in

**24** the living room. And we're going to discuss what we're going to

**25** do and he begins to talk about training. He begins to talk

1   about what we're going to learn.   Knowing under the guise how

11:22:02  2   they're thinking about in order to be trained for this VIP

11:22:06  3   Security.   He begins, the evidence will show -- as you look at

4   this tape, he begins to begin, okay, everybody, listen up, this

5   is what we're going to do.   They don't pay attention to him.

6   And during this -- his speech, Mr. El-Hindi gets up and leaves

7   and comes back and provides everybody with drinks and they begin

8   to ignore him.   And he's talking about I want to go and we're

11:22:31  9   going to do this and we're going to train and we're going to do

10   all this horrible stuff.   And they ignore him.   They have

11   conversations going on.   Mr. Amawi is arm wrestling with one of

11:22:42  12   his kids and says in Arabic:  Boy, he's strong.   He's going to

13   be a real champion someday.   Not even paying attention to what

11:22:50  14   Mr. Griffin is saying but he doesn't know that because they're

15   speaking Arabic.   So there will be numerous exculpatory

11:22:59  16   examples of this going on.   The point being that none of these

11:23:03  17   are plans.

18        And Mr. Griffin says during this meeting, I don't

11:23:09  19   know where you want to go.   Mr. Amawi, you may want to go to

11:23:13  20   Iraq and you may want to go to Lebanon.   You may want to go to

21   Israel and everything.   And they're kind of like, what?   But

11:23:22  22   there's no agreement to do anything in Iraq.   Mr. Griffin

23   himself says I don't know where you guys want to go.   I don't

11:23:29  24   know what you guys want to do.   And I think Mr. Mazloum makes a

25   joke, I want to go to Toledo, and everybody laughs.

11:23:38 **1**        Now, at some point in time, Mr. Amawi, being as he

**2** can be at some times, flips this on Griffin, because one of the

11:23:51 **3** things that Mr. Griffin does to keep this plot, this thing

**4** going, is provide monetary support for Mr. Amawi.  The evidence

**5** is going to show that at various points in time Mr. Griffin gave

**6** Mr. Amawi money for his rent, he paid for the trip back to

11:24:10 **7** Jordan for Mr. Amawi to see his family and other legal

11:24:15 **8** activities.  But Mr. Griffin, knowing what he's planning to do

11:24:20 **9** with this, had a stipulation, and that was being that you -- I'm

**10** not going to train people just to train them.  They've got to

11:24:28 **11** agree that they're going to do this Jihad or whatever, be a good

**12** brother, whatever.  And I'm not going to do all this stuff

11:24:36 **13** unless you agree.  So Mr. Amawi, quite frankly, tells him

11:24:40 **14** whatever he wants to hear.

**15**        At some point you're going to hear Mr. Amawi

11:24:44 **16** agreeing, yeah, sure, we'll do this and we'll do that.   But

11:24:47 **17** keep in mind what's going on, the benefits that Mr. Amawi is

**18** receiving as he said, okay, I'll do this, because he's not

11:24:56 **19** planning to do it, the evidence will show, but he's getting

11:24:59 **20** money.

11:25:00 **21**        And a prime example of this is what Mr. Getz was

11:25:05 **22** talking about:  Mr. Amawi wrote an explosive down, and you'll

**23** get to see the napkin.  Mr. Amawi was asking for support, and

11:25:15 **24** I've got a contact in Syria.  This is how the language thing

11:25:19 **25** comes in.  You're going to hear a tape with Mr. Griffin and Mr.

1 Amawi where Mr. Amawi is listening to PalTalk or a blog or an

11:25:28 2 individual in Arabic is talking solely about religion, nothing

3 to do with terrorism or anything; he's debating religious

4 principles, Islam, things of this nature. But he's saying it

5 in Arabic, the evidence will show, and we're going to have that

11:25:44 6 translation for you. And as Mr. Amawi is listening to this on

11:25:49 7 the PalTalk, Mr. Griffin says, hey, is that one of the brothers?

8 Is that one of the guys that wants to come in? And Mr. Amawi

11:25:57 9 lies to him and tells him: Yeah, yeah, he's saying right now

11:26:02 10 they're getting ready to go into Iraq right now. Nothing even

11 close to that is actually being said in Arabic.

12 Why does Mr. Amawi do this? Well, he does this

13 because Mr. Griffin is going to give him monetary support for

11:26:17 14 things he wants. And as long as he plays along with this, he

11:26:21 15 gets it. But you'll see the translation of that Arabic, and

16 you'll see there's no discussion about going into Iraq or any

11:26:30 17 type of terrorist event by the speaker, as Mr. Amawi is

11:26:34 18 representing to Mr. Griffin.

19 At another point in time Mr. Amawi is talking to an

20 individual who wants to buy his way out of the military service.

11:26:46 21 He told him he can do that for 5,000 dollars. Mr. Amawi tells

22 Mr. Griffin I want to do this, I want to help this guy. I

11:26:54 23 don't have the money to do this. Do you think we can send some

11:26:57 24 money over so we can help this guy? Mr. Griffin again puts the

11:27:01 25 contingency, well, if he's a good brother -- meaning if he's

1    going to do the training -- then we can help him.   So Mr. Amawi

2    says yeah, and gets the money.

11:27:13    3         There are several examples of this, I won't go

11:27:21    4    through all of them with you.   But if you step back, the

5    evidence will show, and take a look at this case, outside of

6    this taping, you'll see the evidence will show this was never a

7    terrorist cell.  In August of 2005, Mr. Amawi and Mr. Griffin

11:27:44    8    traveled to Jordan.   And this is near the end, as the evidence

9    will show, of all this taping and so-called terrorist cell.   As

11:27:55    10    Mr. Getz told you, the purpose was supposed to be to deliver the

11:27:59    11    laptops to the Mujahideen or other terrorist groups.   And Mr.

12    Getz said to you in opening statement that the laptops never got

13    to any of those individuals for reasons that would be explained

14    to you later.

15         Well, I'm going to try to explain it to you now,

16    the reason the laptops never got to those individuals.   And the

17    reason they didn't, the evidence will show, is because Mr. Amawi

18    never had a contact in the Middle East.   Never had a person in

11:28:26    19    Syria that was connected with terrorism.   And never intended to

11:28:30    20    deliver these laptops over to any such terrorist groups.   He

21    had to say that to Mr. Griffin to get Mr. Griffin to pay for --

22    to finance the trip back over to Jordan.   And the evidence will

11:28:42    23    show that once Mr. Amawi got to Jordan, he tells Mr. Griffin

11:28:48    24    after, look, everything fell through, that guy from Syria, he

11:28:52    25    doesn't really need the laptops anymore.   And by the way, can I

1 have one of them?   And Mr. Griffin gives him one of the

2 laptops, and Mr. Griffin takes the -- gets upset about this

3 because he thought he was going to wrap this package up nicely

4 and take the laptops out of Jordan and come back to the United

11:29:16 5 States.

6        Now, this is significant because, if you'll recall,

7 if you can run that up to Jordan -- this is near the end of this

11:29:32 8 so-called case, and it's on the cusp of Mr. Amawi's arrest.

9 Mr. Amawi is back in Irbid, which is approximately ten miles

10 from the border of Syria, where he supposedly told Griffin he

11 had a terrorist contact.   Of course, we never, from over here,

12 know how close it is to Iraq.   It's important to keep in mind.

13        What this case is about, what the government has

14 charged Mr. Amawi and these defendants with, is committing a

15 terrorist act or support of a terrorist act against U.S. troops.

11:30:21 16 At this point in time, Mr. Amawi has received gun training.   At

11:30:25 17 this point in time he's gone with Mr. Griffin over here,

11:30:28 18 supposedly to co-contact here.   He's able to carry out or begin

19 to carry out what this -- the government alleges this conspiracy

11:30:39 20 is supposed to be about.  He's right here.   He's in proximity.

11:30:43 21 The evidence in this case will be that Mr. Amawi remained in

22 Jordan after Mr. Griffin went back and he was there for

11:30:53 23 approximately 7 months before his arrest.

24        The evidence will show during that 7-month period,

25 Mr. Amawi did not go into Iraq, did not try to kill any American

1 soldiers and, most important, the government, through

2 Mr. Griffin, provided Mr. Amawi with a satellite phone, one that

3 can be monitored by law enforcement to see who he's calling.

4 Mr. Amawi used that phone extensively because it wasn't at his

11:31:23 5 expense. He let his friends and family use it. And racked up

11:31:29 6 a bill, the evidence will show, for $45,000 on that satellite

7 phone.

8 And of those conversations the government, we

11:31:35 9 expect the evidence will show, will not show you one

11:31:38 10 conversation that they monitored or recorded that shows Mr.

11 Amawi having any conversation with any known terrorist group,

12 with any known terrorists, or expressing any conversation with

11:31:50 13 anybody on this bill, $45,000 worth of calls, to anything

11:31:55 14 related to going to Iraq and killing anybody.

11:32:00 15 One of the computers that was supposed to go to the

11:32:04 16 Mujahideen, the evidence will show, upon Mr. Amawi's arrest the

11:32:08 17 government seized that computer. From that computer the

11:32:12 18 government will show you not one e-mail, not one communication

11:32:16 19 by Mr. Amawi on that laptop computer to anyone in Iraq, any

11:32:22 20 insurgency end in Iraq, or any violent Jihad groups because he

21 didn't use its for that purpose. There's absolutely no

22 evidence that once he got in, once he got in the area, that

23 subject of this conspiracy, he did absolutely no terrorist act.

11:32:43 24 When Mr. Amawi was arrested, his effects were

25 seized by the Jordanian government and given over to the U.S.

1  government.  Among his effects there were know bomb vests,

2  there were no IEDs, there were no mortars, there were no

3  pistols, there were no rifles, there were no accoutrements, the

4  evidence will show, of terrorism found in Mr. Amawi's effects

11:33:09  5  because he never intended to do any type of conspiracy to do

11:33:13  6  anything.  The evidence will show that the government will not

7  show any meaningful contact between Mr. Amawi when he's in

11:33:24  8  Iraq -- I'm sorry, In Irbid, in Jordan, with his supposed

11:33:29  9  co-conspirators.  There's going to be no evidence, the evidence

10  will show, that Mr. Amawi contacted Mr. El-Hindi to set up some

11:33:37  11  terrorist a camp or some terrorist base out there under the

11:33:44  12  guise of some medical school or whatever they're saying.  None.

11:33:51  13        Now, keep in mind that this case is a conspiracy

11:33:56  14  case.  Meaning that what you have to look out for in this

15  evidence is an agreement between Mr. Amawi, Mr. El-Hindi, and

11:34:09  16  Mr. Mazloum.  That makes up the conspiracy.  And I believe the

17  Judge will give you law and, please, go with what the Judge

18  says, not me, but conspiracy is not an agreement between any of

19  these defendants and Mr. Griffin, because he's the government

11:34:29  20  operative.  The conspiracy has to be made up of evidence of an

21  agreement between these three individuals that are accused here

22  in this courtroom.  And that's significant, because of this 150

23  hours of tape that exist or the excerpts the government is going

24  to show you.  When they were here in America, there is no

25  evidence of any wiretaps which the government can get of their

1 phones, of conversations between them. None. There is no

2 evidence. You're going to see all this computer stuff, they're

11:35:08 3 going to show you horrific videos and everything, but you will

11:35:12 4 not see any evidence of incriminating e-mails between Mr. Amawi,

11:35:17 5 Mr. El-Hindi, and Mr. Mazloum, or any conversation of such.

6 The evidence will show if they are co-conspirators you would

11:35:27 7 expect if they're going to go so far as to go over to Iraq to

8 kill soldiers that they might want to communicate with each

11:35:33 9 other. There's going to be no evidence of surveillance of

11:35:37 10 clandestine meetings between any of these three defendants.

11:35:49 11 Most importantly, these three defendants took no

11:35:53 12 efforts, the evidence will show, to cloak truly who they were

11:35:58 13 and what they were doing. They wore their beard, the

11:36:02 14 government shows you the pictures of them with their long beards

15 at the time of their arrest and all these types of things. The

11:36:11 16 evidence will show that is not the face of terrorism cells in

17 this country. The evidence will show that terrorism cells

11:36:17 18 blend in to American culture, look like Americans, dress like

11:36:22 19 Americans. Not like Muslims because they don't want to attract

11:36:27 20 attention to themselves. The evidence will show terrorist

11:36:30 21 cells like the 9/11 high-jackers were clean shaven, Polo, Tommy

11:36:37 22 Hilfiger, not showing their true Arabic color.

23 Mr. Amawi, the evidence will further show, didn't

11:36:48 24 try to cover up who he was because Mr. Amawi, the evidence will

25 show, in June, 2004, FBI agents came and talked to him. And in

1   their own report, the FBI, the evidence will show, indicated

11:37:07   2   that during this conversation that Mr. Amawi disagrees with

3   Bush's policy in Iraq and Palestine and has been very open about

4   his disagreement with President Bush.

11:37:19   5   Now, if you are a terrorist cell, the evidence will

6   show, if you're a conspirator in a terrorist cell to go into

7   Iraq and kill American soldier, the evidence will show in spite

8   of that fact Mr. Amawi tells the FBI I'm against it and shares

9   his views.   And he also did it at the time of his arrest.

11:37:44   10   Mr. Amawi felt in this particular case he was being

11:37:47   11   followed at one point.   And Mr. Amawi went, the evidence will

11:37:52   12   show, to a representative of Marcie Kaptur's office and

11:37:57   13   complained of this and even filed a police report that somebody

14   is following me.   That evidence will show, despite the fact

11:38:03   15   he's trying to concoct some terrorist cell in this country to do

11:38:09   16   horrific terrorist acts against our soldiers, he's contacting

17   the police, he's contacting Marcie Kaptur.

11:38:22   18   When you view this evidence beyond the tape, think

19   of whatever is said in these tapes, what happens afterwards?

20   Now, I understand -- understand this is a conspiracy case where

21   the government has to prove an agreement and an intention to do

22   something.   Mr. Getz said to you in opening statement that

11:38:43   23   there's nothing more telling than the defendants' own statements

24   and action, and we agree.   Look at their actions.   They look

25   at a bomb vest video.   The evidence will show they never

11:38:58 **1** obtained the materials to make a bomb vest video (sic).   They

**2** were never found in possession of a bomb vest or explosive or

**3** bomb.   They were never found in possession of IEDs or materials

**4** to make IEDs, neither in this country or Mr. Amawi over in

11:39:17 **5** Jordan.

11:39:22 **6**            They took no efforts to hide who they were.

11:39:25 **7** They'd go to Cleland's, an open gun range where anybody, any

11:39:30 **8** citizen can lawfully, it's a place to go to to learn to shoot

11:39:38 **9** guns.   They don't do it in a clandestine way.   Yes, look at

**10** their actions, they make no -- the government -- despite what

**11** you believe or don't believe on this tape, the government will

**12** not introduce evidence of any type that Mr. Amawi, Mr. El-Hindi,

**13** Mr. Mazloum made actual contact with any known insurgent or

11:40:02 **14** terrorist or terrorism group.   They didn't e-mail them; they

**15** didn't call them; they didn't clandestine meet with them.   They

**16** didn't even meet with each other half the time had it not been

**17** for Griffin.   Nothing happened.   Nothing was going to happen.

11:40:26 **18**            And Mr. Hartman in his comments is going to go into

**19** a little bit more detail on some of these points than we did

**20** this morning.   But I want to thank you in advance for your

11:40:41 **21** anticipated adherence to your oath that you judge this case on

**22** the evidence and what is presented in this courtroom.   And

11:40:48 **23** you're going to not take things at face value, that you're not

11:40:52 **24** going to look at a horrific video and ignore all common sense.

**25**            Now, this trial is going to go on for a lengthy

11:41:01  1  period.  There will be different times that different attorneys

2  will take different roles in the case, so I do want to indicate,

3  as you probably guessed by now, I represent Mr. Amawi.   On this

4  team is Ms. Amy Cleary, Elias Muawad, Mr. Ed Bryan, Mr. Jonathon

11:41:23  5  Witmer-Rich.   They'll all be doing different witnesses or

11:41:28  6  making different arguments to you.   So I just wanted you to

7  know who they were because each day you may see a different

8  lawyer doing it differently.   So thank you.   All we ask is

11:41:39  9  that you look at the evidence keep an open mind like the Judge

11:41:42  10  says and decide the case on the evidence and properly.

11:41:49  11            THE COURT:  Mr. Hartman, another short break?

12            MR. HARTMAN:  That would be fine, Judge.

11:41:54  13            THE COURT:  Another maybe ten-minute break or so.

11:41:58  14  Keep an open mind about the case.

11:58:04  15            MR. SOFER:   Your Honor, before the jury comes in,

16  I just want to say I would say conservatively -- the government

17  did not object to Counsel's opening statement but conservatively

18  50 percent of what he said was more than a trial argument.   I

19  would just hope Mr. Hartman doesn't follow suit.  We don't want

20  to object to Counsel's opening statement.  We are planted in our

21  chairs for that reason.   But I think we certainly would have

22  been well within our rights to stand up and object to much of

23  what Mr. Ivey said.

24            THE COURT:  I understand.   I will remind the jury.

11:58:51  25  I'm reluctant to do anything other than that.

12:00:01  **1**     (Recess taken).

**2**     THE COURT:  Mr. Hartman will present the opening

**3**  statement on behalf of Mr. El-Hindi.   Once again, ladies and

**4**  gentlemen, I want to remind you what you are about to hear is

**5**  not evidence, it's not proof of anything.   It's simply

**6**  presented to you to acquaint you with what Mr. Hartman, on

**7**  behalf of Mr. El-Hindi, anticipates the evidence will be and

**8**  will show.   At the concluding of his presentation, you'll be

**9**  excused for the day.

12:00:37 **10**     Mr. Hartman.

**11**     MR. HARTMAN:  Thank you, Your Honor.   Ladies and

**12**  gentlemen, good morning.   I'm going to do my best not to repeat

**13**  anything that Mr. Ivey said.  Please forgive me if I do because

12:00:48 **14**  some of it applies to my client as well.   And I need to make

12:00:51 **15**  sure that I cover everything.

12:00:54 **16**     The evidence is going to show you that nothing

12:00:57 **17**  happened; the evidence will show you that nothing was going to

**18**  happen; and the evidence will show you that if it weren't for

12:01:09 **19**  Darren Griffin, nothing ever would have happened in this case.

12:01:16 **20**     Three and a half years of investigation and

12:01:21 **21**  recording, that's the evidence of Marwan El-Hindi.   And at the

**22**  time of the indictment, after those three and a half years,

**23**  there will be no evidence of a plan, no evidence of a bomb, no

12:01:36 **24**  evidence of a target, no evidence of a pile of money, none of

**25**  those things are going to be in the evidence.   There will be

12:01:47 **1** nothing there to indicate that an agreement was made that was

**2** being carried out. Nothing like that in the evidence.

12:01:56 **3** When they searched his house, they didn't find any

**4** evidence like that either. They did find some evidence on the

**5** computer, videos on the computer. You've heard a little bit

**6** about that; you'll hear more. The government is going to play

12:02:15 **7** you some videos, some recordings, and that's going to be the

12:02:18 **8** majority of their case, as Mr. Getz told you. But they're not

12:02:24 **9** going to show you all of them. They're not going to show you

12:02:27 **10** enough for you to get the big picture. That's the evidence

12:02:31 **11** that we intend to show you. I hope you paid very close

12:02:40 **12** attention during the government's opening statement because I

**13** believe the evidence is going to show you that a lot of things

**14** the government promised just didn't happen.

12:02:54 **15** I do have to correct Mr. Ivey on one point. There

**16** are more than 150 hours of recordings. There are over 300

12:03:03 **17** hours of recordings. The government is not going to play you

**18** 300 hours of recordings. The government is going to play you

12:03:13 **19** snippets. The evidence the government will play will be little

**20** pieces here and there chosen specifically to try to make the

**21** evidence look a certain way.

12:03:23 **22** We are going to attempt to play you more of that so

12:03:27 **23** the evidence shows you the big picture. I'm going to apologize

**24** in advance that sometimes it's going to be a little boring. But

**25** that's what it has to be for us to show you the big picture.

12:03:42  **1**          Many times defense worries about tape-recorded

**2**   evidence.  We don't.  We welcome this evidence, we want you to

**3**   have this evidence because we want you to understand what was

12:03:52  **4**   going on through this whole period of time.   Not just in the

12:03:58  **5**   little periods of time.   Not just in the parts that are taken

**6**   out of context to show things in a certain light.   In fact, the

12:04:12  **7**   evidence that you will see from the government is like a preview

**8**   of a movie.   It will show you part of what it's about.   But it

**9**   won't show you the whole thing.   The evidence is the whole

12:04:25  **10**  movie, and when we show you the whole movie, you'll see the

**11**  evidence shows the case is not what the government advertised

**12**  that movie to be.

12:04:44  **13**          Now, the evidence the government will show will

12:04:48  **14**  create the illusion of a crime.   And there is a reason for

12:04:55  **15**  that.   The reason is that the evidence the government is going

**16**  to show you is based on deceit, is based on manipulation, is

**17**  based on miscommunication, and ambiguity, and lies.   Not by

**18**  these gentlemen.   They are fine lawyers.  Not by the several

12:05:18  **19**  agents sitting back in the gallery.   The evidence is going to

**20**  show you that there's deceit, manipulation and lies by Darren

12:05:29  **21**  Griffin, and it's throughout the case.

12:05:41  **22**          Some of the tapes that you'll hear will show you

**23**  that not only did Darren Griffin lie to Marwan El-Hindi and not

**24**  only did he lie to Mohammad Amawi, and to Wassim Mazloum, he

12:05:58  **25**  lied to the government when they hired him.   Not only that, he

1  lied to the FBI agents who were supervising the work he was

2  doing.   That's on the tapes.   You'll hear it.   He flat out

12:06:13  3  lies to the FBI.   And that lie is about Marwan El-Hindi's

4  involvement.   That's what you'll hear.

12:06:27  5  Now, he's a paid informant.   There's nothing wrong

6  with paid informants in general.   They're used every day in

7  this country.   Lots of courts throughout America.   But in

8  America, we have rules, and those rules have to be followed.

12:06:44  9  Those rules ensure that you, the jury, can get at the truth and

10  find justice.   Darren Griffin did not follow those rules.   In

11  fact, it wasn't even close.   And the evidence will show you

12:07:07  12  that throughout this trial.   The government will try to

13  convince you, well, Mr. Getz told you in his opening about --

14  the way he put Mr. Griffin's past.

15  Well, we feel differently about it obviously.   And

16  Mr. Ivey explained that to you.   We feel very differently about

17  it.   But Mr. Getz said the evidence is the recordings.   And we

18  could not agree more.   He said what's important is the

19  defendants' words.  We feel the evidence is the defendants'

12:07:52  20  words and what you hear on those recording, but it's on those

21  recordings, the evidence will show you, that Darren Griffin was

22  his most manipulative, and his most deceptive the entire time,

23  the three and a half years he spent recording conversations with

12:08:17  24  Marwan El-Hindi.   The evidence that you will hear includes him

25  using words and concepts like "training" and "brothers" and

1 "Jihad" and "camps" and "project". But remember when Mr. Ivey

2 said you can say things three different ways, it shows up on the

3 transcript the same way, even though you said it different ways,

4 12:08:46 the evidence will show you that Mr. Griffin did it in a way to

5 12:08:50 make it all sound very, very sinister, even when it wasn't.

6 12:08:54 And he used certain techniques, certain conversational

7 12:09:00 techniques that you'll hear about in the evidence, in order to

8 make that happen because these recordings were being made for

9 later listeners, and he was the only one that knew that, so he

10 was able to do it.

11 12:09:21 The tapes that you'll hear will never have

12 12:09:28 Mr. Griffin saying directly what he says is the plan. He will

13 never directly say, here's what we're going to do. He will

14 12:09:39 never say, let's go to Iraq, I'm going to train you to go to

15 12:09:45 Afghanistan and hit the Americans. He will never ever directly

16 say any of that. And when you hear the tapes, you'll

17 understand why. Because he knows what will happen. Because a

18 12:09:57 couple of times he directly asks Marwan El-Hindi to get involved

19 in this. The evidence is going to show you he said no. So he

20 gave up the direct approach.

21 12:10:16 The evidence will show you that Griffin constantly

22 12:10:20 criticizes the U.S. Constantly. And he criticizes the U.S.

23 12:10:24 policy in the Middle East. And in Iraq. And he pushes and he

24 12:10:29 pushes and he pushes to get Marwan El-Hindi to agree with him

25 12:10:34 and then to agree to do something about it.

1      Like many Americans, like many of us, Marwan

2  El-Hindi is critical of the U.S. policy in the Middle East.

12:10:47  3  You'll hear evidence of that on the tapes.   You'll hear

4  evidence that at the beginning he was in support of the war in

5  Iraq.   But then things changed for him and he was against it.

6  That will be on the tapes.   That will come into evidence.

12:11:04  7  Despite the fact that he criticizes, and does so fairly

12:11:09  8  frequently, he never, ever, ever, as you will see in the

9  evidence, agrees to do anything.

12:11:22  10      I mentioned conversational techniques and

12:11:26  11  strategies that you hear on these tapes and this evidence.

12:11:31  12  Ambiguity, I touched on.   You will hear Griffin never be clear.

13  And it gets -- it makes it sound like he gets it right up to the

14  edge, but it never goes there.  So there's never a clear

12:11:50  15  understanding in the tapes that you'll hear.   There's a

12:11:53  16  technique called hit and run that you'll hear.   He say

17  something that sounds bad, sounds terrible and changes the

12:12:04  18  subject so fast that the person he's talking to doesn't have a

19  chance to agree or disagree either way.   He puts the words in

20  there then moves on.

12:12:17  21      Contamination is another one you'll hear about.

12:12:20  22  That's when he'll insert negative sounding words, negative

23  sounding ideas and sinister phrases into conversations that have

24  nothing to do with it just to make them sound like there's some

12:12:32  25  kind of planning for some crime, something nefarious going on.

12:12:40   **1**          You will hear him, you will hear Darren Griffin

12:12:46   **2**   inaccurately restate what Marwan El-Hindi says. He acts like

       **3**   he's repeating what Mr. El-Hindi's going to say. He says it

12:12:56   **4**   incorrectly, then he moves on. An because Marwan doesn't know

       **5**   that he's being taped, who would correct him? The evidence

       **6**   will say he wasn't corrected. You'll hear that on the tapes

       **7**   because he didn't know he was being taped.

12:13:13   **8**          Mr. Ivey touched on that; on what that means when

12:13:17   **9**   one person knows that taping is going on and another one

    **10**   doesn't. And the evidence that you're going to hear will make

    **11**   that pretty obvious to you at various points.

    **12**          Now, why would Griffin do all this? Well, there

    **13**   are two simple reasons that you're going to hear from the

    **14**   evidence: 1. You'll hear him call himself supernatural,

12:13:42 **15**   literally, into a tape. He says this is supernatural. This

    **16**   is Darren Griffin. You can decide what that means.

12:13:54 **17**          You will hear his cell phone ring during telephone

    **18**   conversations. And when his cell phone rings, the ring tone is

12:14:02 **19**   the James Bond theme song. We believe the evidence is going to

    **20**   show you he loved doing this because the evidence will show you

12:14:13 **21**   it made him feel like a super hero.

12:14:19 **22**          What's the second reason he had for doing this?

    **23**   Probably more importantly for all this manipulation, all this

    **24**   deceit. Well, he had over 340,000 reasons, and Mr. Ivey

    **25**   touched on that already. And Mr. Ivey was right, the evidence

1  will show you that he did everything he could to keep this

12:14:48  2  investigation going.   And you'll understand when you see how he

3  was paid that, that's because that's how he had to stay on the

4  gravy train.   Before he ever tried to induce Mr. Amawi, when he

5  asked Mr. El-Hindi directly, he asked him directly, are you

6  recruiting for Jihad?   And the answer, no.   Why doesn't that

12:15:20  7  end the investigation?   Because then he doesn't get paid

8  anymore.   You'll hear evidence that during the time that he was

12:15:34  9  paid, nearly $350,000, he had two bank accounts that we know of

10  so far at Fifth Third Bank with over 200 overdraft fees.   While

11  he's getting paid $350,000.  We believe the evidence will come

12  out of why he was having those money problems.

13         The Judge encouraged you to take notes, and I want

14  to say again that the evidence is going to show you the times

15  when he asks Marwan directly to get involved in these crimes.

16  July 15 of 2004, are you recruiting for Jihad?   That's the

17  question directly from Darren Griffin to Marwan El-Hindi, and

18  the answer, ladies and gentlemen, is, no.

12:16:40  19         October 8, 2004, about Zubair and Khaleel Ahmed.

12:16:51  20  Mr. Griffin and Marwan are talking about Zubair and Khaleel,

21  talking about what to do with them, what to tell them.   And

22  Marwan says, tell them you'll train them, but not for Jihad, nor

12:17:07  23  for Jihad.   Now, these are the people the government claims

12:17:12  24  Marwan El-Hindi was recruiting, and Marwan tells Mr. Griffin not

25  for Jihad.   Griffin's response, well, I'll train them for

2130

12:17:27　**1**　whatever they want to do.　You'll hear it on the tapes.

12:17:31　**2**　　　　　There will be over a dozen times that you will hear

12:17:37　**3**　Marwan and Darren Griffin talk about whether the things Darren's

12:17:43　**4**　talking about are legal, and every time he says they're legal.

12:17:48　**5**　I have a security business, Mr. Ivey talked about VIP Security.

**6**　He always says it's legal.　He always says we're not doing

**7**　anything illegal.　And, in fact, ladies and gentlemen, they

**8**　weren't doing anything illegal.

12:18:04　**9**　　　　　Take the example of going to Cleland's.　I know

**10**　that's been mentioned.　Cleland's is a local gun range where

**11**　people go and shoot.　And the evidence will show that

12:18:16　**12**　Mr. Griffin took some people to Cleland's.　Now, Mr. El-Hindi

**13**　didn't go to Cleland's, but if the evidence is supposed to be

12:18:26　**14**　that you want to stay under the radar, do you take people who

12:18:32　**15**　look like Muslims to a gun range in the middle of the day?　The

**16**　evidence will show you it just doesn't make sense.

12:18:44　**17**　　　　　You'll hear evidence about Mr. Griffin's debts.

12:18:51　**18**　You'll hear evidence that he owed back child support.　You'll

**19**　hear evidence about a history of drug use that he failed to

12:18:58　**20**　disclose to the government.　You'll hear other evidence about

**21**　why he needed the money and what happened to it.

12:19:16　**22**　　　　　Now, since the government claims that what really

12:19:22　**23**　matters in this case are the recordings, and they mention to you

12:19:26　**24**　what some of the recordings are, I'd like to run through some of

12:19:30　**25**　those.　What we're going to put on the screen is a timeline

1  right now.

12:19:38  2         Now, this is a timeline of the recorded contacts

12:19:42  3  between Marwan El-Hindi and Darren Griffin.

12:19:46  4         THE COURT:  Does that have an Exhibit Number for

5  the record?

12:19:49  6         MR. HARTMAN:  Yes, Judge, demonstratively that

7  would be Exhibit EH-1.

12:19:56  8         From 2003 to 2006 by month.  I know it's a little

9  hard to see, especially from over there, but by month you'll see

10  this.  This is the number of recorded contacts there are by

11  month.  There are some reasons the pattern looks like it does.

12:20:20  12  And that's evidence that you will hear.

12:20:26  13        Now, Mr. Getz says there's no better evidence than

14  the words of the defendants.  So let's run through some of

15  those words that you're going to hear on these tapes.  The

16  important date, August 2, 2002.  It's not a recording but it's

17  the first acknowledged contact between Marwan El-Hindi and

12:20:47  18  Darren Griffin.

12:20:53  19        March 2 of 2003.  Now, this is the first recorded

20  contact we have between El-Hindi and Griffin.  And they

12:21:01  21  discussed the fact that El-Hindi had been subpoenaed to testify

12:21:06  22  in front of a grand jury in Syracuse about a man named Rafil

23  Dhafir.  This is all going to come into evidence in the tapes.

24  The reason that's important you'll understand in a minute.

25        March 11, 2003.  Griffin drives El-Hindi to the

1 airport for his trip to Syracuse to testify at that grand jury.

12:21:33 2 He records their conversation on the way.   And he starts

3 fishing.   Griffin starts fishing about the U.S. involvement in

4 the Middle East and he says, I wish I could do more.   I've

5 become more militant, he brings that up.   That's not what

12:21:55 6 Mr. El-Hindi says.  This is Darren Griffin.   And this is March

12:22:00 7 of 2003, nearly three years before the indictment came down.

12:22:03 8         Then the conversation turns to Iraq, and he says:

9 I wish I was over there doing a training program.   This is what

10 Darren Griffin's doing in March of 2003.

12:22:24 11         The next day, March 12, 2003, you'll hear a

12:22:27 12 reporting of Mr. Griffin and some other people at an Islamic

13 charity called KindHearts.   And you will see that Darren

12:22:36 14 Griffin isn't just targeting Marwan El-Hindi at this point.

15 He's targeting these folks as well.   You'll hear it on the

16 tape.

12:22:48 17         Marwan 13, 2003.   Griffin's preparing to pick up

18 Marwan from that trip to Syracuse where he went and testified in

19 front of the grand jury.   Mr. Griffin calls himself

12:23:00 20 supernatural.  Then they talk about what happened when Marwan

21 was in Syracuse, and they talk about the interview that he had

22 with the FBI.   Marwan says to Griffin:  You have to be careful

23 because -- and this is a quote -- they will take your word and

12:23:18 24 twist it around.   It's okay for the FBI to lie to you, but it's

12:23:23 25 against the law for you to lie to them.

12:23:28 **1**        Now, this shows what's on Marwan El-Hindi's mind

12:23:32 **2** when Darren Griffin says I wish I was in Iraq doing a training

**3** program. Marwan says you have to be careful. Not because of

**4** what I'm doing, because they'll take your words and twist them

12:23:43 **5** around.

12:23:46 **6**        March 13, same day, Marwan says the FBI in Syracuse

**7** told him he's outspoken. Now, the evidence will show you

**8** that's another thing that Marwan has in common with Mr. Amawi.

12:24:01 **9** Mr. Ivey talked about it. They're both outspoken. And

**10** Marwan's response to that? He said, I am not afraid of

**11** anything, I didn't do anything to be afraid of, I have nothing

**12** to hide and nothing to be ashamed of. That shows you his state

**13** of mind; what is in his mind at the time. And how does Mr.

12:24:24 **14** Griffin respond to that? I am still going along with my plans.

12:24:29 **15** I'll be licensed. There will be training.

12:24:32 **16**        And Marwan says: Well, I was scared of that, but

**17** now I'm all for it because you tell me everything's legal.

**18**        See, Marwan's not afraid of anything in his mind.

**19** But Mr. Griffin's planting seeds, that's what the evidence is

12:24:48 **20** going to show, all the way back even then.

12:24:56 **21**        March 19, 2003, El-Hindi says to Griffin on a

**22** recording, I need a large piece of land to plant things in.

12:25:03 **23** Now, it seems insignificant but the evidence is going to show

12:25:07 **24** you that later on Mr. Griffin talks a lot about getting the

12:25:11 **25** land, about what we're going to do on the land. And this shows

1  you all the way back then what Marwan wants to do with land.

2  He wants to plant things and eventually he wants to raise some

12:25:25  3  animals.   That's what the evidence is going to show you.

12:25:32  4       Let's go back to the timeline here because you can

5  see from March of '03 to December of '03, there are no

12:25:41  6  recordings.   The evidence is going to show you there was plenty

7  of contact, plenty of them.   Why were there no recordings?

12:25:58  8  Well, we believe it's because of what -- it's because of the

9  evidence that you just saw.   Because what Griffin was trying to

10  do with El-Hindi at that time was not working, period.

12:26:16  11       The next recording is December 19 of 2003.   And

12:26:23  12  Mr. Griffin goes to the Mosque and he starts talking to various

13  people about his security business and he's not talking to the

14  people in the Mosque about training for terrorism.   He's

15  talking to the people in the Mosque about training to work for

16  him in his security business which he will represent on these

17  tapes as a perfectly legitimate business that has contracts,

18  that has a license; it has insurance, and he tells these people:

19  It's perfectly legitimate; you should let me train you.

12:27:09  20       January 28, 2004.   El-Hindi and Griffin are

12:27:14  21  filling out paperwork for a business.   They start talking about

22  recruiting.   It has nothing whatsoever to do with terrorism,

23  and you'll hear it on the tape.   The recruiting is part of the

12:27:27  24  business.   In fact, there is the beginning of the conversations

25  about Griffin being involved with the medical student recruiting

1 business.   What that business is, the evidence will show you,

2 is they recruit high school students from here to go over to

3 eastern Europe and go to medical school, EMSS.  You'll hear

12:27:49 4 testimony from witnesses to say that this is actually becoming a

5 very popular thing to do, and it's a lucrative business to be in

6 to help the kids get from here and go there and go to school.

7 The reason it's important here is because they talk

8 about recruiting.   And recruiting is one of those buzz words

9 that Mr. Griffin will pick up later.   And it's one of those

12:28:15 10 words that he'll use on the tapes that you're going to hear.

12:28:19 11 And you hear the way he uses it to make it sound sinister, even

12:28:23 12 when it's not.

12:28:29 13 February 3, 2004.   Still talking about business

12:28:34 14 ideas, which you'll hear, by the way, Marwan does a lot of.

12:28:40 15 Mr. Griffin says, switch gears for a second.   Directly says

12:28:44 16 that.   Switch gears for a second.   He goes fishing and he

17 starts talking about Osama Bin Laden, about transferring money

12:28:52 18 overseas, and about recruiting.   You will hear on the tape it

19 is very clear his motive is sinister.   He's not talking about

20 legal recruiting.   And Marwan doesn't respond to him.   He

12:29:03 21 doesn't bite.   He doesn't take the bait.

12:29:06 22 Later in that conversation, Marwan suggests that

23 Mr. Griffin should be the contact person for EMSS; it stands for

12:29:17 24 European Medical Studies and Services.   You'll hear evidence

25 Marwan wanted Mr. Griffin to be the contact person for that

12:29:26 **1** because he figured it was better to have an American face on the

**2** business than his own.   You'll hear evidence at one point he

**3** asks Darren Griffin to record a voicemail because of his accent.

**4** Marwan speaks English, but he's got an accent.

12:29:46 **5**         February 11, 2004, Griffin continues to push the

12:29:52 **6** security business.   He says he may go through the police

**7** academy so he can teach CCW classes, that's carrying concealed

**8** weapon classes.   And El-Hindi's response is, uh-huh.   You hear

**9** it on the tape.   He's not interested.   Griffin's talking about

12:30:12 **10** being able to teach people to carry a concealed weapon and

**11** El-Hindi's response is uh-huh.

12:30:21 **12**         The two discuss business proposals some more.   And

12:30:24 **13** Griffin suggests getting laptops to sell overseas.   This is

**14** February of 2004.   How long is it before he got Mr. Amawi to

12:30:38 **15** take laptops overseas?   It's a long time.   He tried this for a

**16** long time.   He never got Mr. El-Hindi to do anything about it,

**17** but he worked on it.

12:30:53 **18**         Next, please.

12:30:55 **19**         March 22, 2004, he again calls himself

12:31:01 **20** supernatural.   And you'll hear in the tone what that means to

**21** him.

12:31:07 **22**         Next.

12:31:08 **23**         March 23.   He starts getting more aggressive.   He

12:31:14 **24** says he wants to shoot this summer, so we need to find some

12:31:17 **25** brothers with some land.   It's already too crowded at Cleland's

12:31:22 **1** because of people taking the CCW class.   This is an important

12:31:26 **2** recording because this shows the evidence coming together about

**3** all these different things that he's already talked about.

12:31:33 **4** He's talking about shooting, he's talking about brothers, he's

**5** talking about land, he's talking about CCW, and he's talking

**6** about Cleland's.   He is working hard to get something going.

**7** He is still, still not getting any response from Marwan.   But

**8** he's still trying.   Marwan never says he wants to go shooting,

**9** he does however say to Griffin, well, why don't you teach

12:32:01 **10** classes so you can make some money off of it?   Because this is

12:32:05 **11** another characteristic that you will hear about Marwan El-Hindi:

12:32:08 **12** He comes in with a lot of ideas on how to make money.   An so

**13** when he mentions things like that, it fits in.   But he never

12:32:19 **14** says he wants to go shooting.   Never does go shooting.

12:32:24 **15** Despite the times that Griffin tried to get him to go.

12:32:28 **16** Now, we go back to the recorded contacts because

**17** you can see some more holes in here.   And then you see when

12:32:36 **18** things pick up.   In the summer of 2004.

12:32:48 **19** May 21, 2004, the government already talked about

12:32:52 **20** this.   Zubair and Khaleel Ahmed from Chicago travel to Cairo,

12:32:57 **21** Egypt.   Zubair's parents tell the FBI and Chicago police

**22** department that they're concerned that the boys want to get

**23** involved in the war in some fashion.   That's what their parents

**24** tell the FBI and the Chicago police department.

12:33:12 **25** Next.

1        May 25, Marwan goes with Zubair's father to Cairo

2  to get Zubair and Khaleel and bring them back to the States.

12:33:22  3  Along with Marwan's brother Yousef.   This is what the

4  government told you about, too.

12:33:29  5        June 2, 2004, Zubair, Khaleel, and Zubair's father

12:33:37  6  Mohammad, they come back from Cairo.

12:33:42  7        Marwan returns two weeks later on June 15 of 2004.

12:33:50  8  He returns from Cairo, gets back into Chicago and he stays one

9  night in Chicago.

10        The next day Zubair and Khaleel drive Marwan from

12:34:00  11  Chicago to Toledo, they stay the two nights at Mr. El-Hindi's

12  house, but Marwan does not introduce them to Darren Griffin.

13  These are the boys he's supposedly recruiting.

12:34:16  14        Next.

12:34:17  15        June 23.   This is where Marwan does tell Griffin

12:34:23  16  about Zubair and Khaleel.   He tells him about two brothers, and

17  he says they want training, but then he laughs.   You'll hear

18  him laugh when he says they want to train.   You'll hear that on

12:34:36  19  the tape.

12:34:38  20        He then tells Griffin, they may get together the

21  next day, but there's no evidence that they did actually try to

22  get together.

12:34:49  23        Later that day, Marwan tells Griffin he is waiting

24  for his brother, Yousef, to come in this afternoon.   Griffin

12:35:00  25  asks:  Are they driving or flying?  Marwan says:  No, he's

1   driving.    The reason this is important, they are the brothers.

2   You'll hear it over and over again.    Marwan's just talking

3   about his brother, his biological brother.    But the evidence

12:35:25  4   will show you that that's not the way Mr. Griffin takes it.

12:35:28  5             June 24, 2004.    Zubair and Khaleel drive Marwan's

6   brother, Yousef, from Chicago to Toledo.    Again they stay here

7   two or three days.    And again Marwan does not get Zubair and

12:35:46  8   Khaleel together with Mr. Griffin.    Now, this is the second

9   time they've been in Toledo.

12:35:54  10             June 25, 2004.    The first recorded contact we have

11   between Mr. Griffin and Mr. Amawi.

12:36:10  12             June 28.    You'll hear a recording where Griffin

13   tells Marwan El-Hindi that he's going to an Islamic conference

12:36:18  14   in Cleveland.    You will hear Mr. El-Hindi sound surprised about

12:36:22  15   that, and he says he's going to be there as well to promote

12:36:30  16   EMSS.    Marwan says during that same conversation he wants to

17   get Mr. Griffin involved in EMSS.

12:36:43  18             Next.

19             Marwan, Griffin and Marwan's brother discuss

12:36:48  20   business proposals.    Marwan tells Griffin that he has two

12:36:52  21   brothers who will come to the table and help pass out brochures

22   at the conference.    The government told you the evidence is

12:36:59  23   going to show that Marwan took those boys to that conference in

24   order to introduce them to Mr. Griffin.    That's not what the

25   evidence is going to show.    The evidence is going to show you

1 that Marwan didn't even know Griffin was going to the conference

12:37:17 2 until the 28th of June, and on the 29th he says, yeah, there are

3 these two boys coming who are going to help pass out brochures.

4     Now conference, July 3 and 4, 2004. Zubair and

5 Khaleel discuss weapons and physical training with Mr. Griffin.

12:37:37 6 This is a conversation that is disturbing. We are not going to

7 tell you it's not. They talk about how to use weapons, how to

8 train to use weapons, how to run with a 50 caliber machine gun,

9 those kind of things. And you'll hear it. And that

10 conversation is between Zubair and Khaleel and Mr. Griffin.

12:38:05 11 Marwan is there for part of it, but he's not an active

12 participant in that conversation. More importantly, the

13 evidence is going to show you he didn't do anything after that

12:38:16 14 conversation to facilitate Mr. Griffin getting together with

15 Zubair and Khaleel, nothing.

12:38:25 16     Next, please.

12:38:27 17     July 14, Griffin keeps pushing. He calls Marwan

18 four times in a day without ever getting a return phone call.

19 This is after the evidence will show you that he's taken an

12:38:44 20 interest in Zubair and Khaleel.

12:38:46 21     Next, the 15th, El-Hindi discusses Zubair and

22 Khaleel with Griffin. And he tells Griffin that they tried to

12:38:56 23 travel to Afganistan or Iraq. It's on the tape. You're going

12:39:00 24 to hear it. El-Hindi explained to Griffin that he stopped them

12:39:03 25 and he doesn't want them to do something stupid. Ladies and

1  gentlemen, that is what you're going to hear on the tape.   And

2  these are the kids that Marwan El-Hindi is supposed to be

12:39:12  3  recruiting?

12:39:15  4          Next.

12:39:17  5          El-Hindi then explains to Griffin about Jihad.   He

12:39:22  6  says:  Jihad does not mean taking the sword to fight.   It means

12:39:29  7  converting someone to Islam is better than going to kill

12:39:32  8  yourself.

12:39:33  9          Now, Mr. Ivey touched on the fact this case is in

10  part about Islam.   The evidence will show you that is correct.

11  It is about an understanding or misunderstanding of Islam.

12:39:45  12  It's about what it means to different people.   And you'll hear

13  evidence all about that.

12:39:55  14          Next, July 15, this is where Griffin asks directly,

15  he asks El-Hindi:  Are you recruiting for Jihad?  He says:  No,

16  no, no; I just want to take care of these two boys.   Griffin

17  says:  For their families?  And Marwan responds:  Yes.   But

12:40:15  18  this is the conspiracy that the government wants you to find.

12:40:21  19          Next, please.

12:40:28  20          July 22, 2004.   Griffin leaves a message about

21  Zubair and Khaleel and that project.   Again, you will hear how

22  these words are made to sound a certain way to create the

23  illusion of a crime.  You will then hear El-Hindi return the

24  call and leave a message in return about buying gas stations and

12:40:52  25  starting a business.   When they do talk later, Griffin tries to

1 get El-Hindi to bring Zubair and Khaleel to Toledo. And Marwan

2 says: We'll see. He says: We'll see. But never does bring

12:41:06 3 them.

4 Next, please.

12:41:09 5 July 27. Again, Griffin asks how are Zubair and

12:41:14 6 Khaleel doing. This is all on the tapes you're going to hear.

7 El-Hindi responds they are calming down, they are back in

8 school.

12:41:23 9 Then Griffin again asks him to bring them to

10 Toledo. El-Hindi says again, yeah, I'll try. But he never

11 does.

12 Next.

12:41:39 13 Griffin calls El-Hindi September 11, 2004.

14 Griffin calls El-Hindi eight different times. He finally gets

12:41:49 15 him and he talks about training, saying it's for his security

16 service. So it is legal. And again, this is where Marwan

12:41:58 17 says, well, I want to get involved then. But he never does.

12:42:02 18 But the point is it's after Mr. Griffin says that it's legal.

19 That's what the evidence is like. Throughout.

20 Next, please.

21 September 21, 2004. Two and a half months after

22 the conference, the evidence will show you that Griffin tried to

12:42:26 23 get El-Hindi to hook him up with Zubair and Khaleel multiple

24 occasions and it never happened. So Griffin calls directly.

25 He calls Zubair directly. The evidence will show you that he

2143

12:42:40 **1** realized it wasn't going to happen with Marwan. So he called

**2** direct.

12:42:50 **3**         October 2, there will be a tape that says Zubair

**4** told Griffin that he had prepared a list of written questions

12:42:59 **5** and provided them to El-Hindi to be forwarded to Griffin.

12:43:04 **6** There is no evidence that that ever happened. There is no

12:43:08 **7** evidence that those questions ever existed.

12:43:17 **8**         On the 5th Griffin asks Marwan for the questions

12:43:20 **9** from Zubair. Marwan doesn't know what he's talking about.

12:43:24 **10** It's interesting, you'll hear this tape. You will hear Marwan

12:43:30 **11** very tired on this tape, and you will hear him respond to

12:43:34 **12** Griffin's question as though he understands what he was talking

**13** about. They are so far apart from each other. And it's a

**14** short recording, but it's very, very easy to understand. And

**15** that's October 5, 2004.

12:43:52 **16**         Next.

**17**         October 8. El-Hindi and Griffin talk about Zubair

**18** and Khaleel. Griffin emphasizes the need for the boys to

**19** acquire discipline and training. Griffin emphasizes this.

12:44:08 **20**         Next.

12:44:10 **21**         El-Hindi says, this is what I touched on earlier,

12:44:14 **22** tell them I'm going to train you, but not for Jihad. The boys

12:44:21 **23** he's supposed to be recruiting. Tell them I'm going to train

**24** you, but not for Jihad.

12:44:27 **25**         What follows is just in case someone breaks into

1  your house or something to that effect.

2        Next.

3        Griffin's response, I'll train them for whatever

4  they decide to do.

12:44:44  5        Next.

12:44:46  6        Griffin starts talking about a training program and

7  the need to stay in communication.  This becomes a recurring

8  theme in the tapes as well.  The need to stay in communication.

9  And it's followed shortly thereafter by the need to get moving,

10  we need to move.  We need to get going.  Marwan responds

11  talking about a charity that he's interested in.

12        Next, please.

13        Griffin says we need to get everybody reeled in.

12:45:17  14  And Marwan's response is we're not doing anything illegal, it's

15  just training.  We need to get everybody reeled in.  That's the

16  evidence.

12:45:32  17        Next.

12:45:36  18        November 23, 2004.  El-Hindi and Griffin talk

19  about a camp in Egypt.  And Marwan says the people that he is

20  trying to help out are big shots with the Egyptian police.

12:45:51  21        Next.

12:45:54  22        The talk turns to Zubair and Khaleel.  Griffin

12:45:58  23  says if they want to go and perform Jihad, that is between them

12:46:05  24  and Allah.  Now you remember the last conversation, the last

12:46:08  25  conversation Marwan says tell them you're going to train them,

1    not for Jihad.    Griffin says I'll train them for whatever.

2    Then he says if they want to go perform Jihad, that's between

3    them and Allah.    The evidence does not show Marwan recruiting

4    these boys.    He responds in fact he doesn't see anywhere to

5    fight.

12:46:38   6        Next.

7         Marwan says it is not the time for fighting.

8    Don't go over there and kill yourself for nothing.    For me,

9    there are priorities, and my family comes first.   Ladies and

12:46:50   10   gentlemen, the tapes you're going to hear out of his own mouth

11    he tells you what he does and doesn't believe in.    And that's

12    what it is.

12:46:58   13        Next.

14        December 16, 2004.    Griffin is repeatedly pushing

15    El-Hindi to get going throughout the conversation.    They talk

12:47:14   16   about all sorts of things, they talk about Egypt, the medical

12:47:19   17   recruiting, the brothers, they talk about Zubair and Khaleel and

18    non-profit ventures.    And Griffin says, what we have to do is

19    just we have to get prepared.    Going back to the grants and

20    everything, yeah, we just got to get all that stuff together,

12:47:35   21   like I said, we got to get stuff going here, stuff going there,

22    or we got stuff going here, stuff going there.

12:47:43   23       You're going to see examples throughout these tapes

24    of this kind of pushing.    It doesn't come from Marwan El-Hindi.

25    It doesn't come from Mr. Amawi and it doesn't come from Mr.

1    Mazloum.    It comes from one place, and that is Darren Griffin.

2    Next.

3    December 29, 2004, Griffin talks about training,

4    and Marwan agrees, but -- and this is where Islam can come into

5    it --  Marwan says it because Muslims would not know how to

6    protect themselves and their families.   Griffin pushes the

7    training, and Marwan responds about teaching Muslims.

8    Next.

9    Same conversation.   Griffin talks about teaching

10   others to shoot.   El-Hindi asks if it is illegal, Griffin says

11   it is not illegal, but they are bearded guys so people will be

12   suspicious.   It's not illegal but they're bearded guys so

13   people will be suspicious, and he takes them to Cleland's.

14   Next.

15   Same conversation.  Griffin mentions Zubair and

16   Khaleel again and he says, we have to reel those guys in and see

17   what they are up to.   This is the second time Mr. Griffin has

18   used this phrase, reel those guys in.   This is the manipulation

19   the evidence is going to show you, and this is what we've been

20   talking about.

21   Next.

22   Mr. Amawi asks Griffin about Marwan, if he is a

23   good brother.   Griffin responds, some business dealings he, you

24   know, kind of shady, but…   And that's about all he says about

25   him.   Doesn't say he wants to be a terrorist, doesn't say he

1  wants to get involved in Jihad.   He doesn't say anything like

2  that.

12:49:49  3       Next.

12:49:52  4       February 2, 2005.   Griffin takes Marwan to Amawi's

5  house, and Griffin asks Amawi to show Marwan some videos.   They

6  get on the web and they look at them and they talk about videos.

12:50:07  7  And you're going to see some of those videos, and some of them

12:50:11  8  are disturbing, just like Mr. Ivey told you.   And they're all

12:50:17  9  sitting there watching them.   But Griffin asks Mohammad to show

10  them to Marwan.

12:50:22  11       Next.

12:50:24  12       February 8, El-Hindi and Griffin get on the

13  computer.   They start having a conversation about the

12:50:36  14  insurgency in Iraq.   He said they're taking applications for

15  people who want to spread the news and educate people.   Griffin

16  asks if they are taking applications for actual fighters.

17  El-Hindi says, no, they don't need fighters.   All they need is

18  support from the outside to educate people.

12:50:58  19       Now, the government is going to claim -- the

20  government is going to say the evidence shows that El-Hindi

12:51:05  21  helped Mr. Griffin sign up for a training program.   However,

22  it's Griffin that's pushing and is pushing.   He eventually gets

23  El-Hindi to download something about an IED.   This is what the

12:51:21  24  government mentioned in its opening statement.   El-Hindi does

25  so, and Griffin instructs him, Griffin tells him to e-mail it to

2148

12:51:29 **1** him.  What you see, what the evidence will show you is that at

12:51:38 **2** the time this happens, Mr. Griffin is standing right behind

**3** Mr. El-Hindi, he's telling him -- literally telling him which

12:51:48 **4** buttons to push, how to get it and how to e-mail.

**5** Next, please.

**6** February 16, 2005.  This is the dinner.  If it

**7** wasn't for Darren Griffin this never would have happened.  You

12:52:15 **8** heard Mr. Ivey talk about this.  Marwan thought Mr. Amawi and

12:52:19 **9** Griffin were coming over to install an Arabic Windows in his

**10** computer.  This is the first time El-Hindi ever met Wassim

12:52:29 **11** Mazloum ever.  Mazloum didn't know he was going to

**12** Mr. El-Hindi's for dinner.  You'll hear that.  Griffin

12:52:41 **13** orchestrated this.  El-Hindi never agrees to anything.  He's

**14** not in the room when significant portions of the conversation

**15** take place.  And parts of the conversation sound bad.  They

12:52:53 **16** do.  You'll hear its on the tape.  And the reason is that's

**17** what Darren Griffin decides to talk about.  And you'll hear and

**18** see what the others are doing at the time, and what Mr. Ivey

**19** told you was correct.

12:53:11 **20** Next, please.

**21** February 18, 2005.  Again, Griffin and El-Hindi

12:53:17 **22** surfing the internet together.  Griffin is driving the

**23** conversation and initiating the action on the computer.  He

12:53:25 **24** asks Marwan to send him two e-mails they looked at before.  He

**25** asks him.  He says:  Send me those two things we looked at.

1 And then he asks him to help him sign up for a training program.

2 And although they talk about it, Marwan doesn't do it.

3 Next, please.

12:53:45 4 February 25, 2005, Griffin and El-Hindi look at an

12:53:52 5 e-mail that appears to be a coalition-made instructional tool

6 about avoiding an IED attack. That's what the evidence of that

12:54:02 7 will show you. And Griffin instructs El-Hindi again, key

8 stroke by key stroke, how to send it to him, and asks him to do

9 it.

12:54:14 10 Next, please. March 9, 2005. Griffin calls the

12:54:21 11 boss. The "boss" is his name for his FBI handler. You'll

12 hear him call boss several times during the conversations while

13 his recording device is still on. He tells him, among other

14 things, that Amawi was upset with Marwan because you'll hear

15 evidence that Mohammad wanted Marwan to stay together with his

16 wife or get back together with his wife and Marwan didn't do it.

17 And as Griffin says, he'll smooth all that over and we'll get

18 them together to train. This is the evidence of the

12:54:59 19 conspiracy. We'll get them together to train. This is what

20 Mr. Griffin does. This is not playing by the rules.

12:55:09 21 Next, please.

12:55:13 22 This is when I mentioned that Marwan asks Mr.

23 Griffin to record a voicemail for the business because he feels

12:55:21 24 his accent wouldn't serve him well.

12:55:24 25 Next.

12:55:28    **1**    March 31.   You'll hear Griffin pushing the

12:55:33    **2**    training, brothers, Iraq, et cetera, et cetera, et cetera, and

**3**    Marwan keeps coming back to the ideas that he has about making

**4**    money and being in business.

12:55:46    **5**    Can we skip forward to 131.

12:55:57    **6**    Actually, go back to 4/4.   Give me one second

**7**    please.  4/20, sorry.

**8**    Marwan calls Mr. Griffin, says what's going on.

**9**    Griffin says it's training day.   Marwan responds about having

12:56:31    **10**    some hygiene products that he is importing that are caught in

12:56:37    **11**    Customs, and he doesn't know how to get them through the Customs

**12**    process, and he doesn't know where to go.   You'll hear this on

**13**    the tape.   Then he says to Mr. Griffin, what time is your

**14**    training?   Not our training, what time is your training.

**15**    Next, please.

**16**    Same day.   After Griffin takes some people to

12:57:02    **17**    Cleland's to do some shooting, he calls the boss to report in.

**18**    You will hear the agent on the phone ask about El-Hindi and

**19**    Griffin says, no, never called, he never showed.   Ladies and

12:57:17    **20**    gentlemen, it is a flat out lie.   Griffin talked to El-Hindi

12:57:23    **21**    earlier in that day, he never had any planning to shooting with

**22**    him or to call him back about going shooting, but Mr. Griffin

12:57:35    **23**    lies to the FBI again about how Marwan is involved.

12:57:48    **24**    Next, please.

**25**    August 7, 2005, Marwan is showing Griffin his new

12:57:55　**1**　property on Suder Avenue in Point Place in north Toledo.   The

12:58:00　**2**　conversation starts with:  Long time no see.   Now, I've

12:58:05　**3**　included this to show after the government claims that the

**4**　agreement is made, what is happening here, what the evidence

**5**　will show you is happening is nothing.   Nothing was happening.

12:58:18　**6**　There is nothing to show that an agreement was made and anyone

**7**　was moving forward on that.

12:58:24　**8**　　　　Next.

12:58:29　**9**　　　　El-Hindi and Griffin talk for the first time in

**10**　months.   Griffin says to him, you've lost weight.   It's

12:58:36　**11**　obvious they haven't seen each other in a long time.   Griffin

12:58:39　**12**　even asks if Marwan remembers Wassim, the man he's supposed to

12:58:48　**13**　be conspiring with.   Then he talks about the FBI again.

12:58:53　**14**　Marwan says I don't care, let them come and search the place and

**15**　do whatever they want.   My computers, yes, I go on the internet

12:59:01　**16**　and I download a lot of things; so what?   Is it prohibited to

**17**　go on the net and get the information?   He says the last time

**18**　the FBI came to see him, they asked if they could take some

12:59:15　**19**　letters, and he said okay, and gave him a receipt.   There's no

**20**　talk of any plan, no talk of any agreement, and no progress on

**21**　anything.  And this is Marwan El-Hindi's mindset.

12:59:27　**22**　　　　Next.

12:59:32　**23**　　　　Just a little less than three weeks later is the

**24**　indictment.   And that was the last contact I believe between

**25**　Marwan and Mr. Griffin before the indictment.   What the

1  evidence shows, there was no conspiracy.   The evidence shows

12:59:52  2  even if there was a conspiracy, Marwan El-Hindi never agreed to

3  do anything.   Throughout the case, you will hear evidence about

13:00:04  4  Mr. Griffin trying to set up meetings and get people together 50

13:00:10  5  times, and how many times does he get these three gentlemen

6  together?   Once.   One time.   How many times does he get more

7  than one of them together?   About five.   But he keeps trying

8  and trying and trying.

13:00:32  9              I need to tell you a little bit about Marwan.

13:00:36  10  Obviously Marwan is a Muslim.   He wears a beard.   He's a

11  little different than you and I.   Prays five times a day.   He

13:00:46  12  has an accent.   Speaks English, but it's not great.   Not bad,

13  but it's not great.   He was born in Jordan.   You saw on the

13:01:01  14  Google map demonstration where Jordan is.   I actually brought a

13:01:07  15  little roll-up map to show you but it's too embarrassing after

16  that high-tech map, so I'm not going to show you.

17              He came here in 1984 to go to school.   He left

18  school after a while and took a couple different jobs.   He

19  became a citizen in 1990.   You'll hear evidence, as corny as it

20  sounds, that he's looking for the American dream.   That's what

21  he was doing.   Now, it may not be what you and I think of as

22  the American dream because you're going to hear on these tapes

23  Marwan had some pretty unorthodox and pretty out-there ideas

24  about how to make a living, and how to make some money.   But

25  that's Marwan.   He's a dreamer.   You'll hear evidence of that.

1  He's a bit of a hustler.   You'll hear evidence that he loves

2  this country, that he hates George Bush, and that he's

13:02:13  3  vehemently opposed to what's going on in Iraq.   That doesn't

4  make him a terrorist.

13:02:24  5          He married his wife Nadia in 1992 and had six

6  children.   They were between the ages of 12 and 3 when he got

13:02:33  7  arrested.   He has since been remarried to Marwa and they had a

8  daughter Maria who was about six months old when he was

9  arrested.   So he has 7 children.

13:03:19  10          I tried to show you what the evidence is really

13:03:22  11  going to be rather than tell you what we think the evidence is

12  going to be.   Part of the evidence, as Mr. Ivey told you, will

13  be about fear, will be about Islam, and will be about the War on

13:03:46  14  Terror.  We can't avoid it.   But most of the evidence that

13:03:53  15  you're going to hear about Marwan is what he didn't do.   Now,

16  the Judge will tell you you have to consider the defendants

13:04:02  17  separately.   When you consider Marwan, he'll also tell you what

18  you have to find in order to make a decision on the charges.

19  And as to the first two charges, you'll have to find that he

13:04:17  20  agreed.

13:04:25  21          And as to the charges about disseminating explosive

13:04:29  22  devices, you'll have to find that he intended or he did that

23  with an intent that that be used to commit a federal crime of

13:04:37  24  violence.   Ladies and gentlemen, agreement and intent, the

25  evidence will not show that.   The evidence will not show either

2154

1   one of those.  We intend to show you the big picture so you can

13:04:58   2   understand that.   When you have heard all of the evidence, we

3   will ask you to return what we believe is the only verdict the

4   evidence calls for as to Marwan El-Hindi, and it's a verdict of

5   not guilty on all counts.

6            I thank you very much for your time.

13:05:19   7            THE COURT:  Ladies and gentlemen, we will now

13:05:21   8   adjourn for the day.   I expect that there may well be some

13:05:28   9   media reports about what you've heard this morning, and please

13:05:34   10  simply don't watch television, don't listen to the radio and

13:05:41   11  don't read the newspaper.   And in any event, if any of that

12  sort of stuff comes to your attention, it's not evidence of

13:05:50   13  anything.  I'll tell you tomorrow in a bit more detail, and as

14  I've already told you during voir dire, you can only decide the

13:06:00   15  case on the basis of the evidence.   And the only thing that is

16  considered evidence is what you hear from the witnesses from the

17  stand and what you see in the exhibits that are shown to you

13:06:12   18  during the course of the trial or other materials that go back

13:06:16   19  with you into the jury room.   That can be the only basis for

20  your decision.   Please refrain from any exposure to any media

13:06:25   21  accounts about the case.

22            Keep an open mind.  You've heard no evidence yet.

13:06:31   23  We'll start tomorrow and it will last for several weeks, and

24  don't talk about the case, either amongst yourselves or with

25  anybody else.  We'd like to start at about 8:30 tomorrow.

1          MR. SOFER:    Before you excuse the jury, may we

13:06:49  2  approach for one moment?

3          THE COURT:  Sure.

13:07:44  4  (Discussion had off the record.)

13:07:48  5          THE COURT:  Ladies and gentlemen, you may be

6  excused.

13:18:58  7          (Jury excused.)

13:18:58  8          (Portion of the record sealed by order of the

13:18:58  9  Court.)

13:18:58  10         (Recess taken.)

13:19:33  11         THE COURT:  What I would propose is addressing

13:20:01  12  whatever it is you folks had in mind.   Then perhaps breaking

13  for a bit, if this is agreeable, then talking about the jury

13:20:09  14  instructions for tomorrow.   And then I will try to prepare the

15  final version of those and have them ready for you.   Okay.

13:20:18  16         The other thing we have to do is with the I.T.

17  people check out this problem, or apparent problem, with the

18  sensitivity of the equipment.   See if there's some way that we

19  can't make sure counsel can converse among themselves or the

20  case agent or whatever without risk of that coming to the

21  attention of anybody that's listening to the headphones.   I am

22  told by the I.T. people -- and you should check this -- if you

23  really whisper, it's not a problem.   But we'll find out.

13:21:00  24         MR. SOFER:   A number of housekeeping items, Your

25  Honor, then some more substantive issues with respect to the

1  conversation we just had in the back.  I would just ask that

13:21:13  2  with respect to that conversation and with respect to the

13:21:17  3  replacement of a juror last -- late last week that all counsel

4  and defendant put on the record that they have no objection to

5  us, first with respect to the substitution, second with respect

6  to what happened on the record in the back room.

13:21:32  7          THE COURT:  I hear no objection.

8          MR. BRYAN:  No objection.

9          MR. DOUGHTEN:  No objection, Your Honor.

13:21:43  10          MR. BRYAN:  No objection.

13:21:44  11          MR. SOFER:    In terms of substance, Your Honor, we

12  anticipated this would happen.  On the basis of some of our

13  previous arguments, I'd like the Court to seriously reconsider a

14  number of the rulings that you've heard in light of Defense

15  Counsels' openings, and also sooner rather than later we would

13:22:04  16  like some guidance from the Court about what the government

17  believes is appropriate evidence that can be placed before this

18  jury in light of the fact that I think both Counsel for Amawi

13:22:19  19  and Counsel for El-Hindi have essentially opened to this jury on

20  a number of issues which I think affect the presentation of

21  evidence in this case.

13:22:33  22          First of all, clearly both counsel have made an

13:22:37  23  entrapment argument.    As Your Honor is well aware, by saying

24  that the government's cooperating witness induced this

25  conspiracy, that it would not have happened but for Mr. Griffin,

13:22:56 **1** they may not have used the word entrapment, but that clearly is

13:23:00 **2** an entrapment defense. Again, Your Honor is well aware the

**3** defense is entitled in just its questioning of out witnesses and

**4** in its arguments to put forth an entrapment defense not like

**5** other affirmative defenses, and in response the government I

**6** believe is permitted to put in evidence of predisposition.

13:23:21 **7** I have a list of about 20 things that counsel said

**8** during their opening statements which essentially make the

13:23:28 **9** argument that the government's witness entrapped with an -- that

13:23:35 **10** entrapment would be a defense in this case. It seems to me,

13:23:38 **11** Your Honor, it is only fair to allow the government, since again

**12** they don't have to call witnesses to do this at all, to put in

**13** evidence of predisposition in its direct case.

13:23:48 **14** This leads me -- where I'm going with this, Your

**15** Honor, is back to, among other things, the threats of the

13:23:56 **16** President, which have been severed from the case. I think it's

13:24:00 **17** patently unfair that both sets of lawyers can get up here and

**18** say the defendants hate George Bush, hate the Bush

13:24:06 **19** Administration and also argue entrapment and that the government

**20** is not permitted to introduce the evidence of threats to the

13:24:13 **21** life of the President of the United States. We can brief this

**22** if you want, but I think it's an important concept and only fair

13:24:19 **23** to the government to allow us to present that evidence.

13:24:27 **24** THE COURT: I know I severed the counts, I just

13:24:30 **25** can't recall, but I also made an anticipatory ruling.

1        MR. SOFER:   You severed the counts.   I don't

2   think you said we couldn't introduce the evidence of all of

3   this.   Frankly, we have redacted some of the tapes in order to

4   remove some of that evidence that defense opened in a different

5   way, I think it would have been perhaps fair to do that.   What

6   we're going to end up doing is essentially trying that case

7   anyway before this jury, and we're going to end up having to

8   have another trial later on with the same exact -- some of the

13:25:06   9   same exact evidence.   Again, it's not going to take -- it takes

10   a very short amount of time.   We're talking about minutes of

13:25:13   11   extra evidence, and it's evidence I believe the government is

12   entitled to put in at this juncture, especially given the

13:25:20   13   arguments -- and there were arguments made to the jury

13:25:23   14   already -- of these statements.

13:25:25   15        MR. HARTMAN:   Judge, I would just respond that,

13:25:28   16   number one, my opening statement and I believe that of Mr.

17   Ivey's was specifically tailored based on the rulings that you

18   had previously made, and I think we would object to what is

13:25:45   19   essentially a motion.

13:25:47   20        THE COURT:   I'm not going to bring those counts

13:25:51   21   back into the case.   I will reserve ruling further argument and

13:25:56   22   discussion about admission of that testimony.   I don't think

23   that has to be decided today.

13:26:02   24        MR. SOFER:   You would have to decide it perhaps as

13:26:05   25   early as tomorrow.   Some of that evidence would come out

2159

1  tomorrow.   It's our intention to bring out some evidence of

2  threats to the President.   How close we get to what we would

3  have put in had those counts not been severed is something that

13:26:19  4  needs to be decided by the government.   Again, I don't think

5  there's any argument at this juncture that would fairly preclude

6  the government from putting that evidence in.

13:26:30  7            MR. HARTMAN:  As to El-Hindi, I disagree

8  completely, Judge.

9             THE COURT:  Let's move on down the road and I'll

10  think about it.   What are the dates of those two statements or

13:26:49  11  whatever?   Let me know, okay.  Not right now, but let's move on

13:26:56  12  down the road.

13:26:59  13            MR. SOFER:   We can easily give you the dates, Your

13:27:05  14  Honor.

15             The second piece of what we're asking Your Honor to

13:27:08  16  reconsider is your motion to exclude Evan Kohlmann, at least all

17  of his testimony.   Really, it's only one portion of Your

13:27:18  18  Honor's ruling.  I'd ask you to reconsider, especially in view

19  of the openings here.  We've said over and over again to Your

13:27:25  20  Honor that the case is infused with many, many terms that

13:27:29  21  require -- that are outside the understanding of a normal juror,

22  that are critical to the government's case, and in order for us

23  to try to explain what those terms mean, there needs to be

24  somebody to testify about it.

25            Now, the defense has just opened on essentially

1    saying the case is about Islam. They've mentioned Jihad

13:27:58   2    several times. But the whole case is infused with these

13:28:04   3    concepts. There was a map put up about places in the Middle

13:28:10   4    East and where things happened. And I would note Mr. Ivey, I

5    believe spoke, he implied, and I believe that they will continue

6    to imply, that some of those videos came from Aljazeera, that

7    you can go over to that part of the world and find these videos.

8        This is undercutting the government's ability to

9    prove the case, to some extent, and we're stuck in a position

13:28:33   10    without the ability to call Mr. Kohlmann. I'm not talking

13:28:36   11    about Mr. Kohlmann, the full breadth of his testimony, but our

13:28:40   12    FBI agents, the case agents in the case cannot -- they're not

13:28:45   13    qualified to fill these gaps. They don't have that basis of

13:28:49   14    knowledge. They're not experts. They can't do that. They

15    can fill some of the gaps but not others, but they're not

16    experts. It's sort of unfair to forward those witnesses as the

17    only people who can --

18        THE COURT: Let me say I tried to go off on a

19    slight tangent. I generally discourage counsel from referring

20    to any witness whom we loosely refer to as, quote, an expert.

13:29:16   21    I try to make clear this witness is qualified to give certain

13:29:20   22    opinions rather than the term, quote, expert. But that's just

23    my custom. And I'm probably unable to get counsel to keep that

24    in mind when they're talking. I don't make a big deal out of

25    it. Go ahead.

1    MR. SOFER:   The semantics of it really don't

2    matter to me.   It's just a question, Your Honor, who, if we've

13:29:48  3    lost our ability to fill these gaps in the case and we don't

4    have another person, our -- the only option left to us, and

13:29:57  5    we've done this now, is to propose stipulations to the

13:30:00  6    defendants.   If they are willing to stipulate to what these

13:30:04  7    terms mean, and to who these people are and what these places

8    are, then we can go via stipulation.   I think that would be one

9    way of rectifying what I think is a serious problem.

13:30:17  10    THE COURT:   I think I may have alluded to that.

13:30:19  11    MR. SOFER:   I think you did.   I think that's one

12    of the reasons -- we didn't think of it, but we certainly

13    executed what Your Honor said.   Your Honor also said in your

14    ruling that some of the FIB agents might be able to fill these

15    gaps in a more specific way.   But again, I just don't think

16    that's a viable alternative for the government given what the

17    FBI agents in this case --

18    THE COURT:   Let me ask you this:  Have you -- is

19    this principally or exclusively the meanings of terms and the

13:30:53  20    identities of individuals and geographic information?

13:30:59  21    MR. SOFER:   It is geographic information, although

22    that's a tiny fraction.   A meaning of terms would be a

13:31:07  23    significant portion.   The identify of certain individuals and

24    where they fit in the movement of Jihad, and also the -- those

25    are the principal three, Your Honor.

13:31:21  **1**          THE COURT:  Where are you by way of a stipulation?

**2**          MR. HARTMAN:  We just got it last night.   I

**3** haven't looked at it yet, but I will.

**4**          THE COURT:  You've been busy.   Why don't you talk

**5** to each other about that.   What I need is the opinion, it seems

**6** to me, first of all, my instinctive response is that's a fair

13:31:49  **7** request.  In other words, just as we have translations for

13:31:53  **8** conversations occurring in a foreign language, when terms are

13:31:58  **9** used that may be unfamiliar, I would assume many of the jurors

13:32:05  **10** know the term, quote, Jihad, but there are others, I assume,

13:32:10  **11** perhaps not.   But in any event, even with a term such as that

**12** that may make sense to have -- if there can be a common

13:32:20  **13** understanding, or also to skip around a bit, it may be something

**14** that your translators can say, when you're dealing with terms of

13:32:34  **15** Arabic, so there may be subcategories.   There may be terms that

**16** have a religious or other kind of connotation, there may be

**17** terms that -- as to which you might disagree what a fair

13:32:53  **18** rendering is and there may be alternatives to having your

**19** different renderings presented to the jury.

13:33:01  **20**          One of the thoughts that was on my mind when I made

13:33:05  **21** that reference was to some extent this doesn't seem too

13:33:11  **22** different to me than having, in a drug case, an agent testify

**23** that in this particular case, according to his understanding,

13:33:24  **24** horses meant heroin or whatever.

13:33:32  **25**          Again, I think that this is a bridge that we can

1   wait a little bit to consider crossing.  I know it's important

2   for everybody to know what bridges are going to get crossed and

3   when.   So why don't you talk with each other about a

13:33:46  4   stipulation.  I'm looking at defense counsel.  Say look, I

5   think it's fair.   If there's some person named so-and-so who

13:33:59  6   is, let's say, a terrorist, whom, according to the government…

7   might be another way to phrase something like that:  So-and-so

8   is, according to the government's understanding, a terrorist who

9   is or was active in the vicinity of wherever that may have been

13:34:21  10  during the period whatever.   And I think that -- I don't have

13:34:26  11  any problem with what the government wants to accomplish.   I

12   think it's entirely fair.  Otherwise you've got all these loose

13   and random bits of plots floating out there.  Quite candidly,

14   from the defense standpoint, it seems it's useful for the

13:34:49  15  defendant not to have the jurors wondering what's all that kind

16   of stuff about.

17        MR. SOFER:  Which was our argument at the

18   beginning, Your Honor, as well.   I think, as Your Honor says,

19   we can wait a little bit.   In fact, it's in the government's

13:35:03  20  interest, I think, to let Your Honor see how this evidence is

21   going to unfold a little bit because I think there will be many

13:35:11  22  concrete examples of why it is that these gaps are sort of

13:35:15  23  unacceptable from everybody's standpoint.

24        THE COURT:  I'm not opposed to the idea of having

13:35:21  25  an explanation presented to the jury so the jury understands

13:35:25  **1**  what people, places, and terms with which the jurors either may

13:35:32  **2**  not be familiar or their understanding may be a misapprehension

**3**  or a misunderstanding or simply letting things float out there

13:35:44  **4**  might cause the jurors to be distracted by speculation that we

13:35:48  **5**  can easily avoid.   And I do think -- I mean, clearly my

13:35:52  **6**  preferred way of going about this is by some way of stipulation

**7**  or at least stipulation as to a clump or cluster of stuff.

13:36:01  **8**          Where we're talking about translations where each

**9**  party wants to proffer a different version.   It may be that we

**10**  don't have to fuss a whole lot about, quote, the qualifications

**11**  and just have a witness testify, yes, during the course of my

13:36:20  **12**  work and investigation as an agent I've encountered this term.

13:36:25  **13**  According to my understanding, when used, this term means this.

13:36:32  **14**  But let's see how close you can come to working that out.   And

**15**  if you can't, I will leave the door open.  Certainly if

**16**  necessary, if there really is no other alternative to Mr.

13:36:47  **17**  Kohlmann, I'll consider whether or not to let you put him on for

**18**  a brief period, and for a very limited purpose.

13:36:58  **19**          MR. WITMER-RICH:  If I might briefly respond.   I

**20**  don't anticipate a description of a geographical name, where

**21**  that happens to be.   I don't anticipate a problem with that.

**22**  Perhaps the brief identification of  particular names, who that

**23**  person is.  As long as it's fairly specific and brief, I don't

13:37:15  **24**  anticipate we'd have a problem with that.   The longer --

**25**  certain basic terms like Jihad, it may be possible to reach a

**1** very brief definition of what we have.   The longer that list

**2** gets of terms, Islamic terms, Middle East cultural issues and

13:37:33 **3** things like that, the more appropriate it seems; the less

13:37:36 **4** appropriate that is with a long list of stipulations.  And as to

**5** those issues, I would say Mr. Kohlmann is not an expert on those

13:37:48 **6** subject matters, Islam and the culture; particularly Islam.   So

**7** to the extent that expert testimony may be required to explain

13:37:56 **8** some of those, the defense is anticipating that we may provide

**9** some of those explanations via expert testimony, but the longer

**10** that list gets, the more providing expert opinion -- I think in

**11** a way that's not that helpful.

**12**         And then finally as to the suggestion that Mr. Ivey

**13** was tending to argue many of these videos are simply Aljazeera

13:38:22 **14** videos and didn't come from the website or something, it's not

13:38:25 **15** our intent to present that argument to the jury.

13:38:28 **16**         THE COURT:  I didn't get that impression anyway.

**17**         MR. WITMER-RICH:  Those particular issues we would

13:38:32 **18** object to stipulations of a certain video coming from a certain

**19** place.

13:38:36 **20**         THE COURT:  I think you may be hoping I might go

**21** back there, but I'm disinclined to do that.   The jury can

13:38:45 **22** understand when somebody says something what it means.

**23**         MR. WHITMER-RICH:  The proposed stipulations

13:38:50 **24** contain a number of descriptions of these videos, where they

**25** came from and so forth.   Those we would not be willing to

**1** stipulate to.   That's what I'm addressing.

**2**              THE COURT:   I'm disinclined myself.   You people

**3** talk to each other and see where you get and bring it back to

**4** me.

13:39:06 **5**              MR. SOFER:   It's dovetailed with the issue of

13:39:09 **6** predisposition.   Just as an example:  If one of the defendants

**7** were to view a video that comes from Al-Qaeda --

13:39:21 **8**              THE COURT:   Candidly, if I can interrupt, well,

**9** with regard to the evidence, two statement:  I'm not sort of

13:39:36 **10** unalterably opposed to those two statements coming in.   They

13:39:40 **11** say what they say.   I can clearly tell the jury that they are

13:39:44 **12** to be considered only as to one defendant and not to the others,

**13** move on down the road.   I would be reluctant to have them

13:39:53 **14** characterized as this, that, or the other thing because that

13:39:57 **15** really is -- you would be, the lawyer -- you or the other

**16** lawyers would be testifying as to what they meant.   In the

13:40:05 **17** context, they are what they are.   So I'm less concerned about

13:40:09 **18** that.

**19**              With regard to this, quote, source of particular

**20** videos, I would be very disinclined for anybody to attribute a

**21** particular source.   I think -- I think I wrote a pretty

**22** exhaustive opinion and that's one reason it took me so long to

**23** get it out and get it to you, because I wanted to make it as

13:40:29 **24** clear as I could, in terms of ultimately I think it's kind of --

**25** the original source is one thing, but the source of where it may

13:40:42  **1**  have been found, I'm not really sure -- we're not real sure, I

**2**  don't think we are anyway.  I think I recall pretty clearly that

13:40:53  **3**  that's the bottom line.   In any event, even at that, I'm not

**4**  sure because I think that this material will be seen and stand

**5**  on its own two feet for whatever probative value it has.   And

**6**  wherever it may have been located initially, I don't think that

13:41:09  **7**  matters a whole lot.

13:41:10  **8**           MR. SOFER:  I understand exactly what Your Honor is

**9**  saying.   All I'm saying with respect to this, you said the

**10**  original source may be of importance.

**11**           THE COURT:  No, I'm not so sure it is.   Go ahead.

**12**           MR. SOFER:    I guess my argument with reason to

13:41:24  **13**  that is if, for instance, a video -- the defense is going --

**14**  they've opened on entrapment.   The fact of the matter is the

**15**  government then gets to get into their predisposition to commit

**16**  the crime.   The crime, sheer terrorism crime.   The crime here

**17**  is to kill Americans overseas, among other thing, a conspiracy

**18**  that is to kill Americans overseas.   The source then of a video

13:41:53  **19**  could, not always but could, be evidence of predisposition.

13:41:58  **20**  For instance, there are instances in which even Defendant Amawi

**21**  will say I got this from an Al-Qaeda site.  Well, the fact he

**22**  got it from an Al-Qaeda site versus an Aljazeera or CNN site, it

13:42:14  **23**  does go to predisposition.

**24**           THE COURT:  Then you've got that testimony coming

**25**  in from him.   And you can argue from that:  He said he visited

13:42:22 **1** an Al-Qaeda site; ladies and gentlemen, what does that tell you

**2** about whatever.

13:42:25 **3**          MR. SOFER:   What happens, though, when he is

13:42:28 **4** downloading a video that did not come from an Al-Qaeda site but

**5** is created, distributed and tows the Al-Qaeda line versus a

**6** video that does not start that way, that does not come from an

13:42:44 **7** identifiable group?

**8**          THE COURT:  Again, I'm -- given the lack of -- what

**9** I believe to be a lack of a connection between any particular

13:42:55 **10** group and any of these defendants, I don't think the fact that a

**11** particular group may have ultimately committed the acts being

13:43:05 **12** depicted and then having caused that depiction to become

13:43:10 **13** publicly accessible has any relevance.   Certainly not where

13:43:17 **14** it's not shown that that particular video was obtained from that

**15** particular source.   It may have been obtained from the others

**16** that Mr. Kohlmann talked about, or from somewhere else.   And so

**17** I don't think it's relevant.   And whatever probative value

13:43:40 **18** there might be I think would be vastly outweighed by testimony

13:43:44 **19** about particular sources without that kind of nexus.

**20**          And I viewed everything that the government is

13:43:54 **21** going to be projecting to the jury, and it seems to me that it's

**22** Res Ipsa Loquitur.   It's there, it is what is it.   The likely

**23** impact, I think potentially, can at least be argued, ladies and

**24** gentlemen, look at this, look at the context, what was going on.

**25** And we believe that this is evidence of whatever.   And the

1  defense will argue contrary to that.  The jury is going to see

2  that several-hour presentation ultimately; it was four hours or

13:44:38  3  something, if memory serves.

13:44:40  4  MR. SOFER:  All I'd ask, I guess, is the Court

5  keep an open mind.

13:44:44  6  THE COURT:  I will.  And I will, as that comes in,

7  feel free to renew the request, now that they've seen it, now

8  that you have your assignment.  Now that it's actually been set

9  in the overall context of where we are and where we're headed,

10  this is why, Judge, we think you made a mistake in keeping his

11  testimony about this, that, or the other thing out.  And I

12  think that's a fair request.

13:45:11  13  MR. SOFER:  Thank you, Judge.

14  MR. BRYAN:  If I may, as to Mr. Ivey's -- that Mr.

15  Ivey opened the door to the entrapment defense.  I don't

13:45:28  16  believe anything that Mr. Ivey said is going to open the door to

17  entrapment in this case.  To suggest pointing out --

18  THE COURT:  That's not been my understanding of how

19  the defense is going about its business.

13:45:41  20  MR. BRYAN:  Simply pointing out Darren Griffin may

21  have used certain inducements and things of that nature is what

22  the evidence will be in this case.  To suggest we're point --

13:45:51  23  we're suggesting entrapment is misleading on Mr. Sofer's part.

24  As it relates to the defense in this case, we're not obligated

25  to share with the government what our defense is going to be but

13:46:04 **1** pointing out inducement, manipulation, giving money to and

**2** things of that nature may sound like entrapment and, quite

**3** frankly, I think what Mr. Griffin's efforts were were along the

**4** lines of entrapment, but entrapment encompasses an admission on

**5** the defendants' part that they did commit the crime but they

**6** were induced into doing so by government inducement.   Then the

**7** government's free to argue predisposition and things of that

13:46:30 **8** nature.

**9**         I've used entrapment as a defense in more than one

13:46:33 **10** trial and I get up in my opening statement and explain yeah, my

13:46:37 **11** client committed the crime but the rest of the story is why they

13:46:41 **12** committed the crime.  And I very clearly point out to them how

13:46:44 **13** we were not predisposed to do it but only after X, Y, and Z took

**14** place that he became willing to do it.   Someone who is not

**15** willing to commit the crime, he came to commit the crime.  We're

13:46:55 **16** not submitting our clients were not willing to commit the crime

**17** then committed the crime.  We're saying they didn't commit the

**18** crime at all.

13:47:04 **19**         THE COURT:  I recall that.   He overlooked that

**20** sort of predicate to offering an entrapment defense.

13:47:11 **21**         MR. BRYAN:  There's also a difference between

13:47:13 **22** suggesting, again, the tactics that the informant was using in

**23** this case means that we're going to argue entrapment as a

**24** defense, and the reason I say that is because we don't believe

13:47:27 **25** there was ever an admission in the evidence that the defendants

2171

1    ever agreed to commit the crimes that we believe that Mr. --

2              THE COURT:   There's certainly no acknowledgment of

3    that in the opening statements.

4              MR. SOFER:    All I'm saying is when you say that

13:47:44  5    the defendant was ensnared, or in the web, maybe it doesn't rise

6    to the level legally of an entrapment defense.   If Counsel is

7    saying that they're not going to ask for that instruction, then

13:47:57  8    I'll withdraw any of my applications to put in evidence of

13:48:01  9    predisposition.   But what I think would be unfair to the

13:48:04  10    government --

13:48:05  11              THE COURT:  Let me say time-out.   It does seem to

12    me that it's really more ultimately an order to prove.    In

13    other words, somewhat unusually, not rarely, but, or uniquely

14    you had a pretty clear glimpse into how two of the defendants

13:48:30  15    are going to present their case.   Obviously, when any defendant

13:48:35  16    reserves the right not to give an opening until you've rested,

13:48:39  17    at that point the defendant may well stand up and say, ladies

18    and gentlemen, look, we did this but let us tell you why.   You

13:48:50  19    noticed on cross-examination, now we're going to recall this

20    witness, which then provides the government with the opportunity

21    to say okay now it's rebuttal.   Let us tell you about this,

13:49:03  22    that, and the other thing.

23              So it does seem to me that this, as desirable as it

24    might be having seen -- having gotten a glimpse into the defense

25    case, I can understand tactically it might be desirable to say,

1  look, let's frontload some of this stuff and -- in our case in

2  chief so if nothing else, the jury is -- perhaps takes some of

3  the wind out of the sails of the defense.  But I really see

4  no-harm/no-foul if they say, look -- it seems to me as presently

5  projected, it's my understanding, I'll leave it to the

6  defendants to indicate if my understanding is not correct.  As

7  presently anticipated by the defendants, none of them presently

8  anticipates offering an entrapment defense.  Along that line Mr.

9  Bryan has said it would be incumbent upon them to do so, to

10  stand up and say:  Yes, ladies and gentlemen, we did those

13:50:07 11  things that constitute this crime, but we did it because the

12  government engaged in what is called entrapment.  This is what

13:50:15 13  we have to show and this is how we're going to show it.   And I

14  haven't seen that kind of projection.

15        MR. SOFER:   I understand.  The scenario where the

16  government ends up being prejudiced is when because of the way

13:50:29 17  an entrapment defense works, as I understand it, if the defense

18  did not put a defense case on at all, simply cross-examined and

19  they don't put on case, we then sit down.   They ask for the

13:50:41 20  instruction, we're out of luck.

21        THE COURT:  Not necessarily because then, the

13:50:46 22  competent lawyer you are, you'd say:  Wait a minute, Judge, we'd

23  like leave to reopen.   And under present circumstances I've got

24  a hunch I would probably grant that motion.

25        MR. SOFER:   Understood.   I'll shut up then.

13:51:03  1          THE COURT:  These are fair things to raise, because

13:51:05  2  especially at this point I think it's fair for counsel to try to

3  get some sense of what they ought to be doing when.  We're all

4  better off and the jury's better off.

13:51:16  5          MR. SOFER:  That's all we're trying to do, Judge.

13:51:19  6  I just want to go through a laundry list of things that have

13:51:22  7  been done so it's clear for the record:  The Jencks material for

8  Darren Griffin has been turned over and made available to

13:51:30  9  counsel; a witness list has been turned over to counsel as has

10  an exhibit list.  I do have one thing that needs to be

13:51:39  11  corrected in there, there are 57, not 56 items in government's

13:51:46  12  Exhibit Number 4B.  Those are the transcripts.

13:51:53  13          There are still pending, Your Honor, as I count it,

13:51:58  14  about three different, maybe four different motions that are

15  still pending before the Court.

13:52:07  16          THE COURT:  Why don't you just give Amy docket

13:52:10  17  numbers.

18          MR. SOFER:  I don't have them.  I can do that.

19          THE COURT:  She'll be open for the transaction of

13:52:16  20  business until about 4:30.

13:52:18  21          MR. SOFER:  I don't think I can afford the fee.

13:52:21  22  I think that that is it from the government.  I just want to

23  make it clear for the record again, El-Hindi's Counsel, Mr.

13:52:32  24  Hartman, has put before the jury already, through his opening,

25  some snippets of transcripts.  We've still not received from Mr.

13:52:46  **1**  Hartman a single transcript, as far as I'm aware, of which the

**2**  defense wants to put in.   And I know that Your Honor has said

**3**  that the closer we got to trial the less likely this was.   I

**4**  assume we are free and clear then to put in our transcripts as

**5**  we have them and if the defense wants to make something of them,

13:53:08  **6**  that's what they'll do.

**7**           MR. HARTMAN:  I actually represented that that  was

**8**  what they were going to hear, not what they were going to read

13:53:15  **9**  from the transcript.   However, we do have a list of transcripts

**10**  that, yes, we're ready to produce to the government.   What

**11**  we're doing is we're trying to pare it down so it's just the

**12**  parts you guys are going to use so you don't have to worry about

13:53:30  **13**  the whole thing.   And we'll give you the rest of it before our

13:53:33  **14**  case in chief.  We do intend, and I believe today was our

13:53:36  **15**  deadline -- we may or may not meet that -- but we're going to

**16**  try to get you the earliest ones first.  We do intend to turn

**17**  over the transcripts.   We're getting them back now from the

**18**  extra translators we hired.  We're doing the best that we can.

13:53:54  **19**           THE COURT:  I'll give you my favorite ruling:  Work

**20**  it out.   If you can't, we'll go from there.   You've heard what

**21**  they said.

**22**           MR. HARTMAN:  Judge, I need to for the record --

**23**  Mr. Sofer said that the government has turned over the <u>Jencks</u>

13:54:11  **24**  material, which consisted of 455 page that were completely

13:54:17  **25**  redacted.   And I need to lodge a formal objection because it's

13:54:25 **1** 455 redacted pages.   And I guess the relief that I would ask

**2** for is for the Court to review the completely unredacted pages

**3** to see if it's proper that it should be redacted or not.

13:54:42 **4** Because as it is, it's not <u>Jencks</u> material.   What's the point

**5** of giving it to us?   There's half of one Arabic word.

13:54:51 **6**         MR. SOFER:   Your Honor, we've done that already.

13:54:54 **7** Which is exactly what I've done.

**8**         THE COURT:  I have.   And I concur in the

13:54:58 **9** redactions.

13:55:05 **10**         MR. HARTMAN:  Damn.

13:55:09 **11**         MR. SOFER:   I would also note for the record much

**12** of that material is not technically <u>Jencks</u> material.

13:55:15 **13**         THE COURT:  I understand.

13:55:17 **14**         MR. SOFER:   We have the stipulations.  We'll go

**15** over them with Counsel.

**16**         THE COURT:  Anything else on your --

13:55:26 **17**         MR. SOFER:   That's it, Your Honor.

13:55:29 **18**         THE COURT:  Anything of that sort of stuff that --

**19** from the defense standpoint?

**20**         MR. HARTMAN:  There is one other thing I wanted to

**21** clear up based on what you said earlier about entrapment.   My

**22** understanding is we don't need to admit the elements of the

13:55:44 **23** offense in order to argue entrapment.  We don't know, based on

**24** what the government's case is going to be, whether we would go

**25** that route.   I don't anticipate --

2176

1          THE COURT:  I understand.   That's why I quite

13:55:56  2   carefully tried to say, do you not presently anticipate offering

3   an entrapment defense, but none of us knows what the

4   government's evidence is going to be that comes into the jury.

5   And you may find yourself having to shift field and direction,

6   in which case, fine.  We will go from there.   And if that

13:56:20  7   resulted in your saying we rest, but we want a charge on that,

13:56:27  8   I've already indicated an option that I probably would adopt --

13:56:31  9   would be:  Fine, go ahead and put in the evidence of

13:56:34  10   predisposition.   But that's all I'm saying.  You don't

13:56:39  11   presently intend to offer an entrapment defense.  When and if

12   you change field in that regard, I'm sure we'll all be aware of

13   it, and we'll go from there.

13:56:49  14          MR. BOSS:  If I may, for the record, the El-Hindi

15   defense team has today provided notice of our experts that we

13:56:55  16   would intend to call.  We provided their CVs to the government.

17   And I'm not as knowledgeable as Mr. Hartman in some of the case

18   law, in the Sixth Circuit perhaps, I understood when listening

19   to each of them just now that there seemed to be a slight

20   disagreement that the Amawi team believes that an entrapment

13:57:19  21   defense, that the defendant would have to --

22          THE COURT:  Let me suggest this.   Before you start

13:57:24  23   going into all of that, talk it over between yourselves.   If

13:57:35  24   there's an issue, there's an issue, and we'll go from there.

13:57:38  25   It certainly is not my understanding that some inconsistency in

13:57:42 **1** defenses justifies any kind of relief.   It's something that the

**2** jury can be made to understand.

13:57:50 **3**          MR. BOSS:  Thank you, Judge.

13:57:55 **4**          THE COURT:  Why don't we try to get together around

**5** 2:30 to go over jury instructions.  Is that enough time, 3:00?

13:58:08 **6** How much time do you guys need?

**7**          MR. SOFER:  Some of the defense attorneys have

**8** already approached the government.  We might, might be able to

**9** work this out without having --

13:58:22 **10**          THE COURT:  As Judge Young used to say, compose

**11** your fiction and I'll endorse it.  That's the wonderful judge

13:58:37 **12** that graced this bench for years before I showed up.

13:58:41 **13**          By all means, I'll be in my chambers, if you aren't

**14** able to get things resolved.   What I plan to do, I'm going to

**15** take the <u>Galan</u> preliminary instructions.   I got Angela to send

**16** me the electronic version.   I'm going to write that up.   I

**17** should have that done within an hour.   Just odds and ends of

**18** little things I want to add.   So that should be ready.   If

**19** you're not around, I'll simply e-mail those to you.   Okay.

13:59:12 **20**          Just let me know by 3:00 how you're doing on the

13:59:16 **21** substantive instruction.

**22**          MR. SOFER:   Will do.

**23**          THE COURT:  Actually, why don't you come see me

**24** because I may actually try to do some condensing, because

**25** they're so long.  And, Mr. Herdman, did you send them to me?

13:59:33 1        MR. HERDMAN: I think Mr. Doughten did.

2        THE COURT: Does anyone have an electronic version.

3        MR. HERDMAN: I could probably go downstairs.

13:59:46 4        THE COURT: It would be helpful. That way

5  whatever editing I'm doing I can do it right off the copy.

6                      - - -

7

8               C E R T I F I C A T E

9

10   I certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-entitled matter.

12

13  /s Tracy L. Spore_____      _____

14  Tracy L. Spore, RMR, CRR       Date

15

16

17

18

19

20

21

22

23

24

25