1                      UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF OHIO
2                           WESTERN DIVISION

3    UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                  -
4      Plaintiff,                 - Toledo, Ohio
                                  - April 2, 2008
5           v.                    - Trial
                                  -
6    MOHAMMAD ZAKI AMAWI, et al.,-
                                  -
7      Defendants.                -
     ------------------------------

8
                      VOLUME 20 TRANSCRIPT OF TRIAL
9              BEFORE THE HONORABLE JAMES G. CARR
          UNITED STATES DISTRICT CHIEF JUDGE, AND A JURY
10

     APPEARANCES:
11
     For the Plaintiffs:      United States Attorneys' Office
12                            By:   Thomas E. Getz
                                    Justin E. Herdman
13                            801 Superior Avenue, W
                              Cleveland, OH 44113
14                            (216) 622-3840

15                            U.S. Department of Justice
                              By:  Jerome J. Teresinski
16                                 David I. Miller
                              10th & Constitution Ave, NW
17                            Washington, DC 20530
                              (202) 353-3464
18
                              Office of the U.S. Attorney- Austin
19                            By:  Gregg N. Sofer
                              816 Congress Avenue
20                            Austin, TX 78701
                              (512) 916-5858
21

22

23

24

25

```
 1   For the Defendant Amawi: Office of the Federal Public
                              Defender - Cleveland
 2                            By:  Amy B. Cleary
                                   Jonathan P. Witmer-Rich
 3                                 Edward G. Bryan
                                   Timothy C. Ivey
 4                            750 Skylight Office Tower
                              1660 West Second St.
 5                            Cleveland, OH 44113
                              (216) 522-4856
 6
                              Muawad & Muawad
 7                            By:  Elias Muawad
                              36700 Woodward Avenue, Suite 209
 8                            Bloomfield Hills, MI 48304
                              (248) 594-4700
 9
     For the Defendant        Kerger & Kerger
10   El-Hindi:                By:  Stephen D. Hartman
                              Suite 201
11                            33 South Michigan Street
                              Toledo, OH 43602
12                            (419) 255-5990

13                            Boss & Vitou
                              By:  Charles M. Boss
14                            111 West Dudley Street
                              Maumee, OH 43537-2140
15                            (419) 893-5555

16                            Raslan, El-Kamhawy & Pla
                              By:  Alek H. El-Kamhawy
17                            Suite 3FE, 1700 East 13 Street
                              Cleveland, OH 44114
18                            (216) 928-1500

19   For the Defendant        David L. Doughten
     Mazloum:                 4403 St. Clair Avenue
20                            Cleveland, OH 44103-1125
                              (216) 361-1112
21
                              Helmick & Hoolahan
22                            By:  Jeffrey J. Helmick
                              2nd Floor
23                            1119 Adams Street
                              Toledo, OH 43624-1508
24                            (419) 243-3800

25
```

1    Mohammed Abdrabboh
     1620 Ford Avenue
2    Wyandotte, MI 48192
     (734) 283-8405

3
     Court Reporter:      Tracy L. Spore, RMR, CRR
4    1716 Spielbusch Avenue
     Toledo, Ohio 43624
5    (419) 243-3607

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by notereading.
25

08:36:58  **1**          (Reconvened at 8:36 a.m.)

08:36:58  **2**              THE COURT:  I'll read the instructions, and we'll

**3**  go from there.

08:37:07  **4**              MR. BOSS:  Your Honor, we would request the

**5**  opportunity to discuss an evidentiary matter before we bring the

08:37:13  **6**  jury in.

08:37:15  **7**              THE COURT:  I want these called to my attention as

**8**  soon as you can.   I don't like having the jury wait.  We'll

**9**  take a recess after the instructions are read.   That is an

08:37:27  **10**  ironclad, iron-bound rule.   If you want to talk to me, if you

**11**  have an objection, e-mail me.   E-mail me the night before.

**12**  E-mail me that morning.   I'm sorry, Mr. Boss, but it really --

**13**  let me know promptly, whatever it is notify everybody else and

08:37:48  **14**  we'll deal with it.

08:37:51  **15**              MR. BOSS:  30 seconds ago I was handed a document

**16**  the government intends to use with its first witness.

**17**              THE COURT:  What's the problem?

08:38:01  **18**              MR. BOSS:  Would you like to fill in the Court.

**19**              MR. SOFER:  Your Honor, again in an attempt to try

**20**  to make things smooth we gave to Counsel a copy of a spreadsheet

08:38:12  **21**  essentially which is a summary, among other things, of the

08:38:19  **22**  recordings, that is as -- The jury is here.

08:38:34  **23**              THE COURT:  That's okay.

08:39:34  **24**              (Jury enters the courtroom.)

08:39:35  **25**              THE COURT:  Good morning, ladies and gentlemen.

1   On your chairs are the instructions I will read in a moment.   I

2   would ask that you read along with me.   Please don't read

08:39:44   3   ahead, just follow along as I read you these instructions.

08:39:48   4                Preliminary instruction, introduction.

5                Now that you have heard the opening statements, I

6   want to give you preliminary instructions as to your duties as

7   jurors.

08:40:01   8                Then I will give you initial instructions as to the

9   crimes charged in the indictment against the defendants.   These

10   instructions include details as to what the government, to your

08:40:16   11   unanimous satisfaction, must prove beyond a reasonable doubt for

08:40:19   12   you to return a guilty verdict.

08:40:21   13                Please keep in mind that these are preliminary

08:40:26   14   instructions, intended for your general guidance during the

08:40:30   15   presentation of evidence.   Once you have heard all the evidence

16   and are about to begin your deliberations, I will give my final

08:40:39   17   instructions, which are to control your deliberations.

08:40:42   18                Our normal trial day will be 8:30 to 4:30, Tuesday

19   through Friday.   If I expect a change, I will let you know.

20   If you cannot accommodate any change, please let Amy know, and

21   I'll make whatever adjustment is necessary.

08:41:06   22                It's important that you hear and see everything

23   that's presented to you by way of evidence, the arguments of

08:41:12   24   counsel, my instructions, and my rulings.   If for any reason you

08:41:17   25   cannot hear or see, do not hesitate to let me know.   Don't feel

1  that you will be interfering in any way if you raise a hand and

08:41:24  2  is say, Judge, I can't hear you, or the witness or the lawyer.

3  Likewise, if you find yourself getting a little

4  sleepy, as quite honestly sometimes I do, please don't hesitate

5  to raise your hands and say, Judge, can we have a short break?

08:41:39  6  Duty as jurors.

7  As jurors you are judges -- judges of the facts.

8  You must determine whether, on the basis of all the evidence,

9  the government has proven each and every fact that it must prove

08:41:53  10  beyond a reasonable doubt for you to return a guilty verdict.

08:41:58  11  That's your job.

12  My job is quite different.   My job is simply to

13  tell you what the law is that you have to follow.   Even if you

14  disagree with the law, or don't believe that the law makes

15  sense, you must still follow the law as I define it for you.

08:42:18  16  Evidence: Objections and rulings.

08:42:23  17  I want to remind you that evidence is what you hear

18  from the witnesses as they answer the lawyers' questions and

19  what you learn from the exhibits an other materials (including

20  in this case, audio recordings and video evidence).   Nothing

21  else is evidence.

08:42:40  22  Another part of my job is to determine what

23  evidence can be heard or seen by you.   You have all seen scenes

24  of lawyers objecting and courts ruling.

08:42:51  25  Do not hold it against any lawyer for objecting.

08:42:55 **1** He or she is simply calling my attention to the possibility that

**2** evidence should not be admitted.   There is no effort to hide

**3** anything.   The lawyer wants me to be sure that the evidence is

**4** admissible.

**5**          Sometimes I will have to call counsel to sidebar or

08:43:14 **6** even take a recess to decide the issue.   If so, don't speculate

08:43:19 **7** as to what is going on, or who may be saying or arguing what.

08:43:24 **8**          Finally, when I sustain an objection or tell you to

**9** ignore something, you must not consider the evidence that

08:43:34 **10** thereby has been excluded.   This is so, even if you have heard

08:43:38 **11** already or seen the particular evidence.

08:43:45 **12**          If you have heard or seen evidence which I exclude,

**13** you must ignore it entirely.   Likewise, if I sustain an

**14** objection to evidence that you haven't heard or seen, you must

**15** not wonder what that evidence might have been.

08:43:58 **16**          Considering all the evidence.

08:44:02 **17**          I have already told you that you must decide the

**18** case based only on the evidence, and, in doing so, you must

**19** consider all of the evidence.

08:44:13 **20**          To do so, you must, as I've already noted, pay

08:44:19 **21** close attention throughout the entire trial.   To help you

08:44:22 **22** remember the evidence, we have provided notebooks for you to

08:44:26 **23** use.   You also -- you will also have a photo of each of the

**24** witnesses on separate sheets of paper.

08:44:33 **25**          I encourage you to take notes; you do not need to

1  do so, but it's likely that you'll be able better to remember

2  the testimony and understand the other evidence if you do.

08:44:45  3        I remind you that courts do not customarily have

4  testimony read back during deliberations.   To do otherwise --

08:44:55  5  or permit jurors to expect that they will later have an

08:44:58  6  opportunity to hear portions of the evidence after it has been

08:45:01  7  presented during the trial -- would reduce the importance of

8  being attentive during the trial.   A practice of reading back

08:45:09  9  portions of the testimony might also cause some of the evidence

08:45:13  10  to receive greater weight than it should deserve -- than it

11  should receive.

12        Thus, you should pay close attention to all the

13  testimony of all the witnesses as they testify.

08:45:28  14        Keeping an open mind.

15        Deciding the case on the basis of all the evidence

08:45:34  16  requires keeping an open mind until you, as the result of your

08:45:40  17  discussions with the other jurors, become persuaded that the

08:45:44  18  government has or has not proven a charge or charges beyond a

08:45:49  19  reasonable doubt.

08:45:51  20        To keep an open mind, avoid making any assessment

08:45:56  21  or reaching conclusions or judgments prematurely.   This also

08:46:01  22  means not discussing the case until it is the proper time -- at

23  the end of the trial -- to start doing so.

08:46:09  24        Counsel for the parties.

08:46:12  25        You no doubt notice that several lawyers represent

08:46:16  1  both the government and each of the defendants.

2  This is an important and somewhat complicated case,

3  and the number of attorneys involved reflects that fact.

4  Draw no inferences as to who should or might

5  prevail on the basis of the number of attorneys in the case.

6  That would not be a proper consideration for you as you decide

7  the case on the basis of the evidence and my instructions on the

8  law.

08:46:43  9  Alternate jurors.

10  Just before the jury begins to deliberate, I will

08:46:51  11  excuse the jurors who are serving as alternates.   No final

12  decision has been made as to which jurors are the alternates and

13  which will deliberate.

08:47:00  14  So all of you must assume that you will be among

15  the 12 jurors who will decide the case.   I encourage all of you

16  to pay very close attention throughout the entire trial.

08:47:12  17  This concludes my preliminary instructions on your

08:47:16  18  performance of your duties as jurors.  I will now give you my

19  preliminary instructions on the charges against the defendants.

20  Indictment: Summary.

21  In summary, the indictment charges the defendants

22  with three kinds of offenses.

08:47:34  23  An indictment is not evidence; it is not proof of

24  anything.   It is simply the formal notice to the defendants of

25  the government's allegations against them.

1        The indictment includes the following charges:

08:47:51   2   Charge one: Conspiracy to kill or maim persons in a foreign

08:47:56   3   country (all defendants); .

4        Charge two: Conspiracy to provide material support

5   or resources to terrorists (all defendants); .

6        Charge three: Distribution of information

7   concerning explosives or destructive devices with intent to

8   further a federal crime of violence (charge made against Mr.

08:48:22   9   Amawi and Mr. El-Hindi).

08:48:24  10        Charge one.   Conspiracy to kill or maim persons in

08:48:33  11   a foreign country.

08:48:36  12        The defendants, Mohammad Zaki Amawi, Marwan Othman

13   El-Hindi, and Wassim I. Mazloum are each charged with conspiring

14   to kill or maim persons in a foreign country in violation of

15   Title 18, United States Code, Section 956-A.   That statute

08:48:59  16   provides that:

17        Whoever within the jurisdiction of the United

18   States, conspires with one or more other persons, regardless of

08:49:09  19   where such other persons are located, to commit at any place

20   outside the United States an act that would constitute the

21   offense of murder or maiming if committed in the special

08:49:26  22   maritime and territorial jurisdiction of the United States

23   shall, if any of the conspirators commits an act within the

08:49:33  24   jurisdiction of the United States to effect any object of the

25   conspiracy, be submitted to punishment.

08:49:42 1      To satisfy its burden of proof, the government must

08:49:46 2 prove the following elements beyond a reasonable doubt:

08:49:49 3      1.  Two or more people agreed to murder or maim a

08:49:56 4 person or persons at some place outside the United States, as I

5 will define those offenses; .

08:50:05 6      Second, the defendant knowingly and willingly

08:50:10 7 joined the conspiracy; .

08:50:13 8      Third, the defendant was within the jurisdiction of

9 the United States when he entered into the agreement; and.

10      Fourth, during the existence of the agreement, one

11 of the conspirators -- but not necessarily one of the

08:50:30 12 defendants -- committed at least one overt act within the

08:50:36 13 jurisdiction of the United States in furtherance of any object

08:50:43 14 of the agreement.

08:50:44 15      Quote, conspiracy, close quote, generally.

16      A criminal conspiracy is an unlawful agreement

08:50:57 17 between two or more people to violate the law.

08:51:04 18      The government is not required to show that the

08:51:08 19 conspirators entered into an explicit, formal or detailed

08:51:14 20 agreement.

21      You may find that the government has proven the

08:51:20 22 existence of an unlawful conspiratorial agreement by direct

08:51:24 23 proof.  The government may also meet its burden of proving an

24 unlawful conspiratorial agreement on the basis of the

08:51:32 25 circumstances and conduct of the defendants.

1    It is sufficient if two or more persons, in some

2    way or manner, formally or informally, impliedly or tacitly,

3    come to a common understanding to violate the law and accomplish

4    an unlawful plan.

5    If the government proves such understanding on the

6    part of a defendant, you need not find beyond a reasonable doubt

7    that the defendant knew all the details of the unlawful

08:52:15  8    agreement.

08:52:16  9    Defendants can be convicted of criminal conspiracy

08:52:19  10   even though they do not accomplish the criminal objective which

11   was the purpose of their agreement.

08:52:25  12   A defendant cannot conspire with only a government

08:52:32  13   agent: A government agent thus cannot be the only other member,

08:52:38  14   along with a single defendant, of a conspiracy.

08:52:43  15   Charge one.   Element of agreement to murder or

16   maim outside the United States.

08:52:55  17   The government must first prove beyond a reasonable

08:53:01  18   doubt that a defendant entered into an agreement with at least

19   one other defendant to murder or maim a person or persons at

20   some place outside of the United States.

08:53:12  21   "Murder" means the unlawful killing of a human

22   being with malice aforethought.

23   A person is guilty of murder if he purposely or

24   knowingly causes the death of another human being, or if he

08:53:32  25   causes the death of another human being with extreme

1 indifference to the value of human life.

08:53:38 2 "Maim" means to disfigure, cut, bite, or slit the

3 nose, ear or lip, or cut out or disable the tongue, or put out

4 or destroy an eye, or disable a limb or any member of another

08:53:55 5 person; or throw or pour upon another person any scalding water,

6 corrosive acid, or caustic substance.

08:54:04 7 "Outside the United States" means any place outside

8 the states of the United States, the District of Columbia, and

9 the territories and possessions of the United States, including

08:54:17 10 the territorial sea and the overlying airspace.

08:54:20 11 Charge one: Element of willful participation in the

12 agreement.

08:54:30 13 The second element that the government must prove

08:54:34 14 beyond a reasonable doubt is that the defendant willfully became

15 a party to an agreement to violate the law.

08:54:42 16 To prove this element, the government must prove

17 beyond a reasonable doubt that a defendant willfully

08:54:52 18 participated in the conspiratorial agreement to murder or maim

08:54:56 19 someone outside the United States.

08:54:58 20 To meet this burden, the government must prove

08:55:03 21 beyond a reasonable doubt that the defendant voluntarily joined

22 in the agreement and was aware: First, of at least some of the

23 basic aims and purposes of the agreement, and second, that the

24 conduct contemplated by the agreement was wrongful or unlawful.

25 The government need not prove that the defendant

1   was aware of every detail of the agreement or even the identity

2   of the other parties to the agreement.

08:55:37  3         The government need not prove that the defendant

08:55:41  4   joined in all of the agreement's unlawful objectives.

5   Likewise, the government need not prove that the defendant

08:55:48  6   participated in the conspiracy throughout its entire duration.

08:55:53  7   A single act, if committed willfully while the defendant was a

8   member of the conspiracy, may suffice for conviction.

08:56:04  9         The government must prove each defendant's

10   participation in the agreement by independent evidence of his

11   own acts or statements and those of the other alleged

08:56:17  12   co-conspirators, and the reasonable inferences that may be drawn

13   from such statements or acts.

14         A defendant cannot, however, be convicted of

08:56:30  15   participating in a conspiracy by mere presence at the scene of

16   an alleged crime or his mere knowledge that others were members

17   of a conspiracy.   A person does not become a conspirator just

18   by being or associating with others who are conspirators, or by

08:56:53  19   failing to object to what they are unlawfully planning or doing.

08:56:57  20   This is so, even if he approved of what was happening, provided

08:57:03  21   he did not join with the conspirators.

08:57:06  22         Similarly, just because a defendant may have done

08:57:12  23   something that happened to help a conspiracy does not make him a

24   conspirator unless the government proves he agreed to commit the

25   unlawful act or acts contemplated by the conspirators.

08:57:27 **1**           For the government to meet its burden of proof, it

**2** must prove beyond a reasonable doubt that the defendant, having

**3** had an understanding of the unlawful character of the

08:57:41 **4** conspiracy, willfully engaged in, advised, or assisted in it for

**5** the purpose of furthering its illegal undertaking.

08:57:51 **6**           Charge one: Element of defendant within the

08:58:00 **7** jurisdiction of the United States when the unlawful agreement

**8** was made.

08:58:04 **9**           The government must prove that the defendant was

**10** within the jurisdiction of the United States when the

08:58:11 **11** conspiratorial agreement was made.

**12**           The "jurisdiction of the United States" includes

08:58:19 **13** the territory of the states of the United States, the District

08:58:23 **14** of Columbia, and the territories and possessions of the United

08:58:26 **15** States.

08:58:26 **16**           The Northern District of Ohio, in which Toledo is

**17** located, the Eastern District of Michigan, in which Detroit and

**18** its suburbs are located, and the Northern District of Illinois,

08:58:41 **19** in which Chicago is located, are all within the jurisdiction of

**20** the United States.

08:58:45 **21**           The government need not show that all the parties

**22** to the agreement were within the jurisdiction of the United

08:58:51 **23** States when the agreement was made; rather, you must only find

08:58:56 **24** beyond a reasonable doubt that the defendant was within the

**25** jurisdiction of the United States when the agreement was made.

08:59:06 **1**          Charge one: Element of overt act.

08:59:11 **2**          The government must also prove beyond a reasonable

08:59:17 **3** doubt that one of the members of the conspiracy committed at

**4** least one overt act in the jurisdiction of the United States in

08:59:26 **5** furtherance of any object of the conspiracy.

**6**          To commit an overt act in furtherance of an object

**7** of the conspiracy, a participant need not undertake a course of

08:59:43 **8** action that is certain or even likely to result in the success

**9** of the conspiracy.

08:59:50 **10**          The law does not require that the act be likely to

**11** yield an illegal result, or that the act in question even be

09:00:02 **12** prohibited by law.   Instead, for the defendant to be liable for

09:00:09 **13** conspiracy, you need only find beyond a reasonable doubt that he

09:00:16 **14** or another participant in the conspiracy committed an act for

09:00:21 **15** the purpose of furthering an object of the illegal agreement.

09:00:27 **16**          The defendant himself need not have personally

**17** engaged in or even known about the alleged act in furtherance of

09:00:35 **18** the conspiracy or the identity of the person committed the act.

**19**          Instead, the government must only prove beyond a

09:00:46 **20** reasonable doubt that one of the participants in the conspiracy

**21** in which the defendant was a participant committed an act to

**22** further an objective of the conspiracy.

09:00:58 **23**          The government need not prove that the act actually

09:01:02 **24** furthered an objective of the conspiracy; rather, it need only

**25** prove that one of the conspirators undertook an act or a series

1  of acts intended to further an object of the conspiracy.

09:01:15  2  The government must, however, prove beyond a

09:01:21  3  reasonable doubt that the act occurred during the existence of

4  the conspiracy.   A conspirator's act after the agreement has

09:01:30  5  ended cannot meet the government's burden with respect to this

6  element.

09:01:36  7  When determining whether the alleged act was

8  intended to further an object of the agreement, consider   all

9  the facts, and determine whether the circumstances permit you to

09:01:49  10  conclude beyond a reasonable doubt that the act was intended to

11  further an object of the conspiracy.

09:01:57  12  The government must prove that the act in

09:02:03  13  furtherance of the conspiracy occurred within the jurisdiction

14  of the United States.

09:02:06  15  Charge two: Conspiracy to provide material support

09:02:16  16  or resources to terrorists.

09:02:21  17  The defendants, Amawi, El-Hindi, and Mazloum, are

09:02:26  18  each charged with conspiring to provide material support or

09:02:29  19  resources to terrorists or terrorist activity in violation of

09:02:34  20  Title 18, United States Code, Section 2339-A.

09:02:41  21  This statute provides, in relevant part, that

22  whoever provides material support or resources knowing or

09:02:50  23  intending that they are to be used in preparation for, or in

09:02:55  24  carrying out, a violation of Section 2332 of this title or

09:03:03  25  attempts or conspiracies to do such an act is guilty of a crime.

1          The "material support" need not be to a particular

2 or specified terrorist group.

3          Instead, the support must be known to further or

4 intended to further one of the criminal offenses set forth in

5 the statute.  In this case, this includes a violation of Title

6 18, United States Code, Section 2332-A, which prohibits killing

7 of  United States nationals.

8          Charge two:  Elements.

9          To meet its burden of proof the government must

10 prove beyond a reasonable doubt:

11          First, the defendant conspired to provide material

12 support or resources; and.

13          2.  He did so, knowing or intending that the

14 support or resources were to be used in preparation for, or in

15 carrying out, the killing of United States nationals outside the

16 United States.

17          While the government must prove that the defendant

18 knew or intended that the material support or resources in

19 question were to be used in preparation for, or in carrying out,

20 the killing of United States nationals outside the United

21 States, the government need not prove that the defendant himself

22 or others actually killed United States nationals.

23          The elements of a conspiracy, as defined with

24 regard to Charge One, apply to Charge Two as well.

25          Charge Two, element of provision of material

09:05:06 **1** support.

09:05:07 **2** The term "material support or resources" includes

**3** any property, tangible or intangible, or service, including

09:05:20 **4** currency or monetary instruments or financial securities,

**5** training, communications equipment, explosives or personnel.

**6** The term "training" means instruction or teaching

**7** to impart a specific skill, as opposed to general knowledge.

09:05:41 **8** The term "personnel" means one or more persons who

09:05:48 **9** may be, or include, the defendant's own person.

09:05:52 **10** A defendant conspires to provide material support

**11** or resources if he conspires to make available, or conspires to

**12** transfer or send, support or resources.

09:06:09 **13** Charge Two, element of knowing or intending

09:06:15 **14** material support or resources would be used.

09:06:19 **15** The government must prove beyond a reasonable doubt

09:06:25 **16** that the defendant knew or intended that the material support

09:06:30 **17** was to be used in preparation for, or in carrying out, the

09:06:36 **18** killing of United States nationals.

09:06:39 **19** An act is done "knowingly" if the defendant is

09:06:45 **20** aware of the act and does not do it through ignorance, mistake,

**21** or accident.

09:06:51 **22** An act is done "intentionally" if it is done

09:06:58 **23** deliberately.

**24** The term "United States" includes all the states,

09:07:04 **25** territories, and possessions of the United States, and all

1 places and waters subject to the jurisdiction of the United

09:07:10 2 States.

09:07:10 3       A "national of the United States" is a citizen of

4 the United States or a person owing permanent allegiance to the

5 United States.

09:07:22 6       The government need not prove that the defendant

09:07:25 7 knew that his actions violated a specific statute; instead, you

8 must only find that the defendants knew or intended that their

09:07:36 9 actions would result in the type of conduct forbidden under the

09:07:41 10 statute I have described to you.

09:07:47 11       Charge Three:  Distribution of information

09:07:52 12 concerning explosives or destructive devices with intent to

09:07:57 13 further a federal crime of violence.

09:08:00 14       The Defendants Amawi and El-Hindi have been charged

09:08:04 15 with two separate violations each of Title 18, United States

09:08:12 16 Code, Section 842(p)(2)(A)  which states:

09:08:18 17       It shall be unlawful for any person to distribute

18 by any means information pertaining to, in whole or in part, the

19 manufacture or use of an explosive or destructive device, with

20 the intent that the information be used for, or in furtherance

21 of, an activity that constitutes a federal crime of violence.

09:08:41 22       Charge Three:  Elements.

09:08:45 23       To meet its burden of proof, the government must

24 prove beyond a reasonable doubt that the defendant:

25       First, distributed, by any means, information

09:08:58 1 pertaining to, in whole or in part, the manufacture or use of an

2 explosive or destructive device; and.

09:09:08 3        Second, acted with the intent that the information

4 be used for, or in furtherance of, an activity that constitutes

5 a federal crime of violence, namely the killing of a United

6 States national outside the United States or an officer or

09:09:27 7 employee of the United States.

09:09:28 8        Charge Three, element of distribution of

09:09:37 9 information pertaining to the manufacture or use of an explosive

10 or destructive device.

09:09:46 11        The terms used in the first element of Charge Three

09:09:53 12 have the following meanings.

09:09:55 13        "Distribute" means to sell, issue, give, transfer,

14 or otherwise dispose of" by any means.

09:10:04 15        "Explosive" is gun powder, powders used for

16 blasting, all forms of high explosives, blasting materials,

09:10:16 17 fuses (other than electric circuit breakers), detonator, and

09:10:22 18 other detonating agents, smokeless powder, other explosive or

19 incendiary device, and any chemical compounds, mechanical

09:10:32 20 mixture, or device that contains any oxidizing and combustible

09:10:37 21 unities, or other ingredients, in such proportion, quantities,

22 or packing, that ignition by fire, friction, concussion,

09:10:45 23 percussion, or detonation of the compound, mixture, or device or

24 any part thereof may cause an explosion.

09:10:54 25        "Destructive device" is:

1            Any explosive, incendiary or poison gas, 1. Bomb,

2  2. Grenade, 3. Rocket having a propellant charge of more than

3  four ounces, 4. Missile having an explosive or incendiary charge

4  of more than one-quarter ounce, 5.  Mine, or 6.  Device similar

5  to any of the devices described in the preceding clauses, and

6  any combination of parts either designed or intended for use in

09:11:30 7  converting any device into any destructive device described in

8  subparagraph A or B, and from which a destructive device may be

09:11:40 9  readily assembled.

09:11:44 10         "Federal crime of violence" is either:

09:11:48 11         A, an offense that has an element the use,

09:11:52 12  attempted use, or threatened use of physical force against the

13  person or property of another, or.

14         B, any other offense that is a felony, and that, by

15  its nature, involves a substantial risk that physical force

16  against the person or property of another may be used in the

17  course of committing the offense.

09:12:12 18         Charge Three, element of intent that the

19  information be used for, or in furtherance of, an activity

09:12:23 20  constituting a federal crime of violence.

09:12:25 21         "Intent" means that the Defendant's purpose in

09:12:31 22  providing the information was that it be employed by the

09:12:35 23  recipients to commit, or to further commission of, or to be used

24  for or in furtherance of, a federal crime of violence, namely

25  the killing of U.S. nationals outside the United States or the

09:12:51 **1** killing of United States officers, slash, employees.

09:12:56 **2** In this case, the government alleges that the

**3** federal crime of violence that the defendant intended his

**4** information to be used for, or in furtherance of, was either

**5** Title 18, Section 2332-A, killing of U.S. nationals outside the

**6** United States, or Title 18, Section 1114, killing of any officer

**7** or employee of the United States.

09:13:18 **8** Ladies and gentlemen, that completes my reading of

**9** the preliminary instructions. In a moment I'll have Amy

09:13:26 **10** retrieve those from you. You not have these with you during

**11** the trial. The reason I do that, quite candidly, is to keep

**12** you from referring to them during the trial, simply because I'm

09:13:43 **13** concerned that that in turn might generate discussion, or even

**14** if it didn't generate discussion, any of you who might look at

**15** it might start thinking about what you've heard and seen so far

09:13:56 **16** and trying to see whether it fit or didn't fit into what you

**17** have to decide. That's the human impulse and instinct and it

**18** makes good and common sense; in any context, it's the way we

**19** often go about our business of making our minds up. But as I

09:14:18 **20** emphasized, beginning with voir dire and in these instructions,

**21** that's a process that you have to postpone until you've heard

09:14:25 **22** all of the evidence, you've heard my final instructions on the

**23** law, and you've gathered together to start deliberations, and

09:14:32 **24** you've started talking through the case with each other and

**25** gaining the benefit of the recollections, insights and opinions

2202

1  of your fellow jurors.   That's how a jury verdict is composed,

2  and this is the only way that that process can be accomplished.

3  After telling you that, I will tell you, though,

4  that once I give you final instructions that will control your

09:14:55  5  deliberations you will have those with you and, of course, the

6  purpose of that then will be for you to, in fact, refer to those

09:15:02  7  as you determine whether or not the government has met its

09:15:06  8  burden of proof in proving beyond a reasonable doubt any charge

09:15:11  9  or the charges.

09:15:14  10  Counsel, if you'll come up to sidebar for a moment,

11  please.

12  (The following discussion was had at the

13  bench outside the hearing of the jury:)

14  THE COURT:  So what's the problem?

15  MR. BOSS:  Judge, moments ago we were given this

16  18-page document which I believe is likely a script for Darren

17  Griffin.  It is, at least in my estimation, a set of leading

18  questions that he would not otherwise -- that the prosecuting

19  attorney would not otherwise be able to ask the witness.   It

20  suggests to the witness the answers.

21  THE COURT:  Again, you're going to show this to Mr.

22  Griffin.

23  MR. SOFER:  Mr. Griffin will have this with him

24  when he takes the stand.   This has been on the exhibit list

25  since March 10.   Instead of -- if he has to refer --  this is

1  essentially a summary of notes and the transcripts so that if he

2  has to refresh his recollection, he has something before him.

3  If he does refer to it -- we're not putting this in evidence

4  Judge.  If he has to refresh his recollection during the course

5  of his testimony, I didn't want to have Counsel say:  Well, what

6  is he looking at?  We could do this -- it's no different than

7  any other witness looking at reports if he has to.

8            THE COURT:  Who composed these?

9            MR. SOFER:  It was composed by the government with

10  some interaction with Mr. Griffin so that he would know

11  essentially, to some extent there are words in there that will

12  help him remember.   Again I didn't want to have this -- I

13  didn't want him to refer to notes all of a sudden then Counsel

14  say what is he referring to.  We it's marked as an exhibit;

15  we're not putting it into evidence.

16            THE COURT:  Did he make notes himself?

17            MR. SOFER:  If he made notes they have been

18  incorporated into this.   Really it's a document that was

19  create --

20            THE COURT:  But were notes made by others, are they

21  part of what is contained --

22            MR. SOFER:  That is a summary.   All this is, as it

23  says, it's a reference guide or summary of the recordings and

24  reports that pertain to the case.

25            THE COURT:  Yeah, but are there notes that others

1   created or prepared that had formed the basis for any of this

2   content?

3               MR. SOFER:  I mean the government typed the words

4   on the paper.   But they come -- in other words, the first line

5   or second line would be an actual recording.   That recording

6   could be hundreds of pages long.   There's a very basic -- and

7   the whole document obviously is a very basic summary of each of

8   these dates and incidents.   So either there's a very basic

9   description of the recording that was made or there's a very

10  basic description of an FBI report.   And all of them come from

11  there.   Mr. Griffin has seen these reports or at least he knows

12  of some of the reports.   But more importantly, most of this, I

13  would say 98 percent of it, are just summaries of the actual

14  recordings which the government intends to play.

15              We could do this a different way.   If Counsel

16  wants to give me these all back and we don't -- every time he

17  has to refresh his recollection I can approach him with a 302,

18  if he doesn't recall, and I'd say would anything refresh your

19  recollection and he says yes, the 302 dated such-and-such or a

20  transcript of 1-D17, and I can approach him with those

21  documents.  And we can spend hours and hours having him --

22  having him do it that way.   This is an attempt again to make

23  things move quickly, Your Honor, and the reason we gave it to

24  them.   They want to cross-examine him on where this came from,

25  what he's using it for, I have no problem on cross.   It's not a

1  script.   And he's not going to sit there and read from there.

2  I think in a case in which a witness participated in activities

3  over a period of multiple years, it's sort of silly to think --

4         Again, I'll do this another way if Your Honor rules

5  otherwise, but it's going to take us a lot longer to get through

6  it.

7         MR. BOSS:  May I have a moment to consult with

8  other co-counsel?   This was given to us --

9         THE COURT:  The one thing that I would not want is

10  for him to be kind of reading ahead.

11         MR. SOFER:  And we're not going to do that, Judge.

12         THE COURT:  I think it should be set to one side if

13  he has it up there, can you recall a conversation…   Candidly,

14  I would almost prefer, do you recall on or about day X,

15  conversation with Mr. El-Hindi in which the subject of X came

16  up; what do you recall about that conversation?

17         MR. SOFER:  We'll do it an even easier way.   My

18  plan is to direct his attention to a date, play the actual

19  recording and have him make comments after it.   Again, all of

20  this is designed simply to move us along, Judge.

21         MR. HARTMAN:  Judge, I just -- when I look at this

22  the first thing I see is a note about what's not heard on the

23  recording, and then what does the color coding mean to Mr.

24  Griffin of this?

25         MR. SOFER:  Again, if they want to cross-examine

1   him about any of this...

2            THE COURT:  What does it mean?

3            MR. SOFER:  What is light is actually from a

4   recording that we had planned to play in court.   What is blue

09:22:29  5   in here -- they're just darker -- are things that we're not

6   planning on actually play anything in court but that he might

7   testify about.   And, again, he might testify about these things

8   or not.

9            THE COURT:  You guys talk.   My inclination is to

10  get underway and see how it goes, and then we'll know better

11  whether there's a problem with it.

12           MR. SOFER:  Again, he's not going to read from it,

13  Judge.

14           THE COURT:  I understand.   That's what everybody

15  wants to avoid.

16           MR. BOSS:  I like the Court's suggestion that we

17  get underway and see how it goes for the time being.

18           THE COURT:  Until we take a break.

19           (End of sidebar.)

20           THE COURT:  Thank you for your patience, ladies and

09:22:33  21  gentlemen.   I believe that we're ready to get underway with the

09:22:36  22  government's first witness.   And who is that witness?

23           MR. SOFER:  Darren Griffin, Your Honor.

09:22:42  24           MR. IVEY:  Your Honor, at this point I would make a

25  formal request for separation of witnesses.

09:22:50 **1**          THE COURT:   All parties to monitor the separation

**2** of witnesses.

**3**          MR. SOFER:  We do have --

**4**          THE COURT:   The case agents are an exception.

**5**          MR. SOFER:  Understand.

09:23:00 **6**          MR. BOSS:   A single case agent, Your Honor?

09:23:02 **7**          THE COURT:   Single case agent.

09:24:20 **8**          (The witness was sworn by the clerk.)

09:24:40 **9**          THE COURT:  I think if you sit about this distance

**10** from the microphone, everybody would hear you.   Please tell the

**11** ladies and gentlemen your name.

09:24:49 **12**          THE WITNESS:  Darren L. Griffin.

09:24:52 **13**          MR. SOFER:  May I inquire, Your Honor?

**14**          THE COURT:  Of course.

09:24:55 **15**          DARREN GRIFFIN, DIRECT EXAMINATION

**16** BY MR. SOFER:

**17**     **Q.**   Good morning, Mr. Griffin.

**18**     **A.**   Good morning.

**19**     **Q.**   Could would you please tell the members of the jury how

**20** old you are?

**21**     **A.**   42.

**22**     **Q.**   And where were your born, sir?

**23**     **A.**   In Lima, Ohio.

**24**     **Q.**   Can you tell the members of the jury where you grew up?

**25**     **A.**   Mostly in Toledo, Ohio.

09:25:13 **1**   **Q.**   Can you describe basically for the members of the jury

09:25:16 **2** your family situation when you grew up?

09:25:19 **3**   **A.**   Dysfunctional at best.  It was filled with abuse,

**4** physical abuse, and drug abuse.

09:25:31 **5**   **Q.**   When you say "drug abuse" was that by other members of

**6** your family?

**7**   **A.**   Yes.

**8**   **Q.**   Can you tell the members of the jury where you went to

**9** elementary school?

**10**   **A.**   I -- Lagrange Elementary School.

**11**   **Q.**   Is that here in Toledo?

**12**   **A.**   In Toledo, Ohio, yes.

**13**   **Q.**   Where did you go to high school?

**14**   **A.**   Toledo Woodward.

**15**   **Q.**   Did there come a time when you joined the United States

09:25:54 **16** military?

**17**   **A.**   Yes, shortly after leaving high school.

09:25:59 **18**   **Q.**   Can you tell the members of the jury why it is that you

09:26:02 **19** joined the United States military?

**20**   **A.**   At that time, in 1985, that was when I seen a disturbing

09:26:13 **21** trend of drugs, crack specifically, entering the communities,

**22** and gangs were forming, and basically I looked at that and I

09:26:29 **23** just made a decision that if I didn't get out of there that I

**24** was either going to be dead or on drugs or in jail.

09:26:41 **25**   **Q.**   Did you actually join the military before or after you

1   left high school?

2       A.   It was actually before I left high school.   I was in

3   the Delayed Entry Program.   I entered that program in October

4   of 1984.

09:26:54  5       Q.   Would you give a very basic description to the members

09:26:57  6   of the jury what it is that the Delayed Entry Program meant?

09:27:02  7       A.   It basically means that you process at the MIP station,

8   the entry point, and you make a commitment to the military that

09:27:17  9   you -- you're going in the military.

09:27:23  10      Q.   Did you grow up with people from the Middle East or

11  people that practiced the Muslim faith?

12      A.   Yes, I did.

13      Q.   Could you give a basic description to the members of the

14  jury of that situation?

09:27:32  15      A.   Growing up, in high school mostly, I lived just a few

16  short blocks from here on Superior Street near Lagrange.   And

17  there's a park called St. Francis Park.   And all of us, all

09:27:49  18  colors, ages, religions, we got together and we played sports.

19  That was the biggest thing there, football, basketball,

09:27:58  20  baseball, you name it.   Typical kids' stuff.

21      Q.   Did you ever have any bad experiences with anyone from

22  the Muslim or Middle Eastern community?

23      A.   No.

24      Q.   Do you have any children?

25      A.   Yes.

1   **Q.**   How many children do you have?

09:28:10  2   **A.**   Five.

09:28:11  3   **Q.**   How many of these children are you the biological father

09:28:15  4  of?

5   **A.**   Three.

09:28:16  6   **Q.**   Can you tell the members of the jury how old your

7  biological children are?

8   **A.**   25, 15, and nine.

09:28:23  9   **Q.**   Can you tell the members of the jury who your

10  15-year-old and nine-year-old live with?

09:28:28  11   **A.**   They live with their respective mothers.

12   **Q.**   And can you describe -- when you say "respective

09:28:34  13  mothers", these are children you've had with different women?

14   **A.**   Yes.

15   **Q.**   And can you describe for the jury what your relationship

09:28:41  16  is like with these two mothers of these two biological children?

17   **A.**   We have a wonderful relationship. They know they are

09:28:50  18  sisters and we work together as a unit to ensure that -- to make

19  up one family -- not one family, but to know each other as

09:29:02  20  sisters.

21   **Q.**   Are you presently married?

22   **A.**   Yes.

23   **Q.**   Can you give the jury a basic description of your

09:29:08  24  present family situation and your relationship with your wife?

09:29:11  25   **A.**   I've got a wonderful wife. She keeps the kids

**1** together, she has an excellent relationship with my daughters'

09:29:27 **2** moms, and she's their stepmother.

09:29:29 **3**    Q.   I want to go back to your military service.   Can you

09:29:32 **4** tell us approximately what year it was when you actually entered

**5** the United States military?

**6**    A.   July of 1985.

09:29:40 **7**    Q.   And what branch of the military did you join?

09:29:43 **8**    A.   The U.S. Army.

09:29:45 **9**    Q.   Can you tell the members of the jury why you joined the

09:29:48 **10** Army as opposed to the Navy, Marine Corps or Air Force?

**11**    A.   In October, right before entering the Delayed Entry

09:29:57 **12** Program, I was sitting there evaluating where I was going,

**13** football season had just ended, I had injured my knee, and once

**14** again, I was just evaluating what was -- where was I going to

**15** go, what was I going to do.   And a movie came on.   It was John

**16** Wayne in the "Green Berets".

**17**    Q.   Is that what you wanted to be, a Green Beret?

**18**    A.   Yeah.   I thought that was cool.   I wanted to do that.

**19**    Q.   Can you tell us when you first entered the Army, where

**20** did you go?

09:30:33 **21**    A.   I went to basic training at Fort Jackson, South

**22** Carolina.

**23**    Q.   Can you tell us basically what basic training was about?

**24**    A.   It's basic skills to learn how to move, shoot, and

09:30:46 **25** communicate on the battlefield.

09:30:48  **1**          THE COURT:  I'm sorry, basic skills…

09:30:51  **2**          THE WITNESS:  To learn how to move, shoot and

09:30:54  **3**  communicate on the battlefield.

09:30:57  **4**  BY MR. SOFER:

09:30:57  **5**      Q.    Now, did there come a time when you left basic training

09:31:01  **6**  and continued on with training?

**7**      A.    Yes.  Approximately September of 1985 I went from Fort

**8**  Jackson, South Carolina, to Fort Gordon in Augusta, Georgia.

**9**      Q.    And what did you train for, if anything, at Fort Gordon?

**10**      A.    My hard skills.  I became a signal channel radio

**11**  operator.

**12**      Q.    You said "hard skill", what does that mean?

**13**      A.    Your actual job.

**14**      Q.    What happened after you received that training?

**15**      A.    I left from there to go to my first permanent duty

09:31:39  **16**  station at Fort Lewis, Washington, in Washington state.

**17**      Q.    Can you tell us whether there came a time at Fort Lewis,

09:31:48  **18**  Washington, when you continued your education somewhere?

**19**      A.    Yes.  I didn't graduate with my class in high school,

09:32:01  **20**  and in talking with the counselors they agreed that if I took

09:32:06  **21**  the class that I had failed, that they would send me my diploma.

09:32:14  **22**  So shortly after I got to my first duty station, I took that

09:32:17  **23**  class and I was sent my diploma.

09:32:22  **24**      Q.    Do you remember approximately when that was?

09:32:25  **25**      A.    January of early -- early 2006.

09:32:28 **1**    **Q.**    2006?

**2**    **A.**    Excuse me, 1986.

09:32:33 **3**    **Q.**    You killed 20 years in two seconds. And how old were

**4** you; can you tell the members of the jury how old were you at

**5** this time, about?

09:32:43 **6**    **A.**    I was 19; I turned 20 while I was there.

09:32:47 **7**    **Q.**    Did there come a time when you left Fort Lewis,

09:32:52 **8** Washington, in Washington state?

**9**    **A.**    Yes, in early January of 1987.

09:32:57 **10**    **Q.**    And where did you go?

09:32:59 **11**    **A.**    I went to Camp Gary Owen in South Korea.

**12**    **Q.**    Can you tell the members of the jury basically, and in

**13** summary, what your duties were in South Korea?

09:33:14 **14**    **A.**    I was a -- at first I was just a radio single channel

09:33:21 **15** radio operator. And then I moved up quickly in the ranks. I

**16** became a sergeant and ended up being a chief there. And I also

09:33:32 **17** did -- I was in charge of the secured communications there.

09:33:39 **18**    **Q.**    How long did you stay in Korea?

**19**    **A.**    Approximately three years.

09:33:44 **20**    **Q.**    During that period of time you said you were promoted?

**21**    **A.**    Yes, to sergeant.

**22**    **Q.**    When did you return to the United States, approximately?

09:33:53 **23**    **A.**    About January of 1990.

09:33:57 **24**    **Q.**    And where did you go?

**25**    **A.**    I went back to Fort Lewis, Washington.

1    **Q.**    What did you do there?

09:34:03    2    **A.**    Well, while I was in Korea, prior to leaving, I was

09:34:09    3    recruited by a second of the 75th Ranking Battalion.   But in

09:34:15    4    between leaving Korea and getting to Fort Lewis, Panama hadd

09:34:21    5    just cause because they kicked off and --

6    **Q.**    I'm sorry, what does just cause me an?

09:34:27    7    **A.**    It was the operation to remove Manuel Noriega in Panama.

09:34:33    8    **Q.**    Sorry to interrupt.   Please continue.

09:34:36    9    **A.**    And there they had some jump refusal.   I was not

10    airborne-qualified at that time, so I couldn't be assigned to

11    that unit.   And I walked right out of that unit, walked into

12    Special Forces recruiting.

13    **Q.**    You said in Panama they had "jump refusals".   What do

14    you mean by that?

15    **A.**    People that refused to jump out of planes.

16    **Q.**    So the military changed what the rangers had to do?

17    **A.**    Yes, for the non-infantry, yes.

09:35:13    18    **Q.**    So what did you do next?

09:35:17    19    **A.**    I walked over and I went to Special Forces recruiting.

09:35:24    20    MR. SOFER:  Your Honor, I believe that Mr. Griffin

09:35:26    21    would like a little water.

09:35:28    22    THE COURT:  There should be some, if not, in the

23    pitcher right there.

09:36:01    24    (Discussion had off the record.)

09:36:04    25    BY MR. SOFER:

09:36:05  **1**    **Q.**   Okay.  So after you realized that you had to be

09:36:09  **2**  airborne-qualified, you said you did what?

**3**    **A.**   I walked into Special Forces recruiting.

09:36:14  **4**    **Q.**   And where was that?

09:36:15  **5**    **A.**   There at Fort Lewis, Washington.   1st Special Forces

**6**  Group.

**7**    **Q.**   What happened next?

**8**    **A.**   I basically prepared myself physically and mentally to

09:36:26  **9**  go through the Special Forces selection and assessment and

09:36:30  **10**  selection.

09:36:31  **11**    **Q.**   Did there come a time when you went through Special

**12**  Forces selection and assessment?

**13**    **A.**   Yes.   In November, December of 1986 -- or excuse me,

09:36:44  **14**  1990.

09:36:45  **15**    **Q.**   Did -- can you tell us approximately how many people

**16**  went for that particular selection?

09:36:52  **17**    **A.**   For that rotation was 935 started out.

09:36:58  **18**    **Q.**   935 candidates, would that be the right terminology?

09:37:02  **19**    **A.**   Yes, candidates.

**20**    **Q.**   How many ultimately from those 935 candidates were

09:37:07  **21**  selected to the Special Forces?

**22**    **A.**   88.

**23**    **Q.**   Were you one of them?

**24**    **A.**   Yes.

**25**    **Q.**   What happened after you were selected to enter the

09:37:14  **1**  Special Forces of the United States Army?

**2**  A.  I was attached to Special Forces Command.  I was sent

**3**  back to Fort Lewis to gather my things and report back to Fort

09:37:25  **4**  Bragg, North Carolina via airborne school en route.

**5**  Q.  So you were going to come back to Fort Bragg but you had

09:37:36  **6**  to go where first?

09:37:37  **7**  A.  Airborne school.

09:37:38  **8**  Q.  Where was that?

09:37:39  **9**  A.  In Fort Benning, Georgia.

09:37:41  **10**  Q.  Did you go to Fort Benning, Georgia?

**11**  A.  Yes, I did.

**12**  Q.  Tell the members of the jury basically what you learned

09:37:46  **13**  there.

**14**  A.  How to jump out of planes into combat.

**15**  Q.  Did you qualify, were you airborne-qualified as you

09:37:53  **16**  said?

**17**  A.  Yes.

09:37:54  **18**  Q.  What happened next?

09:37:56  **19**  A.  After airborne school I reported to the Special Forces

09:38:01  **20**  School House at Fort Bragg, North Carolina.

**21**  Q.  What basically happens at the Special Forces School

09:38:07  **22**  House, without getting into any specific details?

**23**  A.  I learned how to become a Green Beret, language school,

09:38:14  **24**  and learned how to work on an A-Team, Special Forces A-Team.

09:38:29  **25**  Q.  Approximately how long did that school house training

1    take place?

2         A.    Approximately a year.

09:38:39  3    Q.    And towards the end of it, was there a particular focus

4    to your training?

5         A.    Yes.

6         Q.    What was that?

09:38:49  7    A.    Language school.

09:38:51  8    Q.    And what language did you train in?

09:38:54  9    A.    Persian, Farsi.

10        Q.    Do you know what part of the world Persian Farsi is

09:39:03 11    spoken in?

12        A.    Iran.

13        Q.    Did you, in fact, receive your Green Beret at the end of

09:39:08 14    school house training?

09:39:09 15    A.    Yes, I did.

09:39:12 16    Q.    Approximately December 18 of 1991 did there come a time

17    when you ended up pleading guilty or being charged with passing

09:39:23 18    a bad check?

19        A.    Yes.

09:39:25 20    Q.    Can you basically tell the members of the jury what

21    happened?

09:39:28 22    A.    When you're going through training, it's not all right

23    there at Fort Bragg.   And due to just a simple accounting error

09:39:40 24    I had prepaid some bills, sent some checks out, and one of them

25    bounced.

09:39:47 **1**    **Q.**   Did there come a time when you pled guilty to something?

09:39:51 **2**    **A.**   Yes.

09:39:52 **3**    **Q.**   Do you know what you had to do to deal with this

**4** particular charge?

09:39:58 **5**    **A.**   They just told me I needed to pay restitution and a

09:40:05 **6** fine.

**7**    **Q.**   Do you remember how much the check was for, about?

09:40:09 **8**    **A.**   I think it was $150.

**9**    **Q.**   Did you ever go to court?

**10**   **A.**   No.

09:40:14 **11**   **Q.**   And about how old were you when this happened?

09:40:18 **12**   **A.**   Let's see, 23.

09:40:22 **13**   **Q.**   How would you describe basically to the members of the

**14** jury your skill level with dealing with your finances back

**15** during those days?

**16**   **A.**   I was -- I grew up poor, so I took that same thinking

**17** from when I was a kid straight to the military, and to sum it

09:40:44 **18** up:  I was financially illiterate, financially irresponsible.

09:40:49 **19** And I was a soup/sandwich...

**20**   **Q.**   When you filled out the security questionnaire in 1997

**21** as part of your background investigation for the United States

**22** military, did you report this check?

09:41:03 **23**   **A.**   Yes.

09:41:04 **24**   **Q.**   Did the military first ask you about it before you

09:41:08 **25** reported it?

09:41:09   **1**    **A.**    Yes.

**2**    **Q.**    And did you give them the explanation that you've just

**3**    described to us?

**4**    **A.**    Yes.

**5**    **Q.**    Were you ultimately issued that security clearance?

**6**    **A.**    Yes.

09:41:20   **7**    **Q.**    Did you willfully withhold any information from the

**8**    military at that time?

**9**    **A.**    No.

09:41:26   **10**   **Q.**    Did there come a time during this same period of time,

09:41:30   **11**   approximately the time you were in the school house training,

**12**   when you ingested drugs?

**13**   **A.**    Yes, during the language portion.

**14**   **Q.**    Would you tell the members of the jury basically what

09:41:40   **15**   happened there?

**16**   **A.**    Before going into language school you actually receive

09:41:45   **17**   your Green Beret.   And I was a heavy drinker back then.   And

09:41:51   **18**   we went out drinking to celebrate.   And I made a bad decision.

09:41:55   **19**   **Q.**    And what kind of drug did you take?

**20**   **A.**    It was acid.

**21**   **Q.**    Have you -- had you ever taken that drug before?

**22**   **A.**    No.

**23**   **Q.**    Have you ever taken it since?

**24**   **A.**    No.

**25**   **Q.**    Did you report that on the security questionnaire that

1    you completed in 1997, six years -- five years later?

2        A.    No, I did not.

3        Q.    And why is that?

09:42:16    4        A.    To -- I knew it was wrong.   To protect myself and

09:42:22    5    others involved.

09:42:24    6        Q.    Now, after you got out of school house training, where

09:42:29    7    did you go?

09:42:30    8        A.    My first duty station was Fort Campbell, Kentucky.   5th

9    Special Forces Group.

10        Q.    How long were you stationed at the 5th Special Forces

11    Group at Fort Campbell, Kentucky?

12        A.    Basically right after leaving Fort Bragg in late 1992,

13    all the way until my leaving the military in July of 1999.

09:42:58    14        Q.    And during this period of time, how much of that time

15    was spent here in the United States?

09:43:04    16        A.    About two months.   You're gone from the duty station

17    about ten months out of the year.

18        Q.    Without giving us specifics, can you tell us what

09:43:14    19    regions you traveled to as part of your work in the Special

09:43:19    20    Forces of the United States Army?

21        A.    From the Middle East all the way up to the Far East.

09:43:24    22        Q.    Did you complete other kinds of training during this

09:43:27    23    period of time or schooling?

24        A.    Yes, I did.

25        Q.    Can you tell us some of the things that you trained in

1   or schools that you attended?

2     **A.**   I attended combat diver's school, SEAL diving supervisor

09:43:43  3   school.

4     **Q.**   Let's go back for a second.   What does a -- what is a

09:43:48  5   "combat diver"?  Again, no specifics about your particular

6   training.

09:43:52  7     **A.**   Basically how to infiltrate in the water.

09:43:57  8     **Q.**   Infiltrate where?

9     **A.**   To different countries, places.

09:44:03  10   **Q.**   I'm sorry.   I cut you off.   What were some of the

11   other skills or schools that you went to?

09:44:11  12   **A.**   The SEAL diving supervisor course, desert maintenance

09:44:19  13   mobility.

09:44:20  14   **Q.**   What is that, "Desert maintenance mobility"?

09:44:24  15   **A.**   Basically if -- you learn how to work on your vehicle if

16   you break down in the desert.   You can't pull over to a gas

17   station.

09:44:33  18   **Q.**   Okay.  What else?

09:44:36  19   **A.**   The enriched aeronautic diver course, the hyperbaric

09:44:43  20   chamber, dive medical technician course, SERE school.

09:45:01  21   **Q.**   Without getting into specifics, can you explain to the

09:45:04  22   jury what SERE is?

23     **A.**   Survival, evasion, resistance, and escape.

09:45:10  24   **Q.**   Again, can you tell us basically, without getting into

09:45:15  25   specifics, what that class or course entails?

09:45:18 **1**    **A.**    Basically to learn how to survive and evade the enemy,

**2**    and if captured how to respond.

09:45:29 **3**    **Q.**    Any other training or schooling that you took during

**4**    this period of time?

09:45:35 **5**    **A.**    There were Arabic language courses.

09:45:40 **6**    **Q.**    Can you tell the members of the jury about what your

09:45:44 **7**    level of proficiency in the Arabic language was after you

09:45:48 **8**    received that training?

**9**    **A.**    At best, I would say a fourth grade level.

**10**    **Q.**    Were you disciplined ever when serving in the United

09:45:58 **11**    States military?

**12**    **A.**    Yes.

09:45:59 **13**    **Q.**    Can you tell the members of the jury what kind of

09:46:03 **14**    discipline you may have received?

**15**    **A.**    I received Article 15's, Uniform Code of Military

09:46:12 **16**    Justice.

**17**    **Q.**    Can you tell us what those incidents were?

09:46:16 **18**    **A.**    The first time was in January of --

**19**            THE COURT:  Excuse me, what is a, quote, Article

09:46:24 **20**    15, what does that mean?

**21**            THE WITNESS:  It's disciplinary actions under the

**22**    military.

09:46:34 **23**            THE COURT:  Does it have a special level?

09:46:34 **24**    BY MR. SOFER:

09:46:37 **25**    **Q.**    Is it something that goes on your record potentially?

09:46:40  **1**   **A.**   Yes.

**2**   **Q.**   And do they have -- do you have to go through some sort

09:46:44  **3**   of procedure to be cited under that particular article?

**4**   **A.**   Yes.   I guess it would be similar to this where -- but

**5**   you only appear in front of your commander and your top

09:46:57  **6**   non-commissioned officer.

**7**   **Q.**   Done within the military, it's a non-judicial

09:47:01  **8**   proceeding?

**9**   **A.**   Yes.

**10**   **Q.**   And what things did you serve an Article 15 for?

**11**   **A.**   There was only twice.   The first time was in January of

09:47:14  **12**   -- right before leaving to go to Korea.   In 1987.   And it was

09:47:22  **13**   drinking underage and causing a disturbance.

09:47:28  **14**   **Q.**   Basically drinking underage and what -- was there a

**15**   fight?

**16**   **A.**   Yes.

09:47:34  **17**   **Q.**   Was that fairly common back then in those days with

09:47:37  **18**   young men in the military?

**19**   **A.**   Oh, yes.

09:47:39  **20**   **Q.**   And did you receive any other Article 15's?

**21**   **A.**   Yes.   Later while I was in Special Forces I received a

09:47:49  **22**   failure to report.

09:47:50  **23**   **Q.**   And can you give us, again, a basic description of how

**24**   what happened?

09:47:55  **25**   **A.**   It was a night on the town down in a border town of

09:48:01  1  Mexico, and we were about an hour away from base.   And without

2  any vehicles.   And we were at the bar and the taxis decided

3  that they weren't going to drive all the way to where they

4  picked us up at earlier.   So those of us that didn't make it

5  back in time, the 3:00 curfew, we got -- I got failure to

6  report.

09:48:33  7     Q.   Didn't make it back to the base on time?

8     A.   Right.

09:48:36  9     Q.   Did you use illegal drugs while serving in the Army

10  other than the incident you've already told us about?

09:48:42  11     A.   No.

12     Q.   Were you subject to random drug tests?

13     A.   Yes.

14     Q.   Did you ever test positive?

15     A.   No.

16     Q.   Did your work in the Special Forces require background

09:48:51  17  checks and a security clearance?

09:48:53  18     A.   Yes.

19     Q.   During your service with the military, were you ever

09:48:56  20  denied a security clearance by the United States military?

21     A.   No.

09:48:59  22     Q.   As a result of your military service did you receive any

09:49:03  23  medals or commendations from the Army?

09:49:04  24     A.   Yes, I did.

25     Q.   I'm going to put Exhibit 1 up on the screen.   Can you

09:49:11  **1**  tell the members of the jury if you recognize Government's

09:49:16  **2**  Exhibit Number 1 for identification?

**3**  **A.**  Yes.   That's a picture of me in my uniform.

09:49:21  **4**  **Q.**  Do you know approximately when that picture was taken?

09:49:25  **5**  **A.**  It says in '93, 08/16.

09:49:33  **6**  MR. SOFER:  At this time the government moves

**7**  Government's Exhibit 1 into evidence.

**8**  THE COURT:  It will be admitted.

09:49:41  **9**  MR. SOFER:  Go to 2-A.

09:49:47  **10**  BY MR. SOFER:

**11**  **Q.**  Can you tell us what is depicted in Government's Exhibit

**12**  2-A for identification?

**13**  **A.**  That is my uniform without me in it.

09:49:55  **14**  **Q.**  Do you fit into that uniform anymore?

09:49:58  **15**  **A.**  Anymore?   I don't think so.

09:50:00  **16**  **Q.**  We all have similar problems.   Does this fairly and

**17**  accurately represent your uniform at approximately the time you

**18**  left the military?

**19**  **A.**  Yes, with a few minor changes.

09:50:12  **20**  **Q.**  Minor changes meaning what?

**21**  **A.**  There is not a Bronze Service Star on there and

09:50:27  **22**  another -- a SCUBA, a Jordanian SCUBA diver's badge on there.

09:50:34  **23**  MR. SOFER:  At this time the government moves

**24**  Government's Exhibit 2-A for identification into evidence.

**25**  THE COURT:  It will be admitted.

09:50:42 **1**              MR. SOFER:  How about 2-B.

09:50:46 **2** BY MR. SOFER:

09:50:47 **3**    **Q.**   Can you tell us basically what's depicted there?

**4**    **A.**   That represents the 12 years that you serve.   Every

09:50:58 **5** three years you get a -- one of these stripes.   That's for

09:51:03 **6** serving honorably in the military.

09:51:07 **7**              MR. SOFER:  Move that into evidence as well, Your

**8** Honor.   2-B for identification.

**9**              THE COURT:  It will be admitted.

**10**              MR. SOFER:  2-C.

09:51:15 **11** BY MR. SOFER:

**12**    **Q.**   Tell us basically what's depicted there?

**13**    **A.**   That is my unit designation patch.   And my job.

09:51:23 **14**    **Q.**   What was your job?

09:51:25 **15**    **A.**   Special Forces Green Beret.

09:51:30 **16**              MR. SOFER:  We move Exhibit 2-C into evidence, Your

09:51:34 **17** Honor.

09:51:34 **18**              THE COURT:  Admitted.

09:51:36 **19** BY MR. SOFER:

**20**    **Q.**   Tell the members of the jury, did you go to the Middle

**21** East as part of your military service?

**22**    **A.**   Yes, of those ten months out of the year being gone,

09:51:44 **23** most of that time we spent in the Middle East.

**24**    **Q.**   And were you involved in combat operations?

**25**    **A.**   Yes.

09:51:50  **1**    **Q.**    Without giving us any detail, can you tell the jury some

**2**    of the conflicts that you participated in?

09:51:56  **3**    **A.**    Desert Storm and Desert Shield.

09:52:00  **4**    **Q.**    Are you able to disclose all of the activities and

**5**    training that you received during your service in the Special

09:52:07  **6**    Forces Services of the U.S. Army here in open court?

**7**    **A.**    No.

**8**    **Q.**    Did there come a time when you left the United States

**9**    military?

**10**    **A.**    Yes.

**11**    **Q.**    Can you tell the members of the jury approximately when

**12**    that was?

09:52:16  **13**    **A.**    July of 1999.

09:52:19  **14**    **Q.**    Tell the members of the jury why it is that you left.

09:52:23  **15**    **A.**    I sustained an injury in November of 1998 on an airborne

09:52:30  **16**    operations.   It was at night, rough terrain, high winds in a

**17**    foreign country.

09:52:37  **18**    **Q.**    And can you tell the members of the jury basically what

**19**    the nature of your injury was?

09:52:42  **20**    **A.**    I injured my left knee.

09:52:46  **21**    **Q.**    Do you still suffer from the effects of that injury

**22**    today?

**23**    **A.**    Yes.

**24**    **Q.**    Can you give us a basic description of what that injury

**25**    is, your understanding of that injury?

**1**     **A.**   I basically have no cartilage in my left knee.  I have

**2**   bone on bone contact.

09:53:07   **3**     **Q.**   Can you tell the jury why it is you have bone on bone in

09:53:10   **4**   your knee?

09:53:11   **5**     **A.**   While performing those duties, I had to walk

09:53:20   **6**   approximately 25 miles to infiltrate.  An during that time,

**7**   once I injured it on the jump, I was given a shot of cortisone

09:53:34   **8**   and it being not a training mission, I had to go on.

09:53:40   **9**     **Q.**   Why did this injury result in you having to leave the

**10**   Special Forces of the United States Army?

09:53:45   **11**     **A.**   Because I couldn't recertify as a Special Forces

09:53:51   **12**   airborne-qualified jumper.

**13**     **Q.**   When you say "recertify", what do you mean by that?

**14**     **A.**   I couldn't perform my duties as a Green Beret.  I

09:54:02   **15**   couldn't do the endurance event followed by the specific tasks

**16**   you have to do after the endurance event.

09:54:15   **17**     **Q.**   Were you discharged from the United States Army as a

**18**   result of this injury?

**19**     **A.**   Yes, in July of 1999.

**20**     **Q.**   Can you tell the jury what kind of discharge you

**21**   received?

**22**     **A.**   Honorable.

09:54:24   **23**     **Q.**   And are you a disabled veteran?

**24**     **A.**   Yes.

09:54:28   **25**     **Q.**   Did you want to leave the United States Army, Mr.

09:54:31  1  Griffin?

09:54:31  2  **A.**  No.

3  **Q.**  Why not?

4  **A.**  It was my life.

09:54:36  5  **Q.**  Were you given a pension?

09:54:39  6  **A.**  I received a severance pay and I received a monthly

09:54:47  7  stipend.

8  **Q.**  How much of a severance pay and how much of a monthly

09:54:54  9  stipend do you get?

09:54:55  10  **A.**  I received about 60,000 dollars and the monthly check is

11  $117.

09:55:00  12  **Q.**  Do you know how far away you were when you left from

09:55:03  13  receiving what amounts to a full pension or a significant

09:55:06  14  pension?

15  **A.**  Six years.

09:55:09  16  **Q.**  And were you also close to being promoted when you left

17  the Army?

09:55:13  18  **A.**  Yes.

19  **Q.**  What was your final rank when you left the United States

20  military?

21  **A.**  Sergeant First Class.

09:55:19  22  **Q.**  Would you give the jury a basic description, Mr.

23  Griffin, of how you were feeling when you were discharged?

24  **A.**  I was lost.

09:55:28  25  **Q.**  Can you explain why?

09:55:41 **1**    **A.**   That was my stability.

09:55:46 **2**    **Q.**   And did have you plans when you left?

09:55:51 **3**    **A.**   Not really.

09:55:53 **4**    **Q.**   What did you do when you separated from the Army?

09:55:58 **5**    **A.**   I was hired at UPS to be a package handler, and then a

09:56:09 **6**  supervisor.

09:56:10 **7**    **Q.**   And did you have any money at that time?

**8**    **A.**   Yes.   I had that severance pay.

09:56:18 **9**    **Q.**   You said you were hired at UPS in what capacity?

**10**    **A.**   First as a package handler here in Toledo, Ohio, and

**11**  then as a part-time supervisor in Canton, Ohio.

09:56:32 **12**    **Q.**   And approximately when was it that you went to Canton,

09:56:36 **13**  Ohio?

**14**    **A.**   In January of 2000.

**15**    **Q.**   And how long did you stay in Canton, Ohio,

09:56:44 **16**  approximately?

**17**    **A.**   About a year.

09:56:45 **18**    **Q.**   Did you go to school during that time?

**19**    **A.**   Yes, I went to Stark State School of Technology.

**20**    **Q.**   Did you receive college credits during that period of

**21**  time?

**22**    **A.**   Yes.

**23**    **Q.**   Approximately how many college credits did you receive

09:57:00 **24**  during 2000?

09:57:01 **25**    **A.**   12, around 12.

| | | | |
|---|---|---|---|
| 09:57:07 | 1 | Q. | Did there come a time when you left school in Canton? |
| 09:57:10 | 2 | A. | Yes. |
| 09:57:12 | 3 | Q. | Where did you go? |
| | 4 | A. | I moved back here to Toledo, Ohio. |
| 09:57:20 | 5 | Q. | And why did you do that? |
| | 6 | A. | Basically to start my business plan for a security |

7 company.

| | | | |
|---|---|---|---|
| 09:57:28 | 8 | Q. | How did you survive financially during that period of |

| | | |
|---|---|---|
| 09:57:32 | 9 | time? |
| | 10 | A. | I still had some of the severance pay left. |
| 09:57:38 | 11 | Q. | Were you paying child support after you left the Army? |
| 09:57:41 | 12 | A. | Yes. |
| 09:57:42 | 13 | Q. | Were you always able to keep current in your child |
| 09:57:45 | 14 | support payments? |
| 09:57:46 | 15 | A. | No. |
| | 16 | Q. | Can you explain that to the members of the jury? |
| | 17 | A. | I basically -- I just didn't go through a child support |
| 09:57:55 | 18 | agency.  I went -- dealt directly with the mothers to provide |
| | 19 | for my kids. |
| 09:58:01 | 20 | Q. | Did you ever have any judgments rendered against you, to |
| | 21 | your knowledge? |
| 09:58:06 | 22 | A. | No. |
| | 23 | Q. | Did you ever go to court for not paying child support, |
| | 24 | to your recollection? |
| | 25 | A. | No. |

09:58:11 **1**  **Q.**  Did there come a time when you volunteered to work for

**2**  the United States Drug Enforcement Administration, also known as

09:58:19 **3**  the DEA?

**4**  **A.**  Yes.

**5**  **Q.**  Approximately when was that?

**6**  **A.**  Around April of 2001.

09:58:26 **7**  THE COURT:  When had you returned to Toledo from

**8**  Canton approximately?

09:58:33 **9**  THE WITNESS:  In January 2001.  Early 2001.

09:58:38 **10**  BY MR. SOFER:

09:58:39 **11**  **Q.**  Can you tell us basically how is it that you ended up

09:58:42 **12**  volunteering for working for the DEA?

**13**  **A.**  I was at a bar, the Sports Zone bar here in Toledo,

**14**  Ohio.  And I was with friends and family members.  And a

**15**  couple of drug dealers had came in and they started a fight with

09:59:00 **16**  me and my friends and family.  And for the wrong reasons I

**17**  basically went into the -- went into the DEA and said:  Hey,

09:59:15 **18**  what can I do?

**19**  **Q.**  You say the "wrong reasons".  What is that?

**20**  **A.**  It was probably selfish.  I wanted to get revenge.

**21**  **Q.**  And were you paid for your work at the DEA?

**22**  **A.**  Yes.

09:59:26 **23**  **Q.**  Do you recall how much?

09:59:28 **24**  **A.**  $21,000.

09:59:31 **25**  **Q.**  And that $21,000 was spread out over approximately how

**1** long, do you know?

09:59:38 **2**     A.   A year and a half.

09:59:40 **3**     Q.   Do you remember how your pay was broken down over that

09:59:43 **4** approximately year period of time?

09:59:46 **5**     A.   $800 a week.

09:59:49 **6**     Q.   Without telling us the names of any of the people that

09:59:52 **7** were involved, can you basically tell us what you did?

09:59:55 **8**     A.   I bought drugs.

09:59:58 **9**     Q.   And did you do that under the guidance of the Drug

10:00:02 **10** Enforcement Administration?

10:00:02 **11**     A.   Yes.

**12**     Q.   Did you yourself use drugs during this time?

**13**     A.   Yes.

10:00:06 **14**     Q.   Will you tell the members of the jury what drugs you did

**15** use?

10:00:09 **16**     A.   Marijuana and cocaine.

10:00:11 **17**     Q.   Can you give us an approximation of how often you used

**18** cocaine during this period of time?

**19**     A.   About once a week.

**20**     Q.   And approximately how long or how often did you use

**21** marijuana during this period of time?

10:00:27 **22**     A.   The same.

10:00:28 **23**     Q.   Can you describe for the jury how and why this happened?

10:00:33 **24**     A.   One began as my cover and credibility.   Two, because of

**25** pressure.   And three, sadly, I began to enjoy it and for

10:00:47  1  recreation.

2  **Q.**  When you say "for cover", what do you mean by that?

3  **A.**  I had to be a drug dealer.

10:00:55  4  **Q.**  Did you tell the DEA agents with whom you were working

5  that you used cocaine?

10:01:00  6  **A.**  No.

7  **Q.**  Why not?

8  **A.**  I knew it was wrong.

10:01:04  9  **Q.**  Did they tell you that you were not to violate the law

10  in this way while you were working for the DEA?

11  **A.**  Yes.

12  **Q.**  Did they ever specifically ask you whether you used

10:01:14  13  drugs?

14  **A.**  No.

10:01:15  15  **Q.**  Did you ever sell any drugs during the time that you

16  worked for the DEA?

17  **A.**  Yes.

10:01:20  18  **Q.**  Other than that which they had told you, you were

19  working with them on a particular sale?

20  **A.**  Yes.

10:01:27  21  **Q.**  Can you describe that for the members of the jury?

22  **A.**  There was a rumor going around that I worked for the

23  police or the DEA.   And I wanted to put some misinformation out

10:01:41  24  there, so I bought some prescription pills from someone that I

10:01:48  25  knew would go and repeat it.   And I then in turn sold those

10:01:52 **1** pills to someone that I knew that would repeat it.

10:01:55 **2**     **Q.** Did you make any money from that deal that you recall?

**3**     **A.** No.

10:02:00 **4**     **Q.** Is that the only time you sold drugs?

**5**     **A.** Yes.

**6**     **Q.** Is that the only time you've ever sold drugs in your

10:02:06 **7** life?

10:02:09 **8**     **A.** Yes.

10:02:11 **9**     **Q.** Did the DEA give you permission for this particular sale

**10** of these pills?

10:02:15 **11**     **A.** No.

10:02:17 **12**     **Q.** Did you ever have to testify in court as a result of

**13** your work with the DEA?

**14**     **A.** No.

10:02:23 **15**     **Q.** Did you have any other jobs while you were working for

**16** the DEA?

**17**     **A.** No.

10:02:29 **18**     **Q.** Did there come a time when you participated in any

10:02:33 **19** programs or classes when you were working for the DEA?

**20**     **A.** Yes, I attended the assets school here in Toledo, Ohio,

**21** learning how to write a business plan for my security company.

**22**     **Q.** And again approximately how long did you work for the

**23** DEA?

10:02:49 **24**     **A.** About a year and a half.

10:02:56 **25**     **Q.** Did there come a time when you transitioned into working

1    for the Federal Bureau of Investigation, known as the FBI?

2        A.    Yes.

10:03:05  3    Q.    Can you describe for the members of the jury basically

4    how that happened?

5        A.    Shortly after 9/11 I was approached by my contact at the

10:03:15  6    DEA.   And he asked me if I wanted to be a part of the task

7    force.

8        Q.    When you said "be a part of the task force", did he mean

9    you were going to become an agent?

10       A.    No, to my understanding it was to be an informant.

11       Q.    And do you remember meeting an FBI agent shortly

12    thereafter?

13       A.    Yes.

14       Q.    Can you tell the members of the jury who that was?

15       A.    Bill Radcliffe.

10:03:45  16    Q.    You describe for the jury basically the transition

10:03:48  17    process that you went through?

10:03:51  18    A.    To what I believe it was a vetting process.   I was

19    given a task to see if I could perform it, and was questioned.

20    I had to take a polygraph test.   And perform certain

10:04:12  21    information gathering.

10:04:16  22    Q.    Okay.  Was there a time when you actually were working

23    for both the DEA and the FBI?

10:04:24  24    A.    Yeah.

25       Q.    Can you basically describe how that happened for the

1  members of the jury?

10:04:29  2  **A.**  From basically October of 2001 to the following year,

10:04:38  3  approximately August, I still gathered information for the DEA

4  and then, while transitioning to the FBI, began to gather

5  information.

10:04:55  6  **Q.**  Did there come a time when the DEA stopped paying you

7  for your work and the FBI started paying you for your work?

8  **A.**  Yes.  I believe it was August of 2002.

10:05:06  9  **Q.**  When approximately -- I'm sorry.

10  Did you, yourself, undergo some personal

10:05:13  11  transformation during the fall of 2001 through middle or early

10:05:19  12  2002?

10:05:20  13  **A.**  Yes.

10:05:22  14  **Q.**  Can you explain that to the members of the jury?

10:05:25  15  **A.**  I had to become -- change my identity from being a drug

10:05:35  16  dealer to creating my new identity as an Islamic extremist.

17  **Q.**  Did you personally also go through your own personal

10:05:47  18  transformation?

10:05:49  19  **A.**  Yes.

10:05:50  20  **Q.**  Can you describe that for the members of the jury?

10:05:53  21  **A.**  On -- basically 9/11 -- or before 9/11, I was just

10:06:12  22  absorbed in myself, I was -- I fell into the thing that I had

10:06:19  23  feared 14, 15 years ago as doing drugs or, you know, being a

10:06:27  24  part of it.  And on 9/11 I was awakened by a family member, and

10:06:37  25  they simply said, are you ready to go back in?  And I didn't

10:06:45 **1** understand.  He told me to turn on the TV.  And the second

10:06:51 **2** plane had hit the towers.  And I didn't have to wait for an

10:07:02 **3** explanation.  I knew, I knew who was responsible because I had

10:07:08 **4** been in the military.  I knew who tried to take it down before,

**5** and I basically had to make a decision.  Was I going to

**6** continue to be selfish and continue to hurt people and do

**7** negative things and be a part of the problem instead of the

10:07:39 **8** solution, or was I finally going to stand for something?

10:07:50 **9** And I simply went and looked in the mirror.  I did

10:07:57 **10** something I hadn't done in a long time.  I took a good look.

10:08:03 **11** And I --

**12** Q.  Did you change your attitude, Mr. Griffin?

**13** A.  Yes.

10:08:26 **14** Q.  Did the DEA coming to you thereafter, was that a good

**15** thing or a bad thing about having you go work for the FBI, or

10:08:35 **16** neither?

**17** A.  It was -- I would consider it a good thing.

10:08:40 **18** Q.  Did you continue to be paid during this period of time?

**19** A.  Yes.

**20** Q.  And do you remember how much you were paid by the FBI

**21** when you first started working for them?

10:08:54 **22** A.  $4,000 a month.

10:08:58 **23** Q.  Did that amount change over time?

**24** A.  Yes.

10:09:02 **25** Q.  How long have you been receiving payments from the FBI

10:09:05   **1**   all together?

10:09:07   **2**    **A.**    From August of 2002 until present.

10:09:16   **3**    **Q.**    And do you know approximately how much money you've been

**4**   paid not counting certain expenses during the approximately six

**5**   years that you've been working for the FBI?

10:09:28   **6**    **A.**    About 350,000 approximately.

**7**    **Q.**    Again, is that over the six years you've been working

**8**   for them?

**9**    **A.**    Yes.

**10**    **Q.**    It's a relatively simple equation.  I don't know if I

**11**   can do it though.  Do you know how much that amounts to every

**12**   year?

10:09:49   **13**    **A.**    About 56,000 a year.

10:09:52   **14**    **Q.**    Can you tell the members of the jury what -- whether

**15**   some of that money was spent on things that were related to your

**16**   work for the FBI?

**17**    **A.**    Yes.  I had to create a whole new identity with that.

10:10:08   **18**   I had to move.  I was --

**19**    **Q.**    Were you asked to move to a particular place?

10:10:13   **20**    **A.**    Yes.  I was asked to get a place downtown Toledo.

**21**    **Q.**    And did that cost more money than the place you were

10:10:22   **22**   living in at the time?

10:10:23   **23**    **A.**    Yes.

**24**    **Q.**    Can you tell the members of the jury, after 9/11 did you

**25**   have other employment opportunities other than working for the

**1** FBI?

10:10:31 **2**    **A.**   Oh, yes.

**3**    **Q.**   Can you explain that to them?

10:10:35 **4**    **A.**   I could have worked for numerous companies, one being

10:10:43 **5** Blackwater, I could have just simply made a phone call and went

**6** there with my skills.

**7**    **Q.**   What kind of company is Blackwater?

**8**    **A.**   It's a security equipment and protection -- security

**9** company.

10:11:00 **10**    **Q.**   Are they operating any particular places around the

**11** world, to your knowledge?

**12**    **A.**   Yes.   They operate in all areas of the world,

10:11:12 **13** particularly they would have been working in combat zones, the

**14** war zones.

**15**    **Q.**   Can you give us an idea how much money, if you know, you

**16** may have been able to garner after 9/11?

**17**          THE COURT:  I'm sure there will be a basis for

**18** this.   I don't see a basis.   It seems somewhat speculative to

**19** me.

10:11:34 **20**          MR. SOFER:  Okay.

10:11:39 **21** BY MR. SOFER:

10:11:40 **22**    **Q.**   The money that you've made during the course of your

**23** time at the FBI, have you paid taxes on that money?

**24**    **A.**   No, I have not.

**25**    **Q.**   Can you tell the members of the jury why that is?

**1**     **A.**   I didn't receive a W-2 or a 1099 from the FBI, and the

**2**   information I had at the beginning when I contacted the IRS is

**3**   that I had to somehow verify where these -- this money was

10:12:08  **4**   coming from.   And I just couldn't pay taxes.   And even up to

**5**   this point it's still a gray area, and it's just recently been

**6**   told to me, since my name has come out in the paper, I can

10:12:23  **7**   actually say what I did, that I can get the taxes taken care of

**8**   and I can -- with help from the FBI, they can verify that, yeah,

**9**   this is from payments from them, and not anything else.

10:12:42  **10**     **Q.**   How were you paid; were you paid by check, cash or

10:12:46  **11**   electronic transfer?

**12**     **A.**   Cash.

10:12:48  **13**     **Q.**   During the time you've worked for the FBI, were you able

**14**   to work another job?

10:12:55  **15**     **A.**   No, I was not.

**16**     **Q.**   Tell the members of the jury why that is.

**17**     **A.**   I had to be available to them 24 hours a day, 7 days a

**18**   week.

10:13:06  **19**     **Q.**   During the time you worked for the FBI, have you ever

**20**   used any illegal drugs?

10:13:12  **21**     **A.**   Yes.

**22**     **Q.**   Can you tell the members of the jury what those drugs

**23**   were and approximately how many times?

10:13:19  **24**     **A.**   It was marijuana.

10:13:20  **25**     **Q.**   And how many times have you used marijuana during the

1  time you worked for the FBI?

2  **A.**  Just a few.

10:13:27  3  **Q.**  Did you ever smoke marijuana while performing your work

4  with the FBI?

10:13:31  5  **A.**  No.

6  **Q.**  Did you ever use any illegal drugs whatsoever while

10:13:35  7  performing your actual work for the FBI?

10:13:37  8  **A.**  No.

9  **Q.**  Can you tell the members of the jury basically what your

10:13:42  10  understanding is of what you were asked to do by the Federal

11  Bureau of Investigation?

12  THE COURT:  Why don't we take a break now?

10:13:49  13  MR. SOFER:  This would be a good spot, Your Honor.

14  THE COURT:  Ladies and gentlemen, we'll try to

15  resume between 25 after and half past.   Don't talk about the

10:13:58  16  case, keep an open mind and we'll see you shortly.   If you want

17  to leave your notebooks on the chair, that's fine.   It's up to

10:15:07  18  you.

10:17:12  19  (Recess taken).

10:36:16  20  THE COURT:  Ladies and gentlemen, are you able to

21  hear okay?

10:36:22  22  THE JUROR:  Yes.

23  THE COURT:  I'll let the far corner be the auditor,

24  so to speak.

10:36:28  25  One thing that I neglected to mention to you, I'm

2243

1 sure that you are fully aware of it in any event, if you happen

2 to see any of us who has anything to do with the case in the

10:36:44 3 corridor, the elevator, or whatever, don't be too offended if

10:36:49 4 we're kind of brusque and don't give you a big hello and start

10:36:54 5 chatting.   I don't want anybody to think there's somehow

10:36:59 6 inappropriate contact with any of us involved in the case or any

7 of us and any of you.   So we don't mean to be rude or impolite,

8 it's just we want to avoid any appearance of anything

10:37:13 9 inappropriate.

10                    Mr. Griffin, you understand you remain under oath.

11                    Mr. Sofer, you may continue.

12                    MR. SOFER:  Thank you, Your Honor.

10:37:22 13 BY MR. SOFER:

10:37:23 14      Q.   Mr. Griffin, can you tell the members of the jury what

10:37:26 15 your basic understanding was of what it is that you were asked

16 to do for the FBI?

10:37:31 17      A.   To gather information.

10:37:35 18      Q.   And approximately when did that start?

10:37:42 19      A.   October, November time frame of 2001.

10:37:50 20      Q.   And what kind of information are we talking about here?

10:37:55 21      A.   Information on threats to the United States.

10:38:00 22      Q.   And were you asked to look for threats to the United

10:38:05 23 States in particular places, communities, areas; what kind of

10:38:11 24 threats were you asked to look for?

25      A.   In the Muslim community.

**1**    **Q.**    And were there things that you had to do that needed to

10:38:22 **2** be done in order for you to gather the kind of threat

10:38:25 **3** information that you're describing?

10:38:27 **4**    **A.**    Yes.   I had to set up an identity that I was an Islamic

10:38:35 **5** extremist.

10:38:36 **6**    **Q.**    And did this extremist identity include concepts of

10:38:45 **7** violence?

**8**    **A.**    Yes.

**9**    **Q.**    Can you describe what you mean by that to the members of

10:38:49 **10** the jury?

10:38:49 **11**    **A.**    Violence to the United States.  And that violence was

**12** either going to be here in the United States or abroad.

**13**    **Q.**    And what kind of violence are we talking about?

**14**    **A.**    To injure, kill, or maim.

**15**    **Q.**    And was this violence connected somehow to the extremist

10:39:14 **16** views?

**17**    **A.**    Yes.

**18**    **Q.**    Can you describe how?

**19**    **A.**    Could you rephrase the question?

**20**    **Q.**    You said that you had to come up with an identity

**21** which -- in which you had extremist views that relate to

10:39:33 **22** violence.   How did the extremist views connect to violence?

10:39:42 **23**    **A.**    Basically the extremists, they injure, kill, or maim in

**24** the name of religion.

10:39:50 **25**    **Q.**    Did you have concerns about what the FBI was asking you

10:39:54 **1** to do?

**2**     **A.**   No.

10:39:57 **3**     **Q.**   Can you tell us again what your general thoughts were

**4** acting in this capacity after 9/11?

10:40:03 **5**     **A.**   That I had to make a decision that was I going to go

**6** stay selfish and go work a job that I knew that was imminent

10:40:15 **7** overseas making $1,000 a day or was I finally, for once in my

10:40:20 **8** life, going to be self-less, and just like the oath I took in

**9** the military, to protect this country from foreign and domestic

10:40:33 **10** enemies.   So it got me back into the thick of things.

10:40:40 **11**     **Q.**   Did you have to learn about the Muslim faith in order to

**12** blend into the community that you were asked to work in?

**13**     **A.**   No, I had learned it prior when I was in the military.

**14**     **Q.**   And can you give us some basic ideas of what you learned

**15** and what your prior experiences were?

10:40:57 **16**     **A.**   The culture and the customs and how the religion and how

**17** it's separated.

**18**     **Q.**   Are you a Muslim today?

**19**     **A.**   No.

**20**     **Q.**   What religion do you practice today?

10:41:11 **21**     **A.**   I consider myself a Christian but, more importantly, I

**22** have a personal relationship with Jesus Christ.

10:41:19 **23**     **Q.**   During your work with the FBI did you ever pretend to

**24** convert to Islam?

**25**     **A.**   Yes.

10:41:25 **1**    **Q.**    Did you truly convert?

**2**    **A.**    No.

**3**    **Q.**    Do you speak Arabic?

10:41:30 **4**    **A.**    I have a working knowledge, first to second grade level

10:41:38 **5**  of Arabic.

10:41:40 **6**    **Q.**    Did you do anything further beyond your military

10:41:44 **7**  training to learn Arabic in order to establish your new

10:41:49 **8**  identity?

**9**    **A.**    Yes.    Part of my identity to build rapport and gather

**10**  information is one of the first things I did is I started to

**11**  study Arabic in the Mosque and take classes also.

10:42:07 **12**    **Q.**    How would you describe your -- I think you said a first

**13**  or second grade level of understanding of Arabic.    Is that

10:42:16 **14**  approximately right?

**15**    **A.**    Well, that would be the -- on the reading and writing

**16**  side of things.

**17**    **Q.**    What about your understanding of what people were

**18**  speaking, approximately?

**19**    **A.**    I could follow conversations, about every other to third

10:42:33 **20**  word.    I know the gist of most conversations.

**21**    **Q.**    Not fluent in any way?

**22**    **A.**    No.

10:42:40 **23**    **Q.**    Did you change your name as part of creating this new

10:42:44 **24**  identity?

**25**    **A.**    Yes.

1    **Q.**    And what name did you adopt?

2    **A.**    Bilal.

10:42:48  3    **Q.**    Do you know where the name Bilal comes from?

10:42:51  4    **A.**    He was the companion of the Prophet Mohammad.

10:42:56  5    **Q.**    Did you change your address?

10:43:00  6    **A.**    Yes.

10:43:02  7    **Q.**    And where did you move?

10:43:04  8    **A.**    I moved to the Lasalle building here in downtown Toledo.

9    **Q.**    A few blocks away from the courthouse here?

10    **A.**    Yes.

10:43:12  11    **Q.**    I think you said earlier you had been asked to move

10:43:16  12  downtown by the FBI?

13    **A.**    Yes.

10:43:18  14    **Q.**    Can you tell the members of the jury what else you

15  basically had to do to establish your new identity, what other

10:43:24  16  things you changed?

10:43:25  17    **A.**    I had to cut ties with friends, family, grow a beard,

18  wear the garb.

10:43:33  19    **Q.**    When you say "the garb", what do you mean?

20    **A.**    The dress, the formal traditional dress of the Arab

10:43:44  21  culture.

22    **Q.**    Anything else you had to do?

10:43:49  23    **A.**    I had to assume the whole identity of Islamic extremist.

24    **Q.**    Did you begin working somewhere as part of establishing

25  this new identity?

10:44:00 **1**    **A.**   Yes.  Shortly -- I would say in the fall of 2002 I had

10:44:14 **2**  worked at a local charity.

**3**    **Q.**   Was that a Muslim charity?

**4**    **A.**   Yes.

**5**    **Q.**   Islamic-based charity?

**6**    **A.**   Yes.

10:44:23 **7**    **Q.**   Can you tell us how long it took to establish this cover

**8**  as you described?

**9**    **A.**   There was a transition between the -- while I was

10:44:33 **10**  working with the DEA and the FBI, but I began my cover and

**11**  identity immediately starting in -- right after 9/11.   And it

**12**  took approximately a few years to establish it, get my story out

**13**  there.

10:44:56 **14**    **Q.**   Who did you tell, if anyone, about the true purpose of

10:45:01 **15**  doing these things?

10:45:03 **16**    **A.**   Only -- no one in the beginning, but later, my wife.

10:45:10 **17**    **Q.**   Can you describe basically for the jury whether you took

**18**  any security precautions during your course of working for the

**19**  FBI?

**20**    **A.**   I took the best measures as I could.   Being from the

10:45:25 **21**  community and growing up as a child here in Toledo, there's

10:45:29 **22**  certain things that were -- would be impossible for me to do

**23**  because I'm from the community, I grew up here, so I couldn't

**24**  assume a totally different name or anything besides my Islamic

**25**  name because it just wouldn't work.

10:45:48 **1**   **Q.**   Did you develop a code name for yourself?

**2**   **A.**   No, I didn't.

**3**   **Q.**   Did someone else come up with a code name for you?

**4**   **A.**   Yes.

**5**   **Q.**   An FBI agent?

**6**   **A.**   I assume.

10:46:00 **7**   **Q.**   Were you ultimately told what your code name was by the

**8**   FBI?

**9**   **A.**   Yes.

10:46:06 **10**   **Q.**   Do you know who told you that?

**11**   **A.**   Bill Radcliffe .

**12**   **Q.**   What was your code name?

**13**   **A.**   Supernatural.

10:46:18 **14**   **Q.**   How is the code name used?

10:46:20 **15**   **A.**   Basically to keep my name secure and known that I was

10:46:29 **16**   working for the FBI .

10:46:36 **17**   **Q.**   Were you concerned that someone might see you working

10:46:40 **18**   with the FBI whom you knew here from Toledo?

10:46:44 **19**   **A.**   That's always at least part of your mind, if you're

**20**   security conscience when you have a different identity.

10:46:58 **21**   **Q.**   Did you own a firearm or firearms during this period of

**22**   time?

**23**   **A.**   Yes.

10:47:02 **24**   **Q.**   Did the security situation make things difficult for you

10:47:06 **25**   on a day-to-day basis in your personal life?

1      **A.**   Oh, yes.

10:47:13   2      **Q.**   Can you tell the members of the jury what, if anything,

3   you did to maintain secrecy when you were communicating with

10:47:20   4   people in the FBI?

5      **A.**   I would not use their name, their actual name.  I would

6   use words like boss, for example.

10:47:32   7      **Q.**   Were you always able to maintain complete security

10:47:36   8   during the time and years you worked for the FBI?

9      **A.**   No.

10      **Q.**   Can you give us some examples of why it was you were not

11   able to maintain complete security?

12      **A.**   Just impossible.   When -- if I was with my family

10:47:52   13   members and I would get a call from a person of interest, if I

14   was with a person of interest and another person of interest

15   called me, it was just -- couldn't do it.   I had to do the best

10:48:09   16   I could.

10:48:12   17      **Q.**   Could you describe for the jury what your general plan

10:48:15   18   was to collect information about possible threats here in the

10:48:20   19   Toledo area?

20      **A.**   Basically put my cover story down that I was an ex-Green

10:48:27   21   Beret, disenchanted with the United States, got out due to an

22   injury, and I did not agree with their foreign policy, and I

23   took the identity of an Islamic extremist.

10:48:46   24      **Q.**   Did you weave together things that were true and things

25   that were not true?

2251

1    **A.**    Yes.

10:48:52    2    **Q.**    Can you describe that for members of the jury?

3    **A.**    I would use, of course, my name, my Social Security

4    number.

10:48:59    5    **Q.**    Why would you use your real Social Security number, as

6    an example?

10:49:04    7    **A.**    Once again, I'm from the community, and if any

10:49:10    8    documentation from getting my Social Security number -- I did

10:49:16    9    travel back here to Toledo, Ohio; I had friends.  It's just one

10:49:21    10    of those things you couldn't hide.    Plus I would have to -- if

11    I did pick another Social Security number, I would have to

12    remember that Social Security number.  And any time you start

13    adding things, you're bound to forget one of them.

10:49:36    14    **Q.**    Did you have to say things that were not true to

10:49:39    15    establish your cover?

10:49:40    16    **A.**    Yes.

17    **Q.**    Did you lie to people?

18    **A.**    Yes.

19    **Q.**    Tell the members of the jury why that was.

10:49:44    20    **A.**    Because I very well couldn't, say, walk into and gather

21    information by walking up to a person, hi, I'm an ex-Green

22    Beret, I'm working for the FBI, and I want to know if, you know,

23    what do you know about the extremist activities in the area.

10:50:09    24    **Q.**    When you began working for the FBI, did the FBI actually

10:50:13    25    ask you to focus your efforts on anyone in particular?

1    **A.**    Yes.

2    **Q.**    Without telling us who those individuals were, were any

10:50:20  3    of those people Mohammad Amawi, Wassim Mazloum or Marwan

4    El-Hindi?

10:50:25  5    **A.**    No.

10:50:26  6    **Q.**    When you first started, how did you know where to go and

7    what to do?

8    **A.**    I was guided, told by the FBI, and I also checked the

10:50:39  9    Toledo area, did the demographics.

10:50:45  10    **Q.**    Did you take notes during the time you were collecting

10:50:48  11    information?

10:50:52  12    **A.**    Just very few, basically maybe a license plate number,

13    maybe a name or a phone number.  But not during operations, just

10:51:07  14    basically once I departed from the people of interest.

10:51:10  15    **Q.**    Okay, and why did you not take notes?

16    **A.**    Basically because it would have been a security risk if

10:51:20  17    I would have kept notes after every event, and put them in my

18    car, in my apartment, if those two things would have got broken

10:51:33  19    into I would have been exposed.

10:51:39  20    **Q.**    Without telling us the specifics with respect to the

10:51:44  21    equipment, can you give us a basic description of what equipment

22    the FBI provided you with in order to perform your information

10:51:50  23    gathering?

24    **A.**    Recording devices and video recording devices and a

10:52:00  25    laptop.

1  **Q.** Did you hide or conceal these devices on your person?

2 Did you ever hide the devices in clothing, or what would you

3 hide them in basically?

10:52:14 4  **A.** Anywhere I thought I could get away with it and

5 accurately record the events taking place.

10:52:21 6  **Q.** To your knowledge did any of the people that you

10:52:24 7 recorded know that you were recording your conversations with

8 them?

10:52:27 9  **A.** No.

10:52:28 10  **Q.** Did you ever have an incident where you dropped the

11 device or you noticed that it was visible to anyone you were

10:52:35 12 recording?

13  **A.** No.

10:52:36 14  **Q.** Do you know if you were given a cell phone by the FBI?

10:52:40 15  **A.** Yes.

10:52:43 16  **Q.** Did they actually hand you the cell phone or did they

17 ask you to --

18  **A.** No, they asked me to purchase a cell phone out of the

19 monthly stipend.

10:52:54 20  **Q.** Do you recall the number that was assigned to that cell

10:52:58 21 phone while you were working for the FBI?

22  **A.** (419)787-3906.

10:53:06 23  **Q.** Do you recall ever being given a satellite phone by the

24 FBI?

10:53:11 25  **A.** Once again, I purchased it out of the monthly stipend.

2254

10:53:18 **1**    **Q.**   Do you remember the number assigned to that device?

**2**    **A.**   I do not.

10:53:22 **3**    **Q.**   Would anything refresh your recollection?

10:53:24 **4**    **A.**   Maybe a phone bill.

10:53:28 **5**             THE COURT:  You can simply suggest the number to

**6**   him, that's fine.

**7**             MR. SOFER:  I'm sorry, Your Honor?

10:53:33 **8**             THE COURT:  You can suggest the number to him.

**9**             MR. SOFER:  I could but then I'd have to remember

**10**  it, too.   Just one moment, Your Honor, 126-A.

**11**             Your Honor, can we approach for one second?   I can

**12**  put it up on the screen but it will be in front of the jury.

**13**             Is that acceptable to Counsel?

10:53:53 **14**            MR. HARTMAN:  If it's just the number, yeah.

**15**            MR. SOFER:  Well, it's the bill.

10:53:58 **16**            MR. HARTMAN:  That's fine.

10:53:59 **17**            MR. SOFER:  126-A, please.

10:54:02 **18**  BY MR. SOFER:

10:54:02 **19**    **Q.**   I don't know if you can see that.   Is there a number on

**20**  there which helps you refresh your recollection as to what the

**21**  number of the actual satellite phone was?

**22**    **A.**   Yes.

10:54:16 **23**    **Q.**   Can you tell the members of the jury what that number

10:54:19 **24**  was.   Can you circle it?   Try your best John Madden

10:54:32 **25**  interpretation.   Can you read that?

1    **A.**   8821651194023.

10:54:44   2    **Q.**   Were you also --

10:54:46   3        I think you said you were also given a laptop

10:54:48   4  computer?

5    **A.**   Yes.

6    **Q.**   Do you remember who gave that to you?

10:54:51   7    **A.**   Shannon Coats.

8    **Q.**   Who is Shannon Coats?

9    **A.**   He's an agent at the FBI.

10    **Q.**   Is he one of the other people that you dealt with

11  regularly?

12    **A.**   My contact, yes.

10:55:00  13    **Q.**   Do you recall approximately when it is that you received

10:55:04  14  this laptop computer?

10:55:06  15    **A.**   The fall or late 2004, early 2005.

16    **Q.**   Can you give us a basic description of what that laptop

10:55:21  17  computer looked like?

18    **A.**   Silver.  It was -- the manufacturer was Dell, and I

19  believe it was an Inspiron.

10:55:33  20    **Q.**   Can you give the members of the jury a basic

21  understanding of what your knowledge was of computers when you

22  started this case?

23    **A.**   I can do a little more than turn it on, send some

10:55:44  24  e-mails, and do a Word document.

10:55:49  25    **Q.**   Have you received any kind of significant computer

1    training in the military?

2        A.    In -- there was basic stuff but it was nothing like they

3    have today.  We had to -- the computers I came across in the

4    military were -- you had to load them by UBC-74.

10:56:14   5        Q.    Nothing like the Dell computer you got in connection

6    with the case in 2004?

10:56:19   7        A.    No.  I could carry this one.

10:56:23   8        Q.    Did your understanding and abilities in the areas of

10:56:27   9    computers change during the course of your involvement in this

10   case?

10:56:30   11        A.    Yes.

12        Q.    Can you tell the members of the jury basically how it

13   changed?

14        A.    Dealing with Mohammad Amawi and basically learning from

15   him, I learned a lot of the things from him and watching him.

16        Q.    Can you --

17            MR. SOFER:  Can you put in 3-A, please?

10:57:05   18   BY MR. SOFER:

19        Q.    Do you recognize what is depicted in Government's

10:57:08   20   Exhibit 3-A for identification?

21        A.    Yes.  It looks like the Dell computer I used.

22            MR. SOFER:  At this time, Your Honor, we'll offer

23   it as Government's Exhibit 3-A.

24            THE COURT:  It will be admitted.

10:57:21   25            MR. SOFER:  How about 3-B.

10:57:28  **1**  BY MR. SOFER:

10:57:29  **2**  **Q.**  Does that look familiar to you?

**3**  **A.**  It looks like the bottom of the Dell computer.

10:57:34  **4**  MR. SOFER:  At this time the government will offer

**5**  3-B.

10:57:38  **6**  THE COURT:  It will be admitted.

10:57:43  **7**  BY MR. SOFER:

10:57:43  **8**  **Q.**  Can you give the jury a basic description of how is it

10:57:48  **9**  you used this laptop computer that was given to you by the FBI?

**10**  **A.**  I used it to help enhance my information gathering.

10:57:57  **11**  **Q.**  And what do you mean by that?

**12**  **A.**  And to bring it sort of -- well, accompany with it, me,

**13**  when I meet with people of interest and view websites.

10:58:18  **14**  **Q.**  Did you put any of your personal information on the

**15**  computer?

**16**  **A.**  I went to some site, yes.

10:58:24  **17**  **Q.**  Did the FBI give you instructions about not putting

10:58:29  **18**  personal information on the computer?

**19**  **A.**  No.  They told me to use it how I normally would.

10:58:35  **20**  **Q.**  Were there times when you gave this computer back to the

**21**  FBI?

**22**  **A.**  Yes.

10:58:39  **23**  **Q.**  And were there times when you gave the computer to

**24**  Mohammad Amawi?

10:58:44  **25**  **A.**  Only when I was physically with him.

10:58:49 **1**     **Q.**    Can you give an example to the jury of why it was you

10:58:53 **2** would have given custody or control of the computer to Mohammad

**3** Amawi during the course of the case?

**4**     **A.**    At least on one occasion while we were at his residence,

**5** we -- he attempted to network the computer from his desktop to

10:59:11 **6** the laptop.

10:59:12 **7**     **Q.**    And what was the purpose of doing that?

**8**     **A.**    To pass videos and information.

10:59:20 **9**     **Q.**    Can you tell the members of the jury -- I think you said

10:59:23 **10** you met with two agents primarily that you've dealt with

**11** throughout the course of the case?

**12**     **A.**    Yes.

10:59:28 **13**     **Q.**    What are their names?

10:59:29 **14**     **A.**    Bill Radcliffe and Shannon Coats.

**15**     **Q.**    Which one did you deal with first?

10:59:34 **16**     **A.**    Bill Radcliffe.

**17**     **Q.**    Do you know if Agent Radcliffe is still working for the

**18** FBI?

**19**     **A.**    He is not.

**20**     **Q.**    Do you know why?

10:59:40 **21**     **A.**    He retired.

10:59:41 **22**     **Q.**    And did Shannon Coats replace Radcliffe when Agent

10:59:48 **23** Radcliffe retired?

**24**     **A.**    Yes.

10:59:49 **25**     **Q.**    You testified the FBI pays you during the course of your

1    work for them?

10:59:53  2    A.    Yes.

3    Q.    Tell the members of the jury what your understanding of

4    what this money was for.

5    A.    To help me keep up the identity of what I had to do and

6    not -- so I wouldn't have to go get a job, just a regular job

11:00:11  7    and try to keep up this identity.   It was also to pay the bills

11:00:17  8    and support my family.

11:00:24  9    Q.    You still being paid by the FBI today?

11:00:26  10   A.    Yes.

11   Q.    Can you tell the members of the jury what your

11:00:29  12   understanding is as to why you're still being paid today?

13   A.    Basically to help and go through all of the videos and

11:00:37  14   all the materials created in this case.

11:00:44  15   Q.    What kind of time have you spent in terms of assisting

16   in the preparation of this case?

11:00:53  17   A.    A huge amount of time.

11:00:55  18   Q.    When you say "huge", what do you mean by that, hours per

11:01:04  19   day?

20   A.    Hours per day?

21   Q.    Can you give us a basic --

22   A.    I would say at least 12 hours a day for the last -- at

11:01:15  23   least the last month, for example.   That's just recent.

11:01:24  24   Q.    Were you asked to review the recordings you made?

11:01:27  25   A.    Every single one.

11:01:31  **1**    **Q.**    Were you able to work full-time during the work with the

11:01:36  **2**  FBI or the duration of this case?

11:01:38  **3**    **A.**    No.

**4**    **Q.**    Is any of the money that you're receiving related to

**5**  what happens in this case?

11:01:47  **6**    **A.**    Can you rephrase the question?

**7**    **Q.**    Has anyone ever told you that if you get --

11:01:52  **8**    THE COURT:  You're starting to lead the witness.

11:01:56  **9**    MR. SOFER:  Sorry, Your Honor.

**10**  BY MR. SOFER:

**11**    **Q.**    Again, your understanding of why it is you were paid

**12**  this money, can you just describe that for the jury?

**13**    **A.**    Just to prepare the case so I didn't have to go get a

**14**  job and it was actually kind of impossible to do that since my

11:02:12  **15**  name was released two years ago.

11:02:17  **16**    **Q.**    Do you recall all the details of all of your

**17**  interactions with the individuals related to this case as you

11:02:23  **18**  sit here today?

**19**    **A.**    No.

**20**    **Q.**    Can you tell the members of the jury why that is?

11:02:27  **21**    **A.**    I spent hundreds of hours with these men and over 20

11:02:38  **22**  subjects I was gathering information on.  It would be

**23**  impossible.  It would be impossible to keep every detail,

**24**  recall every detail.

**25**    **Q.**    When you say "20 subjects", what do you mean by that?

1    **A.**   20 people of interest.

2    **Q.**   So 20 people in addition to these three men?

3    **A.**   Yes.

11:03:00  4    **Q.**   Is that an approximate number?

5    **A.**   Approximate, yes.

11:03:10  6    **Q.**   You testified that you did not, for the most part, take

11:03:14  7  notes.   How did you relate information to the people, your

11:03:19  8  contacts at the FBI?

11:03:20  9    **A.**   One, with the recording devices provided; and two, after

11:03:29  10  or almost always after every event, I would meet with my contact

11:03:36  11  and regurgitate and give to him what I could remember about that

12  contact.

11:03:44  13    **Q.**   Were you always able to relate all of the information

14  right away?

11:03:48  15    **A.**   No.

16    **Q.**   Can you tell the members of the jury why that was?

17    **A.**   These things would go until the early hours of the

18  morning, 12:00, 1:00, 2:00 in the morning, and I would have to

19  wait until the morning to wait until my contact came to work.

11:04:09  20    **Q.**   Can you tell us what you have relied upon primarily in

11:04:13  21  refreshing your recollection of the events relating to this case

11:04:17  22  for your testimony before the jury?

23    **A.**   The recordings.

11:04:22  24       MR. SOFER:  Your Honor, at this time I'd like to

25  hand up to Mr. Griffin what's been marked as Government's

1    Exhibit 4-A for identification, the document we've talked about.

2                THE COURT:  I understand.

11:04:36    3                Objections?

11:04:37    4                MR. BOSS:  Not at this time.

11:04:44    5                THE COURT:  It's my understanding this will not be

6    displayed to the jury; is that correct?

11:04:48    7                MR. SOFER:  Not displayed to the jury and not

11:04:51    8    introduced into evidence by the government.

11:04:55    9                MR. BOSS:  Judge, we would have no objection to the

10    witness having this document.   However, we, of course, would

11    like the Court to caution him it should not be read in advance

12    of his need.

13                THE COURT:  Mr. Griffin, you'll have with you, at

11:05:11    14    least initially, the document marked for identification as 4-A.

15    I instruct you to refrain from looking at or reviewing that

11:05:19    16    document unless expressly asked to do so by Mr. Sofer or someone

11:05:23    17    else.

11:05:24    18                THE JUROR:  Yes, sir.

11:05:25    19                MR. BOSS:  Judge, would that same caution extend to

20    during breaks?

11:05:29    21                THE COURT:  Of course.

11:05:31    22                MR. SOFER:  May I approach the witness?

11:05:33    23                THE COURT:  Of course.

11:05:35    24                MR. SOFER:  I'll turn it over.

11:05:42    25    BY MR. SOFER:

11:05:46  **1**    **Q.**   You stated that you used recording devices as part of

**2**  your work for the FBI.   Can you describe for the jury what

**3**  these devices recorded?

11:05:55  **4**    **A.**   The actual events as they happened.

**5**    **Q.**   And do they record audio, video, or both, or don't you

**6**  know?

**7**    **A.**   Audio and video and both.

11:06:07  **8**    **Q.**   Did you ever wear or hide multiple devices on your

**9**  person?

**10**    **A.**   Yes.

**11**    **Q.**   And can you tell the members of the jury who decided

11:06:16  **12**  what devices you would wear?

11:06:18  **13**    **A.**   The FBI for the most part.

11:06:27  **14**    **Q.**   Can you give the jury a basic description of how you

11:06:30  **15**  used the recording devices that were given to you by the FBI;

**16**  When would you put them on, when would you take it off, how

**17**  would you turn them on, without giving us any details as to the

**18**  particular way they worked?

**19**    **A.**   I tried to turn it on before I actually came in the

**20**  presence of every person of interest because it wasn't -- it

**21**  wasn't easy to turn on.   And -- but you can do it covertly, but

**22**  it's not -- it's obvious, you know.   The best I could, I turned

11:07:11  **23**  it on and off, but usually before I met and then after I left

**24**  the subject.

11:07:18  **25**    **Q.**   Did you always record all of the conversations you had

11:07:22 **1** with people who were of interest to you and the FBI?

**2**    **A.**   No.

11:07:26 **3**    **Q.**   Did the devices that you used have limitations to them?

**4**    **A.**   Yes.

**5**    **Q.**   Can you give us a basic description without going into

11:07:34 **6** specific details of the kinds of limitations we're talking

**7** about?

11:07:38 **8**    **A.**   They had time restraints.

11:07:42 **9**    **Q.**   Can you give the jury some examples of any situations

**10** where you were unable to record conversations?

11:07:50 **11**    **A.**   During prayer times.

11:07:55 **12**    **Q.**   Why was it you were unable to record during prayer

11:08:01 **13** times?

11:08:02 **14**           MR. HARTMAN: Objection. May we approach?

**15**           (Whereupon the following discussion was had at the

11:14:37 **16** bench outside the hearing of the jury:)

11:14:37 **17**           MR. HARTMAN: Judge, if you recall we filed a

**18** motion about these recording devices, we were not allowed to

**19** examine them. Because we weren't allowed to examine them, I

**20** don't think it's fair for him to go into them because we have no

**21** way to test the veracity.

**22**           THE COURT: I agree.

**23**           MR. SOFER: I think that's silly. The reason I

**24** say that, Your Honor, is I'm not asking him about the particular

**25** specifics. In fact, I'm specifically staying away from that.

1    THE COURT:  He's testifying he turned them on and

2  off.

3    MR. SOFER:  How else are we supposed to explain

4  that to the jury?

5    MR. HARTMAN:  Turning them on and off was a serious

6  issue in our defense.   That's why we wanted our expert to

7  examine them and find out what they could and couldn't do.

8  They said no, they wouldn't let us do it.   How can we rely upon

9  him to say that when the expert couldn't even look at it?  We

10  have no way of knowing if he's telling the truth or not.

11    MR. SOFER:  Under that theory, Your Honor, we can't

12  have him explain turning the thing on and off.   It doesn't make

13  any sense.

14    MR. SOFER:  I would --

15    THE COURT:  I would agree.   The issue is not the

16  device itself.   The fact that he's testified he operated it by

17  turning switches, have him testify he turned the switch on and

18  off and he determined he turned it on, it recorded things, when

19  he turned it off, it wouldn't.

20    MR. SOFER:  I am going to ask him if he could tell

21  when he turned it on and off if it was on or off.

22    MR. HARTMAN:  My understanding is he was going to

23  go into what kind of time frame could you record with this

24  device when it was turned on.

25    MR. SOFER:  I'm specifically not asking him the

1  specific question about the capabilities of these devices.   For

2  the same reason that we would not allow defense counsel access

3  to them.

4                    THE COURT:  I'm not so sure.

5                    MR. SOFER:  The government's not asking that

6  information.

7                    MR. IVEY:  He did testify that the devices had time

8  restraints.   And I'm assuming --

9                    THE COURT:  He just said that.

10                   MR. SOFER:  I understood.   That's all I asked him,

11  whether they had time restrictions, not whether he had any

12  limitations.   I didn't ask him how much.   I'm not going to.

13                   THE COURT:  Is there going to be any testimony that

14  portions of conversations were not testified to because it

15  otherwise was not functioning because of any time constraint?

16                   MR. SOFER:  He is going to testify, as I understand

17  it, Judge, that the device, because he knew it had time limits,

18  he had to conserve time here and there and he had to turn it off

19  sparingly sometimes.

20                   THE COURT:  I do think that for the jury to

21  evaluate that evidence, they at least ought to know generally

22  what the life of the device was.   Is it battery-related?

23                   MR. SOFER:  I can do that very generally.   I think

24  for obvious reasons, I'll put them on the record, the government

25  and the FBI are not interested in letting whether they -- I'm

1  not talking about terrorists -- any kind of criminal now; it's

2  no different than telling someone the range of a missile.   Is

3  the comparable type thing to have someone know if I sit with

4  this guy for three hours he can't go any farther.

5           THE COURT:  I think it's appropriate to say what

6  was his understanding as to the period for which this device

7  could operate.   It's his understanding.   It really does affect

8  the issue of when and why he recorded things.

9           MR. SOFER:  Would Your Honor allow a question

10 like -- a fairly leading question in which I ask:  Did the

11 device have less than 12 hours, 10 hours?

12          THE COURT:  Yeah.

13          MR. SOFER:  But I'm specifically going to say, tell

14 us, but don't tell us how much less.

15          THE COURT:  Does this device have a recording --

16          MR. SOFER:  I'm going to tell the Court right now I

17 am going to over-estimate that because I cannot and I will not

18 be able to divulge the specific amount of time these devices are

19 capable of recording.

20          THE COURT:  Overestimate by how much?

21          MR. SOFER:  Then I'm revealing that information.

22          MR. DOUGHTEN:  Weren't those devices four years

23 ago?   Certainly the devices you were using four, five, six

24 years ago aren't the same devices being used now.   So if the

25 interest is protecting that...

1      MR. SOFER:  A I would not guarantee that by any

2  stretch of the imagination.   If you know anything about the

3  government, they were probably years and years old then.   Two,

4  if we want to go down this road with more specificity I need an

5  opportunity to speak with the people whose equity --

6      THE COURT:  We'll return to this.   You don't need

7  that right now.

8      MR. SOFER:  And I won't -- all I've asked him so

9  far is could you turn it on and off and why were you turning it

10  on and off.

11      THE COURT:  We will revisit that.   I think Mr.

12  Doughten raises a very good point.  If it's been replaced or

13  whatever, it's being phased out, that's fine.   I think it is

14  fair, though, I think it's very important that the jury have

15  some sense of the period for which one of these things will run.

16  Most of us have enough experience with tape recorders to know

17  sooner or later the battery runs out.

18      MR. SOFER:  That's all I've asked him so far, does

19  it have limitations.

20      MR. HARTMAN:  There's going to be cross-examination

21  about when and why this was turned on and off,  and therefore --

22      THE COURT:  I understand.

23      MR. HARTMAN:  Okay.

24      THE COURT:  We'll sort it out.   I want him to have

25  a chance to talk to people.   I'll permit him to instruct the

1 witness only to answer that question when the time comes.

2          (End of side bar)

11:14:38  3          THE COURT:  Okay.  Mr. Sofer, ladies and gentlemen,

4 thank you for you patience, and the answer may stand and you may

5 proceed.

11:14:46  6 BY MR. SOFER:

11:14:51  7     Q.   I think I asked you were there times you were unable to

11:14:55  8 record conversations.

11:14:56  9     A.   Yes.  When -- possibly when I simply couldn't turn the

10 device on, if I was with one person of interest, and another one

11:15:10  11 called, it's not convenient.   It's cumbersome to turn it on at

12 times without jeopardizing my security and the operation.

11:15:24  13 There was -- at times I just couldn't.   And to conserve time on

11:15:33  14 the device when we were just doing just normal banter I would

11:15:43  15 turn it off.

16     Q.   Were there times when you didn't have a device at all?

17     A.   Yes.

18     Q.   Can you give the jury an example of why that might

11:15:51  19 happen?

20     A.   I was with my family and a person of interest called.

11:15:57  21     Q.   You said you could be with one person of interest and

22 another person of interest could call or come over.   During the

23 course of your work on this case, approximately how many other

24 people were you gathering information about?

11:16:12  25     A.   Approximately -- over 20.

11:16:16 **1**    **Q.**    And were there days in which you worked on gathering

11:16:20 **2** information from multiple people related to this case?

11:16:24 **3**    **A.**    Yes, most of the time.

**4**    **Q.**    Were there days when you worked on this case and cases

**5** that are not related to this case?

11:16:32 **6**    **A.**    Yes, most of the time.

**7**    **Q.**    Did you have to travel or fill other obligations with

**8** respect to the cases that do not relate to this case?

**9**    **A.**    Yes.

11:16:45 **10**    **Q.**    I think you said you did not record prayers before when

**11** we went up the to the bench?

**12**    **A.**    Yes.

**13**    **Q.**    Can you tell the members of the jury why that was?

**14**    **A.**    I tried to respect the faith.

11:17:02 **15**    **Q.**    And did -- were you always able to do that?

**16**    **A.**    No.

**17**    **Q.**    Can you tell us why not?

**18**    **A.**    I was -- if -- you can't tell if the device is on and

**19** off sometimes.   Once again, it's cumbersome.   And if I started

**20** with a person of interest and they went into prayer, and I

11:17:27 **21** wasn't able to turn the device off, and I could just guesstimate

**22** and do that.

**23**    **Q.**    Were you capable of listening to the recordings after

**24** each one was made?

**25**    **A.**    No.

11:17:39 **1**     **Q.**   Why is that?

**2**     **A.**   I didn't have the software to do it.

11:17:45 **3**     **Q.**   Without going into detail -- strike that.

**4**         Were you able to tell if and when the device was

11:17:54 **5** running out of memory?

**6**     **A.**   No.

11:17:57 **7**     **Q.**   After you were done with a device, what did you do with

11:18:04 **8** it?

**9**     **A.**   I reported to my contact and let him know that I had

**10** information.

11:18:09 **11**     **Q.**   And what did you then do?

**12**     **A.**   I would turn it over to the FBI.

**13**     **Q.**   And what would happen to it after that, do you know?

11:18:19 **14**     **A.**   No. It's my understanding it was cleaned.

**15**     **Q.**   You say "cleaned". What is your understanding of what

**16** that means?

**17**     **A.**   That I would be given a new device with no information

**18** on it.

**19**     **Q.**   Were there times during the case where you accidentally

**20** recorded things you didn't want to record?

**21**     **A.**   Yes.

11:18:39 **22**     **Q.**   Can you tell the members of the jury how that happened?

11:18:43 **23**     **A.**   I -- whether it be the operator or equipment

**24** malfunction, it just didn't go off.

**25**     **Q.**   You were the operator, right?

11:18:56 **1**    **A.**  Yes.

11:18:57 **2**    **Q.**  Can you give us examples of things that you recorded

**3**  that you didn't want to record?

11:19:03 **4**    **A.**  Bathroom incidents and family.

11:19:10 **5**    **Q.**  That is whose family?

**6**    **A.**  My family.

11:19:14 **7**    **Q.**  Were there times when you recorded any of your

11:19:17 **8**  interactions with the FBI?

11:19:18 **9**    **A.**  Yes.

11:19:19 **10**    **Q.**  Approximately how many of those, if you know?

11:19:24 **11**    **A.**  A couple.

11:19:26 **12**    **Q.**  And was it your -- did you do that on purpose or was

**13**  that an accident?

**14**    **A.**  It was an accident.

11:19:34 **15**    **Q.**  If you know, did you have the ability to record over

11:19:37 **16**  portions that were previously recorded?

11:19:40 **17**    **A.**  No.

11:19:41 **18**        MR. HARTMAN:  Objection.

11:19:42 **19**        THE COURT:  Basis.

**20**        MR. HARTMAN:  Same objection.

**21**        THE COURT:  No, that's -- overruled.  You may

**22**  answer to the extent of his knowledge and familiarity.

**23**    **A.**  No.

11:19:56 **24**  BY MR. SOFER:

11:19:56 **25**    **Q.**  Could you open the device and see, like, a tape or CD

11:20:00 **1** inside?

**2**     **A.**  No.

11:20:01 **3**     **Q.**  Were you able to move the recording back and forth like,

11:20:06 **4** say, a tape recorder?

**5**     **A.**  No.

11:20:08 **6**     **Q.**  Did you eventually listen to the recordings that you

**7** made in connection with this case?

**8**     **A.**  Yes.

11:20:14 **9**     **Q.**  Can you tell us approximately when it was that you

11:20:18 **10** reviewed a large portion of these for the first time?

**11**     **A.**  May of 2006.

11:20:23 **12**     **Q.**  And was that after the investigative portion of the case

11:20:27 **13** was over?

**14**     **A.**  Yes.

11:20:28 **15**     **Q.**  Have you listened to some of these recordings on

11:20:34 **16** multiple occasions?

11:20:36 **17**     **A.**  Yes.

**18**     **Q.**  You don't seem very happy about that.   How many times

**19** have you been asked to listen to some of these recordings on

11:20:43 **20** multiple occasions?

**21**     **A.**  Over ten times.   Almost a ridiculous amount.

**22**     **Q.**  Have you listened to several of these recordings over

11:20:53 **23** the past several weeks?

**24**     **A.**  Yes, all of them.

**25**         THE COURT:  The answer was?

2274

11:20:57 **1**　　　　　　　THE WITNESS:  All of them.

11:21:00 **2** BY MR. SOFER:

11:21:00 **3**　　**Q.**　By "all of them", do you mean all of the recordings you

**4** made throughout your work for the FBI?

11:21:06 **5**　　**A.**　No, just the ones that were used in this case.

11:21:10 **6**　　**Q.**　And are those the ones that -- to your knowledge that

**7** you're going to be testifying about here during the government's

**8** case?

**9**　　**A.**　Yes.

11:21:20 **10**　　　　　　MR. SOFER:  Your Honor, at this time I'd like to

**11** show the witness what's been marked Number 4 for identification.

**12** Government's Exhibit 4 for identification.

11:21:47 **13**　　　　　　MR. SOFER:  My little hands can't carry all of

**14** these.

11:21:59 **15**　　　　　　Take a few seconds, please, and take a look at

11:22:03 **16** what's been marked as Government 4.   I believe for the record,

11:22:08 **17** Your Honor, there are 74 compact discs and nine cassette tapes

**18** there.

11:22:38 **19** BY MR. SOFER:

**20**　　**Q.**　As you look through those, do you know what they are?

**21**　　**A.**　They're CDs.

**22**　　**Q.**　Are these the recordings you made or copies of them?

**23**　　**A.**　To my knowledge.

11:22:48 **24**　　**Q.**　You have listened to these?

**25**　　**A.**　Yes.

1    **Q.**    How do you know that?

2    **A.**    Because of my signature and date.

11:23:00  3        MR. SOFER:  I think if Defense Counsel will

4    stipulate that they each contain some marking on them.

5        THE COURT:  Pardon?

6        MR. SOFER:  We either have them go through them

7    all -- let's just go through them all.

8        THE COURT:  I don't think -- unless that's

9    necessary.

11:23:15  10        MR. HARTMAN:  I don't believe it is.

11        THE COURT:  Let's move on.   We'll assume.  If for

11:23:21  12    any reason he appears to conclude that's not so, call it to the

11:23:27  13    jury's attention.

11:23:28  14        MR. SOFER:  Counsel's had an opportunity to review

11:23:31  15    these.

16        THE COURT:  No problem.

11:23:36  17    BY MR. SOFER:

11:23:37  18    **Q.**    Did you record your interactions with the individuals

11:23:39  19    involved in this case?

11:23:40  20    **A.**    Yes.

21    **Q.**    Again, did you record all of your interactions with

22    them?

11:23:44  23    **A.**    No.

24    **Q.**    Why not?

11:23:45  25    **A.**    Because we'd talk about day-to-day stuff at times.   And

11:23:53 **1** due to time limitations, I, and me spending hours with the --

**2** with the men, I would have to conserve space.

11:24:09 **3**    **Q.** Did you end up recording nevertheless just day-to-day

**4** conversation with them?

**5**    **A.** Yes.

**6**    **Q.** Can you tell the jury why that is?

11:24:18 **7**    **A.** Basically I wouldn't know when they're going to say,

11:24:26 **8** hey, check this -- when they would say things -- say things of

**9** interest or when they would be -- announce threats to people of

**10** the U.S. or our allies overseas.

11:24:44 **11**    **Q.** Can you give the jury an idea to your knowledge of what

11:24:48 **12** fraction of the total amount of recordings is contained in the

**13** portions that you have most recently reviewed in Government's

**14** Exhibit Number 4?

11:24:57 **15**    **A.** This is maybe -- maybe ten percent.

11:25:04 **16**       MR. SOFER: If I haven't already, Your Honor, I'd

**17** like to move Government's Exhibit 4 into evidence.

11:25:09 **18**       MR. HARTMAN: No objection.

11:25:10 **19**       THE COURT: It will be admitted.

11:25:15 **20** BY MR. SOFER:

11:25:16 **21**    **Q.** I'd like you to try to give us a very general

11:25:21 **22** description of what happened in the course of this case with

**23** these individuals. Can you try to do that for us?

11:25:33 **24**    **A.** It approximately started shortly after 9/11. I -- they

**25** were not the people of interest, but they ran in circles of

1  people of interest.   They really didn't raise any threats that

2  I could identify or report to the FBI.   In 2002, El-Hindi had

11:26:12  3  said a few things during the early September time frame.

11:26:18  4      Q.   Do you see Marwan El-Hindi in the courtroom today?

5      A.   Yes, I do.

6      Q.   Can you point him out and identify an article of

7  clothing he's wearing?

8           MR. BOSS:   Judge, we'd stipulate to the

9  identification of Mr. El-Hindi.

11:26:32  10           THE COURT:   Okay.

11:26:37  11  BY MR. SOFER:

12      Q.   I want to show you Government's Exhibit 5 for

13  identification.   Do you recognize who's depicted in

11:26:50  14  Government's Exhibit Number 5 for identification?

15      A.   That is Mr. El-Hindi.

16      Q.   Does it fairly and accurately represent the way he

11:26:55  17  looked, approximately, when you first met him?

18      A.   Yes.

19           MR. SOFER:   At this time the government moves

11:27:02  20  Exhibit Number 5 into evidence.

21           MR. HARTMAN:   No objection.

22           THE COURT:   Admitted.

23  BY MR. SOFER:

24      Q.   You said he said something -- I don't know what the word

11:27:09  25  is you used, disturbing or something, to you in early September

1  of 2002?

2  A.    Yes.  He had asked basically two questions:  One, how

11:27:20  3  easy would it be to kidnap an Israeli soldier; and two, how

4  would -- how easy would it be to kidnap a politician?

11:27:33  5  Q.    Now, at that time had you already spent time with

6  Mr. El-Hindi?

11:27:40  7  A.    Yes.

11:27:42  8  Q.    And had you put your cover story out yet?

9  A.    Yes.

10  Q.    And again, can you describe what it is that your cover

11  story was during this period of time?

11:27:55  12  A.    A disenchanted ex-U.S. Army veteran, disenchanted with

13  the government and sympathizing and being an Islamic extremist.

11:28:08  14  THE COURT:  I didn't hear the last part.

11:28:11  15  THE WITNESS:  Islamic extremists.

11:28:19  16  THE COURT:  Before that.  Oh, sympathized.

17  BY MR. SOFER:

18  Q.    Did there come a time after he mentioned kidnapping an

11:28:28  19  Israeli soldier and U.S. politician, did he say something else

20  which gave you concern?

21  A.    Yes, approximately on 9/11, 2002, he made the statement

22  that if I knew any information that could help the brothers

23  overseas, I should share it.

11:28:46  24  Q.    And do you know what he was referring to when he said

25  that?

11:28:49 **1**   **A.**   Yes.  We were about to start a combat operation in Iraq,

11:28:56 **2**   and if -- basically he was asking me if I knew when that was

**3**   going to happen or how.

11:29:05 **4**   **Q.**   Now, did you -- why were you spending time with Marwan

11:29:09 **5**   El-Hindi during this period of time?

**6**   **A.**   Because he was with a person of interest.   He was in

**7**   that circle.

11:29:17 **8**   **Q.**   Did you continue to spend time with him throughout 2002

**9**   and 2003?

**10**   **A.**   Yes.

11:29:23 **11**   **Q.**   And can you tell the members of the jury basically,

11:29:25 **12**   without going into too many of the details, what kinds of things

**13**   he was doing and what kind of things you were doing together

**14**   with him?

11:29:33 **15**   **A.**   He had involved me in a few things.   There was

11:29:43 **16**   money-making ideas.   There were trash bags or -- not trash

**17**   bags, plastic bags, a thing that he tried to make money on.

11:29:54 **18**   Candy, and -- for 2002, 9/11, he had American flags.

**19**   **Q.**   And did you participate in these business activities

11:30:07 **20**   with him?

**21**   **A.**   Yes.

11:30:08 **22**   **Q.**   Were there times when you actually gave him money with

**23**   respect to some of these business ventures?

**24**   **A.**   Yes, I would pay for certain things like storage, a

11:30:24 **25**   storage facility for these items.

**1**     **Q.**     And was this after he had made some of the comments that

**2**   you just described?

**3**     **A.**     Yes.

**4**     **Q.**     Can you tell the members of the jury why -- well, first

**5**   of all, where did you get the money that you gave to him from?

**6**     **A.**     From the FBI.

**7**     **Q.**     And can you tell us why it is that you gave him money?

**8**     **A.**     For one, he was around people of interest, and he had

11:30:48 **9**   started making comments, so I was gathering information to

11:30:54 **10**   become part of that circle, trying to get in that circle.

11:30:58 **11**     **Q.**     Did there come a time during this basic period of time,

**12**   2002, 2003, into 2004 when you met Mohammad Amawi?

**13**     **A.**     Yes.   I'm not sure at the beginning exactly what time.

**14**   And what I mean by that is it could be shortly after 9/11 or

11:31:24 **15**   when I began information-gathering, but basically when I noticed

11:31:34 **16**   him and a visual change was basically spring of 2004, he had

**17**   visibly made -- he returned from a trip from Jordan and he had

11:31:49 **18**   physically changed his appearance and his -- he was more

11:31:56 **19**   outspoken, more radical.

11:32:01 **20**     **Q.**     I'd like to show you what's been marked Government's

11:32:07 **21**   Exhibit 7-E.   Do you recognize who's depicted in Government's

**22**   Exhibit 7-E?

11:32:21 **23**     **A.**     Mohammad Amawi.

11:32:22 **24**     **Q.**     Does that picture fairly and accurately represent the

11:32:25 **25**   way he looked basically when he returned from Jordan?

**1**  **A.**  Yes.

11:32:31 **2**  MR. SOFER:  7-F, please.

11:32:31 **3**  BY MR. SOFER:

**4**  **Q.**  Does that picture also fairly and accurately represent

11:32:37 **5**  the way Mohammad Amawi looked approximately when he returned

**6**  from Jordan in 2004?

**7**  **A.**  Yes.

11:32:44 **8**  MR. SOFER:  7-G, please.

11:32:46 **9**  BY MR. SOFER:

11:32:46 **10**  **Q.**  Does that picture also fairly and accurately represent

11:32:50 **11**  the way Mohammad Amawi looked approximately when he returned

11:32:53 **12**  from Jordan in 2004?

11:32:54 **13**  **A.**  Yes.

11:32:57 **14**  MR. SOFER:  Move those exhibits, 7-E through G,

**15**  into evidence, Your Honor.

**16**  MR. IVEY:  No objection.

**17**  THE COURT:  They we'll be admitted.

11:33:05 **18**  MR. SOFER:  Put up 7-A, please.

11:33:05 **19**  BY MR. SOFER:

11:33:08 **20**  **Q.**  Do you recognize the person depicted in 7-A?

11:33:12 **21**  **A.**  Yes.

11:33:13 **22**  **Q.**  Who is that?

**23**  **A.**  Mohammad Amawi.

11:33:17 **24**  **Q.**  Does that represent the way that Mohammad Amawi looked

11:33:21 **25**  approximately prior to leaving for Jordan in 2004, to the best

**1** of your recollection?

**2**     **A.**  Yes.

11:33:29 **3**         MR. SOFER:  At this time, Your Honor, the

**4** government moves 7-A into evidence.

11:33:34 **5**         THE COURT:  It will be admitted.

11:33:36 **6**         MR. SOFER:  7-B, please.

11:33:42 **7** BY MR. SOFER:

**8**     **Q.**  Again, Government's Exhibit 7-B, do you recognize who's

**9** depicted there?

**10**     **A.**  Mohammad Amawi.

**11**     **Q.**  And does that fairly and accurately represent the way he

**12** looked approximately before he went to Jordan?

11:33:54 **13**     **A.**  Yes.

11:33:56 **14**     **Q.**  How about 7-C.  Do you recognize who's depicted there?

**15**     **A.**  Yes.

**16**     **Q.**  Who is it?

**17**     **A.**  Mohammad Amawi.

**18**     **Q.**  Does that fairly and accurately represent the way he

**19** looked before he went to Jordan, approximately?

**20**     **A.**  Yes.

**21**         MR. SOFER:  7-D, please.

11:34:22 **22**         THE COURT:  7 what?

**23**         MR. SOFER:  "D" as in David, Your Honor.

11:34:25 **24** BY MR. SOFER:

**25**     **Q.**  Do you recognize who's depicted there?

1    **A.**   Yes.

11:34:29   2    **Q.**   Who's that?

11:34:32   3    **A.**   I believe it to be Mohammad Amawi.

4    **Q.**   Does that fairly and accurately represent the way he

11:34:37   5    looked approximately when he returned from Jordan?

11:34:40   6    **A.**   Yes.

7         MR. SOFER:   The government moves Exhibits 7-A, 7-B

8    and 7-C into evidence.

11:34:47   9         MR. IVEY:   No objection.

10         THE COURT:   They'll be admitted.

11    BY MR. SOFER:

11:34:50   12    **Q.**   Do you see Mohammad Amawi in the courtroom today?

13    **A.**   Yes, I do.

14    **Q.**   Would you please point him out and point out an article

15    of clothing he's wearing?

16    **A.**   Gray suit, tie.

11:35:04   17         MR. SOFER:   Indicating the defendant, Your Honor.

18         THE COURT:   It does.

11:35:10   19    BY MR. SOFER:

20    **Q.**   After you noticed Mohammad Amawi in the spring of 2004,

11:35:18   21    did there come a time when in the summer of 2004 you received a

22    telephone call from Marwan El-Hindi?

11:35:27   23    **A.**   Yes, in approximately -- around June 23.

11:35:32   24    **Q.**   And can you tell the members of the jury basically what

25    that telephone call was about?

11:35:38 **1**    **A.**    It was a call out of the blue.   He basically had said

**2**    he had two recruits that he wanted me to meet and train.

**3**    **Q.**    Shortly thereafter did there come a time when you heard

**4**    Mohammad Amawi say something that caught your attention?

**5**    **A.**    Yes.  A few days later at the Mosque on Monroe Street

**6**    here in Toledo, Ohio, he was telling various members at the

**7**    At-Tawfeeq Mosque about his recent trip to Jordan.

11:36:17 **8**         THE COURT:  He was telling various, who?  I

**9**    couldn't heard the word.

11:36:23 **10**        THE WITNESS:  Various people, explaining his trip

11:36:28 **11**   to Jordan, and that on that trip how he tried to get into Iraq

**12**   and perform Jihad.

11:36:39 **13**   BY MR. SOFER:

11:36:39 **14**   **Q.**    Can you tell us, was the there any follow up to the

11:36:43 **15**   telephone call -- strike that.

11:36:46 **16**        To your knowledge during that period of time did

**17**   Marwan El-Hindi and Mohammad Amawi know each other?

11:36:52 **18**   **A.**    Not to my knowledge.

11:36:53 **19**   **Q.**    And were you at that juncture now collecting information

11:36:59 **20**   with respect to both of them after these comments were made?

**21**   **A.**    Yes.

**22**   **Q.**    Did there come a time when the two people that Marwan

11:37:10 **23**   El-Hindi mentioned that he wanted you to train, that you

11:37:13 **24**   actually met them?

**25**   **A.**    Yes, a few days later on July 3 and 4 of 2004.

11:37:22 **1**    **Q.**   Where was that?

**2**    **A.**   At the ICNA conference in Cleveland, Ohio.

11:37:27 **3**          THE COURT:  Can you spell that, please?

11:37:32 **4**          THE WITNESS:  India Charlie Never Alpha.  Stands

**5**    for Islamic Circle of North America.

11:37:40 **6**    BY MR. SOFER:

11:37:40 **7**    **Q.**   Did you meet two people at that conference?

11:37:45 **8**    **A.**   Yes, I met Khaleel Ahmed and Zubair Ahmed.

11:37:51 **9**          THE COURT:  If I can interrupt.   You have referred

**10**   to a Mosque?

11:37:56 **11**          THE JUROR:  Yes.

**12**          THE COURT:  Can you spell that, and please don't

11:37:58 **13**   use the military; it's just easier for me if you use ordinary

**14**   letters.

11:38:06 **15**          THE WITNESS:  I'll give you phonetics.

11:38:15 **16**          THE COURT:  The name of the mosque. Can you say

**17**   what the name of the Mosque is?

11:38:23 **18**          THE WITNESS:  Tawfiq.

**19**          MR. SOFER:  T-A-W-F-I-Q, but I'm not certain.

**20**          THE COURT:  Somebody can tell me.   That's fine.

11:38:31 **21**          Where is this located?

11:38:33 **22**          THE WITNESS:  On Monroe Street near Auburn in

11:38:38 **23**   Toledo, Ohio.

**24**          THE COURT:  Do you happen to know the address?

11:38:41 **25**          THE WITNESS:  I do not.

11:38:45  **1**                    MR. SOFER:  You said you met the two people that --

**2**                    THE COURT:  Let me ask you this:  Do you

11:38:49  **3**  anticipate, Mr. Sofer, when he refers to the Mosque, that's the

**4**  location he'll be referring to?

11:38:56  **5**                    MR. SOFER:  I think he'll be referring to at least

**6**  two Mosques here in Toledo.

**7**                    THE COURT:  Mr. Griffin, when you refer to the

**8**  Mosque, if you'll please indicate which one.

11:39:09  **9**                    THE WITNESS:  Yes, sir.

11:39:10  **10**                   MR. SOFER:  It will be one much more than the

11:39:13  **11**  other, Judge.

11:39:17  **12**  BY MR. SOFER:

**13**      **Q.**   You said you met these two individuals that Marwan

**14**  El-Hindi said he wanted you to train.   Did you understand by

**15**  the way when he asked you to train them what he wanted you to

**16**  train them for?

11:39:30  **17**      **A.**   For which goes back to my cover story, as an Islamic

11:39:36  **18**  extremist for Jihad.

**19**      **Q.**   Had you talked about Jihad in the Mosque and with other

**20**  people?

**21**      **A.**   Yes, during my cover.

11:39:42  **22**      **Q.**   Did some of the people you talked about Jihad, how did

**23**  these people react generally?

11:39:51  **24**      **A.**   Most of them, they gravitated away.   I even got the

**25**  FBI -- they called the FBI on me.   I got reported.

11:40:02 **1**  **Q.**  Did Marwan El-Hindi do that?

**2**  **A.**  Not to my knowledge.

11:40:06 **3**  **Q.**  Did he shy away from you?

**4**  **A.**  No.

11:40:11 **5**  **Q.**  When you -- when you met these individuals, you said you

11:40:16 **6**  met them at the ICNA conference?

**7**  **A.**  Yes.

**8**  **Q.**  Do you know their names?

11:40:23 **9**  **A.**  Khaleel Ahmed and Zubair Ahmed.

11:40:27 **10**  **Q.**  I want to show you what's been marked Government's

11:40:31 **11**  Exhibit Number 9.   Do you recognize the person depicted in

11:40:38 **12**  Government's Exhibit Number 9?

**13**  **A.**  Zubair Ahmed.

11:40:40 **14**  **Q.**  Does it fairly and accurately represent the way he

**15**  looked approximately when you met him back in July of '04?

**16**  **A.**  Yes.

**17**  MR. SOFER:  At this time the government will move

11:40:51 **18**  to admit Government's Exhibit Number 9 in evidence.

11:40:54 **19**  THE COURT:  Any objection?

11:40:56 **20**  MR. HARTMAN:  No.

11:40:59 **21**  MR. IVEY:  No, Your Honor.

**22**  BY MR. SOFER:

**23**  **Q.**  Look at number -- Government's Exhibit 10 for

**24**  identification.   Do you recognize who's depicted in

11:41:07 **25**  Government's Exhibit Number 10?

1    A.    Khaleel Ahmed.

11:41:10   2              THE COURT:  Mr. Sofer, can you spell those for the

3    jury.

4              MR. SOFER:  Zubair is Z-U-B-A-I-R.   Khaleel is

5    K-H-A-L-E-E-L.  Last name Ahmed.   A-H-M-E-D.

6              May I inquire, Your Honor?

11:41:28   7              THE COURT:  Go ahead.

11:41:29   8    BY MR. SOFER:

11:41:30   9    Q.    Government's Exhibit Number 10, does that fairly and

10   accurately represent the way Khaleel Ahmed looked approximately

11   when you met him in July of 2004?

12   A.    Yes.

13              MR. SOFER:   And the government offers Government's

14   Exhibit 10 at this time, Your Honor.

15              THE COURT:  It will be admitted.   Any objection.

11:41:49  16              MR. IVEY:  No.

11:41:50  17    BY MR. SOFER:

11:41:50  18    Q.    You had a conversation with those men at the ICNA

19   conference?

11:41:55  20    A.    Yes.

21    Q.    We'll get to this later, but did you record that

22   conversation?

23    A.    Yes.

24    Q.    Can you tell us again very basically what else

11:42:03  25   transpired through the year or two then that you worked on this

1   case involving Defendant Amawi and Defendant El-Hindi and

2   others?

3       A.    Things began to slowly progress.   I would interact and

11:42:24   4   record all the activities with Mohammad Amawi and Marwan

11:42:30   5   El-Hindi.   I would view videos and materials at Mohammad

6   Amawi's house, also do the same thing at Marwan El-Hindi's

11:42:42   7   house.  We interacted at the Mosque, we ate together, and

11:42:52   8   continued to build a rapport and relationship with them.

11:42:56   9       Q.    Can you tell us some of the things that happened during

10   the course of your interaction?

11:43:05   11      A.    We viewed videos and started gathering information.

12   Mohammad Amawi was giving me training materials.   There was a

11:43:18   13  bomb vest video that he introduced me to, Jihad, Islamic

11:43:29   14  extremist websites that he directed me to, bomb making

15  materials.

11:43:33   16      Q.    What was the purpose of him giving these kinds of

11:43:37   17  materials?

11:43:39   18              MR. IVEY:  Objection.

11:43:40   19              THE COURT:  Sustained.

11:43:40   20  BY MR. SOFER:

21      Q.    What did you understand the purpose --

22              MR. IVEY:  Objection.

23              THE COURT:  Sustained.   I think he can testify as

24  to specific things that may have been said or whatever, but I

25  don't think he can testify as to what someone in fact intended.

1    BY MR. SOFER:

2        Q.    What did you tell Mohammad Amawi about why it was that

3    you needed these materials?

11:44:04  4    A.    To begin training.   He was interested in learning how

5    to fight.

6        Q.    And what did you tell Mohammad Amawi and what did he

7    tell you about the purpose for this training?

8        A.    He told me that he wanted to go perform Jihad against

11:44:22  9    the U.S. troops overseas.

11:44:28  10    Q.    Did he tell you specifically, among other places, where

11:44:31  11    he wanted to do that?

12        A.    In Iraq.

11:44:38  13    Q.    Did there come a time when Mohammad Amawi gave you

11:44:42  14    particular discs or videos?

11:44:45  15    A.    Yes, on numerous occasions.  I believe the first time

11:44:52  16    was in November of 2004.

11:44:58  17    Q.    Generally speaking, what would you do with the materials

18    that were given to you by Mohammad Amawi or Marwan El-Hindi or

11:45:06  19    others?

20        A.    I'd turn it over to the FBI.

21        Q.    Did there come a time when you traveled somewhere with

11:45:12  22    Marwan El-Hindi for purposes of getting a corporation?

23        A.    Yes, we travelled to Michigan.

11:45:22  24    Q.    Do you know approximately when that was?

11:45:27  25    A.    I'd say early 2005.

2291

11:45:31 **1**   **Q.**   Did there come a time when Mohammad Amawi talked to you

**2**   about obtaining a particular substance from overseas?

11:45:38 **3**   **A.**   Yes.

11:45:39 **4**   **Q.**   Can you tell the members of the jury, again very

11:45:41 **5**   basically, about that?

11:45:43 **6**                 THE COURT:   And when was this, time frame?

11:45:43 **7**   BY MR. SOFER:

11:45:48 **8**   **Q.**   Approximately when was that?

**9**   **A.**   Early 2005.

11:45:52 **10**   **Q.**   Okay.  Again, can you describe that basically for the

**11**   jury?

11:45:56 **12**   **A.**   It was Astrolite; it was a chemical compound called

11:46:02 **13**   Astrolite.

11:46:03 **14**                 THE COURT:   Can you spell that, please, slowly.

**15**   **A.**   A-S-T-R-O-L-I-T-E.   I don't know if that's correct,

**16**   though.

**17**   BY MR. SOFER:

**18**   **Q.**   Do you remember what he gave it to you on?

11:46:15 **19**   **A.**   He gave it to me on a Krispy Kreme napkin.

**20**   **Q.**   Did there come a time when you actually trained some of

**21**   the individuals in this case or Mohammad Amawi, Marwan El-Hindi,

11:46:27 **22**   or Wassim Mazloum in how to shoot?

**23**   **A.**   Yes.

11:46:33 **24**   **Q.**   Who did you train?

11:46:35 **25**   **A.**   Marwan -- excuse me, Mohammad Amawi and Wassim Mazloum.

11:46:46 **1**          MR. BOSS:  Your Honor, could we have a

11:46:48 **2** clarification?   I believe he first stated Marwan then did not

11:46:52 **3** clarify that is incorrect.

11:46:54 **4**          THE WITNESS:  Yes, that is incorrect.

11:46:56 **5**          THE COURT:  The jury will disregard that reference

**6** to Mr. El-Hindi.

11:47:00 **7** BY MR. SOFER:

11:47:00 **8**     **Q.**   Did you misspeak?

**9**     **A.**   Yes, I did.

11:47:07 **10**     **Q.**   So you trained Wassim Mazloum and Mohammad Amawi in

11:47:12 **11** shooting?

**12**     **A.**   Yes.

**13**     **Q.**   And where did that take place?

**14**     **A.**   At the indoor shooting range in Cleland's out on Airport

**15** Highway in Toledo, Ohio.

11:47:24 **16**     **Q.**   Again, can you give us a basic time reference as to when

**17** that happened?

**18**     **A.**   The first time was January of '05, and then --

**19**     **Q.**   Who was present for that, among others?

**20**     **A.**   Mohammad Amawi and others.

11:47:38 **21**     **Q.**   When was the next training session like that?

11:47:41 **22**     **A.**   April -- actual shooting was April the 20th of 2005.

11:47:48 **23**     **Q.**   Who was present for that, among others?

11:47:51 **24**     **A.**   Mohammad Amawi and Wassim Mazloum.

11:47:55 **25**     **Q.**   And how about April --  later on in April was there

1    another session?

2    **A.**    April 29.

3    **Q.**    And who was present for that particular session, among

4    others?

5    **A.**    Mohammad Amawi, Wassim Mazloum, and Bilal Mazloum.

6    **Q.**    Who is Bilal Mazloum?

7    **A.**    I believe to be the brother of Wassim Mazloum.

8    **Q.**    Do you see Wassim Mazloum here in the courtroom today?

9    **A.**    Yes, I do.

10    MR. DOUGHTEN:  We'll stipulate, Your Honor, to the

11    identification.

12    THE COURT:  Okay.  The record will so indicate.

13    MR. SOFER:  At this time I'd like you to take a

14    look at 21 for identification, please.

15    BY MR. SOFER:

16    **Q.**    Do you recognize who's depicted in Government's Exhibit

17    21 for identification?

18    **A.**    Wassim Mazloum.

19    **Q.**    And does that fairly and accurately represent the way he

20    looked basically when he was interacting with you during the

21    course of this case?

22    **A.**    Yes.

23    MR. SOFER:  At this time the government moves

24    Exhibit 21 into evidence.

25    MR. HELMICK:  Without objection.

Time stamps:
11:48:00 (line 2)
11:48:01 (line 3)
11:48:05 (line 4)
11:48:15 (line 8)
11:48:18 (line 9)
11:48:20 (line 10)
11:48:29 (line 13)
11:48:38 (line 17)
11:48:40 (line 19)
11:48:48 (line 23)
11:48:54 (line 25)

1          THE COURT:  It will be admitted.

11:48:58  2  BY MR. SOFER:

3      Q.    Did there come a time that you travelled overseas with

11:49:01  4  one or more of the defendants?

5      A.    Yes, with Mohammad Amawi.

11:49:04  6  Q.    Again, basic time frame, can you give the members of the

11:49:07  7  jury an idea of when that happened?

11:49:09  8  A.    The first time was in August, approximately the 22nd, to

11:49:16  9  September 8 of 2005.

11:49:22  10    Q.    Among other things what was the purpose of that trip?

11      A.    To link up with Islamic extremists in other countries.

12      Q.    What was the purpose of doing that?

11:49:32  13    A.    To turn over resources that we had.

11:49:38  14    Q.    To your knowledge what was said about what those Islamic

11:49:42  15  extremists were doing?

16      A.    They were going to perform Jihad and going into Iraq.

11:49:52  17    Q.    Did there come another time when you went to Jordan with

11:49:56  18  Mohammad Amawi?

19      A.    Yes, December 13 through December 26 of 2005 also.

20          THE COURT:  I missed the first date.   When was

21  that?

11:50:09  22          THE WITNESS:  December 13.

23          THE COURT:  Until when?

11:50:12  24          THE WITNESS:  December 26.

11:50:16  25  BY MR. SOFER:

11:50:17 1   **Q.**   Did there come a time when your involvement in -- with

2   the interaction with the defendants stopped?

11:50:26 3   **A.**   Yes.

4   **Q.**   Can you tell the members of the jury basically how and

5   when that happened?

6   **A.**   Approximately February of 2006.

11:50:39 7           MR. SOFER:   Your Honor, this would be an opportune

8   time to stop.  We don't have to...

11:50:44 9           THE COURT:   We'll take our midday break.  We'll try

10   to resume not later than 1:00.   If you could be available a

11:50:52 11   little sooner than that, I'll try to do so myself.   I do have

12   something during the noon hour, but I'll try to be back by

13   quarter of, no later than 1:00.

14           (Recess taken)

12:53:40 15           (Jury not present in the courtroom.)

13:10:59 16           MR. SOFER:   These are relatively minor housekeeping

17   matters.   If Counsel wants to wait until their clients are

18   here...

13:11:11 19           THE COURT:   Let's at least find out what they are.

20           MR. SOFER:   Two things, Your Honor.   One we have a

13:11:16 21   cover sheet, I have distributed to counsel, that basically is a

13:11:20 22   key or a legend for abbreviations that are used in the

13:11:25 23   transcripts that are going to be rolling down the screen.   I

13:11:28 24   thought it might be helpful to give them out to the jury and the

25   Court and perhaps the court reporter and anyone else that wants

1   one, we have lots of copies, so if they see one of these codes

2   it they know what it means.

3           THE COURT:  Just an index basically?

13:11:46   4           MR. SOFER:  I can hand it up to the Court.

13:11:48   5           THE COURT:  Any problem with the defendants?

6           MR. HARTMAN:  No objection.

7           THE COURT:  That's fine.

8           MR. SOFER:  And I just ask that we place these in

9   the juror's notebooks or put them on their chairs.

10          THE COURT:  It might make a little better sense to

11  take off the Bureau logo.

13:12:07   12          MR. SOFER:  We can do that later, unless you give

13  me some scissors.

13:12:14   14          THE COURT:  She'll run it off.   By the time we're

15  ready to go she'll have it for you.

16          Anything else we ought to talk about?

13:12:31   17          MR. SOFER:  The transcripts themselves, which as

13:12:35   18  Counsel and the Court know, are never actually introduced into

19  evidence except for those portions which are translations that

13:12:45   20  are here in court.   And I would -- I'm certainly not going to

21  do this through the witness, per se.   I'd like -- they're

13:12:55   22  marked for identification and I just wanted to put that on the

13:13:00   23  record that they're here, marked for identification and that is

24  what will be in the computer age -- normally you would hand

25  these out to the jurors, they would be marked.   Each transcript

13:13:12  1  here we're running a computer script across the screen, if

13:13:19  2  transcripts are here.   Counsel has been made aware of any of

3  the changes we've made.

13:13:26  4  MR. BOSS:  I was just asking one of the government

13:13:29  5  attorneys about these transcript changes.  We've been given

13:13:34  6  recently a few pages of what's basically an Excel spreadsheet of

7  all the changes.   I'm wondering if we can get an electronic

13:13:44  8  copy which we're discussing of the final changed transcripts

9  with these changes incorporated into them.

13:13:50  10  MR. SOFER:  That's not a problem.  We don't have

11  them right here today.

13:13:54  12  THE COURT:  I understand.

13:13:55  13  MR. SOFER:  I'll e-mail them.

13:13:57  14  THE COURT:  Now, are we going to see these on here?

13:14:04  15  MR. SOFER:  Correct, Your Honor.   And under

16  Murphy's Law, we've tested the audio system, we've done

17  everything we can to make sure it works, but I would not be

18  surprised to watch lightning bolts come out of some device or

13:14:19  19  another.  I guess the first time we do it I'm going to ask Your

20  Honor to ask the jury, can you hear this, is anyone having any

21  trouble.

13:14:27  22  THE COURT:  Two things to remind me.   Are we using

23  headphones now?

24  MR. SOFER:  Yes, Your Honor.   I believe there are

25  headphones for everybody, all the parties.

13:14:39 **1**          THE COURT: I'll instruct the jurors with the news

13:14:44 **2** if they overhear anything other than what is being said, what

13:14:51 **3** anyone seems to be hearing through the recording, that they

**4** should notify us immediately.   In other words, the problem, the

13:14:58 **5** hypersensitivity of the microphone, which Mr. Boss seems to have

13:15:07 **6** had fixed since yesterday --

13:15:11 **7**          MR. BOSS:  We've tried to deal with it.

**8**          THE COURT:  I'm going to give the jurors the

**9** standard instruction on transcript, would somebody make a note

**10** for me to do that in the final jury instructions.

**11**          UNIDENTIFIED SPEAKER:  Sure, Your Honor.

13:15:28 **12**          MR. SOFER:  We have a set of instructions which I

**13** believe -- which relate to the headphones themselves.   I

13:15:36 **14** believe they're in the jury's notebooks already.

13:15:40 **15**          THE COURT:  Technical as opposed to legal

13:15:42 **16** instructions?

13:15:43 **17**          MR. SOFER:  Indeed.   I promise we have not

13:15:46 **18** inserted legal instructions into the jury's notebooks.   These

**19** are not that complicated but they do have a number of buttons on

**20** them.   If you push the bottom button the wrong way you're not

**21** going to hear.   If Your Honor will remind the jurors they have

**22** that.

**23**          THE COURT:  If you want to show them how they work

**24** the first time around, and show the Judge as well...

13:16:09 **25**          MR. SOFER:  I'll do my best.

13:16:16　**1**　　　　　　MR. GETZ:  Your Honor, might I suggest that they

**2**　also be advised if for some reason their batteries are running

13:16:24　**3**　dead or they're having some other control problem with their

13:16:27　**4**　headsets that they let the courtroom deputy know or something or

**5**　they raise their hand or something so they are not missing any

**6**　of the evidence.   I think we have plenty of replacement

**7**　batteries and maybe some spare sets of headsets.

13:19:24　**8**　　　　　　(Jury enters the courtroom.)

13:19:26　**9**　　　　　　THE COURT:  You'll note, once again, there's a

13:19:29　**10**　piece of paper on your chairs.   You should probably keep that

**11**　with your notebooks.  That is a designation of the recordings

13:19:43　**12**　you are about to start hearing.   I believe you're aware there

13:19:47　**13**　will be a number of recordings, I think primarily audio, as well

13:19:52　**14**　as perhaps some occasional video recordings that according to

13:19:57　**15**　Mr. Griffin were made by him during the course of his

**16**　participation in the investigation in this case.   In a moment

13:20:06　**17**　Mr. Sofer will show us all how to put on the headphones that

13:20:11　**18**　you -- that we will all be using to listen from time to time to

**19**　the recordings.

**20**　　　　　　There are a couple things I'd like you to give heed

**21**　to.   First, if for any reason you're not able to hear or it

13:20:28　**22**　starts to fade out on you, which would indicate a battery is

13:20:32　**23**　probably going bad, simply indicate, speak up.  Say:  Judge, I

**24**　can't hear or it's starting to fade out.   The other thing is

13:20:41　**25**　that most of you, I think we had voir dire in this courtroom.

13:20:49  **1**  For some of you it was downstairs because they were working on

**2**  the sound system.   And not only have they vastly improved the

**3**  sound system, again some of you may recall some of the problems

**4**  we were having with it, but apparently these microphones now

**5**  have become very sensitive.  We experienced a day or two ago in

**6**  trying it out that you could, with the headphones on, unless the

**7**  lawyers are very careful, it might be possible for you to hear

**8**  something that a lawyers says or perhaps even other people are

**9**  saying even though they're some distance from the microphone.

13:21:30  **10**  I ask you, please, that if you get some kind of background noise

**11**  of that sort, an overlay of voices or whatever, let us know

**12**  because obviously if I'm saying something to Amy or Tracy or

**13**  whatever, or one of the lawyers is saying something to another

13:21:50  **14**  lawyer or client or representative, it shouldn't come to your

13:21:57  **15**  attention.

**16**          And then finally, I will also remind you about this

13:22:02  **17**  from time to time and at the end of the trial, but you will view

13:22:11  **18**  on your screen written transcriptions of the conversation that

13:22:22  **19**  was recorded.   And something that you should understand that is

13:22:27  **20**  very important, the transcripts are not the evidence.   In other

**21**  words, the words that you see on the screen are not the

13:22:37  **22**  evidence.   It's what you hear with your ears.   So when there's

**23**  any difference of any kind, no matter how trivial it might be or

**24**  how insignificant it might be, the evidence that you can

13:22:51  **25**  consider is what you hear of the conversation with your ears.

**1**        And the transcripts are very conventional, they're

**2**  always prepared whenever we have recordings, and the quality of

**3**  the recordings can vary pretty considerably for various reasons,

**4**  but transcripts are provided to you simply as an aid to your

13:23:16  **5**  understanding, to help you follow along in terms of who's

13:23:19  **6**  speaking and also I think you'll find that they can in fact be

13:23:23  **7**  helpful to you as you listen, and -- if and when the transcript

13:23:34  **8**  appears to deviate from what you hear, it's what you hear that

**9**  controls.

**10**        Anything further in that regard, Counsel?

13:23:42  **11**        MR. HARTMAN:  Just one question.  I'm wondering,

**12**  the recording is -- as they're played, are they transcribed?

**13**        THE COURT:  I apologize, I got back shortly after

**14**  1:00.  I let time get away from me.

13:24:10  **15**        MR. SOFER:  We'll recall to the stand Darren

13:24:15  **16**  Griffin, Your Honor.

13:24:40  **17**        THE COURT:  Mr. Griffin, I remind you you're still

13:24:44  **18**  under oath.

13:24:45  **19**        THE WITNESS:  Yes, sir.

13:24:49  **20**        MR. SOFER:  May I inquire, Your Honor?

**21**        THE COURT:  Of course.

**22**  BY MR. SOFER:

13:24:52  **23**     **Q.**   Mr. Griffin, I want to direct your attention to March of

**24**  2003 again so we can just get a general idea of timing here.

13:25:03  **25**  Did there come a time in March of 2003 when you took Marwan

13:25:10 **1** El-Hindi to an airport?

13:25:11 **2** **A.** Yes, the Toledo airport.

13:25:14 **3** **Q.** Do you recall why it was you took him to the airport?

**4** **A.** He had to testify in front of a grand jury in Syracuse,

**5** New York.

13:25:24 **6** **Q.** Did he later return from that trip and you picked him

**7** up?

13:25:31 **8** **A.** Yes.

13:25:32 **9** **Q.** Did his behavior change after he returned from the trip?

**10** **A.** Yes.   It had seemed as a heightened state of awareness

13:25:43 **11** regarding security.

13:25:45 **12** **Q.** Was there something in specific that he said to you that

**13** he was worried about?

**14** **A.** He was worried about the FBI, that while he was out in

13:25:56 **15** Syracuse he was questioned by them.

**16** **Q.** I just want -- I'm just asking you was there

**17** something -- did he express some concern about something to you?

13:26:07 **18** **A.** Just security.

13:26:13 **19** **Q.** I want to direct your attention to the summer of 2004.

**20** By the summer of 2004, had you actually spoken to Marwan

13:26:26 **21** El-Hindi about your ideology and about your willingness to train

**22** individuals for Jihad?

**23** **A.** Yes.

**24** **Q.** Did you also discuss with him opening some kind of

**25** business?

13:26:35 **1**    **A.**    There was a security company.

13:26:40 **2**    **Q.**    Can you tell the members of the jury what that security

**3**    company was called to the best of your recollection?

13:26:47 **4**    **A.**    It was VIP Security, which morphed into Direct Action

13:26:56 **5**    Security.

13:26:57 **6**    **Q.**    At the time though it was called VIP Security?

**7**    **A.**    Yes.

13:27:03 **8**    **Q.**    Had you said anything to individuals during the course

**9**    of the discussions about VIP Security or Direct Action Security

13:27:10 **10**    providing a cover for something?

**11**    **A.**    Yes.

13:27:12 **12**    **Q.**    Can you basically explain that for the members of the

**13**    jury?

**14**    **A.**    It was a part of my identity that, once again, I was an

**15**    ex-Special Forces soldier, then part of it was now that I was

**16**    out of the military, I was opening a security company and that I

**17**    could train people in certain tactics and weapons training and

**18**    counter surveillance and so forth.

13:27:44 **19**    **Q.**    Now, you testified before about the device or the

13:27:48 **20**    devices that you used to record conversations, and I believe you

13:27:52 **21**    said that they had limited space or storage; is that right?

**22**    **A.**    Yes.

**23**            MR. HARTMAN:  Objection.

13:27:59 **24**            THE COURT:  Overruled.

13:28:02 **25**    BY MR. SOFER:

13:28:02  **1**    **Q.**    Would you tell the members of the jury your

**2**    understanding, your understanding of approximately how much time

13:28:09  **3**    these devices could record before running out of space?

**4**    **A.**    Three to five hours.

13:28:17  **5**    **Q.**    Now, you told us earlier that you reviewed many of the

13:28:21  **6**    recordings that you made?

**7**    **A.**    Yes.

13:28:23  **8**    **Q.**    When you listened to these recordings were you able to

**9**    determine where they took place in reflection?

**10**    **A.**    For the most part, yes.

**11**    **Q.**    Can you give us a basic idea how you were able to do

**12**    that?

**13**    **A.**    By the sounds in the background, by whether I knocked on

**14**    the door of the subject's house or I simply entered through a

13:28:49  **15**    business doorway, or the echos that make sounds from the

13:28:57  **16**    recordings.

**17**    **Q.**    Were you able to identify the people that were speaking?

**18**    **A.**    Yes.

**19**    **Q.**    Can you basically tell us how you were able to do that?

**20**    **A.**    I had spent an enormous amount of time with each, with

**21**    Marwan El-Hindi and Mohammad Amawi, and I knew their voices.

13:29:18  **22**    **Q.**    Did you also spend time with Wassim Mazloum?

**23**    **A.**    Yes.

**24**    **Q.**    And did you recognize his voice as well?

13:29:23  **25**    **A.**    Yes.

13:29:24 **1**      **Q.**    You testified earlier that Marwan El-Hindi called you at

13:29:30 **2**   some point in July of '04 and told you he had the two recruits;

**3**   is that correct?

**4**      **A.**    June of '04, yes.

**5**      **Q.**    My apologies, I misspoke.   Did you record that

13:29:42 **6**   conversation?

**7**      **A.**    Yes.

13:29:44 **8**          MR. SOFER:   Your Honor, at this time I'll go

13:29:46 **9**   through, if it's acceptable to Your Honor, just for the members

**10**   of the jury and ask you to put on you're phones.   There's a

13:29:53 **11**   list of instructions in your books.   They're not that

13:29:58 **12**   complicated, but they do have some buttons on them.   The -- if

**13**   you hold them with the round part towards you, the button that

13:30:08 **14**   turns them on is on the top right.   It's a little tiny button

**15**   and that should -- this should be the on/off button.   I have no

13:30:21 **16**   idea what happens if you turn them on.   But I think you can

13:30:25 **17**   probably hear my voice through them as I get closer to the

**18**   microphone.   That's what the Judge was talking about as he said

13:30:33 **19**   apparently it's very sensitive.

13:30:42 **20**          THE COURT:   Is there a 12-year-old in the house

**21**   that can help us out?

13:30:49 **22**          MR. SOFER:   There's a dual volume so you can turn

**23**   it up or down on both ears.   They have a rolling volume at the

13:31:03 **24**   bottom.   My understanding is you want this last button A/B to

**25**   be on the A, that is out -- in.   If you push it in or out it

1  may be better, but I think it's better if it's out.

13:31:28  2  MR. IVEY:  Your Honor, mine doesn't work.

13:31:34  3  MR. HARTMAN:  Mine's working but you should make

4  sure your microphone's off while we do this.

13:31:43  5  MR. SOFER:  The difficult part of this is going to

6  be the mikes in the courtroom versus having these on.  We'll go

7  through as best we can, Your Honor.  If I have to step away

13:31:59  8  from the mike, that's what I'll do.

9  THE JUROR:  A lot of static.

13:32:23  10  MR. SOFER:  Try changing the channel.  That A/B.

13:32:26  11  Is that better when you push it in?

13:32:47  12  THE JUROR:  I have all static.

13:32:58  13  MR. HERDMAN:  It could be the court reporter's

14  machine.  Point it away from her.

15  MR. SOFER:  Is everyone okay?  Can everyone hear

16  me?

13:33:06  17  If it's okay with Your Honor and Counsel we're just

18  going to run a second or two clip on here just to see if we can

19  all hear.  Please raise your hand anyone having trouble.

13:33:36  20  (Audio played).

13:33:43  21  MR. SOFER:  Can everyone hear that?  Is this

22  working for everyone?  Is anyone having any problem?

13:33:50  23  THE COURT:  What is the date of this conversation?

13:33:52  24  MR. SOFER:  This is June 23.  I'll ask the

13:33:55  25  appropriate questions.  I just want to make sure we can hear.

1    I won't play it right away.   Yes?   No problems?   Okay.

13:34:07  2    BY MR. SOFER:

3    Q.    Mr. Griffin, you've described now a couple times this

13:34:11  4    conversation that took place in the summer of '04.   On June 23,

5    '04, is that the first conversation that we're playing here at

13:34:21  6    least that -- in which Marwan El-Hindi mentions these two

13:34:26  7    recruits that he has?

8    A.    Yes.

13:34:30  9    Q.    Okay.  Let's try playing 4-4.

13:34:49  10            (Audio recording played)

13:36:06  11    BY MR. SOFER:

12    Q.    Okay, Mr. Griffin, the person who was at least

13:36:12  13    designated as T1 in that recording, who was that?

14    A.    That is me.

13:36:17  15    Q.    And the voice -- the other voice on that particular

16    recording was who?

17    A.    Marwan El-Hindi.

13:36:24  18    Q.    Do you remember if that was a phone call or a personal

19    meeting?

20    A.    It was a phone call.

21    Q.    And why did you ask him about Egypt at that time?

22    A.    Prior conversations he stated that he had contacts in

23    Egypt and he had family members in Egypt that we could set up a

13:36:50  24    training facility there and it would be safe for us there.

13:36:53  25    Q.    When you say "safe", what do you mean by that?

**1**  **A.**  We would be able to train people for Jihad.

13:37:01 **2**  **Q.**  Again, when you say "Jihad", what do you mean -- what

**3**  did you understand Jihad to mean?

**4**  **A.**  Jihad in the context of my identity and --

13:37:15 **5**  MR. HARTMAN:  Objection, Your Honor.  May we

**6**  approach on this, please?

13:39:44 **7**  (Whereupon the following discussion was had at the

**8**  bench outside the hearing of the jury:)

**9**  THE COURT:  First, please, whenever you're

**10**  attributing a statement to somebody, if you could ask them to

**11**  tell you when that statement was made.

**12**  MR. SOFER:  Okay.  You mean as I --

**13**  THE COURT:  Well, he made some.

**14**  MR. SOFER:  Previous conversation.

**15**  THE COURT:  He said Mr. El-Hindi said something

**16**  about this or that.  If you connect it to a time.

**17**  MR. SOFER:  If I can or he can, I certainly will.

**18**  MR. HARTMAN:  The basis for my objection is that I

**19**  know that the conversation they're talking about, the recording

**20**  they're talking about where they talk about a camp for training

**21**  in Egypt.  El-Hindi never says that camp is for training for

**22**  Jihad.  He never says that.  I don't think it's right to let

**23**  Griffin represent it that way.  What we could do, if they want

**24**  to play the recording, that's fine.

**25**  MR. SOFER:  That's not the question I asked him.

1  He asked about Egypt.  I asked him what he understood that to

2  mean, and then what he understood the word Jihad to mean.  He

3  did not testify that that is what Marwan El-Hindi said, but I

4  believe what he said was that he had talked about doing a

5  training over there.  I asked him what that training meant,

6  what kind of training.  He understood.  I can clarify it.

7            THE COURT:  Do.  Please do.

8            MR. SOFER:  But the question we're about to ask --

9  I don't know if the objection will continue -- is:  What is his

10  understanding of the word.

11            THE COURT:  Separate the two.

12            MR. SOFER:  Maybe it wasn't clear.

13            (End of sidebar).

13:39:47 14            THE COURT:  Ladies and gentlemen, disregard the

15  last answer, and, Mr. Sofer, you may proceed.

13:39:54 16            MR. SOFER:  Just to clarify.

13:39:56 17  BY MR. SOFER:

13:39:57 18      Q.    Just to clarify something, Mr. Griffin.  I don't know if

13:40:01 19  you can hear me when you have those things on or not, I hope you

20  can.   When Marwan El-Hindi previously had talked about Egypt

21  and training; he didn't actually use the word "Jihad", did he,

22  to your best recollection?

23      A.    Yes.

24      Q.    You believe he did at some point?

13:40:17 25      A.    At some point.  But from the understanding that's what

| | | |
|---|---|---|
| 13:40:20 | 1 | I trained for. That was the purpose of my training. The |
| 13:40:24 | 2 | cover was the security company. But the purpose was to train |
| 13:40:29 | 3 | Islamic extremists for Jihad. |
| 13:40:32 | 4 | Q. That's what you had said in the past? |
| | 5 | THE COURT: I'm going to strike the answer because |
| 13:40:37 | 6 | it's not responsive. The question was very straight forward. |
| | 7 | So the jury will disregard the last answer. Please just answer |
| | 8 | the question asked. |
| | 9 | Go ahead, Mr. Sofer. |
| 13:40:47 | 10 | BY MR. SOFER: |
| 13:40:48 | 11 | Q. When you would describe your company -- |
| 13:40:51 | 12 | A. Yes. |
| 13:40:53 | 13 | Q. -- did you describe the training that it could do in |
| 13:40:59 | 14 | connection with the word "Jihad"? |
| 13:41:01 | 15 | A. Yes. |
| 13:41:03 | 16 | Q. And by the time this last call that we had just heard |
| | 17 | took place on June 23 of 2004, had you already talked in the |
| | 18 | past about the fact that your security company could train, |
| | 19 | among other things, for Jihad? |
| | 20 | A. Yes. |
| | 21 | Q. And when you used the word "Jihad" and told people about |
| | 22 | it, what did you mean by that? |
| 13:41:34 | 23 | A. Threat or violent action against people in the U.S. or |
| 13:41:43 | 24 | overseas and our allies. |
| 13:41:46 | 25 | Q. What was the motivating portion of that threat? |

13:41:51  **1**  **A.**   The purpose of training, the purpose was simply to

13:42:00  **2**  train.   It's just doing regular training, going shooting and

13:42:05  **3**  security surveillance and all that.   That's legal.   But the

13:42:10  **4**  purpose was to fight overseas and Jihad.

**5**  **Q.**   Again, "Jihad" means what in that connection?

13:42:19  **6**  **A.**   To fight.   To engage the U.S. and its allies.

13:42:35  **7**  **Q.**   At the time this conversation had taken place had you

**8**  yet to hear Mohammad Amawi make the comments that you described

**9**  later?   I'm sorry, poor question.   Let me try to ask it a

**10**  different way.

**11**       I want to direct your attention to June 25, two

**12**  days later.   On that particular day did you hear Defendant

**13**  Amawi say something which raised concerns on your part?

13:42:59  **14**  **A.**   Yes.   While he was explaining his trip to Jordan, he

**15**  had attempted to get into Iraq to perform Jihad.

**16**  **Q.**   And did he say whether he was successful?

**17**  **A.**   He said he was unsuccessful due to his family members

13:43:17  **18**  taking all of his money out of the bank and they had called the

13:43:21  **19**  border patrol to stop him.

13:43:24  **20**  **Q.**   Did he say anything about being interested in continuing

13:43:28  **21**  his efforts to join the Jihad in Iraq?

**22**  **A.**   Yes.   As soon as he gathered enough money he was going

13:43:35  **23**  to attempt to get back to Iraq.

13:43:38  **24**  **Q.**   This is what I tried to ask you before.   Were these two

**25**  events two days apart connected at that point?

13:43:44  **1**  **A.**  No.

**2**  **Q.**  And when you described before the fact that you were

13:43:48  **3**  collecting information on lots of different kinds of people,

13:43:51  **4**  were those people all connected together?

**5**  **A.**  No.

13:43:57  **6**  **Q.**  I want to direct your attention to June 29, 2004.  By

13:44:03  **7**  the way, on June 23, after Marwan told you that maybe he'd bring

13:44:08  **8**  them tomorrow, did you meet those two individuals the next day?

**9**  **A.**  I did not.

13:44:17  **10**  **Q.**  Now I want to direct your attention to June 29, 2004,

13:44:23  **11**  about a week later.  Did there come a time when you had another

13:44:27  **12**  conversation with Marwan El-Hindi?

13:44:28  **13**  **A.**  Yes.

13:44:29  **14**  **Q.**  And did that concern the same two brothers and the

**15**  convention?

13:44:34  **16**  **A.**  Yes.

13:44:38  **17**  MR. SOFER:  At this time let's play 4-5, please.

13:44:59  **18**  (Audio is played).

13:46:03  **19**  BY MR. SOFER:

13:46:04  **20**  **Q.**  Okay.  When Marwan El-Hindi said "brother" the first

**21**  time, what was your understanding of what he meant?

13:46:10  **22**  **A.**  I thought it was his natural brother, his family

**23**  brother, blood brother.

**24**  **Q.**  Did he later clarify in that conversation what he was

13:46:19  **25**  referring to.

**1**     **A.**    Yes.  He was talking about the two men that wanted

**2**   training.

13:46:23 **3**     **Q.**    And he said that they would help you at the table.

**4**   What was your stated purpose for going to this conference?

**5**     **A.**    To set up a display for the local charity to gather

**6**   funds.

13:46:37 **7**     **Q.**    Was that one of the purposes of this ICNA conference?

**8**     **A.**    Yes.

**9**     **Q.**    And there's a table that is used in the conference?

**10**     **A.**    Yes.   There's a display table of information and how

**11**   you can donate.

13:46:58 **12**     **Q.**    When he uses the word "brother", but he's not referring

**13**   to his own brother, what did that mean to you -- what did that

**14**   mean to you at the time?

**15**     **A.**    His brother as in thinking as in -- use that as a term

**16**   of endearment kind of thing, like how we would do it here, not

**17**   necessarily our brother but how we would think like, hey, this

13:47:26 **18**   is my brother but has no blood relation or anything, just you're

13:47:30 **19**   that close.

13:47:31 **20**     **Q.**    And -- okay.  Again, during this period of time was

**21**   there any connection as yet between Marwan El-Hindi and Mohammad

**22**   Amawi and Wassim Mazloum as far as you were aware?

**23**     **A.**    No.

13:47:47 **24**     **Q.**    Now, can you describe for the jury what Mohammad Amawi's

13:47:53 **25**   apartment looks like?

1    **A.**    It sits at 7 Shaftsbury off of Hill in Toledo, Ohio.

13:47:59  2    It's the second structure in.   On the front facade is a black

13:48:07  3    door, you have to be buzzed in.   Sometimes it will be open.

4    He stayed on the first floor, first apartment on the left.   As

5    soon as you walk into the left there is the sitting area, the

13:48:20  6    living room.   On the right, the dining room table.   Further to

7    the right there is a kitchen; straight ahead, once you come in

8    the front door, there's a hallway with two bedrooms and the

9    bath -- both on the left, then there's a bathroom on the right.

13:48:36  10    **Q.**    Did Mohammad Amawi have a bedroom there?

11    **A.**    Yes, he did.

12    **Q.**    And was there a computer in his room?

13    **A.**    Yes.

13:48:45  14    **Q.**    Do you know who else lived there?

15    **A.**    His brother Amr and he had a family member stay on and

16    off.

13:48:54  17    **Q.**    Were there times when you would spend time with Mohammad

18    Amawi that other people would come into the room where you were?

19    **A.**    Yes.

20    **Q.**    And where did you spend most of the time that you spent

21    at Mohammad Amawi's apartment or house?

22    **A.**    In the second bedroom on the left, the rear bedroom.

23    **Q.**    Can you tell the members of the jury, among other thing,

13:49:16  24    what kinds of things you did when you were with Mohammad Amawi

13:49:19  25    in his apartment?

**1**     **A.**    We ate, and socialized.

**2**     **Q.**    When you were in his room at the computer, what kinds of

**3** things would you do?

**4**     **A.**    We viewed materials that he was -- training and videos

13:49:41 **5** and things that he would like to do, what he would like to

**6** learn, and also videos from Islamic extremist websites.

13:49:51 **7**     **Q.**    Would you tell the jury basically where you would sit

**8** and where he would sit during the times you were at the

**9** computer?

**10**     **A.**    He would sit at the computer for the most part, the

13:50:01 **11** computer desk, and I would sit on the edge of the bed.

**12**     **Q.**    Did you give computer files to Mohammad Amawi?

13:50:07 **13**     **A.**    No.

13:50:09 **14**     **Q.**    Did you ever hook your computer up to his directly?

13:50:12 **15**     **A.**    I did not, but he did.

13:50:15 **16**     **Q.**    Can you tell the jury which way the files were flowing,

**17** from your computer to his or his to yours or both?

**18**     **A.**    From his desktop to my laptop.

13:50:25 **19**     **Q.**    Did he ever give you program files or CDs during the

**20** course of this case?

13:50:31 **21**     **A.**    Yes, he did.

**22**     **Q.**    Can you tell the members of the jury basically how he

**23** did that?

**24**     **A.**    Basically he saved them to disk and he passed them along

**25** to me primarily.

**1**   **Q.**   Did there come a time when you gave Mohammad Amawi blank

13:50:45 **2**   CDs during the course of this case?

**3**   **A.**   Yes.

13:50:47 **4**   **Q.**   And where did you get those CDs from?

**5**   **A.**   From the FBI.

13:50:51 **6**   **Q.**   Were they still in their wrappings?

**7**   **A.**   Yes.

13:50:55 **8**   **Q.**   Can you tell us what else Mohammad Amawi did at his

**9**   computer when you were there, among other things?

13:51:01 **10**   **A.**   He would chat, he would --

13:51:03 **11**   **Q.**   You say "chat".   What do you mean by that?

13:51:07 **12**   **A.**   With other people on the computer.   He was the head of

**13**   a few chat rooms.  He would give explanations about Islam and

**14**   the thinking, his thinking of it.   He would also do cut-outs,

13:51:24 **15**   he would pass one message from one person to another.

13:51:33 **16**   **Q.**   Did Mohammad Amawi help you ever to understand Arabic?

13:51:41 **17**   **A.**   Yes, he translated with me and my -- after spending so

**18**   many hours with him and others, my Arabic gradually got better.

**19**   **Q.**   I want to direct your attention now to June 30, 2004.

**20**   Did there come a time when you went to Mohammad Amawi's

13:52:07 **21**   apartment on June 30, 2004?

13:52:11 **22**   **A.**   Yes.

**23**   **Q.**   Did you record some or all of your interaction with

13:52:15 **24**   Mohammad Amawi that day?

**25**   **A.**   Yes.

1          MR. SOFER:  Let's play 4-13.

13:52:35  2          (Audio is played).

13:53:00  3  BY MR. SOFER:

4      Q.  I paused that.   When you said, "taking the way of the

13:53:04  5  Shehada," what did that mean?

13:53:06  6      A.  To go martyr myself in the name of religion.

7      Q.  When you say "martyr yourself"?

13:53:14  8      A.  To suicide myself, go kill myself.

13:53:42  9          (Audio is played).

14:00:36  10  BY MR. SOFER:

11      Q.  In this conversation, Mr. Griffin, what did you

12  understand Jihad to mean as Mohammad Amawi described it?

13      A.  To fight in Iraq.  To fight with the Islamic extremists.

14      Q.  The portion of the conversation where he's expressing

15  some debate that he had with someone, is that accurate or not?

16      A.  Yes.

17      Q.  Can you basically tell the jury, as you understood it,

18  what this debate was about?

14:01:06  19      A.  The debate was whether it's permissible to go perform

14:01:10  20  Jihad if you're not in that country.

21      Q.  And what was Mohammad Amawi's position?

22      A.  His position was it's permissible.

23          MR. SOFER:  At this time I'd like to put up 8-E,

14:01:28  24  please.

14:01:31  25          Judge.  We have to toggle back and forth between

1    two systems, so I ask for the Court's indulgence while we do

2    this.

3                    THE COURT:   What was that number?

14:01:44    4                    MR. SOFER:   8-E, as in Edward.

14:01:47    5    BY MR. SOFER:

6        Q.    Can you tell the members of the jury what is depicted in

14:01:50    7    Government's Exhibit 8-E for identification?

14:01:54    8        A.    It looks like 7 Shaftsberry.

14:01:57    9        Q.    Does it fairly accurately reflect the way 7 Shaftsbury

10    looked during at least some of the time that you interacted with

11    Defendant Mohammad Amawi?

12        A.    Yes.

14:02:10    13                    MR. SOFER:   Let's go to 8-A, as in Adam.

14:02:10    14    BY MR. SOFER:

15        Q.    Do you recognize what's depicted in 8-A as in Adam?

14:02:18    16        A.    Yes, the living room area.

17        Q.    Does that fairly and accurately reflect the way it

18    looked at or around the time you interacted with Mohammad Amawi?

14:02:25    19        A.    Yes.

14:02:26    20                    MR. SOFER:   Let's go to 8-B as in Bravo.

14:02:26    21    BY MR. SOFER:

22        Q.    Do you recognize that?

14:02:31    23        A.    Yes.   That is Mohammad Amawi's bedroom.

24                    MR. SOFER:   Let's go to 8-C.

25    BY MR. SOFER:

1     **Q.**   Do you recognize that?

14:02:41   2     **A.**   That is Mohammad Amawi's computer desk.

14:02:45   3     **Q.**   The desk?

14:02:47   4     **A.**   And the computer.

5     **Q.**   Is that the desk or the -- strike that.

6          Does this fairly and accurately represent basically

7     how that desk looked when you were interacting with Mohammad

8     Amawi?

9     **A.**   Yes.

14:03:01   10          MR. SOFER:  Lastly, 8-D.

14:03:01   11     BY MR. SOFER:

12     **Q.**   Can you tell the members of the jury what's depicted

14:03:08   13     there?

14     **A.**   This is the dining room area.

14:03:10   15     **Q.**   Does that fairly and accurately represent the way that

16     room looked basically during the time that you interacted with

17     Mohammad Amawi?

18     **A.**   Yes.

19          MR. SOFER:  At this time the government offers 8-E ,

20     8-A, 8-B, 8-C and 8-D in evidence.

14:03:27   21          MR. IVEY:  No objection.

22          THE COURT:  It will be admitted.

14:03:42   23          MR. SOFER:  I want to play 4-13, 4-A.  Same date,

14:04:04   24     June 30.

14:04:12   25          (Audio is played).

14:05:29 **1** BY MR. SOFER:

**2**   Q.   Can you give the jury a basic description of what was

**3** being said here?

14:05:35 **4**   A.   Once again, he was talking about if it was permissible

**5** to go perform Jihad.

**6**   Q.   And what did Amawi, what did you understand him to mean

14:05:47 **7** when he said if you have the intent you have the reward?   I

**8** think you actually said some of it.

14:05:52 **9**   A.   He had the intention of going.   He attempted to go, but

14:05:57 **10** with circumstances beyond his control, he did not.   So he still

14:06:03 **11** gets the reward.

14:06:05 **12**   Q.   What was your understanding of what happens if you die

14:06:09 **13** in the course of a legitimate Jihad?

14:06:13 **14**   A.   You are raised to the highest form of heaven in the

14:06:20 **15** Islamic belief.

14:06:21 **16**   Q.   I'm sorry, I should have said this, but was this second

**17** clip that we just heard also on June 30, 2004.

**18**       Switching gears, while this is happening, June 30,

**19** did you ultimately make plans to go to this ICNA conference in

14:06:43 **20** July?

14:06:44 **21**   A.   Yes.

14:06:45 **22**   Q.   Where, by the way, was that ICNA conference to take

**23** place?

**24**   A.   In the convention center in Cleveland, Ohio.

14:06:52 **25**   Q.   And did you ultimately meet the two recruits at the

1  conference?

14:06:59  2    **A.**  Yes, I did.

14:07:00  3    **Q.**  Do you remember what date you first met them on?

4    **A.**  On the 3rd and then the 4th of July.

5    **Q.**  Again, did you bring the recording device that day?

6    **A.**  Yes, I did.

7    **Q.**  Did the recording device or devices that you brought on

8  that day have the capability of recording audio?

9    **A.**  Yes.

10    **Q.**  How about video?

11    **A.**  Yes.

14:07:19  12    **Q.**  Can you give the jury a basic description of your

14:07:23  13  ability to aim the video portion of the recording device?

14:07:27  14    **A.**  I had to estimate.  There was no way of knowing.  I

15  wasn't told.  I was just told a general direction.

14:07:35  16    **Q.**  I want to direct your attention to July 3, 2004, at the

14:07:40  17  ICNA conference.  You said that was the first place that you

14:07:44  18  met Marwan El-Hindi's recruits?

19    **A.**  Yes.

20    **Q.**  And again for the members of the jury, what were their

21  names?

14:07:51  22    **A.**  Khaleel Ahmed and Zubair Ahmed.

14:07:56  23        MR. SOFER:  I'd like to play 4-6, please.

14:08:35  24        MR. HARTMAN:  Objection, Judge.  I don't believe

14:08:44  25  we should be playing a transcript with a tape where it's

14:08:47  1  absolutely inaudible.   You can't tell at all what's being said

2  there.

14:08:52  3              MR. SOFER:  Judge, Counsel's had this for, I don't

14:08:57  4  know how long, years.

14:09:02  5              THE COURT:  Why don't you have the jurors take the

14:09:05  6  headphones off and play it for me.   They won't be able to hear

7  it, right?

14:09:14  8              MR. SOFER:  Your Honor, we're trying to make some

14:09:17  9  alterations so it's not quite as loud.

14:09:27  10              MR. BOSS:  Can we turn off the transcript so it's

11  not displayed.

14:09:33  12              THE COURT:  Yeah.   Turn off the monitors.

14:09:48  13              Why don't we excuse the jury for a moment.

14:10:43  14              (Jury exits the courtroom.)

14:10:45  15              MR. SOFER:  I'm confident, Judge, that we -- I know

16  because we've listened to it hundreds of times -- or many times,

17  that it's not the quality of the recording.   It has something

18  to do with the sound system.

14:10:57  19              MR. HERDMAN:  This is a different system that's

20  playing.   So it might affect the volume controls on the

21  headsets.   It just might take a little tweaking.   I think that

14:11:07  22  might explain some of the discrepancy.

14:11:33  23              MR. HARTMAN:  Judge, my problem with that is

24  there's no way you can hear what's going on in this and the

25  sound is the evidence, not the transcript.

2323

1  MR. SOFER:  I agree with Counsel.  We just have to

14:11:44  2  tweak the audio system.

3  THE COURT:  I agree so far.

4  MR. HARTMAN:  If they can find a way to do it, I'll

5  withdraw my objection.  But so far…

14:11:53  6  MR. SOFER:  Is there a way to control it?  It's

14:11:59  7  reverbing out of control.  The enhancements to the system seem

14:12:12  8  to be a little too turbo-charged.

14:12:50  9  Your Honor, if you don't use the headphones it's

14:12:53  10  much more difficult to hear.

14:12:55  11  MR. HARTMAN:  Let's try it again.

14:12:58  12  MR. HERDMAN:  I put the headphones on and I was

13  able to hear.  Obviously, it doesn't matter.

14  THE COURT:  Let's try it with the headphones.

14:13:46  15  MR. SOFER:  I can hear it, Judge.

16  MR. HARTMAN:  I think parts of it are probably

17  fine.  But there are parts I still don't think you can

14:13:52  18  understand enough to play a transcript.

19  THE COURT:  I understand.  I disagree.  I'm going

20  to let them -- but I will remind them if they cannot comprehend

21  something, they're to disregard the transcript.

22  MR. SOFER:  Judge, just so we don't -- we'll do our

23  best.  What is happening here is there are two different kinds

24  of devices.  One of them may have a more powerful signal so

14:14:14  25  it's pushing it sort of through the roof of the capabilities of

14:14:18  **1**  the system.

**2**  The one thing I would say, Your Honor, is for over

**3**  two years now Counsel has had these recordings.  For many, for

**4**  over two years now they've had transcripts.  If they want to

**5**  say something's not audible…

**6**  THE COURT:  The problem is with the production that

14:14:37  **7**  we're experiencing now.

14:14:38  **8**  MR. SOFER:  Understood.

**9**  THE COURT:  Okay.  Let's bring them on back.

14:18:01  **10**  (Jury enters the courtroom).

14:18:06  **11**  THE COURT:  Thank you again for your patience.

**12**  The problem appears to be with the conversion to -- our enhanced

14:18:15  **13**  sound system has created some problems.  We may be experiencing

14:18:20  **14**  different levels of loudness depending upon various recordings.

14:18:31  **15**  We initially expected they would be all at the same level.  So

**16**  you may have to adjust your headphones.  The other thing is in

**17**  the scene that you are about to witness with the video recorded

14:18:42  **18**  scene with the audio, there is a fair amount of background

14:18:48  **19**  noise.  I simply want to remind you that what you are to

**20**  consider as evidence is what you can hear of what is being

14:19:00  **21**  spoken.  To that end, the transcript that's been prepared can

**22**  assist you.  But if there's a disconnect.  If what you're

**23**  hearing for whatever reason, background noise or whatever, is

**24**  not what the transcript indicates, you must disregard the

**25**  transcript because if you can't hear it, you can't consider it.

14:19:30 **1**            MR. SOFER:   I think we resolved our technical

14:19:34 **2** difficulties.   Let's try.

14:19:38 **3**            THE COURT:  You might try keeping the sound down.

14:19:44 **4**            MR. SOFER:  Please raise your hand if you can't

**5** hear.

14:19:56 **6**            (Video is played.)

14:20:30 **7** BY MR. SOFER:

14:20:33 **8**    **Q.**   I notice that both you and either Zubair or Khaleel say

**9** "Insha Allah".   Can you tell the members of the jury what that

14:20:43 **10** means as far as you understand?

**11**    **A.**   God willing, hopefully or God willing, slash, hopefully

**12** it will happen.

14:20:53 **13**    **Q.**   Did there come a time the next day when you actually met

**14** with Zubair and Khaleel again?

**15**    **A.**   Yes.

14:20:59 **16**            THE COURT:  I apologize, what tape number was that?

**17**            MR. SOFER:  That was 1D77, 4-6 is the exhibit

**18** number.

14:21:22 **19**            MR. SOFER:  Next is 1D77, also 4-6.

14:21:22 **20** BY MR. SOFER:

14:21:22 **21**

**22**    **Q.**   Before we play this, now, here, this is the same

14:21:39 **23** recording device.

14:21:42 **24**    **A.**   Yes.

14:21:43 **25**    **Q.**   Did you have an opportunity between the 3rd of July and

**1** the 4th of July to return that recording device to the FBI?

**2**    **A.**   No.

14:21:51 **3**    **Q.**   So would this be one of those examples where you

**4** couldn't have gotten the recording device back to the FBI in

**5** time?

**6**    **A.**   Yes.

**7**    **Q.**   Again, can you remind the jury where you were during the

**8** 3rd and 4th of July of '04?

**9**    **A.**   I was in Cleveland, Ohio.

**10**       MR. SOFER:  Now we can play 4-6, clip 3A, please?

14:22:13 **11**       MR. BOSS:  What's the number again, please?

14:22:15 **12**       MR. SOFER:  3A.

14:23:08 **13**       (Video is played.)

**14**       MR. IVEY:  Your Honor, I have an objection.  Can we

14:32:46 **15** approach, please?

**16**       THE COURT:  Sure.

14:32:48 **17**       (Whereupon the following discussion was had at the

14:36:53 **18** bench outside the hearing of the jury:)

14:36:53 **19**       MR. IVEY:  I'd like a curative instruction to the

**20** jury as it relates to Mr. Amawi.  The witness has testified at

**21** this particular point in time when this was played that

**22** Mr. El-Hindi does not have a connection to Mr. Amawi.  So these

**23** statements can only be utilized in the case against Mr. El-Hindi

**24** at this point because they're not in furtherance of a conspiracy

**25** with Mr. Amawi because they haven't even met each other at this

1  point.   So I'd like the jury to be instructed they can only

2  consider this for purposes of Mr. El-Hindi.

3          MR. SOFER:  Your Honor, you could give a thousand

4  instructions all the way through the case.

5          THE COURT:  I think we can set certain dates as the

6  earliest rather than go through point after point.   I really

7  do.  We can make that very clear.

8          MR. IVEY:  I would just like at some point my

9  objection that that be done.

10          THE COURT: Let me give them a general sort of

11  instruction right now.

12          MR. SOFER:  What instruction will Your Honor give?

13          THE COURT:  Apparently there's no -- Amawi and

14  El-Hindi and Mazloum have not gotten together as of the date of

15  this conversation.

16          MR. SOFER:  True.

17          THE COURT:  So there's no conspiracy that's been

18  formed between them.

19          MR. SOFER:  True.

20          THE COURT:  Maybe the hub of this is Griffin, and

21  they can't be conspiring with Griffin because he's a government

22  agent.

23          MR. SOFER:  No, they can't, but the law, I think,

24  is very clear.   If Marwan El-Hindi is conspiring with two other

25  people, and they join into that conspiracy, they are responsible

**1** for the actions of those conspirators if they join that same

**2** conspiracy.

**3** THE COURT: Prior to knowing.

**4** MR. SOFER: Prior to, afterwards. That's basic

**5** conspiracy law.

**6** THE COURT: I tend to agree.

**7** MR. IVEY: But they have -- I know this is coming,

**8** but there's never a time when Mr. Amawi enters into anything

**9** with Zubair and Khaleel. There can be a conspiracy supposedly

**10** with Mr. El-Hindi and Mr. Mazloum, between the three of them,

**11** not involving Mr. Amawi.

**12** MR. SOFER: Your Honor will give an instruction at

**13** the end of the case. You've already given a preliminary

**14** instruction about all these issues, about who's responsible for

**15** what in the conspiracy. Again, the notion that you would with

**16** every one of these conversations start parsing them out in that

**17** kind of way in the middle, the beginning of trial, doesn't make

**18** any sense.

**19** THE COURT: I'm just going to tell them: Ladies

**20** and gentlemen, you'll recall earlier this morning I instructed

**21** you -- I didn't really instruct them about the coconspirator

**22** exception. What is it exactly you want me to say?

**23** MR. IVEY: I would like you to say that at this

**24** point that this evidence cannot be considered against Mr. Amawi.

**25** And the reason I say that is because they've already -- they

1   play a tape of El-Hindi, then they play a tape of Amawi, then

2   they go to this.   And it unfairly, to me, creates the

3   impression this is all one thing, and it's not.

4           MR. SOFER:  I've made it very clear.   I've asked

5   the witness.

6           THE COURT:  I'm going to let it be.   I'm going to

7   deny the request.

8           (End of side-bar discussion.)

14:36:55  9           THE COURT:  You may continue.

10           MR. SOFER:  Thank you, Judge.

14:36:59  11   BY MR. SOFER:

14:37:00  12   Q.   A fairly lengthy conversation.   I want to ask you about

14:37:03  13   a couple things that were said.   Somewhere in there I believe

14:37:06  14   that Zubair Ahmed said they were developing a five-year plan.

14:37:10  15   What did you understand that to mean?

16   A.   A five year training plan to get to a proficiency level

17   of understanding --

14:37:19  18           THE COURT:  Well, I don't think he can testify --

19   ladies and gentlemen, you can consider a statement somebody

20   makes as evidence of that individual's intent, what the

21   individual has in mind.   But no witness can elaborate upon that

22   directly or indirectly by saying that's what that person had in

14:37:47  23   mind.   I'm going to instruct you to disregard that last bit of

24   evidence.   To the extent you heard what was attributed to Mr.

14:37:59  25   Zubair Ahmed, you can consider that as evidence of what he may

1 have had in his mind. But this witness cannot, in effect,

2 interpret that and say, in effect, this is what that witness had

3 in mind because none of us can peer into somebody else's mind

4 and discern an intent.

5 You can ask him what he then intended to do or

6 whatever, but you cannot have him comment on what he believed

14:38:27 7 somebody meant.

14:38:29 8 MR. SOFER: Understood, Your Honor.

9 THE COURT: By a statement.

10 MR. SOFER: Perhaps I inartfully asked the

11 question. I'll move on.

12 BY MR. SOFER:

13 Q. There was a discussion about a 50 caliber. Can you

14 tell the members of the jury what a 50 caliber is from your

14:38:43 15 experience and training in the United States military?

16 A. It's a 50-caliber machine gun. It's used to engage the

17 enemy.

18 Q. Is it an offensive or defensive weapon, if you know?

19 A. It could be used as both actually.

14:38:58 20 Q. When they mention a FOID card, do you know what that is?

14:39:03 21 A. Vaguely. It is a card that you need to be a security

22 person, officer over in the state of Illinois.

14:39:17 23 MR. SOFER: Did you want to take a break?

14:39:22 24 THE COURT: Why don't we do one more then take a

25 break.

1    BY MR. SOFER:

2        Q.    Was that one or more portion of the conversation on July

14:39:29  3    4th; do you know that?

4        A.    Yes.

5        Q.    The conversation continued?

6        A.    Yes.

14:39:35  7                MR. SOFER:    Let's play 4-6, 4-A, please?

14:39:45  8                THE COURT:    Once again that number 4-6, and I'm

14:39:50  9    referring to these further numbers afterwards, they're just

14:39:54  10   clips within the same conversation.

14:40:00  11                MR. SOFER:   4-6, 4-A, Your Honor.

14:40:23  12                (Video recording is played).

14:40:27  13   BY MR. SOFER:

14        Q.    By the way, I noticed that you have taken some wonderful

14:40:34  15   pictures so far of a white cloth.    Can you describe that for

16    the members of the jury?

14:40:38  17      A.    That is the apron that goes around the booth that they

14:40:42  18   were stationed at.

19        Q.    And again, can you describe to the members of the jury

20    why, if you know, that's what we're seeing here for the most

21    part?

14:40:50  22      A.    Because it was a shot in the dark for me.    I just got a

14:40:53  23   general direction and had to go with it.

14:40:57  24                MR. HARTMAN:  Your Honor, I'm wondering if we can

25    make clear, because these are clips from the same date, the

1   order that they're coming in?   I don't know if the one he just

2   played was before or after the one he played before.

3            THE COURT:   Are these chronological?

4            MR. SOFER:   They are, Your Honor.

14:41:12   5   BY MR. SOFER:

14:41:13   6   Q.   Mr. Griffin, you're aware these are chronological, for

7   the most part, from your previous review; is that right?

14:41:21   8   A.   Yes.

9   Q.   Do you know -- there was some reference in the clip

10  before that to making Duaa.   Do you know what that meant?

11  A.   Making prayer, supplication, and reinforcing that may

12  this come to fruition, the training in this aspect.  This

14:41:45   13  context was the training and being able to get trained to go

14:41:50   14  perform Jihad.

14:41:52   15  Q.   Same conversation, same day, 1D77, 4-6A.

14:42:23   16            (Video is played.)

14:46:16   17  BY MR. SOFER:

14:46:17   18  Q.   During this conversation and the previous clips was

14:46:20   19  Marwan El-Hindi present?

14:46:22   20  A.   He came up at the very end of the last clip.

21  Q.   Was he there for the part about the discussions about

14:46:31   22  50-caliber weapon at the end?

14:46:33   23  A.   I believe he was not.   He was just off of earshot,

14:46:38   24  screen shot.   He was on the phone.

14:46:41   25  Q.   Did you describe that you had talked to these two other

1   men already?

14:46:45   2       A.   Yes.   He had prior told them about me from the

3   conversation.

14:46:51   4       Q.   Did you form an opinion about the threat at that time

14:46:55   5   that Zubair and Khaleel Ahmed posed?

14:47:01   6                   MR. BRYAN:  Objection, Your Honor.

14:47:04   7                   THE COURT:  Opinion about the threat?

14:47:10   8   BY MR. SOFER:

14:47:11   9       Q.   Did you want to follow up with Zubair and Khaleel Ahmed?

10       A.   Yes.

11       Q.   Why is that?

14:47:16   12      A.   They were clearly anxious to receive training and that

13   poses a threat to the United States and its allies.

14:47:31   14                  MR. DOUGHTEN:  Objection.

14:47:31   15                  MR. BRYAN:  Objection.

16                  THE COURT:  Sustained.

17   BY MR. SOFER:

18       Q.   What kind of training did they want to receive that gave

19   you a concern that they were a threat?

20       A.   Jihad training.

21       Q.   Is there something in particular about what they were

14:47:43   22   asking for that stood out to you?

23       A.   The explosives and running with a 50-caliber Gatling

14:47:56   24   gun.

25       Q.   At some point in the conversation Marwan El-Hindi

14:47:59  **1**  mentions starting a group.   What kind of group did you

**2**  understand him to be discussing?

**3**            MR. HARTMAN:  Objection.

14:48:05  **4**            THE COURT:  Sustained.

14:48:06  **5**  BY MR. SOFER:

14:48:06  **6**    **Q.**   Did you know what he was talking about?

**7**    **A.**   Yes.

**8**            MR. HARTMAN:  Objection.

**9**            THE COURT:  Basis.   I agree.

14:48:14  **10**  BY MR. SOFER:

14:48:14  **11**    **Q.**   Had you had previous discussions with Marwan El-Hindi

**12**  about forming a group?

**13**    **A.**   Yes.

**14**    **Q.**   And what was that group supposed to be doing?

**15**            THE COURT:  Why don't we find out what those

**16**  discussions were and when they took place and who may have been

14:48:27  **17**  present and who said what.

14:48:29  **18**  BY MR. SOFER:

**19**    **Q.**   Did you have discussions previously with Marwan El-Hindi

14:48:32  **20**  about forming a group?

**21**    **A.**   Yes.   That was actually --

14:48:36  **22**            THE COURT:  Please, I'm sorry, but just answer the

**23**  question.   The answer is yes.   Let's find out when the

**24**  discussions were.

14:48:44  **25**  BY MR. SOFER:

**1**    **Q.**    Do you know the dates and times of those specific

14:48:48 **2**  discussions as you sit here today?

**3**    **A.**    No, I do not.

**4**    **Q.**    Can you give us a basic description of what those

14:48:54 **5**  discussions were about?

14:48:55 **6**    **A.**    They were -- one was in the cover, and the identity that

**7**  what I wanted to do was form cells to work together and to be

14:49:10 **8**  ready and go engage in Jihad.

14:49:15 **9**    MR. HARTMAN:  Judge, I'm still going to object to

**10**  this because we're talking about things El-Hindi didn't

14:49:21 **11**  specifically say.   We're talking about his.

**12**    THE COURT:  I agree.   Let's bring it down to his

14:49:27 **13**  recollection of conversations he had.

14:49:30 **14**    MR. BOSS:  Can we also determine whether they've

**15**  been recorded or not?

**16**    MR. SOFER:  I'll move on.

**17**    THE COURT:  I'm going to instruct the jury to

**18**  disregard the last sequence of questions.

14:49:40 **19**    MR. SOFER:  Can we please put up on the screen 11?

14:49:46 **20**    THE COURT:  Why don't we take a break after this

**21**  one.

14:49:55 **22**    THE JUROR:  My right speaker keeps going in and out

**23**  on this particular headset.

14:50:08 **24**    MR. SOFER:  There is not a tape, Judge.   These are

**25**  actual pictures.

14:50:15 **1**      THE COURT:  Is this a recording now?

**2**      MR. SOFER:  No, Judge, not a recording, just

14:50:20 **3** pictures.

**4**      THE COURT:  What Exhibit Number is that?

14:50:23 **5**      MR. SOFER:  11.

14:50:25 **6**      THE COURT:  Go ahead.

14:50:30 **7** BY MR. SOFER:

**8**      **Q.**   Do you recognize Government's Exhibit 11?

**9**      **A.**   Yes.

14:50:33 **10**     **Q.**   What is that?

14:50:34 **11**     **A.**   Zubair Ahmed and Marwan El-Hindi.

14:50:37 **12**     **Q.**   Is that a still shot from the video we just saw?

**13**     **A.**   Yes.

**14**     **Q.**   How about 12?

14:50:46 **15**     **A.**   Yes.

14:50:47 **16**     **Q.**   Do you recognize that?   What's that?

**17**     **A.**   Marwan El-Hindi and Khaleel Ahmed.

14:50:55 **18**         MR. SOFER:  13, please.

14:50:55 **19** BY MR. SOFER:

14:50:59 **20**

14:50:59 **21**     **Q.**   Do you recognize that?

**22**     **A.**   Yes.   Once again, it's Marwan El-Hindi and Zubair

14:51:04 **23** Ahmed.

14:51:05 **24**         MR. SOFER:  At this time the government offers 11,

**25** 12, and 13 into evidence.

**1**        MR. HARTMAN:  No objection.

**2**        THE COURT:  Admitted.

14:51:13 **3**        MR. SOFER:  We can take a break now if you want.

**4**        THE COURT:  Why don't we.  We'll try to resume at

14:51:20 **5** five after 3:00.

15:10:49 **6**        (Recess taken).

15:10:57 **7**        MR. SOFER:  Your Honor the government will recall

**8** Darren Griffin.

15:11:31 **9** BY MR. SOFER:

15:11:33 **10**    Q.    Mr. Griffin, I think I asked you before if you followed

**11** up or you desired to follow up with Zubair and Khaleel Ahmed

**12** after July 3 and July 4 in Cleveland; is that right?

**13**    A.    Yes.

15:11:45 **14**    Q.    Among others did the FBI contact that you were dealing

**15** with ask you to follow up with them?

**16**    A.    Yes.

**17**    Q.    And did you make numerous attempts over the next days

**18** and weeks and even months to attempt to call and meet with them

**19** again?

**20**    A.    Yes.

**21**    Q.    And tell the jury basically why that is.

**22**    A.    To gather further information.

15:12:04 **23**    Q.    Now, I want to direct your attention to July 15, 2004.

**24** Did there come a time on that date when you met with Marwan

15:12:15 **25** El-Hindi at his home?

**1**   A.   Yes.

15:12:18  **2**        MR. SOFER:  And I'd like us to play 4-7 from 1D81,

15:12:30  **3**  clip 1-A.  Your Honor, we may have to adjust the sound again

15:12:46  **4**  because we're flipping back to the previous device, I believe.

15:12:54  **5**        (Audio played)

15:18:58  **6**  BY MR. SOFER:

15:19:01  **7**   Q.   To the best of your recollection, was that conversation

**8**  the first time you mentioned Mohammad Amawi to Marwan El-Hindi?

15:19:10  **9**   A.   I believe so.

**10**        MR. SOFER:  And let's play 4-7, clip 3-A.

**11**  BY MR. SOFER:

**12**

**13**   Q.   This is the second clip from the same day, this

15:19:29  **14**  conversation continued, did it not?

**15**   A.   Yes.

15:19:33  **16**        MR. SOFER:  1D81, 4-7, 3-A from July 15, 2004.

15:19:46  **17**        (Audio is played.)

15:28:07  **18**  BY MR. SOFER:

15:28:08  **19**   Q.   Mr. Griffin, did there come a time about a week later on

15:28:13  **20**  July 22 when you had another conversation with Marwan El-Hindi

**21**  about Zubair and Khaleel?

15:28:25  **22**   A.   Yes.

**23**   Q.   Did he express some kind of doubt about their

15:28:29  **24**  seriousness?

15:28:30  **25**   A.   Yes.  They were -- he stated that they were playing

1  games.

2      Q.    I want to direct your attention now to September of '04.

3  Did you continue to try to get in contact with Zubair and

15:28:50  4  Khaleel during September of 2004?

15:28:53  5      A.    Yes.

15:28:54  6      Q.    And again, why was that?

15:28:56  7      A.    To gather information.

15:29:00  8      Q.    What was the importance of gathering information on them

15:29:04  9  as far as you knew?

15:29:06  10      A.    To see if they were obtaining training and if they had

11  started looking in other places to receive training.

15:29:16  12      Q.    Was that something that you were concerned about and the

15:29:19  13  FBI told you to be concerned about throughout the case?

15:29:25  14              MR. BOSS:  Objection.

15              THE COURT:  Sustained -- well, basis?  I think

15:29:35  16  it's leading the witness, but he can testify as to statements

15:29:39  17  that were made that's not for the truth of the matter asserted,

18  if that's where you're headed.  I can explain that to the jury.

19              MR. SOFER:  That's where I'm headed.

15:29:49  20              THE COURT:  Ladies and gentlemen, from time to time

21  a witness will be permitted to testify about something that was

22  told to him or said to him by somebody else, as you just heard

23  the testimony a moment ago.  As a general rule, you can

24  consider that sort of testimony as evidence of what was said to

25  the person, but you cannot consider it to prove the fact that

1 may have been said.   For example, if a witness said I spoke to

2 somebody and he said the light was green, that's evidence that

3 someone told the witness the light was green, but it is not

4 proof that the light, in fact, was green.   In other words,

5 simply that a statement was made, you can consider that.   But

6 not for the truth or as proof of what was asserted.   Okay,

7 Counsel?   I may remind you of that from time to time.   Go

8 ahead.

9 BY MR. SOFER:

10      Q.   Were there things that you did throughout the course of

11 this case as a result of the FBI talking to you about the

12 concept that you just referred to, namely that someone might go

13 somewhere else to get something, get some kind of training?

14      A.   Yes.   Jihad training.

15           THE COURT:   Again, that's not -- the fact that he

16 may have been told that is not proof that in fact the speaker

17 was concerned about somebody going to get Jihad training.  You

18 can consider it only as proof that this witness was told that.

19 It's not proof that somebody went to get Jihad training or even

20 that the speaker was concerned about somebody getting Jihad

21 training.   It's considered only as testimony as to what he was

22 told, the statement itself.

23 BY MR. SOFER:

24      Q.   And what kinds of things did you do as a result of that

25 concern?

15:32:11 **1**   **A.**   I tried to link up with them, to gather more

15:32:17 **2**   information, to ensure that because they had -- I was explained

**3**   by Mr. El-Hindi that they tried to get into Azhar, Afghanistan

15:32:31 **4**   to perform Jihad, so to me that meant they had the intention and

**5**   they were serious about what they were saying when we met.

15:32:40 **6**             MR. BOSS:  Objection, Your Honor.   The tape we

**7**   just listened to do specifically stated Pakistan, not

15:32:46 **8**   Afghanistan.

15:32:47 **9**             THE COURT:  Again, the jury will recall.

15:32:50 **10**             THE WITNESS:  Can I clarify?

15:32:54 **11**             THE COURT:  The tape is the evidence of what was

15:32:57 **12**   said during the conversation.

15:32:57 **13**   BY MR. SOFER:

**14**   **Q.**   I'll ask you:  Can you clarify; can you clarify that?

15:33:05 **15**   **A.**   I misspoke, it was -- I stated it was Afghanistan, but

**16**   it was Pakistan.   And I -- from what I understood, they were

15:33:19 **17**   going to Pakistan.

15:33:21 **18**             MR. BOSS:  Objection.

15:33:22 **19**             THE COURT:  Sustained.   That is exactly the kind

**20**   of thing I was trying to explain a few minutes ago.   That he

**21**   may have been told something, that somebody wanted -- someone

**22**   said to me he wanted to go Pakistan.   That's not proof that the

**23**   speaker that said that wanted to go Pakistan.   It's proof only

15:33:48 **24**   of what he was told and if the government wants to then ask him

**25**   what he did after that, that's fine, but a statement by somebody

15:34:04 **1** who said something to a witness cannot, unless I tell you it

**2** can, but as a general rule cannot be considered as proof of what

**3** was being said, the truth of what was being said; in other

**4** words, in this example, whoever the speaker was in fact wanted

15:34:21 **5** to go to Pakistan or in fact wanted to do Jihad or take a

**6** vacation or anything else.

15:34:27 **7**          MR. HARTMAN:  Your Honor, I might also ask for the

15:34:31 **8** curative instruction because of his characterization of the fact

**9** they wanted to go to Azhar, whether Pakistan or Afghanistan,

**10** because even the tape said Azhar is in Egypt.

**11**          MR. SOFER:  The tape will speak for itself.   The

15:34:46 **12** tape is the tape.

15:34:54 **13** BY MR. SOFER:

15:34:54 **14**     **Q.**   Did you continue to try to contact either Zubair or

**15** Khaleel in September of 2004?

**16**     **A.**   Yes.

15:35:02 **17**     **Q.**   Did there come a time in early October 2004 when in fact

15:35:10 **18** you did get in contact with Zubair Ahmed?

15:35:13 **19**     **A.**   Yes.

15:35:15 **20**     **Q.**   Let's play 1D88, Exhibit 4-9, clip 1A, please.

15:35:27 **21**          MR. BOSS:  1D88.

15:35:38 **22**          MR. SOFER:  1D88.

15:35:40 **23**          MR. HARTMAN:  Clip what?

15:35:42 **24**          MR. SOFER:  Clip 4-9.

15:35:42 **25**          (Audio recording is played.)

15:35:42 **1** BY MR. SOFER:

15:36:23 **2**    **Q.**   Just to clarify something.   I asked you if it was

**3** October 2, the date at least we heard on the tape is Tuesday the

15:36:30 **4** 21st.   Is this a series of telephone calls from your

15:36:34 **5** recollection?

**6**    **A.**   Yes, it is.

15:36:38 **7**             (Audio is played.)

15:37:48 **8** BY MR. SOFER:

**9**    **Q.**   This particular recording, this series of recordings,

**10** there are a number of them in a row, correct?

**11**    **A.**   Yes.

**12**    **Q.**   Can you tell the jury as best as you know why we have a

15:37:59 **13** number of recordings stacked up like this?

**14**    **A.**   In efforts to try to reach Zubair.   And it was a phone

**15** call, and I -- the guidance I was given, if I was calling the

**16** same person, that I could use the same tape, specifically if I

**17** did not talk to them.

**18**    **Q.**   Did you have a different device sometimes for recording

**19** phone calls than the other devices you used?

**20**    **A.**   Yes.

**21**    **Q.**   Did you use a cassette tape recorder more like something

**22** that the jury would be familiar with then?

**23**    **A.**   Yes.

15:38:39 **24**             MR. SOFER:  Let's continue.

15:38:39 **25** BY MR. SOFER:

15:40:38 **1**   **Q.**   Had you missed a call, to your knowledge, during the

15:40:40 **2** first and second calls that were recorded?

**3**   **A.**   To my recollection, yes.

15:40:45 **4**        MR. SOFER:  Let's play the next call.

15:40:48 **5**        (Audio is played.)

15:42:06 **6** BY MR. SOFER:

**7**   **Q.**   Do you know if that was the truth when you told him

**8** that?

**9**   **A.**   It was not the truth.

**10**   **Q.**   Do you recall?

**11**   **A.**   It was not the truth.

**12**   **Q.**   There were times during the case where you did not tell

**13** the truth?

**14**   **A.**   Yes.

**15**   **Q.**   What was the purpose of not telling him the truth there?

**16**   **A.**   I had to get the recording devices ready.   And in a

15:42:26 **17** position to record.

15:42:27 **18**        MR. SOFER:  Let's play the next one.

15:42:38 **19**        (Audio recording is played.)

15:44:18 **20** BY MR. SOFER:

**21**   **Q.**   You said:  Go ahead with that project.   Can you tell

**22** the members of the jury what you meant?

**23**   **A.**   The training.

15:44:25 **24**   **Q.**   Why do you use the word "project"?

**25**   **A.**   Because he was speaking cryptic, so I matched that

15:44:32 **1**  level.

15:44:34 **2**          MR. SOFER:  Okay.  Continue.

15:44:39 **3**          (Audio is played.)

15:46:00 **4**  BY MR. SOFER:

**5**      **Q.**  When you said "going to", what did you mean there?

15:46:03 **6**      **A.**  To perform Jihad.

15:46:10 **7**          MR. SOFER:  Keep playing.

15:46:12 **8**          (Audio is played.)

15:47:43 **9**          MR. IVEY:  Your Honor, I would like to make an

15:47:46 **10**  objection for the record.   I don't think it's proper to blurt

**11**  it out without coming to sidebar.

15:47:56 **12**          (Whereupon the following discussion was had at the

15:51:32 **13**  bench outside the hearing of the jury:)

15:51:32 **14**          MR. IVEY:  I know the Court has already ruled but I

**15**  wanted to make a continuing objection to the evidence of

**16**  statements, recordings of Khaleel and Zubair and Ahmed during

**17**  this point of the trial as it relates to Mr. Amawi because at

**18**  this point there's been no -- I think the testimony has been

**19**  clear from the witness that Mr. Amawi and Mr. El-Hindi have not

**20**  yet met each other, and so there is therefore at this point in

**21**  time no conspiracy established or agreement established between

**22**  the two of them.

**23**          THE COURT:  If I can interrupt.

**24**          MR. IVEY:  So I don't have to keep coming up to the

**25**  side.

1    THE COURT:  You don't.

2    MR. IVEY:  As this comes in I wanted to make sure I

3 have a continuing objection to this for purposes of the record

4 so I don't have to keep interrupting.

5    THE COURT:  Let me say any objection previously

6 made, there were a couple things that came in earlier that I

7 deem those objected to, you don't have to keep saying it.

8 Unless you tell me otherwise, the same with this.   It's my

9 understanding of the law, as Mr. Sofer indicated, that

10 Johnny-come-lately into the conspiracy can get stuck with

11 everything that went before provided he joins the conspiracy and

12 becomes a participant in it.   And, in fact, that if others have

13 been shown to be in a conspiracy together that he joins, what

14 they did is attributable to him.   And if that's a mistake, then

15 I can untangle it quite easily by pointing out anything prior to

16 whatever the date is, the date that the government contends,

17 cannot be attributed to someone else.

18    MR. IVEY:  The reason I bring this -- there can be

19 two separate conspiracies.

20    THE COURT:  I understand, too.

21    MR. IVEY:  I don't believe the evidence is ever

22 going to be that Khaleel and Zubair ever even met Mr. Amawi.

23    MR. BRYAN:  Or that they were aware each other

24 existed.

25    MR. IVEY:  Or there was discussion about the

1    others.

2            THE COURT:  But if there's no nexus established by

3    the government, I'll so instruct the jury.   But I think the

4    government has to be given some leeway to try to connect the

5    dots.   It's up to me, at least preliminarily, to make a ruling

6    as to which any statements can be attributed.   I have to make a

7    finding of a conspiracy in due course.

8            MR. HARTMAN:  The government's going to allege that

9    El-Hindi and Zubair and Khaleel are co-conspirators?

10           MR. SOFER:  We have in the indictment.

11           MR. HARTMAN:  Okay.

12           MR. SOFER:  They're named as co-conspirators in the

13   case, Judge.

14           (End of side-bar discussion.)

15:51:40  15           THE COURT:  You may continue.

16           MR. SOFER:  That would require me remembering where

15:51:45  17   I was.

18           THE COURT:  Completed that conversation I think

15:51:51  19   between the witness and Zubair Ahmed.

15:51:56  20   BY MR. SOFER:

15:51:57  21       Q.   I think towards the end of that conversation -- first of

15:52:01  22   all, strike that.

15:52:02  23           There was some mention of a list of questions that

15:52:06  24   Zubair Ahmed had given to Marwan El-Hindi.   Did you ever

15:52:10  25   receive those questions?

1    **A.**   I did not.

2    **Q.**   And there was some further discussion about you trying

3  to reach out and talk to Marwan El-Hindi about those questions

15:52:21  4  and other things.   Did you on October 5, three days later, have

15:52:28  5  a phone conversation with Marwan El-Hindi?

6    **A.**   Yes.

15:52:32  7         MR. SOFER:  I'd like us to play 1D89, Exhibit

15:52:37  8  Number 4-10, 1A.

15:52:45  9         THE COURT:  What's the date, please?

10        MR. SOFER:  October 5, 2004, Your Honor.

15:53:08 11        (Audio recording is played.)

15:56:39 12  BY MR. SOFER:

13    **Q.**   In this conversation, October 4, 2005, you told Marwan

14  that you didn't think the questions should be laying around.

15  What did you mean by that?

15:56:53 16    **A.**   The questions that Zubair said he had passed to Marwan.

17    **Q.**   You're the one that told him you didn't think the

18  questions should be there, right?

19    **A.**   Yes.

15:57:03 20        MR. SOFER:  Judge we have two choices.   It's up to

21  Your Honor.   I have a significant -- the first sort of longer

15:57:11 22  snippet, which I prefer not to stop in the middle of --

23        THE COURT:  How long?

15:57:15 24        MR. SOFER:  I can tell you almost exactly if you

25  give me a second to count it up.

15:57:42 **1**           I'm going to estimate about 45 minutes with the

15:57:48 **2** questions in between, Your Honor.   It could be a little

15:57:51 **3** shorter, it could be a little longer.

15:57:53 **4**           THE COURT:  Ladies and gentlemen, would you be

15:57:55 **5** willing to work a bit past 4:30?  Candidly, I'd just as soon

**6** kind of move along.   The more we get done today the less we

**7** have to do later.   So why don't we go ahead and take the first

15:58:08 **8** segment.

15:58:08 **9** BY MR. SOFER:

15:58:15 **10**    **Q.**   Approximately three days after you had the conversation

**11** with Marwan El-Hindi that we just discussed, did you eventually

**12** meet Marwan El-Hindi at the Mayo Street address that he

15:58:29 **13** described?

**14**    **A.**   Yes, I did.

**15**    **Q.**   And this is a rather -- have you reviewed 1D90, the

**16** conversation that took place on this day?

15:58:38 **17**    **A.**   Yes, I have.

15:58:39 **18**    **Q.**   We've cut it into a lot of small pieces.   Do you recall

**19** about how long this conversation was?

15:58:45 **20**    **A.**   An hour to an hour and 15 minutes.

15:58:52 **21**    **Q.**   Again, are there many conversations that you've reviewed

**22** that you're going to testify about that we're playing smaller

15:59:01 **23** portions of?

**24**    **A.**   Yes.

**25**    **Q.**   Again, can you tell the jury, if we were to play all of

2350

15:59:05 **1** these conversations, do you have an idea of approximately how

**2** long we would be here?

**3**     **A.**   Christmas.

15:59:13 **4**     **Q.**   Let's play 1D90, cut 4-11 or segment 4-11?

15:59:24 **5**          THE COURT:   1D…

15:59:27 **6**          MR. SOFER:   1D90 from October 8, 2004.   The

15:59:32 **7** Exhibit Number is 4-11.   And the clip number is 2-A, Your

15:59:39 **8** Honor.

15:59:39 **9**          MR. BOSS:   What is the clip, please?

15:59:41 **10**          MR. SOFER:   2-A as in Adam.

15:59:44 **11**          MR. SOFER:   I'll play that first clip.

16:00:41 **12**          (Audio recording is played.)

16:00:41 **13** BY MR. SOFER:

16:00:42 **14**     **Q.**   You mentioned, "this is not sell candy; this is not

16:00:48 **15** flags," I think.   What were you referring to?

**16**     **A.**   Previous dealings with Marwan El-Hindi.

**17**     **Q.**   The business dealings you had described before, the

16:00:59 **18** business dealings?

**19**     **A.**   Yes.

16:08:35 **20**     **Q.**   When you said some of these other brothers that are

16:08:39 **21** going, where are the other brothers going?

16:08:42 **22**     **A.**   To fight.

16:08:45 **23**          MR. SOFER:   Continue.

16:08:45 **24** BY MR. SOFER:

**25**     **Q.**   You said there were -- this is a long conversation.

16:09:04   **1**   There are a number of pieces.

**2**        MR. SOFER:    Can we please play 3-A, clip 3-A?

**3**        (Audio recording is played.)

**4**   BY MR. SOFER:

16:10:59   **5**    **Q.**    This Muwahad that's mentioned at the end of the

16:11:03   **6**   training, is this another person that Marwan El-Hindi was going

**7**   to introduce to you?

**8**    **A.**    Yes.

**9**    **Q.**    Did you in fact get introduced to him?

**10**    **A.**    Yes.

16:11:12  **11**        MR. SOFER:   Let's play 4-A?

16:16:16  **12**        (Audio recording is played.)

16:16:16  **13**        MR. SOFER:   Let's play 7-A.

**14**        THE COURT:    1D90?

16:16:22  **15**        MR. SOFER:   All 1D90 from here on in, Judge.

16:17:33  **16**        (Audio recording is played.)

16:17:33  **17**        MR. SOFER:   Let's play 8-A, please.

16:17:36  **18**        (Audio recording is played.)

16:17:36  **19**   BY MR. SOFER:

**20**    **Q.**    When you told Marwan El-Hindi that you had about eight

**21**   people already, was that true or not true?

16:21:00  **22**    **A.**    Was not.

16:21:02  **23**        MR. SOFER:   Let's continue.

16:21:04  **24**        (Audio recording is played.)

16:21:04  **25**   BY MR. SOFER:

**1**      **Q.**    Who was the enemy you're referring to there, Mr.

16:22:00 **2**   Griffin?

16:22:00 **3**      **A.**    U.S. forces and their allies.

16:22:04 **4**          MR. SOFER:   Let's play 10-A.

16:23:12 **5**          MR. HARTMAN:   Objection, Your Honor.   May we

16:23:15 **6**   approach?

16:23:18 **7**          (Whereupon the following discussion was had at the

16:25:33 **8**   bench outside the hearing of the jury:)

16:25:33 **9**          MR. HARTMAN:   There are several conversations in

**10**   some of these tapes about wives and the first wife and second

**11**   wife.   I don't see how it's at all relevant to the charges.   I

**12**   know it makes Mr. El-Hindi look bad, but it's not relevant.

**13**          MR. SOFER:   I don't think having a lot of wives

**14**   necessarily makes him look bad.   Some may say it makes him look

**15**   good.   I say that facetiously.   The fact of the matter is the

**16**   government's introducing this to show the level of familiarity

**17**   he has with the person on the other end of the line, which is

**18**   Khaleel on this call.   I have no problem with a curative

**19**   instruction from the Court saying this may also be a cultural

**20**   thing.

**21**          THE COURT:   What's the --

**22**          MR. HARTMAN:   I don't know that he was divorced yet

**23**   or not because there's a difference between a legal divorce and

**24**   a divorce in the Islamic way.

**25**          THE COURT:   Candidly, is there going to be a lot of

1  this stuff about wives?

2        MR. SOFER:  Very little, Judge.   As far as I know

3  this is the only one that we plan to play.   I say that,

4  understand I really haven't focused on how many wife

5  conversations.

6        THE COURT:  If we get more…

7        MR. HARTMAN:  That's fine.

8        THE COURT:  He wouldn't be the first guy in the

9  world to talk about a first wife, second wife.    Fortunately, I

10  don't have that problem.

11        (End of sidebar.)

16:25:39  12        THE COURT:  Were you asking a question?

16:25:41  13        MR. SOFER:  No, we were stopped because of the

14  objection which, I take it, for the record has been overruled.

16:25:47  15  Let's keep playing.

16:25:49  16        (Audio recording is played.)

16:29:36  17  BY MR. SOFER:

16:29:37  18     Q.   Mr. Griffin, do you know who Marwan El-Hindi was taking

16:29:40  19  to at that point?

16:29:41  20     A.   Khaleel Ahmed.

21     Q.   Was the uncle he was talking about Zubair's father or

16:29:49  22  don't you know?

23        MR. HARTMAN:  Objection.

24        THE COURT:  Sustained.

16:29:52  25  BY MR. SOFER:

16:29:52 **1** **Q.** Do you know who he was referring to when he said

16:29:56 **2** something about what your uncle says is -- he used an expletive?

16:30:02 **3** MR. HARTMAN: Objection.

16:30:03 **4** THE COURT: I would agree. Let's get some

**5** foundation. How does he know Mr. El-Hindi was talking to Mr.

16:30:11 **6** Ahmed?

**7** MR. SOFER: Excellent question, Your Honor.

16:30:13 **8** BY MR. SOFER:

16:30:14 **9** **Q.** How do you know he was talking to Khaleel Ahmed?

16:30:17 **10** **A.** He stated it when he dialed actually Khaleel and stated

**11** that in the beginning of the conversation.

16:30:23 **12** **Q.** And were you talking about Khaleel and Zubair just prior

**13** to that?

**14** THE COURT: I couldn't hear your question. Maybe

16:30:31 **15** put the Mike on.

**16** MR. SOFER: Strike the question, Your Honor.

16:30:40 **17** Let's go on to the next segment, 11-A, Your Honor.

**18** THE COURT: 11-A.

16:31:12 **19** (Audio recording is played.)

16:31:12 **20** BY MR. SOFER:

16:31:13 **21** **Q.** Again, you say something about trying to get training

16:31:17 **22** somewhere else. Is that something you were concerned about

**23** there?

**24** **A.** That they would find training somewhere else and I would

16:31:30 **25** lose a contact and wouldn't be able to get information on them.

16:31:59  **1**                    MR. SOFER:  Let's play 12-A.

16:32:04  **2**                    (Audio recording is played.)

16:33:11  **3**                    MR. SOFER:  If we can switch over to the exhibits,

**4**  take the headphones off and show us 6-A, please.

16:33:21  **5**  BY MR. SOFER:

16:33:23  **6**      **Q.**    Mr. Griffin, do you recognize what's depicted in

**7**  Government's Exhibit 6-A for identification?

**8**      **A.**    I ts is the Mayo Street address of Marwan El-Hindi.

16:33:35  **9**      **Q.**    To the best of your recollection is this where the

16:33:39 **10**  conversation we just listened to takes place?

16:33:41 **11**      **A.**    Yes.

**12**      **Q.**    Does it fairly and accurately reflect the way it looked

16:33:45 **13**  approximately during the time you were interacting with Marwan

**14**  El-Hindi as just described?

**15**      **A.**    Yes.

**16**                    MR. SOFER:  At this time the government moves 6-A

**17**  into evidence.

16:33:55 **18**                    MR. HARTMAN:  The only thing I can't tell is if

**19**  that was before or after it was burned.   Greg, this picture

**20**  just doesn't seem that clear.   Do you have the original?

**21**                    That's the house we'll stipulate to it.

**22**                    THE COURT:  Does anybody know when the picture was

16:34:09 **23**  taken?

**24**                    MR. SOFER:  I believe it was taken sometime in

**25**  February of '06.

16:34:15 **1**          THE COURT:  It will be admitted.

16:34:19 **2**          MR. SOFER:  Judge, this would be an ideal place to

16:34:22 **3** stop.

**4**          THE COURT:  Okay.  Good enough.   Ladies and

16:34:31 **5** gentlemen, we will adjourn for the day.   Do not talk about the

**6** case with anybody.   Keep an open mind.   I notice that there

**7** was a cover story in Toledo's Blade  about the case.   Please

16:34:41 **8** refrain from looking at <u>The Blade</u> or any part of that newspaper

16:34:48 **9** today, and we'll see you tomorrow morning.  We'll start promptly

**10** at 8:30.

16:34:58 **11**          Thank you very much for your patience and your

16:35:00 **12** attention.

16:35:53 **13**          (Jury exits the courtroom.)

**14**          THE COURT:  There's a motion Amy just gave me.

**15** Motion to reconsider denied discovery request.   Have you seen

16:43:13 **16** that?

**17**          MR. SOFER:  I didn't hear what you said.

**18**          THE COURT:  Amy just gave me a motion, Request for

16:43:18 **19** Reconsideration of Denial and Discovery Relevant to Informants.

16:43:23 **20**          MR. SOFER:  I think we may have seen some of that.

**21** This is for the underlying documents with respect to the Giglio

**22** letter we sent out.

**23**          MS. CLEARY:  That's correct, Your Honor.

**24**          MR. SOFER:  The government's position, just to

**25** remind the Court, not only was the Giglio  letter over-inclusive

16:43:43 **1** under Rule 068 and 069 the defense would even be entitled to

**2** question our witness about -- there's nothing about the

16:43:53 **3** underlying records which I think is necessary to turn over in

**4** order for the defense to have received any information they need

**5** about the witnesses in order to cross-examine them.

16:44:08 **6**      They couldn't put those records in if they wanted

**7** to.   They can't cross-examine the witness about at least a

**8** third of what we turned over in terms of the Giglio letter

**9** because of its remoteness in time, or we have actual particular

**10** cases about particular kinds of information that we've turned

**11** over to Counsel.   The notion that they should be allowed some

16:44:30 **12** massive discovery in records, there's nothing that's not been

16:44:36 **13** turned over in terms of the things that they need to know.

**14** Things that reflect the payments of how much we're talking

16:44:44 **15** about.   That's for us to break down the moment the payments

**16** were made.   Do an accounting of how the FBI paid on a weekly

**17** basis seems to me to be well beyond that which is necessary.

16:44:57 **18**      THE COURT:  I tend to agree.   What matters is the

**19** fact and the amount of payments.   I think it's probably

16:45:07 **20** appropriate to ask in terms of the periodic distribution of the

16:45:11 **21** payments and so forth, but actually having the records, to the

16:45:15 **22** extent that the government has them available, I trust if there

**23** were any inconsistencies in the testimony, that's fine.   But he

**24** testified during a the six-year period he was paid approximately

16:45:29 **25** 240, $250,000; I thought it was monthly, but that can be

1 inquired into. It's my understanding you have disclosed

16:45:41 2 whatever quasi-criminal record...

3        MR. SOFER: Not only did we disclose it, we brought

4 it out in court.

16:45:47 5        THE COURT: I understand. And certainly it is not

16:45:50 6 my understanding that the kind of specificity that you're

16:45:55 7 requesting in this letter -- or this motion is required.

8        MS. CLEARY: The reason we submitted the additional

9 authority, Your Honor, is because we think that we're entitled

16:46:09 10 to the understanding of the nature of the agreement between Mr.

16:46:13 11 Griffin and the government. And that's something that's

12 necessary not only for <u>Brady</u> but for impeachment purposes which

13 is encompassed by <u>Brady</u>.

14        THE COURT: I would agree. You have an

15 opportunity to cross-examine on that. And I mean, let me ask

16:46:28 16 Mr. Sofer: To your knowledge was there any kind of written

16:46:31 17 agreement or understanding; do you know?

18        MR. SOFER: There is administrative paperwork

19 that's filled out when as -- as I understand it, an informant --

20        THE COURT: Is that filled out between the

16:46:41 21 cooperating witness and the government agent or is that internal

22 to the Bureau itself?

16:46:47 23        MR. SOFER: I'd have to ask --

24        THE COURT: Why don't you. If it's internal to

25 the Bureau, I don't think it's appropriate as to disclosure.

1    If, however, there's something signed between the witness and

2    the government agent then I think it's appropriate that it be

3    disclosed.   Why don't you find out.

16:47:04    4        MR. SOFER:  Just so I understand, you're talking

16:47:09    5    about an agreement -- I want to make clear what that means --

6    something that encompasses what do you have to do and what do we

7    have to do, a contract or…

8            THE COURT:  Well the equivalent would be a plea

16:47:22    9    bargain if there had been a 5-K.

10            MR. SOFER:  To my knowledge, there is no such

16:47:27   11    paperwork but let me, before I answer that finally, if I can

12    answer that tomorrow morning, I'd appreciate the opportunity.

16:47:36   13            THE COURT:  Sure.   You refer to administrative

14    paperwork.   The impression I got from that reference is the

15    case agents have to, I assume, make a request to whoever's

16:47:47   16    supervising the office over there, turn it in to the resident

17    agent who's got to turn it in to headquarters who's got to go

18    through various channels and memos and so forth and so on, and

19    it filters its way back down.   I don't think any of that would

16:48:02   20    properly be discoverable.   It's an internal administrative

21    matter.   What matters is the fact at some point the cash

16:48:09   22    register was open and the money started flowing.   But if -- on

16:48:13   23    the other hand, if at some point Agent Radcliffe or Agent Coats

24    or anybody else sat down and said look, this is the deal, and to

25    get this set up, this is a memorandum of understanding…

2360

**1**        MR. SOFER:  I understand.   Ultimately what we're

**2** talking about here are what benefits were given to the witness.

16:48:32 **3** It may be, Your Honor, if in fact there is something that is a

**4** quasi-contract of that nature, I'd ask for leave to show it to

**5** the Court and have Your Honor determine whether or not it's

**6** discoverable, but let's come to that bridge --

**7**        MR. BRYAN:  Your Honor, the records are also

**8** important because of the timing of the benefits.   Mr. Sofer

**9** made it a point to bring out to Mr. Griffin that since he's been

**10** working with the FBI, he's made approximately $350,000 or so;

**11** per year, you're making about 50.   So I think what they're

16:49:07 **12** trying to do is sort of minimize it.   But if all of it came in

**13** one year when he was producing the most fruit --

**14**        THE COURT:   If he got $10,000 for five years and

16:49:16 **15** $300,000 on January 1 of this year, I understand what you're

16:49:20 **16** saying.   And it could be asked.   He can be asked.

16:49:23 **17**        MR. SOFER:  He was asked that question, Your Honor.

**18** I believe the testimony, if we read it back, is he was paid

16:49:30 **19** monthly by the FBI, and I can clarify that.   I'd be more than

16:49:35 **20** happy to.

16:49:36 **21**        MR. BRYAN:  It was my understanding the question

**22** was in averages, the average would be $4,000 a month.

**23**        THE COURT:  Anybody can ask about that.  We don't

**24** need to have copies of the cancelled checks or receipts or the

**25** pay stubs or -- apparently he was paid in cash, in any event.

**1**          MR. SOFER:  I'll clarify with him in the morning.

**2**          MR. HARTMAN:  Judge --

16:49:56 **3**          THE COURT:  It would be interesting to find out if

16:50:00 **4** federal judges aren't the only ones who have gotten a cost of

16:50:04 **5** living adjustment in recent years.

**6**          Mr. Hartman, go ahead.

16:50:07 **7**          MR. HARTMAN:  Judge, I would like to assert our --

**8** or reassert our Motion for Inspection of the Recording Device

**9** based on the following.

**10**          THE COURT:  We'll get -- I don't think this is the

**11** place to raise that issue.

**12**          MR. HARTMAN:  Let me know when you want me to.

16:50:24 **13**          THE COURT:  Okay.

**14**          MR. SOFER:  We'll be ready tomorrow, Judge.

**15**          THE COURT:  Counsel, why don't you come on back?

**16** I don't think we need the defendants for this.

**17**          (Whereupon there was a discussion in chambers

**18** ordered sealed by order of the court.)

**19**                              - - -

**20**                    C E R T I F I C A T E

**21**    I certify that the foregoing is a correct transcript from the

**22** record of proceedings in the above-entitled matter.

**23**

**24** /s Tracy L. Spore_____          _____

**25** Tracy L. Spore, RMR, CRR                 Date

1                            I N D E X

2

3    DARREN GRIFFIN, DIRECT EXAMINATION 2207

4    BY MR. SOFER:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25