1                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION

3   UNITED STATES OF AMERICA,      )  Docket No. 3:06-CR-719

4            Plaintiffs,           )  Toledo, Ohio

5                v.                )  April 4, 2008

6   MOHAMMED AMAWI, ET AL.,        )

7            Defendants.           )

8   ------------------------------

9           TRANSCRIPT OF JURY TRIAL, VOLUME 22
              BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:    Gregg N. Sofer
                           David I. Miller
14                         Jerome J. Teresinski
                           U.S. Department of Justice
15                         10th & Constitution Avenue, NW
                           Washington, DC 20530
16                         (202) 353-3464

17                         Thomas E. Getz
                           Justin E. Herdman
18                         Office of the U.S. Attorney
                           801 Superior Avenue, W
19                         Cleveland, Ohio 44113
                           (216) 622-3840
20
    For the Defendant      Timothy Ivey
21  Amawi:                 Edward Bryan
                           Amy Cleary
22                         Jonathan Whitmer-Rich
                           Office of the Federal Public Defender
23                         750 Skylight Office Tower
                           1660 West Second Street
24                         Cleveland, Ohio 44113
                                       (216) 522-4856
25

```
 1                         Elias Muawad
                          Muawad & Muawad
 2                        Suite 209
                          36700 Woodward Avenue
 3                        Bloomfield Hills, Michigan 48304
                          (248) 594-4700
 4    For the Defendant
      El-Hindi:           Charles M. Boss
 5                        Boss & Vitou
                          111 West Dudley Street
 6                        Maumee, Ohio 43537
                          (419) 893-5555
 7
                          Stephen D. Hartman
 8                        Kerger & Kerger
                          Suite 201
 9                        33 South Michigan Street
                          Toledo, Ohio 43602
10                        (419) 255-5990

11                        Alek H. El-Kamhawy
                          Raslan, El-Kamhway & Pla
12                        Suite 3FE
                          1700 East 13 Street
13                        Cleveland, Ohio 44114
                          (216) 928-1500
14
      For the Defendant   David L. Doughten
15    Mazloum:            4403 St. Clair Avenue
                          Cleveland, Ohio 44103-1125
16                        (216) 361-1112

17                        Jeffrey J. Helmick
                          Helmick & Hoolahan
18                        2nd floor
                          1119 Adams Street
19                        Toledo, Ohio 43624-1508
                          (419) 243-3800
20

21                        Mohammed Abdrabboh
                          1620 Ford Avenue
22                        Wyandotte, MIchigan 48192
                          (734) 283-7000
23

24
      Court Reporter:     Angela D. Nixon, RPR, CRR
25                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
```

1                    (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

1          THE COURT:  We've been discussing the fact that

2   apparently you and Tracy -- that you and Tracy have not

3   been concurrently trying to take down what is being played

4   as it's being played, and apparently defense counsel has a

5   possible concern about that.  I indicated that whatever you

6   would take down would not be the record.  The record is the

7   actual computer program that's projected for the jury to

8   view and to hear, and the government has already prepared

9   transcripts, and I assume the defense either has or will,

10  to the extent it disagrees with the government's version.

11  Whatever you might hear really isn't the record as far as

12  I'm concerned.  Mr. Hartman?

13          MR. HARTMAN:  Judge, I guess my concern is if

14  there's a dispute about the transcripts for the purposes of

15  appellate record, the Court of Appeals is going to have no

16  way of determining what's right --

17          THE COURT:  Yes, it does, that's exactly my

18  point.  There are cases, reported cases in the Court of

19  Appeals listening to -- actually sees what the jury sees

20  just like any other exhibits, hears what the jury hears and

21  reaches its own conclusion, aided by the transcripts that

22  the parties have prepared, not a transcript that is

23  prepared by a court reporter.

24          MR. HARTMAN:  So the recording also becomes part

25  of the record?

1          THE COURT:  The recording is the record.

2          MR. SOFER:  And they've already been --

3          THE COURT:  What's in the box and hopefully gets

4     to the screen will be sent packed up with the Court of

5     Appeals if there's an appeal.  And if there's a dispute

6     where the government says defendant said X and you say no,

7     he said Y, the Court of Appeals, if that's a pertinent

8     appellate issue, plugs up the machine -- plugs into the

9     machine, turns it on.

10         So the fact that the court reporter is not doing

11    anything, A, is fine with me, and, B, may even be helpful

12    to them in terms of working on the transcript otherwise and

13    not having to stay as late as otherwise they might have to.

14         MR. SOFER:  Judge, if counsel will stipulate, and

15    we'll do this at the end of our case, I think we can

16    produce essentially a collection of just that that was

17    played in court so that the appellate court doesn't have to

18    sift through hundreds of hours of tapes in order to

19    determine what exactly -- I mean, in order for us to do

20    that we would need a stipulation from counsel.  We can give

21    it to them to take a look at.  All that would do is make it

22    easier for the appellate court to take a look -- listen

23    actually to the audio.

24         MR. BOSS:  Your Honor, would it be possible to

25    get that copy before they're played so we can check the

1   accuracy against what's played in court?

2         THE COURT:  I think that's a fair request.

3         MR. SOFER:  The answer to that is no.  We -- we

4   just technologically create something like that I'd -- I'd

5   have to talk to our technical person.  That's not something

6   we did.  It's taken us a lot of hours to load this in a

7   certain way to get it played in court.  The presentation is

8   playing.  Counsel has various different ways of assuring

9   that it's accurate.

10        THE COURT:  At some point you're standing there

11  and saying DD, whatever the numbers are and it shows, so

12  before you -- you don't go rummaging through your stack of

13  stuff and say that one.  I think the request is just the

14  evening before if you can tell them these are the clips

15  we're going play.

16        MR. SOFER:  By virtue of the document that

17  counsel's objected to giving to Mr. Griffin, they

18  actually -- I've told them they actually have a road map to

19  exactly what it is the government is playing.  There could

20  be some minor deviation from that.  If there's ever any

21  doubt of where we're going next, it's all laid out.

22        THE COURT:  Well, Mr. Masloum has arrived.  Is he

23  here?

24        MR. HELMICK:  Yeah.

25        MR. BOSS:  Could we give The Court a document of

1  what Mr. Sofer --

2          THE COURT:  We're going to stop this and get the

3  jury in the box and go to work.  Okay.

4          MR. SOFER:  Your Honor, before they come down I

5  wonder if there's any objection from either The Court or

6  counsel if we just do a brief capitulation of the last cut

7  or two, the last segment or two from now two days ago.

8          THE COURT:  I -- any problem if they --

9          MR. BOSS:  I'd like to know what it is in

10  advance.

11          MR. SOFER:  The last two clips we played on --

12          THE COURT:  How long were they?

13          MR. SOFER:  They were not very long.  Let's take

14  a quick look, Judge.

15          THE COURT:  I have no problem.  I'll simply tell

16  the jury we're replaying what we did to help them.

17          MR. BOSS:  Judge, I think it's reinforcing

18  evidence that's already been played to them.

19          THE COURT:  I understand that.

20          MR. SOFER:  Less than two minutes, I believe.

21          THE COURT:  I'm going to let it in.  Listening to

22  book on tape I sometimes will rewind it 30 seconds to

23  remember where you were.

24          MR. BOSS:  We would object for the record.

25          THE COURT:  Overruled.

1              (Jury brought in at 8:45.)

2              THE COURT:  The technical people came to me and

3     said the problem was fixed.  I'll put them under oath and

4     make them swear.  And then he said hanging around lawyers

5     too often he said until the next failure.  So, A, we seem

6     to have it fixed.  There was a cable problem.  And, B,

7     apparently there's a back-up system in the courthouse that

8     we could put into play.  And folks are here from our IT

9     department to help find everything.

10             So some of us, myself included, spent some time

11    on 475 this morning and got here a little late and slow

12    getting underway.  I know you were here on time so we

13    should be here on time.  What we're going to do, because of

14    the lapse of having to adjourn yesterday picking up the

15    threads, I've let -- I'm going to let Mr. Sofer play the

16    last clip or so, last couple minutes.  This is not to

17    emphasize what you hear.  It's simply, as a recall to your

18    mind, where the government is in the presentation of its

19    evidence.  So don't give any special weight to the fact

20    that you hear this little bit again.

21             Go ahead, Mr. Sofer.

22             MR. SOFER:  Thank you, Judge.  And the government

23    recalls Darren Griffin to the stand, Your Honor.

24             THE COURT:  You understand you remain under oath?

25    A.        Yes, sir.

1          THE COURT:  Mr. Sofer, you may begin.

2          MR. SOFER:  Thank you, Judge.  I believe when we

3    left off two days ago I had directed your attention to

4    October 8th, 2004.  And if we can just play 4-11 of 6 -- of

5    1D90 and 11A is the clip number.  And Your Honor, if

6    anyone's head sets have run out of batteries or anything

7    like that, we are -- raise your hand and we'll get them a

8    new set of batteries.

9          (Audio playing.)

10          MR. SOFER:  Okay.  And if we can play segment

11    12A.

12          (Audio playing.)

13    BY MR. SOFER:

14    Q.        Okay.  Mr. Griffin, about six days later, did

15    there come a time when you met with Mohammed Amawi?

16    A.        Yes.

17    Q.        And do you recall that on this day, among other

18    things, you watched videos at Mohammed Amawi's residence?

19    A.        Yes.

20    Q.        And did you do this on more than one occasion

21    throughout the course of the investigation?

22    A.        Yes.

23    Q.        And can you tell the members of the jury what the

24    purpose was of watching these videos?

25    A.        Basically to gather training materials.

```
 1              MR. BOSS:  Objection.
 2              THE COURT:  I would -- he can talk about what his
 3     purpose was, but, again --
 4     BY MR. SOFER:
 5     Q.       Well, did you have discussions with Mohammed
 6     Amawi about what the purpose --
 7              THE COURT:  Excuse me, I'll sustain the objection
 8     as to that answer, but you may continue.
 9     BY MR. SOFER:
10     Q.       Had you spoken with Mohammed Amawi about what the
11     purpose of looking at these videos was?
12              THE COURT:  Well, I'm sorry.  Let's ask -- that's
13     fine, but I want him to say to the best of his recollection
14     what he recalls being said rather than in a conclusory way
15     saying -- I think you understand what I'm saying.  To the
16     extent he can recall who said what, when and where.
17     BY MR. SOFER:
18     Q.       Best as you recall, can you tell the members of
19     the jury the substance of your conversations with Mr. Amawi
20     about the purpose of viewing these videos?
21              MR. BOSS:  Objection.  Judge, the tapes are the
22     best record of what was discussed.  They can play the tape
23     if it was discussed.
24              THE COURT:  Is this -- is there -- is the
25     conversation recorded?
```

1          MR. SOFER:  There's many conversations like this

2    recorded, Judge, but the witness is permitted to testify

3    whether it's recorded or not.

4          THE COURT:  I understand.  I'm going to sustain

5    the objection, leading the witness.

6          Prior to viewing the tapes what, if any,

7    conversation about them did you have with Mr. Amawi?

8    BY MR. SOFER:

9    Q.        Okay.  Can you answer The Court's question?

10   A.        We had discussions about seeing what the brothers

11   were doing overseas and learned their tactics so that he

12   would be able to blend in and know what they were doing so

13   he would be a benefit to them and not a hindrance.

14   Q.        And I guess my general question was the timing of

15   these, did this happen at different intervals throughout

16   the investigation?

17   A.        Yes.

18   Q.        Okay.  If we can please play 4-14 of 1D1.

19         THE COURT:  I'm sorry.

20         MR. SOFER:  4-14 of 1D1 and it's clip 1A.

21             (Audio playing.)

22         THE COURT:  Excuse me, may I ask a question?  I

23   may have missed it, but when -- was this the first time you

24   met Mr. Amawi or when -- that you may have --

25         MR. SOFER:  We've already played the tape, Your

1    Honor, but I can --

2             THE COURT:  That's fine.  When did that --

3    BY MR. SOFER:

4    Q.        This was -- this was not the first time you were

5    at Mr. Amawi's apartment, was it?

6    A.        No, it was not.

7    Q.        Do you recall the date of the first time you were

8    there approximately?

9    A.        It was in the fall of 2004.

10            THE COURT:  Okay.

11            MR. SOFER:  We're going to play 14.  I just

12   caution the jury.  I don't know how loud this will be.  You

13   may want to turn them down a little bit.  We're going to

14   have a back and forth in terms of volume so you can be on

15   the lookout for loud noises.  I have to do something first

16   before I do that.  Government's Number 14 for

17   identification and 15 for identification.

18            THE COURT:  Did you say 14?

19            MR. SOFER:  14 and 15 for identification.

20            May I approach the witness, Your Honor?

21            THE COURT:  Of course.

22   BY MR. SOFER:

23   Q.        Mr. Griffin, can you please tell the members of

24   the jury if you recognize Government's Number 14 and 15 for

25   identification?

```
 1   A.        14 is a --

 2   Q.        Is that a yes?

 3   A.        Yes.

 4   Q.        Can you tell us what 14 is?

 5   A.        14 is a disc.

 6   Q.        And what's on that?

 7             THE COURT:  What?

 8             MR. SOFER:  A disc.

 9             THE COURT:  Okay.

10   BY MR. SOFER:

11   Q.        You may have to speak a little bit louder or you

12   can move the mike back, but speak a little bit louder.  Can

13   you tell us, if you know, what is depicted on Government's

14   Exhibit Number 14 for identification?

15   A.        Number 14 is the video you were watching.  In the

16   last clip, it was the CNN video of Osama bin Laden issuing

17   the Fatwa  against the United States.

18   Q.        Can you tell us what a Fatwa is, if you know?

19   A.        I believe it is a -- a judgment or a -- saying

20   that we must do something in the -- in this -- we must go

21   fight kind of thing.  I'm not, once again, I -- the

22   definitions of all the words and everything I've long since

23   forgotten.

24   Q.        Okay.  And you say number 14 is -- how do you

25   know?
```

```
 1              MR. BOSS:  That's -- the definition was one that

 2   he has forgotten.  We would ask that that be stricken.

 3              THE COURT:  I would agree.

 4              MR. BOSS:  Because it's not the definition.

 5              THE COURT:  He can say what he now recalls what

 6   he thinks it means.

 7              MR. SOFER:  I think that's what he just said,

 8   Judge.

 9              THE COURT:  Okay.  Fine.

10   BY MR. SOFER:

11   Q.        Can you tell us how you know that the video you

12   just described is what's on Government's Exhibit Number 14

13   for identification?

14   A.        Because it has my initials and the date I viewed

15   this video.

16   Q.        And does it fairly and accurately represent the

17   video approximately as you viewed it on October 14th, 2004

18   at Mr. Amawi's house?

19   A.        Yes.

20              MR. SOFER:  At this time, Your Honor, the

21   government offers Government Number 14 into evidence.

22              MR. BOSS:  Judge, could we approach, please?

23              THE COURT:  Sure.

24                   (A side bar conference was had on the

25                    record.)
```

1          MR. BOSS:  Greg, your foundation did not mention

2    whether this is the disc that he walked out of there with

3    that day or whether this was something that he was given

4    from a forensic examiner.  Can you clarify that for us?

5          MR. SOFER:  This is not a disc that was given to

6    him on that day.  I'll ask him whether -- any time there

7    was a disc given to him, I'll make sure I ask that.  All he

8    said was that it is what they watched on that day, so where

9    it came from is -- he doesn't even know.

10         MR. BOSS:  Don't we need to have a forensic

11   examiner indicate that it came from that computer on that

12   day?

13         MR. SOFER:  It could have came from space.

14         THE COURT:  He can testify this is what we saw

15   that day.

16         MR. BOSS:  Note our objection, please.

17         THE COURT:  Okay.

18         MR. SOFER:  And by the way, there will be a

19   forensic examiner who will put this all together, but

20   certainly there's nothing wrong with him -- as long as he

21   recognizes it.

22         THE COURT:  I agree.

23         MR. HARTMAN:  But as you go through the discs --

24   you're going to do this with each one and then play the

25   disc, right?

1          MR. SOFER:  Correct.

2          MR. BRYAN:  Can you just clarify that a disc

3    wasn't made and handed to him at that time and these are

4    just things that they viewed?

5          MR. SOFER:  I'll ask that question.

6          MR. HERDMAN:  It will be obvious when he was

7    going to testify to a disc that was handed to him when he

8    walked out of there.  That will be obvious.

9          THE COURT:  I can't hear you, just -- just it

10   will be obvious when there's a disc that he walked out

11   with --

12          I do think it's fair to say, make that

13   distinction whether this is something that Mr. Amawi -- or

14   it's simply a duplicate of what they watched.

15          MR. SOFER:  I can ask the question, but I object

16   to the notion here, Your Honor, that the defense gets to

17   ask their questions in our case.  If they want to ask him

18   about this later on, that's fine.

19          THE COURT:  I disagree.  I think that it's

20   important that as this evidence comes in, the jury

21   understands whether something was received directly from

22   him by e-mail or downloaded or whatever, or it's simply

23   something that reproduces what they said.

24          MR. SOFER:  I'll clarify it, Judge.

25              (Side bar concluded.)

```
1              MR. SOFER:  Again, Your Honor, on -- the
2    government offers Government Number 14 into evidence.
3    Mr. Griffin, that --
4              THE COURT:  That, too, will be admitted.
5              MR. SOFER:  Thank you.
6    BY MR. SOFER:
7    Q.        Government Exhibit Number 14, that wasn't
8    actually given to you, that particular CD?  Was that
9    actually given to you on that day by Amawi?
10   A.        No, it was not.
11   Q.        That is a -- would it be fair to say that's a
12   copy of the video that you watched on that day?
13   A.        Yes.
14             MR. SOFER:  At this time, Your Honor, the
15   government offers 14 and 15.
16             MR. BOSS:  Judge, subject to our motion objecting
17   to these.
18             THE COURT:  That's fine.
19             MR. SOFER:  Let's play 14 if that's okay.
20             THE COURT:  It will be admitted.
21             MR. SOFER:  May I approach the witness?
22             MR. BOSS:  Your Honor, rather than renewing that
23   objection --
24             THE COURT:  I understand.
25             MR. BOSS:  -- throughout the videos, I take it
```

```
 1    that this one is sufficient?
 2              THE COURT:  Right.
 3              MR. BOSS:  Right.
 4              MR. SOFER:  And again, it may be a little loud.
 5                   (Video playing, Exhibit Number 14.)
 6              MR. SOFER:  For the record, Your Honor, we've
 7    paused the tape at four minutes 22 seconds of four minutes
 8    and 40 seconds.
 9    BY MR. SOFER:
10    Q.        Mr. Griffin, do you recognize any of the
11    individuals who are depicted in that video?
12    A.        Yes, the man in the middle is Osama bin Laden.
13    To our left, his right is Al-Zawahiri.
14    Q.        And who do you understand Zawahiri to be?
15    A.        The second in command of Al-Qaeda.
16    Q.        Okay.  Now, I neglected to ask you about
17    Government Number 15 that you have up there.  Can you tell
18    the members of the jury what's on Government Exhibit Number
19    15?
20    A.        On 15 this is the attack on a compound in Saudi
21    Arabia, and also has commentary of Osama Bin Laden and
22    interview of the attackers.
23    Q.        Okay.  And how do you know that?
24    A.        Because I viewed it and also a clip just like the
25    one we received that we viewed while I was at Mohammed
```

 1   Amawi's house.

 2   Q.        And was that on October 14th of 2004?

 3   A.        Yes, it was.

 4            MR. SOFER:  Okay.  At this time, Your Honor, it

 5   will take us a second to switch these out if that's okay.

 6   And I ask that we play Government's Exhibit Number 15.

 7            MR. BOSS:  Objection.  Can we have a

 8   clarification?  The witness indicated they interviewed the

 9   attackers.  The attackers of what, please?

10            THE COURT:  Watch the videos and then you can ask

11   a couple follow-up questions if you want.

12            MR. SOFER:  I don't have -- any counsel can ask

13   whatever he wants when he gets a chance to talk to

14   Mr. Griffin, Judge.

15            THE COURT:  I'd like you to so the jury

16   understands.  I think it's fair.

17            MR. SOFER:  I'll ask him now.

18   BY MR. SOFER:

19   Q.        You said there were interviews of the attackers?

20   A.        Yes, the attackers that were attacking that

21   compound in Saudi Arabia.  There were interviews on there

22   of them.

23            MR. BOSS:  Thank you.

24            MR. SOFER:  Okay.  Again, I caution the ladies

25   and gentlemen, it could be loud, it could be quiet.

1                  (Video playing, Exhibit Number 15.)

2            MR. IVEY:  Your Honor, I have an objection.  May

3    we approach?

4                  (A side bar conference was had on the

5                  record.)

6            MR. IVEY:  Your Honor, we would move to strike.

7            THE COURT:  I can't hear you.

8            MR. IVEY:  All right.

9            THE COURT:  You can speak louder.

10           MR. IVEY:  I would move to strike on the basis of

11   relevance.  This tape, as the witness testified to do with

12   the attack that was not carried out by any defendant on

13   Saudi Arabia.  This is a case about going to Iraq.  It has

14   nothing to do about training.  It was not produced by any

15   of the defendants.  None of the defendants appear in the

16   video.  There's no testimony any of the defendants are

17   present when the code of conspirators was present.  It has

18   nothing to do with what the witness said it was for.

19   There's no attack that's demonstrated, no training tactics

20   demonstrated nothing to do with Iraq.  Osama bin Laden is

21   not a co-conspirator in this case.

22           MR. SOFER:  And Your Honor, we've discussed this,

23   I think at length pretrial and the reason for these videos.

24           THE COURT:  I've considered this general

25   objection, and I will deem it to be a continuing objection

```
 1   and it will be overruled.  And at the appropriate time I

 2   can and will consider any sort of limiting instruction any

 3   of the defendants want me to make.

 4          MR. BRYAN:  Your Honor, I would assert an

 5   objection for basically --

 6          THE COURT:  You can speak louder, they can't hear

 7   you.

 8          MR. BRYAN:  I apologize.  I would object to the

 9   manner of presentation being prejudicial when Mr. Sofer

10   freezes the frame on the 911 attack on the buildings are

11   exploding, and using that as the time to pause the tape to

12   then ask questions.  I think that's done to prejudice the

13   defendants in this case, and he can let the tape play, but

14   the manner in which he's doing it is done to elicit unfair

15   prejudice.

16          MR. SOFER:  Actually, so I can respond.  I didn't

17   actually stop the tape.  So my --

18          MR. HERDMAN:  I did, Your Honor.  And if you

19   listen closely to the audio, you'll see that's when

20   Mr. Amawi stopped the tape.  That's why we stopped it

21   there.  We can let the whole thing play.  It's 15 minutes

22   long.

23          MR. SOFER:  We actually tried to do our best.

24          THE COURT:  Something like that I will agree, so

25   I'm going to --
```

1              MR. HARTMAN:  I also, Judge, I think I would like

2    to add an objection about Griffin saying about what's on a

3    tape if it's completely in Arabic.  If those are interviews

4    with attackers, he doesn't speak --

5              THE COURT:  I would agree, foundation.

6              MR. SOFER:  You know, Judge, I look at those

7    tapes, and knowing what I know, and I know no Arabic, it's

8    clear to me that that's going on here.  If the jury

9    disagrees with -- with his estimation of what it is, that's

10   fine, but this goes back.

11             I'd like to make this clear for the record.  One

12   of the reasons I am forced to ask these questions of this

13   witness, forced to ask the questions of these witness

14   because we are not permitted at the present of having an

15   actual expert as to exactly what this tape is and there is

16   a -- as you may recall, Your Honor, Evan Kohlmann knows

17   exactly what this tape is.  I would much prefer not to ask

18   this witness these questions but I feel compelled to do

19   that because the government is essentially unable to get to

20   establish anything about some of these tapes without

21   calling an expert witness.  And I think, you know, I'm

22   happy to go along with counsel's objection.  I'd much

23   prefer not to ask Mr. Griffin.  He clearly doesn't know

24   very much about these videos and the specifics of it, he

25   doesn't speak Arabic.  He doesn't know exactly what's being

1    said.  But without an ability to explain that to this jury,

2    I feel that we really -- the government really has no

3    defensible position but to try its best to fit that square

4    peg into this round hole just -- just, Your Honor, I would

5    note for the record Mr. Boss was the one that asked the

6    specific question -- wanted the question asked of

7    Mr. Griffin as to what was specifically on that tape so he

8    understood what it was about.

9           I didn't want to ask that question, Judge,

10   because I know this -- this witness has a limited

11   understanding of these things, if it hasn't become clear by

12   now.

13          THE COURT:  I'm going to let his response stand,

14   okay, because I think the door was opened.  And it doesn't

15   get opened in the future if he's basically speculating, has

16   no foundation for telling the jury what he thinks is on the

17   tape because what he thinks is on the tape doesn't matter.

18   I've already ruled that the tapes are to speak for

19   themselves.  They are what they are.  I will revisit the

20   issue of Mr. Kohlmann if you want me to.

21          MR. SOFER:  I very much do, Judge.

22          THE COURT:  I understand.

23          MR. SOFER:  What I'd like to renew is our request

24   as we go through this, Judge, for you to see this because I

25   think this is -- this just shows the -- it actually

1    reinforces what our reason for calling Mr. Kohlmann was is

2    I'd have to speculate, you would have to speculate and the

3    jury would have to speculate and counsel, of course, is

4    directing us to ask.

5              THE COURT:  The problem is ultimately

6    Mr. Kohlmann would have to speculate as to what Mr. Amawi

7    understood that tape was.  The tape, as I understand it, is

8    offered ultimately to show his intent and through him the

9    intent on the part of the other defendants.  And we don't

10   know, nobody can tell us what Mr. Amawi had in mind except

11   what he says as this is going on.

12             MR. SOFER:  And I don't disagree at all with The

13   Court, and certainly Mr. Kohlmann can never testify about

14   and someone can cross examine him about what does he know,

15   what someone else knows about it but that doesn't mean that

16   you don't, for instance, if -- if you have a piece of

17   evidence, try to describe it as best as what it is so that

18   he can understand what we're talking about.  It's not a

19   complicated weapon even the government would -- you can't

20   testify that someone would know how to shoot it, but we'd

21   be able to -- we'd be able to give much -- plenty of

22   testimony about the nature of the weapon, how it fired,

23   where it comes from.  And I think that's how I view these

24   tapes.

25             THE COURT:  I understand.

```
 1              MR. HARTMAN:  The basis for my objection --

 2              THE COURT:  My ruling --

 3              MR. HARTMAN:  -- is largely translation.  I mean,

 4     they can have a translator.

 5              MR. SOFER:  You -- they objected to the

 6     translation.

 7              THE COURT:  Once again, my understanding of what

 8     this is relevant for relates to Mr. Amawi's intent and

 9     purpose.  We don't know and may never know what he

10     considered was on the tape.  When and if he testifies,

11     you'll be able to cross examine.  If he doesn't testify,

12     then that door is closed.  But my -- certain to

13     Mr. Kohlmann's testimony, I understand that that could be

14     offered would be, in effect, this is what that shows.

15     Ladies and gentlemen of the jury necessarily then is going

16     to infer that Mr. Amawi understood that that was what was

17     being shown and we don't know.

18              MR. SOFER:  But the specific objection that was

19     just raised by counsel was that the translations are not

20     being put before the jury.

21              THE COURT:  That's a different issue.

22              MR. SOFER:  That is a different issue.

23              THE COURT:  And we'll go there then.

24              MR. SOFER:  We want the translations to come in.

25              THE COURT:  We're going to go back.
```

1          MR. IVEY:  Your Honor, if I could, I raised this

2     objection.  I just want to be clear, my objection is no

3     matter whose opinion it is, it's not relevant unless it --

4          THE COURT:  I disagree.  I ruled on it.  I have

5     disagreed.  The objection's been made.  Let's get back to

6     work.

7          MR. IVEY:  And it's continuing.

8          THE COURT:  I've been very clear objections

9     previously made, previously overruled need not be renewed

10    in front of the jury.

11         MR. HELMICK:  And apply to all defendants

12    obviously.

13         MR. EL-KAMHAWEY:  Your Honor, respectfully can

14    defense counsel take two minutes just to confer?

15         THE COURT:  Okay.

16         MR. EL-KAMHAWEY:  Thank you.

17              (A side bar conference was concluded.)

18         THE COURT:  Ladies and gentlemen, I'm going to

19    let you take a five minute break if you want to.  Those of

20    you who are cigarette smokers can take whatever period of

21    time you need for that.  But it will be a couple more

22    minutes and rather than have you sit here.  I'll let you go

23    downstairs and take a bit of a break.  This will also be --

24    we'll also be taking one sometime later in the morning.

25              (A brief recess was taken.)

```
 1              THE COURT:  I'm going to say on the record as far

 2      as I can tell, everything we discussed up at side bar is

 3      simply renewed issues that I've ruled on already.  We've

 4      been in sessions about 50 some minutes and taken about 35

 5      minutes of testimony.  If this is the way this case is

 6      going to go, we're not going to get done until Christmas.

 7      I don't want you coming up to renew objections I've

 8      previously ruled on.  The record has been perfected in that

 9      regard.  I've already made clear any objection previously

10      made is overruled unless I'm told otherwise is a continuing

11      objection and need not be renewed.  I've said before when

12      the jury's in the building I want them in the box.  I don't

13      want to cut off any right to object, but to come up and to

14      renew an objection previously ruled on is not appropriate.

15      I mean, really, at this rate we missed a day yesterday,

16      we're now missing 20 more minutes today in the first hour

17      that we're here.  Let's get to work, let's get the case in.

18      Okay.  Come on up.

19              (A side bar conference was had on the

20              record.)

21          MR. HARTMAN:  We do have an issue that has not

22      been ruled on a motion in limine to some of the videos, the

23      gruesomest hasn't come up yet in any of the videos, but I

24      think number 20 shows a beheading, and that's one of the

25      things we had asked not be shown to the jury just because
```

```
 1    of the nature of it, and Your Honor hasn't ruled on it.

 2              MR. SOFER:  My understanding is you have ruled on

 3    it.

 4              THE COURT:  I did.  I got the program of all the

 5    videos, I reviewed them and I'm allowing them in.

 6              MR. HARTMAN:  I'm sorry.  I didn't understand

 7    that.

 8              MR. HELMICK:  Judge, the other matter --

 9              THE COURT:  I know it's gruesome, I tried to

10    condition the jury.  If you want I will say, ladies and

11    gentlemen, you're about to see one of the videos that I

12    mentioned during voir dire, I remind you that regardless of

13    your emotional reaction that you may well have that you

14    cannot be -- that cannot affect your judgment in any way.

15              MR. HARTMAN:  That's fine.

16              MR. SOFER:  Fine with the government, Judge.

17              THE COURT:  I meant what I said, I don't want

18    people coming up here to renew objections which I have

19    already ruled on.  We have been in this room for more than

20    50 minutes and we've gotten about half of that into

21    evidence.  We're not going to get the case done at any

22    rate.  And the jurors are going to go absolutely crazy.  We

23    want -- I'm going to take a recess for two or three weeks

24    in mid July regardless of the status of this case.  And

25    they're going to attribute that to you and not to me,
```

1  constantly running up here to do things again to try to

2  have me redo things again that I've already done. The time

3  for that is in the evening when the jury's not in the

4  building.

5                    (A side bar conference concluded.)

6              THE COURT: Ladies and gentlemen, you will recall

7  and I think I spoke with each of you individually during

8  the course of voir dire, I tried to, with respect to all of

9  the jurors about the fact that some of the evidence that

10 you will see on the videos is very, very gruesome, and that

11 may be coming up later this morning and some of that will

12 be shown to you, that's my understanding, over the next few

13 days or several days of trial from time to time.

14              I also believe that when I spoke with you during

15 voir dire, I made clear to you that a couple things, that

16 possession of these videos is not unlawful itself. As I

17 indicated to you in my initial preliminary instructions,

18 some of the charges involve the government's allegation

19 that the showing of a couple of the videos are relating to

20 making a bomb. According to the government's allegations,

21 that showing is unlawful and I will describe that and the

22 law at the at the conclusion of the case. But what I'm

23 talking to you about now is the fact that sometime later

24 this morning at some point and throughout the case you will

25 see videos showing people being killed including civilians

1   and including at some point, I don't know when they may be

2   shown, American soldiers.  You will see videos of road side

3   bombs exploding with vehicles passing by and you will see

4   other videos that I suspect some or all of you might find

5   to be horrific.  The thing I want you to keep in mind is

6   that whatever your emotional response to seeing videos of

7   that sort, to seeing evidence of that sort, whatever that

8   emotional response may be must play absolutely no role in

9   your consideration of whether or not the government proves

10   the charges against the defendants beyond a reasonable

11   doubt.  And again, I simply want to remind you that

12   emotions of any kind whatsoever, be they an emotional or

13   personal or subjective attitudes about someone's background

14   or national origin or religious views or political views or

15   whatever, that's not what people can be convicted of a

16   crime for having or expressing.  And that's one reason why

17   I told you about the charges made against the defendants in

18   this case at the outset so that you would have an

19   understanding, at least an awareness of what the government

20   has to prove in its various charges.  And although these

21   videos are evidence, they are evidence, they're being

22   offered for a specific and limited purpose and they're not

23   offered for the purpose of inflaming you emotionally or

24   causing you in any way to deviate from the consideration of

25   the evidence in light of the law that you must follow in

```
 1   deciding this case.

 2             Okay counsel, all counsel?

 3             MR. SOFER:  Yes, Judge.

 4             MR. HARTMAN:  Yes, Judge.

 5   BY MR. SOFER:

 6   Q.        Okay.  Mr. Griffin, did the conversation on

 7   October 14th with Mr. Amawi continue?

 8   A.        Yes.

 9   Q.        Let's play 1D1, clip 2-A Exhibit Number 4-14.

10             THE COURT:  And we need the head phones?

11             MR. SOFER:  We will, Your Honor.

12             THE COURT:  Maybe you can let us know when we

13   need the head phones.

14             MR. SOFER:  When we're playing the audios, yes,

15   and when we're playing the videos most of the time, but

16   I'll do my best to distinguish, Judge.

17             THE COURT:  Very good.

18                 (Audio playing.)

19   BY MR. SOFER:

20   Q.        Okay.  Mr. Griffin, I want to show you what's

21   been marked Government's Exhibits 16, 17 and 18 for

22   identification.  These have all previously been shown to

23   counsel but I'll show them again.

24             MR. SOFER:  May I approach the witness, Your

25   Honor?
```

1    THE COURT:  Of course.

2    MR. SOFER:  Do I need to keep asking that

3  question?

4    THE COURT:  No.

5  BY MR. SOFER:

6  Q.    Tell us what 16, 17 and 18 are, Mr. Griffin.

7  A.    They are CDs.

8  Q.    And if you'll look at them please and tell us

9  whether you recognize those CDs and what's on them.

10  A.    Yes, I recognize them to be videos that we were

11  viewing in this last clip.

12  Q.    Okay.  Basically what were those -- well, strike

13  that.

14    How do you know that those videos that are

15  depicted in 16, 17 and 18 are the -- have videos that you

16  were watching with Mr. Amawi on October 14th, 2004 in the

17  clip that we just heard?

18  A.    Because I reviewed these before.  When I say

19  before, after -- after the clips, I matched them up with

20  the things in the background, the guys talking and what was

21  actually played on the screen.

22  Q.    But do you have an independent recollection of

23  seeing those videos or portions of them on October 14th,

24  2004 in Mr. Amawi's house?

25  A.    Yes, by the 16th, the Pentagon -- when he was at

1  the Pentagon and the commentary about the plane hitting the

2  Pentagon.  On the 17th, it was the interview of the

3  gentleman that was on the phone, and that he said the plane

4  had no windows.  And on 18, there -- it was the last of

5  them, I believe, where he was talking about the conspiracy,

6  the gentleman was talking about conspiracy.

7          MR. SOFER:  Your Honor, at this time the

8  government offers 16, 17 and 18 into evidence.

9          THE COURT:  Okay.  It will be admitted.

10         MR. SOFER:  We're going to play portions and only

11 portions of 16, 17 and 18.  And again, ladies and

12 gentlemen, I caution you these could be a little quiet or a

13 little loud.

14         (Video playing).

15         MR. SOFER:  I am now going to play a portion of

16 Government Exhibit Number 17.  For the record.  We paused

17 that 30 seconds -- of Government Exhibit Number 16 in

18 evidence 30 seconds into the video.

19         (Video playing.)

20         MR. SOFER:  Okay.  And that one we paused at 41

21 seconds into the video.  Now we'll play a portion of

22 Government's Exhibit Number 18.

23         (Video playing.)

24         MR. SOFER:  And for the record, the government

25 paused that Exhibit 18 at 33 seconds into the video.

```
 1  BY MR. SOFER:

 2  Q.        Mr. Griffin, did the conversation on October 14th

 3  in Mr. Amawi's apartment continue?

 4  A.        Yes, it did.

 5            MR. SOFER:  At this time we're going to play 1D1

 6  clip 3A, and it's Exhibit Number 4-14, Your Honor.

 7                   (Audio playing.)

 8  BY MR. SOFER:

 9  Q.        Okay.  Did the conversation continue further,

10  sir?

11  A.        Yes.

12  Q.        We're going to play 4A of the same exhibit and

13  the same 1D.

14                   (Audio playing.)

15  BY MR. SOFER:

16  Q.        Okay.  Did the conversation continue beyond that,

17  Mr. Griffin?

18  A.        Yes.

19  Q.        Let's play 5A.

20                   (Audio playing.)

21  BY MR. SOFER:

22  Q.        Okay.  Mr. Griffin, I want to show you what's

23  been marked government's Exhibit Number 19 for

24  identification.  Why don't you take a look at Government's

25  Exhibit Number 19 for identification.  Do you recognize
```

1  that?

2  A.       Yes, I do.  It's a CD.

3  Q.       And what's on that CD?

4  A.       It is the CNN interview of the U.S. troops that

5  we seen or heard in the last clip.

6  Q.       And how do you know that?

7  A.       Because I reviewed it and it has my initials and

8  date I see.

9           MR. SOFER:  At this time the government offers 19

10 into evidence.

11          THE COURT:  It will be admitted.  Seems that we

12 can hear the audio portion of the video without the head

13 phones.

14          MR. SOFER:  That would be wonderful, but somewhat

15 different than defendants.  It's been back and forth,

16 Judge.  I think it's much better with the head -- with

17 this, but if you can hear it well without it, we certainly

18 don't need them on.

19          THE COURT:  At least the past few clips I've had

20 the head phones off and -- sort of hearing it twice in any

21 event.

22          MR. SOFER:  Understood, Your Honor.

23          THE COURT:  Whatever works for the jurors.

24 Ladies and gentlemen, if you can hear these kinds of

25 exhibits without the head phones, that's fine.  If you

 1    can't, use the head phones.  It's entirely up to you.

 2                    (Video playing.)

 3    BY MR. SOFER:

 4    Q.        Okay.  Mr. Griffin, did the conversation continue

 5    beyond that?

 6    A.        Yes, I believe so.

 7    Q.        And we're going to play 4-14, 1D1, segment 6A.

 8                    (Video playing.)

 9    BY MR. SOFER:

10    Q.        Okay.  I want to show you what's been marked

11    Government's Exhibit Number 20 for identification.  Do you

12    recognize that?

13    A.        It is a CD.

14    Q.        And what's on that CD?

15    A.        The video that we were viewing or getting ready

16    to view about the Egyptian trader.

17    Q.        And do you have independent recollection of

18    watching that video on October 14th, 2004 with Mr. Amawi?

19    A.        Yes, I do.

20              MR. SOFER:  Your Honor, at this time the

21    government offers Government's Exhibit Number 20 into

22    evidence.

23              THE COURT:  It will be admitted.

24              MR. SOFER:  We're going to play portions now

25    here.  Your Honor, I'm going to caution, this one's rough

1   in the sense that it's fairly graphic.

2           THE COURT:  I understand that.  Ladies and

3   gentlemen, I believe that this video shows somebody being

4   killed.  I remind you of my prior lengthy instruction.

5               (Video played.)

6   BY MR. SOFER:

7   Q.      Mr. Griffin, do you recognize the symbol that's

8   being depicted in Government's Exhibit Number 20?

9   A.      Yes, I do.

10  Q.      How is it that you recognize that?

11  A.      That is the Al-Qaeda symbol in Iraq.

12  Q.      And did you learn that from somebody?

13  A.      I learned that from Mr. Amawi.

14  Q.      Okay.

15          THE COURT:  Go ahead.  I'm sorry.

16              (Video played.)

17  BY MR. SOFER:

18  Q.      Okay.  Mr. Griffin, did the conversation continue

19  with Mohammed Amawi after that?

20  A.      Yes.

21  Q.      And if we could play 7A from 1D1, Exhibit Number

22  4-14, please.

23              (Audio playing.)

24  BY MR. SOFER:

25  Q.      Mr. Griffin, did the conversation continue on

```
 1   October 14th?

 2   A.        Yes.

 3   Q.        Let's play clip 8A from 1D1 Exhibit 4-14.

 4                   (Audio playing.)

 5   BY MR. SOFER:

 6   Q.        Mr. Griffin, did the conversation continue?

 7   A.        Yes, it did.

 8             MR. SOFER:  And let's play the next clip, which I

 9   believe is 9A.

10             MR. HARTMAN:  Which one?

11             MR. SOFER:  9A of Exhibit 4-14.

12                   (Audio playing.)

13   BY MR. SOFER:

14   Q.        Okay.  Mr. Griffin, did the conversation continue

15   beyond that?

16   A.        Yes, it did.

17   Q.        And let's play 10A of 4-14, 1D1.

18                   (Audio playing.)

19   BY MR. SOFER:

20   Q.        Who were you referring to the brothers in

21   Chicago?

22   A.        Khaleel and Zubair Ahmed.

23             MR. SOFER:  Please continue.

24                   (Audio playing.)

25   BY MR. SOFER:
```

```
 1   Q.        Okay.  Did the conversation continue?

 2   A.        Yes, it did.

 3   Q.        And we're going to play the last clip 11A of

 4   4-14, 1D1 .

 5                   (Audio playing.)

 6   BY MR. SOFER:

 7   Q.        Okay.  Mr. Griffin, I want to direct your

 8   attention to October 21st, 2004.

 9             THE COURT:  Why don't we take a break now.

10             MR. SOFER:  Okay, Judge.

11             THE COURT:  Ladies and gentlemen, we'll take

12   about a 10 or 15 minute break and we will resume then.

13                   (A brief recess was taken.)

14             THE COURT:  Okay.  Let's continue.  You remain

15   under oath.  And Mr. Sofer, you may resume your

16   examination.

17   BY MR. SOFER:

18   Q.        Mr. Griffin --

19   A.        Yes.

20   Q.        -- in the last -- very last piece of the tape

21   that we heard, I think there was some discussion of an

22   individual named Wassim who sold cars on Monroe?

23   A.        Yes.

24   Q.        Did there later come a time when you learned who

25   that person was?
```

1  A.        Yes, I met Wassim Masloum on November the 17th, I

2  believe.

3  Q.        Okay.  Let's move on to Exhibit Number 4-15, 1D5.

4  And I want to direct your attention, Mr. Griffin, to

5  October 21st, 2004 about a week after the last

6  conversations.  Did there come a time when you met on that

7  day, that is October 21st, 2004 with Mohammed Amawi?

8  A.        Yes.

9  Q.        And if we could play -- I'm sorry, did you take a

10 recording device?

11 A.        Yes, I did.

12 Q.        Did you record all or part of the conversation

13 with him?

14 A.        Yes, I did.

15 Q.        And where did it occur?

16 A.        I believe it occurred -- it started at my

17 apartment and I think it may have moved to my car.  I was

18 unsure when I reviewed the recording.

19          MR. SOFER:  All right.  Let's play segment or

20 clip 4A from 4-15.

21               (Audio playing.)

22 BY MR. SOFER:

23 Q.        Okay.  Mr. Griffin, I want to direct your

24 attention to November 5th, a little less than two weeks

25 later.  Did there come a time on that day when you had a

1    conversation with Mohammed Amawi?

2    A.        Yes, and that prior clip was in my vehicle.

3    Q.        Okay.  So you -- how do you know it was in your

4    vehicle listening to it here in court?

5    A.        Because of the beeping in the background, that's

6    my seat belt -- the no seat belt on indicator.

7    Q.        Meaning you weren't wearing your seat belt?

8    A.        I was not wearing my seat belt.

9    Q.        All right.  Let's turn to November 5th.  That

10   would be Exhibit Number 4-17, 1D9.  And clip 1A, please.

11                 (Audio playing.)

12                 THE COURT:  I'm sorry, what -- give me that

13   Exhibit Number.

14                 MR. SOFER:  1D 9, it's Exhibit Number 4-17 clip

15   1A as in Adam.

16                 (Audio playing.)

17                 MR. SOFER:  Okay.  Did that conversation on

18   November 5th continue?

19   A.        Yes, it did.

20                 MR. SOFER:  And let's play clip 3-D, A-1, D9

21   Exhibit Number 4-17.

22                 (Audio playing.)

23                 MR. SOFER:  Okay.  Again, the Wassim that was in

24   that discussion, did you later meet that individual?

25   A.        Yes, I did.

1  Q.        Was that the Wassim Masloum who is sitting back

2  there in the courtroom?

3  A.        Yes, it is.

4  Q.        Now, I want to direct your attention -- strike

5  that.

6            You said something about space heaters for

7  someplace.  What place were you referring to, can you tell

8  the jury that?

9  A.        I had created and was telling the men that I had

10 a location, a farm house that we could go train in on the

11 inside, and it was going into the winter, and of course

12 it's cold in the winter, and I was going to have space

13 heaters in there so we would be comfortable.

14 Q.        Okay.  Now, the same 1D9 I want to direct your

15 attention to about ten days later.  Did you on

16 November 15th, 2004 -- did there come a time on

17 November 15th, 2004 when you game Mohammed Amawi some

18 money?

19 A.        Yes, there was.

20 Q.        Do you recall how much it was?

21 A.        I believe $850.

22 Q.        And do you recall where you got that?

23           THE COURT:  How much was that?

24 A.        $850.

25           THE COURT:  If you can direct the microphone so

```
 1   that it's in front of you and not too close.  I'm having
 2   trouble hearing you.
 3   A.        Sorry, sir.
 4   Q.        For some reason that -- that particular Mike is
 5   just not --
 6             THE COURT:  Okay.  We'll check into it during the
 7   noon hour.
 8   Q.        The $850 you just described, do you recall where
 9   you got that money from?
10   A.        I got it from the FBI.
11   Q.        And what was the purpose of giving it to Mohammed
12   Amawi?  In other words, why did you tell him you were
13   giving it to him?
14   A.        I gave it to him -- he was in jeopardy of being
15   evicted at the time.  That's what I was told by him, and he
16   needed money, so I reported that to the FBI prior, I'm not
17   sure what day actually, and they -- the FBI gave me the
18   money to give to him.  I did that in attempts to -- to be
19   able to keep gathering information.
20   Q.        Okay.  Now, I want to direct your attention to
21   that same day, November 15th, did there come a time when
22   you met with Mohammed Amawi?
23   A.        Yes.
24   Q.        And did you record that conversation?
25   A.        Yes, I did.
```

1  Q.        Okay.  We're going to go to 1D9, Your Honor,

2  Exhibit Number 4-17, clip 5-A, please.

3            THE COURT:  I'm sorry, I had trouble, 1D9.

4            MR. SOFER:  If I move up this mike.

5            THE COURT:  I agree.  But what was --

6            MR. SOFER:  1D9 Exhibit 4-17 clip 5A.

7            THE COURT:  Thank you.

8                 (Audio playing.)

9  BY MR. SOFER:

10 Q.        When you said to Mohammed Amawi I want to see

11 what we can use, what do you mean by that?

12 A.        About what training that he had on video that we

13 could perform.

14                (Audio playing.)

15 BY MR. SOFER:

16 Q.        Two quick questions, Mr. Griffin.  In hearing

17 this recording, some sort of voices in the background, do

18 you recall basically what those voices were?

19 A.        They were voices from the Internet.  He often

20 goes into --

21 Q.        When you say he, who do you mean?

22 A.        Mohammed Amawi.  He goes into chat rooms on Pal

23 Talk chat rooms and he was a moderator to at least one and

24 he'd listen to them and he'd also would talk to people in

25 the rooms.

1    Q.       And again, when there was a discussion of calling

2    Wassim, did you later learn who that was?

3    A.       Yes, Wassim Masloum.

4    Q.       Okay.  Approximately two days later -- I'm sorry,

5    did this conversation on the 15th continue?

6    A.       Yes, it did.

7            MR. SOFER:  And can we play 1D9, Exhibit 4-17,

8    clip 6A, Your Honor.

9                    (Audio played.)

10   BY MR. SOFER:

11   Q.       Okay.  And again, Mr. Griffin, did you, in fact,

12   later learn who the Wassim was on the telephone?

13   A.       Yes, I did.

14   Q.       Who was that?

15   A.       Wassim Masloum.

16   Q.       Did there come a time --

17           THE COURT:  And may I ask a question?  Do you

18   recall, Mr. Griffin, who called whom?

19   A.       Mohammed Amawi called Wassim Masloum.

20   Q.       And that was in your presence?

21   A.       Yes.

22   Q.       I want to direct your attention to two days

23   later.  Did you, in fact, meet with Wassim Masloum?

24   A.       Yes, I did.

25   Q.       Where did that occur, if you recall?

```
 1   A.         At the apartment of Mohammed Amawi.

 2   Q.         Okay.  And we're going to --

 3              THE COURT:  And two days later, just to remind

 4   what day we're talking about now.

 5   A.         November 17th.

 6              THE COURT:  November 17th, okay.

 7   BY MR. SOFER:

 8   Q.         Did you bring your recording device that day?

 9   A.         Yes, I did.

10   Q.         And did you record some or all of that

11   conversation?

12   A.         Yes, I did.

13   Q.         We're going to play 1D10, Your Honor.  Segment --

14   I'm sorry, Exhibit 4-18, segment 1A.

15                   (Audio playing.)

16   BY MR. SOFER:

17   Q.         Okay.  Mr. Griffin, did that conversation on

18   November 17th continue?

19   A.         Yes, it did.

20   Q.         By the way, who was present during the course of

21   that conversation we just heard?

22   A.         Myself, Wassim Masloum and Mohammed Amawi.

23   Q.         Now, let's play 4-18, 1D10, exhibit --

24              MR. SOFER:  Your Honor, I'm told that our next

25   clip is about 30 minutes long.  So it's up to Your Honor --
```

```
 1              THE COURT:  Why don't we play that and then take

 2    a break.

 3              MR. SOFER:  Okay.

 4              THE COURT:  And 4 what?

 5              MR. SOFER:  4-18, 1D10, clip 2A.

 6                   (Audio playing.)

 7    BY MR. SOFER:

 8    Q.       Who's brother Bilal?

 9    A.       That would be me.

10    Q.       And was this the first moment at which Mohammed

11    Amawi introduced you to Wassim Masloum?

12    A.       Yes, it is.

13    Q.       Let's continue.

14                   (Audio playing.)

15    BY MR. SOFER:

16    Q.       Mr. Griffin, was this story true?

17    A.       No.

18    Q.       Part of your cover?

19    A.       Yes.

20    Q.       Let's continue.

21                   (Audio playing.)

22    Q.       Mr. Griffin, was this true?

23    A.       No, it is not.

24    Q.       Again, part of your cover?

25    A.       Yes, it is.
```

```
 1          MR. SOFER:  Continue, please.
 2               (Audio playing.)
 3          MR. SOFER:  Judge, now would be a good time to
 4   break.
 5          THE COURT:  Okay.  We'll resume at 1:15.  Don't
 6   talk about the case, keep an open mind.  We'll proceed in
 7   an hour.
 8               (A brief recess was taken for lunch.)
 9          MR. SOFER:  I don't know if Your Honor noticed
10   but the government removed actually from our presentation
11   one of the -- a segment, just essentially a few lines out
12   of a segment.
13          THE COURT:  I didn't notice.
14          MR. SOFER:  They related to what was previously a
15   count in the indictment of threatening the president of the
16   United States.  My understanding was that The Court, I
17   thought, had ruled that we would be able to present that
18   evidence, but I wasn't 100 percent sure so we -- we erred
19   on the side of caution and took it out.  I'd like an
20   opportunity, and Your Honor had just said we had just
21   finished this, a bench conference at which it was clear to
22   me and I think everyone else that we should not be
23   interrupting the presentation of evidence, so again -- and
24   we want to move as quickly as we can.
25          THE COURT:  No, what I tried to express this
```

```
 1   morning was I just don't want objections that have

 2   previously been made and ruled on brought back up.

 3   Obviously if there's some reason to make an objection, by

 4   all means, I mean, that's --

 5        MR. SOFER:  It wasn't an objection.  And I guess

 6   all I'm saying is, Judge, we'd like an opportunity to put

 7   that text back in there and play that segment, just the

 8   portion that dealt with the threats to the president.  We

 9   can do that.

10        THE COURT:  What -- was it out of the -- I

11   thought I noticed --

12        MR. SOFER:  There was one -- there were --

13   originally there were two counts of threatening the

14   president of the United States.

15        THE COURT:  Two.

16        MR. SOFER:  Two.  In addition to that there are

17   occasions throughout these transcripts -- there are

18   comments made about the president, some of which could be

19   threatening but were not the subject of those counts.

20   We've heard one of those, I believe, already.  But we

21   actually, as I said, removed from the rolling transcript

22   and the audio the portion.  It's only two lines of the

23   transcript which related to the threats to the president,

24   you know.

25        THE COURT:  Can you -- how do you propose
```

1  presenting that?

2      MR. SOFER:  I would propose that we be permitted

3  to go back and play -- I would propose, Your Honor, that

4  the government be permitted to replay that section in its

5  entirety without taking that out, but we don't have to play

6  the entire segment again, I would just play some of it.  We

7  don't have to do that today.  We can do that on Monday

8  would be fine with the government.  Again, we made a

9  decision sort of on the fly here in court to make sure we

10 were complying with what -- we thought it would be better

11 for us to error on the side of caution.  So I don't want

12 the government to be precluded from putting that evidence

13 in.  On the other hand, I don't -- I don't want to call too

14 much attention to it.

15      THE COURT:  How much that we've already heard

16 would you be replaying?

17      MR. SOFER:  Just a couple minutes, Judge.

18      THE COURT:  I will let you do that.  I will do

19 that and I will also indicate, ladies and gentlemen, we're

20 going to replay a bit of what you've already heard just

21 to --

22      MR. HARTMAN:  Just for the record, I don't know

23 if we formally objected to the admission of that evidence

24 since you severed the charges, but we still would object to

25 the admission.

```
 1           THE COURT:  Understood.

 2           MR. BRYAN:  On behalf of Mr. Amawi, we object as

 3   well.  We also -- I understand Mr. Sofer's concerns, we

 4   also object to the replays because it has a tendency to

 5   exaggerate the evidence.

 6           THE COURT:  Fine.  I understand -- I assume that

 7   everybody objects to letting Mr. Sofer do what he is about

 8   to be allowed to do and the objections are on the basis of

 9   rules 401, 402 and 403.

10           MR. SOFER:  Judge, I would propose we do this

11   tomorrow, otherwise we'd slow things down and we'd like to

12   keep plugging ahead.

13           THE COURT:  Tomorrow.  Go right ahead.

14               (Jury brought back in.)

15           MR. SOFER:  The government recalls Darren

16   Griffin, Your Honor.

17           THE COURT:  You understand you remain under oath.

18   A.      Yes, sir.

19           THE COURT:  And I think that they may have tried

20   to fix the microphone a little bit.  You can still sit back

21   I think.  That's what they were trying to fix, I believe.

22   So see how it goes.

23   A.      Okay.

24   BY MR. SOFER:

25   Q.      Mr. Griffin, when we broke for lunch, we had just
```

 1  played a fairly lengthy portion of the recording that you

 2  made.  During the course of that recording, was Wassim

 3  Masloum present for that conversation?

 4  A.        Yes, he was.

 5  Q.        And there were also a number of outside noises or

 6  noises in the background.  I want to show you what's been

 7  marked Government Exhibit Number 22 for identification.

 8  Can you please tell the members of the jury whether you

 9  recognize Government Number 22 for identification?

10  A.        Yes.  It's a CD.

11  Q.        Can you tell the members of the jury what's on

12  that CD?

13  A.        It is the helicopter attack at night, Mr. Amawi

14  referenced that the -- it's a tractor on there, and you

15  hear gun shots.

16  Q.        And that was during the conversation on

17  November 17th, 2004?

18  A.        Yes.

19  Q.        And do you have an independent recollection of

20  watching that during or portions of that during the

21  conversation you had with Mr. Amawi and defendant Masloum

22  during the course of your time with them on November 17th,

23  2004?

24  A.        Yes, I do.

25  Q.        At this time the government offers government

```
 1    Exhibit 22.

 2              THE COURT:  It will be admitted.  Proceed.

 3              MR. HARTMAN:  No objection.

 4              MR. SOFER:  We're going to play some of

 5    Government's Exhibit 22.  Again, ladies and gentlemen, I

 6    don't know how loud this was.

 7              THE COURT:  Again, maybe you can try it without.

 8    I listened to the last couple of the videos without the

 9    things and did not notice any difference in the sound.

10              (Video playing.)

11    BY MR. SOFER:

12    Q.        Okay.  Did the conversation on November 17th with

13    Mohammed Amawi and Wassim Masloum continue?

14    A.        Yes, it did.

15    Q.        And if we can please play 4-18 from 1D10 clip 3A,

16    please.

17              (Audio playing.)

18    BY MR. SOFER:

19    Q.        Okay.  Did the conversation continue?

20    A.        Yes.

21    Q.        We can now play segment 5-A, please.

22              (Audio playing.)

23    Q.        Did the comment I might disappear cause you some

24    concern?

25    A.        Yes.
```

```
 1   Q.        And can you tell us why you said what you said

 2   after that?

 3   A.        Because I wouldn't be able to gather information.

 4   By this time I thought his intentions --

 5             MR. BRYAN:  Objection, Your Honor.

 6             THE COURT:  I agree.  I will permit you to

 7   testify to what you thought his intentions were, but ladies

 8   and gentlemen, that is not proof of Mr. Amawi's intentions.

 9             MR. SOFER:  I'll make sure that I rephrase the

10   question a little bit.

11             THE COURT:  Disregard that past --

12   BY MR. SOFER:

13   Q.        Why did you say I want you to stay with me the

14   whole way or something like that?

15   A.        Because it posed a threat to the United States if

16   I lost contact with him.  We wouldn't have that

17   information.

18   Q.        Okay.  Let's continue, please.

19             THE COURT:  Excuse me, I'm going to instruct the

20   jury to disregard that thing about it would cause a threat

21   to the United States.  That may be his opinion, and if so,

22   that's it and nothing more, but it's not proof that it

23   would, in fact, be a threat to the United States.

24             MR. SOFER:  Understood, Your Honor, introducing

25   it solely to show why it is Mr. Griffin said what he said.
```

```
 1            THE COURT:  Understood.  It was a somewhat
 2   gratuitous introduction.  He has testified before that he
 3   was undertaking to continue to put together information,
 4   closed quote.
 5   A.          Sorry, Your Honor.
 6               MR. SOFER:  Let's continue.
 7                    (Audio playing.)
 8   BY MR. SOFER:
 9   Q.          Okay.  Did the conversation continue,
10   Mr. Griffin?
11   A.          Yes, it did.
12   Q.          Let's play 6A.
13                    (Audio playing.)
14   BY MR. SOFER:
15   Q.          Okay.  Mr. Griffin, did the conversation
16   continue?
17   A.          Yes.
18   Q.          Let's play 7A, please.
19                    (Audio playing.)
20   BY MR. SOFER:
21   Q.          Was the EPA really doing a geological survey,
22   Mr. Griffin?
23   A.          I don't believe so.
24   Q.          Was there even a farm that had been picked out?
25   A.          No.
```

```
 1   Q.         Okay.  Let's continue.

 2                    (Audio playing.)

 3   BY MR. SOFER:

 4   Q.         By the way, did Mohammed Amawi have swords in his

 5   apartment?

 6   A.         Yes, he did.

 7   Q.         Did the conversation on November 17th continue?

 8   A.         I believe so.

 9   Q.         Let's pay 8A.

10                    (Audio playing.)

11   BY MR. SOFER:

12   Q.         Okay.  And let's -- did the conversation

13   continue?

14   A.         Yes.

15   Q.         Let's play the last segment on 9A.

16                    (Audio playing.)

17   BY MR. SOFER:

18   Q.         Okay.  Mr. Griffin, I want to direct your

19   attention to November 23rd.  Two weeks later or so, two

20   weeks later, less than that.  Actually, six days.

21            Did there come a time when you met again with

22   Mohammed Amawi at his apartment?

23   A.         Yes.

24   Q.         And tell us again where that apartment was.

25   A.         107 Shaftesbury off of Hill in Toledo, Ohio.
```

1   Q.        And did you bring a recording device or devices

2   with you that day as well?

3   A.        Yes, I did.

4   Q.        Okay.  Let's play Exhibit 4-19 from 1D12 and it's

5   segment or clip 1A, Your Honor.

6             THE COURT:  I'm sorry, 1D12.

7             MR. SOFER:  1D12 Exhibit 4-19.  Exhibit 1A.  I'm

8   sorry, clip 1A.

9                  (Audio playing.)

10  BY MR. SOFER:

11  Q.        On this occasion, are you watching videos again

12  with him?

13  A.        Yes we are.

14  Q.        And where is that taking place approximately?

15  A.        In his bedroom.

16  Q.        And what are you watching them on?

17  A.        His personal computer.

18                  (Audio playing.)

19  BY MR. SOFER:

20  Q.        Had you given by this time Mohammed Amawi some

21  discs?

22  A.        I believe so.

23  Q.        Were they -- do you know if they were blank or

24  they had anything on them?

25  A.        I believe they were blank.  They were still in

```
 1  their wrappers.

 2  Q.        And did he -- by this time, had he tried to give

 3  you a disc?

 4  A.        Yes, I believe so.

 5  Q.        And is that the disc you're referring to in the

 6  conversation?

 7  A.        Yes.

 8  Q.        Let's continue.

 9            (Audio playing.)

10  BY MR. SOFER:

11  Q.        Okay.  Mr. Griffin, did the conversation on

12  November 23rd, 2004 at Mohammed Amawi's house continue?

13  A.        Yes.

14  Q.        Would you please play clip 2-A of the same

15  exhibit.

16            (Audio playing.)

17  BY MR. SOFER:

18  Q.        Do you know who Dr. Zawahiri is that he's

19  referring to?

20  A.        The leader in Iraq.

21  Q.        You say the leader, what do you mean by that?

22  A.        The leader of Al-Queda in Iraq.

23  Q.        Continue, please.

24            (Audio playing.)

25  BY MR. SOFER:
```

1  Q.        What, if you recall, is Mohammed Amawi doing

2  here?

3  A.        He is transferring videos and materials from the

4  Internet to CD.

5                  (Audio playing.)

6  BY MR. SOFER:

7  Q.        Judge, it may be a decent time to take a mid

8  afternoon break.  There is another long group of segments.

9  It's up to you obviously, Your Honor.

10            THE COURT:  We probably should.  The next one is

11  fairly long.  Why don't we take about a ten-minute break or

12  so.

13                  (A brief recess was taken.)

14            THE COURT:  Mr. Sofer, while that's getting --

15  how long do you think it will take before we break.

16            MR. SOFER:  It's a little difficult for me to

17  gauge, Your Honor, but I would say between an hour or two

18  hours.  It will depend how smoothly things go.

19            THE COURT:  It's 2:30.  I certainly want to

20  adjourn no later than 4:30.

21            MR. SOFER:  Understood.

22            THE COURT:  And if we took a poll of the jurors,

23  they might suggest that's a little late.

24            MR. SOFER:  Understood, Your Honor.  You don't

25  have to hit me with a baseball bat.

```
1              THE COURT:  Sometime between 4:00 and 430.

2              MR. SOFER:  Understood, Judge.

3              THE COURT:  And how are we doing generally?

4              MR. SOFER:  We've begun now to move along.

5              THE COURT:  Okay.

6    BY MR. SOFER:

7    Q.        Mr. Griffin, I want to redirect your attention to

8    November 23rd, 2004.  Did the conversation continue beyond

9    that which with he satisfy already heard?

10   A.        I believe so.

11   Q.        And can we please play segment 3-A, again we're

12   on Exhibit 4-19 and 1D12, 3-A, Your Honor.

13              (Audio playing.)

14   BY MR. SOFER:

15   Q.        Mr. Griffin, there were a number of videos

16   playing with noises in the back of that particular

17   recording.  I want you to take a look at what's been marked

18   government's number 23 for identification and tell the

19   members of the jury if you recognize this?

20   A.        It's a CD.

21   Q.        And again, can you tell the members of the jury

22   what's on that CD, if you know?

23   A.        It was the CD with -- we talk about its check

24   points, it's a white car.  At the beginning the Al-Queda

25   and -- Al-Qaeda in Iraq symbol comes up and at the end they
```

```
 1    show a killed U.S. troop.

 2    Q.        And do you have an independent recollection of

 3    watching that video back on November 23rd, 2004 in Mohammed

 4    Amawi's apartment?

 5    A.        Yes, I do.

 6              MR. SOFER:  At this time Your Honor, the

 7    government offers number 23 into evidence.

 8              THE COURT:  It will be admitted.

 9              MR. SOFER:  We're going to play a portion of

10    Government 23 in evidence.

11    Q.        And while we're waiting for this to start, what's

12    actually running the computer when these things are

13    happening and the video's being played?

14    A.        Mohammed Amawi.

15                   (Video played.)

16    BY MR. SOFER:

17    Q.        Okay.  I'd like to show you what's been marked

18    Government Exhibit Number 24 for identification.  And

19    again, take a look at it.  Tell us if you recognize it.

20    A.        It is a CD.

21    Q.        And do you know what's depicted on that CD,

22    government's number 24 for identification?

23    A.        Yes, I do.  It's where I stated in the audio

24    portion of it that a 200-pound bomb, I believe, and we

25    heard a armored vehicle and where he said that there was
```

 1  flying debris, flying bodies.

 2  Q.      Do you have an independent recollection of

 3  watching that video on November 23rd, 2004 in Mohammed

 4  Amawi's apartment?

 5  A.      Yes, I do.

 6          MR. SOFER:  At this time, the government offers

 7  number 24.

 8          THE COURT:  It will be admitted.

 9  Q.      I'm going to play a portion of this as well.

10              (Video playing.)

11  BY MR. SOFER:

12  Q.      Okay.  Did the conversation on November 23rd,

13  2004 in Mohammed Amawi's apartment continue?

14  A.      Yes.

15  Q.      In a moment when we catch up, can we play segment

16  4A or clip 4A.

17              (Video played.)

18  BY MR. SOFER:

19  Q.      Okay.  Mr. Griffin, did the conversation continue

20  further?

21  A.      Yes, it did.

22  Q.      And can you play segment 5A from Exhibit Number

23  4-19, 1D12.

24              (Audio played.)

25  BY MR. SOFER:

```
 1   Q.        Okay.  Mr. Griffin, did the conversation

 2   continue?

 3   A.        Yes.

 4   Q.        And here as we play segment 6A --

 5             MR. HARTMAN:  I'm sorry, I can't hear.

 6             MR. SOFER:  Segment 6A of Exhibit 4-19.

 7                  (Audio playing.)

 8   BY MR. SOFER:

 9   Q.        Okay.  Mr. Griffin, did the conversation

10   continue?

11   A.        Yes.

12   Q.        I'm going to play the last segment 7A of Exhibit

13   4-19.

14                  (Audio playing.)

15   BY MR. SOFER:

16   Q.        At this point in the recording did Mohammed Amawi

17   give you something.

18   A.        Yes, either that the time or just prior to that.

19   Q.        And what did he give you?

20   A.        At least one CD.

21                  (Audio playing.)

22   BY MR. SOFER:

23   Q.        As opposed to waking up all the jury members,

24   what was the -- what were the three beeps, if you know.

25   A.        That was my cell phone.
```

```
 1              (Audio playing.)
 2              MR. SOFER:  I should warn the members of the jury
 3   we're going to get another loud noise.
 4              (Audio playing.)
 5   BY MR. SOFER:
 6   Q.       The reason -- is there a reason you said that out
 7   loud, Mr. Griffin?
 8   A.       Because you can't see anything.  This is just
 9   recorded.  I wanted to get that on the device.
10              (Audio played.)
11   BY MR. SOFER:
12   Q.       Did you know what brother Wassim was referring to
13   at that time?
14   A.       At that time, no.
15   Q.       Okay.
16              (Audio played.)
17   BY MR. SOFER:
18   Q.       You said that Amawi gave you a disc on that day;
19   is that right?
20   A.       Yes.
21   Q.       What did you give -- what did you do with that
22   disc?
23   A.       I turned it over to the FBI.
24   Q.       And before doing that, did you alter the disc
25   contents in any way?
```

```
 1  A.        No, I did not.

 2  Q.        Do you know who you gave it to?

 3  A.        I believe it was Shannon Coats.

 4            THE COURT:  I think you have to lean into the

 5  microphone phone.  I think it will pick up.  It might sound

 6  better.  I mean, it sounds a little --

 7  Q.        Try and stand back a little bit.

 8            THE COURT:  Just as you are, I think.  Let's give

 9  it a try.

10  BY MR. SOFER:

11  Q.        You said you believe it was who?

12  A.        Shannon Coats.

13  Q.        Could have been someone else?

14  A.        Could have been Bill Radcliff.

15  Q.        Do you know when approximately you gave it to the

16  FBI?

17  A.        I don't know.

18  Q.        Was it shortly after, a long time after, can you

19  give us an idea?

20  A.        Shortly after, usually within 24 to 48 hours.

21  Generally depends on what time I finished.  I can tell from

22  this recording it was very late, and my contact would not

23  be available 1:00, 2:00, 3:00 in the morning unless it was

24  something urgent.

25  Q.        You said before that you weren't sure who the
```

1  Wassim was, the Wassim and his brother.  Do you know who

2  that was?

3  A.      No, I knew who Wassim was.  I did not know

4  Wassim's brother.

5  Q.      I see.  Did you later learn the name of his

6  brother?

7  A.      Yes, I did.

8  Q.      Can you tell the members of the jury who that

9  was?

10  A.      Bilal.

11  Q.      So when he was referring to the Wassim here,

12  that's the Wassim Mazloum sitting in the back there?

13  A.      Yes, it is.

14          MR. SOFER:  Okay.  Your Honor, I think we can do

15  two more rather quickly and end for the day.  Why don't we

16  try Exhibit 4.

17          THE COURT:  Were you going to be displaying those

18  videos?

19          MR. SOFER:  Yes, I apologize, Judge.  I'm glad

20  someone's paying attention to what I'm supposed to

21  be doing.

22  BY MR. SOFER:

23  Q.      I want to show you what's been marked

24  Government's Exhibit Number 25 for identification.  Do you

25  recognize that?

```
 1   A.        Yes, it's a CD.

 2   Q.        And again, can you tell the members of the jury

 3   what's on that CD, if you know?

 4   A.        It was the airport, I believe it to be an

 5   airport.  It was -- it's at night.  You hear incoming fire

 6   and the alarms go off and I think you hear -- I believe it

 7   to be U.S. personnel or troops.

 8   Q.        Is that one of the videos that you're watching

 9   late in the evening on November 23rd, 2004?

10   A.        Yes.

11   Q.        And do you have an independent recollection of

12   watching that on that evening with Mr. Amawi?

13   A.        Yes, I did.

14              MR. SOFER:  At this time the government will move

15   Exhibit 25 into evidence.

16              THE COURT:  It will be admitted.

17              MR. SOFER:  We'll play some or all of it.

18                  (Video playing.)

19              MR. SOFER:  And the record should reflect we

20   stopped the video at number 25 in evidence at one minute,

21   six seconds.

22   BY MR. SOFER:

23   Q.        I'm going to show you what's been marked number

24   26 for identification.  Tell the members of the jury if you

25   recognize that.
```

1   A.        It is a CD.

2   Q.        And again, can you tell us, if you know, what is

3   on that CD.

4   A.        This was the one with the various IED attacks,

5   the improvised explosive device attacks.  The one where the

6   troops were standing there and I made the comment they

7   must -- they must have put that there the day before.

8   There is a still Convoy.  They're showing the aftermath,

9   and troops ambushed and then there's a Medivac helicopter.

10  Q.        And again, having seen those -- or having seen

11  those back on November 23rd, 2004, do you have an

12  independent recollection of watching them on that

13  particular day?

14  A.        Yes, I do.

15           MR. SOFER:  Your Honor, at this time the

16  government moves 26 into evidence?

17           THE COURT:  It will be admitted.

18           MR. SOFER:  I'm going to play some or all of 26

19  into evidence.

20  Q.        While this is being loaded, Mr. Griffin,

21  throughout this interaction with Mohammed Amawi, there were

22  times when you laughed about certain things with him,

23  certain things on the videos.  Were those your true

24  feelings.

25  A.        No, they were not.

```
1   Q.        Was that part of your cover?

2   A.        Yes, it was.

3                  (Video playing.)

4   BY MR. SOFER:

5   Q.        Okay.  And the record should reflect we've played

6   one minute and four seconds of Government's Exhibit Number

7   26.

8             I want to direct your attention now, Mr. Griffin,

9   to the same day.  Was there a time in the day that you had

10  spent time with Marwan El-Hindi at his home?

11  A.        Yes.

12  Q.        And did you record that conversation?

13  A.        I believe so.

14  Q.        We're going to -- do you know which home or where

15  that home was located?

16  A.        I believe it to be either on Bronson Street in

17  Toledo, Ohio or on Mayo in Toledo, Ohio.

18  Q.        And if we can play Exhibit 4-71 from 1D1.

19            MR. BOSS:  Mr. Sofer, for the record, can we

20  clarify if this is before or after the time of the previous

21  recordings?

22            MR. SOFER:  I believe it to be before.

23            MR. BOSS:  So this is out of chronological order?

24            MR. SOFER:  That would be what before would mean.

25            MR. BOSS:  Thank you.
```

1   BY MR. SOFER:

2   Q.      Let me ask Mr. Griffin, do you recall whether or

3   not this particular session is before or after the session

4   that we just heard?

5   A.      I believe it to be before.  It was pretty late at

6   night after I finished with Mr. Amawi.

7   Q.      Is 2-A of Exhibit 4-71.

8           THE COURT:  What's the 1D?

9           MR. SOFER:  1D1, Your Honor 4-71, 2-A.  Yes,

10  Judge.

11          THE COURT:  And it was --

12          MR. SOFER:  I'm sorry, Judge?

13          THE COURT:  What day was that again?

14          MR. SOFER:  23rd November of 2004, and I'm told

15  by my colleague it's 4-17, not 71.  One moment, Judge,

16  we're checking.  Now I'm told by my colleague it is 4-71.

17  4-71, 1D1, clip 2-A.

18              (Audio playing.)

19  BY MR. SOFER:

20  Q.      On that same day, did that conversation continue?

21  A.      Yes.

22  Q.      And I'd like to next play segment 3-A.

23              (Audio playing.)

24          MR. SOFER:  We pause this only, Judge, because

25  there's about to be a loud noise so I just want to make

```
 1    everyone aware.  We don't want to hurt everyone's ears.

 2                   (Audio playing.)

 3                   MR. SOFER:  Mr. Griffin, I want to direct your

 4    attention finally for today to December 13th, 2004 about 3

 5    weeks later.  Did there come a time on that day when you

 6    spent time with Mohammed Amawi in his apartment?

 7    A.        Yes.

 8    Q.        And did you take your recording device on that

 9    day?

10    A.        Yes, I did.

11    Q.        I want us to play 4-20 from 1D13, and it's clip

12    or segment 2-A.

13                   (Audio playing.)

14    BY MR. SOFER:

15    Q.        Okay.  Mr. Griffin, I want to show you what's

16    been marked Government's Exhibit 29 for identification.

17    Tell the members of the jury if you recognize that.

18    A.        It's a CD.

19    Q.        And again, can you tell us what's on that CD?

20    A.        It is the bombing of -- bombing in Spain of the

21    trains.

22    Q.        Is that bombing video a part or all of the video

23    that you watched on December 13th with Mr. Amawi that we

24    just heard?

25    A.        Yes.
```

```
1   Q.        And do you have an independent recollection of

2   watching it on or about that date?

3   A.        Yes, I do.

4             MR. SOFER:  At this time the Government offers 29

5   into evidence, Your Honor.

6             THE COURT:  It will be admitted.

7   BY MR. SOFER:

8   Q.        We'll play all or part of 29.  Do you recall

9   something or anything that Defendant Amawi stated while

10  watching that video?

11  A.        Basically when he said they love life.

12             (Video playing.)

13             MR. SOFER:  Your Honor, I believe this would be

14  our best time for us to break.

15             THE COURT:  Okay.  We'll adjourn for the weekend.

16  Ladies and gentlemen, let me simply remind you, in the

17  instructions I know you've heard briefly, keep on open

18  mind.  We've begun to see some of the evidence that is

19  going to be seen, so do not start making your minds up

20  about anything to do with the case at all.  Refrain

21  absolutely from exposing yourself to any media accounts.  I

22  know that there have apparently been some periodic reports

23  on the at least the Toledo news stations and I know daily

24  in the blade has carried an article.  So please avoid

25  looking at the Blade or other newspapers that may have
```

 1  articles about this case.

 2          And as I say, avoid any broadcast, radio or TV

 3  publicity about it.  If you happen to see or hear

 4  something, pay no attention to it.  It has nothing to do

 5  with the case and certainly is not evidence.  And finally,

 6  remember my instruction not to talk about the case.  I'm

 7  sure it's very difficult but it's absolutely essential that

 8  you comply with all the instructions.

 9          We will get under way Tuesday at 8:30.  On

10  Thursday we will adjourn a bit early, probably not later

11  than about 3:00.  I have to go to Cleveland to participate

12  in an event that starts shortly after 5:00.  So Thursday we

13  will have a somewhat shorter day than usual, okay.  Safe

14  trip back and forth.  You can leave your notebooks and head

15  sets on the -- on your chairs.

16                  (Jury was excused at 4:25 p.m.)

17          THE COURT:  As you look ahead to next week, it's

18  pretty much the same program on Tuesday?

19          MR. SOFER:  Yes, Judge.  We are -- we're making

20  about the progress that we believe we did, and I think

21  barring kind of things that happen earlier in the morning,

22  we should be able to progress at approximately the same

23  pace.  I'll have a better idea probably Tuesday as to when

24  it is I think we'll be done with the direct examination.

25          THE COURT:  Okay.  Anything from the defense side

1  we have to take care of this evening?

2      MR. BRYAN:  Your Honor, I'll probably maybe bring

3  this up again Tuesday morning, but I have noticed at times

4  that there are some jurors who are removing their head

5  phones during parts of the audio that I think -- I find

6  even difficult to hear, and they're just relying on the

7  transcript and I think the admonishment --

8      THE COURT:  Okay, I will, just remind me Tuesday

9  morning.

10      MR. BRYAN:  That the audio is the record.

11      THE COURT:  I'm focused on typing away at my

12  notes, and so I'm not really paying attention to the

13  jurors.  I appreciate that.  First thing Tuesday morning

14  just remind me, ladies and gentlemen, be sure to leave the

15  head sets on.

16      MR. HERDMAN:  I just was going to note for the

17  record that I've taken my head phones off at times too, but

18  I can still hear The Court's audio system, and I realize

19  Mr. Brian's talking about perhaps maybe a different part,

20  but I want to make a record that it is possible to hear at

21  least some of the audio without the head phones.

22      MR. SOFER:  What I was going to say, Judge, is

23  that the jurors have taken their head sets off occasionally

24  tends to be when the videos are playing, which, as Your

25  Honor pointed out, it's much easier.

1          MR. BRYAN:  I was referring specifically --

2          THE COURT:  He meant during the transcript.  I'll

3     simply remind jurors that while the audio portion is being

4     played, they should keep the head sets on.  I'll repeat the

5     instructions to what the evidence is.  That's a good

6     suggestion and I appreciate you following that.

7          MR. HERDMAN:  Your Honor, one last brief thing --

8          THE COURT:  Let me also say in a couple of

9     instances I've been making a note and getting a little slow

10    getting the head phones on and I couldn't hear, but you can

11    certainly hear a lot better.

12         MR. HERDMAN:  The only thing I was going to

13    mention, there are certain Arabic words are not translated

14    the word UMMA, which appears over and over again in the

15    transcripts, that is one of the words that the government

16    has suggested a stipulation on.  I understand the defense

17    is still trying to figure out what they can agree on.  I

18    think the words that we can agree on to explain to the

19    jurors.

20         MR. WHITMER-RICH:  I think we're very close to

21    sending back to you something that contains quite a bit of

22    I think --

23         THE COURT:  If you can do that over the weekend

24    and then --

25         MR. WHITMER-RICH:  I'll try to do it tonight.

1          THE COURT:  Copy me as well.

2          MR. WHITMER-RICH:  Yes.

3          THE COURT:  Okay.  Have a pleasant weekend and

4    we'll see you bright and early Tuesday morning.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/ Angela D. Nixon

7    --------------------------              -----------

8    Angela D. Nixon, RPR, CRR              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3      Testimony of Darren Griffin continued

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25