```
 1              UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION

 3  UNITED STATES OF AMERICA,    )  Docket No. 3:06-CR-719

 4          Plaintiffs,          )  Toledo, Ohio

 5             v.                 )  April 8, 2008

 6  MOHAMMED AMAWI, ET AL.,       )

 7          Defendants.           )

 8  -----------------------------

 9          TRANSCRIPT OF JURY TRIAL, VOLUME 23
             BEFORE THE HONORABLE JAMES G. CARR
10              UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:   Gregg N. Sofer
                          David I. Miller
14                        Jerome J. Teresinski
                          U.S. Department of Justice
15                        10th & Constitution Avenue, NW
                          Washington, DC 20530
16                        (202) 353-3464

17                        Thomas E. Getz
                          Justin E. Herdman
18                        Office of the U.S. Attorney
                          801 Superior Avenue, W
19                        Cleveland, Ohio 44113
                          (216) 622-3840
20
    For the Defendant     Timothy Ivey
21  Amawi:                Edward Bryan
                          Amy Cleary
22                        Jonathan Whitmer-Rich
                          Office of the Federal Public Defender
23                        750 Skylight Office Tower
                          1660 West Second Street
24                        Cleveland, Ohio 44113
                                       (216) 522-4856
25
```

```
1                              Elias Muawad
                               Muawad & Muawad
2                              Suite 209
                               36700 Woodward Avenue
3                              Bloomfield Hills, Michigan 48304
                               (248) 594-4700
4        For the Defendant
         El-Hindi:            Charles M. Boss
5                              Boss & Vitou
                               111 West Dudley Street
6                              Maumee, Ohio 43537
                               (419) 893-5555
7
                               Stephen D. Hartman
8                              Kerger & Kerger
                               Suite 201
9                              33 South Michigan Street
                               Toledo, Ohio 43602
10                             (419) 255-5990

11                             Alek H. El-Kamhawy
                               Raslan, El-Kamhway & Pla
12                             Suite 3FE
                               1700 East 13 Street
13                             Cleveland, Ohio 44114
                               (216) 928-1500
14
         For the Defendant    David L. Doughten
15       Mazloum:             4403 St. Clair Avenue
                               Cleveland, Ohio 44103-1125
16                             (216) 361-1112

17                             Jeffrey J. Helmick
                               Helmick & Hoolahan
18                             2nd floor
                               1119 Adams Street
19                             Toledo, Ohio 43624-1508
                               (419) 243-3800
20

21                             Mohammed Abdrabboh
                               1620 Ford Avenue
22                             Wyandotte, MIchigan 48192
                               (734) 283-7000
23

24
         Court Reporter:      Angela D. Nixon, RPR, CRR
25                             1716 Spielbusch Avenue
                               Toledo, Ohio 43624
```

1                         (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

1          THE COURT:  There is something you want to talk

2    to me about?

3          MR. SOFER:  Judge, there are a number of issues

4    which I thought we probably should discuss this morning

5    before beginning, and I just wanted to bring to The Court's

6    attention first from the government's perspective relates

7    to the subpoenas of Darren Griffin's bank account which we

8    understand --

9          THE COURT:  Do we have to talk about that now?

10   Can't we wait?

11         MR. SOFER:  We can wait on that.  There are two

12   issues then that I think we need to discuss before we get

13   started.  The first one is I don't know when we'll get to

14   this this morning or -- but I think we probably will get

15   with it this morning.  There's one video the government

16   intends to play where there is a transcript which we'd like

17   to hand out to the jurors.  It's a translation in English.

18   It's what's been referred to as the bomb vest video.  It's

19   the -- as I understand it, it's the only transcript which

20   counsel for El-Hindi did not object to in their motion

21   related to translation, and we think, given the length of

22   the video and the substance of the video, it's also that

23   particular video he --

24         THE COURT:  I'll hear from them.  Any objection

25   to that?

1          MR. BOSS:  Judge, the motion that I filed

2     pertaining to the translations objected to 54 of the 55

3     translations on the basis that the translations were given

4     to us in a dilatory fashion, too late for us to have an

5     opportunity to translate it.

6          THE COURT:  In a way, I disagree.  I thought

7     about this.  All three of these defendants are fluent

8     Arabic speakers.  You have potential translators sitting at

9     your side.  This isn't a case in which you have people who

10    don't know the language, and let's say they were, you know,

11    non Arabic speakers, but they had collected these videos

12    and maybe had somebody tell them -- translate them and tell

13    them what they were about, or I had included, for example,

14    Mr. Kohlmann could testify about them.  I mean, that's

15    different.  But you know, you have people right there next

16    to you who say, no, that's not what that means.  The fact

17    that it came in this morning, I assume you can sit down

18    whenever.

19         MR. SOFER:  Which it did not, Your Honor.

20         THE COURT:  I understand.  So I know we fussed

21    about that whole issue of translation for a long time but

22    this light bulb just went off in my head a couple weeks

23    ago.

24         MR. BOSS:  This is the one I didn't object to

25    because it wasn't produced to us late, so to that extent --

1          THE COURT:  So let's move on.  I'd rather talk

2     about things we have to deal with today.

3          MR. BOSS:  We didn't bring it up.  I would note,

4     however, that the defendants' ability to speak Arabic

5     doesn't necessarily help us if they don't testify.

6          THE COURT:  It can help you in telling you

7     whether the government's translation is accurate or not.

8     That's all my point is.  They can -- they were the speakers

9     whose words are being misinterpreted, mistranslated,

10    according to you.  They can say no.  This word means this

11    in that context.  And you can prepare that transcript.

12         MR. BOSS:  Thank you.

13         THE COURT:  And you can cross examine on that

14    basis.  You're right about the preparation of the

15    transcript, that's another issue.  What I may have to do

16    then is have a hearing outside the hearing of the jury to

17    confirm the integrity of the transcript.  That may cause

18    problems with cross examination for the government but

19    that's when the case is with you, and that's several weeks

20    away.

21         MR. SOFER:  The rest of my issues, Judge, we can

22    do later.  I just ask Your Honor to keep a little bit of

23    time for us today to discuss these issues.

24         THE COURT:  I will at 4:30.

25         MR. SOFER:  Very well.  We're ready to proceed.

```
 1              THE COURT:  Okay.  I'm told I have something at

 2   4:30 so we'll do it at 5:00.

 3              Good morning.  And we're ready to resume.

 4   Mr. Sofer, if you'll call Mr. Griffin to the stand.

 5              MR. SOFER:  Yes, Your Honor.

 6              THE COURT:  Of course you remain under oath.

 7              THE WITNESS:  Yes, sir.

 8   BY MR. SOFER:

 9   Q.        Good morning, Mr. Griffin.

10   A.        Good morning.

11   Q.        I want to go back to October 14th, 2004 before we

12   keep going today.  I direct your attention to what you

13   testified previously was a meeting at Mohammed Amawi's

14   apartment.  And we're going to start by playing clip 10A-2.

15              THE COURT:  Ladies and gentlemen, why don't you

16   go back upstairs, at least you can relax up there instead

17   of sitting and watching us looking at blank screens.

18              Mr. Griffin, you may step down.

19                   (Jury exited the courtroom.)

20              THE COURT:  I want the government to prepare

21   transcripts the old fashioned way so that we don't have

22   this problem.  I know it's going to cost a lot more and be

23   inconvenient, but who knows how much more time we're going

24   to lose because of this system not functioning and people

25   not getting it right.  And I assume the only reasonable way
```

```
 1    for the video is to have the transcription viewed by the

 2    jury.

 3              MR. SOFER:  One of the only reasons.  The other

 4    reason is that, as The Court can see, we've interwoven the

 5    video evidence --

 6              THE COURT:  I understand that.  But at least for

 7    the transcripts --

 8              MR. SOFER:  We can do that.  We'll have to make

 9    lots of copies or.

10              THE COURT:  Let's see what we can do in terms

11    of -- the government's going to start paying for it.  We're

12    going to have a back-up screen in the building.  It's going

13    to be here.  I don't care what it costs, we're not going to

14    put up with this anymore.  So go ahead and order the

15    screen.

16              MR. HERDMAN:  Your Honor, I did have special

17    agents last week and I did go ahead and reach them out to

18    Perrysburg to the aud -- I'm sorry, Your Honor, Dave

19    Spinionich (phonetic) had called the audio visual people in

20    Perrysburg, and I have a quote from him on my computer.  I

21    can pull that up.

22              THE COURT:  Let's just call them if they have a

23    screen that's compatible that can play this to the jury and

24    another one that can display it to defendants, go ahead and

25    get it and have it in here.  It's going to be set to go.
```

1    If it costs $100,000, I don't really care, okay.

2             MR. HERDMAN:  Is there someone on The Court staff

3    that he should coordinate with to give that information to?

4             THE COURT:  Get me John Bianco on the phone or

5    just give me his number and I'll go back and call him right

6    now.

7             I just spoke with our IT director, he claims

8    there's a back-up available that will do as well as the

9    screens will do.  I don't know what it is.  I told him by

10   10:00 I want confirmation that's the case.  In the

11   meantime, find out from the agent, make the contact, make

12   the call, set it up and at least have whoever it is ready,

13   I want to know when they can be here and what it's going to

14   cost.  I want two screens the way we had during opening

15   statements.  It's hardly ideal, but if that's the best we

16   can do, that's the best we can do.

17            MR. HERDMAN:  And Your Honor, my understanding is

18   that right now counsel's monitors are all working, it's

19   just the jury box that's having difficulty.  I've given --

20   we've relayed Mr. Bianco's contact information to Dave

21   Spinionich, and he's going to be in contact with Mr. Bianco

22   directly.

23            THE COURT:  Okay.  All right.  Let's turn to

24   the -- you can be seated.  Let's turn to the other issues

25   that we have.

1          MR. SOFER:  Judge, we have, again, just a number

2    of housekeeping matters, I think at this juncture.  One is

3    the, as I said the subpoenas of the -- of Darren Griffin's

4    checking accounts.  And our concern is simply one of safety

5    for Mr. Griffin.  If to the extent that they were properly

6    subpoenaed -- and I'm not entirely clear in my own mind

7    whether or not that's an appropriate thing to do in this

8    case given the disclosures that have already been made.

9    The governments concerned about simply his safety.

10   Obviously from looking at somebody's checking account, you

11   can tell all kinds of things about them, their family.

12         THE COURT:  Why don't we do this.  Again,

13   assuming that the subpoenas are properly issued, let's make

14   them returnable to counsel only for now and then you see

15   what they are and you can talk with each other.  If they

16   are -- if there is -- if there are documents ultimately

17   that you desire to display, you can do some redaction, I

18   would assume, addresses and so forth, Social Security

19   numbers and that kind of thing.  I mean, is that headed in

20   the direction that you're concerned?

21         MR. SOFER:  It is.  And again, if we were to look

22   at The Court's -- I probably better pick myself instead.

23   If we were to look at my checking account, as dismal as it

24   may be, you'd be able to see essentially close to where I

25   live, you'd see where I go, you'd see my family members.

```
 1          THE COURT:  I understand.

 2          MR. SOFER:  That's really --

 3          THE COURT:  If you were to see mine, you would

 4   see the words overdraft protection.

 5          MR. SOFER:  So this, of course -- this is what

 6   the government's concern is.

 7          THE COURT:  I understand.  Let's find what they

 8   are, assuming -- and go from there, okay.

 9          MR. HARTMAN:  I did get some returned already

10   that frankly I treated under the protective order about his

11   identity information.  I'll share with the government

12   whatever we need to do to protect this file.

13          THE COURT:  I think I can envision you're

14   interested in what comes in and to some extent some of the

15   expenditures, but I think that's a fair thing to call to my

16   attention.

17          MR. SOFER:  The second issue is more significant

18   in some ways relates to the stipulation which we've now

19   sent out, I think in excess of 70 proposed stipulations to

20   counsel.  Of those 70 stipulations, they've come in

21   essentially to me in variety.  One is for evidentiary

22   issues, business records and the like.  Mr. Herdman can

23   break down for you, Your Honor, the specifics of what

24   counsel has agreed to stipulate to.  I think in that area

25   they've stipulated to quite a few records but not all of
```

```
 1    them which we'll -- of course ones that they did not

 2    stipulate to.

 3              THE COURT:  Well, let's be specific.  What has

 4    not been stipulated to in terms of documentary or other

 5    evidence?

 6              MR. SOFER:  One moment, Judge.

 7              THE COURT:  That's fine.

 8              MR. SOFER:  I'll let Mr. Herdman do this, he's

 9    far ahead of me.

10              THE COURT:  Take the middle man out of it.  Let's

11    go directly to the source.

12              MR. HERDMAN:  Generally most of the evidence

13    stipulation, my understanding is all of the records that

14    have been proposed, counsel is -- will stipulate to their

15    authenticity.  If I'm incorrect by that --

16              MR. HARTMAN:  I don't think so.

17              MR. HERDMAN:  In terms of the business records, I

18    don't think we had any disagreement.  The business records

19    we're in agreement on?  You'll --

20              MR. BOSS:  I sent you the exhibit list.

21              MR. HERDMAN:  There were a couple of just --

22    there was an Exhibit 121 which is a letter from Zaim on AZ

23    Travel letter head.  There will be no stipulation as to the

24    chain of custody on that particular item.

25              THE COURT:  A letter?
```

```
 1             MR. HERDMAN:  It's a letter dated August.
 2             THE COURT:  Is he going to be a witness probably?
 3             MR. HERDMAN:  There will be a witness.
 4             THE COURT:  Is he going to be a witness being the
 5  author of the letter?
 6             MR. HERDMAN:  Not at this time.
 7             THE COURT:  Not on the government's part anyway?
 8             MR. HERDMAN:  No, Your Honor.
 9             THE COURT:  And what's the issue with -- if I may
10  ask, what's the problem with anyone -- you're seeking
11  stipulation that it's simply authentic.  It is a letter
12  that was sent by him and those are the contents on the
13  date?
14             MR. HERDMAN:  It was never mailed, Your Honor.
15  It was a letter that was provided to Mr. Griffin and
16  Mr. Amawi.
17             THE COURT:  Okay.  But communication --
18             MR. HERDMAN:  Correct.
19             THE COURT:  What's the problem?
20             MR. BOSS:  Mr. El-Hindi was not involved in the
21  transaction.  We have no awareness of it.
22             MR. HARTMAN:  That one wasn't our objection, I
23  don't think.
24             THE COURT:  I mean, does anybody have any
25  bonafide contention that this is a fake?  I'm sorry, folks,
```

1   that's my bottom line.  If you can say to me, Judge, you

2   know, I don't have the common law mindset that everything

3   has to be proven to be authentic beyond a reasonable doubt.

4   If you have some reason to think it's a fake or it was

5   never written or whatever, then fine.  We'll hold a little

6   voir dire on that.

7           MR. HARTMAN:  Judge, I will tell you I don't have

8   any confirmation on who actually prepared the letter, if it

9   was Mr. Zaim or not.

10          THE COURT:  We can voir dire him, folks.

11  Subpoena him in and I'll voir dire him if there's a real

12  question as to that.

13          MR. HERDMAN:  Your Honor, I think we might be

14  able to work out this particular exhibit perhaps if not --

15          THE COURT:  So everyone understands, if someone

16  says look, Judge, it's our understanding that this letter

17  was never created or communicated, that's one thing.  But

18  if somebody can't say, Judge, we have reason to --

19          MR. HERDMAN:  I --

20          THE COURT:  I'm not going to be looking at my

21  record.

22          MR. HERDMAN:  The way the stipulation's --

23          THE COURT:  Or -- go ahead.

24          MR. HERDMAN:  The way that the stipulation has

25  been proposed to counsel is that they've reserved the right

1  to object to the admissibility on relevance grounds or any

2  other grounds.  This strictly goes to authenticity or

3  custody.

4          THE COURT:  Yeah, it's foundation.

5          MR. HERDMAN:  And we do -- in relation to this

6  particular Exhibit, Your Honor, I believe as the case goes

7  forward, you're going to hear actual consensual recordings

8  that relate directly to the creation of this letter.  So if

9  counsel wants to wait to readdress this at that time, we'd

10  be happy to do so.  There are photographs, Exhibit 134,

11  photographs of Mohammed Amawi labeled 134A through 134G.

12  Those, I believe, are photographs of Mr. Amawi on the plane

13  that were the subject of -- they were introduced during the

14  suppression hearing.  And there have been -- we proposed a

15  stipulation as to the authenticity of these photographs.

16  There's been no agreement as to those particular exhibits.

17          MR. WHITMER-RICH:  I suppose that may have been a

18  slight misunderstanding.  We would stipulate as to

19  authenticity of those photographs.  Misunderstanding, Your

20  Honor.

21          THE COURT:  No problem.

22          MR. HERDMAN:  And Exhibits 141 through 147, all

23  of those relate to property recovered from Mr. Amawi's

24  home, camouflage pants, military web belt and the knives

25  and swords, and we would just propose a stipulation as to

1    the authenticity of --

2              THE COURT:  Yeah, these are items that were

3    discovered on whatever day and where they were discovered.

4              MR. HERDMAN:  Correct.  Well, that's --

5              THE COURT:  I assume this is through a search

6    warrant?

7              MR. HERDMAN:  Yes, Your Honor.

8              THE COURT:  As to which there was --

9              MR. HERDMAN:  There's also an evidence recovery

10   log, which is Exhibit 149.  There's been no stipulation.

11   We would propose a stipulation to Exhibit 148, which is the

12   photographs and search warrant documents relating to -- we

13   would propose a stipulation as to Exhibit 148, which is the

14   photographs and sketch of 7 Shaftesbury, and 149 which is

15   the evidence recovery log from 7 Shaftesbury.

16             THE COURT:  Again, that's the part -- was all of

17   that related to the search, were the pictures -- pictures

18   taken during the search?

19             MR. HERDMAN:  Yes, and defense counsel had

20   proposed redactions to certain photographs so that there --

21   the search was executed, there were actual knives hanging

22   on the wall for 7 Shaftesbury and defense counsel has

23   objected to -- they won't stipulate to any photographs

24   containing those knives.

25             THE COURT:  Again, we're talking about

1   authenticity, we're not talking when the photographs were

2   taken, those objects were in the location that they're

3   depicted being in.

4          MR. WHITMER-RICH:  We will stipulate to

5   authenticity to that, yes.

6          THE COURT:  If -- any objection to the

7   admissibility to any testimony, pictures or whatever?

8          MR. HERDMAN:  Just to clarify, Your Honor, that

9   goes to the physical exhibits as well as the knives and

10  swords.

11         MR. WHITMER-RICH:  Yes.

12         THE COURT:  That's the question, okay.

13         MR. BOSS:  As does defendant El-Hindi on this

14  series.

15         MR. HERDMAN:  And I think the last exhibits, 194,

16  195 and 196, those relate to Bureau of Prisons phone

17  records relating to all three defendants.

18         THE COURT:  Are those recordings or are they

19  simply like pen register, numbers dialed?

20         MR. HERDMAN:  Pen registers, Your Honor.

21         THE COURT:  Okay.  Again, it's authenticity only,

22  right?

23         MR. HERDMAN:  Correct.

24         MR. HARTMAN:  Judge, we're going to have to talk

25  about that one.  We'll get back to you on that.  We may

```
 1    have a problem, we may not.

 2              THE COURT:  To authenticity.

 3              MR. BOSS:  Judge, we don't unfortunately know the

 4    process by which the calls were actually recorded and

 5    attributed to a particular defendant.  I -- it's not that

 6    we're trying to quibble about it.

 7              THE COURT:  I understand.

 8              MR. BOSS:  We just aren't aware.

 9              THE COURT:  It is -- it is the connection between

10    the number called and the particular caller.

11              MR. HARTMAN:  Correct.

12              THE COURT:  I understand.  That's El-Hindi,

13    information is but a phone call away.

14              MR. HERDMAN:  So just to sum up, Your Honor, I

15    guess the only outstanding items are Exhibits 121 and

16    Exhibits 194, 195 and 196.  I think we've reached an

17    agreement on everything else.

18              THE COURT:  Which were those?  Are those the

19    phone --

20              MR. HERDMAN:  194, 195 and 196.

21              THE COURT:  Are the phone records.

22              MR. HERDMAN:  And the letter.

23              THE COURT:  Anything else that we need to talk

24    about?

25              MR. HERDMAN:  Your Honor, relating to proposed
```

1  stipulations, government has proposed a list of

2  stipulations related to names, terms, places.  Defense

3  counsel got back to us with some suggested edits.  The

4  original list from the government included 77 terms, names,

5  places.  And of those 77, we have no disagreement as to 22

6  of those 77.  Most of the ones that we don't -- we don't

7  disagree or that we're in agreement on relate to geographic

8  locations, cities in Iraq.

9      THE COURT:  That you don't disagree on -- that

10  you agree.

11      MR. HERDMAN:  That we agree on.  And there are a

12  few Islam specific terms that we do agree on.  The others I

13  think we're going to have to try to work some of these

14  things out.

15      THE COURT:  Well, why don't we talk about that

16  now.  We've got the time.

17      MR. SOFER:  Judge --

18      THE COURT:  If you'd rather not, that's fine.

19      MR. SOFER:  If I may, we can go through these and

20  I think we certainly should, but I think this highlights

21  the -- one of the continuing issues that the government's

22  been bringing to The Court's attention, which is many of

23  these terms are sort of in the crux of the government's

24  case, Jihad being one of them.  And we -- if you look at

25  what we've said versus what the defense proposed, you'll

1    see, and it will be clear to you, I understand why it is we

2    disagree on this and why a stipulation would be very

3    difficult to arrive at here.  My view is --

4              THE COURT:  Let me interrupt.  The geographic

5    locations, that's easy.  I can take judicial notice.

6              MR. SOFER:  You could, Your Honor.

7              THE COURT:  Even without a GPS, I can take

8    judicial notice.

9              MR. SOFER:  I would have been shocked if someone

10   was not willing to stipulate to --

11             THE COURT:  In fact, that is in Iraq, I

12   understand.

13             MR. SOFER:  It's not controversial.

14             THE COURT:  With regard to terms, in other words,

15   translations.

16             MR. SOFER:  I'm sorry to interrupt, Your Honor.

17   It's not translations, per se, some of it is.

18             THE COURT:  Meaning?

19             MR. SOFER:  Indeed.

20             THE COURT:  With regard to that, let me just

21   propose if you're not able to agree -- to the extent that

22   you aren't, that either you call a witness to testify that

23   in the presence of the jury that can read Arabic and have

24   him say, ladies and gentlemen, for your understanding, the

25   government's position is these terms mean this.  And I'll

1    let the defendant, when its time comes, do the same thing.

2    I think -- make clear that there is dispute and

3    disagreement about that and when the case is with the

4    defense, if they desire to do so, they may present evidence

5    that expresses their understanding of what these terms

6    mean.  I assume that the third category then is people or a

7    category or tell me what the other just general --

8    generically what the categories are, other categories.  But

9    anyway would that --

10         MR. SOFER:  It would to the extent that you said

11   qualified to speak Arabic, some of these things really

12   don't require that, per se, but, yes, I think that's --

13         THE COURT:  I'm trying to be with the Arabic, the

14   interpretation of where that Jihad or Fatwa or whatever

15   we're talking, okay.

16         MR. SOFER:  I guess I would say you have to.

17         THE COURT:  Let me jump ahead of what I think

18   you're -- I don't think I have a problem with having

19   Mr. Kohlmann come in and testify who Al-Zawahiri is or was,

20   who various people are and with probably some sort of

21   limiting instruction as to his testimony presented for

22   general background information so that, the government's

23   perspective this is their view who these people are.  I

24   mean, he's qualified to do that.  I think the point you

25   keep making is that, Judge, we have to have somebody tell

```
 1   them, and he clearly is, in my view, capable to do so.  It
 2   would be pretty straight forward, not elaborate, this is an
 3   area of academic or quasi academic inquiry on your part,
 4   happens a half dozen years or decade or whatever.  And you
 5   will want to very carefully contain in terms of showing the
 6   kind of work that he does.  I wouldn't want to go into all
 7   of his consultantships and testimony and all that simply
 8   saying he knows what he's talking about in that regard that
 9   he's essentially, quote, a student of various movements of
10   this sort with particular reference to places like
11   Afghanistan and Middle East or whatever is relevant in
12   terms of the people.  And so and so Zawahiri was born
13   wherever he was born.  He was engaged in the kind of
14   activities in Al-Queda and Iraq, whatever it was.  Current
15   understanding from whatever until he was killed by American
16   forces --
17          MR. SOFER:  If you look at our stipulation, I
18   think that's almost verbatim what we were trying to get.
19          THE COURT:  I didn't get ex parte, folks, okay,
20   to the extent you may duplicate what they're saying.  But
21   again, and I think Mr. Kohlmann is an appropriate witness
22   for that.  I think our concerns are that the more he tries
23   somehow to suggest a connection between these defendants
24   and particular movements or whatever, that's where --
25          MR. SOFER:  And again, I understand The Court's
```

1  concerns about that, although I would just ask The Court as

2  we go along if we ever go along again, I hope we will this

3  morning, I just ask The Court to put yourself in the place

4  of the jurors.

5          THE COURT:  That's what I'm signaling to you,

6  subject to what they have to say that I'm inclined to let

7  that information be communicated in that fashion.

8          MR. SOFER:  Understood, Your Honor.

9          THE COURT:  And I can understand that's a

10  disagreement and it's up to the defense to come back when

11  the case is with them, you know, Zawahiri was a Sunday

12  school teacher, whatever.  Okay.

13          MR. SOFER:  Exactly Judge.

14          MR. HARTMAN:  Judge, I can speak for the El-Hindi

15  team at least.  I can't speak for anybody else.  We didn't

16  expect that the government would say, okay, you're right.

17  We expected a little back and forth on a lot of these

18  things and are certainly willing to continue the process to

19  talk about what things mean and what they don't.  I mean,

20  we've -- we believe that some of the things that we

21  suggested we have some authority for, and -- and we would

22  undertake some back and forth on.  So it isn't our

23  expectation that this --

24          THE COURT:  That's fine.  I think some of this we

25  better get done pretty soon only because they're hearing

```
 1   these terms, the fact that we may have well have done this

 2   before we started hearing some of the terms, that's all.

 3   So I had, in my mind's eye sometime this week saying, by

 4   the way, ladies and gentlemen, you've heard different terms

 5   and you'll hear some more and the parties agree, whatever

 6   you want.  I'm going to let the government -- if you can't

 7   agree, I'm going to say, okay, fine, when your turn comes

 8   you can bring somebody in.  That's all.

 9             MR. HARTMAN:  We'll endeavor to try to work that

10   out.

11             MR. SOFER:  I wonder whether The Court and

12   counsel to the extent we can agree -- I don't think we're

13   going to agree on everything, but to the extent we can

14   agree, consider giving the jurors in their books --

15             THE COURT:  That's what I anticipate.  And if

16   they have your version, I'll make very clear, ladies and

17   gentlemen, this is what the government says this is.

18             MR. SOFER:  We can do this with the stipulated,

19   certainly with the stipulated terms.

20             THE COURT:  Sure.

21             MR. SOFER:  That should not be --

22             THE COURT:  I had -- that's -- in my mind's eye

23   in thinking about this, I thought we should just let them

24   put them in their books just like a glossary, their own set

25   of terms.
```

```
 1          MR. SOFER:  Exactly.

 2          THE COURT:  Okay.  Are there generic categories

 3    that I haven't --

 4          MR. SOFER:  No, we've talked about all of them.

 5    The only thing that The Court is -- has reservations about

 6    that we haven't really touched upon continues to be these

 7    web sites, and I'm not going to beat this dead horse

 8    anymore, but I will, again, ask you to listen to -- as we

 9    go through the case, I think it will become more apparent

10    why it is that the issue of intent and the issue of exactly

11    what a particular website stands for, what it is, whether

12    it was CNN versus something that was run by, visited by

13    and --

14          THE COURT:  Well, you know, there was these all

15    colossal, whatever it was, I can't remember.  I get

16    something called -- after a batting series, an update on --

17    and that would be good evidence and pay attention to the

18    Red Socks.  It does seem to me the same thing that with

19    regard to at least that where somebody is signed up for a

20    particular service that I'm not ruling that I can see, and

21    there was at least one of those.  The other, remind me

22    again, a couple others --

23          MR. SOFER:  Again, I will propose that we be

24    able -- this is something I think that The Court should

25    rule on as you hear the testimony.  Because I think -- I
```

```
 1    think it's glaringly obvious what it is.  There's about

 2    five or six all together web sites where the defendants

 3    either -- they either accessed them in order to find the

 4    kind of video materials, some of which we've already played

 5    for the jury, more is to come on that, there were these

 6    Yahoo groups like Your Honor has just said.  For instance,

 7    I think Mr. El-Hindi subscribed to Islamic Army in Iraq

 8    Yahoo group.  I'm sure I butchered that in some way, shape

 9    or form, but that's part of the title of the Islamic Army

10    in Iraq.

11            THE COURT:  See, with -- that seems to me -- I'm,

12    at most, approaching getting on the fence about this.  To

13    some extent, something like that, it seems to me you'll

14    have evidence, I gather, that that was the name of the web

15    sites and that it was visited.  I mean --

16            MR. SOFER:  I don't --

17            THE COURT:  I'll listen to the evidence.  I'm

18    not -- despite my ruling, my mind is not closed.  I'm not

19    saying, Mr. Sofer, you mention that one more time and

20    you're going to spend some time next door.  I'm not saying

21    that.

22            MR. SOFER:  That's what I'm hoping to avoid, Your

23    Honor.

24            THE COURT:  Something like that.  Again, it seems

25    to me it may well be appropriate to have someone, probably
```

1   Mr. Kohlmann come in and say Eckhlaas, when it's not

2   apparent, is somebody who's paying attention what it is,

3   then I think you're right, you need somebody to translate

4   that, you know, quote, so that people understand that this

5   is -- you know, this is not the Drudge report or whatever,

6   it isn't something other than that.

7            MR. SOFER:  And then again, I would prefer to let

8   the evidence speak for itself here, Judge, in making this

9   argument.  I've made it enough times.  I think like a lot

10  of things it's only clear when you actually see tapes and

11  hear it.  And here I believe -- I think this will only get

12  clearer to The Court as we proceed.

13           MR. HARTMAN:  Judge, in response I would say,

14  number one, if it's an issue of what web sites people went

15  to, that's for a forensic computer examiner.  The

16  evidence -- you've heard the tapes of the defendants

17  talking about what they see on the website and frankly,

18  what their understanding is is much more important than

19  what Evan Kohlmann or anybody else said.

20           THE COURT:  It does make a defense when somebody

21  signs up to get e-mail updates or whatever, I understand

22  what happened with at least that -- that one particular

23  website.

24           MR. HARTMAN:  And I think there will be exhibits

25  from the government about this IAI Iraq groups and Yahoo

```
 1    groups.  I would like fair warning, I believe The Court's

 2    decision was based primarily on relevance and there's a

 3    whole host of other issues.

 4              THE COURT:  I'm not going to say call

 5    Mr. Kohlmann.  I'm going to say we're going to talk about

 6    this.  But I do understand some -- the problem that they

 7    face, I mean, it's -- it may be sliced pretty thin, and

 8    I -- I remain concerned about the general relevance of --

 9    of Rule 403 issue.  I haven't changed my mind.  I'm

10    thinking about it.  That's all.  I've got some good news

11    and bad news.  Okay.

12              MR. SOFER:  Lastly, Judge --

13              THE COURT:  Go ahead.

14              MR. SOFER:  Sorry.  There is an issue of

15    transcripts, and I just want to say for the record that the

16    government continues every day to pour through our

17    transcripts to find any transcription errors or ability

18    questions, and we've been sending any changes we get to the

19    defense as soon as we either see, found or made them.  I

20    think that will continue.  And I apologize to counsel that

21    that's true, but I guaranty if you listen to these tapes

22    100 times, each time you listen to them you will find

23    something else that needs to be addressed.  So we're

24    continuing to do that.  I just want to reiterate our

25    concern that although we're starting to get some
```

1    transcripts from the defense, particularly Mr. El-Hindi,

2    it's -- unlike the government which was forced to designate

3    those transcripts and even those portions of transcripts

4    which it was going to use in its case, that hasn't happened

5    yet.  If we continue on the pace we are this morning then

6    it won't matter too much, but the bottom line is I just

7    want you to know, Your Honor --

8              THE COURT:  I think that it's fair that you have

9    notice or at least two weeks in advance roughly of this

10   segment so you can designate --

11             MR. SOFER:  I think the government designated no

12   less than five or six months in advance those which it was

13   going to use.  Despite what people may think or read in the

14   newspaper, we do not have unlimited resources, particularly

15   when it comes to something like this.  I actually think the

16   defense probably has more resources than we do in this

17   regard, maybe a couple others in this case.  But the bottom

18   line is two weeks, Judge.  Depends on the volume, of

19   course, of transcripts if two week is more than enough.  If

20   they're going to use 30 transcripts, then we're in a great

21   deal of trouble whether they're -- you know obviously we've

22   done the --

23             THE COURT:  Are you presently in a position to

24   give some indication or not in terms of -- principally the

25   volume of stuff.  It's all worked -- to some extent any

```
 1   defense in any criminal case is a constant work in progress
 2   because you are formulating what you're likely to be doing,
 3   and you don't really know until the time comes to start
 4   doing it to some extent.  But to a certain extent that's
 5   not so.  But nonetheless, but my general question to you is
 6   you guys have a sense of how much we're talking about, 3,
 7   30 or 300?
 8            MR. HARTMAN:  We have some sense on some of it,
 9   and to borrow a phrase from the government, we gave them a
10   road map in opening statement of exactly what we intend to
11   play that we believe is defense oriented.  The rest of it
12   is going to depend on what the government's case is.  We're
13   doing our best to try to give them the transcripts that we
14   have.  Mr. Getz and I traded e-mails yesterday and he said,
15   look, even if you have to overestimate what you're going to
16   use, we're trying to make those decisions as we go.  And
17   just like the government is giving us different
18   transcripts, you know we've got other --
19            THE COURT:  Let me only say I'm going to make
20   sure that whatever you give them in that regard, they have
21   ample time to be prepared to proceed.  I'm not going to be
22   happy if that means taking a two-week hiatus in the trial
23   because of delay.  Though I do understand to some extent
24   it's tactical.  You laid the cards out, Mr. Masloum as he's
25   entitled to has not, and that's fine.  And to some extent
```

1   there's probably cards that you haven't turned over and

2   hold them and that's fine too.  I understand all of that.

3   But certainly to the extent that you presently know,

4   reasonably anticipate, yes, these are things that we

5   presently expect.  We will update.  Even if they are wildly

6   out of chronological order, that's fine.  They don't really

7   care.  That's all.

8            MR. HARTMAN:  That's fine, Judge.

9            THE COURT:  If you can't --

10           MR. HARTMAN:  And if we can, we will.  And to

11   the -- we don't intend to hide the ball.  It's not the kind

12   of case that --

13           THE COURT:  I understand.  I also understand that

14   there are, to some extent, tactical considerations that

15   would cause you to want not to be entirely forthcoming, not

16   to lay all your cards out.

17           MR. HARTMAN:  At times.

18           THE COURT:  A couple of old cards that you want

19   to keep hidden until the pot's full and, you know --

20           MR. HARTMAN:  And much like the government's,

21   Mr. Sofer's right about six months ago they told us these

22   are 33 transcripts we're going go be using, well that

23   changed to 53 and 57 and we understand that.

24           THE COURT:  Mr --

25           MR. BRYAN:  Your Honor, just from the Amawi team

1    perspective, what I would submit is that we aren't on equal

2    footing.  I don't think any of the defense are on equal

3    footing with the government because the government's own --

4    that the government has literally been working with since

5    the beginning of their investigation -- not the beginning

6    of the indictment but since the beginning of the

7    investigation.  Quite frankly, I was a little bit shocked

8    that the government didn't know their evidence a little bit

9    better at the time.

10           THE COURT:  No, what they're talking about is

11   where there's disagreements with translations.  I think,

12   Mr. Sofer, that's all you're talking about.

13           MR. SOFER:  Yeah, we -- we're --

14           THE COURT:  Yes or no?

15           MR. SOFER:  Yes, Judge.

16           MR. BRYAN:  Okay.

17           THE COURT:  That's all we're talking about.  And

18   I think it's fair for them.  If you know there are

19   particular segments, particularly the evidence that the

20   government has put in and you know now that you are going

21   to say you're going to bring in a translator that says, no,

22   that term means this, it's entirely fair for you to go

23   ahead and notify the government of that today.  That's all.

24           MR. BRYAN:  That narrows it down, Your Honor.

25   What I was concerned is that somehow we have to provide to

1    the government everything that we intend to play.  There

2    are things that the government -- government chose not to

3    play that obviously we may for defense purposes.

4         THE COURT:  To the extent that they know that, to

5    the extent that you made that clear in opening statement,

6    and also, quite candidly, absent a tactical reason to turn

7    the card over, to the extent that you know and the

8    government knows that you are likely to be presenting some

9    evidence, give them your translated version -- that's

10   all -- and your transcribed version.

11        MR. BRYAN:  There are some tapes that weren't

12   transcribed by the government that we believe are relevant

13   that aren't even in Arabic.  They're -- they're tapes of

14   all of Mr. Griffin when he speaks.

15        THE COURT:  That's fine.  That's a lot easier, I

16   assume.  I mean, even so, I'm going to want them to have

17   those at least a week or couple weeks in advance of your

18   playing them.  I really -- I don't want to get into a

19   situation where they stand up and say, Judge, we just got

20   43 transcripts totaling 800 pages and we've only seen 40

21   taken of this stuff and we disagree with a lot of it and we

22   need a couple of weeks to go through it.  That's what I'm

23   saying.

24        MR. BRYAN:  We're still receiving that

25   information too, Your Honor.  It's not like we have it in

1    storage somewhere.

2           THE COURT:  I understand that.  That's what I

3    tried to say at the outset of this colloquy.  I know that a

4    defense plan, as conceived on the first day of trial much

5    more often than not in its execution is vastly different

6    because you don't know what the government's going to put

7    in.

8           MR. IVEY:  Your Honor, I just want to ask a

9    question that would aide in this process.  When the

10   government is concluded with their direct examination of

11   Mr. Griffin, what is The Court's thought on what is a

12   reasonable gap in between the finish so we kind of know?

13          THE COURT:  If we conclude Mr. Griffin at 3:00 on

14   Friday, a reasonable gap would be until Tuesday at 8:30 in

15   the morning.  If we conclude Mr. Griffin at 3:30 on

16   Tuesday, it might be a day or two, okay.

17          MR. IVEY:  Okay.

18          THE COURT:  You'll have time.  I'm not going to

19   say Mr. Ivey, your witness.  I'll say -- I'll hear you guys

20   out and say, Judge, 3:30 Tuesday afternoon, can we at least

21   have to Thursday morning or Thursday noon to prepare, or

22   less time if you want.  Okay.  Other things that we --

23          MR. SOFER:  I think that's it from the

24   government's standpoint, Judge.

25          MR. HARTMAN:  We'll try to come up with something

```
 1   later, Judge.
 2          THE COURT:  Okey dokey.  Okay.  I'm going to step
 3   down, and, Angela, you can do likewise.  And Amy, can you
 4   try to get an update and let people know?
 5          MR. WHITMER-RICH:  I'm sorry, briefly one issue.
 6          THE COURT:  Sure, go ahead.
 7          MR. WHITMER-RICH:  We had talked about trying to
 8   get phone records from -- from our client's land lines and
 9   that sort of thing with the government a couple weeks ago
10   and suggested --
11          THE COURT:  I think I said subpoena the company.
12          MR. WHITMER-RICH:  Indeed and we have pursued
13   subpoenas.  The responses to date is that it will be a very
14   lengthy process to get those.  It requires sending out
15   notice to other customers and waivers from them, I'm not
16   sure exactly what's going on.  And the cost is
17   approximately $10,000.  And we're simply --
18          THE COURT:  For just his phone records?  You
19   may -- if I contact Verizon and say please print out --
20          MR. HERDMAN:  Your Honor, we ran into the same
21   problem as we were going through this.  In order to get the
22   local call detail, there is a surcharge of -- of I believe
23   it's 25, it may even be more than that per day and that's
24   why -- that's why.
25          THE COURT:  $25.
```

1          MR. HERDMAN:  $25 per day.

2          THE COURT:  In other words, in effect, pen

3     register information, the phone company equivalent if I

4     call my wife at her office here in Toledo, they actually

5     have that record.

6          MR. HERDMAN:  They do have it.  They have -- what

7     you can get very easily are the long distance calls and

8     billing information.  The local call detail is much more

9     difficult to get and that's why we've provided counsel with

10    what we have in terms of local call detail.  We only got it

11    for the days we were interested in, particular dates that

12    were relevant to our case.  So counsel should have that for

13    those particular dates.

14         THE COURT:  About how many days total?

15         MR. HERDMAN:  I think it was maybe six or seven

16    and they were all April and March of '05.  So what I can --

17    the only thing I can recommend is counsel doing the same

18    thing we did is pick particular days that would be of

19    interest.

20         THE COURT:  I thought I knew a lot about this

21    stuff.  I didn't know they could retrieve that.

22         MR. HERDMAN:  My understanding is they actually

23    have to go into a tape or reel or something and pull the

24    information out of it, that's why it costs $25 per day.

25         MR. WHITMER-RICH:  We simply renew our request

```
 1   to -- that the government provide us the records that they
 2   had.
 3            MR. HERDMAN:  We have, Your Honor.  They're in
 4   our exhibit books and on the list.
 5            THE COURT:  And with -- let me know -- let me
 6   know promptly what more you need, what the company or
 7   companies are telling you in terms of time.  I'm more
 8   concerned about that than cost.  The cost is the cost.  But
 9   in terms of time, if there's anything I can do in terms of
10   moving your request, and there probably aren't that many
11   requests.  It may simply be a matter of getting the work
12   done.  Did they tell you how long?
13            MR. WHITMER-RICH:  They said it would not be done
14   before April 21st.
15            THE COURT:  That's a couple weeks.  Why don't you
16   try and -- I mean, I would assume that the more that you
17   can narrow that down, the more quickly you can get it.  I
18   thought you were talking a couple months or whatever.
19   Okay.
20            MR. SOFER:  Judge, what do you want us to do,
21   hold our --
22            THE COURT:  I want Amy -- Mary Lee.
23                 (A brief discussion was had off the record.)
24            THE COURT:  Please find out about the information
25   on the back-up system.  This is twice in a week.  I don't
```

```
 1   care what it costs.  Let's at least find out.

 2           MR. HERDMAN:  I'll double check the -- my

 3   understanding is we've been in touch with Mr. Bianco and

 4   hopefully we can get that.  We do have an update.  Hot off

 5   the press I guess, there was a verbal quote -- do you want

 6   me to get into the figures here right now, Your Honor?

 7           THE COURT:  I suppose that's fine.

 8           MR. HERDMAN:  Let's --

 9           THE COURT:  All we're talking about is renting

10   the screens but that's neither here nor there.

11           MR. HERDMAN:  There's a sound system, I don't

12   know that we need to concern ourselves with that right now,

13   but in terms of three, 42-inch monitors for the jury, this

14   includes seven, 19-inches monitors for defense, prosecutors

15   and judge, I don't know that we need that but this would be

16   the full back-up system, that would be $4,700 a month for

17   the rental, one day to set up and test, and I think

18   we're -- I think we might need to just tweak this request a

19   little bit to find out about the 42-inch monitors.

20           THE COURT:  That's what I'm talking about is just

21   the setup that we had during opening statement.

22           MR. HERDMAN:  And I can't imagine why that would

23   take a day to set up, but, again, I don't know.  I'll make

24   sure we're on the same page.

25           MR. SOFER:  Judge, one of the marshals said to me
```

```
 1    on the break, I think correctly so, that no one's really

 2    using this big monitor back here.  Now, if you --

 3                    (A brief discussion was had off the record.)

 4                    (Jury brought back in at 10:37 a.m.)

 5              THE COURT:  Ladies and gentlemen, I want to

 6    report to you I just sent the following message, Houston,

 7    all systems are go.  Let's give it a try.

 8              MR. SOFER:  I'll start the countdown, Judge, and

 9    we can all hold our breath.

10              One thing I'll say, ladies and gentlemen, that

11    there's about a two or three second delay from the time you

12    turn it on and actually start hearing something.  So it may

13    seem like to doesn't work.  So if you just give it a little

14    time, it usually just kicks in.  That is, the audio.

15              THE COURT:  Okay.

16              MR. SOFER:  Okay.  Mr. Griffin, try this again.

17    BY MR. SOFER:

18    Q.        I want to direct your attention back to

19    October 14th, 2004.  There was a conversation that we

20    listened to, I believe, on Friday that took place, I

21    believe your testimony was at Mohammed Amawi's apartment;

22    is that correct?

23    A.        Yes.

24    Q.        And we're going to play 10A-2.

25                    (Audio playing.)
```

```
 1   Q.        Okay.  And I want to direct your attention now to

 2   where we stopped I think on Friday, which is December 13th,

 3   2004.  Again, I believe your testimony was you believe that

 4   this conversation took place in Mohammed Amawi's apartment?

 5   A.        Yes.

 6   Q.        And do you recall where we stopped on Friday just

 7   to put us back where we were?

 8   A.        It was -- the cut was -- we were reviewing the

 9   Atocha, Spain train bombings, and Mr. Amawi had laughed and

10   made the statement they love life.

11   Q.        And did that conversation continue?

12   A.        Yes.

13   Q.        We're going to play 1D13, Exhibit Number 4-20.

14   And it's clip 3-A, please.

15                  (Audio playing.)

16   Q.        Mr. Griffin, did the conversation continue on

17   December 13th of 2004 at Mohammed Amawi's apartment?

18   A.        Yes, it did.

19   Q.        And we're going to play 1D13, Exhibit 4-20 clip

20   4A.

21                  (Audio playing.)

22   Q.        Okay.  Mr. Griffin, I want to show you what's

23   been marked Government's Exhibit Number 30 for

24   identification.  Can you tell the members of the jury if

25   you recognize that?
```

```
 1   A.        It is a disc.

 2   Q.        And do you know what's depicted on Government's

 3   Exhibit Number 30 for identification?

 4   A.        This is the video we were watching during this

 5   past clip where he was explaining to me where a sniper he

 6   had hit, he held up and two fingers and said I swear I

 7   killed two Americans.

 8   Q.        Do you remember, among other things, what

 9   Mohammed Amawi said about that guy when he first introduced

10   you to that clip?

11   A.        That he loves this guy.

12   Q.        Do you have an independent recollection of

13   watching that on or about December 13th, 2004 with

14   Mr. Amawi?

15   A.        Yes, I do.

16            MR. SOFER:  At this time the government offers

17   Government Exhibit Number 30 into evidence.

18            THE COURT:  Okay.  It will be admitted.

19   BY MR. SOFER:

20   Q.        We're going to play Government Exhibit Number 30,

21   and, again, I warn you, ladies and gentlemen, when it first

22   starts, it may be a little louder than the other audio that

23   you've heard.

24            (Video playing.)

25   Q.        Okay.  Mr. Griffin, did there come a time three
```

```
 1   days later when you met with Marwan El-Hindi?

 2   A.        Yes.

 3   Q.        And do you recall where that was?

 4   A.        I believe at his apartment.

 5   Q.        Do you know where that was located?

 6   A.        I believe on Main Street, Toledo, Ohio.

 7   Q.        Okay.  And we're going to play 1D2, Exhibit 4-72,

 8   clip 2-A, please.

 9             THE COURT:  That would have been December 16th?

10             MR. SOFER:  Yes, Judge.

11             THE COURT:  What was that number?

12             MR. SOFER:  1D2, Exhibit 4-72, clip 2-A.

13                 (Audio playing.)

14   Q.        Mr. Griffin, did that conversation continue on

15   the 16th of December, 2004?

16   A.        Yes.

17   Q.        And we're going to play clip 4A from 1D2 Exhibit

18   4-72.

19                 (Audio playing.)

20   Q.        I want to direct your attention, Mr. Griffin, to

21   the day after Christmas in 2004.  Do you recall whether or

22   not you had a conversation with someone related to the case

23   on that day?

24   A.        Yes, Khaleel Ahmed.

25   Q.        And can you give us a basic description of what
```

 1 | that conversation was like?

 2 | A.        Basically I was in -- I believe in the Chicago

 3 | area, and I gave him a call to see if he was interested in

 4 | still getting together for Jihad training.

 5 | Q.        And I want to direct your attention to three days

 6 | later on December 29th of 2004.  Did you have a

 7 | conversation on that day with Marwan El-Hindi?

 8 | A.        Yes, I did.

 9 | Q.        And we're going to play 1D4, Exhibit 4-74, clip

10 | 4A.

11 |             (Audio playing.)

12 | Q.        Mr. Griffin, did you ever actually meet with

13 | Zubair and Khaleel again?

14 | A.        I did not.

15 | Q.        And did Zubair and Khaleel ever come to Ohio to

16 | train?

17 | A.        They did not.

18 |             MR. HARTMAN:  Objection, he said he never met

19 | with him.  He wouldn't know.

20 |             THE COURT:  Okay.  That's fine.

21 |             MR. SOFER:  Train with you is what I meant.

22 |             THE COURT:  He said he never met them again, so

23 | I'll sustain the objection.

24 |             MR. SOFER:  Very well.

25 | BY MR. SOFER:

```
1   Q.        I want to direct your attention to January 10th

2   of 2005 into the early morning hours of January 11th, 2005.

3   Did there come a time when you spent the better part of an

4   evening with Mohammed Amawi?

5   A.        Yes.

6   Q.        And among other things, what did you do on that

7   day with him?

8   A.        We viewed numerous videos.  We had lengthy

9   discussions, and most of the time was spent in his room on

10  the computer.

11  Q.        And we're going to play 1D14, Exhibit 4-21.  And

12  we're going to start with clip 1A, please.

13                  (Audio playing.)

14  Q.        Okay.  Mr. Griffin, did the conversation on

15  January 10th continue?

16  A.        Yes, it did.

17  Q.        And we're going to play --

18            MR. SOFER:  Judge, we have a lot of clips here

19  that are all from the same numbers, so I'm just going to

20  refer to them by clips if that's okay.

21            THE COURT:  That's fine.

22  Q.        We're going to play clip 2-A.

23                  (Audio playing.)

24  Q.        Okay.  Did the conversation continue?

25  A.        Yes, it did.
```

```
1    Q.      Let's play clip 3-A please.

2                  (Audio playing.)

3    Q.      Mr. Griffin, did the conversation on

4    January 10th, 2005 continue?

5    A.      Yes, it did.

6    Q.      I'm going to play clip 4A.

7                  (Audio playing.)

8    Q.      Okay.  Did the conversation continue?

9    A.      Yes, it did.

10   Q.      I'm going to play 5A, please.

11                 (Audio playing.)

12   Q.      Okay.  Mr. Griffin, did the conversation

13   continue?

14   A.      Yes, it did.

15   Q.      Let's play 6A.

16                 (Audio playing.)

17   Q.      Okay.  Did the conversation continue on

18   January 10th?

19   A.      Yes, it did.

20   Q.      We're going to play clip 7A, please.

21                 (Audio playing.)

22   Q.      Okay.  Mr. Griffin, did the conversation on

23   January 10th, 2005 at Mohammed Amawi's apartment continue?

24   A.      Yes, it did.

25                 THE COURT:  I'm just curious, about how long is
```

1   this sequence?

2           MR. SOFER:  It's going to be at least another

3   hour, Your Honor, with all the videos.

4           THE COURT:  But in terms of the audio?

5           MR. SOFER:  Well, the audio is interspersed with

6   the video, but I would say -- I can't tell you exactly.

7   Some are between a half hour and 45 minutes, Judge.

8           THE COURT:  Why don't we complete the audio and

9   then break for lunch.

10          MR. SOFER:  Actually, I think, Your Honor,

11  there's a large video that will be played.  It takes almost

12  25 minutes to play the video.  So if we can break before

13  that video, that probably is the best time, otherwise it

14  will interrupt --

15          THE COURT:  And when would that be?

16          MR. SOFER:  I'm hoping in another 15 minutes or

17  so, maybe 20.  I don't have the time on this.

18          THE COURT:  I've got to let my office know

19  because I have things to tend to, that's all.

20          MR. SOFER:  If you give me two seconds, I can

21  take a look at the times that we have and I'll let you

22  know.

23          THE COURT:  Ladies and gentlemen, if you can

24  remember to keep the head sets on during the English

25  portion of the audio recordings, although I did have mine

```
 1   off, and I think it is marginally better if we all have the
 2   head sets on.
 3           MR. SOFER:  We'll try to pick a good place to
 4   stop in about 15 minutes or so.
 5           THE COURT:  Whatever.  I just want to know the
 6   time table.
 7           MR. SOFER:  Understood.
 8           MR. HARTMAN:  Which clip now?
 9           MR. SOFER:  The next one we're going to play is
10   9A.
11           MR. HARTMAN:  Thanks.
12              (Audio playing.)
13   Q.      Okay.  Mr. Griffin, I want to show you what's
14   been marked Government's Exhibit Number 32 for
15   identification.  Can you tell us if you recognize that?
16   A.      It is a CD.
17   Q.      Do you know what's depicted on Government's
18   Exhibit Number 32 for identification?
19   A.      This would be the video that we were viewing,
20   communique number six, I believe.
21   Q.      Was that your independent recollection of
22   watching all or part of that video with Mohammed Amawi on
23   January 10th, 2005?
24   A.      Yes.
25           MR. SOFER:  At this time the government offers
```

```
 1    Exhibit Number 32 into evidence.

 2              THE COURT:  It will be admitted.

 3              MR. HARTMAN:  32?

 4              MR. SOFER:  Yeah, 32.  Again, I don't know how

 5    loud it will be, ladies and gentlemen.

 6              Your Honor, now I think would be a good time to

 7    stop.

 8              THE COURT:  Okay.  We'll resume at 1:00.  Don't

 9    talk about the case.  Keep an open mind and we'll see you

10    then.

11              (A brief recess was taken for lunch.)

12              THE COURT:  You may be seated.  Mr. Griffin, you

13    remain under oath.

14    BY MR. SOFER:

15    Q.        Mr. Griffin, did the conversation on

16    January 10th, 2005 with Mr. Mohammed Amawi continue?

17    A.        Yes, it did.

18    Q.        And when we're all ready, we're going to play

19    clip 10A.

20              (Audio playing.)

21    Q.        Okay.  And did the conversation continue?

22    A.        Yes, it did.

23    Q.        Let's play 11 then.

24              (Audio playing.)

25    Q.        And did the conversation continue?
```

```
 1   A.        Yes, it did.

 2   Q.        Let's play 12 then.

 3             (Audio playing.)

 4   Q.        Okay.  And did the conversation continue?

 5   A.        Yes, it did.

 6   Q.        Let's play 13 then.

 7             (Audio playing.)

 8   Q.        You later learned who that Brother Wassim he was

 9   referring to?

10   A.        Yes, Wassim Masloum.

11   Q.        Continue, please.

12             (Audio playing.)

13   Q.        Okay.  Did the conversation continue?

14   A.        Yes, it did.

15   Q.        Play 14 then.

16             (Audio playing.)

17   Q.        Okay.  And did the conversation continue beyond

18   that?

19   A.        Yes, it did.

20   Q.        And let's play 15.

21             (Audio playing.)

22   Q.        What Brother Marwan were you referring to?

23   A.        Marwan El-Hindi.

24   Q.        Please continue.

25             (Audio playing.)
```

```
 1   Q.        What brother were you referring to who Marwan
 2   El-Hindi introduced you to that wanted training?
 3             MR. HARTMAN:  Objection.
 4             THE COURT:  Basis?
 5             MR. HARTMAN:  I think we need to approach.
 6             THE COURT:  Why don't you rephrase the question.
 7   BY MR. SOFER:
 8   Q.        You indicated that there were some good brothers
 9   that Marwan had introduced you to; is that right?
10   A.        Yes.
11   Q.        And who were you referring to?
12   A.        Khaleel and Zubair Ahmed.
13   Q.        Please continue.
14             (Audio playing.)
15   Q.        Okay.  Did the conversation continue beyond that?
16   A.        Yes, it did.
17   Q.        And let's play 16A.
18             (Audio playing.)
19   Q.        Okay.  Mr. Griffin, I'm going to show you what's
20   been marked Government Number 36 for identification.  Tell
21   the members of the jury if you recognize that.
22   A.        It is a CD.
23   Q.        And do you know what's depicted on Government's
24   Exhibit Number 36?
25   A.        This is the bomb vest video, the video we were
```

```
 1    viewing on this last clip.

 2    Q.        And do you have an independent recollection of

 3    watching some or all of that clip on January 10th, 2005

 4    with Mohammed Amawi?

 5    A.        Yes, I do.

 6              MR. SOFER:  At this time the government offers 36

 7    into evidence.

 8              THE COURT:  It will be admitted.

 9              MR. SOFER:  We're going to play this, Your Honor.

10    It's quite lengthy.  What the government proposes after we

11    play this, to actually give the jurors a translation, and

12    one of us will read the translation, otherwise you can't

13    follow because it's in Arabic.

14              THE COURT:  Okay.  Again, if -- it's up to you,

15    Mr. Sofer, if you would prefer to read a segment of the

16    translation either before or after, whatever.

17              MR. SOFER:  I think it will sort of speak for

18    itself in some ways, but we'll read the translation

19    afterwards.  And I don't know how loud it is, so be

20    careful.

21              THE COURT:  As I indicated, if you can hear

22    without --

23              MR. SOFER:  I think with many of the videos,

24    we'll have to try but you may be able to hear the video

25    without the actual ear phones.
```

1            (Video playing.)

2         MR. SOFER:  Okay.  Judge, with The Court's

3  permission I'd like to hand out translation for the jury.

4         MR. BOSS:  Judge, may we approach for a moment?

5         THE COURT:  Sure.

6            (A side bar conference was had on the

7            record.)

8         THE COURT:  Can you hear us okay?

9         MR. BOSS:  Steve wanted to stretch his back.

10  Beyond that, Judge, first we heard -- at first we heard

11  Mr. Amawi give a translation as the tape was being watched

12  by he and Mr. Griffin.  Then we've just watched the

13  26-minute videotape which frankly, in my opinion, speaks

14  for itself.  To review again now that same information on

15  these transcripts I think is just laying it on a little bit

16  too thick.  I don't believe that we need to do that.

17         MR. SOFER:  What counsel believes we need to do

18  and the government should be entitled to put its brief to

19  the jury.  The bottom line is, among other things, I've

20  heard statements from defense counsel that Mr. Amawi would

21  tell Mr. Griffin things that were not actually happening.

22  Among other things, that is, an agreed upon translation of

23  what it is that's on that tape.  There are portions of

24  it -- Mr. Amawi did translate some of it, he didn't

25  translate all of it.  I think the government's entitled to

1    show the jury that, in fact, what's being demonstrated,

2    what's being showed is what is.

3             It's actually part of three separate counts.

4             MR. BRYAN:  Your Honor, as it relates to what the

5    evidence is in this case, it's what Mr. Amawi said to

6    Mr. Griffin.  There's no evidence, and I don't believe the

7    government's going to introduce any evidence that Mr. Amawi

8    did a verbatim translation of these materials for

9    Mr. Griffin.  The only translation that Mr. Amawi made was

10   the one that we just heard, where it was just basically

11   going along with the video and saying -- summarizing what

12   the video, saying -- until the government's going to

13   present evidence that Mr. Amawi did a verbatim translation

14   of this video and gave it to Mr. Griffin, I don't believe

15   that this is relevant.

16            MR. SOFER:  Again, Judge, the jury, I think, is

17   entitled to -- it should know what is actually on this

18   particular recording.  That's all that this does.  It

19   provides an English translation to what it is that's being

20   shown.

21            THE COURT:  I'm going to permit it.  The reason

22   I'm going to permit it is that I understand the nature of

23   the charge.  Correct me if I'm wrong, it's a transmission.

24            As I understand the charge, the government has to

25   prove that what, in fact, was transmitted were, in fact,

1    instructions that it followed that would enable somebody to

2    make a bomb.  If I'm not correct about that, tell me.  It's

3    not like in the case of attempted distribution of marijuana

4    and you give somebody oregano or whatever and you thought

5    it was marijuana.  Here, as I understand the defense, if

6    somebody followed these directions they could, in fact,

7    make a bomb.

8        Now, the fact that Griffin couldn't read Arabic

9    isn't the issue.  The fact is somebody who had this video,

10   and assuming that he could get somebody to translate to

11   Arabic sat down and connected the dots and could make a

12   bomb.  So I think it's permissible and the objection is

13   overruled.

14       MR. SOFER:  We have a further count in the

15   indictment where what was given to Mr. Griffin was an

16   Arabic document which is never translated in the same way,

17   it's the same exact content.

18       MR. HARTMAN:  Judge.

19       MR. BRYAN:  Your Honor, Mr. Amawi needs a

20   bathroom break as well.

21       THE COURT:  Ladies and gentlemen, we'll take a

22   break for about 10 minutes, 15 minutes.  Nobody heard that

23   either.

24       MR. HARTMAN:  If that's -- if that's the reason,

25   The Court would be inclined to let the translation in.

1    Shouldn't we have a certified translation?

2              THE COURT:  Well, no.  There's no objection, and

3    if you folks haven't objected and said this isn't it, then

4    fine, it's coming in.  Take a break.

5                   (Speaking with a juror independently.)

6              THE COURT:  If you are not up to it, we can

7    adjourn -- if we can continue for a while.

8              THE JUROR:  We can try to continue for a while.

9    If I do have to use the restroom again, if I can be

10   excused.

11             THE COURT:  Is that door open?  Maybe you can

12   just sit right here.  If you don't feel well, you can get

13   all your -- are you willing to do that?

14             THE JUROR:  Yes.

15             THE COURT:  And if we get to the point where it's

16   too much, just say so.  We can quit right now for the day.

17             THE JUROR:  I can try to go on a little bit

18   longer.

19             MR. SOFER:  Judge, can we just approach for a

20   second, please?

21             THE COURT:  Let me ask you this, and will you be

22   able to concentrate --

23             THE JUROR:  Yes.

24             THE COURT:  -- and pay attention?  You feel

25   yourself in either distress or discomfort or basically not

```
 1   able to concentrate, just say Judge --

 2              THE JUROR:  Okay.

 3              THE COURT:  -- can we go home now?

 4              THE JUROR:  Okay.

 5                   (Jury brought in.)

 6              THE COURT:  Ladies and gentlemen, as you may

 7   know, one of your colleagues is not feeling well, and I

 8   think what we'll do as willing as you are to give it a --

 9   give it a try, I think we're going to read the transcript

10   and adjourn.

11              THE JUROR:  Thank you.

12              THE COURT:  Thank you.  I think the record is

13   fair to show that while the mean nasty old Judge was

14   determined to push on his unanimous uprising on the part of

15   counsel said, come on, Judge, now -- once in a while

16   federal Judges get overruled.  Go ahead.  I believe

17   Mr. Sofer and Mr. Getz will read the transcript.

18              MR. SOFER:  Yes, Judge, and I'll get out of the

19   way.

20              THE COURT:  Ladies and gentlemen, it's my

21   understanding that what you will be hearing will be a

22   translation of the Arabic that was displayed, or I guess

23   observed on the video we just watched.  And Mr. Getz, you

24   may continue.

25                   (Tom Getz reading Exhibit Number 36A into
```

1                    the record.)

2          THE COURT:  Ladies and gentlemen, I do think that

3    we will adjourn for the day and hopefully you'll be feeling

4    better tomorrow.  Go home and get your rest.  Okay.  As

5    always, don't talk about the case and keep an open mind and

6    we'll see you tomorrow.  And let's hope all systems are go,

7    please.  We're going to try and move the case along.  I can

8    assure you you're not the only people frustrated by the

9    kinds of problems we had earlier this morning.  Trust me.

10   Thank you very much for your patience and your dedication

11   to serve.

12              (Jury excused at 3:05 p.m.)

13         THE COURT:  We'll see you tomorrow morning.

14         MR. SOFER:  Before we leave, don't you think we

15   ought to complete the record on what we said at side bar?

16         THE COURT:  On behalf of Mr. Amawi, Mr. Bryan

17   made the additional objection to the reading of the

18   transcript to the jurors on the basis that the record would

19   not show that the video was actually downloaded and

20   delivered to Mr. Griffin by Mr. Amawi.  And so therefore,

21   the principal basis on which I allowed the transcript to be

22   admitted, in other words, without the transcript somebody

23   who wanted to understand what was going on would not be

24   able to do so absent the instruction, or at least if it's

25   necessary for the government's proof as to the defenses

1    wish this exhibit relates for the jurors to know what, in

2    fact, was being stated, communicated in Arabic.  Otherwise,

3    one would speculate and it might have nothing to do with

4    anything.  Mr. Bryan pointed out, as I said, that there was

5    no proof that the video was delivered to Mr. Griffin, and

6    Mr. Sofer has represented that there will be proof of

7    delivery of what he has represented is a duplicate video.

8    We don't know whether it's the same video or a duplicate

9    video containing the same material and same text at some

10   point by Mr. El-Hindi or via Mr. El-Hindi to Mr. Griffin so

11   that, in fact, at some point he actually had a duplicate of

12   the video with the text which made introduction of the

13   translation of the Arabic test appropriate.  Does that --

14            MR. BRYAN:  That states it well, Your Honor.

15            MR. SOFER:  Just so it's clear, what ultimately

16   happens is Marwan El-Hindi provides Darren Griffin with the

17   ability to download this particular video from a particular

18   site which requires an understanding of all kinds of areas,

19   different things which, again, I think as we go on, it'll

20   be clearer to The Court.

21            THE COURT:  Okay.  See you guys in the morning.

22

23

24

25

1                    C E R T I F I C A T E

2

3           I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6      S:/Angela D. Nixon

7      --------------------------            -----------

8      Angela D. Nixon, RPR, CRR                Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3     Testimony of Darren Griffin continued

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25