```
1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION

3   UNITED STATES OF AMERICA,     )  Docket No. 3:06-CR-719

4            Plaintiffs,          )  Toledo, Ohio

5                v.               )  April 9, 2008

6   MOHAMMED AMAWI, ET AL.,       )

7            Defendants.          )

8   -----------------------------

9            TRANSCRIPT OF JURY TRIAL, VOLUME 25
             BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11


12  APPEARANCES:

13  For the Plaintiffs:    Gregg N. Sofer
                           David I. Miller
14                         Jerome J. Teresinski
                           U.S. Department of Justice
15                         10th & Constitution Avenue, NW
                           Washington, DC 20530
16                         (202) 353-3464

17                         Thomas E. Getz
                           Justin E. Herdman
18                         Office of the U.S. Attorney
                           801 Superior Avenue, W
19                         Cleveland, Ohio 44113
                           (216) 622-3840
20
    For the Defendant      Timothy Ivey
21  Amawi:                 Edward Bryan
                           Amy Cleary
22                         Jonathan Whitmer-Rich
                           Office of the Federal Public Defender
23                         750 Skylight Office Tower
                           1660 West Second Street
24                         Cleveland, Ohio 44113
                                  (216) 522-4856
25
```

```
 1                         Elias Muawad
                           Muawad & Muawad
 2                         Suite 209
                           36700 Woodward Avenue
 3                         Bloomfield Hills, Michigan 48304
                           (248) 594-4700
 4    For the Defendant
      El-Hindi:            Charles M. Boss
 5                         Boss & Vitou
                           111 West Dudley Street
 6                         Maumee, Ohio 43537
                           (419) 893-5555
 7
                           Stephen D. Hartman
 8                         Kerger & Kerger
                           Suite 201
 9                         33 South Michigan Street
                           Toledo, Ohio 43602
10                         (419) 255-5990

11                         Alek H. El-Kamhawy
                           Raslan, El-Kamhway & Pla
12                         Suite 3FE
                           1700 East 13 Street
13                         Cleveland, Ohio 44114
                           (216) 928-1500
14
      For the Defendant    David L. Doughten
15    Mazloum:             4403 St. Clair Avenue
                           Cleveland, Ohio 44103-1125
16                         (216) 361-1112

17                         Jeffrey J. Helmick
                           Helmick & Hoolahan
18                         2nd floor
                           1119 Adams Street
19                         Toledo, Ohio 43624-1508
                           (419) 243-3800
20

21                         Mohammed Abdrabboh
                           1620 Ford Avenue
22                         Wyandotte, MIchigan 48192
                           (734) 283-7000
23

24
      Court Reporter:      Angela D. Nixon, RPR, CRR
25                         1716 Spielbusch Avenue
                           Toledo, Ohio 43624
```

1                      (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

1   BY MR. SOFER:

2   Q.          Okay.  Mr. Griffin, during that rather long clip,

3   do you recall what Mohammed Amawi was doing during that

4   time?

5   A.          He was adding CDs, trying to get together the

6   training and things that he wanted to participate in in the

7   future.

8   Q.          Was he giving you other kinds of material as

9   well?

10  A.          Yes, things that Mujahideen and other people were

11  doing overseas.

12  Q.          If we can play 19A, please.

13              THE COURT:  This is a continuation, the same?

14              MR. SOFER:  Same one, Judge.

15  BY MR. SOFER:

16  Q.          Mr. Griffin, this was a rather long evening, was

17  it not?

18  A.          Yes, it was.

19  Q.          Do you know whether it went into the early

20  morning hours of January 11th?

21  A.          Yes, about 2:00 in the morning.

22              (Audio playing.)

23              MR. SOFER:  I think we're going to try to turn

24  the volume up a little bit, Judge.

25              (Audio playing.)

1   Q.      Okay.  Mr. Griffin, I'm going to show you what's

2   been marked Government's Exhibit Number 39 for

3   identification.  Tell us if you recognize that.

4   A.      It is a CD.

5   Q.      Do you recall what is on that CD?

6   A.      The assassination of the president of Egypt Anwar

7   Sadad.

8   Q.      And is that what was being referred to in the

9   last clip?

10  A.      Yes.

11  Q.      Do you have an independent recollection of

12  watching all or part of that video on the evening of

13  January 10th going into the morning hours of

14  January 11th of 2005?

15  A.      Yes, I do.

16          MR. SOFER:  At this time the government offers 39

17  into evidence?

18          MR. BOSS:  Judge, we have an objection on

19  relevance ground.  This is a 1981 videotape.  The relevance

20  to this matter is.

21          THE COURT:  I don't -- I prefer that we do this

22  at side bar.

23          MR. BOSS:  I have no further objection.

24          THE COURT:  I prefer that we have any objection

25  at side bar.

1                    (A side bar conference was had on the

2                    record.)

3              MR. BOSS:  Your Honor, I do recognize -- Your

4    Honor, I do recognize that the two parties, Mr. Amawi and

5    Mr. Griffin watched this video during the course of the

6    conversation that we just heard played.  But to play it now

7    for the jury, a 1981 assassination of a political figure

8    unrelated to this alleged conspiracy, time, place or

9    otherwise is irrelevant and I think simply inflammatory and

10   we would object.

11             MR. BRYAN:  I would on a different basis.  I want

12   to correct Mr. Boss.  I don't believe that they watched

13   this videotape.  They reference this videotape and they

14   downloaded it, but based upon my listening of the tape,

15   this doesn't sound like they watched the videotape.

16             MR. SOFER:  I can't testify what they watched and

17   what they didn't.  I think what's happening here is he's

18   showing him various different videos maybe a particular

19   clip to it or not.  Two things, one, you know, I object to

20   the fact that Mr. Boss says this in front of the jury and I

21   could have responded and I didn't.

22             THE COURT:  Please don't -- just say objection,

23   okay.  I really don't want anything on the -- I want

24   objections, if at all possible, called to my attention the

25   afternoon beforehand so we don't have these interruptions.

1  For example, now we have to ask Mr. Griffin perhaps outside

2  the hearing of the jury whether the fact that this was

3  seen.  Do you know whether it was played?  Doesn't sound

4  like it.

5          MR. SOFER:  I don't.  Not from the tape.  This is

6  what we'll do.  I'm willing to skip over this one for now

7  and we can come back to it.  My problem, I just want to

8  put -- what Your Honor said I think is true.  Defense has

9  had these tapes and these videos for some time.  If they

10  have objections to this, we're willing to go through it

11  before it goes in front of the jury, but I object to the

12  way that they objected in the middle of the case.

13          THE COURT:  They're entitled to do it.  It's my

14  instruction to please call it to my attention.

15          MR. BRYAN:  Forgive me the last minute of the

16  case.

17          THE COURT:  I understand.

18          MR. BRYAN:  The evidence is that they didn't view

19  this.  That's why we're objecting.

20          MR. SOFER:  What Mr. Boss said, go through this

21  in terms of relevance, it's relevant because this is

22  something Mr. Amawi is giving Mr. Griffin.  It's relevant.

23          THE COURT:  And I agree with you.

24          MR. SOFER:  It's relevant.  So I can ask him now

25  if -- did you actually watch it or did he just give it.

1          THE COURT:  I think whether he watched it or not

2    doesn't matter.  It's relevant regardless.

3          MR. SOFER:  So I can clarify that with him or we

4    can skip over it and we can come back to it if you want.

5          THE COURT:  I'm going to overrule the objection

6    and let you play it.

7                (Side bar concluded.)

8    BY MR. SOFER:

9    Q.        Mr. Griffin, for clarification purposes, this

10   particular video of the assassination of Anwar Sadad, do

11   you know if you actually watched this whole video on that

12   particular day?

13   A.        I can't recall if it was on that day, but it was

14   viewed definitely around that time.

15   Q.        And did -- and was this one of the files that

16   Mohammed Amawi was attempting to give to you on one of the

17   CDs?

18   A.        Yes.

19   Q.        At this time we're going to play a portion of

20   government's Exhibit 39.  I don't know if Your Honor

21   admitted it or not.

22          THE COURT:  I believe I have.

23                (Video playing.)

24   Q.        And the record should reflect that that video was

25   31 seconds long.  Mr. Griffin, did the conversation on

1   January 10th into January 11th continue?

2   A.        Yes, it did.

3   Q.        And we're going to play 20A, please.

4             (Audio playing.)

5   Q.        Do you know what Mohammed Amawi was referring to

6   there?

7   A.        It was a picture of me while I was in the uniform

8   in the military.

9   Q.        And did you know he had it?

10  A.        I did not.

11            (Audio playing.)

12  Q.        Okay.  Now, at one point in that conversation

13  there was a discussion of someone who had been returned

14  after an operation?

15  A.        Yes.

16  Q.        I want to show you what we marked government's

17  Exhibit Number 41 and 42, and ask if you recognize 41 and

18  42.

19  A.        They are CDs.

20  Q.        And do you know what's depicted on 41 and 42?

21  A.        On 41, this is a night vision picture of a guy

22  that I believe blows himself up, and 42 is what Mr. Amawi

23  was explaining, this is afterwards where he's dead but he's

24  smiling.

25  Q.        And do you have an independent recollection of

```
 1   looking at these photographs sometime on January 10th or

 2   January 11th of 2005 with Mohammed Amawi?

 3   A.        Yes, I do.

 4             MR. SOFER:  At this time, Your Honor, the

 5   government offers 41 and 42 into evidence?

 6             THE COURT:  It will be admitted.

 7             MR. SOFER:  I will publish those to the jury via

 8   the computer.

 9                  (Video playing.)

10   Q.        And the record should reflect we're showing

11   Government Exhibit Number 41 at this time.

12                  (video playing.)

13   Q.        And the record should reflect that we're showing

14   Government Exhibit Number 42 at this time.  Okay

15   Mr. Griffin, did the conversation on January 10th into the

16   early morning hours of January 11th continue even more?

17   A.        Yes.

18   Q.        We're going to play 21A.

19                  (Audio playing.)

20   BY MR. SOFER:

21   Q.        Judge, I ask that we start it over again and they

22   can turn their ear phones over a little bit.

23                  (Audio playing.)

24   Q.        Mr. Griffin, did the conversation continue

25   further?
```

```
 1   A.        Yes, it did.

 2   Q.        I'm going to play 22A.

 3                 (Audio playing.)

 4   Q.        Okay.  Did the conversation continue?

 5   A.        Yes.

 6   Q.        We'll play 23A.

 7                 (Audio playing.)

 8   Q.        Okay.  Did the conversation continue?

 9   A.        Yes, it did.

10   Q.        And I'm going to play 24A.

11                 (Audio playing.)

12   Q.        Okay.  And finally, Mr. Griffin, did the

13   conversation continue a little further?

14   A.        Yes, it did.

15   Q.        And we're going to play 25A.

16                 (Audio playing.)

17   Q.        Okay.  Mr. Griffin, I want to show you what's

18   been marked government's Exhibit Number 46 for

19   identification.  Tell the members of the jury if you

20   recognize that.

21   A.        It is a CD.

22             THE COURT:  May I interrupt.  Are you done with

23   the playing -- does that complete the audio?

24             MR. SOFER:  That completes this day, Your Honor.

25             THE COURT:  Why don't we take our break and we'll
```

1   go from there.  Okay.  We'll go from there.  See you in 15

2   minutes.

3                   (A side bar conference was had on the

4                   record.)

5           THE COURT:  I would -- rather than having him

6   say -- I would rather have him -- rather than having him

7   say this is what was on the record and give some sort of

8   summary or whatever, that you simply say, ask him is this

9   what you viewed during the -- are these the various video

10  claims that you viewed in your conversation, period end of

11  discussion.

12          MR. SOFER:  As opposed to?

13          THE COURT:  This is Sadad's assassination, this

14  is crusaders or whatever, because I think that's all going

15  to be apparent.

16          MR. SOFER:  Okay that's fine.  I'm just trying to

17  make it so sometimes there's like five or six at a time.

18          THE COURT:  We've heard the whole segment.  And

19  Mr. Griffin, is this what you viewed or was given,

20  whichever it is during that period, yes, period.  Move on,

21  rather than have him --

22          MR. SOFER:  Okay.  Again, I think, Judge, most of

23  the time, you're probably right about that.  Some of the

24  time just have the jury -- we played 15 minutes and just so

25  you know this is one of the longer and more tedious ones.

1      THE COURT:  I would ask you then to simply say is

2  this the video showing X that you viewed, lead him that

3  way.  I'd rather have you do that.  I'd rather not have any

4  elaboration, but if you think it's necessary is this the --

5  just let him say yes or no.

6      MR. SOFER:  I can lead him, I've been trying

7  to --

8      THE COURT:  Time out, counsel.

9      MR. HARTMAN:  I would like to make a formal

10 request that the unredacted 302s and Jencks material be

11 held by The Court, sealed in the event of an appeal.

12     THE COURT:  Oh.

13     MR. HARTMAN:  The material that was redacted that

14 we received from the government.

15     THE COURT:  I think that already is.

16     MR. SOFER:  Yes.

17     MR. HARTMAN:  Just wanted to make the formal

18 request.

19     MR. IVEY:  Thank you.  I just want to follow up

20 on the last time we were in front of The Court and when we

21 had had the relevance objection.  And it was indicated by

22 The Court that we should say and also I believe Mr. Sofer

23 to let you know ahead of time.

24     THE COURT:  Time out.  What I would like to do is

25 at the end of each day when the jury's been excused if

1    anybody anticipates in advance, you know you're going to

2    object to a particular piece of evidence, let's take care

3    of it then.  That's all I'm saying.  Obviously, if

4    something comes up, you know, sort of sit there, let it

5    come in, by the way, at 10:30 this morning you let so and

6    so happen, I object time.

7            MR. IVEY:  The point I was trying to make was up

8    to that point.  I've had numerous feelings that a lot of

9    videos or things that were played were irrelevant, but I

10   haven't made objections because when I first made my first

11   one the first day of evidence, The Court indicted not to

12   interrupt, that my objection will be continued.  So I don't

13   want my lack of making objections to be viewed by the Court

14   of Appeals that I waived something.  I just want the record

15   to be clear I'm not interrupting Mr. Sofer because The

16   Court assured me that my objection is continued.  So if we

17   raise this on appeal as something irrelevant --

18           THE COURT:  It is my understanding that all

19   defendants objected to playing of any of the videos on

20   relevance grounds.  I believe I've either expressed an

21   opinion overruling that either orally or in writing, I

22   can't remember which.  I think it was in writing, but I do

23   think that these are relevant.  They were -- to the extent

24   they were either viewed or given to Mr. Griffin by any of

25   the defendants is simply irrelevant.  I think they show --

1  they're relevant -- they are relevant on the issue of

2  intent, which is obviously an element that the government

3  has to prove as to each of its charges, and also under Rule

4  404 B, I think that they are relevant.  Under rule 404 B on

5  that issue so that in terms of standing up and objecting as

6  to each video, I think it's not at all necessary -- it's

7  not at all necessary because among other things, I think it

8  would create in the jury's mind that somehow, you know,

9  we're trying to sweep all this stuff under the rug.  And I

10 think they might even find it irritating that you keep

11 bobbing up and down and I keep saying the same thing.  My

12 point simply is, as there was this morning, there's an

13 occasion for specific objections to some segment portion by

14 all means raise it.  All I'm saying is it's my strong

15 preference so that we don't disrupt proceedings to put the

16 jury on the shelf, take care of it in the afternoon.

17        MR. IVEY:  And I want to respect The Court's

18 ruling and I agree.  I'm actually speaking to the

19 sixth circuit.  I don't want them to say Mr. Ivey, you

20 didn't jump up, so you waive that, and I want to clear

21 that's the reason I'm not doing it.

22        THE COURT:  I want the folks down in the

23 Sixth Circuit absolutely not.  You have made your

24 objections.  I've ruled on the objections and it's simply

25 for matter of convenience for The Court, the smooth flow of

1  the proceedings and also to avoid any risk of projectional

2  prejudice because you're up and down and up and down and

3  I'm sort of slapping you down every time, hopefully

4  politely but even though -- the objection has been

5  preserved and it need not be renewed in a metronomic kind

6  of fashion.

7          MR. SOFER:  Just one other point -- one other --

8  one other point for the record I just want to make in terms

9  of relevance, there are other reasons why the government

10  believes that these particular videos are relevant in

11  addition to intent, in addition to 404 B.  The extent to

12  which the defendant possessed these exact same materials at

13  a later date corroborates the authenticity of the tapes,

14  and they will also, I think, be relevant if he simply

15  possessed them but under the circumstances that relevance

16  is much more heightened as a result of the way in which he

17  possessed them and the way in which he displayed, gave or

18  allowed access to these materials by the government's

19  cooperating witness.

20          THE COURT:  I've made my ruling.

21          MR. IVEY:  I'm not going to argue about it.

22  We'll do that at the appropriate time.

23              (A brief recess was taken.)

24          THE COURT:  You may be seated.  And Mr. Sofer, do

25  you expect that Mr. Griffin will be testifying at all?  If

```
 1   not, does he need to sit on the stand -- we're about to

 2   watch a video; is that correct?

 3              MR. SOFER:  Yes, Judge.

 4              THE COURT:  Do you expect Tim to be asked to

 5   testify during -- are you going to be interrupting the

 6   viewing of the video to ask further questions?

 7              MR. SOFER:  No, but the video won't take very

 8   long.  It's like the ones we've been watching.  It's short.

 9   It's not like the one from yesterday.

10              THE COURT:  Okay.  Fine.  Very good.

11              MR. SOFER:  I think when we broke, I'd asked you

12   whether you recognized what is depicted in Government's

13   Exhibit Number 46 for identification?

14   A.        Yes.

15   Q.        Without telling us what that is, is that a

16   depiction of shooting down of a helicopter that was

17   described in the previous clip that we heard?

18   A.        Yes, it was.

19   Q.        And at this time the government -- do you have an

20   independent recollection of watching some or all of that

21   particular video?

22   A.        Yes, I do.

23              MR. SOFER:  And at this time, Your Honor, the

24   government offers 46 into evidence.

25              THE COURT:  Okay.  It will be admitted.
```

```
 1   Q.        We'll play a portion or all of this.
 2                   (Video playing.)
 3   Q.        While we're keying that up, Mr. Griffin,
 4   throughout your testimony and throughout the playing of the
 5   recordings, you've said nam a lot of times.  Can you tell
 6   the jury what that meant?
 7   A.        Yes, it meant yes.
 8   Q.        In what language, do you know?
 9   A.        Arabic .
10                   (Video playing.)
11   Q.        Okay.  Mr. Griffin, during your interaction with
12   Mohammed Amawi, were there times when he gave you CDs with
13   these types of materials on them?
14   A.        Yes.
15   Q.        And for the most part, what did you do with those
16   discs?
17   A.        I turned them over to the FBI.
18   Q.        And were there times when the FBI turned those
19   discs back over to you?
20   A.        Yes.
21   Q.        Can you tell the members of the jury among other
22   reasons why that is?
23   A.        I had to produce those videos if I was asked
24   about them by Mr. Amawi, also it was part of my identity of
25   being an Islamic extremist, so I had to have that stuff to
```

1   show.

2   Q.      And did Mohammed Amawi ever ask you for some of

3   those discs back?

4   A.      Yes.

5   Q.      Okay.  I want to direct your attention to

6   approximately ten days later on January 20th, 2005.  Did

7   you have an opportunity to meet with Mohammed Amawi on that

8   day?

9   A.      Yes.

10          THE COURT:  I'm sorry, what was the date?

11          MR. SOFER:  January 20th, 2005, Your Honor.

12  A.      I believe so.

13  Q.      And if we can play Exhibit 4-22, 1D16, clip 1A.

14          (Audio playing.)

15          THE COURT:  Can you stop for a moment please.  Is

16  it possible --

17          MR. SOFER:  To add just the audio.

18          THE COURT:  Please.  If you want to begin again,

19  you can.

20          MR. SOFER:  Yeah.

21          (Audio playing.)

22  BY MR. SOFER:

23  Q.      Did you engage in some training the next day with

24  Mohammed Amawi?

25  A.      Yes, I did.

1  Q.       And directing your attention to the next day,

2  January 21st, where did you go with Mohammed Amawi?

3  A.       I myself went to Clelands indoor shooting range

4  right outside of Toledo, Ohio.

5  Q.       And did there come a time when Mohammed Amawi met

6  you there?

7  A.       Yes, he did.

8  Q.       Was he the only person that was receiving some

9  kind of training that day?

10        THE COURT:  Counsel, I'm going to instruct you

11 not to use that.  It's a leading term.  Why don't you say

12 who else was there.  The jury will disregard that question.

13 Q.       Who else was there that you knew?

14 A.       Rashid Harrisson and Charles Pinn (phonetic).

15 Q.       And --

16        THE COURT:  Can you spell that, who was there?

17 A.       Rashid Harrison, R-A-S-H-I-D, Harrisson.

18        THE COURT:  Okay.

19 BY MR. SOFER:

20 Q.       And do you recall whether you took a recording

21 device with you that day?

22 A.       I believe I did.

23 Q.       Do you know if a recording was actually made on

24 that device?

25 A.       I have no way of knowing.

```
 1   Q.        What was the purpose of this shooting session?

 2   A.        Most of it was just to go --

 3             MR. HARTMAN:  Objection.

 4             THE COURT:  Sustained.  I think he can say what

 5   happened and so forth.  Again, he cannot testify as to

 6   somebody else's intent or purpose.

 7   BY MR. SOFER:

 8   Q.        Did you -- did you instruct the individuals you

 9   described about how to shoot?

10   A.        No, I did not.

11   Q.        Did a number of individuals shoot that day?

12   A.        Yes, they did.

13   Q.        Was Mohammed Amawi one of them?

14   A.        Yes.

15   Q.        I want to show you what's been marked

16   Government's Exhibit 47.  Do you recognize that?

17   A.        Yes, I do.

18   Q.        Can you tell the members of the jury what that

19   is?

20   A.        It's a Clelands sign-in roster for the shooting

21   range.

22   Q.        And on this particular page, do you see any of

23   the names of the individuals who attended the shooting on

24   January 21st, 2005?

25   A.        I can identify one.
```

```
 1  Q.         And I don't know if you can try using your John
 2  Madden teleprompter.  Can you circle the name that you
 3  recognize.
 4  A.         He can just tell us.
 5  Q.         Why -- we'll abandon the John Madden -- can you
 6  tell us whose name you recognize?
 7  A.         On the third position down, the name Charles
 8  Pinn.
 9  Q.         If we can go to the next page.  Take a look at
10  that and tell us whether you recognize any of the names on
11  the second page of Government's Exhibit Number 47 for
12  identification.
13  A.         Yes, from the fourth down from the bottom is
14  myself and underneath myself is Mohammed Amawi.
15  Q.         At this time -- do these fairly and accurately
16  represent the way the forms look when you saw them back on
17  January 21st?
18  A.         Yes.
19             MR. SOFER:  At this time the government offers
20  Exhibit Number 47 into evidence.
21  A.         Okay.
22  Q.         Page one --
23  A.         It will be admitted.
24  Q.         I want to direct your attention to January 27th,
25  2005, approximately six days later.  Did there come a time
```

1   when you met with Mohammed Amawi in his apartment that day?

2   A.        Yes.

3   Q.        Do you know if this -- how many devices you

4   brought in this particular day?

5   A.        I believe two.

6   Q.        And can you tell the members of the jury if those

7   devices, if you know, were capable of recording or what you

8   believe them capable of recording?

9   A.        One to record audio and the second to record

10  audio and video.

11  Q.        Do you know which of those devices had a longer

12  memory?

13  A.        The audio.

14  Q.        And if we could play Exhibit 4, I believe it's

15  23.  And it's 1D18, I think, by it's clip 1A.

16                  (Audio playing.)

17          MR. BOSS:  Could we have that reference number

18  again, please.

19          MR. SOFER:  Clip 1A of Exhibit 4-23.  And it's --

20  it's one D 17 and 18.  I believe the first one is from 17.

21          MR. BOSS:  Thank you.

22          MR. SOFER:  1D18?

23          MR. BOSS:  1D18.

24          MR. SOFER:  Correct.

25                  (Audio playing.)

1   Q.        Do you recall why it is you asked him why it

2   looks like you started training?

3   A.        He had moved a treadmill into his bedroom.

4   Q.        Okay.

5                   (Audio and video playing.)

6   Q.        Did the conversation on January 27th continue?

7   A.        Yes.

8   Q.        And we'll play clip 2-A from 1D18.

9                   (Audio and video playing.)

10  Q.        Okay.  Did that conversation continue further?

11  A.        Yes.

12  Q.        And if we can play clip 3-A.

13                  (Video and audio playing.)

14  Q.        Now, in this particular video, can you tell us

15  why, if you know, why or what we're hearing in the

16  background?

17  A.        It is the a chat room on the pal talk, and

18  Mr. Amawi is at least the moderator in one of the rooms.

19  Q.        And was he also -- while that chat was going on,

20  was he also able to send other kinds of messages, to your

21  knowledge?

22  A.        Yes.  He would send and receive I M messages, he

23  would pass I M instant messages back and forth.

24  Q.        Okay.  Let's continue.  One more question.  Did

25  Mohammed Amawi have a microphone by his computer?

1    A.        Yes, he did.

2    Q.        Okay.  Okay.  Did that conversation continue?

3    A.        Yes, it did.

4    Q.        If we can play clip 4A, please.

5              (Video and audio playing.) okay.  And did

6              the conversation continue further?

7    A.        Yes, it did.

8    Q.        And from 1D17 and we play clip 7A, please.

9              MR. HARTMAN:  This is 17?

10   Q.        17, 1D17.

11             THE COURT:  What was the date of that?

12             MR. SOFER:  January 27th, 2005.

13             THE COURT:  Was that a continuation of the prior

14   session?

15             MR. SOFER:  Yes, Judge.

16             THE COURT:  Okay it was just.

17             MR. SOFER:  That was one D 17 which is Exhibit

18   4-23.  All the rest of them were from one D 18, which is

19   Exhibit 4-24.  And Mr. Griffin I want to direct your

20   attention to the next day, January 28th, 2005.  Did you

21   have an opportunity to meet with Mohammed Amawi on that day

22   as well.

23   A.        I believe so.

24   Q.        And if we can play from Exhibit 4-25, 1D19, 1A,

25   please.  Do you know where you are here, Mr. Griffin,

1  during this time January 28th, 2005?

2  A.       I'm at Mohammed Amawi's apartment, his bedroom.

3          (Audio playing.)

4  Q.       The video that you were referring to, is that the

5  video that we saw yesterday?

6  A.       Yes, the bomb making video.

7  Q.       And did the conversation on January 28th

8  continue?

9  A.       Yes.

10  Q.       And play segment 3A, please.

11          (Audio playing.)

12  Q.       Tell the members of jury where you are at this

13  point.

14  A.       I believe we are in my vehicle.

15          (Audio playing.)

16  Q.       Did that conversation continue on January 28th?

17  A.       Yes.

18  Q.       Can we play segment 4A, please.

19          (Audio playing.)

20  Q.       Okay.  Mr. Griffin, I want to direct your

21  attention to two days later, January 30th, 2005.  Did you

22  have occasion to meet with Mohammed Amawi in his apartment

23  on that day?

24  A.       Yes.  Yes.

25  Q.       And we're going to Exhibit 4-26, 1D20, segment

```
 1   1A, please.

 2                  (Audio playing.)

 3   Q.       Did that conversation continue?

 4   A.       Yes.

 5   Q.       We'll play 2A, please.

 6                  (Audio playing.)

 7   Q.       Did that conversation continue?

 8   A.       Yes.

 9   Q.       If we can play clip 3A, please.

10                  (Audio playing.)

11   Q.       Mohammed Amawi said I want you to take that and

12   bring it back tomorrow, what was he referring to?

13   A.       The bomb vest video.

14   Q.       Was it on something that you believe --

15   A.       A disc.

16   Q.       Did you receive a disc from him on this day?

17   A.       I believe so.

18   Q.       Continue.

19                  (Audio playing.)

20   Q.       Okay.  You said that you received a disc from

21   Mohammed Amawi on January 30th?

22   A.       Yes.

23   Q.       What did you do with that disc?

24   A.       I turned it over to the FBI.

25   Q.       And do you recall if you opened that disc before
```

1   you gave it to the FBI?

2   A.      I did not.

3   Q.      Did you alter or add anything to the contents of

4   that disc?

5   A.      I did not.

6   Q.      Do you recall who you gave the disc to?

7   A.      I believe it was either Bill Radcliff or Shannon

8   Coats.

9   Q.      And did there come a time when you received this

10  disc and/or others back from the FBI?

11  A.      Yes.

12  Q.      Did there come a time when you returned one or

13  more of those discs back to Mohammed Amawi?

14  A.      Yes.

15  Q.      I want to direct your attention to February 2nd

16  of 2005.  Did there come a time on that day when you went

17  to Mohammed Amawi's apartment?

18  A.      Yes.

19  Q.      And do you recall on February 2nd, 2005 who else

20  was present at Mohammed Amawi's apartment?

21  A.      Marwan El-Hindi.

22  Q.      And had you made arrangements on the -- the

23  previous day for Marwan to be there?

24  A.      Yes, I did.

25  Q.      Did you talk to Marwan El-Hindi that previous

1 | day?

2 |         MR. HARTMAN:  Objection.  Objection.

3 |         THE COURT:  Basis?

4 |         MR. HARTMAN:  May we?

5 |         THE COURT:  Sure.

6 |             (A side bar conference was had on the

7 |             record.)

8 |         THE COURT:  Basis?

9 |         MR. HARTMAN:  The basis for the objection, number

10 | one, Judge, is hearsay.

11 |         And number two my understanding based on the

12 | synopsis -- they're going to --

13 |         THE COURT:  Speak up.  You can speak a normal

14 | conversational tone.  They cannot hear.

15 |         MR. HARTMAN:  That Griffin's going to testify

16 | about things that -- that El-Hindi got excited about and

17 | he's testifying about things that Amawi proved to on the

18 | day before.  None of this is recorded.  I don't think

19 | there's any additional reliability especially in a case

20 | where they spent two years recording things up until -- I

21 | think it's somewhat akin to you making rulings from the

22 | bench that he can't testify about what somebody thought,

23 | felt or reacted because they can play with said of tape but

24 | here we have the tape so I don't think he should be allowed

25 | to do it.

1          MR. SOFER:  Let me say three things in response.

2          THE COURT:  I disagree.  Obviously somebody

3    testified as to conversation without having recorded it,

4    you can bring it out in cross examination that it wasn't

5    recorded.  To the extent that this is offered as

6    co-conspirator testimony, whether it's hearsay or not, and

7    I would assume in any event most of this is statements

8    being made rather than for the truth of the matter

9    asserted.  It that's correct, I'll give that instruction.

10          MR. SOFER:  First of all, I think it could be

11   the co-conspirator statements it can be.

12          THE COURT:  I don't think the conspiracy's been

13   established yet.

14          MR. SOFER:  And this is part of establishing that

15   conspiracy, Your Honor, the fact that these men planned to

16   meet for a purpose is what this particular conversation is

17   coming.

18          THE COURT:  Let me do this, I would prefer that

19   you say instead of asking did you make arrangements for

20   El-Hindi to meet with you there the next day, on the

21   preceding day, did you have occasion to have a conversation

22   with Mr. El-Hindi, what did you say, what did he say as

23   best you can recall, and then the next day who was present,

24   did you have conversation, as best you can recall who said

25   what, who was present.

```
 1              MR. SOFER:  Not a problem, Judge, and we're not
 2   looking -- this is a very tiny segment.
 3              THE COURT:  I understand, but I try quite
 4   vigorously anybody that testifies about a conversation,
 5   where did it occur, who was present, do you recall who said
 6   it.
 7              MR. BOSS:  Mr. Sofer -- would you also please
 8   just indicate that it's not a recorded conversation.
 9              MR. SOFER:  It's not a recorded conversation.
10              MR. BOSS:  For the jury.
11              MR. SOFER:  Oh, you mean just ask him whether he
12   recorded it?
13              MR. HARTMAN:  Just to clarify the objection
14   can -- can they -- can he testify about how El-Hindi felt?
15              THE COURT:  No, of course not.
16              MR. SOFER:  I'm not going to ask him how he felt.
17              THE COURT:  That's why he will say who said what,
18   that way we avoid the length --
19              MR. SOFER:  What counsel is doing is reading the
20   summary chart which, by the way, I would note for the
21   record Mr. Griffin has never referred to this.
22              THE COURT:  That's fine.
23                   (Side bar concluded.)
24              THE COURT:  Okay.  You may continue.
25   BY MR. SOFER:
```

1    Q.        The previous day on February 1st did you have a

2    conversation with Marwan El-Hindi?

3    A.        Yes, did I.

4    Q.        And was that conversation recorded?

5    A.        I believe it was.

6    Q.        Do you know what was discussed among other

7    things?

8    A.        Going to see Mohammed Amawi at his apartment.

9              MR. BOSS:  Excuse me.  Did -- did the witness say

10   it was recorded or was not?

11             THE COURT:  He testified that he believes that it

12   was.

13             MR. BOSS:  Thank you.

14   BY MR. SOFER:

15   Q.        Now, I want to direct your attention to the next

16   day February 2nd, 2005.  Did there come a time --

17             THE COURT:  Do you recall what you said and he

18   said, you being -- he being Mr. El-Hindi on it would have

19   been I guess the 1st of February?

20   A.        Yes, sir.

21             THE COURT:  And what -- what was that, what did

22   you say -- tell us, you know, where did you have this

23   conversation and who was present?

24   A.        Basically it was just myself and Mr. El-Hindi,

25   and I believe it was on the phone and we had not talked in

```
 1   a few days, I believe, and it was simply --
 2             THE COURT:  Who called whom?
 3   A.        I believe I called him.  I don't know if it
 4   was -- I don't remember if it was a return call or not, but
 5   we had just discussed about getting together, talking about
 6   the grants, his vehicle was not properly working or it was
 7   sketchy at the time, and he needed to be taken a couple
 8   places and I believe we went up to Kinko's copies and I
 9   said we also talked about stopping by to see Mohammed Amawi
10   during that conversation.
11   Q.        Had Mohammed Amawi approved Marwan El-Hindi to
12   come over to his house?
13             MR. HARTMAN:  Objection.
14             THE COURT:  Sustained.
15   Q.        I want to direct your attention to the next day,
16   February 2nd.  Did there come a time when you did meet with
17   Mohammed Amawi at his home?
18   A.        Yes.
19   Q.        I think you already testified to this, but did
20   someone else -- was someone else there during some or all
21   of that meeting?
22   A.        Marwan El-Hindi.
23   Q.        I want us to turn -- by the way, do you know if
24   you brought a recording device on that day?
25   A.        Yes, I did.
```

1   Q.        And if we can turn to Exhibit Number, I believe

2   it's 1D22, Exhibit 4-28, segment 1A, please.

3                    (Video and audio playing.)

4   Q.        Okay.  Mr. Griffin, did that conversation

5   continue on February 2nd, 2005?

6   A.        Yes, it did.

7   Q.        And although it's on video, can you tell us where

8   you are?

9   A.        We are sitting in Mohammed Amawi's bedroom, at

10  his apartment.

11  Q.        I'd like to play 2-A, please.

12                   (Audio and video playing.)

13  Q.        Can you remind the jury who Rafil was, if you

14  know?

15  A.        That was the physician that was friends with

16  Marwan El-Hindi.  He had went out to Syracuse, New York in

17  the beginning and had to testify in front of a grand jury.

18  Q.        Okay.  Let's continue.

19                   (Audio and video playing.)

20  Q.        Did this conversation continue on February 2nd?

21  A.        Yes, it did.

22  Q.        And if I can play clip 3A, please.

23                   (Video and audio playing.)

24  Q.        Okay.  Did this conversation continue beyond

25  that?

```
 1   A.        Yes, it did.

 2   Q.        If we could play 5A, please.

 3                  (Audio and video playing.)

 4   Q.        And Mr. Griffin, I want to show you what's been

 5   marked Government Exhibit Number 54 for identification.

 6   Can you tell us if you recognize that?

 7   A.        Yes, it's a CD.

 8   Q.        And did that CD contain a video which depicts the

 9   same or similar video that was just playing in clip 5-A?

10   A.        Yes, one where the compound is seized.

11   Q.        You don't have to tell us is it the same or

12   similar to the one that you were watching there?

13   A.        Yes.

14   Q.        And do you have an independent recollection of

15   watching that along with Marwan El-Hindi and Mohammed Amawi

16   on February 2nd, 2005?

17   A.        Yes, I do.

18             MR. SOFER:  At this time the government offers 54

19   into evidence.

20             THE COURT:  And how long will this take to play?

21             MR. SOFER:  I think it's relatively short, maybe

22   four or five minutes, Judge.

23             THE COURT:  Would it be a time to break?

24             MR. SOFER:  If Your Honor would like to break, it

25   will be a good time for me.  I don't want to go to jail.
```

```
 1              THE COURT:  I don't want to interrupt if you have

 2    a series of things that you want --

 3              MR. SOFER:  I think this would be a fine time to

 4    stop.

 5              THE COURT:  Okay.

 6                   (Video playing.)

 7              THE COURT:  Okay.  We'll break for lunch.  Let's

 8    plan to resume about 1:15.

 9                   (A brief recess was taken for lunch.)

10              MR. SOFER:  Judge, before the jury comes in, I

11    just wanted to put on the record something about The

12    Court's -- The Court's admonition or instruction to the

13    jury about the transcripts.  We request that instead of

14    saying they're the government's interpretation, that

15    instead they be told it's only for their aide or

16    assistance, and more important than that, Judge, is the

17    fact that portions of the transcript, that is the Arabic

18    portions of the transcript are, in fact, evidence of the

19    case, translation.

20              THE COURT:  Okay.  That's a good point.

21              MR. SOFER:  And I'd be very concerned --

22              THE COURT:  No, very good point.

23              MR. SOFER:  -- about the jury being told that

24    they might misinterpret that.

25              MR. BOSS:  Could we also admonish the witness
```

```
 1    that he's still under oath as time does pass.
 2              THE COURT:  Okay.  Thank you.
 3              MR. HARTMAN:  Judge, I'm wondering would it be
 4    appropriate to tell the jurors that during the defense's
 5    case they might present transcript that don't quite say the
 6    same thing?
 7                    (Jury brought back into courtroom.)
 8              THE COURT:  Ladies and gentlemen, I want to
 9    clarify what I -- something I said inadvertently earlier.
10    When you -- when recorded testimony is presented to you in
11    English, it is what you hear in English as English speakers
12    that is the evidence.  The transcript is simply an aide to
13    your understanding.  And if there's any inconsistency
14    between the transcript and what you hear, what you hear
15    controls.  Or if the, in fact, you can't hear what the
16    transcript shows, you must disregard the transcript.  As to
17    some of the transcripts, it may be, and I don't know, but
18    it might be that the defense, if it offers evidence, of
19    course it has the right not to, but if it does, that it may
20    offer differing versions.  And as I say, when you're back
21    in the jury room it's what you hear that controls.  I
22    misspoke, and I think simply, through oversight.  The
23    translations where there's a translation from a foreign
24    language, in this case Arabic, the translation with the
25    printed translation that you will have, you will see that
```

1   is evidence.  In other words, that is the evidence.

2   Because obviously whatever is being said or written in

3   Arabic, none of us can understand.  So there's a

4   distinction between a foreign language transcription or

5   transcript or translation that is evidence.  And something

6   that's been recorded, something that's spoken in English

7   and has been recorded, and you have a transcript of that.

8   The evidence of that -- those spoken words is the English

9   that you hear.  Okay.

10          JUROR:  I have a question.

11          THE COURT:  And Mr. Griffin, you remain under

12   oath.

13          JUROR:  Is there any way during the English

14   translation -- translation, is there any way to slow that

15   down?  It rolls very fast and it's really hard to read

16   sometimes.

17          THE COURT:  I would assume, I'll talk with the

18   lawyers about that at the end of the day.  I would assume,

19   though, that because it's synchronized with what's being

20   spoken, and then as I say, were there to do otherwise what

21   I think probably increase the risk that you find yourself

22   depending on what you see and what you hear.

23          JUROR:  The English is fine, it's just when

24   they're translating it that it's rolling very very quickly.

25          THE COURT:  I understand what you're saying and

```
 1   I'll talk with counsel about that.  Thank you for raising

 2   that issue.  Okay.  Mr. Sofer.

 3          MR. SOFER:  Thank you, Judge.  And Mr. Griffin I

 4   believe you're still under oath.

 5   A.        Yes, sir.

 6   BY MR. SOFER:

 7   Q.        I wanted to ask you about the last thing we

 8   listened to before the lunch break was a video.  Were both

 9   Mohammed Amawi and Marwan El-Hindi present during the

10   playing of that video?

11   A.        Yes.

12   Q.        And when the symbol for Al-Qaeda in Iraq was on

13   the screen, were both Mohammed and Marwan El-Hindi present

14   in the room?

15   A.        Yes.

16   Q.        Did the conversation on February 2nd, 2005

17   continue?

18   A.        Yes.

19   Q.        And I'd like us to play section -- or segment 6A

20   from Exhibit Number 4-27.

21          THE COURT:  I think it needs to be turned up a

22   bit.

23              (Audio and video playing.)

24          MR. SOFER:  Judge, I'm going to ask to replay

25   that one again because at least I was unable to hear the
```

```
 1    beginning of it.
 2              THE COURT:  That's fine.  Again, this is not
 3    being replayed for emphasis, but just so that what's been
 4    recorded can be heard.
 5                   (Video and audio playing.)
 6    Q.        That Sunnah Center, do you know what Marwan
 7    El-Hindi was referring to?
 8    A.        The mosque on Monroe Street in Toledo, Ohio.
 9    Q.        Could you play segment 8A, please?
10                   (Video and audio playing.)
11    Q.        Okay.  Mr. Griffin, did the conversation that we
12    just heard, was Marwan El-Hindi present for all of that?
13    A.        Yes, he was.
14    Q.        And did the conversation on February 2nd
15    continue?
16    A.        Yes, it did.
17    Q.        Play 9A, please.
18                   (Audio and video playing.)
19    Q.        When you said we'd be working with C4, what is
20    C4, if you know?
21    A.        Plastic explosive.
22    Q.        And was Marwan El-Hindi present when you said
23    that?
24    A.        Yes.
25    Q.        Did the conversation continue on February 2nd?
```

1  A.        Yes.

2  Q.        And let's play one 1A, please.

3                 (Video and audio playing.)

4         MR. SOFER:  And Judge, here both because of the

5  length of it and one of the comments by the jurors I'd just

6  ask permission to play that last little bit again because

7  you'll see how quickly it removed.

8         THE COURT:  Just a reminder, when we replay

9  something it's not for emphasis, simply so that the audio

10 can be heard.

11        MR. BOSS:  Which one is this?

12                (Audio and video playing.)

13 Q.        Okay.  And if we can pull up Government's Exhibit

14 50 for identification, please.  Do you recognize Government

15 Exhibit number 50?

16 A.        Mohammed Amawi.

17 Q.        Okay.  And does that fairly and accurately

18 represent the way he looked during part of that particular

19 interaction with him on February 2nd, 2005?

20 A.        Yes.

21        MR. SOFER:  At this time, Your Honor, the

22 government offers Exhibit Number 50 into evidence.

23        THE COURT:  It will be admitted.

24 BY MR. SOFER:

25 Q.        Did there come a time on February 4th when you

```
 1   met with Mohammed Amawi again?

 2   A.        Yes.

 3   Q.        He had a job by then or not?

 4   A.        Yes.

 5   Q.        Can you tell the members of the jury if you know

 6   where he was working?

 7   A.        He was working at a travel agency on Secor, I

 8   believe, and it's called AZ Travel.

 9   Q.        Do you know who owned AZ Travel or who ran AZ

10   Travel?

11   A.        I believe it to be Ashraf Zaim.

12             THE COURT:  How do you spell that just for the

13   jury?  Can you spell it, Mr. Sofer?

14             MR. SOFER:  It's A-S-H-R-A-F, Z-A-I-M, I believe.

15             THE COURT:  Okay.

16   BY MR. SOFER:

17   Q.        Did you learn what Mohammed Amawi did at AZ

18   Travel?

19   A.        He arranged travel plane tickets back and forth

20   to the Middle East and other places all across the United

21   States, basically four-day flights.

22   Q.        Okay.  Did you ever meet Mohammed Amawi at AZ

23   Travel?

24   A.        Yes.

25   Q.        Was there a computer located there?
```

```
 1   A.        Yes.

 2   Q.        Did he have his own workstation or were there --

 3   did he share workstations, can you give us an idea where he

 4   worked within the building?

 5             THE COURT:  He being Mr --

 6   Q.        Mohammed Amawi?

 7   A.        There was at least three different workstations

 8   there, and he had one that was independent that he always

 9   worked on.

10   Q.        If we could show Government Exhibit Number 202, I

11   think, A for identification.  Can you tell the members of

12   the jury if you recognize 202-A?

13   A.        That is AZ Travel.

14   Q.        And does it fairly and accurately represent the

15   way AZ Travel looked at or about the time that Mohammed

16   Amawi worked there?

17   A.        Yes.

18             MR. SOFER:  At this time, the government offers

19   202-A.

20             THE COURT:  It will be admitted.

21             MR. SOFER:  Go to 202B.

22   BY MR. SOFER:

23   Q.        Can you tell us what's depicted in Government's

24   Exhibit 202B for identification?

25   A.        That is the inside of AZ Travel.
```

```
 1   Q.        And does that picture fairly and accurately

 2   represent basically the way it looked during the time that

 3   Mohammed Amawi worked there?

 4   A.        Yes.

 5             MR. SOFER:  At this time the government offers

 6   202-B.

 7             THE COURT:  It will be admitted.

 8             MR. SOFER:  202-C.

 9   BY MR. SOFER:

10   Q.        Do you recognize that?

11   A.        Yes, it's a picture of the inside of AZ Travel,

12   specifically Mohammed Amawi's workstation.

13   Q.        And does it fairly and accurately represent the

14   way that looked basically during the time that Mohammed

15   Amawi worked there and you visited him there?

16   A.        Yes.

17   Q.        And the government offers 202-C.

18             THE COURT:  It will be admitted.

19             MR. SOFER:  202-D, please.

20   BY MR. SOFER:

21   Q.        Can you tell the members of the jury if you know

22   what's depicted in 202-D for identification?

23   A.        It is another picture of Mohammed Amawi's

24   workstation on the inside of AZ Travel.

25             MR. HARTMAN:  Objection.
```

```
 1              THE COURT:  Basis?

 2              MR. HARTMAN:  Foundation.

 3              THE COURT:  Well, he said if you know.

 4              MR. HARTMAN:  Well --

 5              THE COURT:  Do you want to approach?

 6              MR. HARTMAN:  I think we should approach, Judge.

 7                   (A side bar conference was had on the

 8                   record.)

 9              THE COURT:  Is there any real dispute about this?

10              MR. HARTMAN:  I don't think there's any

11    foundation -- how many times he saw Amawi working there or

12    if he was working.

13              THE COURT:  You can ask him.

14              MR. HARTMAN:  Or any of those.

15              THE COURT:  Ask if he's ever seen him.

16              MR. SOFER:  I asked him if he visited him there.

17              THE COURT:  Yeah, I think he's laid plenty of

18    foundation and there's no dispute.

19                   (Side bar concluded.)

20              THE COURT:  The objection's been overruled.  Do

21    you want the last question read back?  The answer stands.

22    You may continue.

23              MR. SOFER:  We'll offer 202-D into evidence.

24              THE COURT:  Okay.  It will be admitted.

25    BY MR. SOFER:
```

```
 1   Q.        Is this the location that is AZ Travel that you
 2   saw Mohammed Amawi on February 4th, 2005?
 3   A.        Yes.
 4   Q.        And if we can play -- this is now Exhibit 4-29
 5   from 1D23, and it's clip 3-A, I believe.
 6             THE COURT:  I'm sorry, what Exhibit Number?
 7             MR. SOFER:  4-29, 1D23, 3-A, Judge.
 8             (Audio playing.)
 9   Q.        And Mohammed Amawi said brother Wassim and his
10   brother, did you later learn who he was referring to?
11   A.        Wassim Masloum and Bilal Masloum.
12   Q.        Okay.  Continue.
13             (Audio playing.)
14   Q.        Mr. Griffin, do you recall whether Amawi was at
15   AZ Travel that day with anyone other than you?
16   A.        I cannot recall.
17   Q.        Okay.  Let's turn to February 6th of 2005.  Did
18   there come a time when you met with Mohammed Amawi on that
19   day at his apartment?
20   A.        Yes.
21   Q.        And if we can turn to Exhibit 4-30, which is
22   1D24.  And the first clip is 1A.
23             (Audio playing.)
24   Q.        When you referred to the file with the jacket,
25   what were you referring to?
```

```
 1   A.         The bomb vest video.

 2   Q.         Did that conversation continue?

 3   A.         Yes, it did.

 4   Q.         Let's play clip 2A please.

 5              (Audio playing.)

 6   Q.         Is there another person there at this time?

 7   A.         Yes, there is.

 8   Q.         And do you know who that person was?

 9   A.         I believe it to be his spiritual adviser, first

10   name Allah, I'm not sure of his last name.

11   Q.         Okay.

12              (Audio playing.)

13   Q.         Okay.  Did this Allah person, best you recall,

14   was he there when you got there on this day or did he

15   arrive after you?

16   A.         I believe he arrived after I was there.

17   Q.         And I want to show you what's been marked

18   Government's Exhibit Number 51 for identification.

19              Can you tell the jury if you recognize government

20   number 51 for identification?

21   A.         Yes, I do.

22   Q.         Tell the members of the jury what that is.

23   A.         It is a CD.

24   Q.         And does that CD contain all or part of the video

25   with King Fahd when it -- does it contain all or part of
```

1   the video with King Fahd wearing a cross?

2   A.        Yes.

3   Q.        To the best of your knowledge, do you have

4   independent recollection of watching a portion of that

5   video at Mohammed's apartment on February 6th of 2005?

6   A.        Yes, I do.

7             MR. SOFER:  And the government offers 51 into

8   evidence.

9             THE COURT:  It will be admitted.

10  Q.        I'll play a portion of 51.

11            (Video playing.)

12  Q.        And the record should reflect that the government

13  stopped the playing of this exhibit at 28 seconds.  Okay.

14  Mr. Griffin, did the conversation on February 6th at

15  Mohammed Amawi's apartment continue?

16  A.        Yes, it did.

17  Q.        We can play 4A, please.

18            (Audio playing.)

19  Q.        Did the fellow named Allah stay for the entire

20  conversation or did he leave before -- before you?

21  A.        He did not stay.  He left.

22  Q.        And can we play, please, segment 5-A.

23            (Audio playing.)

24  Q.        Okay.  Did the conversation continue?

25  A.        Yes, it did.

```
 1   Q.         Let's play 6A, please.
 2                    (Audio playing.)
 3   Q.         Do you recall, Mr. Griffin, if this was one of
 4   the times you were trying to connect your computer to
 5   Mohammed Amawi's computer directly?
 6   A.         Yes.
 7                    (Audio playing.)
 8   Q.         We'll stop it here.  The times that you were over
 9   at Amawi's house, was it unusual for you to eat while you
10   were there?
11   A.         It was not unusual.
12   Q.         And did you spend sometimes a minute or hours
13   sitting around eating and talking about things other than
14   the tapes that we've been talking about?
15   A.         Yes, many hours.
16              JUROR:  Is there a way we can get the text a
17   little bigger on this?
18              THE COURT:  I don't know.
19              MR. SOFER:  I don't really know that I'm --
20              THE COURT:  We'll try to find out.
21              MR. SOFER:  We'll work on it.
22              JUROR:  Thank you, Your Honor.
23              THE COURT:  I suppose all the questions we ask
24   you, we should have asked about eyesight.  We missed some.
25   Go ahead, Mr. Sofer.
```

```
 1              MR. SOFER:  Let's continue with the tiny writing
 2    scrolling across the screen.
 3              THE COURT:  Is it the next cut?
 4              MR. SOFER:  No, we're still in the middle of this
 5    one, Judge.
 6              THE COURT:  I'm sorry, the --
 7    Q.        Let's continue.
 8                   (Audio playing.)
 9    Q.        You testify before that Mohammed Amawi had given
10    you discs and there were times when you gave discs back to
11    him.  Was this one of those times?
12    A.        Yes.
13                   (Audio playing.)
14    Q.        This brother that he's talking about, is that the
15    individual that just left?
16    A.        Yes.
17    Q.        And again, you knew his name as?
18    A.        Amr.
19    Q.        I'm talking about the individual that just left.
20    A.        Oh, no, that was the neighbor, I believe, that
21    lived upstairs.  His name was Allah.
22    Q.        Okay.
23                   (Audio playing.)
24    Q.        Had you brought the bomb vest video to the
25    attention of the FBI by now?
```

```
 1   A.        Yes.
 2   Q.        And did you have numerous discussions with them
 3   about that particular video?
 4   A.        Yes.
 5   Q.        In any of those discussions, did they indicate to
 6   you whether they were able to open up the bomb vest video?
 7   A.        I believe they were not.
 8   Q.        Let's continue.
 9             (Audio playing.)
10   Q.        Now, when Mohammed Amawi would go to pray, were
11   there times when you would try to turn the device off?
12   A.        Yes.  If he went to pray in the front room, there
13   would be no need to turn it off but sometimes I would,
14   depends on how many hours I had spent there.  I had a
15   limited time upward of five hours or more he needed to pray
16   or we went to pray.
17   Q.        And let's -- did this conversation continue, by
18   the way?
19   A.        Yes.
20   Q.        And I think we're up to 8A -- 7A, I'm sorry.
21             (Audio playing.)
22   Q.        Brother Wassim that Mohammed Amawi's referring
23   to, did you later learn who that was?
24   A.        Wassim Masloum.
25   Q.        Is that the individual here in the courtroom
```

```
 1   today?

 2   A.        Yes, it is.

 3   Q.        Continue.

 4                 (Audio playing.)

 5   Q.        Do you know what that sound is in the background?

 6   A.        It is the sound of Mohammed Amawi's computer

 7   burning CDs.

 8                 (Audio playing.)

 9   Q.        And Your Honor, this would be an opportune time

10   to stop if you want to take a mid afternoon break.  If not,

11   the next cuts are longer.

12                 THE COURT:  Okay.  Why don't we go for a little

13   bit and break, maybe another 20 minutes or so.

14                 MR. SOFER:  This next one is almost exactly 20

15   minutes.  That works.

16                 THE COURT:  Thanks, though, I appreciate it.

17   BY MR. SOFER:

18   Q.        Did the conversation with Mr. Amawi continue on

19   February 6th?

20   A.        Yes, it did.

21   Q.        And if we could now play 8A, please.

22                 (Audio playing.)

23                 MR. SOFER:  Okay, Judge, after that rather

24   painful session, I'd recommend we take a short break.

25                 THE COURT:  Any objection?  Hearing none, we'll
```

```
 1   resume at 3:00.
 2                  (A brief recess was taken.)
 3              MR. SOFER:  Judge, there's one issue before we
 4   bring the jury in, coming up in not this clip but the very
 5   next clip is the first time that there's a gun the
 6   government is going to want to introduce.  I just want to
 7   find out from The Court if you have a particular concern
 8   about how we handle the gun here.
 9              THE COURT:  A real live firearm?
10              MR. SOFER:  It's not loaded, but it's been made
11   safe.  I believe it's got a tie through the breach of the
12   weapon.  I don't know -- I would like -- it actually is a
13   gun that was owned by Darren Griffin, still is owned by
14   Darren Griffin.  I'd like to be able to show it to him on
15   the witness stand but I just don't want to walk around with
16   a pistol -- the gun is safe and we've taken steps to make
17   sure it's okay.
18              THE COURT:  No problem.
19                  (Jury brought back into courtroom.)
20              THE COURT:  You may be seated.  Ladies and
21   gentlemen, I wanted to let you know that tomorrow we'll be
22   adjourning about 3:00.  I think I told you that before, but
23   I have to go to Cleveland for a function that I committed
24   myself to attend several months ago.
25              The lawyers reminded me that have indicated in
```

1    the past that we will not be sitting on the 17th and 18th

2    of April.  That's a week from this Thursday and Friday.  I

3    had a conference in Washington with other district Judges.

4    I decided not to go to that conference, so my present plans

5    are to sit those two days, and I would hope that if we're

6    moving along there will be and no delays through the audio,

7    perhaps we can break a little early on Friday.  We'll have

8    to wait and see.  If that's created a problem for any of

9    you because you anticipated we wouldn't be sitting on any

10   of those days, let Amy know and we'll go from there.  And

11   if I hear that there are 18 problems I'm going to suspect

12   that something is going on.  That's not what we mean by

13   jury unanimity in the middle of April.  Okay.  But I hope

14   that I haven't misled any of you.  Counsel reminded me that

15   I may have indicated that to you at some point.

16              So Mr. Griffin, you remain under oath.

17   Mr. Sofer, you may continue.

18   BY MR. SOFER:

19   Q.         Thank you, Judge.  Did the conversation that we

20   were listening to from February 6th, 2005 continue.

21   A.         I believe so.

22   Q.         And we're going to play 9A.

23                  (Audio playing.)

24   Q.         Say the vest one, what are you referring to?

25   A.         The bomb vest video.

```
 1                    (Audio playing.)
 2   Q.          Okay.  And finally, did the conversation continue
 3   further on February 6th, 2005?
 4   A.          Yes.
 5   Q.          We're going to play 10A, please.
 6                    (Audio playing.)
 7   Q.          When Mohammed Amawi's referring to having -- when
 8   you asked him you did good with it, what date were you
 9   referring to?
10   A.          January 21st.
11   Q.          And was that the day you testified earlier that
12   you went to Clelands with Mohammed Amawi and others?
13   A.          Where Mohammed Amawi met me, yes.
14   Q.          Do you know whether he -- you had a gun with you
15   on the 6th of February, correct?
16   A.          Yes.
17   Q.          I want to show you what's been marked Government
18   Exhibit Number 86, and ask you if you recognize this.
19   A.          Yes.
20   Q.          Whose gun is that?
21   A.          That is mine.
22   Q.          And what kind of gun is it?
23   A.          It is a Glock 19.
24   Q.          Is that one of the guns that Mohammed Amawi
25   trained with on January 21st?
```

```
 1  A.        Yes.

 2            MR. HARTMAN:  Objection.

 3            THE COURT:  Basis?

 4            MR. HARTMAN:   What The Court said earlier about

 5  the term.

 6            THE COURT:  That's right.  Yeah, correct.

 7  BY MR. SOFER:

 8  Q.        That's one of the guns you used, okay; is that

 9  correct?

10  A.        Yes, sir.

11            THE COURT:  Jury, disregard the rest about

12  training.

13  BY MR. SOFER:

14  Q.        Did you bring that gun to the Clelands Shooting

15  Range on January 21st?

16  A.        Yes, I did.

17  Q.        And was that the gun that you brought to Mohammed

18  Amawi's house on February 6th, 2005?

19  A.        Yes, it was.

20            MR. SOFER:  At this time, Your Honor, the

21  government offers Government Exhibit Number 86.

22            THE COURT:  It will be admitted.

23            MR. HARTMAN:  Judge, I mentioned earlier about my

24  back.  I might stand up a little bit.

25            THE COURT:  That's no problem.  Mr. Hartman has
```

```
 1   some back problems so if he's up and down and about --
 2              MR. HARTMAN:  Sorry.
 3   BY MR. SOFER:
 4   Q.        And the Ruger which is being referred to in the
 5   conversation on February 6th, do you recall what weapon
 6   that is?
 7   A.        I believe it is the Ruger 22.
 8   Q.        And where -- is that your gun?
 9   A.        No, that's not.
10   Q.        Whose gun is it, if you know?
11   A.        I believe it belongs to Clelands.
12   Q.        And was that one of the weapons that was used on
13   January 21st?
14   A.        I believe so.
15   Q.        Let's continue.
16              (Audio playing.)
17   Q.        Tell the jury what you're showing Mohammed Amawi
18   how to do here.
19   A.        Basically take the upper receiver from the lower
20   receiver training him on how to take the Glock apart, field
21   stripping.
22              (Audio playing.)
23   Q.        Okay.  On February 6th, Mr. Griffin, did Mohammed
24   Amawi give you a disc?
25   A.        I believe he gave me two CDs that day.
```

```
1    Q.         Okay.  And were those the discs that we heard
2    referred to the recordings?
3    A.         Yes.
4    Q.         And what did you do with those two discs?
5    A.         I turned them over to the FBI.
6    Q.         Do you recall seeing what specific files were on
7    these discs before turning them over to the FBI?
8    A.         I did not.
9    Q.         Do you know when you brought them to the FBI?
10   A.         I cannot recall if it was the same night or the
11   next day.
12   Q.         Did you do anything to alter the discs' contents
13   in any way before giving the discs to the FBI?
14   A.         I did not.
15   Q.         And do you recall who you gave them to?
16   A.         Shannon Coats or Bill Radcliff.
17   Q.         Do you recall whether one or more of the discs
18   had any particular markings on it?
19   A.         I believe one was white and had a star on it,
20   written on it.
21   Q.         Did there come a time when you got one or more of
22   these discs back from the FBI again?
23   A.         Yes.
24   Q.         And again can you tell the members of the jury,
25   if you know, why that is?
```

```
 1   A.         To be able to have them accessed just in case

 2   Mr. Amawi asked for them or it also covered my identity as

 3   being Islamic extremist.

 4   Q.         Okay.  Now, I want to direct your attention to

 5   February 8th, two days later.  Did you have occasion two

 6   days later to meet with Marwan El-Hindi at his home?

 7   A.         Yes.

 8   Q.         And again, can you tell us if you recall what --

 9   where that home was located?

10   A.         On Mayo Street in Toledo, Ohio.

11   Q.         Okay.  And I want us to play Exhibit 4-75, 1D7,

12   clip 1A, please.

13              (Audio playing.)

14   Q.         You refer to do you see the vest.  Can you tell

15   the members of the jury what vest you're referring to?

16   A.         The bomb vest video.

17              MR. SOFER:  Let's continue.

18              (Audio playing.)

19   Q.         Do you know who that unknown child is that's

20   talking about these videos sir?

21   A.         Yes, that's Marwan El-Hindi's son.

22   Q.         Do you know approximately how old he is at this

23   time in 2005?

24   A.         I believe he was about eight years old.

25              (Audio playing.)
```

1    Q.        Okay.  Did the conversation on February 8th with

2    Marwan El-Hindi at his home continue?

3    A.        Yes, it did.

4    Q.        And if we can play clip 2A, please.

5              (Audio playing.)

6    Q.        Tell the members of the jury, if you know, what

7    Zubair is being referred to there?

8    A.        Zubair Ahmed.

9    Q.        Please continue.

10             (Audio playing.)

11   Q.        Did this conversation continue, Mr. Griffin?

12   A.        Yes, it did.

13   Q.        And if we can play clip 3-A, please.  By the way,

14   before you start that, to your best recollection, were you

15   aware of that particular website before February 8th, 2005?

16   A.        I was not.

17   Q.        Continue.

18             (Audio playing.)

19   Q.        What's that rustling noise?

20   A.        That's me walking.

21   Q.        And can you give us an idea where you were

22   walking at that time?

23   A.        On Mayo Street in one of the bedrooms.  I believe

24   it was the second bedroom on the left.

25   Q.        So these first pieces of the conversation that

```
 1   we've heard, do you know approximately where you were
 2   inside of Marwan El-Hindi's home?
 3   A.        Yes, as soon as you come in the door, the living
 4   room area.
 5   Q.        And you were walking to one of the bedrooms?
 6   A.        Yes.
 7   Q.        Do you know if there was a computer in there,
 8   that is this side of Mayo Street, the home?
 9   A.        Yes, at least one.
10   Q.        Okay.  And was there a computer in the bedroom?
11   A.        Yes.
12                 (Audio playing.)
13   Q.        Uthman, do you know who Marwan El-Hindi was
14   referring to at that moment?
15   A.        His young son.
16                 (Audio playing.)
17   Q.        One moment, Judge.  If we can put up Government
18   Exhibit Number 61 for identification.  Do you recognize
19   government Exhibit Number 61?
20   A.        Yes.
21   Q.        In the clip that we just heard, the transcript
22   says something about you had printed out some paper, that
23   is Marwan El-Hindi had printed out some paper but he didn't
24   want to keep it.  Can you tell us what, if anything,
25   Government Exhibit 61 has to do with that paper that Marwan
```

1    El-Hindi is referring to?

2    A.        That is the Muntada Al-Ansar website that he was

3    talking about.

4    Q.        Did he give you that piece of paper on or about

5    February 8th, 2005?

6    A.        Yes, he did.

7              THE COURT:  I'm sorry, how do you spell that?

8    Q.        It's in the transcript, Your Honor.  I think it's

9    M-U-N-T-A-D-A.

10             THE COURT:  I'm sorry.  Start over again.

11             MR. SOFER:  M-U-N-TA-D-A, A-L is the second word,

12   M-A-S-A-D-AH.

13             MR. HARTMAN:  Mr. Sofer?

14             MR. SOFER:  That's approximate.

15             MR. HARTMAN:  Do you have a hard copy that's more

16   clear than that?

17             MR. SOFER:  I don't know if we do.

18             THE COURT:  That's okay.

19             MR. SOFER:  Do you have it on your exhibit books?

20             THE COURT:  It's been on the transcript.  I just

21   didn't hear it.  That's fine.

22   BY MR. SOFER:

23   Q.        Was there papers that day -- was there a second

24   page of information that he gave you on that day?

25   A.        Yes, there was.

1  Q.          And if we can put up 61-002, I believe it is.

2  Just trying to see, Judge, if we can get a clearer version.

3  One minute, Judge.

4          MR. BRYAN:  Your Honor may we approach?

5          THE COURT:  Sure.

6              (A side bar conference was had on the

7               record.)

8          THE COURT:  Ladies and gentlemen, if you want to

9  stand up and stretch a bit or whatever, go right ahead.

10         Okay.  By the way, I have to adjourn promptly at

11  4:30.  I've got a conference call.

12         MR. SOFER:  I don't know for the government at

13  least when this particular clip is done the best way is for

14  us to stop in about ten minutes I think, could be a little

15  longer.  We're moving quickly so --

16         THE COURT:  Okay.

17         MR. BRYAN:  Your Honor, I want to place -- yeah,

18  I need to place this on the record.  I believe the witness

19  when he testified -- I went back and looked at the realtime

20  transcript.  When he was describing the website, he called

21  this the Al-Ansar website, and then when you asked

22  Mr. Sofer to spell the website.  Mr. Sofer spelled a

23  different website, a completely different website in his --

24  and in fact, Mr. Griffin testified to Al-Ansar and Mr.

25  Sofer spelled a different website.  In essence, Mr. Sofer

1  just testified to the jury.  Is there a difference?

2        MR. SOFER:  There is a significant difference.  I

3  thought I could have sworn he said Muntada Al-Ansar.

4  A.      He did.

5        MR. SOFER:  Whatever he said.  For certain if you

6  want to read it back, that's fine.

7        THE COURT:  I'll ask him what website you're

8  referring to.

9        MR. SOFER:  That's fine.  And again, if I did

10  that, I certainly was not trying to testify to the jury.

11        MR. HARTMAN:  Judge, my problem is this is page

12  three of the document that I need to look at before I know

13  if I can properly object.  I need to look at the first two

14  pages which I have but it's going to take me a couple

15  minutes.

16        MR. SOFER:  No, you don't have it.

17        MR. HARTMAN:  I don't have the beginning of this

18  in the Jencks material.

19        MR. SOFER:  No, that was never given to

20  Mr. Griffin.  The client printed out those two pages.

21  Maybe it was part of a bigger, maybe there was six pages in

22  the original but he gave -- he only gave him two.

23        MR. HARTMAN:  That is marked 02.

24        MR. SOFER:  Oh, the 302 is different.  I thought

25  you were talking about the designations of the pages on the

```
 1    bottom of the document.

 2              MR. HARTMAN:  The document is part of the 302 and

 3    I didn't --

 4              MR. SOFER:  I'm sorry, I misunderstood your --

 5              MR. HARTMAN:  Can I just have a couple minutes.

 6              THE COURT:  If you know what you're talking about

 7    because I don't.

 8              MR. HARTMAN:  It's probably nothing, but I do

 9    need to object.

10              MR. SOFER:  If you'd like, I'd prefer if I can

11    ask him the question again.

12              THE COURT:  Of course.

13                   (A side bar conference was had.)

14              MR. HARTMAN:  We have to object to this.

15              THE COURT:  Forget your sidebar voice.

16              MR. HARTMAN:  We have to object to this exhibit

17    for a couple of reasons.  Number one, the registered user

18    on this is Bilal.  Number two it's dated before the date

19    the government ever claims this meeting happened.  We need

20    to find a clean copy of this so we can show that it does

21    say Bilal right here, but the date over here, which we have

22    in the computer.

23              MR. SOFER:  It's all explained in the 1D, so if

24    you let us play on and ask the questions.

25              THE COURT:  All right.  I'll let them connect it
```

1  up.

2              (Side bar concluded.)

3              MR. SOFER:  Is that better?  Can everyone see

4  this?

5              JUROR:  Yes.

6  BY MR. SOFER:

7  Q.        Okay.  Mr. Griffin, I think I asked you if you

8  know what this page is, that is depicted in government

9  Exhibit Number 61.

10  A.        I believe it is the Muntada Al-Ansar website that

11  we had previously discussed before going into there.

12  Q.        Is that the site that he mentioned to you

13  previously on the 1D?

14  A.        Yes.

15  Q.        Okay.  In that case, Your Honor, I guess my

16  spelling was quite a bit off, at least I think this will

17  all be connected up later on.

18              THE COURT:  That's fine.  Go ahead.

19  Q.        And I think I also asked you if there was a

20  second page of information that Marwan El-Hindi gave you on

21  that day.

22  A.        Yes.

23  Q.        And if we look at page 2 of Government Exhibit

24  Number 61, does that represent the second page of what you

25  received on that day?

1    A.        Yes, it is.

2    Q.        And I don't know if you can see where I am

3    pointing with my finger or read that, I'm not sure I can

4    unless I can zoom in on it.  Can you tell us what's -- what

5    I am pointing to now in the middle of the exhibit?

6    A.        The martyrdom operation vest preparation.

7              MR. SOFER:  Okay.  And Your Honor, the government

8    moves Government Exhibit Number 61 both pages into

9    evidence.

10             MR. HARTMAN:  Objection.

11             THE COURT:  It will be admitted.

12             MR. SOFER:  I'm sorry, Judge.

13             THE COURT:  It will be admitted.

14             MR. SOFER:  I don't know if The Court would allow

15   us, we could do this the old fashion and long way.  I'd

16   like to try to show the jurors this if it's acceptable.

17             THE COURT:  Okay.

18             MR. SOFER:  I'm going to wait a moment while that

19   makes its way around, Your Honor.

20             THE COURT:  Okay.

21   Q.        That document's in Arabic, some of it is,

22   correct, Mr. Griffin?

23   A.        Yes.

24   Q.        Were you able to read then or are you able to

25   read now what's written at the top of the first page?

```
 1   A.        I cannot.

 2   Q.        And okay.  We can go back to playing clip 3-A,

 3   and again, I'd ask you to move back just a tiny little bit.

 4                   (Audio playing.)

 5   Q.        Marwan El-Hindi is saying he didn't want the

 6   paper, didn't want the print in there.  Was he referring to

 7   Government's Exhibit 61 too?

 8   A.        Yes.

 9                   (Audio playing.)

10   Q.        What, if you recall, were you referring to there?

11   A.        On the first page of the last two pages that were

12   passed around, on the right-hand corner, there was a name

13   Bilal.

14   Q.        And so what did you mean by this?

15   A.        He was laughing and he said, look who did this.

16   And we laughed because it was Bilal.

17                   MR. HARTMAN:  Objection.

18                   THE COURT:  I mean, what's the basis for his

19   knowing -- the question is who Bilal is?  What's the

20   question?

21                   MR. SOFER:  I think if he could finish answering

22   the question.

23                   THE COURT:  I'll let him answer and --

24   A.        We laughed because it clearly was not me, that he

25   used Bilal which is my Arabic name.
```

```
1   Q.      Let's continue.

2           THE COURT:  Answer may stand.

3                (Audio playing.)

4           THE COURT:  About how much longer?

5           MR. SOFER:  A little bit.  All I'd ask, we be

6   permitted a little bit tomorrow so we can put this into

7   perspective.

8           THE COURT:  Okay.  Ladies and gentlemen, we'll

9   adjourn and tomorrow we'll start at 8:30.  I think we'll

10  probably try to have a fairly short lunch break because I

11  will be adjourning at 3:00.  Thank you for your patience

12  and attention and have a safe trip home.  See you in the

13  morning.

14          MR. SOFER:  Judge, for the record, we stopped

15  this at 5525.

16          THE COURT:  Okay.  You can be seated.

17          MR. SOFER:  Should we have Mr. Griffin step out

18  Judge?

19          THE COURT:  This is just FYI.  I've forgotten on

20  the realtime how to take notes, make notes and so forth.

21  I've asked Tracy, the other court reporter, to show me if

22  you want to stick around a half hour or so.  I mean,

23  there's some neat things you can do that are pretty simple.

24  Some of you may know how to do them already, but annotate

25  text, and so she's going to be up probably around 5:00, 15
```

1    minutes.  It's up to you guys.

2              MR. HARTMAN:  We may do that.

3              THE COURT:  I just wanted to let you know.

4              MR. BOSS:  When are you going to do that?

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


s:/ Angela Nixon

--------------------------                -----------

Angela D. Nixon, RPR, CRR                Date

1            <u>**I N D E X**</u>

2

3    Testimony of Darren Griffin continued

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25