1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )  Docket No. 3:06-CR-719

4             Plaintiffs,           )  Toledo, Ohio

5                  v.               )  April 11, 2008

6    MOHAMMED AMAWI, ET AL.,        )

7             Defendants.           )

8    -----------------------------

9            TRANSCRIPT OF JURY TRIAL, VOLUME 27
                BEFORE THE HONORABLE JAMES G. CARR
10                UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:      Gregg N. Sofer
                              David I. Miller
14                            Jerome J. Teresinski
                              U.S. Department of Justice
15                            10th & Constitution Avenue, NW
                              Washington, DC 20530
16                            (202) 353-3464

17                            Thomas E. Getz
                              Justin E. Herdman
18                            Office of the U.S. Attorney
                              801 Superior Avenue, W
19                            Cleveland, Ohio 44113
                              (216) 622-3840
20
     For the Defendant        Timothy Ivey
21   Amawi:                   Edward Bryan
                              Amy Cleary
22                            Jonathan Whitmer-Rich
                              Office of the Federal Public Defender
23                            750 Skylight Office Tower
                              1660 West Second Street
24                            Cleveland, Ohio 44113
                                      (216) 522-4856
25

```
 1                        Elias Muawad
                          Muawad & Muawad
 2                        Suite 209
                          36700 Woodward Avenue
 3                        Bloomfield Hills, Michigan 48304
                          (248) 594-4700
 4    For the Defendant
      El-Hindi:           Charles M. Boss
 5                        Boss & Vitou
                          111 West Dudley Street
 6                        Maumee, Ohio 43537
                          (419) 893-5555
 7
                          Stephen D. Hartman
 8                        Kerger & Kerger
                          Suite 201
 9                        33 South Michigan Street
                          Toledo, Ohio 43602
10                        (419) 255-5990

11                        Alek H. El-Kamhawy
                          Raslan, El-Kamhway & Pla
12                        Suite 3FE
                          1700 East 13 Street
13                        Cleveland, Ohio 44114
                          (216) 928-1500
14
      For the Defendant   David L. Doughten
15    Mazloum:            4403 St. Clair Avenue
                          Cleveland, Ohio 44103-1125
16                        (216) 361-1112

17                        Jeffrey J. Helmick
                          Helmick & Hoolahan
18                        2nd floor
                          1119 Adams Street
19                        Toledo, Ohio 43624-1508
                          (419) 243-3800
20

21                        Mohammed Abdrabboh
                          1620 Ford Avenue
22                        Wyandotte, MIchigan 48192
                          (734) 283-7000
23

24
      Court Reporter:     Angela D. Nixon, RPR, CRR
25                        1716 Spielbusch Avenue
                          Toledo, Ohio 43624
```

1                          (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  The juror who -- the juror with whom

 2     we started yesterday --

 3              Amy, why don't you come on over?

 4              -- I think she probably should be excused.

 5              COURTROOM DEPUTY:  Juror -- I'm going to have to

 6     look -- is it 254?  154.

 7              MR. HARTMAN:  Not curly, the straight hair.

 8              COURTROOM DEPUTY:  She approached me this

 9     morning.  She talked with her husband, explained to him --

10     he's very upset, she's upset.  Her husband starts a new job

11     on Monday, has to be to work at 5:00 a.m., she could go

12     home and get the boys on the bus, and then would have to

13     start later, but she doesn't think he's going to be able to

14     handle it.

15              THE COURT:  I think we should excuse her.

16              MR. SOFER:  Can we just talk about this for a few

17     moments?

18              THE COURT:  Yeah.  The thing is, she clearly has

19     got problems on the home front, and they're not going to be

20     moderated by --

21              She very much wants to serve, right, Amy?

22              It's not her desire -- she's going to be very

23     upset either way.  If she lived a lot closer, I'd say,

24     look, we can do a little bit of adjustment, even then

25     she's -- the impression I get from Amy, candidly, I assume
```

1    not --

2            Sit down, sit down.

3            -- in the end with her because it's just going to

4    make it a lot more difficult.  I realize the -- the ice is

5    getting kind of thin, but I think the rest of the crowd is

6    committed -- like Grant before Petersburg -- fight on this

7    line all summer long.

8            MR. HARTMAN:  Can defense counsel --

9            THE COURT:  Yes, of course.  Talk to yourselves,

10   then talk to your clients.

11           Okay.  With regard to my suggestion, just

12   indicate whether you concur or not on behalf of the

13   government.

14           MR. SOFER:  Your Honor, we've --

15           THE COURT:  Without going into details please.

16           MR. SOFER:  We -- the government opposes excusing

17   this juror this early in the case.  We have concerns --

18           THE COURT:  Why don't we come up to sidebar.

19               (A sidebar conference was had on the

20                record.)

21           MR. SOFER:  While we're sympathetic to this

22   juror's position and understand that her husband is upset

23   and she's upset, it seems to us that she's known about the

24   length of this trial, the kind of trial it was for a long

25   time.  Your Honor's been very good about letting these

1    jurors know what kind of commitment they're going to make.

2          And our main concern, Judge, is simply, we're two

3    weeks in.  We really haven't -- even with two weeks into

4    the trial, we've only scratched the surface of about a

5    third of way through the government's case, just on the

6    first witness, that is.  And we're frightened, frankly,

7    that, as you say, the ice is thin, and we have months to

8    go.

9          And also, I think it potentially sets the bar in

10   the wrong place, in our position -- in our position,

11   potentially sits the bar in the wrong place that other

12   jurors may develop similar type of hardships.

13         And again, I use that word not in a legal sense

14   during the course of the trial, and if -- and should this

15   become a cascading problem, we obviously want to finish the

16   case, not have a mistrial because we've lost -- again,

17   we're not even two weeks into the case, we've already

18   dipped a third into the --

19         THE COURT:  Let me hear Mr. --

20         MR. HELMICK:  On behalf of Mr. Masloum, our

21   position is we have no objection to The Court excusing her

22   if The Court feels that's appropriate.

23         MR. HARTMAN:  The same on behalf of El-Hindi.

24         MR. SIEVE:  Same here.

25         THE COURT:  I am going to excuse her because I do

1  think that the -- and I appreciate it, trust me, I think I

2  do this with any sense of -- no big deal, far from it, but

3  seeing her yesterday and, you know, talking to her, and

4  then I thought things were being put to rest, but she

5  clearly has some severe and, I think, highly unusual

6  tensions.  I think she clearly understood -- understands

7  that there's no reason for concern.  I don't think she felt

8  any herself even before we talked to her about it.

9           Nonetheless, a combination of a husband who

10  obviously doesn't want her to serve.  She's away from home

11  all week now.  Now she's going to have to start getting

12  everything done, kids on the bus, leave 7:00, 7:15.

13  Doesn't matter to me if we start at 9:30, even if it means

14  losing an hour a day, that's not the issue.  The issue is

15  having the juror with those kinds of circumstances

16  developing with those kind of pressures, the impact

17  emotionally and the distraction it's going to cause add on

18  to her ability to simply focus and concentrate on this

19  case, I think, are not going to be manageable.

20           And now the question is, what, if anything, do we

21  say to the other jurors?  I would like to say to them,

22  ladies and gentlemen, this is why this juror's been

23  excused, that understand this is a drastic and severe

24  situation because of her home circumstances that I conclude

25  simply was not manageable with her obligations as a juror.

1            We are getting a little thin in back-up jurors.

2    So please understand I've done this because it's a highly

3    unusual circumstance, unexpected.  The further we get into

4    the case, the less inclined I am going to be to find no

5    matter what the hardship.  It would have to be something --

6    even if it means postponing the trial somewhat or whatever,

7    I'm going to handle it that way, I expect, rather than

8    excusing jurors.

9            MR. HARTMAN:  Are you going to tell them what the

10   situation is or just say it's something?

11           THE COURT:  No.  I'm just going to say that a

12   very severe situation at home.  She may or may not have

13   discussed it with you, but it would be, in my mind, a clear

14   and constant distraction and difficulty, and she wants to

15   serve, doesn't -- but this is a judgment.

16           MR. HARTMAN:  Maybe it would make it best if you

17   told them the reason you're making the judgment, is because

18   of -- it would make it too hard for her to focus on the

19   case.

20           THE COURT:  Exactly.  So same --

21           MR. SOFER:  I just -- I, frankly, think less is

22   more here, Judge, only because, again --

23           THE COURT:  That's fine.

24           MR. SOFER:  -- our concern is when a juror --

25           THE COURT:  That's fine.  I'll handle it that

1  way.  If you'll have her come down and -- just have her

2  come down.

3         Counsel, counsel, what I'd like to do is have her

4  come down, and on the record, again, with the same cadre

5  for just in chambers, excuse her, have the rest of the

6  jurors brought down, and go from there.

7         Have you talked to your clients?

8         MR. HELMICK:  Yes.

9         MR. HARTMAN:  Yes, he's fine.

10         MR. BOSS:  Yes.

11         THE COURT:  I'll just do it briefly on the

12  record.

13         MR. SOFER:  If we're going to bring her down,

14  Judge, would you object to a little bit of questioning

15  about her situation?

16         THE COURT:  I'm going to.

17         MR. SOFER:  Okay.

18             (In chambers with counsel only.)

19         THE COURT:  I understand you still have problems

20  at home?

21         JUROR:  Yes, I went home last night and it just

22  did not go well.  He's a mason and he's starting a job next

23  week that he has to leave the house at 5:00, and our kids

24  don't get on the bus until 7:15, and I would have to leave

25  at 5:30.  There's some issues with one of our children and

1    their homework and having problems, which I didn't find out

2    until right after I found out I was selected from this, but

3    he just -- my husband is not dealing with this well at all.

4           THE COURT:  And I gather that it would and it is

5    creating and it would create a pretty substantial,

6    continuing, and aggravating --

7           JUROR:  Oh, yes.

8           THE COURT:  -- within the family?

9           JUROR:  Very stressful.

10          THE COURT:  And would it affect your ability to

11   kind of focus and concentrate on trial and would there

12   be -- would the home situation kind of intrude upon your --

13   would you be thinking about it while you're up here?

14          JUROR:  Yes, I would.

15          THE COURT:  Okay.  Okay.

16          Counsel, any questions at all?

17          MR. HARTMAN:  No.

18          MR. HERDMAN:  Do you still want to continue

19   serving as a juror?

20          JUROR:  I would like to, but with all the issues

21   at home, I don't feel like I can.

22          THE COURT:  Okay.  Okay.  Well, we'll excuse you.

23   I'm going to have you wait here, we'll bring the other

24   jurors down.  Have you talked to them about this at all?

25          JUROR:  Just to the one, Tammy.  Her and I kind

```
 1  of talk a little bit, just that, you know, I'm having

 2  troubles at home.

 3         THE COURT:  Do you have any sense that there are

 4  other jurors who are having the same kinds of problems with

 5  participating in trial and so forth?

 6         JUROR:  No.

 7         THE COURT:  Okay.  Nobody's mentioned to you,

 8  gee --

 9         JUROR:  No.  And my issue is it's a two-hour

10  drive.

11         THE COURT:  I understand.  Oh, I know.  And also,

12  I assume that your husband, no matter what you may have

13  told him about what I tried to communicate -- and I really

14  mean that -- he may not be totally persuaded about that,

15  but also you have all these other problems, okay?

16         Well, we hate to see you go, not only because I

17  think clearly you're dedicated, you took this job on

18  knowing it wouldn't be easy, and but I will excuse you and

19  thank you for your service.  And maybe sometime we'll get a

20  shorter, easier case to deal with, okay?

21         JUROR:  Okay.

22         THE COURT:  So thank you.

23         MR. HARTMAN:  We'll get you a nice bank fraud or

24  something.

25         THE COURT:  No.  They tend to go on for a while,
```

```
 1   bank robbery, okay.

 2            MR. HARTMAN:  Yeah, that's true.

 3            THE COURT:  Well, thank you very much, and -- and

 4   do go, not only with our sincere gratitude for your candor

 5   and your openness and your honesty and your dedication and

 6   your understanding, that which I'm sure you have, that this

 7   really is an important civic duty, and you'll get a chance

 8   to do it again sometime under less demanding and stressful

 9   circumstances, those that I trust won't be disruptive, but

10   certainly not as disruptive to your tranquility at home,

11   and we don't want that.  Thank you very much.

12            MR. HARTMAN:  I don't think it's going to be a

13   problem.  We should probably instruct on talking about the

14   case until it's over.

15            THE COURT:  Yeah, don't talk about the case.

16   Those who know that you were serving in this case may well

17   ask you why are you no longer serving, and I think I would

18   ask you only to say --

19            JUROR:  Family issues, can I just say there

20   was --

21            THE COURT:  Just say family issues and that's

22   fine.  And just say, I really can't talk about anything to

23   do with the case until it's all over.  And you, no doubt,

24   will have people ask you what -- what's the case all about,

25   is it really all that we see on the news?  And of course,
```

```
 1   the answer is no, it's not.  But that's neither here nor
 2   there, but you'll say I really can't talk about the case
 3   until it's all over.
 4           It is inconceivable to me that you would have any
 5   contact from the media because of all the reasons I have
 6   said.  The only way that that might happen is if somebody
 7   who knows that you're on the case happens somehow to say
 8   something to something and say something to somebody else
 9   and winds up -- and in that case, I would ask you to do two
10   things:  One is to say, well, how did you get my name?
11           JUROR:  Okay.
12           THE COURT:  And say -- I'm trying to develop a
13   little formula.  How did you get my name and then say, what
14   makes you think that?  Okay?
15           And if it's something that's -- that would
16   indicate to you that things aren't quite as watertight as
17   I've suggested in that regard, I'd appreciate a phone call
18   to my office, if you'd be willing to do so.
19           JUROR:  Yes.
20           THE COURT:  In protecting your own privacy and
21   that of the jurors, say, how did you get my name and what
22   makes you think that?  And then say, you know, I don't want
23   to talk to you.
24           So I'm just suggesting anything you can do and
25   I'm trying to think of a formula that would make people
```

```
 1    think, well, gee, it's, you know, it's a mistake.  Okay?

 2          JUROR:  Okay.

 3          THE COURT:  Without confirming one way or the

 4    other and just say I don't want to talk to you.  Okay?

 5          JUROR:  Okay.

 6          THE COURT:  Good.  I can't imagine that you're

 7    going to get that kind of call, especially because you live

 8    outside, really, Toledo coverage.  It's not as though you

 9    live in the Old West End or whatever.  Even then, the

10    reporter did come up was waiting for me at the close of

11    business yesterday and said, Can you talk to me?  She said

12    I've got an hour and a half of blank page.  I said, well,

13    put the hour and a half of blank page in the paper, but I

14    can't talk to you.

15          MR. HERDMAN:  Your Honor, this might be a good

16    time to remind the juror about the names of other jurors,

17    that they remain protected.

18          THE COURT:  Yeah, you won't -- you won't disclose

19    the names or any of the other jurors obviously?

20          JUROR:  And quite frankly, I only know them by

21    first names.

22          THE COURT:  Okay.  Well, thank you.  With deep

23    regret, we'll send you off, but on the other hand, but with

24    complete understanding.

25          JUROR:  I appreciate the understanding.  I'm
```

```
 1    disappointed in this.

 2              MR. HARTMAN:  It happens, really, I mean, --

 3              THE COURT:  Okey dokey.  If you can just wait a

 4    few minutes, we'll have your now former colleagues down,

 5    and we'll send you on your way.

 6              MR. DOUGHTEN:  When people ask you about the

 7    lawyers, they were all great.

 8              THE COURT:  And the judge.

 9                   (Back in open court with counsel.)

10              THE COURT:  You may be seated.  Let me just say,

11    Mr. Masloum, have your attorneys talked to you about what

12    we've been doing the last few minutes?

13              THE DEFENDANT:  Yes.

14              THE COURT:  And do you concur in the way it was

15    handled and the result?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Mr. El-Hindi, same question?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Have your lawyers filled you in on

20    what we've been doing and do you concur in how I handled it

21    and the result?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  Mr. Amawi, same --

24              THE DEFENDANT:  Yes, Judge.

25              THE COURT:  You've been filled in by the lawyers,
```

```
 1    what we've been up to, and you agree with the way it was

 2    handled and resolved?

 3              THE DEFENDANT:  Yes, Judge.

 4              THE COURT:  Okay.

 5              Okay.  Why don't you bring Mr. Griffin back up

 6    and we'll be on our way.

 7              MR. SOFER:  We're doing it right now, Judge.

 8                   (Jury brought in.)

 9              THE COURT:  Good morning, ladies and gentlemen.

10    You may be seated.  Regrettably and for reasons that I ask

11    you not to speculate about, we had to excuse one of your

12    fellow jurors this morning.  And it was most unfortunate,

13    if for no other reason, as I'm sure you came to know that

14    juror.  She was -- would have made an excellent juror, and

15    for reasons that, as I say, don't speculate about, and

16    we'll get back under way.

17              Go ahead, Mr. Sofer.

18              Mr. Griffin, you remain under oath.

19              THE WITNESS:  Yes, sir.

20                   DIRECT EXAMINATION

21              MR. SOFER:  Thank you, Judge.

22    BY MR. SOFER:

23    Q.       Good morning, Mr. Griffin.

24    A.       Good morning.

25    Q.       We left off yesterday, you had described
```

```
 1   partially the events that took place on February 16th,

 2   2005.  I think we got up to the part where you testified

 3   that Wassim Masloum, Mohammed Amawi, and Marwan El-Hindi

 4   were in the front part of Mohammed -- I'm sorry, Marwan

 5   El-Hindi's home; is that correct?

 6   A.        Yes.

 7             MR. SOFER:  And if we could just replay the very

 8   short clip, which is 5-A, that we ended off yesterday at.

 9   It was 5A.

10             Again, Judge, it was Exhibit 4-23, 1D28.

11                  (Audio playing.)

12   BY MR. SOFER:

13   Q.        Okay.  Mr. Griffin --

14             THE COURT:  If I can interrupt.  Excuse me,

15   ladies and gentlemen, as has happened a couple times

16   before, the reason that that was replayed was not for

17   emphasis, not because it was highlighted in any way, but

18   simply to put what's coming next into context.

19             MR. SOFER:  Thank you, Judge.

20             THE COURT:  Sometimes, if you listen to a book on

21   tape, you'll replay the last sentence or paragraph on the

22   next side to bring you to mind where we were.

23             Go ahead.

24             MR. SOFER:  If we could play 6A.

25                  (Audio playing.)
```

1  BY MR. SOFER:

2  Q.        When you said these words, Mr. Griffin, can you

3  tell the members of the jury who was present?

4  A.        Marwan El-Hindi, Mohammed Amawi, and Wassim

5  Masloum.

6                (Audio playing.)

7  BY MR. SOFER:

8  Q.        Do you recall what was happening there in this

9  part where the child came in and then you thanked somebody?

10  A.        The child had brought either tea or coffee in,

11  and I was thanking, I believe, either her or Marwan

12  El-Hindi.

13  Q.        When you say "her," who are you referring to?

14  A.        One of Mr. El-Hindi's children.

15                (Audio playing.)

16  BY MR. SOFER:

17  Q.        Mr. Griffin, did you give out cards that day?

18  A.        Yes, I did.

19  Q.        Was that part of the discussion about using your

20  company as a cloak?

21  A.        Yes, it was.

22                MR. BOSS:  Your Honor, could we have

23  clarification on that, all the defendants were given cards?

24  BY MR. SOFER:

25  Q.        Do you know if all the defendants were given

 1   cards?

 2   A.        Yes.

 3             MR. SOFER:  And let's pull up 132E, please.

 4   BY MR. SOFER:

 5   Q.        Is that one of your cards?

 6   A.        Yes, it is.

 7   Q.        And those are the cards that you gave out on

 8   February 16th of 2005?

 9   A.        Yes.

10             MR. SOFER:  And can you play --

11             (Audio playing.)

12   BY MR. SOFER:

13   Q.        Who are you referring to with "Brother Atta"?

14   A.        One of the highjackers on 9-11.

15             (Audio playing.)

16   BY MR. SOFER:

17   Q.        Now, Mr. Griffin, during the course of this

18   conversation, who was present?

19   A.        Marwan El-Hindi, Wassim Masloum, and Mohammed

20   Amawi.

21   Q.        And approximately, where in the home did this

22   conversation take place?

23   A.        In the front room, living-room area.

24   Q.        Were you able to tell where the three defendants

25   were focusing their attention?

```
 1   A.        On me.

 2             MR. SOFER:  Let's continue with clip 7A.

 3                  (Audio playing.)

 4   BY MR. SOFER:

 5   Q.        Do you recall, Mr. Griffin, what was happening at

 6   this point?

 7   A.        The children were preparing to bring out food.

 8                  (Audio playing.)

 9   BY MR. SOFER:

10   Q.        Okay.  Again, did the conversation on

11   February 16th, 2005 continue?

12   A.        Yes, it did.

13             MR. SOFER:  And let's play 9A, please.

14             MR. HARTMAN:  9A?

15             MR. SOFER:  9A.

16             MR. HARTMAN:  Thanks.

17                  (Audio playing.)

18   BY MR. SOFER:

19   Q.        And during that end part of the conversation when

20   the defendants were talking with each other, were you able

21   to understand everything they said?

22   A.        Not everything.

23             MR. SOFER:  Let's continue to 11A, please.

24                  (Audio playing.)

25
```

```
 1   BY MR. SOFER:

 2   Q.        Okay.  Again, Mr. Griffin, who was present during

 3   the course of this conversation?

 4   A.        Marwan El-Hindi, Mohammed Amawi, and Wassim

 5   Masloum.

 6   Q.        And did the conversation continue beyond that?

 7   A.        Yes, it did.

 8             MR. SOFER:  Let's go to 12A, please.

 9             MR. BOSS:  What was that last clip, Mr. Sofer,

10   please?

11             MR. SOFER:  Last one was 11.  Next one is 12.

12             MR. BOSS:  Thank you.

13                  (Audio playing.)

14   BY MR. SOFER:

15   Q.        Marwan El-Hindi said, Zubair, do you know who he

16   was referring to?

17   A.        Zubair Ahmed.

18   Q.        "Running with a .50 caliber," did that refer to a

19   conversation that you had back in July of '04?

20   A.        Yes, that was what --

21             THE COURT:  Again, I'm not so sure that he has a

22   foundation for that.  The record is what it is.

23   BY MR. SOFER:

24   Q.        Do you remember a conversation in which .50

25   caliber was mentioned by Zubair, were you present for one?
```

1    A.         Yes.

2    Q.         And when was that and where was that?

3    A.         It was at the ICNA -- ICNA convention, Islamic

4    Circle of North America.  It was a convention in Cleveland,

5    Ohio.

6    Q.         Okay.

7              MR. SOFER:  Let's continue.

8                  (Audio playing.)

9    BY MR. SOFER:

10   Q.         Okay.  Again, Mr. Griffin, did the conversation

11   continue on February 16th, 2005?

12   A.         Yes.

13             MR. SOFER:  And if we can play 13A, please.

14                 (Audio playing.)

15   BY MR. SOFER:

16   Q.         That creaking door sound, can you tell us if you

17   know where you were going?

18   A.         Down the hallway, I believe it was the second

19   room on the left.

20   Q.         And was there something in that room that you

21   were going to see?

22   A.         The -- his -- one of the Marwan El-Hindi's

23   personal computers.

24   Q.         Okay.  Let's continue.  Tell the members of the

25   jury who's in that room at this point.

```
 1   A.          Marwan El-Hindi, Wassim Masloum, and Mohammed

 2   Amawi and myself.

 3                    (Audio playing.)

 4   BY MR. SOFER:

 5   Q.          Mr. Griffin, did the conversation in that room

 6   continue?

 7   A.          Yes, it did.

 8               MR. SOFER:  If we can play 15A, please.

 9                    (Audio playing.)

10   BY MR. SOFER:

11   Q.          Mr. Griffin, I want to show you what's been

12   marked Government's Exhibit Number 23, already in evidence.

13   Can you tell us if you recognize that?

14   A.          Yes, it's a CD.

15   Q.          And can you tell us is -- what is depicted on

16   Government Exhibit 23, something that was watched on

17   February 16th, 2005 from the last clip?

18   A.          Yes, it's the video we were looking at during the

19   last clip.

20               MR. SOFER:  I'm going to play a portion of this,

21   Judge.

22               THE COURT:  Okay.

23                    (Video playing.)

24   BY MR. SOFER:

25   Q.          Okay.  Do the conversations continue, sir?
```

```
 1  A.        Yes, it did.

 2            MR. SOFER:  And if we could please play 16A.

 3                 (Audio playing.)

 4  BY MR. SOFER:

 5  Q.        And did the conversation continue?

 6  A.        Yes, it did.

 7            MR. SOFER:  Let's play 17A.

 8                 (Audio playing.)

 9  BY MR. SOFER:

10  Q.        Okay.  Did the conversation continue Mr. Griffin?

11  A.        Yes, it did.

12            MR. SOFER:  Let's play 18A.

13                 (Audio playing.)

14  BY MR. SOFER:

15  Q.        So sometime in that conversation, did there come

16  a time when you left Marwan El-Hindi's apartment --

17  A.        Yes.

18  Q.        -- or house?  And did you -- did you take anyone

19  with you?

20  A.        Yes, I took Mohammed Amawi and Wassim Masloum.

21            MR. SOFER:  And could you play 19A, please.

22                 (Audio playing.)

23  BY MR. SOFER:

24  Q.        Okay.  And what happened there, if you know, in

25  terms of where you were with Wassim Masloum?
```

```
 1   A.         We picked up and dropped off Wassim Masloum at

 2   his place of employment on Monroe Street in Toledo, Ohio.

 3   Q.         Okay.  And were you dropping him off at that

 4   point?

 5   A.         Yes.

 6   Q.         Did the conversation with Mohammed Amawi

 7   continue?

 8   A.         Yes.

 9              MR. SOFER:  Let's play 20A, please.

10              THE COURT:  How much longer with this series?

11              MR. SOFER:  This will be done in exactly four

12   minutes, Judge, and then we'll be done with this series, if

13   you want to take a break after that.

14                   (Audio playing.)

15              MR. SOFER:  If you want to break, Judge, now

16   would be an opportune time.

17              THE COURT:  Is this the end of the sequence?

18              MR. SOFER:  It is.

19              THE COURT:  We'll resume about 10:25.  Thank you.

20                   (A brief recess was taken.)

21                   (A sidebar conference was had on the

22                   record.)

23              THE COURT:  This truly will be the shortest.

24              Angela, the transcript of the proceedings this

25   morning involving the juror, of course, will be under seal
```

```
 1   and not, you know, reprinted except to counsel, but not

 2   made public without prior court order.

 3             How about that?

 4                  (Jury brought into courtroom.)

 5             THE COURT:  Okay.  You may resume, and

 6   Mr. Griffin you remain under oath.

 7             Mr. Sofer, you may proceed.

 8             MR. SOFER:  Thank you, Judge.

 9   BY MR. SOFER:

10   Q.        Mr. Griffin, did there come a time on the 16th of

11   February where you brought and displayed books to the three

12   defendants related to training?

13   A.        Yes.

14   Q.        And whose books were those?

15   A.        Those were mine.

16   Q.        And I want us to take a look at Government's

17   Exhibit Number 66 for identification.  Is that one of the

18   books that you brought to the training -- I'm sorry, to the

19   meeting on February 16th, '05?

20   A.        Yes.

21   Q.        And was that book displayed to all three

22   defendants during the course of that meeting?

23   A.        Yes, I passed them around.

24   Q.        And does this Government Exhibit Number 66 fairly

25   and accurately represent at least the front of that book as
```

```
 1  it was handed out on February 16th of 2005?

 2  A.       Yes.

 3           MR. SOFER:  At this time, Your Honor, the

 4  government offers Government Exhibit Number 66.

 5           MR. HARTMAN:  No objection.

 6           THE COURT:  It will be admitted.

 7  BY MR. SOFER:

 8  Q.       Take a look at number 67, please.  There was some

 9  discussion about Drager, I believe, in that conversation;

10  is that right?

11  A.       Yes.

12  Q.       And is this also one of the books that you

13  displayed to the -- all three defendants on February 16th

14  of '05?

15  A.       Yes.

16  Q.       And does Government Exhibit 67 fairly and

17  accurately represent the outside of that book as it was

18  displayed to the defendants on February 16th of 2005?

19  A.       Yes.

20           MR. SOFER:  At this time the government offers 67

21  into evidence.

22           MR. HARTMAN:  Again, no objection.

23           THE COURT:  It will be admitted.

24           MR. SOFER:  68, please.

25
```

```
 1   BY MR. SOFER:

 2   Q.        Likewise, Mr. Griffin, was this one of the books

 3   that was displayed to all three defendants on

 4   February 16th, 2005?

 5   A.        Yes.

 6   Q.        And does it fairly and accurately -- that is

 7   Government Exhibit Number 68 for identification fairly and

 8   accurately represent the outside of that book as it was

 9   displayed on that date?

10   A.        Yes.

11             MR. SOFER:  The government offers 68 into

12   evidence.

13             MR. HARTMAN:  No objection.

14             THE COURT:  It will be admitted.

15             MR. SOFER:  69, please.

16   BY MR. SOFER:

17   Q.        This is yet another book that was displayed to

18   the defendants on February 16th of '05?

19   A.        Yes.

20   Q.        Does it fairly and accurately represent the way

21   the outside of that particular book looked on that date?

22   A.        Yes.

23             MR. SOFER:  And the government offers Government

24   Exhibit 69.

25             MR. HARTMAN:  No --
```

1           THE COURT:  It will be admitted.

2    BY MR. SOFER:

3    Q.        Exhibit 70, please.  Is this one of the books

4    that was displayed to the defendants on February 16th of

5    '05?

6    A.        Yes.

7    Q.        And does this Government Exhibit Number 70 fairly

8    and accurately represent the way the outside of that book

9    looked on approximately that date?

10   A.        Yes.

11           MR. SOFER:  Government offers Government Exhibit

12   Number 70 into evidence.

13           THE COURT:  It will be admitted.

14   BY MR. SOFER:

15   Q.        Finally, 71.  Is this one of the books also that

16   was displayed to the defendants on February 16th --

17   A.        Yes.

18   Q.        -- of '05?  And does Government Exhibit Number 71

19   fairly and accurately represent the outside of that book as

20   it was presented to the defendants on February 16th of '05?

21   A.        Yes.

22           MR. SOFER:  And the government offers Government

23   Exhibit Number 71.

24           THE COURT:  It will be admitted.

25           MR. SOFER:  Put up Government Exhibit Number 72,

```
 1   please.
 2   BY MR. SOFER:
 3   Q.        Mr. Griffin, you've grown up and lived in the
 4   Toledo area for a good portion of your life; is that
 5   correct?
 6   A.        Yes.
 7   Q.        About how many years, all together, have you
 8   lived here?
 9   A.        About 16.
10   Q.        And some of that was on and off here in the
11   Toledo area?
12   A.        Yes.
13   Q.        Are you familiar with the distances between
14   streets and locations in the greater-Toledo area?
15   A.        Yes.
16   Q.        And did you become familiar with where Mohammed
17   Amawi, Marwan El-Hindi lived?
18   A.        Yes.
19   Q.        And you also become familiar with where Wassim
20   Masloum worked?
21   A.        Yes.
22   Q.        Okay.  Does this map fairly and accurately
23   represent at least the way that the streets are laid out
24   and highways in the Toledo area?
25   A.        Yes.
```

```
 1   Q.        And can you tell us -- back on February 16th,

 2   2005, I believe you testified that you drove Mohammed Amawi

 3   and Wassim Masloum over to Marwan El-Hindi's house; is that

 4   right?

 5   A.        Yes.

 6   Q.        And you stopped to pick up Mr. Masloum; is that

 7   correct?

 8   A.        Yes.

 9   Q.        Can you tell us approximately how long the drive

10   was from Mohammed Amawi's house to Marwan El-Hindi's house?

11   A.        I would say between 30 and 40 minutes.

12   Q.        And is Marwan El-Hindi's home depicted on

13   Government Exhibit Number 72, the one that you went to --

14   A.        Yes.

15   Q.        -- on February 16th?

16   A.        Yes.

17   Q.        Okay.  Again, I don't know if your teleprompter

18   is working today, but can you circle on the map where

19   Marwan El-Hindi lived on February 16th, 2005, during the

20   meeting that we just heard about?

21   A.        (Witness complies.)

22            MR. SOFER:  And the record should reflect that

23   the witness has circled a box located at 3525 Mayo Street

24   in Toledo.  Can you go back?

25            THE COURT:  It does.
```

```
 1            MR. SOFER:  Thank you.

 2    BY MR. SOFER:

 3    Q.        Can you tell us at that time where -- if you

 4    know, where Mohammed Amawi lived?

 5    A.        Yes.

 6    Q.        And can you circle on Government's Exhibit Number

 7    72 approximately where Mohammed Amawi lived on

 8    February 16th of 2005?

 9    A.        (Witness complies.)

10    Q.        And again, you said the drive distance between

11    those two was between 30 and 40 minutes; is that what you

12    said?

13    A.        Yes.

14            MR. SOFER:  At this time, Your Honor, the

15    government offers 72 into evidence.

16            THE COURT:  It will be admitted.

17    BY MR. SOFER:

18    Q.        By the way, do you see on that map approximately

19    where it is that you picked up Wassim Masloum?

20    A.        I believe so.

21    Q.        And can you circle the area at least where Wassim

22    Masloum was working during that period of time, if you

23    know?

24    A.        (Witness complies.)

25    Q.        And for the record, that's somewhere in the
```

```
 1    neighborhood between Secor and Nebraska Avenue in between

 2    what appears to be Hill Avenue and Bancroft Street?

 3              THE COURT:  Was that on Douglas Road,

 4    Mr. Griffin?

 5              THE WITNESS:  Actually it was on Monroe Street.

 6              THE COURT:  I understand where you pick -- the

 7    question is where you picked him up.

 8              MR. SOFER:  Yes, Judge.

 9              THE WITNESS:  I picked him up on Monroe Street.

10    I'm not sure of the address.  I think it's adjacent to

11    Tiger Bakery.

12              THE COURT:  Would that be approximately Monroe

13    and Douglas?

14              THE WITNESS:  Yes.

15              THE COURT:  Okay.

16    BY MR. SOFER:

17    Q.        Okay.  Now, let me show you exhibit --

18              THE COURT:  Excuse me, have you circled that

19    area?

20              THE WITNESS:  Actually, I just circled right

21    there at Douglas.  I thought that was Monroe Street that

22    goes east and west.

23    BY MR. SOFER:

24    Q.        That map does not indicate all of the streets; is

25    that correct?
```

```
 1   A.        I don't believe so.

 2   Q.        And are you circling a general area where you

 3   believe that you picked him up?

 4   A.        Yes.

 5   Q.        Okay.  I want to show you what's been marked

 6   Government Exhibit Number 62.

 7             THE COURT:  Did you say 62?

 8             MR. SOFER:  Yes, Judge.

 9             THE COURT:  And Amy, the following exhibits have

10   been admitted, 66 through 72, 72 inclusive.

11             MR. SOFER:  Yes, Judge.

12             THE COURT:  She had to step out for a moment.

13   Okay.  Go ahead.

14   BY MR. SOFER:

15   Q.        Tell us -- first of all, how many pages are in

16   Government's Exhibit Number 62 for identification?

17   A.        Three.

18   Q.        And do you recognize those pages?

19   A.        Yes, I do.

20   Q.        Where did you get those pages from?

21   A.        I received them from Marwan El-Hindi.

22   Q.        And can you tell us basically what's on those

23   pages, if you can describe it, Government's Exhibit 62, for

24   identification?

25             MR. HARTMAN:  Objection.  Language.
```

```
 1   BY MR. SOFER:

 2   Q.        Well, is there some English language on those

 3   three pages?

 4   A.        Yes, there is.

 5   Q.        And can you tell us --

 6             THE COURT:  He can describe it.  It's a document

 7   apparently, whatever, he can describe what he sees.

 8             The jury -- the evidence, ladies and gentlemen,

 9   will be what you see, okay, with the document.

10             MR. SOFER:  I think we can actually put this up

11   on the screen, Exhibit 62.

12   BY MR. SOFER:

13   Q.        On the first page, Government Exhibit Number 62,

14   is there some English on there?

15   A.        Yes.

16   Q.        And again, do you recognize that English?

17   A.        Yes.

18   Q.        Can you tell us, do you know where you got this

19   document from?

20   A.        Marwan El-Hindi.

21   Q.        And can you tell us, did that take place on or

22   about February 16th of '05?

23   A.        Yes.

24   Q.        If we could just --

25             MR. SOFER:  At this time, Your Honor -- does --
```

 1   BY MR. SOFER:

 2   Q.        What's depicted in Government's Exhibit Number

 3   62 -- which you actually have in your hand is Government

 4   Exhibit Number 62 for identification -- is that -- are

 5   those the documents you received from Marwan El-Hindi on or

 6   about February 16th of '05?

 7   A.        Yes.

 8             MR. SOFER:  At this the time, Your Honor, the

 9   government offers Government Exhibit Number 62 into

10   evidence.

11             THE COURT:  It will be admitted.

12             MR. SOFER:  If we can just show the next two

13   pages, please, to the members of the jury.

14   BY MR. SOFER:

15   Q.        Now, Mr. Griffin, I want to direct your attention

16   to two days later, on February 18th of 2005.  Did there

17   come a time two days later when you met with Marwan

18   El-Hindi again?

19   A.        Yes.

20   Q.        And do you recall where it was that you met him?

21   A.        I believe that at his Main Street address.

22             MR. SOFER:  And if we can play, please, 1D9,

23   Exhibit Number 4-77, and it's clip 1A.  And I have a little

24   note here that there's a point where we need to turn down

25   the audio because I think it comes up a little bit.  We'll

```
 1 │ try to stop it.
 2 │          Wait for the jury to make sure everyone has their
 3 │ head sets on.  Okay.  If we can play 1A, please?
 4 │               (Audio playing.)
 5 │ BY MR. SOFER:
 6 │ Q.       Can you tell the members of the jury where you
 7 │ were in the Mayo Street address when this took place, if
 8 │ you know?
 9 │ A.       I believe we're in the second room on the left,
10 │ which a computer was located.
11 │          MR. SOFER:  Let's continue.
12 │               (Audio playing.)
13 │ BY MR. SOFER:
14 │ Q.       To the best of your recollection, would you tell
15 │ the members of the jury what was happening at this
16 │ juncture?
17 │ A.       He had --
18 │ Q.       Who's he?
19 │ A.       Marwan El-Hindi had showed me an e-mail, and he
20 │ wanted me to cut the top of the e-mail off because it
21 │ contained his name.
22 │ Q.       Do you recall where that e-mail came from?
23 │ A.       I believe the Just Jeans Company.
24 │ Q.       And did that Just Jeans Company e-mail, was that
25 │ something you had discussed on the 16th as well?
```

```
 1   A.        Yes.

 2   Q.        Okay.

 3             MR. SOFER:  Let's continue.

 4                  (Audio playing.)

 5   BY MR. SOFER:

 6   Q.        Okay.  Did Marwan El-Hindi give you the e-mail

 7   that you were just talking about there?

 8   A.        Yes.

 9   Q.        And there was something there that described a

10   place where there were a lot of videos to download; is that

11   correct?

12   A.        Yes.

13   Q.        Okay.  I want to show you what's been marked

14   Government's Exhibit Number 73 for identification.

15             MR. SOFER:  Counsel do you need this?  It's in

16   your exhibit books.

17   BY MR. SOFER:

18   Q.        By the way, the previous document, that is

19   Government's Exhibit Number 62, did you give that Ansar

20   Jihad page to the FBI?

21   A.        Yes, I did.

22   Q.        Go back to this one now.  Did you -- can you tell

23   us what is -- what you're holding in your hand, that is

24   Government Exhibit Number 73 for identification?

25   A.        The e-mail that I received from Marwan El-Hindi
```

```
 1   on this day.
 2              MR. SOFER:  And -- I asked that we magnify the
 3   top portion.
 4   BY MR. SOFER:
 5   Q.         Is that subject-from-to area, is that -- is that
 6   what you were referring to or he was?
 7              THE COURT:  Is there any way you can --
 8              MR. SOFER:  We're trying, Judge.  There we go.
 9   BY MR. SOFER:
10   Q.         Marwan El-Hindi said something about the top of
11   the document; is that right?
12   A.         Yes.
13   Q.         Is this what he was referring to, to the best of
14   your recollection?
15   A.         Yes.
16   Q.         And what did he want you to do with this?
17   A.         To cut it off.
18   Q.         Did you cut it off?
19   A.         I did not.
20   Q.         And what did you do with this -- did you receive
21   this document, both pages, from Marwan El-Hindi?
22   A.         Yes, I did.
23   Q.         And what did you do with it after you received
24   it?
25   A.         I turned it over to the FBI.
```

1   Q.      We'll go back to the whole -- how many pages is

2   Government Exhibit Number 73?

3   A.      Two.

4   Q.      And did there come a time when you wrote

5   something on Government's Exhibit Number 73?

6   A.      Yes.

7   Q.      Okay.  Can't see it on the screen, but where on

8   Government's Exhibit Number 73 for identification did you

9   write?

10  A.      On the back of page 2.

11  Q.      And can you tell us what you wrote back there?

12  A.      I wrote a website which I believed at the time

13  that the e-mail was.

14          MR. HARTMAN:  Objection.  Objection.  I think the

15  government can maybe clear this up.  Is that where we're

16  talking about?

17          Okay, that's fine.

18  BY MR. SOFER:

19  Q.      The third page in the exhibit book, but on what

20  you have, it's not a third page, that's the original

21  document you're holding?

22  A.      Yes.

23  Q.      Is that what you turned over to the FBI?

24  A.      Yes, I did.

25  Q.      Is that the actual paper you wrote on?

```
 1   A.        Yes, it is.

 2   Q.        Okay.  Now, what's on the screen now, which is

 3   the third page of Government's Exhibit Number 73, is that

 4   your writing?

 5   A.        Yes, it is.

 6   Q.        And I think you were in the middle of testifying

 7   about what you believe this to be?

 8   A.        I believe this to be the website of which this

 9   e-mail was sent from.

10   Q.        Okay.  There was something referred to as a

11   website where videos to be downloaded; is that right?

12   A.        Yes.

13            MR. HARTMAN:  Your Honor, I'm going to object to

14   that.

15            THE COURT:  Pardon?

16            MR. HARTMAN:  I'm going to object to that.  Can

17   we approach, please?

18            THE COURT:  Sure.

19            Disregard the question for now.

20                (A sidebar conference was had on the

21                 record.)

22            THE COURT:  Okay.  Everybody here?

23            MR. HARTMAN:  Basis for the objection, Judge, is

24   because --

25            THE COURT:  You can speak louder.
```

```
 1            MR. HARTMAN:  The document speaks for itself and
 2   it says where it came from, not so much that I don't think
 3   there's any foundation that this e-mail came from there,
 4   when he just testified that to and from accurately reflect
 5   what was on the e-mail.
 6            MR. BOSS:  If I may add, Judge, the bottom of the
 7   page is the printout of where it actually came from, which
 8   differs from what is written on the back by the witness.
 9            MR. SOFER:  I love these objections but only
10   because if they want to cross-examine him about what he
11   says, that's fine.  I can ask him if he knows what the
12   connection was or if he knows where this came from, I
13   think.
14            THE COURT:  I think -- I may have missed it.  Has
15   he been asked how he came to write that?
16            MR. SOFER:  I'll try to clarify that.
17            THE COURT:  Let's sort of lay that.
18            They should come up.
19            MR. SOFER:  Moe's right here.
20            MR. BOSS:  He's the one who's --
21            THE COURT:  I just want to say, subject to
22   argument perhaps, over the noon -- how two things -- first
23   of all, I think now it's sufficient basis relative to a
24   conspiracy.
25            Subject to argument by counsel over the noon hour
```

```
 1   later this afternoon, I think the basis for admission of

 2   co-conspirator statements has been established.  I say that

 3   now because I can anticipate that that might be on -- on --

 4   I have no idea.

 5            MR. SOFER:  This is going to get connected up

 6   later with those kinds of things, Judge, but I think

 7   basically if I can -- if I can ask him some pointed

 8   questions, I think this will be clarified.

 9            THE COURT:  This seemed to pop out of the blue.

10            MR. SOFER:  I understand what counsel's saying,

11   and it's clear that the actual -- the actual e-mail itself

12   does not come from this, so I think there's a connection

13   between the two things, and the witnesses might at least --

14   and I'll try to explore that.  I was trying to do that when

15   counsel objected.

16            THE COURT:  And this can be off the record.

17                 (A brief discussion was had off the record.)

18            THE COURT:  Ruling -- I'll reserve a ruling on

19   the objection.

20                 (Sidebar concluded.)

21            THE COURT:  I've reserved the ruling on the

22   pending objection, but you may proceed.

23   BY MR. SOFER:

24   Q.       Mr. Griffin, you wrote something on the back of

25   Government Exhibit Number 73, correct?
```

```
 1    A.          Yes.

 2    Q.          And can you tell us, as best you can recall,

 3    where what you wrote on the back of 73 came from?

 4    A.          I believe it came from the website, which this

 5    e-mail was coming from, the response.

 6    Q.          And are you familiar with the difference between

 7    a website and a e-mail group?

 8    A.          Vaguely.

 9    Q.          Were you trying to gather information at that

10    time related to the information that was on the computer

11    screen?

12    A.          Yes.

13    Q.          And was the website that you wrote down connected

14    in some way to what was being viewed on the computer at

15    that time?

16              MR. HARTMAN:  Objection.  Vaguely familiar with

17    it.

18              THE COURT:  Well, he's moved on.  I'm going to

19    let the answer stand.

20              Go ahead.

21    BY MR. SOFER:

22    Q.          Was the website that you wrote down, that is this

23    http:/Ekhlaase -- I won't read the rest of it -- was that

24    in some way connected to what was being viewed on the

25    computer screen at or about the time that the e-mail was
```

1 being shown to you?

2 A.       Yes.

3 Q.       Did you, in your mind, associate the two

4 together?

5 A.       Yes.

6 Q.       Are you --

7        THE COURT:  I did not hear your question.

8        MR. SOFER:  I'm sorry.

9 BY MR. SOFER:

10 Q.       Did you, in your mind, associate the two together

11 in some way?

12 A.       Yes.

13        MR. SOFER:  At this time, Your Honor, the

14 government offers Government Exhibit Number 73 into

15 evidence.

16        THE COURT:  Unless there's an objection, I'd like

17 to have him tell us how that happened to be or if you can

18 connect that up somehow.

19 BY MR. SOFER:

20 Q.       How did you -- as best as you recall, how did you

21 connect the website with the e-mail, if you remember?

22 A.       We were viewing the website, and I was told that

23 the response -- this response was --

24        MR. BOSS:  Objection, Your Honor.  The tape, I

25 think, would be the best evidence of what he was told.

```
 1              MR. SOFER:  And that's fine with the government.
 2              THE COURT:  That's fine.  Okay.
 3              MR. SOFER:  I think the witness's answer should
 4   just stand.
 5              THE COURT:  That's fine.
 6              MR. SOFER:  He's explained it the best he can.
 7              THE COURT:  That's fine.  That's fine.  No
 8   problem.  You may continue.
 9              MR. SOFER:  Thank you, Judge.
10   BY MR. SOFER:
11   Q.        What did you do with Government Exhibit Number 73
12   after you got the e-mail?
13   A.        I turned it over to the FBI.
14   Q.        And again, that's your writing on the back of it?
15   A.        Yes, it is.
16   Q.        And for the record, can you -- for the record
17   what's the http://Ekhlaas.com/form/slowtheread.php?+=618.
18   I don't know, is there a -- on the original, if -- are you
19   able to see if there's another number after the eight?
20   A.        I don't know if that's a one or my bad
21   handwriting.
22   Q.        Okay.  There may be a one after it?
23   A.        Possibly.
24              MR. SOFER:  Okay.  And again, if I haven't
25   already, government offers Exhibit Number 73.
```

```
 1            MR. HARTMAN:  Judge, I would just -- pending
 2   further testimony by computer forensics --
 3            THE COURT:  I'll permit you to tie that up in due
 4   course, but I'll reserve the ruling on that.
 5            I will remind you, Mr. Sofer, I will ask you to
 6   remind me or remind yourself to offer --
 7            MR. SOFER:  We'll come back to this, Judge, in
 8   some way.
 9   BY MR. SOFER:
10   Q.       I want to direct your attention -- well, strike
11   that.
12            MR. SOFER:  Let's continue with what -- 1A,
13   please, from 1D9, Exhibit Number 4-77.
14                  (Audio playing.)
15            MR. HARTMAN:  Judge, Your Honor, I wonder if we
16   can find a way -- this is really not clear.
17            MR. SOFER:  It's a little light, but I can hear
18   it, Judge.
19            THE COURT:  I can hear it fine.
20            MR. HARTMAN:  Maybe it's me.
21            MR. SOFER:  Did you turn the volume up on your --
22            THE COURT:  The little wheels are volume.
23            MR. HARTMAN:  Yeah, I know, I tried that.
24            MR. SOFER:  Can we ask the jury whether
25   they're --
```

```
1              THE COURT:  Are you able to hear?
2              JUROR:  Yeah, it's light.
3              MR. SOFER:  Are you making it out?  This one's a
4    little lower.  We're trying to boost up the sound.
5              THE COURT:  Remind everybody, it's the low
6    bidder.
7              MR. SOFER:  Next time we'll see what we can do.
8              THE COURT:  Go ahead.
9                   (Audio playing.)
10             MR. SOFER:  We're going to turn this down, Your
11   Honor, because I believe the recording is going to spike up
12   here for a second.  So I want to warn everybody at 30:05 on
13   the red numbers, I think.
14   BY MR. SOFER:
15   Q.      Is this about when you made those notes on the
16   back of that paper, if you recall?
17   A.      Yes.
18             MR. SOFER:  Continue.
19                  (Audio playing.)
20   BY MR. SOFER:
21   Q.      Mr. Griffin, on this particular day, did Marwan
22   El-Hindi help you register for something?
23   A.      Yes, he did.
24   Q.      And did there come a time when you received some
25   sort of confirmation for the registration that you had
```

```
 1   signed up with, with the help of Marwan El-Hindi?
 2   A.        Yes.
 3   Q.        And I want to show you what's been marked
 4   Government Exhibit Number 74 for identification in your
 5   books.  Can you tell the members of the jury if you
 6   recognize Government's Exhibit Number 74?
 7   A.        Yes, I do.
 8             MR. SOFER:  And can we put 74 up on the screen as
 9   well?
10   BY MR. SOFER:
11   Q.        Is that the confirmation that you were just
12   describing?
13             MR. HARTMAN:  Objection.
14             THE COURT:  Basis?
15             MR. HARTMAN:  I mean --
16             MR. BOSS:  May we approach, Judge?
17             THE COURT:  You may approach.
18             MR. SOFER:  Do you want us to take it off the
19   screen, Judge.
20             THE COURT:  Please, disregard that for now,
21   ladies and gentlemen.
22                 (A sidebar conference was had on the
23                  record.)
24             MR. HARTMAN:  Judge, Exhibit 74 isn't --
25             THE COURT:  You can speak louder.  They cannot
```

1   hear us.

2         MR. HARTMAN:  I'm just saying he, I suppose, can

3   testify to what he thinks it is.  It's not even in a real

4   language to know what it is.

5         THE COURT:  Why don't you say, is the

6   confirmation --

7         MR. HARTMAN:  But how does he know that?  The

8   point is he can't.

9         THE COURT:  It was sent to him; am I correct?

10        MR. SOFER:  Yes, it's got his e-mail address on

11  it.  I go back to this --

12        THE COURT:  That's what he got --

13        MR. SOFER:  If counsel wants to argue these

14  things later.

15        THE COURT:  One at a time.  I don't understand

16  the basis for the objection.  He's testifying this is what

17  he got.  It will speak for itself.

18        MR. HARTMAN:  This is what he got.

19        THE COURT:  And if something happened after that,

20  after getting it, what happened, I would agree he can't

21  say -- he can't deviate from the text of whatever that is

22  unless there's a foundation.

23        MR. HARTMAN:  And what I mean, saying -- is

24  there's no foundation for him saying what this text is

25  because there's no language there.  It's not even Arabic or

1   anything, it's gibberish.

2          MR. SOFER:  We've got a little problem here

3   because, again, I'm not going to sit here and explain to

4   counsel why it is they're wrong about that.  I don't think

5   that's appropriate and fair to the government.  I'm going

6   to bring out -- I will bring out some more about this if

7   I'm permitted to.  If not, I'm willing to just let it go

8   in, and we'll connect it up later.

9          THE COURT:  Go ahead.

10         MR. SOFER:  Also some issue on this which makes

11  it fairly clear where it came from.

12         THE COURT:  Fine, go ahead and ask him.  I'll

13  reserve ruling.

14         MR. SOFER:  I'd like an opportunity, maybe 10

15  minutes before the lunch break, to discuss with The Court

16  an issue which relates to all of this which is very

17  important to the government.  And we'd like 10 or 15

18  minutes of an opportunity to argue at a certain point that

19  relates to this very testimony, this very evidence because

20  it's new.  Your Honor has seen it, the jury has seen it, I

21  think it makes sense to do that.  If you'll give us ten

22  minutes before or after the lunch break, that's my request.

23         THE COURT:  Okay.

24         MR. HARTMAN:  That's fine.

25              (Sidebar concludes.)

```
 1              MR. SOFER:  Can we put 74 back up on the screen,
 2   please?
 3              THE COURT:  You may.
 4   BY MR. SOFER:
 5   Q.        For lack of a better word, it looks like most of
 6   what's on here is wingding or some other kind of writing
 7   that is -- I've certainly never seen.  Can you tell the
 8   members of the jury, if you know, why that is?
 9   A.        My PC or my printer cannot do Arabic characters.
10   Q.        Your printer -- and where was your printer?
11   A.        In my apartment.
12   Q.        Okay.  And so when you received this, what you've
13   described as this confirmation, can you tell us the --
14   there is some English language on here, correct?
15   A.        Yes.
16   Q.        Do you see it -- an e-mail address that you
17   recognize?
18   A.        Yes.
19   Q.        And can you circle that using the green
20   teleprompter as best you can?
21   A.        (Witness complies.)
22              MR. SOFER:  And for the record, Your Honor, the
23   witness has circled Abu_Jihad@SBCglobal.net.
24   BY MR. SOFER:
25   Q.        Whose e-mail address is that?
```

```
 1   A.        That is mine.

 2   Q.        Now, below that, there are some of these odd

 3   characters.  Do you see some further English?

 4   A.        Yes.

 5   Q.        And can you circle that for the members of the

 6   jury?

 7   A.        (Witness complies.)

 8             MR. SOFER:  And for the record, the witness has

 9   circled Ekhlaase@hotmail.com.

10   BY MR. SOFER:

11   Q.        Is the Abu_Jihad@SBCglobal.net e-mail address

12   familiar to you?

13   A.        Yes, it is.

14   Q.        What is it?

15   A.        It is my e-mail address.

16   Q.        And based on what you see here, are you able

17   to -- do you see anything else here that's in English below

18   the Ekhlaase@hotmail.com?

19   A.        Yes.

20   Q.        And can you circle that for the members of the

21   jury?

22   A.        (Witness complies.)

23   Q.        And did you recognize what that is?

24   A.        That is the user name that was used.

25   Q.        And next to that?
```

```
 1              THE COURT:  I'm sorry, I did not hear your
 2   answer.
 3   A.        That is the user name that we used to sign in.
 4   BY MR. SOFER:
 5   Q.        And when you say "we," who are you referring to?
 6   A.        Myself and Marwan El-Hindi.
 7   Q.        Other -- take a look on the whole at Government's
 8   Exhibit Number 74.  Is that what you believe to be the
 9   confirmation that you received for the training that you
10   were signed up for on February 18th?
11   A.        Yes.
12              MR. SOFER:  And at this time the government
13   offers Government Exhibit Number 74.
14              THE COURT:  I'll reserve ruling on it.  You may
15   proceed.
16   BY MR. SOFER:
17   Q.        Did you -- what did you do after printing this
18   out with this particular document?
19   A.        I pointed to the user name.
20   Q.        No, no.  I'm not asking what you did in court.
21   What did you do with this document ultimately?
22   A.        I turned it over to the FBI.
23   Q.        And again, do you recall the agent or agents that
24   you turned it over to, if you know?
25   A.        Either Bill Radcliff or Shannon Coats.
```

```
 1   Q.        Okay.  I want to direct your attention now to

 2   February 25th, 2005, approximately a week later.  Did there

 3   come a time when you, again, met with Marwan El-Hindi at

 4   his home?

 5   A.        Yes.

 6             MR. SOFER:  And if we can, I'd like to play 4-78,

 7   Exhibit 4-78, it's 1D10; and it's segment 1A to start with.

 8   BY MR. SOFER:

 9   Q.        Before we play it, that Abu_Jihad account, was

10   that set up by you or by somebody else?

11   A.        That was set up by myself.

12   Q.        And was it set up -- did you have any input about

13   why that account should be set up?  Did you talk to the FBI

14   about that account?

15   A.        I believe so.

16   Q.        And were they aware of that account as well?

17   A.        Yes.

18   Q.        Okay.

19             (Audio playing.)

20             MR. BOSS:  Could we have a moment, please?  I

21   apologize, Your Honor, and ladies and gentlemen, I just had

22   the wrong place in my transcript.  Thank you.

23             THE COURT:  Okay.  You may resume.

24             MR. SOFER:  Judge, if we can have just one

25   second, please, there's something technically we have to --
```

```
 1    can we block the jury's view, please.

 2              MR. SIEVE:  Your Honor, if I may just clarify the

 3    record, I believe the wrong clip started to be played and

 4    there's a reference to Mohammed Amawi; am I correct in

 5    that?

 6              MR. SOFER:  No.  But you're close, it's actually

 7    for the reference Mr. Masloum and it's --

 8              MR. SIEVE:  I thought the testimony was that he

 9    met with Mr. --

10              THE COURT:  That's okay.  I thought he said

11    El-Hindi.

12              MR. SOFER:  I did.

13              THE COURT:  And --

14              MR. SOFER:  And there's a picture of someone

15    other than Mr. El-Hindi in there that I wanted to take out.

16              THE COURT:  Oh.  I can also tell the jury just to

17    disregard it.

18              MR. SOFER:  I understand, Judge.  But -- okay.

19              THE COURT:  Here I thought we were going to be

20    technically glitchless today.  Okey dokey.  Go ahead.

21                     (Audio playing.)

22    BY MR. SOFER:

23    Q.       Okay.  Mr. Griffin, to the best of your

24    recollection, can you tell us what that conversation was

25    referring to, generally?
```

```
 1   A.        About getting the grants and using them for
 2   training.
 3             MR. SOFER:  Let's continue, please.
 4             MR. BOSS:  Objection.
 5             THE COURT:  I would tend to agree.  Let's get a
 6   foundation here.  I'm going to sustain the objection.
 7             MR. SOFER:  Judge, I believe the foundation has
 8   been laid.
 9             THE COURT:  I'm not going to sustain the
10   objection, then.  I'll just -- the conversation will speak
11   for itself.
12   BY MR. SOFER:
13   Q.        Have you had previous conversations, including on
14   February 16th, 2005, about Marwan El-Hindi being the "grant
15   guy," for lack of a better term?
16   A.        Yes.
17   Q.        And during that conversation, did you discuss
18   diverting some of those funds for the training for Jihad?
19             MR. HARTMAN:  Objection.
20             THE COURT:  Who said what?
21   BY MR. SOFER:
22   Q.        Do you recall what those conversations were
23   about?
24   A.        Yes, part of them were about the grants.
25   Q.        Let's continue.
```

```
 1              THE COURT:  And when were those conversations

 2   again, if you remember?

 3              THE WITNESS:  On the 16th, Your Honor.

 4   BY MR. SOFER:

 5   Q.        And again, can you tell the members of the jury

 6   where you were, if you know, on February 25th of '05?

 7   A.        At the Marwan El-Hindi's Mayo Street apartment.

 8   Q.        Are you able to tell from the noises or anything

 9   approximately where you were in the home?

10   A.        The front room.

11              MR. SOFER:  And let's play 3A, please.

12                  (Audio playing.)

13   BY MR. SOFER:

14   Q.        Okay.  And can we -- did the conversation

15   continue?

16   A.        Yes, it did.

17              MR. SOFER:  And can we play 4A, please?

18                  (Audio playing.)

19   BY MR. SOFER:

20   Q.        Mr. Griffin, you had given Marwan El-Hindi an

21   e-mail address there; is that correct?

22   A.        Yes.

23   Q.        Is that your e-mail address that you described

24   previously?

25   A.        Yes.
```

```
 1   Q.         And you had asked him to forward something to

 2   you?

 3   A.         Yes.

 4   Q.         Somewhere previous in the conversation he

 5   described, you and he discussed some sort of operation?

 6   A.         Yes.

 7   Q.         Can you tell the members of the jury, if you

 8   remember, what that operation was that was being described?

 9   A.         They were still photos of the placement and

10   deployment of an improvised explosive device.

11   Q.         And did you ask Marwan El-Hindi to forward it to

12   you?

13   A.         Yes, I did.

14              MR. SOFER:  Let's continue to the end of this.

15                   (Audio playing.)

16   BY MR. SOFER:

17   Q.         Okay.  If you know, did Marwan El-Hindi, in fact,

18   forward to that account that you gave him an e-mail?

19   A.         Yes, he did.

20              MR. SOFER:  And I want us to put up on the screen

21   Government's Exhibit Number 79 for identification.  Can we

22   magnify the top of this document, please?  Okay.

23   BY MR. SOFER:

24   Q.         Can you tell us again whether you recognize an

25   e-mail account or multiple e-mail accounts on Government's
```

1   Exhibit Number 79?

2   A.        Yes, the from and to.

3   Q.        Can you tell the members of the jury who those

4   e-mail accounts are for?

5   A.        The from line is Marwan El-Hindi and the to line

6   is myself.

7   Q.        And can you tell us the date that's on this?

8   A.        February 25th, 2005.

9             MR. SOFER:  Okay.  If we can put the main

10  document up again.

11  BY MR. SOFER:

12  Q.        There's something else depicted on the first page

13  of this document.  Do you recognize that?  That is a

14  picture?

15  A.        Yes.

16  Q.        Can you tell the members of jury what that is?

17  A.        It seems to be an aftermath of a IED that hit a

18  humvee.

19  Q.        And do you recognize that particular picture in

20  this particular e-mail?

21  A.        Yes.

22  Q.        Do you recognize it from February 25th?

23  A.        Yes, I do.

24  Q.        Is that the same IED operation that you were

25  describing before that you were discussing with Marwan

1    El-Hindi on February 25th, 2005, that we just listened to?

2    A.       Yes.

3            MR. SOFER:  And if we could show the next page of

4    Government's Exhibit Number 79.

5    BY MR. SOFER:

6    Q.       Likewise, are these further pictures from that

7    particular e-mail?

8    A.       Yes.

9            MR. SOFER:  If we can go to the next page,

10   please?  And the next page, please.

11   BY MR. SOFER:

12   Q.       And can you tell the members of the jury, as best

13   as you recall, are these particular pictures discussed back

14   on February 25th, 2005?

15   A.       Yes, they were.

16           MR. SOFER:  And let's continue to the next page.

17   And continue to the next page, I'll leave them up a little

18   bit longer so we can see them.

19   BY MR. SOFER:

20   Q.       You had a conversation with Marwan El-Hindi about

21   batteries?

22   A.       Yes.

23   Q.       Is this the page that was being displayed on the

24   computer when you had that conversation or not?

25   A.       Yes.

```
 1              MR. SOFER:  Continue.
 2   BY MR. SOFER:
 3   Q.        Was there some conversation about observation
 4   posts also?
 5   A.        Yes.
 6   Q.        And was this the photograph or picture that was
 7   displayed at approximately that time?
 8   A.        Yes.
 9              MR. SOFER:  Next page, please.
10   BY MR. SOFER:
11   Q.        And there was some discussion about elements as
12   well?
13   A.        Yes.
14   Q.        Was this the page that was being displayed at
15   that point?
16   A.        Yes.
17              MR. SOFER:  Continue to the next page, please.
18   BY MR. SOFER:
19   Q.        This writing also, is this present on the
20   particular photographs that were contained in the e-mail
21   that you were discussing on February 25th, 2005 with Marwan
22   El-Hindi?
23   A.        Yes, it was.
24              MR. SOFER:  We'll go to the next page now.
25   BY MR. SOFER:
```

```
 1   Q.        Did Marwan El-Hindi ask questions about the
 2   strength of armored vehicles?
 3   A.        Yes, he did.
 4   Q.        Was this one of the photographs that was
 5   displayed at approximately that time?
 6   A.        Yes.
 7             MR. SOFER:  Continue to the next page.
 8   BY MR. SOFER:
 9   Q.        Is this one of the other pages that were shown
10   e-mail?
11   A.        Yes.
12             MR. SOFER:  If we can go to the next page?
13   BY MR. SOFER:
14   Q.        And finally, does Government's Exhibit Number 79
15   fairly and accurately represent what was being viewed on
16   that day, and what was sent to you by Marwan El-Hindi?
17   A.        Yes.
18   Q.        What did you do with this e-mail after you
19   received it?
20   A.        I forwarded it to the FBI.
21             MR. SOFER:  And if we can highlight the very top
22   of the page, please.
23   BY MR. SOFER:
24   Q.        Do you recognize e-mail addresses there?
25   A.        Yes, I do.
```

```
 1   Q.        Can you tell the members of the jury which ones
 2   you recognize?
 3   A.        The from line and the to line.
 4   Q.        Again, can you tell us who the from is?
 5   A.        That is mine.
 6   Q.        Can you tell the members of the jury who the to
 7   line is?
 8   A.        The FBI.
 9   Q.        And had you been given that account by the FBI to
10   communicate with them?
11   A.        Yes.
12             MR. SOFER:  For the record, that reads
13   AHMED_AHMED_1079@hotmail.com.
14             At this time the government offers Government
15   Exhibit Number 79 into evidence.
16             THE COURT:  It will be admitted.
17             MR. SOFER:  And, Your Honor, now would be another
18   opportune time to stop, if you choose.
19             THE COURT:  Yep.
20             Ladies and gentlemen, we're going to take a
21   little bit longer for lunch today.  We're going to try to
22   resume at 1:15.  If you can be available about 1:00, that
23   would be helpful.  We may be able to start a little sooner.
24   Thank you.
25                  (A brief recess was taken for lunch.)
```

1              (Jury excused.)

2              MR. SOFER:  Your Honor, we thought this would be

3  an opportune time -- I'm going to let Mr. Herdman make the

4  crux of the argument -- I think you probably know where I'm

5  going here, but if nothing else, in the case shows the

6  importance of the government being able to explain the

7  connection between certain websites, certain Yahoo groups,

8  and also, I think it's fairly clear that the witness has on

9  the stand does not possess either the knowledge or the

10  expertise to be able to describe that, I think the last

11  pieces of testimony really do that.

12              And specifically, though, there's fact-based

13  testimony to explain what this particular website was.  For

14  instance, we talk about the Ekhlaas website, which was put

15  up there, what was on it, and I'll let -- I'll let

16  Mr. Herdman finish this.

17              THE COURT:  Candidly, I'm not --

18              Is this on?  She may have muted it.  I think she

19  did mute it.

20              I don't think I have a problem with him saying

21  Ekhlaas is a source for obtaining e-mails.  Am I correct

22  about this?  I get confused.

23              MR. SOFER:  It would -- it's a source.  He can

24  call this a website -- it's actually a forum, if you will.

25  There are numerous things posted on it.  For instance, on

1    this particular day --

2         THE COURT:  Let me -- I'm less concerned about

3    what something is and how someone gets to it -- in other

4    words, what steps one has to follow -- and I'm also less

5    concerned about the fact that they are sometimes taken down

6    or shut down.  My principal concern is connecting a

7    particular -- particular videos that were either viewed or

8    downloaded or other materials with attributing those to a

9    particular source, and then sort of going on from there.

10        I mean, quite candidly, I don't want him coming

11   in talking about Chechnya and Mujahideen and all of this

12   stuff, but to have him come in -- or another qualified

13   witness come in -- and say this was a source for obtaining

14   these kinds of materials, and here's how a person would

15   access that source.  And I think I would not -- I'd have a

16   problem with him saying, and it's really super difficult or

17   whatever.  Simply describe the steps that would have to be

18   taken or if he knows based upon the data that's

19   available --

20        Was that Amy?

21        -- or if he knows, say, this is what was done to

22   access this website, to register for this website, and then

23   to describe --

24        Amy, I think you muted the mics, that's all.

25        And Tracy, what's your timetable?  Do you have to

 1 | be somewhere?

 2 | (A brief discussion was had off the record.)

 3 | THE COURT:  It's that kind of sort of basic

 4 | communication.  I don't want testimony about who sponsors

 5 | it.  I don't want -- because there's -- I don't want

 6 | testimony about who the -- who provided the materials that

 7 | are viewed, but in terms of just saying, look, you can go

 8 | to this website or this e-mail address or whatever.  This

 9 | is what you'd be able to view or if it's a source of the

10 | e-mail, whatever you call it, where you signed up to

11 | receive periodic e-mailings -- I get WestClip, for example,

12 | on certain subjects -- how one goes about to sign up for

13 | that and so forth.  I don't have a problem with that.

14 | MR. SOFER:  Let me, again --

15 | THE COURT:  I'll hear from these guys.  I'm just

16 | trying to get a sense --

17 | MR. SOFER:  Understood.  Two quick points, for

18 | instance on the issue you just mentioned, this Yahoo

19 | group -- which you can actually hear in the recording is

20 | IAI -- Islamic Army of Iraq.  Well, I think the government

21 | should be permitted to explain to the jury what that stands

22 | for.  It stands for the Islamic State of Iraq.  It doesn't

23 | stand for some corporation in California.

24 | THE COURT:  Now that you say that, I don't think

25 | I've got a problem with that.

1          Do you know what that is?

2          MR. SOFER:  We don't have to hash this out now.

3          THE COURT:  My concern -- I'm concerned about him

4    sort of testifying about anything or in a way that suggests

5    that these folks had some sort of connection with the

6    various sponsoring groups or whatever.

7          MR. SOFER:  I understand.  Again, all we're

8    trying to do here is stop -- stop at this juncture of the

9    proceedings to put a point on some of the arguments we've

10   been trying to make.

11          And again, I think what happened, Mr. Kohlmann,

12   again, as another example, can -- for instance, he can

13   testify in that string of writing that Darren Griffin wrote

14   on the back of that page, is an actual posting that comes

15   from that particular website.  Well, Mr. Kohlmann has been

16   collecting the postings from those websites for years now,

17   so he can actually tell us exactly what posting that is and

18   it turns out as a -- it's relevant to, of course, what --

19          THE COURT:  Okay.  Again, was that posting viewed

20   by --

21          MR. HERDMAN:  Yes, Your Honor.  From the

22   recording, it's clear that they're looking at these

23   posting --

24          THE COURT:  That's what they were looking at, are

25   you going to show that particular video?

```
 1          MR. SOFER:  We've already played -- it's just an

 2    audio.  It's audio what they were doing on the computer.

 3          THE COURT:  So you're not going to redo that.

 4          MR. HERDMAN:  We actually have the web page, an

 5    archived version of that page that Mr. El-Hindi and

 6    Mr. Griffin were viewing on February 25th.

 7          MR. SOFER:  Again, we're just trying to do this

 8    by way of demonstration, Your Honor, at a point where it's

 9    fresh -- fresh in The Court's mind so you can see what it

10    is the government's not trying to do.

11          We're not asking to have Mr. Kohlmann testify

12    that Al-Qaeda, you know, Osama bin Laden sent the

13    defendants e-mails.  That's not what we're trying to do.

14          THE COURT:  Or as I say, my concern is any

15    testimony that would suggest that somehow there was some

16    kind of connection between the organization and them.  I

17    mean, it's --

18          Mr. Hartman?

19          MR. HARTMAN:  Your Honor, I would respond with

20    the following -- and frankly, if this issue is going to be

21    reconsidered, we'd like to rebrief it, but I -- what's

22    important about these websites and these things is not what

23    they actually are, but it's what the defendants thought

24    they were, that's what was on the tape.  The government has

25    already gotten that into evidence.
```

1              Second, if it's important how you get there and

2     how you get from turning your computer on to getting to a

3     website, that's -- that is material for a forensic computer

4     examiner to say this is exactly what did happen, not for

5     Evan Kohlmann to say this is normally how it happens.

6              THE COURT:  Well, okay.

7              MR. HARTMAN:  You know, I understand IAI was

8     explained, and I understand where they're going, but

9     they've got that evidence on Yahoo group.

10              THE COURT:  But there may be -- it's like other

11    terms, I think that it's appropriate to -- it's exactly --

12    it's appropriate to have A, to have evidence of, ha,

13    that -- what that stands for, what that acronym stands for.

14              MR. HARTMAN:  Even if the defendants -- I mean,

15    even if there's no evidence that the defendants knew what

16    that stood for?  I mean, then why is it --

17              THE COURT:  Well, I think that -- that that can

18    be told to the jury that's what that is, that's all it is.

19    And it doesn't -- whether the defendants knew or not, at

20    some point, I think -- I think that example is

21    permissible --

22              MR. HARTMAN:  And --

23              THE COURT:  -- right now, and we will reexamine

24    this probably pretty soon.

25              MR. HARTMAN:  I understand.  I also have -- I

1   mean, we also would like to revisit the issues of -- the

2   issues that didn't get decided because Your Honor's

3   decision was basically about relevance.  But we have the

4   issues about Kohlmann and his qualifications and the lies

5   that he told on the stand.  I worry immensely about his

6   testimony because of the way he testified because he --

7           THE COURT:  I understand.  I will make very

8   clear -- and I trust the government to make very clear

9   there would be, to the extent possible, a pretty clear road

10  map about the subjects and the mode of questioning and kind

11  of response that I expect.  And I might even either suggest

12  or direct that it basically be a series of leading

13  questions.

14          Candidly, I am persuaded that, at least in terms

15  of the areas that I'm talking about and thinking about,

16  he's qualified, okay.  And you may be right about the

17  computer forensic expert.

18          MR. HERDMAN:  Your Honor, if I may address that

19  briefly.  There are limits to what computer forensics is

20  able to do, and it has to actually be in the computer.

21          THE COURT:  I think all we're doing now is

22  projecting the fact that we've got to revisit some of these

23  issues in response to government's request.

24          MR. SOFER:  That's all we're trying to do is

25  focus on the actual facts of the case.

1          THE COURT:  I understand that's fair, I really

2     do.  And I think that it is appropriate for the jury to

3     understand what these -- what one acquires by going to

4     these locations and what was acquired here at various

5     locations, and how one gets there.  Okay?

6          Now, whether that's a computer forensic expert or

7     it's Mr. Kohlmann or both, remains to be seen, but I'm

8     trying to signal to all of you I think, just as with the --

9     the -- the glossary of various people and things, I think

10    the jury needs to know this stuff; otherwise, it's just

11    floating out there, and I do think that it's pertinent.

12         There's a difference between going to CNN and

13    getting something and going to Al Jazeera and getting

14    something and going to -- and signing up for the Ekhlaas or

15    whatever is -- whatever the e-mail service is.

16         MR. SOFER:  And that's --

17         THE COURT:  And that has probative weight, and

18    I'm trying to see to it that the probative weight is not

19    outweighed by a whole lot of stuff about, you know, how and

20    where and by whom this stuff was produced and who -- you

21    know, who -- okay?

22         MR. HARTMAN:  I understand what The Court's

23    saying, and we are still waiting for the government's

24    response on the stipulation issue, too, so a lot of this

25    might be able to be taken care of.

1          THE COURT:  What I would suggest is maybe at some

2    point, maybe over the weekend, talk with each other and

3    suggest a time either next week or perhaps in Mr. Griffin's

4    testimony, I assume that the bulk of these terms and

5    websites we will have heard that once we're done with

6    Mr. Griffin.

7          MR. SOFER:  Absolutely, Judge.

8          THE COURT:  And so it may be even toward the end

9    of next week is when we ought to sit down, find a time, and

10   take whatever time it needs outside the presence of the

11   jury and after he's been --

12         MR. HARTMAN:  There's one other thing I need to

13   bring to The Court's attention, just given the fact that

14   this ruling may be reconsidered on this, and that may bring

15   up some evidentiary issues for the defense that The Court

16   has already ruled on, and I don't -- we may want revisited,

17   and I don't, frankly, want The Court to get upset if we ask

18   for a reconsideration of certain things.

19         THE COURT:  No.

20         MR. HARTMAN:  Okay.

21         THE COURT:  I mean, I only get upset when it's a

22   habitual practice when I'm asked to revisit something

23   solely on the basis of what I've already considered.

24         MR. HARTMAN:  Okay.

25         THE COURT:  As events unfold, sure, that's

```
1    exactly what Mr. Sofer's doing, and he's still standing

2    upright with his head, hands, arms, and two legs on.  I

3    haven't exercised my usual reaction to, quote,

4    reconsideration and don't worry about it.  I just get upset

5    when someone says, Judge, we know why you decided that, why

6    did you decide it that way, and why didn't you decide it

7    the other way.  I don't like that.  Okay?

8            Let's try to get back together in 15, 20 minutes

9    or so.  And if you guys want to get a sandwich and bring it

10   in here, that's fine.  This is not a mandatory class, okay.

11   I'm doing this for myself, and I'm just saying any counsel

12   who wants to get instructed on this stuff is welcome to sit

13   in.  If nobody wants to, that's fine.

14                  (A brief recess was taken for lunch.)

15                  (Government counsel and judge only in

16                  chambers for sealed conference.)

17           THE COURT:  Mr. Griffin, I assume you understand

18   you remain under oath.

19           And Mr. Sofer, you may continue.

20           MR. SOFER:  I was --

21           THE COURT:  Let the record show we started two

22   minutes of the latter time of starting that I had

23   indicated; getting a little better.

24           Go ahead.

25
```

```
 1   BY MR. SOFER:

 2   Q.        Mr. Griffin, when we broke for lunch I think we

 3   were still discussing February 25th, 2005, and there's one

 4   more very short clip that we're going to play from that,

 5   and that's 5-A.  Let's wait for a second.

 6                   (Audio playing.)

 7   Q.        Okay.  Now, I want to direct your attention next

 8   to March 8th, 2005, a little less than two weeks later.

 9   Did there come a time when you spoke to Marwan El-Hindi on

10   that day?

11   A.        Yes.

12             MR. SOFER:  And if we could play Exhibit Number

13   4-84, 1D12, clip 1A.

14                   (Audio playing.)

15   BY MR. SOFER:

16   Q.        Mr. Griffin, did you know Marwan El-Hindi's

17   cellular telephone number back in March of '05?

18   A.        Yes.

19   Q.        And can you tell us what it was?

20   A.        (419)215-6109.

21                   (Audio playing.)

22   Q.        Had you told Marwan El-Hindi that you were going

23   somewhere during this period of time?

24   A.        Yes, to -- one of the things to visit my daughter

25   out West.
```

```
 1   Q.         And any idea -- he asked was she supplying over
 2   Iraq?
 3   A.         Because she's in the Air Force.
 4              MR. SOFER:  Okay.  Continue.
 5                   (Audio playing.)
 6   BY MR. SOFER:
 7   Q.         Did there come a time, Mr. Griffin, on the next
 8   day, March 9th, 2005 when you spoke as to Mohammed Amawi?
 9   A.         Yes.
10              MR. SOFER:  And if we can play this is Exhibit
11   Number 4-34 from 1D30, Exhibit -- I'm sorry, clip 1A.
12                   (Audio playing.)
13   BY MR. SOFER:
14   Q.         Did that conversation on March 9th continue?
15   A.         Yes.
16              MR. SOFER:  If you'll play 2A, please.
17              MR. BOSS:  Could we take just a moment, please.
18   Is this the same transcript, Mr. Sofer?
19              MR. SOFER:  Yes.  Okay.  So we're going to replay
20   clip 2, I believe.
21                   (Audio playing.)
22   BY MR. SOFER:
23   Q.         Okay.  Now, I'd asked you a long time ago when
24   you first testified about whether there were occasions when
25   you neglected to turn off the device?
```

```
 1   A.        Yes.

 2   Q.        Do you know whether this is one of them?  And do

 3   you know why it was statements that you did not turn off

 4   the device?

 5   A.        I believe either equipment malfunction or

 6   operator error.

 7   Q.        Okay.  And operator --

 8             THE COURT:  Operator error equals you forgot?

 9             THE WITNESS:  Yes, could be, Your Honor.

10   BY MR. SOFER:

11   Q.        You were the operator, right?

12   A.        Yes.

13   Q.        Okay.

14             MR. SOFER:  Let's continue with this clip.

15                  (Audio playing.)

16             THE COURT:  Can you pause that for a moment,

17   please?

18             I believe that these statements, when he refers

19   to statements by others, are not offered for the truth of

20   the matter asserted.

21             MR. SOFER:  No, Judge.

22             THE COURT:  Ladies and gentlemen, during this

23   segment when Mr. Griffin relates a statement that somebody

24   else may have said to him, Mr. Amawi or anybody, no matter

25   who it was, that is evidence only that Mr. Griffin made
```

```
 1   that statement to Agent Radcliff.  It's not evidence about

 2   the truth of whatever was said by the other person.  In

 3   other words, it's offered to show that, quote, I believe,

 4   for example, as if a report was made, but not that what the

 5   report says is true or not.  So for limited purposes, just

 6   so Mr. Griffin made these statements to the agent.

 7           You may continue.

 8   BY MR. SOFER:

 9   Q.      And we talked about this before, Mr. Griffin, you

10   related information to the FBI by sometimes speaking to

11   them on the phone?

12   A.      Yes.

13   Q.      And what was -- what were other ways that --

14   another way that you relayed the information of what had

15   happened?

16   A.      By face-to-face.

17   Q.      Okay.  Were there times when you also returned

18   the recording equipment to them?

19   A.      Yes.

20   Q.      What would your primary mechanism of informing

21   about your activities and the activities of others have

22   been during this time?

23   A.      The recording devices.

24           MR. SOFER:  Continue.

25               (Audio playing.)
```

```
 1   BY MR. SOFER:

 2   Q.        Are you able to tell where you are during this

 3   period of time?

 4   A.        In my vehicle.

 5             MR. SOFER:  Continue.

 6                  (Audio playing.)

 7             THE COURT:  If you can stop there for a second.

 8             For example, Mr. Griffin is telling Agent

 9   Radcliff that Mr. Amawi is going to call this individual

10   and set up a meeting.  That's not proof that Mr. Amawi was

11   going to call or set up a meeting.  It's simply agent -- or

12   excuse me, Mr. Griffin telling the agent that, making that

13   statement to the agent.

14             Go ahead.

15   BY MR. SOFER:

16   Q.        And again, would this be -- I hate to use this

17   word, but a fairly typical interaction over the telephone

18   with one or more of the agents in the FBI?

19   A.        Yes.

20             MR. SOFER:  Please continue.

21                  (Audio playing.)

22   BY MR. SOFER:

23   Q.        Again, can you tell the members of the jury who

24   Ashraf is?

25   A.        The owner or manager of AZ Travel.
```

 1   Q.        What are you basically explaining here when you

 2   stopped when Ashraf came?

 3   A.        Basically talking about what we were doing and

 4   things that were in the last clip.

 5   Q.        I don't understand.  When you said here we really

 6   didn't talk too much about it because I heard Ashraf come

 7   in the back.  What did you mean by that?

 8   A.        Just things we were discussing prior, either to

 9   the training or videos.

10   Q.        With who?

11   A.        With Mohammed Amawi.

12                  (Audio playing.)

13   Q.        Is this the part of the brief where you describe

14   the part of the conversation we have just heard before

15   this?

16   A.        Yes.

17   Q.        And again, this was your best recollection of

18   the -- your best recollection of the time of what had

19   transpired?

20   A.        Yes, just kind of regurgitating everything that

21   had happened.

22   Q.        Okay.

23                  MR. SOFER:  Let's continue.

24                  (Audio playing.)

25   BY MR. SOFER:

1    Q.       And again, did you meet with Agent Radcliff

2    sometime the next morning or in the next day or so?

3    A.       Yes.

4    Q.       And did you give him the recordings, both of the

5    ones that we've just listened to?

6    A.       Yes.

7    Q.       Did you know you had recorded yourself at that

8    juncture?

9    A.       I did not.

10   Q.       And you turned over the recording of the

11   interaction you've had with Mohammed Amawi at that time as

12   well, correct?

13   A.       Yes.

14   Q.       Did there come a time on March 14th when you met

15   with Mohammed Amawi again?

16   A.       Yes.

17             MR. SOFER:  And if we could, please --

18             THE COURT:  And excuse me, what was the day on

19   which you met with Agent Radcliff?  I got a little

20   confused.

21             MR. SOFER:  Do you know?

22             THE COURT:  Or you can just say --

23   BY MR. SOFER:

24   Q.       In the conversation, do you know what day you

25   actually turned over the recording device back to Agent

```
 1    Radcliff?

 2    A.        What was the date actually the recording was made

 3    on?

 4    Q.        Well, I directed your attention to March 9th of

 5    '05, I believe.

 6              THE COURT:  So it would have been March 10th.

 7    BY MR. SOFER:

 8    Q.        Do you have an independent recollection of

 9    turning it over the very next day or was that just your

10    general practice?

11    A.        If Bill Radcliff told me to be there the next

12    morning, I'm there.

13    Q.        Very well.  Okay.  Now, again, I want to direct

14    your attention to March 14th of 2005.

15              MR. SOFER:  And this is 1D32, Exhibit 4-35, and

16    it's clip 1A, please.

17                   (Audio playing.)

18              MR. SOFER:  Just a second.

19                   (Audio playing.)

20    BY MR. SOFER:

21    Q.        Were you able to tell where you are during the

22    course of this conversation on the 14th of March?

23    A.        I believe AZ Travel.

24    Q.        What leads you to believe that, by the way?

25    A.        Because of the background noise.
```

```
 1              MR. SOFER:  Continue.

 2                   (Audio playing.)

 3   BY MR. SOFER:

 4   Q.        Do you know what he's referring to here?

 5   A.        The bomb vest video.

 6                   (Audio playing.)

 7   Q.        By the time, had you had discussions with Agent

 8   Radcliff and other people in the FBI about what you could

 9   and you could not train these defendants to do?

10   A.        Yes.

11   Q.        And had they given you any input on building

12   actual explosives?

13   A.        Yes.

14   Q.        What did they tell you?

15              MR. HARTMAN:  Objection.

16              THE COURT:  Again, this is solely proof of what

17   was said to him, not that that actually is true.  In other

18   words, I gather we're about to hear some instruction, but

19   it's not proof that that, in fact, was what the agent

20   wanted him to do or reflected in FBI policy or whatever.

21   It's simply something said to him.

22              MR. SOFER:  Just to explain his --

23              THE COURT:  I understand.

24   BY MR. SOFER:

25   Q.        Again, had the FBI given you some input about
```

```
 1   actually teaching these defendants how to build an actual

 2   explosive device?

 3   A.        They said do not.

 4             MR. SOFER:  Let's continue.

 5                 (Audio playing.)

 6   BY MR. SOFER:

 7   Q.        Okay.  Mr. Griffin, did the conversation with

 8   Mohammed Amawi continue on that day?

 9   A.        Yes, it did.

10             MR. SOFER:  We'll play 2A.

11             MR. HARTMAN:  2A?

12             MR. SOFER:  2A.

13                 (Audio playing.)

14   BY MR. SOFER:

15   Q.        Okay.  And did this conversation continue?

16   A.        Yes.

17             MR. SOFER:  Let's play 3-A, please.

18                 (Audio playing.)

19   BY MR. SOFER:

20   Q.        Okay.  Mr. Griffin, I want to direct your

21   attention to six days later on March 20th, 2005.  Did you

22   have an opportunity on that day to meet with Marwan

23   El-Hindi?

24   A.        Yes.

25   Q.        And -- strike that.
```

```
 1            Well, did you have an opportunity to communicate
 2   with Marwan El-Hindi?
 3   A.        Yes.
 4   Q.        And did you record that communication in some
 5   way?
 6   A.        I believe I did.
 7            MR. SOFER:  We're going to play now Exhibit 4-79
 8   of 1D13, and it's clip 1A.
 9   BY MR. SOFER:
10   Q.        Let me just ask you, before we start playing
11   it -- I asked you this at the beginning, we're not playing
12   all of your interactions with all of these defendants,
13   correct?
14   A.        No.
15   Q.        And even on the days when you did interact with
16   them, we're not playing an hour or two-hour long meeting
17   with them, sometimes we're taking smaller percentages?
18   A.        Correct.
19   Q.        And in your conversations with them, did you have
20   both conversations about the kinds of things we've talked
21   about here and other matters as well?
22   A.        Yes, both.
23                 (Audio playing.)
24   Q.        Did you forget some of his cell phone number that
25   day?
```

```
 1   A.          I believe I did.

 2               MR. HARTMAN:  We'll stipulate to that Mr. Sofer,

 3   I mean --

 4               MR. SOFER:  Okay.  Let's continue.

 5                    (Audio playing.)

 6   BY MR. SOFER:

 7   Q.          I had asked you incorrectly, did you meet with

 8   him.  Are you able to tell from this that you did not meet

 9   with him?

10   A.          It looks like a phone call.

11               MR. SOFER:  Okay.  Let's continue.

12                    (Audio playing.)

13   BY MR. SOFER:

14   Q.          What did you understand 1.2 to --

15               MR. HARTMAN:  Objection.

16               THE COURT:  Sustained.

17               Jury to disregard the question.

18                    (Audio playing.)

19   BY MR. SOFER:

20   Q.          Again, I asked you, do you know what Marwan

21   El-Hindi is referring to here?

22   A.          One of two things.

23   Q.          Okay.  Will you tell the members of the jury what

24   that is?

25   A.          Either the grants or the making of money with the
```

```
 1   EMSS program.

 2   Q.        And just basically can you give us an idea, if

 3   you know, what this EMSS program is?

 4   A.        I believe it stand for European Medical Services

 5   and something.  It was basically just to send people over

 6   to Europe to become doctors, and they would get money for

 7   that, for recruiting them.

 8   Q.        Okay.  And did you know whether Marwan El-Hindi

 9   was engaged in that?

10   A.        In some fashion, yes.

11   Q.        Do you know who he was engaged with in that?

12   A.        I believe with his brother.

13   Q.        And do you know his brother's name?

14   A.        Yoseff.

15             MR. SOFER:  Let's continue.

16                 (Audio playing.)

17   BY MR. SOFER:

18   Q.        Okay.  And I now want to direct your attention to

19   March 31st, 2005, about 11 days later.  Did there come a

20   time on March 31st when you met with Marwan El-Hindi and

21   Mohammed Amawi?

22   A.        Yes.

23             MR. SOFER:  And we're going to play Exhibit 4-36.

24   It's from 1D41, and it's clip 1A that we're going to begin

25   with.
```

```
 1                    (Audio playing.)

 2   BY MR. SOFER:

 3   Q.         And basically, can you tell the jury what was

 4   happening there?

 5   A.         The forming of the structure of the

 6   organization -- of the non-profit organization.  He was

 7   explaining to me what it needed and what its members,

 8   people would do.

 9   Q.         Okay.  Of the --

10              MR. SOFER:  And let's play clip 2A, please.

11   BY MR. SOFER:

12   Q.         I'm sorry, did the conversation continue?

13   A.         Yes, it did.

14                    (Audio playing.)

15   Q.         Tell the members of the jury what brothers in

16   Chicago you're talking about there.

17   A.         The brothers that we dealt with, the candy thing

18   that I mentioned earlier tried to be a mediator in the

19   whole situation.

20   Q.         When was that business transaction approximately

21   with these other people in Chicago?

22   A.         I believe in -- between 2002 and 2004.

23              MR. SOFER:  Okay.  Let's continue.

24                    (Audio playing.)

25   BY MR. SOFER:
```

1    Q.        At that point, are you going through something?

2    A.        Yes, he had produced papers with the grants on

3    it, and I was going through them, reading.

4    Q.        By the way, do you know who the -- what entity is

5    paying this money out where the grants come from?

6    A.        I believe the government.

7    Q.        Okay.  Okay.  And did the conversation continue?

8    A.        Yes, it did.

9               MR. SOFER:  Let's play 3-A.

10              (Audio playing.)

11   BY MR. SOFER:

12   Q.        Mr. Griffin, I want to show you what's been

13   marked Government's Exhibit 80A through 80Q.  Make that 80A

14   through 80P -- I apologize.  And ask you if you recognize

15   it?

16              THE COURT:  T as in Tom?

17              MR. SOFER:  P as in Peter.

18   BY MR. SOFER:

19   Q.        Do you recognize these?

20   A.        Yes.

21   Q.        And what do you recognize these to be, that is

22   80A through 80P?

23   A.        I believe the grants that we were discussing in

24   the last clip.

25   Q.        Okay.  And is there a particular grant there that

```
 1   you recall discussing with Marwan El-Hindi?

 2   A.        Yes, the Middle Eastern Partnership Initiative.

 3   Q.        Just one question or one moment.

 4             MR. SOFER:  Just one moment, Judge.

 5             THE COURT:  No problem.

 6             MR. SOFER:  We can actually put them -- while

 7   we're doing this, put them up on the screen.  If we can put

 8   up 80A through 80P and we can go through them relatively

 9   quickly.  Although, I'd like you to give a couple seconds

10   for you and the jurors to at least look at them, if that's

11   acceptable to Your Honor.

12             THE COURT:  Yes.

13   BY MR. SOFER:

14   Q.        Can you circle on 80A where you notice this

15   Middle East Peace Initiative or peace process?

16             Hold on.

17             MR. SOFER:  If it's acceptable to counsel and The

18   Court, do you mind if I circle --

19             MR. HARTMAN:  I don't care.  That's fine.

20   BY MR. SOFER:

21   Q.        Is it on this first one?

22   A.        Yeah.

23   Q.        Do you want to come down here and do it?

24             We'll try to do it some other time.  Let's keep

25   rolling through here.  Okay.  Just moving through them.
```

```
 1              Are these from different federal government
 2   agencies, if you know?
 3   A.          I do not know.
 4   Q.          While we're going through these, Mr. Griffin, did
 5   Marwan El-Hindi give you these documents at some juncture?
 6   A.          Yes, he did.
 7   Q.          There's my employer up there.  Do you see at the
 8   top when we make this one bigger?
 9              MR. SOFER:  Let's continue.
10   BY MR. SOFER:
11   Q.          What did you do after receiving these documents
12   with them?
13   A.          I gave them to the FBI.
14   Q.          And again, if you recall, do you know which agent
15   you gave them to?
16   A.          Either Bill Radcliff or Shannon Coats.
17   Q.          Did the conversation on the 31st of March
18   continue?
19   A.          Yes, it did.
20              MR. SOFER:  And if we could play again Exhibit
21   4-36.  This is clip 4A.
22                  (Audio playing.)
23   BY MR. SOFER:
24   Q.          Did the conversation on March 31st continue?
25   A.          Yes, it did.
```

```
 1              MR. SOFER:  Let's play clip 5A, please.

 2                    (Audio playing.)

 3    BY MR. SOFER:

 4    Q.        On this day on the 31st, where were these --

 5    where were -- the first four clips that we listened to,

 6    where did they take place?

 7    A.        At the home or apartment of Marwan El-Hindi.

 8    Q.        And where was that?

 9    A.        On Mayo Street.

10    Q.        Did there come a time when you left there?

11    A.        Yes.

12    Q.        Do you remember where you went?

13    A.        Either AZ Travel or the home of Mohammed Amawi.

14    Q.        Okay.  And let's play a little longer and we'll

15    see if you can recognize where you are.

16                    (Audio playing.)

17              MR. SOFER:  We have a battery pit stop.

18              THE COURT:  About how much longer?

19              MR. SOFER:  They're short clips, but I'm told

20    four to five minutes.

21              THE COURT:  After this and then we'll take a

22    break.

23              MR. SOFER:  You back in business?

24              JUROR:  Yes, sir.

25    BY MR. SOFER:
```

```
1   Q.        I'd asked you previously about discs that
2   Mohammed Amawi had given to you and asked for them back.
3   Is this one is of those occasions?
4   A.        Yes.
5   Q.        I think you testified about a disc that had a
6   star on it.  Do you know if that's what he's referring to
7   here?
8   A.        I believe so.
9             MR. SOFER:  Let's continue.
10                 (Audio playing.)
11  BY MR. SOFER:
12  Q.        Now, do you recognize where you were after
13  listening further to that clip?
14  A.        Yes.
15  Q.        And can you tell the jury where you are and why
16  it is you recognize it?
17  A.        AZ Travel because of the vehicular car traffic.
18            MR. SOFER:  Okay.  Continue.
19                 (Audio playing.)
20            MR. BOSS:  Is this a new clip now?
21            MR. SOFER:  I apologize, Judge, we should have
22  said that this is clip 6A.
23            MR. HARTMAN:  You want to go ahead and start from
24  the beginning then.
25            MR. SOFER:  Yeah.
```

```
 1                    (Audio playing.)

 2   BY MR. SOFER:

 3   Q.        Okay.  And did the conversation continue?

 4   A.        Yes, it did.

 5             MR. SOFER:  And let's play 7A.

 6                    (Audio playing.)

 7   BY MR. SOFER:

 8   Q.        Okay.  And finally, did the conversation continue

 9   further?

10   A.        Yes, it did.

11             MR. SOFER:  And let's play 8A.

12                    (Audio playing.)

13   BY MR. SOFER:

14   Q.        And again who was the Zubair and Khaleel that

15   Marwan was referring to, if you know?

16   A.        I believe Zubair and Khaleel Ahmed.

17             MR. SOFER:  Your Honor, the government offers --

18   if I have not already -- 80A through 80P into evidence?

19             THE COURT:  Okay.  Will be admitted.

20             MR. SOFER:  And now would be an opportune time.

21             THE COURT:  We'll resume at 3:00.  Thank you.

22                    (A brief recess was taken.)

23             THE COURT:  Okay.  You may be seated, and we're

24   back to work.

25             Okay.  Mr. Griffin, you remain under oath.
```

```
 1              Mr. Sofer, you may continue.

 2              MR. SOFER:  Thank you, Judge.

 3    BY MR. SOFER:

 4    Q.        We left off before the break, I believe, at

 5    March 31st, 2005.  And I wanted to ask you -- direct your

 6    attention first to April 4th of 2005 about 4 days later.

 7    Did you have occasion to drive somewhere with Marwan

 8    El-Hindi?

 9    A.        Yes, up to Michigan.

10    Q.        And what was --

11              MR. HARTMAN:  That mic's not on.

12              THE COURT:  Are the mics on?

13              THE DEPUTY CLERK:  Now they are.

14    BY MR. SOFER:

15    Q.        Did you have occasion to drive somewhere with

16    Marwan El-Hindi?

17    A.        Yes, up to Michigan.

18              MR. SOFER:  Okay.  Let's play -- this is Exhibit

19    4-80, it's 1D14, and it's clip 1A.

20              MR. BOSS:  Could we have a date, please?

21              THE COURT:  March 31st?

22              MR. SOFER:  April 4th, Your Honor.

23    BY MR. SOFER:

24    Q.        By the way, the question at this juncture, were

25    you wearing a device capable of recording video that day?
```

```
 1   A.        Yes.

 2              (Audio and video playing.)

 3   Q.        Who's the individual that's pictured in 1D14

 4   wearing the blue shirt at 03:18 on the court presentation

 5   from the government?

 6   A.        Jihad Dahabi.

 7   Q.        And do you know what Jihad Dahabi did, what kind

 8   of business he was engaged in?

 9   A.        I believe he was a CPA.

10              MR. SOFER:  Let's continue.

11              (Audio and video playing.)

12   BY MR. SOFER:

13   Q.        Do you know what state that particular clip was

14   in, state as in Ohio or another state?

15   A.        Michigan.

16              MR. SOFER:  Let's continue with 2-A, please.

17              (Audio and video playing.)

18   BY MR. SOFER:

19   Q.        Okay.  Did that conversation continue?

20   A.        Yes, it did.

21              MR. SOFER:  And let's play clip 3A, please.

22              (Audio and video playing.)

23   BY MR. SOFER:

24   Q.        Okay.  Did the conversation continue further?

25   A.        Yes, it did.
```

```
 1            MR. SOFER:  And can you play 4A, please -- I'm
 2   sorry, 5A.
 3                  (Audio and video playing.)
 4   BY MR. SOFER:
 5   Q.      Okay.  Mr. Griffin, did you and Marwan El-Hindi
 6   get a business card that day from Mr. Dahabi?
 7   A.      Yes.
 8            MR. SOFER:  And let's put up Government's Exhibit
 9   Number 8 one for identification, please.
10   BY MR. SOFER:
11   Q.      And do you recognize what's depicted in
12   Government's Exhibit Number 81?
13   A.      Yes, I do.
14   Q.      What is that?
15   A.      It is the business card of Jihad Dahabi.
16   Q.      And does it fairly and accurately represent the
17   way that card looked, approximately, when you saw it, some
18   time around April 4th, 2005?
19   A.      Yes.
20            MR. SOFER:  At this time the government offers
21   Government Exhibit Number 81.
22            MR. HARTMAN:  No objection.
23            THE COURT:  It will be admitted.
24   BY MR. SOFER:
25   Q.      Okay.  Mr. Griffin, I want to direct your
```

```
 1   attention to two days later, April 6th, 2005.  Did there
 2   come a time on that day when you met Mohammed Amawi?
 3   A.        Yes.
 4           MR. SOFER:  And let's play Exhibit 4-37, 1D42,
 5   and it's clip 1A.
 6   BY MR. SOFER:
 7   Q.        Before we play it, I'm going to ask you a quick
 8   question, Mr. Griffin.  Do you know whether or not you had
 9   some contact with Marwan El-Hindi and Mohammed Amawi some
10   time prior to April 6th, 2005?
11   A.        Yes.
12   Q.        And during your communication with them, did they
13   indicate anything about their ability to train on
14   April 6th?
15   A.        Both were unable.  Mohammed Amawi, his mother --
16   I was told his mother was coming in town and for Marwan
17   El-Hindi, he had a back injury, and his new wife was
18   expecting.
19   Q.        Okay.
20           MR. BOSS:  Were these recorded?
21           MR. SOFER:  Is he asking me or is he asking the
22   witness?
23           THE COURT:  I think he's asking you.  Do you know
24   whether these were recorded?
25           MR. SOFER:  I don't as we sit here, Your Honor.
```

```
 1   I think maybe one of them was recorded.

 2             MR. BOSS:  Thank you.

 3             MR. SOFER:  Let's play 1A again, Exhibit 1-47,

 4   1D42.

 5             (Audio playing.)

 6   BY MR. SOFER:

 7   Q.        Do you recognize from the sounds where this took

 8   place?

 9   A.        AZ Travel.

10             (Audio playing.)

11   Q.        Okay.  Did the conversation on the 6th continue?

12   A.        Yes, it did.

13             MR. SOFER:  And if we can play clip 4A, please.

14             (Audio playing.)

15   BY MR. SOFER:

16   Q.        Okay.  Now, after this conversation with Mohammed

17   Amawi, did you inform the FBI about this chemical?

18   A.        Yes, I did.

19   Q.        And I want to direct your attention to the

20   following day, April 7th, 2005.  Did there come a time when

21   you met with Mohammed Amawi again, the next day, that day,

22   April 7th?

23   A.        Yes.

24   Q.        Do you know where that was?

25   A.        AZ Travel.
```

```
 1              MR. SOFER:  We're going to play Exhibit 4-38.
 2    And it's 1D43, and clip 1A, please.
 3                    (Audio playing.)
 4    BY MR. SOFER:
 5    Q.       Did you later learn what chemical Mohammed Amawi
 6    was referring to?
 7    A.       Yes.
 8    Q.       What was it?
 9              MR. SIEVE:  Objection, Your Honor.
10              THE COURT:  Foundation in terms of sounds like
11    it's going to be hearsay to me, but -- unless he knows of
12    his own knowledge.
13    BY MR. SOFER:
14    Q.       Did you?
15    A.       Yes, I do, Your Honor.
16    Q.       Do you have --
17              THE COURT:  Lay some foundation.
18    BY MR. SOFER:
19    Q.       Were you able to do some research to determine
20    what this chemical was?
21    A.       Yes.
22    Q.       Did it -- did it later become clear what that
23    chemical was called?
24    A.       Yes.
25    Q.       What was the chemical called?
```

```
 1              MR. SIEVE:  Objection.

 2              THE COURT:  Why don't you ask him about his prior

 3    experience.

 4              MR. SOFER:  We can keep going, Judge.

 5              Let's back it up a little tiny bit.  It's going

 6    to be explained in a moment any way.

 7              THE COURT:  No problem.

 8                  (Audio playing.)

 9    BY MR. SOFER:

10    Q.         Okay.  Did Mohammed Amawi give something to you

11    on April 7th, 2005?

12    A.         Yes.

13    Q.         What did he give you?

14    A.         A Krispy Kreme napkin.

15    Q.         And other than whatever debris was left on the

16    Krispy Kreme napkin, was there something else of importance

17    on it?

18    A.         Yes, the name of the chemical.

19    Q.         Let me show you what's been marked Government

20    Exhibit Number 82.

21              MR. SOFER:  You guys have this in your books.

22    BY MR. SOFER:

23    Q.         I want to show you what's been marked government

24    Exhibit Number 82.  Do you recognize that?

25    A.         Yes, I do.
```

```
 1   Q.        And what do you recognize it to be?

 2   A.        A Krispy Kreme napkin.

 3             MR. SOFER:  Will you put it up there?

 4   BY MR. SOFER:

 5   Q.        Does that Krispy Kreme napkin have some writing

 6   on it?

 7   A.        Yes, it does.

 8   Q.        Do you know who wrote on that napkin?

 9   A.        Mohammed Amawi.

10   Q.        And can you it tell us what's written on that

11   napkin?

12   A.        What's in the viewer?

13   Q.        Well, you can look at either one.  What's on the

14   napkin, what's on the viewer?

15   A.        It says Astrolite.

16             MR. SIEVE:  Objection, Your Honor.  Speaks for

17   itself.

18             THE COURT:  If he can read the writing, he can

19   read the writing, either -- looks like both English and

20   Arabic.

21             MR. SOFER:  That's what I was going to get to,

22   Judge.

23   BY MR. SOFER:

24   Q.        Something that you can read?

25   A.        Yes.
```

```
 1  Q.        And what is that?

 2  A.        Astrolite.

 3            THE COURT:  I couldn't hear you.

 4            THE WITNESS:  Astrolite.

 5  BY MR. SOFER:

 6  Q.        Okay.  And below that, do you see something in

 7  another language?

 8  A.        Yes.

 9  Q.        Do you know what language that is?

10  A.        I believe Arabic.

11            MR. SOFER:  At this time the government offers --

12  BY MR. SOFER:

13  Q.        Is this the napkin that was given to you on

14  April 7th, 2005 at AZ Travel by Mohammed Amawi?

15  A.        Yes, it is.

16            MR. SOFER:  At this time the government offers 82

17  into evidence.  Is it admitted, Your Honor?

18            THE COURT:  I'm sorry?

19            MR. SOFER:  With Your Honor's permission, I'd

20  like to publish this to the jury.

21            THE COURT:  You may.

22  BY MR. SOFER:

23  Q.        While that's happening, Mr. Griffin, did you

24  inform the FBI about this chemical?

25  A.        Yes, I did.
```

```
1    Q.        Did you inform the FBI about this napkin?

2    A.        Yes, I did.

3    Q.        Did you give this napkin to the FBI?

4    A.        Yes, I did.

5    Q.        Do you recall who you gave it to?

6    A.        Either Bill Radcliff or Shannon Coats.

7    Q.        While we're passing that around, did there come a

8    time two days later when you had a conversation with

9    Mohammed Amawi?

10   A.        Yes.

11   Q.        Can you tell us basically and in substance what

12   that conversation was?

13   A.        It was about the chemical compound.

14   Q.        Okay.  Did Mohammed Amawi refer to it by the name

15   on the napkin?

16   A.        No, he did not.

17   Q.        Can you tell the members of the jury how he

18   referred to that chemical?

19   A.        He used the code word "pillows."

20   Q.        And how were you able to gather that he was using

21   a code word?

22   A.        From our prior conversations.

23   Q.        And one of the conversations before, Mohammed

24   Amawi talked about French and was that a code word as well?

25   A.        Yes.
```

1  Q.        Do you know what he was referring to there?

2  A.        Jihad training.

3            MR. SOFER:  As soon as that makes its way around.

4  We're going next to 4-39, 1D45, segment 1A.

5  BY MR. SOFER:

6  Q.        And after you informed the FBI about this

7  chemical, did you have conversations with the FBI about how

8  you were to respond to this?

9  A.        Yes.

10  Q.        And again, basically, can you give us an idea of

11  what it is that the FBI asked you to do?

12  A.        What state -- what physical state would he need

13  the compound in, who --

14            THE COURT:  I'm sorry, I'm having a little

15  trouble hearing you, maybe.

16            THE WITNESS:  I'm sorry, Your Honor.

17            THE COURT:  Maybe a little too close to the

18  microphone.

19            MR. SOFER:  Try to speak up so we can hear you.

20            THE WITNESS:  The physical state of what the

21  compound was, being either be solid or liquid.

22  BY MR. SOFER:

23  Q.        Who asked you, not specifically, but what do you

24  mean, the physical state?

25  A.        The -- whether it be liquid or solid.

```
 1   Q.          Okay.  Anything else the FBI asked you to find

 2   out?

 3   A.          Who was requesting that and where.

 4   Q.          And did they ask you anything about your contacts

 5   in Syria?

 6   A.          They asked me about my contacts overseas, yes.

 7   Q.          Had Mohammed Amawi asked you about your contacts

 8   in Syria on the cut -- on the conversation we just heard,

 9   or in the Middle East?

10   A.          Yes.

11   Q.          And did you come up with an idea along with the

12   FBI about a contact in the Middle East?

13   A.          Yes.

14   Q.          Do you recall what name you were going to use for

15   that contact?

16   A.          Mohammed Salah.

17               MR. SOFER:  I think before we continue, we had

18   one more clip from 43, 4-38?

19               THE COURT:  Let me just say, how is that spelled,

20   the last name, S-A-L-L-A-H or --

21               THE WITNESS:  One L, Your Honor.

22               THE COURT:  S-A-L-A-H?

23               THE WITNESS:  Yes.

24               THE COURT:  And was that, to your knowledge a

25   person?
```

```
 1              THE WITNESS:  Yes, it was.
 2              MR. BOSS:  Judge, could I ask for a
 3    clarification?  The witness was asked whether they asked
 4    him for contacts in Syria, was that referring to the FBI or
 5    was that referring to Mr. Amawi, or who was that referring
 6    to?
 7    BY MR. SOFER:
 8    Q.      I think I asked both, but did you discuss being
 9    able to respond to Mohammed Amawi about your contacts in
10    the Middle East?
11    A.      Yes.
12    Q.      And had Mohammed Amawi asked you about what
13    contacts in the Middle East you might have who could get or
14    deliver this chemical compound to?
15    A.      Yes.
16    Q.      The person he was talking to?
17    A.      Yes.
18              MR. SOFER:  Is that clarified, Counsel?
19              MR. BOSS:  Thank you very much.
20    BY MR. SOFER:
21    Q.      And again, I think I went ahead a little bit.
22    Let me go back to April 7th, the day that you received the
23    napkin.
24              MR. SOFER:  Let's play 3A from that conversation.
25                  (Audio playing.)
```

```
 1   BY MR. SOFER:
 2   Q.        What's Mohammed Amawi trying to do here, if you
 3   know?
 4   A.        Google the actual name, look it up on the
 5   computer.
 6   Q.        Okay.  What is it you were taking so Mohammed
 7   Amawi wouldn't have it around?
 8   A.        The Krispy Kreme napkin.
 9             MR. SOFER:  Continue.
10                  (Audio playing.)
11   BY MR. SOFER:
12   Q.        Okay.  And again, two days later, did you have a
13   conversation that you described before with Mohammed Amawi?
14   A.        Yes.
15   Q.        And that was when he used the word "pillows" to
16   describe the chemical?
17   A.        Yes.
18   Q.        And now I direct your attention to two days after
19   that, April 11th, 2005.  Did there come a time when you,
20   once again, met with Mohammed Amawi?
21   A.        Yes.
22   Q.        And by this time had you developed the name of a
23   contact in the Middle East?
24   A.        Yes.
25             MR. SOFER:  And if we could play 4-39.  It's
```

```
 1   April 11th, Your Honor, 1D45.  And it's clip 1A, please.
 2                   (Audio playing.)
 3   BY MR. SOFER:
 4   Q.        Okay.  Mr. Griffin, did the conversation on
 5   April 11th, 2005 continue?
 6   A.        Yes, it did.
 7   Q.        By the way, I don't know if I asked you this or
 8   not, but are you able to tell from the sounds on that
 9   recording where that conversation took place?
10   A.        AZ Travel.
11             MR. SOFER:  If we can play 2A.
12                   (Audio playing.)
13   BY MR. SOFER:
14   Q.        Okay.  Mr. Griffin, two days later on April 13th
15   of 2005, did you have occasion to meet with Mohammed Amawi
16   again?
17   A.        Yes.
18   Q.        And do you recall where that was?
19   A.        I believe at his apartment.
20   Q.        Okay.  Let's listen to it and see if it
21   happens --
22             THE COURT:  And what date would that be?
23             MR. SOFER:  April 13th, 2005, 1D 4669 -- it's
24   Exhibit 4-40, and clip 1A.
25   BY MR. SOFER:
```

```
 1   Q.        Anything in the noises there help you identify
 2   where you were?
 3   A.        I was at AZ Travel.
 4   Q.        Were you mistaken before when you said that?
 5   A.        I was mistaken.
 6             MR. SOFER:  Let's continue.
 7                  (Audio playing.)
 8   BY MR. SOFER:
 9   Q.        Did Mohammed Amawi tell you about the whole
10   thing?
11   A.        I believe so.
12   Q.        Did the conversation continue?
13   A.        Yes.
14             MR. SOFER:  Let's play 2-A.  I think --
15             THE COURT:  Mr. Griffin, sort of about this
16   distance and speak up because if you get a little too
17   close, you get instant feedback.
18             MR. SOFER:  Try to lean back and speak up if you
19   can, please.
20             THE COURT:  About right there.
21             MR. SOFER:  Let's try 2-A, please.
22             And Judge, this will be the last clip for the
23   day, I believe.
24             THE COURT:  Okay.
25                  (Audio playing.)
```

1              THE COURT:  Okay.

2              MR. SOFER:  And Your Honor, that would be a good

3    place for us to stop.

4              THE COURT:  Okay.  We will adjourn for the

5    weekend.

6              Ladies and gentlemen, please keep in mind my

7    constant admonition not to talk about the case and think

8    about the case.  Have a safe trip home, have a pleasant

9    weekend, and we'll proceed Tuesday morning at 8:30.

10                   (Jury leaves the courtroom.)

11             THE COURT:  Okay.  You can be seated.

12             MR. SOFER:  May I excuse Mr. Griffin, if that's

13   acceptable, Judge.

14             THE COURT:  Yes, that's fine.  May I suggest that

15   you folks talk between now and maybe Monday afternoon and

16   set a time for a phone conference.  I'll be over in

17   Cleveland.

18             MR. SOFER:  On Monday, Your Honor?

19             THE COURT:  Yes, I've got meetings and so forth

20   and mid-afternoon.

21             MR. SOFER:  Fine, Judge.

22             THE COURT:  What all -- what all are they, in

23   terms of just to give us some general sense?

24             MR. SOFER:  I'm sorry, Judge?

25             THE COURT:  What all are the issues?

 1              MR. SOFER:  There's really -- at this juncture,

 2    there's really two issues, one actually we can do right

 3    now.  We've still not received notice with respect to the

 4    defense experts, meaning their reports, and we continue to

 5    be concerned about the government's opportunity to

 6    adequately prepare for these witnesses.

 7              Second is the stipulations.  I think we agreed in

 8    theory on something like third to a half of them, I could

 9    be overstating that.  About a third, I'm told.  That leaves

10    2/3 of the terms which the government and counsel, I think,

11    are all now in agreement with that need to be defined for

12    this jury and in a position where we've been unable thus

13    far to come up with acceptable stipulations, that is, the

14    government proposed stipulations.  Counsel has responded

15    and I'd like an opportunity to have The Court take a look

16    at what we propose versus what counsel has responded with

17    because I think it --

18              THE COURT:  Can you give those to me now before I

19    leave?

20              MR. SOFER:  Yes.

21              THE COURT:  I'll be leaving by 5:00 maybe sooner,

22    so if you can give copies to me.

23              MR. SOFER:  We're willing to talk, too, Judge,

24    but I think it will give you an idea of what the issue is.

25              MR. HARTMAN:  As for the expert reports, Judge,

```
 1   the calendar says our initial expert reports are due

 2   April 15th, and I believe we're all aware of that.

 3              MR. SOFER:  I believe Your Honor had coaxed or

 4   requested that we try and move that up for the reasons

 5   that --

 6              THE COURT:  Can you move them up?  Are they

 7   available now?  Because they're likely to be getting them

 8   before initially anticipated when we set the timetable.

 9              MR. BOSS:  We're working on it, Judge.  Part of

10   the issue with regard to the computer forensic matters, as

11   the day goes on we keep e-mailing new requests that will

12   end up being part of the opinion.  That's part of the

13   problem I have with the computer forensic matter.

14              The other expert that the defense -- that

15   Mr. El-Hindi is using, we're still trying to finalize the

16   report.  It isn't quite yet in its finished form, but I

17   think we'll be able to get it to the government this

18   weekend.

19              MR. SOFER:  And I would just say, Your Honor, for

20   the record that counsel has been in possession of the

21   government's evidence for two years.

22              MR. HARTMAN:  You know what, that's --

23              THE COURT:  Time out.  Do the best you can, okay.

24   Move your experts along.

25              The other issues are?  Give me the stipulations.
```

```
 1              MR. HERDMAN:  Your Honor, I have two sets, the --
 2    I have got government's proposed list on the first page,
 3    unless you guys have a clean copy of these?
 4              THE COURT:  Do you have the ones that you're not
 5    agreeing on as to --
 6              MR. HERDMAN:  Well --
 7              THE COURT:  Will I be able to tell just --
 8              MR. SOFER:  Just what happened was defense went
 9    and marked up our list, but they've omitted some of the
10    suggestions that we've made so I have the defense list
11    here.  And then this also has a couple annotations on it as
12    well, nothing I believe that Your Honor would be able to
13    decipher.
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

        I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled matter.


s:/ Angela D. Nixon

--------------------------                    -----------
Angela D. Nixon, RPR                          Date

1                          **I N D E X**

2

3    Testimony of Darren Griffin continued

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25