```
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,     )  Docket No. 3:06-CR-719

 4            Plaintiffs,          )  Toledo, Ohio

 5               v.                )  April 15, 2008

 6   MOHAMMED AMAWI, ET AL.,       )

 7            Defendants.          )

 8   -----------------------------

 9             TRANSCRIPT OF JURY TRIAL, VOLUME 28
                BEFORE THE HONORABLE JAMES G. CARR
10                UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                       (216) 522-4856
25
```

```
 1                          Elias Muawad
                           Muawad & Muawad
 2                          Suite 209
                           36700 Woodward Avenue
 3                          Bloomfield Hills, Michigan 48304
                           (248) 594-4700
 4    For the Defendant
      El-Hindi:            Charles M. Boss
 5                         Boss & Vitou
                           111 West Dudley Street
 6                         Maumee, Ohio 43537
                           (419) 893-5555
 7
                           Stephen D. Hartman
 8                         Kerger & Kerger
                           Suite 201
 9                         33 South Michigan Street
                           Toledo, Ohio 43602
10                         (419) 255-5990

11                         Alek H. El-Kamhawy
                           Raslan, El-Kamhway & Pla
12                         Suite 3FE
                           1700 East 13 Street
13                         Cleveland, Ohio 44114
                           (216) 928-1500
14
      For the Defendant    David L. Doughten
15    Mazloum:             4403 St. Clair Avenue
                           Cleveland, Ohio 44103-1125
16                         (216) 361-1112

17                         Jeffrey J. Helmick
                           Helmick & Hoolahan
18                         2nd floor
                           1119 Adams Street
19                         Toledo, Ohio 43624-1508
                           (419) 243-3800
20

21                         Mohammed Abdrabboh
                           1620 Ford Avenue
22                         Wyandotte, MIchigan 48192
                           (734) 283-7000
23

24
      Court Reporter:      Angela D. Nixon, RPR, CRR
25                         1716 Spielbusch Avenue
                           Toledo, Ohio 43624
```

1                    (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

1             THE COURT:  Ready to go?

2             MR. SOFER:  As always, Your Honor.

3             THE COURT:  Okay.  Good.

4             MR. SOFER:  Judge, if it's acceptable to Counsel

5    and the Court, I'd like to just play the last clip we

6    played on Friday, so we can orient ourselves again.

7             THE COURT:  That's fine.  Amy, if you'll go get

8    the jury, please.

9             MR. SOFER:  That would be 1D46, Exhibit 4-40,

10   clip 2A.

11            MR. HARTMAN:  And the date of that one?

12            MR. SOFER:  That would be April 13th, 2005.

13            MR. HARTMAN:  Thank you.

14            MR. SOFER:  You're welcome.

15            THE COURT:  What was that date again, please?

16            MR. SOFER:  April 13th, 2005.

17            THE COURT:  Mr. Griffin, you remain under oath.

18            And Mr. Sofer, I believe you're going to play a

19   bit of what had already been seen?

20            MR. SOFER:  Yes, Judge.

21   BY MR. SOFER:

22   Q.       When we left on Friday, Mr. Griffin, I directed

23   your attention to April 13th, 2005, a conversation that, I

24   believe, you testified you had with Mohammed Amawi at AZ

25   Travel; and we're just going to replay the last clip, which

```
 1   was 2A.  And again, this is Exhibit 4-40, 1D46, clip 2A.

 2                   (Audio playing.)

 3   Q.          Again, Mr. Griffin, just for a recap, Mohammed

 4   was who?

 5   A.          My contact overseas.

 6   Q.          Okay.  Mr. Griffin, later on April 13th, 2005,

 7   did there come a time when you saw Mohammed Amawi again?

 8   A.          Yes.

 9   Q.          And do you recall where that was?

10   A.          It was at my apartment.

11   Q.          And was he with somebody at that time?

12   A.          Wassim Masloum.

13   Q.          And we're going to play 1D48.  I believe it's

14   Exhibit 4-41, clip 1A.

15               Again, your apartment was where, sir?

16   A.          At the LaSalle building here in downtown Toledo.

17   Q.          Okay.  And did the conversation continue?

18   A.          Yes, it did.

19   Q.          And this is actually -- I was mistaken.  It's

20   Exhibit 4-42, clip 2A.

21               MR. BOSS:  The one coming up, Mr. Sofer, or the

22   last one?

23               MR. SOFER:  All of them are 4-42, 2A.

24                   (Audio and video playing.)

25   BY MR. SOFER:
```

1  Q.        Mr. Griffin, you mention a number of times on the

2  recording this EPA study.  Was the EPA actually doing a

3  study at the location you keep referring to?

4  A.        It was not.

5  Q.        Can you tell the members of the jury why it is

6  that you were telling the defendants that the EPA was doing

7  a study out there?

8  A.        I was waiting for the FBI to find a location for

9  us to go train.

10  Q.        Let's continue.

11                 (Audio and video playing.)

12  Q.        Giving this CD at this moment, who were you

13  giving it to?

14  A.        Mohammed Amawi.

15  Q.        Is this one of -- of those instances that you

16  refer to previously where Mohammed Amawi had asked for one

17  of his CDs back?

18  A.        Yes.

19  Q.        Let's continue.

20                 (Audio and video playing.)

21  Q.        The computer that was on the table there, do you

22  know whose computer that is?

23  A.        That is mine provided by the FBI.

24  Q.        That's the laptop computer that the FBI gave you?

25  A.        Yes.

1    Q.        Continue.

2              (Audio and video playing.)

3    Q.        Okay.  Mr. Griffin, did the conversation continue

4    on April 13th, 2005?

5    A.        Yes, it did.

6    Q.        And let's play clip 3A, please.

7              (Audio and video playing.)

8    Q.        You had said previously, I think, that there were

9    times when Mohammed Amawi used your computer for something;

10   is that correct?

11   A.        Yes.

12   Q.        Is this one of those times?

13   A.        Yes.

14   Q.        And do you know what he's doing here?

15   A.        Trying to open up the videos on that disc and

16   install I believe it was Flash Player.

17   Q.        Some program?

18   A.        Yes.

19             THE COURT:  I'm sorry.  I didn't hear what you

20   said.  All, what?

21   A.        The -- was trying to download Flash Player.

22             THE COURT:  Okay.

23             (Audio and video playing.)

24   BY MR. SOFER:

25   Q.        What's depicted at 1811.8 on 4-42?  Did you tell

```
 1    the members of the jury what you drew there?

 2    A.        I'm drawing outside alignment.

 3    Q.        And what specifically are we looking at, at this

 4    moment?

 5    A.        That point, that's an eye; and we call it the

 6    work.

 7    Q.        Okay.

 8              (Audio and video playing.)

 9    Q.        Do you know, Mr. Griffin, why is it that Mohammed

10    Amawi was explaining this same thing to Wassim Masloum in

11    Arabic?

12              MR. SIEVE:  Objection.

13              THE COURT:  Sustained.

14    BY MR. SOFER:

15    Q.        Had you had discussions with Mohammed Amawi about

16    training him to train others?

17    A.        Yes.

18    Q.        Continue.

19              (Audio and video playing.)

20    Q.        To your knowledge, was this the first time that

21    you mentioned the Astrolite and the contact in Syria in

22    front of Wassim Masloum?

23    A.        To the best I can recall, yes.

24    Q.        And had you ever heard previously Mohammed Amawi

25    mention the Astrolite or the contact in Syria in front of
```

1  Wassim Masloum?

2  A.        I believe he had not.

3  Q.        Let's continue.

4               (Audio and video playing.)

5  Q.        Again, Mr. Griffin, during this period of time

6  and throughout the case, were you having conversations with

7  the FBI about what you could and could not train these

8  defendants on?

9  A.        Yes.

10  Q.        Let's continue.

11               (Audio and video playing.)

12  Q.        Okay.  Did the conversation on April 13th, 2005

13  continue?

14  A.        Yes, it did.

15  Q.        And by the way, do you know basically what time

16  of day it was when this was going on?

17  A.        I believe it was later in the day, after 4:00,

18  5:00 p.m.

19  Q.        Was it after Mohammed Amawi got off of work?  Do

20  you know?

21  A.        I believe so.

22  Q.        Let's continue.

23               (Audio and video playing.)

24  Q.        And I believe that was clip 4A.  Did the

25  conversation continue?

```
1    A.         Yes, it did.

2    Q.         Let's play clip 5A, please.

3               (Audio and video playing.)

4    Q.         You keep saying to Mohammed Amawi, Don't mess

5    with this stuff.  Had you had conversations with the FBI

6    about that?

7    A.         Yes.

8    Q.         And basically, in substance, what were you trying

9    to do there?

10   A.         Not give him the knowledge to be able to

11   reproduce any of this stuff by himself.

12              (Audio and video playing.)

13   Q.         Okay.  Mr. Griffin, did the conversation at your

14   apartment continue that evening?

15   A.         Yes, it did.

16   Q.         And if we could play clip 6A, please.

17              (Audio and video playing.)

18   Q.         Okay.  And finally, did the conversation continue

19   further?

20   A.         Yes.

21   Q.         And we're going to play clip 7A, please.

22              (Audio and video playing.)

23   Q.         Where are you here?  Can you tell the members of

24   the jury?

25   A.         In the underground parking garage at the LaSalle
```

```
 1   building.
 2                  (Audio and video playing.)
 3   Q.        Okay.  On April 13th, in your apartment, there
 4   was a weapon present, was there not?
 5   A.        Yes, there was.
 6   Q.        And if we could put up, again, Exhibit 86, which
 7   is already in evidence, I believe, Government 86.
 8             Do you recognize that?
 9   A.        Yes, I do.
10   Q.        Is that the weapon that was visible on the
11   videotape taken on April 13th, 2005?
12   A.        Yes, it was.
13   Q.        Okay.  On the next day, did there come a time
14   when you met with Mohammed Amawi again at his place of
15   employment, AZ Travel?
16   A.        Yes.
17   Q.        And we're going to play Exhibit 4-43.  It's 1D50,
18   segment 1A.
19                  (Audio playing.)
20   Q.        And did there come a time a day later when you,
21   again, met with Mohammed Amawi at his place of employment?
22   A.        Yes.
23   Q.        And if we could play 1D51, Exhibit 4-44, clip 1A,
24   please.
25             THE COURT:  What day was this?
```

1                    (Audio playing.)

2    BY MR. SOFER:

3    Q.        What is this business about your contacting

4    Mohammed in a different E-mail?  Can you explain that to

5    the members of the jury?

6    A.        Just wanted to appear like -- Mohammed was very

7    cautious -- my contact, Mohammed Salah, was very cautious

8    when linking up with other people.

9    Q.        And was there an E-mail yet at this time that had

10   been developed?

11   A.        There was not.

12   Q.        And were you beginning to discuss an E-mail for a

13   reason, though?

14   A.        Yes.  The FBI wanted me to present my contact,

15   Mohammed Salah, with his E-mail address.

16            MR. SOFER:  Judge, we have a rather long one

17   coming up.  If you want to take a midmorning break now, it

18   might be a good time.

19            THE COURT:  That's fine.  We will do so.  Resume

20   by 10:15.  Thanks.

21                    (A brief recess was taken.)

22            THE COURT:  Okay.  You may be seated.  You remain

23   under oath.  I trust you understood that.

24            Mr. Sofer, you may resume.

25            MR. SOFER:  Thank you, Judge.

```
 1  BY MR. SOFER:

 2  Q.        We stopped before the break on April 15th, 2005.

 3  I want to direct your attention to five days later.  Did

 4  there come a time when you had a conversation with Marwan

 5  El-Hindi?

 6  A.        Yes.

 7  Q.        If we can play 1D15, it's Exhibit 85; and I

 8  believe it's clip 1A.

 9            MR. HARTMAN:  This is April 20?

10            MR. SOFER:  April 20.  It's --

11            THE COURT:  What exhibit number?  I'm sorry.

12            MR. SOFER:  It's Exhibit 4-815, 1D15 from 69440

13  for Counsel; and it's clip 1A, Judge.

14                 (Audio playing.)

15            MR. BOSS:  Your Honor, can we have just a moment,

16  please?

17            THE COURT:  Sure.

18            MR. BOSS:  Thank you.  I'm so sorry about the

19  delay.

20            THE COURT:  No problem.

21            MR. SOFER:  Let's continue.

22                 (Audio playing.)

23  BY MR. SOFER:

24  Q.        Did Marwan El-Hindi train with you that day?

25  A.        He did not.
```

1    Q.         Did there come a time later in that day when you

2    met with Mohammed Amawi and Wassim Masloum?

3    A.         Yes.

4    Q.         And if we can play -- this is 1D52, Exhibit

5    Number 4-45, clip 1A.

6                         (Audio and video playing.)

7    Q.         Can you tell us where you are and what's depicted

8    in clip 1A?

9    A.         We are in my vehicle, and --

10   Q.         Can you tell the members of the jury where you're

11   headed?

12   A.         Out to Cleland's Indoor Shooting Range.

13                        (Audio and video playing.)

14   Q.         Okay.  Mr. Griffin, by the way, do you know who

15   picked up who in the car?

16   A.         I drove to Mohammed Amawi's and picked up

17   Mohammed and Wassim came shortly after and we rode together

18   from Mohammed Amawi's apartment.

19   Q.         Did the conversation continue on the 20th?

20   A.         Yes, it did.

21   Q.         And if we can play clip 2-A, please.  By the way,

22   before we start playing it, there's already -- at 21:21.2

23   on Government's Exhibit 4-45, clip 2A, there's a still of

24   the video there.

25                        Do you recognize where that is?

```
 1   A.          That is Cleland's Indoor Gun Range and Shop.

 2   Q.          Okay.

 3                 (Audio and video playing.)

 4   Q.          Mr. Griffin, when you go to Cleland's Range, do

 5   you have to fill out some forms?

 6   A.          Yes, the first time you go.

 7   Q.          And had you and Mohammed Amawi previously filled

 8   out some of those forms on January 21st of 2005?

 9   A.          Yes.

10   Q.          Let me show you what's been marked Government

11   Exhibit Number 47A.  Do you recognize that?

12   A.          Yes, I do.

13   Q.          What do you recognize that to be?

14   A.          It's a waiver and release form for Cleland's

15   Range.

16   Q.          And does that -- Government's 47A fairly and

17   accurately depict -- or is it the form that you filled out

18   on January 21st, 2005 when you went shooting with Mohammed

19   Amawi and others?

20   A.          Yes.

21                 MR. SOFER:  The Government offers 47A, Your

22   Honor.

23                 THE COURT:  It will be admitted.

24                    (Government's Exhibit Number 47A was

25                     admitted into evidence.)
```

```
 1              MR. SOFER:  Put up 47B.

 2    BY MR. SOFER:

 3    Q.        Do you recognize that?

 4    A.        Yes, I do.

 5    Q.        Can you tell the members of the jury what that

 6    is?

 7    A.        That is a waiver and release signed by Mohammed

 8    Amawi.

 9    Q.        Okay.  And does that look like the one that was

10    signed on January 21st, 2005?

11    A.        Yes.

12              MR. SOFER:  And Government offers 47B at this

13    point.

14              THE COURT:  It will be admitted.

15                   (Government's Exhibit Number 47B was

16                   admitted into evidence.)

17    BY MR. SOFER:

18    Q.        Do you know who paid on April 20th, the day that

19    we just saw, at Cleland's?

20    A.        I did.

21    Q.        And when you pay, what do you pay for there at

22    Cleland's?

23    A.        You pay for the guns, the targets and the range

24    time.

25    Q.        Did you rent a gun on that day?
```

```
 1   A.         I believe I did, the Ruger 22.

 2   Q.         And did you bring two of your own weapons on that

 3   day?

 4   A.         I brought my Glock 9 mill.  I picked up there

 5   from the gunsmith my Desert Eagle 357.

 6   Q.         And that had previously been dropped off with the

 7   gunsmith at Cleland's?

 8   A.         Yes.

 9   Q.         Let me show you Government Exhibit Number 84 and

10   ask you if you recognize this.  If we can put it up on the

11   screen too, please.  That's 84.

12   A.         Yes.

13   Q.         Do you recognize that?

14   A.         Yes.

15   Q.         And tell the members of the jury what that is?

16   A.         It's the Ruger 22.

17   Q.         And do you know if that -- is that the weapon

18   that you rented from Cleland's on April 20th of 2005?

19   A.         Yes, it is.

20              MR. SOFER:  At this time, the Government offers

21   Government Exhibit Number 84 into evidence.

22              THE COURT:  It will be admitted.

23                  (Government's Exhibit Number 84 was admitted

24                  into evidence.)

25   BY MR. SOFER:
```

```
 1   Q.        I'll show you what's been marked -- or what is

 2   Government Exhibit Number 85.  If you'll put that on the

 3   screen, please.  Do you recognize that?

 4   A.        Yes, I do.

 5   Q.        What do you recognize that to be?

 6   A.        My Desert Eagle 357.

 7   Q.        And is that the weapon that you brought to

 8   Cleland's on April 20th, 2005?

 9   A.        This is the weapon I picked up at Cleland's.

10             MR. SOFER:  At this time, the Government offers

11   Government Exhibit Number 85.

12             THE COURT:  It will be admitted.

13                  (Government's Exhibit Number 85 was admitted

14                  into evidence.)

15   BY MR. SOFER:

16   Q.        Finally, I'm going to show you Government Exhibit

17   Number 86.  We've seen it before.  Do you recognize

18   Government Exhibit Number 86?

19   A.        Yes, I do.

20   Q.        And what do you recognize that to be?

21   A.        It is my Glock.

22   Q.        And is that the weapon that you did bring to

23   Cleland's on April 20th, 2005?

24   A.        Yes.

25             MR. SOFER:  At this time, the Government offers
```

```
 1   Government's Exhibit Number 86 into evidence, Your Honor.

 2              THE COURT:  It will be admitted.

 3              MR. HERDMAN:  It's in evidence.

 4              MR. SOFER:  I'm sorry.  This one's in evidence,

 5   my apologies.

 6   BY MR. SOFER:

 7   Q.        You said the first time you go to Cleland's you

 8   have to fill out a waiver form; is that right?

 9   A.        Correct.

10   Q.        And if we can put in eight -- put up 83A on the

11   screen, please.

12              To your knowledge, was this the first day that

13   Wassim Masloum went to Cleland's, at least with you?

14   A.        Yes.

15   Q.        And do you recognize 83A?

16   A.        That is a waiver and release form signed by

17   Wassim Masloum.

18              MR. SOFER:  And Your Honor, the Government offers

19   Government Exhibit Number 83A into evidence.

20              THE COURT:  It will be admitted.

21                   (Government's Exhibit Number 83A was

22                   admitted into evidence.)

23   BY MR. SOFER:

24   Q.        Is there also a sign-in sheet that one has to

25   sign in at Cleland's?
```

1    A.        Yes, for the range time.

2    Q.        If we can put up 83, please.  Do you recognize

3    Government's Exhibit Number 83?

4    A.        Yes, I do.

5    Q.        Can you tell the members of the jury what that

6    is?

7    A.        That is the sign-in sheet for the actual gun

8    range.

9    Q.        And does it reflect the approximate times that

10   you're on and off the range on any given day?

11   A.        Yes.

12   Q.        If we could enlarge the section that starts with

13   Darren Griffin.  Do you recognize the names on that sign-in

14   sheet?

15   A.        Yes, I do.

16   Q.        Can you tell the members of the jury who's on

17   that sheet?

18   A.        Myself, Mohammed Amawi and Wassim Masloum.

19             MR. SOFER:  And at this time, the Government

20   offers Government Exhibit Number 83 into evidence.

21             THE COURT:  It will be admitted.

22                  (Government's Exhibit Number 83 was admitted

23                  into evidence.)

24   BY MR. SOFER:

25   Q.        Did there come a time after the drive that we

1    just saw that was depicted in clip 1A of Government Exhibit

2    4-45 that you -- I'm sorry -- after the initial session at

3    the table there in the counter when you went onto the

4    range?

5    A.        Yes.

6    Q.        And if we could please play clip 3A now, please.

7              THE COURT:  What exhibit is this again?

8              MR. SOFER:  Same exhibit, Your Honor, 4-45,

9    April 20th, 2005, 1D52.

10                 (Audio and video playing.)

11   BY MR. SOFER:

12   Q.        And you refer to what we talked about last week,

13   what were you referring to?

14   A.        The weapons training that we had performed in my

15   apartment.

16   Q.        Continue.

17                 (Audio and video playing.)

18   Q.        Okay.  Mr. Griffin, did that shooting session

19   continue?

20   A.        Yes, it did.

21   Q.        And if we can play 4A from the same visit, Your

22   Honor.

23                 (Audio and video playing.)

24   Q.        Okay.  Mr. Griffin, did your conversation with

25   Mohammed Amawi and Wassim Masloum on April 20th, 2005

1  continue?

2  A.        Yes, it did.

3  Q.        If we can play clip 5A, please.

4                  (Audio and video playing.)

5  Q.        Okay.  Did the conversation continue?

6  A.        Yes, it did.

7  Q.        And by the way, you know where we were -- where

8  you were in clip 5A that we just watched?

9  A.        Back in my vehicle.

10  Q.        Okay.  And do you know where you're headed?

11  A.        I believe back to Mohammed Amawi's apartment.

12  Q.        Okay.  Let's continue.

13                  (Audio and video playing.)

14  Q.        Who is this, him, that we're talking about here?

15  A.        Mohammed Salah.

16  Q.        And again, who is that person?

17  A.        My contact overseas.

18  Q.        And had you yet received, to the best of your

19  recollection, an E-mail address from Mohammed Salah from

20  the FBI?

21  A.        I did not.

22  Q.        Okay.  Mr. Griffin, did there come a time when

23  you recorded a conversation with somebody else that day?

24  A.        Yes.

25  Q.        And did you know it at the time?

```
 1   A.        I did not.

 2   Q.        Have you subsequently learned that you recorded a

 3   conversation with somebody else?

 4   A.        Yes.

 5   Q.        And how did you learn that?

 6   A.        Reviewing the recordings.

 7   Q.        Okay.  And who was that person, if you recall?

 8   A.        Shannon Coats.

 9   Q.        Was he the FBI agent that you were in contact

10   with during this period of time?

11   A.        Yes.

12   Q.        If we can play clip 7A, please.  Is this done on

13   purpose or by accident?

14   A.        By accident.

15                  (Audio and video playing.)

16   Q.        Agent Coats is talking about getting some things

17   in motion and having something by Monday or Tuesday.  What,

18   if you know, did you learn that to be?

19                  MR. HARTMAN:  Objection.

20                  THE COURT:  I would agree.  What the agent

21   learned or what he learned?

22   BY MR. SOFER:

23   Q.        What, if you know, did you later learn that to

24   be?

25                  THE COURT:  Well, let's get some foundation.  It
```

```
 1   sounds like hearsay to me.

 2              MR. SOFER:  I don't think it's hearsay, Judge,

 3   for a variety of reasons.  We can come to the side, if you

 4   want.

 5              THE COURT:  Okay.

 6              MR. SOFER:  You know, Judge, we'll continue.  I

 7   think it will make itself clear later.  Let's keep going.

 8              MR. HARTMAN:  Mr. Sofer, is there -- I don't

 9   know.  Can you guys do anything to make it more clear?

10   This one's kind of not as clear as the others.

11              MR. SOFER:  It's pretty clear to me.  It's as

12   clear as it's going to get.

13                   (Audio and video playing.)

14   BY MR. SOFER:

15   Q.      Okay.  Mr. Griffin, did you return the recording

16   device or devices that you were wearing that day to the

17   FBI?

18   A.      I believe either that night or first thing in the

19   morning.

20   Q.      And did you turn over to the FBI both the

21   recordings of the shooting session that we just saw and the

22   recording of your call with Marwan El-Hindi?

23   A.      Yes.

24   Q.      Did you do that at the same time?

25   A.      I believe so.
```

1    Q.       Can you tell the members of the jury what you

2    meant when you said that Marwan El-Hindi had not called for

3    the shooting session?

4    A.       I meant for the shooting session.  I had talked

5    to him prior.

6            MR. HARTMAN:  Your Honor, I'm going to object,

7    because I think he misstated what the evidence was.

8            THE COURT:  Well, he can relate what -- he can

9    relate whatever conversation he had with Mr. El-Hindi in

10   which he then said to the agent.

11           MR. HARTMAN:  Your Honor, may we approach,

12   please?

13           MR. SOFER:  That's all he's doing, Judge.

14           THE COURT:  Sure.

15               (A sidebar conference was had on the

16               record.)

17           MR. HARTMAN:  Judge, I --

18           THE COURT:  Louder.  You can speak a normal

19   voice.  She can hear.

20           MR. HARTMAN:  First of all, I have a problem with

21   him introducing anything that he said to El-Hindi that's

22   not recorded that day, because everything else is recorded

23   that day.

24           Second of all, he's talking about he's going to

25   talk about what El-Hindi's intent was in the conversation,

1  which is -- he clearly cannot say what El-Hindi's intent

2  was.

3          THE COURT:  I understand.  He can relate

4  statements made by El-Hindi.  He can't say what El-Hindi

5  meant.  And the fact that it's not recorded, you can ask

6  him that on cross.  The fact that it's not recorded doesn't

7  mean it's not admissible.

8          MR. BOSS:  They did just play -- the recorded

9  telephone call between El-Hindi and Griffin was played for

10  the jury, and it was not involving any training mentioned.

11          THE COURT:  It was that call?

12          MR. SOFER:  Let me try to put this in some kind

13  of perspective.  Defense counsel gets up in their opening

14  statement.  They say that this witness lied to the FBI --

15  lied to the FBI -- that's what they said -- about some --

16  about the nature of Marwan El-Hindi not having called this

17  day about the training.  And in fact, there was a call.  I

18  think that's what they're trying to say.

19          There was a telephone call and it was recorded

20  and it turns out and -- that Darren Griffin did not inform

21  the FBI about this telephone call.  In fact, he did inform

22  the FBI of the telephone call; and I'm just asking what he

23  meant when he said in his conversation with the agent he

24  didn't call, because it relates to the training as opposed

25  to the call before, which did not relate to training, which

1   is the allegation that defense counsel made in the opening

2   statement.

3       MR. HARTMAN:  That's not accurate.  What I said

4   in my opening statement was there was a call between

5   El-Hindi and Griffin that day which the Government -- there

6   was a call earlier that day, I said that; and then they

7   went shooting that day.  And then he was asked at the --

8   after the shooting, No.  No call.  No show.  And that

9   wasn't true, because he had talked to him that day; and

10  during that whole conversation, there was no mention that

11  he was supposed to show up.

12      THE COURT:  I'm sorry.  You just played this.

13  So, what more do we have to do?

14      MR. SOFER:  Because Counsel has made this

15  argument to this jury, he's saying that when Darren Griffin

16  said to the FBI agent that he didn't call, that he was

17  lying about this previous call.

18      THE COURT:  The call is the evidence, not what he

19  meant in the call.

20      MR. SOFER:  No, Judge.  In this particular case,

21  the argument that they are making is that he's lied to the

22  FBI; but the witness should be able to explain what he

23  meant when he said he --

24      THE COURT:  I'll let you simply ask that.

25      MR. SOFER:  That's all I'm asking.  I'm not

```
 1    asking any further questions.
 2              THE COURT:  I misunderstood.  I thought I heard
 3    you say something about El-Hindi -- about what El-Hindi had
 4    said.
 5              MR. SOFER:  No.
 6              THE COURT:  Then, I misheard.
 7              MR. SOFER:  And I want to make it very clear,
 8    only asking what question -- what did he --
 9              THE COURT:  Objection overruled.
10              MR. BOSS:  When you question him, you'll refer
11    back to the earlier call that the jury heard.
12              MR. SOFER:  No.  I'm going to ask him what he
13    meant when he said he didn't call.  This call takes place
14    on a particular --
15              THE COURT:  That's fine.  You can ask that.  You
16    can ask that.
17              MR. SOFER:  Okay.
18                   (Sidebar concluded.)
19              THE COURT:  You may continue.  Objection
20    overruled.  You may continue.
21    BY MR. SOFER:
22    Q.        In this particular conversation with Agent Coats,
23    you, I think, informed Agent Coats that Marwan El-Hindi had
24    not called; is that right?
25    A.        Correct.
```

```
1    Q.        Can you tell the members of the jury what you

2    meant by that?

3    A.        He did not call prior to the training.

4    Q.        When you met later with Agent Coats, whether it

5    was that night or the next day, did you give him the tape

6    recording of both this interaction at the Cleland's

7    Shooting Range and the previous call that you had made and

8    recorded with Marwan El-Hindi earlier in the day?

9    A.        Yes.

10   Q.        Did you also orally advise Agent Coats that you

11   had recorded a telephone call with --

12             THE COURT:  You're leading him.

13   BY MR. SOFER:

14   Q.        Okay.  Did you orally advise Agent Coats about

15   anything else?

16   A.        About the call made to Marwan El-Hindi.

17   Q.        And did you also advise him about the shooting

18   session?

19   A.        Yes.

20   Q.        And did you do that at the same time?

21   A.        I may have.

22             MR. BOSS:  Your Honor, may we approach for a

23   moment?

24             THE COURT:  Sure.

25                  (A sidebar conference was had on the
```

```
 1              record.)

 2         MR. BOSS:  I do believe that this is leading; and

 3    I also believe it's completely inconsistent with the

 4    recording that we just heard, which was the witness

 5    advising Shannon Coats about the --

 6         THE COURT:  And you can cross-examine.

 7         MR. BOSS:  Okay.

 8         THE COURT:  You have the tape, and you can

 9    cross-examine and bring all that to the jury's attention.

10         MR. SOFER:  And I have no problem with that.

11         MR. HARTMAN:  I'm just afraid -- Judge, like you

12    said, is -- the evidence is the phone call.

13         THE COURT:  Right.

14         MR. HARTMAN:  And right now he's asking questions

15    completely mischaracterizing evidence, because that was not

16    in the phone call.

17         THE COURT:  Okay.  Fine.  Then, you can call that

18    to the jury's attention on cross.

19              (Sidebar concluded.)

20         THE COURT:  You may continue.

21    BY MR. SOFER:

22    Q.        Okay.  On the 20th when you and Wassim Masloum

23    and Mohammed Amawi went to Cleland's, can you tell us

24    approximately how long it took you to get from Mohammed

25    Amawi's home or wherever it is you met to Cleland's?
```

```
1   A.        I believe 20 to 30 minutes.

2   Q.        Now, I want to direct your attention to five days

3   later, April 25th, 2005.  Did there come a time when you

4   interacted with Mohammed Amawi on April 25th, 2005?

5   A.        Yes.

6             MR. SOFER:  And Your Honor, we're going to play

7   Exhibit 4-46, 1D54; and the first clip is 2A.

8             THE COURT:  Four --

9             MR. SOFER:  Four-46, 1D54, clip 2A.

10            THE COURT:  And this is a conversation on

11  April 25th?

12            MR. SOFER:  Correct, Your Honor.

13  BY MR. SOFER:

14  Q.        Do you happen to recall, before we start playing

15  it, where this took place?

16  A.        I believe AZ Travel.

17  Q.        Okay.  Let's --

18                 (Audio playing.)

19  Q.        You said AZ Travel.  Is that where you were on

20  April 25th, 2005?

21  A.        At this particular section, we're actually in my

22  vehicle.

23  Q.        And did you pick someone up on April 25th, 2005?

24  A.        Yes, Mohammed Amawi.

25  Q.        Do you remember where you picked him up?
```

 1   A.       I believe it was AZ Travel.

 2   Q.       Okay.  Do you know where you were headed here?

 3   A.       I believe up to Adams Travel in Michigan.

 4   Q.       Okay.  Let's play this again from the beginning.

 5              (Audio playing.)

 6            MR. SOFER:  One moment, Judge.

 7            Continue.

 8              (Audio playing.)

 9   Q.       And did this conversation on April 25th, 2005

10   continue?

11   A.       Yes, it did.

12            MR. SOFER:  And let's play 3A.  Same exhibit,

13   Your Honor.

14              (Audio playing.)

15   BY MR. SOFER:

16   Q.       Did this conversation on the 25th of April, 2005

17   continue?

18   A.       Yes, it did.

19   Q.       Let's play 5A, please.

20              (Audio playing.)

21   Q.       Okay.  Mr. Griffin, did the conversation on

22   April 25th continue?

23   A.       Yes, it did.

24   Q.       And let's play 6A, please.

25              (Audio playing.)

```
1    Q.        And again, who were you referring to there as the

2    46-year-old person from Kuwait?

3    A.        Mohammed Salah.

4    Q.        And I want to direct your attention to three days

5    later.  Did there come a time when you met with Mohammed

6    Amawi at AZ Travel?

7    A.        Yes.

8    Q.        And I'd like us to play Exhibit 4-47.  This is

9    from 1D55 and, again, April 28th, 2005; and it's clip 1A,

10   please.

11                 (Audio playing.)

12   Q.        Amawi said, Wassim wants to go.  Who is he

13   referring to?

14   A.        Wassim Masloum.

15   Q.        That's the Wassim Masloum here -- in the

16   courtroom here today?

17   A.        Yes.

18   Q.        Let's continue.

19                 (Audio playing.)

20   Q.        Who's Ashraf, again, that Mohammed Amawi's

21   referring to?

22   A.        Ashraf Zaim.

23   Q.        And what is Ashraf Zaim's relationship with

24   Mohammed Amawi?

25   A.        He is either the owner or manager of AZ Travel.
```

1    Q.        Okay.  Again, what E-mail are you referring to

2    here?

3    A.        An E-mail to my contact overseas, Mohammed Salah.

4    Q.        Let's continue.

5              (Audio playing.)

6              MR. SOFER:  Your Honor, this would be an ideal

7    time to stop for lunch if the Court is willing.

8              THE COURT:  We'll resume at 1:00, ladies and

9    gentlemen.  Don't talk about the case.  Keep an open mind.

10   Have a pleasant lunch hour.

11             (A brief recess was taken for lunch.)

12             THE COURT:  Mr. Griffin, you remain under oath.

13             And Mr. Sofer, you may resume.

14             MR. SOFER:  Thank you, Judge.

15   BY MR. SOFER:

16   Q.        Before the lunch break, Mr. Griffin, I think we

17   were up to April 28th, 2005; and we played Exhibit 4-47.

18             I want to direct your attention to the very next

19   day, April 29th, 2005.  Did there come a time on that day

20   when you and others returned to Cleland's Indoor Firing

21   Range for further shooting?

22   A.        Yes.

23   Q.        And was it the same group of people, or were

24   there other people as well on that day?

25   A.        There was an additional person.

1    Q.        And can you tell the members of the jury who that

2    additional person was?

3    A.        Bilal Masloum.

4    Q.        And if you know, what is the relationship between

5    Bilal Masloum and Wassim Masloum?

6    A.        They are brothers.

7    Q.        Okay.  And we're going to play Exhibit 4-49.

8    It's 1D57, April 29, 2005, clip 1A, please, very short, so

9    at least that's what I have.

10            THE COURT:  Give me half a second, please.

11   BY MR. SOFER:

12   Q.        And before we start playing it on the screen here

13   from the presentation, it's at 000000, are you able to tell

14   from that particular still shot from the video where it is

15   that you are?

16   A.        I am at Mohammed Amawi's apartment sitting at his

17   dining room table --

18   Q.        Okay.

19   A.        -- and we're facing the kitchen area.

20   Q.        And let's play 1A, please.

21            (Audio and video playing.)

22   Q.        We stopped it at 05104.  There's another person

23   in that still shot.  Do you recognize that person?

24   A.        Yes, I do.

25   Q.        And can you tell the members of the jury who that

1   is?

2   A.        That is Mohammed's mother.

3   Q.        Okay.   This Mohammed Salah that we've heard so

4   much about, can you tell the members of the jury, is this

5   a -- a real person?

6   A.        Yes, it's a real person.

7   Q.        And can you tell the members of the jury what you

8   mean by that?

9   A.        It's a real person in my -- in my past, but it is

10  not a true contact overseas.

11  Q.        And are you using this person that you had met in

12  your past for some reason as the contact in the Middle East

13  that you would talk to Mohammed Amawi about?

14  A.        Yes.   The FBI told me to make it appear like I

15  did have a contact overseas, and that is the name and

16  person I used out of my past.

17  Q.        And was some of the information that you provided

18  about that person accurate?

19  A.        Yes.

20  Q.        Was some of the information that you provided

21  about that person to Mohammed Amawi and Wassim Masloum

22  inaccurate?

23  A.        Yes.

24  Q.        And this E-mail that we keep hearing about,

25  likewise, who was it that was to provide you with that

1    E-mail?

2    A.       The FBI.

3    Q.       And again, if you remember, by this point, had

4    they yet gotten around to have been able to set that up and

5    give it to you?

6    A.       I don't believe so.

7    Q.       Start from the beginning, please.

8             (Audio and video playing.)

9    Q.       Okay.  Did the conversation at Mohammed Amawi's

10   house continue?

11   A.       Yes, it did.

12   Q.       And let's, please, play clip 2A from the same

13   exhibit.

14            (Audio and video playing.)

15   Q.       Okay.  Did the conversation on February -- I'm

16   sorry -- April 29th continue?

17   A.       Yes, it did.

18   Q.       And if we can play clip 3A, please.

19            (Audio and video playing.)

20   Q.       Okay.  Mr. Griffin, did the conversation

21   continue?

22   A.       Yes, it did.

23   Q.       And let's play 5A, please.

24            (Audio and video playing.)

25   Q.       From the screen presentation that reads 31:13:7

1   of clip 5A, can you tell the members of the jury what we're

2   looking at there?

3   A.          That is the rear of my car.

4   Q.          Okay.  Let's continue.

5                   (Audio and video playing.)

6   Q.          Okay.  Mr. Griffin, did the conversation on

7   April 29th, 2005 continue?

8   A.          Yes, it did.

9   Q.          And we're going to play 6A, please.

10                  (Audio and video playing.)

11  Q.          Okay.  Mr. Griffin, did the conversation

12  continue?

13  A.          Yes, it did.

14  Q.          And let's play 7A.

15                  (Audio and video playing.)

16  Q.          Who paid on this day -- on the 29th of April for

17  the rental of the lanes and equipment, et cetera?

18  A.          Mohammed Amawi.

19  Q.          Let's continue.

20                  (Audio and video playing.)

21  Q.          Okay.  Let's -- did this conversation continue?

22  A.          Yes, it did.

23  Q.          And let's play segment 8A.

24                  (Audio and video playing.)

25  Q.          Can you tell us -- this is 01:05:51:3.  Can you

1  tell us who's shooting at this time?

2  A.        Wassim Masloum.

3  Q.        And who's the individual standing right behind

4  him?

5  A.        To my right and his right is Bilal Masloum.

6  Q.        Continue.

7               (Audio and video playing.)

8  Q.        Okay.  Mr. Griffin, did the conversation on

9  April 29th, 2005 continue?

10  A.        Yes, it did.

11  Q.        And let's play 9A, please.

12               (Audio and video playing.)

13  Q.        Okay.  Mr. Griffin, did the conversation

14  continue?

15  A.        Yes, it did.

16  Q.        Let's go to 10A.

17               (Audio and video playing.)

18  Q.        Okay.  Mr. Griffin, did the conversation continue

19  beyond that?

20  A.        Yes, it --

21  Q.        And we're going to play 11A.

22               (Audio and video playing.)

23  Q.        Okay.  Mr. Griffin, again, when you sign into

24  Cleland's, there are a number of forms that have to be

25  filled out.  Is that what your testimony was before?

1    A.         Correct.

2    Q.         And if we could put up 91, please -- Government

3    91 on the screen now.  Do you recognize this form?

4    A.         Yes, I do.

5    Q.         Okay.  And if we could enlarge the part on the

6    form from the part where it says, Darren Griffin, down,

7    four.  And do you recognize on Government's Exhibit Number

8    91 a number of names?

9    A.         Yes, I do.

10   Q.         What names do you recognize?

11   A.         There's myself, Wassim Masloum, Mohammed Amawi

12   and Bilal Masloum.

13   Q.         And does it indicate on that approximately the

14   time you showed up?

15   A.         Yes, from --

16   Q.         That's all right.  Does it also indicate what

17   kind of weapons were rented?

18   A.         Yes.

19              MR. SOFER:  Okay.  At this time, Your Honor, the

20   Government offers Government's 91 into evidence.

21              THE COURT:  It will be admitted.

22                   (Government's Exhibit Number 91 was admitted

23                   into evidence.)

24   BY MR. SOFER:

25   Q.         And what kind of weapons were used on April 29th,

```
 1   2005, Mr. Griffin?

 2   A.        Beretta 9 mill and a Glock 22.

 3   Q.        Okay.  And I want to show you what's been marked

 4   Government Exhibit Number 92.  Can you tell the members of

 5   the jury if you recognize Government's 92, please?

 6   A.        I do.

 7   Q.        What is that?

 8   A.        It is a Beretta 9 mill.

 9             MR. SOFER:  Okay.  And the Government offers

10   Government's 92 at this time.

11             JUROR:  Excuse me.  We don't have it on the

12   screen.

13             MR. SOFER:  I'm sorry.  Is that better?  My

14   apologies.

15         The Government offers Government 92 at this time,

16   Your Honor.

17             THE COURT:  It will be admitted.

18                 (Government's Exhibit Number 92 is admitted

19                  into evidence.)

20   BY MR. SOFER:

21   Q.        And was there another weapon that was used that

22   day by Wassim Masloum, Bilal Masloum and Mohammed Amawi?

23   A.        Yes, there was.

24   Q.        And I want to show you what's been marked

25   Government Exhibit Number 93.  Put that up on the screen
```

1  too, please.  Do you recognize Government's Exhibit Number

2  93, which I'm also handing you at this time?

3  A.      Yes, I do.

4  Q.      Could you tell the members of the jury what that

5  is?

6  A.      It is a Glock 22.

7  Q.      And do you know what caliber a Glock 22 fires --

8  what caliber round a Glock 22 fires?

9  A.      10 millimeter.

10      MR. SOFER:  And at this time, the Government

11  offers 93 into evidence.

12      THE COURT:  It will be admitted.

13          (Government's Exhibit Number 93 was admitted

14           into evidence.)

15  BY MR. SOFER:

16  Q.      You testified earlier that when someone first

17  goes to Cleland's, they are to fill out a waiver form; is

18  that correct?

19  A.      Correct.

20  Q.      And I want to show you what's been marked

21  Government's Exhibit 91A, please.  Do you recognize that?

22  A.      Yes, I do.

23  Q.      Are you able to tell what that is?

24  A.      It is a waiver and release form signed by Bilal

25  Masloum.

```
 1   Q.        And at this time -- is the date on there 4-29-05?
 2   A.        Yes, it is.
 3             MR. SOFER:  At this time, the Government offers
 4   91A into evidence?
 5             THE COURT:  It will be admitted.
 6                  (Government's Exhibit Number 91A was
 7                  admitted into evidence.)
 8   BY MR. SOFER:
 9   Q.        Did you keep some of the targets that were used
10   on April 29th, 2005?
11   A.        Yes, I did.
12   Q.        And we'll show you what's been marked Government
13   Exhibit 94A.  Is that one of the targets that was used on
14   April 29th, 2005?
15   A.        Yes, it was.
16   Q.        I'll show you 94B.  Is that another target --
17   A.        Yes, it was.
18   Q.        -- that was used?
19   A.        Yes.
20   Q.        94C, is that another target that was used on that
21   day?
22   A.        Yes.
23   Q.        And 94D, is that another target that was used?
24   A.        Yes.
25   Q.        Did you take those targets with you on
```

```
 1    April 29th, 2005?

 2    A.        Yes, I did.

 3    Q.        Did there come a time when you found these

 4    targets in your personal belongings?

 5    A.        Yes, in, I believe, June of '06.

 6    Q.        And was that after the investigation of this case

 7    was over?

 8    A.        Yes.

 9    Q.        What did you do when you found these targets?

10    A.        I called my contact, Shannon Coats.

11    Q.        And did you give these targets to Shannon Coats

12    after you found them in your personal belongings?

13    A.        Yes, I did.

14              MR. SOFER:  At this time, the Government offers

15    94A, B, C and D into evidence.

16              THE COURT:  Be admitted.

17                   (Government's Exhibit Numbers 94A through

18                   94D was admitted into evidence.)

19    BY MR. SOFER:

20    Q.        Finally, let's put up 97, please -- Government's

21    97 for identification.  Do you recognize what 97 is?

22    A.        Yes.

23    Q.        Is that a still shot from the videotaping on

24    April 29th?

25    A.        I believe so.
```

1   Q.        And can you tell the members of the jury who's

2   captured in Government Exhibit Number 97?

3   A.        Bilal Masloum.

4   Q.        Does it fairly and accurately represent the way

5   he looked on April 29th, 2005 at Cleland's Indoor Shooting

6   Range?

7   A.        Yes.

8             MR. SOFER:  At this time, the Government offers

9   97 into evidence.

10            THE COURT:  Be admitted.

11                (Government's Exhibit Number 97 was admitted

12                into evidence.)

13  BY MR. SOFER:

14  Q.        Okay.  Mr. Griffin, I want to direct your

15  attention to May 1st, 2005.  Did something significant in

16  this case happen on that day?

17  A.        Yes.

18  Q.        And can you tell the members of the jury what

19  that was?

20  A.        I was contacted by Mohammed Amawi.

21  Q.        Do you know where he was contacting you from?

22  A.        I did not recognize the number.

23  Q.        And what was the substance of the conversation

24  that you had with Mohammed Amawi on that day, if you

25  recall?

```
 1   A.        He had called me in a heightened state and he
 2   basically --
 3   Q.        What do you mean by heightened state?
 4   A.        He sounded like he was scared.
 5   Q.        And what did he say in substance?
 6   A.        He -- basically, he said he could not go to
 7   paintball, do not call him at his home and he needs to see
 8   me right away.
 9   Q.        And did you, in fact, go to see him that day?
10   A.        Yes, I did.
11   Q.        When you went, did you bring a recording device
12   with you?
13   A.        Yes, I did.
14   Q.        And we're going to play Exhibit 4-51 from May
15   1st, 2005, 1D59.  By the way, do you know if you had an
16   opportunity to record the conversation when Mohammed Amawi
17   called you?
18   A.        I do not.
19   Q.        And clip 1A, please.
20            MR. HARTMAN:  I'm sorry.  Could you give us the
21   that ID, please?
22            MR. SOFER:  From May 1st, 2005, 1D59, Exhibit
23   4-51, clip 1A.
24            MR. HARTMAN:  Thank you.
25            MR. SOFER:  You're welcome.  Okay.
```

```
 1                    (Audio playing.)

 2   BY MR. SOFER:

 3   Q.       Okay.  Did that conversation continue on May 1st?

 4   A.       Yes, it did.

 5   Q.       And let's play 2A, please.

 6                    (Audio playing.)

 7   Q.       During this conversation, did you gather what it

 8   was that Mohammed Amawi was afraid of?

 9                MR. IVEY:  Objection.

10                MR. HARTMAN:  Objection.

11                THE COURT:  Sustained.

12   BY MR. SOFER:

13   Q.       Did he indicate to you that he was being followed

14   or anything of that nature?

15   A.       Yes.

16   Q.       I want to direct your attention to the very next

17   day.  Did there come a time when you spoke to one or more

18   of the defendants in this case on May 2nd of 2005?

19   A.       Yes.

20   Q.       Can you tell the members of the jury, if you

21   remember, what your interaction was and/or what they said?

22                MR. BOSS:  Is this a recorded conversation,

23   Mr. Sofer?

24                MR. SOFER:  No, not -- some are; some aren't.

25                THE COURT:  Okay.  You can just indicate whether
```

```
 1   they are or not.

 2               MR. SOFER:  If he knows.

 3   A.          The first one is not.  It was when I went to --

 4   up to Michigan with Marwan El-Hindi to try to get his

 5   driver's license.

 6   Q.          Okay.  And did there come a time when you --

 7               MR. HARTMAN:  Objection.  Judge, may we approach,

 8   please?

 9               THE COURT:  Sure.

10                   (A sidebar conference was had on the

11                   record.)

12               THE COURT:  Okay.  Basis for the objection?

13               MR. HARTMAN:  The basis for the objection, Judge,

14   is that at some point, it becomes a matter of fundamental

15   fairness about the -- and I know we can cross on this.  But

16   the choice of what gets recorded, what doesn't get recorded

17   and what's been said about what hasn't been recorded is

18   some of -- it puts together what the recordings are and it

19   creates the bridge for the Government and it's not

20   recording.  I know we can cross on that, but I just think

21   it's fundamentally unfair to allow it to go on.

22               THE COURT:  What do you want me to do?

23               MR. HARTMAN:  Well, if I could have a minute --

24   when we take our afternoon break -- maybe now's a good time

25   if I can discuss it with my defense colleagues.
```

```
 1              MR. SOFER:  Can I just respond to the concept,

 2    Your Honor?

 3              THE COURT:  Sure.

 4              MR. SOFER:  The notion that a witness can't

 5    testify about things that aren't recorded is ridiculous.

 6              THE COURT:  I agree.  There's just no requirement

 7    that every conversation has to be recorded.  There is, in

 8    fact, the fact that some are and some aren't.  I mean, I

 9    tried to at least signal to you and Mr. Sofer to try to

10    have the witness indicate whether it was recorded or not.

11    And you can point -- and you can point that out.  And --

12    but there's certainly no basis to exclude unrecorded

13    testimony because it's not recorded.

14              MR. SOFER:  Judge, just so it's clear that's the

15    only question I'm asking him about this particular -- if it

16    is just -- if we didn't ask him, Counsel will say, Why

17    didn't you ask him about this unrecorded interaction?

18              THE COURT:  I've overruled.  Just renew.

19              MR. SOFER:  Are you going to give us at break

20    now, Judge?

21              MR. HARTMAN:  Whenever you think it makes sense.

22              THE COURT:  I'd like to keep going until 3:00 or

23    whatever.  How much longer in the sequence?

24              MR. SOFER:  They're going to start moving much

25    quicker now, Judge, in smaller sequences.
```

```
 1              THE COURT:  If you want to take a break now --
 2              MR. HARTMAN:  Do you want to get through this
 3  day?
 4              MR. SOFER:  I'd like to just finish this.
 5              THE COURT:  Okay.  Yeah.
 6                  (Sidebar concluded.)
 7              THE COURT:  The objection is overruled.  You may
 8  continue.
 9              MR. SOFER:  I wasn't going to ask anymore
10  questions about that anyway, Judge, so we can move on.
11  BY MR. SOFER:
12  Q.         In the conversation you described on May 1st that
13  you testified Amawi asked you to call Wassim, who was he
14  referring to, if you know?
15  A.         Wassim Masloum.
16  Q.         And did you call Wassim Masloum the next day?
17  A.         Yes, I did.
18  Q.         Can you tell the members of the jury basically in
19  substance what it is you said to Wassim Masloum?
20  A.         I asked him if he was going to paintball.  And I
21  had told you the situation with Mohammed, and he thought he
22  was being followed and --
23  Q.         That Mohammed thought he was being followed?
24  A.         That Mohammed was being followed.  And Wassim
25  made a statement that he shouldn't worry about anything,
```

```
 1   because we're not doing anything.

 2   Q.        And did there come a time when -- later on May

 3   2nd, 2005 when you actually met with Mohammed Amawi and

 4   Wassim Masloum?

 5   A.        Yes.

 6   Q.        And if you recall, what was the purpose of that

 7   meeting?

 8   A.        To basically go pick up the paintball equipment.

 9   Q.        And did you go shopping for paintball equipment?

10   A.        Yes, we did.

11   Q.        Did you go to one store, more than one store, do

12   you recall?

13   A.        I believe at least a couple stores.

14   Q.        And did there come a time when Wassim Masloum

15   purchased paintball equipment at a particular store?

16   A.        Yes.  I believe it was Dick's Sporting Goods.

17   Q.        And what was the purpose of purchasing this

18   paintball equipment?

19   A.        To do tactics out at the training ground.

20             MR. SOFER:  And as per our conversation at the

21   bench, Your Honor, if you want to take a break, that's fine

22   with the Government.

23             THE COURT:  Okay.  Ladies and gentlemen, we'll

24   take -- we'll take a 15-minute break.  Resume about 20 of.

25                  (A brief recess was taken.)
```

1              THE COURT:  You may be seated.  If any of the

2    rest of you would like a footstool or something, we will

3    try to find something somewhere, right, Amy?  Let Amy know,

4    and we'll go from there.

5              Okay.  Mr. Griffin, you remain under oath.

6              And Mr. Sofer, you may resume.

7    BY MR. SOFER:

8    Q.         Mr. Griffin, I think we ended on -- I had asked

9    you something about a conversation that took place on

10   May 2nd and shopping for the paintball on May 2nd of 2005;

11   that is, the paintball equipment.

12             Sometime in late April or early May, did there

13   come a time when you gave Mohammed Amawi an E-mail address

14   that had been given to you by the FBI?

15   A.         Yes.

16   Q.         And what was the stated connection of this

17   particular E-mail?

18   A.         It was for the connection overseas.

19   Q.         And who was that person as far as what you were

20   telling people?

21   A.         Mohammed Salah.

22   Q.         And do you recall what the E-mail address was, as

23   you sit here today?

24   A.         Abu_amed@earthlink.com.

25   Q.         Okay.  I want to direct your attention to May 5th

1   of 2005.  Did there come a time when you met with Mohammed

2   Amawi at his place of employment, AZ Travel?

3            THE COURT:  When was that E-mail you just

4   provided?

5            MR. SOFER:  I think his testimony, Your Honor,

6   was sometime late in April or early May.

7            THE COURT:  I heard late May.  No problem.

8   BY MR. SOFER:

9   Q.       Is that accurate, late April, early May?

10  A.       Yes.

11           JUROR:  Excuse me.  Your microphone I don't think

12  is on.

13  BY MR. SOFER:

14  Q.       I want to direct your attention to May 5th, 2005.

15  And I think I asked you, did there come a time when you met

16  with Mohammed Amawi at AZ Travel?

17  A.       Yes.

18  Q.       And did you bring a recording device that day?

19  A.       Yes, I did.

20  Q.       And if we could play from Exhibit 4-52, 1D63,

21  May 5th, 2005, clip 1A, please.

22           (Audio playing.)

23  Q.       Okay.  Mr. Griffin, did there come a time the

24  next day when you traveled somewhere with Mohammed Amawi?

25  A.       Yes, up to Adams Travel in Michigan.

```
 1   Q.        And can you tell us basically and in substance

 2   what happened there?

 3   A.        Basically, we discussed a passing of the E-mail

 4   to his contact overseas; and also, he tried to pass that

 5   E-mail while he was at Adams Travel.

 6   Q.        Okay.  And did -- was he able to do that from

 7   what you could see?

 8   A.        From what I could gather, he could not.

 9   Q.        Is -- and is there an explanation to that -- you

10   can tell the members of the jury that --

11             MR. HARTMAN:  Objection.

12   Q.        -- that you saw or that you spoke to Mohammed

13   Amawi about?

14             THE COURT:  Yeah.  What, if anything, did he say

15   or did you see with regard to that attempt to send that

16   E-mail?

17   A.        I seen that he couldn't E-mail from the computer

18   he was on in Adams Travel.  And I asked him about it, and

19   he stated that he didn't have the program.

20   BY MR. SOFER:

21   Q.        I want to direct your attention now to

22   May 11th of 2005, five days after that.  Did there come a

23   time when you met again with Mohammed Amawi at AZ Travel?

24   A.        Yes.

25   Q.        We're going to play 4-54 -- that's Government
```

```
 1    Exhibit 4-54, 1D65 from May 11th, 2005.  I think it's clip
 2    1A.
 3                    (Audio playing.)
 4    Q.        Okay.  Now, I want to show you what's been marked
 5    Government's Exhibit Number 63 for identification.  Do you
 6    recognize that?
 7    A.        Yes, I do.
 8    Q.        Can you tell the members of the jury what that
 9    is?
10    A.        That is my business card.
11    Q.        And is that one of the cards you had handed out
12    to the defendants back on February 16th of '05?
13    A.        Yes.
14    Q.        At least the type of card?
15    A.        Yes.
16    Q.        And if you show the back of that -- I think is
17    63-002 -- there's some writing on the back of that card.  I
18    don't know if the teleprompter -- the John Madden
19    telestrator is working today.  But can you circle any
20    writing on there that you recognize; that is, in words on
21    there that you recognize?
22    A.        (Witness complies).
23    Q.        And whose writing is circled in green?  And the
24    record should reflect the witness has circled
25    abu_ahmed@earthlink.com, abu_jihad@sbcglobal.net; and
```

```
 1   underneath that, Darren L. Griffin with an arrow pointed to

 2   sbcglobal.net.  Whose writing is that?

 3   A.         That is mine.

 4   Q.         And can you tell us what those -- are those

 5   E-mail addresses?

 6   A.         Yes, they are.

 7   Q.         And can you tell us what those E-mail addresses

 8   are, if you know?

 9   A.         The abu_ahmed@earthlink.com was the E-mail

10   address given to me by the FBI for my contact overseas; and

11   the abu_jihad and Darrenlgriffin@sbcglobal, those are my

12   personal E-mail addresses.

13   Q.         The writing above that, is that your writing?

14   A.         Above the Abu Amed, yes.

15   Q.         It is not.

16              Okay.  And at this time, the Government offers

17   Government Exhibit Number 63 into evidence.

18              I just want to show you the actual card, which

19   is, I believe, Government Exhibit 132E.  Is that the actual

20   card that we're seeing here at least that the writing is

21   on?

22   A.         Yes, it is.

23              MR. SOFER:  At this time, the Government offers

24   both exhibits; that is, 132E and 63, into evidence.

25              THE COURT:  It will be admitted.
```

```
 1                 (Government's Exhibit Numbers 63 and 132E
 2                 were admitted into evidence.)
 3            MR. HARTMAN:  Mr. Sofer, you just clarified 63's
 4   the front.
 5            MR. SOFER:  63-002 is the back.  132E is the
 6   card.
 7   BY MR. SOFER:
 8   Q.       Okay.  I want to direct your attention now to
 9   May 18th, 2005.  Did you, once again, have an opportunity
10   to meet with Mohammed Amawi at AZ Travel?
11   A.       Yes.
12   Q.       And Your Honor, we're going to play exhibit --
13   Government Exhibit 4-55, which is 1D66, May 18th, 2005,
14   clip 1A.
15                 (Audio playing.)
16   Q.       Okay.  Did this conversation on May 18th, 2005
17   continue?
18   A.       Yes, it did.
19   Q.       And let's play clip 3A from the same Government
20   Exhibit 4-55.
21                 (Audio playing.)
22   Q.       Do you recall what you were referring to when you
23   say get you covered with a certificate?
24   A.       Yes.  That was the -- I could certify people in
25   personal protection, VIP protection.
```

```
 1   Q.        When you say get you covered, what did you mean
 2   by that?
 3   A.        A legal training document.
 4   Q.        Okay.  Let's continue.
 5             (Audio playing.)
 6   Q.        Do you recall what videotapes you're referring to
 7   there?
 8   A.        It is the videotapes for training people for
 9   personal protection.
10   Q.        Is that part of that VIP-type protection?
11   A.        Yes.
12   Q.        Okay.
13             (Audio playing.)
14   Q.        Again, during this time and before, had you been
15   speaking to the FBI about what you could and could not do
16   in terms of training these defendants?
17   A.        Yes.
18   Q.        And in a moment like this, what are you trying to
19   do?
20   A.        Back-pedal.
21   Q.        Continue.
22             (Audio playing.)
23   Q.        What's a PE?
24   A.        A practical exercise.
25   Q.        Okay.  Does this conversation continue,
```

1   Mr. Griffin?

2   A.        Yes, it did.

3   Q.        Let's play segment 4A from Government's Exhibit

4   4-55.

5             MR. SOFER:  I'm sorry.

6             JUROR:  My right speaker's coming in and out.

7   Can I get another set?

8             MR. SOFER:  Sure.

9             Okay.  We good?  Playing 4A, please.

10                 (Audio playing.)

11  BY MR. SOFER:

12  Q.        Okay.  Mr. Griffin, I want to direct your

13  attention to May 25th, 2005, about a week later.  Did there

14  come a time when you met with Marwan El-Hindi and Mohammed

15  Amawi on that day?

16  A.        Yes.

17  Q.        And we're going to play Exhibit 4-57, 1D68 from

18  May 25th, 2005; and the first clip is 3A.

19                 (Audio playing.)

20  Q.        Are you able to tell from the noise in this

21  recording where you are?

22  A.        In my vehicle.

23  Q.        And do you know where you were going?

24  A.        AZ Travel.

25  Q.        Continue.

```
 1                    (Audio playing.)
 2    Q.        Do you know what was being referred to from
 3    Monroe Street?
 4    A.        The mosque, At-Tawfeeq.
 5    Q.        Another mosque here in Toledo?
 6    A.        Yes.
 7    Q.        Is that one of the mosques that you have been
 8    going to here as well?
 9    A.        Yes.
10    Q.        Have you been, for lack of a better word,
11    spreading your cover there as well?
12    A.        Yes.
13                    (Audio playing.)
14    Q.        And did this conversation continue?
15    A.        Yes, it did.
16    Q.        And we're going to play clip 6A from Government
17    Exhibit 4-57.
18                    (Audio playing.)
19    Q.        Okay.  Mr. Griffin, I now want to jump ahead
20    about two weeks.  Do you have another conversation with
21    Mohammed Amawi at AZ Travel?
22    A.        Yes.
23    Q.        And I want to play 1D74 from -- is that on
24    June 8th, 2005?
25    A.        I believe so.
```

1    Q.        And it's Government Exhibit 4-59, June 8th, 2005,

2    1D74, clip 2A, I believe.

3                   (Audio playing.)

4    Q.        Okay.  And I want to direct your attention to a

5    week later -- or about a week later on June 15th, 2005.

6    Did there come a time when you traveled somewhere in a car

7    with Mohammed Amawi?

8    A.        Yes.

9    Q.        Do you recall where that was?

10   A.        I believe AZ -- Adams Travel.

11   Q.        And what state is that in?

12   A.        In Michigan.

13   Q.        And if we could play Government's Exhibit Number

14   4-60, 1D77, June 14th, 2005, clip 1A, please.

15                   (Audio playing.)

16   Q.        Okay.  And did this conversation continue?

17   A.        Yes, it did.

18   Q.        And we're going to play 72A, the same exhibit,

19   Government 4-60.

20                   (Audio playing.)

21   Q.        Who you are referring to that's so worried about

22   Mohammed Amawi?

23   A.        His mother.

24   Q.        Let's continue.

25                   (Audio playing.)

1   Q.        Okay.  And I want to direct your attention to

2   about nine days later, June 23rd, 2005.  Did you have

3   occasion to go back to Mohammed Amawi's apartment on that

4   day?

5   A.        Yes.

6   Q.        And we're going to play 4-61 -- that's

7   Government's Exhibit 4-61, 1D79, June 23rd, 2005, clip 1A.

8                 (Audio playing.)

9   Q.        Had there been an earlier time when you had seen

10  something in Mohammed Amawi's apartment related to someone

11  manipulating his computer?

12  A.        Yes.

13  Q.        And can you just basically describe that for the

14  members of the jury?

15  A.        It was a person that flipped the screen.

16            MR. HARTMAN:  Objection, Your Honor, depending on

17  what we're going to get, foundation.

18            THE COURT:  Yeah.  Let's get a foundation,

19  something he observed.

20  BY MR. SOFER:

21  Q.        Yeah.  Did you actually see something which led

22  you to believe --

23            THE COURT:  Let's find out what he saw.  Go

24  ahead.

25  A.        I observed someone flip the screen upside down

```
 1   and open up the CD drive.
 2   Q.       And that person -- and that person wasn't in the
 3   room with you?
 4   A.       No, it was not.
 5   Q.       Did Mohammed Amawi indicate where that person
 6   was?
 7   A.       Over in Jordan.
 8   Q.       Let's now play 2A, please.
 9                 (Audio playing.)
10   Q.       If you know, who was that other person there?
11   A.       It was Mohammed's mother.
12   Q.       Let's continue.
13                 (Audio playing.)
14   Q.       Mr. Griffin, I want you to take a look at what's
15   been marked Government's Exhibit 101.  Take a look at that
16   and tell us if you recognize it.
17                 THE COURT:  I'm sorry.  Government's?
18                 MR. SOFER:  101.
19   A.       It is a CD.
20   BY MR. SOFER:
21   Q.       And do you know what's on that CD?
22   A.       Yes, I do.
23   Q.       Tell the members of the jury.
24   A.       It is the last clip in the last clip you were
25   listening to.  It's the IED with the radio showing the hand
```

1    at the end.

2              MR. HARTMAN:  Your Honor, may we approach?

3              THE COURT:  Sure.

4                   (A sidebar conference was had on the

5                   record.)

6              MR. HARTMAN:  Judge, the purpose -- I would

7    object -- I would object to anymore playing of the videos.

8    I know that you've said that these are admissible under

9    4003 and not overly prejudicial, but I think at some point

10   they become accumulative.  And I think we've seen enough of

11   it that the jury's not going to get anything new out of it.

12             MR. SOFER:  You know, Judge, we've litigated

13   this.

14             THE COURT:  I agree.  I'll note your objection,

15   and it will be overruled.  I considered this issue, and I

16   think that they are probative and are -- I don't think that

17   the probative value is outweighed substantially so by any

18   risk of unfair prejudice.

19             MR. HARTMAN:  And I wasn't asking the Court to

20   reconsider that.  I was just thinking cumulative.  That's

21   all.

22             MR. SOFER:  I would just satisfy -- Judge, we're

23   actually -- just so it's clear, we're actually not playing

24   individuals that we have that Your Honor have seen and

25   Counsel have seen that we could play --

1          THE COURT:  I understand.

2          MR. SOFER:  -- just to move things along.

3          THE COURT:  Seems to me that if I can guess that

4   perhaps half the individuals that you have put in the tape

5   as exhibits you're not playing, ballpark?

6          MR. SOFER:  Some substantial portion of what

7   we've submitted to the Court and counsel we're not playing;

8   and actually, as we get closer to the end here, we're

9   moving much faster through them.  And we are up to the end

10  of -- one is, for instance, in which, I think, it's one

11  more instance of which there are videos being played, so

12  maybe the last 10 or so of these.

13         MR. IVEY:  Can we take two --

14             (Side bar concluded.)

15         THE COURT:  Counsel, why don't you come here just

16  a second?

17         Are you going to be taking more testimony today

18  or just the videos?

19             Off the record.

20             (A brief discussion was had off the record.)

21         THE COURT:  Ladies and gentlemen, I'm going to

22  let you go upstairs for no more than about ten minutes,

23  five minutes, perhaps even less than that.  We have to tend

24  to something here.  And then I think we're looking at about

25  maybe 20 more minutes after that, if that.  So -- and then

1    we'll be adjourning for the day.

2                    (A brief recess was taken.)

3              THE COURT:  You remain under oath.

4              And you may resume.

5    BY MR. SOFER:

6    Q.        Mr. Griffin, you said you recognized 101 as one

7    of the videos that was being played in the recording that

8    we just heard.

9    A.        Correct.

10   Q.        And again, which one was it, if you recall?

11   A.        The one where the explosion was initiated by the

12   beep of a radio and that they were displaying at the end a

13   hand.

14   Q.        And we're going to play Government's Exhibit 101,

15   at least I hope so.

16                   (Video playing.)

17   Q.        And the record should reflect that the Government

18   stopped this recording at 105 at 2 minutes and 51 seconds

19   at 101 in evidence.

20             Mr. Griffin, did the conversation on June 23rd,

21   2005 continue?

22   A.        Yes, it did.

23   Q.        If we could play clip 4A, please.

24                   (Audio playing.)

25   Q.        And Mr. Griffin, I want to show you what's been

1 | marked Government's Exhibit 102 for identification.  Do you

2 | recognize that?

3 | A.        Yes.  It is a CD.

4 | Q.        And do you know what's on that CD?

5 | A.        The video clip we were listening to -- or we were

6 | watching during that last clip.

7 | Q.        And was that relating to the killing of Dale

8 | Stofel?

9 | A.        Yes.

10 |         MR. SOFER:  And Your Honor, at this time

11 | Government moves 102 into evidence.

12 |         THE COURT:  It will be admitted.

13 |                 (Government's Exhibit Number 102 was

14 |                 admitted into evidence.)

15 |                 (Video playing.)

16 |         MR. SOFER:  And given the hour, Judge, I think we

17 | can stop here if Your Honor wants.

18 |                 (Video playing.)

19 |         MR. SOFER:  Again, Your Honor, if you'd like, we

20 | can stop here for the day.

21 |         THE COURT:  Okay.  Ladies and gentlemen, we'll

22 | adjourn for the evening and plan to start tomorrow morning

23 | at 8:30.

24 |         Counsel, we'll tend to that other business in a

25 | few minutes.

```
1                  C E R T I F I C A T E

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/ Angela D. Nixon

7    --------------------------              -----------

8    Angela D. Nixon, RPR, CRR              Date
```

# I N D E X

Testimony of Darren Griffin continued