1                     UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )  Docket No. 3:06-CR-719

4               Plaintiffs,         )  Toledo, Ohio

5                  v.               )  April 16, 2008

6    MOHAMMED AMAWI, ET AL.,        )

7               Defendants.         )

8    ------------------------------

9         TRANSCRIPT OF PRETRIAL CONFERENCE, VOLUME 29
               BEFORE THE HONORABLE JAMES G. CARR
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                      (216) 522-4856
25

```
 1                          Elias Muawad
                            Muawad & Muawad
 2                          Suite 209
                            36700 Woodward Avenue
 3                          Bloomfield Hills, Michigan 48304
                            (248) 594-4700
 4     For the Defendant
       El-Hindi:            Charles M. Boss
 5                          Boss & Vitou
                            111 West Dudley Street
 6                          Maumee, Ohio 43537
                            (419) 893-5555
 7
                            Stephen D. Hartman
 8                          Kerger & Kerger
                            Suite 201
 9                          33 South Michigan Street
                            Toledo, Ohio 43602
10                          (419) 255-5990
11                          Alek H. El-Kamhawy
                            Raslan, El-Kamhway & Pla
12                          Suite 3FE
                            1700 East 13 Street
13                          Cleveland, Ohio 44114
                            (216) 928-1500
14
       For the Defendant    David L. Doughten
15     Mazloum:             4403 St. Clair Avenue
                            Cleveland, Ohio 44103-1125
16                          (216) 361-1112
17                          Jeffrey J. Helmick
                            Helmick & Hoolahan
18                          2nd floor
                            1119 Adams Street
19                          Toledo, Ohio 43624-1508
                            (419) 243-3800
20
21                          Mohammed Abdrabboh
                            1620 Ford Avenue
22                          Wyandotte, MIchigan 48192
                            (734) 283-7000
23
24
       Court Reporter:      Angela D. Nixon, RPR, CRR
25                          1716 Spielbusch Avenue
                            Toledo, Ohio 43624
```

1          (419) 260-5259

2

3   Proceedings recorded by mechanical stenography, transcript

4   produced by notereading.

```
1              THE COURT:  One of the marshals said there was in
2    an accident on 75 and delayed Mr. Masloum.  And we are set
3    to go?
4              And Mr. Griffin, you remain under oath.
5              And Mr. Sofer, you may resume.
6              MR. SOFER:  Thank you, Judge.
7    BY MR. SOFER:
8    Q.        When we left yesterday, we were, I believe,
9    discussing an interaction that you had with Mohammed Amawi
10   in his apartment on June 23rd, 2005; and I'm going to ask
11   you to just replay a very short clip, which is 1A.  At the
12   beginning of that is our first clip.  Okay.
13                  (Audio playing.)
14   Q.        Okay.  Mr. Griffin, did you notice something
15   unusual about Mohammed Amawi's computer that day?
16   A.        He had a couple of desktop computers over on his
17   bed.
18   Q.        Okay.  And did he have more than one desktop
19   computer in his apartment during some of the time you
20   interacted with him?
21   A.        Yes.
22   Q.        Okay.  Now, we stopped yesterday on clip 4A.  Did
23   the conversation on June 23rd, 2005 at Mohammed Amawi's
24   apartment continue?
25   A.        Yes, it did.
```

```
 1    Q.         We're going to play clip 5A.  Again, this is

 2    Government Exhibit Number 4-61, 1D79, June 23, 2005.

 3                      (Audio playing.)

 4    Q.         Okay.  Can you tell the jury what was playing on

 5    the screen at that time, if you recall?

 6    A.         It was a beheading video.

 7    Q.         Let's move on to clip 6A, please.  Did the

 8    conversation continue?

 9    A.         Yes, it did.

10                      (Audio playing.)

11    Q.         Okay.  Mr. Griffin, I want to show you what's

12    been marked as Government's Exhibit 117.  Can you tell the

13    members of the jury whether you recognize this?

14    A.         This is a disk.

15    Q.         And do you know what's on that disk?

16    A.         It is the gentleman that he called Aquil that

17    they were seeing the wedding procession to.

18    Q.         And you reviewed this prior to today?

19    A.         Yes.

20    Q.         Is that the disk -- did that disk represent all

21    or part of the video that was playing on June 23rd, 2005

22    that we just heard on clip 6A?

23    A.         Yes.

24                      MR. SOFER:  At this time the Government moves 117

25    into evidence.
```

```
 1              THE COURT:  It will be admitted.
 2                   (Government's Exhibit Number 117 was
 3                   admitted into evidence.)
 4              MR. SOFER:  We will play a portion of this.
 5                   (Video playing.)
 6   BY MR. SOFER:
 7   Q.         Okay.  Mr. Griffin, did the conversation on
 8   June 23rd, 2005 continue?
 9   A.         Yes, it did.
10   Q.         In a moment, we're going to replay clip 7A from
11   Government Exhibit 4-61.
12                   (Audio playing.)
13   Q.         Okay.  Now, around the middle to the end of the
14   summer of 2005, did Mohammed Amawi begin to discuss going
15   somewhere?
16   A.         Yes.
17   Q.         Can you tell the members of the jury where that
18   was?
19   A.         Over to the country of Jordan.
20   Q.         And did you discuss the possibility of joining
21   him there?
22   A.         Yes.
23   Q.         Did there come a time in July of '05 when the FBI
24   gave you some additional money?
25   A.         Yes, $5,200.
```

```
 1   Q.        And what was the purpose of that?
 2   A.        That was to pay my child support.  I was unable
 3   to get a passport due that it was more convenient to me to
 4   pay the mother directly.  And if you have arrearages of
 5   over $10,000, which I had since it was more convenient --
 6   since I got out of the military to pay them directly, the
 7   arrearages had accumulated to over $10,000.
 8   Q.        Did you use that money to pay down the arrearage?
 9   A.        Yes, I did.
10   Q.        And did you ultimately get a passport?
11   A.        Yes, I did.
12   Q.        I want to direct your attention now to
13   July 21st of 2005.  Did there come a time when you spoke to
14   Ashraf Zaim at AZ Travel on that day?
15   A.        Yes.
16   Q.        And did he say something that gave you some
17   concern?
18             MR. IVEY:  Objection.
19             THE COURT:  Strike that reference.  But you can
20   relay the conversation if you want:  Who said what, who was
21   present, where it occurred.
22   A.        The location was AZ Travel.  And I was speaking
23   with Ashraf Zaim, the manager -- or owner of AZ Travel; and
24   he told me at that time that --
25             MR. IVEY:  Objection.
```

```
 1              THE COURT:  Ladies and gentlemen, the statement

 2    that you're about to hear can be considered only as -- the

 3    testimony you're about to hear can be considered only as

 4    evidence that that statement was made, not that whatever

 5    was said was true or not, simply that that's what,

 6    according to this witness, Mr. Zaim said to him at that

 7    time.

 8              MR. SOFER:  And Judge, to explain why the witness

 9    did what he did later.

10              THE COURT:  Well, whatever.  Go ahead.

11    A.        Basically, Mr. Zaim had informed me that Marwan

12    El-Hindi had made the statement that I had been working for

13    someone.

14    Q.        You said I, who were you referring to?

15    A.        He was referring to me.

16    Q.        Is that what you understood that to mean?  When

17    he said working for someone, what did you understand that

18    to mean?

19    A.        The government, the FBI or someone in the

20    government.

21    Q.        Okay.  I want to direct your attention to

22    July 27th, 2005.  Did there come a time when you met with

23    Mohammed Amawi in his apartment on that day?

24    A.        Yes.

25    Q.        And did you bring a recording device on that day?
```

1   A.        Yes, I did.

2   Q.        And could you please play -- this is Government

3   Exhibit 4-62, 1D91, July 27th, 2005 -- clip 1A, please.

4                   (Audio playing.)

5   Q.        And did that conversation on July 27th continue?

6   A.        Yes, it did.

7   Q.        We're going to play Exhibit 2A, please.

8                   (Audio playing.)

9   Q.        And then what are you talking about here?

10  A.        My security company, that I was executing a

11  contract over in Dubai UAE.

12  Q.        Was that true?

13  A.        It was not.

14  Q.        And what tickets are you referring to here?

15  A.        Tickets to fly over for a security conference in

16  Dubai.

17  Q.        And did you actually pay for tickets for you and

18  Mohammed Amawi to travel ultimately?

19  A.        Yes.

20  Q.        Where did you travel to Amawi?

21  A.        Amman, Jordan.

22  Q.        Let's continue.

23                  (Audio playing.)

24  Q.        Okay.  You mentioned a thumb drive in this

25  particular conversation, did you not?

```
 1   A.        Yes.

 2   Q.        And when you say I'm going to go get my other

 3   one, what were you referring to?

 4   A.        The additional thumb drive.

 5   Q.        Did you give a thumb drive to Mohammed Amawi?

 6   A.        Yes.

 7   Q.        Had he referred to thumb drives as something else

 8   in your previous conversations?

 9   A.        Yes, flash.

10   Q.        And if we can put up Government Exhibit Number

11   120 for identification on the screen.  Do you recognize

12   what's depicted in 120 -- Government Exhibit 120 for

13   identification?

14   A.        Yes.  It's a thumb drive.

15   Q.        And does that look like one of the thumb drives

16   that you had back on July 27th, 2005?

17   A.        Yes.

18   Q.        Did there come a time when you left the thumb

19   drive with Mohammed Amawi?

20   A.        Yes.

21   Q.        Did you give him another one to use for his own

22   use?

23   A.        Yes.

24   Q.        Did there come a time when you found a thumb

25   drive in your belongings after the investigation was over?
```

```
 1   A.        Yes.

 2   Q.        Do you recall when that was?

 3   A.        The end of February of 2006.

 4   Q.        And did you give that thumb drive -- when you

 5   found that thumb drive, what did you do?

 6   A.        I turned it over to the FBI.

 7   Q.        And do you recall who it was you turned it over

 8   to?

 9   A.        I believe Shannon Coats.

10             MR. SOFER:  And at this time, the Government

11   offers Government Exhibit 120.

12             THE COURT:  It will be admitted.

13                  (Government's Exhibit Number 120 was

14                  admitted into evidence.)

15   BY MR. SOFER:

16   Q.        Did the conversation on July 27th continue?

17   A.        Yes.

18   Q.        Okay.  Play 3A, please.

19                  (Audio playing.)

20   Q.        Okay.  Mr. Griffin, I want to show you what's

21   been marked Government's Exhibit Number 90.  Do you

22   recognize that?

23   A.        Yes.  It's a CD.

24   Q.        And do you know what's on that CD?

25   A.        Yes.
```

```
 1   Q.        Can you tell the members of the jury what that
 2   is?
 3   A.        It is the bombing of the CIA headquarters
 4   overseas.
 5   Q.        And does it fairly and accurately represent the
 6   way you viewed it on or about July 27th, 2005?
 7   A.        Yes.
 8             MR. SOFER:  Government moves 90 into evidence.
 9             THE COURT:  It will be admitted.
10                 (Government's Exhibit Number 90 was admitted
11                 into evidence.)
12             THE COURT:  Where was that -- where was that
13   located?  I didn't hear you.
14   A.        I just said overseas, Your Honor.
15                 (Video playing.)
16   BY MR. SOFER:
17   Q.        Okay.  Mr. Griffin, I want to show you what's
18   been marked Government Exhibit 109.  Can you tell us if you
19   recognize that?
20   A.        It is a CD.
21   Q.        Do you know what's on that CD?
22   A.        Yes, I do.
23   Q.        Okay.  All these CDs you reviewed previous to
24   your testimony here today?
25   A.        Yes.
```

1    Q.        And can you tell the members of the jury what's

2    on that CD basically?

3    A.        It is a double Humvee IED attack where we were

4    talking about -- Mr. Amawi was -- he was explaining to me

5    how they blow up the first one, and you see people walking

6    and then running.  And then another machine comes, and they

7    blow it up.

8              MR. SOFER:  Okay.  At this time the Government

9    offers 109.

10             THE COURT:  It will be admitted.

11                  (Government's Exhibit Number 109 was

12                  admitted into evidence.)

13   BY MR. SOFER:

14   Q.        And we're going to play a portion of that.

15             Okay.  Mr. Griffin, I want to show you what's

16   been marked Government Exhibit Number 110.  Can you tell

17   the members of the jury if you recognize that?

18   A.        Yes, I do.

19   Q.        Is it a CD?

20   A.        Yes, it is.

21   Q.        Do you know what's on that CD?

22   A.        It is the -- the top commander or the -- someone

23   in charge of getting sniper attack.

24   Q.        Is that the one where you said, Good shot?

25   A.        Yes.

```
 1              MR. SOFER:  At this time, the Government offers

 2    110.

 3              THE COURT:  It will be admitted.

 4                   (Government's Exhibit Number 110 was

 5                   admitted into evidence.)

 6                   (Video playing.)

 7    BY MR. SOFER:

 8    Q.        Okay.  I want to show you what's been marked

 9    Government's Exhibit Number 111.  Can you tell us if you

10    recognize that?

11    A.        It is a CD.

12    Q.        And do you know what's on that CD?

13    A.        It is a IED attack initiated by a -- a radio

14    beep.

15    Q.        Is that one of the videos that you watched on

16    July 27th, 2005, at least part of it?

17    A.        Yes.

18              MR. SOFER:  And Government offers 111 at this

19    time?

20              THE COURT:  It will be admitted.

21                   (Government's Exhibit Number 111 was

22                   admitted into evidence.)

23                   (Video playing.)

24    BY MR. SOFER:

25    Q.        Okay.  I want to show you what's been marked
```

```
 1    Government's Exhibit Number 112.  Do you recognize that?

 2    A.       Yes, it's a CD.

 3    Q.       And can you tell us what's on that CD?

 4    A.       This is a suicide bombing which there's a guy

 5    standing with an AK-47, and there's another guy talking.

 6    And he goes and does car bombing after that.

 7    Q.       Is that one of the videos you were discussing

 8    with Mohammed Amawi in this clip?

 9            THE COURT:  I'm sorry.  I couldn't hear the last

10    thing that you said.

11    BY MR. SOFER:

12    Q.       You have to speak up, please.

13    A.       Basically, after the guy gets done talking, the

14    guy that's in the camera with the AK-47 gets in his car and

15    goes blows up -- goes and blows himself up.

16    Q.       And is that one of the videos you watched with

17    Mohammed Amawi on July 27th, 2005 --

18    A.       Yes.

19    Q.       -- at least part of it?

20    A.       Yes.

21            MR. SOFER:  We're going to offer that exhibit,

22    Your Honor.

23            THE COURT:  It will be admitted.

24                  (Government's Exhibit Number 112 was

25                   admitted into evidence.)
```

 1   BY MR. SOFER:

 2   Q.        112, play it.

 3                 (Video playing.)

 4   Q.        Do you see something on the screen here that you

 5   commented on during the course of that particular clip that

 6   we played?

 7   A.        Yes, the date.

 8   Q.        And what was it?

 9   A.        5-11-2005.

10   Q.        Continue.  That was at about 25 seconds for the

11   record.

12                 (Video playing.)

13   Q.        And we're going to stop that at three minutes,

14   seven seconds.

15            Finally, Mr. Griffin, I want to show you what's

16   been marked Government's Exhibit Number 113.  Please tell

17   the members of the jury if you recognize that?

18   A.        It is a CD.

19   Q.        And do you know what's on that particular CD?

20   A.        Yes.  There is -- it's an IED attack with circles

21   on it.  The explosion is so big that they annotate the

22   circles well after the explosion.

23   Q.        Okay.  Is that one of the videos that you watched

24   all or in part on July 27th, 2005 with Mohammed Amawi?

25   A.        Yes.

```
 1            MR. SOFER:  Government offers 113.

 2            THE COURT:  It will be admitted.

 3                (Government's Exhibit Number 113 was

 4                admitted into evidence.)

 5   BY MR. SOFER:

 6   Q.        Play this.

 7                (Video playing.)

 8   Q.        Okay.  Mr. Griffin, did the conversation between

 9   you and Mohammed Amawi on July 27th, 2005 continue?

10   A.        Yes.

11   Q.        We're going to play in a moment clip 4A, please.

12                (Audio playing.)

13   Q.        Mr. Griffin, I want to show you what's been

14   marked Government's Exhibit Number 114 and ask you if you

15   recognize this.

16   A.        It is a CD.

17   Q.        Do you know what's on that CD?

18   A.        Yes.

19   Q.        Tell the members of the jury, please.

20   A.        It is a IED attack with a black car pulling over

21   right before the IED is initiated.

22   Q.        And is that one of the videos that you watched in

23   clip 4A with Mohammed Amawi on July 27th, 2005 or at least

24   part of it?

25   A.        Yes.
```

```
 1              MR. SOFER:  Government offers 114 at this time.

 2              THE COURT:  It will be admitted.

 3                   (Government's Exhibit Number 114 was

 4                   admitted into evidence.)

 5                   (Video playing.)

 6   BY MR. SOFER:

 7   Q.        And Mr. Griffin, I want to show you what's been

 8   marked Government's Exhibit Number 115.  Can you tell the

 9   members of the jury if you recognize that?

10   A.        It is a CD.

11   Q.        Do you know what's depicted on that CD?

12   A.        It is believed to be a dump truck with rockets

13   being launched out of the back of it.

14   Q.        Is that one of the videos that you described and

15   talked to Mohammed Amawi about on July 27th, 2005 or at

16   least part of it?

17   A.        Yes.

18              MR. SOFER:  At this time, the Government offers

19   Exhibit 117 -- I'm sorry -- 115.

20              THE COURT:  It will be admitted.

21                   (Government's Exhibit Number 115 was

22                   admitted into evidence.)

23              MR. HARTMAN:  Which one was this?

24              MR. SOFER:  115.  And we're going to replay a

25   portion of this.
```

```
 1                      (Video playing.)

 2   BY MR. SOFER:

 3   Q.        Okay.  Mr. Griffin, did the conversation on

 4   July 27th, 2005 with Mohammed Amawi continue?

 5   A.        Yes, it did.

 6   Q.        And we're going to play clip 6A, please.

 7                      (Audio playing.)

 8   Q.        Mr. Griffin, I'm going to show you what's been

 9   marked Government's Exhibit Number 119 and ask you if you

10   recognize that.

11   A.        It is a CD.

12   Q.        Please tell the members of the jury what's on

13   that CD, if you know?

14   A.        It is the IED of seven people being blown up.  I

15   believe Mr. Amawi first -- referred to them as soldiers.

16   Q.        And that's one of the videos that are -- or part

17   of one of the videos that you watched on July 27th, 2005?

18   A.        Yes.

19             MR. SOFER:  At this time, the Government offers

20   119 into evidence.

21             THE COURT:  It will be admitted.

22                  (Government's Exhibit Number 119 was

23                  admitted into evidence.)

24                      (Video playing.)

25   BY MR. SOFER:
```

```
1   Q.        Okay.  Did the conversation on July 27th continue

2   after that?

3   A.        Yes, it did.

4   Q.        And if we can play clip 7A, please.

5             (Audio playing.)

6   Q.        Can you basically tell the members of the jury

7   what that conversation was about?

8   A.        About -- excuse me.  Basically about getting a

9   vehicle -- while getting a vehicle over here to Jordan

10  before we go, so we wouldn't have to rent one.

11  Q.        Okay.

12            MR. SOFER:  Judge, now would be a decent time to

13  take a midmorning break, if you want.

14            THE COURT:  Okay.  Resume about a quarter after.

15  Thank you.

16            MR. SOFER:  I'd like to make a very brief record,

17  if I can, while the jury is out of earshot.  Then, we can

18  approach, Judge.  I just want to make sure it's clear for

19  the record that the Government has played -- we're finished

20  with our videos.  And I want to it be clear, we played 35

21  out of 61 and only portions of some of those 35 as well.

22            THE COURT:  Okay.

23            MR. HARTMAN:  Actually, I guess I don't need to

24  come to sidebar.  On the exhibits, some of these exhibits

25  we're going to object and the vast majority we're not, but
```

1    I want to be able to have the opportunity later to take

2    those up with Your Honor.

3            THE COURT:  The ones we've seen?

4            MR. HARTMAN:  Nothing today.  I mean, stuff that

5    earlier we have objected to and a couple of translation

6    issues and things like that.  I just want to have the

7    opportunity to take those up.  I don't want to be finished

8    with that.  I don't think there's anything we're going to

9    object to today, certainly not the videos and those kinds

10   of things.

11           THE COURT:  At least you won't be renewing your

12   objection.  You're not waiving your former objection.

13           MR. HARTMAN:  Correct.

14           MR. SOFER:  I was going to say, I think this has

15   been discussed in every which way.

16           THE COURT:  That's fine.  We'll deal with it when

17   you bring it up.

18           Okay.  The question is adjournment to prepare for

19   cross-examination.  And Mr. Boss has indicated that --

20   well, why don't you go and restate what you said?

21           MR. BOSS:  Speaking on behalf of only the

22   El-Hindi team, when the Government made its -- is the jury

23   coming?

24           THE COURT:  Yeah, why don't we -- we will.

25           MR. HARTMAN:  The jury's here.

```
 1            THE COURT:  They're going to be ordering lunch
 2   anyway, so we can do this immediately and then call them
 3   back down and send them home.
 4            Okay.  What do you think, your time table?
 5            MR. SOFER:  I think, if you're willing to keep
 6   them a little past 12:00, I think we might be able to
 7   finish right now.
 8            THE COURT:  That would be great.
 9            Okay.  Mr. Griffin, you remain under oath.
10            And Mr. Sofer, you may resume.
11            MR. SOFER:  Thank you, Judge.
12   BY MR. SOFER:
13   Q.       Mr. Griffin, I want to direct your attention to
14   now -- we ended on July 27th.  I want to direct your
15   attention to a little over a week later on August 7th of
16   2005.  You testified earlier that there was -- you had a
17   conversation with Ashraf Zaim in which he indicated to you
18   that Marwan El-Hindi had said something about you working
19   for -- I think your testimony was for the government in
20   some way, shape or form?
21   A.       Yes.
22   Q.       Did there come a time on August 7th, 2005 when
23   you had a conversation with Marwan about your conversation
24   with Ashraf Zaim?
25   A.       Yes.
```

1    Q.        And if we can please play -- this is Exhibit --

2    1D18 from August 7th, 2005, and it's clip 1A.

3            THE COURT:  And what exhibit number?

4            MR. SOFER:  We're checking right now, Judge.

5    4-83, and I think the clip's actually designated 4A.

6                    (Audio playing.)

7    BY MR. SOFER:

8    Q.        Did you actually mention Ashraf Zaim, or did you

9    mention someone else?

10   A.        I just kept it vague in general and said,

11   brothers at the mosque, people at the mosque.

12                   (Audio playing.)

13   Q.        Okay.  Now, I want to direct your attention to

14   mid-August, 2005.  Did you have a number of conversations

15   with Mohammed Amawi regarding your upcoming travel

16   overseas?

17   A.        Yes.

18   Q.        And I want to direct your attention specifically

19   to August 12th of 2005.  And this is Exhibit 4-64, 1D94,

20   August 12th, 2005, clip 1A, please.

21            Okay.  Mr. Griffin, I want to direct your

22   attention to three days later.  Did there come a time when

23   you had another conversation with Mohammed Amawi on that

24   day?

25   A.        Yes.

1   Q.        And we're going to play 1D95, which is Exhibit

2   4-65, August 15th, 2005, clip 1A, please.

3                    (Audio playing.)

4   Q.        Do you know what Mohammed Amawi was referring to

5   when he said, You're leaving on the 8th?

6   A.        Yes.  He was referring to the 8th of September.

7   Q.        And what specifically had you discussed with

8   Mohammed Amawi about the 8th of September?

9   A.        That I had to return from Jordan to come back to

10  the United States for a security conference in Orlando,

11  Florida.

12  Q.        Okay.  Continue.

13                   (Audio playing.)

14  Q.        Did there come a time when you actually went to

15  Jordan when you met these individuals who Mohammed Amawi

16  indicated that he trusted so much?

17  A.        Yes.

18                   (Audio playing.)

19  Q.        And Mr. Griffin, if you know, what was the

20  purpose of bringing those computers to Syria?

21  A.        To take them to the contact in Syria so he can

22  give them to the brothers, the insurgencies.

23  Q.        You've got to speak up.

24  A.        Giving the computers to the insurgents that were

25  going to Iraq to perform Jihad.

```
 1    Q.        Okay.  And did the conversation on August 15th

 2    with Mohammed Amawi continue?

 3    A.        Yes.

 4    Q.        Are you able to tell from the sounds of this

 5    particular audio where you were?

 6    A.        We were in my vehicle.

 7    Q.        Continue.

 8              MR. BOSS:  Could we have the time, please?

 9              MR. SOFER:  I'm sorry.

10              MR. BOSS:  Could we please have a time start on

11    this one?  I've kind of lost track of where we are.

12              MR. SOFER:  It's August 15th, 2005, 1D95.

13              THE COURT:  And is this a new clip or the same

14    clip?

15              MR. SOFER:  Same clip, Judge.  It's 2A.  Tell me

16    when you're ready.

17              MR. BOSS:  What date please?  I'm so sorry.

18              MR. SOFER:  August 15th, 2005, 4-65, 1D95, 2A.

19              MR. BOSS:  Just -- go ahead and proceed.  Thank

20    you.

21              MR. SOFER:  We'll play clip 2A.

22                   (Audio playing.)

23    BY MR. SOFER:

24    Q.        What brothers were you referring to?

25    A.        The ones crossing over from Syria to Iraq.
```

```
 1   Q.        Continue.

 2             (Audio playing.)

 3   Q.        And did the conversation continue, Mr. Griffin?

 4   A.        Yes, it did.

 5   Q.        Let's play clip 3A, please.

 6             (Audio playing.)

 7   Q.        Okay.  Did this conversation with Mohammed Amawi

 8   continue?

 9   A.        Yes, it did.

10   Q.        Let's play clip 4A, please.

11             (Audio playing.)

12   Q.        And did this conversation on August 15th, 2005

13   continue, Mr. Griffin?

14   A.        Yes, it did.

15   Q.        And we're going to play 5A, please.

16             (Audio playing.)

17   Q.        Is that last clip referring to the soldier that

18   Mohammed Amawi was taking to --

19   A.        Yes.

20   Q.        I want to direct your attention to three days

21   later, August 18th of 2005.  Did there come a time when you

22   had a conversation with Mohammed Amawi inside of AZ Travel?

23   A.        Yes.

24   Q.        And was there another person there that day?

25   A.        Yes.  Ashraf Zaim.
```

```
 1   Q.        And again, Ashraf Zaim's relation to AZ Travel,
 2   if you know?
 3   A.        Either the manager or owner.
 4   Q.        Okay.  We're going to play 1D96, Exhibit 4-66,
 5   August 18th, 2005, clip 1A, please.
 6                    (Audio playing.)
 7   Q.        Tell us basically what's happening here,
 8   Mr. Griffin.
 9   A.        That Ashraf is producing a cover letter verifying
10   to customs that the computers that we were taking in were
11   for AZ Travel.
12   Q.        Okay.  Continue.
13                    (Audio playing.)
14   Q.        Okay.  Did Ashraf Zaim produce this letter?
15   A.        Yes, he did.
16   Q.        And I want us to put up 121, please, for
17   identification -- Government's Exhibit 121 for
18   identification.  Enlarge this a little bit.
19            Can you tell the members of the jury what Exhibit
20   121 for identification is?
21   A.        It is a copy of the letter that Ashraf Zaim
22   produced.
23   Q.        And again, what was the purpose of this letter?
24   A.        To give an excuse to get the computers into the
25   country of Jordan.
```

```
1   Q.       And was this letter carried to Jordan?

2   A.       Yes, it was.

3   Q.       Do you remember who carried it?

4   A.       I did.

5            MR. SOFER:  Okay.  And at this time, the -- the

6   Government offers 121 into evidence.

7            THE COURT:  It will be admitted.

8                    (Government's Exhibit Number 121 was

9                    admitted into evidence.)

10  BY MR. SOFER:

11  Q.       Did you travel to Jordan with Mohammed Amawi?

12  A.       Yes, I did.

13  Q.       And can you tell the members of the jury

14  approximately when that happened?

15  A.       August 22nd of 2005.

16  Q.       And again, had you told Mohammed Amawi that

17  had -- you had to return sometime?

18  A.       Yes, on September the 8th.

19  Q.       And do you recall when you returned from Jordan?

20  A.       On September the 8th.

21  Q.       Who purchased the tickets for your travel to

22  Jordan with Mohammed Amawi?

23  A.       I did.

24  Q.       And we've heard a conversation about this and

25  you've testified a little bit about it, but what did you
```

```
 1   tell Mohammed Amawi the reason was that you were able to

 2   purchase the tickets?

 3   A.          That I was executing a contract over in Dubai UAE

 4   and that I could take an extra person.

 5   Q.          And did you know -- or was it -- did you have

 6   discussions with Mohammed Amawi about when he was going to

 7   return?

 8   A.          I cannot recall.

 9   Q.          Okay.  Did you bring laptop computers with you?

10   A.          Yes.

11   Q.          Can you tell the members of the jury how many

12   laptop computers you brought?

13   A.          I brought a total of six.

14   Q.          Can you break down the six computers that you

15   brought for the jury?

16   A.          I brought five Sony Vaio's and one personal

17   laptop, the Dell.

18   Q.          And had all of those computers been given to you

19   by the FBI?

20   A.          Yes.

21   Q.          How were they carried over to Jordan, if you

22   recall?

23   A.          I purchased a rather large computer bag.

24   Q.          And were they -- was it checked luggage, or was

25   it brought on board the airplane?
```

```
 1   A.        It was a carry-on.

 2   Q.        And again, can you tell the members of the jury

 3   what the purpose of bringing those computers over to Jordan

 4   was?

 5   A.        To get into the -- to get him to the contact in

 6   the north in Syria.

 7   Q.        I want to show you what's been -- Government

 8   Exhibit 124 for identification.  Could you tell us if you

 9   recognize that?

10   A.        That's one of -- the picture of one of the Sony

11   laptops.

12   Q.        Okay.  And if we can view the next three pages of

13   that exhibit, please, 124, I believe, 02.  Is that similar

14   to that -- could that be another angle of one of the

15   computers?

16   A.        Yes.

17   Q.        And three, please, the back of one of the

18   computers?

19   A.        Yes.

20   Q.        And four please?

21             THE COURT:  Is it this the same computer, or is

22   it simply a depiction of what the four looked like?

23             MR. SOFER:  That's a -- I'll clarify that, Judge.

24   BY MR. SOFER:

25   Q.        Is this -- these series of photos we're looking
```

```
 1   at, if we can go to four also, these are photographs or

 2   pictures of the type of computer that you brought.

 3   A.        Yes.

 4   Q.        Does it look like the computers that you brought

 5   over to Jordan?

 6   A.        Yes.

 7   Q.        And did the computers, other than the Dell that

 8   you described, look the same?

 9   A.        Yes.

10             MR. SOFER:  At this time, the Government offers

11   124 into evidence.

12             THE COURT:  It will be admitted.

13                  (Government's Exhibit Number 124 was

14                  admitted into evidence.)

15   BY MR. SOFER:

16   Q.        Now, when you went to Jordan, did you have a

17   recording device with you?

18   A.        No, I did not.

19   Q.        And can you tell the members of the jury why that

20   is?

21   A.        The FBI thought that it could possibly compromise

22   my identity.

23   Q.        And was that your choice to not bring a recording

24   device or not?

25   A.        It was not.
```

```
 1   Q.        Did you take a camera?

 2   A.        Yes, I did.

 3   Q.        And did you take photographs while you were --

 4   while you were in Jordan?

 5   A.        Yes, I did.

 6   Q.        Did you take any other electronic devices with

 7   you?

 8   A.        A Thuraya satellite phone.

 9   Q.        And this Thuraya satellite phone, did you

10   ultimately --

11            THE COURT:  Excuse me.  How do you spell that?

12            MR. SOFER:  Do you want me to spell it or the

13   witness?  We've run into trouble.

14            THE COURT:  Somebody.

15            MR. SOFER:  I have T-H-U-R-A-Y-A.

16   BY MR. SOFER:

17   Q.        Thuraya is the company that makes the phone, if

18   you know?

19   A.        Yes.

20   Q.        This phone, did you leave this phone with

21   Mohammed Amawi?

22   A.        Yes, I did.

23   Q.        And who was the phone registered to, if you

24   remember?

25   A.        It was -- I was responsible for it.
```

```
1   Q.        But do you remember the name of the entity that

2   it was registered to?

3   A.        Direct Action Security.

4   Q.        And did you, over the next weeks and months when

5   this phone was left with Mohammed Amawi, receive bills for

6   the phone?

7   A.        Yes, I did.

8   Q.        And did you receive the money from those -- for

9   those bills from the FBI?

10  A.        Yes, I did.

11  Q.        Did you pay all of those bills?

12  A.        Not all of them.

13  Q.        Have you paid all those bills today?

14  A.        No, I haven't.

15  Q.        What is the outstanding balance on those bills

16  from what the company has told you?

17  A.        $22,000.

18  Q.        And are you responsible for that money?

19  A.        Yes, I am.

20  Q.        Now, when you traveled over to Jordan, do you

21  remember what airline you took?

22  A.        I believe it was Royal Jordanian.

23  Q.        And did there come a time when something happened

24  on the airplane which Mohammed Amawi brought to your

25  attention?
```

```
 1    A.        Yes.  I can't recall if it was before, during or
 2    after; but there were gentleman with --
 3    Q.        May I interrupt you for a second?  Before, during
 4    or after, what?
 5    A.        The flight.
 6    Q.        Okay.
 7    A.        There were five gentleman -- four were Caucasian
 8    and one was darker-colored skin -- with beards, and they
 9    seemed like they were security people, government people.
10    Q.        Seemed like that to who?
11    A.        Mohammed Amawi.
12    Q.        Did he voice some other concern about them?
13    A.        Yes, that they were following him and waiting to
14    get him.
15    Q.        Okay.  Did these individuals ever do anything
16    like that in your presence?
17    A.        No, they did not.
18    Q.        And did there come a time when you arrived in
19    Jordan?
20    A.        Yes.
21    Q.        Do you recall where it was that you arrived in
22    Jordan?
23    A.        Queen Alia Airport in Amman -- right outside of
24    Amman.
25    Q.        Can you describe for the members of the jury what
```

```
 1   happened as you went through the airport in Jordan?

 2   A.       We went through immigration pretty easy, myself

 3   and Mr. Amawi; and we proceeded to customs.  And we were

 4   stopped at customs for reason -- because of the computers.

 5   Q.       Okay.  And what happened there with customs?

 6   A.       At that point, I produced the letter from AZ

 7   Travel; and there was a lot of discussion between Mr. Amawi

 8   and the custom agent.

 9   Q.       Okay.  And what happened next?

10   A.       Basically, Mr. Amawi informed me that we're going

11   to have to pay to get these laptops into the country.

12   Q.       And were you told how much you were going to have

13   to pay?

14   A.       It was approximately $200 per laptop.

15   Q.       200 U.S. dollars -- U.S. dollars?

16   A.       Yes.

17   Q.       Did the Jordanian customs official do anything

18   with any of the computers?

19   A.       Yes.  They copied the serial numbers of at least

20   three of the computers.

21   Q.       Did there come a time when you were met at the

22   airport by someone to pick you up?

23   A.       Yes.

24   Q.       Do you recall who that was?

25   A.       It was two of Mohammed Amawi's brothers, Amallett
```

 1   (phonetic) and Morack (phonetic), and his mother.

 2   Q.        And do you recall what kind of car they picked

 3   you up in?

 4   A.        It was a Jeep -- silver Jeep Cherokee with Ohio

 5   plates.

 6   Q.        And was that a surprise to you to be picked up by

 7   a car in Jordan with Ohio plates on it?

 8   A.        Very much so.

 9   Q.        Had you previously discussed with Mohammed Amawi

10   getting a vehicle into Jordan?

11   A.        Yes.

12   Q.        Were you aware that that had already occurred?

13   A.        I had no idea.

14   Q.        After you went to -- were picked up at the

15   airport, where did you go?

16   A.        We went north to a town called Irbid.

17   Q.        And what was in Irbid?

18   A.        That's where his family resides in the town of

19   Irbid.

20   Q.        Was there a name that the local people gave to

21   where it is that the Amawi's reside?

22   A.        They lived in a several floor building that I

23   believe they owned, and they referred to it as Casa

24   D'Amawi.

25   Q.        Okay.  I want to show you one Government --

```
 1   Government Exhibit 125CE, please.  Do you recognize what's
 2   depicted in 125CE?
 3   A.         Yes, I do.
 4   Q.         And can you tell the members of the jury what
 5   that is?
 6   A.         That is a picture of Casa D'Amawi.
 7   Q.         And does it fairly and accurately represent the
 8   way it looked approximately when you were there in August
 9   of 2005?
10   A.         Yes.
11              MR. SOFER:  At this time, the Government offers
12   125CE.
13              THE COURT:  It will be admitted.
14                  (Government's Exhibit Number 125CE was
15                  admitted into evidence.)
16   BY MR. SOFER:
17   Q.         You see a vehicle in that picture?
18   A.         Yes, I do.
19   Q.         Will you try to circle it, indicate somehow with
20   the telestrator, there it is?
21              And the witness for the record has circled the
22   vehicle in the right portion of 125CE in evidence.
23              Can you tell the members of the jury what vehicle
24   that is, if you can?
25   A.         That is the silver Jeep Cherokee.
```

```
1    Q.         Now, when you stayed here in this location, do

2    you recall where it is that you stayed?

3    A.         I believe on the first floor.

4    Q.         Okay.  And did you stay there for some or all of

5    the time that you were in Irbid?

6    A.         Yes, some or all.

7    Q.         Did you bring money for giving gifts to Mohammed

8    Amawi's family or other people that you meet while in

9    Jordan?

10   A.         Yes.

11   Q.         And what was the purpose of bringing this money?

12   A.         Basically, it's cultural when you're staying with

13   friends and people that you give a gift for them housing

14   you and feeding you.

15   Q.         Did you actually pay rent or any kind of fee

16   while you were there staying in the Amawi home?

17   A.         I did not.

18   Q.         Do you recall what kinds of gifts or money you

19   gave out while you were in Jordan?

20   A.         I bought a hot and cold water cooler for the

21   family.  I bought Mr. Amawi a --

22   Q.         Stop you there.  Approximately how much money is

23   that?

24   A.         It was approximately 150 U.S. dollars.

25   Q.         Okay.  Anything else?
```

```
 1   A.        I bought a cell phone for Mr. Amawi.

 2   Q.        Okay.  You say Mr. Amawi, which Mr. Amawi?

 3   A.        I bought one for the father.

 4   Q.        Okay.

 5             THE COURT:  For?  I'm sorry.  I didn't hear.

 6   A.        For the father.

 7   BY MR. SOFER:

 8   Q.        And what was the father's name, if you recall?

 9   A.        Zaki.

10             THE COURT:  How do you spell that, if you know?

11   A.        Z-A-K-I.

12   BY MR. SOFER:

13   Q.        Any other gifts while you were there?

14   A.        There was donations to the new mosque in Irbid.

15   Q.        How much money did you give for that?

16   A.        I believe $500.

17   Q.        Was this in U.S. dollars or Jordanian dollars?

18   A.        U.S. dollars.

19   Q.        Any other money that you donated or gave to other

20   people while you were there?

21   A.        Yes.  I gave $250 to two orphans, I believe $200

22   to the school.  The name of the school is Al-Noor.

23             THE COURT:  How do you spell that, please?

24   A.        A-L, hyphen, N-O-O-R .

25             I believe I gave a thousand dollars to Mohammed
```

1   Amawi for the purchase of the Jeep Cherokee.

2   BY MR. SOFER:

3   Q.        Okay.  And what was the purpose of giving that

4   thousand dollars for the purchase of the Jeep Cherokee?

5   A.        So we can use it to travel.

6   Q.        Okay.  Any other money that you gave out that you

7   recall?

8   A.        I paid for hotels while traveling or assisted in

9   paying; and also, Mr. Amawi -- Mohammed Amawi asked me for

10  $100 to give a person when we were down in Diban, Jordan.

11  Q.        Can you spell that?

12  A.        D-I-B-A-N, Jordan.

13            We were hosted by a man called Masoud.  You're on

14  your own now.

15  Q.        Okay.

16  A.        And he had hosted us and fed us.

17            MR. SOFER:  Nothing I can do about that, Judge.

18            THE COURT:  I'll refrain from the -- Masoud, did

19  you say?

20  A.        Masoud.

21  BY MR. SOFER:

22  Q.        Why don't you give it your best shot?

23            THE COURT:  M-A-S-O-U-D, we'll just --

24  BY MR. SOFER:

25  Q.        Okay.  So, you traveled while you were there with

1   Mohammed Amawi?

2   A.        Yes.

3   Q.        And did there come a time when Mohammed Amawi

4   described an Imam or a Shaykh at one of the local mosques?

5   A.        Yes.

6   Q.        And can you tell us basically, if you recall,

7   what the substance of that conversation was?

8   A.        Basically, Mohammed had told me that this was the

9   Imam that stopped him or assisted his family into stopping

10  him to go into Iraq for Jihad.

11  Q.        And did you ever witness, while you were in

12  Jordan with Mohammed Amawi, arguments between Mohammed

13  Amawi and his family regarding things of that nature?

14  A.        Yes.

15  Q.        Can you tell the members of the jury, again,

16  basically and in substance what it is that you heard?

17  A.        Within the first few days, there was an argument

18  where his family wanted him to cut his hair.

19            MR. IVEY:  Objection.

20            THE COURT:  I think -- why don't you come on up?

21            MR. SOFER:  Okay.

22                (A sidebar conference was had on the

23                record.)

24            THE COURT:  Basis?

25            MR. IVEY:  Hearsay statements -- I'm sorry.

```
 1   Hearsay statements, family were not coconspirators.  And
 2   also, Mr. Griffin has said he does not understand Arabic.
 3   It's my understanding the other speaks -- from the bond
 4   hearing speaks Arabic only.  So, how could he know this?
 5            MR. SOFER:  One of the -- first --
 6            THE COURT:  First, I assume I'll instruct the
 7   jury these are offering statements to be made seems to the
 8   extent he's describing, quote, argument.  I think that's
 9   kind of lay observation.  It's like somebody was speeding
10   or whatever, approximation of somebody's weight or expert
11   testimony.
12            I would suggest that you might -- what was going
13   on?  What did you hear?  I also do think, however, we need
14   some foundation in terms of what he's being told.
15            MR. SOFER:  I'll leave the substance out of it.
16   To make it clear, we'll -- I'll cut it loose.
17            THE COURT:  You lose, but he surrenders.
18            MR. SOFER:  Exactly.
19               (Sidebar concluded.)
20            THE COURT:  Ladies and gentlemen, you may
21   disregard the reference to what was being said; but you
22   may, otherwise, consider the testimony.
23            Go ahead, Mr. Sofer.
24   BY MR. SOFER:
25   Q.       In the first few days that you were in Jordan
```

```
 1   with Mohammed Amawi, did you ever take the laptop computers
 2   that you had brought over into Syria?
 3   A.        We did not.
 4   Q.        Can you describe for the jury why that was not?
 5   A.        I was told by Mr. Amawi that the Syrian had
 6   turned around and he was no longer returning his messages,
 7   and that it -- it wasn't safe to go right then and that he
 8   had -- Mr. Amawi had passed the E-mail information from my
 9   contact to the brother in Syria.
10   Q.        Okay.
11             THE COURT:  Ladies and gentlemen, this, again, is
12   one of those statements that you consider as something this
13   witness said that Mr. Amawi said and he heard him say; but
14   it's not proof of whether or not the Syrian, quote, turned
15   around or anything else that's related in the statements.
16   You may consider it as evidence of what Mr. Griffin was
17   told by Mr. Amawi.
18             You may continue.
19   BY MR. SOFER:
20   Q.        Did Mohammed Amawi indicate that he was concerned
21   about people following him?
22   A.        Yes.  He was still alarmed by the five gentleman
23   that were passengers on the airplane, and that he was
24   worried about being followed, and that that's another
25   reason why he did not want to go into Syria for fear of
```

```
1    being arrested or tracked into Syria.
2              THE COURT:  That is something he said to you; is
3    that correct?
4    A.        Yes, Your Honor.
5              THE COURT:  Again, you can consider that that's
6    what he said, not whether or not he, in fact, was
7    concerned.
8              Okay.  Go ahead.
9    BY MR. SOFER:
10   Q.        While you were in Jordan, did you meet with a
11   number of Mohammed Amawi's friends and associates?
12   A.        Yes.
13   Q.        And were photographs taken of some of -- of those
14   meetings?
15   A.        Yes.
16   Q.        And let's put up 125R, please.  I want to show
17   you what's been marked as Government's Exhibit 125R.  And
18   is that a photograph of you and a number of Mohammed
19   Amawi's friends and associates?
20   A.        Yes.
21   Q.        And where were these folks from, if you know?
22   A.        They were in the -- from the town of Irbid.
23   Q.        Did there come a time when you traveled elsewhere
24   and met individuals?  I think you described them before as
25   the trusted brothers.
```

```
 1   A.        Yes.

 2   Q.        And where did you go to meet those individuals?

 3   A.        There were two separate places -- or actually

 4   three.   I believe one was the town of Quaim.

 5             THE COURT:  How do you spell it?  Do you know?

 6   A.        Q-U-A-I-M.

 7             THE COURT:  Okay.  And how do you pronounce it?

 8   A.        Co-main.

 9             THE COURT:  Go ahead.

10   BY MR. SOFER:

11   Q.        Okay.  If we can put that up there again, please.

12   125R fairly and accurately represent the folks that you had

13   met with or were friends and associates of Mohammed Amawi

14   in Irbid?

15   A.        Yes.

16   Q.        And Irbid is where he lived?

17   A.        Yes.

18             MR. SOFER:  At this time, the Government offers

19   125R into evidence.

20             THE COURT:  It will be admitted.

21                  (Government's Exhibit Number 125R was

22                   admitted into evidence.)

23   BY MR. SOFER:

24   Q.        You said you met with the trusted brothers in

25   Quaim?
```

```
 1   A.        Yes.

 2   Q.        Did you travel with them as well?

 3   A.        Yes, down to Diban, to Tifilah.

 4             Do you want me to spell that, Your Honor?

 5             T-I-F-I-L-A-H.

 6   Q.        And you want to put up 125A.

 7             THE COURT:  I'm sorry.  Let me interrupt.  About

 8   how soon or long after you had arrived in Jordan did you

 9   take these various trips that -- could you just simply set

10   a time frame, approximately?

11   A.        I believe by the end of the first week, Your

12   Honor.

13   BY MR. SOFER:

14   Q.        And this was to meet these other individuals?

15   A.        Yes.

16   Q.        Okay.  And if we can put up 125AV, please.  Are

17   these -- those other individuals that you met in Quaim and

18   traveled with?

19   A.        Yes.  These are two of the brothers from Quaim

20   and one brother from Diban that I referred to as Masoud.

21   Q.        Do you know where this photograph was taken, if

22   you recall?

23   A.        I believe it's on the outskirts of Diban.

24   Q.        And does it fairly and accurately represent the

25   way the individuals looked when you met them in August of
```

```
 1    2005?
 2    A.        Yes.
 3              MR. SOFER:  Okay.  And at this time, the
 4    Government offers 125AV?
 5              THE COURT:  It will be admitted.
 6                   (Government's Exhibit Number 125AV was
 7                   admitted into evidence.)
 8              THE COURT:  And who are the people starting at
 9    the bottom left, if you know?
10    A.        That is Brother Masoud.  Going to the right,
11    sitting on the ledge is Mustafa.
12              THE COURT:  M-U-S-T-A-F-A?
13    A.        Yes, sir.
14              THE COURT:  Okay.
15    A.        And the brother standing to our right, Mohammed's
16    left, is Ahmed.
17              THE COURT:  A-H-M-E-D?
18    A.        Yes.
19              THE COURT:  Okay.  Go ahead.
20    BY MR. SOFER:
21    Q.        Towards the end of the trip, did you meet with
22    any relatives of Marwan El-Hindi?
23    A.        Yes.
24    Q.        And can you tell the members of the jury why and
25    where that happened, if you recall?
```

```
 1   A.        Mr. El-Hindi had asked me to give his brother

 2   $500 while I was there.

 3   Q.        And did you do that?

 4   A.        Yes, I did.

 5   Q.        And how did you arrange to do that, if you

 6   remember?

 7   A.        On the way to leaving Jordan, Marwan had gave me

 8   his number -- his brother's number; and I called him.  And

 9   we basically met on the side of the road on the way to the

10   airport.

11   Q.        And how much money did you give Marwan El-Hindi's

12   brother?

13   A.        $500.

14   Q.        And while you were in Jordan, did you have

15   further discussions with Mohammed Amawi about your

16   returning to Jordan?

17   A.        Yes.

18   Q.        And did Mohammed Amawi ask you anything -- ask

19   you to do something for him if and when you did return to

20   Jordan?

21   A.        To bring his desktop computer from his home in

22   Toledo, Ohio.

23   Q.        When you left, did you leave any of the

24   electronic equipment that you described earlier with

25   Mohammed Amawi?
```

1    A.        Yes.

2    Q.        What did you leave?

3    A.        One Sony Vaio laptop computer and the Thuraya

4    cell phone -- satellite phone.

5    Q.        And what did you tell Mohammed Amawi about the

6    use and the cost of the Thuraya cell phone?

7    A.        I told him that it was a monthly flat rate of

8    somewhere in between 250 to $500.

9    Q.        Was that true?

10   A.        That was not.

11   Q.        Did there come a time while you were in Jordan

12   when you communicated or had some communication from Wassim

13   Masloum?

14   A.        Mr. Masloum had attempted to contact me on my

15   cell phone while in Jordan.

16   Q.        And how do you know that?

17   A.        Because it showed up on my caller ID.

18   Q.        Did you return from Jordan in September as you

19   had told Mohammed Amawi you would?

20   A.        Yes, I did.

21   Q.        And upon your return, did you consult with the

22   FBI about your trip?

23   A.        Yes, I did.

24   Q.        Did you receive any extra money for your travel

25   to Jordan from the FBI?

```
 1   A.         I believe $5,000.

 2   Q.         And what was the purpose, if you know, as to why

 3   it was you were given that additional $5,000 payment?

 4   A.         I was told because it was a dangerous situation

 5   and I put myself in a dangerous situation by being over in

 6   Jordan, being that I didn't have a gun, I didn't have

 7   support and I couldn't dial 911.

 8            THE COURT:  Ladies and gentlemen, that is not

 9   proof that he had, in fact, been in a dangerous situation.

10   It is simply a statement made by him upon his return.  Only

11   considered as a statement made.

12   BY MR. SOFER:

13   Q.         Now, I want to direct your attention to the rest

14   of September of 2005.  Did you have communications with

15   Mohammed Amawi while he was overseas during that period of

16   time?

17   A.         Yes, numerous.

18   Q.         And did there come a time in late September,

19   specifically September 28th, when Mohammed Amawi said

20   something to you that gave you some concern?

21   A.         Yes, that the FBI had stopped by AZ Travel and

22   was asking about himself and the AZ Travel business.

23   Q.         And did you do anything as a result of that?

24   A.         Yes.  The next day I went to -- stopped in AZ

25   Travel to see Ashraf Zaim.
```

```
 1    Q.        And did you have a discussion with Ashraf Zaim?

 2    A.        Yes.  He had informed me that the FBI had stopped

 3    by and was asking questions about Mr. Amawi, and I had just

 4    simply said I knew.

 5    Q.        And on that same day did you have a conversation

 6    with Wassim Masloum?

 7    A.        Yes.

 8    Q.        And I want us to play clip -- Exhibit 4-67, 1D103

 9    from September 29th, 2005.

10              THE COURT:  4-67, did you say?

11              MR. SOFER:  Yes.  4-67, 1D103, September 29th,

12    2005, clip 2A.

13                    (Audio playing.)

14    BY MR. SOFER:

15    Q.        While you were in Jordan -- or when you returned

16    from Jordan, the conversations you had with Mohammed Amawi,

17    did those revolve around certain businesses?

18    A.        Yes.

19    Q.        Can you tell the members of the jury what kind of

20    businesses you discussed with Mohammed Amawi?

21    A.        Importing cars, opening up a computer store and a

22    computer cafe.

23    Q.        Okay.  Like an internet cafe?

24    A.        Yes.

25    Q.        Continue.
```

```
 1              (Audio playing.)

 2   Q.        When you first had this conversation with Wassim

 3   Masloum, what did you think he was talking about?

 4   A.        I thought he was talking about getting cars in

 5   the country, for a connection.

 6              (Audio playing.)

 7   Q.        Okay.  And I want to direct your attention to the

 8   month of October.  Did you continue to have conversation

 9   with Mohammed Amawi about these businesses that you

10   described?

11   A.        Yes.

12   Q.        I want to direct your attention specifically to

13   October 5th, 2005.  Did there come a time when Mohammed

14   Amawi called you from Jordan or that you called Amawi --

15   Mohammed Amawi in Jordan?

16   A.        Yes.

17   Q.        And if we can play -- this is Exhibit 4-68, 1D104

18   from October 5th, 2005.  And I believe it's clip 1A.

19              (Audio playing.)

20   Q.        Now, I want to direct your attention to November

21   of 2005 -- early November of 2005 and specifically the

22   first few days of November.  Did there come a time when you

23   went back to Mohammed Amawi's home here in Toledo, Ohio?

24   A.        Yes.

25   Q.        And so tell the members of the jury why that was.
```

```
 1   A.          Had -- Mr. Amawi had wanted me to pick up some
 2   items from his apartment here in Toledo, Ohio to bring with
 3   me on the return trip to Jordan.
 4   Q.          And who was there at the apartment when you
 5   arrived?
 6   A.          His brother, Amr.
 7               THE COURT:  How do you spell that?
 8   A.          A-M-R.
 9   BY MR. SOFER:
10   Q.          And did there come a time when you actually --
11   strike that.
12               To your knowledge, did there come a time when
13   Mohammed Amawi called Amr while you were there?
14   A.          Yes.  While me and Amr was talking, he actually
15   called my cell phone.  When I say he, Mohammed.
16   Q.          And was a particular item discussed about what
17   you might bring to Mohammed Amawi to Jordan on your return
18   trip?
19   A.          Yes.
20   Q.          And can you tell the members of the jury what
21   those items were among others?
22   A.          There was a coat, his parts for the vehicle,
23   papers.
24   Q.          Parts for the vehicle, what vehicle are you
25   referring to, if you know?
```

```
 1   A.          Jeep Cherokee that was in the country.

 2               There were assorted papers, photos, I think, his

 3   birth certificate and a ticket -- a traffic ticket.

 4   Q.          Was there a discussion about CDs as well?

 5   A.          Yes.

 6   Q.          Can you relate, best as you can recall, what that

 7   conversation was about?

 8   A.          Amr handed me three CDs that Mohammed wanted me

 9   to bring over; and he had basically said, Hey, take these

10   three CDs over to Mohammed; but if you think you're going

11   to be -- if it's going to be a problem, then don't worry

12   about it.  Just leave them here.

13   Q.          Was there a reason why there would be a problem?

14   A.          Because --

15               MR. HARTMAN:  Objection.

16               THE COURT:  Sustained.

17               MR. IVEY:  Objection.

18   BY MR. SOFER:

19   Q.          Did anyone tell you that there was some reason to

20   be concerned?

21               THE COURT:  Well, it sounds like hearsay.  It

22   sounds like it's being offered for the truth of the matter

23   asserted.  Again, I will permit only as evidence of what

24   was said, not proof that whatever was being told to

25   Mr. Griffin was true.  And the jury won't consider it as
```

```
 1   such, just as a statement to be made.

 2            Go ahead.

 3   A.            Because of the training and the videos that we

 4   watched on the computer prior, all these months before,

 5   they were on those discs.

 6   BY MR. SOFER:

 7   Q.            Okay.  Did you recognize one of those disks?

 8   A.            Yes, I did.

 9   Q.            And if we can put up 128D, please.  Is that the

10   disk that you recognized?

11   A.            Yes.

12   Q.            And best of your recollection, why is it that you

13   recognized it at that time?

14   A.            Because of the star on it.

15   Q.            That disk with a star on it was one of the disks

16   that had been handed back and forth that you testified to

17   before?

18   A.            Yes.

19   Q.            Did you bring these disks along with the other

20   items over to Jordan ultimately in your return trip?

21   A.            Yes.

22   Q.            And if you know, did you give the disks to

23   Mohammed Amawi?

24   A.            I --

25            THE COURT:  I apologize.  But I'm not sure
```

```
 1   that -- I think you're referencing something that's not in
 2   evidence.  A return trip, has that been testified to yet?
 3              MR. SOFER:  No, Judge; but I think -- if you give
 4   me two questions, I think it will make some sense.
 5              THE COURT:  That's fine.
 6   BY MR. SOFER:
 7   Q.       You returned to Jordan with Mohammed Amawi -- is
 8   that right, to see Mohammed Amawi?
 9   A.       To see him, yes.
10   Q.       When was that approximately?
11   A.       The 13th of December.
12   Q.       And did you bring these disks among the other
13   items that you've testified about?
14   A.       Yes.
15   Q.       And if you recall, did you give these disks to
16   Mohammed Amawi when you were in Jordan on the second trip?
17   A.       I can't recall if I gave it to him and then he
18   returned to me or he forgot and left them in the computer
19   bag.
20   Q.       Did there come a time after the investigation of
21   this case was over that you found these disks?
22   A.       Yes.
23   Q.       And where were they?
24   A.       In the computer bag.
25   Q.       And I want to put up 128B-1.  Is that the
```

1    computer bag you're referring to?

2    A.       Yes.

3    Q.       If we can put up 128B-2.  Is that also a picture

4    of the computer bag?

5    A.       Yes.

6    Q.       Do those pictures fairly and accurately represent

7    the way that bag looked when you brought this bag, among

8    other things, to Mohammed Amawi on your second trip?

9    A.       Yes.

10           MR. SOFER:  And the Government offers 128B-1 and

11   B-2 at this time.

12           MR. BOSS:  Your Honor, can we have just a moment,

13   please?

14           THE COURT:  Sure.

15           MR. BOSS:  Thank you.

16           THE COURT:  Okay.

17   BY MR. SOFER:

18   Q.       You testified that you found the three disks in

19   this bag after the investigation of this case was over?

20   A.       Yes.

21   Q.       And what did you do when you found them?

22   A.       I turned them over to the FBI.

23   Q.       Do you recall who it was?

24   A.       I believe Shannon Coats.

25   Q.       Did Mohammed Amawi ask you to bring anything else

```
 1    with you on your trip back to Jordan in December of '05?

 2    A.        His desktop computer.

 3    Q.        I want to direct your attention to November 16th

 4    of 2005.  Did there come a time when Mohammed Amawi -- when

 5    you spoke to Mohammed Amawi on November 16th of 2005?

 6    A.        Yes.

 7    Q.        And do you recall whether this conversation was

 8    recorded or not?

 9    A.        I cannot recall.

10    Q.        Can you tell us, was -- in this conversation, did

11    Mohammed Amawi ask you to bring something else?

12    A.        Yes, a black satchel.

13    Q.        And did you ultimately retrieve that black

14    satchel before going on your second trip?

15    A.        Yes.

16    Q.        And can you tell us basically, if you recall,

17    what this black satchel contained?

18    A.        I believe just some pictures and papers.

19    Q.        And what did you do with those pictures and

20    papers after you received them -- strike that.

21              Where did you -- did you go back and retrieve

22    that black satchel?

23    A.        Yes, I did.

24    Q.        Where did you get it from?

25    A.        I got it from Mohammed Amawi's brother, Amr.
```

```
 1   Q.        And what did you do with that satchel after you
 2   retrieved it?
 3   A.        I turned it over to the FBI.
 4   Q.        And did there come a time when the FBI gave it
 5   back to you?
 6   A.        Yes.
 7   Q.        Did you bring that black satchel with papers in
 8   it to Jordan as well?
 9   A.        Yes.
10   Q.        Just one moment, Judge.
11             Did there come a time when you returned to Jordan
12   to meet with Mohammed Amawi?
13   A.        Yes.
14   Q.        And did you bring a recording device on this
15   trip?
16   A.        I did not.
17   Q.        And why was that?
18   A.        Because the FBI said it was too risky.
19             THE COURT:  Again, ladies and gentlemen, that's
20   evidence of what he was told.  It is not truth that it was,
21   in fact, quote, too risky, closed quote.
22             Go ahead.
23   BY MR. SOFER:
24   Q.        Was it your choice to bring that device or not?
25   A.        I wanted to bring it.
```

```
 1              MR. HARTMAN:  Objection.
 2              THE COURT:  Sustained.  The answer's not
 3  responsive.  I take it, it was the bureau's choice; is that
 4  correct?
 5              MR. SOFER:  Yes, Judge.
 6              THE COURT:  Is that correct, Mr. Griffin?
 7  A.        Yes, sir.
 8              THE COURT:  That's fine.  Jury will disregard
 9  the, quote, I wanted to take it.
10  BY MR. SOFER:
11  Q.        Did you bring any computers with you on the
12  second trip?
13  A.        Yes.
14  Q.        And do you recall how many you brought?
15  A.        I believe two.
16  Q.        And were those -- what kind of computers were
17  those?
18  A.        The Sony Vaio's.
19  Q.        Did you stay in the same place; that is, the home
20  of Mohammed Amawi, when you arrived in Jordan for the
21  second time, again?
22  A.        Yes.
23  Q.        And did you bring all those other items or many
24  of those other items that Mohammed Amawi had asked you to
25  bring?
```

```
 1   A.        Yes.

 2   Q.        Do you recall whether you had to pay excess

 3   baggage fees in order to get on the airplane with all of

 4   that -- all of those materials?

 5   A.        Yes.

 6   Q.        Do you remember how much that cost?

 7   A.        I think it was approximately -- at least $600.

 8   Q.        And I want to show you 127, please, for

 9   identification.  Do you recognize what's depicted in

10   Government's Exhibit Number 127 for identification?

11   A.        Yes.

12   Q.        Can you tell the members of the jury what that

13   is?

14   A.        Mohammed Amawi's desktop computer.

15   Q.        You said that he had more than one desktop

16   computer?

17   A.        Yes.

18   Q.        Is this the one that you brought over to Jordan?

19   A.        Yes.

20   Q.        And how do you remember that, if you know?

21   A.        Because of the identification of the blue DVK at

22   the top of the computer.

23   Q.        Okay.  And did you bring this computer to

24   Mohammed Amawi in Jordan?

25   A.        Yes.
```

```
 1   Q.        Does it fairly and accurately represent the way

 2   the computer looked approximately when you brought it to

 3   Mohammed Amawi in December of '05?

 4   A.        Yes.

 5             MR. SOFER:  And at this time, the Government

 6   offers Government Exhibit Number 127.

 7             THE COURT:  Admitted.

 8             MR. SOFER:  Thank you, Judge.

 9                 (Government's Exhibit Number 127 was

10                 admitted into evidence.)

11   BY MR. SOFER:

12   Q.        I want to show you what's been marked as

13   Government's Exhibit 129B, please and ask you if you

14   recognize any of the writing on Government's Exhibit Number

15   129B.

16   A.        I do.

17   Q.        And if you can with the telestrator, can you

18   circle what portions of what's on 129B that you recognize?

19             For the record, the witness has circled

20   abu_sbc.net.

21             What do you recognize that to be?

22   A.        My E-mail address.

23   Q.        Put up 129E, please.  Do you recognize what's

24   depicted in Government's 129E for identification?

25   A.        Yes, I do.
```

1  Q.        Tell the members of the jury what that is, best

2  that you recall?

3  A.        It is a traffic ticket.

4  Q.        Is there anything in particular that you recall

5  about that traffic ticket?

6  A.        That is the traffic ticket Mohammed Amawi asked

7  me to bring with him on the second trip.

8  Q.        And I want you to take a look at Government's

9  Exhibit 129 -- strike that.

10          While you were in Jordan the second time, did you

11 have occasion to meet some of the same people that you met

12 on your first trip to Jordan with Mohammed Amawi?

13 A.        Yes.

14 Q.        And did you meet new people as well?

15 A.        Yes.

16 Q.        Did you -- did Mohammed Amawi tell you about

17 opening and participating in a business with him in Jordan?

18 A.        Yes.

19 Q.        And while you were there, did you also discuss

20 traveling to other countries?

21 A.        Yes.

22 Q.        Did you try to determine if Mohammed Amawi could

23 take you -- or the computers that you brought to Syria on

24 the second trip?

25 A.        Yes.

1    Q.        And can you tell us basically in substance what

2    it is Mohammed Amawi said about that while you were in

3    Jordan in December of 2005?

4    A.        That is -- that it is difficult to get into

5    Syria, because there were so many people watching; and the

6    brothers were scared of this town.  They were unable to

7    even go to the mosque.

8    Q.        Did Mohammed Amawi indicate to you what Islamic

9    scholars were saying about going into Iraq at that time?

10   A.        Yes.  Basically, if you didn't know of anyone

11   inside of Iraq, that it would be difficult for a Jihadi to

12   go into Iraq.

13             MR. HARTMAN:  Objection.

14             THE COURT:  Again, this is something that

15   Mr. Amawi told you; is that correct?

16   A.        Yes, Your Honor.

17             THE COURT:  And again, ladies and gentlemen, you

18   may consider it as evidence as to the statements that were

19   made, but not whether it's true or not.  You cannot

20   consider as proof one way or the other as to whether it's

21   difficult to get into Iraq or not.  You simply -- this is

22   simply testimony of something he was said that he was told

23   by Mr. Amawi, and that's all you can consider it for.

24   A.        And basically if you have any support inside of

25   Iraq, that you would just be a burden on the other brothers

1    in Iraq.

2              THE COURT:  And again, that is not evidence that

3    that is so.

4    BY MR. SOFER:

5    Q.         Now, do you recall when it was you got to Jordan,

6    what date it was on the second trip?

7    A.         I believe it was December the 14th.

8    Q.         And on December the 20th, did there come a time

9    when you met somebody of interest?

10   A.         Dr. Marwan Al-Kasay.

11             THE COURT:  How do you spell it?  Do you

12   remember?

13   A.         Last name, A-L, hyphen, K-A-S-A-Y.

14   BY MR. SOFER:

15   Q.         And did Dr. Al-Kasay give something to Mohammed

16   Amawi in your presence?

17   A.         Yes.

18   Q.         And can you tell the members of the jury what you

19   were able to see of what it was that Dr. Al-Kasay gave to

20   Mohammed Amawi?

21   A.         A book with Zarquawi on the front of it.

22   Q.         And I want to put up 130, please, for

23   identification.  Can you tell the members of the jury if

24   you recognize that?

25   A.         Yes, I do.

```
1    Q.        What is it?

2    A.        It is a picture of a book that was given to

3    Mohammed Amawi by Dr. Al-Kasay.

4    Q.        Does it fairly and accurately represent the way

5    that book looked on or about December 20th when you were

6    with Mohammed Amawi?

7    A.        Yes.

8              MR. SOFER:  And at this time, the Government

9    offers 130.

10             THE COURT:  It will be admitted.

11                  (Government's Exhibit Number 130 was

12                   admitted into evidence.)

13   BY MR. SOFER:

14   Q.        Did -- did you purchase additional copies of this

15   book?

16   A.        Yes, I did.

17   Q.        And about when and where did you do that?

18   A.        About 24 to 48 hours after Mr. Amawi received

19   that book in the town of Irbid at a bookstore.

20   Q.        And did you give copies of this book to any of

21   the other defendants in the case when you returned to the

22   United States?

23   A.        Yes, I did.

24   Q.        And who did you give a copy to?

25   A.        Wassim Masloum.
```

```
 1   Q.          Did there come a time in the latter portion of

 2   the trip when Mohammed Amawi said something that concerned

 3   you?

 4   A.          Yes.

 5   Q.          And can you tell us approximately when that was?

 6   A.          I believe it would be around the 21st of

 7   December.

 8   Q.          Okay.  And can you tell us basically and in

 9   substance what it was that Mohammed Amawi said?

10   A.          Basically, he made the statement that don't be

11   surprised when I'm gone.

12   Q.          When you say I'm gone, who was he referring to?

13   A.          He was referring to me.  When I return back to

14   the states, don't be surprised that when you're gone that I

15   go do shahiid.

16   Q.          What does shahiid mean, so you understand it?

17   A.          Suicide.

18   Q.          And did he say anything else?

19   A.          That he had seen a video, and that he couldn't

20   decide what he wanted to do.

21   Q.          Okay.  And what did you say in response in

22   substance?

23   A.          Basically, Make sure you give me a call before

24   you go and to take the Thuraya satellite phone with you.

25   If you're able to get into Iraq, possibly I can support you
```

```
 1   while you're over there.
 2   Q.        And why did you say that?
 3   A.        To at least find out his whereabouts, so he could
 4   stay in contact with me.
 5   Q.        Did there come a time when you left Jordan in
 6   December of 2005?
 7   A.        Yes, December 26th.
 8   Q.        Did Mohammed Amawi return to the United States
 9   with you?
10   A.        He did not.
11   Q.        And did you leave the items that you described
12   that you brought to Jordan to give to Mohammed Amawi in
13   Jordan?
14   A.        Yes.
15   Q.        And did you take any of those items back?
16   A.        I took at least two Sony Vaio laptops, returned
17   them.
18   Q.        When you came back to the United States, did you
19   continue to occasionally speak to Mohammed Amawi?
20   A.        Yes.
21   Q.        And can you give us the general subject matters
22   that you spoke to him about?
23   A.        Basically about businesses, the internet cafe,
24   the cars.  He had wanted me to contact Marwan El-Hindi to
25   inquire about grants for orphans and basically internet
```

1    store and cafe.

2    Q.       Did there come a time in late January of 2006

3    when you spoke to Defendant Wassim Masloum?

4    A.       Yes.

5    Q.       And is that the occasion when you gave Wassim

6    Masloum a copy of the book with Zarquawi's picture on it?

7    A.       Yes.

8    Q.       And specifically, I want to address January 30th,

9    2006.  Did you have a conversation with Wassim Masloum that

10   day?

11   A.       Yes.

12   Q.       And we're going to play Exhibit 4-69, 1D115,

13   January 30th, 2006, clip 2A, please.

14                   (Audio playing.)

15   Q.       Okay.  I want to direct your attention to

16   approximately February 17th or 18th of 2006.  Did you

17   receive a call from the FBI on or about those dates?

18   A.       Yes.

19   Q.       And can you tell the members of the jury what

20   that call was?

21   A.       Basically, I was informed to get out of my

22   apartment in Toledo.

23   Q.       And did they indicate how much time you had to

24   get out of your apartment?

25   A.       Twenty-four hours or less.

1    Q.       And what did you have to do to get out of that

2    apartment?

3    A.       I had -- had to pack up and make a decision on

4    what I was taking, what was staying and what was going to

5    be thrown away.

6    Q.       And did you manage to pack up your apartment

7    during that period of time?

8             MR. HARTMAN:  Objection.  Your Honor, may we

9    approach, please?

10                (A sidebar conference was had on the

11                record.)

12            MR. HARTMAN:  Judge --

13            THE COURT:  You can speak a little louder.

14            MR. HARTMAN:  -- I don't think there's any way

15   this is offered for anything but the truth of the fact that

16   Griffin was -- that an arrest was going to be imminent and

17   that he was going to be in danger and had to be leaving.

18            THE COURT:  Where are you going with this?

19            MR. SOFER:  I'm done with the questions about

20   what it is that the FBI said.  All I -- again, this

21   objection's been raised occasionally, just elicited this,

22   not for its truth, but rather explain why it is he packed

23   up his apartment and left.  I won't ask any further

24   questions about what was said.

25            THE COURT:  Don't try to moderate any suggestion

```
 1   of danger.  Just ask him, what did you do?  Where did you
 2   go?
 3              MR. SOFER:  We're all but done with it anyway.
 4              THE COURT:  Okay.
 5                   (Sidebar concluded.)
 6              THE COURT:  The answer may stand.
 7              And you may continue.
 8   BY MR. SOFER:
 9   Q.        By the way, which apartment was this that you
10   moved out of?
11   A.        LaSalle apartment building.
12   Q.        That's just a couple blocks from the courthouse
13   here, right?
14   A.        Yes.
15   Q.        And did there come a time later -- you testified
16   about this a little bit -- where you found items or papers
17   that were related to this particular case?
18   A.        Yes.
19   Q.        And after -- after you found these items, what
20   did you do?
21   A.        I turned them over to the FBI.
22   Q.        And did the FBI ask you to search through your
23   boxes, your papers, your property to find any other items
24   or papers that were related to the case?
25   A.        Yes.
```

```
 1   Q.        I want to show you what's been marked 131B for
 2   identification and ask you if you recognize this.
 3   A.        That is my business card.
 4   Q.        And I don't know if you can tell, is that -- do
 5   you recognize the telephone number on that?
 6   A.        The one that's printed, or the one that's
 7   written?
 8   Q.        I'm sorry.  The one that's written on top of the
 9   card.
10   A.        I do not.
11   Q.        And can you put up 131C, please.  Do you see
12   anything on 131C for identification that you recognize?
13   A.        Yes, I do.
14   Q.        Tell the members of the jury what that is and
15   circle it, if you can, using the telestrator?
16             THE COURT:  Do you know what this is, this piece
17   of paper or document?
18   A.        It looks like just a piece of paper to me, Your
19   Honor.
20             THE COURT:  Do you know what it is?
21   A.        A piece of paper.
22             THE COURT:  But I mean, is it one of the things
23   you found later?  Where does it come from?
24   A.        You've got me.
25             MR. HARTMAN:  Objection.  Foundation.
```

```
1                THE COURT:  I would think.

2                MR. SOFER:  I will -- we'll connect this up,

3    Judge; or we can recall Mr. Griffin two or three times.

4                THE COURT:  No.  Go ahead.  That's fine.

5    BY MR. SOFER:

6    Q.          Please circle that which you recognize.

7    A.          (Witness complies.)

8    Q.          And for the record, you've circled a telephone

9    number -- or a number, (419)215-6109.  Can you tell the

10   members of the jury if you recall what that number

11   represents?

12   A.          Marwan El-Hindi's cell phone number.

13   Q.          Okay.  I want to show you what's been marked 131D

14   for identification.

15               And very small, can we magnify the bottom part of

16   the document?

17               Is there something in what's been magnified now

18   on 131D that you recognize?

19   A.          Yes.

20   Q.          And can you circle it, again, using the

21   telestrator?

22   A.          (Witness complies.)

23   Q.          Can you tell the members of the jury what that

24   is?

25   A.          That is my cell phone number.
```

```
 1   Q.        Okay.  And for the record, the witness has

 2   circled it looks like cell (419)787-3906.

 3             Can we back -- back out of 131D and magnify the

 4   top portion of the document?

 5             Do you see anything on there that you recognize?

 6   A.        Yes.

 7   Q.        Can you circle -- again, using the telestrator on

 8   what's been magnified, the top of the document; that is,

 9   131D on the document, what it is you recognize?

10   A.        (Witness complies.)

11   Q.        And for the record, the witness has circled the

12   number (419) it looks like 787-3906.

13             Again, can you tell us what that is?

14   A.        That is my cell phone number.

15   Q.        Okay.  Can we put up 131E, please.  Do you

16   recognize what's depicted in Government's Exhibit 131E?

17   A.        Yes.

18   Q.        Tell the members of the jury what that is?

19   A.        Mohammed Amawi's business card.

20   Q.        Okay.  And is that from a particular business?

21   A.        AZ Travel.

22   Q.        And is that the AZ Travel you described before?

23   A.        Yes.

24   Q.        Okay.  And I want to show you what's been marked

25   Government's Exhibit Number 131G, please.  Do you recognize
```

```
 1   that?
 2   A.        That is my business card.
 3   Q.        And this -- this business card, is this the type
 4   of business card that you handed out on February 16th, 2005
 5   when all three of the defendants met together?
 6   A.        Yes.
 7             MR. HARTMAN:  I'm sorry.  This -- I'm sorry.  Can
 8   we have a clarification, same or same type?
 9   BY MR. SOFER:
10   Q.        Same type?
11             MR. HARTMAN:  Thanks.
12   A.        Yes.
13   BY MR. SOFER:
14   Q.        Okay.  And I want to show you what's been marked
15   132E, please.  And is that the same type of business card,
16   again, that you handed out?
17   A.        Yes.
18   Q.        And show the back of that document.  And again, I
19   think you testified about this before.  Is some of the
20   writing on the back of that card familiar to you?
21   A.        Yes.
22   Q.        Can you tell us the things that you recognize as
23   being something that you -- that you know?
24   A.        The abu_amed@earthlink.com.
25   Q.        And what was that?
```

```
 1   A.        That was my contact overseas.

 2   Q.        Okay.  And anything else?

 3   A.        And the abu_jihad and

 4   darrenlgriffin@sbcglobal.net, those are my personal E-mail

 5   addresses.

 6   Q.        Okay.  I want to show you what's been marked

 7   Government's Exhibit Number 136 for identification, please.

 8   Do you recognize this?

 9   A.        Yes.

10   Q.        Tell the members of the jury what that is?

11   A.        One of -- of Mohammed Amawi's desktop computers.

12   Q.        This is not the computer you brought over to

13   Jordan, or is it?

14   A.        It is not.

15   Q.        Is this one of the computers that was in his home

16   during the times that -- some of the times that you visited

17   him throughout the course of your testimony?

18   A.        Yes.

19             MR. SOFER:  And Judge, the Government needs about

20   four or five minutes just to make sure that we've covered

21   everything.  If we can just take a very quick break, we'll

22   be done I'm sure in three or four minutes afterwards.

23             THE COURT:  Okay.  Ladies and gentlemen, why

24   don't you stand up and stretch, if you want?

25             In other words, are you indicating that you
```

```
 1   anticipate that your direct examination of Mr. Griffin is

 2   about to end?

 3            MR. SOFER:  I'm sorry, Judge.

 4            THE COURT:  Do you anticipate that once you check

 5   what you want to check to make sure that you've done what

 6   you want to do that Mr. Griffin's direct examination will

 7   end?

 8            MR. SOFER:  That's correct, Your Honor.

 9            THE COURT:  Okay.  And ladies and gentlemen, if

10   that is so, then I would expect to adjourn for the day and

11   perhaps even longer; but we'll find out from Mr. Sofer

12   whether he has anymore questions.

13                 (A brief recess was taken.)

14            MR. SOFER:  Okay.  Judge, just a few quick

15   questions and we're done.

16   BY MR. SOFER:

17   Q.       I'd like to show you what's been marked

18   Government's Exhibit Number 126 for identification.  Can

19   you tell the members of the jury what that is?

20   A.       It is a Thuraya satellite telephone.

21   Q.       And was that the Thuraya satellite telephone that

22   you left with Mohammed Amawi in August of 2006?

23   A.       Yes.

24   Q.       Does it fairly and accurately represent the way

25   that phone looked at approximately that date?
```

1   A.        Yes.

2             MR. SOFER:  And the Government offers Government

3   Exhibit Number 126 into evidence.

4             THE COURT:  It will be admitted.

5                   (Government's Exhibit Number 126 was

6                   admitted into evidence.)

7   BY MR. SOFER:

8   Q.        I want to show you what's been marked 125CD,

9   please.  Can you tell us whether you recognize what's

10  depicted in 125CD?

11  A.        It is the Jeep Cherokee with Ohio license plate.

12  Q.        Okay.  And can you circle that license plate for

13  us, please?

14  A.        (Witness complies.)

15  Q.        For the record, the witness has circled a license

16  plate on the back that says DDE -- it might say DOE --

17  2734.

18            And does this fairly and accurately represent the

19  way that vehicle looked when it -- when you saw it in

20  August of 2006 at Mohammed Amawi's family's residence?

21  A.        Yes.

22            MR. SOFER:  And the Government offers 125CD into

23  evidence.

24            THE COURT:  It will be admitted.

25                  (Government's Exhibit Number 125CD was

```
 1                    admitted into evidence.)
 2    BY MR. SOFER:
 3    Q.        I want to show you what's been marked
 4    Government's Exhibit 159-005, please.  Do you recognize
 5    anything on this particular exhibit; that is, 125 --
 6    159-005?
 7    A.        Yes.
 8    Q.        And can you circle what it is you recognize
 9    there --
10    A.        (Witness complies.)
11    Q.        -- or put a line through it?  Let's try again.
12              THE COURT:  Do you recognize the writing?
13    A.        I don't recognize the writing.
14              THE COURT:  I meant what's written.
15    A.        Yes, I do, Your Honor.
16              THE COURT:  And that is?
17    A.        My name.
18    BY MR. SOFER:
19    Q.        And what's next to it?
20    A.        My cell phone number.
21    Q.        Okay.  And let me show you what's been marked
22    Government Exhibit Number 128A.  Do you recognize that
23    card?
24    A.        Yes.
25    Q.        Okay.  Is that a card that you possessed at one
```

```
 1  time?

 2  A.        Yes.

 3  Q.        And let's take a look at 128-002, I think it is.

 4  Was that written on the back of that card?

 5  A.        Yes.

 6  Q.        And do you recognize the writing on there?

 7  A.        That is my handwriting.

 8            MR. SOFER:  And at this time, the Government

 9  offers 128A and 128 -- and the back of that as 128A?

10            THE COURT:  What do those numbers signal?

11  A.        I cannot recall, Your Honor.

12            THE COURT:  Okay.  Fine.

13            MR. BOSS:  Can you read them, please?

14            MR. SOFER:  They're on the screen.  If you want

15  me to read them for the record, it looks like 79.  I don't

16  know what the next --

17  A.        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.

18  BY MR. SOFER:

19  Q.        And what else is written on there?

20  A.        Second folder, last video.

21            MR. SOFER:  Okay.  We have no further questions

22  for Mr. Griffin, Your Honor.

23            THE COURT:  Okay.  Ladies and gentlemen, that

24  completes Mr. Griffin's direct testimony, subject possibly

25  to a couple questions that may occur to you when we resume,
```

```
 1    anticipate that completes his direct testimony.

 2              A couple things, I think, Mr. Sofer, that

 3    actually are done with this phase of trial a good bit

 4    sooner than we might have anticipated; is that correct?

 5              MR. SOFER:  By a matter of days maybe, Your

 6    Honor.  Yes, Judge.

 7              THE COURT:  And ladies and gentlemen, I will

 8    consult with counsel in terms of how much we are going to

 9    take.  I doubt whether we would start sooner than late

10    morning or noontime tomorrow; and indeed, we may even have

11    a longer adjournment.

12              The fact that we have completed Mr. Griffin's

13    direct testimony sooner may -- and I'll talk to counsel

14    about this -- have -- may require -- take a bit more time

15    getting prepared for his cross-examination.  So what I

16    suggest you do, we'll try to make that decision by

17    midafternoon today, about 3:00 or so, and have the

18    announcement on the juror phone as to when we will resume.

19    I suppose there's a very slight outside chance we may wait

20    even until next week; but in any event, the earliest will

21    be around this time tomorrow, so -- which means we are

22    adjourned for the day.

23              I understand -- understand you've asked Amy about

24    watching the TV that's upstairs, and I'll give you an

25    answer to that whenever it is you return.  In the meantime,
```

```
 1   I would ask that you not watch it.  Okay.  Don't talk about

 2   the case.  Don't think about the case, however long --

 3   brief or long this adjournment may be.  You've heard part

 4   of the evidence.  There's -- the Government still has a

 5   fair amount of evidence to present.

 6              Can you give any sense of the time table on that,

 7   Mr. Sofer, your best guess just so the jury --

 8              MR. SOFER:  We think somewhere between one and

 9   three weeks, depending on Your Honor's rulings.

10              THE COURT:  Okay.  I guess it may in -- affect

11   how much time the Government still takes; but even so, it

12   is my sense that the Government completing its case within

13   another three weeks or so would still keep us somewhat

14   ahead of the time table that we talked about during voir

15   dire.  Of course, there could be a lot of slippage in

16   between for one reason or another; but I'm just trying to

17   let you folks know that we seem to be moving along more

18   quickly than initially anticipated, which, of course, I'm

19   sure pleases all of you.

20              So keep an open mind.  Don't talk about the case

21   amongst yourselves or with anybody else, and we will see

22   you when we next resume.  You're free to go or you can have

23   your lunch or whatever.

24              (Jury excused.)

25              THE COURT:  You may be seated.  Mr. Griffin, you
```

1  may step down.

2          Okay.  I assume that you would move any exhibits

3  that you happened to overlook.

4          MR. SOFER:  We will, but I'd like to take a look

5  at it.  I think we've moved everything.

6          THE COURT:  I think you have too.

7          MR. SOFER:  A number of -- of these exhibits are

8  subject to connection, particularly the last ones that we

9  went through.  I hope that was obvious.

10         THE COURT:  Yeah.

11         MR. SOFER:  But if it's okay, during whatever

12 break we take, we'd like an opportunity just to make sure

13 we've --

14         THE COURT:  Absolutely.

15         MR. SOFER:  -- moved what needed to be moved.

16         THE COURT:  Actually, it's normally my custom to

17 tell counsel to wait until the end of the presentation of

18 the direct case to move anything, so you're not -- you're

19 not missing the opportunity.

20         MR. SOFER:  I'm sorry if I violated that rule.

21         THE COURT:  That's all right.  Doesn't matter one

22 way or the other.

23         How do you want to proceed?  You guys want to

24 talk for a while, maybe break for half-hour or hour or

25 whatever?  It's up to you.

1          MR. BOSS:  Judge, maybe I can just give the Court

2    some perspective of how I perceive our need now to delay

3    until next Tuesday.

4          MR. SOFER:  Judge, if I --

5          THE COURT:  Let me -- Counsel, why don't you come

6    up here for a second?  Oh --

7          MR. BOSS:  Does this --

8          MR. SOFER:  I hate to say this, Judge; but I

9    don't know what Mr. Boss is going to say.  But I actually

10   think this is an issue that at least has to be -- obviously

11   be on the record, and it's interlinked with a number of

12   other issues that we've discussed.  And so it's your call,

13   Your Honor.  I'm not going to sit here and say it needs to

14   go to the press.  We have no interest in seeing the press

15   at all about this.

16         THE COURT:  My concern is simply that there might

17   be some report about the defense said it would like

18   additional time for whatever reason; and were that to get

19   reported, I would assume it wouldn't come to the attention

20   of the jury.  But I'd rather that we avoid that risk,

21   that's all.  So let me -- why don't you tell us?

22         MR. BOSS:  Thank you, Judge.  Well, the dynamics

23   of the case have been -- you know, it's been a long,

24   unfolding case.  Most recently the Amawi team had new

25   counsel come on board, which among other things, as a

1    courtesy to them, we agreed in all probability we would

2    start our cross-examination of Mr. Griffin first.  So if

3    they start first -- and I certainly have to problem, we can

4    start right now, this afternoon.  But if they don't and we

5    have to start first, a couple of complications are that

6    based on the Government's streamlining of their case.

7              THE COURT:  For which I'm grateful.

8              MR. BOSS:  As are we.

9              We have our initial -- not intention -- well,

10   intention, was to present a wide, wide scope of all these

11   tapes.  That's no longer necessary in my estimation.  We

12   are going to pare our case down as they did.

13             MR. HARTMAN:  Substantially.

14             MR. BOSS:  And since we have to pare it down, we

15   now have to be removing materials that we were expecting to

16   go through.  That's one issue.

17             THE COURT:  And is your projection of at least

18   recorded evidence similar to theirs; in other words, the

19   video or whatever?

20             MR. BOSS:  I don't know what you mean by that.

21             THE COURT:  The screen, are you -- assuming that

22   you're going to have some audio evidence.

23             MR. BOSS:  There will be both audio and video.

24             THE COURT:  But my point is, is it -- it -- is

25   the technology the same that they have used?  In other

1    words, it will be a -- scrolling?

2         MR. BOSS:  We're trying to do that.  The answer

3    is yes.  We've -- in fact, Dave Hess, who's working with

4    us, has been present in court down in the media room since

5    the trial -- he's been in the media room since the trial

6    started working on the collating of the transcript

7    ledges -- the transcript of the audio and/or video.

8         What we have not yet given him are the clips that

9    we would be intending to use.  Because until we heard the

10   Government's case, we didn't know which clips.  We were

11   expecting that we were going to have another two to three

12   weeks based on the Government's initial representations of

13   the time that they would need to present their case before

14   which we would have to do it.

15        THE COURT:  To get this sorted out.

16        MR. BOSS:  So the time from now until the next

17   two or three weeks is when we were intending to present

18   those clips and have it nicely organized.

19        MR. HARTMAN:  We don't have them to the

20   Government yet either.

21        MR. BOSS:  We don't even have them all back.  We

22   have certain transcripts prepared by our court reporters

23   that are not yet in.  Everything that we've been getting,

24   we've been giving to the Government as we go.  Frankly,

25   we've been sitting in trial and have not checked the

 1   accuracy of those transcripts much.  We've been told by

 2   Mr. Sofer that they've had the pleasure of having a couple

 3   of them checked, and they're not satisfied with the

 4   accuracy of some of them.  It may -- may have a perfectly

 5   legitimate complaint, I don't know, because I haven't had a

 6   chance to check yet.

 7                 MR. SOFER:  And Judge, here.

 8                 THE COURT:  Let him finish up.

 9                 MR. BOSS:  That's pretty much the sum and

10   substance of it.  We think for us to present to the jury an

11   efficient, streamlined, shortened case by us, one which

12   contains accurate information as opposed to potentially

13   inaccurate scrolling transcripts and to give us and the

14   Government an opportunity to hash out any disagreements

15   about that, that we need to have between now and Tuesday.

16                 MR. IVEY:  I'll throw in something before

17   Mr. Sofer.  Excuse me.  The other problem we have is that

18   we have to coordinate three separate cross-examinations.

19                 THE COURT:  I understand.

20                 MR. IVEY:  And the issue that we're having is

21   we're all working with our visual evidence, so we all need

22   time to decide what we want to use, put it in, go over it

23   with him to make sure it's going to come out the way we

24   want and then also coordinate among the teams.  Everybody

25   doesn't need to show the same clip on some things.

```
 1              THE COURT:  That's right.

 2              MR. IVEY:  And then give -- and then give why we

 3    don't want to do.  And we it -- did this with opening

 4    statement if the Court will recall.

 5              THE COURT:  To segment, I understand, you have to

 6    have some overlap.

 7              MR. IVEY:  And then after we do that and get it

 8    coordinated, then Mr. Sofer's indicated that the

 9    Government, of course, gave us the benefit of seeing what

10    they were going to play we want to give it to him; and we

11    think that two days would make for actually a quicker

12    cross-examination next week as opposed to getting all this

13    done within 24 to 48 hours is going to be quite --

14              THE COURT:  Mr. Doughten?

15              MR. DOUGHTEN:  The last of the defense, it's true

16    we've actually sat down in certain areas of cross --

17    we've -- you know, the El-Hindi team do A, Amawi do B,

18    we'll do C -- so we don't -- we're not repeating each

19    other.  It would be difficult.  We thought about maybe

20    we'll jump ahead and go first.  The problem is we can't

21    coordinate what everybody else is going to use, that sort

22    of thing.  We believe, so the Court is aware, that if

23    things go as what we planned, because of the shortened

24    case, we have some clips we want to play; but we're going

25    to use the government -- what they gave us.  So, I don't
```

1  think there'll be any disagreement as to translation,

2  because we'll use the transcripts the Government supplied

3  us, so we don't have any.

4          THE COURT:  For Mr. Masloum?

5          MR. HARTMAN:  We will do a lot of that too

6  actually.

7          MR. WHITMER-RICH:  And we will do a fair amount

8  of that as well.

9          MR. HARTMAN:  Using the complaints they had about

10  their translations -- or their translations got a lot more

11  accurate overtime.

12          MR. DOUGHTEN:  And we've got updates, and that's

13  what happened to us.  The things that we were complaining

14  about, the Government has corrected.  They have given to us

15  insufficient time, so we're talking about less than a day

16  for ourselves.

17          THE COURT:  Let's hear it from Mr. Sofer.

18          MR. SOFER:  It's hard for me to think about where

19  to start with this; but the bottom line, Judge, is although

20  I understand what -- some of what counsel has said,

21  essentially, by going -- by streamlining the case, all

22  we've done is make their job easier, not harder.  Instead

23  of having to prepare for 300 transcripts, they've had to

24  prepare for far fewer.  It leaves one wondering what's been

25  happening this entire time beforehand.

```
 1              And I just -- what I think bothers me a little

 2     bit, frankly, Judge, is I can only imagine what the Court

 3     could say were the Government to come to the Court with a

 4     request like this in the middle of the trial when we've

 5     been -- sort of had our feet held to the fire to produce

 6     things early to make discovery early -- to make discovery

 7     beyond that was required by the law; and we've been happy

 8     to do it so that the whole reason that the Government

 9     complied with things that I don't think we actually would

10     have had to comply with legally was so that we could move

11     the case along.

12              Now, we've done that.  We've begged, not for days

13     or even weeks, but now for months to ask counsel for those

14     segments of the -- of the -- of the transcripts that they

15     were going to use.  And here's my problem with this, Judge.

16     Defense counsel had literally years to analyze some of --

17     of this.  They certainly had months to analyze the segments

18     that the Government designated for trial --

19              MR. HARTMAN:  That's not --

20              THE COURT:  Don't interrupt.

21              MR. SOFER:  -- we're going to get now.

22              What I'm concerned about is we're going to get

23     now in one day or two days the defense's version of

24     transcripts that they plan on introducing, I guess, through

25     Mr. Griffin; and how much time will the Government be given
```

1  now.  We don't even have them, as we sit here today, to

2  analyze their veracity, their accurateness, the accuracy.

3  The few that we've been able to look at so far that have

4  been given to us are wrong, Judge; and I think counsel is

5  even saying that they can't vouch for them.

6      And they're wrong in a very particular way, I

7  might add.  They're not wrong as the -- basically they're

8  wrong in ways that -- that I think manipulate the evidence.

9  I'd be happy -- more than happy to have a hearing about

10  this in which Your Honor listens to the tapes, and we --

11  because this is English, the ones we've been able to

12  analyze are in English -- and have Your Honor listen to

13  that which has been produced by the defense versus the

14  actual audio.  But conceivably -- and again, I have no idea

15  what volume we're talking about conceivably.  That hearing

16  could take two weeks if it really required you to sit there

17  and listen to all this.

18      So my concern isn't so much the two days -- or

19  day and a half, two days, even three or four days per se,

20  although I don't know why counsel frankly needs that under

21  the circumstances.  But my concern is what the system that

22  is now in place is going to actually put the Government

23  under this position where and what I think would be just

24  absolutely unfair would be to have transcripts played in

25  front of the jury, which even defense counsel at this late

```
1    time can't vouch for their accuracy.  I mean, that's -- to

2    me, that's the worst kind of danger to present evidence to

3    the jury.

4              THE COURT:  Well, that's -- let's back up for a

5    moment.  First, I think that the request for the time to do

6    the things that they're asking to do is appropriate

7    because, you know, they have had a very substantial

8    quantity of material obviously; but much of that have been

9    winnowed down.  And as in any defense case, the one that

10   you stand up to present and, indeed, in this instance stand

11   up to start cross-examining differs to a considerable

12   extent from what had been anticipated for some time.  And

13   to have, then, the continuing problems of getting

14   translators and translations and transcriptions that time

15   is lost.  So I -- I don't have a problem quite candidly

16   with the continuances as requested.

17             Now, I do have a concern, though, with the extent

18   to which you anticipate variant transcriptions.  And my

19   question to you folks is:  I had had -- toward the end of

20   what you were talking about, I had the impression that you

21   largely anticipate not disputing the Government's

22   transcriptions of the -- of what's being said in English;

23   and I'll indicate, quite candidly, they seemed, with very

24   random exceptions, to be accurate.

25             MR. BOSS:  I agree.
```

1           THE COURT:  And some -- there were things that I

2    heard that weren't in the transcription.  The Ottawa Hills

3    this morning, that's simply ignorance on the part of the

4    transcriber about the geography of Toledo.  So I -- I mean,

5    is that correct?

6           MR. BOSS:  That is correct.

7           THE COURT:  How soon can you get the

8    transcriptions that you propose offering?  It doesn't have

9    to be in the video format, can be in the -- can be in type

10   script format, okay, to Government -- counsel so that if

11   there is a problem we can try to address it before we start

12   playing that.  If we can't, we can't.  It wouldn't be the

13   first time that a jury's heard variant transcriptions and

14   be told again what they hear is -- is what is the evidence.

15           I would say that I doubt whether it would serve

16   the defendants' interest at all to project for the jury

17   variant -- variant transcriptions that simply ain't so.  I

18   mean, there's a lot of evaporation of credibility on the

19   part of counsel that, of course --

20           MR. HARTMAN:  Assuming we started with some.

21           THE COURT:  But -- you know, I think -- what's

22   your anticipated ETA on the transcriptions?

23           MR. BOSS:  The ones that the Government has

24   played thus far we are comfortable with them.  I asked

25   Mr. Sofer earlier this week if we could, indeed, just use

1    their services for those segments that are the same.  And I

2    believe he indicated that as long as we don't touch the

3    computer, it's okay.  And that's our intention at this

4    time, I think.  The ones that we have, we simply sent out

5    to court reporters to transcribe.  Every one of those that

6    we've gotten back, we've passed over to the government; but

7    frankly, haven't had the chance to check them out.

8              MR. HARTMAN:  About 40 of them.

9              THE COURT:  How many more are you waiting on

10   getting?  That's the most crucial question.

11             MR. BOSS:  We've received probably about 25 or

12   so.  I have a list.

13             THE COURT:  Okay.

14             MR. BOSS:  And the list we've given to the

15   Government.

16             MR. SOFER:  But Judge --

17             THE COURT:  No.  Wait a minute.  My question is:

18   How much initial transcription work has yet to be produced

19   of the kind of volume that remains to be produced?

20             MR. IVEY:  Let me just say this:  I'm not sure

21   what Mr. Sofer's referring to; but with respect to Amawi,

22   we have tailored 95 percent of our anticipated cross on the

23   transcript the Government used; or if we're going to add

24   transcript, it's part of the Government's transcript that

25   they chose not to play for the jury that we would play to

```
 1   fill in.  So, I would think we are going to have -- in

 2   terms of us, we're going to have very little to --

 3             THE COURT:  Additional.

 4             MR. IVEY:  -- that Mr. Sofer will dispute that's

 5   going to require hearings, because we feel we can most --

 6   make most of -- of our points on what they produced.  So, I

 7   don't know.

 8             THE COURT:  My question remains -- okay.  My

 9   question remains:  In terms of those things that you folks

10   have asked be transcribed, because either you have a

11   problem with the Government transcription or it's something

12   that has not been transcribed by the Government, how much

13   remains to be produced; and when did the Government and you

14   get it, so if there are problems I can be alerted?  Best

15   guess, or do you want to maybe adjourn for lunch and try to

16   find out?  And we can have this conversation in a half-hour

17   or hour.

18             MR. WHITMER-RICH:  We can talk about whole

19   transcripts globally.  We anticipate that we will use only

20   small sections of whole transcripts; and so there's

21   certainly no reason, I don't think, for the Government to

22   try to go through a 200-page transcript.

23             THE COURT:  Can you and are you willing to -- and

24   I think you should be, quite candidly, willing to

25   designate, you know, conversation of this date, pages this
```

```
 1   to that and being somewhat expansive and realizing you
 2   might even cut down more.  But common understanding would
 3   be absent so, you know, lightening hitting you, in which
 4   case I would expect immediate notice to the Government.  So
 5   in other words, you can basically designate.
 6           MR. WHITMER-RICH:  Yes, we would anticipate that
 7   we would try to produce as quickly; and that's honestly why
 8   I wasn't in court yesterday, Your Honor.  I spent the
 9   entire day trying to create clips to get to visual evidence
10   to start creating these videos or audios that we'll play
11   with the transcript.  And you know, we'll start trying to
12   get those to the Government on a rolling basis as we create
13   them.  And as for the sections that are not -- that aren't
14   from Government transcripts, I -- there will not be an
15   enormous quantity of that material.  I --
16           THE COURT:  I'm still not getting an answer.  Let
17   me --
18           MR. IVEY:  I don't think we've got one.
19           THE COURT:  How soon can you call your
20   transcribers and get some sense?
21           MR. HARTMAN:  We can get a sense by this
22   afternoon.
23           THE COURT:  Why don't we do that?  I mean, as I
24   said, I don't have a problem with continuing the case until
25   Tuesday, because we seem to be moving very expeditiously
```

```
 1    through it.  I don't want to get bogged down.  I will also

 2    say -- Amy, what does Monday look like?

 3            The only time I would have available before

 4    Tuesday, but I'm more than willing to provide it, would be

 5    Sunday afternoon or Sunday evening.  My wife left town

 6    today, and she's coming back Sunday afternoon sometime or

 7    even Sunday morning if people were ready to go then.

 8            I'm not sure we'll have court reporters or

 9    whatever.  We'd have to do whatever we have to do.  If we

10    need a contract reporter, we would or Monday evening around

11    5:00.  If we had to carryover to Tuesday, we would; but

12    Lord knows, I hope that we wouldn't.  And I candidly don't

13    anticipate that's going to be the kind of problem that you

14    understandably, Mr. Sofer --

15            MR. BOSS:  I don't anticipate that we're going to

16    have disputes about this.  The tapes should be accurate.

17    We want them accurate just like you do.

18            THE COURT:  Of course.

19            MR. BOSS:  The -- I know that you've taken your

20    segments that you've put in your excerpts.

21            THE COURT:  Let me ask you this:  Having

22    indicated at this point that I am willing to continue

23    the -- you know, to resume on Tuesday morning, why don't

24    you guys try to spend some time the next half-hour or so,

25    whatever, finding out what you can find out in terms of the
```

```
 1    answer to my question, which is really Mr. Sofer's question
 2    what are we talking about?
 3            If -- if you're talking 40 pages -- four pages,
 4    40 pages, that's a lot different than if you're talking
 5    400 or 4,000 pages of stuff that have to be gone through
 6    and I think what we need to know collectively, so we can
 7    all make sure that we can and will start on Tuesday,
 8    because I intend to.  I don't want to go any further than
 9    that.
10            Is that -- let's find out what the dimensions of
11    what needs to be done are, and we'll go from there.  And
12    we'll work out -- try to find out from your transcribers,
13    How soon can you get us this stuff?
14            MR. HARTMAN:  We'll do that.  And the
15    Government -- by the way, we'll talk to you about using the
16    portions that we're going to use of yourself; and we can
17    start identifying those for you.  I mean, if you're
18    comfortable with that, we can start doing that by tomorrow
19    or Friday.
20            THE COURT:  I have a question too that might help
21    us in getting to that end quicker too.  I know that you've
22    got your segments identified that had been in the
23    transcription played in sync with the audio.  If something
24    is just before that or just after it, has that stuff all
25    been synced also?
```

1          MR. SOFER:  No.  We've cut out the portions for

2    our presentation that we wanted to put in.  There are --

3    and Judge, this goes to another issue, which, again, I --

4    I'm trying to say this in a discreet way; but I mean, I

5    just think it's outrageous that we are having this

6    conversation at sidebar after the direct testimony of the

7    first witness which has taken three weeks.  But putting

8    that issue aside and I'm most worried about --

9    Your Honor -- for instance, Your Honor said, Maybe we'll

10   just -- it won't be the first time that a jury's had two

11   sets of transcripts.  I don't think that's fair to the

12   Government.

13          THE COURT:  I understand that.  I'm saying

14   absolute, utter, worse case scenario.  And on the other

15   hand, from what I've heard of the transcriptions, to the

16   extent that I've heard something different than what was

17   transcribed, it was miniscule.  I mean, it was an inaudible

18   that didn't seem inaudible to me -- or I think I heard

19   something -- and it was indicated as inaudible.  And Lord

20   knows there was very little inaudible.  And otherwise, so I

21   don't envision to the extent that they are using stuff that

22   you've already transcribed and displayed to the jury that

23   there's going to be any deviation or maybe a word here or

24   word there.

25          Likewise, given the moderately good to quite good

1    audibility of the tapes that we've heard so far, I can't

2    imagine that the variance unless they're in the car or

3    there's background noise; but nonetheless, that there are

4    going to be any major surprises or discrepancies.  They may

5    be relatively minor.  If they're not, I will try to deal

6    with them, time permitting.

7         And my point simply is:  The more deviant their

8    tapes are from the Government's, my expectation is it's not

9    going down to their credit, just given what I've heard so

10   far about the generally better than usual audio quality.

11   So, I mean, I really think they have a major incentive in

12   producing something that the Government ultimately, I

13   expect, is unlikely to quarrel with, because for reasons I

14   said earlier.

15        In terms of the timing of this, I don't fault

16   anybody.  There have been massive delays in getting this

17   stuff out, so I don't fault anybody.  And you know, I also

18   understand a situation where despite the numbers of

19   attorneys that are on this case --

20        MR. BOSS:  Maybe because of --

21        THE COURT:  I mean, just work -- there's a lot

22   that has to be getting done.  And so -- and I don't think

23   the Government is either being or at risk of being in any

24   way prejudiced at all whatsoever.  And I also -- just as I

25   think at one point you asked me for a little bit of time to

1 do this or that, because in the expectation that it would

2 take shorter rather than longer, that's the same.  They're

3 singing another version of the same song.

4    MR. BOSS:  And I don't disagree with that, Judge.

5 And all I'm saying a little bit of time is one thing.

6    Two just quick points, and we can bring this up

7 later.  I think concrete examples, I think, as usual make

8 this more clear.  We have seen variance in what was sent to

9 us; and the variance, as I said, has a theme to it.  One --

10 I don't think that theme goes well for the defense, but I

11 don't think putting that in front of the jury is fair

12 either.  And so anyway --

13    THE COURT:  Mr. Sofer?

14    MR. SOFER:  Maybe by the time they've looked at

15 it, because Counsel --

16    THE COURT:  I'm going to interrupt and tell you

17 what we're going to do.  Let's get some -- but not -- it's

18 up to you how many want to show back up.  Why don't we plan

19 to talk about 2:00 and have kind of a status conference on

20 the -- the extent to which you presently anticipate using

21 transcription, other than those provided by the Government,

22 whether they were provided and shown or provided and

23 haven't been shown.  Okay?

24    I'm talking about material as to which the

25 Government has not provided transcriptions:

```
 1              How voluminous do each of you anticipate that

 2    stuff is going to be, number one?

 3              And number two, how soon can the transcribers

 4    provide you with their transcriptions?

 5              And number three, and probably most important,

 6    each of these is, is how soon can you designate for the

 7    Government of those yet to be provided non-Government

 8    transcriptions?

 9              How soon can you provide the designations of that

10    stuff that you presently anticipate you're likely to be

11    playing and displaying transcripts you have to the jury?

12              And I'd like to know that by 2:00 to the extent

13    you can tell me simply so that everybody knows where we are

14    in that process in that overall project; and from that,

15    perhaps gain some sense of the extent to which there are

16    major -- majorly squabbles about the accuracy of the

17    transcriptions.

18              If there are, I will find time somewhere to sit

19    down and do -- if it's humanly possible, to do the

20    necessary determination; and if I cannot, then as a

21    fallback, worse case scenario from the Government's

22    prospective but I think probably from the defense

23    prospective ultimately as well, unless there's serious

24    problem -- problems with the audibility of the tapes, you

25    know, play the variant variations; and I'll give the
```

```
 1    instruction.  Okay?

 2            But let's get -- somebody show up in chambers

 3    with a court reporter at 2:00.

 4                    (A brief recess was taken.)

 5                    (All Counsel and defendants in courtroom.)

 6            THE COURT:  Back to work.  Let's turn to the

 7    question of where you guys are going to be on the

 8    transcripts and all that.

 9            Mr. Hartman, you're the --

10            MR. HARTMAN:  Well, Judge, I have just received a

11    fax of the -- that I'm trying to go over right now of what

12    we have received and what we are waiting to receive; and it

13    means very little to me without taking some time, frankly.

14    It looks -- it looks as though we have received back about

15    three-quarters of what we sent out to be done.

16            THE COURT:  Okay.

17            MR. HARTMAN:  Most of that has been recent,

18    because we've had to hire new people.  And I do have

19    someone here that -- a lot of them that we've gotten can

20    be -- have actually been sent to visual evidence already to

21    begin the process.

22            THE COURT:  Will there be a chance for the

23    Government to sort of filter through the Government -- so

24    any disputes that need to be resolved can be resolved?

25    That's crucial.
```

```
 1          MR. HARTMAN:  We will do whatever we have to do

 2   to give them what we're going to use as soon as possible,

 3   so they can do that.

 4          THE COURT:  So, in time, that you can be in touch

 5   with visual evidence to fix whatever needs fixing.

 6          MR. BOSS:  Your Honor, I spoke over the last hour

 7   with the visual evidence representative; and he advised me

 8   that he can pretty much do it on the fly.  But if there's a

 9   correction that needs to be done, it's very simple for him

10   to do so.

11          THE COURT:  So, technology -- technology's not

12   the issue?

13          MR. BOSS:  Correct.

14          MR. SOFER:  Judge, if I may, part of the reason I

15   think the Government's skeptical about some of this --

16          THE COURT:  Let's hear from the other folks,

17   okay.

18          MR. WHITMER-RICH:  We anticipate of the -- again,

19   the bulk of what we will play during Mr. Griffin's

20   cross-examination will be from the Government's transcripts

21   that they have provided.  We would expect that of the audio

22   and video that was not transcribed and, therefore, that we

23   are getting transcribed as a defense group, that at most,

24   we might have eight to ten clips from those materials; and

25   those clips would likely be --
```

1          THE COURT:  The equivalent of a few pages each.

2          MR. WHITMER-RICH:  At most.  So, I would think 40

3    pages total is the high estimate; and we -- we will start

4    to be able to, I think, produce some of that maybe even

5    later today.  Some of it I don't think we have yet.  It

6    consists of some of the stuff that hasn't been produced

7    yet.  But on a rolling basis, I think we'll be able to

8    start identifying the exact clip that we'll be playing, so

9    it can be checked for accuracy.

10          MR. DOUGHTEN:  Your Honor, any tape, document or

11    exhibit that we would intend on using has been supplied to

12    us by the Government, so we don't expect any problems

13    whatsoever.

14          THE COURT:  Okay.

15          MR. SOFER:  And Judge, of the three varieties of

16    issues, I think we're obviously most worried about that

17    coming from Mr. Hartman and Mr. Boss.  For us to analyze 40

18    pages of text as a practical matter really means we need --

19    we need to call people in for the weekend.  We need a team

20    ready to be able to take a look at this.  We need this

21    stuff no later than I would say Friday for us to make

22    Tuesday.

23          THE COURT:  I would hope you would have it sooner

24    than that.

25          MR. SOFER:  But as far as Counsel for Mr. Amawi,

```
 1   it sounds like we're in a -- at least volumewise something

 2   that we're going to be able to handle.  I'm very skeptical

 3   about what Mr. Hartman and Mr. Boss say only because the

 4   Government has been through this process, so we have -- we

 5   know what this takes; and we know the kind of man-hours it

 6   takes even to take five pages of a transcript and get it

 7   into the trial presentation software.  It's a tremendous

 8   amount of time to do it with any degree of accuracy and

 9   credibility.  And so --

10           THE COURT:  Let me interrupt you, if I may, and

11   ask whether it might be possible to -- for us to postpone

12   Mr. Griffin's cross-examination for an additional day or

13   two and for you to slide in some other testimony.

14           MR. SOFER:  I think that prejudices our case,

15   Judge.

16           THE COURT:  Okay.  If that -- if that's not the

17   way of finessing the problem, fine.

18           MR. SOFER:  And again, I just don't -- what I

19   basically said before, I don't think it's fair to -- to

20   have the Government move and shake and manipulate and

21   change its plan as a result of this, which I just don't

22   think that's fair.

23           THE COURT:  I understand.

24           MR. SOFER:  In this particular case, we'd like to

25   be as accommodating as we can; but I don't think that's
```

1  fair.

2  THE COURT:  Let's wait until -- this way, if we

3  don't wait until Tuesday to resume, we're no better off.

4  MR. SOFER:  Understood.

5  THE COURT:  You'll at least have to deal with the

6  problems.

7  MR. SOFER:  And Judge, I just want to -- I want

8  us to -- to make sure that we are -- that Your Honor's

9  aware of -- there are deeper sort of questions about this,

10  in my opinion.  One is this notion of accuracy, which,

11  again, I think if we end up with a position that Counsel

12  for Amawi puts -- I think we're going to be able to get

13  through that.  We'll do what we have to, to analyze it to

14  make sure if there are issues, Your Honor can resolve them.

15  There are other issues, though, as well.  Without

16  us knowing what it is that the defendant wants to put in,

17  we may have very basic relevance objections to them putting

18  in certain transcripts as an example and this is -- this is

19  something that comes up in lots of cases which -- in which

20  there are tapes and it's been litigated in many occasions.

21  There are times when the defendant might want to put in --

22  say, in quotes, innocent conversations between the

23  Government informant and the defendant.  Well, the fact

24  that there are 800 hours of innocent communications are

25  not -- is not appropriate conversation --

```
 1            THE COURT:  I understand that.

 2            MR. SOFER:  I don't know if that's what we're

 3    talking about here, but in --

 4            THE COURT:  Sort of like saying, I drive to work

 5    five days a week; and for the last 52 weeks, I haven't gone

 6    over the speed limit.

 7            MR. SOFER:  Exactly.  And so -- and again,

 8    without us seeing it, it's impossible for us to react to

 9    it; but it is possible that we would make those kinds of

10    more legal objections to the admission of this.  And then

11    some of this, Judge, may also be hearsay.

12            The fact of the matter is Mr. Griffin's

13    conversation with the defendants, as put in by the

14    Government, are admissions.  When it's a defendant speaking

15    on the tape, there may be exceptions to the hearsay rule

16    perhaps.  There may be a rule of completeness question here

17    or there, but there may be other tapes.  And again, without

18    knowing it, I don't know.  I just want to bring this to the

19    attention of the Court.

20            THE COURT:  Let me ask -- I assume -- we'll go to

21    Mr. Hartman.  I assume you can give the Government today

22    those conversations that you are having transcribed?

23            MR. HARTMAN:  Sure.  Yes, I can do that.  And we

24    have done -- we have sent them lists of -- and actually

25    have sent them some of the work product we have gotten back
```

1    as we have gotten it back.  We have E-mailed it to them.

2            THE COURT:  But I'm trying to address Mr. Sofer's

3    initial question.  And I do think that all of you -- and I

4    realize, just as they didn't have to do in light of the --

5    they didn't do -- you can stand up and say, Judge, we'll

6    tell them when we play the recording.  Well, I'm telling

7    you, I don't think so.  Okay.  And so if -- can you do the

8    same?  Can you at least give them the -- the -- your

9    excerpts?

10           MR. WHITMER-RICH:  Yes, we will.

11           THE COURT:  Okay.  By the end of the day, do you

12   think, or by tomorrow morning?

13           MR. HARTMAN:  Judge, I can tell you that I

14   started last night.  We started the process of picking the

15   actual excerpts that we intend to play.  Whatever we can

16   get -- whatever we pick by the end of today, we'll send

17   them by the end of today; and we will do the same tomorrow.

18   I can't promise when that is going to be finished --

19           THE COURT:  I understand.

20           MR. HARTMAN:  -- because we have transcript to

21   review and that kind of thing.

22           THE COURT:  I understand.  But I think his

23   position is well-taken.

24           MR. HARTMAN:  And I'm not saying that the

25   Government's been unfair with us.  We don't intend to do

1    that.

2             THE COURT:  How soon can you guys get yours, back

3    in the right field back there?

4             MR. DOUGHTEN:  By tomorrow.  By Friday at the

5    latest; and we're talking about, Your Honor, a total

6    maximum of an hour of playing.  I mean, it's not -- it's

7    not extensive.  And again, what you're using are from

8    translations the Government provided us, but --

9             THE COURT:  But I think Mr. Sofer has a

10   double-barreled anxiety, and that is in terms of the

11   accuracy of whatever transcripts you propose displaying and

12   as well whether the Government will have objections to

13   various excerpts on various -- and I think it's an entirely

14   fair request; and so as soon as you can get them as much as

15   you possibly can and keep -- get them to them, do so.

16            MR. HARTMAN:  We fully intend to do that.

17            THE COURT:  And I would ask that if it appears

18   that we cannot resume cross-examination at 8:30 on Monday,

19   to notify my office -- or Tuesday, by let's say at least

20   noon on Monday so that we can have a conference call set up

21   at some point that afternoon and see where we are and what

22   we can do.

23            MR. SOFER:  Your Honor, would you be willing to

24   hold another status conference this Friday since we're all

25   going to be here any way?

 1            THE COURT:  Sure.  I may be working at home that
 2    day, but fine.
 3            MR. BOSS:  Could we possibly make that as a
 4    conference call so that we don't --
 5            THE COURT:  Absolutely.  Absolutely.  I'll be
 6    home.  You can be wherever you want to be.  I actually once
 7    had a conference call involving a lawyer, Reg Jackson, who
 8    I let T-off and then resume the call.  So that can be --
 9    there are things you can do on the telephone that you can't
10    do in open court.
11            By all means, 3:00 Friday?
12            MR. SOFER:  Can we do it a little earlier, Judge,
13    say 1:00?  Would that work?
14            THE COURT:  Sure.  How's that look, Amy?
15            Okay.  1:00.  Good.
16            MR. SOFER:  Judge, the other issues we have --
17            THE COURT:  Do you think we'll need a bridge
18    line?
19            COURTROOM DEPUTY:  We'll have to use the bridge
20    line.
21            THE COURT:  Okay.  Go ahead.
22            MR. WHITMER-RICH:  Very briefly, Your Honor, we
23    understand the reason for production of all of our clips
24    for the cross-examination of the Government.  We would
25    assume that the Government, given that the witness is under

1    oath, is not permitted to share those.  Just putting it on

2    the record, Your Honor.  Thank you.

3         MR. SOFER:  We won't share the clips, Judge.

4    Although keep in mind, we have always -- Counsel has gone

5    through time and time again transcripts ultimately; and the

6    tapes are in the Government's possession.  And we are -- we

7    will use this time to prep our witness for

8    cross-examination.

9         THE COURT:  And I will leave it to your

10   integrity, which I do not doubt in the least that you won't

11   take advantage of whatever it is you get.

12        MR. SOFER:  We will not, Your Honor.

13        The second issue that I was hoping we could

14   discuss with Your Honor relates to the stipulations.  And

15   you know, had we to do it over again, I think we would

16   have -- Government certainly would have liked to have had

17   the jury had a legend essentially in front of their books.

18   It's clear to the Government, at least, that the -- the --

19   we're not going to be able to agree as to the vast majority

20   of stipulations.

21        We've prepared a document, sent it to defense

22   counsel, which lays out what the Government's proposed

23   stipulation was, what the stipulation additions or

24   subtractions that was suggested by the defense were, and

25   what are new stipulations as a result of the final sort of

1  portions of testimony and the review of Mr. Griffin's

2  testimony.

3          What I'd like to do is, unless Counsel disagrees,

4  I'd like Your Honor to see this because --

5          THE COURT:  I saw a version.

6          MR. SOFER:  I think this is an updated version,

7  and I notice Counsel for Marwan El-Hindi has it on their

8  table.  I know Counsel for Masloum was sent a copy of it.

9  It's a multicolored document.  If it's acceptable, Your

10  Honor, we'd like you to look at this.

11          Obviously, we think it reflects, Judge, the

12  reasonableness of the Government's position.  Of course,

13  the defense obviously is not required by any stretch of the

14  imagination to stipulation to anything; and we're keenly

15  aware of that.  What --

16          THE COURT:  Well, why don't I go through -- is

17  there some chance if I went through, I could resolve these

18  now; or put this to one side, look at the other issues?

19          MR. SOFER:  Maybe we can do that on Friday; or if

20  Your Honor had some chance to look at it today before we

21  leave.  It's pretty long, and I wouldn't want to -- it

22  requires a little bit of analysis to be able to determine

23  what we propose, what the defense countered with and what's

24  left over.  So we can do it now, but it actually dovetails

25  with the experts issue, which is what we wanted to at least

1    preview with Your Honor today as well.

2              If we cannot come to a agreed upon stipulation on

3    these terms, as the Government has -- has put forth

4    consistently for sometime now, we believe that these terms

5    have to be defined for the jury by somebody; and we would

6    propose calling an expert witness to do that.  I would take

7    that little piece out of what I'm about to say, because it

8    will depend on what Your Honor thinks about these

9    stipulations.  Some of this may -- we may be able to agree

10   to ultimately, and it will reduce at least the need for a

11   witness to come in and explain these things.  But --

12             THE COURT:  I suppose ultimately if I reach

13   decisions, I would simply instruct the jury.

14             MR. SOFER:  You mean take judicial notice of

15   something.

16             THE COURT:  I don't know.

17             MR. SOFER:  There's some things I imagine the

18   Court could take judicial notice of under the rules.  Other

19   things, I think, would be much more difficult for Your

20   Honor to do that, so we can talk about the best way to

21   resolve this.  May --

22             MR. HARTMAN:  May I -- no.  Go ahead.

23             MR. SOFER:  We need -- for where we are in our

24   case now, our case is going to go in very quickly from here

25   on in.  As I said earlier, the Government's not going to

1    call a witness that is going to come close to being on the

2    stand certainly on direct to Mr. Griffin.  And many of

3    these witnesses will be an hour long, two hours long, half

4    a day, day at the most; but we don't anticipate having

5    witnesses on the stand very long.

6            And we need a ruling from the Court, I'm hoping

7    no later than sometime next week and earlier if possible,

8    to tell us whether or not we're going to be able to call

9    Mr. Kohlmann and exactly what it is that we're going to be

10   permitted to ask him.  And so that's why it's important, I

11   think, that we try to resolve these circumstances sooner

12   rather than later at least for the Government.  And I

13   think -- again, I think our case is going to move much

14   faster than it already has, and we -- we have to figure out

15   the order of witnesses with and without Mr. Kohlmann's

16   testimony.

17           The other issue related to experts is we've now

18   been given -- I think yesterday was the deadline for

19   reports, status of those reports.  I'm not -- I'm fully

20   aware of -- we have what amount to summaries of their --

21   some of their proposed witnesses testimony.  But I can tell

22   you the Government's position on these expert witnesses is

23   if -- if the Court has had questions about Mr. Kohlmann's

24   ability to testify in this case, I think applying some of

25   the logic of Your Honor's decision to many of the proposed

1   experts by the defense, many of these witnesses should be

2   precluded from testifying, if not all of them, except for

3   perhaps language experts.

4           The defense has opened on this case in a way that

5   frankly had the Government done, we would have been

6   criticized by Your Honor and perhaps by everyone else in

7   the world.  We don't think the case is about Islam.  We

8   don't think about -- the case is about the war in Iraq.

9   The experts that have -- proffered sort of testimony of

10  these experts would indicate that the defense would very

11  much like to make the case about Islam and about the war in

12  Iraq.  And if the defense is going to do that, then it's

13  going to put the Government in a position to having find

14  experts to counter some of the things that we're being told

15  they're going to testify --

16          THE COURT:  Let me say this:  I notice that I

17  printed out -- you haven't read what you E-mailed, two CVs

18  and two reports.

19          I'm not sure.  Are there other experts?

20          MR. SOFER:  The other controversial one, I guess,

21  for lack of a better word, is Defendant El-Hindi's trying

22  to call a linguist as an expert who I believe's ultimate

23  conclusion as we have seen on paper is that Marwan El-Hindi

24  and Darren Griffin didn't understand each other.  I believe

25  the exact words were they were two trains passing in the

```
 1   night.  Now, to me, it seems to me that for -- we have a

 2   whole litany of reasons why that is impermissible

 3   testimony.  And on the other hand, were the Court to allow

 4   it and you would be forced to go try and find a witness --

 5   at least take a look at them and analyze them.

 6            THE COURT:  Let me ask you this:  Have you

 7   submitted a copy of the report to me?

 8            MR. HARTMAN:  I don't think so.

 9            MR. BOSS:  No, Judge.  We provided it to the

10   Government.

11            THE COURT:  You better give one to me.

12            MR. BOSS:  Yes, sir.

13            THE COURT:  That's three defense experts.  Are

14   there others, Steve?

15            MR. SOFER:  Those are the ones that I think the

16   Government would probably object to the most.  Again, all

17   we're trying to do is get an idea of what the Court might

18   rule so that we know how we're going to respond.

19            And also, for -- ultimately, it comes back to

20   whether or not the Government's going to be able to call

21   the only real, I think, controversial expert witness in our

22   proposed list of experts, who was Evan Kohlmann.  So, we're

23   just asking Your Honor to take a look at this

24   preliminarily.  I -- I'm not prepared to make these

25   arguments fully today.  We're going to brief all of this,
```

```
 1   but --
 2            THE COURT:  Let me suggest this:  Why don't
 3   you -- I'm looking at Mr. Boss and Mr. Hartman.  Can you
 4   E-mail me a copy of whatever it is you sent to the
 5   Government this afternoon or this evening?
 6            MR. HARTMAN:  Yes.
 7            THE COURT:  And I will try to have -- read stuff
 8   that I got from Mr. Amawi's counsel and Mr. El-Hindi's
 9   counsel and give you something with a heads-up when we talk
10   on Friday about my thoughts and concerns.
11            MR. SOFER:  Okay.  And lastly, Your Honor,
12   Mr. Miller has an issue which relates to translations of
13   the videos that I'm playing which I want to bring to your
14   attention.
15            MR. MILLER:  Your Honor, last week there was some
16   discussion on the record about even though the
17   translations -- the Arabic translations would be
18   technically going into evidence, there was a distinction in
19   terms of what would be going back to the jury room.  And a
20   line was drawn between obviously the rolling presentation,
21   the Government's trial presentation and that is a witness'
22   testimony.  Your Honor's ruled that does not go back to the
23   jury room versus documents that are in Arabic that are
24   being translated.
25            But there is a third category material,
```

1    Your Honor, that's akin to the documents, and that is the

2    videos that have been played.  And there's a fair amount of

3    Arabic in those videos, not only in terms of what's on the

4    screen, Your Honor, but also what people are saying.  The

5    Government does not intend on trying to put translations

6    for every single video that has --

7            THE COURT:  There was at least one threat, wasn't

8    there?

9            MR. MILLER:  Correct.  The bomb vest video, Your

10   Honor.  Certainly, it's the Government's position that this

11   is not a witness' testimony.  This is akin to a document

12   that is in Arabic.  Obviously, it's a video that's being

13   played.

14           THE COURT:  Well, I think it's tension would be

15   something that is ad-libbed and something that is scripted

16   understanding that -- that which is scripted, closed quote;

17   in other words, which may well have been scripted, but

18   something that is not simply a conversation or whatever.

19           MR. MILLER:  Right, Your Honor.  And just to give

20   Your Honor an idea as to what the Government intends to do

21   to provide a complete picture, we have our translator who

22   we intend to putting on the stand who has looked at these

23   videos, who has identified them, has reviewed translations

24   that have been prepared and can testify as to their

25   accuracy; or in some cases, actually prepared the

1    translations themselves.  We can testify they're fair and

2    accurate representations.  So, for those translations of

3    those videos, we would like to submit -- not only submit

4    those into evidence, Your Honor, but have those just like

5    documents to go back with the jury.

6            THE COURT:  And what -- what sort of texts are

7    you talking about?

8            MR. MILLER:  For example, there are

9    conversations.  We've played a couple of videos today

10   where, I believe, there was a martyr who was given a

11   wedding; and there was a fair amount of Arabic discussion,

12   not only in terms of ad-libbing that was put onto the

13   screen, but conversations that were happening, excluding

14   the chance or songs that are being played.

15           The Government is not going to ask its

16   translator, per chance, to read from the stand all of the

17   translations for all the videos that it has put into

18   evidence.  It would not go that far.  But what we'd like to

19   do, Your Honor, is to essentially play a very short --

20   very, very short segment from a particular video that's

21   already into evidence, so it's clear which video we're

22   talking about for both the jury, the Court -- Your Honor

23   and for the expert on the stand; and then ask the expert

24   what is this about generally and can you give us a

25   representative sample of what's being said in Arabic from

1   the stand.

2          You would then very briefly give the translation;

3   and when you put that translation into evidence, there will

4   be a document that we've already provided to the defense

5   that would then go into evidence.  But this witness would

6   only read from the very short segment of it to give an

7   understanding for what is being said on this video.  And

8   then that document, we'd like, Your Honor, to go back with

9   the jury just like all the other documents.

10         THE COURT:  And when you say the document, do you

11  mean the entire text?

12         MR. MILLER:  The -- yes.  The exhibit that has

13  the translation for that video.  And again, the Government

14  is not seeking to submit all of these translations for

15  every single one of the videos that's played.  The

16  Government is keenly aware of the fact that we should be

17  paring down our evidence and have obviously done so in

18  terms of the direct of Darren Griffin.  But also, we're not

19  going to try and get every single piece of translation for

20  every single video that we played into evidence in front of

21  the jury.

22         MR. HARTMAN:  A number of things that I need to

23  respond to, Judge.

24         THE COURT:  Well, first, have you seen the copies

25  of the translation?

1          MR. HARTMAN:  Have I seen the copies of the

2   translation?  We have received some of them, I know.

3          MR. MILLER:  You have all of them.

4          MR. HARTMAN:  I don't know which ones they're

5   talking about sending back.  But I would have a problem

6   with any of them if a translator wants to get on the stand

7   and say what he thinks it says.  That can be the evidence

8   to the jury.  If the Court wants to hear 90 seconds of the

9   vest video translation that they played yesterday, I can

10  show you exactly why it's wrong.  And it's not the vest

11  video that they claim was given from one defendant to the

12  snitch in literally the 90 seconds.  We would have a

13  problem with that.

14          Now, our response would be, Well then, if it's to

15  get an understanding because of what it said, then send the

16  dailies back so they can look at that again.  That's

17  obviously silly.  If they want to have that evidence to the

18  jury, put your translator on the stand.  Let them say this

19  is what the evidence is, and it doesn't go back there.

20          MR. MILLER:  Your Honor, this is really no

21  different than a document that's in Arabic that has been

22  translated by a translators.  It just happens that it

23  happens to be on a computer screen that is played on a --

24  video as opposed to video, it's being a document.  So it --

25  it's the same thing as a document that has been translated,

1   so the translation obviously is in hard copy.  We're not

2   going to publish that translation to the jury again.  Our

3   witness would just testify generally and provide an

4   example.

5          THE COURT:  Why wouldn't the witness just recite

6   or testify from the stand rather than given a bit of

7   translation and -- and say, By the way, ladies and

8   gentlemen, here's the document.

9          MR. MILLER:  Honestly, Your Honor, we can have

10  our witness read the entire translation for the video.  We

11  were just trying to move things along.

12         THE COURT:  If I let this in at all, I would

13  rather have it that way, because I'm concerned that the

14  videos won't be back there.  And I would be concerned with

15  having a quantity of materials translated from Arabic,

16  which among other things are probably highly inflammatory,

17  I assume and being something -- I would be concerned about

18  the weight that might be given to that.

19         I would have to think -- I think I would prefer

20  to have it simply the man or woman, whoever the translator

21  is, sworn and testified and establish a foundation that,

22  You have reviewed this?  Yes.  What are your qualifications

23  and translation in Arabic in English?

24         And in terms of the presentation of that, I think

25  the defense will probably object to this.  I'll hear from

1   them.  But my instinct is you can replay the video with the

2   cautionary instruction that, Ladies and gentlemen -- let me

3   ask you this:  Would it be possible to simply play the --

4   where it is spoken in Arabic, I assume you can just play

5   the audio and not the video.

6         MR. MILLER:  That wouldn't work for most of the

7   videos just because of what's happened.  What we were

8   intending to do initially was actually just play a brief

9   segment of the video and then have the witness testify as

10   to what generally was being discussed and then provide an

11   example.

12         If the witness is going to read, let's say, the

13   entire translation with Your Honor's cautionary

14   instruction, the Government can replay the entire video and

15   then have them read the entire translation into the record.

16   We can do that.

17         MR. HARTMAN:  But judge, if you recall, we still

18   have a motion pending that we want 54 of the 55

19   translations excluded, because the timing that we got

20   them -- no way can we verify whether they're accurate or

21   not.  One we got a long time ago.

22         THE COURT:  How many are you going to be --

23         MR. MILLER:  We're still looking at that,

24   Your Honor.  But given the fact that there's only been

25   about 30-some-odd videos in evidence, it's going to be a

1    number less than that; but I can tell Your Honor that for a

2    fair number of the balance that would be remaining, it's

3    essential.  We probably wouldn't even put a translation in,

4    because they may be hearing Allahu Akbar over and over

5    again, so we don't need the witness to be reading two pages

6    of God is great.

7         THE COURT:  If you can do for them what I'm

8    instructing them to do for you, if you can give them those

9    excerpts, those that you know you want to do, give them to

10   them now.  Those that you're working on, make your minds

11   up.  Make it a production very least.  They don't have to

12   worry about which -- they're not puzzled over which of

13   those 54 or so they are.  And at that point, we'll have to

14   see what their response is.  And I may say, Look, you're

15   not going to be able to offer this next one, so you're

16   going to have to wait until Wednesday after that, because

17   they can't come back with the translation.  We'll just have

18   to wait and see.

19         But my initial response is I'm very reluctant to

20   have a translation of statements that were made on these

21   videos going back to the jury room.  They've seen the

22   videos.  They know what the videos generally are about.

23   They speak them -- themselves largely.  There's an

24   inference in any event that these are produced by and

25   distributed by people who identify with the people who

1    planted the bombs or did the shootings or undertook the

2    attacks.

3           And so in terms of the connection between -- I'm

4    not really sure you need to know what Ashraf Zaim said to

5    know what was being said in effect.  But on the other hand,

6    particularly given the fact that Arabic was a native

7    tongue, as it were, for one or more of the defendants or

8    all of them, I think there's maybe some probative value.

9    But I don't want that probative value to be swamped by the

10   emphasis that might be given back in the jury room.

11          So bottom line is:  Number one, let them know as

12   soon as possible precisely which texts you want to have

13   translated to the jury.

14          And number two, anticipate that I'm likely to say

15   to the extent that that can occur, bring the translator in

16   and have the translator read the translation.  And to the

17   extent that you are able to prepare different texts may

18   simply have to have -- rely on you calling a translator.

19          Again, I'm thinking about it -- it.  It does seem

20   to me that the likelihood that differences in meaning from

21   text of that sort, the likelihood that's going to be very

22   great or significant is pretty slight.  I mean, it doesn't

23   take a genius to know what these people are talking about,

24   even though I don't know a single word of what Allahu Akbar

25   is.  That's the extent of my -- basically for the last 20

1    years or whatever.  But my point simply is: I can't imagine

2    that disagreements over the perfect translation are going

3    to be that potentially significant.  I may be wrong about

4    that.

5             MR. HARTMAN:  I don't think you are, Judge.  And

6    I think that demonstrates why the probative value of these

7    translations is so low.

8             MR. MILLER:  Your Honor, we've played these

9    videos.

10            THE COURT:  I understand.  I'm inclined to permit

11   the translation -- the translator to get on the stand and

12   say, Ladies and gentlemen, this is what was being said

13   while this event was being filmed.  I'm inclined to do

14   that.

15            As I think about it, I'm less inclined to let the

16   entire video be shown again.  I'll just say, Ladies and

17   gentlemen, the next witness will translate that -- or the

18   Arabic text that was spoken or written on the screen for

19   Government Exhibit whatever it was.  And so that you can

20   recall what that exhibit is, you will see the first 20

21   seconds of it.

22            MR. MILLER:  Your Honor, that's what we were

23   intending to do, maybe not the first 20 seconds, because

24   there's some videos --

25            THE COURT:  I understand.  Segment of music or --

```
 1   I would hope that it wouldn't be the bomb going off or
 2   whatever, but I would say the less inflammatory, the
 3   better, but simply, Oh, yeah.  Okay.  Now, we recall what
 4   that is.  And they can make their own -- but to have text
 5   go back to the jury, I'm disinclined to --
 6           MR. MILLER:  Just so our position is clear in
 7   terms of the number of videos we're talking about some
 8   number less than the 35 that has come in and, in fact,
 9   there were a couple of videos in which, again, all you
10   could hear in Arabic is Allahu Akbar.  We don't have to
11   replay that video and have the translator read God is great
12   30 times, so we're going to be very reasonable about this.
13           But again there was a couple of videos in which
14   there was a long discussion in Arabic, and that's what
15   we're talking about.
16           THE COURT:  And from what I heard this morning, I
17   think you're correct.
18           Mr. Ivy?
19           MR. IVEY:  Thank you, Your Honor.  As the Court
20   knows, I made a continuing objection to relevance to these
21   videos.  And I was told that the reason that they are
22   relevant is because they show Mr. Amawi's intent about what
23   the object of this conspiracy was.  And so I don't think
24   you need a translation in any form of what's on these
25   videos for that purpose.
```

```
1              The main thing, Mr. Griffin does not speak
2    Arabic.  He did not have these translated verbatim.  The
3    only thing that's relevant is the extent to what Mr. Amawi
4    told him they were, and the jury's got that.  So the jury
5    would, in essence, be considering evidence that's highly
6    prejudicial that Mr. Griffin was -- when he was shown them
7    to Mr. Amawi, because he doesn't speak Arabic.
8              THE COURT:  Let's do this.  Let's at least find
9    out what they're proffering, so we're speaking in a
10   particular rather than in the abstract.
11             MR. IVEY:  I'll reserve my argument.
12             MR. MILLER:  And just briefly on that,
13   Mr. Griffin was not the conspirator.  Mr. Amawi was.  So if
14   it goes to intent, then the jury's permitted to --
15             THE COURT:  Well, let's see what you produce
16   first; and then we'll go from there.  We have issues both
17   of contentions about possible accuracy and then also
18   admissibility, some greater; but I've indicated to you, if
19   you're all at sidebar, that's probably --
20             MR. HARTMAN:  Judge, the other issue that I
21   needed to address was the stipulations that Mr. Sofer
22   talked about; and it seems to me that I -- that there's
23   still room to work on these between the defendants and the
24   Government.  The El-Hindi team would still like that
25   opportunity.
```

1          But it also seems to me that these terms, whether

2    they're subject to -- to interpretation or not, you know,

3    the Court has the province to call its expert, as a

4    witness, tell the Court what those terms are and the Court

5    tells the jury.  I mean, it could be -- you had thought at

6    one point about doing that anyway for translation.

7          MR. SOFER:  And we'd -- we'd just like an

8    opportunity to look into that from a legal perspective.  I

9    think certainly, as I said, there are -- there are terms on

10   that document that Your Honor has that, I think, not only

11   could the Court call an expert witness, but to explain --

12   but I think The Court could take judicial notice of some

13   things.

14          THE COURT:  Like --

15          MR. SOFER:  Exactly.  On the other hand, some of

16   these terms, I think, are much less susceptible to that

17   kind of analysis.

18          THE COURT:  I would agree.

19          MR. SOFER:  And again, I think the document we've

20   given to the Court speaks for itself, just so I can tell

21   you now, because there are three -- the three colors on

22   there, so I need to give you a code deciphering of those --

23   of those three colors.  The yellow is that, I believe,

24   which the Government and defense have agreed to.

25          THE COURT:  It's all on here.

1          MR. SOFER:  Never mind.

2          THE COURT:  What's the strike out?  Where's

3     something struck out?  Did you both agree to throw that

4     out?

5          MR. HERDMAN:  Those are the original list that

6     Government submitted to defense counsel.  Those are strike

7     out that the defense put in place, and they suggested that

8     certain portions are actual definitions to be taken out

9     either wholesale -- so the strike out are proposed by

10    defense counsel.  Some of those we've agreed to.  Some of

11    those we would want the original to be left in.

12         THE COURT:  I'm a little confused.

13         MR. HERDMAN:  It was our attempt to have a -- the

14    living document of the stipulations, Your Honor, presented

15    to you.

16         THE COURT:  It is wiggling before my eyes.

17         MR. HERDMAN:  It may be on life support actually.

18    I'm not quite sure.  That is the only place you're going to

19    see strike outs, Your Honor, is language that was proposed

20    to be struck by defense counsel that was in the original

21    Government proposal.

22         THE COURT:  And is it presently in or out of

23    this --

24         MR. HERDMAN:  Some of it's in yellow.  Then, we

25    agreed to it being struck.  If it's in red, the Government

```
 1    would want to -- to see it in.
 2              THE COURT:  I'm looking at page 2, number 12, if
 3    it -- that -- the entire thing was stricken without any
 4    color.
 5              MR. HERDMAN:  I believe -- well, if it -- that is
 6    one of the ones that was in there twice, I believe.
 7              MR. HARTMAN:  It's a duplicate.
 8              THE COURT:  But for instance, shake, S-H-E-O-K-H.
 9              MR. HERDMAN:  There is a portion of that that I
10    believe is in red.
11              THE COURT:  But there's some that is stricken.
12              MR. HERDMAN:  I think we would agree the portion
13    that's stricken, but the Government would want the portion
14    that's in red to be considered as part of the definition.
15              THE COURT:  That's my question.  What attention
16    do I pay to something that has been struck --
17              MR. HERDMAN:  But is not in color.
18              THE COURT:  -- but is no the in color?
19              MR. HERDMAN:  That -- I guess ignore that,
20    because the Government is agreeing, in essence, that that
21    language should be struck and maybe dealt with in some
22    other part of the stipulations actually.  For instance, if
23    it -- that it was in there twice.
24              THE COURT:  And then we have, for instance,
25    number 38 is a fuscia head, and it's in yellow, but it's
```

1   also entirely struck out.

2           All agreed, does that mean agreed to strike?

3           MR. HERDMAN:  Correct, Your Honor.

4           THE COURT:  I'll tell you what, this will be my

5   homework in part between now and Friday.

6           MR. HARTMAN:  Good luck.

7           THE COURT:  Maybe we can work something out.

8           MR. WHITMER-RICH:  We would also note as to our

9   period of time disclosures that we gave, Your Honor, we

10  attempted to -- because there's been some uncertainty as to

11  the scope of expert testimony that's going to be permitted,

12  we essentially disclosed the broadest scope that we

13  anticipated using with the -- you know, it really depends

14  heavily on where the case is at, at that point -- you know,

15  the actual scope of testimony that we will seek to elicit

16  from the witness.  But for the purpose of erring on the

17  side of disclosure, we disclose the broadest scope that we

18  would anticipate using.

19          THE COURT:  Okay.

20          MR. SOFER:  That's it for the Government, Your

21  Honor.

22          MR. HARTMAN:  I just got word that 15 percent of

23  the transcripts that we are getting done have not been

24  returned yet.  You wanted a number.  We finally got it.

25          THE COURT:  So, 85 percent.

```
 1              MR. HARTMAN:  We have and can start working with.

 2              THE COURT:  And getting to the Government.

 3              MR. HARTMAN:  That's -- yes.

 4              MR. SOFER:  And again, just for clarity purposes,

 5    an entire, say, hundred-page transcript isn't going to do

 6    us or the defense a whole lot of good.

 7              THE COURT:  I agree completely.  So, please start

 8    getting them in stuff and note the page and lines that you

 9    think are going to be --

10              MR. HARTMAN:  To a certain extent, we know we'll

11    be able to pick it out fairly easily.  Some will be less

12    difficult and -- or some will be more difficult, because

13    it'll kind of depend on how the testimony goes -- how the

14    cross goes.

15              THE COURT:  I understand.

16              MR. HARTMAN:  But we'll do the best we can.

17              THE COURT:  And I know there's a balance.  I

18    assume that 100-page transcript, you might be talking five,

19    ten pages.  But if you think there's no chance that might

20    be 12 to 14 pages, I would go ahead and note those with the

21    understanding that they may or may not be used.  I would

22    rather have you err on the side -- I don't want you to give

23    them 85 pages when you really know you're going to be using

24    10, and you're just trying to make sure that --

25              MR. HARTMAN:  They asked us to overestimate if it
```

1    was a choice.

2              THE COURT:  I would overestimate conservatively.

3              Now, with Mr. Kohlmann, when do you want to make

4    your pitch as to him and have me respond to it?

5              MR. SOFER:  Well, to some extent, Your Honor, I

6    think it does go back to the stipulations, not completely,

7    but -- and it also relates, of course, to what your rulings

8    are as to the defense experts to some extent.

9              THE COURT:  He's the chicken to that egg I think,

10   or maybe he's the egg to that chicken, if I heard

11   Mr. Whitmer-Rich correctly.

12             MR. SOFER:  I'd hate to get into that whole

13   analogy.  But the -- the thing --

14             THE COURT:  Let's put it this way.  I think he's

15   the horse to their cart.  Is that what you're trying to say

16   to me?

17             MR. WHITMER-RICH:  That's one way to put it.

18             MR. SOFER:  I think they have -- my concern is

19   this.  They have the Budweiser Clydesdales in front of

20   their cart, and what I don't want to do and I think -- I

21   don't think any of us --

22             THE COURT:  I haven't read it.  And in all

23   candor, my response to what you said is a response months

24   ago.  He's an expert on terrorism.  Wait a minute.  When

25   you tell me about Islam and whatever the subject is -- wait

1   a minute -- being, okay, the war in Iraq -- wait a

2   minute -- we're dealing with a set of criminal charges very

3   serious, some complicated charges.  And I think I can

4   assure you that going into this as I consider take propose

5   and reconsider what I've done and what you want me to do

6   with Mr. Kohlmann, I am likely to maintain the impulse of

7   constraining rather than opening the door.

8           MR. SOFER:  Understood.  And that's the

9   Government's position also.  In fact, we are more than

10  happy and have -- I think, have argued essentially to try

11  to narrow the focus of Mr. Kohlmann's testimony to those

12  issues which relate directly to specific parts of the

13  testimony in this case.

14          THE COURT:  Well, as I say, I will read the

15  reports by Friday.  I will read the stipulations and try to

16  puzzle my way through those and see if I can't come up with

17  some negotiated suggestions that everybody can live with.

18          MR. HARTMAN:  Is there a written motion on

19  Kohlmann?

20          THE COURT:  To reconsider?

21          MR. SOFER:  No.  We've been arguing this orally.

22  I think it's fair to say that there's been some give and

23  take, back and forth about what's been happening with the

24  Government, the Court; and defense counsel has argued as

25  well.  As I said, I think some of these issues are

```
 1    interlinked.  So what I would ask The Court to do is read

 2    the submissions from the defense, read the stipulations.  I

 3    think the -- when those issues are resolved, the Government

 4    will be in a better position to argue its case about what

 5    exactly is -- it is that's left over, if anything, for

 6    Mr. Kohlmann.  I think there are a few issues that we've

 7    discussed.

 8            THE COURT:  One thing, again, I'm going to

 9    interrupt you.  If you promptly -- somebody can highlight.

10    I know we had a colloquy a day or two ago where I said,

11    Maybe you're right about this.  If you can let Amy, Angela

12    and Tracy know if any of you have that segment and if they

13    can get that to me just to recall to my mind.

14            MR. SOFER:  And I also know we -- the Government

15    will send you a set of transcripts; and I will endeavor to

16    have them E-mailed to you, if that's acceptable to Counsel,

17    this evening.

18            THE COURT:  Rather than E-mailing, if they can

19    just be somehow made available by Friday.

20            MR. SOFER:  And would you prefer them

21    electronically, or would you want us to printout hard

22    copies?

23            THE COURT:  I prefer hard copy.

24            MR. SOFER:  We'll have them by Friday.

25            MR. HARTMAN:  The reason I ask, Judge, is because
```

1  whatever -- whatever the Government's going to ask for, we

2  would like the opportunity to actually brief it rather than

3  just argue it on -- on the terms of Mr. Kohlmann.

4  　　　　　THE COURT:  We'll see.  It will partly depend on

5  the time.  I think it's going to be pretty narrow.  That's

6  why I want to get the transcript of that conversation that

7  we had.  Was it yesterday or the day before?

8  　　　　　MR. SOFER:  Two days ago about this time in the

9  afternoon.

10  　　　　　THE COURT:  Okay.  Anything further from the

11  Government?

12  　　　　　MR. SOFER:  No, Your Honor.

13  　　　　　MR. HARTMAN:  I don't believe so at this time.

14  　　　　　MR. DOUGHTEN:  Nothing more, Your Honor.

15  　　　　　MR. IVEY:  Nothing, Your Honor.

16  　　　　　THE COURT:  Okey-dokey.  If other matters do come

17  up between now and our conversation before Friday, feel

18  free to circulate an E-mail to give me a heads-up.

19  　　　　　MR. HARTMAN:  Judge, there is one more matter

20  that we should bring up.  I think we're going to try to

21  reach a resolution, but there is an exhibit that -- that

22  number of the exhibit, I believe, is 61 that was alleged to

23  have been given by Mr. El-Hindi to Mr. Griffin.  And the

24  original of that exhibit doesn't exist any longer, is my

25  understanding.  What we have is a scanned copy.

 1          The writing on that exhibit is from our -- from a

 2    defense perspective, extremely important.  There is also a

 3    translation of that exhibit, but it's the original that

 4    if -- if the Government can't come up with the original

 5    we're going to ask that the exhibit be stricken, because it

 6    can't be read.  Now, they said that they have another way

 7    to show it to us that may be sufficient.

 8          MR. SOFER:  If Counsel looks to his right, he'll

 9    see it.  I would also note, Your Honor, it's pretty

10    amazing.  It actually happened to us today, something for

11    the Court to consider.  I know this is a touchy subject

12    with Your Honor on our monitors -- or one of the videos we

13    played today was all -- very difficult to see.  I think the

14    record should be clear, was a shooting of an

15    assassination -- or a shooting, sniping attack against --

16          THE COURT:  The guy sort of standing up in the

17    middle was fuzzy.

18          MR. SOFER:  Plain as day on the Government's

19    monitor here, so there's something about the Court's

20    system's monitor which is incompatible with at least that

21    particular video.  Likewise, Your Honor, I'm looking at the

22    exact -- as we sit here, if Your Honor wants to come off

23    the bench, this document on our computer here, it's also on

24    the screens that are available to the Court and jurors.

25    It's plain as day on the Government's computer.  You can't

1    see anything of the writing on the screen that Your Honor

2    can see or that I can see right in front of me.  So, I

3    think Counsel can come over here right now and look at the

4    document; and all of this can be resolved.

5             MR. HARTMAN:  The guy that matters is right

6    there.

7             UNKNOWN SPEAKER:

8             MR. EL-KAMHAWY:  I'll be happy with a copy of

9    this quality, but I don't have a copy of that.

10            MR. SOFER:  We have a copy, also have that

11   quality.

12            THE COURT:  Okay.  Work away.  My favorite order,

13   work it out.  Work away.  Work it out.

14            Anything else at all?

15            MR. HARTMAN:  No thanks.

16            THE COURT:  Is it going -- are we going to

17   need --

18            MR. HARTMAN:  We'll waive the presence of

19   Mr. El-Hindi.

20            MR. DOUGHTEN:  We're okay.

21            MR. WHITMER-RICH:  We're consulting, Your Honor.

22            THE COURT:  Is that okay, Mr. Amawi?  I think it

23   will be legal argument and perhaps some scheduling matters.

24            THE DEFENDANT:  Thank you, Judge.

25            THE COURT:  Mr. Masloum?

1          MR. DOUGHTEN:  For the record, Your Honor, he'll

2    probably be with us.  That won't be a problem.  But he

3    would waive anyway, but he will probably be with us.

4          THE COURT:  That's okay.  Whatever.  Thank you

5    folks.  Thank you.  Talk to you on Friday.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    S:/ Angela D. Nixon

7    --------------------------          -----------

8    Angela D. Nixon, RPR, CRR                Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

Testimony of Darren Griffin continued