```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    )  Docket No. 3:06-CR-719

 4            Plaintiffs,         )  Toledo, Ohio

 5               v.               )  April 22, 2008

 6   MOHAMMED AMAWI, ET AL.,      )

 7            Defendants.         )

 8   -----------------------------

 9           TRANSCRIPT OF JURY TRIAL, VOLUME 32
              BEFORE THE HONORABLE JAMES G. CARR
10               UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                      (216) 522-4856
25
```

```
 1                              Elias Muawad
                                Muawad & Muawad
 2                              Suite 209
                                36700 Woodward Avenue
 3                              Bloomfield Hills, Michigan 48304
                                (248) 594-4700
 4    For the Defendant
      El-Hindi:                 Charles M. Boss
 5                              Boss & Vitou
                                111 West Dudley Street
 6                              Maumee, Ohio 43537
                                (419) 893-5555
 7
                                Stephen D. Hartman
 8                              Kerger & Kerger
                                Suite 201
 9                              33 South Michigan Street
                                Toledo, Ohio 43602
10                              (419) 255-5990

11                              Alek H. El-Kamhawy
                                Raslan, El-Kamhway & Pla
12                              Suite 3FE
                                1700 East 13 Street
13                              Cleveland, Ohio 44114
                                (216) 928-1500
14
      For the Defendant         David L. Doughten
15    Mazloum:                  4403 St. Clair Avenue
                                Cleveland, Ohio 44103-1125
16                              (216) 361-1112

17                              Jeffrey J. Helmick
                                Helmick & Hoolahan
18                              2nd floor
                                1119 Adams Street
19                              Toledo, Ohio 43624-1508
                                (419) 243-3800
20

21                              Mohammed Abdrabboh
                                1620 Ford Avenue
22                              Wyandotte, MIchigan 48192
                                (734) 283-7000
23

24
      Court Reporter:           Angela D. Nixon, RPR, CRR
25                              1716 Spielbusch Avenue
                                Toledo, Ohio 43624
```

1                        (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

```
 1              THE COURT:  Shall we get started?  Ready to go?

 2         MR. SOFER:  Yes.

 3              THE COURT:  Why don't -- I assume everybody had

 4    gotten Mr. Sofer's E-mail from this morning.  Why don't we

 5    just go down the list there and see if that's okay --

 6         MR. HARTMAN:  Sure.

 7              THE COURT:  -- on the stipulations?

 8         MR. SOFER:  Two issues with respect to the

 9    stipulations, Your Honor.  First of all, we encountered a

10    problem with the stipulations relating to a number of the

11    definitions, probably a significant number of them; and the

12    fact that the definitions that are in there are either

13    factually problematic from a policy standpoint or otherwise

14    as far as -- obviously, the Government -- United States

15    Government, not us here in the courtroom, has an interest

16    in making sure that we don't stipulate to facts which the

17    government does not agree with.  And some of these are

18    national, international and other kinds of issues.  We are

19    trying to work through that now with our headquarters in

20    Washington, see if we can't come up with an answer that --

21              THE COURT:  Let me ask you this:  Will you at

22    least consider my noting your objection?  If there's some

23    changes that can be made, making them and simply meeting

24    then without the word stipulation in there and saying to

25    the jury in this case and only in this case, these
```

```
 1   definitions, these terms --

 2           MR. SOFER:  That's exactly the kind of thing we

 3   are trying to work out, some sort of preamble or a

 4   cautionary instruction where we would say something very

 5   similar to that.

 6           THE COURT:  I understand you don't want to be

 7   judicially stopped somewhere down the road.

 8           MR. SOFER:  We're not going to be stopped.  As an

 9   example --

10           THE COURT:  U, the capital U, United, capital S,

11   capital G, Government.

12           MR. SOFER:  There are some specific and sensitive

13   issues in these stipulations.  One example would be the

14   Russian -- the Russian Government's actions in Chechnya.

15   For us to stipulate something that is contrary to United

16   States foreign policy, for instance, or a stated position

17   of the United States Government, I think, is for obvious

18   reasons problematic.

19           THE COURT:  I have no problem uttering something

20   that might be contrary to United States foreign policy.  In

21   fact, if we can work it out that way, work it out that way.

22           MR. SOFER:  I understand Your Honor doesn't have

23   that problem.

24           THE COURT:  I've got to step off the bench.

25                   (Judge stepped down.)
```

1                    (Judge back.)

2            THE COURT:  I gather that's all we can do about

3    that now.

4            MR. SOFER:  It is.  And I think we may be able to

5    work that out.  There's a second piece, though, Judge.  It

6    makes no sense from the Government's standpoint to use the

7    word stipulate or agree or otherwise go forward with these

8    definitions if, in fact, there's going to be a defense

9    expert who comes up and testifies, elaborates, undermines

10   what it is that we've agreed on.

11           THE COURT:  That's fair.  At least my objective

12   is to finish some of the issues regarding Mr. Kohlmann.

13           MR. SOFER:  Understood.

14           THE COURT:  Let me ask the defense if that -- I

15   mean, I give the stipulations as -- present these

16   definitions.  Whenever I say stipulation, I mean

17   definition.

18           Again, if I instruct the jury as to these

19   definitions, will that be the end of it in terms of

20   evidence as to what any of those terms mean?

21           MR. WHITMER-RICH:  For the Amawi team, our

22   position is that we have designated experts that we wish to

23   call to present evidence in our case.  Those experts are

24   qualified and, I think, competent to -- subject to whatever

25   hearings the Court wants to have -- to testify as to those

1  matters.  We think that the matters of their testimony are

2  extremely important to the jury's understanding of the

3  case, and we -- I was reviewing the final set of

4  stipulations last night.

5          We still have a number of objections, not 100,

6  but to some of the terms; and it seems likely that I'm not

7  sure -- it seems unlikely to me that we will reach a

8  definition of Abu Ghraib that will be acceptable to the

9  United States Government.

10          THE COURT:  Why do we need Abu Ghraib in there at

11  all?  People -- Abu Ghraib, what does that have to do with

12  anything?  It was mentioned a few times.

13          MR. WHITMER-RICH:  I don't need a stipulation as

14  to Abu Ghraib.

15          MR. SOFER:  I think this is more sort of

16  generally the question we've described from the beginning

17  is without -- without some definition of the terms that are

18  included within the conversations -- of course, the

19  conversations have a context to them, a meaning -- you end

20  up with -- I don't -- although I certainly -- many of us

21  have heard -- I don't know based on the jury

22  questionnaires.  I think there's at least some possibility

23  that some of the jurors don't know what Abu Ghraib is.

24  It's certainly not critical to the Government's case; but

25  as it becomes a slippery slope, I mean, the notion, again,

1  when we are carrying the burden.

2       THE COURT:  Does anybody have a current version

3  of these?  Anybody?  Or can somebody go out and get one,

4  E-mail it to me; and I'll E-mail it to my office and get it

5  printed?

6       MR. WHITMER-RICH:  I can E-mail it.

7       MR. SOFER:  In any event, Judge, what the

8  Government's position is, we -- we'll pursue this with the

9  powers to be on our end.  I think we probably can resolve

10  it, but it sort of -- I think there's a waste of

11  everybody's time if it turns out we're going to end up --

12       THE COURT:  I would agree.  If I tell them that

13  these terms mean this and somebody comes in and starts

14  talking about varying meanings, then this whole exercise is

15  futile.

16       MR. SOFER:  And we hope that that's not true,

17  Judge; and I've already indicated my reservations, his

18  testimony about his mom and certain other geo-political

19  background.

20       THE COURT:  If you E-mail that to me, I will --

21       MR. SOFER:  Maybe, Judge, one way to proceed

22  would be -- and again, we've not received final reports, I

23  don't believe, for any defense expert.  And one way

24  possibly to proceed, although we're certainly not going to

25  get this done by tomorrow, would be to have the Court

1  decide -- we'd like a ruling on the expert testimony, both

2  for the progress of the Government's case and also this

3  issue.  We could brief it quickly.

4      I'm comfortable going forward orally on any

5  number of -- of these issues if that's how the Court wishes

6  to proceed.  We'll do this however Your Honor wants to.

7  But we -- I think at this juncture, it's in the interest of

8  both parties to have a resolution of the expert testimony

9  that should go to affect the progress -- and Government's

10  agreed upon definitions to the extent we can do it.

11      THE COURT:  It looks as though the earliest

12  available time I would have is Monday evening, again,

13  starting at 4:30, 5:00.  I've got start at 8:00 or 8:30

14  that day and half-hour intervals the entire day.

15      And have you responded, except orally, to the --

16  I think, the three reports that have been provided by the

17  defense?

18      MR. SOFER:  We've been given either summaries --

19  I'm not sure we satisfied the rule either, but we've been

20  given summaries and/or what I think have been described as

21  preliminary reports for I believe it's three experts from

22  the Amawi side and two from El-Hindi.  I may have those

23  numbers --

24      MR. WHITMER-RICH:  For the Amawi side, we had

25  three experts that we had listed their names on April 1st.

1  One of them we will not now be using, so we have two

2  experts; and we provided summary reports that we believe

3  comply with the requirements of Rule 16.  And we -- we're

4  not intending unless the Court -- otherwise, to provide

5  some issue with the report.  We believe that we've

6  satisfied some requirements of the rule, provide the

7  summary of the proposed testimony.

8         MR. HARTMAN:  We intend -- our reports, according

9  to our understanding, was the Court ordered to at least get

10  a preliminary report by the 14th.  We intend to get a more

11  comprehensive and final report to the Government as soon as

12  we can get that.  It depends on the expert.  The computer

13  guy, it's going to be a while, because he's still got a ton

14  of work to do.  The translators should be fairly easy and

15  maybe within the next week.  But we intend to supplement

16  what we gave the Government already.

17         MR. WHITMER-RICH:  I guess an additional expert

18  potentially is the translator that we may share in common

19  is the purpose that we will use that translator for will be

20  to simply get up and testify as to the authenticity of the

21  transcripts that that translator provides.  So we'll be

22  working with the Government to disclose those clips that we

23  want to use.  But apart from that, I'm not sure that

24  there's -- that a report serves --

25         THE COURT:  Why would you need that?  Is there

1   any dispute about the authenticity?  Accuracy is a

2   different thing.  Authenticity is simply --

3           MR. WHITMER-RICH:  I might have used the wrong

4   word.  Sorry.  As to that expert, we weren't really

5   thinking in terms of a report.  We weren't simply going to

6   turn over work product; that is, translations,

7   transcriptions, which we've done already a little bit.  But

8   just for the record that -- that is, I suppose, an expert

9   that we're calling, but we're not proposing a report.  That

10  expert can offer an opinion beyond simply -- beyond the

11  accuracy.

12          THE COURT:  And what are -- will that opinion

13  encompass any of the terms that are in the definitions?

14          MR. WHITMER-RICH:  We do not propose to have that

15  expert offer those sorts of expert testimony, opinion

16  testimony beyond simply saying this is an accurate

17  translation and transcription of this particular clip.

18          MR. HARTMAN:  I don't believe -- I don't believe

19  that the transcripts that we gave them included any kind of

20  disagreement about what the meaning to those words were.

21          So I don't think that would be an issue, do you?

22          MR. SOFER:  Not to my knowledge.  I think this

23  issue -- we've narrowed this down to what we started with,

24  which is the stipulations.  I think the only experts that I

25  understand that will be testifying about the terms of the

1    stipulations would be -- again, I think -- and there may be

2    an expert from --

3           MR. DOUGHTEN:  If I could, Your Honor.  Based on

4    the Court's ruling on Evan Kohlmann, we had an expert we

5    aren't calling, so we've, in essence, let him go.  If the

6    Court would, we thought we had the stipulations worked out.

7           THE COURT:  So did I.

8           MR. DOUGHTEN:  And we're comfortable with what

9    we've worked out, and I believe El-Hindi's team is

10   comfortable with what we've worked out.  And we're

11   agreeable to the suggestion that the Government made about

12   possible -- we have no expert because our expert was only

13   going to be Mr. Kohlmann; and if Mr. Kohlmann doesn't come

14   in, we're not calling an expert.  If The Court revisits it

15   and allows him to come in, we may have--

16          THE COURT:  I will simply say if -- if I give

17   definitions to the jury, they will be deemed instructions.

18   And I will not permit anybody to testify in any way to the

19   contrary.

20          MR. SOFER:  And that's the road we thought we

21   were headed down, Judge.

22          THE COURT:  That's the road -- we get the

23   definitions to the jury.  That's the road we're taking.

24          MR. WHITMER-RICH:  We would not expect the

25   experts that we proffer would contradict the substance of

```
1    the stipulations.

2            THE COURT:  I wouldn't admit them to testify that

3    the term Jihad means whatever else -- anything other than

4    what was in the definition or the other terms.

5            MR. WHITMER-RICH:  In that case, just for the

6    record, I'm not sure that the Amawi team will be able to

7    agree to some of these --

8            THE COURT:  Well, you're headed in the direction

9    of Mr. Kohlmann coming back into the case.  We're either

10   going to do that this way or it's going to open up that can

11   of worms.  I will do everything I can to limit and

12   constrain it.  I'm just letting you know.  There's an easy

13   way to do this, a way that, I think, is entirely fair and

14   accommodates everybody's interest in a sense, moves the

15   case along; and -- but you can't have it both ways.  You

16   can't say, Judge, you tell them this definition; and by the

17   way, we want somebody to come in and elaborate on that or

18   suggest something different.  If nothing else, that leaves

19   the jury totally confused, say, Wait.  What's going on.

20   The Judge just says this, and some guy comes in and says

21   that.

22           MR. HARTMAN:  There's one problem that I just

23   realized is that Mr. El-Hindi in a couple of places on some

24   of these recordings explains what Jihad means to people.

25           MR. SOFER:  Well, that's a different issue.
```

```
1              THE COURT:  That's a different issue.

2              MR. HARTMAN:  Okay.

3              THE COURT:  If any -- if there's a recording in

4   which somebody says something means something or

5   understands something, that's different.

6              MR. HARTMAN:  Okay.

7              THE COURT:  What I'm talking about is

8   Mr. Kohlmann coming in and saying who Zarquawi is or was.

9              MR. HARTMAN:  Got it.  I understand.

10             MR. SOFER:  And Judge, what I was trying --

11             THE COURT:  Al-Ansar Islam is or was and what

12  websites are and so forth.  Okay?

13             MR. HARTMAN:  Yes.

14             THE COURT:  So anyway --

15             MR. SOFER:  All I was going to say, Judge, is

16  unfortunately, in addition to Mr. Kohlmann, we would have

17  to call other witnesses, because Mr. Kohlmann is not

18  qualified to testify to every single term on that list.

19  So, if the Government is forced into this position of

20  having to litigate the terminology that's set out here,

21  it's not just Mr. Kohlmann.

22             Mr. Kohlmann has a particular focus in his work

23  as Your Honor is aware.  If the defense is going to call

24  someone who's going to testify about what Islam is and how

25  Islam affected this case, or is going to testify about
```

1   geo-political issues related to the Iraq war, then the

2   Government's going to be forced -- I think it would be

3   unfair not to allow us to do that.  And we'd like to call

4   those folks in our direct case, which is one of the reasons

5   that we wanted to try to resolve this issue earlier.

6          So, as I understand it, we've worked out sub --

7   contingent on us working out this problem on our own,

8   within our own organizations, we have worked out, I think,

9   a compromise.  One that is not perfect, I don't think, for

10  either side; but it does move the case along.  It gets the

11  terms to the jury in a way that they can at least have

12  something to reference.  And we are happy -- happy would be

13  the wrong word.  We are going -- certainly will comply and

14  live with the Court's decision to exclude most of Evan

15  Kohlmann's testimony with respect to all of those terms as

16  well.

17         And so I think all that's left is the fact that

18  we can't be, then, put in a position where, Okay.  We've

19  agreed to all that.  And then Amawi calling three experts

20  that elaborate, undermine, whatever they do to these same

21  definitions, doesn't make any sense.  In that case, I think

22  we are going to be forced to not only call Mr. Kohlmann and

23  ask Your Honor to reconsider your decision on that; but

24  we're going to have to go out, then, and find a slew

25  potentially of other Government experts to testify about

1   these other subject matters which are -- which, A, I think

2   are inappropriately being injected into the case.  I've

3   made that record already.  But B, we can't sit silent while

4   somebody stands up there and says, Well, you know, the war

5   in Iraq means that because of the war in Iraq and this,

6   that and the polls of the people in the Middle East, these

7   guys must not have been doing what the Government says

8   they're doing.  It's unfair to us.

9         MR. WHITMER-RICH:  Your Honor, on behalf of the

10   Amawi team, in the very short time that we had to prepare

11   for this case, we sought out and retained who we believed

12   are some of the most qualified experts in the world to

13   testify on these matters.  Mr. Altman served in the police

14   administration state department for the year following 911.

15   We did not go find Nomchovski (phonetic) or some person

16   who's going to come in and spin some conspiracy theory

17   about the Iraq war.

18         These are -- both of these experts are relied on

19   extensively by the state department.  The state department

20   sends them overseas to talk to overseas audiences about

21   these issues.  We are trying to present a defense for

22   Mr. Amawi, and we believe these experts and their testimony

23   are a critical part of that.

24         THE COURT:  I understand that.  But I have

25   serious reservations about the pertinence of -- relevance

1  of that kind of testimony in this case.

2          MR. WHITMER-RICH:  I understand Your Honor's

3  position and we'll try to address it with argument and so

4  forth and we'll live with whatever rulings we get.  But in

5  terms of these -- the stipulations and particularly ones

6  that the Government's represented, Mr. Kohlmann is not

7  competent to offer an opinion about -- this just seems,

8  from our perspective, putting the cart before the horse.

9          A stipulation, we're perfectly happy with the

10 stipulations.  We -- many -- the identity of many of these

11 individuals, the location of many of these geographical

12 places, they're not controversial; and we're happy not to

13 have someone get up on the stand for no purpose and testify

14 about that.  But complicated terms that are widely disputed

15 that we think are very important to the case, it just makes

16 no sense from our perspective to try to stipulate to a

17 meaning when it doesn't seem that we'd be able to reach a

18 meaning.

19          THE COURT:  That's fine.  I'm not going to compel

20 you to proceed one way or another.  Perhaps what I should

21 do is simply anticipate maybe as early as tomorrow night

22 doing whatever it takes to get the final rulings on these

23 issues.  I don't know what else I can do.  And I'll hear

24 you orally.  And I'll review the materials that have been

25 presented to me so far and we'll go from there.

```
 1              I have a serious -- I don't see how the

 2    background and history and other data and information about

 3    Islam is any more pertinent at all than all the stuff about

 4    Al-Quaeda and Chechnya and Bosnia and all that stuff

 5    Mr. Kohlmann reported on.  The Government disagrees with

 6    that; and if you disagree with that, that's fine.  But I

 7    will rereview reports that we have.  And Counsel, you can

 8    be prepared tomorrow then to argue those issues before we

 9    go home tomorrow night; and everybody will know where we

10    are.  In the meantime, I've urged the Government to proceed

11    with its course on the definitions; and we'll go from there

12    with that.

13              I would like -- at the very least, if there are

14    specific definitions as to which -- whatever I understood

15    to be agreement has fallen apart -- have fallen apart, I

16    want to know about that right now, so before we go home

17    today.  So, somebody can send me the current list.  I will

18    look at it.

19              MR. WHITMER-RICH:  I E-mailed Your Honor

20    Mr. Herdman's most recent version, and I will also E-mail.

21    I've been trying to review these with my client, and I will

22    E-mail you before the end of today and Mr. Herdman the

23    outstanding objections at least the specific numbers that

24    the Amawi team has and the balance that can be acceptable.

25              THE COURT:  I'd like to look at those before we
```

1  go home today, if possible.

2          MR. WHITMER-RICH:  We can probably.

3          THE COURT:  If you're able -- if I give you some

4  time to do so.

5          MR. WHITMER-RICH:  I would imagine we can do

6  that, Your Honor.

7          THE COURT:  You sent me both a PDF and a Word

8  document.  Are they the same?

9          MR. WHITMER-RICH:  They are the same.  I believe

10  that Mr. Herdman's documents -- yeah, I believe they are

11  the same document.  And I think they contain the same list

12  in three different forms; is that right, Mr. Herdman?  The

13  list that you sent to me that the Judge -- would have them

14  list by topic and the second list them in alphabetical

15  order.

16          MR. HERDMAN:  That's correct.

17          MR. WHITMER-RICH:  So it's two sets of the same.

18  They're both contained in each document.  Each document is

19  the same.

20          THE COURT:  Okay.  And I will forward what you

21  just sent to me to everybody else, I hope.

22          MR. WHITMER-RICH:  They should all be in

23  possession from last night, but that's fine.

24          THE COURT:  Yeah.  If somebody can be at least in

25  terms of those as to which the disagreement, I want to get

1    that sorted out before we go home tonight.  Okay?

2         Okay.  Where are you with production of both

3    transcripts to the extent that they are varied from the

4    Government's and the designation of portions that you are

5    going to be using?

6         MR. HARTMAN:  We have sent as of 11:40 today, I

7    believe, 35 different excerpts to the Government that we

8    intend to be using.  I'm creating a table that so far there

9    are about 22 or 25 on the table that the table kind of

10   matches what the Government gave to us, just as a reference

11   to the page numbers that the excerpts come from and

12   whatnot.  The excerpts are also highlighted in the

13   transcripts.

14        We've been sending the Government all the

15   transcripts that we get, so some of them went there with no

16   highlighting, which frankly confused things for the

17   Government, because we weren't using those excerpts.  But

18   we got these transcripts, so we passed them on.  That's

19   part of the problem.

20        We are -- with the exception, I think, of a

21   couple of videos, all of the what I will call vital

22   recordings have been sent over and have been included in

23   the list and sent to the Government.  We still have a few

24   to review, because we still, quite frankly, are getting a

25   couple of transcripts back.  Wherever possible we are using

1   the Government's transcripts rather than our -- even if we

2   don't -- you know, we're not even comparing to say that

3   ours are more accurate, theirs are less accurate.  We're

4   just using theirs.  You know, we're trying to pare this

5   down, so we don't play entire recordings.

6           THE COURT:  Do you presently have your versions

7   that you plan to use -- not plan, but expect to use where

8   there are variances between your versions and the

9   Government's versions?

10          MR. HARTMAN:  In a couple of cases, yes.

11          THE COURT:  Well then, I'm going to hold an

12  audibility hearing today on those.  I don't know what else

13  to do.  I hoped to get all this stuff cleared up today, so

14  we can move along tomorrow.  If to the extent that there

15  are varying versions, I'm going to do what I did yesterday

16  afternoon.

17          And I thought more about this by the way.  It

18  seems to me that in reviewing a -- a transcript for

19  accuracy, I shouldn't do -- if anything -- if anything, I

20  shouldn't do much more than what the jury -- the jury's

21  going to be exposed to this once, rather than as you all

22  have been, time and time and time and time again and as I

23  did a bit yesterday.  If I don't hear it when it's

24  displayed, where there's no disagreement, that's fine; but

25  if there are two variances, inaudible and a word is

1   believed to have been spoken, or if there is disagreement

2   as to whether a record was spoken and it's truly an

3   inaudible or some other word, I think, candidly, the proper

4   approach is for me -- most proper approach is for me to

5   listen to it the way the jury will, because I have to put

6   myself in the shoes -- or in the earphones of the jurors.

7   And if it can't be heard on an ordinary playing or

8   transmission, it shouldn't be in the transcript.

9          MR. HARTMAN:  Can I have a moment?

10         THE COURT:  Sure.  That's all I'm saying.

11         MR. HARTMAN:  I understand.

12         THE COURT:  This occurred to me this morning as I

13  was coming down here today; and candidly, I don't know --

14  excuse me.  I don't know of any case where a judge has

15  taken this approach, but it sure makes sense to me.

16         MR. HARTMAN:  Did you say it shouldn't be heard

17  or it shouldn't be read, the transcript?

18         THE COURT:  No.  No.  If -- yesterday the whole

19  problem about press and out or whatever we were talking

20  about, you know, it took several replayings before I

21  thought I heard it; and by the time we got to the end, I

22  didn't hear it.  Okay.  And we probably replayed that 25

23  times.  Well, we don't do that in front of a jury.  The

24  jury hears what it hears.  That's the evidence.  It sees

25  what it sees as an aide to understanding, to help us make

1   its hearing more key as it were.  But as that's occurring,

2   there's a disagreement, one of you says, It means A and the

3   other -- or the word was A.  The other one says, No.  It

4   was B.  If there's that disagreement, I don't think I

5   should absolving this agreement as I understand I'm

6   supposed to under the Sixth Circuit law.  I don't think I

7   should sit here and replay something 25 times or replay it

8   until a point where I say, Yeah, you're right.

9           So -- and what I would propose is to the extent

10  that -- as you sit here now, you have presented the

11  Government with transcripts -- not translations, I'm

12  talking transcripts -- of conversation conducted in English

13  that has differing contents of the same conversations that

14  the Government already has transcripts of.  And I would

15  propose that if that stuff is at hand, let me get about the

16  business of listening to it.

17          The whole point of what I've tried to say for the

18  last 10 minutes now -- or five minutes is that course of

19  listening I don't think should involve multiple, multiple

20  replays.  I think I put myself in the jury box; and if I

21  can hear it, I can hear it.  If I can't hear it, I can't

22  hear it.  Or if I hear something different, I hear

23  something different.  That's what I understand I'm supposed

24  to do.

25          MR. BRYAN:  Your Honor, if I may just very

1  quickly, I would -- based on that standard, I would

2  suggest, then, a lot of what the Government played during

3  direct examination of Mr. Griffin would not have passed

4  that standard.  In fact, their own witness testified that

5  he had to listen to the tape multiple times to prepare the

6  transcript.

7       THE COURT:  There was no objection to the

8  accuracy of the transcripts.  So, I was not about to sit

9  down and go home every night and listen to two hours worth

10  of recordings to confirm that I could, in fact, hear the

11  what the transcript said.  And I think the law is quite

12  clear.  I'm not presented with an objection to accuracy.  I

13  sit back and listen along with everybody else.

14       MR. BRYAN:  I agree, Your Honor.  I'm not

15  disputing the accuracy with what the Government proposed.

16  I would just say that listening to it the first time, you

17  don't always hear everything that's there.  I, myself, went

18  through the transcript several times and listened to the

19  tapes at the same time and was able to pick up on it

20  eventually.

21       So, that's what I'm suggesting.  In our effort to

22  try to get some of this information before the jury, if

23  there is a consensus after listening to it -- I'm not

24  saying 20 times, but three or four times.  If Your Honor

25  can hear it and notice it in the transcript, I think that

```
 1    would be more appropriate than just giving it the one shot.
 2              THE COURT:  I'll -- it can vary.  I will see.  It
 3    can vary.  I mean, sometimes you can't hear anything.
 4    Okay.  It's this and not that.  And some, Okay.  Let's
 5    replay, and I think I heard it.
 6              MR. SOFER:  Your Honor, I think Your Honor put
 7    your finger on the -- there was no objection to the
 8    Government's -- the accuracy of the Government's
 9    transcripts and tapes that we put in.
10              Here's our problem with the El-Hindi transcripts
11    and audio.  What we have been supplied with, all due
12    respect to counsel, for Mr. El-Hindi was just a mess.  We
13    could not -- we were getting multiple copies of the same
14    thing.
15              THE COURT:  Let me also say that I will note the
16    objection of counsel for Masloum.  We've -- we'll get to
17    hear Mr. Amawi and Mr. Masloum's cross-examination and give
18    ourselves some breathing room.
19              MR. SOFER:  That's what I was going to suggest,
20    Your Honor.
21              THE COURT:  You've won.
22              MR. SOFER:  Sorry, Judge.
23              THE COURT:  Remember, rule one.  What's rule two?
24    Don't interrupt me.  Rule one's don't interrupt.  Rule two
25    is if you won, sit down.
```

```
 1              MR. BRYAN:  Your Honor, also, the thing -- I have
 2    to object specifically to some of the things in the
 3    Government's trial transcript is based upon certain
 4    reassurances made to us that once we want to present this
 5    evidence that if we believe that it says something else, we
 6    will be given the opportunity to present that.
 7              THE COURT:  Sure, and you will.
 8              MR. BRYAN:  And one specific example in
 9    Mr. Amawi's case, they were watching the beheading --
10    the -- the --
11              THE COURT:  I couldn't hear you.
12              MR. BRYAN:  One specific instance in the
13    Government's transcript where I don't think it was a
14    mistranscription, I think it was something that they listed
15    as inaudible that to me was clearly audible when I heard it
16    the first time.  It said unintelligible; and Mr. Amawi
17    responds to the -- Mr. Amawi said, unintelligible cutting
18    up heads.  The unintelligent word to me clearly was don't.
19    I don't want to see cutting of heads, which clearly changes
20    the meaning.
21              THE COURT:  Rather substantial, I agree.
22              MR. BRYAN:  I think we should be permitted to
23    point that out.
24              THE COURT:  And if you're going to be offering
25    that, by all means.
```

1              MR. SOFER:  Two things about that, Judge.  We

2    have gotten from the Amawi team this alternate

3    transcription.

4              THE COURT:  I understand.

5              MR. SOFER:  And certainly, again --

6              THE COURT:  If -- if it's not in your hands now,

7    they're not going to get to play it tomorrow or the next

8    day.  If they want to come back and offer it in this case

9    in chief and give you time and me time to make an

10   audibility determination, we will.  It's not the end of the

11   case.  We all know that come this weekend, okay, they still

12   have the opportunity to -- talking about cross-examination.

13             MR. SOFER:  Understood, Judge.

14             THE COURT:  In that instance, Mr. Bryan, it's not

15   Mr. Griffin's interpretation; it's the Government's.  And

16   so I wouldn't see an appropriate and necessarily desirable

17   topic for cross-examination.

18             Mr. Boss?

19             MR. BOSS:  Judge, I'm just going to observe that

20   the transcript segments that we have decided to use for

21   most all of the transcripts are, indeed, the ones the

22   Government sent us in their most recent version.  Where

23   there may be some issues is because the Government

24   clarified and certified and made certain that what they

25   played for the most part was accurate; and they shared with

1  us that things outside of the highlighted text that they

2  call their segments or clips, they were not certifying the

3  accuracy of them.  If there is a deviation from, you know,

4  what is heard, likely because the government hadn't had the

5  chance yet to go back and clarify those.

6          We found -- today I was working on a particular

7  clip from the dinner video; and a portion that was played

8  by the Government where I found what I thought to be a

9  deviation from what was actually there, I've had my staff

10  make the change in the Government transcript that we are

11  still using.  But we are sending along with that an alert

12  to the Government that that's where it's exchanged.

13          And so what we're endeavoring to do is where we

14  find a change to make what the Government provided us,

15  we'll give them a heads-up and everyone else when we send

16  it along.

17          We're really trying to get this done, and we

18  don't intend to -- that one that I'm referring to is

19  probably the most important one, the February 16th video;

20  and I'm through perhaps a third of it.  And so we're trying

21  to get this done.  But most of the -- we're 80 percent

22  done, I think.

23          MR. HARTMAN:  Yeah.

24          THE COURT:  Done sending transcripts, or done

25  sending transcripts and specific designations?

```
 1          MR. BOSS:  Transcripts and specific designations.

 2          What we're hoping -- or intending to do next is

 3    go through and weed it out so that we're not playing more

 4    than what's necessary; and we're not, you know, otherwise,

 5    burdening the Court, the jury, the government and any of

 6    the rest of us.

 7          MR. SOFER:  Judge, again, our problem is the

 8    timing of this.  I don't know when this is going to end,

 9    but I've thrown my hands up on this issue.  We -- the Amawi

10    team got us a list of their excerpts.  We looked at them.

11    We analyzed them.  We came back.  We worked it all out.

12    I'm told by a number of people that --

13          THE COURT:  Well, I'll tell you what we're going

14    to do.  To the extent that these aren't resolved by the

15    close of business on Friday, we're coming back here

16    Saturday morning and I'm going to hold my audibility

17    hearings and I'm going to decide.  And as soon as counsel's

18    preference to postpone consideration of the expert

19    testimony, I will do that Saturday and then Sunday, if

20    necessary.  That's the way it's going to be.  If you want

21    your experts here to testify, bring them in for whatever

22    day I say.

23          Mr. Sofer's absolutely correct.  It's crucial

24    that these decisions be made.  I'm not going to go into the

25    whys and wherefores of the delay, because I don't think
```

1    anybody in this case has acted in any way other than with

2    absolute good faith and making every effort to meet that

3    and being professional and cooperate with each other.  If I

4    felt differently I'd be a lot more upset about things; but

5    I don't.  You know, I'm not dealing with a bunch of people

6    who are throwing a lot of elbows under the backboards and

7    calling every -- everyone at fault.  Whether it's in or

8    out, that's what I'm going to do.  I don't know what else I

9    can do, because they have to get this stuff.

10         I want this stuff to them by the close of

11   business tomorrow, every designation.  If you don't have it

12   designated in a transcript by 4:00 tomorrow afternoon,

13   you're not going to get to use it on cross-examination.  I

14   don't know what else to say, because you need to have --

15   they need -- just as you do, the Government needs time to

16   be prepared.

17         MR. HARTMAN:  Judge, I have no problem with that.

18   I think it's completely fair.  I would just want to remind

19   the Court and have on the record, we got no less than four

20   different versions of transcripts from the Government --

21         THE COURT:  I understand all that.  And it's

22   all -- I know the problems in getting the transcripts from

23   the Government.  We are all dealing with a --

24   circumstances, Mr. Griffin's testimony was probably

25   two-thirds of what you expected.  Is that a fair guess?

1          MR. SOFER:  I didn't hear.

2          THE COURT:  Took about two-thirds as long or

3     three-quarters as long as expected, so people thought,

4     Well, gee.  And we've taken a week already, and I'm not

5     going to take anymore time from.  If it means working on --

6     this weekend, because I'm not available next week, we're

7     going to tend to this event.

8          Angela, if it's necessary to get contract

9     reporters, we'll get contract reporters; and you will not

10    have to pay for them.  I will take care of that.

11         MR. BOSS:  Your Honor, while I respect the

12    Court's position, 4:00 tomorrow, and as it's meaningful to

13    me, we have court tomorrow; and we'll be in court all day.

14    It is -- the courses of the transcripts that have yet to be

15    reviewed by us will not be used in the additional

16    examination of Mr. Griffin.  They will not be used until,

17    you know, the following week.  It's my hope that we can --

18         THE COURT:  No.  But my point simply is I have no

19    other time to conduct a meaningful audibility review so

20    that everybody knows as soon as possible, even though much

21    of Mr. Griffin's cross-examination will be done, what's in

22    and what's out.  That's all I'm trying to accomplish.

23         MR. BOSS:  Yes, sir.

24         THE COURT:  Because, you know, I had hoped

25    yesterday and today to rule on a bunch of hearsay issues;

1    but we couldn't.  This is a classic chicken and egg thing.

2    Until we have -- until everybody knows what the -- version

3    of a transcript is that the jury will see, you can't

4    formulate your cross-examination.

5           A class -- A example is the one yesterday.  It's

6    obviously a very important snippet of a conversation of

7    transcript that's not coming in.  The conversation is -- I

8    couldn't hear it, so they have to adjust their

9    cross-examination accordingly and so do you and so -- and

10   the government as well.  So -- and I don't know when else

11   we can do it given the delays that have been encountered.

12   Get it done by noon on Friday.  Okay.  That's all I'm

13   saying.  Give them time to look at it and give each of you

14   time to talk to them.  That's all I'm saying.

15          Look what happened with Mr. Ivy yesterday.  It

16   evaporated, because you took 15 minutes in talking to him.

17          MR. SOFER:  And again, Judge, are you saying noon

18   on Friday or 4:00 tomorrow?

19          THE COURT:  I'm going to -- Mr. Boss, when can

20   you -- what deadline can you impose upon yourself?

21          MR. BOSS:  Noon on Friday would be perfect,

22   Judge.  Thank you.  We'll be able to, then, have all night

23   tonight and all night tomorrow night after court -- 8:00

24   a.m. Friday, because we'll becoming back to court.

25          MR. SOFER:  And Judge, here's my problem with

```
 1   this.  I've raised it before --

 2           THE COURT:  Well, we're adjourning court about

 3   1:45 on Friday afternoon.

 4           MR. SOFER:  -- and what I said starting about two

 5   months ago, Your Honor, was we -- it takes us to give them

 6   this kind of time and then expect the Government to turn

 7   around and in a half a day or day is just -- it's not fair.

 8           THE COURT:  Well, the point still -- the point

 9   isn't as important to the Government as its ability to

10   respond is.  What really matters is my listening and making

11   my mind up.

12           MR. SOFER:  But that would, then, require Your

13   Honor, which I don't think you wanted to do, to sit here

14   with us while we all try to figure out what --

15           THE COURT:  That's what I'm going to do starting

16   at 8:30, 9:00 Saturday morning.  We will do that as long as

17   it takes Saturday and Sunday, if necessary.

18           MR. BOSS:  Much to my surprise, it may not be

19   that big of a deal, because I don't think that we're

20   providing any deviant versions of transcripts, except a

21   sentence or two.  We are adopting the Government's version

22   of the transcripts.

23           MR. SOFER:  I've been told otherwise by the

24   people who are reviewing what we've been getting.  That's

25   all I can say.
```

```
 1              THE COURT:  Focus on how far of -- the

 2     designations -- what percentage of the -- that's what

 3     counts is the designations, what percentage of those by

 4     designation, I mean, things that you may use or

 5     contemplating possibly using on cross-examination,

 6     realizing you may not use all of them.

 7              MR. HARTMAN:  Have we turned over?

 8              THE COURT:  Right.

 9              MR. HARTMAN:  90 percent, I think.  And if the

10     Government wants to tell us --

11              THE COURT:  Before you leave today, sit down and

12     make sure they understand how you've communicated that, so

13     at least say, No.  Oh, that's what you mean.  Okay?

14              MR. HARTMAN:  And I'm certainly willing to.

15              THE COURT:  And if you can't -- whatever isn't

16     worked out by when we adjourn on Friday, we will resume on

17     Saturday.  And I will listen to whatever I have to listen

18     to for as long as I have to listen to it.  But I do not

19     contemplate listening to -- replaying each snippet 22 dozen

20     times.  I would -- I'm not going to do that.  Some I may

21     three or four, let's give it a try again.  Some I may say,

22     No, I can't hear a thing.  Some I might say, You're wrong.

23     That's how I understand I'm supposed to do it in the

24     Sixth Circuit.

25              MR. HARTMAN:  I think that's fine, Judge.
```

1          THE COURT:  And likewise, I will -- I don't think

2    I -- unless you want to try and do it one evening, I'm not

3    real keen on that.  I think we better expect to spend

4    Saturday on the -- and Sunday, if necessary, on being heard

5    about the experts.

6          Each of your experts to the extent that there are

7    objections to the subject matters about which testimony is

8    being offered, certainly with regard to how that interlocks

9    with the Government's case in chief, and because, also, I

10   think the Government's request is entirely fair.  Look,

11   Judge, you really can't tell us whether your decision as to

12   Kohlmann is the last word until you've told us about this

13   other stuff.

14         MR. WHITMER-RICH:  I am moving to a new house

15   this weekend, on Saturday, so I will unfortunately not be

16   here on Saturday; but we will do -- we will do whatever we

17   can.  We'll find able colleagues.  I'm sorry, Your Honor.

18         THE COURT:  Normally, I'd say fine; but I can't.

19   It's too late.

20         MR. WHITMER-RICH:  I understand.

21         THE COURT:  Okay.

22         MR. HARTMAN:  Judge, can I have one second?

23         MR. SOFER:  Judge, here's -- Counsel just asked

24   me a question, and I think it's important for Your Honor to

25   rule on this.  If we're going to be talking about the

1    experts, there are obviously different levels of inquiry.

2    There's a Daubert hearing.  There's the question of their

3    just general relevance.  Counsel asked whether the

4    Government has formally objected to the linguist, for

5    instance, by linguist the ships, trains passing in the

6    night.

7                THE COURT:  Georgetown?

8                MR. SOFER:  Yeah, from Georgetown.  And

9    absolutely, we formally object to his testimony.

10   Absolutely, we formally object to the testimony of the

11   Amawi witnesses other than the translators, slash,

12   linguists; and I understand that pending Your Honor's

13   decision at least for Mr. Masloum, we would object to the

14   witness proffered as an expert by Mr. Masloum as well to

15   the extent that that -- that any of our discussion reopen.

16              I just want to remind the Court again that the

17   Government will -- we've already begun to do this, but we

18   will now do this in earnest.  We will now seek to identify

19   new experts who can fill in the gaps should the Court, not

20   knowing what Your Honor will do, should --

21              THE COURT:  I don't either.

22              MR. SOFER:  -- should the Court allow some of

23   this testimony.  Again, we're going to go out and find a

24   person who can hopefully rebut the testimony of the issue

25   of the ships passing in the night, and whether Islam

1    somehow forgives the behavior and violation of U.S. law,

2    et cetera, et cetera.  Again, we have no choice but to do

3    that on a very short time line.

4              THE COURT:  I understand that.  That's why I want

5    to get this resolved before we -- I want to get this

6    resolved by this weekend at the latest.

7              MR. SOFER:  I hope Your Honor will accept our

8    oral objection as opposed to a written motion given the

9    time frame.

10             THE COURT:  I will.

11             If you have an opportunity to provide, however

12   brief, a summary or bullet point, that's fine too.

13   Whatever is going to facilitate our time together this

14   weekend.

15             MR. HARTMAN:  I'm going to have a bit of a tough

16   time orally arguing without the final report.  I understand

17   Mr. Sofer has the objection to some of the conclusions that

18   are drawn, which I'm frankly saying, Fine, we'll take out.

19   But there's other testimony that I don't believe is --

20   is -- is as objectionable; and without final report, I

21   think we might have a tough time deciding that one.  I'll

22   argue it, but just don't know that we're going to be ready.

23             MR. BRYAN:  Your Honor, the suggestion and red --

24   just to -- to dispel the suggestion and the red herring

25   that was just thrown out by Mr. Sofer, I don't think you

 1  can even glean this from reading the reports of either --

 2  the one expert or Jonathan Alterman.

 3          Nowhere is there going to be an expert that's

 4  called that says that Islam forgives the violation of

 5  federal law.  And I think that if he tries to make a

 6  caricature of what our experts are saying -- and he

 7  sometimes, I think, can win with the Court -- what they

 8  will testify to, quite frankly, I'm not even sure it can be

 9  disputed; but then anyone can dispute it.  And I welcome to

10  see whatever the Government --

11          THE COURT:  It may be as --

12          MR. BRYAN:  These basic simple principles,

13  Your Honor.

14          THE COURT:  It may be as accurate to the

15  proposition, the sun rises in the east and sets in the

16  west; but that doesn't mean that the circuit of the sun has

17  anything to do with the issues in this case.  And the issue

18  is a question of relevance, at least as I understand the

19  basis for the objection.

20          MR. BRYAN:  We're prepared to argue relevance.

21          THE COURT:  And that's my understanding.

22          MR. SOFER:  Absolutely, Judge.  It's a -- it's a

23  down-the-line question of relevance for all -- in the case

24  of I think his name is Dr. Shy.  I apologize if I'm

25  butchering his name.  It's a question of the validity of

1    any of his testimony.  And again, this has been litigated,

2    I believe, in a number of courts; and we'll be prepared as

3    best we can to orally argue this.  But again, the problem

4    we have here, these are relatively complex issues.  It's

5    just -- it's a question of timing.  Again, we're doing this

6    in the middle of the Government's case.

7           THE COURT:  If you can suggest something better

8    than attempting to do this, this Saturday morning, let me

9    know.

10          MR. SOFER:  No.  I think unfortunately that's

11   exactly what we have to do.

12          THE COURT:  As I said, I would like -- there's

13   one other thing I didn't mention -- are there other things

14   anyone else wants to mention?  But I do want to have an

15   audibility hearing or maybe take a recess and have you

16   people look at what you have and talk to each other.

17          I do want to look at the definitions yet this

18   afternoon or this evening.  I should -- I want to tell the

19   defendants that the Government has given to me for

20   in camera review or made available for in camera review the

21   receipts that we talked about, payment receipts may be --

22   the records of various payments to Mr. Griffin.  And my

23   question to you is:  What do you want me to do with them?

24   They're quite voluminous.  I did ask Mr. Sofer, and this is

25   the extent of my inquiry on this.  I think I did ask him

1  what they wanted me to do, because I was kind of -- I

2  couldn't recall why that stuff was coming in, short

3  attention span.  He reminded me that this is in response to

4  that request and order by me and I think the proper

5  question is not what they want me to do, but what you want

6  me to do with it in anticipation of cross-examination.

7          Also, I understand it.  I've not looked at it,

8  but the -- the records are in chronological sequence rather

9  than topical sequence.  In other words, there's not a

10  collection of phone bills.  There's not a collection of

11  meal receipts.  There's not a collection of got to go out

12  and buy videotapes or whatever.  It's just sequentially and

13  it would be hugely helpful to me as I review what I want

14  you -- you want me to do.  Because a Jencks, slash, Brady

15  kind of way when -- if you ask specific questions about

16  specific topics, I can verify the receipt that the answer

17  conforms to the record.

18          MR. BOSS:  It was a bit of that and more.

19          THE COURT:  I mean, because quite candidly, you

20  know, how many years does this cover?  And there's a stack

21  of stuff.

22          MR. BOSS:  What we understand --

23          THE COURT:  And these are -- by the way, only the

24  payments -- only payments, I think, are material are from

25  the FBI.

1          MR. BOSS:  My principal concern did not have to

2     do with the payments that were made to him precisely or

3     exactly for his salary.  Although if there are signed

4     receipts and they reflect that he's acknowledging tax

5     purposes, that would be, of course, important.  But in the

6     direct examination of Mr. Griffin, there was an exchange

7     where Mr. Griffin acknowledged that he had received

8     reimbursement for -- from the Government for $45,000 of

9     satellite phone bills.  He, then, went on to explain that

10    he still owed about 20 of that.  In other words, money that

11    was paid for him.

12          THE COURT:  I think it was 22, but that's okay.

13          MR. BOSS:  Pardon me.  Money that was paid to him

14    extensively to reimburse some other expense was stuck into

15    his pocket and only later -- very recently discovered by

16    the Government which leads us to the conclusion that this

17    may not and probably was not the only time that that

18    happened.

19          And so we are interested in that category of

20    receipts that does not uniquely come to what we've been

21    provided already in terms of his income in Jencks and

22    because we now know he has been known to --

23          MR. HARTMAN:  Not only that, Judge, the

24    Government -- who's responsible for that $22,000?  He said,

25    I am, making it sound like he's the one that had to pay for

1   that.

2          MR. BOSS: We believe that that segment of the

3   testimony causes the entirety of those receipts to now be

4   discoverable. Because as the Government, I believe,

5   acknowledged, they didn't discover this until only

6   recently. Had they known about it, of course, we would

7   have been given notice earlier.

8          The point is they didn't know about it because of

9   the deception of the witness. And so -- and frankly, we

10   believe that in the fact pattern, we have a couple -- in

11   fact, several other instances specifically where he was

12   paid money to be reimbursed as a specific expense where we

13   know that it was paid by someone else instead.

14          THE COURT: Well, to that extent, may I suggest

15   this, you go ahead and question him. Let me hear what the

16   questions are.

17          I was really asking if there are specific items

18   you want me to be prepared to make a determination on

19   instantaneously, but perhaps what we should do is wait and

20   see what -- see what the answers are.

21          MR. BOSS: Okay. We'll try --

22          THE COURT: This really becomes at all -- an

23   issue if there's a variance between an answer and the

24   record, as he did say here, 22,000 is still owed. You can

25   obviously cross-examine him about the misleading

 1   impression.  Well, you got paid for that, didn't you?  Yes.

 2   And move on down the road.  The record will confirm that,

 3   and that would be admissible.  Simply, hearsay statement is

 4   not inconsistent.

 5          MR. BOSS:  We'll try to identify those specific

 6   instances in the record.

 7          THE COURT:  That's all I'm asking.  I don't want

 8   to sit down and review a stack of 3 or 4 inches high of

 9   random paper.  Like Mr. Sofer's saying, you tell me what

10   you want me to look at rather than the whole stack.  That's

11   fine.

12          Okay.  Shall we -- are you in a position -- or

13   would you like me to take a short break to enable you to

14   figure out between yourselves by looking at the list of

15   stipulations, definitions where you're squabbling; and I

16   can come back and see if we can't resolve that,

17   Mr. Doughten?

18          MR. DOUGHTEN:  I just want to be sure I'm clear.

19          THE COURT:  I can't hear you.

20          MR. DOUGHTEN:  I want to be clear, we've been

21   moved second in the pecking order for cross-examination.

22          THE COURT:  Yes.

23          MR. DOUGHTEN:  We have one request; and that is,

24   if Amawi cross is done before the end of the day on

25   Wednesday, if we can have until Thursday morning?  The

```
 1    reason for this, Judge, is we --
 2            THE COURT:  If they get done before normal
 3    closing time tomorrow?
 4            MR. DOUGHTEN:  Yes.
 5            THE COURT:  I don't think that is really an
 6    issue, Mr. Ivy.  It's more like I expect to carry-over
 7    until Thursday.
 8            MR. IVEY:  No.  My whole -- Your Honor, my hope
 9    is to be done tomorrow.  I just gave myself the extra
10    cushion, so I didn't get impeached by the --
11            THE COURT:  Ladies and gentlemen, he promised me
12    I'd be home by 4:30 this afternoon.  Mr. Ivy, you may
13    continue tomorrow morning at 8:00.  Come a little early
14    folks, because Mr. Ivy fibbed to us.
15            Is that okay, Mr. Ivy?
16            MR. IVEY:  Yes.
17            THE COURT:  No.  That's fine.  Whenever he gets
18    done, we'll break tomorrow.
19            MR. DOUGHTEN:  The other issue we have -- and
20    this is just so the Court's aware -- we're all sharing the
21    technician to match up the tapes with the -- I guess, the
22    translations.  We don't have access to that, because I
23    won't mention the party; but they're using up most of the
24    time.  We may have to actually use transcripts that are
25    limited.
```

```
 1              THE COURT:  That's fine.  And --

 2              MR. DOUGHTEN:  They're what the Government gave

 3    us.

 4              THE COURT:  I'm -- I'm sure more ordinary

 5    transcripts would have been more reasonable across the

 6    board anyway.  You're welcome to do that.  You can use the

 7    late 20th century technology.

 8              MR. DOUGHTEN:  I'm doing the cross, and I'm more

 9    comfortable -- if Mr. Helmick were here, he'd have to use

10    the --

11              MR. SOFER:  Your Honor, that point reminds me

12    that when we discussed sort of the logistics of confronting

13    the witness --

14              THE COURT:  Excuse me.  I apologize.  I've got a

15    message I have to look at.

16              Go ahead.  I'm sorry.

17              MR. SOFER:  The logistics of confronting the

18    witness with what could be a prior inconsistent statement,

19    which I think we're talking about here on

20    cross-examination.  We had talked yesterday about whether

21    or not the witness will be shown a transcript versus played

22    the segment; and I think Your Honor asked -- I just don't

23    know the answer to this which is why I bring it up, so we

24    don't end up having to do this tomorrow morning -- is

25    whether or not the defense would prefer to confront the
```

1    witness with the actual recording as opposed to a written

2    transcript, whether or not we can work out a system whereby

3    because he has earphones somehow the witness can hear that

4    and the jury does not, because I don't think that's an

5    appropriate way to confront him.

6                THE COURT:  Hold on a minute, please.

7                      (A brief discussion was had off the record.)

8                THE COURT:  I hope he will know the answer to

9    that question.  I would suggest, though, if we don't get a

10   clearance at the very least by way of back up, you probably

11   should be prepared to present Mr. Griffin with the

12   transcripts.  Candidly, I think that's probably the safer

13   thing to do even if you, then, replay the conversation.

14               Just seems to me that that -- that Mr. Griffin,

15   do you recall this conversation?  The conversation the

16   other day was played for the jury.  Will you please look at

17   this printed transcript version that comes with page 68,

18   line three?  Read it to yourself.  Seems to me, it will be

19   a lot easier.

20               MR. SOFER:  I agree, Judge.

21               MR. BRYAN:  Your Honor, if I may, I was not

22   present during yesterday afternoon's session.

23   Unfortunately, I had another responsibility in Akron, Ohio.

24   But I'm a little bit perplexed, and my colleagues tried to

25   explain to me what was decided yesterday.  But as it

1    relates to the playing of transcript excerpts -- not just

2    transcript excerpts, but the actual audiotape excerpts of

3    Mr. Griffin, I was advised that it's the Court's position

4    that we can't just play excerpts that Mr. Griffin was

5    involved in, say, conversation with Mr. Amawi during the

6    same time frame that the Government's excerpts were used;

7    in other words, before or after.

8           THE COURT:  No.  If it's offered to general -- I

9    think my view would be somewhat flexible or liberal view of

10   completeness to set context, to avoid misunderstanding.  To

11   clarify something, then that's fine.  But the point that we

12   spent a lot of time talking about yesterday -- and I hope

13   to rule on instance by instance yesterday or today, but

14   haven't been able to do so and won't be able to do so

15   probably -- would be where you undertake to introduce

16   conversations or recordings that could properly belong in

17   your case in chief.  There's a difference between

18   cross-examination and introduction of matters that even

19   though they may have been covered on direct examination

20   will be viewed as your case in chief.  More than that, I

21   can't say.

22          I had hoped to go through -- I thought we would

23   be spending yesterday and today going through conversation

24   by conversation.  We can't do that to some extent because

25   we don't know what the conversations are.  We don't know

```
 1  what -- Mr. Ivy, I think, will probably say, Judge, look, I
 2  don't want to get too far into this, because I don't want
 3  to disclose what it is I'm going to be asking.  Again, it's
 4  the chicken and egg.
 5          I don't know what the purpose of the
 6  particular -- what the predicate questions have been
 7  leading up to now that have played, excerpt, whatever it
 8  is.  I don't know whether the Government's going to object
 9  to that or not, and I don't know what the objection is.  I
10  haven't heard from you in terms of what the purpose is.
11  And I think if I can understand this and I would agree and
12  probably taken the same approach, Hey, for me to tell all
13  that to you two days before my cross-examination, my little
14  kittens are out of the bag and running all over the
15  courtroom; and I'm worried about that.  I don't think
16  that's a desirable situation to be in.
17          MR. BRYAN:  So, just to be clear --
18          THE COURT:  I cannot be clear -- I'm sorry --
19  until I see what the question -- until I hear what the
20  questions have been, I hear an objection from the
21  Government.  I can't make anymore -- I'm as frustrated by
22  that as you are.  But that's the way it is.  I can't be
23  more clear.
24          MR. BRYAN:  I understand that.
25          THE COURT:  I'm going to follow the applicable
```

```
 1   rules of evidence as I understand them.

 2             MR. BRYAN:  And just --

 3             THE COURT:  That's what I'm trying to be clear

 4   about.

 5             MR. BRYAN:  I understand that, Your Honor.  But

 6   as it relates to the type of excerpts that I think could be

 7   played during cross-examination -- and again, I'm not --

 8   I'm just doing this for my own clarification in my own

 9   mind.  The first type, it's the type that I first alluded

10   to which is an excerpt that goes beyond the excerpt that

11   the Government played, just to try to put it --

12             THE COURT:  If it's within -- if it's within, my

13   instinct will be my own personal somewhat liberal view of

14   rule of completeness, yes.  If it's not, no, unless it's

15   properly offered for some purpose during cross-examination

16   rather than being offered prematurely, because it's clearly

17   admissible or can be admissible; but it is presentation of

18   the defense theory.

19             And for example, I suppose to the extent that it

20   is or may become involved into a defense theory of

21   entrapment or governmental provocation, it seems to me that

22   that probably is something that ought to be held in

23   abeyance until it's your case.  The Government puts on its

24   case; and it's your turn to say, Wait, folks, you've heard

25   what they did.  You've heard what they said.  But let's
```

1   tell you why all that happened is because of the -- I mean,

2   power tuning and provocation that was going on; and here it

3   is.  I don't think that that's a proper subject of

4   cross-examination.

5          MR. BRYAN:  So, that, then, is the second type of

6   excerpt that --

7          THE COURT:  I don't know.  I can only tell you

8   proceed as you desire to proceed rather than feeling

9   foreclosed as I'm -- because I'm trying to respond to your

10  questions as best I can and answer in the abstract.

11         MR. BRYAN:  As Your Honor mentioned, you

12  mentioned -- and again, this is just for argument purposes.

13  There's evidence that we can use this sort of to develop an

14  entrapment defense.  Again, that's not suggesting that

15  we're going to do that; but if there's evidence there of

16  inducement in some of these other tapes that the Government

17  did play, our ability to present that evidence in

18  cross-examination of the main witness who was inducing,

19  Your Honor, is suggesting that we may -- that we would have

20  to wait until later.

21         THE COURT:  I don't know.  It depends.  Okay.  If

22  he -- let's say he says, Yeah, part of what I was about was

23  trying to get these people to go along with what I was

24  proposing.  Well, what's the need to go cross-examine?  He

25  will admit exactly what it is you're trying to establish.

1          MR. BRYAN:  And it's under those circumstances,

2     if he denies it, then we may be permitted to cross-examine

3     on it.

4          THE COURT:  I don't know.  I'm trying to grasp --

5     I mean, the more I talk, the more I'm setting myself up for

6     being told by the Court of Appeals, You shouldn't have

7     misled them.  Okay.  And I'm sorry.  That's why I don't

8     want to go there, because I don't know what the specific

9     clip is, what its content is.  I don't know what the

10    questions are that have been asked of the witness on

11    cross-examination and their propriety; and I don't know in

12    the face of what objection might be made, and what then

13    your answer would be.

14         And I don't want you standing up if you lose this

15    case a year from now and say, Well, the Judge told us this,

16    because you already suggested that at the start of this

17    colloquy, The Judge told us this; and you know, if he

18    hadn't told us this, we would have done that.  You know, I

19    cannot give you anymore clearer -- I will do within the

20    limits of my human understanding and my human ability the

21    best job I can to follow the rules of evidence as I

22    understand they should be followed.

23         MR. BRYAN:  That's understood, Your Honor.  So,

24    just prepare our cross and proceed as we normally would and

25    wait for objections to be made.

1              THE COURT:  That's right.

2              MR. BRYAN:  Thank you, Your Honor.

3              THE COURT:  And I'll rule on the objections.

4              MR. SOFER:  Just, Judge --

5              THE COURT:  One question, one objection, one

6    ruling and maybe one answer at a time.

7              MR. SOFER:  One issue, though, I think, Counsel

8    appropriately just raised is, you know, again, for us to --

9    and I understand we're going to have to do this on the fly

10   now, and that makes sense to me.  What Your Honor said is

11   perfectly appropriate.  But we're going to, then, have your

12   cake and eat it too strategy.  You can't say we wanted to

13   introduce things for entrapment defense, but we're not

14   presenting an entrapment defense, and then allow and have

15   the Court try to rule on whether or not --

16             THE COURT:  I understand that.  I will hear what

17   the purpose is after I heard what your objection is, know

18   what the questions are and what the clip is.

19             MR. SOFER:  Understood.

20             THE COURT:  I can't do anymore than that.  I

21   really can't.  I don't think there's a situation where

22   anybody says, Gee, you told us this, Judge; therefore, we

23   did that.  If you hadn't told us that, we would have done

24   this.  I want the Court of Appeals to understand how

25   difficult this is.

1              And if that kind of situation arises, I want it

2     to have some sympathy for my inability to rule on things

3     with any degree of specificity in the abstract.  I will do

4     the best I can to let Counsel know I understand what the

5     general guidelines are, so you can prepare yourself so

6     everybody doesn't waste a whole lot of time preparing to do

7     something that I say first question of 25 anticipated,

8     objection sustained .

9              MR. SOFER:  Judge, one other thing, to the extent

10    that we use transcripts tomorrow, I would just ask that we

11    have some mechanism for assuring that the transcript that's

12    being shown to the witness is, in fact, an accurate one;

13    and we can work that out with defense counsel this evening

14    perhaps.  But I don't want -- one of the things we've

15    gotten from Counsel for El-Hindi, one of the things we

16    noticed we're getting old versions of our transcripts

17    occasionally back; and of course, they're full of mistakes,

18    because they were very old versions.  So, to give the

19    witness an old version is going to cause problems.

20             THE COURT:  I agree.

21             MR. IVEY:  Your Honor, one other question, I have

22    a question just for my own information.  With respect to

23    the trial transcript -- not the tapes and videos and all

24    that other stuff -- I'm getting back and I don't -- I

25    wasn't at the real time presentation.  But some of the

```
 1    trial transcript are in numbers with each line along with

 2    it, and others have the time counter time.  And if I want

 3    to use the trial transcript, what is the pro -- which one

 4    should I use?  Maybe I should --

 5              THE COURT:  I would assume --

 6              THE COURT REPORTER:  Page and line.

 7              MR. IVEY:  So, we need to retrieve that we have

 8    just the time --

 9              THE COURT:  Can I suggest that you talk to Angela

10    or Tracy?  Angela will be leaving around 4:30 or so.  In

11    other words, talk to them.  Make sure everybody has the

12    same version.  The IT guy is available.

13              (John Bianco on phone.)

14              MR. BIANCO:  I can hear you fine.

15              THE COURT:  And can you people hear him?

16              Is it possible where a witness is on the stand

17    and a lawyer wants the witness to hear and to view -- hear

18    a recorded conversation and view concurrently the

19    transcript of that conversation for that not to be heard by

20    the jury and not to be viewed by the jury?  Is that

21    technologically -- easily technologically possible?

22              MR. BIANCO:  My first -- the transcript that

23    we're watching, both the same computer that the attorney --

24    that they're running through the system, is it on the same

25    computer?
```

1          MR. SOFER:  That's up to the defense, Judge.  I

2     don't know.  It would be for the Government --

3          THE COURT:  Speak into the microphone.

4          MR. WHITMER-RICH:  Yes.

5          MR. SOFER:  It would be for the Government, and

6     that's what we're talking about.

7          THE COURT:  And also for defense counsel.

8          And that's actually what we're talking about now

9     is cross-examination starting tomorrow morning at 8:30.

10         MR. WHITMER-RICH:  Yes, it will be one computer.

11         THE COURT:  Did you hear that, John?

12         MR. BIANCO:  I did not.

13         When we're talking about the transcript, whatever

14    software is being used, they are hearing it and seeing it

15    at the same time coming from the same computer?

16         MR. WHITMER-RICH:  Yes, I believe so.

17         MR. BIANCO:  So we want just for the witness and

18    no one else in the courtroom to be able to hear and see

19    that?

20         THE COURT:  That would be desirable, I think.

21         MR. WHITMER-RICH:  Or if counsel can see it and

22    hear it, that's probably acceptable; but perhaps desirable,

23    it would be that the jury not be able to hear it.

24         THE COURT:  John, what I'm trying to accomplish

25    is that while it is being heard and displayed to the

1   witness, the lawyers and the other defendants and me, the

2   jury could neither hear nor see; and if that's not

3   technologically doable, that's fine.  In other words, I

4   don't expect you to be here by 5:30 with a crew trying to

5   figure out something else in the next 14 hours to

6   accomplish that.

7            MR. BIANCO:  I know that there's a way to press a

8   button that will stop the publication of the -- I believe,

9   of the display to the jury monitors.

10           THE COURT:  But they still can probably hear it.

11           MR. BIANCO:  I'm trying to think if there's a way

12  to have the headsets work but have the audio in the

13  courtroom and everybody else deleted, and I think it -- it

14  might be possible, but I would like to speak with Dave

15  Sendoll real quick, who's not at his desk at the moment.

16           Can I call back real quick?

17           THE COURT:  Call Joyce, as you did when you got

18  my voice mail, and she'll send me an IM and I'll call you

19  and maybe David on the phone.

20           MR. BIANCO:  But the gist of this is that

21  everybody would have headsets and would be watching their

22  monitors, but the jury could not see anything on their

23  monitor.  And they would not have headsets; is that

24  correct?

25           THE COURT:  That is correct, and there be no

```
 1   broadcast over the court.

 2           MR. BIANCO:  Correct.  I will get that answer as

 3   quickly as possible and get right back to you.

 4           THE COURT:  Thanks, John.  Okay.

 5           Okay.  The other thing -- at least the other

 6   subject you mentioned -- he mentioned three topics in the

 7   E-mail to me that everybody got:  Stipulations of expert

 8   witnesses, general parameters of admissible

 9   cross-examination.  There's also the El-Hindi Motion to

10   Compel.

11           MR. SOFER:  Yes, Judge.

12           THE COURT:  Have you seen his response -- their

13   response?

14           MR. HARTMAN:  I have seen it.  I have not read

15   it.

16           THE COURT:  Well, what other general subjects,

17   because we still have a lot of work to do?  But what other

18   general subjects?

19           MR. SOFER:  The only other thing, Judge, is we

20   will file in the next couple hours our motion.

21   Essentially, it doesn't really ask for anything in

22   particular.  It's sort of a legal memorandum on 68, 69.

23   And the Government's general argument there is essentially

24   we've gone into much, if not all of the witnesses sort of

25   negative aspects, things that might bare on his
```

1  credibility, the things that we believe are --

2          THE COURT:  It's my understanding that that rule,

3  when you're talking about an ancillary or extraneous

4  incident or event, the cross-examiner's stuck with the

5  answer.

6          MR. SOFER:  That is my understanding as well,

7  Judge; and that is part of what my motion said.

8          THE COURT:  At least that's what -- told me 25

9  years ago when I listened to his tape.

10          MR. SOFER:  I think that was correct 25 years

11  ago.  I think it remains correct today.  That's part of

12  what we're arguing.

13          And also, just generally, the Government thinks

14  it would be inappropriate, while certainly if some of this

15  is appropriate for cross-examination to be -- for instance,

16  Counsel remarked to the jury on opening statements that

17  Mr. Griffin had, I don't know, 200 overdrafts or something;

18  but to be going through, I don't think that's quite

19  accurate with the --

20          THE COURT:  I understand.  They say, Mr. Griffin,

21  you had a history of overdrawing one or more checking

22  accounts, yes or no.  If he says no, that's the borderline.

23  You can get really, really egregious, Mr. Griffin, you had

24  an account with Hartford National Bank, number one, two,

25  three, four, five, six during this period.  While you had

1    that account, you had 17 overdrafts.  If he still says no,

2    then we may have a major problem.  I think we all

3    understand the point.

4         And isn't it true that you bounced a check to

5    Target department store in Cleveland, Ohio for $4.78?  And

6    didn't you get charged with that?  And wasn't it nollied

7    when you paid for the $4.78 plus the -- we're not going to

8    go that far, but we'll have to wait and see.

9         But I'll agree with you, we don't engage in a

10   trial of ancillary matters.  And on the other hand, clearly

11   flagrant, unmistakable inference of, you know, kind of

12   initial set of questions that I indicated; and you know,

13   we're all sitting saying, Wait a minute.

14        MR. SOFER:  Understood.  We'll file the motion.

15   As I said, it's sort of a motion that lays this generally

16   out, doesn't really go into a whole lot of very specific

17   issues.

18        THE COURT:  To the extent that everybody

19   understands those rules, I think adjourn --

20        MR. SOFER:  Understood.

21        THE COURT:  Okay.  What else in terms of anything

22   else that's on your mind that we haven't talked about yet?

23        MR. SOFER:  Nothing, Your Honor.  I have a lot on

24   my mind.  I probably shouldn't repeat it.

25        MR. HARTMAN:  Must be about me.

```
1              THE COURT:  I think there's a lot of possible

2    suspects.

3              MR. TERESINSKI:  Judge, he had a guilty

4    conscience.

5              THE COURT:  Anybody behind the bar, and Angela

6    and Tracy and Amy are not above them.

7              MR. TERESINSKI:  Mr. Hartman had a guilty

8    conscience.

9              THE COURT:  On your Motion to Compel, you haven't

10   read their opposition?

11             MR. HARTMAN:  I have not.

12             THE COURT:  What I would like to do, then, is to

13   step down; and before too long but without setting a time

14   limit on it, if you could take some time to read that

15   because I would like to address that and at least get that

16   resolved today --

17             MR. HARTMAN:  Sure.

18             THE COURT:  -- if you could.

19             Also, Mr. Whitmer-Rich, you and somebody from the

20   Government, perhaps Mr. Herdman, to the extent that there

21   are definitions that remain in dispute, if you could talk

22   those through at least be in a position to tell me what

23   they are; and if possible, I'd like to read them to the

24   jury tomorrow.  If we can't, we can't.  The next

25   appropriate time would seem to be at the conclusion of
```

1  Mr. Griffin's testimony.

2        I'd also like -- with regard to any tapes that

3  we're going to hear tomorrow or the next day or this week,

4  I think that there are none; but as to which there are

5  audibility disputes to have those keyed up to get resolved

6  this afternoon.  And I would very much like -- to the

7  extent that you're able to do so, continue audibility

8  disputes and give you time to talk through at least

9  whatever you can now just to see if they're really there,

10 resolve those today as well.  So, we'll take advantage of

11 the next two or three hours, if we can.

12       So, Motion to Compel, definitions and, I guess,

13 audibility, those are the three things I just went through.

14 Okay.

15       MR. HARTMAN:  I'm not sure, Judge, that we're in

16 a position to talk about audibility, because we haven't

17 been told yet what we think is wrong.  I intend to talk to

18 the Government tonight see if we can work it out.

19       THE COURT:  Okay.

20       MR. HARTMAN:  But --

21       MR. SOFER:  Again, Judge, for hopefully the last

22 time, we -- when we get a list of something that we can

23 understand and listen to and analyze, we can get back to

24 counsel and do that.  We've been asking for that for a long

25 time.  We have still not received it.  We've been receiving

1    transcripts as late as nine minutes before we walked --

2            THE COURT:  I thought Mr. Hartman said that

3    they've given you about 90 percent of the designation.  By

4    designation, I mean this segment of this conversation along

5    with a transcript that they want to show to the jury.

6            MR. SOFER:  We received that chart, which is

7    incomplete, sometime -- I don't know what time you sent it

8    yesterday.

9            MR. HARTMAN:  Several times, but most recently at

10   11:40 today.

11           THE COURT:  Look, you know, as I say, it's your

12   weekend too.  If we have to wait until the weekend to do

13   this, okay.  We've got a few hours, couple hours anyway;

14   but if you don't want to spend it -- but aren't able to

15   spend profitably if not, that's fine.

16           At some point, we've got to do -- Mr. Ivy, is

17   Exhibit A -- we had what we expected to be a whole bunch of

18   problems; and they got resolved, because people took the

19   time to talk to each other.

20           MR. SOFER:  And again, Judge, that was because to

21   their credit, the Amawi team got us a -- something we could

22   look at and move quickly on.  We've yet to be able to do

23   that.

24           MR. BOSS:  On a practical level, our audiovisual

25   gentleman's not here at the moment.  I think they're still

1   synchronizing -- trying to synchronize those transcripts

2   with the segments.  So, even if we wanted to go forward, we

3   don't have the equipment or the individual to do so.

4          THE COURT:  The final thing is that I will

5   encourage Mr. Amawi's counsel and Mr. Doughten, certainly

6   Mr. Amawi's counsel, for tomorrow to be prepared to

7   present -- if you want to recall Mr. Griffin conversation

8   to be prepared to show him the written transcript at least

9   as a back up to the -- to the technology version.  I'm

10  concerned that we might not be able to keep the jury

11  unaware of what's being played.

12         MR. SOFER:  Great, Judge.

13         THE COURT:  Okay.  So, I guess read the Motion to

14  Compel, look at the definitions and let me know when we can

15  get back to work.

16              (A brief recess was taken.)

17         THE COURT:  We're on the record.  Angela, thanks.

18         On the Motion to Compel, what remains at issue?

19         MR. HARTMAN:  Well, first, Judge, I want to make

20  clear, we've requested the recording of a two, one

21  conversation that was testified about.  We had a sidebar,

22  and the Government pointed out that Mr. Griffin was

23  mistaken.  There was no recording made that day.  That's

24  fine.  I'm going to throw out that request.  The 302s, the

25  draft versions, I'm withdrawing that request as well.

1          What remains is the original version of Exhibit

2     61, which the Government, I believe, is going to say on the

3     record does not exist, and the E-mails between

4     Mr. Griffin -- Mr. Griffin and the Government.

5          THE COURT:  And with regard to the -- those

6     E-mails, I would think that they're properly discoverable.

7     We all have to rely on the Government doing it's Brady and

8     Giglio job.  So, that motion will be denied as to that.

9          What was -- I'm sorry.  And is there still

10    something else?  I got a little confused in the colloquy

11    before Angela came in.

12         MR. GETZ:  In regards to Exhibit 61, I think

13    there's a Motion to Compel for the Government to produce

14    the original; and the Government is stating that it does

15    not have in its possession the original of that -- that

16    item identified as Government's Exhibit 61.

17         MR. HARTMAN:  The allegation is that Mr. El-Hindi

18    gave Exhibit 61 to Mr. Griffin in paper form.  The

19    Government does not have the paper form.  That's the

20    only --

21         THE COURT:  Okay.  On the definitions, where are

22    we with that?

23         MR. SOFER:  Judge, my understanding is that

24    although we were able to work these definitions out with

25    two out of three counsel -- two out of three isn't bad

1    sometimes -- we are unable with respect to many of them to

2    come to an agreement with Counsel for Mr. Amawi.

3          Our suggestion is -- because, I think, these two

4    issues are so closely interlinked, is to go forward as

5    expeditiously as possible about Your Honor's rulings on the

6    expert testimony from Mr. Amawi.  And we'd ask that you do

7    that one night this week if at all possible, because I

8    think that that will then tell the Government what we are

9    supposed to do.

10         I just would note for the record that leaving

11   these terms undefined, I think, hurts the Government's case

12   and perhaps even helps defense case, which is why we are --

13   since we carry the burden are so interested in getting them

14   defined.  As I said, we were able to work that out with two

15   out of three counsel, but are apparently a long way off on

16   too many of these terms for counsel for Amawi.

17         MR. WHITMER-RICH:  We'd agreed on many of them.

18         THE COURT:  I'm going to go through one by one

19   and see what the problems are, and I will decide whether or

20   not if we can make any progress.  If we can't, we can't.

21   I've downloaded a copy, so I'm set to go.

22         MR. BOSS:  Judge, if these are the last issues

23   that we're dealing with, the stipulations --

24         THE COURT:  Give me half a second.  I've got to

25   tell Tracy that she may be needed at 5:00.  She's with

1    Judge Zouhary.

2            MR. BOSS:  I've reconsidered, Judge.  I was going

3    to ask to be excused, so Mr. Hartman can get working on our

4    segments; but I have reconsidered.

5            THE COURT:  I think it's probably better that you

6    stay.

7            MR. WHITMER-RICH:  Sorted by topic, by first

8    geographic locations or alphabetic locations.

9            THE COURT:  Why don't we do by topic.

10           MR. WHITMER-RICH:  In the geographic locations,

11   the only objection as to Abu Ghraib.

12           THE COURT:  What's the problem with that?

13           MR. WHITMER-RICH:  The problem is it describes

14   what happened under Saddam Hussein imprisonment and

15   torture, political opponents and common criminals; and it

16   describes what the United States did at Abu Ghraib as a,

17   quote, series of abuse, unquote.  It would be factually

18   accurate to state that while the United States used it as a

19   detention facility, there was also torture and killing of

20   suspected insurgents and terrorists.

21           The Government, I'm not surprised, is not willing

22   to stipulate to that.  But it's a very charged subject, I

23   think; and it's one that's, I think, understandably

24   difficult to reach agreement on.

25           MR. HERDMAN:  And Your Honor, I would say at the

```
 1   outset that this particular term Abu Ghraib is one that we
 2   discussed with the Masloum team in particular.  We've
 3   already -- the way we were going to phrase this particular
 4   definition, and I think -- I think our problem with this is
 5   that we've conceded that there were a series of abuses
 6   there, and I'm not aware personally nor has anyone from our
 7   prosecution team --
 8               THE COURT:  What about this Abu Ghraib is the
 9   site of a prison used by the regime of Saddam Hussein and
10   thereafter by U.S. military personnel.
11               Do we need to say anything more than that for any
12   reason at all?
13               MR. HERDMAN:  No, not -- can you repeat it again,
14   Your Honor.
15               THE COURT:  Just Abu Ghraib is a site and prison
16   used by the regime of Saddam Hussein and thereafter by U.S.
17   military personnel.
18               MR. HARTMAN:  Provided nobody's going to make an
19   issue of the Fatima letter that came out of there.  We're
20   not; but if anybody is, then something should be said.
21               THE COURT:  Is Mr. Doughten here?  There you are.
22               MR. DOUGHTEN:  We're fine with that, Your Honor.
23               MR. WHITMER-RICH:  That's fine with us,
24   Your Honor.
25               MR. HARTMAN:  Okay.
```

1              THE COURT:  Okay.  Next as to which --

2              MR. HERDMAN:  Your Honor, just to back up, Abu

3    Ghraib, I believe, also is a city.

4              THE COURT:  It's a city in Iraq located just west

5    of Baghdad.  Abu Ghraib is a site -- or actually probably

6    the location.  I'm going to say Abu Ghraib is a city

7    located just west of a city in Iraq just west of Baghdad,

8    never want to inform any English -- the city in Iraq just

9    west of Baghdad in which is located a prison used by the

10   regime of Saddam Hussein, thereafter U.S. military

11   personnel.

12             Okay.  Next disputed definition.

13             MR. WHITMER-RICH:  In the Arabic terms, the only

14   dispute is as to Jihad.  Right now there's a very lengthy

15   paragraph definition, and there's just a lot in there.  And

16   we find it problematic to just stipulating to a very

17   lengthy detailed definition.  We don't agree with all parts

18   of it.  We -- means to fight, for example --

19             THE COURT:  Pardon me.  I interrupted you.  I

20   apologize.  What -- I interrupted.  I didn't hear what you

21   said.

22             MR. WHITMER-RICH:  We just have -- we have

23   problems in the lengthy paragraph definition to be given

24   there.  We don't think that the translation that it

25   doesn't -- that it's not translated as to fight, an Arabic

1  word that means fight.  We had originally proposed simply

2  the Arabic translation, which is to struggle or strive.  I

3  have a two-sentence additional definition that we would

4  agree with.

5          THE COURT:  Let me hear what that is.

6          MR. WHITMER-RICH:  If I can find it, Your Honor.

7          MR. HERDMAN:  Your Honor, originally, the

8  Government had proposed a two-sentence definition as well;

9  and Mr. Masloum's counsel opposed.  This actual definition

10 is taken directly from the Oxford Dictionary of Islam, and

11 it is longer.  It's certainly not one that the Government

12 is entirely enamored with, but we can live with it for the

13 purposes of this trial.  It is long; it's true.  But I

14 think that it covers every potential context in which that

15 word can be viewed.

16         MR. DOUGHTEN:  Your Honor, our position was this

17 definition came out of an independent source; and I think

18 that the parties want to be able to argue that it means

19 something different within the context that it's used.  And

20 I think this definition allows all parties to argue what

21 they believe the context was.  The Government can argue

22 holy war.  We can argue doing Allah's work.  And you know,

23 over simplification perhaps, but I think that it gives the

24 jury the background to make a decision, so we're

25 comfortable with this definition.

1          MR. HERDMAN:  And that was our position as well,

2    Your Honor.

3          THE COURT:  And this is not -- I recall the red

4    pen of this on Sunday.

5          Does this incorporate my edits, whatever they

6    were?

7          MR. HERDMAN:  You did not edit this particular

8    term --

9          THE COURT:  Okay.  That's fine.

10         MR. HERDMAN:  -- on Sunday.

11         THE COURT:  But it is verbatim from the Oxford

12   English Dictionary or Oxford -- the Oxford Arabic --

13         MR. HERDMAN:  Oxford dictionary of Islam.

14         THE COURT:  Oxford Dictionary of Islam.

15         Why isn't the point that they make well-taken

16   that this, assuming that it's accurate or at least

17   authoritative, it does seem to me to provide an opportunity

18   for parties to argue as to what may have been done in a

19   particular context, and I remain more than willing to

20   instruct the jury, if the parties wish me to, that Arabic

21   is a contextually -- context is important in Arabic.

22         Would you like some time to talk about that

23   further?

24         MR. WHITMER-RICH:  Why don't we skip ahead and

25   maybe come back to this one, Your Honor?

```
 1          THE COURT:  Candidly, all I'm saying, this seems

 2  to me to be a -- very fair because, you know, it talks

 3  about, as I understand it, the Jihad that may involve

 4  somebody's personal effort to control his own passions and

 5  emotions and human inclinations and spiritual contacts.

 6  And it also covers the idea that Jihad is an armed struggle

 7  against -- in furtherance of Islam, or in furtherance of

 8  some other approved goal.  So, why don't we -- we'll hit

 9  the pause button on that.  Mr. Amawi, look at it, and let's

10  move on down the road.

11          MR. WHITMER-RICH:  Let's see.  I believe that

12  the -- in the groups, organizations and institutions.

13          THE COURT:  Let me just ask:  On Qur'an, I

14  realize you all agree with this.  But do you want to use

15  the English variance of Qur'an?  I know that's not

16  contemporary, doesn't matter?

17          MR. HERDMAN:  I believe we used this spelling

18  because it's the way it was translated in the recordings.

19          THE COURT:  Whatever, doesn't matter to me.  I

20  think everybody understands.

21          MR. HERDMAN:  I'm fairly certain that's how we

22  spelled it.

23          THE COURT:  Yeah.  Go ahead.

24          MR. WHITMER-RICH:  On groups, organizations and

25  institutions, a sort of general objection to describing
```

1   that as engaging in terroristic tactics.

2           THE COURT:  That is something that I added.

3           MR. WHITMER-RICH:  Right.  I understand.

4           THE COURT:  Do you have a -- let me get down

5   there.

6           MR. WHITMER-RICH:  It first shows up, I believe,

7   in, say, number three Al Mujahadin Army.  So, the second

8   sentence would be content with the first sentence.  We

9   would seek to exclude the second sentence.

10          MR. HERDMAN:  And Your Honor, this is one of

11  those examples where the Government has conceded I would

12  say quite a bit in terms of allowing the description

13  insurgent group to be implied to some of these

14  organizations, for instance, Al-Quaeda and Iraq.

15          THE COURT:  Well, I'll tell you, if this is not

16  an acceptable definition, if you want to call Mr. Kohlmann

17  to testify to that issue based upon his knowledge, I'll let

18  you do so and ask counsel to let -- in light of that

19  statement on my part, because I think it's entirely

20  appropriate.  The nature of the activities of some of these

21  groups, even though it may not be linked in a sense of

22  agency, with any of the defendants, and it's quite clear to

23  me, nonetheless, to the extent that they have been

24  referenced, I think, is appropriate to let the jury know

25  this is, in a very general sort of way, the kind of group

1   that this is.  And then if defendants want to introduce

2   expert testimony that that's not true, that's fine.

3          And as I think I indicated in my opinion with

4   regard to Mr. Kohlmann, he's clearly qualified.  He's

5   probably as knowledgeable as anybody could be so far as I

6   can tell about much of what he says.  And I think to

7   permit -- to permit the jury to be told very briefly, very

8   pointedly the nature of the activities.  And I do also

9   think, though, and I would ask that it be referred to as an

10  insurgent group as I tried to draw kind of a distinction

11  between the overall character of the group and the nature

12  of some of the things that it does.

13          MR. HERDMAN:  And Your Honor, my response would

14  be --

15          THE COURT:  Let me just say, following the

16  Israeli incurring Lebanon over a year ago or whenever it

17  was, one could have described the mosque as a -- a group

18  devoted to the reconstruction of the facilities in Lebanon.

19  Okay.

20          MR. HARTMAN:  Can the defense have a minute to

21  confer?

22          THE COURT:  Sure.  Just -- just -- and I will

23  just like an opportunity -- one minute.  What I'd like to

24  do is go through this and let you know.  And then so you

25  can talk amongst yourselves after that, and I'm not going

1    to cut that off.  I'm just saying, in this instance, as I

2    understand the evidence, to permit Mr. Kohlmann simply to

3    testify, you know, what is -- or what is or was Al

4    Mujahadin Army, number three.

5              MR. HERDMAN:  There's several in this section,

6    Your Honor.  Can I say in response to that, I can't say

7    that Mr. Kohlmann will testify that the Mujahadin Army is

8    an insurgent group.  He would be able to testify that it is

9    a group, an organization of some sort; and I think he would

10   also -- we proffer his testimony that this particular group

11   has a responsibility for activities or beings, if you want

12   to describe them in a neutral way.

13             THE COURT:  But if it has, that's fine.  Maybe

14   what we should do is sort of have a little preview of

15   the -- you can look at his report or whatever, or we can

16   do -- I'm not trying to prescribe specific.  I'm just

17   saying --

18             MR. HERDMAN:  I understand, Your Honor.  I just

19   wanted to make that clear.

20             THE COURT:  And certainly, if that's not accurate

21   just -- just -- and I actually -- I can't say -- he may --

22   he may say his groups are part of the, quote, insurgency;

23   but he may also describe some activities.

24             I'm trying to defuse the issue of, quote,

25   terrorism as infusing this whole case.  I mean, let it be

1   within the case -- within the -- in the right to pro --

2   proper role or proper place.  That's what I'm trying to

3   accomplish with this.  If it -- this doesn't work, that's

4   fine; and I'll let both sides -- we'll have a checklist.

5           And if you want to call an expert and say that's

6   not true, that's not what this group is about and this is

7   how I know that's not what it's about, that's fine.

8           Hi, Tracy.  Do you want --

9                (A brief recess was taken.)

10          THE COURT:  Okay.  Which is next?

11          MR. WHITMER-RICH:  To report back on the

12  little -- I think that we -- I guess we will.  We're going

13  to change our position; and we'll restipulate to, I think,

14  most of this maybe with a few --

15          THE COURT:  Let's be real, real careful, because

16  I think probably -- I think more appropriately to present

17  this and to have the record show and is -- that you agree

18  that I may present these, I may instruct the jury as to

19  these definitions.  Okay.  We'll -- it may not be that

20  different from, quote, stipulate; but particularly, in view

21  of the Government's situation where they have no objection

22  in this case and this case only to doing some; or even the

23  case of the Government, its objection.  I'm very reluctant

24  to go over the objection of the defendants.

25          MR. WHITMER-RICH:  I understand the -- I haven't

1   I guess thought through this --

2           THE COURT:  That's fine.  I don't want you to

3   stand up here and make a representation that's hasty, okay,

4   because we can wait a little bit.

5           MR. WHITMER-RICH:  But whatever we call them --

6   definitions, what have you -- I think we can probably agree

7   to -- to a lot of this.  I think we'll get to agreement.

8           THE COURT:  And --

9           MR. WHITMER-RICH:  The concern, I suppose, is

10  that, you know, we feel that we have, as I said earlier,

11  retained experts who are competent enough in their fields,

12  who have extremely relevant testimony to provide in this

13  case and that our willingness to agree to certain

14  definitions does not preclude their testimony in any way.

15  Your Honor will make a decision regarding these experts,

16  whether it's tonight or tomorrow night or whenever.

17          THE COURT:  I assume Saturday.

18          MR. WHITMER-RICH:  But by agreeing to certain

19  definitions, we're -- we don't think that in any way

20  mitigates our right on behalf of Mr. Amawi presenting a

21  defense to call experts to testify on relevant and

22  important matters.  That's simply for the record.

23          THE COURT:  I don't consider it a waiver.  I'm

24  just saying, as I said before, I'm not going to let any

25  expert, whether it's Mr. Kohlmann or yourself or whoever,

1    say what do you understand the meaning of X to be if X

2    already told the jury what they are to understand X to be.

3           On the other hand, if I were to, I don't know,

4    permit your witness -- and this is total speculation.  And

5    I can't remember his name, but there is a student in the

6    history of the origins and development of Islam and its

7    various branches and different kinds of believes and so

8    forth.  Then, are you familiar with the term Jihad?  Yes.

9    And can you give us a historical example as to Jihad?  I

10   think it would say, no, you can't do that.

11          If I let that witness testify to that point, is

12   it somehow, otherwise, relevant and permissible?  But I

13   wouldn't want to say a Jihad is something that either took

14   away from or added to or whatever definition that they gave

15   you.  That's all.

16          And I know that's a pretty thin line, but that is

17   one that I would expect to hold very firmly to.  And that

18   presumes that the testimony of that expert, whoever it

19   might be, will be as a general matter, admissible.

20          MR. SOFER:  Your Honor, I just think we have to

21   be -- I think Your Honor's instincts are right that we have

22   to be very careful with this.  Again, the Government's

23   position is we will go forth with what we believe that

24   these agreements, these definitions were.  We think we've

25   conceded significant grounds on some of them if and only if

```
 1    there's not going to be an elaborations.

 2            And the example that you just gave, I think, is

 3    an excellent example of something where you would

 4    essentially have an elaboration, give us some examples

 5    historically of Jihad.  Now, the defense witness I'm, of

 6    course, speculating says some benign nation -- battle of

 7    nations or other conflict.  Well, we -- we have experts who

 8    are able to explain what's going on in Iraq right now is a

 9    good example of Jihad.

10            THE COURT:  Let me, if I can, interrupt.  Were

11    that to happen, I can assure you that you would have every

12    opportunity in rebuttal to call your experts.  And the jury

13    has been told Jihad is whatever and that there as

14    historical examples.  And the expert I assume said, Yes

15    that's correct.  That's the kind of activity that other

16    historical examples that you are familiar with.  Yes.  Tell

17    the jury what those are.  Number one, I'm going to try to

18    avoid that kind of pushing of the boundary, or that

19    territory gets entered into, then, by all means in

20    rebuttal, which, of course, will be the last thing the jury

21    hears on any subject.  I would absolutely let you call

22    somebody and testify.

23            MR. SOFER:  Again, I was just -- I'm just trying

24    to figure out the parameters of this.

25            THE COURT:  Okay.  Okay.  Next.
```

```
 1            MR. WHITMER-RICH:  I guess I would say with our
 2   new position without really putting --
 3            THE COURT:  You want to -- you want to quit now
 4   and talk about it tomorrow night?
 5            MR. WHITMER-RICH:  I believe that by -- within 24
 6   hours, I can either agree to what's here or just maybe a
 7   few minor little tweaks that we want.
 8            MR. HERDMAN:  To that end, Your Honor, we stated
 9   earlier that the Government's conceded quite a bit in terms
10   of arriving at these definitions, in fact, to such an
11   extent because I was the one who sort of let the cows out
12   of the pasture.  I have to try to get them back into the
13   barn now to some extent.
14            THE COURT:  And I'm trying to close the gate, so
15   the ones that are out there --
16            MR. HERDMAN:  I'll try not to step into anything
17   on the way back to the barn.  So, what I would say is there
18   are a couple of minor edits that --
19            THE COURT:  Why don't you go over those?
20            MR. HERDMAN:  -- that suggested that we make to
21   eight terms.  I can say them now, or I can E-mail them
22   around tonight so everyone gets a chance to look at them.
23   Either way I can --
24            THE COURT:  Tonight's Tuesday, right?
25            MR. TERESINSKI:  Yes, Your Honor.
```

```
 1          THE COURT:  I know it's not a Saturday or Sunday,

 2   I know that much.  Of course, this Saturday will probably

 3   feel like a Wednesday.  Why don't we do this?  I mean, I

 4   think we may be making progress; and if we're not, then

 5   I'll be in a position -- obviously, I keep talking about

 6   Jihad.

 7          Jihad's obviously a fundamentally important term,

 8   and you might think about saying each of you is going to be

 9   able to call somebody, probably Mr. Kohlmann, to talk about

10   what Jihad is.  And you've got a linguist who's going to

11   say the same thing, and you may have somebody -- and that

12   may be the kind of thing that you can't deal with in this

13   shorthand, simple fashion; and that's fine.

14          Okay.  Mr. Sofer, I hope you would have -- I hope

15   everybody has -- I'll try to be as fair to everybody as

16   possible, give them the chance; and if they get the

17   chance -- you get the chance -- if you get the chance, they

18   get the chance.  That's my job.

19          MR. SOFER:  I think, Judge, we do think you're

20   trying to be fair; and I hope I've never said otherwise.

21          THE COURT:  No.  No, not at all.

22          MR. SOFER:  Just involved in a certain way that,

23   I think, it's important that the record reflect that.  The

24   Government brought forth an expert.  The defense said that

25   this expert should --
```

```
 1            THE COURT:  Succeeded to knock him out.

 2            MR. SOFER:  Under relevance grounds, they, then,

 3    come back and have proffered several experts, which I think

 4    are -- are of the same flavor.  Perhaps I would venture to

 5    say even more outside of any argument that has been made

 6    with Mr. Kohlmann.

 7            THE COURT:  Sometime on Friday after we get the

 8    audibility stuff done, we're going to deal with the

 9    experts.  Saturday.  Saturday.

10            MR. SOFER:  I'll tell you something else I'm a

11    little worried about, we don't want to call them

12    stipulations -- defense I'm not sure necessarily wants to

13    call them stipulations.  We have to know that there is a

14    legal basis upon which to give definitions to the jury if

15    it doesn't fall into a stipulation category.  We might be

16    able to get to the place -- I hope we'll be able to get to

17    a place where we can stipulate between the parties.

18            THE COURT:  Well, the legal basis would be that

19    neither party objects to my doing it.

20            MR. SOFER:  Understood.

21            THE COURT:  I'm serious about that.  I hereby

22    instruct you A, B, C, D and E.

23            MR. SOFER:  You can't do that if one of our

24    conditions that's imposed on us is that the Government

25    objects.  So, again, all I'm saying, we'll work on this.
```

1  We'll see what we can do.  I have to think that the vast
2  majority of these terms we should be able to stipulate to.
3  Between the problems that we're encountering in Washington
4  and the problems perhaps with the defense team, I think we
5  will have to fill in with expert testimony; and again, to
6  the extent that the Court's willing to review that original
7  decision.
8         THE COURT:  That's what I'm talking about.  By
9  the time we go home tomorrow night, I intend to expect that
10  at about this time tomorrow, you'll tell me number 72,
11  number 13.  This is us.  This is us.  And I will either
12  say, as I did with Abu Ghraib, try to suggest a definition,
13  except I think with those little hard kernels, the wheels
14  of my mind probably won't grind strongly enough to overcome
15  the problem.  And if so, we'll figure out how we go about
16  doing that.
17         But I would like to get as much of this as
18  humanly possible for both of you to cut down on the risk of
19  testimony offered that comes in for a narrow purpose simply
20  spilling over and adversely to the jury in either
21  direction.
22         MR. SOFER:  Understood.
23         THE COURT:  Okay.  What else tonight, if
24  anything, that we should talk about or that you hope to
25  talk about before we showed up?

```
 1              MR. SOFER:  I'll just say, Judge, that we are

 2    filing -- if we have not already, in the next hours, we

 3    will file this motion regarding the general parameters of

 4    cross-examination, just ask the Court and counsel to look

 5    at it before tomorrow, because to the extent that we object

 6    tomorrow, it will be based largely upon this document.

 7              THE COURT:  It will give us a heads-up of what

 8    you may be complaining about.

 9              MR. SOFER:  Exactly.  It's what I described

10    before this notion of extrinsic proof.

11              THE COURT:  Could you do me the favor and make

12    sure that you E-mail a copy tonight.  Because if it gets

13    filed, I won't see it until tomorrow.

14              MR. HERDMAN:  It will be filed under seal.

15              Even though Mr. Griffin testified to the vast

16    majority of these items on his direct examination, there is

17    one discreet item that is known to defense, I believe, and

18    probably is in the report as well.  It's not -- has not

19    been testified to yet.

20              THE COURT:  May I suggest something?

21              MR. HERDMAN:  Yes, Your Honor.

22              THE COURT:  File the principal document with an

23    attachment under seal rather than the whole thing.

24              Can you do that?

25              MR. HERDMAN:  I know we can.
```

1                THE COURT:  Just say also submitted here with

2      this is an additional attachment as to one item under seal.

3      That way I just want the -- don't want the press knocking

4      on my door, because then we do have ancillary --

5                MR. HERDMAN:  I understand.

6                THE COURT:  But anyhow, send me a copy, just send

7      me an E-mail of the whole thing, please.  I'll look at it

8      tonight.

9                Okay.  Anything else from the Government?

10               MR. SOFER:  We're done, Judge.

11               MR. HARTMAN:  We were done a while ago, Judge.

12               THE COURT:  No, you're not.  You've got some

13     transcripts and designations to deliver, Mr. Doughten.

14               MR. DOUGHTEN:  Nothing further, Your Honor.

15     Thank you.

16               MR. WHITMER-RICH:  Nothing further, Your Honor.

17               MR. SOFER:  Actually, Judge, that reminds me.  I

18     just, again, want to put on the record now, since we've

19     been sitting here today, we received, I think, it's four

20     additional clips from the defense on the Amawi team.  And

21     we are -- we've already sent word back to the ranch to

22     process these.

23               THE COURT:  Did they -- are there differences

24     between your transcripts and theirs?  Do you know?

25               MR. SOFER:  At least two of them, I think, are

1    the Government --

2

3            MR. WHITMER-RICH:  They are from Government

4    transcripts that we provided.

5            THE COURT:  Okay.  Then, they shouldn't be

6    that --

7            MR. WHITMER-RICH:  They're short.

8            THE COURT:  The deviation problem shouldn't be a

9    problem.

10           MR. SOFER:  Hopefully not, Judge.

11           THE COURT:  Okay.  Okay.

12           MR. SOFER:  Now we're done.

13           THE COURT:  Good luck on all your homework

14   assignments.  Papers will be turned in at 8:30 tomorrow.

15   Thank you.

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/ Angela D. Nixon

7    --------------------------              -----------

8    Angela D. Nixon, RPR, CRR              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25