```
1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION

3  UNITED STATES OF AMERICA,     )  Docket No. 3:06-CR-719

4          Plaintiffs,           )  Toledo, Ohio

5             v.                 )  April 23, 2008

6  MOHAMMED AMAWI, ET AL.,       )

7          Defendants.           )

8  ------------------------------

9          TRANSCRIPT OF JURY TRIAL, VOLUME 34
            BEFORE THE HONORABLE JAMES G. CARR
10             UNITED STATES DISTRICT JUDGE

11

12 APPEARANCES:

13 For the Plaintiffs:    Gregg N. Sofer
                          David I. Miller
14                        Jerome J. Teresinski
                          U.S. Department of Justice
15                        10th & Constitution Avenue, NW
                          Washington, DC 20530
16                        (202) 353-3464

17                        Thomas E. Getz
                          Justin E. Herdman
18                        Office of the U.S. Attorney
                          801 Superior Avenue, W
19                        Cleveland, Ohio 44113
                          (216) 622-3840
20
   For the Defendant      Timothy Ivey
21 Amawi:                 Edward Bryan
                          Amy Cleary
22                        Jonathan Whitmer-Rich
                          Office of the Federal Public Defender
23                        750 Skylight Office Tower
                          1660 West Second Street
24                        Cleveland, Ohio 44113
                                   (216) 522-4856
25
```

```
 1                              Elias Muawad
                                Muawad & Muawad
 2                              Suite 209
                                36700 Woodward Avenue
 3                              Bloomfield Hills, Michigan 48304
                                (248) 594-4700
 4      For the Defendant
        El-Hindi:               Charles M. Boss
 5                              Boss & Vitou
                                111 West Dudley Street
 6                              Maumee, Ohio 43537
                                (419) 893-5555
 7
                                Stephen D. Hartman
 8                              Kerger & Kerger
                                Suite 201
 9                              33 South Michigan Street
                                Toledo, Ohio 43602
10                              (419) 255-5990

11                              Alek H. El-Kamhawy
                                Raslan, El-Kamhway & Pla
12                              Suite 3FE
                                1700 East 13 Street
13                              Cleveland, Ohio 44114
                                (216) 928-1500
14
        For the Defendant       David L. Doughten
15      Mazloum:                4403 St. Clair Avenue
                                Cleveland, Ohio 44103-1125
16                              (216) 361-1112

17                              Jeffrey J. Helmick
                                Helmick & Hoolahan
18                              2nd floor
                                1119 Adams Street
19                              Toledo, Ohio 43624-1508
                                (419) 243-3800
20

21                              Mohammed Abdrabboh
                                1620 Ford Avenue
22                              Wyandotte, MIchigan 48192
                                (734) 283-7000
23

24
        Court Reporter:         Angela D. Nixon, RPR, CRR
25                              1716 Spielbusch Avenue
                                Toledo, Ohio 43624
```

1              (419) 260-5259

2

3  Proceedings recorded by mechanical stenography, transcript

4  produced by notereading.

1          THE COURT:  So where are we?

2          MR. IVEY:  We have reached an agreement, Your

3   Honor, on where the government's continuation of the last

4   clip I played will begin and end.  If it's permissible, the

5   government has allowed so that no unfair aspersion is put

6   on me for me to just indicate to the witness we're going to

7   play my clip and play some more after that following the

8   transcript.

9          THE COURT:  I'll just tell them to help the jury

10  recall for what this is connected.

11         MR. SOFER:  And for the record, the government's

12  agreed to play three pages of a seven-page excerpt that was

13  previously played for the jury and reserve the right to

14  play the rest of that at some other juncture, perhaps, in

15  the case, but we're trying to accommodate counsel's concern

16  about playing the whole --

17         THE COURT:  And there's some other clips that --

18         MR. IVEY:  I have some clips, and I think it's

19  best if I approach the bench so that The Court can see

20  exactly what I'm talking about.

21         THE COURT:  Have you shown them to Mr. Sofer?

22         MR. IVEY:  No.  I guess I will do that.  They are

23  short clips, Your Honor, five to six lines, and what they

24  are for is to show the repeated efforts of the witness to

25  try to get the defendants together and to meet.

1          I have been pretty, I feel, diligent in making

2    sure that none of my client's comments are aspersed effect

3    or aspersed innocence.  I would prefer to play those clips

4    so that the jury can see, hear the voice inflection, and

5    the insistance that's not really there from a clean piece.

6          THE COURT:  Are you going to be playing other

7    clips, the first set of clips you're going to be playing?

8          MR. IVEY:  I'm sorry?

9          MR. SOFER:  What are you referring to, Judge?

10         THE COURT:  I think -- I agree that you can play

11   the clips.  I have no problem with that, assuming that

12   they're otherwise going to get --

13         MR. SOFER:  Judge, I'll just renew my objection

14   which I've made repeatedly, which is counsel's already

15   cross-examined the witness this way.  I think it's been

16   done the proper way, which is, ask him if he did something.

17         THE COURT:  I understand that, and I'm going

18   to -- I thought that you told me that you had reached an

19   agreement as to a couple of the clips you intend to play?

20         MR. SOFER:  One clip which is being introduced by

21   counsel under the rule of completeness, we've agreed on

22   that.  This is a different theory of occlusion, which is

23   there, they're being introduced, I think defense counsel

24   made the argument that being -- to show that Mr. Griffin

25   was prodding or suggesting things as opposed to them coming

1    from the defendants.  And again, I think that counsel's

2    already cross-examined on that very issue, and I think it's

3    been done the appropriate way, as opposed to having them

4    play these clips.  Which I understand counsel's argument if

5    the witness agrees that he prodded, suggested, or whatever,

6    that should end the matter on cross-examination.

7              THE COURT:  Well, I'm going to let him go ahead

8    and do to it, but the more important question is how we,

9    then, perform the linkage between the two, and you haven't

10   seen -- or you don't know exactly where it is --

11             MR. SOFER:  The only thing I have to do now --

12   since this is the first time I've seen the ones they want

13   to use -- we have to look at these now and make sure that

14   we don't have a disagreement about the accuracy of these.

15   It should take me about ten minutes at the most.  This is

16   the first I've been confronted with these particular clips

17   in this context.

18             MR. WHITMER-RICH:  These are ones -- among the

19   ones you were given.

20             MR. SOFER:  I understand, but we have -- we just

21   have to go through and see if they fall into any of the

22   inaccuracies.  We ended up processing last night, 16 more,

23   not through the fault of counsel, but the way that they

24   came in, we had to process 16 more of the clips.  I -- I

25   just have to make sure it's not part of that group.  It

```
 1    won't take more than a few minutes.

 2            We have one little issue.  We have only one of

 3    these that we can't find that was sent to us.  We'll let

 4    defense play it.  I just ask for leave of The Court if it

 5    turns out we think there's an inaccuracy there, that we be

 6    able to address it.

 7            THE COURT:  Okay.  Let's get the jury.  We're

 8    ready to roll.

 9                 (Jury brought into the courtroom.)

10            THE COURT:  Thank you for your patience.  The

11    attorneys had some things to work out and I hope they are.

12    I hope things will proceed smoothly.  There may be an

13    occasional interruption, just bare with us.

14            Mr. Griffin, you remain under oath.

15            Mr. Ivy, you may continue.

16                    DIRECT EXAMINATION

17    BY MR. IVEY:

18    Q.      Mr. Griffin, right before the break I played a

19    clip for you, your conversation with Mr. Amawi on

20    June 30th, and we're going to, for clarification purposes,

21    we're going to replay that clip, then we're going to play

22    some more, following what I point out, and then there will

23    be some questions.

24                 (Audio playing.)

25            MR. IVEY:  Stop.  I think if you take off your
```

1   head phones it's loud enough on this one that you can hear

2   it without them.

3          Okay.  Go ahead.

4              (Audio playing.)

5          MR. IVEY:  And this conversation continues.

6              (Audio playing.)

7          THE COURT:  Ladies and gentlemen, if I may, what

8   we may be doing off and on is, once a segment is played, a

9   portion of a conversation, the portion of that conversation

10  that you already heard may also be played, not necessarily

11  the entire segment that you heard, but at least enough to

12  recall to your mind to the prior segment to which what you

13  are hearing now for the first time relates to this.

14  BY MR. IVEY:

15  Q.      Mr. Griffin, over the course of your -- I'll call

16  it investigation, for want of a better word, you indicated

17  that your -- your goal was to gather information about

18  threats; is that correct?

19  A.      Correct.

20  Q.      And as part of your gathering of information,

21  you, in that responsibility, you worked, prodded and

22  coerced meetings among these defendants that were not

23  otherwise planned between them; is that correct?

24  A.      I wouldn't use those words.

25  Q.      Okay.  Well, I'd like to play a few clips that

1    are conversations with Mr. Amawi relative to arranged

2    meetings prior to the -- these next several -- prior to the

3    February 16th, '05 meeting or '06 meeting.

4              MR. IVEY:  If we can play clip 1-27-05, clip 1.

5              MR. WHITMER-RICH:  For the record that would be

6    Exhibit A-1-1M.

7              JUROR:  Dash 110?

8              MR. WHITMER-RICH:  1M.

9              JUROR:  Thank you.

10             (Audio playing.)

11             MR. IVEY:  Okay.  Next I'd like to play clip

12   1-30-05, clip 1.  This is from January 30th of '05, it's

13   clip 1-30-05, clip 1.

14             (Audio playing.)

15             MR. IVEY:  Can we run that back to the beginning?

16   There was no audio at the beginning.

17             (Audio playing.)

18             JUROR:  We're getting a lot of static.

19             THE COURT:  There's a lot of static.

20             JUROR:  I think there -- something must be too

21   close to what they're -- something, maybe a speaker too

22   close, another speaker or something.

23             THE COURT:  There is a lot of static.

24             MR. IVEY:  Yeah, I know.  Do we have an idea of

25   what the problem is?

```
 1                 (Audio playing.)

 2            JUROR:  Still static.

 3            MR. IVEY:  Your Honor, can we approach?

 4            JUROR:  I'm wondering if it might be your

 5   speaker.

 6            MR. IVEY:  Let's try it one more time.

 7                 (Audio playing.)

 8            MR. IVEY:  Okay, we're going to surrender on it

 9   that one and we'll go to --

10            JUROR:  He's right about pushing that button.  I

11   pushed that button, it did take the static away.

12            MR. WHITMER-RICH:  It is much better.

13            JUROR:  Yeah, that button that goes A B.

14            MR. WHITMER-RICH:  For the record that was

15   Exhibit A-1-13-1.

16            MR. IVEY:  Now I'd like to play some clips

17   following the February 16th meeting of '05.  This is clip

18   3-8-05, clip 1.  This was on March the 8th of 2005.

19            MR. WHITMER-RICH:  And for the record, it's

20   Exhibit A-1-18-1.

21                 (Audio playing.)

22            MR. IVEY:  Your Honor, can we approach?

23                 (A side bar conference was had on the

24                 record.)

25            THE COURT:  Go ahead, Mr. Ivy.
```

1          MR. IVEY:  I only have at the most about an hour

2     and a half, if that, of questions left.  So I was wondering

3     if we could adjourn for the day and still give Mr. Masloum

4     plenty of time, we can iron out these technical

5     difficulties.

6          MR. SOFER:  Judge, I would object to that.

7          THE COURT:  The static is an annoyance, but you

8     can still hear it.

9          MR. SOFER:  And I go back to judge --

10         THE COURT:  Okay.

11         MR. SOFER:  -- I saw the hand coming out.

12         MR. IVEY:  The issue isn't the audibility, it's

13    now the text isn't coming out to match the audio.  So I

14    don't know what the problem is.  I don't think it's going

15    to hold us up if I just take an hour in the morning to get

16    done and Mr. Masloum has the rest of the day.

17         MR. SOFER:  Judge, what I would say, again, is,

18    counsel actually could do it the way I think it should be

19    done, which is still ask this witness these questions with

20    the transcripts, ask him did you suggest this, did you

21    suggest that.  That's an appropriate way to do it anyway.

22         And my concern is, we've taken an entire week of

23    this trial off for the defense to prepare for

24    cross-examination.  I think it's fairly unusual in the

25    proceedings of trials, and I'm -- I'm becoming concerned

```
 1    about sort of the progress.

 2            THE COURT:  How many more clips do you have?

 3            MR. IVEY:  About --

 4            THE COURT:  Are they all brief like this?

 5            MR. IVEY:  Uh-huh.

 6            THE COURT:  We can do -- I don't find it that

 7    hard.  I mean, if you click the right button.

 8            MR. IVEY:  I'm not concerned about the

 9    audibility.  The text is not matching up.

10            MR. SOFER:  We could take a few minutes.

11            MR. HARTMAN:  What about putting the pages on the

12    ELMO, one page at a time?

13            MR. SOFER:  And play the audio.

14            THE COURT:  Yeah, child of the 20th century over

15    there.

16                 (Sidebar concluded.)

17            THE COURT:  Ladies and gentlemen, we're about to

18    leave the 21st century and go back to the 20th century.

19    What we're going to do is ask Mr. Ivy, where there's a

20    particular portion of a conversation and the ensuing

21    conversation -- it may take a little bit of time to get

22    this up.  We're going to project the page of the transcript

23    that's been prepared and just doing this may take a few

24    minutes to get us coordinated.

25             Mr. Ivy, what I would suggest if this is
```

1   agreeable to you, either this sort of bracket across the

2   page where you'll be beginning the conversation.

3              MR. WHITMER-RICH:  We have the clips.

4              THE COURT:  It's all set?

5              MR. IVEY:  Yes.

6              THE COURT:  And maybe go ahead and turn on the

7   machine.

8              MR. WHITMER-RICH:  Can we use this at the same

9   time that we're playing that?

10                 (A brief discussion was had off the record.)

11             THE COURT:  Okay.  Okay.

12                 (Audio playing.)

13             MR. IVEY:  And then I'd like to move onto March

14  the 9th of 2005, clip 1.

15                 (Audio playing.)

16             MR. IVEY:  Then the conversation continued on

17  March the 9th, and I'd like to play clip 2.

18             THE COURT:  What's that date again?

19             MR. IVEY:  March the 9th, 2005.

20                 (Audio playing.)

21             MR. IVEY:  And then the conversation continued on

22  March the 9th, 2005.  I'd like to play clip 3.

23                 (Audio playing.)

24             MR. IVEY:  Next I'd like to play March the 31st,

25  2005, clip 1.

1            THE COURT:  March 31st?

2            MR. IVEY:  Yes, 2005, clip 1.

3   BY MR. IVEY:

4   Q.       Mr. Griffin, one of the videos that you looked at

5   with Mr. Amawi was a bomb vest video?

6   A.       Correct.

7   Q.       When you initially began to tape Mr. Amawi, look

8   into his activities, Mr. Amawi, to your knowledge, did not

9   have an actual bomb vest video -- bomb vest, did he?

10  A.       Not that I know of.

11  Q.       And even after viewing the video, when you would

12  come by Mr. Amawi's apartment, et cetera, you did not

13  observe any bomb vest in his home, did you?

14  A.       No, I did not.

15  Q.       And even after viewing the video, you did not

16  observe any explosive materials in Mr. Amawi's home

17  specifically for use in a bomb vest?

18  A.       No, I had not.

19  Q.       And when you discussed IEDs and various

20  explosives with Mr. Amawi, he did not go out to a hardware

21  store and purchase any ball bearings that were depicted in

22  that video, did he?

23  A.       Not with me, he didn't.

24  Q.       And he did not obtain any of the explosive

25  materials that were indicated in the video, to your

1   knowledge?

2   A.        To my knowledge, no.

3   Q.        And obviously, when Mr. Amawi went over to

4   Jordan, he did not take the way of the *shahid* and kill

5   himself, because he's sitting here, today, alive, correct?

6   A.        Yes, he is.

7   Q.        Now, Mr. Amawi is very skilled in the use of a

8   computer, would you agree with that?

9   A.        Yes.

10  Q.        And in fact, you learned a lot from him and your

11  association with him in the use of the computer?

12  A.        Some, yes.

13  Q.        Now, there were various parts of time throughout

14  your investigation that you requested Mr. Amawi to either

15  download -- well, specifically, to download the bomb vest

16  video onto a disc?

17  A.        Correct.

18  Q.        But each time you did that, you would then turn

19  the disc over to the FBI, correct?

20  A.        Correct.

21  Q.        And the FBI informed you that they were unable to

22  retrieve the bomb vest video from the disc; is that

23  correct?

24  A.        Correct.

25  Q.        Now, Mr. Amawi, ordinarily, with his level of

1  expertise of a computer downloading something, a video from

2  a computer onto a disc is not a difficult task for him to

3  perform in your observation, is it?

4  A.      I would say it would not be a hard task for him.

5  Q.      Now, there came a point in time when Mr. Amawi

6  informed you that he had a contact in Syria that wanted to

7  go across the border into Iraq and was interested in

8  purchasing an explosive chemical, Astrolite?

9  A.      Correct.

10 Q.      When this initially came up, if I can recall

11 correctly, Mr. Amawi was seated in front of his computer

12 and he was on Paltalk being speaking to someone, correct?

13 A.      Paltalk was open, yes.

14 Q.      And there was someone speaking in Arabic on that

15 Paltalk, correct?

16 A.      I believe so.  We would have to listen to it

17 again to verify.

18 Q.      Well, it was played during your direct testimony,

19 so you're not disputing that fact, are you?

20 A.      No.  If it's in the direct --

21 Q.      Okay.  And then during that Paltalk, I believe

22 your testimony was that it was an instant message that came

23 across?

24 A.      Correct.

25 Q.      Okay.  And that conversation, as well, was in

1    Arabic; is that correct?

2    A.        I believe so, but there was -- there's more than

3    one -- there was more than one box.

4    Q.        Okay.  The -- the reference that Mr. Amawi made

5    regarding the Syrian contact, what that contact was saying

6    relative to going to Iraq, either from the Paltalk or

7    either from the instant message, that was in Arabic, he had

8    to interpret that for you, right, tell you what was being

9    said?

10   A.        Yes.

11   Q.        So you could not yourself -- because you're not

12   fluent in Arabic, you could not look at the screen and

13   verify whether or not Mr. Amawi was telling you the truth

14   about what the Arabic said on the screen, either from the

15   Paltalk or either from instant message?

16   A.        Correct.

17   Q.        Now, after that took place, you contacted the FBI

18   about Mr. Amawi's supposed contact, correct, you let them

19   know about the situation?

20   A.        Yes.

21   Q.        And the FBI, understandably, was interested in

22   finding out who this contact was and making some connection

23   with them; is that correct?

24   A.        I would have to assume yes.

25   Q.        All right.  Well, in response to that, the FBI

1    had you, with your assistance, I'm assuming, create a

2    contact of yourself that could supply Astrolite; is that

3    correct?

4    A.        Correct.

5    Q.        That person was the name that was given to that

6    person was Mohammed Salah; am I saying that right?

7    A.        Yes.

8    Q.        That person was not really a supplier of

9    Astrolite, correct?

10   A.        He was not.

11   Q.        That was -- that -- that person, even though it

12   was a real person, it was a real person from your past,

13   correct?

14   A.        Yes.

15   Q.        But because that person was not really a supplier

16   of Astrolite, what the intention was to try to flush out

17   Mr. Amawi's contact through this fictitious supplier,

18   correct?

19   A.        To gather more information, correct.

20   Q.        Now, one of the things you would tell Mr. Amawi

21   that this contact could supply what was needed, and I think

22   in one tape you said the supplier -- you want to know if

23   the purchaser wanted it hard or soft; is that correct, the

24   Astrolite?

25   A.        He said something about that, yes.

```
 1   Q.        Now, when you would tell Mr. Amawi about what

 2   your fictitious contact was willing to do, what that

 3   contact had said, you always related to Mr. Amawi a

 4   conversation you supposedly had with your contact out of

 5   Mr. Amawi's presence, correct?

 6   A.        Correct.

 7   Q.        And that was because this contact really wasn't

 8   what you represented to him to be, correct?

 9   A.        Correct.

10   Q.        Now, Mr. Amawi, throughout this thing, did the

11   same thing you did, didn't he?

12   A.        You'll have to ask Mr. Amawi.

13   Q.        Well, you would ask Mr. Amawi questions about the

14   Syrian contact, and Mr. Amawi would relate to you what the

15   status of his communications are with the contact outside

16   of your presence?

17   A.        That is not what I gathered.

18   Q.        All right.  Well --

19   A.        At least on -- may I explain?

20   Q.        Well, let me ask it to you this way:  Mr. Amawi,

21   it seemed to me from the tapes, would tell you

22   conversations he had about the Syrian contact or efforts he

23   made to get in contact with the Syrian contact; is that

24   correct?

25   A.        Out of my presence?
```

1   Q.      Uh-huh.

2   A.      Not all the time.

3   Q.      Okay.  But when he had contact with this Syrian

4   contact in your presence, the conversations would be on

5   the -- on the computer and they would be in Arabic,

6   correct?

7   A.      Correct.

8   Q.      From -- throughout this time period, you never

9   actually met this Syrian contact, right?

10   A.      I don't think so.

11          THE COURT:  I didn't hear your answer.

12          THE WITNESS:  I don't think so, Judge.

13   BY MR. IVEY:

14   Q.      Now, another avenue that was created to gather

15   information was you were given an e-mail for this supposed

16   contact, your contact was created for Mr. Amawi to relay

17   that information to his contact so they could contact

18   directly, correct?

19   A.      Correct.

20   Q.      And the hope was that this Syrian contact would

21   e-mail this e-mail that you put out there, and thereby, you

22   could find out who he was or he or she was or the FBI could

23   gather information from you, correct?

24   A.      For the FBI to gather information, yes.

25   Q.      All right.  Now, the best -- to your knowledge --

1    well, Mr. Amawi indicated that he would pass this e-mail

2    onto his contact, correct?

3    A.        Correct.

4    Q.        But the best of your knowledge, the alleged

5    Syrian contact of Mr. Amawi's never e-mailed that e-mail

6    address set up by the FBI, did he?

7    A.        I just observed one time that that was attempted.

8    Q.        Well, you mean Mr. Amawi attempted to forward the

9    e-mail to his contact, correct?

10   A.        I believe it was, yes.

11   Q.        Okay.  But he told you that he was unable to do

12   it because he didn't have the right program to do it,

13   right?

14   A.        Correct.  Correct.

15   Q.        All right.  So Mr. Amawi gave you a reason why he

16   was not able to relay this e-mail to this contact, correct?

17   A.        Yes, sir.

18   Q.        Mr. Amawi did not give you his contact's e-mail,

19   did he?

20   A.        He did not.

21   Q.        And Mr. Amawi did not give you a phone number for

22   this contact, did he?

23   A.        He did not.

24   Q.        And again, to the best of your knowledge, Amawi's

25   supposed-Syrian contact never e-mailed the FBI set-up

1    e-mail, did he?

2    A.        To the best of my knowledge, no.

3    Q.        Now, in one of the conversations that you had

4    with Mr. Amawi regarding this Syrian contact, one of those

5    conversations took place, I believe, at AZ Travel; is that

6    correct?

7    A.        I would assume, yes.

8    Q.        And in one of those conversations while you were

9    asking Mr. Amawi facts or having a conversation about this

10   Syrian, Mr. Amawi was, at that time, attempting to

11   purchase, I believe, a computer on the Internet; is that

12   correct?

13   A.        I think it was part of a computer, but --

14   Q.        And Mr. Amawi asked you if he could use your

15   credit card during this conversation to pay for it; is that

16   correct?

17   A.        Yes.

18   Q.        And he indicated to you that he would give you

19   cash later on if he could use your credit card; is that

20   correct?

21   A.        Yes.

22   Q.        Now, after no contact was made with the Syrian

23   contact after a time, arrangements were made for you and

24   Mr. Amawi to go to Jordan, correct, on August the 22nd of

25   2005?

```
 1   A.         Yes.

 2   Q.         And the purpose of going to Jordan was to get

 3   those laptops computers to Mr. Amawi's Syrian contact; is

 4   that correct?

 5   A.         That was one of the things, yes.

 6   Q.         Okay.  Now, make a long story short, you never

 7   got those laptops to the Syrian contact, did you?

 8   A.         We did not.

 9   Q.         Now, Mr. Amawi understood that one of the

10   purposes or the purpose of going was to deliver those

11   laptops to his Syrian contact, correct?

12   A.         You'd have to ask Mr. Amawi.

13   Q.         Well, didn't you make that clear to him?

14   A.         Yes, that's what I wanted to do.

15   Q.         All right.  Now, in doing that, you purchased

16   Mr. Amawi's ticket to fly back to Jordan, correct?

17   A.         To fly to Jordan, yes.

18   Q.         To fly to Jordan.  So Mr. Amawi did not have to

19   bear the expense of paying for his travel back to where his

20   family lived?

21   A.         Correct.

22   Q.         The laptop computers that were taken were taken

23   in a computer bag; is that correct?

24   A.         Yes.

25   Q.         And a special bag was paid for to put those
```

1  computers in?

2  A.       What do you mean by "special"?

3  Q.       Okay.  That's a bad question.  A bag, a computer

4  bag was purchased?

5  A.       Yes.

6  Q.       That computer bag was purchased by you?

7  A.       Yes.

8  Q.       So Mr. Amawi got a free trip back to Jordan, and

9  he did not have to bear any of the expense of buying the

10  computer bag to take the laptops back to Jordan?

11  A.       Correct.

12  Q.       A satellite phone was given to Mr. Amawi to use

13  while he was in Jordan, correct?

14  A.       Correct.

15  Q.       And that satellite phone was actually given to

16  you by the FBI to give to Mr. Amawi, correct?

17  A.       It was not.

18  Q.       Who -- who bought the satellite phone?

19  A.       I did.

20  Q.       You were responsible for the bill of the

21  satellite phone?

22  A.       Correct.

23          THE COURT:  Responsible for -- I didn't hear you.

24  BY MR. IVEY:

25  Q.       For the bill for the satellite phone, correct?

```
 1   A.         Yes.
 2   Q.         You did leave the satellite phone with Mr. Amawi,
 3   correct?
 4   A.         Correct.
 5   Q.         And you told Mr. Amawi that there was a
 6   200-some-dollar monthly limit on the phone; is that
 7   correct?
 8   A.         I said -- I told him I play a flat rate anywhere
 9   between 250 and $500 for the usage of that phone.
10   Q.         But Mr. Amawi ran up the bill on that phone for
11   almost -- about $47,000, didn't he?
12   A.         I'd have to take your word for it.
13   Q.         Well, you were given money by the FBI to pay
14   that?
15   A.         Yes.
16   Q.         Okay.  And you did not pay all of the bill with
17   the money the FBI gave you?
18   A.         Not all of it.
19   Q.         And in fact, at least at the time of your direct
20   testimony, you still owed $22,000 on that phone?
21   A.         Yes, sir.
22   Q.         Now, Mr. Amawi, making about $47,000 worth of
23   calls on this satellite phone, to your knowledge, has any
24   one of those calls been to any Syrian insurgent contact?
25   A.         Not that I know of.
```

1   Q.        Now, you also purchased a cell phone for

2   Mr. Amawi's father?

3   A.        Yes.

4   Q.        So -- and then you also purchased, I think it

5   was, a -- was it a water -- hot cold water --

6   A.        Yeah, hot-cold water cooler.

7   Q.        For Mr. Amawi's family?

8   A.        Yes.

9   Q.        And the Jeep Cherokee with the Ohio plates that

10  Mr. Amawi's family was using or owned -- do you remember

11  the car I'm talking about?

12  A.        Yes.

13  Q.        That's the one they picked you up from the

14  airport?

15  A.        Yes.

16  Q.        You paid Mr. Amawi's family $1,000 for the use of

17  that vehicle while you were in the Middle East?

18  A.        I gave that money to Mr. Amawi.  He was -- I

19  thought it was for the purchase of it, but I gave it to

20  Mr. Amawi directly, Mohammed Amawi.

21  Q.        You also were introduced to a friend, Masoud, I

22  believe you said his name was, of Mr. Amawi's who fed you

23  and Mr. Amawi; is that correct?

24  A.        Are you referring to the gentleman down in

25  Dhiban?

1    Q.       I believe so.

2    A.       Yes.

3    Q.       Mr. Amawi asked you to give him a hundred

4    dollars; is that correct?

5    A.       That is incorrect.  Mr. Amawi asked me for a

6    hundred dollars which I gave him to give to Masoud.

7    Q.       So Mr. Amawi took the money and then Mr. Amawi

8    handed it to him?

9    A.       Correct.

10   Q.       All right.  But again, that hundred dollars came

11   from you, it didn't come out of Mr. Amawi's pocket?

12   A.       Yes, sir.

13   Q.       Now, you did not cross the border into Iraq when

14   you were there initially?

15   A.       No, I did not.

16   Q.       And you did not meet this Syrian contact?

17   A.       Not that I know of.

18   Q.       And after you get over to Syria, Mr. Amawi tells

19   you that this Syrian contact is no longer returning his

20   calls, he's turned around, and he no longer feels it's safe

21   to go to Iraq, something to that effect?

22   A.       Into Syria, yes.

23   Q.       Into Syria, okay.  Well, and as a result, the

24   laptops don't get delivered and Mr. Amawi gets a free trip

25   back home to Jordan, laptops are brought over in a computer

```
 1    bag purchased by you, his family gets a thousand dollars

 2    for use of a Cherokee, he gets a hundred dollars paid as a

 3    gratuity for being fed, as well as a few other benefits; is

 4    that correct?

 5    A.        Yes.

 6    Q.        Now, you also, I think you gave some money to a

 7    school, was it Al-Mure School (phonetic)?

 8    A.        Yes, sir.

 9    Q.        And you gave some money to some other families?

10    A.        I actually gave it to the gentleman running the

11    school, and that's what I had -- I had identified it for,

12    yes.

13    Q.        So you didn't give any money to any insurgents

14    that you're aware of?

15    A.        Not that I'm aware of.

16    Q.        Now, at a certain point in time you left the

17    Middle East, you left Jordan, and went back to the United

18    States, I believe that was, what, September the 8th, around

19    that time?

20    A.        Yes, sir.

21    Q.        Now, when you go back on September the 8th,

22    Mr. Amawi had some requests for you; is that correct?

23    A.        Correct.

24    Q.        He requested that you go to his apartment and

25    retrieve some of his belongings?
```

1   A.       Correct.

2   Q.       He asked you, among other things, to bring some

3   car parts for the Jeep Cherokee, that you had given a

4   thousand dollars towards for the use of; is that correct?

5   A.       Correct.

6   Q.       He asked you to bring some clothing items and his

7   birth certificate, correct?

8   A.       Ultimately.  I don't know if it was before I left

9   or -- definitely while I was here in the United States he

10  made those requests.

11  Q.       Okay.  And you did retrieve those items?

12  A.       Yes.

13  Q.       And he asked you to bring back his desktop

14  computer to Jordan; is that correct?

15  A.       Yes.

16  Q.       Now, you, in fact, did bring those items back to

17  him, correct?

18  A.       Yes, sir.

19  Q.       And you brought them back, not at his expense,

20  at, I guess it would end up being the government's expense?

21  A.       Yes, sir.

22  Q.       And so Mr. Amawi, we've already been through the

23  benefits he got from you personally, but then the second

24  time, then, at no expense to him, got a lot of his

25  belongings brought over to Jordan from Toledo?

```
1   A.       Yes.

2   Q.       And after that, you inquired of Mr. Amawi about

3   the status of his contact with the Syrian?

4   A.       Before I left the second time?

5   Q.       Yes.

6   A.       Yes.

7   Q.       And again, Mr. Amawi indicated to you that the

8   Syrian was not returning his calls and didn't feel it was

9   the right time to go into Iraq essentially?

10  A.       Yes.

11  Q.       And so when you went back the second time again,

12  you were not able to provide any contact -- Syrian contact

13  or insurgent with any particular resources?

14  A.       I did not link up with the Syrian, if that's what

15  you're asking.

16          THE COURT:  I'm sorry, I couldn't hear you.

17          THE WITNESS:  If he was asking me did I link up

18  with the Syrian.

19          THE COURT:  Maybe back up a bit.

20          THE WITNESS:  If he was asking if I linked up

21  with the Syrian, I did not.

22          THE COURT:  Okay.

23  BY MR. IVEY:

24  Q.       Now, Mr. Amawi told you -- you testified on

25  direct examination, that after you -- okay.  It's getting
```

```
 1    late I'm messing up now, too.

 2              You eventually, then, returned back to the United

 3    States again from Jordan?

 4    A.        From the second trip?

 5    Q.        Yes.

 6    A.        Yes.

 7    Q.        And you had some conversations with Mr. Amawi

 8    regarding businesses that he was interested in developing

 9    or starting over in Jordan, correct?

10    A.        Correct.

11    Q.        Those included an Internet cafe?

12    A.        Yes.

13    Q.        A car importing business?

14    A.        Correct.

15    Q.        And then in -- I'm going to say in late January,

16    you had a phone call with Mr. Amawi that concerned you?

17    A.        Yes.

18    Q.        And that phone call, Mr. Amawi told you that

19    despite desiring to set up an Internet cafe and despite

20    desiring to set up a car importing business, that he was

21    considering going and martyring himself in Iraq?

22    A.        Actually, I would have to correct that.  Those

23    statements were made before I left the second trip.

24    Q.        Okay.  But as it turns out, Mr. Amawi didn't go

25    into Iraq and martyr himself or blow himself up, did he?
```

```
1   A.          He did not.

2   Q.          And since the time you started investigating

3   Mr. Amawi up until the time when you found out he was in

4   custody, to your knowledge, Mr. Amawi hasn't shot anybody,

5   has he?

6   A.          Not to my knowledge.

7   Q.          And to your knowledge, Mr. Amawi has not created

8   a bomb and blown up anything, has he?

9   A.          Not to my knowledge.

10  Q.          And to your knowledge, Mr. Amawi hasn't given a

11  laptop computer to any Syrian insurgent?

12  A.          Not to my knowledge.

13  Q.          And all the time that Mr. Amawi was over in

14  Jordan, Mr. Masloum nor Mr. El-Hindi went over there to

15  join him, did he, to your knowledge?

16  A.          To my knowledge, no.

17              MR. IVEY:  Thank you, Mr. Griffin.  I have no

18  further questions.

19              THE COURT:  Okay.  Counsel please come up for a

20  second.  I think this should be off the record.

21                  (A side bar conference was had off the

22                  record.)

23              THE COURT:  You may be seated.

24              Ladies and gentlemen, actually, despite all the

25  delays within the time frame that we had and anticipated,
```

1    and I think what I will do because, again, we've got some

2    things we've got to sort out before Mr. Doughten begins

3    cross-examination for Mr. Masloum, rather than try to take

4    a half hour or 40 minutes, or whatever, to sort them out

5    and squeeze them into the time this afternoon, I think I

6    will adjourn.  Adjourn, as far as you're concerned, for the

7    day, and we'll spend the rest of the afternoon, or however

8    long it takes, getting whatever matters we can sorted out.

9    And then we'll plan to begin tomorrow morning at 8:30.

10           And on Friday, just so everyone knows, Friday I

11   have something mid-afternoon at the bar association, and I

12   think -- so we'll be adjourning probably around 1:30 or so.

13   I can look at the calendar to give you the precise time.

14   Anyway, Friday, we'll be breaking a bit early because I

15   have something over there.  Okay?

16           Have a safe trip home.  Don't talk about the

17   case.  Don't -- media about the case.

18                 (Jury excused at 3:00 p.m.)

19           THE COURT:  Mr. Griffin, you may step down.

20   You're excused for the day.

21           And everybody else can be seated.  May I suggest,

22   Mr. Doughten, that you -- have you been talking with the

23   government about this?  Okay.  Tidying things up, and I'll

24   be available if you need me.  And what about, then, with

25   regard to your excerpts and so forth?  They told me they've

```
 1   given you everything that's highlighted and so forth.

 2              MR. HARTMAN:  By the end of the day.

 3              THE COURT:  Oh, by the end of the day.  The day,

 4   meaning, this day?

 5              MR. HARTMAN:  This day.  Within this 24-hour

 6   period, no, I expect it before 5:00, frankly.

 7              THE COURT:  Okay.  May I suggest that if you can,

 8   you have the stamina and patience to try to do so, at least

 9   talk over with each other that segment or those segments,

10   that portion of what you presented that if you were to

11   start cross-examination sometime tomorrow afternoon, you

12   can continue, then, until early Friday afternoon, you will

13   be likely to reach.  Just so if there are issues and

14   problems, you can try to work them out and if you can't,

15   we'll find the time to do so.  Okay?

16              MR. SOFER:  Judge, we are attempting -- we have

17   people back in the office working on this now -- we are

18   attempting to do exactly what we've done with the Amawi

19   transcript, that is, see if what the defense is offering is

20   accurate, try to understand under what theory they believe

21   is appropriate to put them into evidence or confront the

22   witness with them.  As soon as we can get through them, we

23   will.

24              THE COURT:  I understand.

25              MR. SOFER:  I'll say again --
```

```
 1              THE COURT:  Really it's more meant for him to
 2     give you a head's up of how far he thinks they can get,
 3     assuming, you know, maybe after lunch tomorrow they get
 4     under way, and they can make use of the day on Friday so
 5     that, you know, they can see at least those issues and
 6     problems that do exist, whether they are translation,
 7     transcription, or evidentiary, I can try to deal with maybe
 8     tomorrow or whatever, okay.  That's all.  Just so we can
 9     make the best use possible of that time.
10              MR. SOFER:  We will do our best to process them
11     so we can have those discussions, Judge.
12              THE COURT:  Good.  And likewise, Steve and Chuck,
13     if you can do the same thing.
14              You indicated there was something you want to
15     talk about today, Mr. Hartman.
16              MR. HARTMAN:  Well, there was an objection I made
17     earlier, Judge, after the government had played one piece
18     of the audio, and I'm afraid I can't -- I'm not sure I can
19     identify it.
20              THE COURT:  Well, when you find it, we'll try and
21     sort it out.
22              MR. HARTMAN:  I don't know if you know it.  It
23     was the audio clip where the vest video was played in the
24     background.
25              MR. SOFER:  Actually, that is something actually
```

1    that is worth discussing, Judge.  I don't have the clip

2    available, but I can highlight, I think, what counsel is

3    referring to.  We played a 1-D in which the bomb vest video

4    was playing in the background.  And as it was being played,

5    the government rolled a translation slash transcription

6    before the jury.

7         Counsel objected at side bar and has made the

8    representation since that what was playing in the

9    background was not the same video as the video that we

10   introduced.  We did introduce the entirety of the video

11   along with the translation.  The government hearing this,

12   went back and took a look at this exhibit, that is the 1-D

13   that they actually -- contemporaneous playing of the audio

14   with the bomb vest video.

15        And frankly, we asked our translator to take a

16   look at this.  They're saying that this is different.  He

17   did take a look at it, and revised his translation, and he

18   is telling us -- and will be available to testify to

19   this -- that, indeed, it is the same.  We sent a copy of

20   that revised translation to defense attorneys via e-mail as

21   soon as it was done.

22        I anticipate Mr. Hartman will argue otherwise and

23   say either his translators or someone else will say it is a

24   different translation, I don't know, but that is the crux

25   of the issue, Your Honor.

1          MR. HARTMAN:  Given that explanation, if that is

2     indeed the case, I would like to be able to cross-examine

3     the translator on his mistake.

4          MR. SOFER:  And I think -- that's fine and

5     counsel has every right and will have an opportunity to do

6     that.  The only thing I'll say is that there's a complexity

7     here which relates to the fact that I --

8          THE COURT:  Can I interrupt?  How significant was

9     the, quote, mistake, closed quote?

10         MR. SOFER:  I'm sure Mr. Hartman will disagree

11    with me.  I will say it was relatively insignificant.  It's

12    a question of a few words, and the key concept here, Your

13    Honor, was that the person who actually translated the 1-D

14    did not have the entire bomb vest video to listen to.  So

15    they were forced, while other people are talking, and you

16    can hear certain snippets of this thing being played during

17    the consensual recording, they were forced to try to

18    understand that text in that sort of very difficult

19    environment.

20         THE COURT:  And that person hadn't seen the

21    other?

22         MR. SOFER:  That is my understanding, never seen

23    the entire -- I'll tell you something else, Your Honor.

24    When we first sent that video out for translation -- I

25    believe I'm right about this, I may be making this up -- we

1    had a translator or someone on the West Coast ended up

2    translating it.  Rather than drag that person across the

3    country to Toledo to have them testify, we had our

4    translators look at it again, and so there -- you know, the

5    point is that there's been some complexity to how the

6    government went about how to translate this.  Again, I

7    think the government will have an opportunity to

8    cross-examine our witnesses about it.

9         I will also say this is the kind of thing, while

10   it is in Arabic, you can hear this video playing in the

11   background, the jury can listen to it.  It's clear to us

12   listening to it, this is the same video.

13        Now, again, I'm sure counsel will disagree, but

14   you don't have to understand -- you don't have to

15   understand Arabic to hear the same noises, the same music,

16   even the same Arabic words being spoken.  But again, I

17   think that they'll have plenty of opportunity to explore

18   this in the cross-examination of our translator.

19        MR. HARTMAN:  My response would be -- not for

20   disagreeing for the sake of disagreeing -- two translators

21   heard two different things, so there's got to be some

22   problem.  One of them was talking about a ratio and one of

23   them wasn't.

24        THE COURT:  Let me see if I understand correctly.

25   The -- the complete video that we saw was translated by

1    somebody who had that complete video at hand while

2    translating it.  The translation of whatever was being

3    played was done by somebody else, and the -- and was trying

4    to translate something that essentially was being played in

5    the background.

6              MR. HARTMAN:  Which is how the defendants heard

7    it.

8              THE COURT:  Pardon?

9              MR. HARTMAN:  Which is how the defendants heard

10   it.

11             THE COURT:  Well, not necessarily for playing in

12   the background in the sense -- I mean, there was -- my

13   point, I'm referring to the recording device was wherever

14   it was.  And it was intermittent conversation between

15   Mr. Griffin and Mr. Amawi -- is it Mr. Amawi or

16   Mr. El-Hindi?

17             MR. SOFER:  It was Mr. El-Hindi.

18             MR. HARTMAN:  It was Mr. El-Hindi.

19             THE COURT:  There was intermittent conversation

20   to which Mr. El-Hindi and Mr. Griffin while, quote, in the

21   background relative to the translator.  The video is being

22   played in Arabic.  That translator does not have the entire

23   video.  So it may have been, quote, in the foreground for

24   Mr. an -- El-Hindi and Mr. Griffin; it was in the

25   background for the translator.  And I may have missed

1   something.

2             MR. SOFER:  No, I think that's right, Judge.

3             THE COURT:  And my next question so -- to the

4   predicate.  My question, then, is has the person who

5   translated the background bomb vest video subsequently

6   listened to the, quote, original bomb vest video that we

7   all saw in total?  And does that person have an opinion

8   as -- based upon the hearing of both in the condition in

9   which the background can be heard, as to whether or not the

10  complete version is the same as the version that he heard

11  and sought to translate as background?  And wouldn't that

12  person be in the best position to tell us whether it is or

13  is not?

14            MR. SOFER:  The answer to your questions are yes

15  and yes, and that person will be called as a government

16  witness and asked these very questions.

17            MR. HARTMAN:  And I would -- and just so The

18  Court knows that we're not trying to make something out of

19  nothing, the -- we believe that the way the first

20  translation came in, you can't take that video and make an

21  explosive vest.  With the second one, you might be able to.

22  And that may be an element of the charge that --

23            THE COURT:  I understand.

24            MR. HARTMAN:  So we're not trying to --

25            THE COURT:  No, but I think the way it seems to

1    me to handle that is to have that person called as a

2    witness, have that person explain what -- oh, how it was

3    done, how it was first done, and how and why subsequently

4    that person has come up with a successor or substitute

5    version, and then you get to cross-examine.

6              And as to that, you may have your own, I don't

7    know, but I can imagine that you would have your own

8    translation offered when the time came for you to put on a

9    case depending upon how things stood at that time.  So --

10             MR. HARTMAN:  The only thing that I would ask is

11   I'm not sure we have a copy, a written copy of the --

12             THE COURT:  Original?

13             MR. HARTMAN:  One is of the translations.

14             THE COURT:  You figure that out.

15             MR. SOFER:  It was e-mailed to counsel.  I'm

16   happy to get him a hard copy.

17             MR. HARTMAN:  That's fine.

18             THE COURT:  That should be no problem.  Okay.

19             Anything else before Mr. Doughten goes to work

20   with Mr. Sofer?

21             MR. GETZ:  Your Honor, I don't know if counsel

22   for El-Hindi is prepared to address the subject matter of

23   the government's addition to its motion that was filed

24   under seal you had asked for some time --

25             MR. HARTMAN:  For the part under seal, we have no

```
 1    intention to use it.

 2              THE COURT:  Okay.

 3              MR. HARTMAN:  I mean, same way the government

 4    answered our motion yeah, nothing, no intention.

 5              THE COURT:  Okay.  So that -- that's that.

 6              Let me know -- if you folks would let me know by

 7    about 4:30 whether you need -- let me know about 4:30 if

 8    you need to straighten things out, and certainly Angela --

 9    and also for Angela so she knows what the deal is.

10              MR. DOUGHTEN:  We'll -- to give The Court a

11    preview --

12              THE COURT REPORTER:  Can you use the microphone,

13    please?

14              MR. DOUGHTEN:  Other than for impeachment

15    purposes, we're talking about three tapes; one is

16    February 16th, the actual video that's not introduced.

17    We're not so concerned with the words that were spoken, but

18    it's important for us to show where people were sitting and

19    how they were situated.  And then we're having two other

20    days that we would like to have the entire tape, including

21    what the government's already played, played.  They're all

22    we're disputing at this point.  And I can't even say it's

23    dispute.  That's all we're attempting to work out at this

24    point in time.

25              THE COURT:  In other words, whether or not
```

1   they're going to object to your playing it or whether

2   there's an objection to the transcription?

3           MR. DOUGHTEN:  To the playing it.  The

4   transcription, we're using theirs, so there's no problem.

5           THE COURT:  And the purpose for which you are

6   offering -- what it is you want to offer?

7           MR. DOUGHTEN:  Yes.

8           THE COURT:  What is that?

9           MR. DOUGHTEN:  I'm sorry, the -- our purpose is

10  we want to show where the defendants were sitting during,

11  that's it.  The conversation has already been played, we

12  don't have a problem with it.

13          On the other two dates, we do believe that the

14  snippets played didn't give the full context of the

15  discussions, so we want to play for completeness, and we'll

16  replay the entire day.  We're not asking for a snippet, we

17  would play what the government already played and put it

18  right within what we want to play.  That's -- that's our

19  request.

20          THE COURT:  Okay.

21          MR. HARTMAN:  Your Honor?

22          THE COURT:  And the purpose in doing that, the

23  objective?

24          MR. DOUGHTEN:  The objective is to show when you

25  look at the portion of the tape that the government played,

1  it takes a different context than what you heard before in

2  that conversation.

3          THE COURT:  Based on what they said, it seems to

4  be -- I'd be inclined to let it in.  I'm just saying, you

5  guys talk it out and let me know what the problem is.

6          MR. SOFER:  We'll have to hear -- see it on paper

7  before we can --

8          MR. HARTMAN:  I unfortunately have to tell The

9  Court, I think we're probably going to need some time

10 tomorrow afternoon to have this similar discussion.  We

11 have a lot we want to play for a lot of different reasons,

12 and I expect Mr. Sofer and I will be able to work most of

13 it out, but I wouldn't count on all of it being worked out.

14         THE COURT:  Okay.  Fine.  I've got an appointment

15 at 4:30, but I'll cancel that, okay?

16         Thank you.  Anything else?

17         MR. SOFER:  Nothing, Judge.

18         MR. HARTMAN:  No, Your Honor.

19         THE COURT:  I'm looking at Mr. Hartman and

20 company and Mr. Ivy and company, is it necessary that what

21 we'll likely be doing the rest of the afternoon vis-a-vis

22 Mr. Doughten -- is it necessary for you and your clients to

23 remain, to continue to hang around?

24         MR. HARTMAN:  No.

25         MR. IVEY:  I don't think so.

1          MR. HARTMAN:  Actually, we need to go get to

2     work.

3          THE COURT:  Okay.  Then we can -- okay.

4          And David, when you guys -- if you do need me,

5     just come on down.  We'll have Angela come up and do it in

6     chambers.

7          MR. SOFER:  Very well, Judge.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6    s:/ Angela D. Nixon

 7    --------------------------              -----------

 8    Angela D. Nixon, RPR, CRR                Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3  Testimony of Darren Griffin continued

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**