1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3    UNITED STATES OF AMERICA,      )  Docket No. 3:06-CR-719

4             Plaintiffs,           )  Toledo, Ohio

5                  v.               )  April 25, 2008

6    MOHAMMED AMAWI, ET AL.,        )

7             Defendants.           )

8    ------------------------------

9            TRANSCRIPT OF JURY TRIAL, VOLUME 36
                BEFORE THE HONORABLE JAMES G. CARR
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                     (216) 522-4856

25

```
 1                          Elias Muawad
                            Muawad & Muawad
 2                          Suite 209
                            36700 Woodward Avenue
 3                          Bloomfield Hills, Michigan 48304
                            (248) 594-4700
 4      For the Defendant
        El-Hindi:           Charles M. Boss
 5                          Boss & Vitou
                            111 West Dudley Street
 6                          Maumee, Ohio 43537
                            (419) 893-5555
 7
                            Stephen D. Hartman
 8                          Kerger & Kerger
                            Suite 201
 9                          33 South Michigan Street
                            Toledo, Ohio 43602
10                          (419) 255-5990

11                          Alek H. El-Kamhawy
                            Raslan, El-Kamhway & Pla
12                          Suite 3FE
                            1700 East 13 Street
13                          Cleveland, Ohio 44114
                            (216) 928-1500
14
        For the Defendant   David L. Doughten
15      Mazloum:            4403 St. Clair Avenue
                            Cleveland, Ohio 44103-1125
16                          (216) 361-1112

17                          Jeffrey J. Helmick
                            Helmick & Hoolahan
18                          2nd floor
                            1119 Adams Street
19                          Toledo, Ohio 43624-1508
                            (419) 243-3800
20

21                          Mohammed Abdrabboh
                            1620 Ford Avenue
22                          Wyandotte, MIchigan 48192
                            (734) 283-7000
23

24
        Court Reporter:     Angela D. Nixon, RPR, CRR
25                          1716 Spielbusch Avenue
                            Toledo, Ohio 43624
```

1                    (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Just by way of update, I got your

2     e-mail, Mr. Sofer, and how much of a residue do you think

3     we're going to have?

4          MR. SOFER:  That's a frightening question, Your

5     Honor, by residue.

6          THE COURT:  If you don't know, that's fine.

7          MR. SOFER:  Residue I can tell you that we have

8     been told by the defense that they plan in their

9     cross-examination to be using 19 transcripts, essentially;

10    some of them multiple portions, but 19 transcripts.  And

11    the government has been able to analyze, so far, 14 of

12    those.

13         THE COURT:  Okay.

14         MR. SOFER:  And when I say "analyze," we've been

15    able to check them to see whether or not the transcripts

16    supplied by the defense varies from the transcripts the

17    government has, and we've done some analysis by way of the

18    relevance and the hearsay issues in terms of objections the

19    government's brought.

20         So the vast majority, I have people working on

21    them right now.  They will bring them done, I was told,

22    somewhere in the 11:00 to 11:30 range.  I think we should

23    be able to deal with that.  I just had a conversation with

24    Mr. Hartman.  I don't necessarily think -- he doesn't

25    think, nor do I, at this juncture, that audibility is going

1  to be necessary in the sense that the varying -- variations

2  in transcript -- we haven't really had a chance to talk

3  about this -- this -- and analysis was just completed.  We

4  think we may be able to work that out.  I think certainly

5  we don't --

6          THE COURT:  That's what I'm meaning by the

7  testimony residue.  I don't think The Court needs to be

8  involved in that yet, and if we have a little time on

9  Monday set aside in an emergency, we can do a quick

10  audibility hearing for what I think will be very small,

11  very few issues.

12          And it turns out that I glanced at my Monday

13  calendar, and that's the first time in almost 30 years that

14  I've been here, my Monday afternoon evaporated.  Normally,

15  I have things every half hour, and I've only got one after

16  about 1:30, 2:00, and that I can either have another judge

17  handle, or if that's a 4:30 -- so any way -- so I think

18  starting about 2:00 on Monday, we should be able to tend to

19  whatever we need to.  That's not to say -- it's not that we

20  can do everything possible today so we know where we are

21  and what's going on.  Okay.

22          Are the defendants here?

23          MR. SOFER:  Judge, our understanding was that

24  Defendant Masloum's attorneys have waived his appearance

25  and that he will formally do so himself.

1          MR. DOUGHTEN:  That's correct.

2          THE COURT:  I think Jeff e-mailed me last night,

3     and I said that's fine.  Okay.

4          What I would propose doing would be to -- and

5     this is subject to whatever counsel thinks would be more

6     efficient -- to hear the government out or hear the parties

7     out on the -- the -- its objections to the proposed defense

8     expert testimony.  Make a decision that we, then, turn to

9     the definitions and see where -- what, if any, sort of

10    progress has been made and deal with that.  And then

11    there's a matter that you all need to deal with in camera

12    together.

13          MR. SOFER:  Judge, I can speak a little bit to

14    the second issue, Your Honor, which relates to the

15    definitions.  The government has been working diligently to

16    work out its own internal issues besides these definitions.

17    We have made progress, but we have not finished having

18    those conversations.  As I indicated to The Court, I think

19    earlier in the week I think understandably there are a

20    number of terms within these definitions that do contain

21    policy, international affairs conditions in them, and we

22    have been trying to work that out with, I believe, those

23    who are paid more money to worry about those things than we

24    are, and I think we will be able to do that.

25          But I think if The Court would respectfully defer

 1   a decision on that.  I don't want to end up agreeing to

 2   something that we end up not being able to agree with.

 3            THE COURT:  No problem at all.

 4            MR. SOFER:  I think -- I'm sorry, Judge.  I

 5   think -- I don't want to violate rule number one.  You've

 6   got me frightened by that.  We -- the Monday afternoon time

 7   might be the best time to do that.  I don't see that as

 8   being a huge time.

 9            THE COURT:  It does seem to me that whatever we

10   accomplish with that may have some effect on having

11   Mr. Kohlmann testify.

12            MR. SOFER:  Understood.  I'll say this, also,

13   Judge, Mr. Herdman will expand on this when we get to

14   hopefully discuss Mr. Kohlmann today.  The government's

15   general position on this is, we have radically narrowed the

16   focus.

17            THE COURT:  Yeah, I saw -- I didn't get a

18   chance -- I'm having it printed out now, and you can either

19   wait until --

20            MR. SOFER:  Our hope is to be able to stipulate

21   on as many of these terms as possible, call Mr. Kohlmann

22   for a very narrow set of purposes that does not relate to

23   the vast majority of terms, abide by Your Honor's greater

24   concerns about his testimony, and we have -- and we have

25   same kinds of objections as obviously the defense experts.

1           THE COURT:  Okay.  At least we've got the

2      weekend.  You folks to work on your end and you folks to

3      talk.  Okay?

4           Why don't I hear from you as to the -- you being

5      institution, whoever wants to --

6           MR. SOFER:  We've each divided up the defense

7      experts.  I've drawn Mr. -- Dr. Shy, I believe is his name,

8      Roger Shy, and --

9           THE COURT:  Let me ask you this:  I think I've

10     got a pretty good grasp and comprehension about the two

11     being offered on behalf of Mr. Amawi, Dr. Shy.  I'm less

12     plugged into the vestige reports, so maybe we can put

13     that -- I just want to let you know that.

14          MR. SOFER:  Understood, Judge.

15          THE COURT:  I think I understand, and maybe,

16     perhaps, what we should do for that is have Mr. Hartman

17     tell us what that's about.  We can do that whenever.  Okay?

18          Why don't we deal with -- let's head in the

19     direction you wanted to go.  That was just by way of FYI,

20     but that may take more in the way of telling me what it's

21     all about that's going on.

22          MR. SOFER:  Judge -- and also, Judge,

23     respectfully, the computer forensic expert, I'm not sure we

24     have a disagreement with him calling him.  It's very

25     unclear to us what it is they'll be testifying about, so

1  maybe that's what The Court's saying.

2          THE COURT:  I thought it was just my own 19th

3  Century mindset.

4          MR. SOFER:  Speaking of the 19th Century, Your

5  Honor, I think Dr. Shy is probably the witness that we --

6  the government institutionally objects to the most here.

7          THE COURT:  Let me tell you my view.  I really

8  think the way that the evidence developed that practically

9  everything that he is saying -- and maybe I should hear

10  from -- maybe I should lay this out and let Steve speak to

11  that and maybe go from there.

12          MR. SOFER:  If I may, I'll say a little synopsis

13  of the government's position.  It may comport with The

14  Court's, I don't know.  And Mr. Hartman can respond.

15          What I think -- first of all, it is clearly

16  counted, I believe, six different circuits that have

17  approved district court decisions to exclude Dr. Shy's

18  testimony.  And although I haven't got a Sixth Circuit case

19  yet, we're still looking, so it's not impossible that we

20  will find one.

21          THE COURT:  Can we go off the record for a

22  moment, please?

23                  (A brief discussion was had off the record.)

24          MR. SOFER:  The rationale behind disallowing his

25  testimony, I think, that's laid out by most of these

1    reports, fits this case perfectly.  There are a number of

2    reasons why it is.  This kind of testimony is highly

3    inappropriate according to the courts that have excluded

4    it.  Not every court has excluded it, but I would note that

5    the courts that have allowed the testimony have --

6    they're -- they've either allowed it -- and often in a

7    different circumstance -- or for very limited purposes.

8              Here -- there's a couple -- there are essentially

9    three reasons why it is, and this is laid out, and, Your

10   Honor, we have the cases here.  I'd like to submit them for

11   The Court.  I'll submit them to Your Honor, but the case

12   I'll -- I'll at least cite for the moment is United States

13   versus Evans, E-V-A-N-S.

14             THE COURT:  Give me one second.

15             And the citation?

16             MR. SOFER:  Citation is 910 F.2d 790.  And it's

17   802 through the end of the case, Your Honor, essentially.

18   It's the 11th Circuit, Your Honor.

19             THE COURT:  Page 802.

20             MR. SOFER:  And it's a 1990 case.  Yes, 802 is

21   the pen cite.  And Judge, here, The Court basically

22   describes the rules, obviously and specifically, rule 7.

23             THE COURT:  Give me a second.  I've got to get

24   into Westlaw.

25             Steve, do you have the case with you?

 1          MR. HARTMAN:  I do not.  First I've heard of it.

 2          THE COURT:  If you can find copies of the case

 3  maybe.

 4          MR. SOFER:  I know we have them.

 5          THE COURT:  Why don't you give them to him

 6  because I can't pull them up.  You can't get Westlaw in

 7  here, can you?

 8          MR. HARTMAN:  Normally, I can, but my dog isn't

 9  running straight, and I'm trying to get it to work.

10          THE COURT:  They've got cases that they brought

11  for me, just give it to them.

12          MR. SOFER:  We'll find the case, Judge.

13          THE COURT:  Okay.  I'm reading.  Just a minute.

14          MR. SOFER:  Here they are.  Unfortunately, we

15  only brought a set for The Court.  Well, then, if Your

16  Honor -- I can give you my -- if counsel doesn't disagree,

17  I can -- I'll give you a list, Judge, if you can read my

18  chicken scratch, you'll -- or I can also read them into the

19  record.  It's up to you.  In any event, Your Honor --

20          THE COURT:  Let me -- just give me about two

21  minutes to glance at it.  And let me say, for several

22  reasons -- and I think I've alluded to this and I think

23  I've actually made quite clear -- I expect that both -- all

24  parties, both sides will have a broad opportunity to play

25  stuff during closing argument, and however you want to

1   present the transcribed versions, either through a scroll

2   mechanism or a copy or, perhaps, even both so the jurors

3   can choose which to watch, because the problem I have is

4   following the conversation was some problems from time to

5   time wasn't so much the audibility with the transcript as

6   so often happens, something is seen difficult to hear when

7   you have the transcript, oh, yeah, fine, okay.  Yeah, okay.

8   And the problem was I -- I frequently have -- just because

9   my eye wouldn't move as quickly as the scroll and sometimes

10  it would and sometimes it wouldn't.

11          But I think given the way that these

12  conversations are at the core of the case for everybody, I

13  expect that you guys will be able to project and present

14  whatever conversations you want, and it's in anticipation

15  of that that is part of my thinking.

16          And any way, give me another minute for Steve and

17  I to read this.

18          Steve, let me know when you're done.  Take your

19  time.

20          MR. SOFER:  I would note, Your Honor, while

21  Mr. Hartman's reading this that this case cites a number of

22  other important --

23          THE COURT:  I saw that, and candidly, those are

24  exactly the points that it makes, are exactly my concerns.

25          MR. SOFER:  Understood.  And I'll give a brief

1    description why the government thinks this is important and

2    then I will sit down.  I think that was rule 2, Judge.

3    Know when to sit down.

4              THE COURT:  You ready?

5              MR. HARTMAN:  I am.  You said there were three

6    issues -- just go ahead.

7              MR. SOFER:  The case talks about a number of

8    reasons why The Court properly excluded Dr. Shy's testimony

9    or this kind of testimony.  I think some -- although

10   Dr. Shy is concededly appears to be, I've done some

11   research -- he appears to be -- I think the line I read

12   somewhere is he is to linguistic discourse analysis as the

13   same as Barry Sheck is to DNA evidence.

14             I don't know if I would consider that necessarily

15   a compliment, but nevertheless, the fact of the matter is

16   that I don't --

17             THE COURT:  You'll be comforted to know that

18   Mr. Sheck was unsuccessful, but we remain on good terms.

19   He's a very impressive guy.

20             MR. SOFER:  Yes, he is, I didn't mean to

21   suggest --

22             THE COURT:  Not at all.

23             MR. SOFER:  The -- what this court focused on, I

24   think, and the reason I chose to bring this particular case

25   out of the many cases in which the expert testimony has

 1  been excluded, is it really, I think, pinpoints the

 2  problems here.

 3        The Court -- basically, there are a number of

 4  reasons why this kind of testimony is problematic.  First

 5  of all, it sort of assumes that the jury can't figure this

 6  out themselves, and in some sense is -- and we've done some

 7  preliminary research about this -- in some sense it almost

 8  seems to imply that the jury's not smart enough to figure

 9  out when somebody's sort of guiding a conversation or

10  manipulating a conversation.  And -- and counsel already

11  has -- they've opened, as Your Honor said, they're going to

12  have free rein in closing, which is another thing that's

13  mentioned throughout the case.

14        THE COURT:  And during the presentation of the

15  case.

16        MR. SOFER:  Indeed, they already have, and I

17  think that's the next thing we're going to turn to, which

18  is the cross-examination of the record which has conceded

19  many of the points that counsel's trying to make about

20  whether or not he sometimes would -- would sometimes would

21  dominate a conversation, sometimes might interrupt, and

22  again --

23        THE COURT:  Overtalker.

24        MR. SOFER:  He said he was an overtalker.  He

25  used words that the defense, no doubt, can make their

1    arguments from.  I don't think that in a case like this

2    with this volume of material and given the latitude that

3    counsel has to make these arguments, that expert testimony,

4    particularly when you look at the report in this case,

5    which doesn't -- which basically says, in the end, the

6    conclusion that the government -- I go back to the analogy

7    of the two, I believe it's trains in this case passing in

8    the night.  That is -- in essence, is the ultimate issue in

9    the case.

10          It's a conspiracy case.  It requires not

11   necessarily that.  In fact, it's impossible that it's only

12   the government's cooperating witness and Mr. El-Hindi, who

13   understood each other, but we're talking about whether

14   people agree to do something.  And that's in another

15   undercurrent throughout these cases, including the case

16   I've cited here, Your Honor.

17          And this goes throughout all expert testimony

18   that you don't want an expert's opinion to substitute for

19   that of the jury because the province of the jury.  And it

20   is a great danger, it seems to me, Your Honor, to have a

21   witness come up and basically say, these two people didn't

22   understand each either.  They were talking about different

23   things.  I don't -- I don't think -- I don't think that's

24   an appropriate thing to be telling a jury at all.  Again,

25   counsel can make those arguments, and they have plenty of

1    ammunition.

2          As Your Honor said, the government -- the tapes

3    are the tapes.  They are what they are.  If there are good

4    things in the tapes, bad things in the tapes, those are --

5    that's what the trial has been about so far and will

6    continue to be that way.

7          In any event, the danger of confusing a jury is

8    very high by bringing this kind of testimony in.  And you

9    very much tempt the jury to substitute the expert opinion

10    for their own.  And that's, I think, highly inappropriate

11    as well.

12          And again, the case here basically said in this

13    case -- this is from the Evans case -- in this case

14    questions regarding the defendant's understanding of

15    illegality of the operation and the extent of the

16    government inducement were the center of the trial.  The

17    jury's task was to determine on the basis of its collective

18    experience and judgment what Evans' state of mind was when

19    he accepted the money and whether he was entrapped to

20    committing the crime for which he was charged.

21          We agree with the district court that the expert

22    testimony would have aided the jury in performing this task

23    and that the testimony presented would not have aided the

24    jury.

25          THE COURT:  Time out.  Reduce the speed.

 1          Right, Angela?

 2          MR. SOFER:  We agree with the district court that

 3   expert testimony would not have aided the jury in

 4   performing this task and that the testimony presented a

 5   risk that the jury would allow the judgment of the expert

 6   to substitute for its own.  And I think those are the facts

 7   we have here.

 8          I would note, also, that if -- and I think

 9   actually Dr. Shy, I believe, testified in many, many cases

10   across the country in -- many in state court, some in

11   federal court, and again, for limited purposes.  I don't

12   know that he's ever testified for the prosecution, that's

13   an issue that would come up if it were that he could be

14   cross-examined.

15          But I think -- I think the -- once again, The

16   Court -- of problems of this kind of testimony are

17   magnified if -- if we say, then, the government would then

18   be able to -- and this is exactly what we'll have to do if

19   it turns out that we go down this road -- we're going have

20   to look for an expert who will then say what -- that the

21   defendant understood what it is that the government's

22   witness was saying, that the defendant did agree with other

23   people, that they weren't of the same mindset.  I mean,

24   that shows a -- sort of the -- again, it goes to the

25   ultimate issue of the case.

1              THE COURT:  In other words, a problem which I

2    hadn't thought of, quite candidly, I think it is one.  The

3    government would be unable to prevent -- present rebuttal

4    testimony because that testimony, by its very nature, would

5    take over the province of the jury and basically have an

6    expert telling them, go ahead and convict.

7              MR. SOFER:  That's right.  That's right.  And

8    that's essentially -- again, it's why in most of these

9    cases, courts have been very hesitant.  Even The Courts

10   that have allowed it, have limited it greatly.  And I just

11   don't think in this particular trial, given the focus and

12   the type of evidence we have here, it's also -- you could

13   imagine if there was some hypertechnical terms or if this

14   was the -- frankly, if the government's witness --

15             THE COURT:  If I can interrupt.  If it were a

16   case in which -- I realize we have foreign language terms,

17   but if this were a case in which uncommon -- there was an

18   uncommon -- there was an allegation of coded conversation

19   in a very uncommon way where, drug cases, it's pretty

20   readily apparent when we're talking about whatever shirts

21   or, you know, hub caps or whatever the deal is, but it's a

22   real dispute, for example, felony.  The target really was

23   in that particular -- was a laundry, you know, clean tops

24   and shirts, and the government was contending, I suppose,

25   then, you might well say, okay, because of the speech

1    patterns and so forth, this really isn't the code.  The

2    real business that's going on, but again, I think --

3              MR. SOFER:  Dr. Shy's own report describes both

4    parties to the conversation as being not particularly

5    articulate.  Once again, I think given the facts of this

6    case, the -- these jurors can figure this out.  They don't

7    need Dr. Shy to tell them that.  The other thing that I

8    would note is that counsel clearly has had access to

9    Dr. Shy, was able to use his information in guiding their

10   cross-examination.

11             THE COURT:  Do you -- I notice in the Evans case

12   there's a reference to charts.  Are you going to -- and if

13   you don't want to say right now, but it would seem to me --

14             Let me say this:  That if you were to be using

15   materials that he prepared about attribution and, say,

16   prepared by Dr. Shy, Georgetown University linguist to what

17   Barry Sheck is to DNA, would you say, ladies and gentlemen,

18   here are 17 times, we all know about, ladies and gentlemen,

19   some of these recorded conversations.

20             It's common sense that they're in a position to

21   direct the conversations in ways that otherwise might not

22   occur.  They have certain -- it's on their mind that that's

23   where they want to go.  It has certain objectives where

24   sure sometimes people do want to -- conversations and

25   sometimes they don't.  And they're in a position to steer

1   the conversation to a particular territory that -- that

2   might not otherwise take.  And ladies and gentlemen, you

3   know, let me play for you two, four, six, eight, 25 times

4   or even have transcript excerpts on the dates and say,

5   look, ladies and gentlemen, you'll recall from what you

6   heard that this happened in that conversation, and there

7   also, ladies and gentlemen, it is a contention that efforts

8   of interjection often didn't work or resulted in kind of

9   ambiguity, the government's now telling you, hey, convict

10  on that basis.  Well, let's look at how frequently that

11  was, the ways that it happened.

12          It would seem to me that you can, if you're able

13  to do so, create the kind of demonstrative exhibit in

14  closing argument.  I don't think it would be properly

15  admitted for the jury.  Might want to say, Judge, let us

16  send these back, perhaps a cautionary instruction.  Have

17  you thought about that?

18          And again, if you don't want to say, that's fine.

19  But it would seem to me that there are ways that you can

20  extract out the kinds of -- the evidentiary basis to make

21  the kind of summary that you would be making in closing

22  argument.

23          MR. HARTMAN:  We have thought about that.  We

24  have thought about it.  That's as much as I do want to say.

25          THE COURT:  Of course.  And I'm trying to signal

1  to you sitting up here and the government say time out,

2  Judge.  But if based on the evidence, this is standard

3  chart summary that you could use to make your points,

4  whatever they are, and I honestly think that you can make

5  them -- the material is there for you to address the jury

6  as to everything that he says in a way that's

7  comprehensible to the jury, and doesn't require you to be

8  an expert or a witness.  Common sense.

9         Let me see if Mr. Sofer has anything else to say.

10         MR. SOFER:  Only with respect to the last piece

11  of what you said.  Again, counsel using -- doesn't use an

12  expert always to testify -- it's clearly obvious to me

13  having read throughout Dr. Shy and having watched what

14  counsel's doing here, they've already utilized his skills

15  and talents.  I agree that they'll be able to make whatever

16  arguments they want.

17         The only thing I would say is, I don't think

18  those kind of demonstrative exhibits go back with the jury.

19         THE COURT:  I tend to -- I'm just saying that's

20  --

21         MR. SOFER:  If Your Honor thought about doing

22  that, I would create my own demonstrative exhibits

23  otherwise.  So the bottom line, again, is that's down the

24  road -- but I think, again, it goes to this notion that

25  what really is going on, ultimately relates to sort of

1    common sense and judgment by the jury and not by an expert

2    witness.  And in this case, given its specific facts,

3    particularly true.

4         MR. HARTMAN:  First of all, the -- Mr. Sofer is

5    correct that we have already begun to cross-examine

6    Mr. Griffin based on some of the things that Dr. Shy would

7    draw the conclusions upon, and he has made some admissions

8    on things.  However, the issue really about his testimony,

9    the types of techniques, the conversational techniques that

10   were used by Mr. Griffin are much, much more technical than

11   just, well, he tried to get him to say Bob, but he said

12   Bill.  And what Dr. Shy explains is how technical they are

13   and how they work.  And his --

14        I mean, we, you're right, we could sit here and

15   play every tape for the jury and point out every time we

16   think Griffin manipulates and be here until Christmas and

17   do all those things, but -- but I think it's -- first of

18   all, this is the more efficient way to do it I believe,

19   Judge.  I don't believe that the things that he would

20   testify about are within the province of the average person

21   because of the technical nature of the way they have it.

22   They are -- it's not just -- well, when you said that it

23   was -- it was ambiguous.  There are techniques that he

24   describes in his book that -- that have -- that are beyond

25   the normal understanding of what you and I would think of

1  when we listen to a conversation.  And given the

2  opportunity to explain that, I think the jury would be

3  able, then, to -- to understand the techniques that were in

4  fact being utilized that's beyond just the fact that, well,

5  I'm an overtalker or I'm proactive.

6         Obviously, Griffin said things that are good for

7  the defense already.  And there are tapes that are good for

8  the defense.  But to be able to explain the technical

9  nature of how these things happen in conversation, I think

10  it's perfectly appropriate to show the jury exactly why the

11  conversations progress the way they did.

12         As for -- as for the -- I mean, I can't really --

13  the case -- the Evans case that Mr. Sofer pointed out,

14  there's an issue about the conclusion, the ultimate issue

15  in the case and that he points to trains passing in the

16  night.  I would agree that we shouldn't have an -- an

17  opinion on whether or not there was an -- an overall

18  agreement from an expert.  However, in specific instances,

19  to be able to explain the what is really a somewhat

20  professional methodology used by Griffin.

21         THE COURT:  I think what you're saying is that he

22  would testify to a reasonable degree of expert certainty

23  that where particular kinds of conversational patterns are

24  detected, the probability of mutual comprehension decreases

25  what -- what it otherwise might be or something of that

1  sort?  And maybe I'm missing the target.

2         MR. HARTMAN:  In some instances, I think that's

3  correct.  I -- this is -- I'm in a bit of a disadvantage,

4  because Chuck was handling this, and we probably would like

5  the opportunity to brief the issue for Your Honor, but I

6  know that there are -- it's -- it's highly technical.  His

7  book about creating language crimes is highly technical in

8  terms of how conversations get manipulated.  It's more than

9  just what was said on the tape.  The issue is how does the

10  conversation get used.  And it's things that you and I may

11  use every day, but we don't understand them because we've

12  never looked at them in terms of technical nature of it.

13         THE COURT:  Why can't you take some or many of

14  his conclusions -- I begin with the proposition that what's

15  going on can be described in the kinds of general terms

16  manipulations, change of topic, ignoring responses, lack of

17  response to -- lack of a -- lack that the parties clearly

18  were talking about the same subject, even though some of

19  the terms they were using may have been the same, the

20  distraction, the -- particularly with regard to your

21  client, the very favorable depiction of him in terms of

22  what he was mostly about, which is figuring out new ways of

23  making money, that's what Mr. Griffin acknowledged, and he

24  even acknowledged that.

25         And I just can't recall, but yesterday

1    afternoon -- but why can't you, then, as an -- say this is

2    what's going on, without saying this is what experts say.

3    Just -- I don't see the gap between his book and his

4    report, but I don't see the gap between what we all are

5    hearing and what we've been reminded of and the -- the

6    descriptions that he gives to it and you want to have given

7    to it.  I don't see the gap between his doing so and you're

8    doing so because I think that they're pretty commonsense

9    notions.  And one looks at things and listens to things and

10   hasn't been pointed out at -- what is sought to be

11   accomplished by calling him, can largely be accomplished

12   through advocacy and a demonstrative aide.  And to the

13   extent that it can't, then we have to go out into an area

14   of speculation and, I think, some uncertainty.

15           And there's also the issue -- I think it's a fair

16   issue -- for the government to point out -- just go out and

17   get a linguist from somewhere who comes in and says, no,

18   that's -- that's not so in this case.  There's ample

19   opportunity, people did know what they were talking about.

20   There was concurrence in -- you look at the overall context

21   and the background and circumstances, the whole

22   relationship was developing, sure, even though Griffin was

23   bringing in the subject, let's go training, let's go

24   shooting so forth and so on.  Nonetheless, there was a

25   common platform of understanding from which they had begun

 1   in view of prior conversations.

 2           They wind up, ultimately, with a pretty complex

 3   dispute that I think really vastly -- potentially, vastly

 4   complicate -- I think there's a pretty simple proposition.

 5           Now, the academic conclusions that are drawn as a

 6   sociolinguistic conversation and linguistic researcher for

 7   a career of 20 or 30 years may be clothed in a kind of

 8   complicated jargon, but that's not at all uncommon.  And

 9   I'm not sure that that gets us anywhere or gets the jury

10   anywhere or gets you anywhere.

11           MR. SOFER:  Your Honor, just one -- there's just

12   one -- what Your Honor said has one further clause to it,

13   which is -- and that is the province of the jury, what it

14   ends up doing is treading on the province of the jury,

15   because they are determining the matter, and that is why so

16   many courts have excluded it.  You end up treading on their

17   province, it's exactly what the rule and conference and The

18   Court do not want expert testimony to do.

19           MR. HARTMAN:  I don't doubt, Judge, that he's

20   been excluded from some cases.  I -- I haven't checked, but

21   I would take Mr. Sofer's word because I don't think he

22   would mislead The Court, but also a number of cases that

23   he's been admitted for this very purpose.  And it's about

24   using -- and it's about how -- how law enforcement uses and

25   misuses language in very technical, technical terms, that

1    I, frankly, cannot explain.  I think so perhaps what we'll

2    need to do and what we would request to do is the

3    opportunity to proffer his testimony for The Court so the

4    judge -- so The Court can understand that he's not just

5    pointing out where there is manipulations, but he's

6    pointing out how that manipulations happens in technical

7    ways that the average layman just doesn't understand.

8    Frankly, the fact that the government says, well, then we'd

9    have to go get our own expert witness that would have to

10   say, no, it didn't happen that way, is --

11            THE COURT:  Such is life.

12            MR. HARTMAN:  Such is life.  And frankly, from a

13   defense point of view, is exactly why I'm going to say this

14   guy didn't commit a crime.  But to explain it from an

15   expert who understands the very technical nature of how

16   language gets used, I think it's very important so the jury

17   really understands, because his lawyers standing up and

18   saying, you know what he suggested, he went shooting 14

19   times.  Okay.  He suggested, he went shooting 14 times, but

20   he also said things on the tapes that made it sound like he

21   wanted to get involved with whatever Mr. Griffin was

22   understanding.

23            Now, an expert can explain that conversation and

24   say, ladies and gentlemen, the technique that was used

25   there to get to this was X, Y, and Z.  The jury can then

1    decide if that's correct or not when they listen to the

2    conversation.  That's correct, but I can't do that.  I

3    can't make that argument as his lawyer.

4         MR. SOFER:  And essentially, once again, Judge,

5    as technical as the subject may be that Dr. Shy has largely

6    developed, I think it is -- it is what it is; the notion of

7    whether someone understands something or doesn't, whether

8    someone has agreed to something or hasn't, isn't what this

9    case is largely about.  And to have someone start using,

10   you know, all these various terms that they've come up with

11   to describe the -- if nothing else is clear, I think Your

12   Honor's watched the testimony, Mr. Griffin is not --

13   there's no technique -- technical techniques to what he's

14   doing, I think that's fairly clear from the evidence.

15   Someone else can come in here and describe it in very

16   technical terms.  But what he's doing is very clear.

17        The jury, again, they're -- they are bright

18   enough to understand this.  They don't -- and counsel can

19   make the very arguments that he just did.  Counsel can make

20   the arguments Your Honor has proposed that he could make.

21        If -- if you want to bring -- bring a witness in

22   here that says, I didn't understand what was going on, then

23   you have to call your client.  That's -- that's -- that's

24   the way this works.  If you want to have someone, say,

25   testify to their state of mind whether they understood,

1  whether there was a meeting of minds, I didn't understand

2  this, I didn't know what he was talking about, he kept

3  saying this, I didn't understand what he meant, you have to

4  call your client.  That's what happens in criminal trials.

5  You don't get an expert witness to come in here and say

6  what your client agreed to, didn't know, knew, didn't know,

7  intended to do.

8       MR. HARTMAN:  That's not expert testimony, by the

9  way.

10      MR. SOFER:  Ultimately, that is -- oh, that is

11 the direction that this goes, and that's why it's so

12 potentially confusing and problematic to have someone come

13 in here and testify like this.  I don't want to call an

14 expert, I don't even know if such an expert would -- expert

15 to testify for the government.

16      I know Dr. Shy was consulted for the government

17 here and there, but in his 500 cases, or whatever it is

18 that he lists on his resume, I don't think he's ever

19 testified for the United States government or any other

20 government entity.  He makes a living, essentially, out of

21 introducing this kind of doubt.  The book is for defense

22 practitioners for the most part.  And I just don't -- I

23 think it's -- I think that it is very dangerous, confusing,

24 and unnecessary argument to be made in this case to

25 substitute his opinion for something that a jury is

1    supposed to be determining itself.

2         MR. HARTMAN:  And I -- I would argue that if it's

3    something that should be within the province of the 12

4    people who sit on the normal jury, then why does the FBI

5    hire him to analyze things for them?  If, you know -- and

6    they do, and he does work for the government --

7         MR. SOFER:  If you look --

8         THE COURT:  What matters --

9         MR. SOFER:  If I'm sorry, Judge.

10        THE COURT:  What matters is what this case

11   contains.

12        MR. SOFER:  I will say, Your Honor, that if you

13   look at why he did consulting with the government is a

14   different --

15        THE COURT:  Yeah, I don't even want to hear that.

16   Probably without constructing already further, the jury

17   being with us and hearing testimony and so forth, what --

18   what beyond what he has to say here will you anticipate I

19   would hear further if he were to come testify?

20        MR. HARTMAN:  I would anticipate that you would

21   hear about -- and again, Mr. Boss can answer this question

22   much better than I can, but I would anticipate that you

23   would hear about the technical nature of conversational

24   techniques that you use every day but don't --

25        THE COURT:  Excuse me for interrupting.  You

```
 1    know, that would be appropriate, it seems to me, where you

 2    have Mr. Griffin having been trained in these techniques

 3    where -- where, you know, the FBI had an informant -- where

 4    they took them for a week and said, look, you know, here's

 5    how you go about getting people to incriminate themselves,

 6    here's how you go about conducting and controlling a

 7    conversation.  Here's how and when you should interject

 8    ambiguity so that, you know, you might both be using the

 9    same term or thinking on the same topic to the same thing,

10    but -- and then you over a period of conversations, you

11    convert the ambiguity and the precision to reach an

12    agreement to do a certain thing.  There's none of that.

13            MR. HARTMAN:  He did say he received training

14    when he was in the military on these issues, and he said he

15    couldn't describe the training, but it was -- had Special

16    Forces or Green Beret school and he did receive training.

17    Part of --

18            THE COURT:  If I recall, gathering information.

19            MR. HARTMAN:  -- what he calls --

20            THE COURT:  If you want to ask him whether he

21    received training in manipulations of conversations in an

22    undercover capacity when he was, quote, charged with,

23    quote, gathering information about possible criminal

24    conspiracies.  And even if you want to do that in a voir

25    dire setting outside the hearing of the jury, that's fine
```

1   for the -- if the premise I was just elaborating on was

2   wrong, then there may be something else.  I doubt if it is,

3   but I certainly say it's appropriate to say let's find out.

4           MR. HARTMAN:  Well, and I think that, you know,

5   the fact that the FBI didn't tell -- didn't tell him how to

6   do or not to do these things is obviously going to become a

7   big issue.  But Dr. Shy can explain conversational

8   techniques we use every day.  We don't even know we're

9   using them.  And how they work and why they work.

10          THE COURT:  But again, doesn't that -- the more

11  of that we get, doesn't it get pretty quickly and pretty

12  thoroughly into the issue of Dr. Shy, in fact, saying,

13  ladies and gentlemen, convict because -- acquit because

14  there wasn't any agreement here and -- in other words,

15  isn't there -- isn't that, as Mr. Sofer points out very

16  dangerous and inappropriate?

17          MR. HARTMAN:  No.  I think that's what we argue

18  on closing based on what Dr. Shy says about his analysis of

19  specific conversations.  I don't think he says that.

20          MR. SOFER:  Which is exactly why, again, counsel

21  can make these arguments.  Counsel just said he's going to

22  testify about things we do every day that we don't even

23  know we're doing.  I mean, it's -- it's such an amorphous

24  and -- and -- on the one hand, and it's a technical and

25  amorphous concept, something we do that we don't know we're

1   doing, on the other hand, it's simple.

2        Every day you're going to instruct this jury,

3   every day you go out and decide whether you believe

4   somebody, you use your common sense.  That's what a jury

5   does.  It uses its common sense and its experience.  That's

6   what this case talks about, the common sense and the every

7   day knowledge of the jury that is supposed to be assisting

8   them in determining what happens in a case.

9        What, instead, you have here, is a person that

10  will come in and describe -- he's come up with all these

11  terms for what we do every day, the driveby's, the

12  camouflage, it's a misdirection, it's a recycling.

13       I mean, again, given the way the testimony has

14  come out, given what the tapes are, we don't need that,

15  Judge.  We can make these arguments.  It's very simple.  He

16  didn't understand.  It's Mr. Griffin who's guiding the

17  conversation.  Mr. Griffin suggested this, he suggested

18  that.  Here's an example of this, here's an example of

19  that.  They've cross-examined him on this already.

20       In some way, it's most illustrative.  Did you

21  intend to camouflage the situation?  Nobody knows what that

22  means.  You can say to someone, did you try to manipulate a

23  conversation to get him to say something incriminating?

24  They've asked him that question.

25       Again, to have this hypertechnical amorphous

1    concept on things we do every day that we don't even know

2    what we're doing, it just injects confusion into the case

3    that does not belong in there.

4            And it is, I believe, injected to do exactly

5    that, to -- injected to confuse the jury so that they can

6    be -- have a difficulty in trying to figure out what

7    happened.  And he actually -- Dr. Shy, allows his ability

8    to take a, you know, a tape that says this, this, and this

9    and get an acquittal.  I just don't think -- I think it's

10   highly -- it's dangerously speculative.

11           The case law supports that position, Judge.  The

12   circuits that have looked at this, all those circuits have

13   looked at this and said, the district court was right, it's

14   not going to make the case more efficient, it's going --

15   going to make it a lot less efficient.  We're going to end

16   up in a battle of the experts as to what the defendants

17   understood.  I think that sums it all up.

18           It show -- it shows the imprudence of going down

19   this road.  We're going to end up having a battle of

20   experts as to what people actually understood.  Again,

21   people who know -- Mr. Griffin knows what he said.

22   Mr. El-Hindi knows what he understood.  You aren't going to

23   call an expert witness in here to get in the way of that.

24   That undermines the whole -- the whole concept behind a

25   trial, and it undermines the jury's functions.

1              MR. HARTMAN:  I think Mr. Sofer just provided the

2    point perfectly when he said nobody knows what camouflaging

3    is.  Well, Dr. Shy's going to get on the stand and explain

4    what camouflaging is so that 12 laypeople understand it and

5    when they hear it, they're going to say, ah-ha, I see

6    exactly what they're talking about now.  Because nobody

7    does understand what examining means, it happens all the

8    time, and I think we need an expert to do that.

9              And if we need to, you know -- if Your Honor is

10   leaning towards excluding him, I would ask for the

11   opportunity --

12             THE COURT:  Which I am, go ahead.

13             MR. HARTMAN:  I picked up on that.  But I would

14   ask for the opportunity to have proffer his testimony to

15   show The Court exactly what it's going to be.

16             THE COURT:  How soon can that be accomplished?

17   And how long do you think it would take?

18             MR. HARTMAN:  I think it would take a half a day,

19   and I don't know how soon it could be accomplished, maybe

20   next weekend.  I would have to talk to Dr. Shy.

21             THE COURT:  I'm out of town next weekend.  I'm

22   speaking in a conference in New York City on Saturday,

23   leaving late Friday afternoon, and gone until Sunday night.

24             MR. HARTMAN:  Okay.  I don't know, you know,

25   maybe -- I don't know, I would have to talk to him.  Maybe

1  we could set something up by teleconference.  I don't know.

2  I would do what I --

3          MR. SOFER:  Judge, I'd ask The Court to make a

4  decision today.  I think -- I think it's -- I think the law

5  is clear, the circuit courts have affirmed district courts

6  opinions in this circumstance.

7          THE COURT:  I'll tell you what I'm going to do.

8  In all candor, I don't want to wake up one morning and

9  finding out that I should have allowed this proffer and but

10  for that, the case was fine.

11         MR. SOFER:  I ask The Court to, then, read the

12  cases that the government submitted.

13         THE COURT:  I will.

14         What I propose to do, you get on the phone and

15  see whether -- I think your suggestion about trying to do

16  this perhaps by video conference would be -- is a very

17  sensible -- just given the facts in terms of his time in

18  particular and his availability, and just so that you are

19  aware, this Monday afternoon or evening, the 28th --

20         MR. SOFER:  Judge, again if I may, an if we're

21  going to have what amounts to a Daubert hearing on this man

22  and we received the report, I don't know, two weeks,

23  saying, if that, where counsel, for instance, had months to

24  prepare for a Daubert --

25         THE COURT:  Hold on one second.  I'm trying to

1    respond by indicating my availability to your desire to get

2    this resolved as promptly as possible.

3           MR. SOFER:  I understand, Judge, but if Your

4    Honor is going to open the door to essentially what amounts

5    to a hearing on this, I'm concerned about the expert

6    testifying, the government not having an opportunity to --

7    I think this could be resolved now, today, I'm comfortable

8    with that.  I've looked at these cases, the government's

9    looked at these cases, we think this is a relatively easy

10   issue.

11          THE COURT:  I'll tell you what I'm going to do.

12   I am going to try, if I can, because I have other

13   commitments, to read the cases.  And if I am comfortable

14   making my mind up on that basis, I will do so, but in the

15   meantime, can you at least find out what his availability

16   might be -- and for that purpose, that would be Monday

17   afternoon on the 28th.  By evening, I mean starting 4:30,

18   5:00.

19          MR. HARTMAN:  He lives in Montana so it would be

20   earlier there anyway.

21          THE COURT:  Yeah, and Tuesday, Wednesday the

22   30th, Thursday the 1st, probably starting around 5:30, and

23   then evening of Tuesday, May 6th, May 7th, Wednesday, I'm

24   not available the evening of the 8th, and I'm out of town

25   on the 9th.  The morning, May 12th, but I must leave.  I've

1  got important meetings in Cleveland starting at noon, so

2  I'd have to leave shortly before 10:00.

3          MR. HARTMAN:  That would be probably a little

4  early for him, judge.  He's mostly retired, so I think

5  you've given me enough options that we can probably --

6          THE COURT:  At least you can let everybody know.

7  That doesn't mean I'm going to set the hearing or we'll

8  hold a hearing.  Concurrently, I will be spending time

9  reading the cases.

10          MR. HARTMAN:  I also would like the opportunity

11 to provide The Court with some cases as well.  If we can do

12 that, yet, and then brief the issue.

13          Just so I'm clear, the -- are we talking about

14 qualification or admissibility?

15          THE COURT:  I don't think it's qualification.

16 Basically whether or not what he has to say has enough of

17 the case in light of the considerations and concerns

18 Mr. Sofer has, and that I have to justify him testifying.

19          MR. HARTMAN:  Okay.

20          MR. SOFER:  And Judge, I don't dispute that he is

21 qualified in this area, but I think there is a -- based on

22 the research and literature that we've been able to find,

23 there is some significant question as to whether this

24 constitutes an area which is properly expert testimony.  So

25 I'm not doubting that he's probably the most qualified

1   person in the world on this particular area.  But whether

2   this particular -- some of the cases I think that you'll

3   see, Judge --

4           THE COURT:  But, yeah.

5           MR. SOFER:  -- puts in question when --

6           THE COURT:  By qualifications, I mean does he

7   have the ability by education, training, and experience to

8   render the opinions that he's given.  It's not whether this

9   is sufficiently recognized and recognizable field of

10  knowledge that the jury should be allowed to hear, which is

11  different.  That doesn't really involve hearing from him.

12          MR. SOFER:  Understood, Judge.

13          MR. HARTMAN:  I understand.

14          THE COURT:  Okay.  The next --

15          MR. SOFER:  That's one out of three, Your Honor.

16          MR. HERDMAN:  Judge, I've been selected to

17  address Mr. Alterman, who's been proffered by the Amawi

18  team.  I think I can try to sum up the government's

19  objection.  I was going to go point by point in terms of

20  the letter that was provided by counsel, but I think, in

21  general, the government's objection relies on Rule 701 and

22  the fact that expert testimony has to be proffered to

23  explain -- help explain to the jury a fact that is at issue

24  in the case.  And as we go through this list of proffered

25  testimony, areas of testimony from Mr. Alterman, I think

1   it's very clear there really is no fact at issue that

2   Mr. Alterman would help to explain for the jury.  In

3   general, many of these items that he's been proffered for,

4   I think, are already in evidence.  They exist in the form

5   of a consensual recordings, the statements of the

6   defendants, and the government's witness.  They also, just

7   from video evidence -- and I have some specific examples I

8   can point, Your Honor, to -- with respect to that.

9          THE COURT:  Why don't you?

10         MR. HERDMAN:  I would do that, Your Honor.  It's

11  probably easier said if I just walk through the letter

12  here.

13         THE COURT:  Okay.

14         MR. HERDMAN:  With respect to the first area,

15  it's -- it says a brief -- Mr. Alterman will provide a

16  brief explanation of the geography of the Middle East.

17  Well, we're happy to stipulate to a map, the Google Earth

18  depiction that was provided to the jury.  Anything like

19  that, I think, would -- would take care of the geography

20  aspect of this.

21         And then his proffer --

22         THE COURT:  And there's also been testimony about

23  the distance from whatever the town Mr. Amawi's family was

24  in and the in and so forth.

25         MR. HERDMAN:  And we'd be happy to stipulate to

1    anything such as that geopolitical dynamics between and

2    among these countries.

3          THE COURT:  Geopolitical dynamics between and

4    among these countries, and again, I don't know what that

5    means.  I subscribe to Foreign Affairs, but I don't read

6    it, quite candidly.  I just leave it on my coffee table.

7    So I don't really know what that means or what that would

8    add in terms of any fact that's at issue.

9          MR. HERDMAN:  As to number 2, the cultural norms

10   of the Middle East, I think we have some strong

11   reservations about the relevance of the cultural norms that

12   are in play here.  I don't -- I don't understand what the

13   relevance of such testimony would be, perhaps counsel could

14   explain that, at which point I would respond.  But on its

15   face, I don't see any relevance of any cultural norms in

16   the Middle East with respect to this case.

17          And this sort of plays into number 3, which is an

18   explanation of certain Arabic language conventions and

19   norms.  We do intend -- at least the government intends to

20   call a narrative language expert that can testify to this.

21   And I know that Mr. Amawi's team has qualified a linguist

22   as well or translator, so it seems to me that that

23   particular area would be covered elsewhere.

24          As to number 4 and really 5, the fifth paragraph,

25   also -- I think I can discuss these two together, Your

1   Honor.

2          THE COURT:  Let me ask Mr. Amawi's counsel, do

3   you expect to have another expert talking about some of the

4   linguistic issues?

5          MR. BRYAN:  I'm not sure if it would be to the

6   extent -- same extent, Your Honor.  The only other language

7   expert, obviously, is the translator, who also, obviously,

8   because he's from the Middle East and --

9          THE COURT:  Can address some of these?

10         MR. BRYAN:  He could also testify to some of

11  these same sort of cultural language things from people who

12  are Middle Eastern and things of that nature.  Mr. Alterman

13  provides examples of a professor that he had at Harvard

14  that was an atheist, but she was from the Middle East and

15  she used the term *inshallah* all the time and other Arabic

16  phrases, Arabic religious phrases, because it has more than

17  just religious connotations, just like us saying, well,

18  perhaps, maybe, or whatever.

19         THE COURT:  Okay.  So you have somebody else in

20  the dug out, so to speak?

21         MR. BRYAN:  Well, the primary purpose of

22  Mr. Nash's testimony, which will be to provide translation

23  of Arabic that occurred during some of these conversations.

24         THE COURT:  Okay.

25         MR. BRYAN:  Saying what was being said in Arabic.

1          THE COURT:  But --

2          MR. BRYAN:  I presume he could also talk about

3    some of those just -- just with respect to *inshallah*.  I

4    think the government would concede, there's no particular

5    religious significance to that saying, that particular

6    word.

7          THE COURT:  Whatever, but I'm just saying as to

8    this particular subject, the defense does have somebody who

9    appears -- and I would agree that appears to be born in

10   that country and a sufficient translator, that I think

11   would be able to testify.  They've got somebody, as I say,

12   in the dug out.  They may not be on deck, they may not be

13   penciled into the score card or the line up, but that's --

14   okay?

15         MR. HERDMAN:  I would suspect before we even got

16   to the defense expert, the government language expert will

17   testify to this exact notion.  Obviously, it's not the

18   exact same thing, but the evidence will be before the jury.

19         With respect to the historical Middle East

20   attitudes towards the United States and this, then, spills

21   over into paragraph number 5, which is a survey of public

22   opinion in the Middle East.  In general, I don't understand

23   the relevance of these particular paragraphs.  But I

24   would -- I would say to The Court that with respect to

25   there being some sort of a negative attitude in the Middle

1   East towards, specifically, U.S. military operations in

2   Iraq, I think that's clearly in evidence in these

3   consensual recordings that have been played for the jury,

4   as well as videos that have been played and replayed by the

5   defense and in cross-examination of Mr. Griffin.  For

6   instance, Your Honor, there is for -- that particular news

7   clip from CNN that depicts a wounded Iraqi person laying on

8   the ground who's then shot, presumably, by U.S. soldiers or

9   Marines, and then there's a discussion in that same

10  consensual recording between Mr. Amawi and Mr. Griffin

11  regarding some of these U.S. military operations.  And in

12  fact, this theme runs throughout all of the consensual

13  recordings.

14          THE COURT:  I understand.  I tend to agree with

15  you.  I'm not sure what history adds to that.

16          MR. HERDMAN:  And if we talk about paragraph 6

17  and 7 together as well, this is a wide-spread prevalence

18  among those in the Middle East of serious doubts that

19  Muslim Arabs were responsible for the attacks in 9-11, as

20  well as a brief explanation, Muslim Arab attitudes towards

21  Osama bin Laden.  Again, Your Honor, both of these

22  paragraphs have been discussed in both consensual

23  recordings that is Mr. Amawi offering opinions or thoughts

24  about his own -- his own beliefs as to what -- whether bin

25  Laden acted properly on 9-11 or what actually occurred on

1   9-11.

2          And again, there were three videos, I think, that

3   were replayed for the jury on -- oh -- I'm losing track of

4   time now -- I think it was Wednesday when Mr. Ivy was

5   cross-examining Mr. Griffin, that relate to this theory

6   that that is a conspiracy related to September 11th.  And

7   there's one particular gentleman, English-speaking

8   gentleman who stars in all these videos.  The notion that

9   there's some debate amongst Arabs or Muslims as to who was

10  responsible for September 11th, and there may be some

11  conflicting notion of whether or not Osama bin Laden was

12  responsible, whether or not he acted properly, all that

13  evidence is also before this jury.  And it's -- and before

14  this jury in the words of the defendant himself.

15          THE COURT:  Okay.

16          MR. HERDMAN:  The next paragraph, number 8, Your

17  Honor, I think so, is probably in terms of the veracity of

18  this evidence.  I think paragraph number 8 is the most

19  problematic and here's why:  What this paragraph proposes

20  is that there are foreign fighters who have gone into Iraq

21  to support the Iraqi insurgency.  Of those 5,000 or so

22  foreign fighters that have gone into Iraq, only a small

23  percentage of those fighters are from Jordan.  Now, this --

24  just imagine, Your Honor, if the government was proffering

25  expert testimony to say that there are 5,000 foreign

1   fighters that have gone into Iraq and every single one of

2   them is a Jordanian.   The inference that we would be

3   drawing for this jury is completely improper in that

4   instance, which is that Mr. Amawi must have been someone

5   who was interested in joining the insurgency in Iraq

6   because other Jordanians make up the bulk of the insurgency

7   in Iraq.   And I think it is completely improper when the

8   defense offers it for the opposite inference, which is to

9   say Mr. Amawi couldn't have been wanting to support the

10  insurgency in Iraq because --

11          THE COURT:   I understand the logic.   Okay.

12          MR. HERDMAN:   And the remainder of this letter,

13  Your Honor, deals with this notion of new media.   And some

14  of it talks about Arabic-language satellite television.

15          THE COURT:   I don't know.   I'll hear from

16  Mr. Rich, I'm sure, but this segment seems to me

17  anticipatory in response to Mr. Kohlmann.

18          MR. HERDMAN:   And that's quite possible, Your

19  Honor.   I would just say for The Court -- that as far as

20  I'm aware -- there's no evidence of any Arabic-language

21  satellite television in this case.   That is to say,

22  Mr. Amawi and Mr. Griffin, Mr. El-Hindi and Mr. Griffin,

23  Mr. Masloum and Mr. Griffin, they didn't sit down and watch

24  Arabic-language satellite television as they did some of

25  these videos that were released on the Internet.   And most

1    of the news media -- and Mr. Alterman, I would submit, is

2    qualified to discuss this, Your Honor -- deals specifically

3    with this notion of satellite television, but he's not a

4    real expert when it comes to the Jihadist use of the

5    Internet.  The areas that he's written on, by and large,

6    can be referred to -- he talks about it in terms of the

7    "new media," but it's really old media.  It's television

8    and it's not so much focused on the Internet.  And we would

9    have some reservations about his qualifications to discuss

10   new media in the sense that it involves the Internet.

11              THE COURT:  Okay.

12              MR. BRYAN:  First of all, as it relates to

13   Mr. Alterman, I don't think -- I don't believe it's

14   necessary to discuss his qualifications as they are very

15   well laid out in -- I -- and I'm not sure that his

16   qualifications are in dispute.  Maybe they dispute whether

17   or not his area of expertise would cover some of the areas

18   of his testimony, but his qualifications are --

19              THE COURT:  I would tend to agree.  I don't think

20   that's the focus of the objection.

21              MR. BRYAN:  And as it relates to experience to

22   relate to these things, Mr. Alterman has traveled

23   extensively to the Middle East.  He's a fluent Arabic

24   speaker and learned in Egypt for a -- he's in and out of

25   the Middle East on a regular basis, including Iraq and

1  Jordan and Syria, including all of the countries of the

2  Middle East.  So as far as his familiarity with the Middle

3  Eastern culture, not only familiarity with it, but

4  experience of the Middle Eastern culture, it's vast and

5  wide.

6         But as it relates to the specific areas of

7  testimony that we want to elicit from Mr. Alterman, we

8  agree that any globe or map or map or Google Earth, or

9  whatever, can establish the basic geography of the area,

10  but it's also -- I think it's important when we talk about

11  geopolitical dynamics among these countries, quite frankly,

12  I don't think -- it's amazing to me, quite frankly, that I

13  learned through Mr. Amawi, his knowledge of his own region

14  as compared to what basic Americans is of what's going on

15  in the Middle East as far as following only the history and

16  politics and the conflicts, and how they arose, and when

17  they arose, and how that becomes ingrained in just about

18  everybody who lives in the Middle East.

19         Even Mr. Griffin testified to yesterday, in

20  response to a question from Mr. Doughten, that -- that

21  Arabic men or people from the Middle East, they love to

22  discuss politics.  Well, they love to discuss politics,

23  quite frankly, because they're not -- in the cradle of

24  political discussion.  Everything that seems to be

25  happening in the world today is as a result of what's been

1   happening in the Middle East for the past, you know, two

2   thousand years.  But these conflicts are paramount in our

3   client's minds, especially in Mr. Amawi's mind.  He's a

4   great student of, not only history, but of religion and

5   conflicts and how they occur.

6         And so I think what Mr. -- Mr. Alterman is able

7   to provide -- and just to back up a little bit about what

8   Mr. Herdman said about the Rule 702, quite frankly, that

9   test is fairly simple.  Expert testimony is permissible

10  where it can help the jurors understand the evidence or

11  determine a factual issue.  And it applies both in this --

12  in -- both rationales behind expert testimony apply in this

13  case.

14        The government has played a tremendous amount of

15  evidence, and it's being replayed on cross-examination,

16  conversations between and among our clients concerning

17  Middle Eastern affairs, and concerns about what's going on

18  in their homelands and where they're from and things of

19  that nature.  Based upon that -- and I also believe, based

20  upon the government's interpretation of these

21  conversations -- they're going to argue to the jury that

22  these defendants have certain motivations to assist in the

23  Iraqi insurgency or to provide material support or to kill

24  or maim American citizens abroad, as it relates -- again,

25  just -- what I'm talking about now is more general and less

1    specific -- but as it relates to -- to the general

2    argument, as it relates to the evidence, as being able to

3    assist the jury in issues and fact.

4         This is the critical nature of that expert

5    testimony in this respect because they -- they play all of

6    this.  And I'm sure they're going to get up this closing

7    argument, and they're going to recount everything that our

8    client said, everything that they said about Osama bin

9    Laden, they're going to remind the jury who Osama bin Laden

10   is.  According to the government, Osama bin Laden is this

11   guy who attacked us on 9-11.  Mr. Amawi's heard expressing

12   admiration for Osama bin Laden, that he must be Osama bin

13   Laden or be like Osama bin Laden.  If he wants to be like

14   Osama bin Laden, that he wants to kill American soldiers

15   abroad, that he's that close to following through with his

16   belief system or his -- maybe even his heartfelt desires,

17   but -- but of proving intent for the government, they based

18   upon all this conversation proving intent is literally an

19   inch away.

20        When you understand the culture, you understand

21   the Middle East and you understand --

22        THE COURT:  None of that's a defense.  I mean,

23   the fact that somebody has a particular world view and acts

24   on the basis of that world view is neither an element of an

25   offense defense or defense, and I have a real problem with

 1    the relevancy of any of this, because to the extent that

 2    it's offered is -- as it seems to being offered as an

 3    explanation of how one might view events, literally view

 4    events, by meaning of video, and how one might interpret

 5    not just the videos, but the -- the conflict in Iraq and

 6    the whole rise of various anti-American, anti-western

 7    groups, or ideologies.  It's no more a defense than in the

 8    charge were having gone into a bank and robbing an armored

 9    truck to raise money to support a particular group -- which

10    obviously isn't here, I take that only as an example.

11          And it seems to me it's no more a defense and no

12    more admissible than it would be in a case against La Cosa

13    Nostra, the Mafia, to say the defendant grew up in a

14    Sicilian setting with the certain code of honor where

15    everybody walked around with the parage and shot guns and

16    where revenge was the highest form of manhood and omata,

17    O-M-A-T-A, is a requisite, so forth and so on.  And that

18    certainly would never be allowed in a prosecution of

19    somebody with having committed a RICO violation.  I have a

20    real problem with that.

21          MR. BRYAN:  Your Honor, I understand completely.

22    We're not offering this testimony as a justification

23    defense.  We deny --

24          THE COURT:  What else do you have?

25          MR. BRYAN:  We deny that our clients had the

1    intent to commit the offense which the government has

2    accused them of committing.  The government is going to use

3    their words against them.  In fact, Mr. Getz said in

4    opening statements these men will be convicted by their

5    words.  If there's an alternate explanation for these mens'

6    words that is consistent with innocent and inconsistent

7    with the intent to commit the crime --

8            THE COURT:  I think Mr. Getz is -- excuse me,

9    Mr. Sofer.

10            The point he made earlier is, I don't think that

11   that explanation can come in this instance from a third

12   party, because the jury -- let's say this comes in, folks,

13   ladies and gentlemen, people who grow up in the Middle East

14   or who's families have recently come, have immigrated from

15   the Middle East, do so in view with the cultural mindset

16   that is common place throughout the Middle East in a

17   society and the circumstances within which they were

18   reared.  The inference that is sought to be drawn, then, by

19   the jury -- the jury is being encouraged, and therefore,

20   ladies and gentlemen, there was no intent to do those

21   things that the government alleges these defendants

22   intended to do.

23            Well, I'm not -- I don't see where that

24   testimony -- that expert did make a nexus of the mindset of

25   a defendant with regard to the acts attributed to the

1  defendant.  And I really don't.  That's the problem that I

2  have.  And it does seem to me that one looks elsewhere in

3  the evidence, which is so far, I think, fairly extensive, I

4  mean, it's -- it's clear quite, candidly -- I think it

5  seems to me, I think it would be clear to the jury that

6  Mr. Amawi has some very fundamentally held and felt

7  religious views.  His religion has played a very active

8  role in his life.  And the jury knows that.  And whether he

9  testifies or not, seems to me, okay -- the evidence about

10  what was on his mind when he was saying and doing the

11  things that the government claims, is proof of an intent to

12  provide material support and to conspire, to agree with

13  others to provide material support to the terrorist --

14  terrorism and conspire to kill and maim American soldiers.

15          I think there's a large distance between having

16  views that favor the insurgency, which are opposed to what

17  is going on in Iraq, and to conspiring to actively

18  participate in those views.  And the evidence is what the

19  evidence is.  And have somebody come in and say, look, this

20  is the way it is in the Middle East, this is how one's

21  ideology and world view are formed, and this is the effect

22  of that world view and instinct and foreign impulse to

23  engage in political discourse in a very broad and extensive

24  way, I don't see the relevancy of that.  I'm just letting

25  you know how I'm responding to what you're saying.

1          MR. BRYAN:  I understand.  I understand Your

2     Honor's thought process on this topic.  Respectfully, Your

3     Honor, I disagree with the thought process, and please give

4     me time to explain my position.

5          The government's entire case against these

6     defendants, especially Mr. Amawi, are the words that he

7     spoke.  They -- they, of course --

8          THE COURT:  It comes in going out shooting and

9     all that stuff, too, but I understand what you're saying.

10    If the words are viewed in one way, wins; if they're viewed

11    in another way the defendant wins.

12         What occurred during the conversations, in light

13    of the actions, is found by the jury to manifest an intent

14    to do the -- to commit the acts that are done in

15    anticipation of doing other acts, the government makes --

16    the jury finds that beyond a reasonable doubt one or more

17    of the defendants will be found guilty; not beyond a

18    reasonable doubt, they won't.  I'm sure that's why we're

19    hearing all conversations.

20         MR. BRYAN:  Understood, Your Honor.  And quite

21    frankly, if it was evidence of acts in furtherance of the

22    conspiracy, there may not even be a trial.  There would be

23    no reason for a trial.  So this case is going to be based

24    upon this man's -- his guilt or innocence in this case is

25    going to be determined, in large measure, by the words that

1    he spoke to Mr. Griffin.  And part of the defense may be

2    that he didn't even intend the words that he spoke to

3    Mr. Griffin because of the considerable evidence that

4    Mr. Griffin, at least towards the end of this case, seems

5    to have been played by it in large measure.  That may be

6    part of the defense.

7          But -- but also part of the defense is something

8    that we will argue to the jury, but I think we are entitled

9    to the assistance of the expert, in fact, I think the

10   jury's entitled to the assistance of the expert is to be

11   able to understand why somebody in Mr. Amawi's position,

12   from where in the world he comes, would have the belief

13   systems that he has and would say the things that he says.

14         Now, in our country you're permitted to have any

15   belief system that you want.  You're permitted to believe

16   in Satan, the most evil of all evils, you're permitted to

17   worship him in this country.  You're permitted to worship

18   Hitler.  You're permitted to read Hitler's writings.

19   You're permitted to argue and have political discourse that

20   Hitler was right, and we should all live under a Nazi

21   regime.  You're permit to argue all of those things, but

22   that doesn't make you a guilty of that crime because of

23   that belief system.  But if there was evidence that someone

24   had those belief systems were -- were planning to attack a

25   synagogue, and there was evidence that there was a plan in

1   place to attack a synagogue, or whatever, then of course

2   the government would be able to present its evidence.

3           Each person's belief system to show what their

4   motive is, to show that they did have an intent to go

5   forward with the commission of the crime.  There's a

6   difference between having a belief system and having the

7   intent to go forward with the crime.  And I think it's

8   important to point out to the jury that Mr. Amawi's belief

9   system is not that out of the norm for people who come from

10  the part of the world that he comes from, as it relates

11  specifically to the Iraqi war and opposition to American

12  troops there, even a belief that the insurgency groups are

13  justed in fighting back and killing American soldiers.

14  There's nothing illegal or inappropriate about that belief

15  system.

16          What the government wants to do is take that

17  belief system, try to present some evidence that there was

18  some kind of plan to go forward, and to deprive this man of

19  his liberty, in essence, in large measure, because of that

20  belief system and not necessarily going to a gun range.

21  The ambiguity about why someone may go to a gun range is

22  also a defense to us, but we also should have an

23  opportunity to explain this belief system, quite frankly,

24  Your Honor, which is foreign to people in America.  It's, I

25  think, less so now because of the time that has passed

1  since this case was being investigated to the present time

2  in 2008.  I mean, American opinion -- and I would

3  acknowledge has -- as -- has -- has evolved over time to be

4  predominately against the Iraq War, not necessarily for the

5  same reasons that Mr. Amawi's against the Iraq War, but

6  because of the policies, that the American soldiers have --

7           THE COURT:  Let me also say, if I may, in terms

8  of how someone might come to view what our government and

9  our military is doing in Iraq negatively, I feel very

10  strongly about that, how that can occur.  I think that

11  clear evidence of that in the case, you see American

12  soldiers shooting somebody lying on the ground, American

13  soldiers engaging, could be argued, at least speaking in

14  the abstract, as target practice, people around trucks, the

15  crusader video and so forth -- that and there may be other

16  examples that are slipping my mind -- but there are things

17  that this jury has seen, I think, that are shocking to its

18  sensibilities as American citizens about what fellow

19  Americans are doing.  And so to argue, ladies and

20  gentlemen, some of the things that you are arguing, I

21  think -- basis of this court.

22           I don't think it's necessary to bring in somebody

23  from -- who is an expert in the history, and also spills

24  over into the other proffered expert as to both of the

25  geopolitical and historical events, both past and

1   current -- past, recent, and current, or in terms of the

2   religion.  And I think that the recordings give an insight

3   into Mr. Amawi's world and religious views that I don't

4   think this jury would view as entirely unsympathetic.

5           The evidentiary basis to the arguments that you

6   want to make is being developed -- I'm sure will be

7   developed more extensively by yourselves.

8           And ultimately, I think Mr. Sofer's point is

9   well-taken, and that is, where we find out what was on a

10  person's mind and what a person intended is in the evidence

11  that we have.  You don't look to experts to come in and

12  tell somebody what was on a person's mind, either directly

13  or indirectly, unless there's an insanity defense or

14  something of that sort, which isn't part of this case.  We

15  look to the words and actions and conduct that are in the

16  evidence.  And we draw the inference from those to

17  determine whether or not they add up to the intent, and

18  it's up to the jury to make that determination.

19          And at some point a defendant has to make a

20  determination to take the stand and explain himself to the

21  jury or not.  And if he does not, I can assure you I will

22  make a -- I will give a vigorous instruction of the jury

23  that there's no inference at all.  I feel very strongly

24  about the necessity of making clear to jurors -- I think we

25  already did during voir dire -- of upholding and respecting

1  fundamental constitutional rights.

2           And I just don't -- I don't see the linkage

3  between -- the nexus between -- like with Mr. Shy, the

4  nexus between these general propositions and its relevance,

5  what they have to say, the relevance of what they have to

6  say in this particular case.  And the nexus and the linkage

7  to Mr. Amawi, in this instance, and Mr. El-Hindi in the

8  other.

9           But go ahead.  I really want you to know exactly

10  where I am so that you can address these and say, Judge,

11  you're wrong on this and this issue.

12           MR. BRYAN:  I understand, Judge.  I understand.

13           Your Honor, I understand that I have arguments

14  available to me that -- we're obviously trying to present

15  some evidence in a way to try to explain why our client may

16  say things that he said at certain times throughout the

17  audio recordings in this case.

18           The government is permitted to draw every

19  negative inference from the things that our client said

20  that the jury may seem to be offensive.  They're able to

21  draw every negative inference that exists known to man, and

22  I don't need to remind the judge that we're sitting in a

23  courtroom in the United States of America and not in the

24  Middle East and that the jury that is sitting in judgment

25  of my client, notwithstanding The Court's extensive

1    inference to draw upon the widest pool of jurors possible,

2    does it have within the final jurors who are here in this

3    case a person of Arabic descent or even Muslim descent.

4    And quite frankly, that is a little bit troubling to me,

5    because we're -- we're in the Toledo, Ohio area, in

6    southern Michigan area, where there is a large population

7    of people from the Middle East and people who practice the

8    Muslim faith.  So, in essence, my client is being judged by

9    American, predominately Christians, whether they're

10   nominal, some of them, if I recall from their

11   questionnaires.

12            THE COURT:  Some are very devout.

13            MR. BRYAN:  Some of them are more devout.

14            And he's clearly a devout Muslim, as evidenced by

15   the tapes played here.  And I think there could be some

16   misunderstanding about some of the things that he says that

17   we're not permitted to call an expert to provide

18   alternative explanations for why some people may say what

19   they're saying.

20            THE COURT:  The point is, I don't think that they

21   can -- that the lingo -- that maybe so, but the general

22   population, you're talking about an individual, and the

23   expert is not able to say -- to draw, I think, that

24   reasonable degree of certainty that because of that,

25   therefore this.  As for this individual, you just can't.  I

1  just don't -- you have --

2          If I recall correctly, Mr. Amawi's father was in

3  the Jordanian military.  Well, a person who's in the

4  military, seems to me it's fair to say, might have

5  different views that were contrary to those of the society

6  on who's behalf he is in commission to act.  And we don't

7  know -- and that fact of itself, does that mean that the

8  setting in which Mr. Amawi was raised, was reared, and the

9  influences that he got in the cradle and the nursery and at

10  the supper table, what were they?  Were they in line with

11  the common perception?

12          We also have in evidence, it seems to me, that

13  there was, perhaps at work, perhaps because -- not because

14  of the history, but because of the current and recent

15  events -- and these were very loosely, quote, a conversion

16  that his family viewed as something that happened to

17  radicalize and to call forth certain views and attitudes

18  that were, at least the concern to them, contrary to what

19  they had -- so when we get into this whole very tangled web

20  that only gets us, for the jury, very far at all because of

21  the -- there's no proof that whatever these cultural,

22  historical, political, religious circumstances were -- even

23  assuming that they are sufficiently widespread that we

24  could draw an inference that they may have had an impact in

25  this case -- where is the connection that they did have an

1    impact on this individual?

2           MR. BRYAN:  There's a couple things that I need

3    to respond to, Your Honor.  The first thing that you said

4    at the beginning was that you feel that's appropriate for

5    an expert to sort of individualize Mr. Amawi based upon

6    what other people in his part of the world think and

7    believe and things of that nature.  We're not calling the

8    expert for that purpose.  He will not even comment on

9    Mr. Amawi's behavior in this case.  He will not even be --

10   he has not even been provided --

11          THE COURT:  But I think what's going on, you

12   want -- you want -- the reason you want the expert is that

13   the jury can infer that he was influenced in this way and

14   that helped to explain the views to the jury as expressed

15   and -- and -- and the significance of the things that he

16   said.  And I don't think that inference, fairly, can be

17   drawn.  And in that sense of it, maybe -- he's sure he's

18   not going to testify, and by the way, he had these views,

19   but the inference that you want the jury to draw is that

20   that's what motivated him, that's what was on his mind.

21   And I just don't think that that inference is a proper

22   inference to propose to the jury on this kind of evidence.

23          MR. BRYAN:  It's an inference being offered to

24   rebut the government's inference that all the things that

25   Mr. Amawi is saying means that he intends to go forward

1   with a conspiracy to aide others in killing American

2   soldiers in Iraq.  I mean, obviously, that's the inference

3   they want drawn from Mr. Amawi's speech, the things that he

4   said.  There's an alternate explanation for the things that

5   Mr. Amawi said, and even Your Honor touched upon --

6           Just strike what I just said because it's the

7   second point I wanted to make about -- the last thing that

8   Your Honor said, I think, explains the need for an expert

9   in this area.

10          You talked about some evidence that's already

11  been presented, that Mr. Amawi's family did, you know --

12  had some problems with him and through Mr. Griffin, the

13  credibility, the extent of that claim, and that Mr. Amawi

14  was having problems with his family because they viewed him

15  as growing more radical, and they feared for his safety,

16  and they wanted him to get out and things of that nature.

17  But that's the evidence that's been presented.

18          The government, I'm quite sure, in closing

19  argument may even make some sort of argument about the

20  radical sayings of Mohammed Amawi, that Darren Griffin

21  faked the radicalization of Darren Griffin, but in doing

22  so, he was able to uncover the true radicalization of

23  Mohammed Amawi.

24          What this expert will do, Your Honor, is sort of

25  demystify that government argument, allow us to respond to

1   that government argument in words beyond just what I would

2   argue to the jury, and he on -- in evidentiary expert

3   evidence that would support my arguments.

4       I believe that Mr. Amawi's entitled to that

5   defense, that his belief system is not that far different

6   than everybody else who's in the Middle East, as it related

7   to Mr. -- Mr. Alterman's research -- that at the time of

8   the Iraqi war, 80 percent of people living in Jordan -- the

9   country that Mr. Amawi lived in -- believed that the

10  terrorists in Iraq were the United States government -- was

11  the United States government.  And that the insurgents were

12  actually the good guys, they were the freedom fighters,

13  they were the ones fighting back under, you know, a

14  defense-of-Islam theory.

15      And that's -- that's the -- he was a young man at

16  the time during -- during the invasion of Iraq.  And it's

17  also commonplace that these are the -- this is more through

18  our other experts and that's why we sort of needed two

19  experts in this area, and I don't want to jump ahead to

20  Mr. Aslom (phonetic), but they do somewhat compliment --

21      THE COURT:  They do, left hands I think of the

22  same --

23      MR. BRYAN:  But it allows us to provide an

24  explanation to some things that Mr. Amawi said that's Al --

25  it doesn't -- it's the correct explanation.  It means it's

1    an alternative -- it's an alternative explanation for the

2    things that Mr. Amawi expresses on the videotape.

3            The jury -- the government just wants the jury to

4    believe that only, in effect, common sense to the jury,

5    people who say these things really mean what they say.

6    They said what they meant, they meant what they say, you

7    know.

8            I can predict, quite frankly, 90 percent of what

9    the government's closing argument is going to be in this

10   case because of that.  I don't think that makes me a wise

11   man.  It just makes me a competent lawyer.

12           But because of that, we're attempting to be able

13   to explain some -- some, admittedly, very serious and

14   troubling things that were just spoken about our client,

15   and we have alternate avenues in which to try to explain

16   what he said to the jury, but I don't believe that we

17   should be denied this avenue to be able to explain it as

18   well.

19           Perhaps maybe Mr. Amawi, you know, could -- and

20   I'm not -- I'm not predicting he could, as Your Honor

21   suggests, take the stand and explain his motivations.

22           THE COURT:  I don't mean to say --

23           MR. BRYAN:  Even if he did, I think he would be

24   entitled to the support of an expert from the region -- not

25   from the region, but an expert on the region from which he

1  comes, to explain that Mr. Amawi has a belief system --

2  isn't so -- so out of the norm in the Middle East.  And

3  that, quite frankly, if the belief system in the Middle

4  East, objecting to American policies in the Middle East and

5  believing that the Iraq War's wrong and believing that

6  certain types of Jihad are permissible or are allowed --

7  that was not -- again, I'm not saying this is a

8  justification of that, because what we would submit to the

9  jury is that clearly our client was rooting for the

10  insurgents, but rooting for the insurgency is not the same

11  as is becoming part of a conspiracy to join the insurgency.

12       But be that as it may, the expert opinion will

13  allow us to sort of demystify Mr. Amawi.  And if the

14  government fears that people who speak like Mr. Amawi are a

15  threat to this country, then we're in huge amount of

16  trouble in this country because there's probably

17  100 million Muslims in the Middle East who think and say

18  the same things there that Mr. Amawi says.

19       Now, I don't believe that Mr. Amawi's a threat to

20  the world, and I don't believe 100 million Muslims in the

21  Middle East who think and say these things are a threat to

22  the world as well.  Because I think what Mr. Alterman will

23  say is that a fraction, a disproportionately small amount

24  of people who think this way will actually engage in that

25  activity, and it's done for many reasons.

1          And the activity that I'm talking about is

2     terroristic activity.  And the reason it's done for many

3     reasons, quite frankly, is just survival.

4          People who live in a comfortable environment are

5     less likely to go and join an insurgency or less likely to

6     become a suicide bomber than someone who grows up in the

7     slums of Saudi Arabia where the vast majority of foreign

8     fighters that come from the Middle East -- which is what

9     Mr. Alter man can testify about -- and they're recruited

10    directly right out of the slums.  They come from the slums

11    of Saudi Arabia because of the deplorable living conditions

12    that they have and the insurgent leaders say and the

13    terrorist leaders -- I don't want to lay the law on

14    insurgent terrorists, but the -- they target these people

15    who are vulnerable.

16         The evidence in this clear is that Mr. Amawi had

17    a more comfortable lifestyle in Jordan than he had in the

18    United States, and quite frankly, that's probably the

19    evidence why he wanted to get -- come to Jordan because he

20    couldn't pay his rent in the United States, but he lived in

21    a six-story villa in Jordan.

22         So this sort of philosophical -- and I'm sort of

23    bleeding over, I think, into what Mr. Aslom's going to

24    provide, it provides an explanation for my client.  It

25    allows us to defend our client by explaining it in a way

1    that's consistent with Islam and inconsistent with the

2    government's idea of guilt.  It's not saying whether

3    depriving the government of their opportunity to argue

4    their inferences -- obviously, they're going to be free to

5    argue every negative inference they can from the things

6    that Mr. Amawi said and from the beliefs that he held, and

7    in certain respects, this is a double-edged sword.

8            But not in certain respects, but in all respects,

9    this testimony provided by our own expert is a double-edged

10   sword, that the evidence in the case, unfortunately, is a

11   sword that's much sharper on the government's side than it

12   is on our side, because the jurors can draw all the

13   negative inferences.

14           And unless they're equipped with the knowledge of

15   the thought processes of the people who live in the Middle

16   East and the concerns about American imperialism and,

17   perhaps, themselves of one day becoming the victim of an

18   invasion into their own country or situation into their own

19   country becomes occupied by the United States -- Mr. Amawi

20   lives 45 minutes from the Iraqi border, 20 minutes from the

21   Syrian border.  This is in his backyard.  I don't see why

22   we shouldn't be able to explain that to the jury.  I don't

23   want to move -- I don't want to --

24           MR. HERDMAN:  Your Honor, I have to respond.

25           THE COURT:  Let me -- if you can complete with

1    regard to Mr. Alterman, and I'll hear from Mr. Herdman.  I

2    think there's another point.

3           MR. BRYAN:  I argued much more generally.  The

4    only thing I really didn't argue or address, I addressed

5    sort of American -- or measurable public opinion in the

6    Middle East, but as it relates to media -- and I admit and

7    acknowledge that there's no evidence of viewing satellite

8    television or whatever -- what -- what Professor Alterman

9    is testifying about or what he would be testifying about is

10   how news media in the Middle East is a relatively recent

11   phenomenon beginning with the widespread use of satellite

12   television because of these countries -- because of the

13   regimes in these countries were oppressive, and they didn't

14   have free use of -- they didn't have -- especially in Saudi

15   Arabia, they had government-controlled media.  And because

16   of the government-controlled media, people in the Middle

17   East were pretty much starved for news from around the

18   world, not only news from around the world, but news in

19   their own backyard, what was really happening in their own

20   backyard.

21          But with the advent of satellite television and

22   satellites, and because of the economy in the Middle East,

23   it -- the satellite dish in the Middle East is relatively

24   inexpensive compared to a satellite dishes in the United

25   States, and they don't have service companies either where

1    once you get a satellite dish in the Middle East -- and

2    Mr. Alterman will explain this -- you basically have free

3    television from around the world.  You pay for the

4    satellite -- it would be great to have in the United

5    States -- but once you put it up, you can -- you have free

6    television from around the world, so that for the first

7    time the satellites came in, people were able to see the

8    BBC, they were able to see CNN, a lot of information that

9    they got was from the objective reporting from American

10   news outlets.

11          Some people would accuse all American media of

12   having a liberal bias in this country, and quite frankly,

13   that liberal bias was reached -- was able to be reached in

14   the Middle East, and people would see that.  And not even

15   American media, but just like CNN or MSNBC or things like

16   that, that people were able to see that they were

17   sympathetic to the plight in the Middle East or the Arabs

18   in the Middle East, the Palestinian -- what was happening

19   in Israel and Iraq and all these other places.

20          So that -- that's important, and that's an

21   evolution, and that evolution led to not just satellite

22   television, but the Arab world getting their own CNN, so to

23   speak, which was Al Jazeera television, which came up in

24   the '90s around the time of the first Gulf War, and it just

25   basically exploded.  And these people, who for centuries,

1   their thirst for knowledge and desire to learn about what

2   was happening in their own world had been suppressed, they

3   just latched onto this -- this new media, this way to

4   obtain information.  The evolution continued, quite

5   frankly, Your Honor, into, you know, the year 2000.

6        THE COURT:  What -- what relationship does that

7   have to this case?

8        MR. BRYAN:  That's what I'm getting to.  The

9   evolution basically transformed this media, this

10  information gathering society.  Then in the -- in, you

11  know, the turn of the century in the year 2000, that's when

12  the Internet began to become prevalent, and especially

13  throughout the first half of the first decade of this

14  century.  The Internet explosion occurred and that's when

15  these videos started developing in the Middle East and the

16  Jihadi videos, specifically.  Again, it's admittedly

17  propaganda put out by American -- so to speak, but this

18  created a situation in the Middle East where these

19  especially young people who were good at using --

20       THE COURT:  What does that have to -- what with

21  this case, how -- I don't see any connection.

22       MR. BRYAN:  Well, this case, Your Honor, the

23  government's -- the vast majority of the case presented

24  against Mr. Amawi thus far has been the conversations

25  between him and Mr. Griffin, but the conversations between

1  him and Mr. Griffin while they're viewing -- while they're

2  viewing videos off the Internet.  99 percent of those

3  videos off the internet, including CNN, Al Jazeera, and

4  admittedly, from insurgent groups, and even Al-Qaeda itself

5  and Osama bin Laden propaganda that's been poured onto the

6  Internet by all these different groups.

7          The evidence is clear that Mr. Amawi was a

8  connoisseur of that, that he was collecting all this

9  information.  I think his computer records will reflect

10 that he collected information from everywhere, which -- not

11 to mention which was a great selection of photographs of

12 American fighter planes -- the best that I've ever seen --

13 and so many different photos of fighter planes and the

14 like.  Just --

15         He just has a thirst for knowledge and

16 information, but that's not unique to Mr. Amawi in the

17 Middle East.  In the Middle East everybody who has access

18 to the Internet downloads videos.  They come in large

19 volumes, they share videos with each other.  Everybody

20 knows the videos.  Everybody knows the symbols, the

21 Al-Qaeda symbols.

22         THE COURT:  I have no problem with even the basis

23 for that kind of opinion, even if you were to slice and

24 dice it down to young men in their 20s, there's no

25 scientific and legitimate way that that kind of proposition

1   can be inserted, I don't think.  And again, the more this

2   gets projected, the further that it gets from this case.

3   And the evidence in this case and the utility of any expert

4   opinion, even better found in the grounded in this case.

5           MR. BRYAN:  Your Honor, I would respectfully

6   suggest that it actually gets to the heart of this case.

7   Because this isn't a case where Mr. Amawi and Mr. Masloum

8   and Mr. El-Hindi were meeting in secrecy and planning how

9   they were going to provide material support, how they were,

10  you know, going to collect as many ball bearings as they

11  could collect, as many, you know, materials for bomb vest,

12  collect -- collect even money to -- to send to the Middle

13  East.  I mean, that -- this case involves for the most part

14  Mr. Amawi and Mr. Griffin viewing videos.  A thing that is

15  extremely common, according to our expert, in the Middle

16  East, a behavior that is extremely common amongst young

17  Arab -- young Arab men in the Middle East.  And it's sort

18  of a sense of empowerment because they can't watch the

19  news, especially in the Middle East because the --

20          THE COURT:  But again, that -- what was watched

21  in this case is the evidence, not what, I mean, really,

22  we -- there's no way of knowing whether anybody else

23  watched that video.  We can sort of speculate, but I just

24  don't see how that has any connection with anything in this

25  case.

1      MR. BRYAN:  Again, Your Honor, I anticipate in

2  the government's use of this evidence, and perhaps their

3  arguments into this evidence, their -- in fact the

4  testimony of Mr. Griffin, himself, which in my own mind,

5  seems somewhat absurd that he was describing a lot of these

6  videos as training videos.

7      THE COURT:  Which is an arguments you can make.

8      MR. BRYAN:  It is an argument that I have, but

9  I'm sure that the government's going to argue that

10 Mr. Amawi's interest in this subject matter is rooting for

11 the participants in these videos.  His -- his expressed

12 admiration for Osama bin Laden, so to speak, goes to his

13 intent to join this conspiracy.  And if we have an

14 alternative explanation, that this isn't uncommon, and

15 he -- again, we would suggest that the government needs to

16 be --

17     THE COURT:  Again, how can there be evidence of

18 how somebody else, much less how on a national or even

19 regional basis, how people would view that and how they

20 might respond?  I don't see the relevance.

21     MR. BRYAN:  Not how they might respond, Your

22 Honor.  That's the province of the jury.  But the actual

23 viewing of these -- these videos, that there is an innocent

24 explanation or one that's not consistent.  But it's

25 inconsistent with innocent, and it's cultural, but also

```
 1    there as well in this respect addresses the -- the video

 2    element as well.  It is cultural.  It's cultural in the

 3    Middle East for people to collect and to view Jihadi

 4    videos.  Now some of this, quite frankly, admittedly so,

 5    was in response to the proffered testimony of Mr. Kohlmann

 6    who was prepared to testify that the viewing of these

 7    videos shows not only a sympathy, but --

 8         THE COURT:  Sure the largest collection in the

 9    Continental United States except for his.

10         MR. BRYAN:  Shows short of a mobilization towards

11    no goal, or whatever.  Clearly, if Mr. Kohlmann would be

12    permitted to come in and testify to this, we believe we

13    should be able to call experts and show, no, this is not

14    the case in the Middle East for the most part.

15         But again, I don't want to -- I don't want to get

16    into Mr. Kohlmann, because I think he's different -- he's a

17    different expert.  He's not relevant because Mr. Kohlmann

18    talks about producers of these videos.

19         MR. HERDMAN:  Before we start talking about

20    Mr. Kohlmann, can we please respond to where we're at?

21         MR. BRYAN:  No.  I'll just stop talking about

22    Mr. Kohlmann.

23         MR. HERDMAN:  I can be very brief in my response,

24    and I think when I first started speaking to Your Honor

25    about what was proffered in this letter regarding
```

1   Mr. Alterman, pointed to paragraph 8, which was a

2   description of the foreign fighters that entered into Iraq

3   in support of the insurgency and a relatively small portion

4   of the Jordan -- relatively small proportion of Jordanians

5   that made up that number of are 5,000.

6          I think what Mr. Bryan is describing for The

7   Court is that paragraph number 8, the logical fallacy, as

8   Your Honor put it, written large across this entire letter

9   in that they want to present this evidence to the jury so

10  that the jury makes an inference based on what is common in

11  the Middle East, what is normal in the Middle East, and

12  then apply those inferences to Mr. Amawi.

13         Just imagine, Your Honor, if the government stood

14  up and proffered the same evidence that Mr. Bryan is

15  proposing with relation to Mr. Amawi.  I would -- I would

16  never make that argument to Your Honor because it's clearly

17  improper evidence.  It's clearly inadmissible for the

18  government to come in here and offer some sort of opinion

19  poll in the least --

20         THE COURT:  This is the way things are,

21  therefore, this is the way they were here.

22         MR. HERDMAN:  Correct, Your Honor.

23         And let me just go right back to -- to what

24  Mr. Sofer and Mr. Hartman discussed because the evidence in

25  this case is the evidence.  And Mr. Bryan wants to be able

1   to argue an inference off that evidence.  He's more than

2   entitled to argue an inference, just as the government will

3   argue an inference from the evidence, from the evidence

4   alone, not from some other expert coming in here and

5   testifying about what the prevailing attitudes in the

6   Middle East were on the United States.

7        Let's not forget Mr. Amawi is a U.S. citizen,

8   Your Honor, so for the government to draw an inference off

9   anything other than what the actual evidence in this case

10  is would be clearly improper, and I think it's improper for

11  the defense to be proffering similar expert testimony.

12       And briefly with respect to the new media with

13  Mr. Alterman's proffered testimony, I think it's very clear

14  based on this letter that Mr. -- and based on what

15  Mr. Bryan just spent several minutes talking about,

16  Mr. Alterman's expertise in the area of satellite

17  television in the Arab countries, and that's -- there's no

18  evidence of that in this case.  And there's nothing -- it

19  has nothing to do with satellite television in this case,

20  it's not at all an issue.

21       But what is very telling about Mr. Alterman's

22  letter, and I think if you contrast it with the -- the very

23  detailed reports about specific evidentiary items in this

24  case that Mr. Kohlmann has proffered with The Court, you

25  see very quickly that Mr. Alterman is not qualified to

1  discuss specific pieces of evidence, talking about videos

2  that are actually in evidence before the jury and before

3  The Court.  Mr. Alterman addresses none of these specific

4  videos in his letter.  I don't know that one --

5           THE COURT:  I understand.

6           MR. HERDMAN:  I don't know that he's qualified

7  to.  There's no evidence of that.

8           There's been nothing proffered with respect to

9  his qualifications to address these Jihadist videos.  It's

10  described in very general, broad terms, whether he is --

11  The Court's already made a ruling with respect to general,

12  broad conclusions that Mr. Kohlmann would draw and the

13  government would not seek to produce that at this point in

14  time.

15           So I think -- so I think that when you talk about

16  this new media, it is -- it is very telling that we're --

17  that Mr. Bryan's talking in general broad steps, and The

18  Government gets around to speaking about Mr. Kohlmann, it's

19  pinpointed on specific exhibits, even, Your Honor.  And

20  we're talking about actual evidence that's before this jury

21  already.

22           MR. SOFER:  Judge, if I may, on a broader scope,

23  not with respect to this, but I think so the tenor of the

24  government's arguments applies to all three of these

25  experts is, we proffered the testimony of one --

1    essentially one expert in this case other than our

2    translators.  The Court looked at that and said, you know

3    what, United States government, you've gone outside the

4    bounds of what is permissible here because, again, you're

5    getting into broad inferences that shouldn't be made, that

6    we should stick to the specific evidence in the case.  The

7    government agrees with that, we've tailored our

8    presentation, we've narrowed it, we've focused it, and

9    we've tried to focus on the specific inferences on the

10   specific pieces of evidence, as Mr. Herdman has said.

11           All of these experts that are being proffered by

12   the defense move us in leaps and bounds away from that

13   concept; that is, here's the evidence, here's the inference

14   that can be made by it, this is the province for the jury

15   to determine whether this is intent of these defendants or

16   not.  If we -- my fear is that we open this door and, you

17   know, I just heard a -- you know, a speech that we want on,

18   and on which, essentially, is just politics.  The case is

19   not about politics, it should not be about politics, not

20   about the war in Iraq, it's not about a religion.  It's

21   about violations of the law in this country that these

22   defendants live.  They don't -- they didn't want to be

23   subject to the United States law.  They didn't have to live

24   in this country.  But this is the -- this is where they

25   lived, this is what they did here.

1              And I think, you know, to open this up the way

2    that's being suggested, it would be so unbelievably

3    offensive.  These lawyers would be jumping up and down and,

4    rightfully so, if the government came in here and said, you

5    know what, 80 percent of the terrorists that have attacked

6    anywhere in the world are such and such religion, are from

7    such and such a country, or from such and such a region,

8    and therefore, it must be that so are these men.

9    Outrageous.  That would be an outrageous thing for us to

10   say.  The fact that it comes from the defense doesn't make

11   it any less outrageous.

12             What I'm saying, Your Honor, is, we open the door

13   to this, then we're going to end up losing the same thing

14   from Dr. Shy, we're going to lose what is supposed to be

15   happening here, which is it to determine whether these men

16   broke the United States' law in this case based on this

17   evidence.  That's our general position, Judge.

18             MR. BRYAN:  Your Honor, if I may.

19             THE COURT:  Just briefly, because I want to take

20   a break.  Go ahead.

21             MR. BRYAN:  Your Honor, Mr. Herdman commented

22   that, you know, the judge -- jury's permitted to draw

23   inferences from the evidence.  What we're trying to do,

24   Your Honor, is present a defense for our client by

25   presenting evidence, expert testimony, that will provide

1  more evidence for the jury from which to draw inferences.

2  What The Government basically wants --

3          THE COURT:  I agree with that.  Otherwise you

4  wouldn't be talking, but the inference -- I don't see that

5  the inference, set of inferences you want to have drawn can

6  properly be connected to this particular defendant, what

7  he's charged with in this case.  And that's the problem I

8  have.

9          MR. BRYAN:  Your Honor, my suggestion would be,

10  then, that the government shouldn't be able to present any

11  evidence of what Mr. Amawi says at all if we're not able to

12  explain his -- his -- his comments.

13          THE COURT:  You are -- you are --

14          MR. BRYAN:  And they should be able to present

15  evidence of what Mr. Amawi did.  And if that were the case,

16  I think Your Honor would Rule 29 this case tomorrow because

17  he did nothing.

18          THE COURT:  Probably so, if these tapes weren't

19  in the case, we wouldn't be here.  But anyway, again, you

20  can present evidence to -- and there is evidence in the

21  case in which you can argue, if contrary to that which the

22  government offers.

23          My point is, I don't think you can offer this

24  particular evidence.  And I'm not ruling -- far from it --

25  that you won't be able to stand up and argue that the jury

1 should reach a conclusion entirely different from that of

2 the government or much less argue that the government's

3 failed to meet its burden of proof.

4    And -- let's -- let's take a break for about 15

5 minutes, and then I'll turn to the other expert offered by

6 Mr. Amawi.

7    Just put Mr. Doughten's request and the fact that

8 I'm granting it on the record, please.

1          C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     s:/ Angela D. Nixon

7     --------------------------          -----------

8     Angela D. Nixon, RPR, CRR               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25