3870

<pre>
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                  -
 4       Plaintiff,               - Toledo, Ohio
                                  - May 2, 2008
 5          v.                    -  Trial
                                  -
 6   MOHAMMAD ZAKI AMAWI, et al. ,-
                                  -
 7       Defendants.             -
     -------------------------------
 8
                     VOLUME 42, TRANSCRIPT OF TRIAL
 9             BEFORE THE HONORABLE JAMES G. CARR
        UNITED STATES DISTRICT CHIEF JUDGE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiffs:   United States Attorneys' Office
12                         By:      Thomas E. Getz
                                 Justin E. Herdman
13                         801 Superior Avenue, W
                           Cleveland, OH 44113
14                         (216) 622-3840

15                         U.S. Department of Justice
                           By:  Jerome J. Teresinski
16                              David I. Miller
                           10th & Constitution Ave, NW
17                         Washington, DC 20530
                           (202) 353-3464
18
                           Office of the U.S. Attorney- Austin
19                         By:  Gregg N. Sofer
                           816 Congress Avenue
20                         Austin, TX 78701
                           (512) 916-5858
21

22

23

24

25
</pre>

| | |
|---|---|
| 1 | For the Defendant Amawi: Office of the Federal Public Defender - Cleveland |
| 2 | By:  Amy B. Cleary |
| | Jonathan P. Witmer-Rich |
| 3 | Edward G. Bryan |
| | Timothy C. Ivey |
| 4 | 750 Skylight Office Tower |
| | 1660 West Second St. |
| 5 | Cleveland, OH 44113 |
| | (216) 522-4856 |
| 6 | |
| | Muawad & Muawad |
| 7 | By:  Elias Muawad |
| | 36700 Woodward Avenue, Suite 209 |
| 8 | Bloomfield Hills, MI 48304 |
| | (248) 594-4700 |
| 9 | |
| | For the Defendant        Kerger & Kerger |
| 10 | El-Hindi:        By:  Stephen D. Hartman |
| | Suite 201 |
| 11 | 33 South Michigan Street |
| | Toledo, OH 43602 |
| 12 | (419) 255-5990 |
| | |
| 13 | Boss & Vitou |
| | By:  Charles M. Boss |
| 14 | 111 West Dudley Street |
| | Maumee, OH 43537-2140 |
| 15 | (419) 893-5555 |
| | |
| 16 | Raslan, El-Kamhawy & Pla |
| | By:  Alek H. El-Kamhawy |
| 17 | Suite 3FE, 1700 East 13 Street |
| | Cleveland, OH 44114 |
| 18 | (216) 928-1500 |
| | |
| 19 | For the Defendant        David L. Doughten |
| | Mazloum:        4403 St. Clair Avenue |
| 20 | Cleveland, OH 44103-1125 |
| | (216) 361-1112 |
| 21 | |
| | Helmick & Hoolahan |
| 22 | By:  Jeffrey J. Helmick |
| | 2nd Floor |
| 23 | 1119 Adams Street |
| | Toledo, OH 43624-1508 |
| 24 | (419) 243-3800 |
| | |
| 25 | |

1    Mohammed Abdrabboh
     1620 Ford Avenue
2    Wyandotte, MI 48192
     (734) 283-8405
3
     Court Reporter:    Tracy L. Spore, RMR, CRR
4              1716 Spielbusch Avenue
               Toledo, Ohio 43624
5              (419) 243-3607

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by mechanical stenography,
24   transcript produced by notereading.
25

3873

08:31:53 **1**            (Reconvened at 8:31 a.m.)

08:36:34 **2**            MR. SOFER: A couple preliminary matters we

08:36:37 **3** should probably deal with first.  Firstly, the

08:36:40 **4** government intends on playing a video which we're asking

08:36:46 **5** that a translation be handed out to the jury.   It's

08:36:50 **6** Government's Exhibit 20A.  It goes with what's already

08:36:54 **7** been introduced into evidence, Government's Exhibit 20.

08:36:58 **8** And we're going to ask that the jury read this probably

08:37:06 **9** before or during the playing of Government's Exhibit

08:37:09 **10** Number 20, which has been previously played.  We're

08:37:13 **11** going to stop it before the more gruesome parts of this

08:37:17 **12** video.

08:37:19 **13**            The other thing, Your Honor, is Mr. Boss

08:37:23 **14** cross-examined Mr. Griffin last week about I believe

08:37:27 **15** what he called shoulder-fired missile launcher.  We have

08:37:34 **16** what amounts to what it is; I have it in my hand now to

08:37:38 **17** mark as Government's Exhibit 205.  And what it is is

08:37:44 **18** a -- essentially it's just a disjuncture, just a blank

08:37:49 **19** tube.  There's nothing -- no munitions in it whatsoever,

08:37:54 **20** but it's sort of like what a shell casing would be to a

08:37:57 **21** bullet, except that this round is designed for antitank

08:38:02 **22** fire.   And given the fact that it's been brought up and

08:38:06 **23** asked about by counsel, we are going to seek to admit

08:38:11 **24** this into evidence.   And that's it.

08:38:14 **25**            In terms of time, Your Honor, I think the

08:38:19 **1** government hopes to be done this morning, maybe late

08:38:23 **2** morning, I should say, and we're going to ask that

08:38:27 **3** hopefully we can try to get finished with Mr. Griffin.

08:38:30 **4**                THE COURT:  Okay.

08:38:32 **5**                MR. IVEY:  Your Honor, our concern is --

08:38:47 **6**                THE COURT:  I realize it's just a few

08:38:49 **7** minutes, but I really wish I'd been told this when I

08:38:53 **8** took the bench.  But go ahead.

08:38:55 **9**                MR. IVEY:  Your Honor, the government sent

08:38:58 **10** us over multiple pages of clips that they propose to

08:39:04 **11** play to the jury on redirect this morning.  We would

08:39:10 **12** have liked to have gotten these and let the Court know

08:39:15 **13** about this, but we didn't get this.

08:39:16 **14**                THE COURT:  When I'm on the bench, let's not

08:39:19 **15** waste time.   Go ahead.

08:39:22 **16**                MR. IVEY:  I had asked the government the

08:39:24 **17** day before yesterday, could they please send us the

08:39:29 **18** clips that they plan to use so that we can invoke the

08:39:33 **19** rule of completeness, so that we can have parts of their

08:39:38 **20** clips played.   I was told at least with respect to Mr.

08:39:42 **21** Amawi that the government had already done that.   They

08:39:44 **22** would not send them to me until the middle of the night

08:39:47 **23** last night.

08:39:48 **24**                THE COURT:  He didn't get them.   Why not?

08:39:50 **25**                Let's move along.   I want to --

08:39:53 **1**              MR. SOFER: We sent them as fast as we had

08:39:55 **2** them, Judge.

08:39:56 **3**              THE COURT:  Okay.  We'll deal with whatever

08:39:58 **4** your problems are.   If we can't complete Griffin today,

08:40:04 **5** we can't.   I want to very much.  We lost a lot of time

08:40:07 **6** in the case.   You had this.  The fact that you didn't

08:40:09 **7** know somebody was going to play it, we've been trying to

08:40:15 **8** be as professionally courteous as we can, but we deal

08:40:18 **9** with these things.  We need some time for you to get

08:40:22 **10** prepared.

08:40:23 **11**              MR. SOFER: I'll just note there's nothing

08:40:25 **12** new in here.

08:40:26 **13**              THE COURT:  I understand.   Okay.

08:43:26 **14**              (The jury enters the courtroom.)

08:43:26 **15**              THE COURT:  I apologize for the delay.

08:43:28 **16** Let's get underway and hopefully we'll have a full day.

08:43:32 **17**              Mr. Sofer, you can begin redirect

08:43:36 **18** examination.

08:43:37 **19**              Mr. Griffin, you remain under oath.

08:43:39 **20**              DARREN GRIFFIN, REDIRECT EXAMINATION

08:43:51 **21** BY MR. SOFER:

08:43:51 **22**    **Q.**  Good morning, Mr. Griffin.

08:43:52 **23**    **A.**  Good morning.

08:43:54 **24**    **Q.**  I'm going to ask you a few questions this

08:43:57 **25** morning, mostly about the questions defense counsel

08:43:59 **1** asked you, and give you a chance to hopefully explain

08:44:01 **2** some of your previous answers.   To begin with, we'll

08:44:07 **3** try to sort of go through it the way that it came out in

08:44:09 **4** court when the defense attorneys asked you questions.

08:44:15 **5** Mr. Ivey asked you about your purpose of going over to

08:44:19 **6** Iraq with Mohammad Amawi, and he asked you if it was for

08:44:22 **7** engaging in violent jihad.  Do you remember that

08:44:25 **8** question?

08:44:28 **9**     A.  Yes, I do.

08:44:29 **10**         MR. IVEY:  Objection.   My question was not

08:44:32 **11** going to Iraq.

08:44:33 **12**         MR. SOFER: I'm sorry.   I misspoke.

08:44:37 **13** Counsel is correct;  I apologize.

08:44:39 **14**     Q.  Going over to Jordan.   Do you remember him

08:44:43 **15** asking that question?

08:44:43 **16**     A.  Yes, sir.

08:44:45 **17**     Q.  And can you tell the members of the jury what

08:44:48 **18** your purpose was of going over to Jordan with Mohammad

08:44:52 **19** Amawi in August of 2005?

08:44:55 **20**     A.  Basically to take over the laptop computers to

08:44:59 **21** supply to the insurgents, specifically the contact in

08:45:05 **22** Syria to provide to the insurgents going in and out of

08:45:10 **23** Iraq.

08:45:10 **24**     Q.  Is that based on conversations you had had with

08:45:12 **25** Mr. Amawi prior to the trip?

08:45:14 **1**    **A.**   Yes.

08:45:15 **2**    **Q.**   Mr. Ivey asked you also about whether there were

08:45:20 **3**   e-mails regarding the jihad training between you and the

08:45:22 **4**   other defendants.   Do you recall that question?

08:45:24 **5**    **A.**   Yes.

08:45:25 **6**    **Q.**   You said you could recall one particular one; is

08:45:28 **7**   that correct?

08:45:28 **8**    **A.**   Correct.

08:45:28 **9**    **Q.**   And can you tell the members of the jury again

08:45:31 **10**   what that particular e-mail was?

08:45:32 **11**    **A.**   Basically that was the February 25, 2005 e-mail

08:45:40 **12**   sent to me by Mr. El-Hindi --

08:45:43 **13**    **Q.**   Go ahead.  I'm sorry?

08:45:45 **14**    **A.**   -- about the IEDs.

08:45:50 **15**    **Q.**   If we can put up 79, please.

08:45:54 **16**        We're displaying the first page of Government's

08:45:57 **17**   Exhibit Number 79.  We're going to come back to this.

08:46:00 **18**   But if we could just go through the other pages so the

08:46:03 **19**   jury can see them.

08:46:44 **20**        (E-mail displayed)

08:46:56 **21**    **Q.**   What's just been shown as Government's Exhibit

08:46:59 **22**   Number 79, is that the e-mail you described that subject

08:47:03 **23**   was an IED attack?

08:47:05 **24**    **A.**   Yes.

08:47:06 **25**    **Q.**   Can you tell the members of the jury, if you

08:47:08 **1** know, what the purpose was of Marwan El-Hindi sending

08:47:11 **2** you that e-mail?

08:47:12 **3**  MR. HARTMAN:  Objection.

08:47:13 **4**  MR. BOSS:  Objection.

08:47:15 **5**  THE COURT:  Sustained.

08:47:16 **6**  **Q.**  Did you have conversations with Marwan El-Hindi

08:47:17 **7** about the purpose of why he sent you that e-mail?

08:47:20 **8**  **A.**  Yes.

08:47:21 **9**  **Q.**  Can you tell the members of the jury basically

08:47:22 **10** what you gleaned from those conversations?

08:47:24 **11**  **A.**  That --

08:47:26 **12**  MR. BOSS:  Objection.

08:47:27 **13**  THE COURT:  I would agree.  Let's have him

08:47:29 **14** testify as to what he recalls he was told.

08:47:32 **15**  **Q.**  Well, we'll come back to it, Judge, we'll play

08:47:35 **16** the tape.

08:47:39 **17**  Mr. Ivey asked you some questions about videos

08:47:42 **18** you watched with Mohammad Amawi.  Do you recall those

08:47:45 **19** questions?

08:47:45 **20**  **A.**  Yes.

08:47:45 **21**  **Q.**  And he showed you a few videos, and he asked you

08:47:49 **22** whether those videos could be used for training.  Do you

08:47:52 **23** recall those questions?

08:47:53 **24**  **A.**  Yes.

08:47:53 **25**  **Q.**  First of all, can you tell the members of the

08:47:56 **1** jury again what the subject areas were of the training

08:47:59 **2** that you were providing to these defendants?

08:48:02 **3**     **A.**   Basically jihad training, tactics, U.S. tactics,

08:48:08 **4** Mujahidin tactics, ambushes, raids, those sort of

08:48:13 **5** things.

08:48:13 **6**     **Q.**   Were there other subjects that you were going to

08:48:16 **7** teach them as well that you discussed with them

08:48:18 **8** throughout the case?

08:48:19 **9**     **A.**   Yes.

08:48:19 **10**     **Q.**   Can you describe some of those?

08:48:21 **11**     **A.**   Basically sniper training was another one.

08:48:31 **12** Basic weapons techniques and things like that.

08:48:36 **13**     **Q.**   Okay.  I'm going to play a couple of these videos

08:48:41 **14** for you, just portions of them.   And I'm going to ask

08:48:44 **15** you if you can describe for the members of the jury what

08:48:46 **16** training value they had.   I think there were a number

08:48:49 **17** of times when you were trying to explain what training

08:48:52 **18** value they had.   I just want to give you an opportunity

08:48:54 **19** to explain that to members of the jury.   Let's start

08:48:57 **20** with Exhibit Number 23, please.   Before we play it, I

08:49:00 **21** think Mr. Ivey asked you if it showed how to build a

08:49:03 **22** bomb.   And I think your answer to his question was, no,

08:49:06 **23** it doesn't show you how to build a bomb.   But let's

08:49:09 **24** take a look at it, if we can.   It's 23.

08:49:19 **25**         MR. SOFER: Judge, I apologize if our -- we

08:49:21 **1** have a couple little quirks as we go through this.   It

08:49:26 **2** will take a couple seconds.

08:49:47 **3**          THE COURT:  Actually, if you want to take a

08:49:49 **4** a moment, I've got a little one of my own.

08:49:58 **5**          MR. SOFER: Apparently they're back at the

08:50:02 **6** ranch.

08:50:03 **7**          THE COURT:  Mine's been fixed, too.

08:50:08 **8**          MR. SOFER: Excellent.

08:50:09 **9** BY MR. SOFER:

08:50:10 **10**    **Q.**  Mr. Ivey asked you some questions about supplying

08:50:13 **11** evidence as opposed to gathering evidence.   Do you

08:50:15 **12** recall that question?

08:50:16 **13**    **A.**  Yes.

08:50:16 **14**    **Q.**  Could you describe, there was a time on February

08:50:19 **15** 16, 2005 when you brought some books over to Marwan

08:50:22 **16** El-Hindi's house?

08:50:23 **17**    **A.**  Yes.

08:50:24 **18**    **Q.**  I think Mr. Ivey characterized that as supplying

08:50:28 **19** evidence.   Can you describe to the members of the jury

08:50:30 **20** why it is you showed the defendants the books that you

08:50:34 **21** brought over on February 16, 2005?

08:50:38 **22**    **A.**  Basically to add to my credibility; to let them

08:50:42 **23** know, hey, this is what I know; this is what we are

08:50:46 **24** going to learn.

08:50:50 **25**    **Q.**  I think Mr. Ivey asked you at that meeting on

3881

08:50:54 **1** February 16, 2005, was that the one and only time that

08:50:57 **2** you met with all of the defendants.   I believe your

08:50:59 **3** testimony was that it was the one and only time you had

08:51:02 **4** met with all of the defendants.   Were there other times

08:51:05 **5** during the course of the case where you met with

08:51:07 **6** multiple defendants but not all of them together?

08:51:09 **7**     A.   Yes.

08:51:10 **8**     Q.   Can you just give the jury again, not giving us

08:51:14 **9** every single example, but some sort of brief examples of

08:51:18 **10** the combinations of the defendants that you met with?

08:51:20 **11**     A.   Basically I met with Marwan El-Hindi when we went

08:51:26 **12** up to -- let's see, April 4, 2005, when we went to meet

08:51:37 **13** Jihad Dahabi, when we went to set up the non-profit

08:51:39 **14** corporation for the grants.   Later that month on the

08:51:42 **15** 20th and 29th I met with Mohammad Amawi and Wassim

08:51:47 **16** Mazloum to go to the Cleland's shooting range.

08:51:50 **17**     Q.   Were there times you met with Mohammad Amawi and

08:51:53 **18** Marwan El-Hindi?

08:51:54 **19**     A.   Yes.

08:51:54 **20**     Q.   What places, if you recall, among others did you

08:51:57 **21** meet with them?

08:51:57 **22**     A.   We met at AZ Travel a few times.

08:52:01 **23**     Q.   Did you ever meet with Marwan El-Hindi and

08:52:05 **24** Mohammad Amawi at Marwan El-Hindi's home?

08:52:07 **25**         MR. HARTMAN:  I'm going to object.  This is

08:52:10 **1** awfully leading.

08:52:11 **2**           THE COURT:  I agree.

08:52:12 **3**           MR. SOFER:  I don't believe under the

08:52:13 **4** circumstances --

08:52:14 **5**           THE COURT:  It is leading the witness.

08:52:16 **6**           MR. SOFER:  Okay.

08:52:19 **7**           THE COURT:  I suppose that's okay in terms

08:52:22 **8** of directional leading.

08:52:24 **9**           MR. SOFER:  I'm just trying to get us --

08:52:27 **10**           THE COURT:  No problem.   In terms of what I

08:52:29 **11** call a roadside leading is fine, but a roadmap leading

08:52:36 **12** is something different.

08:52:39 **13** BY MR. SOFER:

08:52:40 **14**     **Q.**  These times that you met with more than one

08:52:42 **15** defendant at a time, did you record those interactions?

08:52:45 **16**     **A.**  Yes, I did.

08:52:46 **17**     **Q.**  Were there times when one or more of the

08:52:49 **18** defendants mentioned another defendant?

08:52:52 **19**     **A.**  Yes.

08:52:54 **20**     **Q.**  And did you record some of those conversations as

08:52:57 **21** well?

08:52:57 **22**     **A.**  Yes.

08:52:59 **23**     **Q.**  Were there times on occasion when one or more of

08:53:03 **24** the defendants called on the phone in your presence one

08:53:06 **25** or more of the other defendants?

08:53:08 **1**    **A.**  Yes.

08:53:08 **2**    **Q.**  Did you record some or all of those conversations

08:53:12 **3**  as well?

08:53:13 **4**    **A.**  Yes.

08:53:15 **5**    **Q.**  Mr. Ivey asked you some questions about the

08:53:18 **6**  meeting on February 16, 2005, at Marwan El-Hindi's home.

08:53:21 **7**  I think he asked you a whole series of questions.   Did

08:53:29 **8**  Marwan El-Hindi ever ask you to leave his home after you

08:53:34 **9**  made the remarks that you did?

08:53:36 **10**   **A.**  No, he did not.

08:53:37 **11**   **Q.**  And did he ever say, Don't mention these things

08:53:41 **12**  in front of my children?

08:53:42 **13**        MR. IVEY:  Judge, objection.  Can we

08:53:44 **14**  approach, please?

08:53:46 **15**        (Whereupon the following discussion was had

08:56:54 **16**  at the bench outside the hearing of the jury:)

08:56:54 **17**        MR. HARTMAN:  My objection is that we were

08:56:54 **18**  specifically not allowed to get into the fact that in

08:56:54 **19**  this Arab culture that kind of thing doesn't happen.   I

08:56:54 **20**  don't think it's fair to allow the government to then go

08:56:54 **21**  ahead and use it if we weren't allowed to go there and

08:56:54 **22**  show that it doesn't happen.

08:56:54 **23**        MR. SOFER: I don't know what culture --

08:56:54 **24**        THE COURT:  I disagree.   Again, the fact

08:56:54 **25**  that something is a cultural norm or moray, I don't

08:56:54 **1** think there's enough of a nexus to say, well, that's

08:56:54 **2** what was happening in this circumstance or this

08:56:54 **3** happened.   There just isn't.   Again, if somebody -- I

08:56:54 **4** realize it's a -- if he wants to come forward and say,

08:56:54 **5** look, this is the way I was brought up; I never, ever do

08:56:54 **6** X, Y, or Z, and this is why.   But to bring in somebody

08:56:54 **7** who then purports to say:  Look, this is the way our

08:56:54 **8** culture operates; all drivers in New York City are rude.

08:56:54 **9** Therefore, if this happened, that's because all drivers

08:56:54 **10** in New York City are rude.  There's just not a nexus or

08:56:54 **11** connection.

08:56:54 **12**            Now, I thought your objection was to the

08:56:54 **13** form of the question.   I realize it's a very slight

08:56:54 **14** difference, but:  When, if ever, did Mr. El-Hindi --

08:56:54 **15**            MR. SOFER: I can do that, Judge.   I'm

08:56:54 **16** sorry.  I really am just trying to stop us --

08:56:54 **17**            THE COURT:  That's fine.

08:56:54 **18**            MR. SOFER: My intention this morning is to

08:56:54 **19** go as fast as I possibly can.

08:56:54 **20**            THE COURT:  Candidly, folks, so everybody

08:56:54 **21** understands, I am phobic about leading the witness on

08:56:54 **22** redirect.   It's just an evidentiary tick of mine.

08:56:54 **23** That was one of my trigger reactions.   There obviously

08:56:54 **24** is -- there really is a difference between the

08:56:54 **25** direction, did you call, did you meet with them

08:56:54 **1** separately?  When did that occur?

08:56:54 **2**                  MR. SOFER: I have no problem doing that.

08:56:54 **3**                  THE COURT:  The witness, as he did there,

08:56:54 **4** other sorts of training, anything else, perhaps two

08:56:54 **5** firearms; that kind of jog-your-memory leading is fine.

08:56:54 **6**                  MR. SOFER: I understand what Your Honor is

08:56:54 **7** saying, but the question:  Did he ever?  I don't know

08:56:54 **8** that that -- or when if, if ever.  I understand the

08:56:54 **9** difference.

08:56:54 **10**                  THE COURT:  That's what --

08:56:54 **11**                  MR. SOFER: Very well.  I will follow your --

08:56:54 **12**                  (End of sidebar discussion.)

08:57:00 **13**                  THE COURT:  I'm going to sustain the

08:57:04 **14** objection, but you can re-ask it, rephrase it.

08:57:08 **15**                  MR. SOFER: Okay.

08:57:09 **16** BY MR. SOFER:

08:57:11 **17**     **Q.**  I was asking you during the time that you were

08:57:13 **18** with Marwan El-Hindi and saying the things that you did,

08:57:18 **19** the defendants were saying the things that they did, did

08:57:21 **20** there ever come a time -- or when, if ever, was there a

08:57:24 **21** time when Marwan El-Hindi asked you not to mention these

08:57:29 **22** matters in front of his children?

08:57:31 **23**     **A.**  No, Mr. El-Hindi did not.

08:57:36 **24**     **Q.**  Likewise when the books were handed out, did

08:57:39 **25** there come a time at all when any of them said, I'm out

08:57:44 **1** of here; I don't want to see that; Get away from me;

08:57:48 **2** please leave?

08:57:49 **3**     **A.**   No, they did not.

08:57:51 **4**     **Q.**   When you talked about violent jihad on February

08:57:55 **5** 16, 2005, did there ever come a time that any of them

08:58:00 **6** ever stated any kind of concern about discussing these

08:58:04 **7** topics?

08:58:06 **8**     **A.**   No.   Only the aspect of do not mention these

08:58:11 **9** things out in public, you know, around others.   But

08:58:15 **10** while we were together as a whole, permissible.

08:58:19 **11**     **Q.**   Did there come a time when you went to another

08:58:22 **12** area of Marwan El-Hindi's home after the initial

08:58:25 **13** interaction with the defendants in the living room area?

08:58:29 **14**     **A.**   On February 16, yes.

08:58:31 **15**     **Q.**   And can you tell us where it is that you went?

08:58:38 **16**     **A.**   We went to a room in the rear; I believe it's the

08:58:43 **17** second bedroom on the left at the Main Street address.

08:58:47 **18**     **Q.**   Can you tell the members of the jury what, if

08:58:49 **19** anything, you did there?

08:58:50 **20**     **A.**   We viewed jihadist videos.

08:58:54 **21**     **Q.**   Can you tell us, if you know, what kind of --

08:58:59 **22** among other things, what these videos depicted?

08:59:02 **23**     **A.**   Basically attacks overseas.

08:59:10 **24**     **Q.**   After this meeting on February 16, 2005 at Marwan

08:59:13 **25** El-Hindi's house, did you return on occasion to Marwan

08:59:16 **1** El-Hindi's home?

08:59:17 **2**　　**A.**　Yes, I did.

08:59:19 **3**　　**Q.**　And did there come a time when you interacted

08:59:24 **4** with each of the defendants, not necessarily all

08:59:27 **5** together, after February 16, 2005?

08:59:29 **6**　　**A.**　Yes.

08:59:32 **7**　　**Q.**　Mr. Ivey asked you about a meeting on June 30,

08:59:36 **8** 2004, I believe he asked you whether Mohammad Amawi had

08:59:39 **9** picked up the term shehada in a particular conversation.

08:59:43 **10** Do you remember that questioning?

08:59:45 **11**　　**A.**　Yes.

08:59:47 **12**　　**Q.**　Do you recall whether or not that conversation

08:59:50 **13** was longer than the conversation that Mr. Ivey played

08:59:53 **14** for you in court?

08:59:54 **15**　　**A.**　It was.

08:59:55 **16**　　**Q.**　I'm going to ask us to play -- and please assume

09:00:01 **17** the position; put on the headphones, please.

09:00:06 **18**　　　　　MR. IVEY:　Objection.　May we approach?

09:00:10 **19**　　　　　(Whereupon the following discussion was had

09:09:44 **20** at the bench outside the hearing of the jury:)

09:09:44 **21**　　　　　THE COURT:　Mr. Ivey.

09:09:44 **22**　　　　　MR. IVEY:　Thank you, Your Honor.　Under

09:09:44 **23** the same principle that we were -- under under the rule

09:09:44 **24** of completeness, we would like -- the government should

09:09:44 **25** be required to play what's before and after what they're

3888

09:09:44 **1** going to play here.   They already invoked this rule and

09:09:44 **2** played additional -- what they felt was additionally

09:09:44 **3** fair.

09:09:44 **4**                THE COURT:  Are you able to do that or no?

09:09:44 **5**                MR. SOFER: Can I describe where we are with

09:09:44 **6** this?  This is what we've done in the day that we had to

09:09:44 **7** do it.

09:09:44 **8**                THE COURT:  I understand.

09:09:44 **9**                MR. SOFER: If anything, I think what we're

09:09:44 **10** doing here is invoking the rule of completeness.

09:09:44 **11**                MR. BRYAN:  That's what we were trying to do

09:09:44 **12** on cross-examination, and we were not permitted to do

09:09:44 **13** that.

09:09:44 **14**                THE COURT:  Time out.

09:09:44 **15**                MR. SOFER: As I was saying, the basic

09:09:44 **16** concept of what we're trying to do with redirect is just

09:09:44 **17** make sure that the pieces that were played for the

09:09:44 **18** witness in cross-examination are put into a proper

09:09:44 **19** context.   Here's an example.  For instance, this was a

09:09:44 **20** perfect one where counsel questioned the witness, said,

09:09:44 **21** Oh, you brought this shehada concept up, and he didn't

09:09:44 **22** really pick up on it.   Well, it turns out in the early

09:09:44 **23** parts of that conversation, the discussion of jihad

09:09:44 **24** comes up, and it's not the first time that this kind of

09:09:44 **25** thing is being discussed.   First of all, this is a

09:09:44 **1** recording that the defense played, that the government

09:09:44 **2** played a portion of already.  If anything, we're -- as I

09:09:44 **3** say, if anything, we're expanding the amount that's been

09:09:44 **4** played.   I don't believe that a rule of completeness

09:09:44 **5** argument applies at all to this.

09:09:44 **6**              THE COURT:  I would tend to agree with that.

09:09:44 **7**              MR. IVEY:  Your Honor, if I can.   When I

09:09:44 **8** played my clip, the government invoked the rule of

09:09:44 **9** completeness then.   We took a recess, and then they

09:09:44 **10** played the additional parts they thought were relevant.

09:09:44 **11** So that's already been invoked and done.   Anything

09:09:44 **12** beyond that is going beyond the scope of

09:09:44 **13** cross-examination.   It's already been put in context.

09:09:44 **14**              THE COURT:  This is classic redirected

09:09:44 **15** because you inquired into subject A in a particular way

09:09:44 **16** to have the jury draw a particular inference.   And he's

09:09:44 **17** saying, well, that, in effect, ladies and gentlemen,

09:09:44 **18** that inference is not the correct inference to draw with

09:09:44 **19** regard to subject A because here's further evidence

09:09:44 **20** about it.

09:09:44 **21**              MR. IVEY:  I don't dispute his right to do

09:09:44 **22** that.   What I'm disputing  is his right to do that with

09:09:44 **23** playing additional clips because he's already invoked

09:09:44 **24** and already played the additional clips when I did it

09:09:44 **25** the first time and already put it in context.   He's

09:09:44 **1** going beyond that and playing this clip.

09:09:44 **2**             MR. SOFER:  Just to be clear --

09:09:44 **3**             THE COURT:  Let met hear from Mr. Bryan.

09:09:44 **4**             MR. BRYAN:  Your Honor, if I play -- this

09:09:44 **5** takes us back to this whole debacle when it began during

09:09:44 **6** cross-examination when Mr. Ivey stood up to play our

09:09:44 **7** clips that filled in the gaps.   The government came in

09:09:44 **8** somewhat disingenuously, said:  Oh, we want to do the

09:09:44 **9** rule of completeness, which forced us into a tactical

09:09:44 **10** disadvantage of having to play all of the bad stuff

09:09:44 **11** again after we played the stuff to put it in its proper

09:09:44 **12** context.   What we were trying to do on

09:09:44 **13** cross-examination was invoke the rule of completeness by

09:09:44 **14** playing -- and these were -- playing additional

09:09:44 **15** portions.

09:09:44 **16**             THE COURT:  Let me only say, it was called

09:09:44 **17** to do my attention in that discussion.  I could have

09:09:44 **18** then ruled; say, too bad, too late, move on down the

09:09:44 **19** road.   You didn't do it.

09:09:44 **20**             MR. BRYAN:  This takes us back to before

09:09:44 **21** trial with this whole debacle concerning the

09:09:44 **22** transcripts.   Your Honor made it clear before trial.

09:09:44 **23** The government can present whatever they wanted to on

09:09:44 **24** direct examination; you can play whatever you want as it

09:09:44 **25** relates to stuff that they already played on

09:09:44 **1** cross-examination.   Then we tried to do that.   The

09:09:44 **2** rules changed.   Everything got changed in the middle of

09:09:44 **3** the trial.   Your Honor had broad discretion how to

09:09:44 **4** interpret the rule of completeness.  We tried to

09:09:44 **5** complete the record on cross-examination, but then you

09:09:44 **6** gave the government --

09:09:44 **7**           THE COURT:  I thought I let you.

09:09:44 **8**           MR. BRYAN:  No, but we had to do it at the

09:09:44 **9** tactical disadvantage of replaying all of the stuff that

09:09:44 **10** the government had already played.   So here we are

09:09:44 **11** echoing everything the government already did in direct,

09:09:44 **12** totally watering down the effect of trying to complete

09:09:44 **13** the picture for the jury.   And the justification for

09:09:44 **14** allowing the government to do that was, Well, it's been

09:09:44 **15** a long time; the jury may not know exactly where this

09:09:44 **16** conversation was at this juncture.  Which to me, at the

09:09:44 **17** time that -- we argued vigorously at the time that that

09:09:44 **18** was patently unfair because the record is what the

09:09:44 **19** record is.   They could have came back in closing

09:09:44 **20** argument and played the whole thing.  They cherry pick

09:09:44 **21** the evidence all the way through direct examination.  We

09:09:44 **22** sat back thinking, based upon the Court's prior

09:09:44 **23** statements to the defense, that, well, you know, we're

09:09:44 **24** going to be able to get up in cross-examination and fill

09:09:44 **25** in the gaps.   Then when we were told that we're going

09:09:44 **1** to be able to fill in the gaps, then we were told that

09:09:44 **2** we had to play their stuff again.   It was patently

09:09:44 **3** unfair.   It was a tactical move on their part that Your

09:09:44 **4** Honor basically, in essence, took the bait on.  And I

09:09:44 **5** think it was disingenuous for them to argue it that way.

09:09:44 **6** It's also disingenuous for Mr. Sofer to say, Your Honor,

09:09:44 **7** we didn't know what we were going to play in redirect.

09:09:44 **8** He told Mr. Ivey -- he's been misleading the Court all

09:09:44 **9** the way through this trial with his little

09:09:44 **10** Oh-Your-Honor, holier-than-thou attitude.  But what he

09:09:44 **11** told Mr. Ivey two days ago is we already know what clips

09:09:44 **12** we're going to replay on Amawi.  We're still working on

09:09:44 **13** the other ones.  We didn't get their clips until 11:30

09:09:44 **14** last night of Mr. Amawi.   There's 80 some pages of

09:09:44 **15** clips.   They're going to do the same thing.

09:09:44 **16**              MR. HARTMAN:   Valerie said they can hear

09:09:44 **17** you.

09:09:44 **18**              THE COURT:   Watch your tone when you're

09:09:44 **19** speaking to me.   I'll tell you once again; watch your

09:09:44 **20** tone when you're speaking to me.   This is a difficult

09:09:44 **21** case and a hard-fought case.  Watch your tone when

09:09:44 **22** you're speaking to the Court.   Not me individually, but

09:09:44 **23** to the United States District Court.

09:09:44 **24**              MR. BRYAN:   I apologize, Your Honor.  No

09:09:44 **25** disrespect is intended.

09:09:44 **1**          THE COURT:  Well, it's being communicated.

09:09:44 **2** I'm going to warn you once.

09:09:44 **3**          MR. BRYAN:  I agree, Your Honor, it's a very

09:09:44 **4** emotional case.

09:09:44 **5**          What the government did in direct

09:09:44 **6** examination, we're just learning what most of this

09:09:44 **7** evidence is literally during the government's case.  I

09:09:44 **8** know a lot of it because of the hours I spent with Mr.

09:09:44 **9** Amawi.   I'm with him until midnight every night going

09:09:44 **10** over transcripts.   I was with him until midnight last

09:09:44 **11** night again.   I'm horrified at the number of

09:09:45 **12** mistranscriptions and errors in transcription that

09:09:45 **13** because of our late arrival to the case we didn't have

09:09:45 **14** the ability to deal with pretrial, so now we're trying

09:09:45 **15** to deal with them during trial.   And what the

09:09:45 **16** government did during direct examination is they cherry

09:09:45 **17** picked the evidence.  We probably --

09:09:45 **18**          THE COURT:  Anyway, what are we talking

09:09:45 **19** about now?

09:09:45 **20**          MR. BRYAN:  We're talking about the rule of

09:09:45 **21** completeness, Your Honor.   During our cross-examination

09:09:45 **22** they were allowed to invoke that rule even though they

09:09:45 **23** had already played their clips during direct

09:09:45 **24** examination.  We completed it during cross.   They

09:09:45 **25** didn't -- they shouldn't have had the opportunity then

09:09:45 **1** to replay their stuff.

09:09:45 **2**         THE COURT:  Well, they did, for for reasons

09:09:45 **3** I expressed at the time.

09:09:45 **4**         MR. BRYAN:  And I would submit to Your Honor

09:09:45 **5** respectfully that that was an incorrect ruling at that

09:09:45 **6** time.   And I would submit that the only way to cure

09:09:45 **7** that ruling is to allow us now to play the full

09:09:45 **8** transcript during their redirect examination, the same

09:09:45 **9** way that they were able to invoke the rule of

09:09:45 **10** completeness to make us play large segments of their

09:09:45 **11** transcript during cross-examination.

09:09:45 **12**         MR. SOFER: Judge, if I can just respond.

09:09:45 **13** First of all, I, for the record --

09:09:45 **14**         THE COURT:  Tell me -- respond to what he

09:09:45 **15** says.

09:09:45 **16**         MR. SOFER:  Well, he's leveled a number of

09:09:45 **17** allegations against me personally and the government.

09:09:45 **18** I would just like for the record to object to that.

09:09:45 **19**         THE COURT:  I paid no attention.

09:09:45 **20**         MR. SOFER:  Understood, Your Honor.

09:09:45 **21**         Second of all, I have obviously a different

09:09:45 **22** view of the way that this happened.  Again, all we're

09:09:45 **23** doing here -- we can take these one by one if you want,

09:09:45 **24** although I think that would be a mistake -- is we are

09:09:45 **25** completing the record.   Now, technically it's not the

09:09:45 **1** rule of completeness.   The rule of completeness has to

09:09:45 **2** do with when -- all we ever asked was, and I think the

09:09:45 **3** Court made the absolute correct ruling, is if it turns

09:09:45 **4** out you're cutting something off before it should be cut

09:09:45 **5** off in let's say in a particular type --

09:09:45 **6**                    THE COURT:  I understand.  This is not the

09:09:45 **7** rule of completeness.

09:09:45 **8**                    MR. SOFER: That is not what we're doing.

09:09:45 **9** So I think it's --

09:09:45 **10**                    THE COURT:  You have permission to do it.

09:09:45 **11**                    MR. SOFER:  Thank you, Judge.

09:09:45 **12**                    MR. BRYAN:  On recross, Your Honor, we'll

09:09:45 **13** fill in the gaps.

09:09:45 **14**                    THE COURT:  I understand.

09:09:45 **15**                    (End of sidebar discussion.)

09:09:48 **16**                    MR. BOSS:  Could we have the date again?

09:09:51 **17**                    MR. SOFER: June 30, 2004.   1D-84.   Our

09:09:56 **18** clip is now called RD-84, and we're going to play it.

09:10:09 **19**                    (Audio is played.)

09:10:23 **20**                    MR. BOSS:  Your Honor, could we have a

09:10:26 **21** moment, please?

09:10:30 **22**                    (Discussion had off the record.)

09:10:58 **23**                    MR. BOSS:  For defense counsel it's on the

09:11:00 **24** second page of transcripts that they've been sent.

09:11:05 **25**                    MR. SOFER: That's because we had to skip

09:11:06 **1** through something. He just had to flip the page over.

09:11:16 **2** MR. SOFER: Start the clip over.

09:11:17 **3** (Audio is played.)

09:12:32 **4** BY MR. SOFER:

09:12:33 **5** Q. This conversation continued past that particular

09:12:37 **6** clip; is that correct?

09:12:38 **7** A. Yes.

09:12:40 **8** Q. And we're going to play clip 2, please. I

09:12:45 **9** believe this is the portion Mr. Ivey had you listen to.

09:12:49 **10** THE COURT: Just for the record, I note a

09:12:52 **11** continuing objection on the part of counsel.

09:12:55 **12** (Audio is played.)

09:17:29 **13** BY MR. SOFER:

09:17:29 **14** Q. Again, this conversation that Mr. Ivey asked you

09:17:32 **15** about, did it continue a little further?

09:17:34 **16** A. Yes.

09:17:38 **17** MR. SOFER: If we can play clip 3.

09:17:42 **18** (Audio is played.)

09:19:07 **19** BY MR. SOFER:

09:19:08 **20** Q. Mr. Griffin, I think you also told Mr. Ivey that

09:19:14 **21** on one or more occasions you were proactive in your

09:19:17 **22** approach. Can you describe for the jury what you meant

09:19:20 **23** by that?

09:19:20 **24** A. Yes. Basically in this last clip where -- the

09:19:29 **25** last three clips, excuse me, where I talked about going

09:19:35  1  the way of the shehada, martyrdom, he was talking about

09:19:41  2  a woman before that, thinking about getting married.

09:19:44  3  One of the challenges I had as being -- in doing this

09:19:48  4  gathering information is that there would have been

09:19:52  5  questions about, hey, why don't I have a wife?  So to

09:19:56  6  counter that, basically, I was going to say, hey, I'm

09:20:00  7  committing my life for jihad, so I don't have time to

09:20:03  8  get married.   So basically being proactive in that

09:20:06  9  sense.  So -- but the question still comes up, and

09:20:10  10  that's how I fought it, even in other conversations the

09:20:15  11  same way.

09:20:15  12      Q.   Now, Mr. Ivey also asked you a number of

09:20:19  13  questions about the things that you gave to Mr. Amawi

09:20:21  14  and his family, particularly around the time that you

09:20:24  15  traveled to Jordan in August of 2005, and beyond that on

09:20:27  16  the second trip.   Can you give the jury a basic

09:20:31  17  estimate of approximately how much money or other

09:20:35  18  benefits as it were that you gave to Mohammad Amawi and

09:20:39  19  his family during the two years that you interacted with

09:20:42  20  him?

09:20:43  21      A.   I guess my best guess would be between $3,000 and

09:20:48  22  $4,000.

09:20:52  23      Q.   Specifically about this satellite phone, there's

09:20:56  24  no dispute, I don't believe, that the satellite phone

09:20:59  25  bills were enormous.   But what did you tell Mohammad

3898

09:21:02  **1**  Amawi about how much these satellite phone bills were?

09:21:05  **2**  **A.**  Basically that it was a monthly flat rate between

09:21:09  **3**  $250 and $500.

09:21:12  **4**  **Q.**  And did you receive these bills or did Mohammad

09:21:14  **5**  Amawi receive these bills to your knowledge?

09:21:16  **6**  **A.**  I received those bills.

09:21:19  **7**  **Q.**  If you know, did anyone else in your presence

09:21:23  **8**  ever tell Mohammad Amawi how much these bills really

09:21:26  **9**  were?

09:21:27  **10**  MR. HARTMAN:  Objection.  Hearsay.

09:21:30  **11**  MR. SOFER:  It's not being introduced for its

09:21:33  **12**  truth, Your Honor.

09:21:33  **13**  THE COURT:  It's simply to show the

09:21:35  **14**  statement was made, not considered for the truth of this

09:21:38  **15**  matter necessarily, if anything.  Go ahead.

09:21:42  **16**  **A.**  No, he was not.

09:21:43  **17**  **Q.**  Mr. Ivey asked you about the businesses that

09:21:47  **18**  Mohammad Amawi was setting up in Jordan after your first

09:21:50  **19**  trip.  Can you give the members of the jury a basic

09:21:52  **20**  understanding of what these businesses were and how they

09:21:56  **21**  related to your conversations with Mohammad Amawi?

09:21:59  **22**  **A.**  Basically the businesses were to be set up to

09:22:04  **23**  support ourselves and to support the jihadists.

09:22:11  **24**  MR. IVEY:  Objection.

09:22:13  **25**  THE COURT:  Basis?  Come on up.

09:22:13 **1**                    (The following discussion was had at the

09:23:14 **2** bench outside the hearing of the jury:)

09:23:14 **3**                    THE COURT:  Go ahead.

09:23:14 **4**                    MR. IVEY:  The Court has not been permitting

09:23:14 **5** witnesses to testify about the intention or purpose of

09:23:14 **6** others in the in a direct question like that.   That's

09:23:14 **7** my objection.

09:23:14 **8**                    MR. SOFER: I'll ask it a different way.

09:23:14 **9**                    THE COURT:  I'll sustain the objection.

09:23:14 **10**                    MR. SOFER: Then I'm going to follow it up.

09:23:14 **11**                    THE COURT:  Whatever.

09:23:14 **12**                    (End of sidebar discussion.)

09:23:16 **13**                    THE COURT:  Ladies and gentlemen, I

09:23:19 **14** sustained the objection to the question about the

09:23:22 **15** purpose, and I instruct you to disregard the question

09:23:27 **16** and disregard the answer.

09:23:29 **17**                    Mr. Sofer, you may continue.

09:23:31 **18** BY MR. SOFER:

09:23:31 **19**     Q.  Did you have conversations with Mohammad Amawi

09:23:33 **20** about the purpose of setting up these businesses before

09:23:37 **21** they were set up?

09:23:37 **22**     A.  Yes.

09:23:39 **23**     Q.  And can you basically describe what those -- what

09:23:43 **24** Mohammad Amawi and you discussed?

09:23:45 **25**     A.  About supplying capital to help ourselves and to

09:23:51 **1** help the brothers for one instance, a brother in Syria,

09:23:57 **2** and for brothers crossing into Iraq.

09:23:59 **3**     **Q.**  The businesses themselves were legitimate --

09:24:02 **4**     **A.**  Yes.

09:24:03 **5**     **Q.**  -- as far as you know?

09:24:04 **6**     **A.**  As far as I know, yes.

09:24:05 **7**     **Q.**  A number of the defense attorneys asked you

09:24:09 **8** questions about you initiating conversations,

09:24:12 **9** recommending things to the defendants.   Were there

09:24:15 **10** times when it was the defendant -- I think actually once

09:24:19 **11** or twice you said that you had dominated conversations

09:24:22 **12** as well on occasion?

09:24:23 **13**     **A.**  Yes.

09:24:24 **14**     **Q.**  Maybe even a decent number of the conversations

09:24:27 **15** that you've had with the Defendants?

09:24:28 **16**     **A.**  Yes.

09:24:29 **17**     **Q.**  Were there times when indeed it was the other way

09:24:34 **18** around?

09:24:35 **19**     **A.**  Yes.

09:24:35 **20**     **Q.**  And if we could please play -- this is now 57,

09:24:42 **21** 69185-1?

09:24:47 **22**         MR. BOSS:  Could we have a date, please?

09:24:49 **23**         MR. SOFER: The date is 4/29/05.

09:25:27 **24**         (Audio is played.)

09:25:27 **25** BY MR. SOFER:

09:25:27 **1**     **Q.**   Do you know what it is that Mohammad Amawi is

09:25:29 **2** referring to here?

09:25:30 **3**     **A.**   The e-mail address for my contact overseas.

09:27:38 **4**     **Q.**   Let's play 66-1.   That's from May 18, 2005.

09:29:36 **5**         (Audio is played.)

09:31:59 **6** BY MR. SOFER:

09:32:00 **7**     **Q.**   Okay, Mr. Griffin.   I'm going to turn now to

09:32:04 **8** some of the questions that Mr. Doughten asked.   Let's

09:32:09 **9** go back to those videos that Mr. Ivey asked you about.

09:32:14 **10** To start with, Exhibit Number 23.   Again I'm going to

09:32:19 **11** ask you to describe for the jury, if you can, what

09:32:22 **12** training value, if any, these particular videos would

09:32:26 **13** have in your mind.   Again, on this one I believe Mr.

09:32:31 **14** Ivey asked you if it shows you how to build a bomb.

09:32:39 **15**             THE COURT:   What exhibit?

09:32:40 **16**             MR. SOFER: Government's Exhibit Number 23,

09:32:42 **17** Your Honor.

09:32:55 **18**             (Video is played.)

09:33:04 **19** BY MR. SOFER:

09:33:04 **20**     **Q.**   Again, do you recognize the symbol that's on

09:33:07 **21** there?

09:33:07 **22**     **A.**   Yes.

09:33:07 **23**     **Q.**   Tell the members of the jury what it is?

09:33:09 **24**     **A.**   It's the Al-Qaeda in Iraq symbol.

09:33:54 **25** BY MR. SOFER:

09:33:54 **1**    **Q.**  The record should reflect the government stopped

09:33:56 **2** this at 52 seconds of 2 minutes, 22 seconds.

09:34:02 **3**         Again, does this show you how to build a bomb?

09:34:04 **4**    **A.**  No, it does not.

09:34:05 **5**    **Q.**  Does it have training value?

09:34:06 **6**    **A.**  Yes, it does.

09:34:07 **7**    **Q.**  Can you give us a basic description of what

09:34:09 **8** training value it has?

09:34:10 **9**    **A.**  Basically it has the implementation of the

09:34:13 **10** execution of a car bomb and the taping of that.

09:34:18 **11**        MR. SOFER: Let's continue with Government's

09:34:21 **12** Exhibit Number 24.

09:35:56 **13** BY MR. SOFER:

09:35:56 **14**    **Q.**  Again, Mr. Griffin, can you tell the members of

09:35:58 **15** the jury what, if any, training --

09:36:03 **16**        MR. HARTMAN:  Objection, Judge.   May we

09:36:06 **17** approach?

09:36:07 **18**        (Whereupon the following discussion was had

09:38:12 **19** at the bench outside the hearing of the jury:)

09:38:12 **20**        MR. HARTMAN:  The basis for the objection is

09:38:12 **21** there was clearly Arabic conversation going on when they

09:38:12 **22** were showing that bomb.  We don't know if they were

09:38:12 **23** talking about training or what a pretty bomb.   I don't

09:38:12 **24** think you can say the training value unless there's a

09:38:12 **25** translation there to show what they're talking about

09:38:12 **1** when they're showing it.

09:38:12 **2**          MR. SOFER: We'd be happy to put in all the

09:38:12 **3** translations, Judge.

09:38:12 **4**          THE COURT:  I disagree.   Simply to the

09:38:12 **5** extent I assume he's going to say something to the

09:38:12 **6** effect, well, it shows placement and blowing up, or

09:38:12 **7** whatever.   You can redirect and say, you know, that's

09:38:12 **8** his view and his opinion.  The question I have is, it is

09:38:12 **9** an opinion.  Where's the foundation for that opinion?  I

09:38:12 **10** think there's something more, unless defense counsel

09:38:12 **11** don't want it.   I mean, he's -- he could say

09:38:12 **12** practically everything has training value.

09:38:12 **13**          MR. SOFER: I would not have gone here but

09:38:12 **14** for the fact those exact questions were asked of him on

09:38:12 **15** cross.   So if they ask, does it have training value?

09:38:12 **16** And they ask, does this show how to do such and such?

09:38:12 **17** And he says no, then I think he should be permitted to

09:38:12 **18** say what it does show.   As you say, Judge, in some

09:38:12 **19** sense they speak for themselves.   On the other hand --

09:38:12 **20**          THE COURT:  I'm going to overrule this

09:38:12 **21** specific --

09:38:14 **22**          (End of sidebar discussion.)

09:38:16 **23**          THE COURT:  You may continue.

09:38:17 **24**          MR. SOFER: Your Honor, I'll ask the question

09:38:21 **25** again because I think the court reporter didn't get it

09:38:23 **1** all.

09:38:24 **2** BY MR. SOFER:

09:38:25 **3**    **Q.**   I asked, I believe, what, if any, training value

09:38:28 **4** did the video that is depicted in Government's Exhibit

09:38:31 **5** Number 24 have?

09:38:33 **6**    **A.**   It shows the layout and the preparation, the

09:38:36 **7** implementation and execution of a roadside bomb, and the

09:38:41 **8** recording of it.

09:38:46 **9**    **Q.**   Okay.  Let's play Number 32, please, Government's

09:38:53 **10** Exhibit Number 32.

09:39:08 **11**         MR. SOFER: We stopped the last video at 101

09:39:11 **12** for the record.

09:40:00 **13**         (Video is played.)

09:40:47 **14**         MR. SOFER: I paused it at 47 seconds of four

09:40:50 **15** minutes, 59 seconds.

09:40:50 **16** BY MR. SOFER:

09:40:52 **17**    **Q.**   Can you tell the members of the jury whether this

09:40:54 **18** has some training value?

09:40:55 **19**    **A.**   Yes, it does.

09:40:56 **20**    **Q.**   Can you tell us basically what it is?

09:40:58 **21**    **A.**   The preparation of a mortar round and the

09:41:02 **22** preparation of the actual tube.

09:41:18 **23**         (Video is played.)

09:42:06 **24** BY MR. SOFER:

09:42:07 **25**    **Q.**   Again, I stopped it at one minute, 33 seconds.

09:42:10 **1**        You said one of the things that you had -- were

09:42:13 **2** training and were going to train the defendants on was

09:42:16 **3** Mujahidin tactics; is that right?

09:42:17 **4**     **A.**   Correct.

09:42:18 **5**     **Q.**   Can you tell us basically what, if any, value one

09:42:21 **6** minute and 33 seconds and the little time before that,

09:42:24 **7** what training value that might have?

09:42:26 **8**     **A.**   Basically it depicts the preparation of an

09:42:32 **9** ambush.  If you play it a little bit longer, we'll see

09:42:37 **10** that.

09:42:45 **11**        (Video is played.)

09:44:11 **12**        MR. SOFER:  And the government stopped

09:44:12 **13** playing that at 3 minutes, five seconds.

09:44:19 **14** BY MR. SOFER:

09:44:20 **15**     **Q.**   During the course of the case did Mohammad Amawi

09:44:22 **16** give you disks and show you videos other than the ones

09:44:26 **17** that Mr. Ivey played for you during cross-examination?

09:44:29 **18**     **A.**   Yes.

09:44:29 **19**     **Q.**   And again, a very basic estimate of approximately

09:44:35 **20** how many videos do you think Mohammad Amawi showed you,

09:44:39 **21** played for you, or gave you during the course of this

09:44:42 **22** case?

09:44:43 **23**     **A.**   I would have to say conservatively upwards of 100

09:44:49 **24** or more videos.

09:44:52 **25**        MR. SOFER: We're going to play Government's

09:44:55 **1** Exhibit Number 26.   Again, I'm going to ask you

09:45:03 **2** basically what, if any, training value this video has.

09:45:33 **3** (Video is played.)

09:46:02 **4** BY MR. SOFER:

09:46:03 **5** Q.   Tell the members of the jury what, if any,

09:46:04 **6** training value Government's Exhibit Number 26 has?

09:46:07 **7** A.   Surveillance, placement, and execution of an IED.

09:46:14 **8** MR. SOFER: Play 101, please.   For the

09:46:18 **9** record, we stopped at 35 seconds of 14 minutes and 50 --

09:46:27 **10** sorry, there's one more segment we're going to skip to

09:46:30 **11** at 10:58, I believe.

09:46:32 **12** Q.   I'm going to ask you what, if any, training value

09:46:35 **13** this little segment has?

09:46:46 **14** MR. HARTMAN:  Mr. Sofer --

09:46:47 **15** (Discussion had off the record.)

09:46:58 **16** (Video is played.)

09:48:29 **17** MR. SOFER: The government stopped the

09:48:32 **18** recording at 12:22 of 14:50.

09:48:32 **19** BY MR. SOFER:

09:48:37 **20** Q.   I'd ask Mr. Griffin what, if any, training value

09:48:39 **21** you believe this has?

09:48:40 **22** A.   Surveillance and information gathering on our

09:48:44 **23** troops as they respond to our injured troops overseas.

09:48:55 **24** Q.   During your conversations with Mohammad Amawi and

09:48:57 **25** some of the recorded conversations that we've played,

09:49:00 **1** did Mohammad Amawi express interest in certain types of

09:49:03 **2** attacks?

09:49:03 **3**    **A.**  Yes.

09:49:04 **4**    **Q.**  Again, basically and in summary can you tell the

09:49:07 **5** members of the jury what some of those were?

09:49:08 **6**    **A.**  Stand off attacks like sniper attacks and like

09:49:13 **7** what we just viewed, IED attacks from an observation

09:49:18 **8** area.

09:49:21 **9**         MR. SOFER: I want to play Exhibit Number

09:49:24 **10** 109.   I think Mr. Ivey played you a portion of this but

09:49:27 **11** not the rest of it.   I'd like to play the rest of it as

09:49:30 **12** well.

09:50:02 **13**         (Video is played.)

09:51:24 **14**         MR. SOFER: The government stopped the

09:51:26 **15** playing of this at 58 seconds of 1:06.

09:51:26 **16** BY MR. SOFER:

09:51:30 **17**    **Q.**  Can you tell the jury what, if any, training

09:51:32 **18** value that had?

09:51:32 **19**    **A.**  Basically it shows the tactics of the insurgents,

09:51:38 **20** an IED attack followed by the U.S. response followed by

09:51:42 **21** a secondary following attack, which was another IED

09:51:46 **22** attack.

09:51:52 **23**         MR. SOFER: Let's play Exhibit 110.   Here we

09:51:56 **24** tried this when counsel played it also, but the jury's

09:51:59 **25** and the Court's system video, it makes it very difficult

09:52:02 **1** to see this one.   So we put a monitor here.  We'll see

09:52:06 **2** if we can do any better with it.   If not, I hope it

09:52:10 **3** will work.   I hope everyone will be able to see it.  I

09:52:13 **4** don't know in everyone will be able to see it or not.

09:52:20 **5** Can everybody see that?

09:52:37 **6**            I'm not a technical expert, but I think this

09:52:40 **7** is the problem.

09:52:41 **8**            THE COURT:  Let the record slow a plug being

09:52:44 **9** put in.

09:52:45 **10**            MR. SOFER: I think when it's connected to

09:52:48 **11** this, it has to be connected to something else.

09:52:51 **12**            THE COURT:  I once took a vehicle to a

09:52:53 **13** repair shop and was told I should have filled the gas

09:52:55 **14** tank, so don't ask me to fix it.

09:53:03 **15**            MR. HARTMAN:  You're going to hear about

09:53:04 **16** that again, Judge.

09:53:06 **17**            THE COURT:  Okay.  All set?

09:53:21 **18**            MR. SOFER:  Is it any better?

09:53:23 **19**            THE JUROR:  It's the same.

09:53:46 **20**            (Video is played.)

09:54:22 **21** BY MR. SOFER:

09:54:23 **22**    **Q.**  Again, Mr. Griffin, can you tell the members of

09:54:24 **23** the jury what, if any, training value that particular

09:54:27 **24** video has?

09:54:28 **25**    **A.**  It shows the bullet trace.

09:54:32 **1**    **Q.**   What do you mean by "bullet trace"?

09:54:34 **2**    **A.**   You can actually see the bullet leave from the

09:54:37 **3**  weapon system onto the human target in this case, and

09:54:41 **4**  the execution of a sniper attack.

09:54:49 **5**    **Q.**   We're going to try 111.

09:55:27 **6**        (Video is played.)

09:55:34 **7**        MR. SOFER:  The government stopped this

09:55:36 **8**  recording at 10:16.

09:55:36 **9**  BY MR. SOFER:

09:55:38 **10**    **Q.**   I believe Mr. Ivey asked you, does this video

09:55:42 **11**  show you how to strap a bomb on.   You said no.   Can

09:55:45 **12**  you tell the members of the jury what, if anything, this

09:55:47 **13**  does show in the way of training?

09:55:48 **14**    **A.**   The implementation and execution of a roadside

09:55:51 **15**  bomb using a radio device.

09:55:55 **16**        MR. SOFER:  We're going to play exhibit

09:55:57 **17**  number 38, please.

09:56:02 **18**        (Video is played.)

10:00:12 **19**        MR. SOFER:  We're pausing at 3 minutes, 45

10:00:17 **20**  seconds.

10:00:18 **21**  BY MR. SOFER:

10:00:18 **22**    **Q.**   Mr. Griffin, this video goes on to show young

10:00:21 **23**  people dead, women and children dead as well; is that

10:00:25 **24**  right?

10:00:25 **25**    **A.**   Yes.

10:00:25 **1**    **Q.**  I think you testified under cross-examination

10:00:27 **2** Mohammad Amawi expressed sadness after watching this

10:00:30 **3** video; is that right?  Do you recall saying that?

10:00:32 **4**    **A.**  I believe so.

10:00:33 **5**    **Q.**  Did Mohammad Amawi express other emotions as

10:00:36 **6** well?

10:00:36 **7**    **A.**  Yes.

10:00:36 **8**    **Q.**  What were those?

10:00:38 **9**    **A.**  Anger.

10:00:40 **10**    **Q.**  Were there occasions when Mohammad Amawi

10:00:43 **11** expressed that kind of anger when viewing other videos

10:00:47 **12** connected to this case?

10:00:48 **13**    **A.**  Yes.

10:00:49 **14**    **Q.**  And do you recall instances in which he ever

10:00:54 **15** threatened any kind of violence after watching such

10:00:57 **16** videos?

10:00:58 **17**    **A.**  Yes.

10:00:58 **18**    **Q.**  And we're going to play 1D-14.   That's from

10:01:04 **19** January 10, 2005.   And it's clip 1.

10:01:14 **20**          MR. BOSS:  Could we have that again, Mr.

10:01:16 **21** Sofer, please.

10:01:17 **22**          MR. SOFER: Sure.   It's the first page of

10:01:18 **23** what you have.   And it's from 1D-14 from January 10,

10:01:23 **24** 2005.

10:01:56 **25**          (Audio is played.)

10:04:17  **1**  BY MR. SOFER:

10:04:17  **2**  **Q.**  Okay, Mr. Griffin, I want to turn to some of the

10:04:20  **3**  questions that Mr. Doughten asked you now.

10:04:23  **4**  THE COURT:  Should we perhaps take a break?

10:04:25  **5**  MR. SOFER: If you'd like, Your Honor.

10:04:27  **6**  THE COURT:  Why don't we.  We'll try to

10:04:29  **7**  resume in about 20 minutes or so.

10:05:16  **8**  (Recess taken.)

10:24:24  **9**  THE COURT:  Mr. Sofer, you may resume.

10:24:26  **10**  MR. SOFER: Mr. Griffin, as I said, I want to

10:24:29  **11**  ask you a few questions about some of the questions that

10:24:32  **12**  were asked of you by Mr. Doughten.   I believe Mr.

10:24:37  **13**  Doughten asked you about the meaning of the word "cell."

10:24:40  **14**  He asked you if it was just a description for a group of

10:24:43  **15**  people.   I think you said the answer to that was yes.

10:24:46  **16**  Does that refresh your recollection?  Is that about what

10:24:49  **17**  you said.

10:24:50  **18**  **A.**  Yes.

10:24:50  **19**  **Q.**  Did there come a time when you described what

10:24:53  **20**  kind of cell was being set up in this case?

10:24:56  **21**  **A.**  Yes.

10:24:57  **22**  **Q.**  And at the time that you explained what kind of

10:25:01  **23**  cell was being set up, did you give the individuals you

10:25:04  **24**  were talking to an example?

10:25:06  **25**  **A.**  Yes, I did.

10:25:07 **1**    **Q.**    Who was there and approximately when did this

10:25:10 **2** occur among other times?

10:25:13 **3**    **A.**    I believe it was the February 16, 2005 meeting.

10:25:18 **4**    **Q.**    Was that the meeting inside of Marwan El-Hindi's

10:25:21 **5** home?

10:25:21 **6**    **A.**    Yes.

10:25:22 **7**    **Q.**    And can you tell the members of the jury what

10:25:25 **8** example you used related to what kind of cell that you

10:25:28 **9** were setting up among the defendants?

10:25:31 **10**    **A.**    I used the Mohamed Atta and the 9/11 highjackers,

10:25:35 **11** the 9/11 example.

10:25:37 **12**          THE COURT:  What was the date of that?  I'm

10:25:39 **13** sorry.

10:25:39 **14**          MR. SOFER: February 16, 2005, Your Honor.

10:25:49 **15**          May I inquire, Your Honor?

10:25:53 **16**          THE COURT:  Of course.   I'm sorry.

10:25:58 **17** BY MR. SOFER:

10:25:58 **18**    **Q.**    Now, a number of the defense attorneys asked you

10:26:01 **19** a question about whether the activities that you were

10:26:04 **20** participating in and the defendants were participating

10:26:06 **21** in were illegal.   I think you said that there were a

10:26:09 **22** number of activities that were legal as far as you knew.

10:26:12 **23**    **A.**    Yes.

10:26:13 **24**    **Q.**    Can you give us an example from the case about a

10:26:16 **25** kind of activity like that?

10:26:18 **1**   **A.**   Going shooting at Cleland's.

10:26:23 **2**   **Q.**   And did the defendants themselves talk about

10:26:27 **3**   certain activities being legal throughout the case?

10:26:31 **4**   **A.**   Yes.

10:26:32 **5**   **Q.**   And did you record some of those conversations?

10:26:35 **6**   **A.**   Yes.

10:26:35 **7**   **Q.**   And did you agree with them and also say things

10:26:38 **8**   about things being legal?

10:26:39 **9**   **A.**   Yes.

10:26:40 **10**   **Q.**   Can you tell the members of the jury why that

10:26:42 **11**   was?

10:26:43 **12**   **A.**   From an outside looking in, for example, if we go

10:26:50 **13**   out to Cleland's and shoot from the outside, that's

10:26:52 **14**   perfectly legal.   But from the inside --

10:26:54 **15**                 MR. HARTMAN:  Objection.

10:26:55 **16**                 THE COURT:  I would agree.   In other words,

10:26:59 **17**   in terms -- to the extent he's saying what is or isn't

10:27:03 **18**   legal, I think it's permissible to ask testimony about

10:27:07 **19**   whatever conversation occurred, simply what he

10:27:12 **20**   considered to be legal or not.

10:27:14 **21**                 MR. SOFER: I'm not asking whether it's legal

10:27:16 **22**   or not but why it is that he said those things.

10:27:19 **23**                 THE COURT:  Okay.  When he testified his,

10:27:26 **24**   quote, understanding, close quote, that's okay.  But in

10:27:29 **25**   terms of telling the jury what is or is not legal --

10:27:32 **1**          MR. SOFER: I agree, Your Honor.

10:27:33 **2**          THE COURT:  So why don't you -- I'll strike

10:27:38 **3** that portion of the answer, but you can re-ask or

10:27:40 **4** rephrase.

10:27:42 **5** BY MR. SOFER:

10:27:42 **6**     **Q.**   Again, I'm asking you a specific question, Mr.

10:27:45 **7** Griffin.  Why did you agree, and why did you continue to

10:27:48 **8** say that these things were legal, some of these things?

10:27:51 **9**     **A.**   Because they were.

10:27:53 **10**     **Q.**   But was there a reason behind saying this?

10:27:56 **11**     **A.**   Yes.   To basically -- looking at it once again,

10:28:13 **12** it's totally legal to go shooting.   And I was

10:28:17 **13** participating in these things, and plus everything was

10:28:24 **14** cloaked in my security company.

10:28:25 **15**     **Q.**   When you say cloaked -- and you did use those

10:28:28 **16** words on occasions, correct?

10:28:29 **17**     **A.**   Yes.

10:28:30 **18**     **Q.**   Can you tell the members of the jury why it is

10:28:32 **19** you talked about cloaking things?

10:28:34 **20**     **A.**   I talked about cloaking to describe how we would

10:28:39 **21** cover our training or the purpose of the training that

10:28:43 **22** we were doing in something that was not wrong, basically

10:28:50 **23** going shooting.

10:28:52 **24**     **Q.**   Mr. Doughten also asked you if you got people

10:28:56 **25** together and you encouraged one or more of the

10:28:58 **1** defendants to recruit others.  Do you remember him

10:29:01 **2** asking that question?

10:29:02 **3**     **A.**   Yes.

10:29:02 **4**     **Q.**   I believe that you did that kind of thing,

10:29:05 **5** correct?

10:29:05 **6**     **A.**   Yes.

10:29:05 **7**     **Q.**   Can you tell again the members of the jury why it

10:29:07 **8** is that you were doing that?

10:29:09 **9**     **A.**   Basically to identify other threats.   I don't

10:29:13 **10** know who these men know, but they helped get my cover

10:29:21 **11** out, and then I can help identify other threats against

10:29:24 **12** the United States.

10:29:25 **13**     **Q.**   Did this work?

10:29:27 **14**     **A.**   Yes, it did.

10:29:28 **15**     **Q.**   Can you give the jury an example of how it

10:29:31 **16** worked?

10:29:31 **17**     **A.**   Basically Mohammad Amawi introduced me to Wassim

10:29:35 **18** Mazloum, and Marwan El-Hindi introduced me to the Zubair

10:29:43 **19** and Ahmed -- or Zubair and Khaleel Ahmed.

10:29:50 **20**     **Q.**   Did you talk directly to Wassim Mazloum about the

10:29:54 **21** jihad training you were providing before Mohammad Amawi

10:29:57 **22** brought him to you?

10:29:58 **23**     **A.**   I did not.

10:29:59 **24**     **Q.**   Mr. Doughten asked you if you had brought other

10:30:02 **25** people to shoot at Cleland's besides the defendants in

3916

10:30:05 **1** this case.  Do you remember that?

10:30:06 **2**     A.   Yes.

10:30:06 **3**     Q.   Do you remember your answer about how many people

10:30:09 **4** you brought to Cleland's to shoot?

10:30:10 **5**     A.   I believe I said about a dozen.

10:30:12 **6**     Q.   If you know, have any of those individuals been

10:30:14 **7** arrested or charged as a result of those shooting

10:30:17 **8** sessions?

10:30:17 **9**              MR. HARTMAN:  Objection.  Relevance.

10:30:21 **10**              THE COURT:  I would tend to agree.

10:30:25 **11**              MR. SOFER: Okay.

10:30:25 **12**              THE COURT:  Sustained.   The jury should

10:30:27 **13** disregard the question.

10:30:28 **14**     Q.   What was the purpose of Mohammad Amawi and Wassim

10:30:33 **15** Mazloum, if you know, going shooting with you on April

10:30:36 **16** 20, April 29 of 2005?

10:30:38 **17**              MR. IVEY:  Objection.

10:30:39 **18**              THE COURT:  Why don't you rephrase.

10:30:40 **19**     Q.   Did you have conversations with both of those

10:30:42 **20** defendants prior to going shooting?

10:30:44 **21**     A.   Yes.

10:30:45 **22**     Q.   Based on those conversations, can you tell us

10:30:48 **23** what the purpose of those visits to Cleland's were?

10:30:51 **24**     A.   It was to lay down a foundation for weapons

10:30:55 **25** training, to move on to other weapons systems such as

3917

10:31:00 **1** snipering to go into jihad.

10:31:04 **2**     **Q.**   Now, Mr. Doughten also asked you about a

10:31:07 **3** conversation between you, Wassim Mazloum and Mohammad

10:31:10 **4** Amawi on November 17, 2004.   Do you recall him asking

10:31:14 **5** you a question about that conversation?

10:31:15 **6**     **A.**   Yes.

10:31:16 **7**     **Q.**   And I think he played a portion of it, and we're

10:31:19 **8** going to try to play -- it's noted as RD-10, 11-171,

10:31:26 **9** 2004.

10:31:31 **10**         MR. DOUGHTEN:  Your Honor, we didn't play

10:31:33 **11** any portion from 11-17.

10:31:33 **12** BY MR. SOFER:

10:31:35 **13**     **Q.**   Maybe he just asked you a question about it.

10:31:38 **14** It's possible.   I apologize.   I think what he did was

10:31:41 **15** show you a transcript.  I misspoke.   He showed you a

10:31:44 **16** transcript of that conversation; is that correct?

10:31:46 **17**     **A.**   Yes.

10:31:48 **18**         THE COURT:  Is that correct, Mr. Doughten?

10:31:51 **19**         MR. DOUGHTEN:  I believe so, yes.

10:31:55 **20**         MR. SOFER: It's RD-10, from November 17,

10:32:01 **21** 2004.

10:32:02 **22**         (Audio is played.)

10:32:41 **23** BY MR. SOFER:

10:32:41 **24**     **Q.**   What did you mean when you said Allah's work?

10:32:44 **25**     **A.**   To conduct jihad in the name of a religion.

3918

10:32:48 **1**          (Audio is played.)

10:37:31 **2** BY MR. SOFER:

10:37:34 **3**     **Q.**  Mr. Griffin, did there come a time when Wassim

10:37:39 **4** Mazloum and you also discussed the need not to talk

10:37:43 **5** about certain aspects of what you and the defendants

10:37:46 **6** were doing and planning?

10:37:48 **7**     **A.**  Yes.

10:37:49 **8**          MR. SOFER:  And we're going to play RD-52,

10:37:53 **9** clip 1.   It's from April 20, 2005, Your Honor.

10:38:02 **10**          (Video is played.)

10:38:38 **11** BY MR. SOFER:

10:38:38 **12**     **Q.**  Just so the jury understands, can you tell us if

10:38:41 **13** you recall where you were at this time and what was

10:38:44 **14** happening?

10:38:44 **15**     **A.**  We were just leaving the Cleland's shooting

10:38:48 **16** range.

10:38:53 **17**          (Video continues.)

10:40:21 **18** BY MR. SOFER:

10:40:27 **19**     **Q.**  Okay.  One of the other questions Mr. Doughten

10:40:30 **20** asked you was about receiving a phone call from Wassim

10:40:36 **21** Mazloum when you were overseas with Mohammad Amawi, I

10:40:38 **22** believe in the second trip; it may have been the first

10:40:41 **23** one; I don't recall.   Do you recall?

10:40:43 **24**     **A.**  One of the trips, yes.

10:40:45 **25**     **Q.**  And I think you said that you knew that Wassim

10:40:48 **1** Mazloum had called you because there was something on

10:40:50 **2** your phone; is that right?

10:40:51 **3**     **A.**  Yes.

10:40:54 **4**     **Q.**  Do you know whether Wassim Mazloum had access to

10:40:57 **5** other telephones here in Toledo?

10:41:01 **6**     **A.**  Yes.

10:41:04 **7**          MR. DOUGHTEN:  Objection.

10:41:06 **8**          THE COURT:  Basis?

10:41:08 **9**          MR. DOUGHTEN:  Foundation for his knowledge.

10:41:11 **10**          THE COURT:  Okay.  How does he know?

10:41:11 **11** BY MR. SOFER:

10:41:13 **12**     **Q.**  How do you know?

10:41:14 **13**     **A.**  He at least had another cell phone prior, and he

10:41:18 **14** has a home phone.

10:41:20 **15**     **Q.**  And did you answer this call when you were

10:41:24 **16** overseas or not?

10:41:25 **17**     **A.**  I did not.

10:41:27 **18**     **Q.**  Do you recall whether you received a voice mail

10:41:29 **19** or not?

10:41:30 **20**     **A.**  I believe I did not.

10:41:36 **21**     **Q.**  Now, Mr. Doughten asked you if you discussed the

10:41:39 **22** car business with Wassim Mazloum during your interaction

10:41:42 **23** with him.  Do you remember that question from Mr.

10:41:44 **24** Doughten?

10:41:44 **25**     **A.**  Yes.

10:41:46 **1**    **Q.**   Did you have a conversation with Wassim Mazloum

10:41:48 **2** about him using his car business in the context of Iraq?

10:41:53 **3**    **A.**   Yes.

10:41:54 **4**    **Q.**   And did you have a different conversation with

10:41:57 **5** him about using his car business for some legitimate

10:42:01 **6** business with Mohammad Amawi when Mohammad Amawi was

10:42:04 **7** over in Jordan?

10:42:05 **8**    **A.**   Yes.

10:42:07 **9**       MR. SOFER: We're going to play 28, 69185-1.

10:42:12 **10** It's RD-8, 991851.   It's 2-16, of '05.

10:42:38 **11**       (Audio is played.)

10:43:37 **12** BY MR. SOFER:

10:43:38 **13**    **Q.**   Mr. Griffin, I want to ask you some questions

10:43:40 **14** about the questioning from Mr. Boss now.   Among other

10:43:43 **15** things, Mr. Boss asked you about whether your work for

10:43:46 **16** the FBI was as a result of some feelings of revenge.

10:43:49 **17** Can you describe again to the members of the jury how it

10:43:52 **18** was that you came to work for the FBI basically?

10:43:54 **19**    **A.**   Basically shortly after 9/11 I was contacted by

10:43:59 **20** my contact from the DEA, and he told me they were

10:44:03 **21** putting a task force together in the area.

10:44:08 **22**    **Q.**   Did there ever come a time when you contacted the

10:44:10 **23** FBI directly to ask to work for them?

10:44:12 **24**    **A.**   I did not.

10:44:14 **25**    **Q.**   Mr. Boss asked you a question about being in, I

10:44:17 **1** think -- I don't remember what the question was,

10:44:19 **2** something you ended up saying you were an over-talker.

10:44:22 **3** Can you tell the members of the jury what you meant by

10:44:24 **4** that?

10:44:24 **5**     A.   Just basically to get my point across and to -- I

10:44:31 **6** don't know, just talk, talk over people to do that.

10:44:36 **7**     Q.   And was that a good thing or a bad thing as far

10:44:39 **8** as you're concerned?

10:44:40 **9**             MR. HARTMAN:  Objection.

10:44:43 **10**             THE COURT:  I think he can answer.   That's

10:44:44 **11** okay.  What do you mean?

10:44:47 **12**             MR. SOFER:  It will connect up in one second,

10:44:49 **13** Judge.

10:44:50 **14**             THE COURT:  Okay.  Rude or -- the question's

10:44:54 **15** a little vague.

10:44:55 **16** BY MR. SOFER:

10:44:55 **17**     Q.   In the context of your work in the case, would

10:44:58 **18** you consider that a good thing or bad thing after having

10:45:01 **19** reviewed the conversations that were recorded?

10:45:03 **20**     A.   I believe it was a bad thing because if I would

10:45:06 **21** have kept my mouth quiet more, we would have heard -- we

10:45:11 **22** would have heard more on the recordings.

10:45:13 **23**     Q.   Now, were there times when one or more of the

10:45:16 **24** defendants -- you also told Mr. Boss that you dominated,

10:45:19 **25** I think was the word you used or he used to say there

10:45:22 **1** were conversations, some of which you dominated; is that

10:45:26 **2** correct?

10:45:26 **3**     **A.**  Yes.

10:45:26 **4**     **Q.**  And again, in this context with Mr. El-Hindi,

10:45:30 **5** were there times when Marwan El-Hindi or one of the

10:45:32 **6** other defendants dominated the conversations?

10:45:36 **7**     **A.**  Yes.

10:45:38 **8**     **Q.**  And here we're going to play not a conversation

10:45:41 **9** with Mr. El-Hindi, but a conversation with the other two

10:45:44 **10** defendants, Mr. Amawi and Mr. Mazloum, and it's 28,

10:45:50 **11** 69185-2A.   It's from February 16, 2005.

10:47:42 **12**          (Audio is played.)

10:48:01 **13** BY MR. SOFER:

10:48:02 **14**     **Q.**  Mr. Boss asked you a series of questions about

10:48:04 **15** whether you decided when to stop and start the

10:48:07 **16** recordings.   I believe you testified for the most part

10:48:10 **17** you did; is that right?

10:48:12 **18**     **A.**  Yes.

10:48:13 **19**     **Q.**  After reviewing and listening to the recordings

10:48:15 **20** in this case in preparation for your testimony, did you

10:48:17 **21** hear occasions when the recording stopped on its own as

10:48:21 **22** a result of the device stopping on its own?

10:48:22 **23**     **A.**  Yes.

10:48:23 **24**     **Q.**  Did you ever stop the recording, Mr. Griffin, in

10:48:28 **25** order to avoid recording something that the defendants

10:48:31 **1** were saying other than their prayers?

10:48:33 **2**     **A.**   At no time.

10:48:34 **3**     **Q.**   How would you have known when the defendants were

10:48:37 **4** going to say something before they were going to say it?

10:48:40 **5**     **A.**   I wouldn't have known.

10:48:41 **6**     **Q.**   Did you enjoy spending hours with these

10:48:44 **7** defendants?

10:48:45 **8**             MR. HELMICK:  Objection.

10:48:46 **9**             THE COURT:  Sustained.

10:48:47 **10**            MR. SOFER: Judge, I think it goes to -- may

10:48:50 **11** we approach?

10:48:51 **12**            (Whereupon the following discussion was had

10:55:31 **13** at the bench outside the hearing of the jury:)

10:55:31 **14**            THE COURT:  The basis for the objection?

10:55:31 **15**            MR. HELMICK:  The basis for the objection is

10:55:31 **16** it is irrelevant whether he enjoyed it or didn't enjoy

10:55:31 **17** it.   It opens the door, Judge, to the type of response

10:55:31 **18** that the jury really ought not to be hearing from the

10:55:31 **19** witness, just like he shouldn't have been speculating a

10:55:31 **20** little bit ago about what more they would have heard had

10:55:31 **21** he not talked over them or interrupted so much.   I

10:55:31 **22** don't like where this is going.

10:55:31 **23**            MR. SOFER: Let me explain why I'm asking it,

10:55:31 **24** and perhaps that will illuminate this.   The defense, I

10:55:31 **25** think, has put a regular -- has opened, and they asked

10:55:31 **1** questions about Mr. Griffin sort of loving this and

10:55:31 **2** being -- he had to get back in the game, and he was --

10:55:31 **3** there was a ringer on his phone with 007 playing, and he

10:55:31 **4** enjoyed his work, and he thinks this is the greatest

10:55:31 **5** thing.   They've also implied that he somehow had a

10:55:31 **6** motivation to have these defendants talk more, and I

10:55:31 **7** think there are instances, A, where the witness actually

10:55:31 **8** tries to have them -- tries to get away from them

10:55:31 **9** because he's had it with them.

10:55:31 **10**          THE COURT:  Let me suggest two things.

10:55:31 **11** Rather than, quote, enjoy, because, the word exciting

10:55:31 **12** has been asked, do you find this exciting from time to

10:55:31 **13** time?  And let him say, no, it was boring, whatever.

10:55:31 **14** And with regard to the point you were just making, I

10:55:31 **15** think you can inquire about that too.   Were there times

10:55:31 **16** when you may have tried to terminate conversations, you

10:55:31 **17** know.  Those are -- they call for an area of appropriate

10:55:31 **18** responses.   But to, quote, enjoy.   Candidly, if I were

10:55:31 **19** a defense attorney, and he said, yes, I loved every

10:55:31 **20** minute, or, I didn't, I think my question is going to

10:55:31 **21** be, you were getting paid so much an hour, weren't you?

10:55:31 **22** I'm just saying, it's not a very -- the reason I

10:55:31 **23** objected to it -- "I object."   Actually, I did that

10:55:31 **24** once.   I did that once.  I was half asleep, and I

10:55:31 **25** actually heard a question; I was a magistrate, a

10:55:31 **1** non-jury claim.   Woke everybody up, including myself.

10:55:31 **2**          But anyway, the reason I sustained it, it's

10:55:31 **3** so open-ended, and it doesn't really connect --

10:55:31 **4**          MR. HELMICK:  To be clear, what I want to

10:55:31 **5** avoid is him going into any speculation about how he

10:55:31 **6** detested doing this as a patriot, as a veteran.   That's

10:55:31 **7** where I'm afraid it's going.   That's improper.

10:55:31 **8**          MR. SOFER: That's fine, but then I'll ask

10:55:31 **9** Your Honor on summation to preclude an argument that

10:55:31 **10** this man was somehow so into this that --

10:55:31 **11**          THE COURT:  But I think you can ask the

10:55:31 **12** question to get his views on that out other than as

10:55:31 **13** open-ended as, quote, enjoy.   You were asked whether

10:55:31 **14** you were excited by this.   How exciting was this?

10:55:31 **15** Were there times when it was more exciting than others?

10:55:31 **16**          MR. SOFER: Was it boring?   I'll tell you

10:55:31 **17** another question.

10:55:31 **18**          THE COURT:  It is leading to say, "Was it

10:55:31 **19** boring?" But nonetheless, button it down.  Jeff can

10:55:31 **20** object.

10:55:31 **21**          MR. HELMICK:  I'm not going to object to

10:55:31 **22** these type of leading questions.

10:55:31 **23**          MR. SOFER: I'll modify it so we don't end

10:55:31 **24** back up here in two seconds.

10:55:31 **25**          THE COURT:  Do you think that's going to do

10:55:31 **1** it?

10:55:31 **2** MR. SOFER: No, I don't. But I do think,

10:55:31 **3** one of the questions I'm going to ask him is -- and

10:55:31 **4** again, it goes to this same concept, which is somehow

10:55:31 **5** he -- and this is the point that the defense has made

10:55:31 **6** many times, that he had to somehow keep this, I think,

10:55:31 **7** money train open, statements going. It turns out the

10:55:31 **8** government's position is had this money train stopped,

10:55:31 **9** that is this particular investigation. Mr. Griffin was

10:55:31 **10** doing lots of other things that would have kept him

10:55:31 **11** fully employed. Because I'm going to ask him that

10:55:31 **12** question because I think it goes directly to --

10:55:31 **13** THE COURT: I'm not sure he can answer that

10:55:31 **14** unless you have some statements that were made to him.

10:55:31 **15** And if you do, that's fine.

10:55:31 **16** MR. HARTMAN: You wouldn't let us get into

10:55:31 **17** it.

10:55:31 **18** MR. SOFER: I'll ask him whether he continue

10:55:31 **19** to do work on other cases during the course of this.

10:55:31 **20** THE COURT: Okay. That's fine.

10:55:31 **21** THE COURT: Agent Coats --

10:55:31 **22** MR. SOFER: He will.

10:55:31 **23** THE COURT: I think that basically has him

10:55:31 **24** vouching for the truth of statements that were told to

10:55:31 **25** him.

10:55:31 **1**                    MR. SOFER: That's fine, so long --

10:55:31 **2**                    THE COURT:  If they were made, if you want

10:55:31 **3** to ask him about particular conversation he may have had

10:55:31 **4** with regard to other activities and the likelihood that

10:55:31 **5** they might be continuing, that's fine.

10:55:31 **6**                    MR. SOFER: Very well.   I'll lead him a

10:55:31 **7** little through this.

10:55:31 **8**                    MR. HARTMAN:  We weren't allowed to go there

10:55:31 **9** with him.

10:55:31 **10**                    MR. SOFER: Go where?

10:55:31 **11**                    MR. HARTMAN:  When we asked him questions

10:55:31 **12** about that, about other things that he was doing.

10:55:31 **13**                    THE COURT:  Not the details, but the fact he

10:55:31 **14** was doing other things.   That's in the record.   It

10:55:31 **15** wasn't that you -- you were not permitted to ask about

10:55:31 **16** specific details about what they were.

10:55:31 **17**                    MR. HELMICK:  And you're not going there?

10:55:31 **18**                    MR. HARTMAN:  So you're just going to say

10:55:31 **19** there was other work that he was doing?

10:55:31 **20**                    THE COURT:  Other projects that were

10:55:31 **21** continuing, in effect.

10:55:31 **22**                    MR. HARTMAN:  Judge, also, he asked about

10:55:31 **23** what -- about some bills.   I'm wondering if you got

10:55:31 **24** through those receipts because on redirect I think it's

10:55:31 **25** entirely proper for us to talk about that if he didn't

10:55:31  **1** tell the truth -- I mean recross.

10:55:31  **2**         THE COURT:  Let's see.   I did not.

10:55:31  **3**         MR. SOFER: We're talking about two different

10:55:31  **4** things, expenses versus what he paid --

10:55:31  **5**         (End of sidebar discussion.)

10:55:34  **6**         THE COURT:  Ladies and gentlemen, I

10:55:37  **7** sustained the objection to the last question, but you

10:55:40  **8** may rephrase and proceed.

10:55:41  **9**         MR. SOFER: Yes, Judge.

10:55:43 **10** BY MR. SOFER:

10:55:44 **11**     **Q.**  Were you excited during the hours of times that

10:55:47 **12** you spent with Mohammad Amawi, Wassim Mazloum, and

10:55:50 **13** Marwan El-Hindi?

10:55:52 **14**     **A.**  I was not.

10:55:55 **15**     **Q.**  Can you tell the members of the jury during this

10:55:56 **16** time and as this particular investigation heated up, did

10:56:00 **17** you continue to work on other investigations that you

10:56:04 **18** were working on with the FBI?

10:56:05 **19**     **A.**  Yes.

10:56:08 **20**     **Q.**  Now, the defense attorneys also asked you a

10:56:10 **21** number of questions about the clear and unambiguous, I

10:56:14 **22** think is the wording that they used, in your discussions

10:56:17 **23** with the defendants.   Were you unclear with the

10:56:21 **24** defendants on February 16, 2005, when you discussed the

10:56:25 **25** purpose of the jihad training with all of them?

10:56:28 **1**    **A.**  I was not.

10:56:29 **2**            MR. HARTMAN:  Objection, Judge.  That speaks

10:56:30 **3**  for itself.

10:56:31 **4**            THE COURT:  I tend to agree.   I think that

10:56:33 **5**  his characterization in that conclusory fashion will not

10:56:39 **6**  be allowed.   It really asks for a conclusion.

10:56:42 **7**            MR. SOFER: The defense asked these questions

10:56:44 **8**  exactly the other way around.  I'm just asking the same

10:56:46 **9**  question.

10:56:47 **10**           THE COURT:  In any event, it's a leading

10:56:49 **11**  question.   I'm going to sustain the objection on that

10:56:52 **12**  basis.   Again, you can replay clips or reference to

10:56:56 **13**  specific conversations, whatever.   But I'll sustain the

10:57:00 **14**  objection.   And the jury will, I assume, see, if not

10:57:06 **15**  now, then at the close of the case, various portions of

10:57:09 **16**  various recordings and in closing argument.

10:57:13 **17**           All counsel will be able to argue the points

10:57:18 **18**  to you, and you draw the inferences that you draw.

10:57:21 **19**           Go ahead.

10:57:22 **20**  BY MR. SOFER:

10:57:23 **21**    **Q.**  Were there times when you were unclear?

10:57:25 **22**    **A.**  Yes.

10:57:25 **23**    **Q.**  And can you tell the members of the jury why that

10:57:28 **24**  is?

10:57:28 **25**    **A.**  It's -- it's just to act natural for the simple

10:57:35 **1** fact I believe I probably said it too much, "jihad" and,

10:57:38 **2** you know, certain specifics.   It would be no different

10:57:42 **3** than, say, when I was working for the DEA, if I was

10:57:46 **4** going to meet for a drug buy, I wouldn't say, hey, bring

10:57:50 **5** the cocaine, and I'll bring this much money over on the

10:57:54 **6** phone.   It's not natural.   So we would use other

10:57:58 **7** things, say other ways, be unclear, say, hey, bring that

10:58:02 **8** stuff, I'll meet you over here kind of thing.   It's no

10:58:05 **9** different.

10:58:07 **10**          MR. SOFER:   Along the lines of what Your

10:58:08 **11** Honor suggested, we're going to play RD-29, 69185-3A,

10:58:14 **12** please?

10:58:15 **13**          THE COURT:   Date?

10:58:17 **14**          MR. SOFER: February 16, 2005.

11:03:17 **15**          (Video is played.)

11:03:20 **16** BY MR. SOFER:

11:03:20 **17**     **Q.**   By the way, were you able to tell whether Marwan

11:03:23 **18** El-Hindi was present during that conversation?

11:03:25 **19**     **A.**   Yes, I could.

11:03:27 **20**     **Q.**   Mr. Boss asked you about Marwan El-Hindi not

11:03:30 **21** being on the list of people that the FBI asked you to

11:03:33 **22** collect information about initially.   Do you recall

11:03:35 **23** that question?

11:03:35 **24**     **A.**   Yes.

11:03:36 **25**     **Q.**   Was Marwan El-Hindi on the initial list?

11:03:39 **1**  **A.** He was not.

11:03:40 **2**  **Q.** And did you engage or why did you engage in

11:03:42 **3**  business activities and spend time with Marwan El-Hindi

11:03:45 **4**  in the earlier parts of -- later parts of 2001, 2002,

11:03:50 **5**  and then you went into 2003 and early 2004?

11:03:56 **6**  **A.** Basically he was in the circle of people of

11:04:00 **7**  interest that I was gathering information on. And

11:04:04 **8**  that -- so by being around Mr. El-Hindi, I could gain

11:04:08 **9**  access and gather information on those people.

11:04:10 **10**  **Q.** Mr. Boss asked you if Marwan El-Hindi ever sought

11:04:15 **11**  and received any grants for the jihad training. I

11:04:19 **12**  think you testified that he did not.

11:04:21 **13**  **A.** Yes.

11:04:21 **14**  **Q.** Let me take out the word "received" and ask you

11:04:24 **15**  if Marwan El-Hindi ever sought or tried to get a grant

11:04:28 **16**  to support the jihad training that you discussed in the

11:04:31 **17**  February 16, 2005 meeting at Marwan El-Hindi's home?

11:04:35 **18**  **A.** Yes.

11:04:36 **19**  **Q.** Can you tell the members of the jury when and how

11:04:38 **20**  that happened?

11:04:39 **21**  **A.** April 4th of 2005 when we went out to meet Jihad

11:04:47 **22**  Dahabi at his office and to put together the non-profit

11:04:51 **23**  organization to receive those grants.

11:04:54 **24**  **Q.** To your knowledge did that grant or that

11:04:56 **25**  corporation even ever get established?

11:04:59 **1**    **A.**  I signed my name that day on the line for the

11:05:03 **2** paperwork, so that's to the extent I know it.

11:05:08 **3**    **Q.**  Did you ever see any grants come in as a result

11:05:10 **4** of that?

11:05:10 **5**    **A.**  I did not.

11:05:11 **6**    **Q.**  Mr. Boss asked you about a -- I think he referred

11:05:15 **7** to it as a shoulder-fired missile launcher.   Did you

11:05:18 **8** ever actually show a device like that to Marwan

11:05:20 **9** El-Hindi?

11:05:20 **10**    **A.**  I did not.

11:05:22 **11**    **Q.**  Did you have such a device displayed in your

11:05:25 **12** apartment?

11:05:26 **13**    **A.**  Yes, I did.

11:05:27 **14**    **Q.**  And what apartment was that?

11:05:28 **15**    **A.**  At the LaSalle apartment building in downtown

11:05:32 **16** Toledo here.

11:05:33 **17**    **Q.**  And were there times when Marwan El-Hindi was in

11:05:36 **18** your apartment and had an opportunity to see that?

11:05:39 **19**    **A.**  Yes.

11:05:40 **20**    **Q.**  Can you give us a general timeframe of when that

11:05:43 **21** might have been?

11:05:44 **22**    **A.**  I believe in the 2003, 2004 timeframe.

11:05:52 **23**    **Q.**  Do you know whether it would have been before or

11:05:54 **24** after Marwan El-Hindi introduced Zubair and Khaleel to

11:06:00 **25** you?

11:06:00  **1**    **A.**  It was before.

11:06:03  **2**    **Q.**  By the way, has Marwan El-Hindi, to your to

11:06:05  **3**  knowledge, ever been in your mother's garage?

11:06:07  **4**    **A.**  He has not.

11:06:09  **5**         MR. HARTMAN:  Objection.   May we approach,

11:06:11  **6**  please?

11:06:12  **7**         THE COURT:  Sure.

11:06:12  **8**         (Whereupon the following discussion was had

11:08:02  **9**  at the bench outside the hearing of the jury:)

11:08:02  **10**        MR. HARTMAN:  Judge, the government's now

11:08:02  **11**  going to show this shoulder-fired missile launcher.

11:08:02  **12**        THE COURT:  Whatever it is.

11:08:02  **13**        MR. HARTMAN:  Whatever it is.  But they

11:08:02  **14**  haven't established this is what Marwan El-Hindi ever

11:08:02  **15**  saw.   They said he wasn't in his mother's garage.

11:08:02  **16**  That's all he testified on direct examination.   He

11:08:02  **17**  can't testify that he ever saw this in his apartment.

11:08:02  **18**  He said he wasn't in his mother's garage.

11:08:02  **19**        MR. SOFER:  I don't know that he could

11:08:02  **20**  testify that he ever -- that Marwan El-Hindi ever saw

11:08:02  **21**  the thing at all.   But I think they would object to

11:08:02  **22**  that if I asked that question.   All I asked was whether

11:08:03  **23**  he had an opportunity to see it.   They get to ask --

11:08:03  **24**  again, I go back to we would not have gone down this

11:08:03  **25**  road, frankly, but for fact they cross-examined --

11:08:03 **1**          THE COURT:  That is whatever it was that was

11:08:03 **2** talked about.  The fact he didn't see it, it wasn't

11:08:03 **3** there, you may sort it out.   I think it's, quote, in

11:08:03 **4** the case, and the government has has the right to show

11:08:03 **5** what it is that's in the case.

11:08:03 **6**          MR. SOFER: For the record, we were not going

11:08:03 **7** to introduce this, but I believe the door's been opened.

11:08:03 **8**          THE COURT:  I agree.

11:08:03 **9**          (End of side-bar discussion.)

11:08:10 **10**          THE COURT:  You may continue.

11:08:13 **11** BY MR. SOFER:

11:08:14 **12**    **Q.**  Mr. Griffin, I want to show you what's been

11:08:15 **13** marked Government's Exhibit Number 205.   For everyone,

11:08:19 **14** it is completely empty.   Can you tell the members of

11:08:24 **15** the jury if that's one of the things that was displayed

11:08:29 **16** in your apartment on or about the times that you

11:08:32 **17** described Marwan El-Hindi having visited?

11:08:35 **18**    **A.**  It was.

11:08:38 **19**    **Q.**  Can you tell the members of the jury whether

11:08:41 **20** after coming to your apartment where that was displayed

11:08:45 **21** whether Marwan El-Hindi stopped talking to you or said

11:08:48 **22** he didn't want to deal with you anymore?

11:08:50 **23**    **A.**  He did not.

11:08:55 **24**          MR. SOFER: Your Honor, at this time the

11:08:56 **25** government would offer 205 into evidence.

11:09:00 **1**              THE COURT:  What is it, if he knows.

11:09:03 **2**              MR. SOFER: I apologize.

11:09:05 **3**  BY MR. SOFER:

11:09:05 **4**      **Q.**   Can you give a basic description of what that is?

11:09:08 **5**      **A.**   It is what our military uses.  It's an AT-4.

11:09:12 **6**  It's an inoperable weapon delivery system for antitank

11:09:17 **7**  round.

11:09:20 **8**              MR. SOFER: Again, Your Honor, the government

11:09:22 **9**  offers 205 into the evidence.

11:09:24 **10**             THE COURT:  It will be admitted.

11:09:40 **11** BY MR. SOFER:

11:09:41 **12**     **Q.**   Mr. Boss asked you about a statement that was

11:09:43 **13** made on one of the recordings.  He asked you

11:09:45 **14** specifically about a particular statement that Marwan

11:09:48 **15** El-Hindi made.  We're going to play that now.  It's

11:09:53 **16** RD-90, 66747-1A from 10-8 of '04.  That's October 8,

11:10:02 **17** '04, Your Honor.

11:10:25 **18**             (Audio is played.)

11:11:58 **19** BY MR. SOFER:

11:11:59 **20**     **Q.**   Now, can you explain to the jury what the purpose

11:12:04 **21** of your comments to Marwan El-Hindi were about Zubair

11:12:08 **22** and Khaleel there?

11:12:09 **23**     **A.**   Raising concerns about meeting them and not

11:12:12 **24** interacting with them after that, and the possible

11:12:17 **25** security leak.

3936

11:12:20 **1**    **Q.**  And when Marwan El-Hindi said something to the

11:12:23 **2** effect of we'll tell them I'm going to train you not for

11:12:27 **3** jihad, just to be ready if someone breaks into your

11:12:30 **4** house, blah, blah, blah, can you tell the members of the

11:12:33 **5** jury what you understood that to mean?

11:12:34 **6**          MR. HARTMAN:  Objection, Judge.

11:12:40 **7**          THE COURT:  I'll let him testify what his

11:12:42 **8** understanding was.   Again, the words are the words, and

11:12:48 **9** the jury will no doubt hear and see.   Go ahead.

11:12:56 **10**    **A.**  I ronically, he's trying to protect me as far as

11:13:01 **11** he says "we'll tell them."

11:13:03 **12**          MR. HARTMAN:  Objection.

11:13:04 **13**          THE COURT:  Sustained.  I agree.  I'm going

11:13:06 **14** to strike the answer.

11:13:08 **15**          MR. HARTMAN:  Move to strike.

11:13:09 **16** BY MR. SOFER:

11:13:10 **17**    **Q.**  Were there a number of occasions during the

11:13:12 **18** course of the case when you or one of the defendants

11:13:18 **19** discussed how you might explain yourselves if you're

11:13:21 **20** ever caught?

11:13:21 **21**    **A.**  Yes.

11:13:23 **22**    **Q.**  And can you describe those kinds of conversation?

11:13:28 **23**    **A.**  Like the one we just listened to.

11:13:32 **24**    **Q.**  Were there other conversations?

11:13:34 **25**          MR. HARTMAN:  Judge, I'm going to object and

11:13:36 **1** move to strike.   He just said the same thing in a

11:13:39 **2** different way.

11:13:40 **3**            MR. SOFER: I don't believe so, Judge.

11:13:41 **4**            THE COURT:  I agree.   Overruled.

11:13:46 **5** BY MR. SOFER:

11:13:47 **6**     **Q.**  Were there other conversations with Marwan

11:13:50 **7** El-Hindi about Zubair and Khaleel that you recorded?

11:13:51 **8**     **A.**  Yes.

11:13:52 **9**     **Q.**  And did some of these conversations relate to

11:13:54 **10** jihad training?

11:13:55 **11**     **A.**  Yes.

11:13:56 **12**     **Q.**  We're going to play a series of these, hopefully

11:14:00 **13** fairly quickly.   The first one is 89; it's from October

11:14:07 **14** 5, 2004, 66747-1A?

11:14:13 **15**            MR. BOSS:  Could we have just a moment?

11:15:15 **16**            MR. SOFER: We'll play 1D-90 from October 8.

11:15:21 **17** RD-90, 66747-1.

11:15:47 **18**            (Audio is played.)

11:20:19 **19** BY MR. SOFER:

11:20:20 **20**     **Q.**  Okay.  If we could play RD-2, 69441-1 from

11:20:27 **21** December 16 of '04.

11:20:57 **22**        (Audio is played.)

11:23:03 **23** BY MR. SOFER:

11:23:03 **24**     **Q.**  Finally, I'm going to play RD-22, 69185-1 from

11:23:09 **25** February 2, 2005.

3938

11:23:09 **1**          (Video is played.)

11:23:09 **2** BY MR. SOFER:

11:23:45 **3**     **Q.**  When you say plastique or plastic, what do you

11:23:47 **4** mean by that?

11:23:48 **5**     **A.**  An explosive.

11:24:27 **6**          (video continues.)

11:24:48 **7** BY MR. SOFER:

11:24:48 **8**     **Q.**  Mr. Boss showed you a different video that

11:24:52 **9** captured you and Marwan El-Hindi and Zubair and Khaleel

11:24:55 **10** on July 4 of 2004 at the ICNA conference, and he asked

11:24:59 **11** you some questions about when Marwan El-Hindi was

11:25:01 **12** present and when he was not.   Do you recall those

11:25:04 **13** questions?

11:25:04 **14**     **A.**  Yes.

11:25:05 **15**     **Q.**  We're going to play a segment of that recording,

11:25:08 **16** particularly a portion Mr. Boss did not play for you.

11:25:11 **17** I think it's RD-77, 66747-2.

11:25:25 **18**          MR. BOSS:  Can we have a date on that,

11:25:26 **19** please?

11:25:27 **20**          MR. SOFER: July 4, 2004.

11:29:29 **21**          (Video is played.)

11:29:30 **22**          MR. HARTMAN:  Your Honor, I'd like the

11:29:31 **23** record to reflect I believe counsel was mistaken.  We

11:29:34 **24** played that whole video.

11:29:36 **25**          MR. SOFER:  It's certainly a possibility.

11:29:39 **1** I wouldn't rely on my memory.

11:29:41 **2** THE COURT: Okay.

11:29:42 **3** BY MR. SOFER:

11:29:43 **4** Q. Mr. Boss also asked you a series of questions

11:29:46 **5** about whether or not you clearly stated to the

11:29:49 **6** defendants, particularly Marwan El-Hindi, that the plan

11:29:53 **7** was to kill U.S. servicemen and women overseas. Can

11:29:56 **8** you tell the members of the jury again why; why, if you

11:30:00 **9** didn't, you didn't use those exact words?

11:30:02 **10** A. Once again, it's not natural to just state those

11:30:06 **11** things.

11:30:07 **12** Q. Were there recorded conversations in which you

11:30:09 **13** and Marwan El-Hindi did discuss U.S. military tactics?

11:30:12 **14** A. Yes.

11:30:13 **15** Q. We're going to play RD-90, 66747-2?

11:30:20 **16** THE COURT: Date?

11:30:22 **17** MR. SOFER: The date is 10-8-04, Your Honor.

11:30:40 **18** (Audio is played.)

11:34:48 **19** BY MR. SOFER:

11:34:53 **20** Q. Mr. Griffin, Mr. Boss spent a lot of time asking

11:34:56 **21** you questions about when -- when Marwan El-Hindi was

11:34:59 **22** present and when he was not present during the meeting

11:35:01 **23** that you had with all the defendants on February 16,

11:35:04 **24** 2004. Do you recall that?

11:35:05 **25** A. Yes.

3940

11:35:06 **1**      **Q.**   I believe Mr. Boss referred to this as a dinner

11:35:11 **2**  meeting; did he not?

11:35:12 **3**      **A.**   Yes, he did.

11:35:13 **4**      **Q.**   Can you tell the members of the jury what your

11:35:16 **5**  understanding of that meeting was at Marwan El-Hindi's

11:35:19 **6**  house?

11:35:19 **7**      **A.**   Basically get together, discuss what kind of

11:35:22 **8**  training they wanted, to be specific in what we were

11:35:24 **9**  going to do, and that Marwan El-Hindi was hosting that

11:35:28 **10**  meeting.

11:35:28 **11**      **Q.**   Had you discussed meeting on this day, that is

11:35:32 **12**  2-16, prior to February 16 of '05?

11:35:35 **13**      **A.**   Yes.   On February the 14th, two days earlier.

11:35:39 **14**      **Q.**   And we're going to play 1D-27, RD-27 now, 69185-1

11:35:47 **15**  from February 14, 2005.

11:35:51 **16**          By the way, before we do that, do you know what

11:35:54 **17**  day of the week -- have you been able to determine what

11:35:56 **18**  day of the week February 14, 2005 was?

11:35:58 **19**      **A.**   It was on a Monday.

11:36:39 **20**  BY MR. SOFER:

11:36:41 **21**      **Q.**   By the way, on February 16 of 2005, when you were

11:36:46 **22**  speaking with the defendants, did you notice any

11:36:49 **23**  surprise whatsoever in their actions or their words

11:36:52 **24**  during the times you discussed jihad, ambushes, or

11:36:57 **25**  explosives training?

11:36:58 **1**  **A.**  I did not.

11:36:59 **2**  **Q.**  Was Marwan El-Hindi present as you described the

11:37:04 **3**  purpose of the jihad training?

11:37:06 **4**  **A.**  He was.

11:37:06 **5**  **Q.**  Can you tell the members of the jury, if you

11:37:08 **6**  know, did he participate in that conversation?

11:37:10 **7**  **A.**  Yes, he did.

11:37:11 **8**  MR. HARTMAN:  Objection.

11:37:12 **9**  THE COURT:  Basis.

11:37:13 **10**  MR. HARTMAN:  Because the film speaks for

11:37:14 **11**  itself.  They saw exactly who participated and said

11:37:17 **12**  what.

11:37:18 **13**  THE COURT:  I'll let him answer.  But as I

11:37:20 **14**  say --

11:37:21 **15**  MR. SOFER: We'll play it, Judge.  I'll

11:37:23 **16**  withdraw the question.

11:37:27 **17**  (Video is played.)

11:37:27 **18**  BY MR. SOFER:

11:37:28 **19**  **Q.**  Were Marwan El-Hindi's children sitting in the

11:37:30 **20**  room as you discussed the jihad training?

11:37:33 **21**  **A.**  Yes.

11:37:34 **22**  **Q.**  Were you able to tell all the time whether the

11:37:38 **23**  camera was obstructed?

11:37:39 **24**  **A.**  No, I was not.

11:37:41 **25**  **Q.**  Did there ever come a time in the case where you

11:37:43 **1** purposely obstructed the camera in any way to try to

11:37:46 **2** prevent it from capturing any image that you were

11:37:49 **3** recording?

11:37:49 **4** **A.** No.

11:37:52 **5** MR. SOFER: We're going to play a series of

11:37:55 **6** recordings from February 16, 2005. And we're going to

11:38:01 **7** start with 29, 69185-4A. Before we do that, Judge, I'm

11:38:08 **8** going to ask that we be permitted to hand out a

11:38:11 **9** translation that I believe counsel all have and are

11:38:14 **10** taking a look at. We're going to ask that that

11:38:17 **11** translation, which is Government's Exhibit 20A --

11:38:21 **12** MR. IVEY: Objection, Your Honor. Can we

11:38:23 **13** approach?

11:48:38 **14** (Whereupon the following discussion was had

11:48:38 **15** at the bench outside the hearing of the jury:)

11:48:38 **16** MR. IVEY: I believe this translation is a

11:48:38 **17** translation of the beheading video.

11:48:38 **18** MR. SOFER: It is.

11:48:38 **19** MR. IVEY: I think this exceeds the scope of

11:48:38 **20** cross because I don't think at any time I cross-examined

11:48:38 **21** on anything to do with the beheading.

11:48:38 **22** MR. SOFER: What the -- not Mr. Ivey, but

11:48:38 **23** what Mr. Boss did was spend a lot of time discussing

11:48:38 **24** whether Mr. El-Hindi was present during that point in an

11:48:38 **25** attempt, I believe, to show the jury that somehow what

11:48:38 **1** was going on there, Marwan didn't know about. And they

11:48:38 **2** talk about at length this particular video, which again,

11:48:38 **3** the concept I think defense counsel is trying to elicit

11:48:38 **4** and spent a lot of time in their cross-examination about

11:48:38 **5** is whether Marwan El-Hindi was present for the, quote,

11:48:38 **6** incriminating, unquote, parts of the conversations.

11:48:38 **7** And in fact, there are many incriminating parts of the

11:48:38 **8** conversation, including the fact that they're aware of

11:48:38 **9** and discussing one of these videos. By the way, this

11:48:38 **10** is a video that both Mr. Amawi and Marwan El-Hindi

11:48:38 **11** describe their knowledge of I think independently.

11:48:38 **12** We're not going to play the beheading part

11:48:38 **13** of the video. I think we've been very careful not to

11:48:38 **14** do that kind of thing. So we won't play the actual

11:48:38 **15** violent nasty part of this, but we are going to play the

11:48:38 **16** part that they're discussing about how they're

11:48:38 **17** discussing amongst themselves.

11:48:38 **18** I might add, Your Honor, how the person

11:48:38 **19** who's depicted in this video threw a chip into various

11:48:38 **20** places, and that chip was essentially used by the United

11:48:38 **21** States military to target those locations. Of course,

11:48:39 **22** that goes to the very heart of whether or not Marwan

11:48:39 **23** El-Hindi knew and was aware of and had the intent to

11:48:39 **24** commit this crime. They're trying to say he didn't see

11:48:39 **25** or hear the important parts of the conversation. This

3944

11:48:39  **1**  is a critically important part.

11:48:39  **2**        THE COURT:  Go ahead.

11:48:39  **3**        MR. IVEY:  I think that there is loads of

11:48:39  **4**  evidence that the government can point to, but the

11:48:39  **5**  beheading video doesn't really relate to this point.   I

11:48:39  **6**  think it's unfair.  The inflammatory nature of this

11:48:39  **7**  outweighs the probative value.

11:48:39  **8**        THE COURT:  I'm not sure why it's necessary

11:48:39  **9**  to play a transcript that could have been played earlier

11:48:39  **10**  on direct.   Can you accomplish whatever it is you're

11:48:39  **11**  trying to accomplish by asking him whether during that

11:48:39  **12**  meeting, February 16 get-together, the -- what the jury

11:48:39  **13**  has seen called the beheading video was discussed.   I

11:48:39  **14**  don't see why we need the transcript.

11:48:39  **15**        MR. SOFER: I'll explain why we need the

11:48:39  **16**  transcript, Judge.   The video itself, it is what it is.

11:48:39  **17**  As you've said many times, it is what is it.   But it

11:48:39  **18**  doesn't depict -- you have to read this to see what

11:48:39  **19**  we're talking about.   The discussion relates to

11:48:39  **20**  specific aspects of the video, these chips.   If you

11:48:39  **21**  watch the video, you don't -- it's not apparent

11:48:39  **22**  necessarily on its face.   The connection to the way the

11:48:39  **23**  government establishes a nexus is through the words that

11:48:39  **24**  are being spoken in the video, and they happen to be

11:48:39  **25**  spoken largely in Arabic.   It's the defendant's talking

11:48:39 **1** about --

11:48:39 **2**            THE COURT:  Is the entire transcript of the

11:48:39 **3** entire video or only that segment?

11:48:39 **4**            MR. SOFER: It's the entire -- if I may,

11:48:39 **5** counsel.   It's relatively short.   And again, so it's

11:48:39 **6** clear, I understand what counsel is saying.  We're not

11:48:39 **7** interested in playing the beheading portion.  That is

11:48:39 **8** not the portion the government is going to be

11:48:39 **9** introducing, only the portion which establishes a nexus

11:48:39 **10** between that which you can hear on the recording, the

11:48:39 **11** discussions between the defendants, and that video.

11:48:39 **12** Without this it's nearly impossible.  One could make an

11:48:39 **13** inference, but I think the government should be entitled

11:48:39 **14** to link this up.   The reason we didn't bring this

11:48:39 **15** translations in on direct -- we could have put in all of

11:48:39 **16** the translations on direct.   But largely because for

11:48:39 **17** the purposes that we initially offered them, the videos

11:48:39 **18** do to some extent speak for themselves, and we thought

11:48:39 **19** it would slow down the presentation of evidence quite a

11:48:39 **20** bit.   It is the government's intention to put all of

11:48:39 **21** these translations of these videos in because counsel

11:48:39 **22** spent a lot of time talking about what these videos

11:48:39 **23** actually depict.   Well, if you speak Arabic and you

11:48:39 **24** understand what's being said here, it makes it much

11:48:39 **25** clearer exactly what they depict, which goes to the

3946

11:48:39 **1** defendants' intent.   Here it's not so much the intent

11:48:39 **2** element that we're looking to put in but to establish a

11:48:39 **3** nexus between the conversation that's going on in the

11:48:39 **4** room and this particular video.

11:48:39 **5**           Mr. Herdman wants to say a word.

11:48:39 **6**           MR. HERDMAN:  Desperately.   To tie this

11:48:39 **7** into why we're doing this on redirect, Mr. Boss, if you

11:48:39 **8** remember, there was a series of conversations that took

11:48:39 **9** place in Arabic.   Mr. Boss asked a specific question of

11:48:39 **10** Mr. Griffin, which was, the portions that you just read

11:48:39 **11** that were scrolling down the screen in Arabic, do those

11:48:39 **12** contain any conversation about violent jihad?  Mr.

11:48:39 **13** Griffin said no.   One of them did.  We need to redirect

11:48:39 **14** the witness' attention to one of those conversations.

11:48:39 **15**           MR. IVEY:  Mr. Boss asked that question

11:48:39 **16** regarding the conversation between three defendants

11:48:39 **17** while they were eating, not when they were looking at

11:48:39 **18** the video.   I have it; it's on page 64 of the

11:48:39 **19** transcript.  I pulled that up specifically.  Just this

11:48:39 **20** conversation is while they're eating.

11:48:39 **21**             It is true I cross-examined on videos, what

11:48:39 **22** they mean, but I didn't do so in a global sense.   I did

11:48:39 **23** so on specific ones that were played.   I did not play

11:48:39 **24** the beheading video.   I think this goes --

11:48:39 **25**           MR. HARTMAN:  This is not while they were

11:48:39 **1** eating.  We played the entire tape of while they were

11:48:39 **2** eating of what they were doing.  This is back when they

11:48:39 **3** were in the computer room.

11:48:39 **4** MR. HERDMAN:  It's not.  It's while they're

11:48:39 **5** sitting around the table.

11:48:39 **6** MR. SOFER:  If you want to look at that

11:48:39 **7** outside the presence of the jury, I'd be happy to show

11:48:39 **8** it to you.

11:48:39 **9** THE COURT:  If I understand correctly, what

11:48:39 **10** you are trying to show is this disk business, that that

11:48:39 **11** was what the person shown kneeling about the beheading

11:48:39 **12** was saying.  It was a confession, in effect.

11:48:39 **13** MR. SOFER:  Correct.

11:48:39 **14** THE COURT:  Can't you -- can you simply

11:48:39 **15** limit it to that segment, 325, and let that go?

11:48:39 **16** MR. HERDMAN:  Yes, absolutely.

11:48:39 **17** MR. HARTMAN:  Is this from the audio or

11:48:39 **18** video?

11:48:39 **19** MR. HERDMAN:  This is a translation.

11:48:39 **20** THE COURT:  It's translation of the

11:48:39 **21** beheading video.  And I do think that because there was

11:48:39 **22** reference to disks, I think it's appropriate say --

11:48:39 **23** point out where that reference comes from and what it

11:48:39 **24** is, and so I think the jury can see that portion of it

11:48:39 **25** and lay a foundation.

11:48:39 **1**　　　　　　　MR. HARTMAN:  So this is not the defendants

11:48:39 **2** talking?

11:48:39 **3**　　　　　　　THE COURT:  No.

11:48:39 **4**　　　　　　　MR. SOFER:  Talking about --

11:48:39 **5**　　　　　　　MR. HARTMAN:  It's the beheading victim's,

11:48:39 **6** quote, confession, what I would call a confession?

11:48:39 **7**　　　　　　　MR. EL-KAHMAWY:  I haven't looked at the

11:48:39 **8** translation.   I don't have a video in front of me, so

11:48:39 **9** we don't know whether it's an accurate translation or

11:48:39 **10** not.

11:48:39 **11**　　　　　　　THE COURT:  Well, if it's not, you can come

11:48:39 **12** back and say this is what it is.

11:48:39 **13**　　　　　　　MR. HERDMAN:  This has been provided to

11:48:39 **14** defense counsel in March at some point.

11:48:39 **15**　　　　　　　THE COURT:  Whatever.

11:48:39 **16**　　　　　　　MR. HELMICK:  Judge, is the government -- is

11:48:39 **17** there a connection between what Marwan El-Hindi says

11:48:39 **18** about this video and exactly what's contained in the

11:48:39 **19** translation?

11:48:39 **20**　　　　　　　MR. SOFER: Yes.

11:48:39 **21**　　　　　　　MR. HERDMAN:  And Amawi as well.

11:48:39 **22**　　　　　　　MR. HELMICK:  So he makes specific reference

11:48:39 **23** to something he would only know if he understood the

11:48:39 **24** Arabic that's being played on the recording?

11:48:39 **25**　　　　　　　MR. SOFER:  Mr. Amawi too.

| | |
|---|---|
| 11:48:39 | **1**  THE COURT:  I'm going to permit you -- |
| 11:48:39 | **2**  MR. SOFER:  Let me say what it is I think the |
| 11:48:39 | **3**  government would like to do.   The disk discussion |
| 11:48:39 | **4**  begins at 1:58. |
| 11:48:39 | **5**  THE COURT:  I will permit that. |
| 11:48:39 | **6**  MR. SOFER:  And we can end it if you want at |
| 11:48:39 | **7**  4:50, 4:38, if you want us to stop. |
| 11:48:39 | **8**  THE COURT:  Read through the 3:25 segment |
| 11:48:39 | **9**  and stop there. |
| 11:48:39 | **10**  MR. SOFER:  Very well.   So we need to tell |
| 11:48:39 | **11**  our person where he's going. |
| 11:48:39 | **12**  THE COURT:  That's fine. |
| 11:48:39 | **13**  MR. SOFER:  Is there any objection to me |
| 11:48:39 | **14**  handing out the translation to the jury so that they can |
| 11:48:39 | **15**  read it? |
| 11:48:39 | **16**  THE COURT:  I would prefer that you show it |
| 11:48:39 | **17**  on the ELMO. |
| 11:48:39 | **18**  MR. EL-KAHMAWY:  Your Honor, respectfully, |
| 11:48:39 | **19**  there is on 2-2, there was a conversation in Arabic that |
| 11:48:39 | **20**  it was for about more than five or six minutes where the |
| 11:48:39 | **21**  killings and beheadings and the punishments are |
| 11:48:39 | **22**  discussed.   They're discussed in Arabic.   It's related |
| 11:48:39 | **23**  to what's going to be played.   So are we going to be |
| 11:48:39 | **24**  allowed to introduce this without the translation and |
| 11:48:39 | **25**  all that? |

11:48:39 **1**          THE COURT:  If I understand what you're

11:48:39 **2** saying, I assume so.   But I'm going to permit him that

11:48:39 **3** excerpt that I'm talking about, those rather lengthy

11:48:39 **4** segments of the individual speaking himself and telling

11:48:39 **5** what he did, I will permit that to be presented.

11:48:39 **6**          MR. SOFER: We're going to cut it right now.

11:48:39 **7** I'll play it first while they're snipping the

11:48:39 **8** translation.

11:48:39 **9**          (End of side-bar discussion.)

11:48:41 **10**          THE COURT:  Ladies and gentlemen, there has

11:48:43 **11** to be a bit of adjustment to what you are about to see,

11:48:48 **12** both in terms of video and in terms of what the

11:48:50 **13** government's presenting as the translation of this

11:48:56 **14** segment of the video that you will be seeing.

11:48:58 **15**          MR. SOFER: Your Honor, I'll offer

11:49:00 **16** Government's Exhibit Number 20-A, but those portions

11:49:02 **17** that the Court has limited the government to in evidence

11:49:06 **18** at this time.

11:49:29 **19**          We're going to start by playing RD-29.

11:49:35 **20**          MR. BOSS:  What was that?

11:49:37 **21**          MR. SOFER: RD-29, 69185-4A.

11:50:03 **22**          (Video is played.)

11:53:32 **23** BY MR. SOFER:

11:53:34 **24**     **Q.**  Mr. Griffin, there was a portion of that

11:53:36 **25** conversation which the defendants discussed an Egyptian

11:53:42 **1** and some chips and some money for chips. Do you know

11:53:46 **2** what they were talking about there?

11:53:47 **3**   **A.** Yes. One of the videos played earlier about the

11:53:54 **4** Egyptian --

11:53:56 **5**         MR. IVEY: Object.

11:53:57 **6**         THE COURT: Overruled.

11:54:02 **7**   **A.** -- about the Egyptian man that were throwing

11:54:07 **8** chips to target or to signal or to mark a target for the

11:54:12 **9** U.S. planes.

11:54:19 **10**   **Q.** I'm going to show you and the jury what is now in

11:54:23 **11** evidence as Government's Exhibit Number 20-A, if we can

11:54:28 **12** switch over to to the lectern.

11:55:06 **13**         THE COURT: It's my understanding you will

11:55:07 **14** see a portion of the video that previously was viewed by

11:55:11 **15** you in which there was Arabic language, and what you're

11:55:17 **16** about to view is presented as a translation of a

11:55:20 **17** segment, that segment of the -- the Arabic segment or

11:55:26 **18** the language in that segment you're about to see.

11:55:31 **19**         MR. SOFER: Can everybody see that and read

11:55:33 **20** it? I'll leave it up there for a moment, Judge.

11:55:43 **21**         THE COURT: You can wait to read it though.

11:55:47 **22**         MR. SOFER: Why don't I put the first portion

11:55:49 **23** up. Is that better?

11:55:54 **24**         THE JUROR: Much.

11:56:13 **25**         (Text is displayed.)

| | | |
|---|---|---|
| 11:56:37 | **1** | MR. SOFER: Has everybody read that? |
| 11:56:39 | **2** | The next section. |
| 11:56:47 | **3** | (Text is displayed.) |
| 11:57:57 | **4** | MR. SOFER: Has everybody read that? |
| 11:58:02 | **5** | For the record, Your Honor, the government |
| 11:58:04 | **6** | displayed to the jury the section from 1:58 to 3:25, |
| 11:58:12 | **7** | that paragraph. |
| 11:58:21 | **8** | Now we can go back to the actual video.  We |
| 11:58:28 | **9** | can play a portion of 20.  We're starting at 1:58. |
| 11:59:34 | **10** | (Video is played.) |
| 12:00:16 | **11** | MR. SOFER:  The record should reflect the |
| 12:00:17 | **12** | government stopped this at 3 minutes, 34 seconds out of |
| 12:00:24 | **13** | five minutes and 26 seconds. |
| 12:00:29 | **14** | BY MR. SOFER: |
| 12:00:29 | **15** | Q.  Now, was Marwan El-Hindi present during the |
| 12:00:32 | **16** | conversation that discussed this matter? |
| 12:00:34 | **17** | A.  Yes. |
| 12:00:34 | **18** | Q.  And I want us to now go to RD-28, 69185-8, same |
| 12:00:42 | **19** | date, 2-16-05. |
| 12:01:19 | **20** | MR. SOFER: RD-29, 69185-5. |
| 12:01:24 | **21** | MR. HERDMAN:  A. |
| 12:01:26 | **22** | MR. BOSS:  Can we have just a moment, |
| 12:01:29 | **23** | please. |
| 12:01:29 | **24** | MR. SOFER: Sure. |
| 12:01:32 | **25** | MR. BOSS:  5A or 5? |

12:01:39 **1**          MR. SOFER: I believe it's 5A.

12:01:53 **2**          (Discussion had off the record.)

12:02:04 **3**          MR. SOFER: I guess I got it right.   It's

12:02:08 **4** actually 8.

12:02:17 **5**          MR. SOFER: Judge, if we could play it, we

12:02:19 **6** can figure it out while it's playing if counsel has been

12:02:23 **7** directed to the right portion of the transcript.  Do you

12:02:27 **8** have it?

12:02:28 **9**          MR. BOSS:   Eight is the next one in the

12:02:30 **10** sequence that was sent to us.

12:02:34 **11**          MR. SOFER: Then let's play 8.

12:03:17 **12**          (Video is played.)

12:03:18 **13**     Q.  Was Marwan El-Hindi present for that portion of

12:03:21 **14** the conversation on 2-16-05?

12:03:25 **15**     A.  Yes.

12:03:25 **16**     Q.  RD-2969185, I have 6A.

12:04:18 **17**          (Video is played.)

12:04:19 **18** BY MR. SOFER:

12:04:20 **19**     Q.  Again I'd ask if Marwan El-Hindi present for that

12:04:21 **20** portion of the conversation?

12:04:23 **21**     A.  Yes, he is.

12:04:23 **22**     Q.  RD-29-69185-7A.   Before you start it, can you

12:04:33 **23** see Marwan El-Hindi in what's depicted there on the

12:04:35 **24** screen?

12:04:35 **25**     A.  Yes, I can.

12:04:39 **1**          (Video is played.)

12:05:20 **2** BY MR. SOFER:

12:05:21 **3**     **Q.**  When Wassim Mazloum asked if you were going to

12:05:23 **4** teach how to make bombs, was Marwan El-Hindi present?

12:05:26 **5**     **A.**  Yes, he was.

12:05:27 **6**     **Q.**  When there was a discussion of what the United

12:05:30 **7** States military's fear of snipers is, was Marwan

12:05:33 **8** El-Hindi present?

12:05:34 **9**     **A.**  Yes, he was.

12:05:46 **10**          MR. SOFER: RD-29, 69185-5, please.

12:05:46 **11**          (Video continues.)

12:06:25 **12** BY MR. SOFER:

12:06:25 **13**     **Q.**  When you're discussing the need for funding for

12:06:27 **14** this type of training and the grant, is Marwan El-Hindi

12:06:30 **15** present?

12:06:30 **16**     **A.**  Yes, he is.

12:06:32 **17**     **Q.**  Was he actively participating in the conversation

12:06:35 **18** there?

12:06:35 **19**     **A.**  Yes, he is.

12:06:42 **20**          (Video continues.)

12:09:02 **21**          MR. SOFER: RD-2969185-8A.

12:09:10 **22**          (Video is played.)

12:09:35 **23** BY MR. SOFER:

12:09:36 **24**     **Q.**  When there's a description about manpower needed

12:09:39 **25** for military actions in Iraq on behalf of the

3955

12:09:43 **1** insurgency, was Marwan El-Hindi present?

12:09:45 **2**    **A.**   Yes, he was.

12:09:46 **3**    **Q.**   Did there come a time when this conversation

12:09:48 **4** turned to sniper attacks that had already been

12:09:51 **5** perpetrated inside the United States?

12:09:53 **6**    **A.**   Yes.

12:09:54 **7**    **Q.**   And can you give the jury a basic understanding

12:09:57 **8** of what that conversation was about?

12:10:00 **9**    **A.**   Basically I had brought up the Virginia sniper,

12:10:10 **10** Muhammad and Malvo is what the name was, what they had

12:10:15 **11** did out there in Virginia and how it affected the

12:10:17 **12** people.

12:10:18 **13**    **Q.**   Was Marwan El-Hindi present for those

12:10:20 **14** conversations as well?

12:10:21 **15**    **A.**   Yes, he was.

12:10:22 **16**    **Q.**   I'm going to play RD-2969185-9A.   Who's depicted

12:10:29 **17** at -- that begins at five minutes, 50 seconds.

12:10:33 **18**    **A.**   Mr. El-Hindi.

12:11:57 **19**       (Audio is played.)

12:11:59 **20** BY MR. SOFER:

12:12:00 **21**    **Q.**   Mr. Boss asked you a question or two about a

12:12:05 **22** woman named Sister Fatimah and a letter that was sent

12:12:08 **23** from Abu-Ghraib prison.   Do you recall those questions?

12:12:12 **24**    **A.**   Yes, I do.

12:12:12 **25**    **Q.**   And I think in answer to his questions you stated

12:12:15 **1**  that the letter made some kind of -- in addition to what

12:12:20 **2**  Mr. Boss was asking you about, also that the letter made

12:12:23 **3**  a request?

12:12:24 **4**      **A.**  Yes.

12:12:24 **5**      **Q.**  And can you give a description basically to the

12:12:27 **6**  jury of what you were talking about when you tried to

12:12:29 **7**  answer that question?

12:12:30 **8**      **A.**  In the letter it was a request to --

12:12:32 **9**          MR. HARTMAN:  Objection, Your Honor.   It

12:12:34 **10**  would be hearsay unless we see the letter.

12:12:36 **11**          MR. SOFER: Okay.  We have that.   That's

12:12:39 **12**  61A, please.

12:12:50 **13**          Your Honor, this is a translation of this

12:12:54 **14**  document.   It's already in evidence, Government's 61A.

12:13:03 **15**          MR. BOSS:  However, he's asking the witness

12:13:05 **16**  if he was familiar with this.   The witness doesn't read

12:13:08 **17**  or speak Arabic.   Referring to a document that was in

12:13:11 **18**  Arabic not translated for him, we would object.

12:13:14 **19**          THE COURT:  Let's take that off.

12:13:15 **20**          MR. SOFER: Let me clarify this, Judge.

12:13:18 **21**  BY MR. SOFER:

12:13:18 **22**      **Q.**  You had had conversations with Mohammad Amawi

12:13:20 **23**  about this letter from Sister Fatimah, right?

12:13:23 **24**      **A.**  Yes.

12:13:23 **25**      **Q.**  And can you give us a basic description again of

3957

12:13:27  **1**  what this letter was about?

12:13:31  **2**         THE COURT:  According to what?

12:13:33  **3**         MR. SOFER: According to your discussions

12:13:35  **4**  with Mr. Amawi and whatever you were able to discern

12:13:37  **5**  from your interactions with Mr. Amawi.

12:13:39  **6**         THE COURT:  Again, ladies and gentlemen --

12:13:44  **7**  go ahead.

12:13:45  **8**      **A.**  Basically that Fatimah was in prison in

12:13:50  **9**  Abu-Ghraib jail and that she wrote a letter to the

12:13:58  **10**  insurgents telling them to come in, attack the prison

12:14:02  **11**  and kill her in the attacking of it.   She just wanted

12:14:06  **12**  to die at that point.

12:14:08  **13**      **Q.**  Now, you have had an opportunity to look at

12:14:10  **14**  Government's Exhibit Number 61-A?

12:14:12  **15**      **A.**  Just when the defense showed me for the first

12:14:18  **16**  time.

12:14:18  **17**      **Q.**  And does the description of Fatimah in

12:14:24  **18**  government's 61-A that the defense showed you remind you

12:14:27  **19**  or in any way correspond to the Sister Fatimah and the

12:14:30  **20**  letter you just described to the jury?

12:14:32  **21**      **A.**  Yes.

12:14:33  **22**      **Q.**  Do you believe them to be the same individual?

12:14:35  **23**      **A.**  Yes.

12:14:36  **24**         MR. SOFER: If we could please put 61-A back

12:14:39  **25**  on the screen, Your Honor.

3958

12:14:42 **1**          THE COURT:  Okay.

12:14:43 **2**          MR. SOFER: For the record, it's the second

12:14:45 **3** page which actually says page 3 of 6 on the back of it.

12:15:00 **4**   **Q.**  By the way, were there a number of times when

12:15:03 **5** Mohammad Amawi discussed sort of the concept of revenge

12:15:09 **6** for Fatimah?

12:15:11 **7**   **A.**  Yes.

12:15:11 **8**   **Q.**  And were some of the other conversations you had,

12:15:14 **9** including one I believe we already played here, a

12:15:17 **10** discussion about those kind of things?

12:15:18 **11**   **A.**  Yes.

12:15:21 **12**   **Q.**  We'll give the jury a moment to read this, then

12:15:24 **13** we'll move on.

12:15:53 **14**          MR. SOFER: I'm being pointed to the lunch

12:15:56 **15** clock, Your Honor, by one of the jurors.   I defer to

12:16:00 **16** Your Honor.

12:16:01 **17**          THE COURT:  How much longer do you think

12:16:02 **18** you're --

12:16:03 **19**          MR. SOFER: I have at most 15, 25 minutes.

12:16:07 **20** Between 15 and 25 minutes.

12:16:09 **21**          THE COURT:  Ladies and gentlemen, do you

12:16:10 **22** mind if we continue for a half hour to have lunch?

12:16:15 **23**          THE JUROR:  That's fine.

12:16:16 **24**          THE COURT:  That way we'll complete this

12:16:18 **25** segment.   Thank you for your patience.

12:16:26 **1** BY MR. SOFER:

12:16:26 **2**    **Q.**  Mr. Boss asked you about a recorded conversation

12:16:29 **3** on February 2 of 2005.   And we're going to play what's

12:16:34 **4** been designated as RD-2269185-2 and then -2A?

12:16:45 **5**           THE COURT:  Did you say February 22?

12:16:47 **6**           MR. SOFER: February 2, 2005.

12:16:51 **7**           THE JUROR:  What was the year?

12:16:52 **8**           MR. SOFER: 2005, 2A and then 2.

12:16:52 **9** BY MR. SOFER:

12:17:02 **10**    **Q.**  By the way as a refresher, this is one of the

12:17:05 **11** occasions that you and Mohammad Amawi and Marwan

12:17:08 **12** El-Hindi were -- in fact, the first occasion when you,

12:17:12 **13** Marwan El-Hindi and Mohammad Amawi were in Mohammad

12:17:14 **14** Amawi's apartment?

12:17:15 **15**    **A.**  Yes.

12:17:41 **16**           MR. SOFER: Back to the beginning so we make

12:17:44 **17** sure we're clear.

12:17:45 **18**           (Video is played.)

12:18:12 **19** BY MR. SOFER:

12:18:13 **20**    **Q.**  Reading the English translation, are you able to

12:18:16 **21** discern what is it they're talking about there?

12:18:18 **22**    **A.**  At least explosives, yes.

12:18:24 **23**           THE COURT:  I couldn't hear you.

12:18:25 **24**           THE WITNESS:  At least explosives, yes.

12:18:51 **25**           (Video continues.)

12:23:45 **1**      MR. SOFER:  The record should reflect the

12:23:46 **2** government stopped this at 20:23.

12:23:48 **3**      Let's play the next clip, please.

12:23:52 **4**      MR. BOSS:  What's the number for the next

12:23:54 **5** clip?

12:23:54 **6**      MR. SOFER:  RD-22, 69185-2.

12:23:58 **7**      THE COURT:  Same date?

12:24:00 **8**      MR. SOFER: Same date, Your Honor.

12:24:37 **9**      (Video continues.)

12:24:42 **10** BY MR. SOFER:

12:24:42 **11**    **Q.**  This conversation on February 2 lasted for some

12:24:45 **12** time, correct?

12:24:46 **13**    **A.**  Correct.

12:24:46 **14**    **Q.**  At the end of that conversation do you recall

12:24:48 **15** what Marwan El-Hindi did?

12:24:51 **16**    **A.**  He invited Mr. Amawi over to his house.

12:24:57 **17**    **Q.**  Let's play RD-22, 69185-3, same date, 2-2-05.

12:25:24 **18**      (Video continues.)

12:25:30 **19** BY MR. SOFER:

12:25:31 **20**    **Q.**  Now, Mr. Boss asked you about another recorded

12:25:33 **21** conversation that took place on February 8, 2005.   I

12:25:37 **22** believe he asked you whether you had gone to the

12:25:40 **23** Almusada website before February 8, 2005.   I want to

12:25:47 **24** show you Exhibit Number 61 quickly.

12:25:53 **25**      I believe your testimony was that you had

12:25:55 **1** received this document from Marwan El-Hindi and given it

12:25:59 **2** to the FBI; is that correct?

12:26:00 **3**    **A.**   Correct.

12:26:01 **4**    **Q.**   Do you recall whether you went to this site?

12:26:03 **5**        THE COURT:  For the record --

12:26:05 **6**        MR. SOFER: It's 61 in evidence, Your Honor.

12:26:09 **7** BY MR. SOFER:

12:26:11 **8**    **Q.**   Do you recall whether you went there before or

12:26:14 **9** after February 8, 2005?

12:26:16 **10**    **A.**   I can't recall before, but definitely after I

12:26:19 **11** received that, I went to it.

12:26:21 **12**    **Q.**   And we're going to play RD-7, 69440-1 from

12:26:28 **13** February 8, 2005.

12:26:56 **14** BY MR. SOFER:

12:26:56 **15**    **Q.**   By the way, can you remind us again who Uthman

12:27:00 **16** is?

12:27:00 **17**    **A.**   That is his son.

12:27:27 **18**        (Audio continues.)

12:27:33 **19** BY MR. SOFER:

12:27:34 **20**    **Q.**   At this juncture do you recall whether this has

12:27:36 **21** something to do with the paper that you receive that is

12:27:38 **22** Government's Exhibit Number 61 to the best of your

12:27:41 **23** knowledge?

12:27:41 **24**    **A.**   Yes.   He's thumbing through some papers at this

12:27:44 **25** point.

12:27:47 **1**                    MR. SOFER: Continue.

12:27:48 **2**                    (Audio continues.)

12:30:30 **3** BY MR. SOFER:

12:30:31 **4**     **Q.**  The part where you laugh there, do you recall why

12:30:35 **5** you laughed?

12:30:35 **6**     **A.**  Because of my Arab name, Bilal, was in the

12:30:45 **7** corner, and he made reference to it.

12:31:02 **8**                    (Audio continues.)

12:31:09 **9** BY MR. SOFER:

12:31:10 **10**     **Q.**  When Marwan El-Hindi said this is the one how to

12:31:13 **11** make it, did you learn what that was?

12:31:15 **12**     **A.**  Yes, it was the bomb vest video.

12:31:17 **13**     **Q.**  And I think Mr. Boss asked you whether you were

12:31:20 **14** eager to get the bomb vest video.   Is it fair to say

12:31:23 **15** you were eager to get the bomb vest video?

12:31:25 **16**     **A.**  Yes, I was.

12:31:26 **17**     **Q.**  Can you tell the members of the jury why that

12:31:27 **18** was?

12:31:28 **19**     **A.**  It's instructional training on how to get a --

12:31:31 **20** create a bomb.  Also to get it to the FBI.

12:31:36 **21**     **Q.**  Had you had discussions with the FBI about the

12:31:39 **22** importance of getting this bomb vest video?

12:31:42 **23**     **A.**  Yes.

12:31:42 **24**     **Q.**  On this day did Marwan El-Hindi give you Exhibit

12:31:45 **25** Number 61, which we saw?

12:31:47 **1**    **A.**   Yes, he did.

12:31:48 **2**    **Q.**   What did you use it for, if anything?

12:31:51 **3**    **A.**   I used it to navigate to that actual website and

12:31:55 **4** download the bomb vest video.

12:31:57 **5**    **Q.**   Now I want to direct your attention to February

12:32:00 **6** 25, 2005.   And specifically, Exhibit Number 79, which

12:32:06 **7** we started with here.   I'll just put the front of that

12:32:09 **8** document up.   And Mr. Boss asked you if the e-mail with

12:32:15 **9** this IED attack attached could be used for avoiding an

12:32:21 **10** IED; is that correct?   Do you recall him asking you

12:32:25 **11** that question?

12:32:26 **12**    **A.**   I recall.

12:32:27 **13**    **Q.**   And had you had conversations with Marwan

12:32:32 **14** El-Hindi about what the purpose was of him sending this

12:32:35 **15** to you?

12:32:36 **16**    **A.**   Yes.

12:32:36 **17**    **Q.**   We're going to play RD-10, 69440-1.

12:32:44 **18**          MR. BOSS:  Ten?

12:32:46 **19**          MR. SOFER:  Ten, 69440-1.

12:32:50 **20**          THE COURT:  Date?

12:32:52 **21**          MR. SOFER: Date is February 25, 2005, Your

12:32:59 **22** Honor.

12:32:59 **23**          The last clip, for the lunch query.

12:33:52 **24**          (Audio is played.)

12:35:12 **25** BY MR. SOFER:

12:35:13 **1**    **Q.**  If we could go back to 79.

12:35:24 **2**       Was this what was being displayed?  We're going

12:35:32 **3**  to get to it in a second.   My question would be, were

12:35:35 **4**  the batteries that were being displayed what Marwan

12:35:38 **5**  El-Hindi was asking you about how to get them?

12:35:40 **6**    **A.**  Yes.

12:35:43 **7**    **Q.**  Lastly, Mr. Griffin, I ask you, at any time in

12:35:48 **8**  this case did you ever force these defendants to meet

12:35:51 **9**  with you in any way?

12:35:53 **10**    **A.**  I did not.

12:35:54 **11**    **Q.**  And did you ever threaten them in any way at any

12:35:57 **12**  time whatsoever?

12:35:58 **13**    **A.**  I did not.

12:36:01 **14**       MR. SOFER: Judge, I have no further

12:36:02 **15**  questions.

12:36:03 **16**       THE COURT:  Okay.  We'll try to resume in

12:36:05 **17**  about an hour, folks.

12:36:07 **18**       MR. BOSS:  Judge, could we have just a

12:36:10 **19**  moment for a defense conference before the jury

12:36:13 **20**  adjourns?

12:36:13 **21**       THE COURT:  Okay.

12:36:15 **22**       MR. BOSS:  Thank you.

12:37:45 **23**       (Discussion had off the record.)

12:37:49 **24**       MR. BOSS:  Thank you, Judge.

12:37:51 **25**       THE COURT:  Ladies and gentlemen, see you in

3965

12:37:53  1  about an hour.

12:37:55  2              (Lunch recess taken.)

3              (Sealed sidebar follows.)

4                      - - -

5

6              C E R T I F I C A T E

7

8    I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled

10  matter.

11

12  /s Tracy L. Spore_____        _____

13  Tracy L. Spore, RMR, CRR              Date

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3   DARREN GRIFFIN, REDIRECT EXAMINATION 3875

4   BY MR. SOFER:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25