```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3   UNITED STATES OF AMERICA,     - Docket No. 3:06-CR-719
                                   -
 4     Plaintiff,                  - Toledo, Ohio
                                   - May 6, 2008
 5           v.                    -  Trial
                                   -
 6   MOHAMMAD ZAKI AMAWI, et al.,-
                                   -
 7     Defendants.                 -
     -------------------------------
 8
                        VOLUME 44, TRANSCRIPT OF TRIAL
 9                  BEFORE THE HONORABLE JAMES G. CARR
             UNITED STATES DISTRICT CHIEF JUDGE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiffs:      United States Attorneys' Office
12                            By:   Thomas E. Getz
                                    Justin E. Herdman
13                            801 Superior Avenue, W
                              Cleveland, OH 44113
14                            (216) 622-3840

15                            U.S. Department of Justice
                              By:  Jerome J. Teresinski
16                                   David I. Miller
                              10th & Constitution Ave, NW
17                            Washington, DC 20530
                              (202) 353-3464
18
                              Office of the U.S. Attorney- Austin
19                            By:  Gregg N. Sofer
                              816 Congress Avenue
20                            Austin, TX 78701
                              (512) 916-5858
21

22

23

24

25
```

```
 1   For the Defendant Amawi: Office of the Federal Public
                              Defender - Cleveland
 2                            By:  Amy B. Cleary
                                   Jonathan P. Witmer-Rich
 3                                 Edward G. Bryan
                                   Timothy C. Ivey
 4                            750 Skylight Office Tower
                              1660 West Second St.
 5                            Cleveland, OH 44113
                              (216) 522-4856
 6
                              Muawad & Muawad
 7                            By:  Elias Muawad
                              36700 Woodward Avenue, Suite 209
 8                            Bloomfield Hills, MI 48304
                              (248) 594-4700
 9
     For the Defendant        Kerger & Kerger
10   El-Hindi:                By:  Stephen D. Hartman
                              Suite 201
11                            33 South Michigan Street
                              Toledo, OH 43602
12                            (419) 255-5990

13                            Boss & Vitou
                              By:  Charles M. Boss
14                            111 West Dudley Street
                              Maumee, OH 43537-2140
15                            (419) 893-5555

16                            Raslan, El-Kamhawy & Pla
                              By:  Alek H. El-Kamhawy
17                            Suite 3FE, 1700 East 13 Street
                              Cleveland, OH 44114
18                            (216) 928-1500

19   For the Defendant        David L. Doughten
     Mazloum:                 4403 St. Clair Avenue
20                            Cleveland, OH 44103-1125
                              (216) 361-1112
21
                              Helmick & Hoolahan
22                            By:  Jeffrey J. Helmick
                              2nd Floor
23                            1119 Adams Street
                              Toledo, OH 43624-1508
24                            (419) 243-3800

25
```

1  Mohammed Abdrabboh
  1620 Ford Avenue
2  Wyandotte, MI 48192
  (734) 283-8405

3

  Court Reporter:  Tracy L. Spore, RMR, CRR
4  1716 Spielbusch Avenue
  Toledo, Ohio 43624
5  (419) 243-3607

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

  Proceedings recorded by mechanical stenography, transcript
24 produced by notereading.

25

| | |
|---|---|
| **1** | (Reconvened at 8:55 a.m.) |
| **2** | THE COURT:  Are we ready to go? |
| 00:00:02 **3** | MR. HERDMAN:  We are. |
| 00:00:03 **4** | THE COURT:  Counsel, ready to go? |
| 00:00:05 **5** | MR. HARTMAN:  We are. |
| -08:-55:-51 **6** | THE COURT:  I'm sorry for the delay. |

00:00:12 **7** MR. SOFER:  Judge, defense has raised an issue with

00:00:15 **8** respect to <u>Jencks</u>.  We'd like to turn documents over.  We don't

-08:-55:-51 **9** have to deal with it now, but give you a chance to take a look

-08:-55:-51 **10** at them during a break.

00:00:26 **11** THE COURT:  These are?

00:00:29 **12** MR. SOFER:  There was an e-mail last night from Mr.

00:00:32 **13** Boss and Mr. Hartman related to an issue with respect to <u>Jencks</u>.

-08:-55:-51 **14** If you get a chance at the break or whatever --

00:03:06 **15** (Jury enters the courtroom.)

00:03:06 **16** THE COURT:  As you are well aware, unhappily it's

-08:-55:-51 **17** my custom to start out every morning with an apology for the

-08:-55:-51 **18** delay.   Let me simply say, I suspect, like many of you, you are

00:03:21 **19** trying to squeeze in all the other things that you otherwise

00:03:24 **20** would be doing if you weren't spending your days here and trying

-08:-55:-51 **21** to tend to those other things, and that's what happened to me

-08:-55:-51 **22** this morning.   There were some matters I had to tend to in

-08:-55:-51 **23** dealing with other aspects of my job, and it took longer than I

00:03:43 **24** anticipated.   Which, of course, is typically the case.   I

-08:-55:-51 **25** appreciate your patience.

4042

| | | |
|---|---|---|
| 00:03:48 | **1** | It's my understanding in a moment the government |
| 00:03:52 | **2** | will offer a videotape deposition of the accountant who was |
| -08:-55:-51 | **3** | visited by Mr. El-Hindi and Mr. Griffin, Mr. Dahabi, who is |
| 00:04:05 | **4** | unable -- and don't wonder why he can't come to court.   So the |
| -08:-55:-51 | **5** | parties agree that he could be questioned under oath and that |
| -08:-55:-51 | **6** | the deposition thereby be created, which was videotaped, could |
| -08:-55:-51 | **7** | be considered by you as the -- to the same extent, to the same |
| 00:04:27 | **8** | degree as if he were here in the courtroom on the stand. |
| -08:-55:-51 | **9** | There may be some sort of breaks in the flow of the |
| 00:04:35 | **10** | deposition, and that's simply because at my suggestion the |
| -08:-55:-51 | **11** | parties worked together to take out a couple of instances where |
| -08:-55:-51 | **12** | there was an objection or ruling by me one way or the other. |
| -08:-55:-51 | **13** | So don't kind of wonder, gee, what is that flicker or somehow |
| 00:04:57 | **14** | not a direct flow in the questioning or conversation.   Just |
| -08:-55:-51 | **15** | ignore that. |
| 00:05:03 | **16** | Basically what you are about to see and listen to |
| 00:05:07 | **17** | is evidence, and it can be considered by you as evidence to the |
| -08:-55:-51 | **18** | same extent as all the other evidence in the case.   And it's my |
| 00:05:16 | **19** | understanding after that videotape -- which if memory serves, |
| 00:05:21 | **20** | it's about an hour. |
| 00:05:24 | **21** | MR. SOFER:  A little less than that with |
| 00:05:26 | **22** | redactions. |
| 00:05:27 | **23** | THE COURT:  The government, I believe, anticipates |
| 00:05:29 | **24** | calling Special Agent Shannon Coats of the FBI who worked with |
| -08:-55:-51 | **25** | Mr. Griffin for a fair portion of the duration of the |

-08:-55:-51 1   investigation.   Okay.  So if technology cooperates and works --

00:05:49 2            MR. SOFER:  We'll give it our best shot, Judge.

-08:-55:-51 3            THE COURT:  And if memory serves, the direct

00:05:54 4   examination was conducted by Mr. Hartman.

-08:-55:-51 5            MR. HARTMAN:  Correct, Your Honor.

-08:-55:-51 6            THE COURT:  And the fact that he conducted the

-08:-55:-51 7   direct and -- I can't remember which government attorney, Mr.

-08:-55:-51 8   Getz maybe, conducted the cross-examination, that sequence makes

-08:-55:-51 9   no difference.   Okay.

00:06:14 10            MR. SOFER:  For the record, this is Government's

00:06:18 11   Exhibit Number 200.

00:07:01 12            (Video deposition played.)

00:07:09 13            THE COURT:  Ladies and gentlemen, you hear my voice

-08:-55:-51 14   because Mr. Dahabi, in fact, was sitting in that chair.  In

-08:-55:-51 15   other words, we tried to replicate the circumstances as if he

-08:-55:-51 16   were present in court.

-08:-55:-51 17            And there is reference to the fact that at the time

-08:-55:-51 18   he was in custody.  Ignore that.  It has nothing to do with his

-08:-55:-51 19   testimony or the evidence that you are hearing, simply the

-08:-55:-51 20   circumstance that it existed at that time.   And also that is

00:07:45 21   not -- his being in custody, that is not why he's not available

-08:-55:-51 22   to testify today.

-08:-55:-51 23            I'll try to refrain from any further interruption.

00:07:56 24            MR. SOFER:  There were a number of exhibits, as I

-08:-55:-51 25   understand it, introduced during the course of Mr. Dahabi's

4044

| | | |
|---|---|---|
| 00:08:04 | **1** | testimony.   And we can stop the tape and publish them, or we |
| -08:-55:-51 | **2** | can proceed however Your Honor wishes us to.   But we have those |
| 00:08:16 | **3** | physical exhibits here. |
| -08:-55:-51 | **4** | THE COURT:  I think it would probably make better |
| -08:-55:-51 | **5** | sense for the jury's comprehension of his testimony if we did |
| -08:-55:-51 | **6** | stop and perhaps display them on the screen. |
| 00:08:26 | **7** | MR. SOFER:  Okay. |
| -08:-55:-51 | **8** | THE COURT:  Is that okay, Counsel? |
| -08:-55:-51 | **9** | MR. HARTMAN:  I agree. |
| 00:08:34 | **10** | THE COURT:  Okay. |
| 00:08:45 | **11** | (Video deposition continues.) |
| 00:14:40 | **12** | MR. SOFER:  Judge, for the record, we'll put up 1C, |
| -08:-55:-51 | **13** | which is a multipage exhibit. |
| 00:15:08 | **14** | THE COURT:  What exhibit? |
| 00:15:10 | **15** | MR. SOFER:  1C, Your Honor. |
| 00:15:12 | **16** | THE COURT:  Dahabi testimony 1C? |
| 00:15:15 | **17** | MR. SOFER:  200-1C.   It's eight pages. |
| 00:15:29 | **18** | Can everybody see that? |
| 00:15:45 | **19** | If you look up when you're done, I'll know to |
| -08:-55:-51 | **20** | switch the pages. |
| 00:16:25 | **21** | (Document displayed). |
| 00:18:26 | **22** | (Video deposition continues.) |
| 00:20:25 | **23** | MR. SOFER:  Your Honor, we'll display to the jury |
| -08:-55:-51 | **24** | 1B, which is the first document that was referred to in the |
| -08:-55:-51 | **25** | deposition. |

| | | |
|---|---|---|
| -08:-55:-51 | **1** | THE COURT:  Fine. |
| 00:20:36 | **2** | (Document displayed.) |
| -08:-55:-51 | **3** | THE COURT:  It's a little difficult.   Can you make |
| 00:20:45 | **4** | it a little bit -- enlarge it a bit? |
| 00:21:02 | **5** | That's better.   Just so the jury can understand |
| -08:-55:-51 | **6** | what the nature of the document is. |
| 00:21:19 | **7** | MR. SOFER:  This is 200-1B. |
| 00:22:12 | **8** | (Document displayed.) |
| 00:23:33 | **9** | MR. SOFER:  That was 200-1B.   This is the document |
| 00:23:40 | **10** | I believe referred to as the rejection. |
| 00:24:43 | **11** | (Document displayed - 1A.) |
| 00:25:08 | **12** | (Video deposition continues.) |
| 01:14:01 | **13** | THE COURT:  Ladies and gentlemen, why don't we take |
| 01:14:03 | **14** | our mid-morning break, then we'll resume. |
| 01:37:51 | **15** | (Whereupon the following discussion was had at the |
| -08:-55:-51 | **16** | bench outside the hearing of the jury:) |
| -08:-55:-51 | **17** | THE COURT:  What's the Jencks -- I got an e-mail, |
| -08:-55:-51 | **18** | which I printed out, from Mr. Hartman. |
| -08:-55:-51 | **19** | MR. SOFER:  We received the e-mail from Mr. Boss, I |
| -08:-55:-51 | **20** | think it was, last night indicating that Mr. Boss had looked at |
| -08:-55:-51 | **21** | a 302 which had been turned over as part of the discovery |
| -08:-55:-51 | **22** | materials with respect to Mr. Griffin's testimony, and that the |
| -08:-55:-51 | **23** | 302 indicated that there were notes, written answers to written |
| -08:-55:-51 | **24** | questions by government's cooperating witness.   And we went |
| -08:-55:-51 | **25** | back and took a look at it.   Indeed it does say in the 302 that |

-08:-55:-51 **1** there were written answers to written questions that were

-08:-55:-51 **2** supplied to Mr. Griffin.  We managed to find those written

-08:-55:-51 **3** answers and written questions.   What I've given to the Court is

-08:-55:-51 **4** the document that the defense received in discovery, then an

-08:-55:-51 **5** unredacted copy that you can see what it is redacted.   Then the

-08:-55:-51 **6** notes themselves which contain information that relates to the

-08:-55:-51 **7** redacted and unredacted materials in the 302.   The government's

-08:-55:-51 **8** position on this document is simply A -- and Mr. Boss said

-08:-55:-51 **9** something once again about some lie that he believes he's

-08:-55:-51 **10** discovered.

-08:-55:-51 **11**          A, counsel had 302 in their possession to

-08:-55:-51 **12** cross-examine the witness with.  We submit to Your Honor if you

-08:-55:-51 **13** look at the notes versus what's in the 302 they are duplicative.

-08:-55:-51 **14** Meaning anything that was in the notes counsel already had an

-08:-55:-51 **15** opportunity to cross-examine the witness on.   So the government

-08:-55:-51 **16** believes and it actually says in the 3502 there are written

-08:-55:-51 **17** answers to written questions also.  So that's our position.

-08:-55:-51 **18**          Now, one thing I will say is this has caused us

-08:-55:-51 **19** some concern obviously because, frankly, I was unaware --

-08:-55:-51 **20** government counsel is unaware of the existence of those notes;

-08:-55:-51 **21** as we prepared the case we didn't recognize this.   But for this

-08:-55:-51 **22** group of notes, that's our position.  We think it's duplicative,

-08:-55:-51 **23** not an issue.   At the moment, as we speak, we have sent forth

-08:-55:-51 **24** people to make sure that no other material like this exists and

-08:-55:-51 **25** we're awaiting the final determination about that.

-08:-55:-51  **1**      But with respect to the particular issue that's

-08:-55:-51  **2**  been brought to the Court's attention, the reason you have those

-08:-55:-51  **3**  three documents is the notes themselves again do relate to some

-08:-55:-51  **4**  of the redacted materials and that's why we submitted them to

-08:-55:-51  **5**  the Court, and it is our position that they are duplicative and

-08:-55:-51  **6**  therefore there is no issue there.   Counsel has had full and

-08:-55:-51  **7**  fair opportunity to cross-examine the witness on anything in

-08:-55:-51  **8**  those documents.

-08:-55:-51  **9**      MR. HARTMAN:  When you say "notes", do you mean the

-08:-55:-51  **10**  actual written answers to the questions?

-08:-55:-51  **11**      MR. SOFER:  What it is is a series of questions

-08:-55:-51  **12**  typed out, then written answers.

-08:-55:-51  **13**      THE COURT:  In other words, it's questions and then

-08:-55:-51  **14**  there are very cryptic yes, no, what, X, Y -- in other words,

-08:-55:-51  **15**  kind of sort of like a fill-in-the-blank very cryptically.

-08:-55:-51  **16**  Then I will reread this stuff.   As I read it I figured what's

-08:-55:-51  **17**  all this about?   It's in English at least, but beyond that I

-08:-55:-51  **18**  didn't know what the deal was.   I'll look at it during the noon

-08:-55:-51  **19**  hour with an eye to determining whether there's anything

-08:-55:-51  **20**  inconsistent between the fill-in-the-blanks notes and the

-08:-55:-51  **21**  narrative that was provided to me, which, I assume, will be the

-08:-55:-51  **22**  end of the issue assuming there's nothing owed.

-08:-55:-51  **23**      MR. HARTMAN:  I would add, number one, well, I

-08:-55:-51  **24**  would add that the 302 is not a statement that gets adopted by

-08:-55:-51  **25**  Griffin.   It's the agent's statement.   And if written

-08:-55:-51 **1** statement, answer, is Griffin's.

-08:-55:-51 **2** THE COURT:  No, it's the agent's note.

-08:-55:-51 **3** MR. SOFER:  I think there's a combination of

-08:-55:-51 **4** things.

-08:-55:-51 **5** THE COURT:  I'll look at it.  The issue is whether

-08:-55:-51 **6** there's anything inconsistent between the 302.

-08:-55:-51 **7** MR. HARTMAN:  With all due respect to Your Honor,

-08:-55:-51 **8** the way I read it, it sounded to me like Griffin was provided

-08:-55:-51 **9** with questions, he wrote answers and gave them back.

-08:-55:-51 **10** THE COURT:  Did Griffin write the answers?

-08:-55:-51 **11** MR. SOFER:  Indeed.  What I wanted to say, I

-08:-55:-51 **12** believe if you look at that there are both agents' notes; there

-08:-55:-51 **13** may even be multiple agents notes plus Mr. Griffin's notes.

-08:-55:-51 **14** The last complicating factor is some of the notes

-08:-55:-51 **15** on there do not relate to the direct testimony of Mr. Griffin.

-08:-55:-51 **16** It was information, if it was brought up at all, that came up on

-08:-55:-51 **17** cross-examination so it wouldn't be <u>Jencks</u> either.  There's a

-08:-55:-51 **18** conglomeration in there that doesn't fall under the <u>Jencks</u>

-08:-55:-51 **19** statute.

-08:-55:-51 **20** THE COURT:  To the extent it's stuff from Griffin,

-08:-55:-51 **21** then the issue is whether it's inconsistent with his testimony,

-08:-55:-51 **22** right?

-08:-55:-51 **23** MR. SOFER:  And whether or not counsel had a full

-08:-55:-51 **24** and fair opportunity to sort of -- in other words, the 302 is a

-08:-55:-51 **25** description of what Griffin's notes are, Judge, so it's not as

-08:-55:-51 **1** if -- that's something else the Court can examine, but we

-08:-55:-51 **2** believe if you look at the 302 and look at his notes, it's the

-08:-55:-51 **3** same information. And it says on there he's supplied with

-08:-55:-51 **4** questions and he gave answers and it lists information.

-08:-55:-51 **5** MR. BRYAN: One other matter before we begin Agent

-08:-55:-51 **6** Coats' testimony. I wanted to make sure to renew the motion for

-08:-55:-51 **7** separation of witnesses. We have concerns that there may be

-08:-55:-51 **8** another.

-08:-55:-51 **9** MR. SOFER: Just so it's clear, Judge, we have two

-08:-55:-51 **10** other agents in the courtroom now, one of them is Special Agent

-08:-55:-51 **11** Gubanich who's going to testify. The agent next to him, as I

-08:-55:-51 **12** understand it, is not on the witness list, not somebody the

-08:-55:-51 **13** defense is interested in and I don't believe he's received any

-08:-55:-51 **14** subpoenas or anything of that nature. Up until now, he's been

-08:-55:-51 **15** charged, among other things, with security.

-08:-55:-51 **16** THE COURT: I understand. Will Gubanich be outside

-08:-55:-51 **17** when Coats testifies?

-08:-55:-51 **18** MR. SOFER: You may recall, Your Honor, initially

-08:-55:-51 **19** defense counsel had said one agent only. We requested that

-08:-55:-51 **20** given the complexity of the case two agents be allowed in.

-08:-55:-51 **21** THE COURT: Okay.

-08:-55:-51 **22** MR. SOFER: If --

-08:-55:-51 **23** MR. TERESINSKI: It would be those two.

-08:-55:-51 **24** MR. SOFER: Can you give us an idea, Counsel, an

-08:-55:-51 **25** idea of how long cross-examination will take so we can do some

-08:-55:-51 **1** scheduling, approximately?

-08:-55:-51 **2** MR. BRYAN: Two, three hours.

-08:-55:-51 **3** MR. SOFER: Two, three hours maximum for him.

-08:-55:-51 **4** MR. BRYAN: The same for cross.

-08:-55:-51 **5** MR. HARTMAN: Depending on what they cover, and

-08:-55:-51 **6** they're going first, I would think an hour-and-a-half to two

-08:-55:-51 **7** hours.

-08:-55:-51 **8** THE COURT: Assume we'll finish him tomorrow.

-08:-55:-51 **9** MR. HERDMAN: To clarify with Agent Gubanich, do

-08:-55:-51 **10** you want him excluded or can he sit in?

-08:-55:-51 **11** THE COURT: It's up to you. He can sit in but it

-08:-55:-51 **12** might make sense that he be excluded from this agent's

-08:-55:-51 **13** testimony.

-08:-55:-51 **14** MR. BOSS: We would request he be excluded.

-08:-55:-51 **15** THE COURT: It's its issue to argue on appeal.

-08:-55:-51 **16** (End of side-bar discussion.)

01:37:56 **17** THE COURT: Call your next witness.

01:37:58 **18** MR. SOFER: Your Honor, the government calls

-08:-55:-51 **19** Special Agent Shannon Coats of the FBI.

01:38:16 **20** (The witness was sworn by the clerk.)

01:38:23 **21** MR. SOFER: May I inquire, Your Honor?

01:38:26 **22** THE COURT: Will you tell the ladies and gentlemen

-08:-55:-51 **23** your name, please?

-08:-55:-51 **24** THE WITNESS: My name is Shannon Coats. The

01:38:31 **25** spelling of the last is C-O-A-T-S.

| | | |
|---|---|---|
| 01:38:37 | **1** | THE COURT:  Perhaps sit a tad back so we don't get |
| 01:38:40 | **2** | feedback. |
| 01:38:41 | **3** | THE WITNESS:  Is this better? |
| 01:38:44 | **4** | MR. SOFER:  I like the James Earl Jones sound, |
| -08:-55:-51 | **5** | Judge. |
| 01:38:47 | **6** | THE COURT:  Your present employment or occupation? |
| -08:-55:-51 | **7** | THE WITNESS:  I'm presently employed by the Federal |
| -08:-55:-51 | **8** | Bureau of Investigation as a Special Agent. |
| -08:-55:-51 | **9** | THE COURT:  Can you confirm for me the indication |
| -08:-55:-51 | **10** | you gave a while ago that the term special agent is simply the |
| 01:39:03 | **11** | conventional name given to agents of the FBI? |
| 01:39:11 | **12** | THE WITNESS:  Yes, it's my understanding Congress |
| 01:39:14 | **13** | established us for a special or specific powers; that's why |
| 01:39:18 | **14** | we're called Special Agent. |
| 01:39:20 | **15** | THE COURT:  That's been the traditional |
| 01:39:23 | **16** | nomenclature and title that you've had? |
| -08:-55:-51 | **17** | THE WITNESS:  That is correct. |
| -08:-55:-51 | **18** | THE COURT:  How long have you been employed by the |
| 01:39:29 | **19** | FBI? |
| -08:-55:-51 | **20** | THE WITNESS:  About ten years. |
| -08:-55:-51 | **21** | THE COURT:  Prior to that did you have any law |
| 01:39:33 | **22** | enforcement experience? |
| 01:39:34 | **23** | THE WITNESS:  I do. |
| -08:-55:-51 | **24** | THE COURT:  Just briefly, what was that? |
| -08:-55:-51 | **25** | THE WITNESS:  I was employed for five years with |

-08:-55:-51 **1**  the police department in Boise, Idaho.   Three years as a

01:39:45 **2**  patrolman and two years as a detective.

01:39:49 **3**            THE COURT:  Any other law enforcement experience or

01:39:53 **4**  employment before that?

01:39:54 **5**            THE WITNESS:  No, Your Honor.

01:39:58 **6**            THE COURT:  Where are you presently stationed?

-08:-55:-51 **7**  Where's your place of -- or your duty station as it's called?

01:40:07 **8**            THE WITNESS:  I'm presently assigned to the Joint

-08:-55:-51 **9**  Terrorism Task Force at the Toledo resident agency of the FBI in

-08:-55:-51 **10**  Toledo.

01:40:14 **11**            THE COURT:  How long have you been in the Toledo

01:40:17 **12**  office?

-08:-55:-51 **13**            THE WITNESS:  I've been in the Toledo office about

-08:-55:-51 **14**  ten years.

01:40:22 **15**            MR. SOFER:  You asked all my questions, Judge.

-08:-55:-51 **16**            THE COURT:  You may cross-examine.

-08:-55:-51 **17**            Mr. Sofer, you may proceed.

01:40:33 **18**                       - - -

01:40:33 **19**            SHANNON COATS, DIRECT EXAMINATION

-08:-55:-51 **20**  BY MR. SOFER:

-08:-55:-51 **21**     **Q.**   Good morning, Agent Coats.

-08:-55:-51 **22**     **A.**   Good morning.

01:40:37 **23**     **Q.**   I'll see if I can get any of your background the Judge

-08:-55:-51 **24**  hasn't asked.

01:40:41 **25**            Will you please tell the members of the jury how

4053

-08:-55:-51 **1**  old you are?

01:40:44 **2**  **A.**  41 years old.

-08:-55:-51 **3**  **Q.**  You tell us basically where it is that you grew up?

01:40:48 **4**  **A.**  I grew up in Boise, Idaho.

-08:-55:-51 **5**  **Q.**  Are you married?

-08:-55:-51 **6**  **A.**  I am.

01:40:52 **7**  **Q.**  For how long have you been married?

-08:-55:-51 **8**  **A.**  I've been married almost 20 years.

-08:-55:-51 **9**  **Q.**  Do you have any children?

-08:-55:-51 **10**  **A.**  I do.

-08:-55:-51 **11**  **Q.**  You tell us basically what your educational background

01:41:02 **12**  is?

-08:-55:-51 **13**  **A.**  I have a bachelor's degree in psychology.

01:41:05 **14**  **Q.**  And where did you go to college?

01:41:09 **15**  **A.**  I went to Boise State University in Boise, Idaho.

01:41:13 **16**  **Q.**  Can you tell the members of the jury what you did after

-08:-55:-51 **17**  you graduated from college?

-08:-55:-51 **18**  **A.**  Immediately after graduating from college I spent about

-08:-55:-51 **19**  five years working in the mental health field.

01:41:24 **20**  **Q.**  Approximately how long did you work in the mental health

01:41:28 **21**  field?

-08:-55:-51 **22**  **A.**  A total of about 7 years, but after college about five

-08:-55:-51 **23**  years.

01:41:33 **24**  **Q.**  Can you tell us basically, without going into too many

01:41:37 **25**  details, what you did in the mental health field?

-08:-55:-51 **1**   **A.**   Yes.  I spent most of the time as a program director for

-08:-55:-51 **2** a private company that provided services to developmentally

-08:-55:-51 **3** disabled kids.

01:41:51 **4**   **Q.**   After you worked in the mental health field can you tell

-08:-55:-51 **5** the members of the jury what you did?

01:41:56 **6**   **A.**   In January of 1993 I went to work for the police

01:41:59 **7** department in Boise, Idaho.

-08:-55:-51 **8**   **Q.**   And I think you said that you started off as a patrol

-08:-55:-51 **9** officer?

01:42:04 **10**   **A.**   Yes.

-08:-55:-51 **11**   **Q.**   Can you tell the members of the jury basically what you

-08:-55:-51 **12** did in your capacity as patrol officer?

-08:-55:-51 **13**   **A.**   Yes.  My duties as a patrol officer were to respond to

-08:-55:-51 **14** general calls for service, domestic violence calls, bar fights,

01:42:18 **15** enforce traffic law, conduct some traffic investigation, make

-08:-55:-51 **16** arrests, some collecting of evidence.   Things related to that.

01:42:28 **17**   **Q.**   How long were you on patrol?

-08:-55:-51 **18**   **A.**   Approximately three years.

01:42:32 **19**   **Q.**   Did there come a time when you were promoted to another

-08:-55:-51 **20** position?

-08:-55:-51 **21**   **A.**   Yes.

-08:-55:-51 **22**   **Q.**   I think you said you were a Detective next?

-08:-55:-51 **23**   **A.**   Correct.   I was a Detective assigned to the Property

-08:-55:-51 **24** Crimes Unit.

-08:-55:-51 **25**   **Q.**   How long did you serve as a Detective with the Boise

4055

01:42:45　**1**　Police Department?

-08:-55:-51　**2**　　**A.**　Approximately two years.

-08:-55:-51　**3**　　**Q.**　Did there come a time while you were working for the

-08:-55:-51　**4**　Boise Police Department that you were hired by the Federal

-08:-55:-51　**5**　Bureau of Investigation?

-08:-55:-51　**6**　　**A.**　Yes, there did.

-08:-55:-51　**7**　　**Q.**　Again, you were hired in what capacity?

-08:-55:-51　**8**　　**A.**　I was hired as a Special Agent.

01:42:59　**9**　　**Q.**　Do you remember what day you began your service with the

-08:-55:-51　**10**　FBI?

-08:-55:-51　**11**　　**A.**　I do.

01:43:02　**12**　　**Q.**　You tell the members of the jury when that was?

01:43:04　**13**　　**A.**　December 7, 1997.

01:43:06　**14**　　**Q.**　You have been with the FBI ever since?

-08:-55:-51　**15**　　**A.**　Yes, I have.

-08:-55:-51　**16**　　**Q.**　I think you said ten years you've been all together?

01:43:13　**17**　　**A.**　Correct, just over ten years.

01:43:15　**18**　　**Q.**　When you first accepted your position as a Special Agent

01:43:18　**19**　in the FBI, where did you go?

-08:-55:-51　**20**　　**A.**　I went to the FBI Academy in Quantico, Virginia.

-08:-55:-51　**21**　　**Q.**　And without too many details, can you give the jury a

01:43:26　**22**　basic description of what kind of training you received at the

-08:-55:-51　**23**　FBI Academy in Quantico, Virginia?

-08:-55:-51　**24**　　**A.**　I can.　The training consisted of some legal

01:43:36　**25**　instruction, some instruction in how to conduct investigations,

01:43:42  1   pursuit driving, using firearms, report writing, utilizing the

-08:-55:-51  2   various computer systems that the FBI uses, and things related

-08:-55:-51  3   to those kinds of training.

-08:-55:-51  4       Q.   Did you graduate from the FBI Academy?

-08:-55:-51  5       A.   I did.

-08:-55:-51  6       Q.   How long did the academy training last?

-08:-55:-51  7       A.   At the time the academy training was approximately four

-08:-55:-51  8   months.

-08:-55:-51  9       Q.   And after you completed your training, where were you

-08:-55:-51  10  assigned?

-08:-55:-51  11      A.   I was assigned to Toledo, resident agent.

01:44:13  12      Q.   Is that here in northern Ohio?

-08:-55:-51  13      A.   Yes.  Yes, it's within the City of Toledo.

-08:-55:-51  14      Q.   Tell us what area that covers in northern Ohio?

-08:-55:-51  15      A.   Well, the Cleveland division of the FBI covers the --

-08:-55:-51  16  basically the northern half of the state of Ohio.   And the

-08:-55:-51  17  Toledo resident agency coves approximately 23 or so counties

-08:-55:-51  18  nestled in the northwest corner of the state of Ohio.

-08:-55:-51  19      Q.   So would it be fair to say the Toledo resident agency is

-08:-55:-51  20  part of the Cleveland division of the FBI?

-08:-55:-51  21      A.   That's correct.

01:44:44  22      Q.   Can you tell the members of the jury what your

-08:-55:-51  23  assignment was when you were first assigned here to the Toledo

-08:-55:-51  24  resident agency?

-08:-55:-51  25      A.   Yes, when I first arrived in Toledo I was assigned a

4057

01:44:54 **1** variety of different matters. I worked some drug

01:44:57 **2** investigations, some bank robbery, some mail fraud, wire fraud,

01:45:03 **3** international parental kidnapping act violations, just to name

01:45:11 **4** some of the major ones.

-08:-55:-51 **5**     **Q.** And approximately what year, by the way, was it when you

-08:-55:-51 **6** arrived here?

-08:-55:-51 **7**     **A.** I arrived in April of 1998.

01:45:19 **8**     **Q.** And with respect to the kinds of cases that you just

-08:-55:-51 **9** described, what were your basic duties as an FBI agent?

-08:-55:-51 **10**     **A.** Basic duties were to collect evidence, to interview

01:45:30 **11** witnesses, interview victims, interview subjects, conduct

01:45:36 **12** background investigations sometimes of individuals related to

01:45:40 **13** those, those matters, and make reports on those matters.

-08:-55:-51 **14**     **Q.** Did you receive additional training during these initial

-08:-55:-51 **15** years here at the Toledo resident agency?

-08:-55:-51 **16**     **A.** I did.

-08:-55:-51 **17**     **Q.** Can you give a basic description to members of the jury

-08:-55:-51 **18** what kind of training that was?

-08:-55:-51 **19**     **A.** Attended a number of different training sessions on

01:46:02 **20** conducting white collar crime investigations, background

-08:-55:-51 **21** investigations, things such as that.

01:46:11 **22**     **Q.** Did there come a time when your assignment changed?

-08:-55:-51 **23**     **A.** Yes, it did.

-08:-55:-51 **24**     **Q.** Can you tell the members of the jury when that was?

-08:-55:-51 **25**     **A.** Yes, it was on September 11, 2001.

4058

-08:-55:-51 **1**   **Q.**   How did your assignment change after September 11 of

-08:-55:-51 **2**  2001?

01:46:24 **3**   **A.**   I was assigned to the Joint Terrorism Task Force,

01:46:29 **4**  sometimes referred to as the JTTF.

01:46:33 **5**   **Q.**   Do you know when the JTTF was created here in Toledo?

-08:-55:-51 **6**   **A.**   Approximately.   It was created approximately two months

01:46:43 **7**  prior to September 11, 2001.

-08:-55:-51 **8**   **Q.**   Are there other agencies that participate in the Joint

01:46:50 **9**  Terrorism Task Force here in Toledo?

-08:-55:-51 **10**   **A.**   Yes, there are.

-08:-55:-51 **11**   **Q.**   Can you tell us what some of those agencies are?

-08:-55:-51 **12**   **A.**   Yes.   There are some state, local, and federal agencies

01:46:59 **13**  assigned to the Joint Terrorism Task Force.  Locally the Lucas

-08:-55:-51 **14**  County Sheriff's Office the Toledo Police Department, the Wood

-08:-55:-51 **15**  County Sheriff's Office has participated in the past, the Ohio

01:47:14 **16**  State Highway Patrol participates, just to name a few of the

01:47:17 **17**  members.

-08:-55:-51 **18**   **Q.**   Was the DEA part of this task force?

01:47:19 **19**   **A.**   Yes, it was.

-08:-55:-51 **20**   **Q.**   Was there another FBI agent that you worked with more

01:47:23 **21**  than others when you first started your work on the JTTF?

-08:-55:-51 **22**   **A.**   Yes, there was.

-08:-55:-51 **23**   **Q.**   Can you tell the members of the jury what his or her

-08:-55:-51 **24**  name was?

01:47:32 **25**   **A.**   Special Agent William Radcliffe.   The spelling is

-08:-55:-51  **1**  R-A-D-C-L-I-F-F-E.

01:47:41  **2**  Q.  Is Agent Radcliffe still working with the FBI?

-08:-55:-51  **3**  A.  He is not.

-08:-55:-51  **4**  Q.  You tell the members of the jury why that is?

-08:-55:-51  **5**  A.  Yes, he retired.

-08:-55:-51  **6**  Q.  Now, as part of your work on the JTTF did you actually

01:47:56  **7**  participate in other training?

01:47:58  **8**  A.  Yes, I did.

-08:-55:-51  **9**  Q.  Again, can you give us, without telling the details, the

01:48:03  **10**  basic description of what that training was?

-08:-55:-51  **11**  A.  Yes.  I attended a number of different training sessions

-08:-55:-51  **12**  on conducting counter-terrorism investigations.

01:48:12  **13**  Q.  Can you tell the members of the jury what the primary

01:48:15  **14**  function of the JTTF here in Toledo?

-08:-55:-51  **15**  A.  Yes, the primary function is to develop intelligence or

-08:-55:-51  **16**  to develop information sufficient to prevent another terrorist

01:48:30  **17**  attack.

-08:-55:-51  **18**  Q.  Can you give the jury a basic description of what your

01:48:33  **19**  duties were as a MIP of the J?

01:48:36  **20**  A.  Yes, some of my basic duties include when leads would

-08:-55:-51  **21**  come into the Toledo resident agency of a terrorism or a

-08:-55:-51  **22**  counter-terrorism nature, to pursue those leads, conduct

01:48:49  **23**  investigations related to those leads, interview witnesses,

01:48:53  **24**  sometimes interview subjects, and to write reports on the

-08:-55:-51  **25**  findings of those.

01:48:59  **1**  **Q.**   Can you tell the members of the jury basically, if you

-08:-55:-51  **2**  know, the general priorities of the FBI in the area of

01:49:07  **3**  counter-terrorism?

-08:-55:-51  **4**  **A.**   Yes.   The priorities are as follows: First of all, to

-08:-55:-51  **5**  prevent other terrorist attacks, the second priority is to

01:49:17  **6**  disrupt -- that is, if the FBI is made aware of plans to conduct

-08:-55:-51  **7**  a terrorist or commit a terrorist act, to disrupt that quad.

-08:-55:-51  **8**  And the third priority is to prosecute persons found to be

-08:-55:-51  **9**  involved in criminal violations of counter-terrorism statutes.

01:49:36  **10**  **Q.**   And I think you said that one of the missions of the

01:49:41  **11**  JTTF is also to develop intelligence?  Is there another word for

-08:-55:-51  **12**  intelligence?

-08:-55:-51  **13**  **A.**   Yes, information.

01:49:50  **14**  **Q.**   Can you describe for the members of the jury what a

-08:-55:-51  **15**  human source is?

-08:-55:-51  **16**  **A.**   I can.   A human source is someone that the FBI or law

-08:-55:-51  **17**  enforcement agency utilizes to collect information, to be given

01:50:05  **18**  in some cases specific tasks to go out and acquire specific sets

-08:-55:-51  **19**  of information.

-08:-55:-51  **20**  **Q.**   What are the primary reasons for using a human source,

-08:-55:-51  **21**  if you know?

-08:-55:-51  **22**  **A.**   The primary reasons are, first of all, to make sure that

01:50:21  **23**  that source is kept safe, that his or her security is

01:50:25  **24**  maintained, and then, second, to verify the information that

-08:-55:-51  **25**  that individual is bringing to you, and to collect -- utilize

-08:-55:-51  **1**  that person to collect information that might aid the FBI in

01:50:40  **2**  preventing a terrorist attack.

01:50:45  **3**      **Q.**    You tell the jury basically and in substance how it is

01:50:48  **4**  that you would use a human source in connection with a

-08:-55:-51  **5**  counter-terrorism act?

01:50:52  **6**      **A.**    Yes.   In using a human source, you may give that human

-08:-55:-51  **7**  source some specific task to go to certain places, to talk to

-08:-55:-51  **8**  certain people in an attempt to collect specific information

-08:-55:-51  **9**  about either organizations, entities, other people who may be

-08:-55:-51  **10**  involved in either planning a terrorist act or in supporting

-08:-55:-51  **11**  those who plan terrorist acts.

-08:-55:-51  **12**      **Q.**    Can you tell the members of the jury, basically without

01:51:25  **13**  revealing any specifics that would compromise FBI operations,

-08:-55:-51  **14**  how it is that you might go about finding a human source to work

01:51:32  **15**  with the FBI?

-08:-55:-51  **16**      **A.**    Yes.   There are several primary ways in which the FBI

01:51:40  **17**  obtains human sources.   One of them is someone may walk in off

-08:-55:-51  **18**  the street and indicate that they have specific access to an

01:51:48  **19**  organization or a set of people that they believe would be

-08:-55:-51  **20**  useful to the FBI to know about.   A second would be sometimes

-08:-55:-51  **21**  the FBI or another law enforcement agency also have someone

01:52:02  **22**  who's been arrested and they have some motivation to work off

-08:-55:-51  **23**  that charge, as it were, or to gain some consideration in their

01:52:11  **24**  sentencing.   An then finally, someone -- we may become aware of

-08:-55:-51  **25**  someone based on virtue of their position within the

4062

01:52:22 **1** organization or social setting that we believe would be valuable

-08:-55:-51 **2** to the FBI, and we may actually make an approach of that

-08:-55:-51 **3** individual to sit down and talk with them and assess their

-08:-55:-51 **4** ability to gather information and their willingness to do so.

01:52:42 **5**   Q.   I want to direct your attention to the fall of 2001.

-08:-55:-51 **6** Did there come a time in the fall of 2001 when you heard about a

-08:-55:-51 **7** person named Darren Griffin?

-08:-55:-51 **8**   A.   Yes, I did.

-08:-55:-51 **9**   Q.   Do you recall where it was that you heard about Darren

01:52:53 **10** Griffin?

01:52:53 **11**   A.   Yes, I heard about Darren Griffin from -- there were a

-08:-55:-51 **12** couple of personnel from the Drug Enforcement Administration who

-08:-55:-51 **13** were participating members of the Joint Terrorism Task Force and

-08:-55:-51 **14** they indicated that there was an individual that they had been

01:53:09 **15** utilizing as a cooperating witness and that they believed, based

-08:-55:-51 **16** upon Mr. Griffin's background, specifically in the Special

-08:-55:-51 **17** Forces and his understanding of Middle Eastern culture and

01:53:21 **18** Islamic culture, that he may be somebody that we might be able

-08:-55:-51 **19** to utilize in the gathering of information.

01:53:31 **20**         MR. BOSS:  Mr. Coats, could you use the microphone?

-08:-55:-51 **21**         THE COURT:  Maybe a little closer.   Ladies and

01:53:37 **22** gentlemen, are you able to hear?

01:53:39 **23**         THE JUROR:  Yes.

01:53:42 **24**         MR. SOFER:  Try to speak a little louder.

-08:-55:-51 **25** BY MR. SOFER:

-08:-55:-51 **1**     **Q.** You described the various ways in which the FBI

-08:-55:-51 **2** identifies people who could be human sources. What was -- was

-08:-55:-51 **3** Mr. Griffin in trouble at that time?

01:53:56 **4**     **A.** He was not.

01:53:57 **5**     **Q.** Was he a walk-in?

01:53:59 **6**     **A.** He was not.

01:54:00 **7**     **Q.** So he came in this other category then; is that correct?

01:54:04 **8**     **A.** Yes. We were made aware of him by another law

-08:-55:-51 **9** enforcement agency.

-08:-55:-51 **10**     **Q.** Did there come a time when you and other FBI agents met

-08:-55:-51 **11** with Darren Griffin in the fall of 2001?

01:54:15 **12**     **A.** Yes, there was.

01:54:16 **13**     **Q.** And after the initial meeting, did there later come a

-08:-55:-51 **14** time when Darren Griffin stopped working with the Drug

01:54:23 **15** Enforcement Administration and started working exclusively for

-08:-55:-51 **16** the FBI?

-08:-55:-51 **17**     **A.** Yes, he did.

-08:-55:-51 **18**     **Q.** Can you tell the members of the jury, basically in

01:54:29 **19** summary, how that happened?

01:54:30 **20**     **A.** Yes. Over the course of an approximately eight- or

-08:-55:-51 **21** nine-month time period, Mr. Griffin made a transition from

01:54:40 **22** working with the Drug Enforcement Administration into a role

-08:-55:-51 **23** that we began discussing with him, that of an Islamic extremist.

-08:-55:-51 **24** Due to the nature of his transition it was necessary that it

-08:-55:-51 **25** take place over a fairly substantial time period. He couldn't

-08:-55:-51 1 simply go from one day being in an environment of drugs and

-08:-55:-51 2 narcotics and purchasing drugs and narcotics to the next day

01:55:07 3 going to the role of an Islamic extremist.

01:55:12 4     **Q.**   Did Darren Griffin have to fill out some lengthy

-08:-55:-51 5 questionnaire in order to work for the FBI?

-08:-55:-51 6     **A.**   He did not.

-08:-55:-51 7     **Q.**   Did there come a time when he entered into an agreement

01:55:22 8 to work for the FBI?

01:55:23 9     **A.**   Yes, he did.

01:55:27 10     **Q.**   By the way, is there another term for someone who agrees

-08:-55:-51 11 to work for the FBI as a human source?

01:55:32 12     **A.**   Yes, they're often referred to as a "cooperating

-08:-55:-51 13 witness".

01:55:36 14     **Q.**   Is that sometimes referred to as a "CW"?

-08:-55:-51 15     **A.**   Correct.

01:55:41 16     **Q.**   Is there another term used to describe the people who

01:55:49 17 have primary contact with the CW or cooperating witness?

-08:-55:-51 18     **A.**   Yes, they're often referred to as the contact agent,

01:55:56 19 sometimes as the handler.

-08:-55:-51 20     **Q.**   Were you one of the contact agents for Darren Griffin

01:56:02 21 during the course of the investigation that led to the instant

-08:-55:-51 22 case?

-08:-55:-51 23     **A.**   Yes, I was.

-08:-55:-51 24     **Q.**   Was there another contact agent?

-08:-55:-51 25     **A.**   Yes, there was.

-08:-55:-51 **1**   **Q.**   Can you tell the members of the jury who that was?

-08:-55:-51 **2**   **A.**   Yes, that was Special Agent William Radcliffe.

01:56:15 **3**   **Q.**   Who preceded who?

01:56:17 **4**   **A.**   Mr. Radcliff preceded myself.

01:56:22 **5**   **Q.**   Did you work with Agent Radcliffe during the time or

-08:-55:-51 **6** much of the time that he was the primary contact agent for

01:56:29 **7** Darren Griffin?

-08:-55:-51 **8**   **A.**   Yes, I did.

01:56:31 **9**   **Q.**   Do you remember when it was that you became the primary

01:56:36 **10** contact agent for Darren Griffin?

-08:-55:-51 **11**   **A.**   Yes, I do.

-08:-55:-51 **12**   **Q.**   Can you tell the members of the jury when that was?

-08:-55:-51 **13**   **A.**   Approximately April 1, 2005.

-08:-55:-51 **14**   **Q.**   Why did that take place?

01:56:45 **15**   **A.**   As a result of the retirement of Special Agent

01:56:50 **16** Radcliffe.

01:56:50 **17**   **Q.**   By the way, have you worked extensively with a younger

01:56:54 **18** agent during the course of this case?

-08:-55:-51 **19**   **A.**   Yes, I have.

-08:-55:-51 **20**   **Q.**   Who is that individual?

-08:-55:-51 **21**   **A.**   That's Special Agent Steven Gubanich.

01:57:02 **22**   **Q.**   You spell that for us?

-08:-55:-51 **23**   **A.**   The spelling of the last name is G-U-B-A-N-I-C-H.

01:57:09 **24**   **Q.**   G-U-B-A-N-I-C-H?

01:57:14 **25**   **A.**   Correct.

-08:-55:-51  **1**  **Q.**  Was Special Agent Steve Gubanich ever the primary

-08:-55:-51  **2**  handler for Darren Griffin?

-08:-55:-51  **3**  **A.**  He was not.

01:57:21  **4**  **Q.**  Do you recall what Darren Griffin was told to do by the

-08:-55:-51  **5**  FBI when he started working as a cooperating witness basically?

-08:-55:-51  **6**  **A.**  Yes.  When he first began working as a cooperating

01:57:32  **7**  witness he was told about this, the plan to develop him as an

-08:-55:-51  **8**  Islamic extremist, and was told to go to various social

01:57:42  **9**  gatherings, to attend Mosque or a Mosque, and to work his way

-08:-55:-51  **10**  into that social environment.

01:57:51  **11**  **Q.**  And do you recall if he was told anything whatsoever by

-08:-55:-51  **12**  the FBI initially about Mohammad Amawi, Marwan El-Hindi or

01:57:59  **13**  Wassim Mazloum, the three defendants in this case?

-08:-55:-51  **14**  **A.**  He was not.

01:58:04  **15**  **Q.**  Do you recall whether shortly after working for --

01:58:09  **16**  beginning his work for the FBI, he was asked to interact with

01:58:16  **17**  particular individuals who were people of interest?

01:58:20  **18**  **A.**  Yes, he was.

01:58:21  **19**  **Q.**  And were any of those people Mohammad Amawi, Marwan

01:58:25  **20**  El-Hindi or Wassim Mazloum?

01:58:26  **21**  **A.**  They were not.

01:58:28  **22**  **Q.**  Can you give the jury a basic description of the steps

-08:-55:-51  **23**  that had to be taken in order to get Darren Griffin into a

-08:-55:-51  **24**  position to perform his work for the FBI in gathering

01:58:39  **25**  information?

4067

-08:-55:-51   **1**   A.   Yes.   As I indicated a few moments ago, this was a

01:58:46   **2**   process that took a number of months for him to move out of his

01:58:51   **3**   prior existence and into his role as an Islamic extremist.   It

01:58:57   **4**   meant that he was going to have to change where it was he lived;

01:59:00   **5**   he was going to have to live in or around downtown Toledo, Ohio;

-08:-55:-51   **6**   he was going to have to make himself available to make

01:59:09   **7**   consensual recordings with individuals who the FBI deemed that

-08:-55:-51   **8**   he needed to make recordings with; he was going to have to

01:59:16   **9**   change the way in which he dressed; he was going to have to

-08:-55:-51   **10**   change the way in which he went out to restaurants.   He was

-08:-55:-51   **11**   going to have to change his social environment, his social

01:59:27   **12**   circles.  He was going to have to be available for gatherings

01:59:33   **13**   within the Islamic or Muslim community locally.   He was going

-08:-55:-51   **14**   to have to attend the Mosque at least on a weekly basis; he was

01:59:41   **15**   going to have to attend Arabic language classes.  Just to name a

01:59:45   **16**   few of the kinds of things that he was going to have to do in

-08:-55:-51   **17**   order to adopt that persona.

-08:-55:-51   **18**   Q.   Did the FBI offer to pay Darren Griffin for this work?

01:59:53   **19**   A.   We did.

01:59:54   **20**   Q.   Can you tell the members of the jury why?

01:59:56   **21**   A.   Yes.   Based on the -- on all of what I just described,

-08:-55:-51   **22**   it was going to take a substantial amount of his time, so much

-08:-55:-51   **23**   so that he was not going to be able to hold down a regular

-08:-55:-51   **24**   full-time job.

02:00:09   **25**   Q.   How much was Darren Griffin paid by the FBI?

-08:-55:-51 **1**   **A.**   Initially he was paid 4,000 dollars a month.

-08:-55:-51 **2**   **Q.**   And how was he paid?

02:00:17 **3**   **A.**   He was paid on a monthly basis in cash.

02:00:22 **4**   **Q.**   Can you tell the members of the jury why it was Darren

-08:-55:-51 **5**   Griffin was paid in cash?

-08:-55:-51 **6**   **A.**   It's the bureau's policy, we pay informants in cash.

-08:-55:-51 **7**   **Q.**   Is there a purpose for that?

02:00:34 **8**   **A.**   So it limits the paper trail that identifies that

02:00:37 **9**   individual as working with or connected to the FBI.

02:00:40 **10**   **Q.**   As far as you know is that how every cooperating

02:00:44 **11**   witness, CW or human source, is paid, at least during the time

02:00:48 **12**   that you've been working these kinds of cases?

-08:-55:-51 **13**   **A.**   Yes.

02:00:51 **14**   **Q.**   Did there come a time when Darren Griffin was given a

-08:-55:-51 **15**   raise?

02:00:55 **16**   **A.**   Yes, there did.

-08:-55:-51 **17**   **Q.**   And do you recall when that was?

-08:-55:-51 **18**   **A.**   Yes.   That was in August -- approximately August of

02:01:03 **19**   2004.

02:01:04 **20**   **Q.**   Now, in August of 2004, Mr. Griffin was working on this

02:01:13 **21**   matter and others; is that fair to say?

02:01:15 **22**   **A.**   That is correct.

-08:-55:-51 **23**   **Q.**   And you give us a very basic approximation of what

02:01:20 **24**   fraction of his total reporting centered on any of the three

02:01:26 **25**   defendants in this case when he was given his raise?

02:01:30 1    A.    I would approximate maybe 30 to 40 percent of his time.

-08:-55:-51 2    Q.    So the other 60 or 70 percent related to other

-08:-55:-51 3    individuals or other investigations that the FBI was conducting?

-08:-55:-51 4    A.    A variety of other investigations, yes.

02:01:45 5    Q.    Did there come a time when Darren Griffin's salary was

02:01:48 6    reduced?

-08:-55:-51 7    A.    Yes, there did.

-08:-55:-51 8    Q.    Can you tell the members of the jury when that was, if

-08:-55:-51 9    you recall?

02:01:53 10    A.    Yes.   Between August of 2005 and December of 2005.

02:01:59 11    Q.    Can you tell us why that occurred?

-08:-55:-51 12    A.    Yes, I can.   In July of 2005 or approximately July of

-08:-55:-51 13    2005, we had requested that Mr. Griffin obtain his passport in

02:02:14 14    anticipation of him traveling overseas and it was discovered at

-08:-55:-51 15    that time that due to some arrearages in his child support that

-08:-55:-51 16    it was going to be necessary to pay down that child support

-08:-55:-51 17    amount so that he could obtain a passport, and so the FBI paid

02:02:32 18    Mr. Griffin approximately 5,220 or so dollars to bring that

-08:-55:-51 19    arrearage down such that he could obtain a passport.

-08:-55:-51 20    Q.    Then what happened to his salary? .

-08:-55:-51 21    A.    His salary was reduced by $1,000 a month for five months

-08:-55:-51 22    to repay that cost.

-08:-55:-51 23    Q.    During the course of the investigation did the FBI pay

-08:-55:-51 24    other expenses incurred by Darren Griffin?

-08:-55:-51 25    A.    Yes, we did.

-08:-55:-51 **1**  **Q.**  And I want to refer specifically to one of these and

-08:-55:-51 **2**  that relates to the Thuraya cell phone bill which was a whole

02:03:05 **3**  lot of money, wasn't it?

-08:-55:-51 **4**  **A.**  Yes, it was.

02:03:07 **5**  **Q.**  Did Darren Griffin receive money in order to pay for

-08:-55:-51 **6**  this expense?

-08:-55:-51 **7**  **A.**  Yes, he did.

-08:-55:-51 **8**  **Q.**  Can you tell the members of the jury why that is?

-08:-55:-51 **9**  **A.**  Yes, the Thuraya satellite phone was in Mr. Griffin's

-08:-55:-51 **10**  name.  And on a monthly basis he would get -- a bill for that

02:03:23 **11**  Thuraya cell phone was sent to him.  He would present that bill

-08:-55:-51 **12**  to me.  I would turn that bill into the administrative

02:03:32 **13**  department of the FBI along with paperwork requesting payment

-08:-55:-51 **14**  for that amount.

-08:-55:-51 **15**  **Q.**  Can you tell us why the phone itself was important at

02:03:39 **16**  that time, if it was at all?

-08:-55:-51 **17**  **A.**  Yes.  We wanted to purchase a satellite phone for Mr.

-08:-55:-51 **18**  Griffin to utilize overseas.

-08:-55:-51 **19**  **Q.**  Did there come a time when he gave that phone to someone

-08:-55:-51 **20**  else, to your knowledge?

-08:-55:-51 **21**  **A.**  Yes, he did.

-08:-55:-51 **22**  **Q.**  Do you know who that person was?

02:03:54 **23**  **A.**  Yes, I do.

-08:-55:-51 **24**  **Q.**  Who was it?

-08:-55:-51 **25**  **A.**  The phone was given to the defendant, Mohammad Amawi.

| | | |
|--|--|--|
| 02:03:58 | **1** | **Q.**   Was it important to the FBI to know who defendant |
| 02:04:01 | **2** | Mohammad Amawi was calling? |
| -08:-55:-51 | **3** | **A.**   Yes, it was. |
| -08:-55:-51 | **4** | **Q.**   What is your current understanding of the situation |
| 02:04:09 | **5** | related to the Thuraya cell phone bill? |
| -08:-55:-51 | **6** | **A.**   My current understanding is Mr. Griffin owes |
| 02:04:14 | **7** | approximately 22-or-so thousand dollars to the Thuraya satellite |
| 02:04:20 | **8** | phone. |
| -08:-55:-51 | **9** | **Q.**   Have you discussed this with Mr. Griffin? |
| -08:-55:-51 | **10** | **A.**   Yes, I have. |
| -08:-55:-51 | **11** | **Q.**   Was Darren Griffin ever given what amounts to a bonus or |
| 02:04:26 | **12** | an extra payment during the course of this case? |
| -08:-55:-51 | **13** | **A.**   Yes, he was. |
| -08:-55:-51 | **14** | **Q.**   Can you tell the members of the jury when that was and |
| -08:-55:-51 | **15** | why? |
| 02:04:31 | **16** | **A.**   Yes.   On two occasions Mr. Griffin received a bonus of |
| 02:04:36 | **17** | -- I believe it was 5,500 dollars.   He received that bonus |
| -08:-55:-51 | **18** | after having made each of the two overseas trips that we |
| -08:-55:-51 | **19** | requested Mr. Griffin make, and the purpose for that bonus was |
| -08:-55:-51 | **20** | he was going to be in an environment that was potentially |
| 02:04:53 | **21** | dangerous, and he couldn't simply pick up the phone and make a |
| -08:-55:-51 | **22** | phone call to have someone come and rescue him if he got into |
| 02:05:01 | **23** | trouble or needed… |
| 02:05:04 | **24** | **Q.**   Were those bonuses related to the prosecution or arrest |
| -08:-55:-51 | **25** | of anyone? |

02:05:08 **1**    **A.**   No, they were not.

-08:-55:-51 **2**    **Q.**   Did Darren Griffin receive any medical, dental or other

-08:-55:-51 **3**  type of expenses from the FBI?

-08:-55:-51 **4**    **A.**   He did not.

-08:-55:-51 **5**    **Q.**   Was he issued a W2 form by the FBI as far as you're

-08:-55:-51 **6**  aware?

-08:-55:-51 **7**    **A.**   He was not.

02:05:20 **8**    **Q.**   Was the payment of monies by the FBI to Darren Griffin

02:05:24 **9**  connected to a particular agreement?

02:05:27 **10**    **A.**   Yes, they were.

-08:-55:-51 **11**    **Q.**   And was that one of the agreements known as a -- what

-08:-55:-51 **12**  was that agreement called?

-08:-55:-51 **13**    **A.**   The agreements are referred to as a personal services

02:05:38 **14**  agreement, or sometimes a PSA.

02:05:42 **15**    **Q.**   I'm going to put on to the board here what's

02:05:50 **16**  Government's Exhibit 204-A in evidence.   And I am on the third

-08:-55:-51 **17**  page of that document?

02:06:05 **18**          MR. HARTMAN:  Which exhibit?

02:06:09 **19**          MR. SOFER:  204-A.   Basically this document is the

02:06:13 **20**  same.  There were a number of these agreements executed during

-08:-55:-51 **21**  the course of Mr. Griffin's employment or work with the FBI.

-08:-55:-51 **22**    **A.**   Yes.

02:06:20 **23**    **Q.**   Basically they're the same except some minor

-08:-55:-51 **24**  differences, specifically about the amount of money he's being

-08:-55:-51 **25**  paid?

02:06:27 **1**    **A.**    That is correct.

02:06:29 **2**    **Q.**    There's been quite a bit of discussion about this

02:06:32 **3**  Paragraph Number 6 on here.  Can you see that on the screen?

02:06:38 **4**    **A.**    Yes.

02:06:39 **5**    **Q.**    Can you tell the members of the jury what your

02:06:42 **6**  understanding is of Paragraph Number 6?

02:06:45 **7**    **A.**    Yes.  It's my understanding that this is notifying, in

-08:-55:-51 **8**  this case Mr. Griffin, that he's not to initiate any plans to

-08:-55:-51 **9**  commit a criminal act without the knowledge of the FBI and the

-08:-55:-51 **10**  participation of the FBI.  It also admonishes him that he's not

-08:-55:-51 **11**  to participate in an act of violence and that if he becomes

-08:-55:-51 **12**  aware of any plans to commit an act of violence that he needs to

02:07:15 **13**  let the FBI know about that as soon as possible.

02:07:19 **14**    **Q.**    You've listened to most or all of the consensual

02:07:23 **15**  recordings in this case?

-08:-55:-51 **16**    **A.**    That is correct.

02:07:25 **17**    **Q.**    And is it your understanding -- well, let me ask it this

-08:-55:-51 **18**  way.

02:07:32 **19**          Did Darren Griffin violate Paragraph Number 6 as

-08:-55:-51 **20**  far as your understanding?

02:07:38 **21**          MR. HARTMAN:  Objection.

-08:-55:-51 **22**          THE COURT:  Sustained.

02:07:41 **23**  BY MR. SOFER:

02:07:41 **24**    **Q.**    Can you tell us what the purpose, as far as you know, is

-08:-55:-51 **25**  of Paragraph Number 6?

4074

-08:-55:-51 **1**   **A.**   Yes.   The purpose is to make sure that the cooperating

-08:-55:-51 **2**  witness, in this case Mr. Griffin, understands that he cannot

02:07:57 **3**  participate in criminal acts without the knowledge of the FBI,

-08:-55:-51 **4**  and he can't participate in any acts of violence, and if he

-08:-55:-51 **5**  becomes aware of the planning of acts of violence, he needs to

02:08:09 **6**  make the FBI aware of that.

-08:-55:-51 **7**   **Q.**   With respect to his interaction with the defendants in

-08:-55:-51 **8**  this case, did Darren Griffin participate in any criminal acts

02:08:18 **9**  after your review of the recordings?

02:08:20 **10**   MR. HARTMAN:  Objection.

-08:-55:-51 **11**   THE COURT:  Let's finish the question.   I would

-08:-55:-51 **12**  express concern it might call for a legal conclusion.

02:08:32 **13**  BY MR. SOFER:

-08:-55:-51 **14**   **Q.**   After you reviewed the recordings in this case, were any

-08:-55:-51 **15**  of the acts -- forget whether they're criminal or not -- that

-08:-55:-51 **16**  Darren Griffin either participated in or recommended to these

-08:-55:-51 **17**  defendants that are related to the charges in this case done

-08:-55:-51 **18**  without the knowledge of the FBI?

-08:-55:-51 **19**   **A.**   They were not done without the knowledge of the FBI.

02:08:52 **20**   **Q.**   Okay.  Now, was Darren Griffin told that he was

-08:-55:-51 **21**  responsible for paying taxes on the money the FBI was paying

-08:-55:-51 **22**  him?

-08:-55:-51 **23**   **A.**   Yes, he was.

-08:-55:-51 **24**   **Q.**   Did there come a time when you learned Darren Griffin

-08:-55:-51 **25**  was not paying the taxes on this money?

-08:-55:-51  **1**   **A.**   Yes, there did.

-08:-55:-51  **2**   **Q.**   Can you tell the members of the jury what you did as a

-08:-55:-51  **3**   result of learning that?

-08:-55:-51  **4**   **A.**   As a result of learning --

-08:-55:-51  **5**         THE COURT:  If I may ask, can we have a time frame

02:09:22  **6**   as to when, according to his present recollection, he first

-08:-55:-51  **7**   became aware of that situation?

-08:-55:-51  **8**         MR. SOFER:  I was going to get to that, Judge, but

-08:-55:-51  **9**   we can ask it now.

02:09:33  **10**  BY MR. SOFER:

-08:-55:-51  **11**  **Q.**   Approximately when was it that you learned this?

-08:-55:-51  **12**  **A.**   Approximately March of 2006.

02:09:40  **13**  **Q.**   You tell us what you did as a result of that, if

-08:-55:-51  **14**  anything?

-08:-55:-51  **15**        MR. HARTMAN:  Objection.   Can we approach?

-08:-55:-51  **16**        THE COURT:  Sure.

02:09:45  **17**        (Whereupon the following discussion was had at the

02:12:53  **18**  bench outside the hearing of the jury:)

02:12:53  **19**        THE COURT:  What do you expect the answer to be?

-08:-55:-51  **20**        MR. SOFER:  I was just going to say, did you talk

-08:-55:-51  **21**  to him about it and eventually learn that this was more complex

-08:-55:-51  **22**  than it initially appeared?

-08:-55:-51  **23**        THE COURT:  Because?

-08:-55:-51  **24**        MR. SOFER:  Because there's no W2.  He is a

-08:-55:-51  **25**  consultant essentially.   Essentially you need an accountant to

-08:-55:-51 **1** break all this down.   He can't tell anybody the truth about

-08:-55:-51 **2** what he's doing.   It's not a question of just walking in --

-08:-55:-51 **3**                 THE COURT:  It appears to me it's going to start

-08:-55:-51 **4** getting into some hearsay.

-08:-55:-51 **5**                 MR. SOFER:  What's the objection?

-08:-55:-51 **6**                 MR. HARTMAN:  First of all the objection is, number

-08:-55:-51 **7** one, it's post indictment.   It's going to lead us into getting

-08:-55:-51 **8** into fees on taxes.   We're going to bring in an EZ form that

-08:-55:-51 **9** says other income.   Did you read that form?  It's going to lead

-08:-55:-51 **10** us into all sorts of areas like that.   Second of all, I don't

-08:-55:-51 **11** think it matters.   You can't say -- the government can't say, I

-08:-55:-51 **12** don't believe this agent can say that it gets more complicated

-08:-55:-51 **13** because you have to ask an accountant to break it down.

-08:-55:-51 **14**                 MR. SOFER:  I'm willing to forego this, especially

-08:-55:-51 **15** the whole.

-08:-55:-51 **16**                 THE COURT:  I think it would.   Quite candidly, I

-08:-55:-51 **17** don't recall how this came to my attention in the past week or

-08:-55:-51 **18** so, but apparently the bureau never provides a W2, and in all

-08:-55:-51 **19** candor, I think in terms of Griffin's credibility, not paying

-08:-55:-51 **20** taxes is an important issue, and it might get muddy into gee,

-08:-55:-51 **21** the bureau, he didn't get a W2, that's fine;  well, that's the

-08:-55:-51 **22** way the bureau works.   I don't think it would be fair or

-08:-55:-51 **23** appropriate for the defense to point that out.   The issue is he

-08:-55:-51 **24** didn't pay the taxes.

-08:-55:-51 **25**                 MR. SOFER:  I'll ask where did he learn that from,

-08:-55:-51 **1** how's that?

-08:-55:-51 **2** THE COURT:  And the answer is.

-08:-55:-51 **3** MR. SOFER:  Darren Griffin.

-08:-55:-51 **4** THE COURT:  That's fine.

-08:-55:-51 **5** MR. HERDMAN:  He might be able to ask a question

-08:-55:-51 **6** such as did the FBI issue a W2?

-08:-55:-51 **7** MR. SOFER:  I did ask that.

-08:-55:-51 **8** THE COURT:  It's in the record.  It did not.

-08:-55:-51 **9** I want to stay away from all issues of policy.

-08:-55:-51 **10** MR. HARTMAN:  As long as we're here, I'm wondering

-08:-55:-51 **11** if we can ask the witness to stop saying another terrorist

-08:-55:-51 **12** attack.  Because he's talking.

-08:-55:-51 **13** THE COURT:  He's moved on.

-08:-55:-51 **14** (End of sidebar).

02:12:57 **15** (Whereupon the following discussion was had at the

02:15:07 **16** bench outside the hearing of the jury:)

02:15:07 **17** MR. SOFER:  Can you look?

-08:-55:-51 **18** THE COURT:  That's exactly what I was looking for.

-08:-55:-51 **19** MR. SOFER:  It's important to the government

-08:-55:-51 **20** that -- I believe I asked that question.  Mr. Herdman says I

-08:-55:-51 **21** did not ask that question.  I just want to make sure I did.

-08:-55:-51 **22** MR. HERDMAN:  You asked a question.  My memory is

-08:-55:-51 **23** you asked is a question whether there was a record of it.

-08:-55:-51 **24** THE COURT:  I have a note that says, quote, didn't

-08:-55:-51 **25** get a W2.

02:15:10 **1**              (End of sidebar discussion.)

02:15:10 **2**              THE COURT:  Thanks for your patience.   Quite

02:15:13 **3**  candidly, I can't recall the last question, whether there was a

-08:-55:-51 **4**  question.   I trust that the jurors can't either.   But

02:15:22 **5**  disregard the question, and you may proceed.

02:15:24 **6**              MR. SOFER:  I'll withdraw the question and rephrase

-08:-55:-51 **7**  it, Your Honor.

02:15:27 **8**  BY MR. SOFER:

02:15:28 **9**     Q.    Agent Coats, from where did you learn that Darren

-08:-55:-51 **10**  Griffin had not yet paid his taxes on the money he was paid by

-08:-55:-51 **11**  the FBI?

-08:-55:-51 **12**     A.    I learned it from Mr. Griffin.

02:15:38 **13**     Q.    Was Darren Griffin ever given a drug test once he

-08:-55:-51 **14**  started working for the FBI?

-08:-55:-51 **15**     A.    He was not.

-08:-55:-51 **16**     Q.    Can you tell the members of the jury why that is?

-08:-55:-51 **17**     A.    As a matter of general policy we don't drug test

02:15:50 **18**  cooperating witnesses.

-08:-55:-51 **19**     Q.    Did you talk to Darren Griffin about keeping his work

-08:-55:-51 **20**  for the FBI a secret?

-08:-55:-51 **21**     A.    I did, although I would add that based on Mr. Griffin's

02:16:00 **22**  background, he was acutely aware of his need to keep what he was

02:16:05 **23**  doing a secret.  We did have some discussions regarding how to

-08:-55:-51 **24**  keep that a secret.

-08:-55:-51 **25**     Q.    Again, I'm going to ask you to try to keep your voice

-08:-55:-51 **1** up?

-08:-55:-51 **2**     **A.**    Sorry.

02:16:15 **3**     **Q.**    Can you give us basically what the substance of those

02:16:20 **4** instructions were about keeping his work secret and what kind of

02:16:23 **5** things you encouraged him to do?

-08:-55:-51 **6**     **A.**    For example, when we would talk to each other on the

02:16:30 **7** telephone, neither of us would use the other person's name.   He

-08:-55:-51 **8** would refer to me as boss, I would refer to him as a guy or

-08:-55:-51 **9** something like that.  In addition, we would often change the

-08:-55:-51 **10** location of where it was we met in an effort to prevent people

-08:-55:-51 **11** who might observe us from drawing a conclusion that we were --

02:16:49 **12** either of us were connected in some way to the FBI.

-08:-55:-51 **13**     **Q.**    Were there times when you met with Darren Griffin

02:16:54 **14** outside the Toledo area?

-08:-55:-51 **15**     **A.**    Yes, there were.

02:16:57 **16**     **Q.**    Now, was Darren Griffin told what the money he was being

-08:-55:-51 **17** paid by the FBI was for?

02:17:02 **18**     **A.**    Yes.

02:17:03 **19**     **Q.**    Can you tell the members of the jury basically what that

02:17:06 **20** was?

-08:-55:-51 **21**     **A.**    Yes, he was told that monies he was paid on a monthly

02:17:11 **22** basis were for living expenses so he could support himself and

-08:-55:-51 **23** his family.

-08:-55:-51 **24**     **Q.**    Was the money paid to Darren Griffin ever linked in any

-08:-55:-51 **25** way to the FBI's arresting or prosecuting Marwan El-Hindi,

4080

1    Mohammad Amawi or Wassim Mazloum?

2        **A.**   It was not.

3        **Q.**   Was it ever linked to the arrest or prosecution of

4    anyone?

5        **A.**   It was not.

6        **Q.**   Was he ever promised a reward of any kind?

7        **A.**   He was not.

8        **Q.**   I think you answered this question little bit, but was

9    Darren Griffin collecting information related to other

10   investigations and other targets of FBI investigations other

11   than the defendants in this case?

12       **A.**   Yes, he was.

13       **Q.**   And did that work continue up until the work stopped in

14   this case and this investigation came to a close?

15       **A.**   Yes, it did.

16       **Q.**   Were some of the investigations still active at the time

17   that this case terminated?

18       **A.**   They were.

19       **Q.**   Was Darren Griffin able to continue his work on those

20   other investigations after this investigation was terminated?

21       **A.**   He was not.

22       **Q.**   Can you tell the members of the jury why that is?

23       **A.**   Yes.   Because in February of 2006 it became publicly

24   known that Mr. Griffin had served as a cooperating witness for

25   the FBI.

-08:-55:-51  **1**    **Q.**    Now, can you give the jury an idea, without referring to

-08:-55:-51  **2**  specific details, about how many other people, other than these

-08:-55:-51  **3**  three defendants, that Darren Griffin was tasked with collecting

02:18:44  **4**  information about?

-08:-55:-51  **5**            MR. HARTMAN:  Judge, I'm going to object on

02:18:47  **6**  relevance.

-08:-55:-51  **7**            THE COURT:  I tend to agree.

-08:-55:-51  **8**            MR. SOFER:  Just a quantity, Judge, not the actual.

-08:-55:-51  **9**            MR. HARTMAN:  Still, I mean…

-08:-55:-51  **10**            THE COURT:  That's okay, in terms of the numbers.

02:19:00  **11**  You may answer.

02:19:02  **12**    **A.**    At least 20 or so.

02:19:06  **13**  BY MR. SOFER:

02:19:06  **14**    **Q.**    Did Darren Griffin collect information about these

02:19:08  **15**  people while also working on collecting information in this

-08:-55:-51  **16**  case, to your knowledge?

02:19:11  **17**    **A.**    Yes, he did.

-08:-55:-51  **18**    **Q.**    Were there people that Darren Griffin collected

02:19:14  **19**  information on who have not been arrested?

-08:-55:-51  **20**    **A.**    Yes.

02:19:18  **21**    **Q.**    And were there even people associated with this

-08:-55:-51  **22**  particular investigation who Darren Griffin collected

-08:-55:-51  **23**  information on who were not arrested?

02:19:25  **24**    **A.**    Yes.

-08:-55:-51  **25**            MR. HARTMAN:  Objection, Judge.  Can we approach,

| | | |
|---|---|---|
| 02:19:28 | **1** | please? |
| -08:-55:-51 | **2** | THE COURT:  I'm going to agree with that.   I'm |
| -08:-55:-51 | **3** | going to sustain the objection.   Come on up and we can talk. |
| -08:-55:-51 | **4** | You can disregard that question and answer for now. |
| 02:19:37 | **5** | (Whereupon the following discussion was had at the |
| 02:22:39 | **6** | bench outside the hearing of the jury:) |
| 02:22:39 | **7** | THE COURT:  I responded, it seems to me like were |
| -08:-55:-51 | **8** | there other speeders you didn't catch.   Maybe I missed |
| -08:-55:-51 | **9** | something.   What's the basis for the objection? |
| -08:-55:-51 | **10** | MR. HARTMAN:  That was part of it, too, but the |
| -08:-55:-51 | **11** | other part is if they get any further into this I'm going to |
| -08:-55:-51 | **12** | want to get into it on cross, and I'm going to want to get into |
| -08:-55:-51 | **13** | things they are going to object to and call it privileged. |
| -08:-55:-51 | **14** | THE COURT:  So anyway. |
| -08:-55:-51 | **15** | MR. SOFER:  I'm not trying to get into the |
| -08:-55:-51 | **16** | specifics.   Sort of the allegation has been made here that |
| -08:-55:-51 | **17** | somehow Mr. Griffin is on some gravy train and that it's somehow |
| -08:-55:-51 | **18** | connected to arresting people.   And all I'm trying to bring out |
| -08:-55:-51 | **19** | is the fact a lot of his work -- |
| -08:-55:-51 | **20** | THE COURT:  I think it's already clear, and I don't |
| -08:-55:-51 | **21** | think you can contend that was sort of a bounty hunter |
| -08:-55:-51 | **22** | relationship, bring in a raccoon skin, you get so much; coyote |
| -08:-55:-51 | **23** | skin, so much.   But in terms of the fact that there was likely |
| -08:-55:-51 | **24** | information on other people, the government decided not to |
| -08:-55:-51 | **25** | prosecute or convict, I don't think that matters.   If anything |

-08:-55:-51 1 goes more to the government's determination, or the quality of a

-08:-55:-51 2 prosecutable case or, maybe I don't know, I have no idea, you

-08:-55:-51 3 might go out to another group of people.  I agree with him.  I

-08:-55:-51 4 think they're going to say why, why not.

-08:-55:-51 5 MR. SOFER:  I understand.  The point I want to

-08:-55:-51 6 bring out is broader than this.  Maybe the Court will --

-08:-55:-51 7 THE COURT:  That is?

-08:-55:-51 8 MR. SOFER:  A lot of Darren Griffin's work was

-08:-55:-51 9 collecting information about things that would not necessarily

-08:-55:-51 10 be criminal cases at all.  In fact, his job is to collect

02:22:40 11 information from all kinds of places.

-08:-55:-51 12 THE COURT:  You've already asked it in terms of the

-08:-55:-51 13 investigation and intelligence gathering.  I think perhaps you

-08:-55:-51 14 should say:  What was the general nature of that work?  And

-08:-55:-51 15 perhaps even lead:  Was it criminal investigation or

-08:-55:-51 16 intelligence gathering?  Let him lead a little bit.  Then I

-08:-55:-51 17 think he'll simply say it was intelligence gathering.  That's

-08:-55:-51 18 fine.  You're entitled to do that.

-08:-55:-51 19 MR. HARTMAN:  I don't have a problem with that.

-08:-55:-51 20 (End of sidebar.)

02:22:42 21 THE COURT:  The jury will disregard the last

-08:-55:-51 22 question and answer, but Mr. Sofer you may continue.

-08:-55:-51 23 MR. SOFER:  Thank you, Judge.

02:22:48 24 BY MR. SOFER:

02:22:51 25 Q.  Can you explain to the jury why it would be important to

4084

-08:-55:-51 1 the FBI for Darren Griffin to collect information on people who

02:23:02 2 have not and may never be arrested or prosecuted in a case?

02:23:06 3     **A.**   Yes.   A couple of different issues related to that.

-08:-55:-51 4 One of them is that due to what it is we were asking Mr. Griffin

-08:-55:-51 5 to do, it was necessary for him to spend time in the local

-08:-55:-51 6 Islamic community.   So he spent a lot of time at various social

02:23:26 7 gatherings and attending the Mosque and classes and that sort of

-08:-55:-51 8 thing.   In addition to that, it's receiving information;

-08:-55:-51 9 receiving information can be valuable to us in terms of who owns

-08:-55:-51 10 or who is likely to own various companies or organizations or

-08:-55:-51 11 are members of certain entities, who travels where, who may be

-08:-55:-51 12 going where, who may be meeting with who, a variety of pieces of

02:23:54 13 information that may help us actually determine in some cases

-08:-55:-51 14 that information received through other avenues indicates that

-08:-55:-51 15 individuals might not necessarily be a threat to the United

-08:-55:-51 16 States.   So just the general obtaining of information helps us,

02:24:13 17 leads into the FBI to determine in some cases whether or not

02:24:19 18 those individuals or entities about whom he's gathering

-08:-55:-51 19 information do indeed constitute a threat or not.

02:24:26 20     **Q.**   Now, you said that Darren Griffin was sent sort of into

-08:-55:-51 21 the Muslim community here in the Toledo area; is that correct?

-08:-55:-51 22     **A.**   That is correct.

-08:-55:-51 23     **Q.**   Were there steps taken to limit Darren Griffin and the

02:24:38 24 FBI's activities to ensure that religious beliefs and

02:24:41 25 sensitivities were not offended?

1  **A.**  Yes, there were.

2  **Q.**  Can you tell the members of the jury what some of those

3  steps were?

4  **A.**  I can.  A couple of items come immediately to mind.

5  One of them is that frequently Mr. Griffin would be reminded

6  that we're not the thought police and that we're not interested

7  in what people were thinking and their religious expression.

8  Mr. Griffin was also instructed that to the extent possible he

9  should not record prayers and to not record speeches and

10  presentations that were given in the Mosque because we weren't

11  interested in those things.

12  **Q.**  Was Darren Griffin told he could record conversations of

13  anybody and everything he came upon in his work for the FBI?

14  **A.**  No, he was not.

15  **Q.**  Can you give us a basic description of what instructions

16  he was given in this regard?

17  **A.**  Yes.  Mr. Griffin was instructed that there were

18  specific individuals that we were interested or tasked with

19  obtaining information on and recording conversations of, in some

20  cases those people would be with other people, and those people

21  would also be recorded.

22  **Q.**  Were there times when these three defendants became

23  persons of interest or people who the FBI was specifically

24  investigating?

25  **A.**  Yes, they did.

02:26:03 **1**   **Q.**   Now, did the FBI encourage Darren Griffin to spread this

02:26:11 **2**  cover story or identity throughout the community here?

02:26:15 **3**   **A.**   Yes.  He was encouraged to make his background known,

-08:-55:-51 **4**  to utilize that in developing his persona as an Islamic

-08:-55:-51 **5**  extremist.  I would add, though, that Mr. Griffin had to be

-08:-55:-51 **6**  somewhat circumspect in the places where he shared that story.

-08:-55:-51 **7**  If you were too outspoken or too boisterous we were afraid he

-08:-55:-51 **8**  would be dismissed as an informant.  So he had to be somewhat

02:26:44 **9**  circumspect about where he spread that story.

-08:-55:-51 **10**   **Q.**   Did the FBI assist or participate in helping craft this

02:26:52 **11**  cover story that Darren Griffin developed?

-08:-55:-51 **12**   **A.**   We did.

02:26:56 **13**   **Q.**   Was Darren Griffin ever given any formal training by the

-08:-55:-51 **14**  FBI on how to be a cooperating witness?

-08:-55:-51 **15**   **A.**   He was not.

02:27:03 **16**   **Q.**   Did the FBI give Darren Griffin certain equipment for

-08:-55:-51 **17**  his use during the course of this investigation?

-08:-55:-51 **18**   **A.**   Yes, we did.

-08:-55:-51 **19**   **Q.**   Can you give the members of the jury a basic description

-08:-55:-51 **20**  of some of that?

-08:-55:-51 **21**   **A.**   Yes.  Mr. Griffin was equipped with audio recording

02:27:20 **22**  equipment and video slash audio recording equipment, that is a

02:27:26 **23**  device that we do both.  Those were some of the primary tools

-08:-55:-51 **24**  that he used.

02:27:30 **25**   **Q.**   Was Darren Griffin -- what was he told about how he

-08:-55:-51  1  should utilize those recording devices, that is those that

02:27:37  2  recorded audio and those that recorded audio and video?

-08:-55:-51  3  A.  He was given instruction in -- basic instruction in how

-08:-55:-51  4  to turn the device on, how to turn the device off and given some

-08:-55:-51  5  indication of the amount of memory on each of the devices so

-08:-55:-51  6  that he could make decisions about, during the course of a day,

-08:-55:-51  7  if he had several devices and several different interactions to

-08:-55:-51  8  have, he could make decisions about how long to utilize each

02:28:02  9  device.

02:28:03  10  Q.  Were there times throughout the investigation that you

-08:-55:-51  11  would meet with Darren Griffin and provide him with sort of

02:28:09  12  general and specific guidance about how and what to discuss with

02:28:15  13  these three defendants?

02:28:16  14  A.  Yes.

-08:-55:-51  15  Q.  Were there ever times when technical problems with the

02:28:21  16  devices meant that there were none available or that one or

-08:-55:-51  17  another of them was sort of out of service?

-08:-55:-51  18  A.  Yes, there were.   There were several occasions in which

-08:-55:-51  19  that was the case.

02:28:31  20  Q.  Were there ever times when there was simply no device

02:28:34  21  available at all because it was being used in some other FBI

02:28:37  22  operation?

-08:-55:-51  23  A.  Yes, there were.

-08:-55:-51  24  Q.  Was Darren Griffin ever told that he was required to

-08:-55:-51  25  record every part of every conversation?

-08:-55:-51  **1**   **A.**   No, he was not.

-08:-55:-51  **2**   **Q.**   Was he ever told that he was required to record every

-08:-55:-51  **3**  part of every conversation with these three defendants?

-08:-55:-51  **4**   **A.**   No, he was not.

02:28:55  **5**   **Q.**   Was he ever told that he had to record some part of

02:28:59  **6**  every conversation with these three defendants?

-08:-55:-51  **7**   **A.**   No, he was not.

02:29:03  **8**   **Q.**   Why not?

-08:-55:-51  **9**   **A.**   As a practical matter, Mr. Griffin spent several years

02:29:09  **10**  living in this environment, and he -- if he had been given

02:29:13  **11**  instructions to record every conversation, it would be

02:29:18  **12**  voluminous computer discs with conversations on them, and it

-08:-55:-51  **13**  would be a practical impossibility to listen to all of them.

-08:-55:-51  **14**   **Q.**   Now, what type of -- you said there were two sort of

02:29:29  **15**  general type of devices, one that recorded audio and one that

02:29:32  **16**  recorded both audio and video?

-08:-55:-51  **17**   **A.**   Correct.

02:29:35  **18**   **Q.**   Which of those devices had the longer memory or storage

-08:-55:-51  **19**  a capability?

02:29:41  **20**   **A.**   As a general matter, the audio recording devices could

-08:-55:-51  **21**  go for a greater length of time.

-08:-55:-51  **22**   **Q.**   Can you tell the members of the jury why not just always

-08:-55:-51  **23**  use the video?

-08:-55:-51  **24**   **A.**   There are a couple of reasons for that.  One of them is

02:29:54  **25**  the limited availability of these devices.  It's my

-08:-55:-51 **1** understanding they're very expensive and that the FBI has

-08:-55:-51 **2** limited number of them.   We have far more audio recording

02:30:04 **3** devices.  In addition to that, there were complications.  Mr.

02:30:12 **4** Griffin didn't know exactly where the camera was aimed, so to

-08:-55:-51 **5** speak.  He wouldn't know if you were capturing someone's image

02:30:21 **6** or not on the device.   Clothing would fall in front of it.   As

-08:-55:-51 **7** a general matter, the audio device had a little higher quality

-08:-55:-51 **8** in terms of the quality of the audio recording.

02:30:36 **9**     Q.    Did there come a time when the FBI gave Darren Griffin a

02:30:40 **10** laptop computer?

-08:-55:-51 **11**     A.    Yes, there did.

-08:-55:-51 **12**     Q.    Can you describe that device for the members of the

-08:-55:-51 **13** jury?

-08:-55:-51 **14**     A.    A basic Dell laptop computer.

-08:-55:-51 **15**         MR. SOFER: Would you put up Exhibit Number 3,

02:30:52 **16** please?

02:31:04 **17** BY MR. SOFER:

02:31:04 **18**     Q.    I'm going to show you what's been marked as Government's

-08:-55:-51 **19** Exhibit Number 3 -- or not.

-08:-55:-51 **20**         Again, can you just describe it for the members of

02:31:20 **21** the jury?

02:31:20 **22**     A.    Yes.  It's a basic laptop computer.   The -- it said

02:31:28 **23** Dell, when it's closed.   It's sort of a silverish gray color.

02:31:35 **24**     Q.    What, if anything, was Darren Griffin told about the use

02:31:39 **25** of this laptop computer for this and other investigations?

-08:-55:-51 **1**    **A.**    He was told to utilize it as he would his personal

-08:-55:-51 **2** laptop computer.

02:31:48 **3**    **Q.**    Did you use the Dell laptop as well?

-08:-55:-51 **4**    **A.**    I did on a few occasions, yes.

02:31:54 **5**    **Q.**    We've managed to go through the analog method of the

02:32:02 **6** picture.    I'll show you what is actually marked Government's

-08:-55:-51 **7** Exhibit 3-A.    Does that appear to be the Dell laptop computer

-08:-55:-51 **8** that was given to Darren Griffin for use in this investigation?

02:32:15 **9**    **A.**    It does.

02:32:21 **10**    **Q.**    You said you used it as well?

-08:-55:-51 **11**    **A.**    I did.

-08:-55:-51 **12**    **Q.**    Can you tell us why?

-08:-55:-51 **13**    **A.**    Yes.    I recovered it from Mr. Griffin on several

-08:-55:-51 **14** occasions.  One, to obtain some information from the laptop

02:32:34 **15** computer, that is to take some videos and some materials off of

-08:-55:-51 **16** the laptop computer.

-08:-55:-51 **17**    **Q.**    Specifically was there a particular video that you

02:32:44 **18** recall being on that laptop computer?

-08:-55:-51 **19**    **A.**    Yes, there was.

-08:-55:-51 **20**    **Q.**    What was that?

-08:-55:-51 **21**    **A.**    An instructional video on how to build a bomb vest.

02:32:53 **22**    **Q.**    Go ahead, I interrupted you.

-08:-55:-51 **23**    **A.**    In addition, on at least one occasion I had to place

02:33:00 **24** some antivirus software onto the laptop computer.    I also, on

-08:-55:-51 **25** another occasion, used the laptop computer to create a

02:33:10 **1** PowerPoint presentation and place it on the hard drive of the

02:33:13 **2** laptop.

02:33:14 **3**     Q.    What was the PowerPoint presentation about?

-08:-55:-51 **4**     A.    The PowerPoint presentation was a depiction of six or

-08:-55:-51 **5** eight different weapons, different guns, for example AK-47, a

-08:-55:-51 **6** Glock 19, that were present in the environment in Iraq.

02:33:32 **7**     Q.    Was Darren Griffin ever told not to use this laptop

02:33:36 **8** computer for personal reasons?

-08:-55:-51 **9**     A.    He was not.

02:33:38 **10**     Q.    And were you aware that Darren Griffin had a personal

-08:-55:-51 **11** computer in his home?

-08:-55:-51 **12**     A.    Yes, I was.

02:33:44 **13**     Q.    Was he ever given instructions by you as to what he

-08:-55:-51 **14** could and could not use that computer for?

-08:-55:-51 **15**     A.    No, he was not.

-08:-55:-51 **16**     Q.    I want to go back to the recording devices that you

-08:-55:-51 **17** described.   Can you describe for the jury how you and the FBI

02:33:58 **18** use the recordings that Darren Griffin made during the course of

02:34:01 **19** this investigation?

02:34:02 **20**     A.    Yes.  We utilize recordings in a couple different ways.

-08:-55:-51 **21** One of them is to verify the veracity of what it is Mr. Griffin

-08:-55:-51 **22** was telling us, verify the information he was telling us was

-08:-55:-51 **23** indeed correct.   As well as because Mr. Griffin could not -- he

-08:-55:-51 **24** couldn't take notes during the course of his interaction with

02:34:24 **25** other people, the recordings served as the best record of what

02:34:30 **1** occurred.  It was an exact -- it was exactly what happened.

02:34:34 **2**   Q.   Were you also receiving regular oral briefings with

-08:-55:-51 **3** Darren Griffin?

02:34:39 **4**   A.   Yes, I was.

02:34:40 **5**   Q.   And were there certain kinds of things that Darren

02:34:45 **6** Griffin, for instance, was unable to fully describe in the oral

-08:-55:-51 **7** briefings that the tapes could provide instead?

-08:-55:-51 **8**   A.   Yes, there was.

-08:-55:-51 **9**   Q.   Can you give us an example of something like that?

02:34:54 **10**   A.   Yes.  For example, Mr. Griffin doesn't understand Arabic

02:35:00 **11** perfectly; he has some understanding of Arabic.  But when the

-08:-55:-51 **12** defendants around him would have conversations in Arabic, the

02:35:10 **13** device would pick that up and we could take that and give that

-08:-55:-51 **14** to a translator.

02:35:18 **15**   Q.   Try to keep your voice up if you can.

-08:-55:-51 **16**   A.   I'm sorry.

02:35:24 **17**   Q.   Were all of the recordings that Darren Griffin made

-08:-55:-51 **18** using the devices that you described reviewed by you or other

02:35:33 **19** members of the FBI in this matter within hours, days, a couple

-08:-55:-51 **20** days, a few days after they were made?

-08:-55:-51 **21**   A.   Yes.  In most cases they were reviewed within a few

-08:-55:-51 **22** days.

02:35:45 **23**   Q.   Can you give the jury a description of the timing and

-08:-55:-51 **24** the relationship between the interactions between Darren Griffin

02:35:56 **25** and the defendants, and then the actual recordings, and also the

-08:-55:-51  **1**  oral briefings that you received from Darren Griffin and then

02:36:05  **2**  your review of these tapes, how that sort of went?

-08:-55:-51  **3**  A.    Yes.   Mr. Griffin would be given at least a device, in

-08:-55:-51  **4**  some cases several devices, in preparation for the next day's

02:36:19  **5**  activities, and he would have interactions with persons

-08:-55:-51  **6**  throughout the day.   He -- that evening or the next morning, I

-08:-55:-51  **7**  would meet with Mr. Griffin.   He would give me the devices.

02:36:30  **8**  He would give me a summary of what had occurred at each of those

02:36:35  **9**  environs in which he met with someone.   And we  would record

-08:-55:-51  **10**  that information, place that information into what the FBI calls

02:36:43  **11**  a 302 Report of Investigative Activity.   And then the device

-08:-55:-51  **12**  would be taken back to the Toledo resident agency where they --

02:36:54  **13**  the information was placed onto a computer disk, the device was

02:36:59  **14**  prepared for reuse and then taken back to Mr. Griffin in

02:37:03  **15**  anticipation of the next day's activities.

02:37:05  **16**      Q.    And I think you said in most cases you were able to

-08:-55:-51  **17**  shortly thereafter listen to the recording itself?

02:37:11  **18**      A.    Correct.

-08:-55:-51  **19**      Q.    Were you able to determine the consistency between the

02:37:15  **20**  oral briefings that Darren was giving you and the actual tapes?

-08:-55:-51  **21**      A.    Yes, I was.

-08:-55:-51  **22**      Q.    Can you describe that for the jury?

02:37:25  **23**          MR. BOSS:  Objection.

02:37:27  **24**          THE COURT:  I would agree.

-08:-55:-51  **25**          MR. SOFER:  Why the agency did what it did and how

-08:-55:-51 **1** it proceeded in the investigation.

02:37:39 **2**  THE COURT:  I would agree.  If you want to go into

02:37:41 **3** details about specific briefings, I'm not so sure it's relevant.

02:37:49 **4**  THE COURT:  Why don't you perhaps rephrase.

02:37:51 **5**  MR. SOFER:  I'll come back to it specifically.

02:37:51 **6** BY MR. SOFER:

02:38:00 **7**  **Q.**  Can you tell the members of the jury --

02:38:01 **8**  THE COURT:  Do you want to come up right now?

02:38:03 **9**  MR. SOFER:  No.

-08:-55:-51 **10**  THE COURT:  The jury will disregard the question

-08:-55:-51 **11** now.  We can revisit it at sidebar if you want.

02:38:10 **12** BY MR. SOFER:

-08:-55:-51 **13**  **Q.**  Can you tell the members of the jury what your primary

02:38:14 **14** objectives were in operating Darren Griffin as a human source

-08:-55:-51 **15** for the FBI in this particular matter?

-08:-55:-51 **16**  **A.**  Yes.  First, we wanted to keep him safe, to keep his

02:38:24 **17** family safe.  We wanted to verify the information that he was

-08:-55:-51 **18** giving to us, verify the summaries that he was giving were

-08:-55:-51 **19** indeed accurate.  And then to collect information initially.

-08:-55:-51 **20** Then as the investigation progressed, to collect evidence of

02:38:46 **21** criminal activity.

02:38:51 **22**  **Q.**  I want to talk a little bit about some of the specific

-08:-55:-51 **23** events that occurred during the course of this investigation.

-08:-55:-51 **24**  Did you become aware of the fact that Mohammad

-08:-55:-51 **25** Amawi gave Darren Griffin discs throughout the course of the

02:39:06  **1**  investigation?

-08:-55:-51  **2**      A.    Yes, I did.

02:39:08  **3**      Q.    And did you have discussions with Darren Griffin and did

-08:-55:-51  **4**  you consider issues with respect to giving those discs back to

-08:-55:-51  **5**  Darren Griffin after he brought them to the FBI?

02:39:23  **6**      A.    Yes.   Based on Mr. Griffin's position, that is he was

02:39:29  **7**  going to be in constant contact with the defendants, I thought

02:39:33  **8**  it was necessary for him to have those computer discs available

-08:-55:-51  **9**  to him should he be asked for one or more of them.   If he were

-08:-55:-51  **10**  not able to produce these computer discs in a timely fashion, we

02:39:47  **11**  were concerned that the defendants may begin to suspect that he

-08:-55:-51  **12**  was an informant.

02:39:54  **13**      Q.    Now, we've heard a lot about the suicide bomb vest

-08:-55:-51  **14**  video.   Did there come a time in January of '05 when the FBI

02:40:02  **15**  learned through Darren Griffin about the existence of this bomb

02:40:07  **16**  vest video in this case?

-08:-55:-51  **17**      A.    Yes, we did.

-08:-55:-51  **18**      Q.    Can you describe for the jury what the FBI's interest in

02:40:14  **19**  this particular video was and why?

02:40:16  **20**      A.    Yes.   The FBI was very interested in obtaining a copy

-08:-55:-51  **21**  of that video because we had heard that it provided some

-08:-55:-51  **22**  specific instruction in how to conduct or how to put together a

-08:-55:-51  **23**  bomb vest, and we were very concerned about obtaining a copy of

-08:-55:-51  **24**  that so we could ascertain -- it would help us ascertain the

-08:-55:-51  **25**  level of threat in this particular matter.

02:40:43 **1**          THE COURT:  Help you ascertain the level of what?

02:40:47 **2**          THE WITNESS:  Level of threat.

02:40:51 **3** BY MR. SOFER:

-08:-55:-51 **4**     Q.    Likewise, we've heard about a chemical compound known as

-08:-55:-51 **5** Astrolite.  Did the FBI have an interest in this particular

02:40:59 **6** chemical compound in the context of this case?   When I say the

-08:-55:-51 **7** FBI, I mean you and your fellow agents who were conducting this

02:41:08 **8** investigation.

-08:-55:-51 **9**     A.    Yes, we were concerned that we obtain as much

-08:-55:-51 **10** information as possible about Defendant Amawi's overseas contact

02:41:16 **11** who wanted this chemical and wanted to take this chemical

-08:-55:-51 **12** through Syria into Iraq.  We were very concerned about obtaining

02:41:26 **13** the identities of people associated with that.

02:41:29 **14**     Q.    Can you tell us how that sort of fits into the FBI's

-08:-55:-51 **15** mission as you described it of identifying threats?

-08:-55:-51 **16**     A.    Yes.   The information of that nature comes very close

02:41:41 **17** or much closer to actually perpetuating or actually committing

-08:-55:-51 **18** an act.   And we were very concerned that this pipeline, if you

-08:-55:-51 **19** will, of persons potentially involved in this distribution of

-08:-55:-51 **20** this chemical, that we discover their identity so we can prevent

-08:-55:-51 **21** a terrorist act from occurring.

-08:-55:-51 **22**     Q.    Now, there was also quite a bit of discussion in the

-08:-55:-51 **23** recordings about sniping and explosives and gun training.  Can

-08:-55:-51 **24** you tell the members of the jury whether the FBI's -- sort of

02:42:22 **25** what the FBI's concerns were with respect to this training?

02:42:28  **1**                        MR. BOSS:  Judge, can we approach for a moment?

02:44:17  **2**                        (Whereupon the following discussion was had at the

-08:-55:-51  **3**  bench outside the hearing of the jury:)

-08:-55:-51  **4**                        MR. BOSS:  The FBI is a rather large agency.  I'm

-08:-55:-51  **5**  wondering if you might be a bit more specific when you say "the

-08:-55:-51  **6**  FBI".

-08:-55:-51  **7**                        MR. SOFER:  I think I did that already.

-08:-55:-51  **8**                        THE COURT:  You did that.  But I agree.  I think

-08:-55:-51  **9**  I would ask -- I would prefer that you say your interest or the

-08:-55:-51  **10**  interest that you and those working with you in the JTTF.

-08:-55:-51  **11**                        MR. SOFER:  I agree.  I should be doing that more

-08:-55:-51  **12**  often.  I'll try to make that clear.

-08:-55:-51  **13**                        THE COURT:  Do you mind if I simply say:  You've

-08:-55:-51  **14**  heard reference to the FBI, you understood that to mean you or

-08:-55:-51  **15**  your colleagues?

-08:-55:-51  **16**                        MR. SOFER:  I'll clear it across the board.  There

-08:-55:-51  **17**  were very general --

-08:-55:-51  **18**                        THE COURT:  Once in a while when you have that,

-08:-55:-51  **19**  institutionally, the FBI.

-08:-55:-51  **20**                        (End of sidebar.)

02:44:21  **21**                        THE COURT:  Mr. Sofer, I sustained the objection to

02:44:24  **22**  the last question.  Mr. Sofer may rephrase.

-08:-55:-51  **23**                        MR. SOFER:  Thank you, Judge.

-08:-55:-51  **24**  BY MR. SOFER:

02:44:28  **25**       **Q.**  I've asked you a series of questions with respect to

-08:-55:-51 **1** this investigation, in particular things that took place in this

02:44:34 **2** investigation about the FBI's interest or concerns. When you

02:44:41 **3** describe the FBI's interest and concerns, are you describing

02:44:46 **4** your concerns and your fellow agents who were working on this

-08:-55:-51 **5** investigation as well as your immediate supervisors and the

-08:-55:-51 **6** like?

02:44:53 **7** A. Yes.

-08:-55:-51 **8** Q. I asked you a couple questions a long time ago.

02:44:58 **9** THE COURT: You've been asked, quote, the FBI-this

-08:-55:-51 **10** or the FBI-that, it was your understanding you responded on the

02:45:08 **11** basis that was what you were talking about, individually or

02:45:12 **12** collectively, with those working with you in this particular

02:45:16 **13** investigation?

02:45:17 **14** THE WITNESS: Yes.

02:45:18 **15** THE COURT: Okay. Go ahead, Mr. Sofer.

02:45:21 **16** BY MR. SOFER:

-08:-55:-51 **17** Q. Now, with respect to the kind of training that was being

-08:-55:-51 **18** discussed, did you and your fellow agents working on this case

-08:-55:-51 **19** have concerns about what kind of training and guidance Darren

-08:-55:-51 **20** Griffin could actually provide?

02:45:38 **21** A. Yes, we did.

-08:-55:-51 **22** Q. And specifically with respect to the sniper training and

-08:-55:-51 **23** the building of explosives, can you describe for the members of

-08:-55:-51 **24** the jury what those concerns were?

-08:-55:-51 **25** A. Yes. We were -- we absolutely were not going to allow

02:45:54  **1** Mr. Griffin to give specific instruction on how to build an IED.

02:46:00  **2** We instructed Mr. Griffin to not give them specific ideas on how

-08:-55:-51  **3** to put together a bomb, nor was he to give them specific

02:46:10  **4** instructions on how to conduct a sniper attack.  We wanted to

02:46:15  **5** draw the investigation out as long as we could in order to -- in

-08:-55:-51  **6** order to collect as much information as possible about potential

02:46:25  **7** threats, each of the defendants indicated other people that they

-08:-55:-51  **8** were aware of that would be interested in obtaining Jihad

02:46:36  **9** training or training for Jihad.  And we wanted to obtain as

-08:-55:-51  **10** much information about those people as possible but were not

-08:-55:-51  **11** going to provide specific training on how to build an IED or

-08:-55:-51  **12** specific training on how to conduct a sniper attack.

-08:-55:-51  **13**     **Q.**  Was Darren Griffin given specific guidance to misdirect

02:46:56  **14** the defendants to something that was less concerning to the FBI

-08:-55:-51  **15** and to you and your colleagues in the FBI?

-08:-55:-51  **16**     **A.**  Yes, he was.

-08:-55:-51  **17**     **Q.**  Now, here when I talk about the FBI, this concern

02:47:08  **18** actually wasn't limited just to you and the people on the ground

-08:-55:-51  **19** here in Toledo?

-08:-55:-51  **20**     **A.**  That is correct.

02:47:16  **21**     **Q.**  Okay.  I want to direct your attention then to the end

-08:-55:-51  **22** of the case.

-08:-55:-51  **23**         Do you recall giving Darren Griffin instructions

02:47:24  **24** about leaving town essentially?

02:47:26  **25**     **A.**  Yes, I did.

-08:-55:-51 **1**    **Q.**    Can you give a basic description to the members of the

-08:-55:-51 **2**  jury how that happened and what instructions were given to Mr.

-08:-55:-51 **3**  Griffin?

-08:-55:-51 **4**    **A.**    Yes.   Within the FBI the decision was made to end the

02:47:40 **5**  investigation.   Mr. Griffin was told that it would be.

-08:-55:-51 **6**                MR. HARTMAN:  Objection.

-08:-55:-51 **7**                THE COURT:  I would tend to agree.   I don't see

-08:-55:-51 **8**  the relevance of this.

02:47:50 **9**                MR. SOFER:  I can tell you at sidebar or here.

02:47:53 **10**                (Whereupon the following discussion was had at the

02:47:55 **11**  bench outside the hearing of the jury:)

02:50:45 **12**                MR. SOFER:  What's the objection?

-08:-55:-51 **13**                THE COURT:  My question is, where are you going

-08:-55:-51 **14**  with this?   If the FBI said we were concerned for his safety,

-08:-55:-51 **15**  I'm a little worried about that because it's generic

-08:-55:-51 **16**  apprehension without any specific basis to something these

-08:-55:-51 **17**  people said or did.   I assume that's what you guys are getting

-08:-55:-51 **18**  at.

-08:-55:-51 **19**                MR. HARTMAN:  Exactly.

-08:-55:-51 **20**                MR. SOFER:  Again, I didn't understand what the

-08:-55:-51 **21**  nature was.   When you said relevance -- I didn't want to say

-08:-55:-51 **22**  too much.   All I want to bring up is he was basically told to

-08:-55:-51 **23**  get out of town, get out of town quickly.   That explains why it

-08:-55:-51 **24**  is, for instance, a number of the items that were recovered

-08:-55:-51 **25**  ultimately by the government, in the fashion.   Collect up his

-08:-55:-51 **1** house and get out of town. I think some brief discussion of

-08:-55:-51 **2** why that is necessary is appropriate. But if you want me to

-08:-55:-51 **3** limit it just do the timing issue.

-08:-55:-51 **4**         THE COURT: Let me suggest this: Rather than,

-08:-55:-51 **5** quote, get out of town quickly, I'll suggest was it suggested to

-08:-55:-51 **6** Mr. Griffin that he should leave Toledo and do so fairly

-08:-55:-51 **7** promptly and according to your understanding did that cause him

-08:-55:-51 **8** to leave various things behind that only later came to the

-08:-55:-51 **9** attention of the bureau, or whatever. Just kind of side blow

-08:-55:-51 **10** it. I don't want any suggestion -- or if this is the case,

-08:-55:-51 **11** say, Agent, you didn't have any specific reason to apprehend any

-08:-55:-51 **12** of these defendants, might pose any danger, did you. If that's

-08:-55:-51 **13** true, why don't you soften that with that kind of…

-08:-55:-51 **14**         MR. SOFER: I wouldn't ask that question. I

-08:-55:-51 **15** believe that's a cross-examination question.

-08:-55:-51 **16**         MR. HARTMAN: No, go ahead.

-08:-55:-51 **17**         THE COURT: I don't want a suggestion lingering in

-08:-55:-51 **18** their mind unless there's some clear basis for it that somehow

-08:-55:-51 **19** these guys or people they knew, you knew, had come to your

-08:-55:-51 **20** attention or that of the bureau or anybody else, you better get

-08:-55:-51 **21** out because they're after you. I don't want that impression.

-08:-55:-51 **22**         MR. SOFER: I understand. Again, it's the timing

-08:-55:-51 **23** issue that's important. I'll limit it.

-08:-55:-51 **24**         (End of side-bar discussion.)

02:50:48 **25**         THE COURT: Okay, the jury will disregard the

-08:-55:-51  **1**  entire question.

-08:-55:-51  **2**  But you may rephrase and proceed.

02:50:57  **3**  BY MR. SOFER:

-08:-55:-51  **4**  Q.  Did there come a time when you had a conversation with

02:51:01  **5**  Darren Griffin about leaving the Toledo area?

-08:-55:-51  **6**  A.  Yes.

-08:-55:-51  **7**  Q.  And was that at approximately the time that this case,

02:51:10  **8**  the investigative portion or the initial investigative portion

-08:-55:-51  **9**  was coming to a close?

-08:-55:-51  **10**  A.  Yes.

02:51:16  **11**  Q.  And did you inform Mr. Griffin that he had to leave in a

02:51:21  **12**  certain amount of time?

02:51:22  **13**  A.  A general time frame, yes.

-08:-55:-51  **14**  Q.  Can you tell the members of the jury about how much time

02:51:28  **15**  the FBI, that is you, gave Darren Griffin to leave the Toledo

-08:-55:-51  **16**  area?

02:51:33  **17**  A.  My recollection is approximately two days.

02:51:40  **18**  Q.  I want to direct your attention to April 20, 2005,

02:51:44  **19**  another specific area of this particular case.  On April 20,

02:51:51  **20**  2005, did you receive recordings from Darren Griffin?

02:51:55  **21**  A.  I believe I received a recording either that evening or

-08:-55:-51  **22**  the first thing the next day.

-08:-55:-51  **23**  Q.  And they related, among other things, to what?

-08:-55:-51  **24**  A.  They related to, I believe, a telephone conversation

02:52:11  **25**  that Mr. Griffin had with the Defendant Marwan and the other

-08:-55:-51 **1** recording, I believe, related to Mr. Griffin's attendance at

02:52:23 **2** Cleland's Indoor Shooting World with the Defendants Wassim

-08:-55:-51 **3** Mazloum and Mohammad Amawi.

02:52:32 **4**     Q.    Did Darren Griffin also provide you with an oral

02:52:36 **5** briefing when he turned in those recordings?

02:52:39 **6**     A.    Yes, he did.

-08:-55:-51 **7**     Q.    And was there anything unusual about one or more of

-08:-55:-51 **8** those recordings when you received them?

02:52:46 **9**     A.    There was.

02:52:47 **10**     Q.    Can you tell the members of the jury what was unusual?

-08:-55:-51 **11**     A.    Yes.   On the recording device that had recorded Mr.

-08:-55:-51 **12** Griffin's interaction with the defendants at Cleland's Indoor

-08:-55:-51 **13** Shooting World, Mr. Griffin had not turned the device off.   The

-08:-55:-51 **14** device was allowed to continue, and it recorded, at least in

-08:-55:-51 **15** part, a telephone conversation between Mr. Griffin and myself.

02:53:13 **16**     Q.    And did you analyze both that recording, that is the

-08:-55:-51 **17** Cleland's, and then the accidental recording that occurred after

-08:-55:-51 **18** it as well as the recording of the telephone conversation

02:53:27 **19** earlier in the day?

02:53:28 **20**     A.    Yes, I did.

-08:-55:-51 **21**     Q.    Did this analysis cause you any concern with respect to

02:53:32 **22** Darren Griffin's recording?

-08:-55:-51 **23**         MR. HARTMAN:  Objection, Judge.

02:53:38 **24**         THE COURT:  Why don't you come on up.

02:53:42 **25**         (Whereupon the following discussion was had at the

02:57:29 **1** bench outside the hearing of the jury:)

02:57:29 **2** THE COURT:  The question is the basis for concern?

-08:-55:-51 **3** MR. HARTMAN:  The basis of my objection is his

-08:-55:-51 **4** assessment of the recordings really doesn't matter.   The

-08:-55:-51 **5** recordings speak for themselves.

-08:-55:-51 **6** THE COURT:  Where are you headed with this?   My

-08:-55:-51 **7** real concern is to find out what the testimony is going to be.

-08:-55:-51 **8** It's kind of like an ad hoc committee voir dire in effect.   I

-08:-55:-51 **9** just want to know what's coming so that we don't try to unring

-08:-55:-51 **10** the bell.

-08:-55:-51 **11** MR. SOFER:  This is back to sort of the general

-08:-55:-51 **12** consistency between things.  And Your Honor said, well, if you

-08:-55:-51 **13** want to bring up a specific instance, you said we'll get back to

-08:-55:-51 **14** you, which is, in fact, where we are.   Counsel has opened to

-08:-55:-51 **15** the jury, has argued to the jury, will continue to argue to the

-08:-55:-51 **16** jury that somehow this interaction on April 20 is a lie that was

-08:-55:-51 **17** told to the agent.

-08:-55:-51 **18** THE COURT:  Which interaction?

-08:-55:-51 **19** MR. WITMER-RICH:  April 20.

-08:-55:-51 **20** MR. SOFER:  Their argument -- and Counsel can stop

-08:-55:-51 **21** me if I'm wrong or they can let me say something that is wrong,

-08:-55:-51 **22** I don't really care.   Their argument essentially is by not

-08:-55:-51 **23** reporting both that certain aspects of the first conversation

-08:-55:-51 **24** that took place -- that Darren Griffin somehow withheld

-08:-55:-51 **25** information from the FBI.   Now, if that was true, and the agent

-08:-55:-51 **1** continued to operate Darren Griffin in the way that he was and

-08:-55:-51 **2** he was not given an opportunity to explain his mindset, it makes

-08:-55:-51 **3** him look like what he's doing is essentially one of: Here's a

-08:-55:-51 **4** guy that's lying to me; I'm going to keep putting him out there.

-08:-55:-51 **5** I think that's a bad implication. We want to try to rectify

-08:-55:-51 **6** that by asking the agent simply: Did he determine there was

-08:-55:-51 **7** anything about this which was in any way inappropriate or wrong?

-08:-55:-51 **8** So in this particular instance, it explains --

-08:-55:-51 **9** THE COURT: Let me suggest this. I think you used

-08:-55:-51 **10** the word. Perhaps rephrase: On review of those recordings

-08:-55:-51 **11** what, if any, concerns did you have about what was going on?

-08:-55:-51 **12** Something like that.

-08:-55:-51 **13** MR. SOFER: I'm happy to do that, Judge.

-08:-55:-51 **14** THE COURT: He'll say none. I assume he'll say

-08:-55:-51 **15** none.

-08:-55:-51 **16** MR. SOFER: Yes.

-08:-55:-51 **17** MR. HARTMAN: Well, if that's the question and

-08:-55:-51 **18** answer I have no problem with it.

-08:-55:-51 **19** THE COURT: What, if any, -- you reviewed the two

-08:-55:-51 **20** recordings -- yes -- on that day, including the inadvertently

-08:-55:-51 **21** recorded conversation. Following that, what, if any, concerns

-08:-55:-51 **22** did you have about what Griffin was doing or what was going on?

-08:-55:-51 **23** Something of that sort.

-08:-55:-51 **24** MR. BOSS: Will you be moving on after that

-08:-55:-51 **25** question or further probing with him on that issue at this time?

-08:-55:-51 **1**              MR. SOFER:  I think I'll be moving on.   Just to be

-08:-55:-51 **2** clear here on cross-examination, I'm certain this is going to be

-08:-55:-51 **3** something --

-08:-55:-51 **4**              THE COURT:  You'll get rebuttal.   If they

-08:-55:-51 **5** undermine that, keep digging.

-08:-55:-51 **6**              MR. SOFER:  They're going in that direction.

-08:-55:-51 **7**              (End of sidebar.)

02:57:36 **8**              THE COURT:  Is there some problem with the

-08:-55:-51 **9** monitors?   I won't tell you, even though it's April 15, what

-08:-55:-51 **10** the government spent turning a rather shabby looking courtroom

02:57:56 **11** into the splendid place that this is for trial, just because

02:57:59 **12** some pieces may be falling apart in your lap may be distressing.

-08:-55:-51 **13** But we'll -- Amy will call that to the attention of the repair

-08:-55:-51 **14** crew.  We'll try to keep things from collapsing.

02:58:16 **15**              MR. SOFER:  I'll rephrase the question.

-08:-55:-51 **16**              THE COURT:  Disregard the last question.

-08:-55:-51 **17**              But you may proceed.

02:58:20 **18** BY MR. SOFER:

-08:-55:-51 **19**    **Q.**   You analyzed the telephone conversation that was

02:58:23 **20** recorded between Darren Griffin and Marwan El-Hindi;  is that

-08:-55:-51 **21** correct?

-08:-55:-51 **22**    **A.**   That is correct.

-08:-55:-51 **23**    **Q.**   You also analyzed the recording which I think also had

-08:-55:-51 **24** video on it, if my memory serves correct, from the April 20

02:58:38 **25** interaction with the defendants?

| | | |
|---|---|---|
| 02:58:39 | **1** | **A.**  That is correct. |
| -08:-55:-51 | **2** | **Q.**  At Cleland's? |
| -08:-55:-51 | **3** | **A.**  Correct. |
| -08:-55:-51 | **4** | **Q.**  And that also captured your conversations with Darren |
| 02:58:46 | **5** | Griffin? |
| 02:58:46 | **6** | **A.**  Correct. |
| 02:58:47 | **7** | **Q.**  What, if any, concerns did you have when you listened to |
| -08:-55:-51 | **8** | those two conversations? |
| 02:58:53 | **9** | **A.**  I didn't have any concerns. |
| 02:58:55 | **10** | **Q.**  Now, did Darren Griffin give you those two recordings at |
| -08:-55:-51 | **11** | the same time? |
| -08:-55:-51 | **12** | **A.**  Yes, he did. |
| 02:59:04 | **13** | MR. SOFER:  Judge, subject to the Court's approval. |
| -08:-55:-51 | **14** | This would be a good place to break for lunch. |
| 02:59:09 | **15** | THE COURT:  Okay.  Why don't we try to resume at |
| 02:59:18 | **16** | 1:00. |
| 02:59:19 | **17** | Ladies and gentlemen, as you heard me say so often, |
| -08:-55:-51 | **18** | keep an open mind, don't talk about the case, and we'll see you |
| 02:59:26 | **19** | at 1:00. |
| | **20** | (Recess taken.) |
| | **21** | - - - |
| | **22** | |
| | **23** | |
| | **24** | |
| | **25** | |

1

2                     C E R T I F I C A T E

3

4    I certify that the foregoing is a correct transcript from the

5   record of proceedings in the above-entitled matter.

6

7   /s Tracy L. Spore _____          _____

8   Tracy L. Spore, RMR, CRR               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4109

1       I N D E X

2

3   SHANNON COATS, DIRECT EXAMINATION 4052

4   BY MR. SOFER:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25