```
1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          WESTERN DIVISION

3    UNITED STATES OF AMERICA,     )  Docket No. 3:06-CR-719

4             Plaintiffs,          )  Toledo, Ohio

5                  v.              )  May 8, 2008

6    MOHAMMED AMAWI, ET AL.,       )

7             Defendants.          )

8    ------------------------------

9             TRANSCRIPT OF JURY TRIAL, VOLUME 47
                 BEFORE THE HONORABLE JAMES G. CARR
10                 UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                      (216) 522-4856
25
```

```
 1                              Elias Muawad
                                Muawad & Muawad
 2                              Suite 209
                                36700 Woodward Avenue
 3                              Bloomfield Hills, Michigan 48304
                                (248) 594-4700
 4      For the Defendant
        El-Hindi:               Charles M. Boss
 5                              Boss & Vitou
                                111 West Dudley Street
 6                              Maumee, Ohio 43537
                                (419) 893-5555
 7
                                Stephen D. Hartman
 8                              Kerger & Kerger
                                Suite 201
 9                              33 South Michigan Street
                                Toledo, Ohio 43602
10                              (419) 255-5990

11                              Alek H. El-Kamhawy
                                Raslan, El-Kamhway & Pla
12                              Suite 3FE
                                1700 East 13 Street
13                              Cleveland, Ohio 44114
                                (216) 928-1500
14
        For the Defendant       David L. Doughten
15      Mazloum:                4403 St. Clair Avenue
                                Cleveland, Ohio 44103-1125
16                              (216) 361-1112

17                              Jeffrey J. Helmick
                                Helmick & Hoolahan
18                              2nd floor
                                1119 Adams Street
19                              Toledo, Ohio 43624-1508
                                (419) 243-3800
20

21                              Mohammed Abdrabboh
                                1620 Ford Avenue
22                              Wyandotte, MIchigan 48192
                                (734) 283-7000
23

24
        Court Reporter:         Angela D. Nixon, RPR, CRR
25                              1716 Spielbusch Avenue
                                Toledo, Ohio 43624
```

1                      (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good morning.  You may be seated.
 2              Agent, you understand you remain under oath?
 3              THE WITNESS:  Yes.
 4              THE COURT:  And counsel, you may resume your
 5    examination.
 6    BY MR. TERESINSKI:
 7    Q.        Good morning, Agent Whitworth.
 8    A.        Good morning.
 9    Q.        I'm just going to briefly reorient you to where
10    we were yesterday when we stopped.  You're prepared to
11    render an opinion in this case, in the United States versus
12    Mohammed Amawi and Marwan El-Hindi and Wassim Masloum?
13    A.        Yes, sir.
14    Q.        And what -- what you did -- three things in this
15    case, could you tell the members of the jury what you did?
16    A.        Yes.  I reviewed a DVD of a suicide bomber vest
17    being prepared.  I reviewed the English translation of the
18    Arabic text and language that was in the DVD, and looked at
19    an e-mail with some photographs attached, and I also was
20    asked about where you could get Astrolite from and what it
21    was.
22    Q.        And when we last left off, we were about ready to
23    look at a new exhibit which had been prepared which was
24    Government Exhibit 36B, or Bravo.  Did you have a chance to
25    view that video?
```

```
 1   A.         Yes.
 2              MR. TERESINSKI:  And if we could, Your Honor,
 3   with The Court's permission.
 4   BY MR. TERESINSKI:
 5   Q.         At various points, Agent Whitworth, we're going
 6   to stop and ask your opinion about certain things?
 7   A.         Okay.
 8              MR. TERESINSKI:  And for the record, counsel's
 9   been made aware of what we did here.  And there were no
10   objections.
11                  (Video playing.)
12              MR. TERESINSKI:  I'd like to stop the video there
13   at that point.
14   BY MR. TERESINSKI:
15   Q.         Agent Whitworth, the video, itself, is broken
16   down into different parts.  Could you explain what those
17   parts are?
18   A.         Yes.  The video itself, it gives a --
19   preparations for making a suicide vest or an improvised
20   explosive device.  And for that, for an improvised
21   explosive device, you need a fusing system and a main
22   charge, an explosive, and the vest.  Talks first about the
23   explosives, themselves, that are used, then it goes in to
24   the shrapnel that would be added to the vest, the different
25   type of fusing system that is used with the vest,
```

1  construction of the vest itself, and then finally, how it's

2  deployed.

3  Q.       Okay.  And --

4           THE COURT:  Did you say -- first of all, can you

5  maybe position the microphone about this distance and maybe

6  raise it up.  This part can --

7           THE WITNESS:  Yes, sir.

8           THE COURT:  And that's much better.  And then

9  talk about this distance from it.  And you can move it

10  around so that you can -- if you want.  And did you say

11  infusion system?

12          THE WITNESS:  Fusing system.

13          THE COURT:  Fusing system.

14  BY MR. TERESINSKI:

15  Q.       Okay.  And those are the different parts of the

16  vest or the different steps in order to make the vest that

17  you just explained; is that right?

18  A.       Yes, sir.

19  Q.       And there were three items that came up:

20  Nitrogrycol, nitrocellulose, and nitronaphthalene.  Could

21  you explain to the members of the jury what they are?

22  A.       The first one mentioned in the video, it's

23  mentioned as nitrogrycol.  That's most likely a reference

24  to nitroglycol, which is an explosive compound very similar

25  to nitroglycerin; it's an explosive.  In the explosive

1    industries, it's called ethylene glycol dinitrate.

2    Q.        Is that also known as EGDN?

3    A.        EGDN is the more common name for ethylene glycol

4    dinitrate or nitroglycol.  Nitroglycol is a fuel.  Ethylene

5    glycol is a fuel.  It's also used as an anti-freeze.  And

6    it is put through a chemical process with nitric and

7    sulfuric acid and at the end of that process, oxygen

8    responded to it, and that creates an explosive, much like

9    nitroglycerin, which more people commonly know about.

10            Nitroglycerin is just -- glycerin is the fuel,

11   and again, it's put through the same process with nitric

12   and sulfuric acid, and oxygen is bonded to it, and it

13   becomes nitroglycerin, a more commonly known explosive.

14   Both are the same power, potency.  They just have some

15   different properties.

16   Q.        Okay.  Let -- can you characterize that as an

17   explosive?  I know that yesterday the jury heard about high

18   and low explosives.  Primary and secondary and tertiary

19   ones under high.  Can you tell the members of the jury

20   where would this fit?

21   A.        Nitroglycol would be a secondary explosive, so it

22   would not be a primary explosive.  It would be used in

23   blasting caps, but it would be the main bulk explosive

24   material that would be used.

25            THE COURT:  Main, what explosive?

1    A.        The bulk material.

2    BY MR. TERESINSKI:

3    Q.        And if you could, also, as His Honor said, please

4    speak up.

5              Let's go back.  Could we -- let's go back to

6    where we were?

7    A.        Okay.

8    Q.        Which is, we were talking about nitroglycol or

9    nitroglycerin.  It's a secondary explosive; is that what

10   you were just saying?

11   A.        Yes.

12   Q.        And in terms of secondary explosive, it's also a

13   high explosive?

14   A.        Yes.

15   Q.        Which means it's very potent?

16   A.        Correct.  It detonates.

17   Q.        But you need -- it needs something else in order

18   to make that explode?

19   A.        Yes, secondary explosives are shock fusing system

20   initiated by primary explosives, most likely blasting caps.

21   Q.        Now, is it -- does it have any odor?

22   A.        Yes, it does have a strong pervasive odor, much

23   like nitroglycerin, and because of that, it can cause

24   headaches.

25   Q.        And what is it used to pro -- what is it used for

1   in the world?

2   A.        It's used in the production of commercial

3   dynamites.  It's a replacement for nitroglycerin.  It's

4   less sensitive to freezing temperatures to nitroglycerins

5   and nitroglycerin-based dynamites; therefore, you can use

6   it in colder weather.  So it's a replacement or used in

7   conjunction with nitroglycol in dynamites.

8   Q.        Now, you mentioned -- second item that came up,

9   the second explosive is nitrocellulose.  Could you tell the

10  members of the jury what that is?  What it is, how it's

11  produced, its potency, and what it's used for?

12  A.        Nitrocellulose, again, is starting out with a

13  fuel, and the fuel in this case, they use cotton fibers,

14  wood pulp, things of that nature, as a fuel source, and put

15  it through the same nitration process as with the other

16  nitrate and fuels like nitroglycerin, nitroglycol.  And

17  that produces, again, a bond with the oxygen, so you come

18  up, in this case, with, instead of a high explosive, a low

19  explosive, a burning powder; or in this case, shown on the

20  video, it's called "gun cotton," so it looks like cotton,

21  but it is -- when you light a match to it or put flame to

22  -- there were -- reacts very quickly, almost instantaneous

23  in its burning.

24  Q.        What is it used for in ordinary life?

25  A.        What you see it in ordinary life is it's used in

1  commercial explosives.  It's used in rocket fuels or solid

2  rocket motors, and it's used most commonly as propellant

3  for firearms.  It's -- "smokeless powder" is another name

4  for nitrocellulose, so a smokeless powder used in a

5  firearm.  Your standard weapon is what it's most commonly

6  used for here in the United States.

7  Q.       And as you said, it's a low explosive?

8  A.       Yes, it is a low explosive.

9  Q.       All right.  And the third item that appeared in

10  the video was nitronaphthaline.  Could you tell the members

11  of the jury what nitronaphthaline is, how it's produced,

12  what its potency is, and where you get it on the average

13  day?

14  A.       Nitronaphthaline -- Naphthalene is a fuel source,

15  it's from coal tar.  It's used in a lot of different

16  products, and in this case, it's nitrated again with nitric

17  acid, and it becomes a combustible material.  It's not

18  quite an explosive yet, it's just a fast-burning, fuel-type

19  material.

20  Q.       And those are the three explosives that are

21  identified by the narrater in this video, which has been

22  referred to for the record as 36B?

23  A.       Yes.

24          MR. TERESINSKI:  And Your Honor, for the record,

25  we stopped the video previously at 1:43.

```
 1              THE COURT:  Okay.

 2              MR. TERESINSKI:  May we proceed?

 3              THE COURT:  Of course.

 4                   (Video playing.)

 5              MR. TERESINSKI:  If we could just stop at 2:29.4.

 6   BY MR. TERESINSKI:

 7   Q.       The video, itself, is set up in overview.  In

 8   other words, it gives an overview first and then it gets

 9   into some detail?

10   A.       Yes.

11              MR. TERESINSKI:  Proceed.

12                   (Video playing.)

13              MR. TERESINSKI:  And we've stopped the video he

14   for the record at 5:52.8.

15   BY MR. TERESINSKI:

16   Q.       Agent Whitworth, I want to ask you a few

17   questions about what we just saw.  The video showed the

18   mixture of these three substances, these explosives, into

19   sort of a rectangular block.  Could you explain that to the

20   jury and how -- how we get what we get?

21   A.       When you mix the three substances here, explosive

22   compounds and combustible material, you would get a piece

23   of explosive.  Nitroglycol -- EGDN, in the explosive

24   industry -- is used in dynamite, along with nitroglycerin,

25   and both of them have been used in dynamites called
```

1    "gelatin dynamites" with nitrocellulose.  The reason

2    they're called gelatin dynamites is because when they're

3    added to the gun cotton or the nitrocellulose, they turn

4    the material into a pasty material, and they're sort of a

5    gel.

6              Then, in the explosive industry, when you make

7    dynamites, they add combustible materials to it, peach

8    pits, sawdust, other things like that.  They kind of soak

9    up that gelatinized material and turn it into a more of a

10   solid-type material.

11             The nitronaphthaline would serve that purpose in

12   this instance here, and you would get this flexible sheet

13   of explosive out of the combination of the three.  Video

14   really doesn't go into the ratios or how much of each is

15   mixed, but --

16   Q.        I was going to ask that question next.  Does it

17   matter -- I mean, from the video itself, in terms of the

18   ratios, can you talk a little bit about that, the fact that

19   you don't know the ratios?

20   A.        Yes, we do not --

21   Q.        Go ahead.

22   A.        The video doesn't talk about the ratios for the

23   mixture.  As long as the nitronaphthaline is not used in

24   too great of quantities, then it would not affect the

25   explosive properties of the other two things when they're

1    mixed together, the nitroglycol and the gun cotton or

2    nitrocellulose.

3    Q.        Okay.  And the video narrater also talked about

4    thickness and pointed to the thickness of it.  What is --

5    what -- why is that important?

6    A.        There are two things that are important about the

7    narration that show that they -- whoever made the video

8    understands explosive properties very well.  And the first

9    one is that in explosives, there's what we call "critical

10   thickness" or "critical diameter" associated with

11   explosives.  And if you get the explosive sheet too thin,

12   then when you detonate it, the detonation will not travel

13   through the material properly, and it will fail to function

14   properly.  So if you get it too thin, you'll get a partial

15   detonation of the explosive.  So you want to test it and

16   make sure that you haven't gotten it in too thin of state

17   to be used, so the critical thickness is very important

18   there.

19        The other thing that we talked about a little bit

20   earlier -- and it's important and that shows in the

21   picture -- is wrapping it with a Saran wrap or the nylon

22   type of wrap.  We talked about it with the ethylene glycol.

23   Nitroglycerin cause headaches, and, basically, the fumes

24   from them cause headaches, so if you don't wrap the

25   explosive with something to keep those fumes from coming

```
 1   out, permeating it, the wearer would get a pretty bad
 2   headache from them.
 3   Q.        Now, the narrater in the video recommends a
 4   length of 40 centimeters and a width of 25 centimeters.  Is
 5   that important to your opinion as well?
 6   A.        Talks about the length and the width.  Basically,
 7   you want to fit it to the person that's going to wear it.
 8   So you want to make sure it's a substantial length so it
 9   will fit around the person that is going wear the
10   thickness, to get your best explosive properties out of it.
11   Q.        What about flexibility, why is that important?
12   A.        So it can be molded to the body of the suicide
13   bomber, because in this case, this is what this is being
14   used for.
15   Q.        Okay.  Thank you.
16            MR. TERESINSKI:  And let's continue.
17                (Video playing.)
18            MR. TERESINSKI:  And for the record, we stopped
19   the video at 10:15, 10 minutes and 15 seconds.
20   BY MR. TERESINSKI:
21   Q.        Agent Whitworth, I'm going ask you a few
22   questions about what we just saw on the video as well.  We
23   talked about the explosive materials, the mixture.  Let's
24   talk about the shrapnel fragmentation.  Why is that added
25   to the improvised explosive device, what's its
```

 1    significance?  Please tell the members of the jury what you

 2    just saw and why that's important.

 3    A.        In the video they showed the building of a

 4    fragmentation sleeve that's used with the vest.  This

 5    fragmentation sleeve includes ball bearings or metal

 6    spheres, and over -- covering that, rubber cement-type

 7    material, something to make it flexible.  And it's flexible

 8    so it can, again, be molded like the explosive to the body

 9    of the suicide bomber and be easily hid under clothing.

10            The shrapnel, itself, is there for one reason:

11    To increase the lethality of the IED, the improvised

12    explosive device.  The explosives, themselves, can kill

13    individuals in short distance away from it, but to reach

14    out and kill people further from it, in tens of yards, you

15    would want to add shrapnel to it to increase the lethality

16    of the device.

17    Q.        And essentially, the shrapnel becomes projectile

18    and they go in various places?

19    A.        Yes.

20    Q.        After the explosion?

21    A.        Yes.

22    Q.        And they mentioned 6 millimeter diameter round or

23    somewhere between 4 and 7 millimeter.  Why is it that --

24    why is that size important, if at all, if you know, does it

25    matter?

1  A.        Doesn't really matter.  A shrapnel is a shrapnel.

2  If you add smaller shrapnel, you'll get, you know, more

3  shrapnel added to the device.  So that might be the reason

4  they call for the size, but I'm not sure.

5  Q.        Okay.  All right.

6            MR. TERESINSKI:  Continue.

7                (Video playing.)

8            MR. TERESINSKI:  Okay.  Note for the record, we'd

9  stopped at 11 minutes.

10  BY MR. TERESINSKI:

11  Q.        An Agent Whitworth, I want to ask you a few

12  questions about these items that we just seen on the video.

13  What are they and explain how they work?

14  A.        The video indicates that these are the initiators

15  for the device, and they consist of two brass cubes, and

16  the silver objects at the end of those are visually

17  consistent with nonelectric plastic caps.  Doesn't show the

18  internal functioning in the system, but there are systems

19  out there that are used by the military that are very

20  similar to these that have a spring-loaded cock striker on

21  the inside of them, and they're used to detonate

22  nonelectric blasting caps with a percussion primer embedded

23  in the end.

24  Q.        How does work, what happens, what do you do?

25  A.        Again, for the ones that I've seen that are like

1    this, you set the spring-loaded mechanism on the inside of

2    it, and then, when you either put tension on the end of the

3    system or pull the safeties out of it, the striker, the

4    spring, will fire the firing pin into the percussion cap

5    and it will function, or plastic caps mounted on the end of

6    it.

7    Q.       Are there other types of igniters not depicted

8    here?

9    A.       Yes.  There's all kinds of fusing systems that

10   are used in devices other than this type here, yes.

11            MR. TERESINSKI:  And if we can continue.

12               (Video playing.)

13            MR. TERESINSKI:  And for the record, we stopped

14   the video at 15:26.7.

15   BY MR. TERESINSKI:

16   Q.       And ask you a series of questions, Agent

17   Whitworth.  What we've just seen on the video, there was a

18   depiction of an area cut from the corners of the

19   explosives.  Could you explain why that's done and it

20   also -- and its significance?  Let me go there first and

21   I'll ask the question after that.

22   A.       By cutting the area to place the detonators in,

23   the producers of the video -- the producers of the video

24   are creating or showing that they have a good understanding

25   of explosive materials.  They're making a priming hole or a

1   priming location for the detonators to go into.  And they

2   cut out a slot in the explosives to place the detonators

3   into, and then they take two small pieces of explosives and

4   stitch those around that and that surrounds the detonators

5   completely with explosives.  And therefore, there's good

6   continuity between the explosives and the detonator and

7   when the detonators function, that increases the likelihood

8   that the explosive will function properly also.

9   Q.        And what is the significance of putting the

10  igniter device -- that's actually depicted at 15:26.7 on

11  the video -- what's the significance of putting that device

12  into a cradle, is there a significance for that, too?

13  A.        Yes.  By using the two detonators, they're

14  showing, again, a good understanding of explosive

15  properties, and it's what we would call in the explosives

16  field "dual priming the system."  Basically, if one fails

17  to function, the other one will hopefully function the

18  device.  And by putting them in that position there, it's

19  where the suicide bomber will have easy access to them,

20  close into his body, when he is getting ready to function

21  the device.

22  Q.        When you say "getting ready to function the

23  device," they've got to pull the pin, right?

24  A.        Yes.

25  Q.        And finally for this section of the video, they

1   talked about where to actually place the shrapnel and where

2   to place the explosives could you explain that and why

3   that's important?

4   A.        They talk about putting the explosive in the vest

5   and you see on their vest, constructed there, putting the

6   shrapnel in it, and making sure that you get the explosives

7   up against the bomber's body and then the shrapnel outside

8   of the explosive, therefore, when it detonates the shrapnel

9   will go out and will be able to inflict more damage to

10  people in the surrounding --

11  Q.        So in other words, you wouldn't put explosive

12  shrapnel on the back as it would just go through the person

13  as opposed to going further?

14  A.        Yes.  You wouldn't put the shrapnel inside of the

15  explosive, whether it was on the front or the back of the

16  body, you would want to make sure that you put the shrapnel

17  on the outside of the explosive, whether it's on the front

18  or back of the body.

19  Q.        To project outward?

20  A.        Yes.

21  Q.        Okay.

22            MR. TERESINSKI:  Can we continue.

23                (Video playing.)

24            MR. TERESINSKI:  For the record, we've stopped at

25  15:55.9.

1  BY MR. TERESINSKI:

2  Q.        What we've just seen on the video, could you tell

3  the members of the jury what's happening here and why is

4  that important to your opinion?

5  A.        They're taking a small piece of explosive, and

6  they're basically connecting the explosives in the front of

7  the vest to the explosives in the back of the vest.  It's

8  important because their -- their initiation system is only

9  in the front portion.

10       We've done tests in my unit where we've made

11  suicide vests and if you don't have that continuity of the

12  explosives between the front and the back, the front may

13  detonate, but the back may not receive a shock to detonate

14  itself.  So you take a small piece of explosive and you

15  connect through from the front to the back and that insures

16  that the back will also function.

17  Q.        And if that piece isn't there, is that -- what

18  happens?

19  A.        If depends on the explosive.  It depends on

20  sometimes the luck of chance, whether or not the detonation

21  wave will transfer with enough power to the back of the

22  vest to get it to detonate.

23  Q.        So in essence, it's sort of a fail safe,

24  something to make sure that they both go off?

25       MR. HARTMAN:  Objection to form.

```
 1            THE COURT:  Pardon?

 2            MR. HARTMAN:  Object to the form.

 3            MR. TERESINSKI:  I'll rephrase it.

 4   BY MR. TERESINSKI:

 5   Q.       Why is that important, again?

 6   A.       It's important because it ensures that the

 7   detonation will transfer from the front of the vest to the

 8   back of the vest.

 9                 (Video playing.)

10            MR. TERESINSKI:  And for the record, we stopped

11   it at 18:05.3.  Just a few questions then.

12   BY MR. TERESINSKI:

13   Q.       Agent Whitworth, you've seen four blasts,

14   basically, in the video.  Could you explain, in your

15   experiences as an explosives and hazardous device expert,

16   the significance of those blasts and whether or not they're

17   consistent with what was instructed in terms of making them

18   in this video?

19   A.       In the video they show detonations of a suicide

20   vest.  They don't show which vest is on the mannequin.  But

21   they do show the vest detonating or a vest detonating.  And

22   it's very consistent with a high explosive, detonating

23   shrapnel associated with it, because of the witnesses that

24   are placed there and the damage that are shown like in the

25   image there, where the shrapnel has gone through the
```

1    witness plates.  The fireball associated with the vest

2    blowing off, the shock wave coming off of the vest, that is

3    all very consistent with the detonation of a high

4    explosive.

5    Q.        And the items that basically were -- simulate

6    human beings; is that fair to say?

7    A.        They look like witness plates, so they're trying

8    to show the effect of the explosive.

9    Q.        And obviously -- well, let me continue at this

10   point, continue to another series of --

11               (Video playing.)

12               MR. TERESINSKI:  And we've stopped the video at

13   22:14.4, for the record.

14   BY MR. TERESINSKI:

15   Q.        There was a discussion in the narration of

16   distance, in terms of meters from the blast, 6 to

17   30 meters.  Describe the importance of that to your

18   opinion.

19   A.        In the test showing -- showing the effective

20   radius of the vest, so they're showing that people in the

21   near field could be injured by blast, but also by shrapnel,

22   and people that would be outside of the affect of the

23   actual blast in the further field would be injured by

24   shrapnels or possibly killed.

25   Q.        Okay.  Now, the opinion that you have about the

1   suicide vest shown and constructed in this video is, what?

2   A.        That from the video preparation shown in the

3   video, if you were given correct ratios for the explosives

4   or had the correct ratios, if you had a way to get ahold of

5   those explosives, if you knew the functionality of how

6   those detonators functioned, that you could create a -- a

7   improvised explosive device or a homemade bomb.

8   Q.        And if it was properly assembled and initiated,

9   what would it be capable of doing?

10  A.        If it was properly assembled and initiated, it

11  would be capable of maiming, killing, and doing property

12  damage.

13            THE COURT:  I'm sorry, I think I heard you, but

14  can you, again, please speak up a bit.

15  A.        Yes, sir.  It was -- it would be capable of

16  maiming, killing, or producing property damage.

17  BY MR. TERESINSKI:

18  Q.        And of course, it would all depend on who's

19  around you.  If it was set off in a bus, in a dining

20  facility, or in a crowded, wherever?

21  A.        Yes.

22  Q.        And that would cause the number of people to be

23  injured, the number to go up or down?

24  A.        Yes, depending on who was there.

25  Q.        Now, we talked about -- that was the first

```
 1    portion of your opinion.  There was two other areas that

 2    you were asked to render an opinion on.

 3              MR. TERESINSKI:  I would like to, now, Your

 4    Honor -- I just move 36 Bravo, 36B, in evidence?

 5              MR. HARTMAN:  No objection.

 6              THE COURT:  It will be admitted.

 7    BY MR. TERESINSKI:

 8    Q.        And I want to go now to what's been premarked --

 9    and defense has seen it and it's been -- it's already moved

10    in evidence, I believe -- Government's Exhibit 79.  You

11    were asked to review an e-mail.  Could you tell the members

12    of the jury -- first of all, before we do that, some of

13    your duties at the FBI laboratory, as it relates to

14    improvised explosive devices, what are some of you're

15    duties there?

16    A.        As part of our duties, we not only review the

17    evidence that comes in, we also teach individuals how to

18    investigate bombing crime scenes, including, we do what we

19    call a "combat crime scene course" for military EOD units

20    that are rotating in Iraq and Afghanistan so that they can

21    prepare reports and from the postblast evidence collected

22    at the scenes there in Iraq and Afghanistan.

23    Q.        How long have you been doing that?

24    A.        We have been doing the actual courses for combat

25    postblast for almost two years, I think.
```

1   Q.          And as part of your duties, did you become

2   familiar with improvised explosive devices that were used

3   in Iraq back in 2003, 2004, and up -- and on up?

4   A.          Yes, sir.

5   Q.          Could you explain to the members of the jury how

6   they would have -- how they've changed in that period of

7   time, if you could?

8   A.          Our unit is a subset of what is called Terrorism

9   Explosives Devices Analytical Center, TDAK.  TDAK is a

10  joint U.S. DOD, Department of Defense, intelligence-based,

11  FBI, ATF group that basically interrogates or looks at all

12  of those devices that are coming out of Iraq and

13  Afghanistan and exploring them, so we can protect troops,

14  so we can show the DOD guys how to beat the device.  And

15  the Bureau's main interest is to -- we look at forensics,

16  hairs, fibers, fingerprints, DNA, those types of things

17  that are recovered from the devices to use that.

18          As part of that, we get to see the devices that

19  are coming out of Iraq and Afghanistan.  And earlier, more

20  the roadside bombs that are used in targeting units,

21  persons, used a lot of old Iraqi ordnance that was

22  basically --

23  Q.          What's "ordnance"?

24  A.          Ordnance is projectiles, mortars, artillery

25  rounds, air-dropped bombs, and that's basic term for

```
 1    military ordnance.  And as the war progressed, those items

 2    were -- were left unsecured and were taken by the

 3    insurgency, and they're being used against U.S. soldiers

 4    over there.

 5            Early in the war they were using this ordnance to

 6    target U.S. troops.  They would drive by and detonate the

 7    ordnance and target them.  Now they've progressed to some

 8    more sophisticated type of devices that they're using

 9    against U.S. troops.

10    Q.      Okay.  Now, it is with this backdrop of

11    information and experience that you were then asked to look

12    at Government's Exhibit 79?

13    A.      Yes, sir.

14    Q.      And when you looked at Government Exhibit 79, do

15    you have an opinion about what's displayed there.  And if

16    we could, I know there's a number of photos.  I think

17    there's 22 photos in total.  If we could just go to --

18    first of all, what's depicted on the first page?

19    A.      The first page shows a humvee or military vehicle

20    being attacked.  It looks like it's been an improvised

21    explosive device hidden in the curb area there, and it's

22    damage to the front end of the vehicle that is consistent

23    with that type of device, improvised explosive device,

24    detonating in close proximity to it.

25            MR. TERESINSKI:  Could we go to the next number
```

```
 1   of photos.  There's two photos on the second page and then
 2   if we could go -- well, let's -- and there's another photo
 3   if we can go back one page, please, on page 3.  And we're
 4   on page 2 for the record.
 5   BY MR. TERESINSKI:
 6   Q.        You see two photos.  Could you describe?
 7   A.        Both vehicles are -- both photos show a burning
 8   vehicle.  The one in the bottom view, again, shows a humvee
 9   that has been damaged based on the rubble that's scattered
10   around, the damage to the vehicle.  It looks like it was
11   targeted by some type of explosive device and burned as a
12   result of that.
13   Q.        And why do you say that?
14   A.        Because you see the rubble that's laying around
15   it there.  Also, the damage to the rear of the vehicle
16   there.  This would -- and the burning there caused by the
17   explosion going off and rupturing fuel tanks and stuff like
18   that.
19   Q.        Okay.
20             MR. TERESINSKI:  If we can go to the next page
21   and the next page which is page 4.
22   BY MR. TERESINSKI:
23   Q.        I want to talk briefly or have you talk briefly,
24   this page, which depicts two photographs, is this important
25   to your opinion about this e-mail?
```

```
1    A.        Yes, sir.

2    Q.        Could you explain to the members of the jury

3    what's depicted here in -- and what your opinion is about

4    this?

5    A.        This set of photographs, and the photographs

6    after it, depict a roadside attack that occurred in Iraq

7    using improvised explosive devices that were placed on the

8    side of the road, two of which are still intact.  And this

9    one here, in particular, shows a rubble pile that is being

10   used to disguise the device.

11             And in the top photograph you can see the rear

12   end of an artillery -- what is visually consistent with an

13   artillery projectile sticking out of it.  And then the

14   bottom one, it shows the nose end of the same -- of a

15   projectile.  It's like the same projectile, and it

16   indicates that there is wires running into the nose end of

17   the projectile.

18   Q.        How would that -- how would that IED, improvised

19   explosive device, be detonated?  How does that work?

20   A.        Typically, the projectiles that are used over

21   there, the fusing systems are removed from them, the things

22   that would make the detonate on impact, and the fuse boils

23   are packed with a plastic explosive and a detonator.  And

24   the detonator is inserted into that fuse boil so they can

25   be controlled and detonated by the individual controlling
```

1   the roadside bomb.

2           MR. TERESINSKI:  If we can go to the next page.

3   BY MR. TERESINSKI:

4   Q.        And would you explain what -- there's three

5   photographs on this next page?

6   A.        There's -- in this one it shows the rock pile.

7   It calls it the second IED.  What it shows is wire running

8   up a berm and behind the rock pile.  This would be an

9   indications of a command-wire-detonated device.

10          There's three types of explosive devices that are

11  generally deployed:  Time, time goes off; the device

12  function action, somebody has to do something to the device

13  to get it to function; and then the third type is command

14  detonated.  In other words, the bomber stays in control of

15  the device so they can detonate it when they want it to go

16  off.

17  Q.        And how would they detonate it to make it go off?

18  A.        In this case -- and early in the war a lot of it

19  was what we called "command wire" -- long wire leading to

20  the device and on the other end, a power source, sometimes

21  a switch and you just connect the wire to the power source

22  in the switch, and then when you want the device to

23  function, you function it.

24  Q.        Do you need any other devices in order to make it

25  function?  If somewhere in the command area, say the person

1   wants to blow this IED up, and they're in the command area,

2   how would they do that?

3   A.        The bars connected to this leading into the nose,

4   we will -- would indicate an electrically initiated device.

5   And for an electrically initiated device, you need a power

6   source, something to heat up the bridge wire and the

7   electronic detonator to get it to function and some wire to

8   get that power to the detonator.  And in most instances,

9   they have some type of switch, push button, toggle switch,

10  something where they can pull, control the detonation.

11  Q.        Where do they get the electrical spark from?

12  A.        It's from the power source or battery.

13  Q.        Okay.

14          MR. TERESINSKI:  Could we go to the next page,

15  please?

16  BY MR. TERESINSKI:

17  Q.        There's three more photographs.  Could you just

18  explain what's depicted in these photographs and why that's

19  important to your opinion?

20  A.        One shows the wire spool, which would be the

21  command wire to be rolled up on so that it be easily

22  deployed.  And then the green things, the photograph

23  indicates that they're batteries or power sources that

24  would be used to initiate the device.

25  Q.        These aren't hard to get, are they, these are

1    common, ordinary household items?

2    A.        Batteries, themselves, are household.  In most

3    instances, you use telephone wire, speaker wire, lamp cord,

4    all types of wire to use the for the command wire.

5    Q.        Anything to give you a current?

6    A.        Correct.

7    Q.        Okay.

8             MR. TERESINSKI:  If we could just go to the next

9    page, please.

10   BY MR. TERESINSKI:

11   Q.        What's depicted here?

12   A.        Shows a burning humvee and the locations of both

13   IEDs under rubble piles.  And there's an indication of an

14   observation post on that photograph.

15   Q.        Okay.

16            MR. TERESINSKI:  And you can just go to the

17   remaining pictures?

18   BY MR. TERESINSKI:

19   Q.        Again, these are photographs taken of the

20   attack -- of an attack?

21   A.        Yes.

22   Q.        And this page, what does that depict?

23   A.        It depicts the overall scene of the attack and

24   the humvee burning and another military vehicle in the

25   background.

```
 1    Q.        Okay.  The attack that's depicted in Government

 2    Exhibit 79, was some of it successful and some of it not

 3    successful?

 4    A.        Yes.  Reading the text it says that there was an

 5    RPG fired at one vehicle and then -- which caught fire --

 6    and then the other two devices weren't deployed.

 7    Q.        Do you have an opinion about what you've seen

 8    depicted in Government Exhibit 79?

 9    A.        Yes.

10    Q.        What is it consistent with?

11    A.        It consists of photographs of roadside attacks

12    that were -- was initiated in Iraq and this is the

13    after-action reports made for that roadside attack.

14    Q.        And you, in fact --

15              THE COURT:  Again, I didn't hear what you just

16    said.

17    A.        It's the after-action report that was created for

18    that attack.

19    BY MR. TERESINSKI:

20    Q.        And do you remember or could you tell on or about

21    when this would have occurred?

22    A.        There's a date on that of July of 2003, I

23    believe.

24    Q.        Okay.  And these are consistent -- these photos

25    and this attack are consistent with the IED that were being
```

```
 1   deployed back then?
 2   A.        Yes, sir.
 3   Q.        Okay.  At this point, I just want to ask you --
 4   and that's the second area we've talked about -- and you
 5   were asked to render your opinion also about a third area
 6   about something called "Astrolite."  Could you tell the
 7   members of the jury what Astrolite is and how you make it
 8   and what it's used for and that type of thing?
 9   A.        Yes.  Astrolite is a commercial explosive that
10   was developed in the 1960s by the Atlas Powder Company,
11   which was an explosive manufacturer.  It consisted of
12   ammonium nitrate, which is oxidizer, commonly used as
13   fertilizers, and hydrazine, which is a fuel most commonly
14   used as a rocket fuel.  Mixture of the two together in the
15   correct ratio created a very powerful, very sensitive
16   commercial explosive.
17             Because of its sensitivity, several accidents
18   with it, and consequently, it fell out of favor with the
19   explosive industry, and it's no longer being used or sold
20   in the United States, or that I'm aware of, in the world.
21   Q.        Okay.  Does it come in different forms, solid and
22   liquid?  How do you get Astrolite, itself?
23   A.        It's a two-part explosive, what we would call a
24   "binary."  It consists of a solid material.  The ammonium
25   nitrate is a solid, white material, and that's the fuel
```

```
 1    source -- I mean, the oxygen source.  And then hydrazine,

 2    which is a liquid, which is the fuel source.  And when you

 3    mix them together, it will become a syrupy, kind of a thick

 4    gooey gel of material that can be used as an explosive.

 5    Q.        And how potent is this?

 6    A.        It's as potent as RDX or PETN, which are two

 7    explosives that are used in plastic explosives like C-4 or

 8    Semtex.  It was along the power of those two explosives

 9    mixtures.  So very, very powerful.

10    Q.        Could it level a building?

11    A.        If you had enough of -- there were, yes.

12              MR. TERESINSKI:  And The Court's indulgence.  Try

13    to work the ELMO, Your Honor.  Court's indulgence?

14              THE COURT:  No problem.

15    BY MR. TERESINSKI:

16    Q.        I have in my hand, for the record, what's been

17    marked as Government's Exhibit 28, and I've shown it to

18    counsel this morning.

19    A.        Okay.

20    Q.        And I want to now show it to the witness if I

21    can, see if I can do this right.  Showing you page 1 of

22    Government Exhibit 28, and then I'll just flip to page 2.

23    What's depicted here in this document, if you could tell

24    us?

25    A.        It's two --
```

```
 1              MR. BOSS:  Can we approach for a moment, Judge,
 2    please?
 3                   (A sidebar conference was had on the
 4                   record.)
 5              THE COURT:  Where did this come from?
 6              MR. TERESINSKI:  I let counsel know that it came
 7    from Government Exhibit 121-1.
 8              MR. HERDMAN:  124-1W.
 9              THE COURT:  Which means?
10              MR. TERESINSKI:  It was in evidence.
11              MR. BOSS:  I'm sorry, what is it?  I'm sure I
12    probably knew at one time, but I just don't recognize it.
13              MR. HARTMAN:  I don't remember it.
14              THE COURT:  So what's the original source?
15              MR. TERESINSKI:  Go ahead just in --
16              THE COURT:  Before it became a government
17    exhibit, where was it, what was it, just -- just my
18    understanding what Mr. Teresinski's going to do, this
19    particular exhibit is not going to be admitted into
20    evidence, it's merely just to direct the witness' attention
21    to it.
22              MR. TERESINSKI:  124-1W is a file off of the Sony
23    VAIO laptop that was recovered from Mohammed Amawi, and
24    just --
25              THE COURT:  This was obtained from the
```

```
 1   defendant -- or Mr. Amawi?

 2           MR. TERESINSKI:  Yes.

 3           MR. HERDMAN:  I told Mr. Whitmer-Rich before, the

 4   document is made reference Mujahideen explosives handbook.

 5           MR. HARTMAN:  Yeah, I just don't know.  That's

 6   fine.

 7           THE COURT:  Wait.  Counsel, just one second.

 8           I forgot, do you want me to say something?

 9           MR. HARTMAN:  Do you want him to mention about

10   Marwan not standing up yesterday?

11           MR. BRYAN:  Yes, he's suffering from a back

12   problem.

13           THE COURT:  Ladies and gentlemen, Mr. Teresinski

14   may continue.

15           Something occurred to me while we were talking

16   about the question that counsel had raised.  I don't know

17   if you noticed yesterday, but as you entered and left the

18   courtroom, Mr. El-Hindi was not standing.  And you should

19   understand, that's because he's experiencing some back

20   pain.  It's not any indication of disrespect, so I didn't

21   notice.  It was mentioned to me, and it occurred to me, you

22   might have noticed.  I simply don't want you drawing any

23   inferences that he was being disrespectful.  He had some

24   discomfort and that's why he didn't stand up.

25           Okay.  Mr. Teresinski, you may continue.
```

1            MR. TERESINSKI:  Thank you, Your Honor.

2    BY MR. TERESINSKI:

3    Q.        I was showing you what's been marked as

4    Government's Exhibit 28 for the record, and I asked you

5    questions about page 1.  And the bottom which is

6    highlighted and also on page 2.  Could you just tell the

7    members of the jury what this is or what -- why it's

8    important to your opinion?

9    A.        It looks like it's a recipe for Astrolite using

10   showing two different types of Astrolite that were

11   developed.  One of the Astrolite that was developed had

12   aluminum powder in it, and the aluminum is added to

13   explosives to make it more sensitive.  It's another fuel

14   source that's commonly used in commercial explosives like

15   munitions and water gels that are used today.

16            MR. TERESINSKI:  And if -- I just have a few more

17   questions, if we can.  Just a few more follow-up questions,

18   Your Honor, The Court's indulgence.

19   BY MR. TERESINSKI:

20   Q.        The -- let me just go back to the improvised

21   explosive devices, the one that's depicted in the suicide

22   vest, that kind of IED, could that be used in other ways

23   with other detonation systems?

24   A.        Yes, sir.

25   Q.        Can you explain that?

```
 1   A.        It can be used to be planted somewhere when some

 2   type of action-initiated device associated with electric

 3   fusing system.  If you open a device or you move the

 4   device, it functions.  It can be planted with a time

 5   device.  It has the explosives.  If you change around the

 6   initiation system, you can use it otherwise, yes.

 7   Q.        You say initiation, way to make it go?

 8   A.        Yes.

 9   Q.        And the explosives that were depicted in the bomb

10   vest video and could they be used in other forms and in

11   greater amounts?

12   A.        Yes.

13   Q.        And would you explain that a little bit?

14   A.        You know, they can be used as a fault charge.

15   Q.        What does that mean?

16   A.        Instead of, you know, dividing it up, putting it

17   on the front of the vest, back of the vest, just combines

18   it all into one package and using it.  And again, it could

19   be used with the correct initiation system as a time device

20   or command-detonated device or as an action device.

21   Q.        And in your opinion -- I'm sorry.  In your

22   opinion, the IED e-mail itself and also the bomb vest

23   video, what could a person -- in your opinion, what could a

24   person who's ignorant of basically the construction and use

25   of these IEDs, what could they glean from these things?
```

```
 1   A.        Both of them contain the two things that are in
 2   an improvised explosive device, a fault charge --
 3             MR. HARTMAN:  Your Honor, I'm going to object to
 4   that.
 5             THE COURT:  Basis?
 6             MR. HARTMAN:  Well, speculation about what a
 7   hypothetical person could glean.
 8             THE COURT:  Why don't you rephrase the question?
 9   BY MR. TERESINSKI:
10   Q.        In your opinion as an explosives and hazardous
11   device expert, if you were to look at that bomb vest video
12   as well as the IED e-mail, and what -- in your opinion,
13   what could the average person glean from that?
14             MR. BOSS:  Objection.
15             THE COURT:  Why don't you come on up?
16             (A sidebar conference was had on the
17             record.)
18             THE COURT:  If you want, I think that the
19   question should be rephrased.  I think you can ask him do
20   you have an opinion to a reasonable degree of certainty or
21   whatever it is explosives or whether a layperson, generally
22   unfamiliar with the chemical properties, da, da, da.
23             MR. TERESINSKI:  Could follow the steps?
24             THE COURT:  What could that person do with this
25   stuff?  I think that's -- A, it's more open-ended; and B, I
```

```
 1   think that crucial thing's, quote, a layperson, rather

 2   than, you know, quote, an average person or -- could glean.

 3           MR. BOSS:  We object, too, that it calls for

 4   speculation regarding the intent of these defendants, and I

 5   think it invades the province of the jury to conclude what

 6   they could or could not do with the information.

 7           THE COURT:  I disagree.  I think it simply is --

 8   it's entirely appropriate for him to inquire what, quote, a

 9   layperson, on viewing this, despite unfamiliarity with

10   whatever, could do upon review of these materials.

11           MR. HARTMAN:  I would ask that he -- I'm not even

12   sure how to phrase this, but he asked about what a

13   layperson could do with those things separately because

14   they're separate items, they're separate pieces of

15   evidence.

16           THE COURT:  That's fine.

17           MR. HARTMAN:  I assume you don't have a problem

18   with that.  And then from the IED, what?

19           THE COURT:  The other opinion is to how a

20   layperson, unfamiliar with chemicals and their properties,

21   could use or follow these materials to accomplish a certain

22   result.  If he says, yes, and then you say what is that

23   opinion.

24           MR. TERESINSKI:  Great, thanks.

25           MR. BOSS:  We'll note our okays here at the
```

1  sidebar, if that's okay.

2          THE COURT:  Sure.  Rather than bouncing back and

3  forth, let's just move on down the road.

4              (Sidebar concluded.)

5          THE COURT:  You should disregard the last

6  question.  I think if you move the microphone so it's

7  between you and the jury.

8          MR. TERESINSKI:  Thank you, Your Honor.

9  BY MR. TERESINSKI:

10  Q.          Let me rephrase, I probably wasn't as artful as I

11  should have been.

12          Agent Whitworth, do you have an opinion to a

13  reasonable degree of scientific certainty what a layperson,

14  uninformed by, you know, any of the explosives and

15  sophistication that were to follow, for instance, the bomb

16  vest video instructions, what could -- could they use and

17  follow those materials?  Do you have an opinion about that?

18  A.          The bomb vest video shows the correct preparation

19  for creating a suicide vest.  If you had the access to the

20  explosives and mixed those explosives in the correct

21  ratios, you had some knowledge of the initiation system,

22  you would be able to create a -- that -- that vest.

23          MR. HARTMAN:  Your Honor, I'm going to object.

24          THE COURT:  Let him finish the answer.  Let's

25  hear what the answer is.  Come on up and then we'll

```
 1    instruct the jury to disregard the answer if the

 2    objection's well taken.

 3    A.        You would be able to create the vest.

 4    BY MR. TERESINSKI:

 5    Q.        And what would you be able to accomplish?

 6              THE COURT:  Now Mr. --

 7              MR. HARTMAN:  Now, I object.

 8              THE COURT:  Do you want to be heard up here?

 9              MR. HARTMAN:  Please.

10                  (A sidebar conference was had on the

11                   record.)

12              THE COURT:  Okay.  Basis for the objection?

13              MR. HARTMAN:  Basis for the objection is that the

14    question was a layperson with no knowledge of the chemicals

15    and the answer was if you had knowledge of the chemicals to

16    make the explosives.

17              THE COURT:  No.  I don't think -- I think.

18              MR. TERESINSKI:  I wrote it down.  I tried to be

19    as precise.

20              MR. HARTMAN:  Steve, the question wasn't my

21    objection.

22              THE COURT:  The point is, you are objecting on

23    the basis of the unresponsiveness of the answer.  And it's

24    my understanding that the rules are that only the

25    questioner can object to an unresponsive answer.  He puts
```

```
 1    the question whether the answerer answers the question,

 2    that's up to him to determine.  And that's -- so to the

 3    extent that that's the basis for the objection, it's

 4    overruled, he's got the answer.  If it's not responsive,

 5    then that's his tough luck.  Okay.

 6                    (Sidebar concluded.)

 7              THE COURT:  Okay.  Excuse me.

 8              The question may stand.  The objection's

 9    overruled.

10    BY MR. TERESINSKI:

11    Q.        And just briefly, a couple more follow-up

12    questions.

13              The bomb vest video, is that -- the instructions

14    and everything that is provided in there, does that give

15    you all the answers about how to build, or is this just a

16    piece of the puzzle?

17    A.        It's just a piece of the puzzle, yes.

18    Q.        Okay.  And all the opinions that you've rendered

19    here today, you hold them to a reasonable degree of

20    scientific certainty in the area of explosives and

21    hazardous devices?

22    A.        Yes.

23              MR. TERESINSKI:  I have nothing further.

24              One moment, Your Honor.

25              I'm sorry, my colleague has indicated that -- of
```

1    course, I'm human.

2    BY MR. TERESINSKI:

3    Q.       I want to ask you just a follow-up question about

4    the IED e-mail.  In your opinion, what could a layperson,

5    who is basically ignorant of the instruction and use of an

6    IED, what could he glean from that?

7    A.       The e-mail shows the placement of a roadside

8    device and provides explosive device that's

9    command-detonated, so it shows how to place that.

10   Q.       And could you also learn something else from

11   that, if you know -- is there anything else you could learn

12   from that?

13   A.       It does show how to place the device, you know,

14   how to initiate it from a location where you have an

15   observation booth so that you can target a specific

16   individual.  And that's the reason you use command wire, so

17   you can target specific people instead of random people who

18   set off the bomb.

19   Q.       And how about Government Exhibit 28, in terms of

20   the Astrolite, described -- or the information contained in

21   28, what could the average layperson glean from that?

22   A.       It shows ratios that things should be mixed in,

23   oxidizers and fuels need to be mixed in the correct ratio

24   so that they work properly together, and that would give

25   you a ratio for that.

1   Q.        Okay.  We've covered everything.  And you hold

2   all those opinions to a reasonable degree of scientific

3   certainty in the field of explosives and hazardous devices?

4   A.        Yes.

5             MR. TERESINSKI:  Thank you.

6             Now I think I'm done, Your Honor.

7             THE COURT:  Okay.  We'll take our mid-morning

8   break and resume with cross-examination.

9                  (Recess.)

10            Ladies and gentlemen, I just informed counsel

11  that I had overlooked this, we will not be able to start

12  court Tuesday until about noon or shortly thereafter.  We

13  are in the process of designing a new -- starting the

14  process of designing a new courthouse, new federal

15  courthouse, here in Toledo.  It will actually be located

16  out where the parking lot is now, and I overlooked the fact

17  that we have a meeting set for 9:30 on Tuesday.  And it's

18  essentially the meeting which, apparently, we will be

19  deciding on the general architectural concept for the

20  building, and that is something that I am very anxious to

21  be a participant in.  But it won't take any length or all

22  mistakes that the architect make, which I don't think we

23  can do.

24            But anyway, I have asked to see if we could start

25  closer to -- I've -- if we can, A, start on time and

1    perhaps start as early as 8:00 or 8:30, if you can report

2    at noon, I will hope to start as soon as possible.

3              JUROR:  Can you give us that other date that we

4    don't have court as well?

5              THE COURT:  Let me check.  June 6th is a date.

6    Let me -- let me check.  I'll let you know this afternoon.

7    It's important so you folks can plan on your schedule.

8    Okay.

9              Back on the stand.  You remain under oath.

10             And Mr. Boss, you may examine.

11                        CROSS EXAMINATION

12   BY MR. BOSS:

13   Q.        Hello, Mr. Whitworth.

14   A.        Hello.

15   Q.        I'm Chuck Boss.  I represent Mr. El-Hindi.  From

16   your report, I'm principally concerned about the bomb vest

17   video and the IED e-mail.

18   A.        Yes.

19   Q.        You've, in fact, provided a report to the

20   government, then, in turn, provided it to us, and I just

21   have a couple questions that really arise from the report

22   as much as anything else.  The -- that bomb vest video,

23   that video, you worked off of a translation?

24   A.        Yes.

25   Q.        And the translation included, among other things,

```
 1   a mention about the ingredients, explosive ingredients,

 2   that were to be used in the bomb vest, itself?

 3   A.        Yes.

 4   Q.        And one of them, the translator told you was

 5   nitro, N-I-T-R-O, hyphen, G-R-I-C-O-L, is that an explosive

 6   that you're familiar?

 7   A.        Nitrogricol, no, sir.

 8   Q.        So did you -- were to attempt -- you don't know

 9   what nitrogricol is?

10   A.        As I stated earlier in my testimony, nitroglycol

11   is an explosive, and that is an almost clear liquid.

12   Q.        So you're assuming that it is a different one

13   that you are familiar with?

14   A.        Yes, sir.

15   Q.        Okay.  I see.

16             Now, the video itself, as we had the translation

17   here, it -- it mentioned these ingredients, two of the

18   three that you're familiar with, and one that you believe

19   is a different material that you are familiar with.  The

20   video itself doesn't tell the ratio of the mix.  Isn't that

21   pretty important?

22   A.        The ratio of the mix is important when it comes

23   to the nitronaphthalene.  It is a combustible material and

24   I'm not sure if the ratios would be needed, if you mix the

25   three ingredients together, and that's how you produce the
```

1  explosive together.

2  Q.          It's important to know the ratio for a person

3  who's trying to make an explosive, isn't it?

4  A.          The nitroglycol and the nitrocellulose will

5  produce an explosive, and as long as you know not to over

6  saturate it with the nitronaphthalene, then you would be

7  able to produce an explosive.

8  Q.          I take it that's a, yes?

9  A.          Yes.

10 Q.          It's important?

11 A.          Yes, sir.

12 Q.          Okay.  But those ratios were not provided in the

13 video, were they?

14 A.          No, sir.

15 Q.          And the video didn't also provide us with

16 information about the detonation process; is that right?

17 A.          As I stated in my report, yes, sir, it does not

18 go into the details of how to manufacture the internal

19 workings of that fusing system.

20 Q.          So it's -- it's not a complete instruction road

21 map, it's a partial one, is what you're saying?

22 A.          Yes, sir, there are some missing parts there.

23 Q.          Let's talk about that other -- the IED e-mail

24 that was sent.  And you examined that as well?

25 A.          Yes, sir.

1    Q.        That -- that IED e-mail, is it your opinion that

2    that's a postaction e-mail, it -- it's depicting what

3    happened in the past not what's about to happen?

4    A.        There are images in that, yes, sir, and there's

5    text in it that indicates to my -- from reading similar

6    things, that that's what I would call an after-action

7    report.

8    Q.        And is it your opinion that this video

9    after-action report was prepared by coalition forces?

10   A.        Yes, sir, I do believe from the text in the

11   message and some of the terminology that that was most

12   likely prepared by coalition forces.

13   Q.        You mean like U.S. military or their allies?

14   A.        Yes.

15   Q.        Okay.  And is it, in fact, your opinion that this

16   IED e-mail was designed so as to tell the reader how to

17   avoid being the victim of an IED attack?

18   A.        In the after-action report, that would have been

19   the intent.

20   Q.        Thank you.  Now, my next question for you is

21   the -- hold on for just one moment, if I may.

22            You were describing the -- where they mound it up

23   with rocks and other debris, the explosive device, and you

24   said there's a well, or something, that has to be packed

25   with explosives?

1   A.          In the artillery shell, there is a fusing well

2   that is packed with explosives and this improvised

3   instances, yes, in these.

4   Q.          And the IED e-mail doesn't tell the reader how to

5   do that?

6   A.          No, sir.  It shows the nose well packed with

7   explosives and the wires leading into it, but it does not

8   instruct that.

9   Q.          Now, this IED e-mail, it's generally available on

10  the Internet?

11  A.          I was able to find it on the Internet as the

12  after-action report, not as the e-mail, but I was able to

13  find the after-action report on the internet, yes.

14  Q.          So let -- I mean, the report that was forwarded

15  in Exhibit 79, is something that -- how did you -- you just

16  type in IED or how did you get it?

17  A.          No.  I had actually started looking for some of

18  the photographs to try to determine where this was obtained

19  from.  And eventually, I was able to find it.

20  Q.          So it was just available out there, I mean, it's

21  not any secret type of document, it's floating in the

22  Internet?

23  A.          It is floating in the Internet.

24  Q.          All right.  Thank you so much.

25                        CROSS EXAMINATION

```
 1   BY MR. WHITMER-RICH:

 2   Q.        Good morning.

 3   A.        Good morning.

 4   Q.        I'd like to talk to you briefly about your

 5   testimony about the Astrolite.

 6   A.        Okay.

 7   Q.        Just at the beginning, to your knowledge is there

 8   a explosive or chemical that goes by the name Astulit or

 9   Astulrt.  I'll spell that:  A-S-T-U-L-I-T or A-S-T-U-L-R-T?

10   A.        Not that I'm aware of.

11   Q.        Are you aware of any chemical explosive that

12   would go by the name Astoleet?  And I'll spell that:

13   A-S-T-O-L-E-E-T.

14   A.        Not that I'm aware of, no.

15   Q.        So if someone were to use one of those terms to

16   try to describe a chemical or explosive, at the very least,

17   that would be making some sort of minor mistake; is that

18   correct?

19             MR. TERESINSKI:  Objection.

20             THE COURT:  I would agree.  I would agree as to

21   what somebody else might be doing using that term.

22   BY MR. WHITMER-RICH:

23   Q.        You testified that Astrolite is a very sensitive

24   explosive; is that correct?

25   A.        Yes.
```

```
 1   Q.        And that means that it explodes quite easily?

 2   A.        Yes.

 3   Q.        Does that mean that Astrolite would be very

 4   difficult to transport?

 5   A.        I don't know if it's -- I'd have to look.  I

 6   don't know if it's during the manufacturing process or in

 7   the transport when it becomes the problem, when the

 8   accidents took place.  I don't know if it -- they were

 9   during the manufacturing process or during the

10   transportation, so I'm not sure of that.

11   Q.        Okay.  And you testified that there are two, I

12   guess, precursor materials that are mixed in a specific

13   ratio to create Astrolite?

14   A.        Correct.

15   Q.        And it's a mixture of one of the materials is a

16   solid and one of the materials is a liquid; is that

17   correct?

18   A.        Yes.

19   Q.        And so the result, then, is a substance that is

20   enough to -- I think you testified of a syrupy or some kind

21   of a gooey gel; is that correct?

22   A.        Yes.

23   Q.        So would it be correct that you couldn't create

24   Astrolite that would be in the form of a solid?

25   A.        Not that I'm aware of, no.
```

1    Q.        And to your knowledge, it wouldn't be possible to

2    create Astrolite that would be in the form of just a

3    regular liquid?

4    A.        In the research on -- in the literature on

5    Astrolite, they talk about it being pourable into ground

6    and rock situations, so there is some liquid form to it.

7    Q.        So the gooey gel or the syrupy, has some liquid

8    properties to it?

9    A.        Correct.

10   Q.        Okay.  But as far as you know, it comes in one

11   material form?

12   A.        Yes.

13   Q.        Very quickly, as to the bomb vest video.  I think

14   this is on the record, but just to be clear, in summary

15   fashion, I believe you testified that a layperson could use

16   that video to create a bomb vest if several conditions were

17   met, correct?

18   A.        Correct.

19   Q.        And you testified, I think, to at least three

20   conditions.  First, if you could get or manufacture the

21   three explosives that are discussed, correct?

22   A.        Correct.

23   Q.        And second, if you have correct ratios of those

24   explosives, correct?

25   A.        Correct.

1   Q.        And third, if you knew how to create or use the

2   detonators shown, correct?

3   A.        Correct.

4   Q.        And so without access to those materials or

5   knowledge, at least, a layperson would not be able to

6   actually create a vest, a bomb vest from the video,

7   correct?

8   A.        They would be need a road map on how to proceed

9   with the -- the video would be, but there are those three

10  items that are missing.

11  Q.        Okay.  Thank you.

12            MR. DOUGHTEN:  Nothing, Your Honor.

13            THE COURT:  Okay.  Any redirect?

14            MR. TERESINSKI:  Just briefly, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. TERESINSKI:

17  Q.        Agent Whitworth, just to follow-up on Mr. Amawi's

18  counsel's questions, you indicated that the information

19  that the bomb vest video would be a road map.  So

20  basically, the information contained in there, in part,

21  would provide what a layperson would need in order to make

22  this bomb vest, yes; is that right?

23  A.        Right.  It gives you information on, you need

24  explosives, an improvised explosive fusing system.

25            THE COURT:  I'm sorry I didn't hear your answer.

```
 1   A.         It gives you the explosives that you need,
 2   explosives and a fusing system to create the vest, yes.
 3   Q.         And it gives you part of a piece of the puzzle
 4   that you need to make this thing?
 5   A.         Yes.
 6   Q.         And as you indicated it's a road map?
 7   A.         Yes, sir.
 8   Q.         And the -- and Mr. Amawi -- I'm sorry
 9   Mr. El-Hindi's counsel was asking questions about
10   nitrogricol, there was a picture that came up that
11   displayed that; am I correct?
12   A.         Yes.
13   Q.         And based upon your experience and your knowledge
14   and your expertise and the picture and what was referenced
15   in the context of this, it clearly -- it is --
16              MR. BOSS:  Objection.  Leading.
17              THE COURT:  Sustained.  I agree.
18              Why don't you rephrase?
19              MR. TERESINSKI:  I'll rephrase.
20   BY MR. TERESINSKI:
21   Q.         Nitrogricol.  There's no nitrogricol, right?
22   A.         Correct.
23   Q.         What, based upon your experience, then -- in your
24   opinion, what was displayed in the context of everything,
25   what was your opinion that that was?
```

```
 1   A.        Nitroglycol, a clear liquid.

 2   Q.        And that's an explosive?

 3   A.        That's an explosive.

 4   Q.        As you indicated, a high explosive, I believe?

 5   A.        Yes, a high explosive.

 6   Q.        And on terms of -- final question -- in terms of

 7   the -- a couple of final questions on the IED e-mail.  You

 8   mentioned that you pulled off certain things on the

 9   internet, but exhibit -- Government Exhibit 79, what you

10   reviewed that was an e-mail; is that right?

11   A.        Correct.

12   Q.        And that was sent from one person to another

13   person?

14   A.        Correct.

15   Q.        And as far as Astrolite is concerned, it's your

16   opinion -- and correct me if I'm wrong -- is it your

17   opinion that Astrolite is made from two substances?

18   A.        Correct.

19   Q.        And what are those substances again, just so

20   we're clear?

21   A.        Ammonium nitrate and hydrazine.

22   Q.        And one is in a liquid form?

23   A.        The hydrazine is in liquid form.  The other is

24   solid.

25   Q.        And they're combined to create this gel?
```

```
 1   A.        Yes.

 2             MR. TERESINSKI:  I have nothing further, thank

 3   you.

 4             THE COURT:  Further cross?

 5             MR. BOSS:  No, thank you.

 6             MR. WHITMER-RICH:  Nothing further.

 7             MR. DOUGHTEN:  Nothing, Your Honor.

 8             THE COURT:  You may step down.

 9             Excuse me.  Who's the government's next witness

10   and what can we -- what is -- in general terms, do you

11   expect the witness to testify to?

12             MR. TERESINSKI:  Your Honor, may I be excused for

13   a second?

14             MR. MILLER:  Can we have a brief sidebar before

15   we call the next witness?

16             THE COURT:  Sure.

17                  (A sidebar conference was had on the

18                   record.)

19             THE COURT:  Okay.  Mr. Miller?

20             MR. MILLER:  Your Honor, the government's next

21   witness is a man by the name of Mikaeil Al Mozrouei, and

22   he's going to testify about a number of things as a fact

23   witness.  He was a former neighbor, if you will, of

24   Mr. Amawi's.  But one of the issues that he's going to

25   testify about is interaction with Mr. El-Hindi about three
```

years ago in which, after a session at the mosque, Mr. El-Hindi asked a question: Would you be interested in going overseas to Afghanistan to train for Jihad? And we're going to ask him that question, so we wanted to, obviously, discuss this issue beforehand. We anticipate counsel may have an objection so we wanted to resolve this.

MR. DOUGHTEN: We have an objection on another issue, but we'll finish this one first.

MR. HARTMAN: I'd like a moment to talk -- my understanding was he wasn't going to be called until the afternoon and you were going to proceed with the Fifth-Third stuff now, so we'd like an opportunity --

THE COURT: Well, as to that one issue, it seems to me to be Rule 404(b) evidence, even though it's -- yeah, I think it's outside the period of the conspiracy. And I can, obviously, and I should probably limit consideration of that testimony as to only Mr. El-Hindi and nobody else because it's not, you know, it's not a coconspirator statement.

MR. DOUGHTEN: Your Honor, from the 302s --

THE COURT: A little loud, if you can speak normal voice.

MR. DOUGHTEN: From the 302, it appears -- and I can't pronounce his name, but it's previous name Michael Rice. Mr. Rice had made a statements that he had never

1  seen Wassim Masloum talk to Mr. El-Hindi in -- and then he

2  kind of changed his mind.  I think I saw him to dinner once

3  and then he made reference to, I think he's a member of a

4  sect of Islam.  Our objection is this from personal

5  knowledge or from hearsay?

6        MR. MILLER:  We're not going to ask about that.

7        MR. HARTMAN:  There is also an issue about him --

8  he has or may have in his 302 bipolar disorder and ADD,

9  and --

10       MR. MILLER:  I'll be bringing that on in direct.

11       MR. HARTMAN:  Okay.  Can I have -- I'd like a

12  couple minutes to discuss with Chuck the issue because we

13  didn't think -- we were going to talk about it at lunch.

14       THE COURT:  Well, I mean, what needs discussing

15  in terms of the testimony of Mr. El-Hindi?  Normally, I'd

16  say fine, but honestly, it seems to me extremely straight

17  forward.

18       MR. MILLER:  It's during the conspiracy, 2005.

19       THE COURT:  I'm sorry, I thought it was outside.

20       MR. SOFER:  But it's not a coconspirator

21  statement, and it only involved one defendant.

22       MR. MILLER:  Only in terms of time frame, it's

23  about that time.

24       THE COURT:  It seems to be me classic 404(b)

25  evidence.  It can be before, during, or after the offense

1  charged, and it's it seems to me to be material on the

2  issue of intent.

3          MR. MILLER:  And Your Honor, just so the record's

4  clear, you know, certainly this is particularly relevant

5  considering the cross-examination by El-Hindi counsel about

6  the cooperating witness and Special Agent Coats of that

7  recruitment.

8          THE COURT:  Let me also say and also explain --

9  I'm sorry, but -- I can't see what's to talk about until we

10  get to direct exam.  It's their exam, and you'll be able to

11  object.

12          MR. SOFER:  We just don't want to ask a

13  question -- the nature of the question without The Court

14  and counsel know --

15          MR. MILLER:  And the second quick issue is and

16  Mr. Doughten just alluded to it.  His name, originally, was

17  Michael Rice.  He changed it legally to Mikaeil Al

18  Mozrouei.  He, I think, would like to change it back

19  eventually for purposes of publicity.  I'm going to ask him

20  what his name is, he's going to say -- Mikaeil Al Mozrouei.

21  I'm going to ask if it's been legally change to that, but

22  I'm not going to ask him if his name used to be Michael

23  Rice, obviously, since that gets in the papers and so

24  forth.

25          MR. IVEY:  One other issue, and I don't know if

```
 1   they're going to bring it out, but the witness in the 302
 2   gives his opinions about Jihad and what means what, the
 3   conditions for it, and that should be out.
 4           THE COURT:  I agree.
 5           MR. MILLER:  I'm not going to ask him.
 6           THE COURT:  I agree.  Maybe, someday, we'll even
 7   have an agreed understanding for limited purposes of this
 8   case.
 9           MR. SOFER:  We're trying to stipulate, Judge.
10              (Sidebar concluded.)
11           THE COURT:  Okay.  Mr. Miller, who's your next
12   witness?  And in a couple sentences, what we're likely to
13   hear.
14           MR. MILLER:  Your Honor, the next witness for the
15   government is Mikaeil Al Mozrouei.  He will testify on a
16   few matters, as a fact witness, related to his interaction
17   with all three defendants.
18           THE COURT:  Okay.
19           A-L-M-O-Z-R-O-U-E-I, first name, M-I-K-A-E-I-L
20   was herein, called as if upon examination, was by me first
21   duly sworn, as hereinafter certified, and said as follows.
22           THE WITNESS:  Yes, I do.
23           THE COURT:  You may be seated.
24           Can you spell that name?
25           MR. MILLER:  M-I-K-A-E-I-L.
```

```
 1              Woah, woah, woah.  Slow.
 2              MR. MILLER:  M-I-K-A-E-I-L, last name,
 3    A-L-M-O-Z-R-O-U-E-I.
 4              THE COURT:  And will you tell -- oh, you're going
 5    to have to sit about this distance from the microphone so
 6    that you can slide the -- up a bit.  And then maybe raise
 7    the microphone up.  And if you can swivel a little bit so
 8    as you address the jury, your microphone will be between
 9    you and the members of the jury and they will be able to
10    hear.  And if you can keep your voice up and try to speak
11    clearly.
12              Now that we've heard your name spelled and I'll
13    ask you, is your name is --
14              THE WITNESS:  Mikaeil Al Mazrouei.
15              THE COURT:  And was it spelled correctly?
16              THE WITNESS:  Yes, it was.
17              THE COURT:  Okay.  And what is your city or
18    municipality of residence?
19              THE WITNESS:  Michigan.
20              THE COURT:  Okay.  And you are acquainted with
21    one or more of the defendants in this case; is that
22    correct?
23              THE WITNESS:  Yes, I am.
24              THE COURT:  And do you recognize Mr. Mohammed
25    Amawi in court today?
```

```
1              THE WITNESS:  Yes.

2              THE COURT:  And Mr. Masloum El-Hindi?

3              THE WITNESS:  Yes.

4              THE COURT:  And Mr. Wassim Masloum?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  Mr. Miller, you may inquire.

7              MR. MILLER:  Thank you, Your Honor.

8                       DIRECT EXAMINATION

9   BY MR. MILLER:

10  Q.       Good morning, Mr. Al Mazrouei, did you have your

11  name legally changed to Mikaeil Al Mozrouei?

12  A.       Yes, I did.

13  Q.       When was that?

14  A.       1987.

15  Q.       Mr. Al Mazrouei, what is your current occupation?

16  A.       Carpenter.

17  Q.       For whom do you work?

18  A.       I'm self-employed.

19  Q.       And where were you born?

20  A.       In Lebanon, New Hampshire.

21             THE COURT:  I sorry, I couldn't hear you.  Once

22  again, project your voice so all of the way in the back

23  row.  I gather that you're fairly soft spoken and probably

24  a bit nervous about being in this situation, but we all

25  have to hear you, and if you can just keep in mind, speak
```

```
 1    loudly and nobody will yell at you if you think you're
 2    shouting, okay.  So -- and I did not hear your last answer.
 3    A.          Lebanon, New Hampshire.
 4    BY MR. MILLER:
 5    Q.          What year were you born?
 6    A.          1967.
 7    Q.          Where did you grow up?
 8    A.          Lebanon, New Hampshire.
 9    Q.          And Mr. Al Mazrouei, what religion do you
10    practice?
11    A.          The religion of Islam.
12    Q.          Mr. Al Mazrouei, did there come a time when you
13    decided to move out of New Hampshire?
14    A.          Yes.
15    Q.          And when was that, sir?
16    A.          1990.
17    Q.          Where did you move to?
18    A.          Toledo, Ohio.
19    Q.          And at this time, how long did you reside in
20    Toledo?
21    A.          Five or six years.
22    Q.          And where did you move after that?
23    A.          Michigan.
24    Q.          Were you employed there in Michigan?
25    A.          Yes, I was.
```

```
1   Q.        Where?

2   A.        At a fish market.

3             THE COURT:  Where I'm sorry?

4             THE WITNESS:  Fish market?

5             THE COURT:  A fish market.

6             THE WITNESS:  I don't recall the name of the fish

7   market.

8             THE COURT:  It was a fish market.

9             THE WITNESS:  Sorry.

10            THE COURT:  Again, the way you said the word

11  sorry, that's the volume of it, okay.  Please, just go

12  ahead and speak nice and loudly.

13            Go ahead, Mr. Miller.

14  BY MR. MILLER:

15  Q.        Sir, in what city was that fish market located,

16  if you recall?

17  A.        Detroit.

18  Q.        And approximately when was that?

19  A.        '89 -- oh, 1998 or 2000.

20  Q.        While you were working at the fish market in

21  Detroit, did you meet any of the defendants in this case?

22  A.        Yes, I did.

23  Q.        Who did you meet?

24  A.        Marwan El-Hindi.

25  Q.        And what was your relationship with Mr. El-Hindi
```

```
 1   at that time?
 2   A.        Co-worker, casual.
 3   Q.        Mr. Al Mazrouei, do you see Mr. El-Hindi in the
 4   courtroom today?
 5   A.        Yes, I do.
 6   Q.        Can you identify him?
 7   A.        Yes, I can.
 8   Q.        And where is he, can you identify by what he's
 9   wearing?
10   A.        Sitting over there.
11             MR. MILLER:  Your Honor, can the record
12   reflect --
13             THE COURT:  It does.
14   BY MR. MILLER:
15   Q.        Mr. Al Mazrouei, did there come a time when you
16   decided to move back to Toledo?
17   A.        Yes.
18   Q.        And what year was that, approximately?
19   A.        About 2003.
20   Q.        Mr. Al Mazrouei, do you know Defendant Mohammed
21   Amawi?
22   A.        Yes, I do.
23   Q.        When did you first -- first meet Mr. Amawi?
24   A.        What year?
25   Q.        Approximately, how many years ago?
```

```
 1   A.          2003, 2004.

 2   Q.          Where did you initially meet him?

 3   A.          Islam mosque.

 4   Q.          Which mosque was this?

 5   A.          Secor Road.

 6   Q.          Okay.  Do you see Mr. Amawi in the courtroom

 7   today?

 8   A.          Yes, I do.

 9   Q.          Can you identify him, please?

10   A.          (Nonverbal response).

11   Q.          Over there?

12   A.          Yes.

13               MR. MILLER:  Can the record reflect he identified

14   Mr. El-Hindi?

15               THE COURT:  It does.

16   BY MR. MILLER:

17   Q.          Mr. Al Mazrouei, did there come a time when you

18   had additional interaction with Mr. Amawi?

19   A.          Yes.

20   Q.          And when was that?

21   A.          When I moved into a building of 5 Shaftsbarry in

22   Toledo.

23   Q.          And approximately when was that?

24   A.          About the same time, 2004, 2005.

25   Q.          I'd like to show you what's in evidence as
```

```
 1   Government Exhibit 8A.  If we can put that up on the
 2   screen.  Do you recognize what building is shown in this
 3   picture?
 4   A.        That's one of the two buildings on that street.
 5   Q.        Which building is this that you recognize?
 6   A.        I can't see the number, but there's only two
 7   buildings, either 5 Shaftsbury or 7 Shaftsbury.
 8   Q.        And you said that you lived in five Shaftsbury,
 9   correct?
10   A.        Excuse me.  It has a satellite dish in the front,
11   so I know it's the other building.
12   Q.        Would that be 7 Shaftsbury?
13   A.        Yes.
14   Q.        Do you know who used to live in seven Shaftsbury?
15   A.        Yes.
16   Q.        And who's that?
17   A.        Mohammed.
18   Q.        And that's Mr. Amawi?
19   A.        Amawi.
20   Q.        How often would you socialize with Mr. Amawi?
21   A.        Two or three times a week.
22   Q.        Was there a time when you became aware that
23   Mr. Amawi traveled to Jordan?
24   A.        Yes.
25   Q.        And when was that?
```

```
1    A.          Short time after I moved in.

2    Q.          And that would be moving back -- moving into the

3    Shaftsbury?

4    A.          That's correct.

5    Q.          Okay.  Do you recall how long Mr. Amawi was in

6    Jordan?

7    A.          Three to six months.

8    Q.          When Mr. Amawi returned from Jordan, what if any

9    changes did you notice in his appearance?

10   A.          Appearance, he dressed more religiously and he

11   grew his beard.

12   Q.          I'm sorry, I didn't hear what you said.

13   A.          He grew his beard and he dressed more

14   religiously.

15   Q.          After Mr. Amawi return from Jordan, what, if any,

16   changes did you notice in the way he acted?

17   A.          He was more --

18               THE COURT:  Again, lean forward as you had.

19   A.          He was more vigorous about our religion.

20   BY MR. MILLER:

21   Q.          And what do you mean by "more vigorous"?

22   A.          He wanted to practice more.

23   Q.          Okay.

24               MR. HARTMAN:  I couldn't understand the answer.

25   A.          He wanted to practice more.
```

```
1              THE COURT:  I'm very sorry, but now you're a
2     little too close, about this distance, okay?  A moment ago,
3     you leaned forward sort of reflects the way and that's the
4     right distance maybe slide the chair up at 3 or 4 inches
5     and about this distance.  Do you see, about maybe the width
6     of three or four of your fingers.
7              Okay.  Go ahead.
8              MR. MILLER:  Thank you, Your Honor.
9     BY MR. MILLER:
10    Q.       During this time that you socialized with
11    Mr. Amawi, did you ever see Mr. Amawi use a computer?
12    A.       Yes.
13    Q.       How often?
14    A.       Seemed like 24/7.
15    Q.       And that would be 24 hours, 7 days a week?
16    A.       Sorry.
17    Q.       Yes?
18    A.       That's okay.
19    Q.       Did Mr. Amawi ever show you any websites or
20    videos on his computer?
21    A.       Yes.
22    Q.       What did he show you?
23    A.       A couple of beheadings and one vehicle in Israel
24    was going into an Army camp, I don't know if it was
25    American or Israeli, but it blew up.
```

```
 1   Q.        Did he show you videos on a couple of occasions?
 2   A.        Two.
 3   Q.        Okay.  And when was that, if you can recall,
 4   approximately?
 5   A.        Sometime after he came back, I guess.
 6   Q.        You say "came back," from -- you mean, from
 7   Jordan?
 8   A.        Yeah, after he came back from Jordan.
 9   Q.        Did Mr. Amawi say anything to you when he showed
10   you these videos?
11             MR. BRYAN:  Objection, Your Honor.
12             THE COURT:  Basis?
13             MR. BRYAN:  I'm not -- I'm not per -- I'm not
14   per.
15             THE COURT:  It's being offered for the truth of
16   the matter asserted or for state of mind?
17             MR. MILLER:  For state of mind, Your Honor.
18             THE COURT:  Do you want to be heard further or?
19             MR. BRYAN:  May we approach, Your Honor.
20             THE COURT:  Sure, of course.
21                  (A sidebar conference was had on the
22                  record.)
23             THE COURT:  Objection, basis?
24             MR. IVEY:  First, Your Honor, I believe that this
25   statement is said outside --
```

```
 1              THE COURT:  What's the answer?

 2              MR. MILLER:  The answer is going to be that

 3    essentially when he was showing him the videos, he was

 4    laughing about it in and support of it.  This took place

 5    after Mr. Amawi came back from Jordan, basically, you know,

 6    the witness says sometime around 2004-ish, and, you know,

 7    number one, as I mentioned, go to his state of mind.

 8    Number two, it's an admission.

 9              THE COURT:  I would agree, so let's hear your

10    objection.

11              MR. IVEY:  First, it's not said to a

12    coconspirator.  It's outside the formation of the

13    conspiracy, and it's irrelevant whether or not he -- his

14    impression of how he acted looking at a beheading is

15    irrelevant to this conspiracy.

16              THE COURT:  As to that, I disagree, but I'll give

17    a limiting instruction, considered only as to Mr. Amawi.

18              MR. MILLER:  Just so we're not back here again.

19    I'm then going to ask him and what was your response to Mr.

20    Amawi and did Mr. Amawi have a response to your --

21              THE COURT:  Okay and what's all that going to be?

22              MR. MILLER:  He's going to say that basically he

23    responded by saying this is not funny.  This is the killing

24    of innocents, and Mr. Amawi's going to respond back saying

25    that he essentially supports this activity and that he
```

```
 1   supports it.
 2              THE COURT:  And it's 404(b) evidence.
 3              Objection noted.  And overruled.
 4                  (Sidebar concluded.)
 5              THE COURT:  And just for the record, also
 6   considered Rule 404(b) factors.
 7              Go ahead.
 8   BY MR. MILLER:
 9   Q.       Again, did Mr. Amawi say anything to you when he
10   was showing these videos that you mentioned?
11   A.       He -- his reaction was happy, glad that --
12              THE COURT:  I'm sorry.  Once again, you really
13   have to speak up.  It's very, very hard to hear you.
14   A.       His reaction was happy about the events.
15   BY MR. MILLER:
16   Q.       And why are you saying that you think he was
17   happy?
18              MR. IVEY:  Objection.
19              THE COURT:  Overruled.  He can testify as to what
20   he observed.
21   A.       I feel that he thought it was a victory for
22   Islam.
23   Q.       What, if anything, was your response?
24   A.       My response was that it was not the same.
25              THE COURT:  I'm sorry.  I do apologize.  I really
```

```
 1  can't hear you.  You really have to speak more loudly,
 2  okay?
 3  A.        My reaction was that this was not -- I thought
 4  this was not a victory for Islam, this was not just, and I
 5  think he thought it was just.
 6  Q.        Did Mr. Amawi have any response to what you said?
 7  A.        He -- he said he tried to convince me of his
 8  opinion of why he thought it was a just cause to do those
 9  things or have those things happen.
10  Q.        Do you remember any specifics of what he might
11  have said to you?
12  A.        No specific words.  He thought it was a victory
13  for Islam, you know.
14  Q.        I'm sorry, victory for?
15  A.        Victory for Islam.
16  Q.        During that conversation or any other time, did
17  Mr. Amawi ever say anything to you about wanting to go
18  overseas to fight?
19  A.        He wanted -- he said he wanted to be a martyr.
20  Q.        Okay.  That he wanted to martyr himself overseas?
21  A.        Overseas or here, I'm not sure.  I don't recall.
22            THE COURT:  And when, approximately, as best you
23  can recall, what time frame, year, a month, or whatever?
24  A.        2005, maybe.
25            THE COURT:  Pardon me?
```

```
 1   A.        2005.

 2   BY MR. MILLER:

 3   Q.        Do you recall where he might have said this to

 4   you?

 5   A.        In his apartment.

 6   Q.        Was anybody else present when he said this to

 7   you?

 8   A.        No.

 9   Q.        After Mr. Amawi showed you the beheading videos

10   or expressed his desire to become a martyr, did you

11   continue to socialize with him?

12   A.        No.

13   Q.        Why?

14   A.        I felt uncomfortable.  I thought he was going

15   down the wrong path.

16   Q.        What do you mean by "going down the wrong path,"

17   sir?

18   A.        His thinking was not going according to Islam.

19             THE COURT:  Again, I could not hear what you

20   said.

21   A.        His thinking or thought was not according to

22   Islam.

23   Q.        Sir, during this particular period of time that

24   we've just discussed, were you taking any medication?

25   A.        No.
```

```
 1   Q.        At one point in the last five to ten years, have
 2   you taken any prescription medication?
 3   A.        Yes.
 4   Q.        What are you taking?
 5   A.        I've taken Concerta and Strattera.
 6             THE COURT:  Do you know how to spell those, at
 7   least phonetically?
 8             THE WITNESS:  Concerta, C-O-N-C-E-R-T-A.
 9             THE COURT:  And the other medication was, sir?
10             THE WITNESS:  Strattera.
11             THE COURT:  And what are these?  Excuse me.
12             MR. HARTMAN:  Can you spell that?
13             THE COURT:  To the best of your ability, can you
14   spell that?
15             THE WITNESS:  S-T-R-A-T-T-E-R-A, Strattera.
16   BY MR. MILLER:
17   Q.        And sir, do you know what those medications are
18   for?
19   A.        ADD.
20   Q.        What is ADD, to your understanding?
21   A.        Attention deficit disorder.
22   Q.        And again, to your understanding, what does that
23   mean?
24   A.        I have a difficult time concentrating, mostly
25   scholastically.
```

```
 1   Q.          Mostly scholastically, is that what you said?

 2   A.          That's correct.

 3   Q.          Do you have any other conditions?

 4               THE COURT:  I'm sorry, but do you recall when you

 5   took either or both of those medications, from when to

 6   when?

 7               MR. MILLER:  Again, you're one step ahead of me,

 8   Your Honor.

 9   A.          No, I don't.

10               THE COURT:  Okay.

11   BY MR. MILLER:

12   Q.          Do you have any other conditions?

13   A.          Bipolar.

14   Q.          What -- what is your understanding as to the

15   condition of bipolar?

16               MR. HARTMAN:  Objection.

17               MR. MILLER:  His understanding.

18               THE COURT:  Excuse me?  I'll let him answer it,

19   just solely for his own understanding about what his

20   condition is.  This is not medical testimony.

21               MR. MILLER:  Thank you, Your Honor.

22               THE COURT:  Should not be considered as such by

23   the jury.

24               MR. MILLER:  You can answer.

25   A.          There's different degrees, but it's an emotional
```

```
 1  rollercoaster.
 2  BY MR. MILLER:
 3  Q.       I'm sorry?
 4  A.       Emotional rollercoaster.
 5  Q.       Now, you mentioned that you weren't taking
 6  medications during the period that you just discussed, but
 7  regardless, at any point you took these medications, do
 8  they affect your perceptions?
 9  A.       No.
10  Q.       Do they affect your memory?
11  A.       No.
12  Q.       Do you still take any medication for this
13  condition?
14  A.       No, I do not.
15  Q.       When did you stop?
16  A.       Three or four years ago.
17  Q.       Does your condition, in any way, affect your
18  perception or powers of observation?
19  A.       No.
20  Q.       Does your condition affect your memory?
21  A.       No.
22  Q.       Do you know the defendant Wassim Masloum?
23  A.       Yes.
24  Q.       And how do you know him, sir?
25  A.       He helped me fix my van.
```

```
 1              THE COURT:  Again, I didn't hear you.
 2   A.         He helped me fix my van.  It was broken -- there
 3   were -- needed mechanical work.
 4   Q.         Did anybody introduce you to him?
 5   A.         Mohammed.
 6   Q.         And that would be Mr. Amawi?
 7   A.         Mohammed Amawi.
 8   Q.         Do you see Mr. Masloum in the courtroom today?
 9   A.         Yes, I do.
10   Q.         Can you identify him, please?
11              MR. DOUGHTEN:  We'll stipulate, Your Honor.
12   BY MR. MILLER:
13   Q.         Did you ever see Mr. Masloum at Mr. Amawi's
14   apartment?
15   A.         Couple times, maybe.
16   Q.         To the best of your recollection, when was it
17   that you saw Mr. Masloum at Mr. Amawi's apartment?
18   A.         Maybe once after he came back from Jordan and
19   probably once before.
20   Q.         Once before Mr. Amawi went to Jordan?
21   A.         Possibly.
22   Q.         Is that what you just said, I'm sorry?
23   A.         Yes.
24   Q.         Sir, when you moved back from Michigan to Toledo,
25   how often would you see Mr. El-Hindi?
```

```
 1   A.        I saw him on a few occasions.

 2   Q.        And where were those occasions that you would see

 3   him?

 4   A.        I saw him once at Home Depot, and I saw him in

 5   the mosque.

 6   Q.        What, if anything, happened when you saw him on

 7   that occasion at Home Depot?

 8   A.        He was coming out and I was going in, and I saw

 9   him pushing materials on a cart.  I just asked him what he

10   was up to and he said he had made a deal or a bargain with

11   some Arab guys to --

12            THE COURT:  I'm sorry, sorry.  I really

13   apologize, but I can't hear the answers.  You really sit up

14   like this and speak loudly, okay.  I know you're nervous

15   and --

16            THE WITNESS:  I'm a soft speaker.  When I speak

17   loudly, I feel like I'm yelling at people.

18            THE COURT:  I'm more likely to yell at you if you

19   don't yell at us, okay.  And I apologize for interrupting,

20   but it's very important that we hear what you say.  What

21   was -- do you recall the question?  Why don't you back up a

22   little bit?

23   BY MR. MILLER:

24   Q.        Sir, you mentioned that you saw Mr. El-Hindi on

25   occasion at Home Depot.  My question is, what, if anything,
```

```
 1  happened when you saw him at Home Depot?
 2  A.        Yes, I saw him with materials on his cart, and he
 3  had told me that he had -- has a contract with a couple
 4  people on the east side to renovate their homes.
 5  Q.        What kind of --
 6            MR. HARTMAN:  To what?
 7  A.        Renovate their houses.
 8  BY MR. MILLER:
 9  Q.        And what kind of materials were they?
10  A.        Building materials.
11  Q.        Okay.  And why do you remember this?
12  A.        I knew he did a lot of different small jobs,
13  different jobs he had in the past, but I didn't remember
14  that he knew anything about renovating.
15  Q.        Okay.
16            MR. HARTMAN:  Your Honor, I'm going to object as
17  to what his testimony that he -- I mean --
18            THE COURT:  I'll overrule it.  The answer will
19  stand.
20  BY MR. MILLER:
21  Q.        Mr. Al Mozrouei, was there a reason that you
22  didn't socialize with Mr. El-Hindi more often?
23  A.        I guess we didn't really click.
24  Q.        Okay.  Mr. Al Mozrouei, did there come a time
25  when Mr. El-Hindi asked you a question that made you
```

1   uncomfortable?

2   A.      Yes.

3   Q.      What happened?

4   A.      We were in the mosque --

5   Q.      Can you lean in, sir?

6   A.      We were in the mosque and it was after prayer and

7   everyone was socializing, and he was sitting on the floor

8   with a couple other brothers, and I sat down to say, you

9   know, hello, how are you, and it was brought up -- he

10  brought up, did anybody want to go to Afghanistan to train.

11  Q.      Train for what, did he say?

12  A.      Jihad.

13  Q.      For Jihad?

14  A.      Yeah.

15  Q.      And do you recall when this was?

16  A.      When?

17  Q.      Yes, approximately.

18  A.      2005, I guess.

19  Q.      2005, you said?

20  A.      Yes, 2005.

21  Q.      And was he directing that question at you, sir?

22  A.      I think it was in general to the people that were

23  sitting near him.

24  Q.      And were you present?

25  A.      Yes, I was present.

```
 1   Q.        What, if anything, was your response to Mr.
 2   El-Hindi's question?
 3   A.        I kind of smiled, but I felt uncomfortable so I
 4   got up and left.
 5   Q.        Sir, did you ever talk to Mr. El-Hindi after he
 6   asked you that question?
 7   A.        Few times in passing, just, you know, said
 8   Wa-Aleikum Aassalaam, which means a greeting, which was
 9   used to greet each other.
10   Q.        Did you have any other conversations with Mr.
11   El-Hindi other than passing conversations with him after
12   that?
13   A.        No.
14   Q.        And why not, sir?
15   A.        I didn't want to be around that kind of
16   conversation, I felt uncomfortable about it.
17   Q.        Okay.  Sir, you testified earlier about --
18            THE COURT:  If I may, ladies and gentlemen, you
19   can consider the testimony about the comment of Mr.
20   El-Hindi only as him, not to any of the other defendants.
21   BY MR. MILLER:
22   Q.        Sir, you testified earlier about how Mr. Amawi
23   changed after he came back from Jordan.  I'd like to show
24   you what's in evidence, Government Exhibit 7A, as in apple.
25   Does this fairly and accurately reflect what Mr. Amawi
```

1   looked like before he went to Jordan?

2   A.        Yes.

3   Q.        And if we can put up Government's Exhibit 7B in

4   evidence.  Does this fairly and accurately represent what

5   Mr. Amawi looked like before he went to Jordan?

6   A.        Yes.

7   Q.        Same question for government Exhibit 7C as in

8   Charlie, that's in evidence.

9   A.        Yes.

10  Q.        And now, sir, I'd like to show you what is in

11  evidence Government 7D, as in David.  Sir, does this fairly

12  and accurately reflect what Mr. Amawi looked like after he

13  came back from Jordan?

14  A.        Yes.

15  Q.        Same question for Government's Exhibit 7E, as in

16  Edward, that's in evidence?

17  A.        Yes.

18  Q.        Same question, sir, for Government Exhibit 7F, as

19  in Frank, that's in evidence?

20  A.        Yes.

21  Q.        And finally, sir, same question for Government

22  Exhibit 7G, as in Gary, that's in evidence?

23  A.        Yes.

24            MR. MILLER:  A moment, Your Honor?

25            THE COURT:  Of course.

```
 1              MR. MILLER:  Your Honor, no further questions at
 2   this time.
 3              THE COURT:  Very good.
 4              Cross-exam.  Would you like a couple minutes for
 5   cross-exam?
 6              MR. BRYAN:  Can we just have a couple minutes?
 7              THE COURT:  Sure.  Of course.
 8              Ladies and gentlemen, if you want to stand up or
 9   whatever, that's fine.
10                  (A brief discussion was had off the record.)
11              THE COURT:  Okay.  You ready to go?
12              MR. BRYAN:  Yes, sir.
13                          CROSS EXAMINATION
14   BY MR. BRYAN:
15   Q.      Good morning, Mr. Al Mazrouei.
16   A.      Good morning.
17   Q.      Am I pronouncing your last name correctly?
18   A.      Say it five times fast, you get a prize.
19   Q.      I'll do my best, and I apologize in advance if I
20   do mispronounce it.  It's my own limitations.
21              Sir, obviously being in court today isn't a
22   positive experience for you, correct?
23   A.      It's what?
24   Q.      It's not -- it's not a good feeling being in
25   court today, correct?
```

```
 1   A.          I'm kind of nervous little bit.

 2   Q.          Little bit nervous, okay.  You testified on

 3   direct examination about some of your experiences with

 4   Mohammed Amawi, correct?

 5   A.          Yes.

 6   Q.          And the first time -- strike that.

 7               As it related to Mohammed Amawi, you've already

 8   indicated that you knew him and that you first met him at

 9   the mosque on Secor Road, correct?

10   A.          Yes.

11   Q.          And then you grew to be a more familiar with Mr.

12   Amawi because you lived in the same apartment complex with

13   him, correct?

14   A.          That's correct.

15   Q.          Now, sir, you you've obviously testified this

16   morning in Court -- today's May 8th, 2008?

17   A.          Uh-huh.

18   Q.          And you're also aware from living in the area

19   that sometime in February of 2006, the person that you

20   knew -- and not only Mr. Amawi, but two other individuals

21   that you knew, were charged in this case, correct?

22   A.          Yes.

23   Q.          Okay.  And that probably caused you some concern

24   because Mr. Amawi was somebody that you spent a lot of time

25   with in the past, correct?
```

```
1    A.        Yes.

2    Q.        And it not only concerned necessarily for Mr.

3    Amawi, but concern for yourself as well, correct?

4    A.        In what way?  Concern for myself because they got

5    arrested?

6    Q.        Just concerned because you were so close to the

7    situation that you knew Mr. Amawi and spent some time with

8    him, a lot of time?

9    A.        I was close with them, I don't know about the

10   situation.

11   Q.        Okay.  Now, the next time that you were

12   officially contacted by anybody regarding any knowledge

13   that you may have concerning Mr. Amawi was in about April

14   of 2007; is that correct?

15   A.        On the arrest?

16   Q.        Any time that you were contacted by anyone

17   concerning this case to try to interview you concerning

18   this case, correct?

19   A.        Yes.

20   Q.        Okay.  And you were contacted by the FBI,

21   correct?

22   A.        That's correct.

23   Q.        Okay.  And when you were contacted, do you

24   remember the agent specifically that you were contacted by?

25   A.        The agent?  I forgot his name.
```

```
 1   Q.        Does Agent Steven Gubanich --

 2   A.        Steven, yes.

 3   Q.        And was there a Special Agent David Smiljanich,

 4   as well?

 5   A.        Yes.

 6   Q.        Did they contact you --

 7             THE COURT:  How do you spell that name?

 8             MR. BRYAN:  The spelling, Your Honor, according

 9   to the 302, is:  S-M-I-L-J-A-N-I-C-H.

10   BY MR. BRYAN:

11   Q.        Were you contacted in person by these

12   individuals?

13   A.        Yes.

14   Q.        Okay.  And where were you -- what -- were you in

15   Toledo still at that time?

16   A.        I was in Michigan.

17   Q.        So you were in Michigan.  And they started

18   interviewing you concerning any knowledge you may have

19   about Mohammed Amawi and the other defendants in this case,

20   correct?

21   A.        Yes.

22   Q.        Okay.  Did they also conduct a telephone

23   interview with you at any time?

24   A.        No.

25   Q.        And what they were -- in essence, at that time
```

```
 1   they were further investigating this matter and they --
 2   strike that.
 3           Prior to this time, April 17th, 2007, had you had
 4   any contact or did the FBI ever seek you out prior to that
 5   time?
 6   A.      They didn't seek me out, no.
 7   Q.      Did you have any -- did you -- did you seek the
 8   FBI out?
 9   A.      No.  But one evening, I think in 2005, I came
10   from work, which was a job in Michigan, and there was in
11   the parking lot, there was about ten cars with many agents
12   around it, goes to each apartment asking questions about a
13   particular person in the building.
14   Q.      Okay.  So, that was -- that was actually in June
15   of 2004, wasn't it?
16   A.      I don't remember the date.
17   Q.      But you remember it being in the summer sometime?
18   A.      Yes.
19   Q.      Okay.  We'll talk about that in a minute.  But
20   that was the only other time that you had contact with the
21   FBI?  They actually talked to you about anything that you
22   may know was going on in the apartment complex, correct?
23   A.      Yeah.
24   Q.      And in fact, that day, they were interviewing
25   basically everybody who lived in those complexes, right?
```

```
 1   A.          That's correct.

 2   Q.          Okay.  We'll get to that in a moment.

 3               Now -- but on April 17th, 2007, that, now, is the

 4   first time that you were being asked by law enforcement

 5   officers to try to remember some of the things that were

 6   going on with Mr. Amawi, correct?

 7   A.          Yes.

 8   Q.          And you -- also, that law enforcement officer

 9   believed -- that these law enforcement officers, the FBI

10   itself, believed Mr. Amawi to have been involved in

11   violating the law in some way, correct?

12               MR. MILLER:  Objection, as to what this witness

13   would know, Your Honor.

14               THE COURT:  That's correct, I would agree.

15   Sustained.  He testified as to what they may have said or

16   whatever, but not to what he may believe they may have --

17   that they may have believed.

18   BY MR. BRYAN:

19   Q.          Well, they advised you that they believed

20   Mohammed Amawi was involved in a conspiracy to make Jihad

21   abroad, correct?

22   A.          Abroad?

23   Q.          To make Jihad, let's just say to make Jihad?

24   A.          I mean, they used the word "terrorist attack."

25   Q.          Okay.  And that caused you some alarm, did it
```

```
1   not?

2   A.        It surprised me.

3   Q.        You were surprised by it and you didn't believe

4   it either, correct?

5   A.        No.

6   Q.        Okay.  But also -- they also, during this

7   interview, indicated that your name had come up during

8   their investigation as well, correct?

9   A.        After I came down to -- I drove down to Toledo to

10  talk to them, and after talking to them for about probably

11  an hour to an hour and a half, they had mentioned that

12  Mohammed had said that I would be a good candidate for

13  Jihad.

14  Q.        That was their words, that you would be a good

15  candidate for Jihad, correct?

16  A.        That they said that was his words.

17  Q.        They said, right.  That's what they said that

18  Mohammed said.  That you would be a good candidate for

19  Jihad, correct?

20  A.        Right.

21  Q.        Did that cause you some discomfort at that time?

22  A.        No.  Why would it?

23  Q.        Because they're claiming that you may also be

24  someone that wants to go make Jihad somewhere?

25            MR. MILLER:  Objection, Your Honor.  Can we call
```

1   for sidebar, please?

2          THE COURT:  Sure.

3              (A sidebar conference was had.)

4          MR. MILLER:  The basis --

5          THE COURT:  Speak in a normal tone of voice.

6          MR. MILLER:  The basis of my objection, Your

7   Honor, is the fact that this whole line of questioning

8   is -- I see where counsel is going on this whole line of

9   questioning, but it really goes to what his feelings were

10  as opposed to what the FBI may have been thinking.  Even

11  Mr. Amawi was concerned about -- about -- or what this

12  witness is concerned about.  If he wants to ask him, you

13  know, were you concerned for yourself, fine, as opposed to

14  this, you know, continuing down this road about, were you

15  concerned about what the FBI might have been thinking Mr.

16  Amawi said that you said.

17         MR. BRYAN:  Your Honor, I think it's relevant to

18  this witness' motivation.  That if he perceived that he was

19  somehow being involved in this case, that he may want to be

20  a lot more --

21         THE COURT:  I think he said he was not or not

22  really.  I think he was asked were you concerned, he said,

23  no, not really.

24         MR. BRYAN:  He did -- that was his answer to the

25  question, so I mean, I don't know how much further I'm

```
 1   going to --
 2           THE COURT:  Well, you can't, because that's the
 3   answer you got.  What would you anticipate asking him
 4   further?
 5           MR. BRYAN:  Well, I was just going to continue a
 6   little bit, Your Honor, to say, you know, after the FBI
 7   told you that Mohammed Amawi said that you were a potential
 8   recruit for Jihad, that didn't cause you concern?
 9           MR. HERDMAN:  It sounds like argument, Your
10   Honor.
11           THE COURT:  It certainly does.
12           MR. BRYAN:  The witness' motivation to be -- to
13   provide favorable testimony.
14           THE COURT:  Whatever.  I'll let you ask that
15   question and that's -- but it is more properly presented to
16   the jury in light of the answer, but if you want to ask it,
17   that's fine.
18           MR. BRYAN:  Okay.
19               (Sidebar concluded.)
20           THE COURT:  I don't recall the question, but I'll
21   say why don't you go ahead and re-ask.  You can proceed.
22           MR. BRYAN:  Thank you, Your Honor.
23   BY MR. BRYAN:
24   Q.       Sir, in response to my last question, you said
25   that finding out that Mohammed Amawi had allegedly said
```

```
 1    that you could potentially be someone that could be trained

 2    for Jihad, I believe your response was, no, why would that

 3    cause me concern or why would I be concerned about that?

 4    A.        Yes.

 5    Q.        Is it safe for me to say that you feel

 6    comfortable in that situation because you knew that you

 7    didn't do anything wrong?

 8    A.        That's correct.  And also that I sat with the FBI

 9    for an hour and a half, and I think they knew my

10    personality, and they knew I'm not a person by that.

11    Q.        So by that point of the interview -- at that

12    juncture of the interview, you felt more comfortable when

13    they presented that information to you?

14    A.        More comfortable?

15    Q.        You felt more comfortable that they wanted --

16    that they weren't, themselves, believing that you were

17    thinking about Jihad yourself, correct?

18    A.        Yes.

19    Q.        But the other reason you felt comfortable is that

20    you, personally, knew that you never did anything wrong,

21    correct?

22    A.        That's correct.

23    Q.        And that you never did anything wrong with

24    Mohammed Amawi, as well, correct?

25    A.        Yes.
```

1    Q.        Now, as concerning that relationship you had with

2    Mohammed Amawi, you're being asked now in 2007 to recall

3    things that had happened several years before now, correct?

4    A.        That's right.

5    Q.        And do you agree with me that that was somewhat

6    difficult to do and that it wasn't anything that you were

7    ever going to have to recall later on in your life exactly

8    what was three or four years before?

9    A.        Dates and times are hard.

10   Q.        So dates and times are hard to try to put this

11   into proper context.  Is it -- would you agree with me that

12   you can remember things that happened, but maybe not

13   exactly when they happened and in what order they may have

14   happened?

15   A.        I mean, I always remember peoples' faces, but not

16   necessarily the time that I saw him or that I met them,

17   rather.

18   Q.        Okay.  When you first met Mr. Amawi, would that

19   have been around 2001 when you first met him at the mosque,

20   on Secor Road, or was that closer to 2003?

21   A.        It could be 2002, somewhere -- give or take.

22   Q.        And you knew him, basically, from somebody who

23   attended the same mosque that you attended, correct?

24   A.        No.  I saw him in the month of Ramadan, and there

25   was a person giving the lecture there and asking for

```
 1    donations, and I remember Mohammed not having any money,

 2    but he had three or four cars, and he had offered to all of

 3    them except for one for himself, and I thought that was

 4    very generous.

 5    Q.        Okay.  So he had donated cars for charity?

 6    A.        I don't know if they took the cars, but he

 7    offered them.

 8    Q.        He offered them.  And your impression of him was

 9    that he was a charitable person at that time?

10    A.        Yes.

11    Q.        And that impression of him continued, did it not,

12    throughout the time that you knew Mr. Amawi?

13    A.        Yes.

14    Q.        That he frequently shared his own belongs with

15    other people?

16    A.        Yes.

17    Q.        And he spent a lot of time with children as well?

18    A.        A lot of time with children.

19              MR. MILLER:  Your Honor, objection.

20    A.        Some time with children.

21              THE COURT:  I agree.

22    BY MR. BRYAN:

23    Q.        Now, Mr. Al Mazrouei, at one point in time -- and

24    again, I'm not real good with dates either, as it relates

25    to this case, but I'm doing my best -- but at one point in
```

```
 1    time, you were working in general construction in the

 2    Toledo area?

 3    A.        At some point, yes.

 4    Q.        Doing some carpentry work and remodeling and that

 5    type of thing?

 6    A.        Yes.

 7    Q.        And during that period of time, did you work --

 8    did you allow Mr. Amawi to work with you, as well, on a

 9    number of occasions?

10    A.        I believe so, yes.

11    Q.        Okay.  And you would pay him money for the work

12    that he did for you?

13    A.        Yes.

14    Q.        Okay.  You indicated that you and Mr. Amawi grew

15    distant and that you stopped spending time with him after a

16    period of time, correct?

17    A.        Yes.

18    Q.        Okay.  Do you recall when Mr. Amawi left to go to

19    Jordan, when that was about?

20    A.        2004, I guess.

21    Q.        Let me back up a little bit.  When Mr. Amawi was

22    working with you doing construction-type work, helping in

23    your remodeling work, was that prior to this trip to Jordan

24    that you talked about?

25    A.        Uh-huh.
```

```
 1   Q.        Okay.  And was that prior to you living at seven

 2   Shaftsbury, it was after you were living at seven

 3   Shaftsbury?

 4   A.        Yes.

 5             MR. MILLER:  I'm sorry, I didn't hear the answer.

 6   A.        Yes.

 7   BY MR. BRYAN:

 8   Q.        Do you recall?

 9             MR. MILLER:  Your Honor, it was a compound

10   question.  Was it, yes, before or, yes, after?

11   A.        Yes.

12   BY MR. BRYAN:

13   Q.        So he worked with you before and after you

14   started living in the same apartment complex with him or

15   just after?

16   A.        No, just after.

17   Q.        Okay.  And to get the timeline correct here, can

18   you remember when you first moved into Shaftsbury, the

19   month and date?

20   A.        It was probably closer to fall.

21   Q.        Okay.  So the fall of 2004 or the fall of 2003?

22   A.        It could be either, I'm very sorry.

23   Q.        Okay.  It could have been the fall of 2003?

24   A.        Yes.

25   Q.        Okay.  In the fall of 2003, Mohammed Amawi was
```

```
 1   already living at seven Shaftsbury when you moved in,

 2   correct?

 3   A.        That's correct.

 4   Q.        Okay.  And at some -- and he was living there

 5   with his brother Amr?

 6   A.        Yes.

 7   Q.        And you know his brother Amr as well?

 8   A.        (Nonverbal response).

 9   Q.        And during that period of time, do you know

10   whether or not his mother was there as well?

11   A.        I don't think she was there, originally, but she

12   came.

13   Q.        Okay.  Did she come prior to Mr. Amawi then going

14   to spend some time in Jordan himself, so was she in the

15   apartment complex prior to when Mr. Amawi left?

16   A.        Uh-huh, yes.

17   Q.        And do you recall about how many months you lived

18   in Shaftsbury and you knew Mr. Amawi lived in Shaftsbury

19   prior to him leaving and going to Jordan for a period of

20   time?

21   A.        Approximately, May, I lived there for three years

22   and probably could have been year to year-and-a-half.

23   Q.        Okay.  But before he went to Jordan the first

24   time and then came back I'm talking about?

25   A.        The first time?
```

1   Q.          Right.  You said he had left and went to Jordan

2   and then he came back from Jordan and returned from seven

3   Shaftsbury, correct?

4   A.          Yes.

5   Q.          Okay.  So you were -- spring of 2003, you were

6   living in Shaftsbury, you know Mohammed Amawi, correct?

7   A.          Mr. Masloum.

8   Q.          In the fall of 2003?

9   A.          Yes.

10  Q.          You -- you've -- you were living in Shaftsbury,

11  you know Mohammed Amawi.  During sometime during that

12  period of time, he was working with you in the construction

13  business, correct?

14  A.          Yes.

15  Q.          Okay.  And at some point after the fall of 2003

16  or just after you met Mr. Amawi, he, then, went on a trip

17  to Jordan, correct?

18  A.          (Nonverbal response).  Yes.

19  Q.          And do you recall him returning to seven

20  Shaftsbury sometime in the spring, like, say, March of

21  2004?

22  A.          Yes.

23  Q.          Okay.  And when he returned, did he express to

24  you that you still owed him some money from when he worked

25  with you beforehand?

```
1   A.        Yes.
2   Q.        Okay.  And did that make you feel uncomfortable?
3             MR. MILLER:  Objection, Your Honor.  Relevance.
4   Where is this going?
5             THE COURT:  No.  I'll let him answer the
6   question.
7   A.        Yes.
8   BY MR. BRYAN:
9   Q.        Okay.  And isn't it true to say that Mr. Amawi
10  felt uncomfortable, himself, asking about this money?
11  A.        Yes.
12            MR. MILLER:  Only time I recall as to what Mr.
13  Amawi --
14            THE COURT:  Sustained.  Jury will disregard the
15  answer.  Again, absent some observation and comment, the
16  witness cannot testify as to how someone else may have
17  felt.
18  BY MR. BRYAN:
19  Q.        Well, did Mr. Amawi aggressively seek this money?
20  A.        No.
21            MR. MILLER:  Objection, as to the word
22  "aggressive."
23            THE COURT:  I think he can answer that question.
24  BY MR. BRYAN:
25  Q.        Did he aggressively seek this money?
```

```
 1   A.        No.

 2   Q.        Did he come to you in sort of a humble manner?

 3   A.        Yes.

 4   Q.        And isn't it true at that time that Mr. Amawi was

 5   struggling financially with his bills?

 6   A.        I can't say.

 7   Q.        Okay.  Isn't it true that you were struggling

 8   financially at that time as well?

 9            MR. MILLER:  Objection as to relevance.

10            THE COURT:  I'll let him answer.

11   A.        Yes.

12   BY MR. BRYAN:

13   Q.        Okay.

14            THE COURT:  Who owed who money?  I'm confused.

15   BY MR. BRYAN:

16   Q.        Mr. Amawi said that you owed him money from when

17   he worked with you before, correct?

18   A.        Yes.

19   Q.        And that is a correct statement, you did still

20   owe him some money from when he worked with you?

21   A.        That's correct.

22   Q.        Okay.  But you didn't have the ability to pay him

23   back that money at that time, correct?

24   A.        That's correct.

25   Q.        And he was sort of humble and contrite in asking
```

```
 1    for it, but he was asking for it because he really needed

 2    it because of his own financial situation, right?

 3    A.        That's correct.

 4    Q.        And you really --

 5              THE COURT:  Again, witness can't say why somebody

 6    did something.  Again, if something was said at the time,

 7    then that's fine.  He can testify as to what --

 8    BY MR. BRYAN:

 9    Q.        What did Mr. Amawi say to you in asking for

10    money?

11    A.        What did he say?  I can't recall, but he just

12    requested that he needed to be paid.

13    Q.        And his tongue was sort of apologetic, if you

14    recall?

15    A.        Yes.

16    Q.        Okay.  And humble?

17    A.        Yes.

18    Q.        And your tone back to him, again, apologetic and

19    humble, was you didn't really have the ability to give it

20    back to him at that time?

21    A.        That's correct.

22    Q.        Is this something that went back and forth for a

23    period of time, while Mr. Amawi --

24    A.        A few times, perhaps.

25    Q.        Okay.  And do you recall the time sometime near
```

1    October or November of 2004, Mr. Amawi was about to be

2    evicted from his apartment?

3    A.          I don't recall.

4    Q.          Do you remember ever remember him telling you,

5    brother, I'm going to be evicted from my apartment, I need

6    money somehow to keep from being evicted?

7    A.          I don't recall.

8    Q.          Do you recall in the fall of 2004 that Mr. Amawi

9    and his brother, they, themselves, went to Jordan and Mr.

10   Amawi was alone, then, in seven Shaftsbury?

11   A.          I don't remember that.

12   Q.          Okay.  Now, going back to the June of 2004, you

13   say Mr. Amawi returns somewhere in the spring or March of

14   2004, but in June of 2004 the FBI came to your apartment

15   complex, correct?

16   A.          Uh-huh.

17             MR. MILLER:  Your Honor, just for clarity, I

18   think the witness didn't say any particular month, I think

19   the question was spring of '04.

20             THE COURT:  Okay.  That's fine.  Rephrase it.

21   BY MR. BRYAN:

22   Q.          I think we'll -- but could it have been just

23   sometime in the early summer?

24   A.          I can't say.

25             MR. BRYAN:  Your Honor, other evidence --

```
 1    A.         I thought you were speaking generally.

 2    BY MR. BRYAN:

 3    Q.         You remember the day the FBI came in seven

 4    Shaftsbury?

 5    A.         I remember the day, yes.

 6    Q.         And prior to the FBI coming to seven Shaftsbury,

 7    obviously, you're not -- not Arab, correct, or from the

 8    Middle East?

 9    A.         That's correct.

10    Q.         You're from America, you were born and raised in

11    the United States, correct?

12    A.         Yes.

13    Q.         But you're -- you subscribe to Islam, correct?

14    A.         If you want to use that word, I guess,

15    subscription.

16    Q.         I'm sorry, that's a bad choice?

17    A.         That's a long --

18    Q.         Your faith, your faith is Islam, correct?

19    A.         That's right.

20    Q.         Okay.  And that -- that you entered into that

21    faith about the time that you were 18 years old?

22    A.         That's correct.

23    Q.         Okay.  And you -- you -- and how old are you

24    today?

25    A.         Forty-one.
```

```
1   Q.          Okay.  And you continue strong in that faith, you
2   continue to practice as a Muslim, correct?
3   A.          Yes.
4   Q.          Okay.  And you were continuing to practice strong
5   as a Muslim back in 2004, as well, correct?
6   A.          Yes.
7   Q.          Okay.  And that's how you knew the defendants in
8   this case, because they were practicing as Muslims as well,
9   correct?
10  A.          I don't consider myself --
11              THE COURT:  I can't hear you, I'm sorry.
12  A.          I don't consider myself a strong, practicing
13  Muslim.
14  Q.          Okay.
15  A.          If you -- I don't want to get into details.
16  Q.          But you came to be able to spend not only a lot
17  of time with Mr. Amawi, but other people from the mosque
18  who were from the Middle East?
19  A.          I've been around Arabs and Pakistanis since I
20  became Muslim in 1987.
21  Q.          And isn't it true that in that environment, that
22  there's a tendency to want to love to talk about politics
23  and world affairs and what's going in the world?
24  A.          They talk about everything.
25  Q.          Talk about religion and politics and things like
```

```
 1   that?

 2   A.        Yes.

 3   Q.        Okay.  Now, when the FBI came in the summer of

 4   2004 to interview people at your apartment complex, did the

 5   FBI interview you?

 6   A.        They spoke to me.

 7   Q.        Were you aware they interviewed Mohammed Amawi,

 8   as well?

 9   A.        I assume they talked to everybody.

10   Q.        Do you have any recollection of people talking

11   about how Mr. Amawi spoke with the FBI that day?

12   A.        How he spoke with them?

13   Q.        Whether or not he openly invited the FBI in and

14   gave them drink and frankly shared his opinions?

15   A.        Yes.

16              MR. MILLER:  Your Honor, is he asking --

17              THE COURT:  Yeah, to the extent that he's

18   testifying to some conversations and comments made by

19   others, those comments and conversations will not be

20   considered for the truth of the matter asserted, namely how

21   Mr. Amawi may have received the FBI.  It's not evidence of

22   that.

23   BY MR. BRYAN:

24   Q.        But you became aware of that, not only through

25   others, but through Mr. Amawi, himself?
```

```
 1              MR. MILLER:  What is that, Your Honor?
 2    A.        He told me, yes.
 3              THE COURT:  Again, the objection's sustained.
 4    Cannot consider truth of whatever may have been asserted,
 5    that it was said and will be considered, but that's all.
 6              MR. BRYAN:  We're not offering it for the truth,
 7    Your Honor.
 8    BY MR. BRYAN:
 9    Q.        And you knew this about Mr. Amawi, as well, that
10    he loved to debate and talk to people, correct?
11              MR. MILLER:  Objection, Your Honor, as to
12    relevance.
13              THE COURT:  Overruled.
14    A.        That's correct.
15    BY MR. BRYAN:
16    Q.        He spent 24/7 on the computer, correct?
17    A.        Yes.
18    Q.        Okay.  Even one of the things he did on the
19    computer was he ran chat rooms?
20    A.        That's right.
21    Q.        Were you with him when he was running a lot of
22    these chat rooms?
23    A.        A few.
24    Q.        Okay.  And you said that you spent, maybe, times
25    with Mr. Amawi, three days, three times a week or so often,
```

1   whenever he was there?

2   A.        That's correct.

3   Q.        Okay.  And he was pretty easy to find because he

4   was usually sitting in front of his computer?

5   A.        Yes.

6   Q.        Okay.  And he loved to share what he was doing

7   with other people; is that true?

8   A.        I mean, I wasn't there when other people were

9   there, but every time I went there, you know, he let me

10  come in his bedroom and sit.

11  Q.        Were you ever there when other people were there?

12  A.        On his computer or just in general?

13  Q.        Yes, in general?

14  A.        I mean, people came and went.

15  Q.        Okay.  But he wasn't real secretive about it,

16  didn't have like a special place he was hiding while he was

17  on the computer, it was pretty much open to the world,

18  correct?

19  A.        I mean, before he went to Jordan, he -- and when

20  I knocked on the door, he would always answer and we'd sit

21  down and talk or --

22            THE COURT:  I'm very sorry, I couldn't hear what

23  you are saying.

24  A.        Before he went to Jordan, he would always be --

25  be one of -- of those people who answered the door or he

```
 1   would come and greet me at the door, but after he came back

 2   from Jordan, when he was on the computer so much, I always

 3   had to walk back to his bedroom to talk with him.

 4   BY MR. BRYAN:

 5   Q.        Okay.  Meaning, the door was open and you would

 6   just walk right in?

 7   A.        Basically.

 8   Q.        Knock your announcement and he'd yell back here

 9   and you'd go back?

10   A.        Yes.

11   Q.        And his bedroom actually faced the parking lot,

12   correct?

13   A.        That's correct.

14   Q.        So he would sit by his -- and his computer was

15   basically by the window?

16   A.        Yes.

17   Q.        Okay.  And you -- sometimes when you were out

18   walking to the parking lot or taking stuff to the garbage

19   or whatever, you could see him sitting at his computer,

20   right?

21   A.        If the shade was up.

22   Q.        Now, Mr. Al Mozrouei, were you with Mr. Amawi at

23   times when he was debating with other people online,

24   running a chat room?

25   A.        Yes.
```

```
 1   Q.        In that chat room, do you recall him going onto
 2   Paltalk and there were different types of chat rooms that
 3   were on there?
 4   A.        I don't remember any particular chat rooms, but
 5   there were chat rooms.
 6   Q.        Okay.  And the chat rooms, as they related to
 7   religion, a lot of them were related to religion?
 8   A.        Almost always.
 9   Q.        Frequently, it was Mr. Amawi debating people from
10   other faiths as well, correct?
11   A.        That's correct.
12   Q.        And debating with, let's say, Christians
13   frequently as well, right?
14   A.        Yes.
15   Q.        Do you -- did you consider Mr. Amawi when you at
16   least -- what you observed him sometimes, not only debating
17   them, but proselytizing as well?
18   A.        I don't know that word, sorry.
19   Q.        Trying to convert them to become a Muslim?
20   A.        Yes, of course.
21   Q.        Okay.  And did he consider that to be part of
22   being a good Muslim is to try to gain converts for Islam?
23   A.        Yes.
24   Q.        Okay.  And in -- and he was doing this frequently
25   in your presence, correct?
```

1    A.      Yes.

2    Q.      Okay.  Did some of these debates lead to

3    Christians who were being critical of Muslims because of,

4    like, beheadings and things like that?

5    A.      I don't recall.

6    Q.      Well, they would say things like, how can Islam

7    be so great if the people in Islam, they behead people and

8    things like that?

9    A.      I can't --

10   Q.      Okay.  Well, you testified in direct examination

11   about seeing a beheading video or -- I don't know how

12   frequently, but you saw a beheading video that Mr. Amawi

13   showed you, correct?

14   A.      Yes.

15   Q.      Do you remember during these debates that Mr.

16   Amawi would not only speak to people he was debating with,

17   but they would e-mail each other video clips and things

18   like that?

19   A.      I don't recall.

20   Q.      Okay.  Do you recall him, while he was debating

21   Christians, talking about these people being beheaded and

22   things like that, showing atrocities that were committed

23   against Muslims in other parts of the world?

24   A.      Can you repeat that?

25   Q.      Do you recall that, like, during some of these

```
 1   debates, Mr. Amawi showing atrocities that were committed

 2   against Muslims in different parts of the world?

 3   A.        Yes.

 4   Q.        Okay.  And these atrocities -- and we're not

 5   talking about the United States, we're talking, like, in,

 6   say, in Indonesia and things like that, did you view these

 7   videos as well, did he show you these videos as well?

 8   A.        Yes.

 9   Q.        Okay.  And was showing you these videos in

10   response to your telling him that this be heading is really

11   bad, or whatever, that he was, then, trying to explain to

12   you that, you know, atrocities are taking place?

13           MR. MILLER:  Objection as to what Mr. Amawi --

14           THE COURT:  I agree.  You can describe the

15   circumstances and what things preceded, but --

16           MR. BRYAN:  I'm sorry, Your Honor.

17   BY MR. BRYAN:

18   Q.        Again, you're being asked to recall memories that

19   are several years old now, and even at the time you were

20   first asked to recall them, they were a couple years old,

21   correct?

22   A.        Yes.

23   Q.        And it's pretty easy to remember a beheading

24   video.  You see it once and you'll remember them for the

25   rest of your life, correct?
```

```
 1   A.        I couldn't sleep that well the next few nights.
 2             THE COURT:  I'm sorry, I couldn't hear.
 3   A.        I couldn't sleep that well the next few nights
 4   after seeing that video.
 5   BY MR. BRYAN:
 6   Q.        What I'm asking you is, try to remember the
 7   context of having seen this beheading video, and those
 8   facts are a little easier to forget over time, would you
 9   agree with me about that?
10   A.        No.
11             MR. MILLER:  Objection, as to easy to forget.
12             THE COURT:  I agree.  Sustained.
13   BY MR. BRYAN:
14   Q.        But as it relates to these debates, you did --
15   Mr. Amawi did say, you know, over in Indonesia and other
16   parts of the world -- and he would show you videos
17   somewhere of, like, children -- he -- been slaughtered,
18   Muslim children who had been slaughtered?
19   A.        I mean, I can relay the videos that I -- he
20   showed me, but I don't remember that particular one talking
21   about.
22   Q.        Do you remember a man who was being chased?
23   A.        Yes, I do.
24   Q.        And he was being hacked with a machete?
25   A.        Had been and was, yes.
```

```
 1   Q.        And this was -- this was a Muslim who was being
 2   attacked by -- at least according to what was being
 3   portrayed in the video -- by a group of Christians in a
 4   different part of the world, correct?
 5   A.        It was an individual with a sword, and I remember
 6   them -- there was police there with M-16s standing around
 7   doing nothing about it.  And just local people actually in
 8   Islam.
 9   Q.        And at least, according to the video and what was
10   perceived by you and Mr. Amawi, the man that was being
11   hacked with a machete was a Muslim, correct?
12   A.        Yes.
13   Q.        Okay.  And then did Mr. Amawi, then, go on to
14   explain to you the person who was beheaded in the video why
15   he was being beheaded?
16   A.        He tried to explain his view after I said it was
17   unjust.
18   Q.        Not his view, but did he explain to you that the
19   circumstances of the video?  You don't speak Arabic,
20   correct?
21   A.        I speak a little.
22   Q.        Oh, you -- okay.  But do you speak it fluently?
23   A.        No.
24   Q.        Now, this beheading video that you saw was in
25   Arabic, correct?
```

```
 1   A.          Yes, people speaking were speaking in Arabic.

 2   That's correct.

 3   Q.          Was it frequent when Mr. Amawi was watching

 4   videos with you to be explaining what was being said in the

 5   video?

 6   A.          I don't recall.

 7   Q.          Do you recall watching the beheading video, Mr.

 8   Amawi explaining that the person who was receiving, quote,

 9   justice or whatever, was a traitor?

10   A.          He could --

11   Q.          Do you remember saying this gentleman was someone

12   who had worked with Americans and left some type of chips

13   in homes and Americans bombed these homes and a lot of

14   innocent people were killed and things like that?

15   A.          Yes.

16   Q.          And did he explain what was happening in that

17   video was sort of the Islamic version of capital

18   punishment, correct?

19   A.          Yes.

20   Q.          That this man's actions had lead to the deaths of

21   a lot of innocent people because they -- their homes were

22   bombed and that they were carrying out justice on this man

23   by executing him, correct?

24   A.          But he was an innocent person.

25   Q.          No.  The man in the video -- at least
```

1    purportedly -- the man in the video was the guy who had

2    laid the chips in homes that had then exploded and people

3    had died, correct?

4    A.        He showed me two videos.  So one of them he

5    talked about that, but the other one, I think, was a

6    reporter or something.

7    Q.        Okay.  So then you saw, you say, a video of a

8    reporter correct or?

9    A.        I saw beheading of two people.

10   Q.        And from the best of your recollection, the other

11   guy may have been a reporter?

12   A.        Now, that you mention the chips, I recall, my

13   memory's coming back to me that he mentioned something

14   about that, yes.

15   Q.        Okay.  Now, you also said that Mr. Amawi showed

16   you videos of military trucks that got blown up and things

17   like that?

18   A.        One video.

19   Q.        Okay.  Do you recall other times Mr. Amawi

20   showing you other videos?

21   A.        I mean, there's two occasions.  One of them was

22   of a Serbian convoy and they were being ambushed by, I

23   forgot the country -- the country.

24   Q.        Was he explaining these other videos sort of as

25   another prospective, other peoples', instead of the western

```
 1   media prospective, of what's going on, the other
 2   perspective of what's happening over there, do you recall
 3   him explaining that, too?
 4   A.        Yes.
 5   Q.        Okay.  And did you witness Mr. Amawi doing this
 6   frequently with other people as well, trying to, like,
 7   during his debating, explain that what you're hearing over
 8   here isn't the whole picture, there's more to the picture?
 9   A.        Well, I knew that -- I don't remember -- I don't
10   remember anybody else -- there's one neighbor that came
11   over the second time he showed me a video.
12   Q.        Okay.  When you talked about first time and
13   second time, were you talking about two different days?
14   A.        That's correct.
15   Q.        You're not talking about two different videos?
16   A.        What's that?
17   Q.        You're not talking about two different videos,
18   you're talking about two different occasions that you
19   viewed videos with Mr. Amawi?
20   A.        There was two occasions where he showed me
21   videos.
22   Q.        Okay.  And there were multiple videos that he
23   showed you?
24   A.        That's correct.
25   Q.        And some of those videos that we discussed
```

1   earlier involved atrocities that were taking place against

2   Muslims in other parts of the world?

3   A.          I believe the second time he showed me, there was

4   only one video.  The first time it was all those that we're

5   discussing.

6   Q.          Was it the first time you saw the beheading

7   videos as well?

8   A.          What --

9   Q.          Was it --

10  A.          -- first time or second time?

11  Q.          -- the first time that you saw the beheading

12  videos, as well?

13  A.          The first time, I saw one beheading video.

14  Q.          Okay.  And then he showed you all these other

15  videos, as well, like bad things that were happening

16  against Muslims if other parts of the world?

17  A.          That's correct.

18  Q.          Okay.  Now -- and then the second time, were the

19  videos more of a military nature, like military attacks

20  being carried out on different service?

21  A.          It was a mixture.

22  Q.          Okay.  And again, part of him showing you the

23  videos was to explain that there was more sides to the

24  story, correct?

25              MR. BRYAN:  Objection, purpose?

```
 1              THE COURT:  I would agree.  Why somebody does

 2   something, one person cannot testify to that unless it was

 3   accompanied by something that was said or done and that he

 4   can testify to.

 5   BY MR. BRYAN:

 6   Q.        Did he say to you that you don't -- you don't get

 7   everything from western media?

 8   A.        That's correct.

 9   Q.        And he said this was another way of getting

10   information from -- from what was really going on over

11   there, correct?

12   A.        I mean, he was trying to tell me something that I

13   already knew.

14   Q.        All right.  You already knew that, but again,

15   that's what he's explained, correct?

16   A.        Yes.

17   Q.        Okay.  And so you personally believe that as

18   well, that you don't get the whole picture?

19   A.        I don't think he showed me the videos necessarily

20   to teach me that, you know.

21   Q.        Now, on -- during, again, this is now the early

22   part of summer of 2004.  Did you know a person by the name

23   of Bilal Griffin?

24   A.        Yes.

25   Q.        Okay.  Now, was he a person that started coming
```

```
 1   around and seeing Mohammed Amawi at his apartment during

 2   that period of time say summer of 2004?

 3            THE COURT:  How much longer do you expect to be

 4   on cross-examination?

 5            MR. BRYAN:  A little while longer, Your Honor.

 6            THE COURT:  A little while meaning two minutes,

 7   two hours?

 8            MR. BRYAN:  Half-hour, Your Honor.

 9            THE COURT:  Okay.  I have some things scheduled

10   at noon, and I think we'll break now.  It seems to be a

11   good break point; is that correct?

12            MR. BRYAN:  That's correct.

13            THE COURT:  Ladies and gentlemen, if I'm going to

14   be delayed because of these other matters that are

15   scheduled, I'll try to let Amy know and I'll give you all a

16   heads up.

17            MR. HARTMAN:  What time are we due back, Judge?

18            THE COURT:  1:00.

19

20

21

22

23

24

25
```

```
 1                   C E R T I F I C A T E

 2

 3            I certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6    s:/ Angela D. Nixon

 7    --------------------------             -----------

 8    Angela D. Nixon, RPR, CRR              Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**I N D E X**</u>

<u>**Witness**</u>                                              <u>**Page**</u>

Cross Examination of Mr. Whitworth

(By Mr. Boss)                                    46

(By Mr. Whitmer-Rich)                                    51

ReDirect Examination

(By Mr. Teresinski)                              54


Direct Examination of Mikaeil Al Mozrouei          63

Cross Examination of Mikaeil Al Mozrouei          85

(By Mr. Bryan)