1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                   WESTERN DIVISION

3   UNITED STATES OF AMERICA,    )  Docket No. 3:06-CR-719

4          Plaintiffs,           )  Toledo, Ohio

5              v.                 )  May 13, 2008

6   MOHAMMED AMAWI, ET AL.,       )

7          Defendants.           )

8   -----------------------------

9         TRANSCRIPT OF JURY TRIAL, VOLUME 49
           BEFORE THE HONORABLE JAMES G. CARR
10            UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:    Gregg N. Sofer
                           David I. Miller
14                         Jerome J. Teresinski
                           U.S. Department of Justice
15                         10th & Constitution Avenue, NW
                           Washington, DC 20530
16                         (202) 353-3464

17                         Thomas E. Getz
                           Justin E. Herdman
18                         Office of the U.S. Attorney
                           801 Superior Avenue, W
19                         Cleveland, Ohio 44113
                           (216) 622-3840
20
    For the Defendant      Timothy Ivey
21  Amawi:                 Edward Bryan
                           Amy Cleary
22                         Jonathan Whitmer-Rich
                           Office of the Federal Public Defender
23                         750 Skylight Office Tower
                           1660 West Second Street
24                         Cleveland, Ohio 44113
                                       (216) 522-4856
25

```
1                            Elias Muawad
                             Muawad & Muawad
2                            Suite 209
                             36700 Woodward Avenue
3                            Bloomfield Hills, Michigan 48304
                             (248) 594-4700
4    For the Defendant
     El-Hindi:               Charles M. Boss
5                            Boss & Vitou
                             111 West Dudley Street
6                            Maumee, Ohio 43537
                             (419) 893-5555
7
                             Stephen D. Hartman
8                            Kerger & Kerger
                             Suite 201
9                            33 South Michigan Street
                             Toledo, Ohio 43602
10                           (419) 255-5990

11                           Alek H. El-Kamhawy
                             Raslan, El-Kamhway & Pla
12                           Suite 3FE
                             1700 East 13 Street
13                           Cleveland, Ohio 44114
                             (216) 928-1500
14
     For the Defendant       David L. Doughten
15   Mazloum:                4403 St. Clair Avenue
                             Cleveland, Ohio 44103-1125
16                           (216) 361-1112

17                           Jeffrey J. Helmick
                             Helmick & Hoolahan
18                           2nd floor
                             1119 Adams Street
19                           Toledo, Ohio 43624-1508
                             (419) 243-3800
20

21                           Mohammed Abdrabboh
                             1620 Ford Avenue
22                           Wyandotte, MIchigan 48192
                             (734) 283-7000
23

24
     Court Reporter:         Angela D. Nixon, RPR, CRR
25                           1716 Spielbusch Avenue
                             Toledo, Ohio 43624
```

1                        (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Mr. Teresinski, who is your next

 2   witness?

 3            MR. TERESINSKI:  United States of America is

 4   going to call Toledo Police Officer Michael Stewart to the

 5   witness stand, and then also another police officer from

 6   Toledo, David Lamberger.  Both are going to testify

 7   regarding their interactions with the defendant

 8   Mr. Mohammed Amawi on May 2nd, 2005 and May 4th, 2005,

 9   respectively.

10            THE COURT:  Okay.

11            MR. TERESINSKI:  May I proceed, Your Honor?

12            THE COURT:  Yes.

13            MR. TERESINSKI:  Thank you, sir.

14            Police Officer Michael Stewart.

15                     MICHAEL STEWART,

16   was herein, called as if upon examination, was first duly

17   sworn, as hereinafter certified, and said as follows:

18            THE COURT:  And Officer, you should slide your

19   chair up so you're about this distance from the microphone

20   and speak loudly and clearly, please.

21            THE WITNESS:  Yes.

22            THE COURT:  And will you tell the ladies and

23   gentlemen and me your name?

24            THE WITNESS:  Michael Stewart.

25            THE COURT:  S-T-E-W-A-R-T?
```

1             THE WITNESS:  Yes.

2             THE COURT:  And you're a Toledo police officer?

3             THE WITNESS:  Yes.

4             THE COURT:  How long have you worked for the

5    Toledo Police Department?

6             THE WITNESS:  Twenty-two years.

7             THE COURT:  And what is your current assignment?

8             THE WITNESS:  Patrolman, northwest district

9    station.

10            THE COURT:  And back in May of 2005, what was

11   your assignment?

12            THE WITNESS:  Patrolman, northwest district

13   station.

14            THE COURT:  And at some point during that time

15   you had an encounter with one of the defendants; is that

16   correct?

17            THE WITNESS:  Yes.

18            THE COURT:  Is that Mr. Amawi?

19            THE WITNESS:  Yes.

20            THE COURT:  And do you see him in the courtroom

21   today?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.  And is he sitting over at

24   counsel table?

25            THE WITNESS:  Yes.

```
 1              THE COURT:  Record should show that he's
 2   identified Mr. Amawi.  Okay.
 3              MR. TERESINSKI:  May I proceed, Your Honor?
 4              Thank you.
 5                    DIRECT EXAMINATION
 6   BY MR. TERESINSKI:
 7   Q.        Good afternoon.  Were you working as a
 8   Philadelphia -- strike that.  That's habit.
 9              Were you working as a Toledo police officer back
10   on May 2nd, 2005?
11   A.        Yes.
12   Q.        And were you in uniform on that date and riding
13   in a marked patrol car?
14   A.        Yes.
15   Q.        And what shift were you working that day?
16   A.        Day shift.
17   Q.        And during the course of your official duties,
18   did you come in contact with the defendant Mohammed Amawi?
19   A.        Yes.
20   Q.        And was that in response to a 911 call to go to
21   AZ Travel in Toledo?
22   A.        Yes.
23   Q.        And what is the address for AZ Travel?
24   A.        4110 Secor.
25   Q.        And could you tell the members of the jury what
```

1  the nature of the 911 call was that brought you to that

2  location?

3  A.        It was a call about suspicious people following

4  him.

5  Q.        Okay.  And did you have contact and interactions

6  with Mr. Amawi on that date?

7  A.        Yes.

8  Q.        And describe the nature and circumstances of

9  those interactions.

10  A.        He was upset and wanted to find out who was

11  following him.  He said he'd been followed on several

12  occasions by several different vehicles with different

13  people driving the vehicles.

14  Q.        Did he describe the vehicles?

15  A.        One was a gold SUV.  I think the other one was a

16  darker SUV and one was a Honda Civic.

17  Q.        Did he, in fact, give you a license plate for one

18  of those vehicles?

19  A.        Yes.

20  Q.        And did he indicate whether it was -- did he

21  describe the people who were following him in any way?

22  A.        He said there were two white males and a white

23  female.

24  Q.        And did he tell you anything else about being

25  followed?

```
1   A.         He had been followed several different times, and

2   at one point he said that someone was following his mother

3   driving his car.

4   Q.         Okay.  What else did Mohammed Amawi tell you at

5   AZ Travel?

6   A.         He pointed out a telephone pole across the street

7   and stated that he was being filmed.

8   Q.         Okay.  And did you do anything to calm his

9   concerns?

10  A.         I told him if he sees these people again, he'd

11  have to call us, because I have no idea what's going on.

12  Q.         And did you write down your information in the

13  report as you normally would?

14  A.         Yes.

15  Q.         I have nothing further.  Thank you.

16             THE COURT:  Any questions?

17                         CROSS EXAMINATION

18  BY MR. IVEY:

19  Q.         Officer Stewart, just a few questions.  The call

20  that was made, that was on May the 2nd, 2005; is that

21  correct?

22  A.         Yes.

23  Q.         And one of the things that Mr. Amawi indicated to

24  you was that he felt he had been followed on several

25  occasions prior to this time, correct?
```

1    A.        Yes.

2    Q.        And so since this was early May of 2005, that

3    would be back well into April, at least several weeks prior

4    to this date, he had also felt he was being followed?

5    A.        I believe he said he was followed that day, but I

6    don't know exactly the dates that he was followed.

7    Q.        I'm not asking you the dates, but did the --

8    during the call did he indicate to you he had been followed

9    for several weeks prior to this time?

10   A.        I don't remember if he said several weeks, but he

11   said several times.

12   Q.        Okay.  Several times prior to May 2nd?

13   A.        Yes.

14   Q.        Okay.  Now, when these calls come out, there is a

15   written record made, an incident report of what transpired

16   in the call; is that correct?

17   A.        Not always, but I did make a report form.  He

18   asked me to make a report and I made a report.

19   Q.        Okay.  You received the call initially by

20   dispatcher, correct?

21   A.        Correct.

22   Q.        And that dispatcher tells you the general nature

23   of the call you were going out on; is that correct?

24   A.        Yes.

25   Q.        And the dispatcher will also give you facts, some

```
1   basic facts about the calls they may feel you need to know,

2   correct?

3   A.        Yes.

4   Q.        Okay.  I'm going to show you a written record.  I

5   guess this is defense exhibit -- I have no idea what the

6   number was.

7            MR. WHITMER-RICH:  A-11.

8   BY MR. IVEY:

9   Q.        Defense A-11, I'm just going to show this to you

10  to see if it refreshes your recollection about whether or

11  not you were informed he was followed for the past few

12  weeks.

13  A.        Yes.

14  Q.        So does that help your memory as to whether or

15  not Mr. Amawi indicated he felt he was being followed the

16  past few weeks?

17  A.        Yes.

18  Q.        And that, in fact, is what he indicated.  At

19  least that's what the written report indicated to you?

20  A.        Yes.

21  Q.        Okay.  Thank you, officer.

22            THE COURT:  Any other questions?

23            MR. TERESINSKI:  No, Your Honor.

24            THE COURT:  Okay.

25            Officer, you may step down.
```

```
 1          MR. TERESINSKI:  United States of America calls

 2   Police Officer David Lamberger.

 3          MR. IVEY:  Your Honor, can we approach for a

 4   moment, please?

 5          THE COURT:  Sure.

 6              (A sidebar conference was had on the

 7              record.)

 8          THE COURT:  Your office is going to be short one

 9   assistant if we designated -- off the record.

10              (A brief discussion was had off the record.)

11          MR. IVEY:  I just wanted to clarify the record.

12   I went back to the trial table and looked at realtime.  The

13   court reporter wrote down I had asked was he followed the

14   past two weeks, but actually I asked him if it was the past

15   few weeks and I just wanted to make sure that was on the

16   record.

17                  DAVID LAMBERGER,

18   was herein, called as if upon examination, was first duly

19   sworn, as hereinafter certified, and said as follows:

20          THE COURT:  And Officer, if you'll be about this

21   distance from the microphone and speak loud so everybody

22   can hear you.  And will you tell me and the ladies and

23   gentlemen of the jury your name?

24          THE WITNESS:  Officer David Lamberger.

25          THE COURT:  And how do you spell your last name?
```

1          THE WITNESS:  L-A-M-B-E-R-G-E-R.

2          THE COURT:  Okay.  And you're currently employed

3    by the Toledo Police Department?

4          THE WITNESS:  Yes, I am.

5          THE COURT:  How long have you been with the

6    department?

7          THE WITNESS:  Eleven years.

8          THE COURT:  What is your current assignment?

9          THE WITNESS:  I patrol downtown.

10         THE COURT:  And on or about sometime in May of

11   2005, about three years ago, what was your assignment?

12         THE WITNESS:  I patrolled the northwest district

13   station.

14         THE COURT:  Okay.  And were you with anybody?

15   Did you have a partner at that time?

16         THE WITNESS:  My partner was John Eischen.

17         THE COURT:  Okay.  And did you encounter one of

18   the defendants in this case?

19         THE WITNESS:  Yes, I did.

20         THE COURT:  Do you see him in the courtroom?

21         THE WITNESS:  Yes, I do.

22         THE COURT:  And do you know his name?

23         THE WITNESS:  Mohammed Amawi.

24         THE COURT:  The record should will show that the

25   officer identified the defendant.

```
1              Mr. Teresinski, you may begin.

2              MR. TERESINSKI:  Thank you, Your Honor.

3                         DIRECT EXAMINATION

4    BY MR. TERESINSKI:

5    Q.        Officer, good afternoon.  Thanks for coming in.

6              Back on May 4th of 2005, were you in uniform in a

7    marked patrol car that day?

8    A.        Yes, I was.

9    Q.        And you worked for the Toledo Police Department?

10   A.        Yes.

11   Q.        And what time did your shift start that day?

12   A.        2:30 in the afternoon.

13   Q.        And did you and your partner, Officer Eischen --

14   you mentioned you came in contact with an individual who

15   identified himself as Mohammed Amawi?

16   A.        That's correct.

17   Q.        And that was in response to a 911 call?

18   A.        Yes.

19   Q.        And what was the -- could you describe the nature

20   of the call and what happened?

21   A.        Well, we were dispatched to Central Avenue and

22   Executive Parkway to meet a complainant in a parking lot.

23   He was concerned he was being followed.

24   Q.        Could you describe to the members of the jury

25   your interaction with Mohammed Amawi at that time?
```

```
 1    A.        We pulled into the lot.  We saw one person

 2    standing there.  It was a man, smaller body type, wearing

 3    black clothing, had a beard, and we asked him, Are you our

 4    caller?  And he said, yes, and he explained that he was

 5    concerned because he felt he was being followed.

 6    Q.        Okay.  And did he give you information regarding

 7    his identification, Social Security Number, address?

 8    A.        No.  We didn't get into that.

 9    Q.        What did he do physically, did he tell you

10    anything?

11    A.        He said that he was convinced he was being

12    followed, that he suspected it was either the government or

13    somebody else.  He said if it was the government, that was

14    fine because that's what the government's supposed to do.

15    He was worried it was somebody else.  And furthermore, that

16    the person that was following him was parked across the

17    parking lot.

18    Q.        Did you, based on your interactions with

19    Mr. Amawi, go over and investigate the vehicle?

20    A.        Yes, we told him we would go investigate the

21    vehicle he pointed out and go back and tell him what we

22    found out.

23    Q.        When you came back, what did you tell Mr. Amawi?

24    A.        That it was a gentleman waiting for his wife to

25    come out of the business.
```

```
 1   Q.        Did you have any further contact with Mr. Amawi
 2   that day?
 3   A.        No.  We concluded our assistance, and he thanked
 4   us, and we left in our patrol car.
 5             MR. TERESINSKI:  And I don't think I have any
 6   more questions at this time.  Thank you very much.
 7             Thank you, Your Honor.
 8             MR. IVEY:  Your Honor, we have no questions for
 9   the witness.
10             THE COURT:  Okay.  Anybody any questions?
11             MR. BOSS:  No, thank you.
12             THE COURT:  Officer, you may step down.  You may
13   go or you're welcome to stay.  It's entirely up to you.
14             And the government's next witness is?
15             MR. TERESINSKI:  Let me confer with my colleague,
16   Your Honor.  May I also take leave to step outside and
17   dismiss the police officer?
18             THE COURT:  No problem.
19             MR. GETZ:  At this time United States of America
20   calls Special Agent Charles Holloway.
21                       CHARLES HOLLOWAY,
22   was herein, called as if upon examination, was first duly
23   sworn, as hereinafter certified, and said as follows:
24             THE COURT:  And will you tell the ladies and
25   gentlemen your name, please.
```

```
 1              THE WITNESS:  Charles R. Holloway,
 2    H-O-L-L-O-W-A-Y.
 3              THE COURT:  And are you currently employed?
 4              THE WITNESS:  Yes, sir.  I'm a special agent with
 5    the Federal Bureau of Investigation.
 6              THE COURT:  And you have a particular location or
 7    office from which you are resigned -- assigned and location
 8    to which you are assigned?
 9              THE WITNESS:  Yes, sir.  I'm assigned to the
10    office in Sandusky, Ohio.
11              THE COURT:  And is that part of what they call
12    the Toledo Regional Agency?
13              THE WITNESS:  It's part of the Cleveland
14    division.  Our immediate supervisor is located here in
15    Toledo.
16              THE COURT:  How long have you worked for the FBI?
17              THE WITNESS:  Approximately 28 1/2; 25 of those
18    as a special agent.
19              THE COURT:  Okay.
20              MR. GETZ:  Thank you, Your Honor.
21              THE COURT:  And Agent Holloway, I'd ask you if
22    you can sit up just a little bit, and if you can pull the
23    chair up, you've got to be about this distance.  If you get
24    a millimeter or so closer, you'll have feedback and
25    2 millimeters or so back, we have trouble hearing you.  But
```

 1   actually, it's a vastly improved system from what we once

 2   had.

 3           About that distance, you may have to lean

 4   forward.  Pull your chair in just a tad further and ladies

 5   and gentlemen also are very good about letting you know

 6   when they can't hear you, which is good.

 7           MR. GETZ:  Thank you, Your Honor.

 8                   DIRECT EXAMINATION

 9   BY MR. GETZ:

10   Q.      Agent Holloway, you indicated you've been

11   employed by the FBI for, I believe you said, about 28 1/2

12   years?

13   A.      Yes, sir.

14   Q.      So you were so employed on February 19th, 2006?

15   A.      Yes, sir.

16   Q.      And you recall if you were working on that date?

17   A.      Yes, I was.

18   Q.      Now, on that date, February 19th, 2006, did you

19   become involved in this case in some manner?

20   A.      Yes, I did.

21   Q.      And can you explain for the jury in what manner

22   you became involved in this case?

23   A.      Yes.  I was one of three individuals who were

24   assigned to interview Mr. El-Hindi.

25   Q.      And when you say Mr. El-Hindi, you're referring

```
 1   to?

 2   A.        Marwan El-Hindi.

 3   Q.        And do you see the person you know?

 4             MR. HARTMAN:  We'll stipulate.

 5             THE COURT:  He's in the courtroom, right?

 6             THE WITNESS:  Yes, sir.

 7   BY MR. GETZ:

 8   Q.        And again, you indicated on February 19th, 2006

 9   you participated in interviewing the defendant Marwan

10   El-Hindi?

11   A.        Yes, I did.

12   Q.        And where did that interview take place?

13   A.        At the FBI office in Toledo.

14   Q.        And who, besides yourself and defendant El-Hindi,

15   were present during that interview?

16   A.        Ken Stambaugh, who was an investigator from the

17   Ohio State Highway Patrol assigned full-time to the Joint

18   Terrorism Task Force and Special Agent Jack Davis from the

19   Toledo office from the United States Secret Service.

20   Q.        And was Agent Davis also assigned to the

21   Terrorism Task Force, if you know?

22   A.        I believe he was.

23   Q.        And what about yourself?

24   A.        I was not a full-time member of it.

25   Q.        Okay.  Now, approximately what time on that day
```

```
 1   did the interview begin?
 2   A.          Approximately 8:30, and it was a short break and
 3   then we resumed approximately ten minutes later.
 4   Q.          Okay.  So you arrived at the -- the FBI office
 5   here in Toledo somewhere around 8:30 in the morning?
 6   A.          I was there before that, but Mr. El-Hindi was
 7   brought into the office around that time.
 8   Q.          And what was the first thing that happened in the
 9   course of that interview?
10   A.          We introduced ourselves to him, indicated where
11   we were employed, both by telling him, by displaying
12   credentials.  Then he was advised by Ken Stambaugh of why
13   he was there and the nature of the charges against him.
14   Q.          And then what happened?
15   A.          He asked if he could pray -- well, we told him
16   that we wanted to speak with him concerning the case
17   against him.  He indicated he was willing to do that, but
18   asked if we would allow him to pray before we actually
19   commenced with the interview, and we allowed him to do
20   that.
21   Q.          Do you recall approximately how long the prayer
22   time went?
23   A.          Eight or ten minutes, approximately.
24   Q.          And then when that was finished -- well, first of
25   all, strike that.
```

```
 1              Let me ask you this:  In the -- in conducting the

 2    interview of defendant El-Hindi, what language was used?

 3    A.        English.

 4    Q.        And did the defendant at any time request to

 5    conduct that interview in another language?

 6    A.        He did not.

 7    Q.        Did he appear to understand and freely converse

 8    you with in English during the course of that interview?

 9    A.        Yes.  He appeared to understand everything we

10    were asking him, and he was able to articulate his answers

11    in English very clear.

12    Q.        And was the defendant advised of his

13    constitutional or Miranda rights?

14    A.        Yes, he was.  After he -- he -- an opportunity to

15    say his -- do his prayers, he was read his Miranda rights

16    by Ken Stambaugh, who read those to him from the standard

17    form that we used called the advice of rights form.

18              MR. GETZ:  May I approach, Your Honor?

19              THE COURT:  Okay.

20              MR. HARTMAN:  Twenty-seven, Tom?

21              MR. GETZ:  Exhibit 207.

22    BY MR. GETZ:

23    Q.        Agent Holloway, I've placed before you a document

24    marked Government Exhibit Number 207.  Do you recognize

25    that?
```

```
 1   A.        Yes, I do.

 2   Q.        And can you tell the jury what that is?

 3   A.        Yes.  This is the advice of rights form that was

 4   read to Mr. El-Hindi at the time of the interview by Ken

 5   Stambaugh and was subsequently signed by him and witnessed

 6   by myself and Ken Stambaugh.

 7   Q.        During the course of having that form or the

 8   rights read to the defendant from that form, did he appear

 9   to understand what was being explained to him?

10   A.        Yes, he did.

11   Q.        And did he ask any questions about any of the

12   rights that were explained to him?

13   A.        No, he did not.  He indicated he understood his

14   rights and was willing to speak with us without an attorney

15   present.

16   Q.        And he agreed to speak with you after having been

17   advised of those rights?

18   A.        Yes, he did.

19   Q.        Did he sign the form?

20   A.        Yes, he did.

21             MR. GETZ:  Permission to publish that, Your

22   Honor?

23             THE COURT:  You may.

24   BY MR. GETZ:

25   Q.        I'm going to direct your attention to the
```

1   upper-right corner.

2   A.        Yes, sir.

3   Q.        And it indicates the place of the interview; is

4   that correct?

5   A.        Yes, it does.

6   Q.        And what does -- what does that statement -- what

7   does it represent?

8   A.        Toledo R.A., which stands for the Toledo Resident

9   Agency, which is what the Toledo office of the FBI is

10  called.

11  Q.        Okay.  And then the date of the interview, is

12  that reflected there?

13  A.        Yes, February 19th, 2006.

14  Q.        Okay.  And what time is reflected?

15  A.        The time that the advice of rights started being

16  given to Mr. El-Hindi was 8:40 a.m.

17  Q.        Okay.  And then what follows under the section

18  "your rights," those were the rights that were read to and

19  explained to the defendant?

20  A.        Yes.

21  Q.        And there are a number of signature lines there.

22  Directing your attention to the top-most line on the right

23  side of the page.

24  A.        Yes.

25  Q.        There's a signature there?

```
 1   A.        Yes.

 2   Q.        And did you observe the person who placed their

 3   signature on that line?

 4   A.        Yes, I did.

 5   Q.        And who's signature is that?

 6   A.        Marwan El-Hindi.

 7   Q.        And your signature, is that representative also

 8   on that form?

 9   A.        Yes, on the second witness line.

10   Q.        Okay.  And on the witness signature lines,

11   there's a time indicated when those were signed?

12   A.        Yes, 8:42 a.m.

13   Q.        Now, during the course of the interview, was the

14   defendant threatened or coerced in any way to sign that

15   form or to participate in the interview?

16   A.        No, he was not.

17   Q.        Was he -- were any promises made to him that he

18   would receive some award or benefit or gain something by --

19   by participating in the interview or signing the form?

20   A.        No, sir.

21   Q.        During the course of the interview, did you or

22   any of the other two agents that were present take your

23   guns out or display any weapons of any kind?

24   A.        No, sir.

25   Q.        Approximately how long did the interview last?
```

```
 1   A.          From beginning to end, approximately 2 1/2 hours.
 2   There was approximately a half-hour break in the middle of
 3   the interview.
 4   Q.          So it was not a nonstop interview?
 5   A.          That's correct.  Approximately 10:30, we took
 6   about a half-hour break, including Mr. El-Hindi, to get
 7   something to drink and to use the restroom and so forth.
 8   Q.          And then when the interview resumed after that
 9   half-hour break, approximately how long did it go?
10   A.          Approximately another hour and ten minutes.
11   Q.          Now, during the course of that interview -- well,
12   first, strike that.
13              Were you present for the entire interview?
14   A.          Yes.
15   Q.          Was the defendant made aware -- I believe you
16   indicated earlier that -- that one of the agents did
17   explain to him the reason for the interview and the
18   charges.  Were you present when he was made aware of the
19   purpose of the interview and the charges he was facing?
20   A.          Yes, I was.
21   Q.          And did he appear to understand those?
22   A.          Yes, he did.
23   Q.          Now, during the course of that interview, did you
24   inquire of the defendant anything about his overseas
25   travel?
```

1    A.        Yes, we did.

2    Q.        And what did the defendant tell you about

3    overseas travel?

4    A.        He indicated that besides trips back home to

5    Jordan, he had made two trips to Egypt, one of those for

6    pleasure and one for the purpose of getting married.  And

7    we asked him whether or not he had any overseas travel

8    besides those, and he indicated nothing other than to

9    Canada.

10   Q.        Did -- in the course of his discussion of

11   overseas trips, and specifically his travel to Egypt, did

12   he mention anything about rescuing anyone in Egypt?

13   A.        No, sir.

14   Q.        Did he mention the name Ahmed or Zubair or

15   Khaleel?

16   A.        No, sir.

17   Q.        Did the defendant talk to you or give you any

18   information regarding his e-mail communications?

19   A.        Yes, he did.

20   Q.        And did he provide you any e-mail addresses?

21   A.        Yes.  We asked him for all of the e-mail

22   addresses that he used at that time and prior to that, and

23   he gave us three e-mail addresses that he used.

24   Q.        And he represented that those three e-mail

25   addresses were the only e-mail addresses he used?

```
 1   A.         Yes, sir.

 2   Q.         And do you recall what those e-mail addresses

 3   were?

 4   A.         Yes.  The first one was El-Hindi@yahoo.com,

 5   El-Hindi@yahoo.come, and Marwan@European-MSS.com.

 6             THE COURT:  What were the first two?  They

 7   sounded the same.

 8             THE WITNESS:  One was -- both was El-Hindi.  One

 9   was at hotmail.com and one was at Yahoo.com.  Sorry, I may

10   have said the same place.

11             THE COURT:  And last one was?

12             THE WITNESS:  It was Marwan@European-MSS.com.

13   BY MR. GETZ:

14   Q.         Did the defendant give you or ever provide you

15   with an e-mail address that he used of

16   MarwanEl-Hindi@hotmail.com?

17   A.         No, he did not.

18   Q.         Did he provide you any other e-mail addresses

19   that had relevance to his communications?

20   A.         Yes, he did.

21   Q.         And what e-mail or whose e-mail did he represent

22   that to you?

23   A.         During the course of the interview, the name of

24   Darren Griffin came up, and he indicated that he -- he --

25   e-mail communication with Darren Griffin.  And we asked him
```

```
 1   what e-mail address Darren Griffin utilized and he advised

 2   DarrenGriffin@SBC.

 3   Q.       And was it the only e-mail address that he gave

 4   for Darren Griffin?

 5   A.       Yes, it was.

 6   Q.       He did not provide you an e-mail address of

 7   Abu_Jihad@SBCGlobal.net?

 8            MR. HARTMAN:  Objection, Your Honor.  May we

 9   approach?

10            THE COURT:  Sure.

11                 (A sidebar conference was had on the

12                  record.)

13            MR. HARTMAN:  Basis for the objection is that 302

14   does, in fact, say that he gave the e-mail address of

15   DarrenGriffin@hotmail.com, but he doesn't say that.  He

16   said that was the only one he used.  And I don't think it's

17   proper if he didn't say it, unless Mr. El-Hindi said that's

18   the only one he used to -- to go into.

19            THE COURT:  No.  I think the fact that it's on

20   the 302, doesn't mean he didn't do it or say it.  If you

21   want to ask him did I prepare a report?  During the report

22   did you note everything important?  There's no mention that

23   the failure to say that, you can ask in cross, but I don't

24   think there's any reason that he can't testify, no, he

25   didn't tell me anything about that.  I mean, I'm not
```

```
 1   sure -- maybe I'm missing something.
 2           MR. HARTMAN:  He made it sound like that was the
 3   only -- he made it sound like that was the only e-mail
 4   address that -- he made it sound like El-Hindi represented
 5   that was the only e-mail address that Griffin used.
 6           MR. GETZ:  Your Honor, I believe the question was
 7   did he give you any other e-mail addresses for him and that
 8   was his response.  They can certainly ask him if he
 9   indicated that address that he gave was the only one.  I
10   don't believe --
11           THE COURT:  Yeah, I thought the question was did
12   you give -- did he give you a specific -- you rattled it
13   off kind of fast -- and he said no.  Did you ask any other
14   e-mail addresses?  Maybe I missed that.  I don't think you
15   did.
16           MR. GETZ:  Not after that question.
17           THE COURT:  Had you asked before?
18           MR. GETZ:  I asked if he had --
19           THE COURT:  Fine.
20           MR. GETZ:  -- provided an e-mail address for him.
21   He gave you that one.  I asked, did he give you this one?
22   He said, no.
23           THE COURT:  That's what I thought.
24           I don't get the objection, I'm sorry.
25           MR. HARTMAN:  The 302 doesn't say that that was
```

1   the only one he had.  It doesn't say they asked if he had

2   any others.

3            THE COURT:  I think you can ask that on

4   cross-examination.  I mean, there doesn't have to be

5   constant congruity between a prior report and the

6   testimony.  To the extent that there isn't, you may have --

7   you may have something to cross-examine about or you may

8   not.  That's up to you, but the fact that something is not

9   in the 302 doesn't preclude him from testifying about

10  whatever.

11           MR. HARTMAN:  Got it.

12           THE COURT:  As long as it's otherwise admissible.

13                (Sidebar concluded.)

14           THE COURT:  Okay.  Objection's overruled and the

15  answer may stand.

16           And you may continue.

17  BY MR. GETZ:

18  Q.       Agent Holloway, during the course of the

19  interview, did the topic or the subject of violent Jihad or

20  the insurgency come up?

21  A.       Yes, it did.

22  Q.       And did the defendant provide you with any

23  information in response to your questions about his

24  knowledge of those topic areas or anyone involved in those?

25  A.       Yes we had asked him whether or not he knew

1    anybody who was in Iraq fighting with the insurgency.  He

2    said he did not.  We asked him whether or not he knew

3    anybody in Afghanistan fighting against U.S. troops, and he

4    indicated he did not.

5            And we asked him whether or not he ever engaged

6    in any discussions with anybody else concerning traveling

7    to Iraq or joining the insurgency or travel to Afghanistan

8    to fight against the U.S. troops, and he indicated he had

9    not discussed that with anyone and never considered himself

10   going over to do any of those things.  He also indicated

11   that had somebody had such a discussion with him he would

12   have reported it to the FBI.

13   Q.       Okay.  He volunteered that?

14   A.       Yes, he did.

15   Q.       Related to that topic, was there any discussion

16   of any kind of -- any kind of training or his involvement

17   in training?

18   A.       Yes, there was.

19   Q.       And what did he tell you?

20   A.       We asked him a number of things.  We asked him

21   whether or not he ever downloaded any training manuals, and

22   he indicated that he had not.  We also asked him whether or

23   not he had ever discussed with anyone training in the areas

24   of handguns, sniper training, explosives, IED training,

25   tactical training, and he initially denied having any

1   discussions with anyone concerning those topics.

2   Q.        Now, you had mentioned that at some point during

3   the interview the name Darren Griffin came up?

4   A.        Yes, it did.

5   Q.        Do you recall how that occurred?

6   A.        I don't remember exactly whether at some point

7   Ken Stambaugh brought that name up or after we continued to

8   discuss this training issue with Mr. El-Hindi, he

9   ultimately brought up Mr. Griffin's name, but we repeatedly

10  asked him about this training issue, whether or not he had

11  ever received or solicited any firearms training.  And he

12  eventually indicated that he -- he -- discussions with

13  Darren Griffin about firearms training.

14  Q.        And what were those discussions, what did he tell

15  you those discussions were?

16  A.        He indicated that he had two or three

17  conversations with Darren Griffin about Griffin teaching

18  him how to shoot.  We asked him who had initiated those

19  conversations, he initially said that Mr. Griffin had

20  approached him about it, but then as the ven -- but then as

21  the interview continued, he said he couldn't remember

22  whether he had first approached the subject or Mr. Griffin

23  had.  He indicated that the purpose of wanting to learn to

24  shoot was for hunting and/or personal protection.

25            We asked him whether or not he was hunter, and he

1  said he was not a hunter.  We asked him if he had ever been

2  hunting, he said he'd never been hunting.  We asked him if

3  he owned any firearms, and he said he did not personally

4  own any firearms.

5  Q.      Did he bring up the topic or the issue of a

6  security business or bodyguard protection services in the

7  course of that discussion about the training?

8  A.      Did not.

9  Q.      Did he indicate to you -- and by "he," I mean the

10  defendant Marwan El-Hindi -- during the course of this

11  interview, that he was aware of Darren Griffin's

12  background?

13  A.      Yes, he did.  He said he knew that he had a

14  military background, that he thought he had possibly been a

15  Navy Seal.

16  Q.      Did the defendant indicate to you that besides

17  these conversations that he had about the training and

18  learning to shoot, that he had any other kind of

19  relationship or interaction with Darren Griffin?

20  A.      We asked him whether or not he had ever traveled

21  with Darren Griffin, and initially, he said, no.  And then

22  we pressed him on that, and eventually, he indicated that

23  had he and Griffin had traveled to several restaurants

24  together, and that Griffin had accompanied him on one trip

25  to Michigan to meet with his certified public accountant.

1  Q.        And did he tell you what the purpose for that

2  trip to the accountant was?

3  A.        He did not.

4  Q.        Did he discuss with you any kind of business

5  relationship with Darren Griffin?

6  A.        He indicated -- we asked him specifically whether

7  or not he indicated he had any business arrangements with

8  Darren Griffin or ever discussed them.  He denied having

9  any business arrangements with him or discussing any

10 business ventures, other than he said he had considered

11 utilizing Mr. Griffin as a recruiter for a business that he

12 and his brother were operating, which was where they were

13 recruiting students to an attend medical schools overseas.

14 And he indicated he had considered recruiting Darren to be

15 a recruiter for that medical school and that is the only

16 business discussions he said he ever had with Darren

17 Griffin.

18 Q.        And during the -- these conversations that he was

19 telling you about that he had with Darren Griffin, about

20 shooting and learning too shoot and training, did he

21 indicate that there were any other kinds of discussions

22 about other training-related matters?

23 A.        We discussed suicide bomber vests with him.  We

24 asked him whether or not he had ever downloaded any

25 suicide -- any photos or information on suicide bomber

```
 1   vests.  He indicated that he had not.  Subsequently, he

 2   advised that he had looked at suicide bomber vests online,

 3   but had never knowingly solicited any information on them

 4   online.  We also asked him whether or not he had ever

 5   downloaded any information on vests onto discs or forwarded

 6   that information to anybody else, and he denied ever doing

 7   those.

 8   Q.       Did he indicate, in terms of his relationship

 9   with Darren Griffin, that they had ever visited each other

10   in their homes?

11   A.       Yes, he did.  He indicated that he had been to

12   Darren Griffin's residence on two or three occasions.

13   Q.       Now, in addition to his discussion of Darren

14   Griffin, did he bring up -- or during the course of the

15   interview were any other individuals brought up?

16   A.       Yes.  Just the other thing to -- on Griffin, we

17   also specifically asked him whether he ever discussed any

18   military Jihad-type topics with Griffin.  He denied doing

19   that.  We asked him whether or not he had ever approached

20   Griffin about providing firearms training to anybody else,

21   and he also denied that.

22            As far as your last question goes, yes, there was

23   also a discussion about a relationship he had with a

24   individual named Mohammed.

25   Q.       And when he indicated that individual named
```

1    Mohammed, did he give you any further identification?

2    A.        He described him for me.  He said he did not know

3    Mohammed's last name.  He described him as an Arabic male

4    with long hair with a receding hairline and full beard.

5    Q.        Did he indicated to you how it was that he knew

6    this Mohammed?

7    A.        Yes, he did.  He indicated he first met him at

8    Lebanese Tiger bakery here in Toledo, and subsequently, had

9    contacts with him at AZ Travel, at the mosque, and they had

10   both visited each others residences.  I believe he

11   indicated that he had been to Mohammed's residence on two

12   occasions, and Mohammed had visited his residence on one

13   occasion.

14   Q.        And did he indicated whether any other

15   individuals were present during any of those visits or

16   meetings?

17   A.        Yes.  We specifically asked him whether or not he

18   ever had any meetings where there were three people

19   present, himself, Mohammed, and Darren Griffin, and he

20   indicated that the three of them had gotten together on

21   four or five occasions, once at Mr. El-Hindi's residence,

22   once at AZ Travel where Mohammed worked, and two or three

23   times at the mosque where they prayed.

24   Q.        What else did he tell you, if anything, about

25   Mohammed?

1  A.        We asked him whether or not Mohammed had ever

2  expressed any anti-U.S. sentiments or stressed any

3  extremist views and he said --

4           MR. IVEY:  Objection.

5           THE COURT:  I would tend to agree.  I think --

6  this is offered for the truth of the matter asserted or

7  simply to -- for statements made and as evidence as to

8  Mr. El-Hindi?

9           MR. GETZ:  Your Honor, it's -- it's not made for

10  the truth of the matter asserted.

11           THE COURT:  Okay.  Ladies and gentlemen, you can

12  consider the testimony about what somebody else may have

13  said to Mr. El-Hindi, related by Mr. El-Hindi to the agent,

14  only as testimony that those -- according to Mr. El-Hindi,

15  statements were made to him, not as proof of whatever it

16  was that was being asserted in those statements.

17           MR. IVEY:  Your Honor, may we approach as well?

18           THE COURT:  Sure.

19                (A sidebar discussion was had on the

20                record.)

21           MR. IVEY:  Your Honor, my additional -- my

22  additional objection is the Bruton problem this raises

23  because we cannot cross-examine Mr. El-Hindi about the

24  nature of statements Mr. Amawi may or may not have made to

25  put this in any context if he does not take the stand.

1              And I don't see why this is really relevant to

2    whether or not Mr. El-Hindi's incriminating himself.  And

3    if it is, I think that the danger of violating Bruton

4    outweighs any implications of guilty mind on the part of

5    Mr. El-Hindi.

6              MR. GETZ:  We're not asking any additional

7    questions regarding statements.

8              THE COURT:  Why don't I tell them to disregard?

9              MR. GETZ:  With regard to Mr. Amawi, about --

10   Your Honor, these are not fairly inculpatory statements at

11   all.  Basically, what he's telling the agents -- again, not

12   offered for the truth of what -- of what Mr. Amawi said,

13   but offered to -- it's a statement that Mr. El-Hindi is

14   saying, which we believe to be false as attributing to

15   Mr. Amawi in the course of this interview to the agents.

16   The fact that it's not an inculpatory statement in regards

17   to Mr. Amawi doesn't raise a Bruton issue.

18             MR. SOFER:  The point is, they asked him from

19   answering the question, Judge, and I think the answer is

20   going to be, no, he didn't express these extremist views to

21   him, so there's nothing inculpatory about Mr. Amawi.  That

22   turns out to be a lie, but --

23             THE COURT:  I understand.  Do you want to get the

24   answer in light of the representation?

25             MR. SOFER:  I assume he's going to say, no, he

```
 1   never made a statement.

 2          MR. GETZ:  And that's indicated in the 302 which

 3   counsel has.

 4          MR. HARTMAN:  My problem is if it's not offered

 5   for the truth, then you get to the point that you show that

 6   it's a lie.  Then, eventually, you're going to have to say

 7   that Amawi didn't offer the statements, and then the Bruton

 8   problem comes up, doesn't it?

 9          MR. SOFER:  That's what the tapes are.  In other

10   words --

11          THE COURT:  I understand.  There was no answer to

12   the question, so --

13          MR. IVEY:  Well, I guess -- I'm sorry, I guess my

14   point is, maybe this will be a no harm, no foul.  But I'm

15   concerned about repeated questions about what said or did

16   not say.

17          MR. SOFER:  Counsel has a 302.  Your Honor's seen

18   the 302 also.  This particular line of questioning relates

19   to -- as I think pretty much all there is -- about

20   statements made by Mohammed Amawi, and they are -- as to

21   Mr. Amawi, they are not inculpatory, so there is no Bruton

22   problem.

23          THE COURT:  I agree with that.

24          Do you want to rephrase the question?

25              (Sidebar concluded.)
```

1              THE COURT:  You may continue.

2              MR. GETZ:  Thank you, Your Honor.

3              THE COURT:  Again, if he was told anything, you

4     are not to consider it as truth as to Mr. Amawi --

5     BY MR. GETZ:

6     Q.        Let me ask you this as a follow-up to that

7     question before you answer:  In regards to the individual

8     he identified as Mohammed, did Defendant El-Hindi indicate

9     anything in regards to any concerns he had -- strike that.

10    Let me withdraw that question.

11             Let me ask you this:  During the course of these

12    meetings or discussions, Defendant El-Hindi told you about,

13    that he had in the presence of Mohammed and Darren Griffin,

14    did he indicate to you the nature of the things that they

15    talked about?

16    A.        He specifically indicated that there was no

17    discussion between the three of them during these meetings

18    about traveling to Iraq and joining the insurgency, said

19    there was no discussion about traveling Afghanistan to

20    fight U.S. troops.  He indicated there was no discussion

21    concerning training in regards to firearms, explosives,

22    IEDs, and tactical training.  He said there was no

23    discussion between the three of them about those issues.

24    Q.        And did he talk about any activities that they

25    engaged in during these meetings, or did you ask him about

```
1    any activities?

2    A.        I'm not sure what type of activities you're

3    referring to.

4    Q.        Specifically, in regards to, say, for example,

5    looking at things on the Internet?

6    A.        Yes.  We asked him whether or not --

7    specifically, whether he and mow -- this Mohammed had ever

8    gone on the Internet together to research a particular

9    topic or look anything up, and he indicated that they had

10   not.

11   Q.        At approximately what time did the interview end?

12   A.        Approximately 12:10 p.m.

13   Q.        So again, it was approximately about a four-hour

14   interview with about a half-hour break and some other short

15   breaks?

16   A.        I think it was about 3 1/2 hours, with about a

17   half-hour break.

18   Q.        Do you recall having any further involvement with

19   this investigation or this case after that day?

20   A.        After that day, no, I do not.

21            MR. GETZ:  Just a moment, Your Honor.  No further

22   questions.  Thank you.

23            MR. HARTMAN:  One moment.

24            THE COURT:  Sure.

25            MR. GETZ:  Your Honor, at this time if I may, we
```

```
 1   move to admit Government Exhibit 207.
 2              MR. HARTMAN:  No objection.
 3              THE COURT:  It will be admitted.
 4                       CROSS-EXAMINATION
 5   BY MR. HARTMAN:
 6   Q.        Agent Holloway, good morning.
 7   A.        Good morning.
 8   Q.        My name is Steve Hartman. I'm one of the lawyers
 9   representing Marwan El-Hindi.  Just a couple of things I
10   want to make sure I'm clear about.
11              Did you say that Mr. El-Hindi told you he had
12   seen or watched a bomb vest video, but not downloaded it?
13   A.        He said that he had seen suicide bomb vests on
14   the Internet, but had never downloaded anything onto a disc
15   and never forwarded the information he saw to another
16   individual.  And indicated that he had never knowingly
17   solicited or sought that type of information on the
18   internet, although he had seen it on the Internet.
19   Q.        Now, just -- I mean, are those his words
20   "solicited" or "sought" or are those your words?  I mean,
21   did he talk that way?
22   A.        Those may be my words.  The gist was that he said
23   he never knowingly went on the Internet and sought
24   information about suicide bomb vests.
25   Q.        Okay.  You were -- did you testify that you were
```

```
 1   already at the resident agency before he was brought there?
 2   A.       Yes.
 3   Q.       So you were not on the arrest team?
 4   A.       That is correct.
 5   Q.       Okay.  You didn't record this interview, did you?
 6   A.       Did not.
 7   Q.       You had the capability to do so?
 8   A.       I assume that we could have, but in my 28 1/2
 9   years at the FBI, we've never recorded interviews.
10   Q.       Would you agree with me that a recording is
11   generally more accurate?
12           MR. GETZ:  Objection, Your Honor.
13           THE COURT:  Basis?  I'll let him answer.
14           Go ahead.
15   BY MR. HARTMAN:
16   Q.       Would you agree with me that a recording is
17   generally more accurate than a report based on notes taken
18   during an interview?
19   A.       Well, it would be verbatim, so from that respect,
20   it would be.  But I like to think our reports are pretty
21   accurate.
22   Q.       I'm not saying it's not, but the report's not
23   word for word?
24   A.       That's true.
25   Q.       And a recording would be?
```

```
 1    A.        That's correct.

 2              MR. HARTMAN:  One moment, Judge.

 3              We have no further questions.  Thank you, Agent

 4    Holloway.

 5              THE COURT:  Any other questions?

 6              MR. HARTMAN:  No, Your Honor.

 7              THE COURT:  Any redirect?

 8              MR. GETZ:  No, Your Honor.

 9              THE COURT:  Agent, you may step down.  You're

10    free to go or you're welcome to stay.  It's up to you.

11              And your next witness is and what are we going to

12    hear?

13              MR. SOFER:  Agent William Radcliff and he's going

14    to describe briefly his involvement in the investigation of

15    this case, Judge.

16                        WILLIAM RADCLIFF,

17    was herein, called as if upon examination, was first duly

18    sworn, as hereinafter certified, and said as follows:

19              THE COURT:  Would you tell the ladies and

20    gentlemen your name, please?

21              THE WITNESS:  I'm sorry, Your Honor?

22              THE COURT:  Tell the ladies and gentlemen your

23    name, please.

24              THE WITNESS:  My name is William S. Radcliff.

25              THE COURT:  And you have to sit about this
```

```
 1    distance from the microphone.  Slide the chair up.
 2              And you formerly were employed with the FBI; is
 3    that correct?
 4              THE WITNESS:  Yes, Your Honor.
 5              THE COURT:  And what was the period of your
 6    employment?
 7              THE WITNESS:  I entered upon duty on March 8th,
 8    1976 and retired on April 1st, 2005.
 9              THE COURT:  I'm sorry, when did you started
10    again?
11              THE WITNESS:  March 8th, 1976.
12              THE COURT:  Okay.  And you retired?
13              THE WITNESS:  April 1st, 2005.  And --
14              THE COURT:  And are you presently employed at all
15    or are you retired?
16              THE WITNESS:  Basically retired, and I teach
17    part-time.
18              THE COURT:  Okay.  And during your period of
19    employment with the bureau, were you assigned to the office
20    here in Toledo?
21              THE WITNESS:  Yes, Your Honor.
22              THE COURT:  And what was that period of
23    assignment?
24              THE WITNESS:  I began actually in Toledo, Ohio,
25    on -- in January of 1979 until I retired.
```

```
1              THE COURT:  Okay.

2              Mr. Sofer?

3                      DIRECT EXAMINATION

4    BY MR. SOFER:

5    Q.        Good afternoon, former Agent Radcliff.

6    A.        Good afternoon.

7    Q.        Would you tell the members of the jury how old

8    you are?

9    A.        I'm almost 61.

10   Q.        And where did you grow up?

11   A.        Columbus, Ohio.

12   Q.        Are you presently married?

13   A.        Yes, I am.

14   Q.        How long have you been married?

15   A.        Thirty-four years.

16   Q.        Can you tell the members of the jury basically

17   your educational background?

18   A.        I have a B.A., plus 30 hours in sociology.

19   Q.        And you have a B.A.  What was the year you

20   graduated from college?

21   A.        In 1970.

22   Q.        And what school did you attend?

23   A.        I attended the Ohio State University and Capital

24   university in Columbus, Ohio, but I graduated from Capital

25   University.
```

1    Q.        What did you do after you graduated from college?

2    A.        I taught high school.

3    Q.        And how long did you teach high school?

4    A.        Approximately, 5 1/2 years.

5    Q.        Can you tell the members of the jury, after you

6    taught high school, is that when you joined the FBI?

7    A.        Yes.

8    Q.        And you said that was in what year?

9    A.        That was in 1976.

10   Q.        And I'm terrible with the numbers, from 1976 to

11   2005, how many years together?

12   A.        It was a little over 29 years.

13   Q.        And again, you were first assigned to what

14   location when you joined the FBI?

15   A.        I was first assigned to Milwaukee division.

16   Q.        About how long did you spend in Milwaukee?

17   A.        Approximately, two years.

18   Q.        Can you tell members of the jury what kinds of

19   cases or what you did in Milwaukee?

20   A.        I was assigned to what are now called "violent

21   crimes," extortions, bank robberies, kidnappings and

22   fugitives.

23   Q.        Did there come a time when your assignment

24   changed?

25   A.        Yes.

1    Q.         And when was that?

2    A.         That was in 1978.

3    Q.         And do you recall where it was that you were next

4    assigned?

5    A.         Yes.   I was assigned to the Washington field

6    office.

7    Q.         And that's in Washington D.C.?

8    A.         That is correct.

9    Q.         And tell us basically what you did in the

10   Washington field office?

11   A.         I worked foreign counterintelligence.

12   Q.         And without getting into too many details, could

13   you give the members of the jury a basic description of

14   what foreign counterintelligence work is for an FBI agent?

15   A.         Yes.   Our responsibility was to locate and detect

16   foreign intelligence officers, in other words, crime spies.

17   Q.         Did there come a time when you were assigned

18   here, to the resident agency in Toledo?

19   A.         Yes.

20   Q.         I think you told the judge this, what year was

21   that?

22   A.         That was actually in January of 1979.

23   Q.         And again, can you give the members of the jury a

24   basic idea of what you were asked to do when you were

25   assigned here to the R.A.?

```
 1   A.          I began working violent crimes and partially
 2   organized crime.
 3   Q.          And approximately how long and how many years did
 4   you work those kinds of cases here in Toledo?
 5   A.          I worked -- for my first year in Toledo, I worked
 6   a combination of the violent crimes and organized crime,
 7   and then from that point on, I worked almost exclusively
 8   organized crime.
 9   Q.          And for about how long did you work organized
10   crime?
11   A.          It was in excess of 20 years.
12   Q.          Did there come a time when your assignment, that
13   is the kinds of cases that you were asked to work on,
14   changed?
15   A.          Yes.
16   Q.          And can you tell the members of the jury
17   approximately when that was?
18   A.          It was in late 2000, early 2001.
19   Q.          And how did your assignment change?
20   A.          I was assigned to work counterterrorism and
21   counterintelligence part-time in the Toledo Resident
22   Agency, in addition to my organized crime.
23   Q.          Did there come a time when you helped to create
24   or form in the formative stages of the Joint Terrorism Task
25   Force here in Toledo?
```

```
 1   A.        Yes.

 2   Q.        And was that before or after 9-11, when the

 3   formative stages, at least of that task force?

 4   A.        That was prior to September 11th, 2001.

 5   Q.        After September 11th, 2001, did the volume of

 6   work at the JTTF increase?

 7   A.        Yes, it did.

 8   Q.        Did there come a time when you received help from

 9   another agent on the JTTF, another FBI agent on the JTTF,

10   to work on many of the matters with you?

11   A.        Yes.

12   Q.        Who was that?

13   A.        Special Agent Shannon Coats.

14   Q.        Do you remember about how long you were working

15   on counterterrorism matters before Agent Coats was

16   assisting you?

17   A.        It was approximately nine months, I would -- I

18   would imagine.

19   Q.        Was that shortly after 9-11?

20   A.        That's correct.

21   Q.        2001?

22   A.        That's when he began, yes.

23   Q.        I want to ask you a few questions about the

24   investigation that lead to the case against these

25   defendants.  Have you recently reviewed all of the
```

1    recordings made by Darren Griffin before testifying here

2    today?

3    A.        No.

4    Q.        And have you reviewed a number of those

5    recordings yourself?

6    A.        Parts, approximately four or five.

7    Q.        And except for the parts or portions of the four

8    or five, when was the last time that you remember listening

9    to some or all of the recordings that Darren Griffin made?

10   A.        The last time probably would have been in

11   March -- early to mid-March of 2005.

12   Q.        Was that part of your work, in terms of receiving

13   those recordings, at or near the time that they were made?

14   A.        That is correct.

15   Q.        Can you describe for the jury your ability to

16   recall the events and circumstances of this particular

17   investigation?

18   A.        It's difficult.

19   Q.        Can you tell the members of the jury why that is?

20   A.        In addition to my working several matters back at

21   the time that these matters before The Court were being

22   investigated, I had those several matters, plus when I

23   left, these were highly sensitive matters, and I purposely

24   was avoiding any -- a lot of thought or anything else

25   relative to the case because of their sensitivity, so I

1   wanted to just walk away and not risk inadvertently letting

2   something go that might be classified.

3   Q.       And basically, when you retired, you retired; is

4   that another way of putting that?

5   A.       That's correct.  That's correct.

6   Q.       When you retired from the FBI, did you know

7   whether criminal charges were going to be brought in this

8   case?

9   A.       I did not.

10  Q.       If you do recall, can you tell us approximately

11  when it was that you first learned about an individual

12  named Darren Griffin?

13  A.       It was in late 2001.

14  Q.       And did there come a time when Darren Griffin

15  became a cooperating witness for the FBI?

16  A.       That is correct.

17  Q.       Can you tell us again, approximately when that

18  took place?

19  A.       The -- the suitability assessment began within a

20  few weeks or a month after we first laid -- I first met

21  Mr. Griffin.

22  Q.       And how long did that process last,

23  approximately?

24  A.       To which are you referring, the suitability?

25  Q.       Uh-huh.

```
 1   A.         It usually takes about 30 days.

 2   Q.         And after that was there a time when Darren

 3   Griffin was assessed by you and other agents in the FBI?

 4   A.         That's correct.

 5   Q.         Did that assessment take a period of time?

 6   A.         It did.

 7   Q.         Again, approximately how long did that assessment

 8   take place, if you recall?

 9   A.         I don't -- I don't recall.

10   Q.         Was it days, months, years?

11   A.         Well, it would have been -- it would have been

12   possibly weeks or even months.

13   Q.         Was the assessment of Darren Griffin ongoing

14   throughout his involvement with the FBI?

15   A.         Yes.

16   Q.         Did there come a time when you became one of

17   the -- or the main FBI contacts or handlers for Darren

18   Griffin?

19   A.         Yes.

20   Q.         And were you the first person to take that role?

21   A.         That is correct.

22   Q.         And again, if you can, can you give us an

23   approximate -- from what date to what date were you one of

24   the handlers for Darren Griffin?

25   A.         Again, it's sometime in late 2001 until March
```

1    of -- sometime in March of 2005.

2    Q.        And was Agent Coats also involved during this

3    period of time, being one of the contact agents or

4    handlers?

5    A.        Yes, he was.

6    Q.        Was there a term that was used in the FBI to

7    refer to what role he played before you retired?

8    A.        At one point, he became the alternate agent of

9    record.

10   Q.        And if you know, did he ultimately become the

11   primary contact or primary handler of Darren Griffin?

12   A.        Yes, prior to my retirement, so there was a

13   smooth handling.

14   Q.        To the best of your recollection, when Darren

15   Griffin began his work for the FBI, was Darren Griffin told

16   anything by you or any other FBI agent in your presence

17   about Mohammed Amawi, Marwan El-Hindi, or Wassim Masloum?

18   A.        No.

19   Q.        Was Darren Griffin paid by the FBI?

20   A.        Yes.

21   Q.        Can you tell the members of the jury why he was

22   paid?

23   A.        Mr. Griffin was being asked to spend a lot of

24   time attempting to get information on our behalf, and the

25   demands of this made it prohibitive from him actually

1   obtaining or retaining a job, and so it's just a matter of

2   him being able to live.

3   Q.        Was the money that Darren Griffin was paid ever

4   in any way linked by you or any other FBI agent in your

5   presence to the arrest or prosecution of anyone?

6   A.        No.

7   Q.        Was he ever promised by you or anyone in your --

8   any other FBI agent in your presence any kind of reward for

9   his work?

10  A.        No.

11  Q.        During the time that you were the primary contact

12  for Darren Griffin, was Darren Griffin working on other

13  investigations unrelated to this case?

14  A.        Yes, prior to and contemporaneous to these cases.

15  Q.        Now, can you tell the members of the jury

16  basically why it was that Darren Griffin was sent into the

17  locations that he was sent by the FBI --

18  A.        As I indicated --

19  Q.        -- I'm sorry, with respect to this case and

20  others?

21  A.        I'm sorry, would you repeat that?

22  Q.        I'm sorry, let me rephrase the question.

23          When Darren Griffin was first asked by the FBI to

24  go to certain locations on behalf of the FBI, can you tell

25  the members of the jury why it was he was sent to these

1    locations?

2    A.      We had specific investigative subjects that,

3    initially, Mr. Griffin wasn't even aware of.  And some of

4    them -- some of them had been associates of some of the

5    subjects that Mr. Griffin worked when he was with the Drug

6    Enforcement Administration.  And we asked Mr. Griffin to go

7    and -- and that it was after the attacks of

8    September 11th -- and meet with some of the individuals at

9    certain locations.  And he did and we knew that certain

10   subjects were going to be in certain locations at a given

11   time.  And Mr. Griffin went and he met with them, and he

12   reported back to us.  But again, we did not specifically

13   identify them at that time.

14   Q.      And were any of those subjects Marwan El-Hindi,

15   Mohammed Amawi, or Wassim Masloum at the beginning of the

16   investigation?

17   A.      No.

18   Q.      I want to ask you about a number of pieces of

19   property.  Specifically, I want to direct your attention to

20   approximately November 24th of 2004.  Do you recall

21   receiving something from Darren Griffin on or about that

22   date?

23   A.      Yes.

24           MR. SOFER:  And if we can put up Government

25   Exhibit Number 27.  I believe it's on the computer.

1    BY MR. SOFER:

2    Q.       Do you recognize what's depicted there in

3    Government Exhibit Number 27?

4    A.       Yes.  It is a compact disc case, and it has my

5    initials, and the date by would have been the date I

6    received it.

7             MR. SOFER:  And can we go to the second page of

8    that exhibit.

9    BY MR. SOFER:

10   Q.       Can you tell the members of the jury what that

11   is --

12   A.       Yes.

13   Q.       -- if you know?

14   A.       Yes, that is a compact disc with my initials and

15   the date I received it.

16   Q.       And is that the compact disc that was given to

17   you by Darren Griffin on November 24th, 2004?

18   A.       Yes, it was -- or it is.

19   Q.       How do you know that?

20   A.       Again, because it has my initials on it, and it

21   has the date on it, and it has a case file, and it has a

22   particular identifying number.

23            MR. SOFER:  At this time the government offers

24   Government Exhibit Number 27 into evidence.

25            THE COURT:  It will be admitted.

```
1    BY MR. SOFER:

2    Q.        What did you do with Government's Exhibit Number

3    27 now in evidence?

4    A.        I submitted it to our evidence vault in

5    Cleveland, and thereafter, had it examined by our Computer

6    Analysis and Response Team personnel.

7    Q.        Okay.  And that team is also known as the CART

8    team, for the acronym of also known as Computer Analysis

9    Response Team?

10   A.        That's correct.

11   Q.        And I want to direct your attention to

12   approximately February 7th of 2005.

13             MR. SOFER:  And if we can put up Exhibit Number

14   59?

15   BY MR. SOFER:

16   Q.        On or about February 7th, 2005, did Darren

17   Griffin bring additional items to you and the FBI?

18   A.        Yes, he did.

19   Q.        Can you tell the members of the jury what those

20   items wants were?

21   A.        The best of my recollection, he brought two

22   compact discs.

23   Q.        And can you tell the members of the jury what it

24   is that you did with those two compact discs?

25   A.        Mr. Griffin indicated that there may be a
```

 1   necessity to have the discs returned, so unlike the

 2   previous disc, I received the disc from Mr. Griffin and

 3   then had the CART agent in our Toledo office make a -- make

 4   copies so that I could return the originals to Mr. Griffin

 5   in case he had to return them.

 6   Q.        Return them to who, do you remember?

 7   A.        Yes, I believe it was Mr. Amawi.

 8   Q.        And do you recall the name of the individuals

 9   from the CART team that you gave these discs to?

10   A.        Yes, Special Agent David Barns.

11   Q.        I want to direct your attention to approximately

12   February 9th, 2005.

13             MR. SOFER:  And here if we can put up Exhibit

14   Number 61 in evidence.

15   BY MR. SOFER:

16   Q.        Did you receive something on or about

17   February 9th, 2005 from Darren Griffin?

18   A.        Yes, I did.

19   Q.        And can you tell the members of the jury what

20   that was?  Well, if we can skip ahead and say -- I'll ask

21   you whether Exhibit 61 was one of the things you received

22   on that day?

23   A.        Yes.

24   Q.        Do you recall how many pages were given to you on

25   that day?

```
 1   A.        To the best of my recollection, two.

 2   Q.        And is this the first page of what was given to

 3   you by Darren Griffin on February 9th?

 4   A.        Yes, I believe it is.

 5             MR. SOFER:  And if we can look at the second

 6   page, which we can never see very well on these screens.

 7   That's a little better.

 8   BY MR. SOFER:

 9   Q.        Does that appear to be the second page of the

10   document that Darren Griffin gave to you on or about

11   February 9th, 2005?

12   A.        It could be because I'm 61, but I'm having

13   difficulty seeing here.

14   Q.        I understand.  I'm a little younger and I have

15   the same difficulties.  We can show it to you on the screen

16   or we might actually have a better copy, unless counsel

17   objects.

18             MR. SOFER:  May I approach the witness, Your

19   Honor?

20             THE COURT:  You may.

21

22   BY MR. SOFER:

23   Q.        I'll show you the second page on a piece of

24   paper.  Does that appear to be the second page?

25   A.        Yes.
```

```
 1   Q.        Of the two-page document that was given to you on

 2   or about February 9th?

 3   A.        Yes.

 4   Q.        Now, do you recall what you did with Government

 5   Exhibit Number 61?

 6   A.        Yes.  I -- I brought the items back to our office

 7   and prepared an FD-302.

 8   Q.        An FD-302 is a name of a form?

 9   A.        That's correct.  It's a record of investigation

10   or interview.

11   Q.        And what did you do with Exhibit Number 61 with

12   respect to the 302?

13   A.        I placed -- I placed copies of that exhibit on

14   the FD-302.

15   Q.        And how did you do that?

16   A.        I had it copied or scanned onto the paper and

17   made it in a -- as an addendum.

18   Q.        Do you know what happened -- I'm sorry.  Did I

19   interrupt you?

20   A.        No, that's fine.

21   Q.        What happened to the original, if you know?

22   A.        I don't recall.

23            MR. SOFER:  At this time, Your Honor, the

24   government offers 61 into evidence?

25            MR. BOSS:  Your Honor, may we approach?
```

```
 1              THE COURT:  Sure.
 2                   (A sidebar conference was had on the
 3                   record.)
 4              THE COURT:  Objection?
 5              MR. BOSS:  Yes, Your Honor.  This is a document
 6    that earlier we had about the objection to the
 7    admissibility of the document.  The Court reserved judgment
 8    on it pending the examination of this witness.  We'd ask
 9    The Court to continue reserving that determination until
10    after he's been cross-examined on the whereabouts of the
11    original and what happened to it and so forth.
12              MR. SOFER:  I see no need for that, Judge.  The
13    rules are clear.  A copy -- I mean an original is not
14    present.
15              THE COURT:  I don't know what you can -- you can
16    ask him.  I think a foundation's been laid.  He got it.
17    That's what he got.  He doesn't know where the original is.
18    He made a copy of it.
19              MR. SOFER:  If they want to argue weight, but I
20    think it's clearly admissible, Judge.
21              THE COURT:  Why don't you move the admission
22    later?  I mean, I can't see.
23              MR. SOFER:  I'll move it and await The Court.
24              THE COURT:  I'll reserve ruling and renew it.
25              MR. SOFER:  Okay.  If I remember.
```

```
 1                    (Sidebar concluded.)
 2   BY MR. SOFER:
 3   Q.        I want to direct your attention on or about
 4   February 17th of 2005 and ask you if you recall receiving
 5   anything from Darren Griffin on that day?
 6   A.        Yes, I do.
 7             MR. SOFER:  If we can put up Exhibit Number 62.
 8   I believe it's already in evidence.
 9   BY MR. SOFER:
10   Q.        And ask you, does what's depicted in Exhibit
11   Number 62 fairly and accurately represent the first page of
12   what was given to you by Darren Griffin, best as you
13   recall, on or about February 17th of 2005?
14   A.        Yes.
15   Q.        And if you know, were there additional pages, as
16   well, given to you on that day?
17   A.        I believe there were.  I don't recall how many.
18   Q.        Okay.  Well, let's take a look at the second
19   page.  Does that refresh your recollection as to whether
20   there was a second page given to you on that day?
21   A.        Yes.
22   Q.        Does that refresh your recollection as to whether
23   there was a third page given to you to that date?
24   A.        Yes, it does.
25   Q.        Again, thank you.
```

1            Tell the members of the jury what you did with
2   Government Exhibit Number 62, best as you recall, after you
3   received it from Darren Griffin?
4   A.       Again, after meeting with Mr. Griffin, I returned
5   to the office, prepared an FD-302, and attachments were
6   made.
7   Q.       So you think you attached this to a 302?
8   A.       To the best of my recollection, I don't --
9   Q.       Would a 302 have to be prepared every time a
10  piece of property like this would come in?
11  A.       No.
12  Q.       What would other -- what other kinds of things
13  might be you do with a piece of document or another piece
14  of evidence that came into the FBI through Darren Griffin?
15  A.       They could be placed in evidence, either in
16  what's called a Vocke exhibit (phonetic) or a 1A exhibit.
17  Q.       And do you recall which of those three things you
18  did, 302, one Vocke exhibit, or 1A, with respect to this
19  particular piece of evidence?
20  A.       No, I don't.
21  Q.       I want to direct your attention to February 19th
22  of 2005.  And ask you, did you receive something on that
23  date from Darren Griffin?
24  A.       Yes, I did.
25            MR. SOFER:  And if we can put up exhibit --

 1  Government's Exhibit Number 73.

 2  BY MR. SOFER:

 3  Q.        Again, I'd ask you if this refreshes your

 4  recollection, is this the document -- that first page of

 5  the document that you received from Darren Griffin on or

 6  about February 19th of 2005?

 7  A.        Yes, it is.

 8  Q.        Do you recall, did this document have an

 9  additional page or more?

10  A.        I believe it did.

11  Q.        Okay.

12          MR. SOFER:  If we can go to the second page.

13  BY MR. SOFER:

14  Q.        Government's Exhibit Number 73, is that the

15  second page of the document that was given to you?

16  A.        To the best of my recollection, it is, yes.

17  Q.        Again, did you secure this document using one of

18  the methods that you just described to the members of the

19  jury?

20  A.        Yes, I did.

21          MR. SOFER:  Your Honor, this is, I believe, in

22  evidence, but subject to connection, just for The

23  Court's -- this is the connection, just so The Court --

24          THE COURT:  Any objection?

25          MR. HARTMAN:  I didn't hear Mr. Sofer.

```
 1              THE COURT:  He's offering the exhibit.  He's

 2   reoffering the exhibit suggesting that no basis to continue

 3   reserving for consideration.

 4              MR. HARTMAN:  I think this was already entered

 5   into evidence.

 6              THE COURT:  Okay.  It will be -- it will be.

 7   BY MR. SOFER:

 8   Q.         I want to direct your attention to approximately

 9   the same day.  Did you get another item from Darren Griffin

10   on that date, best as you recall?

11   A.         Yes, I did.

12   Q.         Can you tell the --

13              MR. SOFER:  Let's put up Government's Exhibit

14   Number 74, which is already in evidence.

15   BY MR. SOFER:

16   Q.         And ask you if this is the additional document

17   that you received from Darren Griffin on February 19th,

18   2005?

19   A.         Yes, it is.

20   Q.         Finally, did there come a time on February 27th,

21   2005 when you received an e-mail from Darren Griffin?

22   A.         That's correct.

23   Q.         And can you tell the members of the jury how it

24   was that you received an e-mail from Darren Griffin, best

25   as you recall?
```

```
1    A.        To the best of my recollection, Mr. Griffin sent

2    an e-mail to what would be called an "undercover" Hotmail

3    address that we received at a stand-alone computer in our

4    Toledo office of the FBI.

5    Q.        Without going into too many details, can you just

6    tell the members of the jury what an "undercover" e-mail

7    address would be?

8    A.        Yes.  We had the undercover e-mail address, as

9    much as anything, to protect Mr. Griffin.  We couldn't have

10   him sending an e-mail to an FBI e-mail address, so -- so as

11   not to raise the concerns or suspicions of anybody, we

12   asked him to send it to that address.

13   Q.        And do you recall what that address is as we sit

14   here?

15   A.        Yes, it's Ahmed, A-H-M-E-D, underscore,

16   1079@Hotmail.com.

17             MR. SOFER:  And let's put up Government's Exhibit

18   Number 79, which is already in evidence.  If we can just --

19   BY MR. SOFER:

20   Q.        On the second line -- which is the third line

21   down -- on Government's Exhibit Number 79, at

22   Ahmed_1079@hotmail.com, is that the address you're

23   referring to?

24   A.        Yes, it is.

25   Q.        Were you aware of the Darren Griffin e-mail
```

```
 1   address at that time, as well?

 2   A.        Yes, sir, I was.

 3   Q.        And were you monitoring the Ahmed -- or

 4   Ahmed_1079@hotmail.com account?

 5   A.        Yes.

 6   Q.        Can you tell the members of the jury what you did

 7   after -- well, before we do that, this was -- this was a

 8   multipage mail?

 9   A.        Yes, it was.

10   Q.        And if we could just go through the pages, I just

11   want you to confirm whether or not the additional pages on

12   Government's Exhibit Number 79 in evidence were, in fact,

13   received on or about February 27th, 2005.

14             MR. SOFER:  And for the record, we went through

15   the additional pages.

16   BY MR. SOFER:

17   Q.        I'd ask you, again, is this the e-mail that you

18   received from Darren Griffin on or about the date that I

19   mentioned?

20   A.        Yes.

21   Q.        Can you tell the members of the jury what you did

22   with this e-mail, best as you recall?

23   A.        Best of my recollection, again, as with the

24   previous items, I obtained them from Mr. Griffin, and

25   again, put them into evidence in the case file.
```

```
 1  Q.        And on this particular one, do you recall copying

 2  it onto a floppy disc or some other media?

 3  A.        Yes, we did, because we actually -- in receiving

 4  it from Mr. Griffin, it was an e-mail, and so I downloaded

 5  it on the old style floppy and then placed that into the

 6  case file, so I did not receive it personally from Mr.

 7  Griffin.  I did receive it through the e-mail.

 8  Q.        Through the FBI's undercover?

 9  A.        Correct.

10            MR. SOFER:  I have no further questions.

11            MR. HARTMAN:  Judge, do you mind if we take a

12  short break?

13            THE COURT:  That would be fine.

14            Ladies and gentlemen, why don't we take about a

15  ten-minute break or so.

16            You may step down.

17               (A brief recess was taken.)

18            THE COURT:  And you remain under oath.

19            And Mr. Hartman, you may you begin.

20            MR. HARTMAN:  Thank you, Your Honor.

21                        CROSS EXAMINATION

22  BY MR. HARTMAN:

23  Q.        Good afternoon, sir.  My name's Steve Hartman.  I

24  represent Marwan El-Hindi.

25            Just so I'm clear, is it still Agent Radcliff or
```

```
 1  is it former or Mr.?  How do you want -- how do you want to

 2  be addressed?

 3  A.        I'm just a used-to-be.

 4  Q.        Well, I'm a never-has-been, so don't worry about

 5  it.

 6            Would you agree with me that the best

 7  interaction -- or the best evidence of the interaction

 8  between Mr. Griffin and my client is what is recorded on

 9  the recordings rather than what's recorded later in

10  reports?

11  A.        I'd say for the most part, unless there's other

12  evidence.

13  Q.        Let me ask you about physical evidence, again,

14  just because I want to make sure that it's clear.  When you

15  get physical evidence in, just procedurally, what do you do

16  with it?

17  A.        Normally what happens when we get any evidence,

18  we bring it in, and we place it in the case file.

19  Q.        You fill out a form?

20  A.        It can be -- it can be a form or it can be

21  submitted to the case file, depending on the size of the

22  piece of evidence.  If it's a document, it could be placed

23  in an envelope and sent to the case file.  If it's a bulky

24  item, it's placed in what they call bulky evidence; it's

25  still a part of the file.
```

```
1    Q.        It's labeled somehow, correct?

2    A.        Yes, it is.

3    Q.        Now matter how big or small it is, everything's

4    labeled?

5    A.        Yes, it is.

6    Q.        And you start a chain of custody form for each

7    piece of evidence?

8    A.        In the bulky -- bulky exhibits, that's correct.

9    Q.        What kind of exhibits don't you use a chain of

10   custody form for?

11   A.        Again, if an item is placed into the case file

12   that is not a large piece of evidence that has to go to the

13   bulky room, and it goes directly to the case file, it could

14   be placed in what is called a "1A envelope" that goes to

15   the file.

16   Q.        So then the 1A envelope becomes the record of the

17   document or whatever it is going into the file?

18   A.        That's correct.

19   Q.        Now, for Exhibit 61 that we talked about --

20             MR. HARTMAN:  Can we put that back up?  Actually

21   we've seen it, we know what it is.

22   BY MR. HARTMAN:

23   Q.        We talked about Exhibit 61 was a 1A envelope

24   filled out for Exhibit 61?

25   A.        I don't recall.
```

```
 1    Q.         Did you fill one out that you're --

 2    A.         Sir, I'm sorry, I don't recall.

 3    Q.         Was a chain of custody form ever filled out for

 4    Exhibit 61?

 5    A.         I don't recall.

 6    Q.         That's not normal, correct?

 7               MR. SOFER:  Objection.

 8               THE COURT:  Why don't you rephrase?

 9    BY MR. HARTMAN:

10    Q.         Okay.  Would you agree with me that it's out of

11    the ordinary for the FBI to get an original document and

12    not be able to locate it later on in an investigation?

13    A.         I'm sorry, would you repeat that?

14    Q.         Would you agree with me that it's not normal for

15    the FBI not to be able to locate the original of a document

16    that's involved in an investigation?

17    A.         If it's placed in the file?

18    Q.         If it's given to an FBI agent?

19    A.         It would be placed in the file and it would be --

20    it would be relatively unusual.

21    Q.         How often would you say that happens?

22    A.         I don't know.

23    Q.         When you received Exhibit 61, was that document

24    fingerprinted?

25    A.         Not to my knowledge.
```

```
 1   Q.        Is it -- is it standard policy to scan a document

 2   and attach it to a 302?

 3   A.        It's not necessarily standard, it's the call of

 4   the -- of the author of the 302.

 5   Q.        Okay.  So in this case, it was your call?

 6   A.        Yes.

 7   Q.        What made you decide to do it?

 8   A.        In looking at 61, it was an item that we needed

 9   to have analyzed for intelligence purposes, and the best

10   vehicle to do that would be to attach it to an FD-302.

11   Q.        Rather than -- strike that.

12             Tell me about the process of getting recordings.

13   Were you the person who would receive -- early on in the

14   investigation, were you the person who would receive the

15   recording device from Mr. Griffin?

16   A.        Many times, yes.

17   Q.        Would you ever listen to the recording with

18   Mr. Griffin when he gave you the device?

19   A.        It's -- it depends on the type of recording, but

20   usually not.

21   Q.        Okay.  What's the usual -- tell the jury what the

22   usual procedure is.

23   A.        Again, depending on the type of recording, if it

24   was an audio recording, it was recorded on a digital

25   format, and it actually had to be downloaded from a -- a
```

1   recording device onto a disc, then it became evidence.

2   Q.        So when would you review a recording with

3   Mr. Griffin at the time that he gave it to you?  Were there

4   any instances that you remember doing so?

5   A.        I don't recall it, but I can't say that it's

6   absolutely not -- not the case.  I don't recall.  It

7   wouldn't be on one of those types of downloads because I'd

8   have to take it back and then download it.

9   Q.        Understood.  You would listen to the recording

10  later?

11  A.        I would.

12  Q.        Did you listen to all the recordings while you

13  were -- I don't know if I know the term "lead agent" on the

14  case?

15  A.        I can't say all of them, but I try to listen to

16  them.  Other agents that began assisting in the matter and

17  then ultimately became the case agents, then assumed the

18  responsibility.

19  Q.        When Mr. Griffin would bring you recordings, you

20  would have a debriefing as well, usually?

21  A.        That's correct.

22  Q.        And you would create a 302 of the meeting?

23  A.        Yes.

24  Q.        Now, would you make those 302s before or after

25  you listened to the recording?

```
 1   A.         Usually prior.

 2   Q.         So the order of things was, you'd make the 302

 3   and then listen to the recording?

 4   A.         Not all of the time; oftentimes, yes.

 5   Q.         Oftentimes.  Well, to the extent that you made

 6   the 302s and then listened to the recordings, were there

 7   times when you noticed inconsistencies in what Mr. Griffin

 8   had reported and what you heard on the recording?

 9   A.         Not that I recall.

10   Q.         It could have happened, you just don't remember

11   it?

12   A.         If you have some examples, I could -- because

13   again, there are -- there are a lot of recordings and there

14   were a lot of debriefings.

15   Q.         Well, do you recall filling out a 302 or

16   dictating a 302 on 1-03-2005 about November 23rd, 2004?

17   A.         I -- on -- may I see the document?

18              MR. HARTMAN:  Absolutely.

19              MR. SOFER:  Counsel.

20   BY MR. HARTMAN:

21   Q.         I'm sorry.  If you can just take a look at that

22   and give it a read and let me know when you're finished.

23   A.         Okay, sir.

24   Q.         My first question is, that was about an

25   investigation -- the investigation date is November 23rd of
```

1   2004; is that correct?

2   A.        That is correct.

3   Q.        And yet it wasn't dictated until January 3rd of

4   2005; is that correct?

5   A.        That's what is indicated.

6   Q.        Is it normal to have that much time between when

7   you get the debriefing and when you dictate the 302?

8   A.        No.

9   Q.        Would you read the highlighted portion to

10  yourself, please.

11  A.        Yes.

12  Q.        Now, that says, according to your debriefing,

13  that Mr. Griffin told you that Marwan El-Hindi has been in

14  contact?

15            MR. SOFER:  Objection.

16            THE COURT:  I would tend to agree.

17            MR. HARTMAN:  May we approach?

18            THE COURT:  Yeah.

19            (Sidebar discussion was held on the record.)

20            THE COURT:  I don't think -- you can't read this

21  into the record.  You're testifying, not he.  You're

22  testifying.  If you want to ask him, did he have a

23  conversation with Mr. El-Hindi and what did he --

24            MR. HARTMAN:  You mean, from Mr. Griffin.

25            THE COURT:  Mr. -- Mr. Griffin.  But again, it's

 1  hearsay.

 2          MR. HARTMAN:  Well, it's not offered for the

 3  truth because, in fact, it's not true.  And the jury heard

 4  the recording of that day.

 5          THE COURT:  Okay.

 6          MR. HARTMAN:  And there's no where in the mention

 7  of that, that this video can't be --

 8          MR. SOFER:  Judge, I'm back to where I have been

 9  all along.

10          THE COURT:  This isn't coming in.  This is not --

11  I mean, so where do we go from there with that?

12          MR. HARTMAN:  My point is, Judge, when the agent

13  listened to the recording -- and it's very clear that what

14  Griffin says is completely different than what's in the

15  recording what -- what's the agent do about it.

16          MR. SOFER:  Two things, Judge --

17          THE COURT:  Well, I think you should confirm that

18  the agent recalls listening to a recording.  I mean, it

19  have been, what, three-plus years since he made this note,

20  and he indicated that he listened to, what, four or five

21  recordings, so --

22          MR. HARTMAN:  Okay.

23          THE COURT:  If you want me to excuse the jury and

24  question the agent, and we can play the recording and ask

25  him if he recalls that, and then, say, show him this and

1    ask him does he recall noting any inconsistency between the

2    recording and what --

3            I mean, the problem is, there's no linkage

4    between his having cognizance of the recording and what

5    they told him, and when the recording occurred.  He did

6    indicate fairly soon, but there's a disconnect here.

7    You've already established that there was some period of

8    time between these two.

9            MR. SOFER:  But also, Judge, this goes back to a

10   number of objections the government has lodged.  A witness

11   who made this statement, the person that he wants to

12   cross-examine has come and gone.

13           MR. HARTMAN:  That's not true.

14           THE COURT:  Well, but the point of this, before

15   you can ask him what he did about it, about this, in light

16   of the recording, we've got to establish that he recalls

17   hearing the recording.  I mean, this is just --

18           MR. HARTMAN:  I'm trying to avoid playing the

19   recording for him.  I mean --

20           THE COURT:  Well, but I don't think there's any

21   way you can.  I mean, if you want me to excuse the jury and

22   well -- we can voir dire the witness and ask him, do you

23   recall having heard this recording -- whatever date it

24   was -- and please take a look at what's been marked for

25   identification as defense exhibit -- whatever it is -- do

1    you recall Griffin telling you?  If he does, and then

2    agent, what, if anything, did you do having heard the

3    recording and then Agent Griffin telling you this, if

4    anything?

5            MR. SOFER:  We have to also establish -- and I

6    don't know if this is can be done or not.  This goes --

7    again, 302 is a report.

8            THE COURT:  But the issue also is, we have a

9    recording on which El-Hindi tells Griffin he's doing

10   something, right?

11           MR. HARTMAN:  Yes.

12           THE COURT:  Okay.  That doesn't mean there might

13   not have been some other time when El-Hindi told Griffin

14   something else.  We don't know if that's the only occasion

15   that El-Hindi said something to Griffin about what he was

16   going to be doing in Egypt.  Without Griffin, you can't

17   establish that --

18           MR. SOFER:  Or even that the agent, because it's

19   his report, doesn't make some logical --

20           THE COURT:  I'm sorry --

21           MR. SOFER:  -- conclusion.

22           THE COURT:  -- before we get there, okay.

23           So I'm going to sustain the objection.  If you

24   want to recall the agent at some point, and/or Griffin, but

25   right now, the fact that at one point there's a recording

1  of El-Hindi telling Griffin I'm going to Egypt to do X,

2  does not preclude the possibility, at some point, El-Hindi

3  said something to Griffin about doing Y, as reflected in

4  this report.

5      MR. HARTMAN:  But that's my foundations for the

6  question were that he would talk to Griffin and get the

7  information before he listened to the recording.

8      THE COURT:  How does he know that Griffin may or

9  may not have ever told him that?  You've got to have

10  Griffin telling the agent that -- you've got to get Griffin

11  saying either did or didn't tell the agent about Jihad

12  training.  I realize if it's -- if he actually was told

13  that, likely he would have told the agent, but without

14  Griffin telling us yea or nay, I told Radcliff this or

15  that, then -- and the fact that Radcliff may have been told

16  two separate things, doesn't really matter.

17      As Mr. Sofer said, it's a report.  It's something

18  that Griffin told him.

19      MR. HARTMAN:  But --

20      MR. SOFER:  Maybe --

21      MR. HARTMAN:  -- exactly.  And how about I ask

22  him, Agent Radcliff, would you include information in that

23  from anywhere but the subject?  I mean, it's -- it's a

24  source provided the following information.  Griffin's the

25  source.  Griffin provided this information that says right

1   there --

2            MR. SOFER:  Basically, what he's doing is --

3            THE COURT:  I agree.  I'm sustaining the

4   objection.  I don't -- there's just not enough nexus and

5   until you have some time to show that there's some

6   meaningful significance to impeach this agent or otherwise

7   correct testimony is, we don't know.

8            Griffin should have been asked, Mr. Griffin, did

9   you ever tell the agent that El-Hindi said he was going to

10  do Jihad training, even more importantly, did El-Hindi ever

11  tell you he was going to Egypt to do that?  And if Griffin

12  said, no, then fine.  We have a predicate on which, you

13  know, the evidence showed the agent that Griffin testified

14  that he never -- El-Hindi never told him that, how would

15  this come to be in your report.  That's fine.  We don't

16  have any of that predicate.  We really don't.

17           I'm going to sustain the objection.

18           MR. SOFER:  That's exactly the government's

19  point, for the record.

20           MR. HARTMAN:  Will Your Honor give me a moment

21  because I need to re --

22           THE COURT:  Of course.

23                (Sidebar concluded.)

24           MR. HARTMAN:  Thank you, Judge.

25           THE COURT:  Ladies and gentlemen, I sustained the

 1   objection.  Disregard the last bit of -- last statement by

 2   Mr. Hartman.

 3            You may continue.

 4   BY MR. HARTMAN:

 5   Q.       Mr. Radcliff, when you would listen to the

 6   recordings, would you make notes of your own?

 7   A.       On some occasions, yes.

 8   Q.       Would those become part of the case file or not,

 9   if you know?

10   A.       No, not necessarily.

11   Q.       Sometimes?

12   A.       As a possibility, again, they may be in 1A

13   section.

14   Q.       You mentioned earlier that you listened to parts

15   of four or five recordings in preparation for your

16   testimony here today?

17   A.       Yes, sir.

18   Q.       Do you remember which ones?

19   A.       Not specifically.  I -- I don't recall the 1Ds

20   and necessarily the specific dates.

21   Q.       Were they -- did you pick out which ones you

22   listened to?

23   A.       I did not.

24   Q.       At the time that you were the lead agent on this

25   investigation, how many other investigations were you

```
 1   working on?  And I don't want to know the details about any

 2   others, just so we're clear.

 3   A.        Several.

 4   Q.        Would it be fair to say you had a lot going on

 5   while this investigation was going on?

 6   A.        Yes.

 7   Q.        What percentage of your time would you say was

 8   spent on this investigation?

 9   A.        Which -- which investigation do you mean?

10   Q.        The one that resulted in this case.

11   A.        Okay.  Because actually, there were at least

12   three different investigations involved in this case.

13   Q.        Do you mean because of the number --

14             MR. HARTMAN:  Judge, can I have a minute?

15             THE COURT:  Sure.

16   BY MR. HARTMAN:

17   Q.        You said on direct examination that you continued

18   your assessment of Darren Griffin's performance, your

19   assessment was ongoing throughout the investigation; is

20   that right?

21   A.        That's correct.

22   Q.        Did you ever find -- did you ever, in your

23   assessment of what he was doing, become concerned about the

24   things he was doing?

25   A.        During the course of the investigation when he
```

```
 1   was doing the investigation, there was -- there was -- in

 2   the tapes and the recordings that we had and the physical

 3   surveillances, everything was going fine.

 4   Q.       And just so I'm clear, you retired April 1st of

 5   2005?

 6   A.       Yes, sir.

 7   Q.       And at that point no decision about whether or

 8   not charges were going to be filed in this case; is that

 9   correct?

10   A.       None at all.

11   Q.       You talked to Mr. Griffin regularly on the

12   telephone as well, did you not?

13   A.       I did.

14            MR. HARTMAN:  Judge, I'd like to, at this point,

15   play a conversation that was recorded between Agent

16   Radcliff and Mr. Griffin?

17            THE COURT:  Okay.  Why don't you let him know

18   what it is?

19            MR. SOFER:  I know what it is, but I'd like to

20   lay a foundation for doing so with the questions.

21            MR. HARTMAN:  Okay.

22   BY MR. HARTMAN:

23   Q.       When you would talk to Mr. Griffin on the phone,

24   you talked about the case, obviously, right?

25   A.       Some aspect, yes.  Or if there was a personal
```

```
 1   problem he had, I would talk to him about those.  There
 2   could be any number of reasons for talking to him.
 3   Q.        Would you agree with me -- well, there's been
 4   testimony in his case that his job was to go out and gather
 5   information; is that correct?
 6   A.        That's correct.
 7   Q.        And is it your assessment that that's what he was
 8   doing the entire time of this investigation?
 9   A.        When he was working for us, yes.
10   Q.        Do you remember having a phone call with Mr.
11   Griffin on or about March 9th of 2005 after he had taken
12   some people shooting at Cleland's?
13   A.        Not specifically, but if you have a recording or
14   if you have the record.
15   Q.        I happen to have a recording we can play for you.
16   One moment, please.
17            MR. SOFER:  Judge, again, if we can approach, I
18   just don't think this is a proper manner of doing this.
19            THE COURT:  Come on up.
20                 (A sidebar conference was had on the
21                  record.)
22            THE COURT:  This is the one in the car where he
23   was talking to Radcliff.
24            MR. HARTMAN:  Yes, it was a video and Griffin
25   called Radcliff.
```

```
 1            THE COURT:  What are we doing?

 2            MR. HARTMAN:  What we're doing is, he just said

 3     that his sense Griffin was his doing the job the entire

 4     time and his job was to gather information.  Mr. Griffin

 5     tells him during the conversation that Mr. Amawi was very

 6     upset with El-Hindi, but Griffin says, but don't worry

 7     about it, I'll do the greater good thing.  I'll get it

 8     smoothed over and we'll get them together to train.

 9            THE COURT:  Okay.  And I think that this video

10     does go to the question of whether he was, quote, gathering

11     information.

12            MR. HARTMAN:  And that's the question I'm going

13     to, so afterwards --

14            THE COURT:  You want to play the recording and

15     how audible is it?

16            MR. HARTMAN:  It's very audible.

17            THE COURT:  Okay.

18            MR. SOFER:  And Judge, again, I think that the

19     appropriate way of doing this is to ask a question, ask the

20     witness whether he -- if he denies that, then play the

21     tape.

22            THE COURT:  Why don't you -- do you recall a

23     conversation in which Griffin said A and Griffin said the

24     following, do you recall that conversation?

25            MR. SOFER:  And if he does -- he doesn't recall,
```

 1   playing it would help his recollection.

 2            MR. HARTMAN:  He just asked --

 3            THE COURT:  There was an -- do you recall

 4   speaking with Griffin on day X?  No, I don't.  Is there a

 5   transcript or whatever that we can show to him.

 6            MR. HARTMAN:  Yeah, we have a transcript to play

 7   with the --

 8            THE COURT:  And just so -- say, do you recall on

 9   that occasion Griffin told you X?  And let it go, fine.

10   Then you can argue the point.  You can ask him, isn't it --

11   however you want to handle it, fine, but I'll let you get

12   the conversation.

13                  (Sidebar concluded.)

14   BY MR. HARTMAN:

15   Q.       Mr. Radcliff, this was a day, I think I said,

16   that Mr. Griffin took some people to Cleland's and dropped

17   them off.  Do you recall a phone conversation with him in

18   which he was telling you that Mr. Amawi was upset with

19   Mr. El-Hindi?

20            MR. SOFER:  Objection, Your Honor, as to the

21   first part of the statement by Mr. Hartman was, A, I don't

22   believe there's any evidence of; and, B, I believe is a

23   mischaracterization of the day.

24            THE COURT:  Why don't you ask him if he recalls

25   the conversation between himself and Mr. Griffin on that

```
 1   day when they were returning -- going to and from

 2   Cleland's.

 3            MR. HARTMAN:  I will rephrase.

 4   BY MR. HARTMAN:

 5   Q.       Do you recall a conversation, on or about that

 6   day, on the telephone between you and Mr. Griffin in which

 7   Mr. Griffin was telling you that Mr. Amawi was upset with

 8   Mr. El-Hindi?

 9   A.       I do not.

10            THE COURT:  I'm sorry, I didn't hear your answer.

11   A.       I do not.  I don't recall this specifically.

12   BY MR. HARTMAN:

13   Q.       Okay.  Do you ever recall Mr. Griffin saying that

14   he would take care of the problems between the defendants

15   and smooth things over?

16   A.       I don't recall that specifically, no.

17   Q.       If I have a recording of the conversation, would

18   that help refresh your recollection?

19   A.       It's possible.

20            MR. HARTMAN:  Okay.

21                (Audio playing.)

22            JUROR:  There's no video?

23            THE COURT:  There is no video on the --

24            JUROR:  No video.

25            JUROR:  Now we have it.
```

```
 1                THE COURT:  Why don't you -- can you restart it,
 2   please?
 3                MR. HARTMAN:  Sorry about that folks.
 4                    (Audio playing.)
 5                MR. SOFER:  Your Honor, I object as to the
 6   relevance of playing this whole thing.  It's unrelated to
 7   this --
 8                THE COURT:  I believe --
 9                MR. SOFER:  -- the question.
10                THE COURT:  -- I believe the portion that you
11   wanted to call to his attention -- how much further do you
12   need of this conversation?
13                MR. HARTMAN:  I will have to check, Judge, it
14   will take me a minute.
15                THE COURT:  I agree.  I understood there was a
16   portion that you wanted to call to the jury's attention.
17                MR. HARTMAN:  All right.  Judge, we have the
18   portion.
19                THE COURT:  Can you move forward?
20                MR. HARTMAN:  Yes.  We're ready to play it right
21   now.
22                THE COURT:  This is part of the same
23   conversation?
24                MR. HARTMAN:  Yes, this is later in the same
25   conversation.
```

1      MR. BOSS:  For the record, the recording is being

2  started at 56 minutes, 49 seconds.

3                  (Audio playing.)

4      MR. HARTMAN:  Okay.  You can stop.

5      And just for the record, we stopped at 56 minutes

6  and 36 seconds.

7  BY MR. HARTMAN:

8  Q.      Mr. Radcliff, do you remember that conversation

9  now?

10  A.      I do.

11  Q.      Do you believe that Mr. Griffin saying that he

12  was going to do the greater good thing and smooth it all

13  over so he could get them together to train, do you believe

14  that was just gathering information?

15  A.      I'm sorry, I don't understand your question.  Can

16  you be more specific?

17  Q.      Well, yes.  Mr. Griffin was talking to you?

18  A.      Yes.

19  Q.      About stress between Mr. Amawi and Mr. El-Hindi?

20  A.      Yes.

21  Q.      We heard the conversation, because Mr. Amawi was

22  upset with Mr. El-Hindi because he didn't reconcile with

23  his wife?

24  A.      Yes.

25  Q.      And Mr. Griffin said, Don't worry, I'll do the

```
 1  greater good thing and smooth it over, so it's no big deal,
 2  we'll get them together to train.  In your mind, is that
 3  just gathering information?
 4  A.        Is -- get them together to train and -- I'm
 5  sorry, I missed -- I didn't hear that.
 6  Q.        Taking action to resolve conflict between these
 7  two men so he can get them together to train, is that just
 8  gathering information?
 9  A.        Again, I'll have to go back.  I do not recall
10  hearing that in the conversation, to get them together to
11  train.
12  Q.        Yes.  It's still on the screen --
13  A.        I'm sorry.
14  Q.        -- if you want to read it.  Oops?
15  A.        Okay.  Yes.  I see what you're talking about now.
16  I'm sorry.
17  Q.        So it says he'll smooth that over so we'll get
18  them together and train so it's no big deal.  Do you think
19  that is just gathering information?
20  A.        Yes, in a way.
21            MR. HARTMAN:  No further questions.  Subject to
22  recall during our case in chief, Judge.
23            THE COURT:  Okay.  Mr. Bryan?
24                      CROSS EXAMINATION
25  BY MR. BRYAN:
```

1  Q.        Good afternoon, Agent Radcliff.

2  A.        Good afternoon.

3  Q.        My name's Edward Bryan.  I'm one of the attorneys

4  representing Mohammed Amawi, and I have some questions for

5  you as well.

6  A.        Yes, sir.

7  Q.        Sir, you began putting together this

8  counterterrorism task force in the Toledo office actually

9  prior to 9-11; is that true?

10 A.        That's correct, sir.

11 Q.        And not long after you began the process of

12 putting that together, 9-11 occurred, correct?

13 A.        That is correct.

14 Q.        Is it safe for me to say, then, that sort of a --

15 it was sort of a new emphasis put on getting this task

16 force together and getting it up and running at that point

17 in time?

18 A.        We had more folks that were listening to us about

19 putting it together, yes, sir.

20 Q.        Okay.  And that was something that was important

21 to you as an agent at that time, correct?

22 A.        Of course.

23 Q.        And you had some experience in the past, back in

24 the '70s, actually, doing, not counterterrorism, but

25 counterintelligence-type work; is that correct?

```
 1    A.        That's correct.

 2    Q.        And after a long period of time of doing more --

 3    I don't want to say rudimentary, but doing more commonplace

 4    FBI investigations, this was bringing you back to something

 5    that was similar to what you did in your earlier '70s,

 6    correct?

 7    A.        I wouldn't call racketeering cases rudimentary;

 8    they're complex.

 9    Q.        I would agree with that, and I didn't mean to

10    belittle that work.  It's very important work, but going

11    back and comparing it to what you were doing in the early

12    '70s with counterterrorism -- or excuse me

13    counterintelligence -- just to clarify, was that like spies

14    and all that kind of stuff?

15    A.        We were, in essence, counterintelligence or

16    counter spies.

17    Q.        Okay.  And that was during the Cold War, correct?

18    A.        That was correct.

19    Q.        And your concern, your target, or your foe at

20    that time was the FBI -- or excuse me, was the -- was the

21    Soviet Union?

22              MR. SOFER:  Objection as to relevance, Judge.

23              THE COURT:  I would agree.

24              MR. BRYAN:  He brought it up in direct.

25              MR. SOFER:  Not to which service or which
```

```
 1   country, Your Honor.

 2              THE COURT:  I would agree.

 3   BY MR. BRYAN:

 4   Q.        And now your -- is it safe for me to say that

 5   this video work was not only investigative, and that you

 6   were trying to develop cases, but it was also preventative

 7   as well?

 8   A.        To which you're referring, the previous work in

 9   Washington field?

10   Q.        The previous work, the counterintelligence work

11   that you were doing?

12   A.        That's correct.

13   Q.        Okay.  And in essence, what you were trying to

14   prevent was some sort of breach of national security,

15   correct?

16   A.        That's correct.

17   Q.        And then in the meantime, since the earlier '70s,

18   you were involved in very important work dealing with

19   racketeering and things of that nature, correct?

20   A.        That's correct.

21   Q.        And those, too, also affect security at different

22   levels, correct?

23   A.        Depends on what you mean by security.

24   Q.        But not necessarily national security, maybe

25   security on a local level, I heard something like that?
```

1   A.        There were a variety of organized crime cases I

2   had, and I can't really pigeonhole them.

3   Q.        Okay.  But you had specific targets.  There were

4   individuals whom you believe were violating the law, the

5   racketeering laws?

6             MR. SOFER:  Objection.  Relevance.

7             THE COURT:  I agree.  If you want to ask him how

8   that differed or didn't differ from what he resumed doing

9   following his assignment in the Joint Task Force, that's

10  fine, but --

11            MR. BRYAN:  Okay.  Well, let's fast forward.

12            THE COURT:  The issue here is what happened

13  regarding these defendants.

14            MR. BRYAN:  Understood, Your Honor.

15  BY MR. BRYAN:

16  Q.        We'll fast forward, then, to the beginning of the

17  counterterrorism task force in Toledo, Ohio, okay?  Now,

18  directing your attention to shortly after 9-11, that's when

19  this task force started taking shape and you were gathering

20  certain individuals from various parts of law enforcement,

21  correct?

22  A.        That's correct.

23  Q.        Local law enforcement?

24  A.        Yes.

25  Q.        Other federal agencies, correct?  Including the

1    DEA?

2    A.        Yes.

3    Q.        Okay.  And is it safe for me to say that your

4    primary responsibility after 9-11, in developing this task

5    force, this counterterrorism task force, was to prevent

6    another terrorism attack?

7    A.        Yes.

8    Q.        Okay.  And then the secondary responsibility was

9    maybe developing whatever evidence that there may be that

10   could potentially lead to a case sometime in the future, if

11   evidence existed of that nature, correct?

12   A.        In an intermediate step, not only to prevent, but

13   to disrupt any ongoing terrorist activity that's been

14   identified, and the criminal cases, the criminal aspects,

15   were secondary.

16   Q.        Certainly.  So to prevent and disrupt and to be

17   able to prevent and disrupt it to identify potential

18   threats, correct?

19   A.        That's correct.

20   Q.        And identifying these potential threats -- by

21   keeping them from taking place, correct?

22   A.        That is correct.

23   Q.        Now, it would have been important as parts of

24   this task force, then, if you would have identified, say,

25   an existing terrorist cell, people who were already engaged

```
 1   in putting the plan together to -- to bring a terrorist
 2   attack onto the United States?
 3   A.        Certainly.
 4   Q.        And so that would have about been a high level
 5   task force in the task force to be able to infiltrate that
 6   type of a group, correct?
 7   A.        Certainly.
 8   Q.        And based upon this -- this responsibility, this
 9   wasn't just at the FBI level, this was at the national
10   level; is that safe to say?
11            MR. SOFER:  Objection as to relevance.
12            THE COURT:  I tend to agree.  What -- what
13   matters is what involvement he had in this investigation
14   with these defendants.
15   BY MR. BRYAN:
16   Q.        Is it safe to say that the agents at the
17   agent-level, that was sort of a front line of this
18   approach, its front line of preventing another terrorist
19   attack?
20   A.        I would agree with that.
21   Q.        You were the guys that were out there actually
22   working the cases on the street, correct?
23   A.        That's correct.
24   Q.        Okay.  And then there are certain people above
25   you who also were relating to you, in one shape or another,
```

1    but they weren't the ones on the street working the cases,

2    correct?

3    A.        That's correct.

4    Q.        And they were maybe even advising you on the law

5    and things of that nature as well?

6              MR. SOFER:  Objection as to relevance.

7              THE COURT:  I agree.

8              MR. BRYAN:  Your Honor, may we approach.

9              (A sidebar discussion was had on the

10             record.)

11             THE COURT:  Again, I don't want to know about

12   general FBI process.  What's the purpose of all this?

13   What's the point?  Where are we going with this?

14             MR. BRYAN:  We're not -- this isn't referring to

15   the FBI philosophy, we're referring to their investigations

16   and these cases and what this agent was doing since 2001.

17             THE COURT:  What difference does it make?  What

18   matters is what he was doing in this case.

19             MR. BRYAN:  Exactly.  And what he was doing in

20   this case, Your Honor, wasn't just investigating the cases,

21   but he was taking advice from people up above him to

22   determine how to investigate these cases.

23             THE COURT:  If you want to ask him that,

24   that's -- I mean, if you wanted to ask him whether he had

25   any special training or instruction with regard to this

```
 1    kind of activity, generally, following the Joint Terrorism

 2    Task Force and/or following September 11, 2001, fine, but

 3    this kind of general, sort of, well, what were you doing

 4    then, what were you doing now --

 5              MR. BRYAN:  I'm sort of beyond that.

 6              THE COURT:  Just focus.  All I'm saying is, let's

 7    focus in on what -- if you want to ask him whether he

 8    received any specific training or instruction with regard

 9    to his activities as a member of this task force and/or

10    with regard to Mr. Griffin and/or with regard to these

11    specific defendants, I think that's fine, a bit.

12              Although, I'm not real sure how it's connected

13    with anything, but let's at least connect it to this case.

14              MR. BRYAN:  Okay, I know, Your Honor.

15                 (Sidebar conference was concluded.)

16    BY MR. BRYAN:

17    Q.        You, as part of your efforts in this case, in

18    this specific investigation, the sort of general

19    investigation as it related to how to approach gathering

20    information, as it relates to potential terrorism threat,

21    and more specifically, as it may have related to your

22    interactions in how you conducted your investigations on

23    the streets, as it may have related to these three

24    defendants, isn't it true that you received some legal

25    instruction from people higher up the chain of command, so
```

1    to speak?

2    A.        Yes, that's correct, any -- also locally.

3    Q.        And also locally.  And some of that legal

4    instruction maybe warned you of how not to conduct the

5    investigation so as to avoid potential legal problems in

6    the future?

7    A.        That's correct.

8    Q.        And also may have instructed you on, say, the law

9    of conspiracy, what's necessary for the law of conspiracy?

10   A.        There was a discussion of conspiracy, that's

11   correct.

12   Q.        Okay.  And you were told that one of the most

13   basic elements of the law of conspiracy is that it's a

14   criminal agreement involving two or more individuals,

15   correct?

16            MR. SOFER:  Object to the relevance.

17            THE COURT:  Again, I agree.  You can ask him what

18   he was told.

19

20   BY MR. BRYAN:

21   Q.        That one of the most basic, objective elements of

22   the conspiracy, that it involves a criminal agreement

23   between two or more individuals, correct?

24   A.        We learned that in special agent school, yes.

25   Q.        And you also knew it as part of your

1  investigation in this case, as well as any potential,

2  quote, criminal conspiracy that could develop during your

3  investigation in this case, correct?

4  A.        Correct.

5  Q.        Okay.  And you knew that one of those individuals

6  could not be a law enforcement officer, someone who is

7  working on behalf of law enforcement, such as an informant,

8  right?

9          MR. SOFER:  Objection.  And I object to the

10  characterization of the legal concept.

11          THE COURT:  I agree.  I mean, in terms of -- the

12  problem is that you are discussing legal terms.  And you

13  can ask him what he may have been told or what he

14  understood the law was, but not whether he was told that

15  the law was specifically this or that because that's for me

16  to tell the jury what the law is.

17  BY MR. BRYAN:

18  Q.        Well, as it related -- we'll talk about more

19  about Mr. Griffin in a minute.  But as it related

20  specifically to Mr. Griffin and what he was doing in the

21  community, you knew, not only from advice, but from your

22  training in the FBI academy, that an agreement between

23  Mr. Griffin and somebody else would not be sufficient to

24  establish a criminal conspiracy, correct?

25  A.        That's correct.

1    Q.         Okay.  So you needed, in addition to Mr. Griffin,

2    you needed one of the defendants, as well as at least one

3    other defendant to agree with the goal of the conspiracy?

4              MR. SOFER:  Objection, Your Honor.

5              THE COURT:  I agree.  It's not whether he knew

6    what the law is.  You can ask him if he understood the law

7    is.

8              But I want the jury to understand, I will tell

9    you what the law is and whatever Mr. Radcliff or anybody

10   else may have been told about the law, whatever lawyer

11   suggests to you the law might be, cannot be considered by

12   you.

13   BY MR. BRYAN:

14   Q.         Again, your primary responsibility in this area

15   is to prevent -- to gather information so as to prevent

16   another terrorist attack?

17   A.         Prevent and deconstruct.

18   Q.         And secondary to that is to maybe -- to

19   investigate any cases that may have grew out of that

20   investigation, correct?

21   A.         Yes.

22   Q.         Now, in your investigation, you were given

23   certain tools to be able to conduct your investigation,

24   correct?

25   A.         This -- which specific investigation?

```
 1   Q.        The investigation that led to the charges in this

 2   case?

 3   A.        Yes.

 4   Q.        And some of those tools were the ability to

 5   listen to conversations between and among the defendants,

 6   correct?

 7            MR. SOFER:  Objection.

 8            THE COURT:  I'll let him answer that.

 9   A.        I can comment, in part.

10   BY MR. BRYAN:

11   Q.        Okay.  Let's just clarify.  I mean, just related

12   to their interactions with Mr. Griffin, right?

13            MR. SOFER:  Again, objection.

14            THE COURT:  I agree.  Why don't you rephrase the

15   question?

16   BY MR. BRYAN:

17   Q.        Well, the primary purpose has already been stated

18   in this case for the investigation was to gather

19   information, correct?

20   A.        Yes.

21   Q.        And you were going to utilize certain tools to be

22   able to gather information to either to prevent or disrupt

23   a potential activity against the United States, correct?

24   A.        Yes.

25   Q.        And also to -- to investigate any cases or crimes
```

```
 1   that you believe may have arose out of that investigation,
 2   correct?
 3   A.        Yes.
 4   Q.        And as part of this effort, you develop numerous
 5   sources of information?  I'm not asking you to identify
 6   what those sources are.
 7   A.        Yes.
 8   Q.        But just numerous sources.  Some of these sources
 9   could have been concerned citizens who just voluntarily
10   called the FBI and gave information?
11             MR. SOFER:  Objection to what sources could have
12   been, Your Honor.
13             THE COURT:  I agree.  You can rephrase it.
14   BY MR. BRYAN:
15   Q.        Okay.  Some sources are concerned citizens?
16   A.        I can't comment on my sources, sir.
17   Q.        Okay.  Some of the sources -- and again, I don't
18   want you to comment on who they were or identify anybody --
19   but some of the sources could also come from within the
20   community that you're investigating?
21             MR. SOFER:  Objection as to relevance.
22             THE COURT:  I would agree.  I think you can ask
23   him about participants in this investigation and in this
24   case.
25   BY MR. BRYAN:
```

```
 1   Q.        Well, as it relates to this, just general

 2   investigation, is it safe for me to say that at the

 3   beginning of this investigation, you were the agent in

 4   charge of it?

 5   A.        I was the agent in charge.

 6   Q.        You were the --

 7   A.        You mean, the big office or -- I don't

 8   understand.

 9   Q.        The investigation that led to the charges in this

10   case -- and I understand that it was a broad investigation

11   than just the charges that led to this case -- but on the

12   terrorism task force, isn't it true, Agent Radcliff, that

13   you were the person who was in charge of that task force?

14   A.        I was coordinating it.

15   Q.        Okay.

16   A.        I was not the supervisor.

17   Q.        Okay.  But you were the coordinator of that task

18   force, correct?

19   A.        That's correct.

20   Q.        So you would have been, what, the second in

21   command of the local task force, underneath the supervisor?

22            MR. SOFER:  Again, objection as to relevance,

23   Judge.

24            THE COURT:  I agree.  You can ask him what he did

25   in this case.
```

BY MR. BRYAN:

Q.      Well, as the coordinator of this task force, you developed at least one proactive source, and that was Darren Griffin, correct?

A.      That is correct.

Q.      Okay.  Darren Griffin was brought to your attention by a DEA agent on your counterterrorism task force, correct?

A.      That is correct.

Q.      He had been working for the DEA, making undercover, drug controlled buys from targeted drug dealers, correct?

A.      I don't know all of the specifics, but I assume that's the case, yes.

Q.      Okay.  I believe you used the term referring to a period of time where you were sort vetting Darren Griffin and what was the term that you used, sir?

A.      I don't recall.

Q.      Suitability assessment, I believe is what you said?

A.      Yes.

Q.      Okay.  And that began, initially, when it was first brought to your attention that Mr. Griffin could potentially assist you in an undercover capacity, correct?

A.      Yes.

```
 1   Q.        And as it related to this suitability assessment,
 2   you interviewed Darren Griffin himself, correct?
 3   A.        That's correct.
 4   Q.        Maybe asked his handler from the DEA about him
 5   and how he worked out in the DEA?
 6   A.        Yes.
 7   Q.        Did you polygraph Darren Griffin?
 8             THE COURT:  I'm sorry, I didn't hear your
 9   question.
10   BY MR. BRYAN:
11   Q.        Polygraph Darren Griffin?
12   A.        Yes, we did.
13   Q.        Did you drug test Darren Griffin?
14   A.        We did not.
15   Q.        Were you aware during this suitability assessment
16   that Darren Griffin had used drugs while he was working for
17   the DEA as a DEA informant, were you aware at that time?
18   A.        No, sir.
19   Q.        Were you aware during this suitability assessment
20   that Darren Griffin, himself, had actually engaged in
21   trafficking in narcotics during the period of time that he
22   was working as a DEA informant?
23   A.        No, I'm not aware of that.
24   Q.        Is it safe for me to say that that's something
25   that would affected your suitability assessment if you knew
```

```
 1   that at that time?

 2             MR. SOFER:  Objection.  Speculation.

 3             THE COURT:  I would agree.  It matters what was

 4   done with speculation not what might have been done.

 5   BY MR. BRYAN:

 6   Q.        After this suitability assessment, is it -- is it

 7   fair for me to say that you then set out with all the other

 8   agents, the other people on the task force, and Darren

 9   Griffin, himself, to create a plan how to best utilize him

10   in this investigation process?

11   A.        That's correct.

12   Q.        Okay.  And as part of this plan, you were going

13   to -- Darren Griffin, you knew, was going to, in essence,

14   become the eyes and ears of the FBI when the FBI couldn't

15   see for themselves what was going on?

16   A.        He was to gather information, correct.

17   Q.        Okay.  And he was going to use certain tools to

18   gather that information, including audio recording devices?

19   A.        Yes.

20   Q.        And video recording devices as well?

21   A.        Yes, sir.

22   Q.        And you knew as part of his cover that he just

23   couldn't just walk into -- strike that.

24             How was it determined what community that Darren

25   Griffin was going to, in essence, enter into?
```

```
 1   A.         As I indicated previously, there were ongoing
 2   investigations prior to 9-11, subsequent to 9-11, and prior
 3   to Mr. Griffin working with us, and there were certain
 4   individuals that we were interested in, so we directed him
 5   to where they were going to be.
 6   Q.         Okay.  Of these individuals that you were
 7   interested in, I believe you already said they were not
 8   Mohammed Amawi, Marwan El-Hindi, or Wassim Masloum,
 9   correct?
10   A.         That's correct.
11   Q.         But again, not asking you specifically why you
12   were interested in these individuals, is it safe for me to
13   say that these individuals were members of the Muslim
14   community?
15   A.         I can't comment on that.
16   Q.         You can't comment or --
17   A.         I can't comment.
18   Q.         Okay.  Is it safe for me to say that the -- some
19   of the targets were from the Muslim community in Toledo,
20   Ohio?
21   A.         I can't comment on that.
22   Q.         All right.  Well, some of the places that
23   Mr. Griffin went into were mosques, correct?
24   A.         Yes.
25   Q.         Okay.  Did he go into any Catholic churches?
```

```
 1   A.        No, he did not.

 2   Q.        Did he go into any Baptist churches?

 3   A.        He did not.

 4   Q.        Did he go into any Methodist churches?

 5   A.        He did not.

 6   Q.        Did he go into any Jewish synagogues?

 7   A.        He did not.

 8   Q.        Mr. Griffin went into mosques, correct?

 9   A.        He did.

10   Q.        And did the individuals that he was making

11   relationships with or becoming familiar with were people

12   who went to these places, correct?

13   A.        Some could have, yes.

14   Q.        Okay.  Or were involved in other Muslim

15   organizations, correct?

16   A.        I can't comment on that.

17             MR. SOFER:  Object as to relevance here, Judge.

18             THE COURT:  I'll let the answer stand and the

19   question.

20   BY MR. BRYAN:

21   Q.        As part of Mr. Griffin's cover story, he was --

22   this was a cover that he was going to take several months

23   to develop, correct?

24   A.        Yes.

25   Q.        Okay.  And the beginning part of his cover story
```

1    was that he was going to represent himself as a former

2    soldier who recently converted to Islam, correct?

3    A.        That's correct.

4    Q.        Okay.  And so he then went into these places and

5    would tell his, in essence, his conversion story to people

6    who seem interested in listening about his conversion

7    story, correct?

8    A.        He had discussions with specific individuals

9    about it.

10   Q.        Okay.  And of those specific individuals, were

11   people that were already people of interest to the FBI?

12   A.        That's correct.

13   Q.        But is it safe to say that at some period of time

14   that Mr. Griffin, then, was permitted to develop contact

15   information from people who were not part of that initial

16   investigation, correct?

17   A.        Well, there were individuals who were associates

18   that did come into contact with Mr. Griffin, that's

19   correct.

20   Q.        Okay.  And gradually, over time, Mr. Griffin,

21   then, was supposed to sort of transform his recent

22   conversion into somebody who was critical of the United

23   States foreign policy and that he was developing into

24   people who they observed from the outside, and they had

25   concerns that he may have had some extremist viewpoints?

```
 1   A.          Actually, at the outset, he was training himself
 2   as a disaffected, former U.S. soldier.
 3   Q.          So then it wasn't for a period of over months
 4   that he gradually developed into that role then?
 5   A.          The disaffected U.S. soldier, that's how we had
 6   him portray himself.
 7   Q.          Okay.  Now -- and then he was going to the mosque
 8   and sharing this viewpoint or these viewpoints with others?
 9   A.          He was going several places.  And I liken it to
10   my old Mafia cases, when informants and undercover agents
11   would go a lot of different places, including churches for
12   christenings and going to weddings and the like, and they
13   go in different locations as well.
14   Q.          Now, were you aware as also -- I mean, Darren
15   Griffin was driving a vehicle at this time, correct?
16   A.          Yes.
17   Q.          And he was driving a newer model Honda Accord?
18   A.          I don't recall what he was driving.
19   Q.          And do you recall that he also was -- was set up
20   in a downtown apartment?
21   A.          Yes.
22   Q.          Okay.  And that downtown apartment, is it safe to
23   say that it's a nicer place to live in downtown and not --
24               MR. SOFER:  I'll object to this whole line of
25   questioning and what the relevance is.
```

```
 1              THE COURT:  I agree.  Sustained.
 2    BY MR. BRYAN:
 3    Q.       As part of his cover, Mr. Griffin also had to
 4    have some kind of employment as well, correct?
 5    A.       Yes.
 6              MR. SOFER:  Same objection, Your Honor.  May we
 7    approach?
 8                   (A sidebar conference was had on the
 9                   record.)
10              MR. SOFER:  It seems like we've been down this
11    road.  I don't understand where we're going.  It seems
12    irrelevant to me, and I object to the general line of
13    questioning, unless it's headed to some point that has to
14    do with the cross, again, the cross-examination.  As much
15    as counsel would like to use these agents to cross-examine
16    or rehash the testimony of Darren Griffin, I just don't
17    think they can do this through the cross-examination of
18    this witness.
19              THE COURT:  Where are you going and when are we
20    going to get there?
21              MR. BRYAN:  Your Honor, first of all, this agent
22    was the person who was --
23              THE COURT:  I understand.
24              MR. BRYAN:  -- responsible for Darren Griffin and
25    the part of the investigation.  Where I'm going with this
```

1   is that Darren Griffin represented that he owned a security

2   company.  I want to ask the agent if he was aware of that

3   representation.

4           THE COURT:  Then let's ask specific questions,

5   the fact that he lived in the nicer area of downtown Toledo

6   is no significance whatsoever.

7           MR. BRYAN:  It's part of the cover, Your Honor,

8   to show that he's a successful businessman.

9           MR. SOFER:  That's already come out.

10          MR. BRYAN:  That he has a successful security

11  company.

12          THE COURT:  Let's find out about the security

13  company representation and see what he says, I mean,

14  it's -- let's get to the specific points that are being

15  made.

16          MR. SOFER:  All I will say, Judge, is, counsel

17  wants to bring out the facts that've already come out.

18  They've come out there.  Griffin, Agent Coats, we can bring

19  them -- I just don't see the relevance of bringing them out

20  through every witness that comes and testifies.

21          THE COURT:  Let's move along.

22          MR. BRYAN:  Yes, Your Honor.

23              (Sidebar concluded.)

24  BY MR. BRYAN:

25  Q.      Agent Radcliff, based upon the fact that you were

1   handling Mr. Griffin at this time, were you aware that he

2   held himself out in the community as the owner of a Direct

3   Action Security Company?

4   A.        Yes.

5   Q.        Okay.  And that this Direct Action Security

6   Company was something that could provide VIP protection to

7   dignitaries and things of that nature, correct?

8   A.        Among other things.

9   Q.        Okay.  And he had talked about this in the

10  community that he was going into, correct?

11  A.        He began with certain individuals.

12  Q.        Okay.  And that he also passed out business cards

13  that had his name?

14  A.        He did.

15  Q.        And looked very professional and everything?

16  A.        Correct.

17  Q.        And he offered -- or he advised people that he

18  had the ability -- that he had multiple contracts worth

19  certain dollar amounts, correct?

20  A.        I don't recall that.

21  Q.        Okay.  Now -- and that he offered people the

22  ability to learn private security as well?

23            MR. SOFER:  Same objection.

24            THE COURT:  Again, I'm not sure he can testify as

25  to what Mr. Griffin did.  That's for Mr. Griffin to

```
 1   testify.
 2           And if you want, and if it's pertinent, you can
 3   ask him about what any instructions he may have given or if
 4   that's what he was told.  But I'll sustain the objection to
 5   the form of the question.
 6   BY MR. BRYAN:
 7   Q.      Well, were you aware that Mr. Griffin was
 8   representing himself in this manner?
 9   A.      Which manner is that, sir?
10   Q.      As an owner of a private security company?
11   A.      Yes.
12   Q.      And that he offered security training to people
13   who were interested?
14   A.      Yes.
15   Q.      And that he took people to the shooting range to
16   teach them how to shoot?
17   A.      That wasn't immediately, no.
18   Q.      But aside from the defendants in this case,
19   Mr. Griffin did take numerous other individuals to the
20   shooting range to teach them how to shoot?
21           MR. SOFER:  Objection, as to relevance with
22   regards to what Mr. Griffin did with other individuals.
23           THE COURT:  I would agree.
24           MR. BRYAN:  If the agent is aware --
25           THE COURT:  It's also based on hearsay.
```

```
 1   A.        I don't recall.
 2   BY MR. BRYAN:
 3   Q.        Did you surveille any of these, or were you aware
 4   of any surveillance?
 5           MR. SOFER:  Objection as to relevance, Judge, as
 6   to whether or not the agent surveilled other people
 7   unrelated to this case.
 8           THE COURT:  I understand.  That's fair.
 9           MR. BRYAN:  I'll move along, Your Honor.
10   BY MR. BRYAN:
11   Q.        Let's direct our attention to my client, Mohammed
12   Amawi, okay?
13   A.        Yes, sir.
14   Q.        You're aware, having reviewed the evidence in
15   this case, that Mr. Amawi was first recorded by Mr. Griffin
16   on June 30th, 2004?
17   A.        I don't recall that.  If you can show me the
18   documentation on the recording.
19   Q.        Well, it's -- it's already part of the record,
20   sir, so I -- it was just -- it was just an important
21   question to ask you.  Do you recall the first time that you
22   had any -- any knowledge of Mohammed Amawi during this
23   investigation?
24   A.        I can't comment on that.
25   Q.        Do you recall the first time you created a 302
```

```
 1   concerning Mr. Amawi?
 2   A.        I can't comment on that.
 3   Q.        Okay.
 4             MR. BRYAN:  Your Honor, may I approach the bench?
 5             THE COURT:  Sure.
 6                 (Sidebar conference was held on the record.)
 7             MR. SOFER:  Here's the problem, Judge.  The way
 8   that these questions are being asked, the witness is being
 9   asked the first time he did this, the first time he did
10   that, and it's --
11             MR. HARTMAN:  That white noise isn't on.
12             THE COURT:  Amy, can you put the --
13             MR. SOFER:  And clearly, the witness is
14   uncomfortable with that, and I can say, to some extent, why
15   that is.  There are -- there were other sources in this
16   case, and the fact that -- to ask him a question about the
17   first time such and such happened, I think is problematic.
18   If he wants to ask him the first time he received
19   information from Darren Griffin in the case, that might not
20   be -- I don't know that he's going to recall that.  How do
21   you -- how do you know?
22             THE COURT:  What's this?
23             MR. SOFER:  This is probably, if not certainly,
24   one of the first 302.
25             MR. BRYAN:  That's the first 302 that relates to
```

1  Mohammed Amawi.

2          THE COURT:  Well, then, if you want to ask him

3  again.  What are you trying to have him testify to?

4          MR. BRYAN:  Well, just as to establish that

5  Mohammed Amawi was -- was known to the agent prior to

6  June 30th, actually prior to June 25th.

7          THE COURT:  Why don't you ask him whether he had

8  heard the name or was aware of a person by the name of

9  Mohammed Amawi before June 30th?  And I think it's probably

10  okay for you to ask without asking disclosed sources about

11  what point in time can you recall before then that you

12  heard that name.  And you know, if you want to set that

13  kind of time frame.

14          Again, I'm not sure it's pertinent, but, you

15  know, that's how I would suggest that you ask it.

16          MR. SOFER:  Keep in mind that, you know, if he

17  asks a question he maybe -- I'm going to warn counsel where

18  he's going to venture into a place that is problematic for

19  all of us.  If it turns out somebody else had something to

20  say about Mohammed Amawi, the government has not called as

21  a witness --

22          THE COURT:  I understand that.

23          MR. BRYAN:  I certainly don't want to be ambushed

24  by you questions.  All I'm saying is that I know that as of

25  May 13th, 2004, this is the first 302 that I was given.

```
 1              MR. SOFER:  I understand and that's why I asked

 2    to come up, Judge, because I'm actually I'm not trying to

 3    help counsel.

 4              MR. BRYAN:  If I can just ask about the 302.

 5              THE COURT:  I wasn't sure what the purpose is.

 6    But if you want to say, do you recall when you first

 7    started making reports on Mr. Amawi or whatever?  And if he

 8    says, do you recognize this as, in all likelihood, the

 9    first instance in which were 302.

10              MR. SOFER:  That question, Your Honor, is going

11    to open the door to other potential evidence and

12    information, so instead, if we -- what I'm suggesting might

13    be a way of dealing with this so counsel is ask free to ask

14    whatever question he wants, but so long as he continues to

15    mention Darren Griffin in connection with this someone, we

16    won't run into the problem that I'm trying to prevent

17    happening.  So if that works for you --

18              MR. BRYAN:  So this information is from Darren

19    Griffin?

20              MR. SOFER:  I believe it is because I based that

21    because it says --

22                        (Sidebar concluded.)

23              THE COURT:  You may continue.

24    BY MR. BRYAN:

25    Q.        Sir, you've previously alluded to FBI 302,
```

1  correct, an FBI 302?

2  A.      Specifically, what are you talking about, we've

3  been talking about --

4  Q.      Just generally?

5  A.      The concept, what it is?

6  Q.      Yes.

7  A.      Yes.

8  Q.      It's a report that FBI agents make when they

9  receive information?

10  A.      Yes, sir.

11  Q.      And sir --

12         MR. BRYAN:  Your Honor, may I approach the

13  witness?

14         THE COURT:  Sure.

15  BY MR. BRYAN:

16  Q.      Sir, I'm handing you what's been previously

17  marked as Defendant's Exhibit A12 for identification.  Do

18  you recognize that as an FBI 302?

19  A.      Yes, I do.

20  Q.      Okay.  And when Darren Griffin would provide you

21  with information, frequently you would -- you would reduce

22  that to an FBI 302, correct?

23  A.      If you can just give me a moment.

24  Q.      Take your time to read it.

25  A.      I'm a little slow on my reading.  Okay, sir.

1    Q.          That three -- that FBI 302 is dated May 13th,

2    2004, correct, the transcription date?

3    A.          The date of transcription, yes.

4    Q.          And the date of investigation is May 5th, 2005?

5    A.          Yes.

6                MR. SOFER:  Objection to reading from the 302.

7                THE COURT:  I would agree.

8    BY MR. BRYAN:

9    Q.          Well, does that -- that 302 refresh your

10   recollection of receiving information from Darren Griffin

11   that day?

12   A.          Not specifically, sir, because I -- you have me

13   at a disadvantage.  I don't know if this is Mr. Griffin's

14   report specifically or not.

15   Q.          Okay.  But as it relates to the date?

16               THE COURT:  The record otherwise indicated

17   Mr. Griffin and you had contact or he had reported to you

18   on that day, would you dispute that, that he was the

19   source?

20               THE WITNESS:  If that is the record, that's

21   correct.

22               THE COURT:  Okay.

23   BY MR. BRYAN:

24   Q.          Now, the date that you took that information from

25   Mr. Griffin was May 5th of 2004, correct?

```
 1           MR. SOFER:  Objection, Your Honor.  He said if

 2   the record supported it.

 3           THE COURT:  I would agree.  That's dated that

 4   date.

 5   BY MR. BRYAN:

 6   Q.       Obviously prior to June of 2004, correct?

 7   A.       I'm sorry.

 8   Q.       The date of that report is obviously prior to

 9   June of 2004 -- June of 2004, correct?

10   A.       Yes.

11   Q.       Okay.  And were you aware, based upon your

12   investigation at that time, about Mohammed Amawi's travels

13   and having just recently returned from Jordan to the United

14   States in the spring of 2004, if you can recall?

15   A.       I -- I don't recall.

16   Q.       Okay.  Sir, as it relates to Mohammed Amawi,

17   himself, do you recall a date, June 9th, 2005 to be

18   specific, when you, along with numerous other law

19   enforcement officers, went to an apartment complex on

20   Shaftsbury in Toledo, Ohio?

21   A.       I don't recall that.

22   Q.       To investigate a threat on the president, do you

23   recall that?

24   A.       I recall generally, but I don't recall a specific

25   date of the -- again, if you have a document.
```

```
 1   Q.        Okay.
 2             MR. BRYAN:  Your Honor, may I approach?
 3             THE COURT:  You may.
 4   BY MR. BRYAN:
 5   Q.        Sir, I'm handing you what's just been marked
 6   Defense Exhibit A13 for identification purposes.  Sir, take
 7   some time to read that over to yourself.
 8   A.        Okay, sir.
 9   Q.        That's another FBI 302 form, correct?
10   A.        Yes.
11   Q.        That was not, itself, written by you, but it was
12   written by other agents, correct?
13   A.        And the investigation was by other task force
14   members.
15   Q.        Okay.  After reading that FBI 302, does that help
16   resurrect a memory of you going, along with other agents,
17   to shafts Barry to conduct various interviews?
18   A.        To my recollection, I don't recall going to
19   shafts Barry.  Do you have anything that shows I went to --
20   Q.        Well, the question is, do you -- did you go to
21   shafts Barry on June --
22   A.        I've never been to shafts Barry.
23   Q.        Did you ever go to Mr. Amawi's apartment and
24   participate in an interview with Mr. Amawi?
25   A.        No.
```

```
 1              MR. SOFER:  Objection.  He just said he's never
 2    been to --
 3              THE COURT:  That's fine.  The answer may stand.
 4    BY MR. BRYAN:
 5    Q.        Okay.  Now, sir, as you're monitoring this
 6    investigation, between the investigation that's being
 7    conducted with the services of Darren Griffin, from
 8    May 30th, 2004 until June 30th, 2004, are you personally
 9    aware of any -- any contacts between Darren Griffin and
10    Mohammed Amawi, to the best of your recollection?
11    A.        Sir, I don't recall specifics.  Again, it's been
12    a passage of time, and I'm sorry, I would -- I would like
13    to recollect.
14    Q.        I understand.  Sir, if you -- you were part of
15    this investigation as it related to Mr. Amawi now from
16    summer 2004 until spring of 2005, that's when you retired,
17    correct?
18    A.        I would say that's fair to say.
19    Q.        Okay.  And you were the primary agent who was
20    responsible for Mr. Griffin, at least during a significant
21    portion of that time, correct?
22    A.        For a portion of that time, yes.
23    Q.        Okay.  Now, are you familiar with the fall of
24    2004 and the nature of the investigation as it related to
25    Mr. Amawi at that time?
```

1  A.        You'll have to refresh my memory, sir.

2  Q.        Okay.  Well, in a minute I'm going to play a tape

3  where you're actually a part of the conversation, but prior

4  to that, do you recall Mr. Amawi -- Mr. Griffin going to

5  Mr. Amawi's home where they listened to and viewed videos

6  from the Internet and that would be in October of --

7  A.        Just in general concept.  I -- I'm sorry.  In

8  general, I do not -- I don't recall specific dates.

9  Q.        Okay.  So generally, you recall in the fall of

10 2004 Mr. Griffin starting to view videos with Mr. Amawi and

11 in Mr. Amawi's apartment?

12 A.        Again, whether -- specifically, when it was.  I

13 recall, in general, that there were viewings of videos.

14 Q.        Okay.  And sir, do you also recall that, during

15 that time period, Mr. Amawi struggling financially at that

16 time, based upon your memory of the investigation?

17 A.        Yes.

18 Q.        Okay.  And do you recall during that time period

19 Mr. Amawi having had some employment with a local cab

20 service, but wasn't able to continue with that because it

21 prohibited insurance?

22 A.        Yes, I do.

23 Q.        Insurance coverage?

24 A.        Yes, sir.

25 Q.        And that was because he was under 25 and the

1   insurance rates were too high for him to be able to work

2   and make money at the same time?

3   A.        Again, I don't know the specifics, but that

4   sounds familiar.

5   Q.        Okay.  And that, again, is like the fall of 2004,

6   correct?

7   A.        I don't know.

8   Q.        Okay.  Do you recall Mr. Amawi, during this

9   period of time, expressing to Mr. Griffin his concern about

10  not being able to find employment?

11  A.        I do recall the discussions about that.  I

12  don't -- I don't --

13  Q.        Do you recall that being a concern of the FBI, as

14  well, because Mr. Amawi also was having problems paying his

15  rent as well, correct?

16  A.        Oh, yes, yes, I do recall that.

17  Q.        And you wanted, in essence, to be able to

18  continue to monitor Mr. Amawi so that there was a decision

19  to be made, an administrative decision where you guys

20  decided to allow Mr. Griffin, with FBI funds, of course, to

21  pay Mr. Amawi's rent so that he wouldn't be evicted from

22  his apartment?

23  A.        That is correct.

24  Q.        Okay.  And during this time period, again -- was

25  this October, November of 2004, or the fall of 2004?

```
 1   A.        I'm sorry, I don't know.

 2   Q.        Okay.  Sir, do you recall a specific occasion --

 3   now, you said that you have listened to some audiotapes --

 4   A.        Yes.

 5   Q.        -- in preparation for your testimony today, and

 6   those were provided to you by the United States Attorney's

 7   office?

 8   A.        Yes, portions of.

 9   Q.        Portions of some recordings, correct.  Do you

10   recall listening to a recording that occurred in October --

11   on October 21st, 2004?

12   A.        Again, I don't recall.

13             THE COURT:  Why don't you indicate what the

14   general subject was?

15             MR. BRYAN:  I will, Your Honor.

16             THE COURT:  He obviously has no recollection of

17   specific dates.

18   BY MR. BRYAN:

19   Q.        Just to set the scene a little bit.  This was an

20   occasion, whereas I asked you before, Mr. Griffin had

21   actually gone to Mr. Amawi's home on a couple of occasions?

22   A.        Yes, sir.

23   Q.        And viewed these video recordings, correct?

24   A.        Yeah, I do have the general recollection of that,

25   yes.
```

1    Q.        Do you recall the time where Mr. Griffin actually

2    invited Mr. Amawi to come to his downtown apartment in

3    October of 2004?

4    A.        I -- I do recall him inviting Mr. Amawi to his

5    apartment.  Again, the specific dates --

6    Q.        Okay.  And during -- during that visit, several

7    things were discussed in the apartment that -- on that day,

8    correct?

9    A.        I assume they were.

10   Q.        Okay.  And do you also recall during that visit

11   you being the agent who was monitoring that -- that visit

12   while it was occurring?

13   A.        I don't know if I was specifically, because,

14   again, due to -- important matters going on, and there were

15   times that Special Agent Coats would receive information.

16   Without seeing specifically an item, I can't comment.

17   Q.        We're not talking about the item here.  We're

18   talking about -- well, even after the occasion, did you

19   have the opportunity to listen to the -- the tape and even

20   view an audiotape that took place that day?

21   A.        Again, the specific on -- if I could see the tape

22   or hear the tape, I could help you out.

23   Q.        Okay.

24             MR. BRYAN:  Your Honor, at this time the defense

25   is prepared to play a portions of 1D4, which is the

```
 1   videotape of -- of October 21st, 2004.
 2              MR. SOFER:  Your Honor, can we approach?
 3              THE COURT:  Sure.
 4                   (A sidebar conference was had on the
 5                   record.)
 6              MR. SOFER:  Again, just trying to understand what
 7   the basis of playing this is.
 8              THE COURT:  It also seems to be quite far beyond
 9   direct examination.
10              MR. SOFER:  It's well beyond cross-examination.
11   What's the date again?
12              MR. BRYAN:  October 21st, 2004.
13              THE COURT:  Which one is this?  Which video is
14   this?
15              MR. BRYAN:  It was both an audio and video,
16   the -- the government's version of the transcript is some
17   85 pages, I'm obviously not going to play 85 pages.  There
18   are two things that I want to play.  The first thing I want
19   to play is just portions of the videotape after Mr. Amawi
20   and Mr. Griffin arrived at Mr. Griffin's apartment just to
21   show that, you know, to -- to help refresh the agent's
22   recollection.
23              THE COURT:  About what?
24              MR. BRYAN:  Of the meeting that took place that
25   day.
```

```
 1              THE COURT:  He wasn't there.  Whatever he knows
 2    about it --
 3              MR. BRYAN:  Well, I assume -- he said he viewed
 4    these things after the fact.
 5              THE COURT:  Do we have a transcript of this?
 6              MR. SOFER:  I don't even have a transcript.  This
 7    is not something the government, I don't think --
 8              MR. BRYAN:  I have extra transcripts for the
 9    government.
10              THE COURT:  What are you doing?  What's this
11    about, what's the point of this on cross-examination?
12              MR. BRYAN:  Well, it's basically -- it's
13    demonstrating what was happening on that day, which
14    obviously we believe is relevant to our defense, we believe
15    that this is the best witness to introduce this evidence
16    through because he was the witness who was in control of
17    the -- of the --
18              THE COURT:  But he wasn't there.
19              MR. BRYAN:  -- the fall at that time.
20              THE COURT:  It was something that was given to
21    him.  You call Griffin or your own client or somebody else
22    that may have been there to say were you there and what
23    happened then.  You can't prove this up through him.  This
24    is simply something he received from somebody else.
25              MR. BRYAN:  In addition to that, Your Honor, this
```

 1   agent called Mr. Griffin while he was in the apartment.

 2   Mr. Griffin left the vicinity of the living room to go deal

 3   with a call from this agent, and then I want to play the --

 4   that call and then the transcript immediately following it.

 5   And it goes to the manner in which he was conducting the

 6   investigation and how he was directing the investigation.

 7           THE COURT:  May I suggest asking him if he

 8   recalls, to the extent he had contact with Griffin, and the

 9   Griffin -- what his understanding was in the company of the

10   other people in that apartment.  And let's see if he does

11   or not.

12           MR. SOFER:  Am I to understand you're going to

13   roll a transcript or not roll a transcript?

14           MR. BRYAN:  I'm going to roll a transcript of the

15   call and what happened immediately following the call.

16           MR. SOFER:  Is that a transcript that the

17   government has played prior?

18           MR. BRYAN:  No, it is not a transcript that The

19   Government has played.  It's a transcript I gave you last

20   week when I thought Agent Coats was the one who --

21           MR. SOFER:  Now, we listened to transcript,

22   Judge, here in the courtroom, if I recall correctly.  In

23   addition to not being able to discern very much, if

24   anything, on the actual audio, that's when we -- our best

25   estimate was that it was not Agent Coats.

```
 1            And again, if this was a document, what you would
 2    do is show it to the witness, see if he recalls it.  I
 3    think we've asked the agent to review this.  I'm not
 4    actually 100 percent certain, as we stand here.  I think we
 5    did.  My -- if, in fact, we're talking about the same
 6    thing, he can't even recognize whether it's him or not,
 7    much less what's being said.  And so there are -- and I
 8    think I -- and I think I indicated to counsel last week
 9    when they tried to play this that were they to try to play
10    this tape, we would ask for an audibility hearing because
11    much of it is not audible.  But maybe I'm thinking of
12    something different.
13            MR. BRYAN:  No.  That's the exact --
14            MR. SOFER:  Okay, they gave us a transcript.  We
15    went back.  You may recall, I asked people to run back and
16    listen to it.  In addition to many number of portions of it
17    which are either inaudible --
18            THE COURT:  Why don't you move onto something
19    else and before excusing this witness completely, I'll take
20    an audibility hearing outside the hearing of the jury and
21    we'll go from there.
22            MR. BRYAN:  Your Honor, as it relates to that,
23    there are certain portions that are -- there are certain
24    portions that are audible.  There are certain that are
25    inaudible.  There are some that will probably be in
```

 1   dispute, and obviously, Your Honor's going to have to make

 2   that call.

 3           THE COURT:  I want to use the next 45 minutes

 4   doing something other than that.

 5           MR. BRYAN:  I understand that, Your Honor.  All

 6   I'm saying, in addition to that, there's a conversation

 7   between Mr. Griffin and Mr. Amawi that, by inference,

 8   because the conversation shifts from, hey, let's go to your

 9   house and watch some videos, can you download some videos

10   for me.  That's what the agent discussed with Mr. Griffin

11   was, get Amawi to go play some videos and download some

12   videos, so I need --

13           THE COURT:  Why don't you ask the agent if he

14   recalls having given that sort of instruction to

15   Mr. Griffin.  I mean, if that's the point you're trying to

16   make, let's find out from the agent, and, you know, if you

17   want to say what kinds of instructions did you give to

18   Griffin, what did you do, how did you control, and

19   ascertain he was doing what you expected and wanted him to

20   do.  Let's ask him that, rather than bringing in bits and

21   pieces of random conversations particularly when, according

22   to Mr. Sofer, this agent cannot be certain that it's him on

23   the tape.  And if it's not him --

24           MR. BRYAN:  It's either him or Agent Coats and

25   the excuse they gave me last week for me not playing it for

```
 1    Agent Coats is that he says --
 2              THE COURT:  If he can't recognize it --
 3              MR. BRYAN:  So we're not allowed to present
 4    relevant information to our defense?
 5              THE COURT:  You can ask this agent what kind of
 6    instruction, what kind of direction, what kind of control
 7    did you give to Mr. Griffin?  How did you ensure and
 8    satisfy yourself that he was complying with those
 9    instructions?  Were there occasions when you told him that
10    to do specific things and take specific steps?  That lays
11    the foundation, that lays the groundwork.  Playing a bit of
12    a partially audible tape doesn't do anything, especially if
13    we can't hear what the agent's saying.
14              Let's at least, first, say whether the agent --
15    the if the agent says I never told him to do anything, he
16    was entirely on his own, that's one thing.  If he says I
17    told him to do X, but not to do Y, you can impeach with
18    that evidence, even though it's a collateral, but I'm
19    not -- at this point, I'm not going to permit the recording
20    to be played because in light of what Mr. Sofer's
21    represented as to its audibility issues.  Please move on.
22              (Sidebar concluded.)
23    BY MR. BRYAN:
24    Q.        Agent Radcliff, your responsibilities, as it
25    related to Darren Griffin, obviously, you were providing
```

1   him some guidance on how to conduct his affairs when he was

2   working undercover on your behalf, correct?

3   A.        Can you be more specific about that?

4   Q.        Well, were there times that you ever, in essence,

5   tried to direct Mr. Griffin in certain ways in an effort to

6   maybe gather more information?

7   A.        You're talking about in the conduct of an

8   investigation?

9   Q.        During the context of this investigation, were

10  there times where you, in essence, coached him on how to

11  maybe try to get about gathering additional information?

12  A.        Yes.

13  Q.        And also coached him on how not to ask certain

14  questions and what questions to ask?

15  A.        Yes.

16  Q.        Okay.  During this case, during this

17  investigation, you were aware that Mr. Griffin was offering

18  individuals in this case the ability to train, that he was

19  setting out some sort of training program?

20  A.        That is correct.

21  Q.        And part of your concern as the agent was, you

22  didn't really want to train the individuals, but you wanted

23  to give them the perception that you were going to train

24  them, correct?

25  A.        That's correct.

1  Q.      So various times throughout this investigation,

2  isn't it true that Mr. Griffin made representations about

3  the training that he can provide, but then would frequently

4  provide excuses for why they couldn't begin their training

5  right away?

6  A.      That's correct.

7  Q.      And one of those excuses was as it related to

8  putting forth a place to train, correct?

9  A.      Specifically?

10  Q.      Well, specifically, Mr. Griffin talked about this

11  farm that he was preparing so that they could go and train

12  on this farm, correct?

13  A.      I do recall that, yes.

14  Q.      And do you recall that Mr. Griffin even talking

15  about lining this barn with hay bales and things like that

16  so as to muffle shooting that may be taking place inside

17  the barn?

18  A.      I don't recall the specifics.

19  Q.      Okay.  But do you recall him, in essence,

20  delaying the actual beginning of the training by saying

21  that, you know, the barn's not ready yet or --

22  A.      Yeah.

23  Q.      -- or the training grounds aren't ready yet?

24  A.      Yes.

25  Q.      Okay.  Also as it related to -- to this training

```
 1   ground, do you recall Mr. Griffin developing a concept of
 2   the EPA was doing a study out by the -- by the farm?
 3   A.        I don't recall that, I'm sorry.  The -- that --
 4   again, I don't recall specifics.
 5   Q.        Okay.  And this was, in order to delay the
 6   defendants or delay anybody who was he was offering
 7   training to the opportunity to actually train, correct?
 8             MR. SOFER:  Objection.  He just said he didn't
 9   recall.
10             THE COURT:  I agree, sustained.
11   BY MR. BRYAN:
12   Q.        Well, if we've heard evidence already in this
13   case that Mr. Griffin used the excuse of an EPA study
14   taking place out there, would that be consistent with your
15   directive to Mr. Griffin that he had to sort of stall and
16   not actually get these guys training?
17   A.        I recall, correct, that we were delaying any of
18   the training out at the location, the farm being as you
19   said.
20   Q.        Okay.  Now, as it related to VIP or security
21   training, do you recall Mr. -- Mr. Griffin using as an
22   excuse the quote, I'm waiting on a package before I can
23   begin the security training?
24   A.        No.  I don't recall that specifically.
25   Q.        Okay.  Sort of a package that he needed something
```

 1    from the state before he could start and employee people in

 2    the security company, do you recall any of that?

 3              MR. SOFER:  Objection.  He already said he didn't

 4    recall.

 5              THE COURT:  I agree.

 6              MR. BRYAN:  One moment, Judge.

 7    BY MR. BRYAN:

 8    Q.        Sir, again, it's difficult, I know, for anyone to

 9    recall dates so many years after the fact.  Do you recall

10    an occasion during your investigation Mr. Griffin now being

11    with Mr. Amawi in Mr. Griffin's apartment that you were, in

12    essence -- oh well, during these times that Mr. Griffin was

13    meeting with the defendants, were you sometimes able to

14    listen in on what was going on in the conversation?

15    A.        Agents -- there were occasions when agents were

16    able to listen in.  I, personally, no.

17    Q.        And sometimes -- sometimes, Mr. -- Mr. Griffin

18    either had on his person or at his apartment a transmitting

19    device that allowed you to contemporaneously listen into

20    the conversation as it was occurring?

21    A.        In his apartment?

22    Q.        In his apartment or even when he was out on the

23    road?

24    A.        Yes.

25    Q.        But specifically, as it relates to his apartment,

```
 1   do you recall a time in October of 2004, October 21st, to

 2   be precise, where you were listening in on Mr. Griffin as

 3   he was engaged in conversation with Mr. Amawi?

 4   A.       I don't recall it.  If you have something to

 5   refresh my memory -- and I apologize counselor, because

 6   it's --

 7            THE COURT:  You may approach.

 8   BY MR. BRYAN:

 9   Q.       Sir, I'm going to show you what's been -- what's

10   identified as Government's Exhibit 1D5, conversation date

11   10-21-04.  It's a copy of a --

12            THE COURT:  Well, why don't you ask him, do you

13   recognize what it is?

14            MR. SOFER:  Judge, I don't know if the record --

15   maybe I heard it wrong.  I thought the witness said he

16   personally never did listen to the contemporaneously, but I

17   may be wrong about that.

18   BY MR. BRYAN:

19   Q.       Sir, did you, at times, listen in to

20   conversations while Mr. Griffin was engaged in his

21   activities?

22   A.       And -- at Mr. Griffin's apartment, not

23   Mr. Amawi's apartment.

24   Q.       That's correct, Mr. Griffin's apartment?

25   A.       Yes.
```

```
 1   Q.        Okay.  And do you recall a time in October of
 2   2004 where you were listening in on this conversation and
 3   you called Mr. Griffin on his cell phone?
 4   A.        No.  I don't specifically recall.
 5   Q.        Okay.  Sir, I'm handing you a portion of that
 6   transcript, and I'm just going to ask you to read the first
 7   page of this transcript and see if any of that helps
 8   refresh your memory of what happened that day.
 9   A.        Okay, sir.
10   Q.        Did reading the first page of that transcript
11   help refresh --
12   A.        No.
13   Q.        -- your memory of what happened that day?
14   A.        No.
15   Q.        Could you read the next page then, sir.
16   A.        I still don't recall this.
17   Q.        So by reading the transcript, the first part of
18   that transcript, it appears that Mr. Griffin received a
19   telephone call from somebody?
20            MR. SOFER:  Objection.  The witness does not
21   recall.
22            THE COURT:  I agree.
23            MR. BRYAN:  Your Honor, may we approach?
24            THE COURT:  Do you recall an occasion which you
25   may have called Mr. Griffin while he was in the company of
```

```
 1    other defendants that you placed the call?

 2              THE WITNESS:  Oh, I've done that, yes, Your

 3    Honor.

 4              THE COURT:  And are you able to tell, looking at

 5    that transcript, whether that was one three of those

 6    occasions?

 7              THE WITNESS:  No, Your Honor.

 8    BY MR. BRYAN:

 9    Q.        Sir, one of the things that we discussed before

10    in your testimony dealt with this concept of conspiracy,

11    correct, that you needed two or more individuals involved

12    in a criminal agreement for a conspiracy?

13              MR. SOFER:  Same objection.

14              THE COURT:  I agree.

15              MR. BRYAN:  That's just a foundation question.

16              THE COURT:  Then ask the next question.

17              Jury will disregard that.

18    BY MR. BRYAN:

19    Q.        Do you recall -- when we were listening to the

20    tape that Mr. Hartman played, there was a reference to a

21    Mahmoun when he first began playing the tape that he played

22    for you when Mr. Hartman was cross-examining you.  Do you

23    recall that?

24    A.        Yes.

25    Q.        And do you recall a person by the name of Mahmoun
```

```
 1   who was from the Bowling Green, Ohio area, that Mr. Amawi
 2   had discussed with Mr. Griffin --
 3               MR. SOFER:  Objection, Your Honor.
 4   Q.          -- in your investigation?
 5               MR. SOFER:  Government objected also when that
 6   portion of the tape was being played as not being relevant.
 7               THE COURT:  I agree, sustained.
 8   BY MR. BRYAN:
 9   Q.          Well, do you recall that -- do you recall -- you
10   recalled several meetings between Mr. Amawi and Mr. Griffin
11   at Mr. Griffin's apartment?
12   A.          The number, I don't know.  There were meetings at
13   Mr. Griffin's apartment.
14   Q.          Okay.  Now, the first meeting that happened in
15   Mr. Griffin's apartment on October 21st, 2004, do you
16   recall advising Mr. Griffin that you wanted to see if he
17   could get Mr. Amawi together with this gentleman named
18   Mahmoun, this guy from Bowling Green, do you recall ever
19   directing Mr. Griffin to do that?
20   A.          I'm sorry, sir, I don't specifically recall that.
21   Q.          Okay.  Was that part of your investigation that
22   you wanted to see if you could draw out other people in the
23   community to assess them for threat purposes?
24   A.          We were attempting to find out if there were
25   individuals out there that were looking to engage in
```

```
 1    training for terrorist activity.

 2    Q.        Right.  So you were encouraging Mr. Griffin to

 3    encourage Mr. Amawi to bring people to their meetings,

 4    correct?

 5    A.        Yes.

 6    Q.        And do you recall encouraging Mr. Griffin to

 7    encourage Mr. Amawi to bring this gentleman by the name of

 8    Mahmoun to a meeting in October 21st, 2007?

 9    A.        Your general question, I recall.  The specific

10    one, sir, I'm sorry, I don't recall.

11    Q.        Okay.  Do you recall Mr. Amawi showing up at

12    Mr. Griffin's apartment by himself on an occasion when you

13    thought that Mr. Amawi was going to bring this Mahmoun with

14    him to see Mr. Griffin?

15              MR. SOFER:  Objection, Your Honor.

16              THE COURT:  Sustained.

17              MR. BRYAN:  May we approach, Your Honor?

18              THE COURT:  Sure.

19                   (A sidebar conference was had on the

20                   record.)

21              THE COURT:  I don't see the point of it.  Also,

22    it depends upon hearsay.  How -- how he would think that

23    Amawi is going to come with somebody or not come with

24    someone and whether or when he showed up with or without

25    somebody.
```

 1          MR. BRYAN:  Your Honor, the whole purpose for why

 2   I wanted to play the tape for this day is because the tape

 3   clearly establishes that this -- that an agent contacted

 4   Mr. Griffin, had a telephone conversation with him, and

 5   expressed disappointment that Mr. Amawi didn't --

 6          THE COURT:  If you want to, we'll keep this agent

 7   after we adjourn the jury.  We'll let him listen to the

 8   tape to see if he recalls it was he.  If he doesn't recall

 9   it was he and Mr. Griffin hasn't testified that it was he

10   and there's no basis for playing the tape and attributing

11   to him that this video statement.

12          We don't know.  Coats said it wasn't he.  If

13   Radcliff said it wasn't he, then we don't know.

14          MR. BRYAN:  Your Honor, as it relates to this

15   line of questioning -- though all I'm trying to establish

16   at this agent's direction was he trying to get Darren

17   Griffin to encourage the other defendants to bring people

18   together.

19          MR. SOFER:  He already testified that he did.  He

20   asked that question generally.  Did he try to get the

21   defendants to bring other people?  He said absolutely, that

22   --

23          MR. BRYAN:  This is an effort to try to restore

24   the agent's memory of this particular incident.

25          THE COURT:  You've shown him the transcript.  And

```
 1   I'm saying, my point is, when the jury goes home, we'll ask

 2   him listen to that segment and we'll see what he does.  He

 3   has no present recollection.  The transcript doesn't work,

 4   and I don't want to take the time right now.

 5           I'm telling you, move onto some other subject, or

 6   if this is the last one, then we'll excuse the jury and

 7   we'll go to an audibility hearing.  That's all I'm saying.

 8   I said that half an hour ago, that Mr. Sofer has

 9   represented that -- that the agent has indicated he doesn't

10   recognize his voice.  In any event, it's considerably

11   inaudible.  And if he doesn't recognize it and the tape is

12   inaudible, no amount of talking about it is going to

13   restore his recollection.  Okay.

14              (Sidebar concluded.)

15   BY MR. BRYAN:

16   Q.        Sir, you testified that you don't recall

17   Mr. Griffin using this concept of a package for why he was

18   waiting on starting up his security company.  Do you recall

19   not recalling that?

20   A.        I don't recall.  I know we were -- there were

21   different times that we would stall for time.  I don't

22   recall specifics.

23   Q.        In reading that transcript, did you see anything

24   in that transcript that recalled or the mention of a

25   package that Mr. Griffin didn't have yet or anything like
```

```
 1   that?
 2   A.         No.   I don't recall.
 3   Q.         Okay.  Do you recall reading that in the
 4   transcript?
 5   A.         Yes, sir.
 6   Q.         Okay.  But you don't recall what package
 7   Mr. Griffin is referring to?
 8   A.         No, I don't recall.
 9   Q.         But Mr. Griffin did reference a package that
10   said, Sorry, brother, he doesn't have the package, correct?
11              MR. SOFER:  Objection.  Hearsay.
12              THE COURT:  Sustained.
13   BY MR. BRYAN:
14   Q.         Now, sir, as it relates to directing Mr. Griffin
15   to direct the defendants to bring others to train, do you
16   also recall directing Mr. Griffin to try to acquire from
17   Mr. Amawi copies of the videos that they watched?
18   A.         Yes.
19   Q.         Okay.  Do you recall on October 21st, 2007 when
20   Mr. Amawi appeared by himself at Mr. Griffin's apartment,
21   you advising Mr. Griffin to see if he could take Mr. Amawi
22   back to his apartment to download some videos to give to
23   Mr. Griffin, do you recall that?
24              MR. SOFER:  Objection to the form.  I think he's
25   drawn the witness to potentially the wrong date, Your
```

1  Honor.

2              THE COURT:  Why don't you ask him without a date

3  whether he recalls that incident and perhaps trying to pin

4  it down.

5  BY MR. BRYAN:

6  Q.        Do you recall an incident in October or in the

7  fall of 2004 when you instructed Mr. Griffin to instruct

8  Mr. Amawi to go back to their apartment to -- to download

9  some videos onto some CDs for Mr. Griffin?

10  A.        I know they did.  I don't recall specific

11  instructions.

12  Q.        Okay.  And from reading that transcript, did that

13  trigger any memory --

14  A.        No, sir.

15  Q.        -- of any instructions of that regard?

16  A.        No, sir.

17  Q.        But from reading that transcript, you can see

18  that's what was going onto happen?

19              MR. SOFER:  Objection.

20              THE COURT:  Sustained.  Jury will ignore that.

21  BY MR. BRYAN:

22  Q.        Now, you've referenced in direct examination

23  Government Exhibit 27, which was a compact disc that you

24  received from Darren Griffin, do you recall that?

25  A.        Yes.  I'd have to see specifically which date was

```
 1   that.  Yes, I can -- by the initials and the date, I
 2   recognize that.
 3   Q.        Okay.  And that date is November 24th, actually,
 4   there's 2004, correct?
 5   A.        Yes.
 6   Q.        Kind of looks like it's a six, but it's actually
 7   a four, just to be clear?
 8   A.        Yes.
 9   Q.        And that's the date that you received that
10   compact disc from Mr. Griffin, correct?
11   A.        Yes, sir.
12   Q.        And that was the disc that was purportedly given
13   to him by Mr. Amawi after Mr. Griffin asked Mr. Amawi to
14   put some information on that disc, correct?
15   A.        Yes, sir.
16   Q.        Okay.  Now, later on you've testified on direct
17   examination -- on February 7th, 2005 -- you testified about
18   Exhibit 59.
19             MR. BRYAN:  If you'll get to Exhibit 59, please.
20   BY MR. BRYAN:
21   Q.        And you recognize Exhibit 59 is a disc that you
22   received from Darren Griffin on February 7th, 2005,
23   correct?
24   A.        No, sir.  I don't, but that is -- that is a copy
25   of a disc, I believe, because it does not have my initials
```

1    on it.

2    Q.        Okay.  You may not have been referring to this

3    exhibit, but as I wrote in my notes, I wrote it underneath

4    this exhibit.  You also said, though, in around that same

5    time period, that Darren Griffin brought to you two

6    additional items that were two compact discs, do you recall

7    that?

8    A.        Yes.

9    Q.        And you said different from the first occasion.

10   In the first occasion is when Mr. Griffin actually gave you

11   the disc to keep, Mr. Griffin told you that he may need

12   these discs back?

13   A.        Yes, I recall that.

14   Q.        And the reason Mr. Griffin gave you the discs to

15   keep the first time was because that was a copy of the disc

16   that Mr. Amawi had given to Mr. Griffin to keep for

17   himself, correct?

18   A.        Yes.

19   Q.        Okay.  But on this occasion, Mr. Griffin said

20   that Mr. Amawi may be asking for these discs back, correct?

21   A.        That's correct.

22   Q.        When we were listening to that Mahmoun reference

23   in the tape that Mr. Hartman played, Mr. Griffin talked

24   about how he was sort of looking over Mr. Amawi's shoulder

25   to try to be able to identify this person better, either on

```
 1    the computer screen or some piece of paper that was on his

 2    desk, do you recall that?

 3    A.        Yes.

 4    Q.        And that he was looking for a credit card number

 5    as well?

 6    A.        He wasn't looking for a credit card number, but

 7    he saw a piece of paper with a credit card number on it.

 8    Q.        Okay.  Now, in -- and he's basically trying to

 9    gather information for you so that you can identify --

10    A.        That's correct.

11    Q.        -- this person later on?  Did Mr. Griffin ever

12    tell you that the reason that he wanted to get these discs

13    back and be able to give them back to Mr. Amawi is because

14    he actually just stole those discs from Mr. Amawi's

15    apartment and brought them to you?

16    A.        No, sir.

17    Q.        He represented to you that Mr. Amawi gave them to

18    him, correct?

19    A.        To the best of my recollection.

20    Q.        Okay.  But he said he had to get those discs back

21    --

22    A.        Yes.

23    Q.        -- to Mr. Amawi at some point in time?

24              MR. BRYAN:  I have nothing further at this time,

25    Your Honor, except for the matter that we discussed
```

```
 1   earlier.

 2            THE COURT:  Okay.

 3            Mr. Hartman or Mr. Boss, any questions?  Or

 4   Mr. Doughten?

 5            MR. BOSS:  I believe we did our cross already.

 6            THE COURT:  You did, I'm sorry.

 7            Mr. Doughten and Mr. Helmick?

 8            MR. HELMICK:  No, Your Honor.

 9            THE COURT:  Redirect?

10            MR. SOFER:  Just one moment, Judge, if I may.

11   Just a few, Judge.

12                    REDIRECT EXAMINATION

13   BY MR. SOFER:

14   Q.       Agent Radcliff, Mr. Hartman asked you whether or

15   not -- he had some question about 61, Government's Exhibit

16   Number 61.

17            MR. SOFER:  If you can put that -- this up where

18   the original after that document is.

19   BY MR. SOFER:

20   Q.       You don't know where the original is, though,

21   right?

22   A.       I do not.

23   Q.       Is this, though, the document that was given to

24   you by Darren Griffin on February 9th, 2005?

25   A.       Yes, it is.
```

1    Q.         Did you scan it into the file so that there would

2    be a permanent record of what document was given to you on

3    that date?

4    A.         Yes, sir.

5    Q.         There was some discussion about the difference

6    between the dates of transcription and the date of the

7    investigation?

8    A.         Yes, sir.

9    Q.         Can you tell the members of the jury whether the

10   date of transcription is the same date you take your notes

11   that are used to prepare the 302?

12   A.         No, sir.  It's the date of the actual

13   investigation is when any notes are taken.

14   Q.         So the record of what would have happened was

15   taken at or near the time that the event took place?

16              MR. HARTMAN:  Objection.

17              THE COURT:  Well, maybe rephrase.  You're leading

18   a bit.  Why don't you --

19              MR. SOFER:  I am leading, Judge.  I think I

20   should have a little tiny bit of latitude here.

21              THE COURT:  Go ahead try and --

22   BY MR. SOFER:

23   Q.         You get some information from Darren Griffin or

24   from any other source, correct?

25   A.         Yes.

```
 1   Q.         You take notes.  Those notes preserve what
 2   information is relayed to you?
 3   A.         Yes.
 4   Q.         Those notes are later transcribed into a 302?
 5   A.         Yes.
 6   Q.         In other words, typed into a 302?
 7   A.         That's correct.
 8   Q.         And that's done by you or is that done by a
 9   secretary or some other support personnel?
10   A.         It's done by folks that do transcriptions.
11   Q.         So you don't actually, at least during the time
12   that this was taking place, as this investigation, you
13   weren't typing most of your own 302s?
14   A.         That's correct.
15   Q.         Some secretarial person or some other support
16   personal was doing that for you?
17   A.         That's correct.
18   Q.         But the record that you made was made in your
19   notes?
20   A.         That's correct.
21   Q.         And those are made -- in what relation were your
22   notes made to the actual events?
23   A.         When I was debriefing, in this case, Mr. Griffin.
24              MR. SOFER:  Judge, I have nothing else.
25              Your Honor, at this time the government moves its
```

 1   exhibits into evidence including those which are subject to

 2   connection.

 3           THE COURT:  Okay.

 4           MR. HARTMAN:  Judge, we have nothing further

 5   except to move our audio recording into evidence as well.

 6           THE COURT:  Okay.

 7           MR. SOFER:  And I will object to that.

 8           THE COURT:  We'll do that at sidebar.

 9           Any further questions?

10           MR. BRYAN:  Nothing further.  Thank you, Your

11   Honor.

12           MR. DOUGHTEN:  Nothing, Your Honor.

13           THE COURT:  Ladies and gentlemen, we'll adjourn

14   for the afternoon and start tomorrow at 8:30.  See you

15   then.

16               (Jury dismissed at 4:20 p.m.)

17           THE COURT:  Shall we play that tape so we can

18   either excuse Agent Radcliff or tell him to come back

19   tomorrow morning?

20           MR. TERESINSKI:  I believe so, Your Honor.

21   Mr. Sofer just stepped out to use the restroom.

22           THE COURT:  Why don't we take a five-minute

23   break?

24               (A brief recess was taken.)

25           THE COURT:  Okay.  Let's tee that up and get the

1   agent back.

2        MR. SOFER:  Judge, I think what we can do, if

3   it's acceptable to counsel, is we have a version of their

4   transcript.  They have a new thing -- give that to The

5   Court.  I can give The Court, also, our version of the

6   transcript -- at least the things that we listened to here.

7   I don't know if putting them side by side will be helpful

8   to Your Honor to do that or whether you just want to make

9   your own assessment -- which I think is probably the most

10  important thing -- of what The Court can hear.

11       THE COURT:  Let me see what the different

12  versions are.  Or are not.

13       MR. SOFER:  Just the one with the exhibits,

14  that's the government's.

15       THE COURT:  Rather than highlight.

16       MR. WHITMER-RICH:  The highlight will be --

17       THE COURT:  Okay.  And Agent, it's my

18  understanding that another question is whether you

19  recognize the voices on the tape and whether there's any

20  portion of the tape which you believe is or might be your

21  voice.  I think that's one of the issues.  The other is

22  simply whether for me to hear whether I can hear.

23       MR. SOFER:  Yes, Judge.  And just to clarify, I

24  think that Agent Radcliff has listened to this already, but

25  I'm not 100 percent certain about that.

1          MR. BRYAN:  Your Honor, there's actually two

2    portions.  The first portion is the telephone conversation,

3    and then there's a transcript that follows that.  And I

4    think the transcript that follows helps recall what was

5    said before because of the context of the how the

6    conversation changes.

7               (Audio playing.)

8          THE COURT:  Okay.  Can we replay it?  I was only

9    able to look at one transcript.

10         MR. SOFER:  Understood.  Let me also just say,

11   Your Honor, that the government -- whatever the government

12   did -- I didn't do this, one of our other team members did

13   it -- and it was done, once again, using Bose headsets, so

14   I can tell you from me listening to -- there were -- I can

15   barely hear anything.

16         THE COURT:  That was my reaction.  There were

17   random -- there were random words that seemed audible, but

18   in terms of -- in terms of any sort of coherence or

19   meaning, the clips, but let me watch the one on the monitor

20   and if you can key it back up, please.

21         MR. BRYAN:  Your Honor, if somehow, the courtroom

22   mics can be turned off, too, I think that might provide a

23   little extra --

24              Your Honor, for the record, this first telephone

25   conversation, we're not -- this just puts it in context.

```
 1              (Audio playing.)
 2              THE COURT:  Actually, I was able to hear a good
 3  bit more with that.  There was some portions of it that
 4  were not comprehensible to me.  Maybe we should go by
 5  having played a segment --
 6              First of all, Agent, do you recognize the voice
 7  on there?
 8              THE WITNESS:  I can't say absolutely what's on
 9  there.
10              THE COURT:  In terms of simply the voice of the
11  person speaking with Mr. Griffin, do you recognize that as
12  yourself or don't you know?
13              THE WITNESS:  I don't know, I'm sorry.
14              THE COURT:  Okay.  Do you recall having a
15  conversation of that sort with him?
16              THE WITNESS:  I may have, Your Honor, I don't --
17  I don't know.  There are so many conversations in the
18  context of so many investigations.
19              THE COURT:  Do you recall whether at some point
20  you asked him to procure any videotapes and return them to
21  Mr. Amawi?
22              THE WITNESS:  I may have, I don't know.  I
23  specifically don't recall.
24              THE COURT:  If you'll step out for a second,
25  okay.
```

```
 1                (Agent Radcliff left the courtroom.)

 2           THE COURT:  I don't -- I don't think there's any

 3    basis for that's Agent Radcliff's voice.  He listened to

 4    it.  If anybody's going to recognize his voice, it's he.

 5           MR. SOFER:  And again, Judge, I would concede

 6    that during this time of the investigation, that it likely

 7    would be him, but that doesn't mean it couldn't be someone

 8    else.

 9           And while I also must admit that the second time

10    through, I was able to pick up more than the first time.  I

11    bet if you listen to it five and six times, you might

12    continue to pick it up bits and pieces, but I'll say this,

13    in order to really parse this out, which I do not -- I will

14    say this, from the government's standpoint, the transcript

15    that is rolling on this tape does not accurately reflect

16    that conversation, and I think it has language in it that

17    goes well beyond that which I was able to discern.  And so

18    for that reason, and the fact that the witness is unable to

19    recall or identify his voice, in particular, I just don't

20    think it's appropriate.

21           I would also add, Your Honor, that counsel asked

22    the witness and received an answer from him that he did

23    sometimes coach the -- the informant, Darren Griffin, to

24    behave in a certain way, to ask him certain things, and I

25    believe he even asked -- I could be wrong, but I think the
```

1  record will reflect that he even said that he asked him to

2  procure discs sometimes during his cross-examination.  Put

3  all those things together, Judge, I just think to play this

4  tape and more importantly to roll this transcript for the

5  jury would be inappropriate.

6       MR. BRYAN:  Your Honor, if I may, first of all,

7  as it relates to the transcript --

8       THE COURT:  I'm having trouble hearing you.

9       MR. BRYAN:  I apologize, Your Honor.

10      First of all, as it relates to the transcript

11  itself, the transcript, quite frankly, was prepared by me,

12  Your Honor, after sitting for a long time with Mr. Amawi

13  and listening very closely to what was being said.  I would

14  submit to The Court that what is submitted in -- and

15  obviously there's still a lot of unintelligible scattered

16  throughout the transcript, we didn't try to just

17  self-insert stuff.  Those are words that as an officer of

18  The Court I would submit to Your Honor that I heard after

19  much, much listening to these tapes.

20      Now, I would submit that the government has had

21  the opportunity to do that with portions of their

22  transcripts that were also difficult to hear.  Mr. Griffin

23  himself testified that he listened to the tapes for hours

24  upon hours, and he was the one that they used to, in

25  essence, create their own transcript.  And there are

```
 1    difficult portions of the government's tape that are
 2    difficult to hear, yet we rely upon the fact that
 3    Mr. Griffin said he heard those words as being part of the
 4    transcript.
 5              I -- as I listened to it, obviously as Your Honor
 6    did as well, I'm able to hear -- I was able to hear things
 7    better the second time than I was the first time.  I would
 8    submit to Your Honor that everything that is in that
 9    transcript is something that I heard.  And I think it's
10    also clear from the context of what happens after that,
11    what follows from that conversation, is that Darren Griffin
12    turns to Mr. Amawi and says, hey, let's go back over to
13    your house and that that was the instruction that he was
14    getting.
15              The -- I think the clearest thing in the
16    transcript is the agent saying words to the effect, see if
17    you can go download some videos and bring them back to me,
18    or words to that effect.  To me, that was the clearest
19    thing, and that's the part of the transcript that we're
20    trying to get in.
21              Earlier there was a reference to the person who
22    didn't show up.  And that, admittedly, is more difficult to
23    hear, but at the beginning of the transcript, you can tell
24    from Mr. Griffin's responses that, yeah, you know, in
25    essence, the agent was inquiring where is the other guy,
```

```
 1    and Griffin's basically just saying, yeah, he decided not
 2    to show up, or whatever.
 3          So those are the two points that I was trying to
 4    make as it related to this agent, and I think the
 5    transcript of what occurred on that --
 6          THE COURT:  What is the significance of those
 7    points relative to this agent's testimony rather than
 8    relative to Griffin?  And I don't recall -- if you come up
 9    during Griffin's testimony, because he would have been the
10    one to the extent that would have been able to recognize
11    either the speaker or what was being said or could have
12    testified about the flow of events.
13          Certainly could have been asked prior to this,
14    you were not -- I assume this is the case, prior to this,
15    had you suggested to Mr. Amawi that we go get the tapes,
16    no.  You had a conversation, yes, and with -- I would
17    assume Griffin would say it was Radcliff, I don't know, but
18    so far we don't know.  And --
19          MR. BRYAN:  And perhaps --
20          THE COURT:  -- and again, Griffin miss I mean
21    peeved if you want to recall him.  I don't understand what
22    this has to do with Radcliff, because Radcliff admitted
23    that he's instructing him, he's working with him, he's
24    handling him, and --
25          MR. BRYAN:  That's your -- first of all, it does
```

1  have to do with Agent Radcliff because Agent Radcliff is

2  instructing the investigation to take a certain course and

3  that is, you know, to get people together and to try to

4  collect audio tapes -- not audio tapes, but videotapes from

5  Mr. Amawi, that he's instructing Griffin to do so.  Griffin

6  implied --

7          THE COURT:  But I think that this video matters

8  because Griffin has already --

9          MR. BRYAN:  If I may Your Honor, as it relates to

10  whether or not we could have cross-examined Griffin with

11  this bit of transcript, quite frankly, Your Honor, in that

12  juncture of the case, I believe that Mr. Sofer would have

13  objected and said it's beyond the scope of cross, it

14  doesn't go to impeach him in any way or anything like that.

15  And quite frankly, Your Honor's correct, the only other way

16  to introduce this -- there are three ways to introduce this

17  testimony, is through the agent, because I think he was

18  part and parcel of what occurred here.  I'm not asking to

19  introduce everything that happened prior to leading up to

20  this, only what happened when the agent injected himself

21  into the process and gave Mr. Griffin some direction.

22          THE COURT:  But he has no recollection, that's

23  the whole problem.

24          MR. BRYAN:  The only thing I can say --

25          THE COURT:  There's not enough there to figure

 1  out what's going on.

 2          MR. BRYAN:  The only thing I can say in response

 3  so that Your Honor is I prepared, this line of

 4  cross-examination for Agent Coats because I can't

 5  distinguish between this voice, whether it's Agent Coats or

 6  Agent Radcliff.  I was told at the time by The Government

 7  that it's not Agent Coats, it's Agent Radcliff.  So now

 8  that I'm trying to proceed, Your Honor, present this

 9  evidence through Agent Radcliff, I'm being presented with

10  the obstacle that Agent Radcliff can't decipher his own

11  voice, can't hear his own voice on the tape.  I mean, is

12  there any other agent that worked for the government during

13  this investigation that it could be?  If it's not Agent

14  Coats, to me, it has to be Agent Radcliff whether or not he

15  has sufficient evidence to --

16          THE COURT:  The point simply is to the extent

17  that this is admissible at all -- and I gather that it's

18  your contention it is because it shows that there were

19  occasions when Mr. Griffin was instructed to take various

20  steps -- candidly, I don't think there's -- I don't see how

21  there is any more improper, inappropriate or the subject

22  upon which one can raise questions about either the

23  propriety of the investigation or the credibility of either

24  Agent Radcliff, Agent Coats, when he testifies, or

25  Mr. Griffin.  Because that's exactly what happens when you

1  wire up an informant, you count out the money and record

2  the bills and make sure he's clean, send him in telling him

3  to buy dope.  He comes out with the dope, you go in, and

4  you find the bills in the drug defendant's pocket.  You

5  know there's nothing pertinent or probative to that.

6         The fact that this agent was telling Mr. Griffin

7  to take certain steps that have the effect of procuring or

8  possibly procuring evidence, you know, just -- and it's

9  common sense that the agent would be doing that.  The

10 problem is Griffin is the one to tell you, yes, we had a

11 conversation, I don't -- I can't recall what was said.  But

12 to me, you start talking about going and getting the

13 videos, you get the videos, you give them to Radcliff, and

14 you get them back.  That's all that the jury needs to know.

15 What --

16         MR. BRYAN:  Well, I mean, Your Honor, I

17 understand I think -- I think the analogy to the drug case

18 is a little bit apples and oranges, and I say it for this

19 reason, the government has already made a point of the fact

20 that Mr. Amawi allegedly gave Mr. Griffin videos and

21 Mr. Griffin testified that the purpose of the videos and

22 Mr. Amawi giving him the videos was for training purposes

23 so he could use the videos to train the brothers.  What

24 this tape demonstrates, Your Honor, quite frankly, is the

25 genesis at the very beginning of Darren Griffin's video

1   collection activities on behalf of the FBI and what it

2   shows is that this was the FBI's idea to ask Mr. Amawi to

3   download videos.

4           THE COURT:  And that's impeaching Mr. Griffin

5   through collateral evidence.  I mean, this is going to show

6   Griffin lied as to the purpose for which he procured the

7   videos from Mr. Amawi.  The person to ask about that is

8   Mr. Griffin.

9           The problem is you don't have Radcliff --

10          MR. BRYAN:  Your Honor, if I may, what it also

11  demonstrates, the conversation after the telephone

12  conversation between Mr. Amawi and Mr. Griffin, is that

13  there's absolutely no training reason being offered.

14          THE COURT:  Fine.  And that's my --

15          MR. BRYAN:  The 9-11 conspiracy, what he wanted,

16  and that's born, also, I think for the agent in the manner

17  in which he's conducting the investigations as well.

18          THE COURT:  You can do that with Griffin.  And

19  Griffin may be able to tell you who the person was, and it

20  may be likely it was Coats or Radcliff.  And that's the

21  same transcript two different versions.  Griffin can look

22  at it and see, do you recognize what was said to you at

23  that time and see what he says.  And I would be inclined to

24  play the transcript itself to Mr. Griffin, and then you can

25  develop through what happened and argue it for the jury.

1            MR. SOFER:  If I may, Judge, a couple things.

2      Again, we're going to end up having this -- having this

3      argument some other time, but my view, the government's

4      view, that is the time to cross-examine Darren Griffin is

5      over.  They don't get two chances to cross-examine Darren

6      Griffin.  This is why we have -- we have fundamentally

7      opposed this notion of recalling him unless there's some

8      other purpose.

9            THE COURT:  I disagree with that.  They, in the

10     presentation of their case, can recall Mr. Griffin.  He's a

11     witness identified as opposing party and ask leading

12     questions to develop whatever evidence they want to, in

13     this case, gather from what Mr. Bryan's saying, either to

14     show that Griffin was not telling the truth when he said

15     they were obtained for purposes of, quote, training or also

16     to show the way in which it was Griffin conducting the

17     operation that was the Bureau.

18            Now, again, I'm not sure that that's particularly

19     significant here, or startling, but I do think if that's

20     something that they want to develop in their -- their case,

21     they can do so.

22            And I -- I -- let's put it this way, I'm not

23     acquainted with any doctrine that says to a lawyer in a

24     criminal case defending a defendant that says, you have to

25     ask all the questions you might want to ask of the

1  government witness, or at least those which may relate to

2  his credibility, when he's presented by the -- the

3  government.

4        MR. SOFER:  I think, Your Honor, that's exactly

5  what the law says that you're talking about, those that

6  relate to his credibility, that's -- that's what

7  cross-examination is.  And you don't, then, get to -- after

8  you had one round of cross-examination, just recall

9  government witnesses in your case to impeach their

10  credibility.

11        THE COURT:  If you find me cases that make clear

12  that this video is of, what I understand, very general

13  discretion conduct order for examination and that's fine.

14        MR. SOFER:  The other thing I would say, you can

15  see why that is impractical, I believe, and the law would

16  forbid it, for one thing.  The government calls a witness,

17  the defense attacks his credibility, the defense now calls

18  that witness and attacks his credibility again.  The

19  government then puts on evidence which would tend to

20  support the credibility of that witness.  You're going to

21  have two identical -- what, essentially, would force the

22  government into a position, then, is to play its case over

23  again.  And the notion that we would go down that road, I

24  think, shows why that's not a -- appropriate way of calling

25  witnesses.

1          But -- and Your Honor said something specifically

2     about this, which I think is very important, if it's to

3     show that Darren Griffin lied about a couple things.  First

4     of all, defense has already established through this

5     witness -- if we can just stay on the point that we're on

6     first -- the defense already established through this

7     witness that he has been provided coaching and did, I

8     believe, ask Darren Griffin to go to try to get discs.

9     That's just what Mr. Bryan was trying to establish.  He's

10    got that already.  He doesn't --

11          I don't believe, then, that you, especially under

12    the circumstances here, that it's, then, appropriate to

13    play this tape, which the witness doesn't recall.  And

14    which, just as an example of that kind of behavior, maybe

15    if, in fact, it is Agent Radcliff -- I'm not saying it is

16    Agent Radcliff, I can't speak to whether he recognizes his

17    voice or not.  That's the first issue that The Court's

18    confronted with.  I would like what opportunity to -- to

19    when we get there, Your Honor -- and I'd like Your Honor to

20    keep an open mind as to this notion, because it's clear to

21    the government that, throughout the cross-examination of

22    other witnesses, they continue to try that as a defense.

23    The defense continues to try to impeach Darren Griffin, and

24    impeachment is the subject of cross-examination.

25          If there's some other purpose for calling a

```
 1    government witness in a defense case, that's different.
 2    But certainly to try to demonstrate to the jury that the
 3    witness was not credible, that the witness did something
 4    that they had an opportunities to ask on cross, to then
 5    call them in their case, and then have the government have
 6    to respond with all the evidence that would tend to show
 7    that that's not true, essentially you -- you retry the
 8    entire case.  It doesn't make any sense.
 9             THE COURT:  It depends, okay.  Clearly, the
10    defense can offer testimony that contradicts testimony of
11    the government witness.
12             MR. SOFER:  Certainly.
13             THE COURT:  Taking into consideration and
14    pursuant to instructions in that regard as to evaluating
15    credibility and believability, to the extent to which the
16    testimony of the witness is supported or disputed by that
17    of other witnesses or evidence.
18             MR. SOFER:  And --
19             THE COURT:  And I don't expect we're going to
20    spend a great, huge amount of time in, quote, impeaching
21    Mr. Griffin.  The point I was picking up on, Griffin said
22    at one point, the purpose was for training.  But I also
23    think that it's appropriate for them to ask Griffin about
24    basically whose idea was this anyway.
25             MR. SOFER:  I don't disagree, Judge.  But they
```

1    had -- all I'm saying is, they had their opportunity to do

2    that.  That's cross-examination.

3           Now, again, if we're going to go down this road

4    with Griffin being called as a defense witness, then the

5    government is going to -- is going to put in tapes again of

6    all the instances where the training did have some

7    something to do with a position consistent with the

8    government's position.

9           All I'm asking Your Honor to do now is reserve a

10   decision on this notion and reserve it as to particular --

11   as always with you, do a lot of this discussion in any case

12   about hypothetical situations -- and I'm just asking The

13   Court to wait until we get to something real.

14          Here, Your Honor, what The Court's faced with

15   here, I would say defense has accomplished the point that

16   they want to.  And the government concedes, by the way --

17   I'm not going to stipulate to it, but this is not something

18   that the government has -- is fighting in this case,

19   that -- that as you said, Darren Griffin acted like -- like

20   a cooperating witness in any number of cases where he goes

21   out and does things at the behest of the FBI.  I think some

22   of the cross of Darren Griffin was, he wasn't doing this at

23   the request of the FBI, now they want to say it is.  We'll

24   let them make those arguments.  They did get their point

25   across in front of the jury, which was --

```
 1            THE COURT:  Let me -- let me hear from
 2   Mr. Hartman.
 3            MR. HARTMAN:  Judge, I just would like to -- I
 4   would just like to say, Mr. Sofer keeps referring to the
 5   fact that we're trying to impeach Mr. Griffin through
 6   government witnesses.  And I -- I think what Mr. Bryan is
 7   trying to do -- I won't speak for him, but in some of the
 8   cases, what we are doing is showing the interaction between
 9   Mr. Griffin and certain government witnesses because, quite
10   frankly, government conduct is at issue in this case.
11            And you have said on -- in some of your rulings,
12   okay, but you've got to save that for your case in chief.
13   Okay.  You made your rulings.  But it's not that we're
14   trying to impeach Griffin necessarily, as much as putting
15   the government's --
16            THE COURT:  That's what I thought I heard him
17   say.
18            MR. HARTMAN:  I just --
19            THE COURT:  Griffin had said it was for training
20   and --
21            MR. BRYAN:  Your Honor, it serves multiple
22   purposes, and one is to impeach Griffin, but it's directly
23   relevant to the agent's investigation at that juncture of
24   the case, how he was -- how he was steering Griffin.  And
25   you know, we've --
```

```
 1          THE COURT:  I'll tell you what I'm going to do.
 2   You can resume with the agent tomorrow, and you can ask him
 3   specifically in terms of -- Agent, what kind of interaction
 4   did you have with Mr. Griffin with regard to what you are
 5   asking him to do?  Did you -- from time to time, did you
 6   give him specific instructions about things to do or things
 7   to say?  Not whether he can recall any specific one.  And
 8   if he says yes, that's fine.  And -- and were there -- were
 9   there occasions that you can recall that you would take the
10   initiative in that regard and suggested activities on his
11   part that took him in a particular direction?
12          I think that's all they're trying to establish.
13          MR. SOFER:  And Your Honor, I believe if you read
14   the record back, that's exactly what has already happened.
15          THE COURT:  I understand.  I'm going to say in
16   lieu of going through this exercise, I'm going to let him
17   do that with the agent tomorrow.  This is simply not
18   audible enough.  All we know -- and is this excerpt
19   otherwise in the record?
20          MR. SOFER:  I don't believe it is in anyway,
21   Judge.
22          THE COURT:  Do you want to play this at some
23   point in your case to show that this is an instance where
24   the jury can draw the inference, that that's what was going
25   on?  If it's that significant to do so -- if there's no --
```

1    Griffin talked these people into showing him various

2    videos, he gave the videos back or to the agent, and some

3    of them he gave back to, I think, Mr. Amawi.

4              And -- go ahead.

5              MR. BRYAN:  Your Honor, if I may, I mean,

6    obviously, in the effort to defend Mr. Amawi, there are

7    certain things that I'm trying to get before the jury to

8    see.  If we were to try to cross-examine Mr. Griffin with

9    this exact excerpt, I am sure Mr. Sofer would have stood

10   up, would have objected, said, Your Honor, this is beyond

11   the scope of cross-examination.  It doesn't fulfill the

12   rule of completeness.  We didn't play anything even from

13   that day.

14             THE COURT:  I understand.

15             MR. BRYAN:  He would have raised --

16             THE COURT:  Now is not the time for that.  I'll

17   hear your argument and his when you undertake to recall

18   Mr. Griffin, and then to ask him specific lines of inquiry.

19             MR. BRYAN:  But to be blunt, what the defense is

20   trying to do and what the government is trying to do -- and

21   I don't think this is any secret -- is the government's

22   trying to get as much of their case before the jury as they

23   can get before the jury.  And to the extent that they can,

24   they're trying to keep us from being able to argue as much

25   as our defense to the jury as we can.

1              THE COURT:  The case is not with you yet.  When

2     it is, if I exclude that opportunity, then you can make

3     this argument, okay?

4              MR. BRYAN:  But in an effort to try to get into

5     the record that which we want to be able to argue to the

6     jury --

7              THE COURT:  You have another opportunity.  If I

8     don't grant you that opportunity because I accept

9     Mr. Sofer's argument, then you have an issue on appeal.

10    Now is not the time.

11             If nothing else, this is substantially afield

12    from direct examination.  It's part of your defense to show

13    that, I gather, that show that Griffin was out doing

14    whatever he was doing, in part at least, at the direction

15    of the FBI.  I'm not sure what -- where that gets you, but

16    that's up to you.  That's the point that you want to try to

17    make now, and I'm saying to you now, on this conversation,

18    I'm not going to -- as to this conversation, I'm not going

19    to permit it at this time.  We'll, revisit it when you

20    recall Mr. Griffin in your case, and Mr. Sofer objects, and

21    if I pull a rug out from underneath you, I have done that,

22    and we all live with that on appeal --

23             MR. BRYAN:  I understand, Your Honor.

24             THE COURT:  -- if you lose.  If you don't, that's

25    fine.

1          MR. BRYAN:  Your Honor, as it relates --

2          THE COURT:  And I have, you know, under Rule 611,

3     I have very substantial discretion to control the -- the

4     mode of examination and that's exactly what I'm doing right

5     now, exercising that discretion to tell you the time will

6     come in your case, if it becomes pertinent.

7          All I'm trying to suggest to you, if you want

8     Agent Radcliff back briefly tomorrow to ask him

9     specifically, were there occasions when you, on your own

10    initiative, told Mr. Griffin to do certain things?  If he

11    says, yes, then you can say, and the purpose of doing so is

12    to gain evidence that might help lead to a conviction in

13    this case.  And if he says, no, to gather information.

14         But we're here today, aren't we, and all this

15    evidence is being presented.  And much of it was gathered

16    by Mr. Griffin.  I mean, again, if it -- that's the point

17    you're trying to make with Radcliff, I think you can still

18    make it and can make it directly.

19         MR. BRYAN:  Your Honor, just -- if I may, I agree

20    with Mr. Sofer, I believe I've already made that point.

21         THE COURT:  Okay.

22         MR. BRYAN:  My only purpose for bringing Agent

23    Radcliff tomorrow morning would be to play the tape, and if

24    I'm not going to be permitted to do that --

25         THE COURT:  Not now.  I'm not excluding the tape

 1    permanently.  I'm just saying, I'm exercising my discretion

 2    under Rule 611 to control the scope and conduct of

 3    examination, particularly with regard to cross-examination.

 4    This is outside the scope of direct examination.

 5              MR. BRYAN:  That's understood, Your Honor, so

 6    there's no need to bring Agent Radcliff back.

 7              THE COURT:  Okay.

 8              Now, other issues we have to tend to?

 9              MR. SOFER:  Your Honor, I'll ask Mr. Herdman to

10    come up because most of the other issues relate to the

11    remaining witnesses in the case, and he has most of them.

12              THE COURT:  I just want to get that e-mail.  Give

13    me a second, please.  Okay.

14              MR. SOFER:  Judge, just so it's clear, we'll tell

15    Agent Radcliff not to return tomorrow.

16              THE COURT:  All done for now?

17              MR. HARTMAN:  We are.

18              MR. SOFER:  We'll call our next witness.

19              MR. BRYAN:  Oh, yeah, we're fine.

20              THE COURT:  Okay.  Let's take a look, I've also

21    got a motion here in limine, but let's deal with the stuff

22    from last night's e-mail.

23              MR. HERDMAN:  Your Honor, most of what was in

24    last night's e-mail deals with what we expect to be the

25    testimony of Special Agent Gubanich regarding the

1    statements by Mohammed Amawi on the flight back from

2    Jordan.  I think the first issue we've -- I think Mr. Ivey

3    would not object to the government -- we're happy to do it

4    either way, Your Honor, but photographs with Mr. Amawi in

5    restraints.  Mr. Amawi's indicated he would like those

6    photographs to be shown in restraints, handcuffs.

7              THE COURT:  In other words, without editing the

8    picture.

9              MR. IVEY:  I'm not saying I want them to show

10   them.  I'm just not objecting if the government decides to

11   use them.

12             MR. HERDMAN:  Well, those are the photographs.

13   The second issue relates to presence on that flight of a

14   Secret Service agent, Your Honor.  If you remember from the

15   hearing, there was -- there was a Secret Service agent that

16   was present on board during the flight back from Jordan.

17   In fact, notably, the Secret Service agent was the only

18   female that was on board that flight.  That may -- you may

19   remember that specific fact as well.  But the presence of

20   that Secret Service agent was specifically linked to

21   allegations that Mr. Amawi had threatened the President.

22             THE COURT:  Unless you feel some urgency to bring

23   that out, I don't think it's necessary.  I mean, do you

24   care one way or the other?

25             MR. HERDMAN:  We'd like to have --

1           THE COURT:  Is there occasional glancing blows

2    about it, but the fact that there was somebody from some

3    other agency there, big deal.  I don't think it's necessary

4    to show why it was she was there.

5           MR. HERDMAN:  I do have the agent prepped to

6    provide some mutual explanations that wasn't there that

7    doesn't reference any specific threats or allegations, Your

8    Honor.

9           THE COURT:  And that would be sufficient,

10   something along the lines of Secret Service had an interest

11   in a portion of this case, without elaborating it.  So why

12   do we even need that into why she was there.  Who cares?

13   She's there.  Big deal.

14          MR. HERDMAN:  Your Honor, again, it's difficult

15   for us to do this sort of in a vacuum, and I think once we

16   get to the ultimate issue here, which is the voluntariness

17   issue, what instructions we'll give to this jury, I'll feel

18   a little more comfortable with what Agent Gubanich

19   testified to.

20          But the fact of the matter is, I think there were

21   about 11 or 12 people that were on that the FBI flight, and

22   I do feel it's necessary for the agent to go through to

23   sort of enumerate who was on this flight, and I would like

24   to do that on direct because I think Mr. Ivey might take a

25   crack at it on cross if I don't do so.

```
1            MR. IVEY:  Your Honor, how do I say this?  I
2   am -- I can guaranty I'm not going to ask one question as
3   to why a Secret Service agent was on the plane.  The Court
4   has excluded those counts from this trial.  I don't think
5   it helps Mr. Amawi's defense to have an explanation of why
6   the Secret Service agent was on the flight.
7            THE COURT:  I will agree.
8            MR. IVEY:  I won't open the door to that.
9            THE COURT:  In which case, I'm going to instruct
10  the jury that the government, if it calls that agent, she
11  can obviously testify as to her -- her office as it were,
12  and she was present on the trip.
13           There were ten or 11 people on the plane, right?
14           MR. HERDMAN:  Yes, Your Honor.
15           MR. IVEY:  I believe as it relates to the
16  voluntariness issue, number one, I would just ask to see
17  whether I even raise this aggressively or not before we go
18  through.
19           THE COURT:  I agree.
20           MR. IVEY:  But assuming that I would do so, I
21  think from the suppression hearing transcript, it was quite
22  clear that the female agent was not present when the cavity
23  search, or whatever, was done of Mr. Amawi.  And I can
24  guaranty I will not suggest in any way any question that
25  the female was present, if I decide to go down that road.
```

```
 1  In fact, I'll even make it clear she wasn't, so again --

 2          THE COURT:  Excuse me, excuse me.  Do you plan to

 3  have that Secret Service agent testify?

 4          MR. HERDMAN:  No, Your Honor.

 5          THE COURT:  All right.  Then, fine.  There may be

 6  mention that she was on the plane -- might even suggest

 7  another government agent Judy Jones.  I don't think it's

 8  necessary to go to -- there were a couple illusions to

 9  this.  I'm trying to keep this out of the case because I

10  think it's apparent from --

11          MR. HERDMAN:  Your Honor, that's fine.

12          THE COURT:  And the defendants being ordered to

13  provide -- excuse me, delay -- we'll just have to wait and

14  see.

15          There was a chance you were going to get done

16  today or this week.

17          MR. SOFER:  There is still a chance that we can

18  get done this week.  What we're looking to avoid is the

19  kind of delays we had.

20          THE COURT:  No, you won't.

21          MR. SOFER:  That's mostly because we all want to

22  get home and continue our lives, at least I can speak for

23  myself.  I just think it's inappropriate.

24          THE COURT:  I understand.  I understand

25  completely.  I'll expect them -- I mean, if we get done --
```

1   if we get done at 8:45, then maybe we'll start at 11:00 or

2   whatever, but if we get done at 2:00, and I'll probably say

3   let's go home and start tomorrow.

4          MR. HARTMAN:  Judge, then we're going to need a

5   better -- we're going to need a more definitive date for

6   the government to be finished so we can have some

7   subpoenaed witnesses ready to go.

8          THE COURT:  Well, right now if the government

9   finishes by the time we adjourn on Friday, we'll start with

10  you on Tuesday, and I think we'll know that better tomorrow

11  how we're doing.  I thought we'd get further along today.

12         MR. HERDMAN:  Your Honor, I think I can

13  address -- I can try to address that as best as I can.  And

14  I'll do this -- actually, I think all but one of the

15  next -- our last witnesses are mine.  What I didn't want to

16  do was raise The Court's attention that we have a timing

17  issue with respect to Evan Kohlmann, and that issue is as

18  follows:  I'll outline for you who I anticipate calling and

19  the order and how long I think their testimony is going to

20  take.  Tomorrow morning, we're going to start with Special

21  Agent David Barns.  I think his direct testimony will be 20

22  minutes, certainly no more than 30 minutes, and I don't

23  know how long the cross will go, but I don't anticipate it

24  will be very long.

25         Special Agent Gubanich will then testify, and I

1   anticipate his direct testimony will be about two hours

2   long.

3          THE COURT:  Special Agent, who?

4          MR. HERDMAN:  Gubanich, Your Honor.  I anticipate

5   the cross maybe a little more lengthy, but certainly

6   nowhere near what we saw at least with Special Agent Coats.

7          And then in the afternoon I'd like to get to

8   Joseph Corrigan, who is the government's forensic computer

9   analyst.  And his testimony, actually, I think, could

10  approach three hours, which means he would spill over

11  possibly into Thursday morning.

12         THE COURT:  What's he going to talk about?

13         MR. HERDMAN:  He is -- he's prepared to discuss

14  sources of a lot of the forensic computer evidence,

15  indications that certain evidence existed at one time or

16  was played at one time on various pieces of computer

17  evidence.  It's fairly wide range of testimony, but I have

18  them -- it's kind of blocked into topics, Your Honor.  And

19  I anticipate that he could be -- depending on how long

20  cross is, he could be done by Thursday morning, which

21  raises the following issue:  Evan Kohlmann is not available

22  to testify on Friday, but we would -- we certainly want

23  him -- if we're going to finish this week, we want him to

24  testify on Thursday.  Your Honor has limited the amount of

25  what he's going to testify to, so I don't anticipate that

```
 1   cross will be very lengthy, but what I would ask for is The
 2   Court -- I --
 3           THE COURT:  Well, you -- if you're done with the
 4   forensic guy, fine.  If you're not, interrupt his testimony
 5   and explain to the jury, due to scheduling, we have to
 6   interrupt him.  That's fine with me.
 7           MR. HERDMAN:  And I guess what I'd ask for The
 8   Court, if it takes a couple minutes past 4:30 for defense
 9   counsel to finish their cross, I just would ask for, I
10   guess, your assistance in --
11           THE COURT:  Sure.
12           MR. HERDMAN:  -- getting this case on board.
13           THE COURT:  And I will tell the jury that we're
14   doing this because we hope to finish with the government's
15   case tomorrow, which is a lot earlier than many of us
16   thought.
17           MR. HERDMAN:  Okay.  And then I think we can
18   finish on Friday with Robert Antu who is the translator.
19           THE COURT:  Okay.
20           MR. HERDMAN:  So assuming everything goes well we
21   should be done by Friday.
22           THE COURT:  Okay.  Now, let's assume you guys
23   start next Tuesday.  Why don't you --
24           MS. CLEARY:  Wednesday.  You're in D.C. on
25   Tuesday.
```

```
 1            THE COURT:  Oh, that's right.  Well, that may --
 2   right now it looks as though next week 21, 22, and I think
 3   23 are fine.  All three days should be full days.  I may
 4   have another meeting about our building on the 27th, the
 5   28th, and I'm told that I may have a building on the 30th.
 6   So I think -- let me check on that Amy, okay, which of
 7   those is more important.
 8            MR. HARTMAN:  We're off the 20th; is that
 9   correct?
10            THE COURT:  The 20th, yeah.  We'll not have Court
11   on the 20th.  I'm in D C.
12            But Amy, if you can remind me to check tomorrow.
13   I'll do that right now.  Give me one minute, please.  I
14   should be able to tell you tomorrow what the date is.
15            MR. HERDMAN:  What is this?
16            THE COURT:  The week of the 27th, the week before
17   the 27th, 28th, 29th, 30th.  There are a couple of meetings
18   about our new building.  I just sent an e-mail to find out
19   what's important there.  They tend to be important.
20            MR. HERDMAN:  And, Your Honor, I don't recall and
21   just -- Mr. Sofer just asked me this as well -- the
22   original trial order indicated a date by which the
23   government was to be provided with the defense witness
24   lists.  I thought that it was a week prior to the beginning
25   of the defense case, but that -- my -- my recall has been
```

```
 1   slighted throughout this case.

 2           THE COURT:  Why don't you -- can you get them

 3   your witness list by Friday, at least your first week's

 4   worth of witnesses?

 5           MR. HARTMAN:  Yeah.  I believe we can.  I don't

 6   know that we're going first yet.  We need to discuss that

 7   with them, but, yes we can.

 8           THE COURT:  The defendants will be expected to

 9   provide the list that was anticipated of witnesses and the

10   exhibits it expects to -- or anticipates offering.  I

11   realize the word anticipates, I understand that there may

12   be changes, but in good faith, this week, on Friday, for

13   next week, but -- and then the following week thereafter on

14   Thursday by noon, so that gives you three or four days to

15   figure out.  It's -- it's a movable fees.  One of those --

16   all these dates are in the calendar.

17           Now, the expert reports, what's -- where are you

18   with -- obviously, three experts have been excluded.  Are

19   there other experts?

20           MR. HARTMAN:  We won't -- we'll have a computer

21   expert.  We won't -- we provided preliminary reports as

22   we've gotten them, but I don't know that we have a final

23   report until their expert testifies --

24           THE COURT:  Okay.

25           MR. HARTMAN:  -- that I can -- that I can
```

```
 1    produce.  And as soon as I get it, we'll produce it.

 2            MR. SOFER:  Judge, I just don't -- both the

 3    witness list issue and the expert reports, I don't know,

 4    I'm not the case lawyer, but I think if we could get a

 5    final report at some point before --

 6            THE COURT:  I do think that with regard to the

 7    computer expert, to the extent that his testimony may take

 8    into account what your expert says, that's pretty

 9    conventional.  I suspect you would rather have -- you would

10    like to know what he has to say about that rather than

11    having him say A, B, C, oh, and by the way, B, D, F, in

12    light of what's been said.

13            MR. SOFER:  I understand.  Again, we've sort of

14    got a hodge podge of preliminary reports.  We're just

15    trying to get some certainty here so we know how to

16    proceed.

17            MR. BOSS:  If I may, Judge?

18            MR. HARTMAN:  So do we on one of --

19            MR. BOSS:  In terms of the computer forensic

20    expert we've been using, the government has been provided

21    all work that has been done.  If there is additional work

22    that occurs between now and then, based on the testimony of

23    the government expert witness, that will become

24    incorporated into a final report, and we'll provide it to

25    you --
```

1          THE COURT:  As promptly as reasonably --

2          MR. BOSS:  -- as soon as we have it.

3          THE COURT:  -- possible.  As soon as you have it.

4          MR. BOSS:  Yes, sir.

5          THE COURT:  Okay.  Research issue what, if any,

6    instruction should be given to the defense

7    cross-examination of Gubanich that suggests improper

8    conduct.

9          MR. HERDMAN:  Your Honor, found nothing in the

10   Sixth Circuit pattern jury instructions with respect to the

11   voluntariness of statements Mr. Amawi -- instructions on

12   voluntariness.

13         THE COURT:  If you have a proposed instruction

14   that you found somewhere, send it to everybody.

15         MR. HERDMAN:  I can do that.

16         THE COURT:  We'll go from there.

17         MR. HERDMAN:  I guess before I -- before I

18   finalize what Agent Gubanich is going to be asked on direct

19   examination now, I'd like some idea whether The Court would

20   be in favor of providing an instruction -- this jury is

21   allowed -- obviously allowed to consider the voluntariness

22   of his statements.  However, The Court has already made a

23   finding as a matter of law that these statements were made

24   voluntarily.  And if you remember, Your Honor, at the

25   hearing there were certain issues regarding -- statement

 1   regarding attorney -- Court found there was not an

 2   equivocal request or an unequivocal request for counsel.

 3   And -- and the government's position is that if -- if the

 4   voluntariness instruction is given to this jury, the jury

 5   should also know The Court, as a matter of law -- obviously

 6   different than what the jury's going to be asked to find,

 7   but as a matter of law, there was a finding that there was

 8   nothing improper about the way that Mr. Amawi was

 9   Mirandized or the way these statements were taken.

10        MR. IVEY:  Your Honor, I told the government that

11   it's not my intention to rehash the suppression hearing

12   that I've got an adverse ruling on by The Court, and I

13   don't think it behooves Mr. Amawi's defense for me to

14   suggest all this stuff and then have you turn around and

15   say he is wrong.  So my only request is this, is that if an

16   instruction is given to The Court as I've told the

17   government, that The Court does not give that instruction

18   until after my cross to see if I open the door.

19        THE COURT:  Yeah, I think that's quite correct.

20        But anyway, if you have an instruction, proposed

21   instruction, circulate it, and we can talk about it.  I

22   would be inclined to wait and see what happens.  And about

23   as far as I might go would be -- I think I never

24   encountered this before -- something to the effect that,

25   ladies and gentlemen, although on consideration of various

1    factors, comma, I have concluded that you should hear the

2    testimony about the conversation between Mr. Amawi and one

3    or more of the agents while he was in custody, and

4    nonetheless, as a matter of law, a final determination

5    whether or not those statements were made knowingly,

6    intelligently, and voluntarily is for you to determine in

7    light of all the evidence and circumstances, all the

8    evidence related to the circumstances which any statements

9    were made by him, something like that.

10         I'm sure there is more elaborate and elegant out

11   there somewhere, and Mr. Ivey, I simply wait and see what

12   all you get into.

13         MR. IVEY:  Yeah, I'm not saying I won't touch on

14   those facts, but I would just like the opportunity not to

15   open the door before The Court presumes I'm going to open

16   the door.

17         MR. HERDMAN:  Your Honor, I guess the

18   government's position is we may have to open that door

19   before Mr. Ivey gets a chance to do so based on the fact --

20   if we knew, for instance, that -- and I realize Mr. Ivey

21   can't answer this question necessarily -- but I'm in a

22   position now where we have to decide whether or not it's

23   best to ask Mr. Gubanich -- or Agent Gubanich everything we

24   should ask about all the circumstances of his statement

25   before Mr. Ivey gets into it on cross.  And I can't expect

1  him to answer that.  All I can do is just highlight for The

2  Court the position that we are in with respect to this

3  issue.

4       THE COURT:  And in any event, the testimony is

5  not likely to take all that long, and I really think it's

6  appropriate to wait and given an instruction at the end of

7  his testimony, and also, if you have rebuttal as well.  And

8  always, I say simply by instruction, in response to juror

9  request for sort of a formal statement, ladies and

10  gentlemen, you can make your mind up, but I've already made

11  my mind up.  It's okay.

12       I don't think that's what Mr. Ivey would like to

13  have me say, and I don't think it would be appropriate for

14  me to say so.  So I'm saying again, if you find any

15  instructions out there, if this has come up in the past

16  some place, just commonly, I just haven't encountered, so.

17       MR. SOFER:  Judge, the very specific issue in the

18  end, which is the request for a lawyer, when it's -- when

19  it's an equivocal request to a layperson hearing it, they

20  say, would you -- he asked for a lawyer and they didn't

21  give him one.  And that issue specifically has been decided

22  as a matter of law.  The voluntariness issue is a whole

23  different kettle of fish.

24       THE COURT:  And I might well consider saying

25  something to the effect, you heard testimony that

```
 1    Mr. Amawi -- I can't remember exactly what it was -- you
 2    should understand that I think this would probably be
 3    appropriate, that it was not -- I indicated -- I instruct
 4    you that it was not improper for the government to continue
 5    questioning and talking to Mr. Amawi after he made that
 6    request because it did not constitute an unequivocal
 7    request for a lawyer, and law enforcement officer doesn't
 8    have to guess what a reference may mean.  However, you
 9    should also understand, you can take that into
10    consideration when considering the totality of the
11    circumstances and whether or not you find beyond a
12    reasonable doubt or a preponderance --
13               MR. SOFER:  Preponderance.
14               THE COURT:  That's what I thought.  I think
15    you're right.  Where it's more likely than not it was
16    knowingly, intelligently, and voluntarily.
17               MR. IVEY:  Your Honor --
18               THE COURT:  Just give me enough -- just give me
19    some play dough to work with here.
20               MR. SOFER:  Understood.  And again, that's, I
21    think the -- if counsel's not planning on going down the
22    road, then neither will we, and we can put this aside, but
23    I think The Court can understand why it would be of some
24    concern to us.
25               THE COURT:  Sure.
```

```
 1          MR. IVEY:  Your Honor, the only thing is maybe

 2   The Court -- my -- my issue is not whether or not whatever

 3   an instruction says, it's when it's given, and I would just

 4   like it to be given after --

 5          THE COURT:  Let me say it for the third time.

 6   I'm not going to give it until no further questions and

 7   Agent you may step down.  May we approach, yes.  Ladies and

 8   gentlemen, you just heard the testimony of Agent Gubanich

 9   about this and that.

10          This is what you do, this is what I do, okay?

11   Because I agree with Mr. Ivey.  I agree with the -- it

12   would be inappropriate to sort of -- the jury, in the final

13   context, will understand what I'm talking about.

14          Okay.  You guys gave me a motion.  I think we've

15   touched on all -- you're --

16          MR. HERDMAN:  This actually -- the motion in

17   limine was just filed this afternoon -- touches directly

18   upon the testimony that we need to introduce tomorrow.

19          THE COURT:  And let's take a look at that.

20          Okay.  Remind me what Kohlmann is going to

21   testify about, at least in light of what he's --

22          MR. HERDMAN:  The subject of the motion in limine

23   that's pending before The Court is not going to be part

24   of --

25          THE COURT:  I didn't think so.
```

1          MR. HERDMAN:  We actual truly never proffered

2    that at this point in time.

3          THE COURT:  If it's not Kohlmann, what else --

4          MR. WHITMER-RICH:  If they're not being proffered

5    then --

6          MR. HERDMAN:  No.  The photos certainly are, Your

7    Honor, but we don't --

8          THE COURT:  Kohlmann's not --

9          MR. HERDMAN:  -- we didn't feel a need to call

10   Evan Kohlmann to explain these photos; however, in light of

11   counsel's arguments in motion, if -- depending how The

12   Court is viewing this evidence and how Your Honor's willing

13   to rule on this, having Kohlmann certainly does have

14   different layer of explanation to these particular photos,

15   but we are prepared to proceed without Evan Kohlmann even

16   addressing the issue of these photos, Your Honor.

17         THE COURT:  How and when are we proposing to

18   offer the photos themselves without Kohlmann's testimony,

19   if you were?

20         MR. HERDMAN:  The photos were going to be offered

21   through Special Agent Gubanich tomorrow, Your Honor.  He

22   has conducted a thorough review of all the computer

23   evidence collected in this case.

24         THE COURT:  And they are probative as to?

25         MR. HERDMAN:  They are probative as to Mohammed

1   Amawi's intent, certainly with respect to the 956 charge,

2   Your Honor, and I would also add with respect to the 2339A

3   charge, and also with respect to expect to the distribution

4   charge.

5          What -- what the photos depict, and it may assist

6   The Court if you see the actual photos themselves.  I can

7   bring them up on the screen here, if I can have just a

8   moment.

9                 (Photos being shown.)

10          MR. HERDMAN:  And the next one is AS.  And for

11   the record, Your Honor, the government is displaying --

12   these are Government Exhibits 124-1AV, AS, AT, and AU.

13          THE COURT:  Okay.  And Mr. Whitmer-Rich,

14   Kohlmann's not going to testify about these, why shouldn't

15   these come in on their own?

16          MR. WHITMER-RICH:  I believe that they just --

17   there's no -- there's no context for what the

18   photographs -- what the meaning of the photographs is.

19   There's no testimony about circumstances of what -- when

20   the photographs were taken, who was taking them, anything.

21          MR. HERDMAN:  Your Honor, with respect to when

22   the photos were taken, counsel raises a motion effecting

23   alternative explanation for those photos.  Our forensic

24   computer examiner will be on the stand and will be able to

25   either verify or testify himself as to when these photos

1   were created.  So there's sort of a alternative explanation
2   to all of these.
3           However, the government's explanation, these are
4   highly probative of the defendant's intent to martyr
5   himself.  And you've already heard, Your Honor, significant
6   evidence about -- respect to Mohammed Amawi's intent to
7   become Shahiid or a martyr, and it goes directly to the
8   distribution charge in this count, the construction of a
9   suicide vest.  It goes directly to the conspiracy charge
10  and that Mohammed Amawi wanted to go overseas to kill
11  others by his own hand, if need be.  And it goes directly
12  to the 2339A charge.
13          THE COURT:  Let me hear from him.
14          MR. BRYAN:  Your Honor, if I may, these are
15  photographs of Mohammed Amawi laying in a purported coffin.
16  If you look at the one photograph, there's actually two of
17  those boxes on top of each other.  The boxes are underneath
18  the stairs of the mosque in Jordan.  The picture was taken
19  by a friend of Mohammed Amawi, and in sort of a joking
20  manner.  The -- basically, Mr. Amawi was lying in this box
21  catching some extra shut eye, or whatever, during a period
22  of time while he was in the mosque in Jordan.  The
23  government wants to draw inferences from these photographs
24  that are so far reaching that they would -- they would just
25  blow the doors right off this case as it relates to 403.

1        The probative value of these photos is minimal

2   compared to the prejudicial effect that it would have.  I

3   mean, they say that Mr. Amawi said that he wanted had to be

4   a martyr.  According to the testimony of Darren Griffin,

5   however, there's other tapes played by the government's own

6   case that Mr. Amawi said that I would never want to be a

7   suicide bomber, that I want to live to fight the long

8   fight, that I want to be a sniper, that I want to be

9   someone who knows how to fight from afar, not to be up

10  close.

11       And what the government's trying to do through

12  the introduction of these photos, a lot of people made --

13  they have everything that this man has, Your Honor, as it

14  relates to his computer.  Every computer file that this man

15  ever had on his computer, they have.  And for them to be

16  able to go in and pull out of there some -- could be

17  looking photographs and then be able to argue to the jury

18  later on that this man was on a suicide mission, that he

19  was going to do that, is clearly -- probative value of that

20  is outweighed by the danger of unfair prejudice.

21       The photographs that were taken on October 31st.

22  For all intents and purposes, it could have been Mr. Amawi

23  with his buddies just screwing around acting like he was

24  laying in a coffin like a vampire or something on

25  Halloween, on October 31st.  Those are alternative

1    explanations that we could make to the jury.  But by the

2    same token, Your Honor, we shouldn't have to make those

3    alternative explanations because the probative value of

4    this is so small compared to the danger of undue prejudice.

5         We'll comment a little bit on what Mr. Kohlmann

6    said as it related to these photographs, even though the

7    government doesn't intend to use Mr. Kohlmann just to

8    show -- short of not only the absurdity of the government's

9    position on this point.

10        THE COURT:  You're not going to reference

11   anything Kohlmann said, because if you do, he's going to

12   come back and testify.  You can't say the government has a

13   witness that the judge wouldn't let you hear from who said

14   this -- and that's silly.  You can't --

15        MR. BRYAN:  Your Honor, I'll stay away from Evan

16   Kohlmann, Your Honor.  If he's permitted to testify in this

17   area --

18        THE COURT:  I don't expect that he would be, and

19   Mr. Herdman has indicated he won't.

20        MR. HERDMAN:  And certainly on our direct case,

21   Your Honor, but we would reserve -- depending how the

22   defense case goes, we would reserve the availability.

23        THE COURT:  I'll deal with that.  That's a couple

24   of hills and valleys over the horizon.

25        MR. BRYAN:  What the government's trying to do is

1    to present the evidence without us being able to challenge

2    it with the threat that Mr. Kohlmann would be able to come

3    back later on and explain, you know, some theory that

4    Mr. Kohlmann had that I don't believe is even supported by

5    Mr. Kohlmann's own research.

6              THE COURT:  Well, candidly, I'm going to overrule

7    the motion.  And the reason I'm going to do that is, it

8    seems to me similar photographs, in looking at it in a much

9    more common kind of case, involving drug charges or

10   defendants charged with drug charges, shown posing on piles

11   of money or with guns or whatever.  And I think that

12   evidence is admissible in that situation, and I think this

13   is admissible in this situation.  And I will -- taking the

14   403 issues into account, I will overrule the motion in

15   limine.  Obviously, I don't expect Kohlmann's going to say

16   a word about this stuff in whatever he says.

17             Mr. Ivey?

18             MR. IVEY:  Your Honor, I'm sorry, I wanted to

19   kind of throw my two cents in, if I can, just make it for

20   the record.

21             THE COURT:  Sure.

22             MR. IVEY:  I think I've had drug cases like that,

23   but generally, the defendants are posing with the

24   coconspirators and there's been -- from a practical

25   standpoint, there's been no testimony from Mr. Griffin that

1  Mr. Amawi said I made my martyr photos, here they are, to

2  Mr. Griffin, and that he, in their many viewing sessions,

3  looked at them.

4          There's been no testimony that any of the other

5  co-defendants either took the photos or where the photos --

6  that Mr. Amawi showed them the photos.  There's been no

7  testimony to testify that I took the photos of Mr. Amawi,

8  he asked me to do it.  They're just photos without that

9  context, in the context of any relevance in this case.  And

10  for that reason, I think that they should be excluded and

11  that's why unfair prejudice comes in without any

12  involvement of -- or co-defendants in any way in these

13  photographs or any words from Amawi in these tapes, or

14  otherwise, or in his conversations, or whatever, that any

15  referencing these photos, so --

16          THE COURT:  Well, I do think that they're

17  probative on the issue of intent, and they -- obviously,

18  I'll give a limiting instruction.

19          MR. BOSS:  Thank you, Judge.

20          On behalf of Defendant El-Hindi, we would, at

21  this time, also ask that those photos not be admitted.

22  We're, unfortunately, getting hit as collateral damage in

23  this photograph, something that Mr. El-Hindi had no

24  knowledge of or awareness of.  I believe that the

25  inflammatory nature of this can do us serious damage, and

```
 1    we would join in the request that they not be permitted.

 2          THE COURT:  I disagree.  I think a cautionary

 3    instruction would avoid any adverse effect on either

 4    Mr. Masloum or Mr. El-Hindi, but I do think they're

 5    probative in light of all the evidence in the case.

 6          MR. HERDMAN:  Your Honor, the motion continued

 7    into the second paragraph, also, which dealt with -- I

 8    don't really -- didn't point to any specific computer

 9    items, but there was a second half to this motion.

10          THE COURT:  Right.

11          MR. HERDMAN:  Without knowing specifically what

12    it is counsel objects to, I'm at a little bit of a

13    disadvantage with respect to responding.  I would point out

14    that there are a number of files that the government

15    intends to introduce over the next day and a half, two

16    days, that we anticipate will be linked to Mr. Amawi.  And

17    I, rather than dealing with the objections as they come up,

18    if counsel can point to specific files that they object to.

19          THE COURT:  To the extent that -- and I've

20    already in response to -- or not response to Mr. Ivey, and

21    I apologize to that.  I do not think that a foundation

22    through Mr. Griffin is necessary as items that were found

23    in Mr. Amawi's presence, in his custody, and possession, in

24    Mr. Amawi's possession on his computer.  And I don't think

25    any further foundation is being -- with regard to those.
```

1         Now with regard to the sort of generic motion as

2    it relates to the computer evidence --

3         MR. BRYAN:  Your Honor, Mr. Whitmer-Rich will

4    address that.  Just one last thing for the record as

5    relates to these photographs, Your Honor.  This puts us in

6    a position, I believe, that would require us to be able to

7    call -- excuse me, Your Honor -- an Islamic scholar, an

8    Islamic expert, to be able to explain that, first of all,

9    people in Islam do net get buried in coffins.  There's no

10   such thing as a coffin burial in Islam.  These are not

11   coffins.  They were carrying cases or things that are used

12   sometimes to carry bodies to the graveyard, sometimes to be

13   used for other purposes as well.  They have handles on

14   them.

15        But for them to -- for the government to be able

16   to present this evidence without an explanation that people

17   don't get buried in coffins in Islam without an explanation

18   that, according to Mr. Griffin, Mr. Amawi said that he

19   wanted, you know, to go the way of the Shahiid, the way of

20   the martyr, to die in -- and to die in the manner that

21   is -- that serves God -- God's purpose, isn't the same as

22   saying to die as a suicide bomber, so to speak.

23        What the government's trying to gain through

24   these photographs, without any evidence to buttress this

25   claim or to buttress this inference, is this ghastly

1  inference that our client lying in a coffin means that he

2  intended to commit suicide.  And we have no way to defend

3  against that inference without being able to call some sort

4  of cultural expert to be able to explain that.

5  THE COURT:  Okay.  And if you have an expert that

6  can do so, get them a report promptly and go from there.

7  Basically, in light of what you told me, I'd be inclined to

8  say, fine, that person could probably testify.  That might

9  well prepare, in a way, that Mr. Kohlmann to -- way for him

10  to testify, but I'm not saying that that would be the case.

11  I'm just saying that would be the government's request in

12  rebuttal, but that's up to you and up to them.

13  Certainly -- if you have somebody who's in a

14  position to testify to that, certainly, that clearly is an

15  appropriate response to the admission of those photographs.

16  And if that, in fact, is a custom and practice, something

17  that the jury clearly would not be familiar with, and would

18  be, seems to me, properly informed.

19  MR. HERDMAN:  Your Honor, the government would

20  just reserve -- at this point, reserve any objection to

21  what Mr. Bryan said until we get the actual report.

22  THE COURT:  Absolutely.  I hear what you're

23  saying.  Get the expert, get the report, and I'll rule on

24  it.  But I -- my instinct on this is, yeah, that's -- I

25  think they're entitled to offer an explanation that is well

```
 1   founded in a witness' experience.  In some religions,

 2   people are to be buried within 24 hours, if that's an

 3   important issue and the appropriate testimony in that

 4   regard.

 5        MR. HERDMAN:  All I'll say, Your Honor, is that

 6   the government's fairly confident that we have evidence

 7   that will rebut any such assertion.

 8        THE COURT:  Whatever.

 9        MR. HERDMAN:  Just putting counsel on notice.

10        THE COURT:  The other computer stuff, what else

11   were you shooting at in this motion?

12        And Angela really has to leave very promptly.

13        MR. WHITMER-RICH:  I understand, and I suppose

14   it's general because I don't know all of what they do

15   intend to introduce.  I guess the concern is that

16   introduction of files was found on this date, without any

17   evidence that we know who viewed it or who put it there or

18   anything like that; that's the general concern.

19        THE COURT:  That seems to me to go to weight and

20   not admissibility.  Candidly, it seems to me -- again, I

21   haven't encountered this, so I can't cite it chapter and

22   verse -- but analogy to the extent that they are probative

23   and relevant, they are admissible, kind of like an

24   admission of a party opponent.  He has certain stuff that,

25   if otherwise pertinent or probative, would have in their
```

1    possession.  It's probably admissible, even though you

2    don't know who took it or whether it was looked at or not,

3    that goes to weight.

4            We don't -- you know, especially if there's a

5    computer expert that said -- and I don't know whether there

6    is such a person but if so that's fine -- which you can

7    download stuff like this without even looking at it.  I

8    don't know.  Or if you can't, you can't.  It's probative

9    that at one point, at least to some extent, it makes it

10   more likely than not and contributes to the other all

11   government -- that this stuff could not be downloaded

12   without it being viewed by the person doing the

13   downloading, I think the government's entitled to have

14   someone testify to that effect.

15           But -- so my point is, I don't see any specific

16   objection here and we'll deal with that.

17           MR. WHITMER-RICH:  We'll raise the specific

18   objection.

19           THE COURT:  Yeah, as they come in.

20           MR. WHITMER-RICH:  Thank you, Your Honor.

21           THE COURT:  How much of the volume of stuff do

22   you expect or can you tell them this evening perhaps which

23   images or materials you expect to offer?

24           MR. HERDMAN:  I can say, generally, that I think

25   through Agent Gubanich, there will probably be about 20

```
 1   files perhaps, maybe 25 files.
 2           THE COURT:  And what do they consist of, videos
 3   or stills or?
 4           MR. HERDMAN:  There are four videos in particular
 5   that I can remember, and there are about 15 manuals,
 6   English language manuals.
 7           THE COURT:  Okay.  Is there anything else you
 8   need to talk about tonight?  At least that needs a court
 9   reporter and Amy.
10           MR. HARTMAN:  If you will, Judge, very quickly.
11   I just want to make clear that the extent of Kohlmann's
12   testimony is whatever definitions can't be stipulated; is
13   that correct?
14           MR. HERDMAN:  No, Your Honor.
15           THE COURT:  Go ahead.
16           MR. HERDMAN:  We're not just limited to
17   definitions.  We had a lengthy discussion about this a
18   couple weeks ago, and I --
19           THE COURT:  Remind me.
20           MR. HERDMAN:  I went through specific exhibits.
21           THE COURT:  Let's talk about that sometime
22   tomorrow.
23           MR. HARTMAN:  That's fine.
24           THE COURT:  And I'm going to say this:  Whatever
25   you haven't decided by noon tomorrow with the definitions,
```

 1   that's what we've got and where we are, okay.  We've got to

 2   put an end to this at some point.

 3         MR. SOFER:  Judge, one final thing, about a week

 4   and a half ago counsel brought to our attention a 302 which

 5   referenced questions that have been sent back and forth,

 6   specifically some that may have been sent to Darren

 7   Griffin, and we told -- and we submitted something to The

 8   Court at that time.  The Court looked at it, turned out

 9   there was nothing discoverable in it.

10         At that juncture we said we were going to look

11   for any other that have been sent to Mr. Griffin.  We have

12   found another set of those questions and would like to

13   submit them to The Court with a little key on them about

14   who's writing and is who is, under the same theory that

15   they are not discoverable.  They are not inconsistent with

16   any testimony and that they need not be turned over.

17         THE COURT:  Do you have that now?

18         MR. MILLER:  Yeah, with one caveat, there is some

19   handwriting for which we couldn't identify who actually

20   wrote that.

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6   s:/ Angela D. Nixon

7   ---------------------------              -----------

8   Angela D. Nixon, RPR, CRR                Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     **I N D E X**

2

3   **Witness**                                    **Page**

4   Michael Stewart

5   (Direct Examination)                           4659

6   (Cross Examination0                4662

7

8   David Lamberger

9   (Direct Examination)                           4665

10

11  Charles Holloway

12  (Direct Examination)                           4670

13

14  William Radcliff

15  (Direct Examination)                           4698

16  (Cross Examination)                4722

17  (ReDirect Examination)                         4805

18

19

20

21

22

23

24

25