```
 1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
 2                         WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                  -
 4      Plaintiff,                - Toledo, Ohio
                                  - May 14, 2008
 5           v.                   - Trial
                                  -
 6   MOHAMMAD ZAKI AMAWI, et al.,-
                                  -
 7      Defendants.               -
     ------------------------------

 8
                         VOLUME 50, TRANSCRIPT OF TRIAL
 9              BEFORE THE HONORABLE JAMES G. CARR
           UNITED STATES DISTRICT CHIEF JUDGE, AND A JURY
10
     APPEARANCES:
11
     For the Plaintiffs:      United States Attorneys' Office
12                            By:   Thomas E. Getz
                                    Justin E. Herdman
13                            801 Superior Avenue, W
                              Cleveland, OH 44113
14                            (216) 622-3840

15                            U.S. Department of Justice
                              By:  Jerome J. Teresinski
16                                  David I. Miller
                              10th & Constitution Ave, NW
17                            Washington, DC 20530
                              (202) 353-3464
18
                              Office of the U.S. Attorney- Austin
19                            By:  Gregg N. Sofer
                              816 Congress Avenue
20                            Austin, TX 78701
                              (512) 916-5858
21

22

23

24

25
```

| | |
|---|---|
| 1 | For the Defendant Amawi: Office of the Federal Public |
| | Defender - Cleveland |
| 2 | By:  Amy B. Cleary |
| | Jonathan P. Witmer-Rich |
| 3 | Edward G. Bryan |
| | Timothy C. Ivey |
| 4 | 750 Skylight Office Tower |
| | 1660 West Second St. |
| 5 | Cleveland, OH 44113 |
| | (216) 522-4856 |
| 6 | |
| | Muawad & Muawad |
| 7 | By:  Elias Muawad |
| | 36700 Woodward Avenue, Suite 209 |
| 8 | Bloomfield Hills, MI 48304 |
| | (248) 594-4700 |
| 9 | |
| | For the Defendant        Kerger & Kerger |
| 10 | El-Hindi:            By:  Stephen D. Hartman |
| | Suite 201 |
| 11 | 33 South Michigan Street |
| | Toledo, OH 43602 |
| 12 | (419) 255-5990 |
| | |
| 13 | Boss & Vitou |
| | By:  Charles M. Boss |
| 14 | 111 West Dudley Street |
| | Maumee, OH 43537-2140 |
| 15 | (419) 893-5555 |
| | |
| 16 | Raslan, El-Kamhawy & Pla |
| | By:  Alek H. El-Kamhawy |
| 17 | Suite 3FE, 1700 East 13 Street |
| | Cleveland, OH 44114 |
| 18 | (216) 928-1500 |
| | |
| 19 | For the Defendant        David L. Doughten |
| | Mazloum:            4403 St. Clair Avenue |
| 20 | Cleveland, OH 44103-1125 |
| | (216) 361-1112 |
| 21 | |
| | Helmick & Hoolahan |
| 22 | By:  Jeffrey J. Helmick |
| | 2nd Floor |
| 23 | 1119 Adams Street |
| | Toledo, OH 43624-1508 |
| 24 | (419) 243-3800 |
| | |
| 25 | |

4865

1    Mohammed Abdrabboh
     1620 Ford Avenue
2    Wyandotte, MI 48192
     (734) 283-8405

3

     Court Reporter:        Tracy L. Spore, RMR, CRR
4    1716 Spielbusch Avenue
     Toledo, Ohio 43624
5    (419) 243-3607

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by notereading.
25

**1**      (Reconvened at 8:54 a.m.)

**2**           MR. HERDMAN:  I wanted to make a brief record

**3** regarding the evidentiary issue.   On the original exhibit list

**4** for Exhibit 75 and 76, the serial numbers of the HP Vectra

**5** computers that belong to Marwan El-Hindi were switched.   So in

**6** actuality, Exhibit 75 is HP serial ending 121.  And Exhibit 76

**7** is HP Vectra serial number ending 796.

**8**           THE COURT:  Let me ask a quick question.   I

**9** received an e-mail from Mr. Sofer yesterday evening about Mr.

**10** Kohlmann's testimony.   Is there any problem with that in terms

**11** of the timing?   That was your question, I think.

**12**           MR. SOFER:  Yes, Judge.   Counsel didn't get the

**13** e-mail.   They should have gotten it.

**14**           MR. HELMICK:   Doing it Wednesday morning?  No

**15** objection.

**16**           THE COURT:  Whoever's going to lead off, lead right

**17** into that.  We still have Saturday, Sunday, Monday and Tuesday

**18** to get underway, put together.

**19**           And the other thing, what's your sense about

**20** adjourning on Friday whether we are likely to do -- I'd rather

**21** have you not push anything else over to the next week, but do

**22** you have a sense?

**23**           MR. SOFER: The only way that this will result in a

**24** delay of some kind is if the witnesses that we have already for

**25** the next two days, really three, days go faster than filling up

-08:-54:-17  **1**  all of Friday.  We would have finished then on Friday with Mr.

00:01:39  **2**  Kohlmann.   Again, we don't.

-08:-54:-17  **3**  THE COURT:  So there's some fair chance we may

-08:-54:-17  **4**  adjourn early Friday.

-08:-54:-17  **5**  MR. SOFER:  I would say there's a chance.

-08:-54:-17  **6**  Yesterday you recall I thought we might have to put in another

-08:-54:-17  **7**  couple witnesses.   That never happened.

00:01:56  **8**  (Jury in.)

00:02:48  **9**  THE COURT:  I had some matters to attend to briefly

-08:-54:-17  **10**  this morning for the last 20 minutes, half-hour.   This is not

-08:-54:-17  **11**  in the way of either a prediction or a promise, but it looks as

-08:-54:-17  **12**  though by next Wednesday the government may be completed with

00:03:04  **13**  its presentation of its case in chief, which is somewhat earlier

-08:-54:-17  **14**  than I think all of us had anticipated.

00:03:11  **15**  At that point the defendants also have the

-08:-54:-17  **16**  opportunity if they desire to present testimony and evidence.

-08:-54:-17  **17**  I remind you, and I'll remind you then, they don't have to.

-08:-54:-17  **18**  The entire burden is upon the government to prove beyond a

00:03:26  **19**  reasonable doubt each and every element of the charge or charges

00:03:31  **20**  that it brings against a defendant.

00:03:34  **21**  But I just wanted to let you know there's a fair

00:03:38  **22**  expectation, anticipation, by sometime on Wednesday the

-08:-54:-17  **23**  government will have completed the presentation of its evidence.

00:03:51  **24**  I hope Friday we can adjourn a bit early but, again, it sort of

00:03:55  **25**  depends.   I hope by tomorrow morning I can let you know, maybe

| | | |
|---|---|---|
| 00:04:02 | 1 | this evening, give you a sense of where we will be just so you |
| -08:-54:-17 | 2 | can adjust your own schedules and tend to some of the things |
| -08:-54:-17 | 3 | that you have been not tending to the last several weeks.   By |
| -08:-54:-17 | 4 | way of reminder, there will be no court on Monday as is |
| -08:-54:-17 | 5 | customary, and then I'm out of town for a meeting on Tuesday. |
| 00:04:25 | 6 | So, once again, we'll have a fairly long hiatus.   In terms of |
| -08:-54:-17 | 7 | the timetable when the government will complete, that's simply a |
| 00:04:36 | 8 | present anticipation.   If they're not done within that time, |
| -08:-54:-17 | 9 | don't hold it against them. |
| 00:04:43 | 10 | Your next witness. |
| 00:04:44 | 11 | MR. HERDMAN:  Your Honor, The United States of |
| -08:-54:-17 | 12 | America calls Special Agent David Barnes. |
| 00:04:53 | 13 | THE COURT:  What is he going to talk about? |
| 00:04:55 | 14 | MR. HERDMAN:  He's going to talk about several |
| 00:04:57 | 15 | dates with respect to the investigation and the creation of some |
| -08:-54:-17 | 16 | of the computer evidence in the case. |
| 00:05:30 | 17 | (The witness was sworn by the clerk.) |
| 00:05:41 | 18 | THE COURT:  It is about this distance from the |
| -08:-54:-17 | 19 | microphone.   Will you tell the ladies and gentlemen who you |
| -08:-54:-17 | 20 | are? |
| 00:05:49 | 21 | THE WITNESS:  David Barnes.  B-A-R-N-E-S.   I'm a |
| 00:05:53 | 22 | Special Agent with the FBI. |
| -08:-54:-17 | 23 | THE COURT:  How long you have worked for the FBI? |
| -08:-54:-17 | 24 | THE WITNESS:  17 years. |
| 00:05:58 | 25 | THE COURT:  Prior to that did you have any law |

| | | |
|---|---|---|
| 00:06:01 | **1** | enforcement or similar experience ever? |
| 00:06:03 | **2** | THE WITNESS: No, I was a computer programmer with |
| 00:06:06 | **3** | Nationwide Insurance. |
| 00:06:07 | **4** | THE COURT: Does what you do for the FBI involve |
| 00:06:11 | **5** | computers? |
| -08:-54:-17 | **6** | THE WITNESS: Yes. |
| 00:06:13 | **7** | THE COURT: Do have you a job title or designation |
| -08:-54:-17 | **8** | or called something? |
| -08:-54:-17 | **9** | THE WITNESS: I'm currently assigned to be the |
| 00:06:20 | **10** | Director of the Miami Valley Regional Computer Forensic Lab in |
| -08:-54:-17 | **11** | Dayton, Ohio. |
| -08:-54:-17 | **12** | THE COURT: Is that an FBI facility? |
| 00:06:29 | **13** | THE WITNESS: Yes. The FBI provides the funding |
| -08:-54:-17 | **14** | and the space. In essence, it's like an FBI task force in |
| 00:06:41 | **15** | digital examinations of forensic evidence. |
| 00:06:43 | **16** | THE COURT: I was unaware that there was such a |
| 00:06:45 | **17** | facility. And do you provide -- do you work also for state and |
| -08:-54:-17 | **18** | local authorities if they have issues or problems or is it |
| 00:06:53 | **19** | exclusively government or it is more exclusively just FBI? |
| -08:-54:-17 | **20** | THE WITNESS: We do work with state and locals. |
| 00:06:59 | **21** | THE COURT: And other federal agencies as well? |
| -08:-54:-17 | **22** | THE WITNESS: Yes. |
| 00:07:02 | **23** | THE COURT: And how long have you been in that |
| -08:-54:-17 | **24** | position? |
| 00:07:08 | **25** | THE WITNESS: Almost three years. |

4870

-08:-54:-17 **1**      THE COURT:  Before that what sort of experience did

00:07:12 **2** you have during your 17 years with the government?

-08:-54:-17 **3**      THE WITNESS:  My first seven years I worked in the

00:07:17 **4** Detroit division working general cases.   While I was in Detroit

-08:-54:-17 **5** I started to get training to be a computer forensic examiner

00:07:26 **6** through the FBI's computer analysis team.

00:07:31 **7**      THE COURT:  Maybe speak a little closer to the

-08:-54:-17 **8** microphone.  You can address the jury if you want.   And

00:07:39 **9** continue.

-08:-54:-17 **10**      THE WITNESS:   In my last year in Detroit I started

00:07:43 **11** getting the training to become a computer forensic examiner for

-08:-54:-17 **12** the FBI.  Then in '98 I transferred to the Toledo office where I

-08:-54:-17 **13** work computer crime investigations such as computer intrusion

-08:-54:-17 **14** and child pornography over the internet while also conducting

-08:-54:-17 **15** the forensic examinations of the digital evidence that we've

00:08:00 **16** seized.

00:08:02 **17**      THE COURT:  And then you've been working down in

-08:-54:-17 **18** Dayton.  Is that where your office is presently?

-08:-54:-17 **19**      THE WITNESS:  True.  In June of 2005 I was

00:08:12 **20** transferred to the Dayton office from Toledo to be the director

-08:-54:-17 **21** of the computer forensic lab there.

00:08:23 **22**      THE COURT:  How large of a staff do you supervise?

-08:-54:-17 **23**      THE WITNESS:  Including myself, there's four.

-08:-54:-17 **24** Then we've got one person part-time.

-08:-54:-17 **25**      THE COURT:  Do you have sort of a region for which

4871

-08:-54:-17  **1**  you're responsible for which you get matters to work on?

-08:-54:-17  **2**      THE WITNESS:  We provide digital forensic expertise

00:08:43  **3**  for the southern half of Ohio; basically the Cincinnati FBI

-08:-54:-17  **4**  field office territory.   A lot of the local agencies are from

-08:-54:-17  **5**  the Dayton area, but we have helped Columbus Police Department

00:08:59  **6**  on a couple matters and some farther east.

00:08:59  **7**      - - -

00:08:59  **8**      DAVID BARNES, DIRECT EXAMINATION

00:08:59  **9**  BY MR. HERDMAN:

00:09:09  **10**    **Q.**   Good morning, Agent Barnes.   How old are you, Agent?

-08:-54:-17  **11**    **A.**   45 years old.

-08:-54:-17  **12**    **Q.**   You've gone over a lot of your background.   I'm going

-08:-54:-17  **13**  to touch on a couple points.

-08:-54:-17  **14**      Can you describe your educational background?

-08:-54:-17  **15**    **A.**   In 1986 I got a Bachelor of Science in Information

00:09:23  **16**  Systems from DeVry University in Columbus, Ohio.   In 2006 I got

-08:-54:-17  **17**  a Master's in Information Insurance from Norwich University.

00:09:32  **18**    **Q.**   I'm going to ask you to speak a little more slowly if

-08:-54:-17  **19**  you can.

-08:-54:-17  **20**      THE COURT:  Where is Norwich University?

00:09:39  **21**      THE WITNESS:  Norwich University is in Vermont.

00:09:44  **22**  BY MR. HERDMAN:

00:09:44  **23**    **Q.**   I think you said this, but I'll ask again:  After you

00:09:47  **24**  graduated from DeVry in 1986, what did you do after you

00:09:52  **25**  graduated?

4872

-08:-54:-17   **1**    **A.**   I worked for a small retail company for about one year.

-08:-54:-17   **2**   Then I was hired by Nationwide Insurance where I worked until I

-08:-54:-17   **3**   was hired by the FBI.

-08:-54:-17   **4**    **Q.**   When was it you were hired by the FBI?

-08:-54:-17   **5**    **A.**   March of 1991.

00:10:04   **6**    **Q.**   After you got hired by the FBI, where did you go?

-08:-54:-17   **7**    **A.**   Quantico, Virginia, for new agents training.

-08:-54:-17   **8**    **Q.**   Then after -- is that called the FBI academy?

00:10:13   **9**    **A.**   Correct.

-08:-54:-17   **10**    **Q.**   You graduated from the FBI academy?

-08:-54:-17   **11**    **A.**   Yes, in June of 1991.

00:10:18   **12**    **Q.**   And where did you go after you graduated from the

-08:-54:-17   **13**   academy?

-08:-54:-17   **14**    **A.**   My first office was Detroit, Michigan.

-08:-54:-17   **15**    **Q.**   I think you said you were there until 1998.

-08:-54:-17   **16**    **A.**   Yes.

-08:-54:-17   **17**    **Q.**   Then at that point in time you came to Toledo?

00:10:29   **18**    **A.**   Yes.

-08:-54:-17   **19**    **Q.**   Now, at some point in your career as an FBI agent did

00:10:35   **20**   you become assigned to what's known as CART?

-08:-54:-17   **21**    **A.**   Yes.   1997, my last year in Detroit, I started the

-08:-54:-17   **22**   training process and became officially certified in June of '97.

00:10:47   **23**    **Q.**   Just for the jury's information, what does "CART" stand

-08:-54:-17   **24**   for?

00:10:50   **25**    **A.**   Computer Analysis Response Team.  We conduct the

00:10:55 **1** forensic examinations of digital evidence.

-08:-54:-17 **2**     Q.    Did you have to receive any specialized training to

00:11:04 **3** become CART certified?

-08:-54:-17 **4**     A.    Yes, we had a two-week basic training over computer

00:11:08 **5** systems and evidence handling, specifically digital evidence

00:11:12 **6** handling and analyzing the evidence and then there was another

00:11:15 **7** one-week inservice.  After that you had to pass competency tests

-08:-54:-17 **8** before we could be certified.

-08:-54:-17 **9**     Q.    So how long you have been in the FBI, you said 17 years?

00:11:27 **10**     A.    Correct.

00:11:28 **11**     Q.    About how long within that 17 years have you been an

-08:-54:-17 **12** agent assigned to CART?

-08:-54:-17 **13**     A.    11 years.

00:11:37 **14**     Q.    I'd like to direct your attention to some specific

00:11:41 **15** events in this case.   First directing your attention to June 9,

00:11:44 **16** 2004.   On that date did you go to an address here in Toledo?

-08:-54:-17 **17**     A.    Yes.

-08:-54:-17 **18**     Q.    Was that 7 Shaftsbury?

-08:-54:-17 **19**     A.    Yes.

-08:-54:-17 **20**     Q.    What was the reason that you went to 7 Shaftsbury on

-08:-54:-17 **21** that day?

-08:-54:-17 **22**     A.    We received information that an individual was talking

00:11:59 **23** about assassinating President Bush at President Reagan's

-08:-54:-17 **24** funeral.

-08:-54:-17 **25**     Q.    Prior to going to 7 Shaftsbury, you obviously had the

4874

00:12:09 **1** information you just described to the jury?

-08:-54:-17 **2**     A.   Yes.

-08:-54:-17 **3**     Q.   Had you heard the name Mohammad Amawi prior to going to

00:12:14 **4** 7 Shaftsbury?

-08:-54:-17 **5**     A.   No.

-08:-54:-17 **6**     Q.   Did you speak to Mohammad Amawi on June 9, 2004 at 7

00:12:19 **7** Shaftsbury?

-08:-54:-17 **8**     A.   Yes.

00:12:20 **9**     Q.   How was it that you came to speak to Mohammad Amawi on

-08:-54:-17 **10** that date?

-08:-54:-17 **11**     A.   Detective Bart Beavers of the Toledo Police Department

00:12:26 **12** and I --

00:12:27 **13**           THE COURT:  Once again, try to slow down.  I try

-08:-54:-17 **14** to take notes and, of course, the court reporter does, and many

-08:-54:-17 **15** of the jurors do.  Also speak up.

00:12:42 **16**           You just mentioned a Detective's name.  Can you

-08:-54:-17 **17** spell that?

-08:-54:-17 **18**           THE WITNESS:  B-E-A-V-E-R-S.

00:12:51 **19**           THE COURT:  That's a good pace.  Go ahead.

00:12:54 **20** BY MR. HERDMAN:

00:12:54 **21**     Q.   What was his first name?

-08:-54:-17 **22**     A.   Bart.

00:12:57 **23**     Q.   Please continue.

00:12:59 **24**     A.   We didn't know where the information had come from.  So

00:13:06 **25** several teams were sent to talk to people at this apartment

4875

-08:-54:-17 **1** complex.   Detective Beavers and I were told to just go to one

00:13:14 **2** apartment and it turned out to be Apartment B.   And Mr. Amawi

-08:-54:-17 **3** was at that apartment at that time.   So it was just coincidence

-08:-54:-17 **4** that I happened to talk to him on that day.

-08:-54:-17 **5**     **Q.**   Do you remember leaving a business card with Mohammad

-08:-54:-17 **6** Amawi on that date?

00:13:29 **7**     **A.**   Yes.

-08:-54:-17 **8**     **Q.**   Do you remember whether Detective Beavers left a

-08:-54:-17 **9** business card with Mohammad Amawi?

00:13:33 **10**     **A.**   I don't recall him doing it, but it was common for him

00:13:37 **11** to leave a card with whoever we talked to.

-08:-54:-17 **12**     **Q.**   Now, as far as you're aware, Agent Barnes, did what

00:13:44 **13** Mohammad Amawi said to you on June 9, 2004, lead to any of the

00:13:48 **14** subsequent investigation into Mohammad Amawi?

-08:-54:-17 **15**     **A.**   No.

00:13:52 **16**     **Q.**   I want to fast forward to January 31 of 2005.   On that

-08:-54:-17 **17** date did you receive two compact discs from Special Agent Coats?

-08:-54:-17 **18**     **A.**   Yes.

00:14:03 **19**     **Q.**   Is there anything distinctive about one of those CDs you

00:14:07 **20** received from Special Agent Coats?

-08:-54:-17 **21**     **A.**   One of the CDs had "Blue Star" written on it.

-08:-54:-17 **22**     **Q.**   And what was the reason that Special Agent Coats gave

00:14:14 **23** you those CDs?

-08:-54:-17 **24**     **A.**   He wanted me to make copies of them.

-08:-54:-17 **25**     **Q.**   Were you given any information with regard to the

-08:-54:-17    **1**    urgency of making these copies?

-08:-54:-17    **2**        **A.**   Yes.   They were in a hurry to get the CDs back to

-08:-54:-17    **3**    return to the source who was meeting with the subject later that

-08:-54:-17    **4**    day.

00:14:34    **5**        **Q.**   Did you, in fact, copy the two CDs you were given on

-08:-54:-17    **6**    January 31st, 2005?

-08:-54:-17    **7**        **A.**   Yes.

-08:-54:-17    **8**        **Q.**   Did you return those discs to Special Agent Coats on

-08:-54:-17    **9**    that same day?

-08:-54:-17    **10**        **A.**   Yes.

-08:-54:-17    **11**        **Q.**   All right.   I'd like to show you what's been marked as

00:14:47    **12**    Exhibit 48.

00:14:57    **13**              Can you see that Agent Barnes?

-08:-54:-17    **14**        **A.**   Yes.

00:15:00    **15**        **Q.**   Do you recognize that?

-08:-54:-17    **16**        **A.**   Yes.

-08:-54:-17    **17**        **Q.**   How do you recognize that?

00:15:03    **18**        **A.**   It's got my handwriting, my initials, and the date on

-08:-54:-17    **19**    the CD.

00:15:12    **20**        **Q.**   Now, I note the date on this is February 3, 2005.

00:15:17    **21**        **A.**   Yes.

-08:-54:-17    **22**        **Q.**   Can you describe for the jury why the date on there is

-08:-54:-17    **23**    February 3, 2005?

-08:-54:-17    **24**        **A.**   On January 31 they brought the CDs in.  We had one

00:15:28    **25**    software program that could copy CDs, but for some reason it had

-08:-54:-17 **1** a problem with it.   The computer that I was using at the time

00:15:37 **2** could not handle Arabic file names.   I believe that's what

-08:-54:-17 **3** caused the problem with making copies.   I was able to copy the

-08:-54:-17 **4** files to the second computer.   However, the software that burns

00:16:08 **5** the CDs could not handle the Arabic file names.   And it took me

00:16:14 **6** a couple of days until I found software that was able to burn

-08:-54:-17 **7** the files to a CD.

00:16:20 **8**      Q.   So the date that this actual CD, Exhibit 48, was burnt

-08:-54:-17 **9** or created was February 3, 2005?

-08:-54:-17 **10**      A.   Yes.

-08:-54:-17 **11**      Q.   But this is a copy of one of the discs you received from

00:16:32 **12** Special Agent Coats on January 31?

-08:-54:-17 **13**      A.   Yes.

00:16:35 **14**      Q.   Do you remember which of the discs that you received

-08:-54:-17 **15** from Special Agent Coats this is a copy of?

-08:-54:-17 **16**      A.   This is a copy of the CD that had the blue star on it.

00:16:44 **17**      Q.   I'd like to direct your attention to Exhibit 49.   Can

-08:-54:-17 **18** you read that, Special Agent Barnes?

-08:-54:-17 **19**      A.   Yes.

-08:-54:-17 **20**      Q.   Do you recognize that?

-08:-54:-17 **21**      A.   Yes.

00:16:58 **22**      Q.   Is this a copy of one of the CDs that you received on

00:17:02 **23** January 31, 2005?

-08:-54:-17 **24**      A.   Yes, that's the copy of the CD that did not have the

-08:-54:-17 **25** blue star on it.

4878

-08:-54:-17 **1**      MR. HERDMAN:  And this time, Your Honor, if they

-08:-54:-17 **2** haven't been offered into evidence I'd offer Exhibits 48 and 49

-08:-54:-17 **3** into evidence.

-08:-54:-17 **4**      THE COURT:  They we'll be admitted.

00:17:23 **5** BY MR. HERDMAN:

-08:-54:-17 **6**   **Q.**   Special Agent Barnes, I'd like to direct your attention

-08:-54:-17 **7** to February 7, 2005.   On that date did you receive two compact

00:17:31 **8** discs from Special Agent Bill Radcliffe?

-08:-54:-17 **9**   **A.**   Yes.

00:17:34 **10**   **Q.**   Was there anything distinctive about one of those CDs?

00:17:38 **11**   **A.**   One of those CDs also had a blue star on it.

-08:-54:-17 **12**   **Q.**   And was time a priority with respect to these two

00:17:45 **13** compact discs as well?

-08:-54:-17 **14**   **A.**   Yes, for the same reason.   They had to return CDs to

-08:-54:-17 **15** the source because he was going to meet the subject later that

-08:-54:-17 **16** day.

00:17:53 **17**   **Q.**   And did you copy those CDs as well?

-08:-54:-17 **18**   **A.**   Yes.

-08:-54:-17 **19**   **Q.**   All right.   And after you made the copies of those two

00:18:01 **20** CDs did you give them back to Special Agent Radcliffe on

-08:-54:-17 **21** February 7?

-08:-54:-17 **22**   **A.**   Yes.

00:18:06 **23**   **Q.**   I'd like to show you what's been marked as Exhibit 59.

00:18:15 **24** There's a glare on that.

-08:-54:-17 **25**      Can you read that, Special Agent Barnes?

-08:-54:-17 **1**    **A.**    Yes.

00:18:19 **2**    **Q.**    Do you recognize that?

00:18:20 **3**    **A.**    Yes.   I can see my handwriting.

00:18:22 **4**    **Q.**    And is this a copy of one of two CDs you received from

-08:-54:-17 **5** Special Agent Radcliffe on February 7?

00:18:29 **6**    **A.**    Yes.   This is a copy of the CD that had the blue star

-08:-54:-17 **7** on it.

00:18:34 **8**    **Q.**    I'd like to show you Exhibit 60.   Again, there's a

00:18:41 **9** glare on that.

-08:-54:-17 **10**    Can you read that, Special Agent Barnes?

-08:-54:-17 **11**    **A.**    Yes.

-08:-54:-17 **12**    **Q.**    And is this a copy of one of two CDs you received from

-08:-54:-17 **13** Special Agent Radcliffe on February 7?

-08:-54:-17 **14**    **A.**    Yes.   That's a copy of the CD that did not have a blue

-08:-54:-17 **15** star on it.

00:18:55 **16**    MR. HERDMAN:  At this time, if they haven't been

-08:-54:-17 **17** offered already, I'd offer Exhibits 59 and 60.

-08:-54:-17 **18**    THE COURT:  They'll be admitted.

-08:-54:-17 **19** BY MR. HERDMAN:

-08:-54:-17 **20**    **Q.**    I'd like to direct your attention to Exhibit 128-D as in

-08:-54:-17 **21** Delta.

-08:-54:-17 **22**    Do you see anything on this disc that is

-08:-54:-17 **23** distinctive?

00:19:16 **24**    **A.**    Yes, a blue star written on the upper right there.

-08:-54:-17 **25**    **Q.**    And is that marking on that CD similar to the marking

| | | |
|---|---|---|
| 00:19:24 | **1** | you've described for the jury as a blue star? |
| -08:-54:-17 | **2** | A.   Yes. |
| 00:19:31 | **3** | Q.   Now, Agent Barnes, I'd like to direct your attention to |
| 00:19:34 | **4** | February 9, 2005.   On that date were you presented with a Dell |
| 00:19:39 | **5** | laptop from Special Agent Coats? |
| 00:19:41 | **6** | A.   Yes. |
| 00:19:42 | **7** | Q.   I'm going to show you Exhibit 3 -- 3-A.   Then 3-B.  Is |
| -08:-54:-17 | **8** | that the laptop that you were presented with on February 9, |
| 00:20:03 | **9** | 2005? |
| -08:-54:-17 | **10** | A.   Yes. |
| 00:20:04 | **11** | Q.   Did you copy a file off of that computer on that date? |
| 00:20:08 | **12** | A.   Yes. |
| 00:20:09 | **13** | Q.   And do you remember what the name of that file was? |
| -08:-54:-17 | **14** | A.   Yes.   Martyrdom Operation Vest Preparation.wmv. |
| 00:20:21 | **15** | Q.   How did you copy that file, what did you do? |
| 00:20:25 | **16** | A.   I copied it over to a flash drive which I then put on |
| -08:-54:-17 | **17** | the computer that I used to make the first two CDs with. |
| 00:20:33 | **18** | Q.   So you actually put a file that you took off of this |
| 00:20:36 | **19** | computer on to a CD? |
| 00:20:37 | **20** | A.   Yes. |
| -08:-54:-17 | **21** | Q.   Did you book that CD into evidence? |
| -08:-54:-17 | **22** | A.   Yes. |
| -08:-54:-17 | **23** | Q.   And just what does that mean, "booking it into |
| -08:-54:-17 | **24** | evidence," just for the jury? |
| -08:-54:-17 | **25** | A.   Enter the CD into our evidence control system. |

4881

00:20:48  **1**     **Q.**   Can I show you Exhibit 203?   Do you recognize that

-08:-54:-17  **2**  exhibit?

00:20:55  **3**     **A.**   Yes.

-08:-54:-17  **4**     **Q.**   What is that?

-08:-54:-17  **5**     **A.**   That's the CD with the file that I copied from the

00:21:03  **6**  laptop computer.

00:21:06  **7**     **Q.**   That, the file that you described for the jury,

-08:-54:-17  **8**  Martyrdom Operation Vest Preparation is on that CD?

-08:-54:-17  **9**     **A.**   Yes.

00:21:32  **10**          MR. HERDMAN:  May I have a moment, Your Honor?

00:21:36  **11**          THE COURT:  Of course.

00:21:51  **12**          MR. HERDMAN:  May I approach the witness, Your

00:21:53  **13**  Honor?

00:21:54  **14**          THE COURT:  Uh-huh.

00:21:56  **15**  BY MR. HERDMAN:

-08:-54:-17  **16**     **Q.**   Agent Barnes, I'm showing you Government's Exhibit 36 in

00:21:59  **17**  evidence.   Can you take a look at that exhibit?

00:22:02  **18**     **A.**   Okay.

-08:-54:-17  **19**     **Q.**   Do you see anything on that exhibit that is familiar to

-08:-54:-17  **20**  you?

-08:-54:-17  **21**     **A.**   Yes.   Title of the file at the top is "Martyrdom

00:22:09  **22**  Operation..."  Underneath it says, "Bomb vest video" --

00:22:14  **23**          THE COURT:  Can you sit a little closer?

00:22:20  **24**     **A.**   -- which was consistent with the file name that I had

00:22:27  **25**  copied from the laptop to burn a CD.

| | | |
|---|---|---|
| 00:22:38 | 1 | BY MR. HERDMAN: |
| 00:22:38 | 2 | **Q.**  I'd like to show you Exhibit 61.  Can you go to the |
| 00:22:43 | 3 | second page.  Can you zoom in -- right there.  It's faint but |
| -08:-54:-17 | 4 | can you read that, Agent Barnes? |
| 00:22:52 | 5 | **A.**  Yes. |
| -08:-54:-17 | 6 | **Q.**  Do you see anything that's familiar to you on that |
| -08:-54:-17 | 7 | exhibit? |
| 00:22:59 | 8 | **A.**  Yes.  File name:  MartyrdomOperationVest |
| 00:23:08 | 9 | Preparation.wmv. |
| 00:23:08 | 10 | **Q.**  That's the same as the file that you copied on to a CD |
| -08:-54:-17 | 11 | on February 9, 2005? |
| -08:-54:-17 | 12 | **A.**  Yes. |
| 00:23:15 | 13 | MR. HERDMAN:  I have nothing further, Your Honor. |
| 00:23:19 | 14 | THE COURT:  Any questions. |
| 00:23:38 | 15 | - - - |
| 00:23:38 | 16 | DAVID BARNES, CROSS-EXAMINATION |
| 00:23:41 | 17 | BY MR. BRYAN: |
| 00:23:41 | 18 | **Q.**  Good morning, Agent Barnes.  Agent Barnes, you |
| -08:-54:-17 | 19 | testified I guess as it related to this investigation the first |
| -08:-54:-17 | 20 | time you were called upon to do anything even related to this |
| -08:-54:-17 | 21 | operation at the time was on June 9, 2004.  You, along with a |
| -08:-54:-17 | 22 | team of task force officers and agents, went to the Shaftsbury |
| 00:24:03 | 23 | residence to interview the residents there, correct? |
| -08:-54:-17 | 24 | **A.**  Correct. |
| -08:-54:-17 | 25 | **Q.**  That was pursuant to a threat that was believed to have |

-08:-54:-17  **1**  been made, correct?

-08:-54:-17  **2**      **A.**    Yes.

-08:-54:-17  **3**      **Q.**    And prior to that date you didn't know who Mohammad

-08:-54:-17  **4**  Amawi was or anything like that, correct?

00:24:14  **5**      **A.**    Correct.

-08:-54:-17  **6**      **Q.**    But you did have the name of somebody whom you suspected

-08:-54:-17  **7**  could have been involved in that?

00:24:19  **8**      **A.**    No.

-08:-54:-17  **9**      **Q.**    You weren't asking questions about this particular

00:24:23  **10**  person who lived in an upstairs apartment at Shaftsbury?

00:24:31  **11**      **A.**    The name came up.   I don't recall how the name came up,

00:24:35  **12**  but when we went, we didn't have any names.

00:24:38  **13**      **Q.**    You have prepared an FBI 302 for the interview that day?

-08:-54:-17  **14**      **A.**    Yes.

00:24:50  **15**              MR. BRYAN:  Your Honor, may I approach the witness?

00:24:52  **16**              MR. HERDMAN:  I object, Your Honor.   Can we

-08:-54:-17  **17**  approach, Your Honor?

-08:-54:-17  **18**              THE COURT:  Uh-huh.

00:24:56  **19**              (Whereupon the following discussion was had at the

-08:-54:-17  **20**  bench outside the hearing of the jury:)

-08:-54:-17  **21**              MR. SOFER:  I think he answered the question.   I

-08:-54:-17  **22**  don't think we have to show him a 302.

-08:-54:-17  **23**              MR. HERDMAN:  Your Honor, my objection.   That 302

-08:-54:-17  **24**  contains a statement of Mohammad Amawi on June 9, 2004.   It's

-08:-54:-17  **25**  pure hearsay at this point in time.   Self-serving hearsay.

-08:-54:-17 **1** And there's nothing to refresh the witness's recollection at

-08:-54:-17 **2** this point.

-08:-54:-17 **3** THE COURT:  I agree.  The issue was whether they

-08:-54:-17 **4** had a specific person in mind.  They said no.  You're stuck

-08:-54:-17 **5** with the answer.

-08:-54:-17 **6** MR. HERDMAN:  Also I would add that's not

-08:-54:-17 **7** inconsistent with what that 302 says.

-08:-54:-17 **8** MR. BRYAN:  Your Honor, again, if I may.  In the

-08:-54:-17 **9** fifth paragraph of the agent's 302 it say specifically that he

-08:-54:-17 **10** asked -- asked if Mohammad Amawi knew this Sam Nadeem or Abu

-08:-54:-17 **11** Ali.  In fact, we heard from the earlier witness, Mr.

-08:-54:-17 **12** Almozrouei, that they were asking questions about this

-08:-54:-17 **13** particular gentleman, wondering whether this particular

-08:-54:-17 **14** gentleman could have made a threat on the President.  That was

-08:-54:-17 **15** according to Mr. Almozrouei's testimony.

-08:-54:-17 **16** THE COURT:  If you want to have him take a look at

-08:-54:-17 **17** paragraph five, does that refresh your recollection as to

-08:-54:-17 **18** whether you may have had a name.  He may have acquired it

-08:-54:-17 **19** there.

-08:-54:-17 **20** MR. HERDMAN:  Your Honor, I would just note

-08:-54:-17 **21** paragraph five notes Amawi knows then states a name.  It

-08:-54:-17 **22** doesn't say there was any question directed to him about this

-08:-54:-17 **23** specific person.

-08:-54:-17 **24** THE COURT:  I'm to going to let him ask

-08:-54:-17 **25** specifically about that.

-08:-54:-17 **1**          (End of sidebar).

-08:-54:-17 **2**  BY MR. BRYAN:

00:27:04 **3**     Q.    Agent Barnes, I'm handing you what was previously marked

-08:-54:-17 **4**  Exhibit 13 for identification purposes.

-08:-54:-17 **5**          Do you recognize that as a copy of the 302 that you

00:27:13 **6**  prepared for that day?

-08:-54:-17 **7**     A.    Yes.

-08:-54:-17 **8**     Q.    Could you just read to yourself the fifth paragraph of

-08:-54:-17 **9**  that 302?

00:27:21 **10**     A.    Yes.

00:27:23 **11**     Q.    Does that help refresh your recollection that there was

00:27:26 **12**  somebody specific that you were asking questions about that day?

00:27:30 **13**     A.    I know we talked about him.   I eventually did ask

00:27:34 **14**  questions, but I don't recall bringing the name up.   I don't

-08:-54:-17 **15**  know that one as someone Mr. Amawi mentioned when we went in to

00:27:40 **16**  talk to him about it or...

-08:-54:-17 **17**     Q.    But you did specifically talk to Mr. Amawi about another

-08:-54:-17 **18**  resident in Shaftsbury, correct?

-08:-54:-17 **19**     A.    Yes, eventually.

00:27:48 **20**     Q.    And he was the only other resident that you discussed

-08:-54:-17 **21**  with Mr. Amawi in Shaftsbury that day, correct?

00:27:53 **22**     A.    Correct.

00:27:54 **23**     Q.    Now, present with you on that day, you've already

-08:-54:-17 **24**  testified, was Detective Bart beavers?

-08:-54:-17 **25**     A.    Yes.

4886

| | | |
|---|---|---|
| 00:28:00 | **1** | **Q.**  And his name appears on this 302 as well, correct? |
| -08:-54:-17 | **2** | **A.**  Yes. |
| -08:-54:-17 | **3** | **Q.**  And as it related to the number of people that want -- |
| -08:-54:-17 | **4** | that went to Shaftsbury that day, can you estimate the number of |
| -08:-54:-17 | **5** | agents and officers that appeared that day? |
| 00:28:19 | **6** | **A.**  I want to say it was about ten because we had the |
| 00:28:22 | **7** | apartments on the one -- at the two Shaftsbury buildings, and |
| 00:28:29 | **8** | everybody responded to different apartments to talk to all the |
| 00:28:34 | **9** | residents there at once. |
| -08:-54:-17 | **10** | **Q.**  And you break up in teams, basically, to accomplish this |
| -08:-54:-17 | **11** | task? |
| -08:-54:-17 | **12** | **A.**  Yes. |
| -08:-54:-17 | **13** | **Q.**  Do you recall -- in addition to Agent Beavers, do you |
| -08:-54:-17 | **14** | recall another civilian being in the apartment with Mr. Amawi at |
| -08:-54:-17 | **15** | the time? |
| -08:-54:-17 | **16** | **A.**  Yes. |
| -08:-54:-17 | **17** | **Q.**  And you eventually interviewed that individual as well, |
| 00:28:50 | **18** | correct? |
| -08:-54:-17 | **19** | **A.**  Yes. |
| 00:28:51 | **20** | **Q.**  Do you recall that gentleman, he had two names, one was |
| -08:-54:-17 | **21** | Abu Ali and the other was Sam Nadeem? |
| -08:-54:-17 | **22** | **A.**  Yes. |
| 00:29:05 | **23** | **Q.**  Abu Ali, also known as Sam Nadeem; correct? |
| -08:-54:-17 | **24** | **A.**  Yes. |
| -08:-54:-17 | **25** | **Q.**  And he was actually a gentleman who was from Iraq itself |

4887

-08:-54:-17 **1** who was an Iraqi citizen?

-08:-54:-17 **2**     **A.**   Yes.

-08:-54:-17 **3**     **Q.**   And he was in the room with Mr. Amawi when you were

00:29:19 **4** talking to Mr. Amawi as well?

00:29:21 **5**     **A.**   Yes.

00:29:22 **6**     **Q.**   Now, when you were talking to Mr. Amawi, do you recall

00:29:26 **7** Mr. Amawi inviting you into his apartment and offering you

-08:-54:-17 **8** something to drink and things like that?

-08:-54:-17 **9**     **A.**   Yes.

00:29:32 **10**         MR. HERDMAN:  Your Honor, I object.  Relevancy.  I

-08:-54:-17 **11** don't see the relevance of this.

-08:-54:-17 **12** BY MR. BRYAN:

00:29:42 **13**     **Q.**   Mr. Amawi wasn't evasive with you, correct?

-08:-54:-17 **14**         MR. HERDMAN:  Objection.

-08:-54:-17 **15**         THE COURT:  I'll let him answer.

-08:-54:-17 **16**     **A.**   What was the question?

00:29:48 **17** BY MR. BRYAN:

00:29:48 **18**     **Q.**   Mr. Amawi was not evasive with you, was he?

-08:-54:-17 **19**     **A.**   No.

-08:-54:-17 **20**     **Q.**   In fact, he was not saying what he said, but he was very

-08:-54:-17 **21** open-minded and told you everything that was on his mind that

-08:-54:-17 **22** day, correct?

-08:-54:-17 **23**         MR. HERDMAN:  Objection.

-08:-54:-17 **24**         THE COURT:  Sustained.  No way he would know.

00:30:05 **25** BY MR. BRYAN:

4888

| | | | |
|---|---|---|---|
| 00:30:06 | **1** | **Q.** | He didn't -- just simply he wasn't evasive that day? |
| 00:30:11 | **2** | **A.** | No, he was not. |
| 00:30:12 | **3** | **Q.** | Do you recall how long the conversation lasted with Mr. |
| -08:-54:-17 | **4** | | Amawi? |
| 00:30:16 | **5** | **A.** | No, I don't recall. |
| -08:-54:-17 | **6** | **Q.** | Was it over an hour, if you recall? |
| -08:-54:-17 | **7** | | MR. HERDMAN:  Objection. |
| 00:30:21 | **8** | | THE COURT:  Sustained. |
| 00:30:28 | **9** | | BY MR. BRYAN: |
| -08:-54:-17 | **10** | **Q.** | The next bits of information that you provided during |
| -08:-54:-17 | **11** | | your direct testimony get you receiving these various CDs from |
| 00:30:38 | **12** | | Agent Coats and Agent Radcliffe in this case.   Specifically you |
| 00:30:43 | **13** | | indicated the first exhibit that you received from -- I believe |
| 00:30:46 | **14** | | it was from Agent Coats, you had some difficulty downloading the |
| -08:-54:-17 | **15** | | information off that CD or transferring it to another CD, was |
| -08:-54:-17 | **16** | | it? |
| -08:-54:-17 | **17** | **A.** | Yes. |
| -08:-54:-17 | **18** | **Q.** | And you determined that the difficulty was due to the |
| -08:-54:-17 | **19** | | fact that the CD from which you were trying to transfer the |
| -08:-54:-17 | **20** | | information included Arabic file names, correct? |
| 00:31:06 | **21** | **A.** | Yes. |
| -08:-54:-17 | **22** | **Q.** | And at least at that time your computer wasn't |
| 00:31:10 | **23** | | Arabic-enabled to be able to read those files, was it? |
| -08:-54:-17 | **24** | **A.** | That particular computer was not. |
| -08:-54:-17 | **25** | **Q.** | But you did secure all of the information that was on |

-08:-54:-17  **1**  that CD, correct?

-08:-54:-17  **2**     **A.**  Yes.

-08:-54:-17  **3**     **Q.**  You just didn't have the ability to download it to

-08:-54:-17  **4**  another CD until a few days later, correct?

-08:-54:-17  **5**     **A.**  Correct.

-08:-54:-17  **6**     **Q.**  And when you downloaded it to another CD a few days

00:31:30  **7**  later, you were successfully able to download all the

-08:-54:-17  **8**  information that was on the original CD that Agent Coats had

00:31:37  **9**  handed to you on to a duplicate CD, correct?

00:31:40  **10**     **A.**  Yes.

-08:-54:-17  **11**     **Q.**  And that was true of all the CDs that you were asked to

00:31:44  **12**  create copies for, correct?

-08:-54:-17  **13**     **A.**  Yes.

00:31:48  **14**         MR. BRYAN:  Nothing further at this time, Your

00:31:57  **15**  Honor.

00:31:57  **16**         THE COURT:  Any further questions?

00:32:00  **17**         MR. BOSS:  Just briefly, Your Honor.

00:32:02  **18**            - - -

00:32:02  **19**       DAVID BARNES, CROSS-EXAMINATION

00:32:04  **20**  BY MR. BOSS:

00:32:04  **21**     **Q.**  Hello.  I'm Chuck Boss.  I represent Mr. El-Hindi along

-08:-54:-17  **22**  with my colleagues.

00:32:10  **23**         The computer discs that you were given that you had

-08:-54:-17  **24**  some difficulty downloading at first --

-08:-54:-17  **25**     **A.**  Uh-huh.

4890

-08:-54:-17 **1**    **Q.**    -- what was the basic content of those, if you recall?

-08:-54:-17 **2**    **A.**    I didn't look too much at the contents of the CD.   My

-08:-54:-17 **3**    job was just to try to get a copy.  Whichever agent brought me

-08:-54:-17 **4**    the CDs was going to review.

00:32:32 **5**    **Q.**    I'm sorry?

-08:-54:-17 **6**    **A.**    The agent that brought me the CD was going to review the

00:32:36 **7**    contents on the copy.   My job was just to get the copies made

00:32:40 **8**    as quickly as possible so they could return the original to the

-08:-54:-17 **9**    source.

00:32:45 **10**    **Q.**    Were they at all related to the martyrdom operation vest

00:32:52 **11**    thing, if you know?

-08:-54:-17 **12**    **A.**    I don't know.

-08:-54:-17 **13**    **Q.**    You don't know what computer they would have been played

00:32:56 **14**    on?

00:32:57 **15**    **A.**    I don't know.

00:32:58 **16**    **Q.**    You didn't do an analysis of any of the computers; am I

-08:-54:-17 **17**    correct about that?

-08:-54:-17 **18**    **A.**    Correct.   I did not analyze computers.

00:33:05 **19**              MR. BOSS:  Thank you.

00:33:09 **20**              MR. HELMICK:   No questions.

-08:-54:-17 **21**              THE COURT:  Any redirect?

00:33:14 **22**              MR. HERDMAN:  If I could have just a moment, Your

-08:-54:-17 **23**    Honor.

-08:-54:-17 **24**              THE COURT:  Of course.

00:33:27 **25**              (Discussion had off the record.)

-08:-54:-17 **1**          MR. HERDMAN:  No, Your Honor, no redirect.

-08:-54:-17 **2**          THE COURT:  You're free to go or welcome to stay.

-08:-54:-17 **3** It's entirely up to you.

-08:-54:-17 **4**          Your next witness is?

00:33:37 **5**          MR. HERDMAN:  Special Agent Steven Gubanich, Your

00:33:43 **6** Honor.

00:33:43 **7**          His last name is spelled G-U-B-A-N-I-C-H.

00:33:48 **8**          MR. BOSS:  Your Honor, could we approach one

-08:-54:-17 **9** moment?

00:33:51 **10**          MR. HERDMAN:  Your Honor, I think one of the jurors

-08:-54:-17 **11** has a question.

00:34:11 **12**          THE JUROR:  Can you redo the name again?

00:34:14 **13**          MR. HERDMAN:  S-T-E-V-E-N.  Gubanich.

-08:-54:-17 **14** G-U-B-A-N-I-C-H.

00:34:24 **15**          THE COURT:  Counsel, come on up.

00:39:44 **16**          (Whereupon the following discussion was had at the

-08:-54:-17 **17** bench outside the hearing of the jury:)

-08:-54:-17 **18**          MR. BOSS:  Judge, last evening sometime between

-08:-54:-17 **19** 10:30 and midnight we received two e-mails that contained some

-08:-54:-17 **20** information that I believe pertains to Mr. Gubanich's testimony.

-08:-54:-17 **21**          MR. HERDMAN:  Correct.

-08:-54:-17 **22**          MR. BOSS:  Then this morning we received about nine

-08:-54:-17 **23** different documents containing --

-08:-54:-17 **24**          THE COURT:  What are they?

-08:-54:-17 **25**          MR. HERDMAN:  These are Special Agent Gubanich's

4892

-08:-54:-17 **1** notes and essentially it's much like what we did with Darren

-08:-54:-17 **2** Griffin, Your Honor.   You're talking about literally thousands

-08:-54:-17 **3** of computer files.   Special Agent Gubanich has been through all

-08:-54:-17 **4** of them, has made notes.   Just in the interest of time, moving

-08:-54:-17 **5** his testimony along, I propose that he go up on the stand with

-08:-54:-17 **6** his notes in front of him so I don't have to keep showing him

-08:-54:-17 **7** things to refresh his recollection.   I provided to Counsel a

-08:-54:-17 **8** copy of those notes.   I would say that he's not going to be

-08:-54:-17 **9** testifying about all of these things.   There are very select

-08:-54:-17 **10** portions.   Counsel will be directed immediately to the actual

-08:-54:-17 **11** part of his notes that we're talking about.

-08:-54:-17 **12**         MR. BOSS:  Can you even tell us what the different

-08:-54:-17 **13** documents represent?

-08:-54:-17 **14**         MR. HERDMAN:  These are in the original exhibit

-08:-54:-17 **15** list.  I provided Counsel with exhibit lists that pertain to all

-08:-54:-17 **16** the computer evidence.   So, for instance, Mr. Boss has here

-08:-54:-17 **17** Exhibit 139-B as in Bravo, which is a particular computer disc

-08:-54:-17 **18** that's been marked 130-B.  I've marked the actual files that

-08:-54:-17 **19** were contained on that CD with letters so that they actually

-08:-54:-17 **20** have an exhibit number for each file.   I did that, obviously,

-08:-54:-17 **21** for the purpose of the record that we need to make.   And also

-08:-54:-17 **22** for counsels' convenience and for our convenience so we can all

-08:-54:-17 **23** refer to a common code to refer to these files.   Counsel's had

-08:-54:-17 **24** the original exhibit list.

-08:-54:-17 **25**         MR. BOSS:  I do understand that these -- and I

-08:-54:-17 **1** don't refer to the agent's notes, but there's new material that

-08:-54:-17 **2** we were provided today in terms of translations and so forth

-08:-54:-17 **3** that have not been previously provided.

-08:-54:-17 **4**          MR. HERDMAN:  There are some translations that

-08:-54:-17 **5** don't pertain to what -- I'm trying to think about this.   I

-08:-54:-17 **6** want to make sure that I'm telling you this correctly.   You

-08:-54:-17 **7** were provided with translations today.   All of the translations

-08:-54:-17 **8** that you have been provided relate to evidence that you've

-08:-54:-17 **9** already been given notice of.   I don't think Special Agent

-08:-54:-17 **10** Gubanich is going to testify to any particular piece of evidence

-08:-54:-17 **11** married with a translation but for two video files that are very

-08:-54:-17 **12** brief.   They contain cell phone video.   And I can provide you

-08:-54:-17 **13** with those exhibit numbers if you like.

-08:-54:-17 **14**          THE COURT:  Let me suggest this.   Why don't we

-08:-54:-17 **15** move on down the road to testimony and see what arises.

-08:-54:-17 **16**          MR. HERDMAN:  Obviously our position on this, Your

-08:-54:-17 **17** Honor, is Special Agent Gubanich has had to rely on translators.

-08:-54:-17 **18** We're not going to say he speaks Arabic, but he has had Arabic

-08:-54:-17 **19** translators review this material with him.   He's relied on

-08:-54:-17 **20** certain translations, specifically file names.   If there's an

-08:-54:-17 **21** Arabic file name, we've had to translate that for Agent

-08:-54:-17 **22** Gubanich.   He's had to rely on that.   Any translation that's

-08:-54:-17 **23** being introduced through Special Agent Gubanich we're going to

-08:-54:-17 **24** have the translator come in and testify to the translation of

-08:-54:-17 **25** that particular file.   If he's testifying about anything that's

-08:-54:-17 **1** been translated they're going to get a shot at a witness who's

-08:-54:-17 **2** going to testify to translation of that file.

-08:-54:-17 **3**           MR. HARTMAN:  Judge, the problem I have with it is

-08:-54:-17 **4** we were told in the e-mail we got at about 10:44 last night that

-08:-54:-17 **5** some of what was included in there were exhibits we were already

-08:-54:-17 **6** given.

-08:-54:-17 **7**           THE COURT:  Let's wait and see what he testifies

-08:-54:-17 **8** to.   If this creates some kind of problem in terms of your

-08:-54:-17 **9** ability to cross-examine, come up and tell me about it.   I'll

-08:-54:-17 **10** deal with it then.   Okay.  I'm going to let him testify as to

-08:-54:-17 **11** what he's been called to testify to.   And if there's some issue

-08:-54:-17 **12** or problem about this, we'll deal with it.

-08:-54:-17 **13**           MR. BOSS:  Are these in the same order that the

-08:-54:-17 **14** witness will be using them in?

-08:-54:-17 **15**           MR. HERDMAN:  I believe they are.   That's how they

-08:-54:-17 **16** were presented to you.   I think they are.   Although I can tell

-08:-54:-17 **17** you -- no, they're not.   I'm sorry.   They're not.

-08:-54:-17 **18**           THE COURT:  Just go through and take it slowly.

-08:-54:-17 **19**           MR. HERDMAN:  I will.   I'll do everything I can to

-08:-54:-17 **20** just point Counsel to the right plate of where we're going, page

-08:-54:-17 **21** numbers, exhibit numbers, things like that.

-08:-54:-17 **22**           THE COURT:  What I'm going to do, so we don't have

-08:-54:-17 **23** the delay in getting underway, keep the noise on until Tracy's

-08:-54:-17 **24** plugged back in.

-08:-54:-17 **25**           (End of side-bar discussion.)

| | | |
|---|---|---|
| 00:39:52 | **1** | THE COURT: Ladies and gentlemen, whatever the |
| 00:39:57 | **2** | repair was needed, I assume that's taken care of over there. A |
| 00:40:02 | **3** | new change in procedure. I've only been in this building for |
| 00:40:06 | **4** | 28 or 29 years. It finally occurs to me. Amy's going to keep |
| -08:-54:-17 | **5** | the white noise on until Tracy's plugged back in which will be |
| -08:-54:-17 | **6** | the signal for the lawyers they can now start asking questions.: |
| -08:-54:-17 | **7** | It occurred to me that's the way to handle that problem. |
| 00:40:24 | **8** | Sir, if you'll come up and be sworn. |
| -08:-54:-17 | **9** | (The witness was sworn by the clerk.) |
| 00:40:37 | **10** | THE COURT: If you'll take a seat, please. If |
| 00:40:40 | **11** | you'll slide the chair up so you're about this distance from the |
| 00:40:44 | **12** | microphone. Tell the ladies and gentlemen your name. |
| 00:40:50 | **13** | THE WITNESS: Steven Gubanich. |
| -08:-54:-17 | **14** | THE COURT: G-U-B-A-N-I-C-H? |
| 00:40:56 | **15** | THE WITNESS: That's correct. |
| 00:40:57 | **16** | THE COURT: Your present occupation or employment? |
| -08:-54:-17 | **17** | THE WITNESS: I'm an FBI agent. |
| -08:-54:-17 | **18** | THE COURT: How long have you been an agent of the |
| -08:-54:-17 | **19** | Bureau? |
| 00:41:04 | **20** | THE WITNESS: Approximately five and a half years. |
| -08:-54:-17 | **21** | THE COURT: Your formal title is Special Agent; is |
| 00:41:09 | **22** | that correct? |
| 00:41:09 | **23** | THE WITNESS: That's correct, sir. |
| -08:-54:-17 | **24** | THE COURT: Before that did you have any law |
| 00:41:12 | **25** | enforcement experience? |

| | | |
|---|---|---|
| 00:41:13 | **1** | THE WITNESS:  No, I did not. |
| 00:41:15 | **2** | THE COURT:  And you are assigned to which office? |
| -08:-54:-17 | **3** | THE WITNESS:  The Toledo RA. |
| 00:41:19 | **4** | THE COURT:  Any particular group or whatever in the |
| 00:41:24 | **5** | office? |
| -08:-54:-17 | **6** | THE WITNESS:  Yes, I'm assigned to the Joint |
| 00:41:28 | **7** | Terrorism Task Force. |
| 00:41:28 | **8** | THE COURT:  How long have you had that assignment? |
| 00:41:31 | **9** | THE WITNESS:  For approximately five years. |
| -08:-54:-17 | **10** | THE COURT:  So shortly after joining the Bureau? |
| 00:41:36 | **11** | THE WITNESS:  Correct. |
| -08:-54:-17 | **12** | THE COURT:  Go ahead, Mr. Herdman. |
| 00:41:40 | **13** | - - - |
| 00:41:40 | **14** | STEVEN GUBANICH, DIRECT EXAMINATION |
| -08:-54:-17 | **15** | BY MR. HERDMAN: |
| -08:-54:-17 | **16** | Q.   Good morning, Agent Gubanich.   How old are you, Agent |
| 00:41:44 | **17** | Gubanich? |
| 00:41:44 | **18** | A.   33. |
| -08:-54:-17 | **19** | Q.   Can you briefly describe for the jury your educational |
| -08:-54:-17 | **20** | background? |
| -08:-54:-17 | **21** | A.   I have a Bachelor's in Chemical Engineering from Ohio |
| 00:41:51 | **22** | University. |
| -08:-54:-17 | **23** | Q.   And when did you graduate from OU? |
| 00:41:54 | **24** | A.   1998. |
| 00:41:55 | **25** | Q.   After you graduated from OU, what did you do? |

4897

00:41:58 **1**    **A.**   I worked for a little over two years as a computer

00:42:02 **2**  analyst.   Then I was a product manufacturing engineer.

00:42:06 **3**            THE COURT:  A couple things.   If you can, be a

-08:-54:-17 **4**  little closer to the microphone and please try to speak more

00:42:12 **5**  slowly.

00:42:13 **6**            THE WITNESS:  Yes, sir.

-08:-54:-17 **7**            THE COURT:  She has to get everything you say, and

-08:-54:-17 **8**  I and several of the jurors are taking notes.   And just so if

-08:-54:-17 **9**  you can just keep in mind to speak more slowly.   And feel free

00:42:27 **10**  to address the jury rather than me when you're responding to

00:42:30 **11**  questions from me, but speak into the microphone.   Okay?

-08:-54:-17 **12**            THE WITNESS:  Yes, sir.

00:42:35 **13**  BY MR. HERDMAN:

-08:-54:-17 **14**    **Q.**   And when His Honor was asking you some questions, you

00:42:38 **15**  stated you're currently employed by the FBI?

-08:-54:-17 **16**    **A.**   Correct.

00:42:41 **17**    **Q.**   As a Special Agent?

-08:-54:-17 **18**    **A.**   Correct.

-08:-54:-17 **19**    **Q.**   When were you hired by the FBI?

00:42:44 **20**    **A.**   I was hired in October, 2002.

00:42:47 **21**    **Q.**   After you were hired, where did you go?

-08:-54:-17 **22**    **A.**   I went to the FBI academy in Quantico, Virginia.

00:42:54 **23**    **Q.**   Can you briefly describe for the jury what kind of

00:42:57 **24**  training you received at the FBI academy?

-08:-54:-17 **25**    **A.**   I received training in legal firearms, tactical

-08:-54:-17 **1** operations, and investigations.

-08:-54:-17 **2**     **Q.**    You mentioned tactical operations.  What does that

-08:-54:-17 **3** mean?

-08:-54:-17 **4**     **A.**    That means things like executing a search warrant, car

00:43:15 **5** stops, things of that nature.

-08:-54:-17 **6**     **Q.**    When did you actually graduate from the FBI academy?

00:43:22 **7**     **A.**    I graduated in February, 2003.

-08:-54:-17 **8**     **Q.**    Then you said -- I don't know you said this.  Where

-08:-54:-17 **9** were you assigned after you graduated from the academy?

-08:-54:-17 **10**     **A.**    I was assigned to Toledo.

-08:-54:-17 **11**     **Q.**    That was also in 2003, you said?

-08:-54:-17 **12**     **A.**    Yes, the end of February, beginning of March.

00:43:39 **13**     **Q.**    You still assigned here in Toledo?

00:43:41 **14**     **A.**    Yes, I am.

-08:-54:-17 **15**     **Q.**    I heard you say Toledo RA.  Can you remind the jury what

-08:-54:-17 **16** that means?

00:43:46 **17**     **A.**    Toledo is the resident agency out of the Cleveland

-08:-54:-17 **18** division.

00:43:50 **19**     **Q.**    You said you're a member of the Joint Terrorism Task

00:43:54 **20** Force here in Toledo?

00:43:55 **21**     **A.**    That's correct.

-08:-54:-17 **22**     **Q.**    Is that different than a joint task force that might be

00:43:59 **23** elsewhere in the Cleveland division?

-08:-54:-17 **24**     **A.**    We investigate things of a terrorist threats in

-08:-54:-17 **25** northwest Ohio.

-08:-54:-17 **1**   **Q.**   So it's specifically focused out of the RA on northwest

00:44:13 **2**   Ohio?

-08:-54:-17 **3**   **A.**   Yes.  That's correct.

00:44:15 **4**   **Q.**   I'd like to direct your attention to this particular

-08:-54:-17 **5**   case and to February 19 of 2006.   February 19.

00:44:23 **6**   Were you assigned as part of an arrest team on that

00:44:27 **7**   date?

-08:-54:-17 **8**   **A.**   Yes, I was.

00:44:28 **9**   **Q.**   Who was the person you were assigned to arrest?

-08:-54:-17 **10**   **A.**   Mohammad Amawi.

-08:-54:-17 **11**   **Q.**   Do you see Mr. Amawi in the courtroom?

00:44:33 **12**   **A.**   I do.

00:44:34 **13**   **Q.**   Could you please point to him and indicate an article of

-08:-54:-17 **14**   clothing that he's wearing?

-08:-54:-17 **15**   **A.**   He's sitting there wearing a gray suit, blue shirt, red

00:44:42 **16**   tie.

-08:-54:-17 **17**   **Q.**   What was the basic plan, what was your understanding of

-08:-54:-17 **18**   the basic plan for this arrest of Mr. Amawi to be accomplished?

-08:-54:-17 **19**   **A.**   Myself along with other federal agents were going to fly

00:44:53 **20**   to Jordan to execute the arrest of Mr. Amawi.

-08:-54:-17 **21**   **Q.**   You said it was going -- the arrest was going to take

-08:-54:-17 **22**   place in the country of Jordan?

-08:-54:-17 **23**   **A.**   That's correct.

-08:-54:-17 **24**   **Q.**   Now, prior to this decision to go arrest Mohammad Amawi,

00:45:07 **25**   were you aware of statements that Mohammad Amawi had made to

4900

-08:-54:-17 **1** Darren Griffin in December, 2005?

-08:-54:-17 **2**     A.    Yes.

-08:-54:-17 **3**     Q.    What was your understanding of those statements?

-08:-54:-17 **4**     A.    My understanding was that Mr. Amawi had told Mr. Griffin

-08:-54:-17 **5** that he was thinking about going to Iraq and becoming a martyr.

00:45:25 **6**     Q.    What was the date that you actually went to go arrest

00:45:29 **7** Mohammad Amawi?

-08:-54:-17 **8**     A.    February 19 is when we arrived.

00:45:32 **9**     Q.    And at that time, at the time that you actually arrested

-08:-54:-17 **10** Mohammad Amawi, had he been indicted in the United States?

00:45:39 **11**     A.    Yes, he had.

00:45:41 **12**     Q.    Did you have an arrest warrant for him?

-08:-54:-17 **13**     A.    I did.

-08:-54:-17 **14**     Q.    Can you describe for the jury the airplane that you used

-08:-54:-17 **15** to go pick up Mohammad Amawi?

00:45:50 **16**     A.    It was similar to a corporate jet.   It's a smaller size

-08:-54:-17 **17** jet seating approximately 10 to 12 people.   Sort of a

00:46:04 **18** higher-end aircraft.

00:46:08 **19**     Q.    I'm going to show you Exhibit 134-H.   Do you recognize

-08:-54:-17 **20** that?

00:46:18 **21**     A.    Yes, I do.

-08:-54:-17 **22**     Q.    Does that fairly and accurately depict the airplane you

-08:-54:-17 **23** used to pick up Mohammad Amawi?

-08:-54:-17 **24**     A.    Yes, it does.

-08:-54:-17 **25**             MR. HERDMAN: I'd offer Exhibit 134-H in evidence.

-08:-54:-17 **1**          THE COURT:  It will be admitted.

00:46:31 **2** BY MR. HERDMAN:

-08:-54:-17 **3**     **Q.**    Now, was this particular plane divided up in any way?

00:46:35 **4**          THE COURT:  I didn't hear what you said.

00:46:37 **5**          MR. HERDMAN:  Was it divided up in any way?

00:46:39 **6**     **A.**    Yes.

00:46:39 **7** BY MR. HERDMAN:

-08:-54:-17 **8**     **Q.**    Can you describe that for the jury?

00:46:41 **9**     **A.**    The front part of the passenger cabin had two chairs

00:46:46 **10** with a small table and a couch.   And the rear part of the cabin

-08:-54:-17 **11** had eight seats, four facing each other in front, four facing

-08:-54:-17 **12** each other in the back.   It was all part of the compartment.

-08:-54:-17 **13**     **Q.**    Other than the way the plane was built was it divided up

-08:-54:-17 **14** in any way, were there partitions or anything?

00:47:08 **15**     **A.**    We hung a partition in the back of the plane to separate

00:47:12 **16** the last four seats from the front four seats in the rear cabin.

00:47:19 **17**     **Q.**    Now, was there a restroom onboard this plane?

-08:-54:-17 **18**     **A.**    Yes.

-08:-54:-17 **19**     **Q.**    And how many other people other than yourself were on

00:47:25 **20** board this plane?

00:47:26 **21**     **A.**    It was myself and Agent Coats, an agent from the Secret

00:47:33 **22** Service, three members of the FBI Hostage Rescue Team, two FBI

00:47:41 **23** supervisors, one doctor, and three pilots.

00:47:47 **24**     **Q.**    The hostage rescue team, can you describe what that is

-08:-54:-17 **25** for the jury?

-08:-54:-17  **1**    **A.**    It's sort of like the FBI's national SWAT team where

00:47:58  **2**    they're responsible for the security of personnel on the trip as

-08:-54:-17  **3**    well as any governmental property.

00:48:06  **4**    **Q.**    And what was the purpose of the three members of the

-08:-54:-17  **5**    hostage rescue team on board that plane?

-08:-54:-17  **6**    **A.**    They were there to both secure Mr. Amawi and to tend the

-08:-54:-17  **7**    to the security of the people on the plane.

00:48:18  **8**    **Q.**    And what was your role and Agent Coats' role on the

00:48:25  **9**    arrest team?

-08:-54:-17  **10**    **A.**    We were to execute the arrest of Mr. Amawi and to

00:48:32  **11**    conduct the interview of Mr. Amawi.

00:48:35  **12**    **Q.**    And the pilots, obviously, were there to fly the plane?

-08:-54:-17  **13**    **A.**    Correct.

-08:-54:-17  **14**    **Q.**    What about the two supervisors, what was their role?

-08:-54:-17  **15**    **A.**    They were there to oversee the general operation, if we

-08:-54:-17  **16**    run into any problems.

00:48:49  **17**    **Q.**    What was your understanding of the physician's role?

-08:-54:-17  **18**    **A.**    The physician was there both to conduct a physical of

00:48:55  **19**    Mr. Amawi when he was brought on board as well as to administer

-08:-54:-17  **20**    any medical emergency that may occur on the plane.

-08:-54:-17  **21**    **Q.**    Now, approximately what time did you arrive on board on

00:49:06  **22**    February 19, 2006?

-08:-54:-17  **23**    **A.**    Approximately 7:00 a.m. Eastern Standard Time, which was

00:49:12  **24**    roughly 12:00, 1:00 in the afternoon in Jordan.

00:49:18  **25**    **Q.**    And was Mohammad Amawi brought on board this airplane by

00:49:22  **1**  one of the FBI employees?

-08:-54:-17  **2**      A.    Yes, he was.

-08:-54:-17  **3**      Q.    Which employee was that?

-08:-54:-17  **4**      A.    I believe it was one of the HRT agents.

00:49:32  **5**      Q.    Now, at the same time that Mohammad Amawi was brought on

-08:-54:-17  **6**  board the plane, were you made aware of certain property that

-08:-54:-17  **7**  was brought on board at the same time?

00:49:41  **8**      A.    Yes, I was.

-08:-54:-17  **9**      Q.    Can you describe Mohammad Amawi's general appearance

-08:-54:-17  **10**  when boarding the plane?

-08:-54:-17  **11**      A.    He seemed to be in fine physical condition.   He was

-08:-54:-17  **12**  wearing dress pants and a dark pea coat.

00:49:55  **13**      Q.    I'm going to show you what's been marked as Exhibit

00:49:58  **14**  134-A.   Do you recognize that?

-08:-54:-17  **15**      A.    Yes, I do.

00:50:03  **16**      Q.    And does that fairly and accurately depict the way that

00:50:06  **17**  Mohammad Amawi appeared when he boarded the plane on February

-08:-54:-17  **18**  19, 2006?

-08:-54:-17  **19**      A.    Yes, it does.

00:50:13  **20**      Q.    Now, what part of the plane was Mohammad Amawi initially

-08:-54:-17  **21**  brought to?

-08:-54:-17  **22**      A.    He was brought to the rear part of the cabin that was

00:50:24  **23**  separated by the hanging up of the poncho.

-08:-54:-17  **24**          THE COURT:  In you can, move a little closer to the

-08:-54:-17  **25**  microphone and speak more slowly.   Thank you.

BY MR. HERDMAN:

Q.   Can you repeat your answer to that?   What part of the plane was he brought to?

A.   He was brought to the rear portion of the passenger cabin of the plane.

Q.   Is this photograph actually taken of Mr. Amawi seated in that portion of the plane?

A.   Yes, it does.

Q.   And the tarp behind him, that camouflage tarp, is that the poncho that you were referring to?

A.   Yes.

Q.   When, approximately, was this photograph taken of Mohammad Amawi?

A.   After he was brought on board.  I would say I'd estimate probably 7:15-ish.

Q.   What was the reason that Mr. Amawi was brought to the rear of the plane?

A.   He was brought to the rear of the plane for a physical examination, to be changed, and that's where he was going to travel for the duration of the flight.

Q.   Maybe another question about the layout of the plane. That rear portion that was partitioned off, is that the same area where the restroom is located?

A.   Yes.   There's the rear seat.   There's a kitchen/galley, then the restroom.

4905

| | | |
|---|---|---|
| 00:51:54 | **1** | **Q.**   Who was present during the actual physical examination |
| -08:-54:-17 | **2** | of Mr. Amawi? |
| -08:-54:-17 | **3** | **A.**   Obviously the physician, and two, possibly three members |
| -08:-54:-17 | **4** | of the HRT. |
| 00:52:09 | **5** | **Q.**   Where were you during that physical examination? |
| -08:-54:-17 | **6** | **A.**   I was in that passenger compartment.   I was on the |
| -08:-54:-17 | **7** | other side of that poncho that was hung up to divide the cabin. |
| 00:52:21 | **8** | **Q.**   You were forward in the airplane? |
| 00:52:23 | **9** | **A.**   Correct. |
| -08:-54:-17 | **10** | **Q.**   How far away were you from the actual tarp, |
| 00:52:27 | **11** | approximately? |
| 00:52:30 | **12** | **A.**   A foot or less.  Poncho. |
| 00:52:39 | **13** | **Q.**   What was your understanding of the purpose of -- you |
| 00:52:43 | **14** | refer to the HRT.   That's the Hostage Rescue Team? |
| 00:52:46 | **15** | **A.**   Yes. |
| -08:-54:-17 | **16** | **Q.**   You said there was one or more Hostage Rescue Team |
| -08:-54:-17 | **17** | members present during the physical examination? |
| -08:-54:-17 | **18** | **A.**   Yes. |
| 00:52:52 | **19** | **Q.**   What was your understanding of the reason why those |
| 00:52:54 | **20** | individuals were in the rear of the plane during that physical |
| 00:52:58 | **21** | examination? |
| -08:-54:-17 | **22** | **A.**   They're there for the doctor's security, to help him |
| -08:-54:-17 | **23** | conduct the physical. |
| 00:53:03 | **24** | **Q.**   Now, go back to 134-A. |
| 00:53:11 | **25** | **A.**   (Complied.) |

-08:-54:-17  **1**   **Q.**   Was Mr. Amawi restrained in any way in that photograph?

-08:-54:-17  **2**   **A.**   Yes, he was.

00:53:15  **3**   **Q.**   How is he restrained?

-08:-54:-17  **4**   **A.**   I can tell for sure he's handcuffed, his hands in the

00:53:20  **5**   front.

-08:-54:-17  **6**   **Q.**   Was there a point in time during the physical

-08:-54:-17  **7**   examination where he was unrestrained?

-08:-54:-17  **8**   **A.**   Yes.

00:53:30  **9**   **Q.**   Now, you said that there was a change of clothes that

-08:-54:-17  **10**   was provided to Mr. Amawi?

-08:-54:-17  **11**   **A.**   Yes.

-08:-54:-17  **12**   **Q.**   Can you just describe what those clothes were?

-08:-54:-17  **13**   **A.**   Yes.  We brought sweat pants and a sweatshirt for him to

-08:-54:-17  **14**   wear.

-08:-54:-17  **15**   **Q.**   What was the reason that Mr. Amawi was provided with a

-08:-54:-17  **16**   change of clothes?

-08:-54:-17  **17**   **A.**   We knew it was going to be a long trip so we brought

-08:-54:-17  **18**   something comfortable.  When you're traveling for some time…

-08:-54:-17  **19**   Also we wanted to make sure Mr. Amawi didn't have anything

00:53:56  **20**   hidden in his clothing that he was wearing.  So to be safe we

00:53:59  **21**   took that clothing and provided this clothing for him.

-08:-54:-17  **22**   **Q.**   I'll show you Exhibit 134-B.   Is that Mr. Amawi secured

00:54:10  **23**   after he changed his clothes?

-08:-54:-17  **24**   **A.**   Yes.

-08:-54:-17  **25**   **Q.**   Does that fairly and accurately depict the way he

-08:-54:-17 **1** appeared on February 19?

-08:-54:-17 **2**     **A.** Yes.

00:54:17 **3**         MR. HERDMAN: Your Honor, I'd offer Exhibit 134-B

-08:-54:-17 **4** in evidence.

-08:-54:-17 **5**         THE COURT: It will be admitted.

00:54:25 **6** BY MR. HERDMAN:

-08:-54:-17 **7**     **Q.** I notice Mr. Amawi is wearing a white sweat suit here.

-08:-54:-17 **8** Was this picture taken after the physical examination was

00:54:33 **9** conducted?

-08:-54:-17 **10**     **A.** Yes.

00:54:38 **11**     **Q.** Now, at some point in time did the plane take off from

00:54:42 **12** Jordan?

-08:-54:-17 **13**     **A.** Yes, it did.

00:54:43 **14**     **Q.** When approximately was that?

-08:-54:-17 **15**     **A.** Approximately 7:45 Eastern Standard Time.

-08:-54:-17 **16**     **Q.** Is that after completion of the physical exam?

-08:-54:-17 **17**     **A.** Yes, it was.

-08:-54:-17 **18**     **Q.** And following the plane's takeoff from Jordan, did you

-08:-54:-17 **19** go to the rear of the plane?

00:54:57 **20**     **A.** I did.

-08:-54:-17 **21**     **Q.** Who went back there with you?

-08:-54:-17 **22**     **A.** Agent Coats and also present in the back was obviously

-08:-54:-17 **23** Mr. Amawi and one member of the Hostage Rescue Team.

00:55:08 **24**     **Q.** Were you armed when you went back to the rear of the

-08:-54:-17 **25** plane?

-08:-54:-17 **1**   **A.**   I was not.

-08:-54:-17 **2**   **Q.**   Were you armed at any time on the plane?

-08:-54:-17 **3**   **A.**   Was not.

00:55:15 **4**   **Q.**   What was the reason that you were not armed?

-08:-54:-17 **5**   **A.**   As we're traveling to a foreign country, we are not

00:55:20 **6**   permitted to bring our weapons with us.

00:55:22 **7**   **Q.**   And to your knowledge was Agent Coats armed?

-08:-54:-17 **8**   **A.**   He was not.

-08:-54:-17 **9**   **Q.**   To your knowledge was the member of the Hostage Rescue

-08:-54:-17 **10**   Team that was in the rear of the plane armed?

00:55:33 **11**   **A.**   I don't know.

00:55:34 **12**   **Q.**   What was your -- what was the reason that you went back

-08:-54:-17 **13**   to the rear of the plane at that point in time?

-08:-54:-17 **14**   **A.**   We were about to conduct the interview of Mr. Amawi.

-08:-54:-17 **15**   **Q.**   And what was your understanding of the reason -- what

-08:-54:-17 **16**   was your understanding at the time, the reason a member of the

-08:-54:-17 **17**   Hostage Rescue Team was there?

-08:-54:-17 **18**   **A.**   Just for security.

-08:-54:-17 **19**   **Q.**   And what was the first thing -- you went to the rear of

00:55:57 **20**   the plane.   What was the first thing that you said to Mr.

-08:-54:-17 **21**   Amawi?

-08:-54:-17 **22**   **A.**   I showed Mr. Amawi my FBI credentials and introduced

-08:-54:-17 **23**   myself and Mr. Coats.  We informed him that he was under arrest.

00:56:10 **24**   He was indicted by a federal grand jury of the United States and

-08:-54:-17 **25**   that we were traveling back to the United States to undergo the

4909

-08:-54:-17  **1**  criminal process here.

-08:-54:-17  **2**      **Q.**   Did Mr. Amawi say anything in response?

00:56:19  **3**      **A.**   Not that I recall.

00:56:22  **4**      **Q.**   What did you do next?

-08:-54:-17  **5**      **A.**   I then told Mr. Amawi that -- I reassured him we were

-08:-54:-17  **6**  not going to go through Guantanamo Bay or anything like that.

-08:-54:-17  **7**              THE COURT:  Can you speak more slowly, please.

00:56:38  **8**              THE WITNESS:  I reassured Mr. Amawi that we were

-08:-54:-17  **9**  not going to travel to Guantanamo Bay or anything like that.  We

00:56:46  **10**  were going back to the United States and he was going to be

-08:-54:-17  **11**  tried in the criminal system.

00:56:54  **12**  BY MR. HERDMAN:

00:56:54  **13**      **Q.**   Did you advise Mr. Amawi of his rights at that point in

-08:-54:-17  **14**  time?

-08:-54:-17  **15**      **A.**   I did.

00:56:58  **16**      **Q.**   Does the FBI have a form for that?

-08:-54:-17  **17**      **A.**   Yes, an FD-395.

00:57:02  **18**      **Q.**   Let me show you what's been marked as Exhibit 135.  And

-08:-54:-17  **19**  this is the advise of rights form that you -- did you actually

00:57:19  **20**  read this to Mr. Amawi on February 9, 2006?

-08:-54:-17  **21**      **A.**   I did.  I read it verbatim.

-08:-54:-17  **22**      **Q.**   And there's a time at the -- is that the time that you

00:57:27  **23**  read Mr. Amawi this form?

-08:-54:-17  **24**      **A.**   Yes, approximately.

-08:-54:-17  **25**      **Q.**   And then there's a statement that reads:  I have read

-08:-54:-17 **1** this statement of my rights; I understand what my rights are; at

-08:-54:-17 **2** this time I am willing to answer questions without a lawyer

00:57:40 **3** present?

-08:-54:-17 **4**     **A.**   Uh-huh.

-08:-54:-17 **5**     **Q.**   There's a signature there.   Whose signature is that?

-08:-54:-17 **6**     **A.**   That is Mr. Amawi's.

00:57:46 **7**     **Q.**   And is your signature on there?

-08:-54:-17 **8**     **A.**   Yes, it is.

-08:-54:-17 **9**     **Q.**   And is Special Agent Coats' signature on there?

-08:-54:-17 **10**     **A.**   Yes.

-08:-54:-17 **11**          MR. HERDMAN:  At this time I'd offer Exhibit 135

00:57:56 **12** into evidence?

-08:-54:-17 **13**          THE COURT:  It will be admitted.

00:57:59 **14** BY MR. HERDMAN:

-08:-54:-17 **15**     **Q.**   Now, after Mr. Amawi and yourself signed this form, did

-08:-54:-17 **16** you, in fact, speak to Mr. Amawi?

-08:-54:-17 **17**     **A.**   Yes.

00:58:08 **18**     **Q.**   And who was present during the interview of Mr. Amawi?

00:58:12 **19**     **A.**   Agent Coats and one member of the HRT team.   They'd

00:58:18 **20** rotate.

00:58:19 **21**     **Q.**   When you say they would rotate, you mean somebody would

-08:-54:-17 **22** take a break then the other one --

00:58:25 **23**     **A.**   Correct.

-08:-54:-17 **24**     **Q.**   Did you ask questions of Mr. Amawi?

-08:-54:-17 **25**     **A.**   Yes, I did.

-08:-54:-17 **1**    **Q.**    While you were asking questions of Mr. Amawi, what did

-08:-54:-17 **2**  Special Agent Coats do?

-08:-54:-17 **3**    **A.**    He was taking notes of the interview.

-08:-54:-17 **4**    **Q.**    And what was the reason that -- had you decided that

-08:-54:-17 **5**  that was going to be the division of labor beforehand?

-08:-54:-17 **6**    **A.**    Yes, we decided that one of us would focus on asking Mr.

-08:-54:-17 **7**  Amawi the questions and that the other person would focus on

00:58:47 **8**  taking notes of the interview.

00:58:50 **9**    **Q.**    Now, with respect to the entire course of the trip back

-08:-54:-17 **10**  to the United States -- let me show you Exhibit 134-B again.   I

-08:-54:-17 **11**  notice that there's a bottle of water next to Mr. Amawi there.

-08:-54:-17 **12**    **A.**    Yes.

00:59:08 **13**    **Q.**    Was he provided with food or drink if he expressed that

-08:-54:-17 **14**  he was either thirsty or hungry?

-08:-54:-17 **15**    **A.**    Yes, he was provided with water and tea at his request.

00:59:18 **16**    **Q.**    Was he allowed to use the restroom if he wanted to?

-08:-54:-17 **17**    **A.**    Yes.

-08:-54:-17 **18**    **Q.**    Did he have any physical complaints during the course of

-08:-54:-17 **19**  the flight?

-08:-54:-17 **20**    **A.**    He had -- he complained of some stomach pain, some gas

00:59:32 **21**  pain.   He requested to see the physician for a second time.

00:59:36 **22**    **Q.**    Did he, in fact, see the physician?

-08:-54:-17 **23**    **A.**    Yes.

-08:-54:-17 **24**    **Q.**    And was Mr. Amawi allowed to sleep back to the --

00:59:42 **25**  allowed to sleep on the flight back to the United States?

4912

-08:-54:-17  **1**  **A.**  Yes.

-08:-54:-17  **2**  **Q.**  I'm going to show you Exhibit 134.

-08:-54:-17  **3**  **A.**  Yes.

00:59:48  **4**  **Q.**  What is that?

-08:-54:-17  **5**  **A.**  That's Mr. Amawi sleeping on the flight.

00:59:52  **6**         MR. HERDMAN:  Your Honor, I'd offer Exhibit 134-F

00:59:57  **7**  into evidence.

-08:-54:-17  **8**         THE COURT:  It will be admitted.

01:00:02  **9**  BY MR. HERDMAN:

-08:-54:-17  **10**  **Q.**  During the entire time Mr. Amawi was on the plane, did

-08:-54:-17  **11**  you ever see anyone or hear anyone threaten him in any way?

-08:-54:-17  **12**  **A.**  No.

01:00:11  **13**  **Q.**  Did you ever hear anyone make any promises to Mr. Amawi?

-08:-54:-17  **14**  **A.**  No.

01:00:15  **15**  **Q.**  Did you ever hear Mr. Amawi complain of any discomfort

01:00:18  **16**  other than the gas pain you just testified to?

-08:-54:-17  **17**  **A.**  No.

-08:-54:-17  **18**  **Q.**  Again, he saw a doctor for that?

-08:-54:-17  **19**  **A.**  Yes.

-08:-54:-17  **20**  **Q.**  Were you present with him during all of the questioning?

-08:-54:-17  **21**  **A.**  Yes, I was.

-08:-54:-17  **22**  **Q.**  Did anyone else question Mr. Amawi?

01:00:29  **23**  **A.**  Not to my knowledge.

01:00:31  **24**         MR. HERDMAN:  Your Honor, I can proceed.   But if

01:00:33  **25**  you want to take a break, this might be an opportune time to

01:00:37  1   take a break.

01:00:38  2            THE COURT:  Why don't you go for a bit longer.

-08:-54:-17  3   We've only been going for an hour.

-08:-54:-17  4   BY MR. HERDMAN:

-08:-54:-17  5       Q.   You mentioned earlier there, you were aware of some

-08:-54:-17  6   property brought on board the plane with Mr. Amawi.

-08:-54:-17  7       A.   Yes.

01:00:49  8       Q.   Now, at some point during the interview of Mr. Amawi did

01:00:52  9   you present pieces of property to him?

-08:-54:-17  10      A.   Yes.

-08:-54:-17  11      Q.   And did he say that some of the things that you showed

01:01:00  12  him were his?

-08:-54:-17  13      A.   Uh-huh.

-08:-54:-17  14      Q.   Did he say that some of the things you showed him were

-08:-54:-17  15  not his?

-08:-54:-17  16      A.   Yes.

01:01:05  17      Q.   Were there other things that he was unsure whether they

01:01:08  18  were his or not?

-08:-54:-17  19      A.   Yes.   That's correct.

-08:-54:-17  20      Q.   Physically how did you present this property to Mr.

01:01:14  21  Amawi?

-08:-54:-17  22      A.   We brought the property back to where he was seated and

-08:-54:-17  23  we took each a piece of property out of the box it was in,

-08:-54:-17  24  showed it to Mr. Amawi and he made a comment about that

01:01:25  25  property.

01:01:26   **1**      **Q.**    Did he tell you -- all of the items that you showed him,

-08:-54:-17   **2**   did Mr. Amawi tell you where they came from?

01:01:32   **3**      **A.**    Yes.

01:01:33   **4**      **Q.**    And he said this collectively, they all came from

01:01:37   **5**   particular --

-08:-54:-17   **6**      **A.**    He said all the items we showed him came from his

01:01:41   **7**   bedroom in Jordan.

01:01:43   **8**      **Q.**    I'm going to show you Exhibit 136.   Do you recognize

-08:-54:-17   **9**   that?

01:01:51   **10**     **A.**    Yes.

-08:-54:-17   **11**     **Q.**    What is that?

-08:-54:-17   **12**     **A.**    That is a computer tower.

01:01:55   **13**     **Q.**    Is this one of the items that you presented to Mr. Amawi

01:01:59   **14**   during the interview?

01:02:00   **15**     **A.**    Yes, it was.

01:02:01   **16**     **Q.**    What did he say with respect to this particular exhibit?

01:02:04   **17**     **A.**    He said that this computer was cheaper and it was sort

01:02:09   **18**   of a piece of junk.   He said it was owned by his brother Malin,

-08:-54:-17   **19**   but he used it any time he wished.   And that it was set up in

-08:-54:-17   **20**   his bedroom in Jordan which he shared with his brother Malin,

01:02:24   **21**   and it also was hooked up to the internet via a DSL line.

01:02:29   **22**     **Q.**    Next I'll show you Exhibit 127.   Do you recognize that?

01:02:38   **23**     **A.**    Yes.

-08:-54:-17   **24**     **Q.**    What is that?

-08:-54:-17   **25**     **A.**    That is a computer tower.

01:02:43 **1**      **Q.**   Was this presented to Mr. Amawi during the interview?

-08:-54:-17 **2**      **A.**   Yes, it was.

-08:-54:-17 **3**      **Q.**   What did he have to say about this exhibit?

01:02:50 **4**      **A.**   He said that this was a computer that he purchased while

01:02:55 **5**   in the United States, and that Mr. Griffin brought him this

-08:-54:-17 **6**   computer in November of 2005 to Jordan, and that he had this

-08:-54:-17 **7**   computer underneath his bed in his bedroom in Jordan, and he was

-08:-54:-17 **8**   about to give it to somebody else for their use.

01:03:15 **9**      **Q.**   You said that he told you that Mr. Griffin brought it in

-08:-54:-17 **10**   November of 2005.   Was he referring to Darren Griffin?

-08:-54:-17 **11**      **A.**   Yes, he was.

-08:-54:-17 **12**      **Q.**   Are you aware of a trip Darren Griffin made to Jordan in

-08:-54:-17 **13**   November, 2005?

01:03:28 **14**      **A.**   Not November.

01:03:30 **15**      **Q.**   Is it your opinion Mr. Amawi was mistaken about that

-08:-54:-17 **16**   date?

-08:-54:-17 **17**      **A.**   I think he was.

01:03:37 **18**      **Q.**   I show you Exhibit 124.   Do you recognize that?

01:03:46 **19**      **A.**   Yes.   That's a Sony Vaio laptop.

-08:-54:-17 **20**      **Q.**   Was this particular exhibit presented to Mr. Amawi on

-08:-54:-17 **21**   February 19, 2006?

-08:-54:-17 **22**      **A.**   Yes, it was.

-08:-54:-17 **23**      **Q.**   What did Mr. Amawi do when you presented him with this

01:04:02 **24**   exhibit?

-08:-54:-17 **25**      **A.**   Initially when we showed him the laptop he didn't say

-08:-54:-17  **1**  anything for about three seconds or so.   Just stared at us.

01:04:11  **2**  Then finally he said that this was the laptop that was given to

-08:-54:-17  **3**  him by Mr. Griffin in September of 2005.

01:04:20  **4**      Q.   You said there was a pause of about 3 seconds before he

01:04:24  **5**  answered?

-08:-54:-17  **6**      A.   Yes.

-08:-54:-17  **7**      Q.   Was that a noticeable pause?

-08:-54:-17  **8**      A.   Yes, it was.

01:04:27  **9**      Q.   How was it noticeable?

-08:-54:-17  **10**      A.   Because we showed him the piece of property and waited

-08:-54:-17  **11**  for a response and for at least three seconds there was no

-08:-54:-17  **12**  response from Mr. Amawi at all.

-08:-54:-17  **13**      Q.   Did Mr. Amawi respond that way with respect to any of

-08:-54:-17  **14**  the property you discussed so far with him?

-08:-54:-17  **15**      A.   No.

-08:-54:-17  **16**      Q.   What did Mr. Amawi say about Exhibit 124?

-08:-54:-17  **17**      A.   He said -- I think he stated that it was given to him

-08:-54:-17  **18**  from Darren Griffin in September, 2005.   And that he would take

01:05:04  **19**  this laptop with him to internet cafe's and people would ask to

01:05:12  **20**  see his laptop, and he would let people use it in his presence.

01:05:18  **21**      Q.   Directing your attention to Exhibit 126.   Do you

01:05:21  **22**  recognize that?

01:05:22  **23**      A.   Yes.

01:05:23  **24**      Q.   What is that?

-08:-54:-17  **25**      A.   A Thuraya satellite phone.

4917

| | | | |
|---|---|---|---|
| -08:-54:-17 | **1** | **Q.** | Did you present this to Mr. Amawi during the interview? |
| 01:05:32 | **2** | **A.** | Yes. |
| -08:-54:-17 | **3** | **Q.** | What did he have to say about this exhibit? |
| -08:-54:-17 | **4** | **A.** | He said that this phone was left by Darren Griffin for |

**5** him and that Darren Griffin paid a flat fee of 400 dollars a

**6** month for this phone no matter how much it was used, so Mr.

**7** Amawi said he used the phone a lot as well as letting family

**8** members and friends use the phone.

| | | | |
|---|---|---|---|
| -08:-54:-17 | **9** | **Q.** | Did he tell you when Mr. Griffin left this phone for |

**10** him?

| | | | |
|---|---|---|---|
| 01:06:00 | **11** | **A.** | I don't recall. |
| 01:06:05 | **12** | **Q.** | Now, also were there numerous compact discs and maybe |

**13** other sorts of portable media that were presented to Mohammad

**14** Amawi?

| | | | |
|---|---|---|---|
| -08:-54:-17 | **15** | **A.** | Yes. |
| 01:06:16 | **16** | **Q.** | And this was on February 19, 2006? |
| -08:-54:-17 | **17** | **A.** | Yes. |
| 01:06:21 | **18** | **Q.** | Did -- approximately how many CDs or floppy discs were |

**19** there that were presented to Mr. Amawi?

| | | | |
|---|---|---|---|
| 01:06:30 | **20** | **A.** | Somewhere between -- maybe, approximately 75 to 100. |
| -08:-54:-17 | **21** | **Q.** | Did Mr. Amawi say that some of these discs were his? |
| -08:-54:-17 | **22** | **A.** | Yes. |
| -08:-54:-17 | **23** | **Q.** | Did he say some of the discs were not his? |
| -08:-54:-17 | **24** | **A.** | Yes. |
| -08:-54:-17 | **25** | **Q.** | Was he unsure about some of the discs? |

-08:-54:-17  **1**  **A.**  Yeah.

-08:-54:-17  **2**  **Q.**  What was the process that you went through in order to

-08:-54:-17  **3**  separate out what Mr. Amawi said was his and what he said was

-08:-54:-17  **4**  not his?

-08:-54:-17  **5**  **A.**  We removed each CD from the container, showed him the

-08:-54:-17  **6**  CD, and if he said it was his, we put it in one stack.  If he

-08:-54:-17  **7**  said it was not his, we put it in another stack.   If he said he

-08:-54:-17  **8**  wasn't sure, we put it in a third stack.

-08:-54:-17  **9**  **Q.**  I'm going show this you Exhibit 139.  Now, the CDs that

-08:-54:-17  **10**  you've just seen near Exhibit 139, what did Mr. Amawi have to

-08:-54:-17  **11**  say about these CDs collectively?

-08:-54:-17  **12**  **A.**  Those are the CDs that Mr. Amawi said belonged to him.

-08:-54:-17  **13**  **Q.**  And I just want to draw your attention a particular --

01:07:49  **14**  Exhibit 139A.   Was Exhibit 139(a)(1) of the compact discs that

01:07:56  **15**  Mr. Amawi said was his?

-08:-54:-17  **16**  **A.**  Yes.

01:08:03  **17**      MR. HERDMAN:  Can you go to 139.

01:08:03  **18**  BY MR. HERDMAN:

01:08:07  **19**

01:08:07  **20**  **Q.**  Was 139 one of the compact discs that Mr. Amawi said was

-08:-54:-17  **21**  his?

-08:-54:-17  **22**  **A.**  Yes.

-08:-54:-17  **23**      MR. HERDMAN:  Your Honor, at this point in time I

-08:-54:-17  **24**  would offer Government's Exhibit 139, 139A and 130-B, into

-08:-54:-17  **25**  evidence.

01:08:25  1          THE COURT:  They'll be admitted.

01:08:34  2  BY MR. HERDMAN:

01:08:35  3      Q.    Did you also present Mr. Amawi with a compact disc

01:08:38  4  containing a video game?

01:08:40  5      A.    Yes.

-08:-54:-17  6      Q.    Did he say that that was his?

-08:-54:-17  7      A.    Yes, he did.

-08:-54:-17  8      Q.    What was the name of the video game?

-08:-54:-17  9      A.    Metal Gear.

01:08:48  10      Q.    Showing you Exhibit 131, do you recognize that?

-08:-54:-17  11      A.    I do.

-08:-54:-17  12      Q.    What is that?

-08:-54:-17  13      A.    It's a bag of miscellaneous personal papers belonging to

-08:-54:-17  14  Mohammad Amawi.

01:09:06  15      Q.    And was this part of the property you presented to Mr.

-08:-54:-17  16  Amawi on February 19?

-08:-54:-17  17      A.    Yes.

01:09:12  18      Q.    What did he have to say about these papers sort of

01:09:18  19  collectively or generally?

01:09:19  20      A.    He said that those papers were his, they were brought to

-08:-54:-17  21  him to Jordan by Darren Griffin and Darren brought him a bunch

-08:-54:-17  22  of things that he didn't need.

01:09:34  23          THE COURT:  I did not hear what you just said at

-08:-54:-17  24  the end.

01:09:37  25          THE WITNESS:  He brought a bunch of documents,

-08:-54:-17  **1**  papers that Mr. Amawi did not need.

01:09:44  **2**  BY MR. HERDMAN:

-08:-54:-17  **3**  Q.  Are you aware of some documents that Mr. Griffin brought

01:09:47  **4**  over to Jordan in 2005?

-08:-54:-17  **5**  A.  Yes.

-08:-54:-17  **6**  Q.  And are you aware of what the FBI did with respect to

-08:-54:-17  **7**  some of those documents?

01:09:54  **8**  A.  Yes.  We photocopied those documents.

-08:-54:-17  **9**  Q.  And I want to direct your attention to some specific

01:10:04  **10**  items within Exhibit 131.   If you go to 131-A.  What is Exhibit

-08:-54:-17  **11**  131-A?

-08:-54:-17  **12**  A.  That's a birth certificate for Mohammad Amawi.

-08:-54:-17  **13**  Q.  Was this document in that yellow bag?

01:10:22  **14**  A.  It was.

01:10:27  **15**       MR. HERDMAN:  Can you zoom in?   Go to Exhibit

-08:-54:-17  **16**  131-B.

01:10:44  **17**  BY MR. HERDMAN:

01:10:44  **18**  Q.  What is this document?

01:10:46  **19**  A.  That is a business card for Darren Griffin with some

01:10:49  **20**  writing and a phone number on the front of it.

01:10:52  **21**       MR. HERDMAN:  Can you go to the second page of

01:10:55  **22**  this?

-08:-54:-17  **23**  A.  That is the back of the card.

-08:-54:-17  **24**  BY MR. HERDMAN:

-08:-54:-17  **25**  Q.  And this particular Direct Action Security card was in

-08:-54:-17 **1** that yellow bag?

-08:-54:-17 **2**   A.   It was.

01:11:05 **3**          MR. HERDMAN:  Go to 131-W.

01:11:07 **4** BY MR. HERDMAN:

01:11:07 **5**   Q.   What does this appear to be, Agent Barnes?

-08:-54:-17 **6**   A.   It appears to be a listing of phone numbers.

01:11:14 **7**   Q.   And this document was in that yellow bag?

-08:-54:-17 **8**   A.   Yes, it was.

01:11:22 **9**          MR. HERDMAN:  Go to 131-D.

-08:-54:-17 **10** BY MR. HERDMAN:

-08:-54:-17 **11**   Q.   What does this appear to be?

-08:-54:-17 **12**   A.   This appears to be phone numbers and drawings and

01:11:32 **13** possibly names.

-08:-54:-17 **14**   Q.   And was this document in that yellow bag as well?

-08:-54:-17 **15**   A.   Yes, it was.

-08:-54:-17 **16**   Q.   You can go to 131-E.   What is this?

-08:-54:-17 **17**   A.   That's a business card for Mohammad Amawi for AZ Travel.

01:11:50 **18**   Q.   Was this business card in that yellow bag as well?

-08:-54:-17 **19**   A.   Yes.

01:11:55 **20**          MR. HERDMAN:  Go to 131-F.

01:11:58 **21** BY MR. HERDMAN:

01:11:58 **22**   Q.   What is this?

-08:-54:-17 **23**   A.   That's a piece of paper with some notes written onto it.

01:12:07 **24**   Q.   And that was also in the yellow bag?

-08:-54:-17 **25**   A.   Correct.

01:12:11  **1**                  MR. HERDMAN:  Finally, Exhibit 131-G.   Actually,

-08:-54:-17  **2**  can you -- is there a second page to that?

01:12:26  **3**             131-G.

01:12:29  **4**  BY MR. HERDMAN:

01:12:29  **5**     **Q.**    What is that?

-08:-54:-17  **6**     **A.**    A business card for Darren Griffin.   Is there a second

-08:-54:-17  **7**  page to this?

01:12:37  **8**     **Q.**    Is that the back of that card?

-08:-54:-17  **9**     **A.**    Yes, that's the back of that card.

-08:-54:-17  **10**     **Q.**    So that card was also in the yellow bag?

-08:-54:-17  **11**     **A.**    Yes.

01:12:46  **12**     **Q.**    Now, Agent Barnes, you just testified regarding some of

-08:-54:-17  **13**  the computer evidence that you discussed with Mohammad Amawi on

-08:-54:-17  **14**  February 19?

-08:-54:-17  **15**     **A.**    Yes.

01:12:54  **16**     **Q.**    Have you had an opportunity to review the actual

-08:-54:-17  **17**  computer evidence in this case?

-08:-54:-17  **18**     **A.**    Yes, I have.

01:13:00  **19**              THE COURT:  Why don't we take our break now.  We'll

-08:-54:-17  **20**  try to resume about 25 after.

01:13:10  **21**              (Recess taken.)

01:36:37  **22**              THE COURT:  Thanks for your patience.   Agent, you

-08:-54:-17  **23**  remain under oath.   You may continue.

-08:-54:-17  **24**              MR. HERDMAN:  Thank you, Your Honor.

-08:-54:-17  **25**  BY MR. HERDMAN:

01:36:45  **1**  **Q.**  Agent Gubanich, right before we broke I had asked a

-08:-54:-17  **2**  question regarding your review of the computer evidence in case.

01:36:51  **3**  **A.**  Yes.

01:36:53  **4**  **Q.**  You said you had an opportunity to review the actual

01:36:56  **5**  computer evidence in this case?

-08:-54:-17  **6**  **A.**  I did.

-08:-54:-17  **7**  **Q.**  Meaning like the files instead of just the outside of

-08:-54:-17  **8**  the computer?

01:37:02  **9**  **A.**  Correct.

-08:-54:-17  **10**  **Q.**  And have you had a chance to review computer evidence

01:37:07  **11**  that pertains not only to Mr. Amawi but to any other defendants?

-08:-54:-17  **12**  **A.**  Yes, Mr. El-Hindi as well.

-08:-54:-17  **13**  **Q.**  Have you reviewed any of the computer evidence that had

-08:-54:-17  **14**  been placed on a disc and that Darren Griffin provided to the

-08:-54:-17  **15**  FBI?

-08:-54:-17  **16**  **A.**  Yes, I have.

01:37:23  **17**  **Q.**  And did you -- can you just briefly describe or to the

-08:-54:-17  **18**  jury kind of the process you went through to review these items?

01:37:31  **19**  **A.**  Yes.  The computer evidence was processed by a member

-08:-54:-17  **20**  of our CART team, computer examination team of the FBI.  By

-08:-54:-17  **21**  that I mean basically they're loaded into a software that I can

-08:-54:-17  **22**  then view all the files.

-08:-54:-17  **23**  **Q.**  So you first viewed them using this software.  What's

-08:-54:-17  **24**  the name of that software, by the way?

-08:-54:-17  **25**  **A.**  FTT, Forensic Tool Kit.

4924

01:37:58 **1**    **Q.**   Since certain pieces of evidence have been assigned

-08:-54:-17 **2** exhibit numbers in the case, have you had a chance to review it

-08:-54:-17 **3** again?

-08:-54:-17 **4**    **A.**   Yes.

01:38:06 **5**    **Q.**   Do you have any estimate of the amount of time you

-08:-54:-17 **6** personally spent reviewing computer evidence in this case?

-08:-54:-17 **7**    **A.**   Several weeks' worth at least.

-08:-54:-17 **8**    **Q.**   And with respect to your language skills, do you speak

-08:-54:-17 **9** Arabic?

-08:-54:-17 **10**    **A.**   No, sir.

-08:-54:-17 **11**    **Q.**   Were some of the files that you reviewed, were they

-08:-54:-17 **12** either in Arabic or contain some Arabic language?

01:38:27 **13**    **A.**   Yes.

-08:-54:-17 **14**    **Q.**   How have you been able to deal with those files or

01:38:30 **15** documents that contain Arabic?

-08:-54:-17 **16**    **A.**   I relied on translations from the FBI translator.

01:38:36 **17**    **Q.**   I'd like to direct your attention to a particular

01:38:41 **18** exhibit now, Exhibit 27.

01:38:45 **19**         MR. HERDMAN:  Could you show that on the screen.

01:38:48 **20**         Go to the next page.

01:38:52 **21** BY MR. HERDMAN:

01:38:53 **22**    **Q.**   That's a compact disc, Agent Gubanich?

-08:-54:-17 **23**    **A.**   Yes.

01:38:56 **24**    **Q.**   Have you had a chance to review the files that had been

01:38:59 **25** contained on this particular disc?

-08:-54:-17  **1**  **A.**  Yes.

-08:-54:-17  **2**  **Q.**  Did you use a -- is there any kind of list that's been

01:39:08  **3**  produced that outlines all the files that are on this particular

01:39:12  **4**  disc?

-08:-54:-17  **5**  **A.**  Yes, an exhibit has it.

-08:-54:-17  **6**  **Q.**  I'm going to show you what's been marked as Exhibit

01:39:18  **7**  27-1.  Do you recognize that?

-08:-54:-17  **8**  **A.**  Yes.

-08:-54:-17  **9**  **Q.**  What is that?

-08:-54:-17  **10**  **A.**  That is a list of all the files on that disc.

-08:-54:-17  **11**  **Q.**  Have you had a chance to review the actual files that

01:39:32  **12**  relate to everything that's on this list here?

-08:-54:-17  **13**  **A.**  Yes.

01:39:37  **14**  **Q.**  Can you give the jury a general idea of the material,

01:39:43  **15**  type of material that was on this disc, Exhibit 27?

-08:-54:-17  **16**  **A.**  Yes.  There were -- there's one directory or file

-08:-54:-17  **17**  folder, electronic file folder on this disc, which I believe is

01:39:58  **18**  sub-Exhibit A.  And then within -- contained within that

-08:-54:-17  **19**  electronic file folder were files listed with that in front of

01:40:08  **20**  it there.

01:40:10  **21**  MR. HARTMAN:  I'm sorry, I didn't hear that.

01:40:12  **22**  BY MR. HERDMAN:

01:40:12  **23**  **Q.**  Can you just repeat the last part of your answer?

-08:-54:-17  **24**  **A.**  The files contained in the file folder A have the A in

-08:-54:-17  **25**  front of them; A1, A2, for example.

01:40:25 **1**    **Q.**   You mentioned a file folder.  What do you mean by that,

-08:-54:-17 **2**  a file folder?

01:40:30 **3**    **A.**   It's an electronic folder on your computer that you

-08:-54:-17 **4**  would utilize to organize and store your files into.

-08:-54:-17 **5**    **Q.**   So you're saying when you opened up or when you started

01:40:41 **6**  reviewing this computer evidence there was an actual file folder

-08:-54:-17 **7**  that was on this disc?

-08:-54:-17 **8**    **A.**   Yes.

-08:-54:-17 **9**    **Q.**   And that -- what's the exhibit number for the actual

-08:-54:-17 **10**  file folder that you were referring to?

-08:-54:-17 **11**    **A.**   A.

-08:-54:-17 **12**    **Q.**   That's a directory that's in Arabic there?

01:40:56 **13**    **A.**   Correct.

-08:-54:-17 **14**    **Q.**   Did you rely on any translations of the actual file

01:41:01 **15**  names or directory names in your review of the computer

-08:-54:-17 **16**  evidence?

-08:-54:-17 **17**    **A.**   Yes, I did.

01:41:08 **18**    **Q.**   I'm going to show you 27-2, now J, for directory names.

01:41:16 **19**  What is that?

-08:-54:-17 **20**    **A.**   That's a listing of the same files with two additional

-08:-54:-17 **21**  columns to include a translation and notes.

01:41:23 **22**    **Q.**   So with respect to that exhibit we just talked about,

01:41:27 **23**  27-1, you see in the third column there it says Original File

-08:-54:-17 **24**  Name.   That's the Arabic file name?

-08:-54:-17 **25**    **A.**   Correct.

-08:-54:-17 **1**    **Q.**   Then in that fourth column it says:  Translation, If

01:41:40 **2** Needed.  Is that the translation of that Arabic file name?

01:41:43 **3**    **A.**   Yes.

01:41:44 **4**    **Q.**   What was the name of -- what is the translated name of

-08:-54:-17 **5** 27-1 A?

-08:-54:-17 **6**    **A.**   Heroes of Palestine.

01:41:53 **7**    **Q.**   Now, what type of files, can you indicate on this

-08:-54:-17 **8** 27-2 -- something of Palestine?

-08:-54:-17 **9**    **A.**   Heroes.

01:42:03 **10**          THE COURT:  Maybe just back a tad.   It's very hard

-08:-54:-17 **11** for this microphone to get the modulation just right.   What was

-08:-54:-17 **12** it?

01:42:12 **13**          THE WITNESS:  Heroes of Palestine.

-08:-54:-17 **14**          THE COURT:  A little closer.   There's kind of an

01:42:18 **15** echo if you get too close, okay.  Thanks.   Go ahead.

01:42:23 **16** BY MR. HERDMAN:

01:42:25 **17**    **Q.**   With respect to that directory which is marked Exhibit

01:42:29 **18** A, Heroes of Palestine, were there actual computer files that

-08:-54:-17 **19** were contained within that directory?

-08:-54:-17 **20**    **A.**   Yes.

-08:-54:-17 **21**    **Q.**   You had a chance to review those computer files?

01:42:38 **22**    **A.**   Yes.

-08:-54:-17 **23**    **Q.**   How are those computer files that were contained within

-08:-54:-17 **24** the directory, Heroes of Palestine, how were they marked on

-08:-54:-17 **25** Exhibit 27-2?

4928

| | | |
|---|---|---|
| -08:-54:-17 | **1** | **A.**   They are marked A-1 through A-26. |
| 01:42:52 | **2** | **Q.**   Can you give the members of the jury a general idea of |
| 01:42:56 | **3** | what was depicted on these files marked A-1 through A-26? |
| 01:43:02 | **4** | **A.**   These were mostly computer video files of improvised |
| 01:43:09 | **5** | explosive device attacks and rocket attacks and mortar attacks. |
| 01:43:18 | **6** | MR. HERDMAN:  If we can -- can I have just a |
| -08:-54:-17 | **7** | moment, Your Honor?  If we can go to page 2 of this document, |
| 01:43:32 | **8** | Kevin. |
| -08:-54:-17 | **9** | With respect to 27-1.  I would offer that into |
| -08:-54:-17 | **10** | evidence. |
| -08:-54:-17 | **11** | Can you just bring that up? |
| -08:-54:-17 | **12** | BY MR. HERDMAN: |
| 01:43:59 | **13** | |
| 01:43:59 | **14** | **Q.**   By the way, Agent Gubanich, this Exhibit 27, do you know |
| -08:-54:-17 | **15** | what the source of this particular CD was, the original source |
| 01:44:06 | **16** | of this CD? |
| -08:-54:-17 | **17** | **A.**   This CD came originally from Mohammad Amawi. |
| -08:-54:-17 | **18** | MR. HERDMAN:  Now, this 27-1, Your Honor, I would |
| -08:-54:-17 | **19** | offer this into evidence at this point in time. |
| 01:44:20 | **20** | THE COURT:  It will be admitted. |
| -08:-54:-17 | **21** | MR. HERDMAN:  Your Honor, I'd offer 27-2 into |
| -08:-54:-17 | **22** | evidence subject to connection. |
| -08:-54:-17 | **23** | THE COURT:  Any objection? |
| -08:-54:-17 | **24** | MR. HARTMAN:  Subject to translation issues. |
| 01:44:36 | **25** | THE COURT:  I understand.  I'll reserve ruling on |

4929

-08:-54:-17 **1** this but you may continue, you can display it and so forth.

-08:-54:-17 **2**       MR. HERDMAN:  Thank you, Your Honor.   If we could

-08:-54:-17 **3** go to page 2 of this.

01:44:49 **4** BY MR. HERDMAN:

01:44:49 **5**   **Q.**   Now, Agent Gubanich, I'd like to direct your

01:44:54 **6** attention -- one of the jurors had a question?

-08:-54:-17 **7**       THE JUROR:  You said Agent Barnes a couple times.

-08:-54:-17 **8**       MR. HERDMAN:  I apologize if I said Agent Barnes

-08:-54:-17 **9** during Agent Gubanich's testimony.   It's harder to say Gubanich

01:45:07 **10** than Barnes, I think that's why.

01:45:11 **11** BY MR. HERDMAN:

01:45:12 **12**   **Q.**   Agent Gubanich, directing your attention here to Exhibit

-08:-54:-17 **13** 27-1K.

01:45:17 **14**   **A.**   Yes.

01:45:28 **15**   **Q.**   What is the name of that file, 27-1K.

01:45:34 **16**   **A.**   Big1.ram.

01:45:41 **17**   **Q.**   Does that appear to be one of a series of similar files?

01:45:47 **18**   **A.**   Yes, it was.

01:45:48 **19**   **Q.**   What are the exhibit numbers of that series of similar

-08:-54:-17 **20** files?

01:45:53 **21**   **A.**   Sub-Exhibit K through sub-Exhibit P.

-08:-54:-17 **22**   **Q.**   What are the file names that you're referring to there?

01:46:01 **23**   **A.**   Big 1 dot ram up through big 6 dot ram.

01:46:08 **24**   **Q.**   What did those exhibits, K through P, big one dot ram

01:46:13 **25** through big six dot ram --

4930

01:46:16   **1**          MR. BRYAN:  Your Honor, may we approach?

-08:-54:-17  **2**          (Whereupon the following discussion was had at the

-08:-54:-17  **3**   bench outside the hearing of the jury:)

-08:-54:-17  **4**          MR. BRYAN:  Your Honor, yesterday at the end of

-08:-54:-17  **5**   court we were addressing a Motion in Limine as it related to

-08:-54:-17  **6**   things that were recovered generally from the computer files of

-08:-54:-17  **7**   Mr. Amawi.   And at the time yesterday Your Honor indicated that

-08:-54:-17  **8**   we really couldn't deal with them.  We'd have to deal with it

-08:-54:-17  **9**   file by file.   At this moment I'm prepared just basically to

-08:-54:-17  **10**  make a blanket objection to anything that the government is

-08:-54:-17  **11**  attempting to introduce from Mr. Amawi's computer files that are

-08:-54:-17  **12**  not part of the Darren Griffin investigation, that being things

-08:-54:-17  **13**  that were collected by Darren Griffin or somehow secured through

-08:-54:-17  **14**  the undercover investigation that somehow were related to the

-08:-54:-17  **15**  conspiracy itself in that there were items that were shared with

-08:-54:-17  **16**  other coconspirator, things that were shared with Mr. Griffin.

-08:-54:-17  **17**  I don't want to have to do this for every one because I think it

-08:-54:-17  **18**  would be obstructive, but we want to make a general objection.

-08:-54:-17  **19**          THE COURT:  And the basis for the objection?

-08:-54:-17  **20**          MR. BRYAN:  The basis is it's not relevant to prove

-08:-54:-17  **21**  any of the charges at issue and that the danger of unfair

-08:-54:-17  **22**  prejudice under 403 significantly outweighs whatever probative

-08:-54:-17  **23**  value that the government can present as it relates to Mr.

-08:-54:-17  **24**  Amawi's intent in this case.

-08:-54:-17  **25**          MR. HERDMAN:  Your Honor, with respect to this

-08:-54:-17 **1** particular exhibit I believe the testimony was that this

-08:-54:-17 **2** actually was a disc that was given directly from Mohammad Amawi

-08:-54:-17 **3** to Darren Griffin.   So to that extent, Mr. Bryan's objection is

-08:-54:-17 **4** not ripe.

-08:-54:-17 **5** MR. BRYAN:  It is a premature objection as it

-08:-54:-17 **6** relates to things that are coming up.

-08:-54:-17 **7** MR. HERDMAN:  And the government's response is the

-08:-54:-17 **8** same as it was yesterday.   The items that were retained,

-08:-54:-17 **9** stored, collected by Mr. Amawi are directly relevant to the

-08:-54:-17 **10** issue of his intent.

-08:-54:-17 **11** THE COURT:  Yeah.   But I think it's appropriate to

-08:-54:-17 **12** limit consideration as to those items to him.

-08:-54:-17 **13** MR. HERDMAN:  With respect to --

-08:-54:-17 **14** THE COURT:  If he has something that wasn't shared

-08:-54:-17 **15** or we have no basis to believe it was called to the attention of

-08:-54:-17 **16** the coconspirator, nor to Mr. Griffin, it's communicative

-08:-54:-17 **17** content, whatever it is, or its content, whatever it

-08:-54:-17 **18** communicates, isn't a coconspirator statement.   It relates

-08:-54:-17 **19** solely to him.

-08:-54:-17 **20** MR. HERDMAN:  It's not a coconspirator statement,

-08:-54:-17 **21** but for the record I would indicate this conspiracy the

-08:-54:-17 **22** government alleges continued up until the arrest in this case,

-08:-54:-17 **23** February 2006.   And that while there may not be any direct

-08:-54:-17 **24** evidence that certain coconspirators had knowledge of what Mr.

-08:-54:-17 **25** Amawi had collected or had stored, it's certainly still relevant

-08:-54:-17 **1** to the ongoing conspiracy.   The fact that there was a

-08:-54:-17 **2** conspiracy that existed and the fact that there was a certain

-08:-54:-17 **3** purpose or objective to that conspiracy.

-08:-54:-17 **4**                    THE COURT:  I have to think about that.

-08:-54:-17 **5**                    MR. HARTMAN:  I would say -- your point is well

-08:-54:-17 **6** taken, that it can be relevant to the existence of a conspiracy

-08:-54:-17 **7** but only as to Mr. Amawi.   If it wasn't shared with the

-08:-54:-17 **8** co-defendant, I would ask for a limiting instruction.

-08:-54:-17 **9**                    MR. SOFER:  You can have two competing problems.

-08:-54:-17 **10** When Your Honor instructs the jury on the law of conspiracy, it

-08:-54:-17 **11** does say you are responsible for the actions of your

-08:-54:-17 **12** coconspirators, in furtherance of the conspiracy.

-08:-54:-17 **13**                    THE COURT:  That's right.   Even if you're not

-08:-54:-17 **14** aware.

-08:-54:-17 **15**                    MR. SOFER:  Even if you're not aware of them.   On

-08:-54:-17 **16** the other hand, we would agree that the mere possession of some

-08:-54:-17 **17** of these items would go to the intent of one defendant with

-08:-54:-17 **18** respect to his participation in the conspiracy.   So I would

-08:-54:-17 **19** caution the Court about trying to structure an instruction at

-08:-54:-17 **20** this juncture.   I think at some further time, with the help of

-08:-54:-17 **21** Counsel, we can find the right balance between those two things.

-08:-54:-17 **22** But, for instance, the acquisition, if he did acquire some of

-08:-54:-17 **23** these or create some of these files, and those were overt acts

-08:-54:-17 **24** in furtherance of the conspiracy, then, in fact, every defendant

-08:-54:-17 **25** is responsible for that act.

-08:-54:-17 **1**      On the other hand, the main purpose for which the

-08:-54:-17 **2** government is proffering this evidence is the intent of Mohammad

-08:-54:-17 **3** Amawi.

-08:-54:-17 **4**      THE COURT: And I understand that. But I'm not

-08:-54:-17 **5** sure that -- I think what I should do is when you start getting

-08:-54:-17 **6** into that stuff, say, ladies and gentlemen, with regard to these

-08:-54:-17 **7** exhibits, rather than trying to go back at the end, Exhibit D

-08:-54:-17 **8** da-da-da. They can note it. To this exhibit at this time I'm

-08:-54:-17 **9** instructing you it may be considered as evidence of intent on

-08:-54:-17 **10** the part of Mr. Amawi but not on the part of the other

-08:-54:-17 **11** defendants. I expect that I will later instruct you as to the

-08:-54:-17 **12** extent to which, if at all, you can otherwise consider this

-08:-54:-17 **13** evidence. Okay. And I'd like to cabin it now and again, I

-08:-54:-17 **14** haven't encountered something where somebody simply goes out and

-08:-54:-17 **15** collects. We don't know if he looks at it after he collected it

-08:-54:-17 **16** and so forth. I will try to do it that way. We can address

-08:-54:-17 **17** that issue later.

-08:-54:-17 **18**      MR. BRYAN: That's our concern as it relates to Mr.

-08:-54:-17 **19** Amawi. Although I don't know the computer forensics can

-08:-54:-17 **20** establish every time they were viewed or just the last time they

-08:-54:-17 **21** were viewed. I think there is a habit on Mr. Amawi's part to

-08:-54:-17 **22** basically right click, save files in mass. Fact all of this

-08:-54:-17 **23** ended up on his computer. If he never saw it or read it, it

-08:-54:-17 **24** can't go to his intent.

-08:-54:-17 **25**      THE COURT: That's something you can establish on

-08:-54:-17  **1**  cross-examination.   As I say, I don't know from a technological

-08:-54:-17  **2**  standpoint whether if I see something out on the internet that I

-08:-54:-17  **3**  might want to save for some later date, whether I have to

-08:-54:-17  **4**  actually view it before saving it.   If I don't, then that

-08:-54:-17  **5**  clearly diminishes, I think very significantly, the significance

-08:-54:-17  **6**  of the fact that I simply dumped it into my computer.   But you

-08:-54:-17  **7**  can bring out what the agent -- this agent or any other agent

-08:-54:-17  **8**  knows about when that stuff may have been viewed, or whether it

-08:-54:-17  **9**  was necessary to view it.   And if you want to voir dire their

-08:-54:-17  **10**  computer expert about that so that you don't get torpedoed by an

-08:-54:-17  **11**  answer, that's fine with me.   Because I don't know.   I just

-08:-54:-17  **12**  don't know the technology.   And if, on the other hand, this

-08:-54:-17  **13**  clearly goes to -- ultimately to the weight of the fact that

-08:-54:-17  **14**  somebody simply downloaded it.   These are issues we can

-08:-54:-17  **15**  address.

-08:-54:-17  **16**          But right now when you come to one of these, I will

-08:-54:-17  **17**  simply instruct the jury for now it can be considered only as

-08:-54:-17  **18**  intent, Mr. Amawi's intent.   And we'll worry about the

-08:-54:-17  **19**  conspiracy down the line.

-08:-54:-17  **20**          MR. IVEY:  Along those same lines, I would request

-08:-54:-17  **21**  a similar instruction when get to the El-Hindi stuff.   I

-08:-54:-17  **22**  haven't said anything, but the government continues to bring

-08:-54:-17  **23**  things in without clearing up which defendant they came from,

-08:-54:-17  **24**  which is their right.   But I'd just like that clarified in

-08:-54:-17  **25**  fairness.

-08:-54:-17 **1**      THE COURT:  You can tug on their hem and say, hey,

-08:-54:-17 **2** where is this finger pointing?

-08:-54:-17 **3**      MR. SOFER:  We'd be more than happy to point at the

-08:-54:-17 **4** defendants specifically.

-08:-54:-17 **5**      MR. BOSS:  Can you give us an indication of what

-08:-54:-17 **6** the color codings on the various documents mean?

-08:-54:-17 **7**      MR. HERDMAN:  The green are things he's going to be

-08:-54:-17 **8** asked about on direct.   I should have told you that.   I'm

-08:-54:-17 **9** sorry.

-08:-54:-17 **10**      MR. BOSS:  Do we know which ones are new materials

-08:-54:-17 **11** that haven't previously been given to us?

-08:-54:-17 **12**      MR. HERDMAN:  None of them are new.

-08:-54:-17 **13**      MR. HARTMAN:  Some of this information on this

-08:-54:-17 **14** chart is new.

-08:-54:-17 **15**      MR. HERDMAN:  That's different than the one I

-08:-54:-17 **16** offered into evidence.

-08:-54:-17 **17**      MR. BOSS:  The one that had notes on there.

-08:-54:-17 **18**      MR. HERDMAN:  Those are translator notes.

-08:-54:-17 **19**      MR. BOSS:  They were all translator notes.

-08:-54:-17 **20**      THE COURT:  Can I -- why don't we talk about this

-08:-54:-17 **21** during the noon hour.

-08:-54:-17 **22**      (End of side bar.)

01:55:14 **23**      THE COURT:  Ladies and gentlemen, I expect that

01:55:20 **24** you're about to hear some testimony about the content of some of

-08:-54:-17 **25** the files or items found on Mr. Amawi's computer.   You may

-08:-54:-17 **1** even --

01:55:33 **2** Will we be viewing some of those?

-08:-54:-17 **3** MR. HERDMAN:  No, Your Honor, not at this point.

01:55:39 **4** THE COURT:  I'll ask the government to indicate

01:55:44 **5** whether the evidence shows that particular items were either,

01:55:50 **6** according to the government's evidence, shared with one or more

-08:-54:-17 **7** of the defendants or with Mr. Griffin.  With regard to those

01:56:03 **8** items that there's presently no proof that they were so shared

-08:-54:-17 **9** with anyone, or anyone having to do with this case, I instruct

-08:-54:-17 **10** you at this time those items that were not shared can be

-08:-54:-17 **11** considered by you only as to evidence as to Mr. Amawi on the

01:56:26 **12** issue of intent.  At a later date I will instruct you on the

-08:-54:-17 **13** issue generally of a conspiracy and I may indicate at that time

-08:-54:-17 **14** that there may be some specific purpose for which you can

01:56:43 **15** consider items that were not shared as to other defendants.

-08:-54:-17 **16** But for now, and until I give you that instruction, any items

01:56:56 **17** about which the agent will be testifying that were not shared

01:57:02 **18** and as to which the government does not show sharing, they may

01:57:07 **19** be considered only as to Mr. Amawi.  And when and if there's

01:57:14 **20** testimony as to items retrieved from Mr. El-Hindi in the

01:57:20 **21** computer, the same instruction will maintain.  In other words,

-08:-54:-17 **22** if shared, the evidence with another defendant, you can consider

-08:-54:-17 **23** it with regard to that other defendant, or shared with Mr.

-08:-54:-17 **24** Griffin.

-08:-54:-17 **25** Okay, Counsel, for now?

4937

01:57:36 **1**          MR. HERDMAN:  Thank you.

01:57:37 **2**          MR. HARTMAN:  Yes, Your Honor.

01:57:40 **3**          THE COURT:  Okay.  Mr. Herdman, to the extent you

-08:-54:-17 **4** can recall or somebody can point out --

-08:-54:-17 **5**          MR. HERDMAN:  Where we were.

-08:-54:-17 **6**          THE COURT:  When something fits in that slot or

01:57:52 **7** not.

-08:-54:-17 **8**          MR. HERDMAN:  Certainly.

01:57:53 **9**          THE COURT:  And you may continue.

-08:-54:-17 **10**          MR. HERDMAN:  I think we were on Exhibit 27-2, page

-08:-54:-17 **11** 2.

01:58:03 **12** BY MR. HERDMAN:

01:58:04 **13**     **Q.**   Agent Gubanich, I had directed your attention to Exhibit

01:58:08 **14** 27-1K, which was big1.ram?

01:58:14 **15**     **A.**   Yes.

-08:-54:-17 **16**     **Q.**   I'm going to show you quickly, at least with respect to

-08:-54:-17 **17** this exhibit, what's been marked and entered into evidence as

-08:-54:-17 **18** Government's Exhibit 15.

01:59:04 **19**          MR. HERDMAN:  May I approach the witness, Your

-08:-54:-17 **20** Honor?

-08:-54:-17 **21**          THE COURT:  Uh-huh.

01:59:07 **22** BY MR. HERDMAN:

-08:-54:-17 **23**     **Q.**   Agent Gubanich, I'm showing you what's been marked

01:59:10 **24** Government's Exhibit 15.   Take a look that, please.

-08:-54:-17 **25**          Do you recognize anything that's written on that

01:59:16 **1**   CD?

-08:-54:-17 **2**        **A.**   I recognize the file name big1.ram.

01:59:21 **3**        **Q.**   Now, if I could direct your attention back to the second

-08:-54:-17 **4**   page here of 27-2.   You said there were six files, big 1

01:59:32 **5**   through big 6?

01:59:34 **6**        **A.**   Correct.

-08:-54:-17 **7**        **Q.**   Did you view all these files?

01:59:36 **8**        **A.**   I did.

01:59:37 **9**        **Q.**   Directing your attention specifically to Exhibit 27-1M.

-08:-54:-17 **10**  Big3.ram.   Was there anything of significance on that

-08:-54:-17 **11**  particular file?

-08:-54:-17 **12**       **A.**   Yes.   There is a period of time during this video in

-08:-54:-17 **13**  which there is a tactical training going on during the video.

-08:-54:-17 **14**       **Q.**   And what kind of training are you referring to when you

-08:-54:-17 **15**  talk about "tactical training"?

-08:-54:-17 **16**       **A.**   For example, there are room clearing techniques that are

02:00:05 **17**  shown.   By that I mean people would go into a room and secure

-08:-54:-17 **18**  the room with weapons.   And there's also some hand-to-hand

02:00:16 **19**  combat techniques shown.   There are some weapons firing

02:00:20 **20**  techniques shown, among others.

02:00:23 **21**       **Q.**   What kind of weapons in particular, do you remember?

02:00:26 **22**       **A.**   There are rifles.   There are also shoulder-fired

02:00:29 **23**  missiles that are shown.

02:00:33 **24**       **Q.**   Now, was this -- you said before that this big 1 through

-08:-54:-17 **25**  big 6, there seemed to be six parts of a series?

4939

02:00:41 **1**   **A.**   Yes.

-08:-54:-17 **2**   **Q.**   Was any part of that series recreated elsewhere on this

02:00:46 **3**  CD?

-08:-54:-17 **4**   **A.**   Yes.   There was a file that seemed to encompass

02:00:51 **5**  multiple sections of big 1 through big 6.

-08:-54:-17 **6**   **Q.**   Do you see that particular file here on the screen?

02:01:04 **7**  Directing your attention to 27-AA?

02:01:12 **8**   **A.**   Yes.

-08:-54:-17 **9**   **Q.**   It's called max1.ram?

-08:-54:-17 **10**   **A.**   Yes.

02:01:16 **11**   **Q.**   What does that depict?

02:01:17 **12**   **A.**   That depicted many of the same scenes seen in big 1

-08:-54:-17 **13**  through big 6, only the extended versions pull in one file or

-08:-54:-17 **14**  many of them inputted into one longer file.

-08:-54:-17 **15**   **Q.**   I'd like to direct your attention on the third page of

-08:-54:-17 **16**  this document, Exhibit AU.   Can you zoom in on that, at AU?

02:01:48 **17**   **A.**   Yes.

-08:-54:-17 **18**   **Q.**   That's an Arabic file name there?

-08:-54:-17 **19**   **A.**   Yes.

02:01:51 **20**   **Q.**   What was the translated name of that file?

-08:-54:-17 **21**   **A.**   Artillery education.

02:01:57 **22**         MR. HERDMAN:  If I could have a moment.

02:02:11 **23**  BY MR. HERDMAN:

02:02:11 **24**   **Q.**   While he's doing that, can you describe to the jury what

02:02:15 **25**  27-1U depicted?

-08:-54:-17 **1**      **A.**    It appeared to be a lengthy manual in Arabic that had

02:02:21 **2** diagrams and apparently instructions on how to fire --

02:02:26 **3**           MR. HARTMAN:  I'm going to object.

-08:-54:-17 **4**           THE COURT:  I would agree.   So just disregard

-08:-54:-17 **5** after the word "apparently".

02:02:51 **6** BY MR. HERDMAN:

02:02:51 **7**      **Q.**    Is that the manual that you just described for the jury?

-08:-54:-17 **8**      **A.**    Yes.

-08:-54:-17 **9**           MR. HERDMAN:  Can we go to page 28?

-08:-54:-17 **10** BY MR. HERDMAN:

02:03:03 **11**      **Q.**    Does that depict some of what you were describing to the

-08:-54:-17 **12** jury?

02:03:07 **13**      **A.**    Yes.

-08:-54:-17 **14**      **Q.**    Go to the next page.   This is page 29.   And if we

02:03:13 **15** could go to page 68.

02:03:18 **16**         Again, you don't understand Arabic, correct?

-08:-54:-17 **17**      **A.**    Correct.

-08:-54:-17 **18**      **Q.**    Did you review this with a translator?

-08:-54:-17 **19**      **A.**    I did.

02:03:31 **20**      **Q.**    Now I'd like to direct your attention to Exhibit 48.

-08:-54:-17 **21**         Did you review Exhibit 48 as part of your review of

-08:-54:-17 **22** the computer evidence in this case?

02:03:47 **23**      **A.**    Yes, I did.

02:03:48 **24**      **Q.**    Exhibit 48, this is a disc, was that given to Darren

-08:-54:-17 **25** Griffin from Mohammad Amawi?

-08:-54:-17 **1**  **A.**  Yes.

02:03:57 **2**  **Q.**  I'd like to direct your attention to 48-1.

-08:-54:-17 **3**  What is that, Agent Gubanich?

02:04:05 **4**  **A.**  That is the file listings of the contents of that CD.

02:04:10 **5**  **Q.**  Go to 48-2.  What is that?

-08:-54:-17 **6**  **A.**  Those are the same file listings but also two additional

02:04:21 **7**  columns for the translation and notes.

02:04:25 **8**  MR. HERDMAN:  Your Honor, at this point in time I'd

02:04:28 **9**  offer Exhibit 48-1 into evidence, and 48-2 I'd offer subject to

-08:-54:-17 **10**  connection.

02:04:34 **11**  MR. BOSS:  Your Honor, may we approach for just a

-08:-54:-17 **12**  moment?

-08:-54:-17 **13**  (Whereupon the following discussion was had at the

02:15:51 **14**  bench outside the hearing of the jury:)

02:15:51 **15**  MR. BOSS:  Judge, the document that is 48-2 that

-08:-54:-17 **16**  they're offering into evidence --  You're offering…

-08:-54:-17 **17**  MR. HERDMAN:  Subject to connection.

-08:-54:-17 **18**  MR. BOSS:  -- is essentially this portion of 48

-08:-54:-17 **19**  that we've been provided.  It contains on it basically

-08:-54:-17 **20**  commentary.  For instance, on 48-1A3, Al-Rahman is one of the

-08:-54:-17 **21**  names of God.  So it's containing hearsay.  It isn't just a

-08:-54:-17 **22**  translation.  It isn't --

-08:-54:-17 **23**  THE COURT:  I would agree with that.

-08:-54:-17 **24**  MR. HERDMAN:  Those are notes made by the

-08:-54:-17 **25**  translator himself.  And they are simply explanatory.  For

-08:-54:-17  1  instance, I know this one in particular, it's not just the name

-08:-54:-17  2  Al-Rahman, but it actually means something in particular.   The

-08:-54:-17  3  literal interpretation is Al-Rahman, but there's a connotation

-08:-54:-17  4  to that word as well that's important if you're a translator.

-08:-54:-17  5  These are notes that that translator made.   They'll be the

-08:-54:-17  6  subject of his testimony.

-08:-54:-17  7            THE COURT:  Will he testify?

-08:-54:-17  8            MR. HERDMAN:  Yes, Your Honor.

-08:-54:-17  9            THE COURT:  Okay.

-08:-54:-17  10           MR. HERDMAN:  I should say, Mr. Boss asked a

-08:-54:-17  11  question --

-08:-54:-17  12           THE COURT:  I'm going to permit this to come in

-08:-54:-17  13  subject to being -- do you have to display that now?

-08:-54:-17  14           MR. HERDMAN:  I suppose I don't.

-08:-54:-17  15           THE COURT:  Then let's not.   Then when the

-08:-54:-17  16  translator comes --

-08:-54:-17  17           MR. HERDMAN:  The only exception would be Mr. Boss

-08:-54:-17  18  asked me a question previously to that sidebar with respect to

-08:-54:-17  19  who made the notes and I did remember that Agent Gubanich placed

-08:-54:-17  20  certain URLs relating to web pages.  There were shortcuts on

-08:-54:-17  21  certain discs that contain links to web pages.   He was able to

-08:-54:-17  22  determine what the URL was by simply right clicking the page.

-08:-54:-17  23  He put those into the notes.   I could have him testify to each

-08:-54:-17  24  URL, but it's going to take a long time.  That would be the only

-08:-54:-17  25  exception with respect to using these until the translator

-08:-54:-17  **1**  testifies.

-08:-54:-17  **2**  THE COURT:  Fine.  Those aren't in the right-hand

-08:-54:-17  **3**  column?

-08:-54:-17  **4**  MR. HERDMAN:  He has his own notes.  It may take a

-08:-54:-17  **5**  little longer doing it this way, but he has his own notes.

-08:-54:-17  **6**  THE COURT:  Up there, you mean?

-08:-54:-17  **7**  MR. HARTMAN:  The part they're offering are these

-08:-54:-17  **8**  columns.

-08:-54:-17  **9**  THE COURT:  If you can display it to the jury

-08:-54:-17  **10**  without that, then when the translator comes in, that's fine.

-08:-54:-17  **11**  Well, the translator is going to come in and say this, right?

-08:-54:-17  **12**  MR. HERDMAN:  Yes.

-08:-54:-17  **13**  THE COURT:  I will indicate, ladies and

-08:-54:-17  **14**  gentlemen -- or I'll indicate nothing.   You're going to tie it

-08:-54:-17  **15**  up so you can display it.  The objection will be overruled.

-08:-54:-17  **16**  MR. MILLER:  Just so I understand Your Honor's

-08:-54:-17  **17**  ruling, my intention is to have the translator basically say

-08:-54:-17  **18**  these are translations, that's in his notes regarding the

-08:-54:-17  **19**  translation, but not to necessarily walk through every item.

-08:-54:-17  **20**  THE COURT:  That's fine.   Whatever they want,

-08:-54:-17  **21**  whatever they don't object to, and go to item number whatever,

-08:-54:-17  **22**  fine.   The jury can consider it.

-08:-54:-17  **23**  MR. SOFER:  He'll be subject to cross-examination

-08:-54:-17  **24**  on all this.

-08:-54:-17  **25**  THE COURT:  Of course.

-08:-54:-17 **1**      Now, on the URL, whatever you want to do as long as

-08:-54:-17 **2** they don't object.

-08:-54:-17 **3**      MR. HERDMAN:  I can take 30 seconds and direct your

-08:-54:-17 **4** attention to it now, Your Honor.

-08:-54:-17 **5**      THE COURT:  My attention or their attention?

-08:-54:-17 **6**      THE COURT:  Your attention and Counsels'.   If they

-08:-54:-17 **7** want to object to it, we can get it out of the way.

-08:-54:-17 **8**      (Discussion had off the record.)

-08:-54:-17 **9**      MR. HERDMAN:  This is from Exhibit 139 A-2.   And

-08:-54:-17 **10** this is starting with Exhibit A-8, a directory called "Jihad".

-08:-54:-17 **11** Then are a number of notes on the side here.   It says shortcut

-08:-54:-17 **12** to -- for instance, the first one is A8A.   The file name is

-08:-54:-17 **13** albasrah.net.   The note is that this is the shortcut to

-08:-54:-17 **14** http://www.albasrah.net.  In terms of his testimony, Agent

-08:-54:-17 **15** Gubanich's testimony, he's going to say he was able to determine

-08:-54:-17 **16** that was the URL associated with this web shortcut.

-08:-54:-17 **17**      MR. HARTMAN:  Can defense counsel have a moment to

-08:-54:-17 **18** conference on this?

-08:-54:-17 **19**      THE COURT:  Sure.   Define "a moment."

-08:-54:-17 **20**      MR. HARTMAN:  90 seconds in here.

-08:-54:-17 **21**      (End of sidebar discussion.)

-08:-54:-17 **22**      THE COURT:  Ladies and gentlemen, we're going to

-08:-54:-17 **23** take a short break.  We'll be back in business shortly.

-08:-54:-17 **24**      (Discussion had off the record.)

-08:-54:-17 **25**      (Whereupon the following discussion was had at the

4945

-08:-54:-17 **1** bench outside the hearing of the jury:)

-08:-54:-17 **2**          MR. HELMICK:   With regard to this particular

-08:-54:-17 **3** exhibit, Your Honor, I think our concern, our objection is there

-08:-54:-17 **4** are those comments.

-08:-54:-17 **5**          MR. WITMER-RICH:  We're talking now about the

-08:-54:-17 **6** translation notes.

-08:-54:-17 **7**          MR. HELMICK:   Why would those go in as an Exhibit

-08:-54:-17 **8** from the government into evidence and couldn't we instead simply

-08:-54:-17 **9** have them print a copy that deletes that column from the

-08:-54:-17 **10** spreadsheet so that everything else can go in by way of

-08:-54:-17 **11** reference but those particular comments or notes would be

-08:-54:-17 **12** omitted or removed from the exhibit?

-08:-54:-17 **13**          THE COURT:  Because otherwise, to the extent that

-08:-54:-17 **14** it has any probative value, the jurors aren't going to know.

-08:-54:-17 **15**          MR. HERDMAN:  It's the part left over from the

-08:-54:-17 **16** fold, Agent Gubanich's notes.

-08:-54:-17 **17**          THE COURT:  Alternatively, we can add these to the

-08:-54:-17 **18** definitions.   I think they're entitled to know.  Or do you

-08:-54:-17 **19** care?  It's up to you.

-08:-54:-17 **20**          MR. HERDMAN:  I just think in terms of the

-08:-54:-17 **21** comprehension of these exhibits, it makes sense to have

-08:-54:-17 **22** something --

-08:-54:-17 **23**          THE COURT:  I agree.

-08:-54:-17 **24**          MR. HERDMAN:  Some of these are cities.

-08:-54:-17 **25** Albasrah.net is a city somewhere.   That's important.

4946

-08:-54:-17 **1**       THE COURT:  I agree.   To the extent that they may

-08:-54:-17 **2** be inaccurately translated, that can be brought out.   And if

-08:-54:-17 **3** they're not, then I think in terms of the jury's understanding

-08:-54:-17 **4** what a term means, is entirely appropriate.

-08:-54:-17 **5**       MR. HERDMAN:  What I would say, Your Honor --

-08:-54:-17 **6**       THE COURT:  You've won.

-08:-54:-17 **7**       MR. HERDMAN:  Well, if there's specific objections,

-08:-54:-17 **8** I would say, Counsel, bring them to my attention, and we might

-08:-54:-17 **9** be able to work it out somehow.

-08:-54:-17 **10**       MR. WITMER-RICH:  To the extent that specific terms

-08:-54:-17 **11** need to be explained through evidence, we're not objecting to

-08:-54:-17 **12** the translation of the name of the file, but then there's kind

-08:-54:-17 **13** of an explanation of what a bunch of stuff means.

-08:-54:-17 **14**       THE COURT:  Like what?  Show me.   I was looking at

-08:-54:-17 **15** the translation.

-08:-54:-17 **16**       MR. WITMER-RICH:  Like "Havage" means South

-08:-54:-17 **17** America.

-08:-54:-17 **18**       THE COURT:  Saudi Arabia.   This means a

-08:-54:-17 **19** collection.

-08:-54:-17 **20**       If there's disagreement as to whether the

-08:-54:-17 **21** translation is accurate, that can be brought out.   I'm going to

-08:-54:-17 **22** allow it.

-08:-54:-17 **23**       MR. HERDMAN:  Just for the record, so it's clear,

-08:-54:-17 **24** what Mr. Witmer-Rich is referring to are files that actually

-08:-54:-17 **25** have Latin letters.   They're not Arabic letters.   So it's

-08:-54:-17  **1**  actually an Arabic word that's been translated into our

-08:-54:-17  **2**  alphabet.   So the translator felt more comfortable putting it

-08:-54:-17  **3**  down as a note rather than a translation.

-08:-54:-17  **4**        THE COURT:  I'm going to overrule the objection,

-08:-54:-17  **5**  move on down the road.

-08:-54:-17  **6**        (End of sidebar.)

02:15:59  **7**        THE COURT:  Okay.  You may resume.

-08:-54:-17  **8**        MR. HERDMAN:  Thank you, Your Honor.

02:16:05  **9**  BY MR. HERDMAN:

02:16:06  **10**     Q.   I think we were discussing Exhibit 48.   This is 48-2

-08:-54:-17  **11**  that's on the screen there.   And, Agent Gubanich, can you just

-08:-54:-17  **12**  again just generally describe on this particular Exhibit 48 what

-08:-54:-17  **13**  were some of the things that were on this CD?

02:16:28  **14**     A.   Can I refer to some notes?

02:16:35  **15**     Q.   Absolutely.  By the way, how many files or directories

02:17:17  **16**  did you review on Government's Exhibit 48?

-08:-54:-17  **17**     A.   I believe there's approximately 106.

-08:-54:-17  **18**     Q.   I didn't ask you this, but with respect to the one we

-08:-54:-17  **19**  just looked at, which is Exhibit 27, how many files or

-08:-54:-17  **20**  directories did you review on that disc?

-08:-54:-17  **21**     A.   Approximately 90.

02:17:34  **22**     Q.   Now, I'd like to direct your attention specifically

-08:-54:-17  **23**  to -- on this Exhibit 48, Exhibit 48-1B.  What was that

02:17:46  **24**  particular exhibit?

02:17:47  **25**     A.   That is a file folder or directory in Arabic that was

-08:-54:-17 **1** translated for me.

-08:-54:-17 **2**     Q.   What was the translated name of that particular

-08:-54:-17 **3** directory?

02:18:01 **4**     A.   The translated name was Jihad.

02:18:05 **5**     Q.   Can you just describe generally for the jury what were

-08:-54:-17 **6** some of the items that were contained within that directory?

02:18:13 **7**     A.   Some of the items included a U.S. and Coalition Force

02:18:17 **8** operations, IED attacks, media reports about different types of

02:18:26 **9** attacks, REG attacks and --

02:18:31 **10**         THE COURT:   Your voice is trailing off there.

-08:-54:-17 **11** And speak into the microphone.

02:18:41 **12**     A.   Vehicle borne improvised explosive device tactics.

02:18:41 **13** BY MR. HERDMAN:

-08:-54:-17 **14**     Q.   The contents of that file folder that was named Jihad,

-08:-54:-17 **15** how are these -- the actual files that were within that

02:18:55 **16** directory, how are they designated on this list here, 48-2?

02:19:01 **17**     A.   They're designated with the letter B.   Then a numerical

-08:-54:-17 **18** number after that.

02:19:07 **19**     Q.   So B-16 would be the last file.   This would be the

02:19:16 **20** second page.   B-16 would be the last file in that particular

02:19:20 **21** directory?

-08:-54:-17 **22**     A.   That's correct.

02:19:22 **23**     Q.   I would like to direct your attention to, on the same

-08:-54:-17 **24** page here, 48-1C.   What was that?

-08:-54:-17 **25**     A.   That was, again, a file folder or directory.

02:19:35  1    **Q.**    What was contained within that -- let me back up a

02:19:40  2    second.   What was the name of that directory?

02:19:42  3    **A.**    It was in Arabic, but it was translated for me as

-08:-54:-17  4    military lessons, (audio)for Sheik Yusif Al-Uyari, spelled the

-08:-54:-17  5    way it's on there, Y-U-S-I-F, A-L-U-Y-A-R-I.  God have mercy on

02:20:16  6    him.

-08:-54:-17  7    **Q.**    Within that directory, what were some of the things that

02:20:21  8    were within that directory?

-08:-54:-17  9    **A.**    Within this directory there were audio files that ranged

-08:-54:-17  10   in length from 23 minutes to over an hour, some cases an hour

-08:-54:-17  11   and a half.

02:20:34  12   **Q.**    What language were those audio files in?

-08:-54:-17  13   **A.**    Those were in Arabic.

-08:-54:-17  14   **Q.**    Were they organized in any way in that directory?

-08:-54:-17  15   **A.**    Yes, they were organized in sub directories or sub file

-08:-54:-17  16   folders.

02:20:45  17   **Q.**    And can you just explain for the jury how they were

02:20:48  18   organized?

-08:-54:-17  19   **A.**    There was a file folder with a lesson number on it and

02:20:55  20   name.   And then within that file folder contained several

-08:-54:-17  21   files.

02:20:59  22   **Q.**    And the files that were within the lesson file or the

-08:-54:-17  23   lesson folder, what form were the files within the lesson

-08:-54:-17  24   folder?

-08:-54:-17  25   **A.**    They were ZIP archive files.

02:21:14  **1**   **Q.**   We'll have somebody explain later what a zip file is,

02:21:18  **2**   but ultimately what was the format of the file that you

-08:-54:-17  **3**   reviewed?

-08:-54:-17  **4**   **A.**   It was an audio -- I forget which software played it,

-08:-54:-17  **5**   but an audio file.

02:21:30  **6**   **Q.**   Directing your attention specifically to 48-1C2.   What

-08:-54:-17  **7**   was the name of that particular lesson?

02:21:40  **8**   **A.**   The translation of it is:   Lesson 1, The Athletic Course

-08:-54:-17  **9**   for the Mujahid.

02:21:48  **10**   **Q.**   I'd like to direct your attention to 48-1C4.   What was

-08:-54:-17  **11**   the title?

02:21:57  **12**   **A.**   Lesson 2, Introduction to Guerilla Warfare.

02:22:01  **13**   **Q.**   Directing your attention to 48-1C3.  What was the title

-08:-54:-17  **14**   of that lesson?

02:22:07  **15**   **A.**   Lesson 3, Introduction to the Weapon of Signals.

02:22:15  **16**         MR. HERDMAN:   If we could go to the next page.

02:22:19  **17**   BY MR. HERDMAN:

-08:-54:-17  **18**   **Q.**   Directing your attention to 48-1C6, what was the name of

-08:-54:-17  **19**   that lesson?

-08:-54:-17  **20**   **A.**   Lesson 4, Fighting Equals Defense Plus Offense.

-08:-54:-17  **21**   **Q.**   Directing your attention to 48-1C5.   What was the name

-08:-54:-17  **22**   of that lesson?

-08:-54:-17  **23**   **A.**   Lesson 5, Urban Warfare.

02:22:41  **24**   **Q.**   Directing your attention to 48-1C7, what was the title

-08:-54:-17  **25**   of that lesson?

4951

| | | |
|---|---|---|
| 02:22:48 | **1** | **A.**    Lesson 6, Introduction to the Weapon of Electronic |
| -08:-54:-17 | **2** | Navigation. |
| 02:22:56 | **3** | **Q.**    I'd now like to direct your attention, Agent Gubanich, |
| -08:-54:-17 | **4** | to Exhibit 49.    Did you review this particular exhibit during |
| -08:-54:-17 | **5** | the course of the investigation? |
| -08:-54:-17 | **6** | **A.**    Yes, I did. |
| -08:-54:-17 | **7** | **Q.**    This is a copy of a disc that was provided from Mohammad |
| -08:-54:-17 | **8** | Amawi to Darren Griffin? |
| 02:23:18 | **9** | **A.**    I believe that's correct. |
| 02:23:21 | **10** | **Q.**    And showing you 49-1, what is that, Agent Gubanich? |
| 02:23:28 | **11** | **A.**    That is a listing of the files contained on that disc. |
| 02:23:33 | **12** | **Q.**    Showing you 49-2, what is that, Agent Gubanich? |
| 02:23:40 | **13** | **A.**    That is the same file with the addition of the |
| 02:23:44 | **14** | translations and the notes. |
| 02:23:47 | **15** | MR. HERDMAN:  At this point in time I'd offer 49-1 |
| 02:23:50 | **16** | into evidence and 49-2 subject to connection. |
| -08:-54:-17 | **17** | MR. HARTMAN:  Did he say that had translation? |
| 02:23:57 | **18** | MR. HERDMAN:  I believe he did. |
| 02:24:00 | **19** | THE WITNESS:  In some cases. |
| 02:24:02 | **20** | THE COURT:  In light of our prior conversation, it |
| 02:24:06 | **21** | will be admitted subject to that condition.    And taking |
| 02:24:12 | **22** | counsels' comments into account, both prosecution and defense. |
| 02:24:20 | **23** | BY MR. HERDMAN: |
| 02:24:21 | **24** | **Q.**    Agent Gubanich, with respect to Exhibit 49, how many |
| 02:24:25 | **25** | files were contained on that particular compact disc? |

02:24:28 **1**   A.   I found approximately 588 files or directories.

02:24:33 **2**   Q.   Can you give the jury a general idea of what type of

02:24:36 **3** files or directories were located on this CD?

02:24:39 **4**   A.   Sure.   There were files such as web links or shortcuts

-08:-54:-17 **5** to internet websites that were saved such that the person could

-08:-54:-17 **6** go back to a specific website if desired.   There were also

02:25:03 **7** files that were contained elsewhere in the case that contained

-08:-54:-17 **8** rocket attacks and IED attacks.   There were publications in

02:25:15 **9** Arabic.

02:25:20 **10**   Q.   I'd like to direct your attention specifically to

02:25:24 **11** Exhibit A-1.   This is going to be 49-1.   A-1G.   I believe

-08:-54:-17 **12** it's on the third page of this particular document.

-08:-54:-17 **13**         Do you see Exhibit A-1G on there, Agent Gubanich?

-08:-54:-17 **14**   A.   Yes, I do.

-08:-54:-17 **15**   Q.   What was Exhibit A-1G?

-08:-54:-17 **16**   A.   It was an electronic file folder or directory named

-08:-54:-17 **17** "Jehad."

-08:-54:-17 **18**   Q.   That was the spelling?   That was the spelling of the

-08:-54:-17 **19** actual directory?

-08:-54:-17 **20**   A.   Yes.

02:26:06 **21**   Q.   What was contained within that particular directory?

02:26:11 **22**   A.   It contained approximately 15 shortcuts to different

02:26:16 **23** websites.

02:26:18 **24**   Q.   I see on the screen here in the original file name

-08:-54:-17 **25** there's something that's written.   What was -- what was that?

4953

| | | |
|---|---|---|
| -08:-54:-17 | **1** | Can you explain what that actual file name refers to there? |
| 02:26:32 | **2** | And that is for -- let's just take, for an example, A-1G1. |
| 02:26:41 | **3** | **A.**  That particular A-1G1 is a website address. |
| 02:26:46 | **4** | **Q.**  Now, the way -- can you explain for the jury how it |
| -08:-54:-17 | **5** | appears on a computer screen, this particular file? |
| 02:26:54 | **6** | **A.**  It appears as an icon for an internet browser, like the |
| 02:27:01 | **7** | Internet Explorer icon. |
| -08:-54:-17 | **8** | **Q.**  Does it have that name attached to the icon? |
| 02:27:06 | **9** | **A.**  Yes. |
| -08:-54:-17 | **10** | **Q.**  Now, if you look over in the third column it says in the |
| -08:-54:-17 | **11** | notes column, if you follow across on Exhibit A-1G1, there's |
| 02:27:14 | **12** | something written in that particular column? |
| 02:27:16 | **13** | **A.**  Yes. |
| -08:-54:-17 | **14** | **Q.**  What is that that's there? |
| -08:-54:-17 | **15** | **A.**  That is if the website that is associated with or is |
| -08:-54:-17 | **16** | pointed to by that particular web link or web shortcut. |
| -08:-54:-17 | **17** | **Q.**  So how were you able to get that information containing |
| -08:-54:-17 | **18** | that website location? |
| -08:-54:-17 | **19** | **A.**  When you're reviewing the files, if you right click on |
| -08:-54:-17 | **20** | the icon, the shortcut icon, and go to Properties, it will list |
| -08:-54:-17 | **21** | the property, the address to which the link points to. |
| 02:27:50 | **22** | **Q.**  So maybe just by way of explanation, if you clicked on |
| 02:27:54 | **23** | the icon, the name that's written in the original file name |
| 02:27:58 | **24** | there, www.alqassam.net, once you clicked on that icon would |
| -08:-54:-17 | **25** | your computer then take you to the website that's listed under |

02:28:11 **1** A-1G1 in the notes section?

-08:-54:-17 **2**  **A.**  That's correct.

02:28:16 **3**  **Q.**  You said there were how many of these websites located

-08:-54:-17 **4** in this particular directory?

-08:-54:-17 **5**  **A.**  Approximately 15.

02:28:22 **6**  **Q.**  And they are designated as -- how are they designated in

-08:-54:-17 **7** terms of exhibits?

02:28:27 **8**  **A.**  A-1G1 through A-1G15.

-08:-54:-17 **9**  **Q.**  Can you go to the next page?  Do you see the rest of

-08:-54:-17 **10** the files that were contained in that directory on this page?

-08:-54:-17 **11** This is the fourth page.

02:28:53 **12**  **A.**  Yes.

02:28:58 **13**  **Q.**  I'd like to direct your attention as well to Exhibit B-2

02:29:26 **14** which, I believe, is on the 12th page -- 14th page.  Do you see

-08:-54:-17 **15** Exhibit 59-B2?

-08:-54:-17 **16**  **A.**  Yes.

-08:-54:-17 **17**  **Q.**  Does that look similar to something else you reviewed

02:29:54 **18** during the course of your investigation?

-08:-54:-17 **19**  **A.**  Yes, it appears to be a directory and contents that were

-08:-54:-17 **20** found on another exhibit, specifically 27-1.

02:30:04 **21**  **Q.**  Just for the record, what is the name of that particular

-08:-54:-17 **22** exhibit?

-08:-54:-17 **23**  **A.**  The Heroes of Palestine.

02:30:10 **24**  **Q.**  Did it contain the same times that were in that

02:30:14 **25** particular directory that was on Exhibit 27?

-08:-54:-17   **1**      **A.**   Yes, I believe it did.

02:30:21   **2**      **Q.**   Can you go to the next page?   Go to the next page.

-08:-54:-17   **3**   And go to the next page.   Next page.

02:30:46   **4**           I'd like to direct your attention to Exhibit B4B.

02:30:54   **5**      **A.**   Yes.

-08:-54:-17   **6**      **Q.**   Do you recognize that?

02:30:56   **7**      **A.**   I do.

-08:-54:-17   **8**      **Q.**   What is that?

02:31:00   **9**      **A.**   The file name is IraqMojahidin1.ram

02:31:13   **10**      **Q.**   I'm going to show you what's been entered into evidence

-08:-54:-17   **11**   at Government's Exhibit 26. I show you Government's Exhibit 26.

02:31:40   **12**   Do you recognize anything on that CD?

-08:-54:-17   **13**      **A.**   Yes, the file name.

-08:-54:-17   **14**      **Q.**   How does that file name compare to Exhibit 49-1B4D?

02:31:52   **15**      **A.**   It's the same file name.

-08:-54:-17   **16**      **Q.**   Was that file on Exhibit 49, was that contained in a

-08:-54:-17   **17**   directory?   You say what a directory is.   Is that particular

-08:-54:-17   **18**   file, 49-1B4B, was that contained in a directory on that CD?

-08:-54:-17   **19**      **A.**   Yes.

-08:-54:-17   **20**          THE COURT:   What was the translated name?

02:32:12   **21**          THE WITNESS:   Americans' Hell in Iraq.

02:32:12   **22**   BY MR. HERDMAN:

02:32:28   **23**      **Q.**   Did you review Government's Exhibit 59?

-08:-54:-17   **24**      **A.**   Yes, I did.

-08:-54:-17   **25**      **Q.**   That's also a CD that was given from Mohammad Amawi to

-08:-54:-17  **1**  Darren Griffin?

-08:-54:-17  **2**    **A.**   Yes, I believe that's correct.

-08:-54:-17  **3**    **Q.**   A copy of that CD at least?

-08:-54:-17  **4**    **A.**   Uh-huh.

02:32:38  **5**    **Q.**   And I show you Exhibit 59-1.   What is that?

02:32:47  **6**    **A.**   That is the file listings for that compact disc.

02:32:56  **7**    **Q.**   Showing you exhibit 59-2.  What is that?

02:33:03  **8**    **A.**   That is the file listings with the addition of the

02:33:06  **9**  translation column and notes column.

-08:-54:-17  **10**          MR. HERDMAN:  Your Honor, at this point in time I'd

-08:-54:-17  **11**  offer Exhibit 59-1 into evidence, and 59-2 subject to

02:33:19  **12**  connection.

02:33:19  **13**          THE COURT:  Same ruling.

02:33:22  **14**          MR. HERDMAN:   I'm going to move to Government's

02:33:24  **15**  Exhibit 60 now.

02:33:24  **16**  BY MR. HERDMAN:

02:33:24  **17**

-08:-54:-17  **18**    **Q.**   Agent Gubanich, what is Exhibit 60?  Is that a CD you

-08:-54:-17  **19**  reviewed?

02:33:34  **20**    **A.**   Yes.

-08:-54:-17  **21**    **Q.**   That's a copy of a CD provided from Mohammad Amawi to

-08:-54:-17  **22**  Darren Griffin?

-08:-54:-17  **23**    **A.**   I believe that's correct.

02:33:39  **24**    **Q.**   I show you 60-1.   What is that?

02:33:46  **25**    **A.**   That's a listing of the file names contained on that CD.

| | | | |
|---|---|---|---|
| -08:-54:-17 | **1** | **Q.** | Showing you 60-2. |
| 02:33:53 | **2** | **A.** | That's the second page. |
| 02:33:58 | **3** | **Q.** | 60-2? |
| 02:34:00 | **4** | **A.** | That is the file names with the addition of the |
| -08:-54:-17 | **5** | | translation and the notes. |
| -08:-54:-17 | **6** | | MR. HERDMAN:  Again, Your Honor, I'd offer 60-1 and |
| 02:34:08 | **7** | | 60-2 into evidence, 60-2 subject to connection. |
| 02:34:15 | **8** | | THE COURT:  Same ruling. |
| 02:34:18 | **9** | | BY MR. HERDMAN: |
| -08:-54:-17 | **10** | **Q.** | I want to point out one file in here.   60-1W.   Do you |
| -08:-54:-17 | **11** | | see that exhibit on here? |
| 02:34:24 | **12** | **A.** | Yes. |
| 02:34:25 | **13** | **Q.** | What was that file? |
| -08:-54:-17 | **14** | **A.** | The file name for that is translated to:  Urban Warfare. |
| 02:34:34 | **15** | **Q.** | What kind of file was that? |
| 02:34:37 | **16** | **A.** | It was an audio file that was in Arabic. |
| -08:-54:-17 | **17** | **Q.** | I'd like to direct your attention now to Exhibit 120. |
| -08:-54:-17 | **18** | | Do you recognize Exhibit 120? |
| -08:-54:-17 | **19** | **A.** | It is a thumb drive. |
| 02:34:58 | **20** | **Q.** | Did you review files contained on that thumb drive |
| 02:35:02 | **21** | | during the course of your investigation? |
| -08:-54:-17 | **22** | **A.** | Yes, I did. |
| -08:-54:-17 | **23** | **Q.** | Showing you Exhibit 120-1.   Is that similar to the |
| -08:-54:-17 | **24** | | other exhibits, it's a list of files that were contained on |
| -08:-54:-17 | **25** | | Exhibit 120? |

-08:-54:-17  **1**     **A.**   That's correct.

02:35:17   **2**     **Q.**   Showing you Exhibit 120-2, that's that same listing

-08:-54:-17  **3**   containing translations and notes?

02:35:24   **4**     **A.**   Correct.

02:35:28   **5**              MR. HERDMAN:  Your Honor, again, I'd offer 120-1

02:35:33   **6**   into evidence and 120-2 subject to connection.

02:35:36   **7**              MR. BOSS:  Can we have a foundation as to the

-08:-54:-17  **8**   source?

02:35:40   **9**   BY MR. HERDMAN:

02:35:40   **10**    **Q.**   Are you aware of where that thumb drive came from, Agent

-08:-54:-17  **11**  Gubanich?

-08:-54:-17  **12**    **A.**   I don't recall.

02:35:50   **13**             THE COURT:  Subject to connecting that up.

02:35:55   **14**             MR. HERDMAN:  I believe it's in the record, Your

02:35:58   **15**  Honor.

02:35:58   **16**             THE COURT:  I believe that's correct.

02:35:59   **17**             MR. HERDMAN:  May I have a moment?

-08:-54:-17  **18**             THE COURT:  Sure.

-08:-54:-17  **19**             (Discussion had off the record.)

02:36:03   **20**             MR. HERDMAN:  My colleague points out the thumb

-08:-54:-17  **21**  drive itself is in evidence.

-08:-54:-17  **22**             THE COURT:  That's my understanding.   So subject

-08:-54:-17  **23**  to the prior rulings, the same rules as this whole series.

02:36:19   **24**  BY MR. HERDMAN:

-08:-54:-17  **25**    **Q.**   Agent Gubanich, if I can point you to just some specific

02:36:24 **1** items on here, Exhibit 120-1J, which I think is on this first

-08:-54:-17 **2** page here.

02:36:33 **3**     **A.**   Yes.

02:36:34 **4**     **Q.**   What did that particular exhibit depict?

-08:-54:-17 **5**     **A.**   It's a sniper attack on a soldier.

02:36:41 **6**     **Q.**   Could you tell what nationality the soldier was who was

-08:-54:-17 **7** the victim of that attack?

-08:-54:-17 **8**     **A.**   I could not.

-08:-54:-17 **9**     **Q.**   Were there other similar videos on this exhibit?

-08:-54:-17 **10**     **A.**   There were a variety of shooting and improvised

02:37:00 **11** explosive device attacks as well as some executions.

02:37:08 **12**     **Q.**   Now I'd like to direct your attention to Exhibit 124.

02:37:15 **13** Do you recognize that?

-08:-54:-17 **14**     **A.**   Yes.

-08:-54:-17 **15**     **Q.**   Is that the Sony Vaio laptop you presented to Mohammad

-08:-54:-17 **16** Amawi on October 17, 2006?

-08:-54:-17 **17**     **A.**   Yes.

02:37:27 **18**     **Q.**   Did you have a chance to review some of the files that

-08:-54:-17 **19** were contained on Exhibit 124?

-08:-54:-17 **20**     **A.**   Yes.

-08:-54:-17 **21**     **Q.**   I'll show you Exhibit 124-1.  Is that a listing of the

02:37:39 **22** files that you reviewed?

02:37:40 **23**     **A.**   Yes.

-08:-54:-17 **24**     **Q.**   This isn't a complete listing of all files that are on

-08:-54:-17 **25** this particular Exhibit, is it?

4960

-08:-54:-17  **1**  A.   No, it is not.

-08:-54:-17  **2**  Q.   And generally in your knowledge does a computer contain

-08:-54:-17  **3**  more files than, say, a CD or thumb drive?

-08:-54:-17  **4**  A.   Generally, yes.

-08:-54:-17  **5**  Q.   So do you have any idea just approximately how many

-08:-54:-17  **6**  files were on this particular laptop?

-08:-54:-17  **7**  A.   I don't have a good handle on that.

-08:-54:-17  **8**     THE COURT:  I can't hear you, so please speak into

02:38:07  **9**  the microphone and speak up.

02:38:08  **10**     THE WITNESS:  I don't have a good understanding of

-08:-54:-17  **11**  how many files total were on the laptop.

-08:-54:-17  **12**  BY MR. HERDMAN:

-08:-54:-17  **13**  Q.   How many did you actually review and have placed onto

-08:-54:-17  **14**  this particular --

-08:-54:-17  **15**  A.   I reviewed 126 files from that laptop.

02:38:20  **16**  Q.   And I'd like to direct your attention specifically to

02:38:25  **17**  any exhibit that you viewed that contained any photographs or

02:38:31  **18**  video of Mohammad Amawi.   Just talk about video.

02:38:37  **19**     Were there any video files that contained a

-08:-54:-17  **20**  depiction of Mohammad Amawi?

02:38:42  **21**  A.   Yes, I believe there was a video from what appears to be

02:38:46  **22**  a cell phone in which Mohammad Amawi is having a conversation

02:38:51  **23**  with somebody else.   He's, I believe, lying on the couch.

02:38:57  **24**  Q.   If we could go to Exhibit 124-1AP.

-08:-54:-17  **25**     MR. HERDMAN:  Your Honor, I'd ask permission to

-08:-54:-17  **1**  play that particular exhibit at this point in time.

02:39:22  **2**  THE COURT:  You may.

02:39:29  **3**  MR. IVEY:  Objection, Your Honor.  Can we stop it?

02:39:32  **4**  THE COURT:  Hold on a second.  Time out.

-08:-54:-17  **5**  (Whereupon the following discussion was had at the

02:43:36  **6**  bench outside the hearing of the jury:)

02:43:36  **7**  MR. IVEY:  We don't know what this is.

-08:-54:-17  **8**  THE COURT:  What are we going to see?

-08:-54:-17  **9**  MR. HERDMAN:  It's -- the agent described it.

-08:-54:-17  **10**  It's a cell phone video that shows Mohammad Amawi essentially

-08:-54:-17  **11**  laying on a couch while other people are talking around him.

-08:-54:-17  **12**  THE COURT:  So…

-08:-54:-17  **13**  MR. HERDMAN:  It's indicia of ownership,

-08:-54:-17  **14**  possession, certainly relevant from our perspective in terms of

-08:-54:-17  **15**  Mr. Amawi's control and custody of this particular exhibit.

-08:-54:-17  **16**  THE COURT:  Is there any dispute about this?

-08:-54:-17  **17**  MR. HERDMAN:  I don't know what the objection is.

-08:-54:-17  **18**  MR. IVEY:  We didn't know what we were about to

-08:-54:-17  **19**  see.  We didn't want this stuff to get out before we could

-08:-54:-17  **20**  object.

-08:-54:-17  **21**  THE COURT:  I should have waited a moment.  I

-08:-54:-17  **22**  didn't hear anything.

-08:-54:-17  **23**  MR. WITMER-RICH:  So the purpose of the video is to

-08:-54:-17  **24**  show ownership and control of the laptop itself?

-08:-54:-17  **25**  MR. HERDMAN:  For this particular one, yes.

-08:-54:-17 **1**      MR. WITMER-RICH:  Because the laptop is on the

-08:-54:-17 **2** video or because the file is on the laptop or because the file

-08:-54:-17 **3** shows something about the laptop?

-08:-54:-17 **4**      MR. HERDMAN:  Because the file is on the laptop and

-08:-54:-17 **5** the file depicts Mr. Amawi.

-08:-54:-17 **6**      THE COURT:  Is there any dispute about --

-08:-54:-17 **7**      MR. SOFER:  We wouldn't play any of this if Counsel

-08:-54:-17 **8** wants to stipulate to the fact that he had ownership or control

-08:-54:-17 **9** over this.  We have to prove his -- in order to connect up

-08:-54:-17 **10** what's on it we have to show it's his and he used it.

-08:-54:-17 **11**      MR. WITMER-RICH:  We just had testimony he admitted

-08:-54:-17 **12** to owning it.

-08:-54:-17 **13**      MR. SOFER:  All these things are true.

-08:-54:-17 **14**      THE COURT:  Is there any objection on the part of

-08:-54:-17 **15** any of the defendants as to what is sought to be proved by

-08:-54:-17 **16** looking at this, namely that Mr. Amawi had possession and

-08:-54:-17 **17** control over the device?

-08:-54:-17 **18**      MR. IVEY:  No.

-08:-54:-17 **19**      MR. SOFER:  We want a stipulation to be read to the

-08:-54:-17 **20** jury then.   Otherwise I think the government's entitled to

-08:-54:-17 **21** prove this up.  We're not going to spend time putting 4,000

-08:-54:-17 **22** things from the computer on it.

-08:-54:-17 **23**      MR. HERDMAN:  If Counsels are going to say right

-08:-54:-17 **24** now affirmatively that they will stipulate to the fact Mr. Amawi

-08:-54:-17 **25** had custody control of this particular laptop.

-08:-54:-17 **1**        MR. WITMER-RICH:  For 7 months or on specific dates

-08:-54:-17 **2** or just generally?

-08:-54:-17 **3**        MR. SOFER:  That's another issue:  The files have

-08:-54:-17 **4** dates on them as well.   And so it shows his control at a

-08:-54:-17 **5** certain time.

-08:-54:-17 **6**        MR. IVEY:  There's no dispute that when Griffin

-08:-54:-17 **7** gave it to him in Jordan he had it while he was in Jordan, if

-08:-54:-17 **8** that's what you mean.

-08:-54:-17 **9**        THE COURT:  Why don't I simply say this.   Ladies

-08:-54:-17 **10** and gentlemen, there is no dispute that the laptop in which

-08:-54:-17 **11** these various files were obtained was in Mr. Amawi's possession

-08:-54:-17 **12** and control.   Period, end of discussion.  In terms of the

-08:-54:-17 **13** dates, you've got different dates, if that makes a difference

-08:-54:-17 **14** that's fine.

-08:-54:-17 **15**        MR. HERDMAN:  I would just reserve the ability to

-08:-54:-17 **16** revisit this particular issue, whatever we stipulate to in

-08:-54:-17 **17** writing.

-08:-54:-17 **18**        THE COURT:  We're not going to get done before

-08:-54:-17 **19** lunch anyway.   Why don't you guys talk during lunch.   If you

-08:-54:-17 **20** can't work it out, I would suggest giving that very simple

-08:-54:-17 **21** instruction.

-08:-54:-17 **22**        MR. HARTMAN:  Was there a time when this was under

-08:-54:-17 **23** Griffin's custody and control?

-08:-54:-17 **24**        MR. HERDMAN:  I think the evidence is the evidence

-08:-54:-17 **25** with respect to this particular item.   This is the -- this is

-08:-54:-17 **1** one of the laptops he brought over with him to Jordan.

-08:-54:-17 **2**      MR. IVEY:  Left it at the house.

-08:-54:-17 **3**      THE COURT:  I'm saying why don't you move on.

-08:-54:-17 **4** You're not going to get done with him before lunch.

-08:-54:-17 **5**      MR. SOFER:  I think the point of the objection was

-08:-54:-17 **6** they were worried there was some sort of inflammatory or

-08:-54:-17 **7** something else on there.   This is probably the least

-08:-54:-17 **8** inflammatory thing we have.

-08:-54:-17 **9**      THE COURT:  I'm saying move on and we can come back

-08:-54:-17 **10** to it.

-08:-54:-17 **11**      (End of side-bar discussion.)

02:43:39 **12**      THE COURT:  Okay.  Moving on.

02:43:54 **13** BY MR. HERDMAN:

02:43:54 **14**    **Q.**   Showing you 124-2. I'd like to direct you attention to

-08:-54:-17 **15** Exhibit 124-1BT.   I think it's on the next page -- the third

-08:-54:-17 **16** page.   The 124-1BT, Agent Gubanich, did you have a chance to

-08:-54:-17 **17** review that particular file?

-08:-54:-17 **18**    **A.**   Yes, I did.

-08:-54:-17 **19**    **Q.**   And can you just generally describe for the jury what

-08:-54:-17 **20** was depicted in that file?

02:44:34 **21**    **A.**   It appears to be the making or manufacturing of a

-08:-54:-17 **22** chemical substance, and the file name of the case is:  The

02:44:46 **23** Manufacturing of Black Powder.

02:44:48 **24**    **Q.**   And is there -- just directing your attention back to

-08:-54:-17 **25** that very quickly.   BT, in the actual file name, are there a

-08:-54:-17  1    couple words in English letters there?

-08:-54:-17  2        A.   Yes.

-08:-54:-17  3        Q.   What are those -- what is that lettering?

-08:-54:-17  4        A.   Baroodaswad.

02:45:07  5        Q.   Can you spell that for the court reporter?

02:45:09  6        A.   B-A-R-O-O-D-A-S-W-A-D.

02:45:17  7              MR. HERDMAN:  Your Honor, I think I should approach

02:45:19  8    at this point in time just to ask a question of the Court.

02:45:22  9              (Whereupon the following discussion was had at the

02:48:10  10   bench outside the hearing of the jury:)

02:48:10  11             MR. HERDMAN:  I apologize, Your Honor, I should

-08:-54:-17  12   have brought this up at our last sidebar.   I intend to play

-08:-54:-17  13   this particular video.   It's three minutes long.  We don't have

-08:-54:-17  14   a translation of it.   I think it, in essence, speaks for

-08:-54:-17  15   itself.  We would seek to play it for the jury now as well as a

-08:-54:-17  16   video to follow this which I think is about two minutes long.

-08:-54:-17  17             THE COURT:  What do they show?

-08:-54:-17  18             MR. HERDMAN:  This particular video shows the

-08:-54:-17  19   actual chemical manufacture of black powder.

-08:-54:-17  20             THE COURT:  Will there be a translation at some

-08:-54:-17  21   point?

-08:-54:-17  22             MR. HERDMAN:  There will not be.   It was the

-08:-54:-17  23   government's perspective that this video speaks for itself.

-08:-54:-17  24   Especially in light of the file name.   The next one we would

-08:-54:-17  25   seek to play is Exhibit BU, which I think is immediately

-08:-54:-17  **1** underneath that.   It shows the manufacture of the detonation

-08:-54:-17  **2** device.

-08:-54:-17  **3**          THE COURT:  You have seen it before?

-08:-54:-17  **4**          MR. HARTMAN:  Is somebody going to establish that

-08:-54:-17  **5** these were watched?

-08:-54:-17  **6**          MR. HERDMAN:  At some point in time we have

-08:-54:-17  **7** evidence that your client, in fact, watched this particular

-08:-54:-17  **8** video.

-08:-54:-17  **9**          THE COURT:  Okay.

-08:-54:-17  **10**          MR. IVEY:  I guess it's a goose/gander type thing.

-08:-54:-17  **11** We've pointed out when Amawi had stuff.   Then I think if he

-08:-54:-17  **12** doesn't have stuff --

-08:-54:-17  **13**          MR. HERDMAN:  We're going to get to that, Counsel.

-08:-54:-17  **14** I can't do it through this witness but we're going to get there.

-08:-54:-17  **15**          MR. SOFER:  Your client has it.   His client also

-08:-54:-17  **16** watched it.   That's what our -- not necessarily together.

-08:-54:-17  **17**          THE COURT:  Provided that there will be evidence of

-08:-54:-17  **18** that, I'm going to let it come on in.

-08:-54:-17  **19**          MR. SOFER:  Either way it would come in now, Your

-08:-54:-17  **20** Honor, just for Mr. Amawi's possession of it and what it shows.

-08:-54:-17  **21** That's our initial…

-08:-54:-17  **22**          THE COURT:  What I think I'll do is simply indicate

-08:-54:-17  **23** for now they can consider this evidence of Mr. Amawi's intent.

-08:-54:-17  **24** If there is evidence another defendant viewed it it can be

-08:-54:-17  **25** considered as to that defendant as well rather than identifying

-08:-54:-17 **1** anybody.

-08:-54:-17 **2** MR. SOFER:  The thing, I think Your Honor's given a

-08:-54:-17 **3** general instruction this way already to the jury.   Rather than

-08:-54:-17 **4** try to parse each one of these out not even knowing whether the

-08:-54:-17 **5** government is going to try to introduce evidence -- unless the

-08:-54:-17 **6** defendants disagree.

-08:-54:-17 **7** MR. HARTMAN:  I wouldn't request that either.

-08:-54:-17 **8** THE COURT:  That's fine.

-08:-54:-17 **9** (End of sidebar.)

02:48:12 **10** THE COURT:  You may continue.

-08:-54:-17 **11** BY MR. HERDMAN:

02:48:22 **12** Q.  At this point in time the government is going to play

-08:-54:-17 **13** 124-1BT.

-08:-54:-17 **14** THE JUROR:  Do we need headphones?

-08:-54:-17 **15** MR. HERDMAN:  There's a question of the jurors,

02:48:36 **16** whether they need headphones.   I don't believe that's

-08:-54:-17 **17** necessary.

02:48:39 **18** THE COURT:  I don't think so.

02:48:47 **19** (Video played.)

02:51:44 **20** BY MR. HERDMAN:

02:51:45 **21** Q.  Again, Agent Gubanich, that Exhibit 124-1BT that we just

02:51:51 **22** watched, what was the name of that the file?

-08:-54:-17 **23** A.  Baroodaswad.wmv.

02:51:56 **24** Q.  What was your understanding of the translation of those

-08:-54:-17 **25** words, barood aswad?

-08:-54:-17 **1**    **A.**    My understanding was that it stands for black powder.

02:52:07 **2**    **Q.**    Did you also review --

-08:-54:-17 **3**         MR. HERDMAN:  Can you put up 1234-2, the third page

02:52:15 **4**    I believe.

02:52:15 **5**    BY MR. HERDMAN:

02:52:16 **6**    **Q.**    Now I'd like to direct your attention to -- the next

-08:-54:-17 **7**    page.   Directing your attention to 124-1DN, and D0.

02:52:40 **8**         Agent Gubanich, did you review the files that are

-08:-54:-17 **9**    depicted in 124-1DN and DO?

-08:-54:-17 **10**    **A.**    Yes, I did.

-08:-54:-17 **11**    **Q.**    And what did those files depict?

-08:-54:-17 **12**    **A.**    They demonstrated how to apparently construct a

-08:-54:-17 **13**    homemade-type detonating device.

02:53:07 **14**    **Q.**    What was the translated name of that particular file?

-08:-54:-17 **15**    **A.**    The translated name was:  How to Manufacture a Generic

02:53:16 **16**    Detonator.

02:53:21 **17**         MR. HERDMAN:  I'd ask to play 124-1DN.

-08:-54:-17 **18**         THE COURT:  Same ruling.

02:53:42 **19**         MR. HERDMAN:  Just for the record, it says here on

-08:-54:-17 **20**    the screen it's 13 minutes and 30 seconds.   I'm just going to

-08:-54:-17 **21**    play a portion of this video.

02:53:51 **22**         (Video played.)

02:54:28 **23**         MR. HERDMAN:  Pausing for a second at the 40 second

-08:-54:-17 **24**    mark.

-08:-54:-17 **25**    BY MR. HERDMAN:

02:54:32 **1**     **Q.**   Agent Gubanich, did you see sort of the opening scene of

-08:-54:-17 **2** this video?

-08:-54:-17 **3**     **A.**   Yes.

-08:-54:-17 **4**     **Q.**   Does that opening scene compare at all to any of the

02:54:39 **5** other evidence that you reviewed in this case?

-08:-54:-17 **6**     **A.**   Yes, it does.

-08:-54:-17 **7**     **Q.**   What is it similar to?

-08:-54:-17 **8**     **A.**   It's similar to the beginning, opening of the

-08:-54:-17 **9** instruction of the suicide vest video.

02:54:50 **10**     **Q.**   How it is similar, in what way?

-08:-54:-17 **11**     **A.**   It opens with a camouflage type screen.

-08:-54:-17 **12**              THE COURT:  Can you speak more slowly?

02:54:59 **13**              THE WITNESS:  Yes, Your Honor.   It opens with the

-08:-54:-17 **14** background of a camouflage pattern and attacks across the front

02:55:09 **15** before it begins.

02:57:09 **16**              MR. HERDMAN:  Your Honor, I ask to pause this at

-08:-54:-17 **17** the 2 minute, 35 second mark.

02:57:16 **18** BY MR. HERDMAN:

-08:-54:-17 **19**     **Q.**   Now, when you reviewed Exhibit 124-1BT, that was the

-08:-54:-17 **20** video we just watched, and that particular video, 124-DN, did

-08:-54:-17 **21** you do so with a translator?

-08:-54:-17 **22**     **A.**   Yes, I did.

-08:-54:-17 **23**     **Q.**   Where was the Arabic translator in relation to you when

-08:-54:-17 **24** you reviewed these videos or other videos in this case?

-08:-54:-17 **25**     **A.**   He sits right next to me.

| | | |
|---|---|---|
| 02:57:39 | **1** | MR. HERDMAN:  Can you go back to Exhibit 124-2. |
| 02:57:45 | **2** | And on the same page here, 124-1DC and down to DE, if you could |
| 02:57:57 | **3** | zoom in on that area, with respect to -- let's take 124-1DC and |
| 02:58:06 | **4** | 124-1DE, those two particular exhibits. |
| 02:58:06 | **5** | BY MR. HERDMAN: |
| 02:58:06 | **6** | |
| -08:-54:-17 | **7** | Q.   Did you review those files? |
| -08:-54:-17 | **8** | A.   Yes, I did. |
| 02:58:14 | **9** | Q.   And you reviewed those with the help of a translator? |
| -08:-54:-17 | **10** | A.   Yes. |
| -08:-54:-17 | **11** | Q.   What was the file name of 124-1DC? |
| 02:58:23 | **12** | A.   Hzam 1 -- that's H-Z-A-M -- 1.wmv. |
| 02:58:32 | **13** | Q.   Then there's some Arabic writing in the file name as |
| -08:-54:-17 | **14** | well? |
| -08:-54:-17 | **15** | A.   Correct. |
| -08:-54:-17 | **16** | Q.   What was the translated name of that particular file? |
| -08:-54:-17 | **17** | A.   Manufacturing of the Explosive Belt and How to Detonate |
| 02:58:43 | **18** | It. |
| 02:58:46 | **19** | Q.   Directing your attention to 124-1DE, what was the name |
| -08:-54:-17 | **20** | of that particular file? |
| 02:58:54 | **21** | A.   Hzam2 -- H Z A M -- 2.wmv? |
| 02:58:59 | **22** | Q.   What was the name of that file? |
| -08:-54:-17 | **23** | A.   The same, Manufacturing of the Explosive Belt and How to |
| -08:-54:-17 | **24** | Detonate It. |
| 02:59:07 | **25** | Q.   Did you review these two files during your computer |

-08:-54:-17  **1**  review?

-08:-54:-17  **2**  A.  Yes.

-08:-54:-17  **3**  Q.  Generally what do these appear to depict?

-08:-54:-17  **4**  A.  They appear to depict how to make a bomb vest.  Actually

02:59:22  **5**  appears to be the same video as we've seen previously here in

02:59:28  **6**  court except in this case it comes in two pieces; one file shows

-08:-54:-17  **7**  the manufacturing up to a certain point and then the second file

02:59:39  **8**  picks up where the first file sort of leaves off and shows the

-08:-54:-17  **9**  rest of the manufacturing and testing.

02:59:49  **10**  Q.  I'd like to direct your attention to Exhibit 124-1AR,

-08:-54:-17  **11**  which I think is probably back in the first or second page.

-08:-54:-17  **12**  Agent Gubanich, did you review that file before?

-08:-54:-17  **13**  A.  Yes, I did.

-08:-54:-17  **14**  Q.  What was the translated name of that particular file?

-08:-54:-17  **15**  A.  The translated name is:  Healing of Chests.

03:00:24  **16**  Q.  What generally did that particular video depict?

03:00:27  **17**  A.  It depicted multiple training sessions and then a

-08:-54:-17  **18**  variety of -- what I call operations or attacks.   And then it

03:00:41  **19**  ended with the training of a younger adolescent.

03:00:48  **20**  Q.  You said depicted training, can you describe what that

-08:-54:-17  **21**  was that you're calling training?

03:00:54  **22**  A.  Shooting guns, hand-to-hand self-defense techniques,

03:01:00  **23**  things of that nature.

-08:-54:-17  **24**  Q.  I'd also like to direct your attention to Exhibit BJ, on

03:01:11  **25**  that same page there.   What was the name of that file?

4972

| | | |
|---|---|---|
| 03:01:18 | **1** | **A.**   Albadr-imc.rm.  A-l-b-a-d-r-i - i-m-c.r-m. |
| 03:01:28 | **2** | **Q.**   What did this particular file depict? |
| 03:01:30 | **3** | **A.**   It shows people training in firearms and other tactics |
| -08:-54:-17 | **4** | in a wooded area, wooded setting. |
| 03:01:47 | **5** | MR. HERDMAN:  I don't know if the Court is willing |
| -08:-54:-17 | **6** | to break for lunch soon, but this would be a good time to break. |
| 03:01:53 | **7** | THE COURT:  We'll try to resume at 1:00. |
| 03:02:43 | **8** | (Jury exits the courtroom.) |
| 03:02:44 | **9** | THE COURT:  Just so the record is clear, regarding |
| -08:-54:-17 | **10** | this whole series, it's not necessary to renew the objection. |
| -08:-54:-17 | **11** | When I said same ruling, I didn't want to say for the jury |
| 03:02:56 | **12** | "objection overruled," "objection overruled."   The objection |
| -08:-54:-17 | **13** | previously made will be continued. |
| -08:-54:-17 | **14** | MR. BRYAN:  These last exhibits, these were found |
| -08:-54:-17 | **15** | solely on Mr. Amawi's computer, and these weren't things given |
| -08:-54:-17 | **16** | to Darren Griffin? |
| 03:03:13 | **17** | MR. HERDMAN:  I think with respect to the ones that |
| -08:-54:-17 | **18** | we've shown so far, Your Honor, that is true. |
| 03:03:18 | **19** | THE COURT:  I probably should give, in view of |
| 03:03:21 | **20** | giving the list, if you just give me a list of the ones we've |
| -08:-54:-17 | **21** | seen so far, when we start, after lunch, I'll say ladies and |
| -08:-54:-17 | **22** | gentlemen with regard to this series of exhibits…  limiting |
| 03:03:36 | **23** | instruction.   Okay.  See you in an hour.   I'll make a note. |
| -08:-54:-17 | **24** | (Lunch recess taken.) |
| 04:13:16 | **25** | (The jury is not present.) |

4973

| | |
|---|---|
| 04:13:19 | **1** |
| -08:-54:-17 | **2** |
| -08:-54:-17 | **3** |
| 04:13:28 | **4** |
| 04:13:31 | **5** |
| 04:13:35 | **6** |
| 04:13:41 | **7** |
| -08:-54:-17 | **8** |
| -08:-54:-17 | **9** |
| -08:-54:-17 | **10** |
| 04:13:54 | **11** |
| -08:-54:-17 | **12** |
| 04:14:00 | **13** |
| 04:14:04 | **14** |
| 04:14:08 | **15** |
| 04:14:12 | **16** |
| 04:14:17 | **17** |
| 04:14:20 | **18** |
| 04:14:23 | **19** |
| 04:14:30 | **20** |
| -08:-54:-17 | **21** |
| 04:14:36 | **22** |
| -08:-54:-17 | **23** |
| -08:-54:-17 | **24** |
| 04:14:45 | **25** |

1        MR. SOFER:  I'll ask Counsel to agree with this if,

2  in fact, it's true.  We've agreed to the so-called stipulations

3  or definitions.

4        THE COURT:  Definitions is probably a better term.

5        MR. SOFER:  I agree, Your Honor.  We have them.

6  They're ready, I would just ask that we -- we think the sooner

7  the jury gets these the better and have an opportunity to read

8  them the better.   So my guess is --

9        THE COURT:  Can I suggest when we adjourn today

10  rather than in the middle of this testimony?

11        MR. SOFER:  What I was going to say is if we have

12  the time after this witness has finished testifying and there's

13  a half-hour or even 40 minutes left, I think that would be an

14  opportune time.   If not, between this witness and next.

15        THE COURT:  Thank you.   Thanks to everybody.

16        MR. SOFER:  I'll submit one to Your Honor.

17        MR. TERESINSKI:  May I approach, Your Honor?

18        MR. SOFER:  I think they should be technically

19  probably a court's exhibit given both sides have agreed.

20        THE COURT:  If I don't hear any objection after the

21  next break, that's what I'll do.

22        MR. HERDMAN:  Your Honor, before we broke for

23  lunch, you asked for a record regarding the computer exhibits we

24  discussed already.   I have my list -- let me make up an

25  alternative list for Your Honor.

| | |
|---|---|
| 04:14:47 | **1** These are the ones I've discussed so far.  Do you |
| 04:15:12 | **2** want all of them? |
| -08:-54:-17 | **3** THE COURT:  Why don't we wait until the end of his |
| -08:-54:-17 | **4** testimony. |
| 04:15:40 | **5** (Jury enters the courtroom.) |
| 04:16:41 | **6** THE COURT:  Ladies and gentlemen, thanks for your |
| -08:-54:-17 | **7** patience.   It's my present understanding the exhibits to which |
| 04:16:47 | **8** reference has been made thus far in Agent Gubanich's testimony |
| 04:16:51 | **9** are those covered by my earlier instruction in terms of being |
| 04:16:58 | **10** relating at this point to -- at this point they can be |
| 04:17:02 | **11** considered as evidence by you only with regard to Mr. Amawi's |
| 04:17:06 | **12** intent.   If they can be expansively considered, you'll be |
| -08:-54:-17 | **13** informed either specifically or in the context of the general |
| -08:-54:-17 | **14** instructions.   It's also my understanding that until we are |
| 04:17:20 | **15** otherwise told, maybe that's the way to do it, the same will be |
| -08:-54:-17 | **16** true with what we hear or are about to hear or hear about; is |
| 04:17:29 | **17** that correct, Mr. Herdman? |
| 04:17:30 | **18** MR. HERDMAN:  I don't know specifically what you're |
| -08:-54:-17 | **19** referring to, Your Honor, but that sounds generally correct. |
| 04:17:36 | **20** THE COURT:  What we will do, when the Agent is done |
| -08:-54:-17 | **21** with his testimony, you'll be provided with a list of those |
| -08:-54:-17 | **22** specific exhibits for your own notes so that you can correlate |
| 04:17:49 | **23** your deliberations with this instruction and the one I gave |
| 04:17:55 | **24** earlier. |
| 04:17:56 | **25** Okay, you remain under oath.   You may resume. |

4975

-08:-54:-17 **1**        MR. HERDMAN:  If I could have Exhibit 124 up.

04:18:03 **2** BY MR. HERDMAN:

-08:-54:-17 **3**    **Q.**   Agent Gubanich, when we left off before lunch you were

-08:-54:-17 **4** discussing some files that came off of Exhibit 124.   Again,

-08:-54:-17 **5** that's the Sony Vaio laptop depicted here.

-08:-54:-17 **6**    **A.**   That's correct.

-08:-54:-17 **7**    **Q.**   That's the laptop you presented to Mohammad Amawi in

04:18:22 **8** October, 2006 and --

-08:-54:-17 **9**    **A.**   Correct.

-08:-54:-17 **10**    **Q.**   -- and about which you made certain statements?

04:18:27 **11**    **A.**   Correct.

-08:-54:-17 **12**    **Q.**   During the course of your investigation did you become

-08:-54:-17 **13** familiar with a person named Ibtesam Maqableh?  I believe it's

04:18:38 **14** I-b-t-e-s-a-m; next name is M-a-q-a-b-l-e-h.   I-b-t-e-s-a-m,

04:18:57 **15** M-a-q-a-b-l-e-h?

04:18:57 **16**    **A.**   Yes.  I know that to be Mohammad Amawi's mother.

04:19:03 **17**    **Q.**   Can you bring up Exhibit 131-A, please?

04:19:11 **18**        This is the birth certificate you testified to

-08:-54:-17 **19** earlier?

-08:-54:-17 **20**    **A.**   That's correct.

-08:-54:-17 **21**    **Q.**   And if I could direct your attention to I think in block

04:19:25 **22** 6A on there.   That's the name that you said was Mohammad

-08:-54:-17 **23** Amawi's mother, in block 6A?

04:19:34 **24**    **A.**   Correct.

04:19:35 **25**    **Q.**   Were you able to obtain -- have you ever seen Ms.

04:19:41  **1**  Maqableh before?

-08:-54:-17  **2**      **A.**  I've seen photographs of her.

-08:-54:-17  **3**      **Q.**  Were you able to obtain photographs of Ms. Maqableh

04:19:47  **4**  during your investigation?

-08:-54:-17  **5**      **A.**  Yes.

04:19:51  **6**      **Q.**  I'm going to show you Exhibit 206-A. Is that Ms.

-08:-54:-17  **7**  Maqableh?

04:20:01  **8**      **A.**  It is.

-08:-54:-17  **9**      **Q.**  That's Mohammad Amawi's mother?

04:20:03  **10**      **A.**  Correct.

-08:-54:-17  **11**      **Q.**  I'm going to show you 206-B.   Is that another

04:20:09  **12**  photograph of Mohammad Amawi's mother?

-08:-54:-17  **13**      **A.**  Yes it.

-08:-54:-17  **14**      **Q.**  And 206-C.   That's a third photograph of Mohammad

-08:-54:-17  **15**  Amawi's mother?

-08:-54:-17  **16**      **A.**  Indeed.

-08:-54:-17  **17**      **Q.**  During the course of your review of certain materials

-08:-54:-17  **18**  that were contained on the Sony Vaio laptop, Exhibit 124, did

-08:-54:-17  **19**  you come across any videos that featured Ibtesam Maqableh?

-08:-54:-17  **20**      **A.**  Yes.

04:20:37  **21**      **Q.**  Did you review those videos with the help of an Arabic

04:20:40  **22**  translator?

04:20:41  **23**      **A.**  Yes.

-08:-54:-17  **24**      **Q.**  Are you aware of whether there's been a translation of

-08:-54:-17  **25**  any of those videos produced?

04:20:46  **1**  **A.**  Yes.

04:20:47  **2**  MR. IVEY:  Objection.  May we approach?

04:20:50  **3**  (Whereupon the following discussion was had at the

04:24:12  **4**  bench outside the hearing of the jury:)

04:24:12  **5**  THE COURT:  Basis of the objection?

-08:-54:-17  **6**  MR. IVEY:  My concern is if they're going to play a

-08:-54:-17  **7**  video of Mr. Amawi's mother translating something, and

-08:-54:-17  **8**  translated it could be hearsay.

-08:-54:-17  **9**  MR. HERDMAN:  We have two videos we'd like to play,

-08:-54:-17  **10**  both of which feature Mr. Amawi's mother.  The video itself is

-08:-54:-17  **11**  rather short, 15 or 20 seconds, but there is a translation

-08:-54:-17  **12**  that's been produced.  We are prepared to play it synched up so

-08:-54:-17  **13**  the translation would be synched up with the actual audio.

-08:-54:-17  **14**  Again, I think Agent Gubanich's testimony would be that the

-08:-54:-17  **15**  translation -- we're introducing that subject to connection at

-08:-54:-17  **16**  this point in time.  He's seen the video; he watched it with an

-08:-54:-17  **17**  Arabic translator.  And he has an understanding of the video

-08:-54:-17  **18**  alone, but he also has a more informed opinion based on the

-08:-54:-17  **19**  translation that's been completed.

-08:-54:-17  **20**  THE COURT:  What's being said?

-08:-54:-17  **21**  MR. HERDMAN:  The two videos, Your Honor, depict  a

-08:-54:-17  **22**  cell phone video of Mohammad Amawi's mother saying:  I'm giving

-08:-54:-17  **23**  my son to the people of Iraq for purposes of the ummah and for

-08:-54:-17  **24**  purposes of Islam essentially.

-08:-54:-17  **25**  MR. IVEY:  That's hearsay.

-08:-54:-17  **1**          THE COURT:  I would agree.   No, I'm not going to

-08:-54:-17  **2** permit.   Also, she's not charged as coconspirator.   It's

-08:-54:-17  **3** awfully hard, even if it weren't being offered -- certainly it's

-08:-54:-17  **4** not offered for the truth of the matter asserted, then it's not

-08:-54:-17  **5** relevant.

-08:-54:-17  **6**          MR. HERDMAN:  Your Honor, I think evidence would

-08:-54:-17  **7** also suggest that Agent Gubanich recognizes Mohammad Amawi's

-08:-54:-17  **8** voice actually holding the cell phone that's being taped.   And

-08:-54:-17  **9** there is a male that is Mohammad Amawi speaking on this video as

-08:-54:-17  **10** well, sort of urging her to say certain things.   And the theory

-08:-54:-17  **11** behind it, Your Honor, is that -- again, this isn't something

-08:-54:-17  **12** that we're going to have.

-08:-54:-17  **13**          THE COURT:  Adopt an admission, is that what you're

-08:-54:-17  **14** going to say?   He's adopting --

-08:-54:-17  **15**          MR. HERDMAN:  This is Mohammad Amawi himself urging

-08:-54:-17  **16** his mother to create a video which the government would contend

-08:-54:-17  **17** demonstrates Mr. Amawi's intent.

-08:-54:-17  **18**          THE COURT:  Who's depicted on the video?

-08:-54:-17  **19**          MR. HERDMAN:  The mother is depicted sitting down

-08:-54:-17  **20** on the couch, and there's a cell phone being held filming this,

-08:-54:-17  **21** and you can hear Mr. Amawi speaking behind the phone to his

-08:-54:-17  **22** mother urging her to say certain things.

-08:-54:-17  **23**          MR. SOFER:  This would be no different, Your Honor,

-08:-54:-17  **24** than -- another analogy would be a drug dealer who's

-08:-54:-17  **25** videotaping, and you can hear him in the background, his drug

-08:-54:-17 **1** operation, at some level.

-08:-54:-17 **2**                   THE COURT:  What does he say?

-08:-54:-17 **3**         I'm going to send the jury upstairs.

-08:-54:-17 **4**                   MR. SOFER:  They're very short.

-08:-54:-17 **5**                   THE COURT:  Let me find out.

04:24:17 **6**         (End of side-bar discussion.)

-08:-54:-17 **7**                   THE COURT:  We're very sorry, but there's a matter

-08:-54:-17 **8** I have to take up with Counsel.   It will take, at the outside,

-08:-54:-17 **9** probably ten minutes.   I think it's best if I excuse you and

-08:-54:-17 **10** let you back upstairs and relax for a bit.

04:24:31 **11**         (Jury exits the courtroom.)

04:25:33 **12**                   MR. HERDMAN:  Your Honor, we can have the actual

-08:-54:-17 **13** translation of the first video I intend to play.   I can bring

-08:-54:-17 **14** that on the screen so you can see the translation.   Then we'll

-08:-54:-17 **15** play the video synched with the actual video.

04:25:49 **16**         212.

04:26:13 **17**                   MR. IVEY:  Are the media cameras on?

04:26:23 **18**         (Discussion had off the record.)

04:26:44 **19**                   THE COURT:  Is there anybody from the media

04:26:47 **20** present?

04:26:54 **21**                   MR. HELMICK:   There's a sketch artist in the back

-08:-54:-17 **22** of the courtroom.

04:27:00 **23**                   THE COURT:  I'm going to ask that you step outside

04:27:03 **24** for a minute.   We're ruling on an issue of evidence.   I think

-08:-54:-17 **25** it's probably appropriate, however briefly it is, that you wait

4980

| | | |
|---|---|---|
| 04:27:11 | **1** | outside. |
| 04:27:42 | **2** | MR. WITMER-RICH:  Is this the entire video? |
| -08:-54:-17 | **3** | MR. HERDMAN:  Yes. |
| 04:28:26 | **4** | (Video is played.) |
| -08:-54:-17 | **5** | MR. HERDMAN:  There's a second video, 124-1AK. |
| 04:28:36 | **6** | (Video played.) |
| 04:29:14 | **7** | THE COURT:  How is this admissible? |
| -08:-54:-17 | **8** | MR. HERDMAN:  It goes directly to Mohammad Amawi's |
| 04:29:24 | **9** | essentially urging someone else to make a statement on his |
| 04:29:29 | **10** | behalf, essentially.   It's certainly what Mohammad Amawi's |
| -08:-54:-17 | **11** | saying in this video is admissible.   Certainly what Mohammad |
| -08:-54:-17 | **12** | Amawi is saying in this video is admissible as an admission. |
| 04:29:43 | **13** | It's no different than any other conversation where the rest of |
| -08:-54:-17 | **14** | the conversation has to be put in in order to contextualize the |
| -08:-54:-17 | **15** | admission of that defendant. |
| 04:29:53 | **16** | MR. IVEY:  Your Honor, I think this is -- obviously |
| 04:30:00 | **17** | Mr. Amawi is laughing.   They're horsing around.   I think it's |
| -08:-54:-17 | **18** | wrong to let the government take this and make those type of |
| 04:30:06 | **19** | inferences when he's obviously laughing and joking around. |
| -08:-54:-17 | **20** | She's not available here to cross-examine.   It's hearsay, one. |
| 04:30:16 | **21** | Even if it's not, I think the prejudice in this is tremendous. |
| 04:30:20 | **22** | I think that this is obviously taken out of context, which is a |
| -08:-54:-17 | **23** | joking and horsing around context, and trying to place it into a |
| 04:30:29 | **24** | serious one where we don't have an opportunity to ask Mrs. Amawi |
| 04:30:35 | **25** | questions.   I think this is a little bit too much. |

04:30:38  1     MR. HERDMAN:  Well, Your Honor, it's no different

04:30:42  2  than any other recording that features Mr. Amawi in this case in

-08:-54:-17  3  that he's part of this conversation.   It's no different than

-08:-54:-17  4  any recording that's been offered.  In fact, I believe Mr.

-08:-54:-17  5  Amawi's mother has been featured in other recordings.  She's

-08:-54:-17  6  come into the room at certain points in time; she's left the

-08:-54:-17  7  room; she's said things that were overheard in the recordings.

04:31:01  8  It's not what he's saying that's important; it's what the

-08:-54:-17  9  defendant's saying and what's going on that's important.

-08:-54:-17  10     THE COURT:  I'm not going to permit it to be

-08:-54:-17  11  played.   The reason I'm not, viewing it and reading the

04:31:15  12  translation, it's inherently ambiguous.  You really can't say.

-08:-54:-17  13  I realize arguably one can draw an inference that it was

04:31:24  14  seriously intended and reflects Mr. Amawi is confirming or

04:31:34  15  enlisting his mother's support for whatever he has in mind.   On

-08:-54:-17  16  the other hand, as Mr. Ivey just stated, hey, they're horsing

-08:-54:-17  17  around, in whatever bizarre and peculiar way; nonetheless,

-08:-54:-17  18  that's what's going on.   So perhaps under normal circumstances,

04:31:59  19  were the declarant available, I would not have a problem, but if

-08:-54:-17  20  the declarant was called to testify or whatever.   I am troubled

04:32:12  21  by the inability really to test this in any way to find out

04:32:16  22  whether what was happening was serious or carefully and

04:32:23  23  deliberately intended, or whether it was simply, for whatever

-08:-54:-17  24  reason, some kind of peculiar joking around.   And there's a

04:32:38  25  certain quality of unreliability to it.   I don't know whether

-08:-54:-17 **1** that fits within any 303 or 304 as a reason to exclude it, but

-08:-54:-17 **2** I'm troubled by that fact.   As well, under all the

-08:-54:-17 **3** circumstances it seems to me whatever minimum probative value it

-08:-54:-17 **4** has, it is minimal given the other evidence in the case.   This

-08:-54:-17 **5** is hardly the linchpin evidence that the government's offering

-08:-54:-17 **6** in terms of intent against Mr. Amawi.   And on balance with the

-08:-54:-17 **7** other evidence I've seen, it seems to me that this has very

04:33:16 **8** slight additional probative effect and value and, given the

04:33:27 **9** circumstances, the video being in Jordan, the woman in Islamic

04:33:33 **10** costume or traditional costume, female costume, before a jury

04:33:43 **11** that it's highly unlikely to sort of understand -- not that so

-08:-54:-17 **12** much, but might itself potentially draw a certain adverse

04:33:57 **13** interest from the setting and the situation.

-08:-54:-17 **14**        I think that the likelihood of very substantial

04:34:05 **15** prejudice to Mr. Amawi and possibly, despite any limiting

-08:-54:-17 **16** instruction to the other defendants, is so very substantially

-08:-54:-17 **17** great that on balance with what I see there's really minimal

-08:-54:-17 **18** probative value under Rule 403.  I'm going to exclude it.

-08:-54:-17 **19**        MR. HERDMAN:  Your Honor, I don't want to belabor

-08:-54:-17 **20** this point.   The only other thing I want to point out, we do

-08:-54:-17 **21** have some additional corroborative evidence in that it was saved

-08:-54:-17 **22** on this evidence, and it was titled -- titled

04:34:35 **23** "FarewellofMother", one word.   So to the extent there's any

04:34:40 **24** corroborative evidence, the government certainly does believe --

-08:-54:-17 **25**        THE COURT:  I didn't realize that.  I was making

| 04:34:46 | 1 | notes.  And, nonetheless, I still think that the bottom line is |
| 04:34:52 | 2 | the probative value really seems to me to be very, very slight |
| 04:34:59 | 3 | and there's very substantial risk of unfair and undue prejudice |
| -08:-54:-17 | 4 | if this were shown. |
| 04:35:06 | 5 | Let's get the jury back and get back to work. |
| -08:-54:-17 | 6 | MR. BOSS:  Your Honor, before the jury returns, on |
| -08:-54:-17 | 7 | Exhibit 124-1, CC through FF, and 124-1, AR through AB -- we |
| 04:35:23 | 8 | discussed this briefly yesterday about the photographs of Mr. |
| 04:35:26 | 9 | Amawi purportedly in a coffin.  We would renew our objection now |
| -08:-54:-17 | 10 | rather than interrupting the examination of the witness as the |
| -08:-54:-17 | 11 | government might approach those exhibits. |
| 04:35:38 | 12 | THE COURT:  Okay.  No need to renew.  The |
| -08:-54:-17 | 13 | objection will be overruled for the same reasons I expressed |
| 04:35:45 | 14 | yesterday. |
| -08:-54:-17 | 15 | MR. SOFER:  May I make one request with respect to |
| -08:-54:-17 | 16 | the video, which is:  I could see why anybody watching a video |
| -08:-54:-17 | 17 | like this would assume that they're horsing around.   And |
| 04:35:56 | 18 | obviously the government can't prove or disprove whether |
| -08:-54:-17 | 19 | someone's horsing around in a given moment.   I will say this: |
| 04:36:03 | 20 | The government could, and to the extent that the Court might be |
| 04:36:07 | 21 | willing to consider this later, not now, we won't put it in now, |
| -08:-54:-17 | 22 | but we could proffer evidence through an expert, Your Honor, |
| -08:-54:-17 | 23 | that actually, if you look at martyrdom videos, that is videos |
| -08:-54:-17 | 24 | that are made after, quote, the capture, both before, during, |
| 04:36:26 | 25 | and after, suicide bombers, for instance, it is -- although it |

4984

04:36:30 **1** may be surprising to some of us, it is not remotely unusual to

-08:-54:-17 **2** see a mother smiling, laughing, and, in fact, I would describe

04:36:44 **3** ebullient about the fact that her son is dead and has done so in

04:36:50 **4** a particular manner.   And so all I would ask Your Honor to do

-08:-54:-17 **5** is consider -- and again, we won't put it in now -- whether or

-08:-54:-17 **6** not you'll hear some testimony of that before deciding the

04:37:03 **7** reliability of this.  Because, as with everything else in this

-08:-54:-17 **8** case, it has to come in some sort of context.   And there is a

04:37:11 **9** context for this very kind of recording.   This is -- this is

-08:-54:-17 **10** not an unusual thing to see, I don't believe.   And I think we

-08:-54:-17 **11** could demonstrate that to the Court.

-08:-54:-17 **12**          THE COURT:  I'll deal with that down the road.   If

04:37:24 **13** you'll get the jury in, please.

04:39:34 **14**          (Jury enters the courtroom.)

04:39:35 **15**          THE COURT:  I sustained the objection to the

-08:-54:-17 **16** evidence about to be offered.   Disregard that.

04:39:46 **17** BY MR. HERDMAN:

-08:-54:-17 **18**    **Q.**   Now, Agent Gubanich, during your review of computer

04:39:52 **19** files located on Exhibit 124, did you come across any written

-08:-54:-17 **20** documents that were actually in English?

-08:-54:-17 **21**    **A.**   Yes, I did.

-08:-54:-17 **22**    **Q.**   Were those in the form of manuals of some sort?

-08:-54:-17 **23**    **A.**   They were.

-08:-54:-17 **24**    **Q.**   Were there any manuals or publications that related to

-08:-54:-17 **25** the concept of Jihad?

-08:-54:-17 **1**   **A.**   Yes.

04:40:10 **2**   **Q.**   I'd like to direct your attention to Exhibit 124-1P.

-08:-54:-17 **3**   What is that document?

04:40:42 **4**   **A.**   It's an article entitled:  Jihad, The Forgotten

04:40:46 **5**   Obligation.

04:40:47 **6**   **Q.**   I'd like to direct your attention now to Exhibit 124-1S.

-08:-54:-17 **7**   What is that document?

-08:-54:-17 **8**   **A.**   It's a document entitled:  The Virtues of Jihad.

04:41:10 **9**   **Q.**   Directing your attention now to Exhibit 124-1I.   What

-08:-54:-17 **10**   is that document?

-08:-54:-17 **11**   **A.**   It's a document entitled:  Defense of the Muslim Lands.

-08:-54:-17 **12**   The First Obligation of Imam.

04:41:29 **13**   **Q.**   Who's the author, at least on the cover of that?

04:41:32 **14**   **A.**   Abdullah Azzam.

-08:-54:-17 **15**   **Q.**   How many pages long is this particular document?

04:41:39 **16**   **A.**   I believe about 54 pages long.

04:41:44 **17**        MR. HERDMAN:  For the record, I'm showing the first

-08:-54:-17 **18**   page of those documents.

-08:-54:-17 **19**   BY MR. HERDMAN:

-08:-54:-17 **20**   **Q.**   Is that correct, Agent Gubanich?

-08:-54:-17 **21**   **A.**   That's correct.

-08:-54:-17 **22**   **Q.**   These documents were all in English you said?

-08:-54:-17 **23**   **A.**   That's true.

04:41:56 **24**   **Q.**   124-1G.   The first page or the title page of this.

-08:-54:-17 **25**   What's the name of the document?

-08:-54:-17 **1**   **A.**   The Azzam Brigades.

04:42:13 **2**   **Q.**   How long is this document?

-08:-54:-17 **3**   **A.**   Appears to be about 90 pages.

-08:-54:-17 **4**   **Q.**   Directing your attention to Exhibit 124-1M.   What is

-08:-54:-17 **5**   this document?

-08:-54:-17 **6**   **A.**   It's a document entitled:  Join the Caravan.

-08:-54:-17 **7**   **Q.**   How long is this?

-08:-54:-17 **8**   **A.**   It appears to be 38 pages.

04:42:41 **9**          MR. HERDMAN:  If you could zoom in on the top

-08:-54:-17 **10**  there.

-08:-54:-17 **11**  BY MR. HERDMAN:

04:42:44 **12**  **Q.**   Does any of this purport to state who the author of this

-08:-54:-17 **13**  document is?

-08:-54:-17 **14**  **A.**   I believe the author is Abdullah Azzam.

04:42:54 **15**  **Q.**   If I could direct your attention to Exhibit 124-1F.

04:43:04 **16**  What is the title of this document?

-08:-54:-17 **17**  **A.**   An Advice to Those Who Abstain from Fighting in the

04:43:11 **18**  Cause of Allah.

04:43:25 **19**  **Q.**   Do you happen to know who the purported author of this

04:43:30 **20**  is?

04:43:31 **21**  **A.**   I do not.

04:43:36 **22**  **Q.**   The next one, 124-1R.   What is the English portion of

04:43:50 **23**  the title of this document?

-08:-54:-17 **24**  **A.**   Essential Provision of the Mujahid.

04:43:59 **25**  **Q.**   How long is this document?

-08:-54:-17  **1**     **A.**    170 pages.

-08:-54:-17  **2**     **Q.**    Were there some manuals or publications that related to

04:44:06  **3**   surveillance or electronic surveillance?

-08:-54:-17  **4**     **A.**    Yes.

04:44:11  **5**     **Q.**    Do those publications largely appear to be in English?

-08:-54:-17  **6**     **A.**    Yes.

-08:-54:-17  **7**     **Q.**    I'd like to direct your attention to 124-1E.   What is

-08:-54:-17  **8**   the title of that document?

-08:-54:-17  **9**     **A.**    Electronic Surveillance Devices.

-08:-54:-17  **10**     **Q.**    Can you give the jury a general sense of what that

04:44:33  **11**   document is about, this manual is about?

-08:-54:-17  **12**     **A.**    I believe it's about devices like GPS tracking devices

04:44:43  **13**   and things like that.

-08:-54:-17  **14**     **Q.**    What is a GPS tracking device?

-08:-54:-17  **15**     **A.**    It's a device you can place anywhere and it tracks your

-08:-54:-17  **16**   movement based upon satellite locations.   It's -- I believe

04:44:56  **17**   it's also about bugging devices, listening devices.

-08:-54:-17  **18**     **Q.**    I forget if I asked you this.   How long is this

04:45:04  **19**   document?

-08:-54:-17  **20**     **A.**    It appears to be 117 pages.

04:45:07  **21**     **Q.**    Can you go to 124-1CK.   And what is the title of this

04:45:24  **22**   particular document?

04:45:25  **23**     **A.**    The title is:  Telephone Privacy.

04:45:28  **24**     **Q.**    Who is the author of it?

04:45:30  **25**     **A.**    Stuart Goldsmith.

| | | |
|---|---|---|
| 04:45:32 | **1** | **Q.**   Did you see this particular author in a couple of these |
| -08:-54:-17 | **2** | different documents? |
| -08:-54:-17 | **3** | **A.**   Yes, I did. |
| -08:-54:-17 | **4** | **Q.**   What generally is this particular document about? |
| -08:-54:-17 | **5** | **A.**   It's about the ability of governments to eavesdrop on |
| -08:-54:-17 | **6** | telephone conversations. |
| 04:45:46 | **7** | **Q.**   If we could now go to Exhibit 124-1CL.   Is this another |
| 04:46:00 | **8** | Stuart Goldsmith publication? |
| -08:-54:-17 | **9** | **A.**   Yes, it. |
| -08:-54:-17 | **10** | **Q.**   What's the title of this particular one? |
| -08:-54:-17 | **11** | **A.**   Computer Privacy. |
| -08:-54:-17 | **12** | **Q.**   What does -- generally, what is this document about? |
| 04:46:09 | **13** | **A.**   It talks about the government's ability to look for |
| -08:-54:-17 | **14** | files even after deleted, things like that. |
| 04:46:16 | **15** | **Q.**   Going to Exhibit 124-1CN.   Stuart Goldsmith again? |
| -08:-54:-17 | **16** | **A.**   Yes. |
| -08:-54:-17 | **17** | **Q.**   What is this particular document or manual about? |
| -08:-54:-17 | **18** | **A.**   It's entitled: Mail Privacy.  It's about if your mail is |
| 04:46:40 | **19** | secure or not. |
| 04:46:45 | **20** | **Q.**   How many pages long is it? |
| 04:46:48 | **21** | **A.**   It appears to be 21 pages. |
| 04:46:52 | **22** | **Q.**   We can go to Exhibit 124-1CM.   It's another Stuart |
| -08:-54:-17 | **23** | Goldsmith publication? |
| -08:-54:-17 | **24** | **A.**   Indeed. |
| -08:-54:-17 | **25** | **Q.**   What's the title of this document? |

-08:-54:-17  **1**    **A.**    Alternate I D.

04:47:08   **2**    **Q.**    Generally what is this manual about?

-08:-54:-17  **3**    **A.**    It's about establishing a secondary persona or I D so

-08:-54:-17  **4**   that you can -- if need be, you can start becoming a different

-08:-54:-17  **5**   person.

04:47:21   **6**    **Q.**    How many pages long is this particular document?

04:47:25   **7**    **A.**    Nine.

04:47:26   **8**    **Q.**    Now, did you find in your review of Exhibit 124, the

-08:-54:-17  **9**   Sony Vaio laptop, did you find any publications that appeared to

04:47:37   **10**   be military related?

-08:-54:-17  **11**   **A.**    Yes.

04:47:39   **12**   **Q.**    And I'd like to direct your attention to -- do you

-08:-54:-17  **13**  remember specifically one of those documents?

-08:-54:-17  **14**   **A.**    One is entitled:  A Soldier's Pocketbook.

04:47:49   **15**   **Q.**    Directing your attention to 124-1T.   Is this the

-08:-54:-17  **16**  document you're talking about?

-08:-54:-17  **17**   **A.**    Yes, it is.

-08:-54:-17  **18**   **Q.**    How long is this manual?

04:48:14   **19**   **A.**    It appears to be 222 pages.

-08:-54:-17  **20**   **Q.**    What type of topics does this particular manual discuss?

-08:-54:-17  **21**   **A.**    Various topics including how to read maps, how to do

04:48:23   **22**  land navigation, how to escape and evade, ambushes.  Things like

-08:-54:-17  **23**  that.

04:48:33   **24**   **Q.**    Did you find any documents related to firearms,

04:48:40   **25**  specifically silencers?

| | | | |
|---|---|---|---|
| -08:-54:-17 | **1** | **A.** | Yes. |
| 04:48:42 | **2** | **Q.** | I'd like to direct your attention to 124-1V.  What was |
| 04:48:56 | **3** | | the title of this document? |
| -08:-54:-17 | **4** | **A.** | How to Make Disposable Silencers, Volume 2. |
| -08:-54:-17 | **5** | **Q.** | It says it's a, "complete illustrated guide?" |
| -08:-54:-17 | **6** | **A.** | Yes. |
| -08:-54:-17 | **7** | **Q.** | How many pages long is this? |
| 04:49:07 | **8** | **A.** | It appears to be 116 pages. |
| -08:-54:-17 | **9** | **Q.** | Do you remember seeing volume 1? |
| -08:-54:-17 | **10** | **A.** | I did not see volume 1. |
| 04:49:15 | **11** | **Q.** | Did you see any manuals that dealt with the manufacture |
| -08:-54:-17 | **12** | | of poisons? |
| -08:-54:-17 | **13** | **A.** | I did. |
| 04:49:20 | **14** | **Q.** | Directing your attention to Exhibit 124-1U.  What is |
| -08:-54:-17 | **15** | | the title of this document? |
| 04:49:31 | **16** | **A.** | The Mujahidin Response Handbook. |
| -08:-54:-17 | **17** | **Q.** | It purports to be by a certain author? |
| 04:49:38 | **18** | **A.** | Abdel-Aziz. |
| 04:49:44 | **19** | **Q.** | Is this an English document? |
| 04:49:46 | **20** | **A.** | It is. |
| 04:49:47 | **21** | **Q.** | How long is this document? |
| -08:-54:-17 | **22** | **A.** | 23 pages. |
| 04:49:49 | **23** | **Q.** | What does it generally describe? |
| -08:-54:-17 | **24** | **A.** | Sort of a step-by-step guide on how to make poisons. |
| 04:49:56 | **25** | **Q.** | How about any manuals related to explosives or bomb |

-08:-54:-17  **1**  designs?

-08:-54:-17  **2**    **A.**   Yes.

-08:-54:-17  **3**    **Q.**   Directing your attention to 124-1D.  What is the title

-08:-54:-17  **4**  of this document?

-08:-54:-17  **5**    **A.**   Improvised Radio Detonation Techniques.

-08:-54:-17  **6**    **Q.**   How long is this manual?

-08:-54:-17  **7**    **A.**   42 pages.

-08:-54:-17  **8**    **Q.**   What does this manual generally describe?

-08:-54:-17  **9**    **A.**   It describes how to detonate a device remotely, an

04:50:31  **10**  explosive device remotely.

-08:-54:-17  **11**    **Q.**   Directing your attention 124-1B, "B" as in bravo.   Can

04:50:56  **12**  you describe this for the jury?

-08:-54:-17  **13**    **A.**   It's a document entitled:  Car Bomb Recognition Guide:

04:51:02  **14**  How They're Made; How to Detect Them.

-08:-54:-17  **15**    **Q.**   How long is this document?

-08:-54:-17  **16**    **A.**   51 pages.

-08:-54:-17  **17**    **Q.**   Can you generally describe what the contents of this

-08:-54:-17  **18**  document provide?

04:51:11  **19**    **A.**   Yes, there are descriptions on various bomb designs.

04:51:19  **20**    **Q.**   Does this particular exhibit mention any explosive

04:51:26  **21**  ingredients in particular?

-08:-54:-17  **22**    **A.**   Yes, I believe it mentions black powder.

04:51:33  **23**    **Q.**   Moving on now to direct your attention to Exhibit

04:51:39  **24**  124-1C, as in Charlie.   Is this the cover of that document?

-08:-54:-17  **25**    **A.**   Yes.

-08:-54:-17  **1**    **Q.**   What is being -- can you describe this document for the

-08:-54:-17  **2**  jury?

-08:-54:-17  **3**    **A.**   It's a document entitled:  Middle Eastern Terrorist,

-08:-54:-17  **4**  Bomb Designs.

-08:-54:-17  **5**    **Q.**   How long is this document?

-08:-54:-17  **6**    **A.**   38 pages.

04:52:05  **7**    **Q.**   Is that the table of contents there?

-08:-54:-17  **8**    **A.**   Yes.

-08:-54:-17  **9**    **Q.**   What does this particular document describe or

04:52:15  **10**  demonstrate?

04:52:16  **11**    **A.**   It shows the different bomb designs that you can

04:52:22  **12**  assemble or I guess for recognition purposes, but they're

04:52:31  **13**  basically bomb designs.

-08:-54:-17  **14**    **Q.**   Are there any particular examples off this table of

04:52:37  **15**  contents that you remember?

04:52:39  **16**    **A.**   Yeah, I looked at several of these.   There's a hand

04:52:46  **17**  grenade.   A block with gasoline with a bomb in the middle of

-08:-54:-17  **18**  it.   There are bombs having to do with being set off by tape

-08:-54:-17  **19**  recorders or watches and things like that.

04:53:02  **20**    **Q.**   Why don't we scroll down a couple pages.

04:53:11  **21**        You said something about a grenade being launched?

-08:-54:-17  **22**    **A.**   Yes.

-08:-54:-17  **23**    **Q.**   Stop us when we get to that particular one.

04:53:23  **24**    **A.**   That's it there.   It's called a cement hand grenade.

04:53:33  **25**    **Q.**   I'd like to direct your attention no to Exhibit 124-1W.

-08:-54:-17  **1**  What is this manual?

-08:-54:-17  **2**      **A.**    This is entitled:  The Mujahidin Explosives Handbook by

04:53:53  **3**  Abdel-Aziz.

04:53:57  **4**      **Q.**    What generally was this document about?

-08:-54:-17  **5**      **A.**    It's about how to manufacture explosive compounds.

04:54:05  **6**      **Q.**    Did this particular document describe any explosive

04:54:10  **7**  compounds that were relevant to this particular case?

04:54:13  **8**      **A.**    It did.

-08:-54:-17  **9**      **Q.**    What was one of those compounds?

-08:-54:-17  **10**      **A.**    Astrolite.

04:54:20  **11**      **Q.**    If you could go to page 57.   Do you see Astrolite on

-08:-54:-17  **12**  that page, Agent Barnes (sic)?

04:54:51  **13**      **A.**    I apologize, the screen's not very good up here.

04:55:02  **14**          MR. HERDMAN:  If you could zero in.   We'll zoom in

-08:-54:-17  **15**  on a portion of it.

04:55:11  **16**      **A.**    There's a reference it to under 13.1.5.1.  It states

04:55:22  **17**  that the power is only second to Astrolite.

04:55:26  **18**  BY MR. HERDMAN:

04:55:26  **19**      **Q.**    By the way, when this particular page 57 out of this

-08:-54:-17  **20**  manual is referring to Astrolite, is there another compound

-08:-54:-17  **21**  that's relevant to this case that's discussed with respect to

-08:-54:-17  **22**  Astrolite?

04:55:41  **23**      **A.**    Yes.   Nitrocellulose is another compound.  I don't

04:55:49  **24**  know if it's with respect to Astrolite directly, but

04:55:54  **25**  nitrocellulose is another compound discussed in this case.

| | | | |
|---|---|---|---|
| -08:-54:-17 | **1** | **Q.** | Do you know where it was discussed? |
| -08:-54:-17 | **2** | **A.** | It was discussed in the bomb vest video. |
| 04:56:05 | **3** | **Q.** | Page 59.  Do you know if there was any other reference |

to Astrolite in this document?

**5**    **A.**    Yes.  There was a reference to it in two other places

**6** which describe how to make the compound.  If you do a search on

**7** Astrolite, it will come up.

**8**        MR. HERDMAN:  I have a moment, Your Honor.  I

**9** apologize.

**10**        Page 58 on the face of the document.   Page 64 on

**11** this particular program.

**12**        THE COURT:  I'm having a little trouble hearing

**13** you.

**14**        MR. HERDMAN:  This is page 58 if you were to print

**15** this document out.   It as actually page 58.   On the face of

**16** the document it says 58.

**17** BY MR. HERDMAN:

**18**    **Q.**    Agent Gubanich, do you see Astrolite on this page?

**19**    **A.**    Yes, section 13.3.3 it reads Astrolite A.

**20**    **Q.**    The next page.   Does this page also discuss Astrolite?

**21**    **A.**    Yes, 13.3.4 is Astrolite G, with some instructions on

**22** how to prepare it.

**23**    **Q.**    Right under the box there on 13.3.4, what does this

**24** document say with respect to Astrolite?

**25**    **A.**    It lists the two ingredients in Astrolite G and a note

-08:-54:-17 **1**  that reads, "most powerful explosive to date," and it's dated

-08:-54:-17 **2**  12/3/96.   "Good for one to two years, direct from," quote, "the

04:58:33 **3**  master", unquote, "himself."

04:58:44 **4**              MR. HERDMAN:  Could I have just a moment, Your

-08:-54:-17 **5**  Honor?

-08:-54:-17 **6**              THE COURT:  Yes, of course.

04:58:59 **7**              (Discussion had off the record.)

-08:-54:-17 **8**              MR. HERDMAN:  Kevin, could you bring up 139-A,

04:59:04 **9**  please.

04:59:06 **10**  BY MR. HERDMAN:

04:59:07 **11**     **Q.**   Agent Gubanich, do you recognize Exhibit 139-A?

-08:-54:-17 **12**     **A.**   Yes.

04:59:10 **13**     **Q.**   And was this one of the discs that you presented to

-08:-54:-17 **14**  Mohammad Amawi on February 19, 2006?

-08:-54:-17 **15**     **A.**   Yes, correct.

04:59:18 **16**     **Q.**   And what did Mr. Amawi say with respect to this

04:59:21 **17**  particular disc?

-08:-54:-17 **18**     **A.**   He said that was a disc that he owned.

04:59:26 **19**     **Q.**   Did you have a chance to review this disc?

04:59:29 **20**     **A.**   Yes.

04:59:31 **21**     **Q.**   Showing you what's been marked Government's Exhibit

04:59:35 **22**  139-A-1, what is that?

04:59:45 **23**     **A.**   That's a listing of files on the disc.

-08:-54:-17 **24**     **Q.**   Showing you Exhibit 139-A-2.   What is that?

-08:-54:-17 **25**     **A.**   That is a listing of files with the addition of columns

05:00:12  **1**  of translation and notes.

05:00:19  **2**      **Q.**  139-A-8 on this document.   I think it's the next page.

05:00:45  **3**              With respect to Exhibit --

05:00:49  **4**              MR. BRYAN:  Objection, Your Honor.  May we

-08:-54:-17  **5**  approach?

05:00:51  **6**              THE COURT:  Sure.

05:00:53  **7**              (Whereupon the following discussion was had at the

05:03:52  **8**  bench outside the hearing of the jury:)

05:03:52  **9**              THE COURT:  Basis.

-08:-54:-17  **10**              MR. BRYAN:  The basis of my objection is as it

-08:-54:-17  **11**  relates to this particular exhibit with the columns created for

-08:-54:-17  **12**  translations and the like.

-08:-54:-17  **13**              THE COURT:  Can I see it?

-08:-54:-17  **14**              MR. BRYAN:  Based upon my review of the exhibit

-08:-54:-17  **15**  just as it came up on the screen, there's a tremendous amount of

-08:-54:-17  **16**  Arabic that there's no translations for.   And I presume it's

-08:-54:-17  **17**  because it's stuff that the government's not interested in.

-08:-54:-17  **18**  And basically it's sort of the manner that they're sort of

-08:-54:-17  **19**  cherry picking the things that are bad.   This probably contains

-08:-54:-17  **20**  a lot of things that are innocuous or not harmful to Mr. Amawi

-08:-54:-17  **21**  as well.   They don't provide the translation for that.   So

-08:-54:-17  **22**  they're providing the translations for the bad stuff but they're

-08:-54:-17  **23**  not providing translations for the innocuous stuff.

-08:-54:-17  **24**              THE COURT:  This is found on his computer.   I

-08:-54:-17  **25**  assume he knows what the Arabic means.   If there's anything

-08:-54:-17 **1** that's properly admissible on the defense case, fine.  This is

-08:-54:-17 **2** the same old story.  It's not a defense to say:  I never went

-08:-54:-17 **3** faster than 25 miles an hour when I'm clocked in a 35 mile an

-08:-54:-17 **4** hour zone.   The government is absolutely entitled to pick and

-08:-54:-17 **5** choose its evidence.   There's nothing wrong with that.   In

-08:-54:-17 **6** terms of what the rest of this stuff means, it -- he speaks

-08:-54:-17 **7** Arabic.   If it's properly admissible, you can get into it.

-08:-54:-17 **8**               MR. HERDMAN:  Your Honor, the only record I wanted

-08:-54:-17 **9** to make was what the government did in this respect was we

-08:-54:-17 **10** actually said these are all religious or Islamic sites.   It's

-08:-54:-17 **11** not hurtful at all to the defendant, those particular sites.

-08:-54:-17 **12** We mentioned what they were.

-08:-54:-17 **13**               MR. BRYAN:  It's not helpful because it doesn't

-08:-54:-17 **14** list what the sites are.

-08:-54:-17 **15**               THE COURT:  Well, but my point is, if it were

-08:-54:-17 **16** harmful to the defendant, the government would introduce it.

-08:-54:-17 **17** They don't have to introduce stuff that is helpful to the

-08:-54:-17 **18** defendant unless there's some <u>Brady</u> issue.   And in any event,

-08:-54:-17 **19** this seems to be an example of:  Officer, I never sped before.

-08:-54:-17 **20** So what?

05:03:54 **21**               (End of sidebar discussion.)

05:03:57 **22**               THE COURT:  You may continue.

05:04:00 **23**               MR. HERDMAN:  Putting back up 139-A-2.   I think

-08:-54:-17 **24** it's page 8 -- page 5.   I'm sorry.

-08:-54:-17 **25** BY MR. HERDMAN:

05:04:20   **1**

05:04:20   **2**     **Q.**   Directing your attention to 139-A-1.   At page 8, do you

-08:-54:-17   **3**  see something that is of interest to you, Agent Barnes (sic)?

-08:-54:-17   **4**     **A.**   Yes.  It was a file folder or directory named Jihad.

05:04:36   **5**     **Q.**   What was within that particular directory?

05:04:39   **6**     **A.**   There were approximately 25 web links or shortcuts to

-08:-54:-17   **7**  web pages.

05:04:49   **8**     **Q.**   I know you expressed this concept earlier.   Was this

-08:-54:-17   **9**  the same idea, shortcuts to a particular web page?

-08:-54:-17   **10**    **A.**   That's correct.

05:04:56   **11**    **Q.**   I see there's a column on notes there.   It says:

-08:-54:-17   **12**  Shortcut to.   Then there's what appears to be a web address?

-08:-54:-17   **13**    **A.**   Correct.

-08:-54:-17   **14**    **Q.**   How did you obtain that information?

05:05:06   **15**    **A.**   I clicked on the file, right clicked and got the

05:05:11   **16**  properties, and I copied from the properties the address

05:05:15   **17**  associated with that file in that shortcut, and pasted it in

-08:-54:-17   **18**  that spreadsheet.

-08:-54:-17   **19**    **Q.**   And how many total web favorites or shortcuts were there

-08:-54:-17   **20**  in this particular directory marked Jihad?

-08:-54:-17   **21**    **A.**   I believe there was 25.

05:05:30   **22**    **Q.**   How are they designated, by the way, on this Exhibit

05:05:35   **23**  139-A-2?

-08:-54:-17   **24**    **A.**   AA through --  I'm sorry, A8A through A8X.

05:05:50   **25**    **Q.**   We'll go to the next page.   This is page 6.

05:06:14  1              Now, on this computer disc, Exhibit No. 139-A,  did

-08:-54:-17  2  you find any photographs of Mohammad Amawi?

05:06:23  3      A.   I believe I did.

-08:-54:-17  4      Q.   Is there more than one photograph of Mr. Amawi on this

05:06:28  5  CD?

-08:-54:-17  6      A.   Oh, yes, there were many.

-08:-54:-17  7      Q.   I'd like to direct your attention to a couple in

-08:-54:-17  8  particular.   Exhibit 139-A-1 L2A2.

05:06:48  9              MR. HARTMAN:  Can we have that again, 139-A-1 L2A2?

05:07:02  10             Thank you.

05:07:03  11             MR. HERDMAN:  Sure.

05:07:27  12             (Displayed.)

-08:-54:-17  13  BY MR. HERDMAN:

-08:-54:-17  14     Q.   There is Exhibit L2A2.   That's Mohammad Amawi?

-08:-54:-17  15     A.   Yes, it is.

-08:-54:-17  16     Q.   And now I'd like to direct your attention to Exhibit

-08:-54:-17  17  L2A4.   Is that also Mohammad Amawi?

05:07:47  18     A.   It is.

-08:-54:-17  19     Q.   Directing your attention to Exhibit L2A5.  Is that also

-08:-54:-17  20  Mohammad Amawi?

-08:-54:-17  21     A.   Yes, it is.

-08:-54:-17  22     Q.   Now, did most of the photographs that were contained on

-08:-54:-17  23  this CD appear to be taken with a similar device?

05:08:05  24             MR. HARTMAN:  Objection.

05:08:06  25             THE COURT:  I would agree, unless there's some

05:08:10  **1**  particular technical expertise in that regard.

05:08:13  **2**  BY MR. HERDMAN:

05:08:13  **3**      **Q.**    Were there other photographs on this CD that appeared

-08:-54:-17  **4**  similar in the way that they were taken as compared to the three

05:08:21  **5**  photographs you've just presented to the jury?

-08:-54:-17  **6**      **A.**    Yes.

05:08:24  **7**      **Q.**    And can you approximate how many there were?

05:08:42  **8**      **A.**    I would say there's somewhere between 40 to 60.

-08:-54:-17  **9**      **Q.**    And they were all photographs of Mohammad Amawi?

-08:-54:-17  **10**     **A.**    Correct.

05:08:53  **11**            THE COURT:  In terms of similar, similar attired or

05:08:57  **12**  what's the…

05:08:58  **13**            MR. HERDMAN:  If we can approach, Your Honor, I can

05:09:00  **14**  explain this very briefly.

-08:-54:-17  **15**            THE COURT:  Sure.

05:09:02  **16**            (Whereupon the following discussion was had at the

05:10:52  **17**  bench outside the hearing of the jury:)

05:10:52  **18**            THE COURT:  Do you care?  The word "similar", he

-08:-54:-17  **19**  said there's 45 similar photographs.   In effect.

-08:-54:-17  **20**            MR. HERDMAN:  The bottom line is all of those

-08:-54:-17  **21**  photographs were taken with a web camera.   That's the only

-08:-54:-17  **22**  issue.

-08:-54:-17  **23**            MR. HARTMAN:  How do we know that?

-08:-54:-17  **24**            MR. HERDMAN:  I could go through every single

-08:-54:-17  **25**  photograph and you'd see that the positioning of whatever the

-08:-54:-17  **1**   device is appears to be very similar and the background.

-08:-54:-17  **2**                   MR. IVEY:  It's irrelevant.

-08:-54:-17  **3**                   THE COURT:  I agree.   The fact they were with a

-08:-54:-17  **4**   webcam, so what?

-08:-54:-17  **5**                   MR. HERDMAN:  I can withdraw all these questions.

-08:-54:-17  **6**   My only question is there's multiple photos of Mr. Amawi on

-08:-54:-17  **7**   here.   They all appear to be taken roughly around the same

-08:-54:-17  **8**   time; based upon the time, they're all using the same device.

-08:-54:-17  **9**                   THE COURT:  I thought you meant using the same kind

-08:-54:-17  **10**  of garb.

-08:-54:-17  **11**                   MR. HERDMAN:  No.   He's not.   I'm certainly

-08:-54:-17  **12**  prepared to ask Agent Gubanich that.   I had to rephrase the

-08:-54:-17  **13**  question on the fly.   I obviously didn't do a good job of that.

-08:-54:-17  **14**                   MR. WITMER-RICH:  There are thousands and thousands

-08:-54:-17  **15**  of photos of Mr. Amawi taken by all sorts of devices in all

-08:-54:-17  **16**  sorts of settings.   Just thousands of them.

-08:-54:-17  **17**                   MR. HERDMAN:  This relates to one particular --

-08:-54:-17  **18**                   MR. WITMER-RICH:  Now we're getting a little far

-08:-54:-17  **19**  afield.

-08:-54:-17  **20**                   MR. HERDMAN:  It's not a big deal, Your Honor.  I

-08:-54:-17  **21**  can withdraw this line of questioning.   That's fine.

-08:-54:-17  **22**                   (End of side bar discussion.)

05:10:54  **23**                   THE COURT:  This most recent line of questions is

-08:-54:-17  **24**  going to be withdrawn; is that correct?   The question and

-08:-54:-17  **25**  answer that you asked will be withdrawn; is that correct?

05:11:03    **1**           MR. HERDMAN:  That's correct.

05:11:04    **2**           THE COURT:  Ladies and gentlemen, I understand one

-08:-54:-17 **3** of you would like to run upstairs.  Why don't all of you run

05:11:10    **4** upstairs.   We'll take about a ten-minute break.

05:22:48    **5**           (Recess taken.)

-08:-54:-17 **6**           THE COURT:  You remain under oath.

05:22:56    **7**           You may resume.

05:23:00    **8** BY MR. HERDMAN:

05:23:01    **9**     **Q.**   Agent Barnes (sic),  you mentioned earlier in your

-08:-54:-17 **10** testimony?

-08:-54:-17 **11**           THE COURT:  I think Agent Gubanich is still on the

05:23:07    **12** stand.

05:23:09    **13**           MR. HERDMAN:  Sorry, Your Honor, I apologize.

-08:-54:-17 **14**           MR. HARTMAN:  We'll stipulate.

05:23:14    **15**           MR. HERDMAN:  It's afternoon and Barnes is

05:23:18    **16** definitely a lot easier to say.

-08:-54:-17 **17**           THE COURT:  That's quite all right.   Go ahead.

05:23:25    **18** BY MR. HERDMAN:

-08:-54:-17 **19**     **Q.**   Agent Gubanich, earlier in your testimony you described

05:23:29    **20** reviewing certain computer evidence that related to Defendant

-08:-54:-17 **21** Marwan El-Hindi?

05:23:33    **22**     **A.**   Yes.

-08:-54:-17 **23**     **Q.**   I'd like to direct your attention to Exhibit 76.   What

-08:-54:-17 **24** is that item?

-08:-54:-17 **25**     **A.**   That is a computer taken from Marwan El-Hindi's house.

-08:-54:-17 **1**    **Q.**    What kind of computer is that?

-08:-54:-17 **2**    **A.**    It's a Hewlett Packard Vectra computer.

-08:-54:-17 **3**    **Q.**    Did you review some files recovered from this exhibit?

-08:-54:-17 **4**    **A.**    Yes.

05:24:04 **5**    **Q.**    I'd like to show you Exhibit 76-1.  What is that?

05:24:11 **6**    **A.**    That is the file listings of files found on the

05:24:15 **7** computer.

05:24:16 **8**    **Q.**    Then I'd like to show you Exhibit 76-2.  What is that?

05:24:26 **9**    **A.**    That's the same file listings with the addition of the

05:24:31 **10** translation and notes column.

05:24:34 **11**    **Q.**    As part of your review, did you view any what appear to

-08:-54:-17 **12** be recovered e-mail boxes?

-08:-54:-17 **13**    **A.**    Yes.

05:24:47 **14**    **Q.**    I'd like to direct your attention to AO, 76-1AO.

05:24:53 **15**          MR. BOSS:  Could we have that number again?

-08:-54:-17 **16**          MR. HERDMAN:  76-1AO.

05:25:17 **17** BY MR. HERDMAN:

-08:-54:-17 **18**    **Q.**    What does this appear to be, Agent Gubanich?

05:25:20 **19**    **A.**    It appears to be an e-mail inbox.

05:25:24 **20**    **Q.**    There's two -- can you draw the jurors' attention to two

-08:-54:-17 **21** e-mails at the bottom there?

-08:-54:-17 **22**    **A.**    I think one is dated 5/30/05 and one is dated 5/31/05.

05:25:43 **23** One is an e-mail from Dr. Yousef at European-MSS.com.  And the

-08:-54:-17 **24** one dated 5-31, 2005, is from Atul Kaushal.

05:26:07 **25**    **Q.**    You said that this was an inbox.  What do you base that

5004

-08:-54:-17 **1**  on?

05:26:12 **2**  **A.**  I base that on the fact that along the sides there are

-08:-54:-17 **3**  various folders:  Inbox, compose, folders, search, et cetera.

-08:-54:-17 **4**  And also it appears to be a listing of e-mail header

05:26:34 **5**  information.

05:26:38 **6**  **Q.**  Now I'd like to direct your attention to Exhibit 76-1AR.

05:26:47 **7**  MR. HERDMAN:  That's AR, Counsel.

05:26:47 **8**  BY MR. HERDMAN:

05:26:54 **9**

05:26:54 **10**  **Q.**  What does this appear to be, Agent Gubanich?

-08:-54:-17 **11**  **A.**  This appears to be another e-mail inbox with e-mail

05:27:05 **12**  header information.

05:27:07 **13**  THE COURT:  I'm sorry, I didn't hear what you said

-08:-54:-17 **14**  at the beginning.

-08:-54:-17 **15**  THE WITNESS:  It appears to be another e-mail inbox

-08:-54:-17 **16**  with e-mail header information.

05:27:16 **17**  BY MR. HERDMAN:

05:27:16 **18**  **Q.**  Do you see any of the same e-mails that you just

05:27:19 **19**  testified to with respect to another recovered inbox?

-08:-54:-17 **20**  **A.**  Yes, Atul Kaushal, as well as Dr. Yousef at MSS.com.

05:27:41 **21**  **Q.**  76-1AS.  Can you just describe that for the jury?

-08:-54:-17 **22**  **A.**  Yes.  It appears to be another e-mail inbox with e-mail

05:28:01 **23**  header information.  Again listing e-mails from Atul Kaushal

05:28:07 **24**  and Dr. Yousef at MSS.com.

-08:-54:-17 **25**  MR. HARTMAN:  Judge, can we approach for a minute,

-08:-54:-17 **1** please?

05:28:18 **2**                    THE COURT:  Sure.

-08:-54:-17 **3**                    (Whereupon the following discussion was had at the

05:29:29 **4** bench outside the hearing of the jury:)

05:29:29 **5**                    MR. HARTMAN:  I'm relatively confident that's not

-08:-54:-17 **6** quite what these e-mail inboxes looked like when they were on

-08:-54:-17 **7** the computer.   That, I don't have a problem with.   But this

-08:-54:-17 **8** third one that you used didn't have a date on those e-mails at

-08:-54:-17 **9** all.   That, I would like to know.   The first two the dates

-08:-54:-17 **10** were listed, but this one it didn't say what the dates of the

-08:-54:-17 **11** e-mail were.

-08:-54:-17 **12**                    MR. HERDMAN:  This is sort of part one of a

-08:-54:-17 **13** three-part series, Your Honor.   And our computer forensic

-08:-54:-17 **14** expert can explain why it is that certain things appear

-08:-54:-17 **15** differently in certain files.   I'm certain -- it's certainly

-08:-54:-17 **16** something you can cross-examine on.

-08:-54:-17 **17**                    THE COURT:  We'll get the answer at some point.

05:29:32 **18**                    (End of sidebar discussion.)

05:29:38 **19**                    THE COURT:  You may continue.

05:29:38 **20** BY MR. HERDMAN:

-08:-54:-17 **21**      Q.   Can you repeat the e-mails that you saw on -- that you

-08:-54:-17 **22** see there on what is Exhibit -- Government's Exhibit AS?

05:29:53 **23**      A.   Yes.   There is an Atul Kaushal.   I see three e-mails

-08:-54:-17 **24** on the screen -- four.   My apology, four e-mails on that screen

-08:-54:-17 **25** from that person.   There is an e-mail from Dr. Yousef at

| | |
|---|---|
| 05:30:09 | **1** MSS.com. There's also an e-mail actually listing the name Dr. |
| -08:-54:-17 | **2** Yousef El-Hindi. |
| -08:-54:-17 | **3** Q. Do you know who Yousef El-Hindi is? |
| -08:-54:-17 | **4** A. I believe Marwan has a brother named Yousef El-Hindi. |
| 05:30:30 | **5** Q. Now let's direct your attention to Government's Exhibit |
| 05:30:33 | **6** 76-1AQ. If you could scroll down to the bottom there. Now, |
| 05:30:51 | **7** do you see -- actually this is probably a good place to ask you |
| -08:-54:-17 | **8** this particular question. |
| -08:-54:-17 | **9** What's the program that's up on the screen right |
| -08:-54:-17 | **10** now if you know? |
| -08:-54:-17 | **11** A. It's Microsoft Internet Explorer. |
| 05:31:04 | **12** Q. And I'd like to direct your attention to that last |
| 05:31:07 | **13** e-mail. The one dated 2-7, 2005. |
| -08:-54:-17 | **14** A. Yes. |
| -08:-54:-17 | **15** Q. That e-mail address, who does that appear to be from? |
| 05:31:14 | **16** A. Alm2sda@alm2sda.net. |
| 05:31:20 | **17** Q. What are some of the e-mail addresses above that e-mail |
| -08:-54:-17 | **18** dated 2-7, 2005? |
| 05:31:26 | **19** A. There's an e-mail from Dr. Yousef. There's an e-mail |
| 05:31:30 | **20** from Bhargav Atel. There's an e-mail from Dr. Yousef at |
| -08:-54:-17 | **21** European.MSS.com. |
| -08:-54:-17 | **22** Q. The e-mail dated 2-8, 2005. There's one immediately |
| -08:-54:-17 | **23** above that e-mail date 2-7, 2005? |
| -08:-54:-17 | **24** A. Yes. |
| 05:31:52 | **25** Q. What's the name of the person that e-mail is from? |

-08:-54:-17 **1**    **A.**    Waseem, last name N-u-q-u-l.

-08:-54:-17 **2**    **Q.**    What's the subject line of that particular e-mail?

05:32:09 **3**    **A.**    There are two from that date.

05:32:11 **4**    **Q.**    The one immediately above the e-mail date 2-7, 2005.

-08:-54:-17 **5**    **A.**    "To the kind attention of Mr. El-Hindi."

05:32:20 **6**    **Q.**    Now, related to the e-mail dated 2-7, 2005 from alm2sda,

05:32:27 **7** in the subject line of that e-mail -- do you see those

05:32:31 **8** characters there?

-08:-54:-17 **9**    **A.**    Yes.

05:32:33 **10**    **Q.**    What is your understanding of what those characters are?

-08:-54:-17 **11**    **A.**    Those characters are unencoded text that would, if

-08:-54:-17 **12** encoded, become Arabic text.

05:32:54 **13**    **Q.**    Have you seen texts similar to that in this particular

-08:-54:-17 **14** case?

-08:-54:-17 **15**    **A.**    Yes, I have.

05:33:00 **16**    **Q.**    Would you be able to at this point in time actually

05:33:03 **17** convert the encoding on this web page?

-08:-54:-17 **18**    **A.**    I believe so.

-08:-54:-17 **19**    **Q.**    How would you do that if you were to do that?

-08:-54:-17 **20**    **A.**    I would right click on the box.

05:33:12 **21**       MR. HERDMAN: Your Honor, I'm going to ask leave of

-08:-54:-17 **22** court if the person operating the computer could follow, this is

05:33:18 **23** for demonstrative purposes, Agent Gubanich's instructions at

-08:-54:-17 **24** this point.

05:33:24 **25**       MR. BOSS: Could we approach for a minute?

-08:-54:-17 **1**          THE COURT:  Sure.

05:33:27 **2**          (Whereupon the following discussion was had at the

05:36:31 **3** bench outside the hearing of the jury:)

05:36:31 **4**          MR. BOSS:  Your Honor, we appear to be conducting

-08:-54:-17 **5** an in-court experiment to which the defense has been given no

-08:-54:-17 **6** notice.   And we have not been given an opportunity to check or

-08:-54:-17 **7** verify the accuracy of the information nor where we're going

-08:-54:-17 **8** with this.

-08:-54:-17 **9**          MR. HERDMAN:  We're about to find out whether or

-08:-54:-17 **10** not it works.

-08:-54:-17 **11**          THE COURT:  I don't think it's an experiment.

-08:-54:-17 **12** It's a demonstration.   Go ahead.

-08:-54:-17 **13**          MR. HERDMAN:  I have provided, certainly, notice of

-08:-54:-17 **14** the encoding issue with respect to Internet Explorer to Counsel.

-08:-54:-17 **15** Because, if you remember, Exhibit 791, the IED e-mail

-08:-54:-17 **16** purportedly from Marwan El-Hindi to Darren Griffin, I provided

-08:-54:-17 **17** Counsel with and I actually said this is in the body of the

-08:-54:-17 **18** e-mail.   I said this is a copy of the e-mail with the Arabic

-08:-54:-17 **19** encoded.   That was, I think, on May 5 I provided that e-mail.

-08:-54:-17 **20** So as far as I'm aware, I've given plenty of notice.

-08:-54:-17 **21**          THE COURT:  Where are we going with this?

-08:-54:-17 **22**          MR. HERDMAN:  No, if the demonstration goes the way

-08:-54:-17 **23** I expect it to, if the encoding is done properly, those

-08:-54:-17 **24** characters in the subject line will be transformed essentially

-08:-54:-17 **25** into Arabic, which this agent can't read.

-08:-54:-17 **1**        THE COURT:  Your point?

-08:-54:-17 **2**        MR. HERDMAN:  What's in the subject line will be in

-08:-54:-17 **3** Arabic text that our translator can come in and essentially say

-08:-54:-17 **4** for the Court what the Arabic text means.

-08:-54:-17 **5**        THE COURT:  What does it mean?

-08:-54:-17 **6**        MR. HERDMAN:  I believe it says from the alm2sda

-08:-54:-17 **7** web page, and it says the date.  New from the alm2sda web page.

-08:-54:-17 **8**        MR. SOFER:  Your Honor may recall around this same

-08:-54:-17 **9** time the evidence so far has shown, we believe, that Marwan

-08:-54:-17 **10** El-Hindi gave printed pages of the alm2sda web page to Darren

-08:-54:-17 **11** Griffin who then used those to ultimately acquire the bomb vest

-08:-54:-17 **12** video, which is one of the counts in the indictment.  So this

-08:-54:-17 **13** all marries up.

-08:-54:-17 **14**        MR. HARTMAN:  And our expert will provide evidence

-08:-54:-17 **15** that Marwan El-Hindi never printed those pages at any time on

-08:-54:-17 **16** his computer.  And unless the government can show that what

-08:-54:-17 **17** they're about to convert to Arabic was converted to Arabic on

-08:-54:-17 **18** his computer so he could read it, I don't think he should be

-08:-54:-17 **19** allowed to do it.

-08:-54:-17 **20**        MR. HERDMAN:  We can do it.  Not through this

-08:-54:-17 **21** witness, but through other witnesses.

-08:-54:-17 **22**        THE COURT:  Okay.  In light of that, I'll allow you

-08:-54:-17 **23** to proceed.  If they don't do it, I'll strike or consider a

-08:-54:-17 **24** motion to strike.

-08:-54:-17 **25**        MR. HERDMAN:  Your Honor, even if we didn't do

-08:-54:-17   **1**   that, which again --

-08:-54:-17   **2**   THE COURT:  Okay.

-08:-54:-17   **3**   MR. HERDMAN:  Yes, Your Honor.  Next week's

-08:-54:-17   **4**   argument can wait.

-08:-54:-17   **5**   (End of sidebar.)

05:36:36   **6**   THE COURT:  Do you recall the last question?

05:36:40   **7**   MR. HERDMAN:  I was --

-08:-54:-17   **8**   THE COURT:  That's fine.   You may proceed.

05:36:44   **9**   BY MR. HERDMAN:

-08:-54:-17   **10**   Q.  Agent Gubanich, could you just demonstrate?

-08:-54:-17   **11**   MR. HERDMAN: Again with leave of Court, I'd ask the

-08:-54:-17   **12**   individual operator of the computer to follow Agent Gubanich's

-08:-54:-17   **13**   direction here.

05:36:54   **14**   A.  Could you right click on the screen?  Go down to

05:37:00   **15**   "encoding".  Go down to the "more" option and select "Arabic

05:37:05   **16**   Windows".  Now the Arabic text is displayed.

05:37:13   **17**   BY MR. HERDMAN:

05:37:13   **18**   Q.  This is just for the record.  Agent Gubanich, describe

-08:-54:-17   **19**   what, after we've changed the encoding to Arabic Windows, how

-08:-54:-17   **20**   does this particular exhibit appear?   Specifically with respect

05:37:27   **21**   to the e-mail on 2-7, 2005.

05:37:30   **22**   A.  The subject line has changed from the -- we've been

05:37:37   **23**   using the term Win Games because it's not really comprehensible

05:37:41   **24**   text to the following 2005-2-7, followed by what appears to me

-08:-54:-17   **25**   to be Arabic text.

-08:-54:-17 **1**   **Q.**   You, obviously, can't read or interpret that?

-08:-54:-17 **2**   **A.**   I cannot read it, no.

05:37:55 **3**   **Q.**   I'd like to direct your attention now to Exhibit 76-1AY.

05:38:17 **4**         MR. HERDMAN:  Can you bring up 76-2?   If we could

-08:-54:-17 **5** go to the next page.   I'd like to direct your attention to

05:38:35 **6** Exhibit 76-1AY.   If you could zoom in on that.

05:38:46 **7** BY MR. HERDMAN:

-08:-54:-17 **8**   **Q.**   With respect to that exhibit, what's the name of that

05:38:49 **9** particular file?

-08:-54:-17 **10**   **A.**   Message from the resistance.wmv.

05:38:55 **11**   **Q.**   Are your familiar with that particular file?

-08:-54:-17 **12**   **A.**   I am.

-08:-54:-17 **13**   **Q.**   How are you familiar with it?

-08:-54:-17 **14**   **A.**   It's a file that Mohammad Amawi played for Darren

05:39:07 **15** Griffin and also supplied to him.

-08:-54:-17 **16**   **Q.**   Does that particular item go by a different name?

-08:-54:-17 **17**   **A.**   Exhibit 32 in this case.   It also goes by a name,

05:39:17 **18** communiqué 6.

05:39:19 **19**   **Q.**   To your knowledge is that an Arabic language or English

05:39:24 **20** language video?

-08:-54:-17 **21**   **A.**   It's English language.

05:39:30 **22**   **Q.**   Now I'm about to direct your attention to Exhibit 76-1AK

05:39:35 **23** on the same document.   I apologize.   Right at the top there.

-08:-54:-17 **24**         With respect to Exhibit AK, are you familiar with

-08:-54:-17 **25** that file?

-08:-54:-17  **1**    **A.**   Yes.

-08:-54:-17  **2**    **Q.**   Can you just briefly describe for the jury what that

-08:-54:-17  **3**  file depicts?

-08:-54:-17  **4**    **A.**   The file depicts a U.S. helicopter operation assault.

05:40:02  **5**    **Q.**   Is there anything in particular about the way the camera

-08:-54:-17  **6**  depicts what happens?

-08:-54:-17  **7**    **A.**   It's like a night vision operation and you can hear

05:40:13  **8**  communications over the radio.

05:40:29  **9**    **Q.**   Finally with respect to this Exhibit 76, can you go to

05:40:36  **10**  Exhibit 76-AD.

05:41:01  **11**           This is Exhibit AD again.   Did you review this

-08:-54:-17  **12**  particular document during your review of the computer evidence

05:41:10  **13**  in this case?

-08:-54:-17  **14**    **A.**   Yes, I did.

-08:-54:-17  **15**    **Q.**   Was there any significance in this particular document?

-08:-54:-17  **16**    **A.**   The heading is EMSS student's 2004, 2005.   And the

-08:-54:-17  **17**  first entry underneath that heading is Yasmeen Ahmed.

05:41:28  **18**    **Q.**   Do you know who Yasmeen Ahmed is?

05:41:31  **19**    **A.**   It is the sister of Zubair Ahmed.  And also the e-mail

-08:-54:-17  **20**  address.

-08:-54:-17  **21**    **Q.**   What is the e-mail address listed for Yasmeen?

-08:-54:-17  **22**    **A.**   Nightsniper18@hotmail.com.

-08:-54:-17  **23**    **Q.**   I'd like to direct your attention now to Exhibit 77.

-08:-54:-17  **24**  What is that?

-08:-54:-17  **25**    **A.**   That is a laptop computer from Marwan El-Hindi's

05:42:10 **1** residence.

-08:-54:-17 **2**    Q.    Did you review the files off this exhibit during the

05:42:14 **3** course of your computer review?

-08:-54:-17 **4**    A.    Yes, I did.

-08:-54:-17 **5**    Q.    And I want to direct your attention in particular to a

-08:-54:-17 **6** couple photographs.  Exhibit 77-1M.  Who's depicted in that

-08:-54:-17 **7** photograph, Exhibit M?

-08:-54:-17 **8**    A.    From left to right it's Marwan El-Hindi, Mohammad Ahmed,

05:42:52 **9** and Khaleel Ahmed.

-08:-54:-17 **10**    Q.    Who is Mohammad Ahmed?

05:42:55 **11**    A.    Mohammad Ahmed is the father of Zubair Ahmed and Yasmeen

05:43:01 **12** Ahmed.

-08:-54:-17 **13**    Q.    Now I'm showing you Exhibit 77-1N.  Who's depicted in

-08:-54:-17 **14** that photograph?

-08:-54:-17 **15**    A.    From left to right:  Khaleel Ahmed, Marwan El-Hindi,

05:43:19 **16** Mohammad Ahmed, and Zubair Ahmed.

05:43:23 **17**              MR. HARTMAN:  Mr. Herdman, what was that exhibit

05:43:26 **18** number?

05:43:26 **19**              MR. HERDMAN:  77-1N as in November.

05:43:26 **20** BY MR. HERDMAN:

-08:-54:-17 **21**    Q.    Now directing your attention to Exhibit 77-1O.  Who's

05:43:42 **22** depicted in that photograph?

05:43:43 **23**    A.    From left to right, Khaleel Ahmed, Marwan El-Hindi,

05:43:49 **24** Yousef El-Hindi, Mohammad Ahmed, and Zubair Ahmed.

05:43:55 **25**    Q.    Do you have any knowledge of a place where all five of

-08:-54:-17   **1**   these individuals were together at some point?

05:44:01   **2**   **A.**   They were together in Egypt.

05:44:05   **3**   **Q.**   Showing you Exhibit 77-1P. Who's in that photograph?

05:44:15   **4**   **A.**   Khaleel Ahmed, Marwan El-Hindi and Zubair Ahmed.

-08:-54:-17   **5**   **Q.**   Directing your attention 77-1V.

05:44:33   **6**   MR. HARTMAN: "B" as in boy?

05:44:35   **7**   MR. HERDMAN: "V" as in Victor.

05:44:41   **8**   BY MR. HERDMAN:

05:44:42   **9**   **Q.**   Agent Gubanich, what does that appear to you to be?

-08:-54:-17   **10**   **A.**   It appears to me to be the pyramids in Egypt.

-08:-54:-17   **11**   **Q.**   Have you ever been to Egypt before?

-08:-54:-17   **12**   **A.**   I have not.

05:44:52   **13**   **Q.**   Have you ever seen pictures or other photographs of the

05:44:57   **14**   pyramids in Egypt before?

-08:-54:-17   **15**   **A.**   Yes.

05:45:00   **16**   **Q.**   Directing your attention to 77-1W. What does that

05:45:10   **17**   appear to be?

-08:-54:-17   **18**   **A.**   Again, a photograph with the pyramids. It appears to

05:45:15   **19**   be taken in Egypt.

05:45:16   **20**   **Q.**   Now, the five or six photographs that we just went

-08:-54:-17   **21**   through, is there any way that you can describe for the jury, at

-08:-54:-17   **22**   least with respect to the names of these files in any case, that

05:45:31   **23**   they were taken in close proximity to each other in terms of

-08:-54:-17   **24**   time?

05:45:35   **25**   **A.**   It appears by the file names that they were taken on a

05:45:41 **1**   camera.

-08:-54:-17 **2**                       MR. HARTMAN:  Objection.

-08:-54:-17 **3**                       THE COURT:  I would agree.   Unless there's some

-08:-54:-17 **4**   basis and foundation for this.

05:45:49 **5**                       MR. HERDMAN:  Can we bring up Exhibit 77-2, please?

05:45:49 **6**   BY MR. HERDMAN:

05:46:04 **7**

05:46:04 **8**       **Q.**   Again the photographs we just viewed.

-08:-54:-17 **9**                       MR. HERDMAN:   If you could zoom in on 77-1M through

-08:-54:-17 **10**  77-1W.

-08:-54:-17 **11**  BY MR. HERDMAN:

05:46:14 **12**      **Q.**   Can you just describe first maybe 77-1M, Agent Gubanich;

-08:-54:-17 **13**  can you describe what the name of that particular file is?

-08:-54:-17 **14**      **A.**   It is dscf0041.jpg.

05:46:37 **15**      **Q.**   How about 77-1S, what's the name of that particular

-08:-54:-17 **16**  file?

05:46:47 **17**      **A.**   Dscf0047.jpg.

05:46:56 **18**      **Q.**   Then 77-1V, what's the name of that particular file?

-08:-54:-17 **19**      **A.**   Dscf0055.jpg.

05:47:13 **20**      **Q.**   I'm going to show you now a picture of Exhibit 78.   Are

-08:-54:-17 **21**  you familiar with that exhibit?

-08:-54:-17 **22**      **A.**   That is a cell phone belonging to Marwan El-Hindi.

05:47:25 **23**      **Q.**   Did you review a forensic report of this exhibit at some

-08:-54:-17 **24**  point?

-08:-54:-17 **25**      **A.**   Yes, I did.

-08:-54:-17  **1**      **Q.**    Showing you Exhibit 78-A.   If you could go to the next

-08:-54:-17  **2**    page, please.   H is page 2.   What does that appear to you to

-08:-54:-17  **3**    be?

-08:-54:-17  **4**      **A.**    It appears to be an address book of telephone numbers.

-08:-54:-17  **5**      **Q.**    And on this first page here, are there any names in this

05:47:57  **6**    address book that were of interest to you in your review?

05:48:01  **7**      **A.**    Yes.

-08:-54:-17  **8**      **Q.**    Can you please point those out to the jury?   I don't

-08:-54:-17  **9**    know if you can touch the screen, if that will work.

05:48:10  **10**     **A.**    Mohammad Ahmed, Zubair Ahmed, Ashraft Zaim.

05:48:23  **11**     **Q.**    Can you point to that one?

05:48:26  **12**     **A.**    Can you see it? "Beelal."   I believe that to be Darren

05:48:39  **13**   Griffin.

05:48:39  **14**     **Q.**    On what do you base that?

-08:-54:-17  **15**     **A.**    On the phone number, 419-787-3906.

05:48:51  **16**     **Q.**    Do you see the name Khaleel on that first page?

-08:-54:-17  **17**     **A.**    Yes.   Right there.

05:49:01  **18**     **Q.**    If we go to the second page --  I'm sorry.   Stay on the

-08:-54:-17  **19**   first page a moment.

-08:-54:-17  **20**             Do you see the name Atul on that first page of the

-08:-54:-17  **21**   address book?

05:49:16  **22**     **A.**    Yes, I do.  Yes.

05:49:34  **23**     **Q.**    Can you go to the third page.   Did you see any names of

-08:-54:-17  **24**   interest on this other page here, towards the bottom

05:50:02  **25**   specifically?

05:50:03 **1**  **A.**  Again, here is Mohammad Ahmed. And there's a name

-08:-54:-17 **2** Bhargav; I've never seen that before.

-08:-54:-17 **3**  **Q.**  If we can go to the next page.

05:50:35 **4**  MR. HARTMAN: Page 3?

05:50:36 **5**  MR. HERDMAN: This is page 4.

05:50:39 **6**  MR. HARTMAN: The last one was page 3?

05:50:42 **7**  MR. HERDMAN: Correct.

05:50:43 **8**  MR. HARTMAN: Thank you.

05:50:46 **9** BY MR. HERDMAN:

-08:-54:-17 **10**  **Q.**  Did you see any names of interest on this page?

-08:-54:-17 **11**  **A.**  Yes, Jihad Dahabi.

05:51:03 **12**  **Q.**  If you could go to the fifth page. Did you see any

05:51:17 **13** names of interest on this page?

-08:-54:-17 **14**  **A.**  There's Mohammad Amawi. There's Wassim Mazloum.

05:51:46 **15**  **Q.**  I'd like to direct your attention to Exhibit 79. If

05:51:59 **16** you could zoom in on the subject line.

05:52:04 **17**  With respect to the subject line of this particular

05:52:07 **18** exhibit, does the text of that subject line -- does that sort of

-08:-54:-17 **19** look familiar to something you've testified to previously

-08:-54:-17 **20** already?

-08:-54:-17 **21**  **A.**  Yes.

-08:-54:-17 **22**  **Q.**  What would this indicate to you in the way the text

05:52:21 **23** appears in the subject line in Exhibit 79?

-08:-54:-17 **24**  **A.**  It appears the encoding has not been changed to Arabic.

-08:-54:-17 **25**  **Q.**  Were you able to actually -- strike that.

-08:-54:-17  **1**          Let me ask this question.   How did this exhibit,

-08:-54:-17  **2**  79, how did this originally arrive in the custody of the FBI?

-08:-54:-17  **3**      A.    It was e-mailed initially from Marwan El-Hindi to Darren

05:52:46  **4**  Griffin, who then forwarded the file from Darren Griffin to the

-08:-54:-17  **5**  FBI cover account.

-08:-54:-17  **6**      Q.    How was Exhibit 79 preserved?   In what way was it

05:53:00  **7**  preserved?

-08:-54:-17  **8**      A.    It was saved to a disc.

-08:-54:-17  **9**      Q.    So the original electronic information of this e-mail

05:53:05  **10**  was preserved?

-08:-54:-17  **11**      A.    Correct.

-08:-54:-17  **12**      Q.    Were you able to access that electronic version of this

05:53:11  **13**  e-mail?

-08:-54:-17  **14**      A.    Yes.

-08:-54:-17  **15**      Q.    Then I think we see a demonstration here, but can you

-08:-54:-17  **16**  tell the jury what you did in order to change the encoding?

05:53:19  **17**      A.    I brought up the original file again and I changed the

05:53:22  **18**  encoding to Arabic so that the text would be displayed in

-08:-54:-17  **19**  Arabic.

05:53:28  **20**      Q.    And did it, in fact, display what appeared to be Arabic

05:53:34  **21**  characters?

-08:-54:-17  **22**      A.    Yes, it appeared so.

-08:-54:-17  **23**      Q.    I'm going to show you Exhibit 79-A.   What is this?

-08:-54:-17  **24**      A.    That is the same file with the encoding changed to

05:53:53  **25**  Arabic.

5019

05:54:10 **1**     **Q.**   Do you know whether there was additional Arabic text

-08:-54:-17 **2** that appeared after you changed the encoding?

-08:-54:-17 **3**     **A.**   Yes.   At the end of the file there was several lines.

05:54:29 **4**     **Q.**   Can you indicate --  This is page 15.

-08:-54:-17 **5**          Can you indicate, Agent Gubanich, where there was

05:54:37 **6** Arabic encoded lettering that appeared?

-08:-54:-17 **7**     **A.**   Yes.  Below the picture.

-08:-54:-17 **8**     **Q.**   And on the next page.   Again, you don't speak Arabic,

-08:-54:-17 **9** do you?

-08:-54:-17 **10**    **A.**   No.

05:54:51 **11**    **Q.**   Does that appear to you to be Arabic lettering?

-08:-54:-17 **12**    **A.**   It appears to be.

05:54:58 **13**    **Q.**   The next page.   And is there what appears to be Arabic

05:55:06 **14** lettering on that page?

-08:-54:-17 **15**    **A.**   Yes.

-08:-54:-17 **16**    **Q.**   This is page 17.   Okay.

05:55:22 **17**          Agent Gubanich, if you can bring up Exhibit 130-B.

05:55:32 **18** Are you familiar with this exhibit?

-08:-54:-17 **19**    **A.**   Yes.

-08:-54:-17 **20**          THE COURT:   130-B?

05:55:39 **21**          MR. HERDMAN:  Yes, Your Honor.

05:55:41 **22** BY MR. HERDMAN:

05:55:41 **23**    **Q.**   What is this exhibit?

-08:-54:-17 **24**    **A.**   This is a compact disc from the collection of CDs that

05:55:47 **25** Mr. Amawi said were his.

05:55:49 **1**    **Q.**   And he told you that on February 19, 2006?

-08:-54:-17 **2**    **A.**   That's true.

-08:-54:-17 **3**    **Q.**   Did you have a chance to review this particular exhibit?

-08:-54:-17 **4**    **A.**   Yes, I did.

05:55:58 **5**    **Q.**   Can you bring up 130-B1.

05:56:08 **6**             What is that, Agent Gubanich?

-08:-54:-17 **7**    **A.**   A listing of files found on the CD.

-08:-54:-17 **8**    **Q.**   Could you bring up 130-B2.   What is that?

05:56:32 **9**    **A.**   That is a listing of the files with the additional

-08:-54:-17 **10** columns of translation and notes.

05:56:40 **11**    **Q.**   Did you -- just generally what did this particular CD,

05:56:46 **12** what kind of files did it contain?

-08:-54:-17 **13**    **A.**   They appeared to be mostly pictures.

-08:-54:-17 **14**    **Q.**   I'd like to direct your attention to some photographs in

-08:-54:-17 **15** particular.   If you could go to the computer evidence.

-08:-54:-17 **16** 130-B1-22.

-08:-54:-17 **17**             MR. HARTMAN:  Can we have that again?

05:57:16 **18**             MR. HERDMAN:  B-22.

05:57:21 **19** BY MR. HERDMAN:

05:57:21 **20**    **Q.**   What does that appear to you to be?

-08:-54:-17 **21**    **A.**   It appears to be several photos of dead men.

05:57:32 **22**    **Q.**   If we could go to Exhibit 130-B1E23.   What does that

-08:-54:-17 **23** appear to be?

-08:-54:-17 **24**    **A.**   It appears to be more photos of dead people on the

05:57:59 **25** right.

| | | | |
|---|---|---|---|
| 05:58:01 | **1** | **Q.** | If we could go to E24.   What does that appear to be? |
| 05:58:13 | **2** | **A.** | The lower right-hand depicts a dead man with his -- and |
| -08:-54:-17 | **3** | | the picture of his face, sort of superimposed in the right-hand |
| 05:58:25 | **4** | | corner. |
| 05:58:26 | **5** | **Q.** | Could we go to E25.   What does that appear to be? |
| -08:-54:-17 | **6** | **A.** | It appears to be a picture of a dead man, possibly even |
| 05:58:45 | **7** | | in a coffin. |
| -08:-54:-17 | **8** | **Q.** | If we could go to E28.   What does that appear to be? |
| -08:-54:-17 | **9** | **A.** | It appears to be a picture of a dead man. |
| 05:58:56 | **10** | **Q.** | If we could go to E30.   What does that appear to be? |
| -08:-54:-17 | **11** | **A.** | It appears to be a picture of another dead man. |
| 05:59:08 | **12** | **Q.** | Could we go to E31? |
| 05:59:16 | **13** | **A.** | Yet another picture of a dead man. |
| 05:59:19 | **14** | **Q.** | And if we could go to E32. |
| 05:59:26 | **15** | **A.** | Another picture of a man who appears to be dead. |
| 05:59:30 | **16** | **Q.** | Did you -- in your review of all the computer evidence |
| -08:-54:-17 | **17** | | in this case, did you view any photographs of Mohammad Amawi |
| -08:-54:-17 | **18** | | that appeared similar to the photographs that were just |
| -08:-54:-17 | **19** | | displayed? |
| 05:59:41 | **20** | **A.** | Yes, I did. |
| 05:59:43 | **21** | **Q.** | Where were those photographs located? |
| -08:-54:-17 | **22** | **A.** | On the Sony Vaio. |
| 05:59:48 | **23** | **Q.** | Exhibit 124? |
| 05:59:50 | **24** | **A.** | Correct. |
| -08:-54:-17 | **25** | **Q.** | Could you put up Exhibit 124-1?   That's the Exhibit |

| | | |
|---|---|---|
| 05:59:57 | **1** | list for 124-1? |
| -08:-54:-17 | **2** | **A.**   Yes. |
| -08:-54:-17 | **3** | **Q.**   If you could, bring up Exhibit 124-2.   What is that, |
| 06:00:05 | **4** | Exhibit 124-2? |
| 06:00:07 | **5** | **A.**   That's the files, and the translation and notes columns. |
| -08:-54:-17 | **6** | **Q.**   You said you've seen some photographs similar during |
| -08:-54:-17 | **7** | your review of the computer evidence in Exhibit 124, the Sony |
| 06:00:25 | **8** | Vaio laptop? |
| 06:00:27 | **9** | **A.**   Correct. |
| -08:-54:-17 | **10** | **Q.**   I'd like to direct your attention to 124-1AV.   Who is |
| -08:-54:-17 | **11** | that? |
| 06:00:47 | **12** | **A.**   That's Mohammad Amawi. |
| 06:00:52 | **13** | **Q.**   Directing your attention to Exhibit 124-1AS.   Who is |
| -08:-54:-17 | **14** | that? |
| -08:-54:-17 | **15** | **A.**   That is Mohammad Amawi. |
| 06:01:06 | **16** | **Q.**   Directing your attention to Exhibit 124-1AT.   Who is |
| 06:01:15 | **17** | that? |
| -08:-54:-17 | **18** | **A.**   Another picture of Mohammad Amawi. |
| 06:01:18 | **19** | **Q.**   And directing your attention to Exhibit 124-1AU.   Who |
| -08:-54:-17 | **20** | so that? |
| 06:01:28 | **21** | **A.**   That's another picture of Mohammad Amawi. |
| 06:01:31 | **22** | MR. HERDMAN:  If I could have just a moment, Your |
| 06:01:34 | **23** | Honor. |
| 06:01:34 | **24** | THE COURT:  Sure. |
| 06:02:05 | **25** | MR. HERDMAN:  Your Honor, I have no further |

-08:-54:-17 **1** questions of Agent Gubanich.

06:02:08 **2**       THE COURT: Okay. Why don't we take another

-08:-54:-17 **3** recess. Maybe about ten minutes. Then we'll have

-08:-54:-17 **4** cross-examination.

06:02:16 **5**       MR. IVEY: Your Honor, when we take a recess can we

-08:-54:-17 **6** approach?

06:02:21 **7**       THE COURT: Sure.

06:04:56 **8**       (Jury outside.)

-08:-54:-17 **9**       MR. IVEY: Just two quick points. The first one

-08:-54:-17 **10** is I'm going to be conducting cross-examination of Agent

-08:-54:-17 **11** Gubanich. What we'd like to ask the Court's indulgence my team

-08:-54:-17 **12** is telling me there's something they want to establish, a very

-08:-54:-17 **13** narrow area related to the computer disc which I have no clue

-08:-54:-17 **14** about. So I'm asking the Court's indulgence for Mr. Rich to do

-08:-54:-17 **15** that one part of it. That's just due to my ignorance.

-08:-54:-17 **16**       The second thing is with respect to Mr. Amawi's

-08:-54:-17 **17** statement, I think that the government has opened the door to

-08:-54:-17 **18** one aspect for the rule of completeness. Agent Gubanich

-08:-54:-17 **19** indicated that one of the computer towers from Mr. Amawi was

-08:-54:-17 **20** indicated that he was going to give it to somebody. And since

-08:-54:-17 **21** one of the allegations in this case that the government has

-08:-54:-17 **22** advanced is that he was going -- he and Griffin were going to

-08:-54:-17 **23** give computers and stuff to the Syrian contact.

-08:-54:-17 **24**       THE COURT: Laptops.

-08:-54:-17 **25**       MR. IVEY: He indicates here exactly who he's going

-08:-54:-17 **1** to give it to, and it's a computer that's there.   I think in

-08:-54:-17 **2** fairness that part should be able to come in.

-08:-54:-17 **3**                    MR. HERDMAN:  This's fine, Your Honor.   That's

-08:-54:-17 **4** just an oversight in terms of trying to cover every detail.   If

-08:-54:-17 **5** it's the one individual.

-08:-54:-17 **6**                    MR. IVEY:  The teacher.

-08:-54:-17 **7**                    MR. HERDMAN:  Okay.

-08:-54:-17 **8**                    (End of side-bar discussion.)

06:18:13 **9**                    (Recess taken.)

06:19:29 **10**                    THE COURT:  You may cross-examine.

06:19:34 **11**                    Agent Gubanich, you remain under oath.

-08:-54:-17 **12**                    THE WITNESS:  Yes, sir.

06:19:39 **13**                                        - - -

06:19:39 **14**                    STEVEN GUBANICH, CROSS-EXAMINATION

06:19:41 **15** BY MR. IVEY:

06:19:41 **16**     **Q.**   Agent Gubanich, you were assigned to the arrest team

06:19:48 **17** with some other federal agents to go from America to Jordan to

06:19:53 **18** arrest Mr. Amawi; is that correct?

-08:-54:-17 **19**     **A.**   Yes, sir.

-08:-54:-17 **20**     **Q.**   One of the primary reasons that the arrest team was sent

-08:-54:-17 **21** to Jordan to get Mr. Amawi was based upon a phone call that Mr.

06:20:06 **22** Griffin relayed to you that he had with Mr. Amawi, correct?

06:20:09 **23**     **A.**   Could you be more specific?

06:20:11 **24**     **Q.**   Well, Mr. Griffin informed you that Mr. Amawi indicated

06:20:14 **25** he wanted to martyr himself or commit suicide over in Iraq; is

5025

-08:-54:-17 **1** that correct?

-08:-54:-17 **2**      **A.**  That's correct.

-08:-54:-17 **3**      **Q.**  That prompted you to go, correct?

-08:-54:-17 **4**      **A.**  In part.

-08:-54:-17 **5**      **Q.**  And that phone conference was -- that telephone call

-08:-54:-17 **6** with Mr. Griffin by Mr. Amawi was supposedly in December of

06:20:28 **7** 2005, correct?

06:20:30 **8**      **A.**  I don't recall.

06:20:31 **9**      **Q.**  Didn't you say on direct examination that it was in

-08:-54:-17 **10** December?

-08:-54:-17 **11**      **A.**  I don't think I gave a date.

-08:-54:-17 **12**      **Q.**  Okay.  It was around that time?

06:20:39 **13**      **A.**  That is possible, yes.

-08:-54:-17 **14**      **Q.**  It wasn't in the month of February 2006, was it?

-08:-54:-17 **15**      **A.**  I don't believe so.

-08:-54:-17 **16**      **Q.**  And you were here when Mr. Griffin testified, correct?

-08:-54:-17 **17**      **A.**  For some of it.

-08:-54:-17 **18**      **Q.**  And did you hear Mr. Griffin indicate that phone

06:20:54 **19** conference took place in December, 2005?

-08:-54:-17 **20**      **A.**  I don't.

06:20:57 **21**          MR. HERDMAN:  Objection, Your Honor.

-08:-54:-17 **22**          THE COURT:  Well, he doesn't know, okay.

06:21:02 **23** BY MR. IVEY:

06:21:04 **24**      **Q.**  It was not in February of 2006?

-08:-54:-17 **25**      **A.**  I don't believe so.

06:21:07 1    Q.   Before Mr. Griffin had indicated he had this

-08:-54:-17 2  conversation with Mr. Amawi, the arrest team had not been sent,

-08:-54:-17 3  were making plans to go to Jordan, correct?

-08:-54:-17 4    A.   One more time, sir.

-08:-54:-17 5    Q.   I think you answered my question.   The point is one of

-08:-54:-17 6  the major reasons that you went over to Jordan was because of

-08:-54:-17 7  this phone call I just asked you about that Mr. Griffin relayed?

-08:-54:-17 8    A.   Yes, in part.

-08:-54:-17 9    Q.   And you got to Jordan February 18 and 19 of 2006?

-08:-54:-17 10   A.   Yes, 19th.

-08:-54:-17 11   Q.   And when you got there, Mr. Amawi was alive?

-08:-54:-17 12   A.   Yes.

-08:-54:-17 13   Q.   He had not martyred himself?

-08:-54:-17 14   A.   He had not.

-08:-54:-17 15   Q.   You were asked to look at some photographs of some

06:21:49 16  individuals that were dead or appeared to be dead from the

06:21:55 17  evidence that you reviewed in this case, correct?

-08:-54:-17 18   A.   Correct.

-08:-54:-17 19   Q.   Some of them were individuals or people other than Mr.

-08:-54:-17 20  Amawi that appeared to be dead, correct?

-08:-54:-17 21   A.   Correct.

-08:-54:-17 22   Q.   Those came off a CD of 130-B, I believe, that Mr. Amawi

-08:-54:-17 23  indicated was one of his CDs?

06:22:16 24   A.   I could check.   That's correct.

06:22:19 25   Q.   And the photograph of Mr. Amawi in appearance similar to

06:22:25 **1**  that didn't come from that CD, did it?

-08:-54:-17 **2**      **A.**   No, it did not.

-08:-54:-17 **3**      **Q.**   It came from the Sony Vaio computer, correct?

-08:-54:-17 **4**      **A.**   Yes.

-08:-54:-17 **5**      **Q.**   Not from a CD?

-08:-54:-17 **6**      **A.**   That's correct.

-08:-54:-17 **7**      **Q.**   And you don't -- in your investigation, you don't know

-08:-54:-17 **8**  the circumstances surrounding those photos being taken, do you?

-08:-54:-17 **9**      **A.**   No, I don't.

-08:-54:-17 **10**      **Q.**   You didn't interview the individual who took the

06:22:47 **11**  photograph?

-08:-54:-17 **12**      **A.**   I did not.

-08:-54:-17 **13**      **Q.**   You did not talk to any witness who was present when the

06:22:52 **14**  photograph was taken?

-08:-54:-17 **15**      **A.**   I did not.

-08:-54:-17 **16**      **Q.**   And you did not interview Mr. Amawi about the

-08:-54:-17 **17**  circumstances the photo was taken, did you?

06:22:59 **18**      **A.**   No, I did not.

-08:-54:-17 **19**      **Q.**   When Mr. Amawi was placed on the airplane, you

06:23:04 **20**  questioned him about whether or not he admitted ownership to

06:23:08 **21**  various items of evidence that you've talked about this morning

06:23:11 **22**  and this afternoon, correct?

06:23:12 **23**      **A.**   Correct.

-08:-54:-17 **24**      **Q.**   One of them was a computer tower, correct?

06:23:15 **25**      **A.**   Yes, there was two computer towers.

5028

-08:-54:-17  **1**   **Q.**   Actually two computer towers?

-08:-54:-17  **2**   **A.**   One was the Sony Vaio laptop computer.  Correct.

-08:-54:-17  **3**   **Q.**   That was the computer Mr. Griffin left with Mr. Amawi

06:23:27  **4**   when he was in Jordan with him, correct?

06:23:29  **5**   **A.**   Correct.

-08:-54:-17  **6**   **Q.**   And you know that, of course, one of the purposes of Mr.

06:23:35  **7**   Amawi and Mr. Griffin going over into Jordan was to deliver some

06:23:42  **8**   laptops or a laptop to a supposed Syrian contact, correct?

-08:-54:-17  **9**   **A.**   Yes, in part.

-08:-54:-17  **10**   **Q.**   So obviously this -- at the point where you came and

-08:-54:-17  **11**   arrested Mr. Amawi in February of 2006, that computer was still

-08:-54:-17  **12**   in Mr. Amawi's possession, correct?

06:23:56  **13**   **A.**   Yes, it was.

06:23:57  **14**   **Q.**   Now, the satellite phone, that was another item that you

06:24:03  **15**   asked Mr. Amawi about, correct?

-08:-54:-17  **16**   **A.**   Correct.

-08:-54:-17  **17**   **Q.**   And he had that over in Jordan, correct?

-08:-54:-17  **18**   **A.**   Yes.

-08:-54:-17  **19**   **Q.**   And about 75 to 100 computer discs?

-08:-54:-17  **20**   **A.**   In that range.

06:24:14  **21**   **Q.**   And some personal papers in a yellow bag that we saw,

-08:-54:-17  **22**   right?

-08:-54:-17  **23**   **A.**   Right.

06:24:19  **24**   **Q.**   Now, these items were confiscated from Mr. Amawi's

06:24:22  **25**   belongings in Jordan, correct?

06:24:24 **1**    **A.**   That's my understanding, yes.

-08:-54:-17 **2**    **Q.**   And those items were confiscated by the Jordanian

-08:-54:-17 **3**  authorities in helping you out?

-08:-54:-17 **4**              MR. HERDMAN:   Objection on several grounds.

06:24:37 **5**              THE COURT:   I don't think it's relevant.

06:24:43 **6**    **A.**   I don't know who actually collected those materials.

06:24:43 **7**  BY MR. IVEY:

06:24:48 **8**    **Q.**   Mr. Amawi didn't collect them and bring them to the

-08:-54:-17 **9**  plane, correct?

-08:-54:-17 **10**    **A.**   I don't think so.

-08:-54:-17 **11**    **Q.**   Who did you receive the items from when you asked Mr.

06:24:58 **12**  Amawi, you know, did he have ownership?

06:25:01 **13**              MR. HERDMAN:   Your Honor, I object to the form.

-08:-54:-17 **14**              THE COURT:   I agree.   Sustained.

-08:-54:-17 **15**  BY MR. IVEY:

06:25:07 **16**    **Q.**   Were the items obtained by you and taken by the FBI in

-08:-54:-17 **17**  the course of your investigation?

-08:-54:-17 **18**    **A.**   Yes.

06:25:21 **19**    **Q.**   And they were not obtained by Mr. Amawi to give to you,

-08:-54:-17 **20**  correct?

-08:-54:-17 **21**    **A.**   He did not bring them to us, no.

-08:-54:-17 **22**    **Q.**   You received them from some other individual?

06:25:32 **23**    **A.**   Yes.

-08:-54:-17 **24**    **Q.**   Prior to Mr. Amawi arriving at the plane, correct?

-08:-54:-17 **25**    **A.**   At the same time.

06:25:37 **1**    **Q.** The same time, okay. Whoever was escorting Mr. Amawi to

-08:-54:-17 **2** the plane gave them to you, correct?

06:25:43 **3**         MR. HERDMAN: I object, Your Honor. Asked and

-08:-54:-17 **4** answered.

06:25:46 **5**         THE COURT: I think the point's been made. Move

06:25:50 **6** on.

-08:-54:-17 **7** BY MR. IVEY:

-08:-54:-17 **8**    **Q.** I want to talk to you about some items that were not

06:25:54 **9** found among Mr. Amawi's belongings either in Jordan or in the

-08:-54:-17 **10** United States here in Toledo.

-08:-54:-17 **11**         There was no completed bomb vest, video bomb vest?

-08:-54:-17 **12**    **A.** No, there was not.

-08:-54:-17 **13**    **Q.** There was no nitroglycol in Mr. Amawi's belongings?

-08:-54:-17 **14**    **A.** Not that I'm aware of.

-08:-54:-17 **15**    **Q.** There was no Nitrocellulose in Mr. Amawi's belongings?

-08:-54:-17 **16**    **A.** No.

-08:-54:-17 **17**    **Q.** No nitronaphthalene?

06:26:17 **18**    **A.** No.

-08:-54:-17 **19**    **Q.** There were no chemistry set and beakers in Mr. Amawi's

06:26:21 **20** possessions, were there?

-08:-54:-17 **21**    **A.** Not that I'm aware of.

-08:-54:-17 **22**    **Q.** There were no pulley pipes to ignite a bomb vest found

-08:-54:-17 **23** in Mr. Amawi's belongings, were there?

-08:-54:-17 **24**    **A.** Not that I'm aware of.

-08:-54:-17 **25**    **Q.** There were no detonators found in Mr. Amawi's

-08:-54:-17 **1** belongings, were there?

-08:-54:-17 **2**     **A.**   Not that I'm aware of.

-08:-54:-17 **3**     **Q.**   There was no vest apparatus with pockets to hold the

06:26:39 **4** explosives on a bomb vest in Mr. Amawi's belongings, was there?

-08:-54:-17 **5**     **A.**   Not that I'm aware of.

-08:-54:-17 **6**     **Q.**   There were no sniper rifles in Mr. Amawi's belongings?

-08:-54:-17 **7**     **A.**   Not that I'm aware of.

-08:-54:-17 **8**     **Q.**   There was no ammunition in Mr. Amawi's belongings, were

-08:-54:-17 **9** there?

-08:-54:-17 **10**     **A.**   Not that I'm aware of.

06:26:55 **11**     **Q.**   There were no plastic explosives in Mr. Amawi's

-08:-54:-17 **12** belongings, were there?

-08:-54:-17 **13**     **A.**   Not that I'm aware of there.

-08:-54:-17 **14**     **Q.**   There were no push button switches or batteries to

-08:-54:-17 **15** ignite an IED in Mr. Amawi's belongings, were there?

-08:-54:-17 **16**     **A.**   Not that I'm aware of.

-08:-54:-17 **17**     **Q.**   There were no shoulder-fired missiles in Mr. Amawi's

06:27:10 **18** belongings, were there?

-08:-54:-17 **19**     **A.**   Not that I'm aware of.

-08:-54:-17 **20**     **Q.**   There was no black powder, as we saw in the video, how

-08:-54:-17 **21** to make, in Mr. Amawi's belongings, was there?

-08:-54:-17 **22**     **A.**   Not that I'm aware of.

-08:-54:-17 **23**     **Q.**   Now, there was a homemade detonator video that we looked

06:27:26 **24** at, government 124-1 in your direct examination, correct?

-08:-54:-17 **25**     **A.**   Yes.

-08:-54:-17 **1**   **Q.**   And that video showed how a detonator can be made with

-08:-54:-17 **2** some common household items, correct?

-08:-54:-17 **3**   **A.**   That's my impression.

-08:-54:-17 **4**   **Q.**   It showed how one could be made with the use of a pop

-08:-54:-17 **5** can or soda can, correct?

-08:-54:-17 **6**   **A.**   Correct.

-08:-54:-17 **7**   **Q.**   It showed the use of a simple ink pen, correct?

06:27:49 **8**   **A.**   Correct.

-08:-54:-17 **9**   **Q.**   And a hollow bullet casing, it looked like, correct?

-08:-54:-17 **10**   **A.**   Yes.

-08:-54:-17 **11**   **Q.**   No homemade detonator device was found in Mr. Amawi's

06:27:59 **12** belongings, was there?

-08:-54:-17 **13**   **A.**   Not that I'm aware of.

-08:-54:-17 **14**   **Q.**   No Astrolite was found in Mr. Amawi's belongings?

-08:-54:-17 **15**   **A.**   Not that I'm aware of.

-08:-54:-17 **16**   **Q.**   No ammonium nitrate was found in his belongings?

06:28:10 **17**   **A.**   Not that I'm aware of.

06:28:11 **18**   **Q.**   No hydrazine found in his belongings?

-08:-54:-17 **19**   **A.**   Not that I'm aware of.

-08:-54:-17 **20**   **Q.**   No GPS tracking devices or bugging devices found in Mr.

-08:-54:-17 **21** Amawi's belongings, were there?

-08:-54:-17 **22**   **A.**   Not that I'm aware of.

-08:-54:-17 **23**             MR. HERDMAN:  I object.

-08:-54:-17 **24**             THE COURT:  Overruled.   You may continue.

06:28:27 **25** BY MR. IVEY:

06:28:27 1    Q.    Like the book we saw in direct examination, there were

-08:-54:-17 2  no secondary or alternate fake IDs with Mr. Amawi in the picture

-08:-54:-17 3  with some other name in his belongings, were there?

-08:-54:-17 4    A.    I'm not aware of any.

-08:-54:-17 5    Q.    There were no disposable silencers in Mr. Amawi's

-08:-54:-17 6  belongings, were there?

-08:-54:-17 7    A.    Not that I'm aware of.

-08:-54:-17 8    Q.    There were no Mujahidin poisons or poisons of any type

-08:-54:-17 9  in Mr. Amawi's belongings, were there?

06:28:52 10    A.    Not that I know of.

-08:-54:-17 11    Q.    There were no print-out documents of bomb designs in Mr.

-08:-54:-17 12  Amawi's belongings, were there?

-08:-54:-17 13    A.    I'm sorry?

06:29:00 14    Q.    Printout of a design.  You showed in your direct

06:29:04 15  examination a book of documents, of designs of bombs.

-08:-54:-17 16    A.    Yes.

06:29:09 17    Q.    Those weren't in Mr. Amawi's belongings, were they?

06:29:12 18    A.    Well, the --

06:29:14 19    Q.    The book was on the computer, but there was no hard

06:29:18 20  copy?

-08:-54:-17 21    A.    No hard copy.

-08:-54:-17 22        MR. HERDMAN:  I think that he's trying to answer,

-08:-54:-17 23  and there's a conversation.

-08:-54:-17 24        THE COURT:  Let him answer.

-08:-54:-17 25  BY MR. IVEY:

5034

-08:-54:-17  **1**  **Q.**  I'm sorry.

-08:-54:-17  **2**  **A.**  The file was in his possession, but not in hard copy.

-08:-54:-17  **3**  **Q.**  Thank you.   There were no cement hand grenades found in

06:29:36  **4**  Mr. Amawi's belongings, were there?

-08:-54:-17  **5**  **A.**  Not that I'm aware of.

06:29:41  **6**  **Q.**  And Mr. Amawi had been over in Jordan, as far as you

-08:-54:-17  **7**  knew, from the latter part of August of 2005 up until the time

-08:-54:-17  **8**  he was arrested by you and your team in February of 2006,

06:29:54  **9**  correct?

-08:-54:-17  **10**  **A.**  That's correct.

06:29:56  **11**  **Q.**  Now let's talk about that arrest.   Mr. Amawi was picked

-08:-54:-17  **12**  up by you.   And when I say "you", I'm talking about your arrest

-08:-54:-17  **13**  team, the individuals on the plane, picked up by them at the

-08:-54:-17  **14**  airport, correct?

-08:-54:-17  **15**  **A.**  Yes.

-08:-54:-17  **16**  **Q.**  And you were on the plane with the rest of your team,

-08:-54:-17  **17**  correct?

-08:-54:-17  **18**  **A.**  Yes.

-08:-54:-17  **19**  **Q.**  Mr. Amawi arrived at the airport in an SUV?

-08:-54:-17  **20**  **A.**  Yes.

06:30:25  **21**  **Q.**  When you first saw Mr. Amawi come out of his SUV, he was

06:30:31  **22**  restrained?

-08:-54:-17  **23**  **A.**  I believe he was.

-08:-54:-17  **24**  **Q.**  You saw he was handcuffed?

-08:-54:-17  **25**  **A.**  I believe he was.

-08:-54:-17 **1**     **Q.**    He appeared to be in custody, correct?

-08:-54:-17 **2**     **A.**    Yes.

06:30:38 **3**     **Q.**    You did not feel he appeared to be in any physical or

06:30:42 **4** emotional distress?

06:30:43 **5**     **A.**    No.

-08:-54:-17 **6**     **Q.**    When he got on the plane, he was taken to the rear where

06:30:47 **7** the poncho was set up in the back, to the section off the rear

-08:-54:-17 **8** of the plane, correct?

-08:-54:-17 **9**     **A.**    Yes.

-08:-54:-17 **10**     **Q.**    His clothes were removed?

06:30:56 **11**     **A.**    Yes, for the physical exam.

-08:-54:-17 **12**     **Q.**    For the physical examination.   Correct.   When his

-08:-54:-17 **13** clothes were removed, no weapons were found?

06:31:04 **14**     **A.**    No.

-08:-54:-17 **15**     **Q.**    Part of the examination of Mr. Amawi included a cavity

-08:-54:-17 **16** search, a rectal exam, did it not?

06:31:13 **17**     **A.**    It did.

-08:-54:-17 **18**     **Q.**    And that rectal exam, there was no weapons or any

06:31:17 **19** contraband found in that area of Mr. Amawi, was there?

-08:-54:-17 **20**     **A.**    No.

06:31:21 **21**     **Q.**    Mr. Amawi did not appear to be under the influence of

-08:-54:-17 **22** any drugs or alcohol, did he?

-08:-54:-17 **23**     **A.**    Did not appear to be.

-08:-54:-17 **24**     **Q.**    He seemed to be in good health except for the gas pain

-08:-54:-17 **25** he complained of?

-08:-54:-17  **1**     **A.**   Correct.

06:31:33    **2**     **Q.**   Now, you've showed Mr. Amawi your FBI credentials,

-08:-54:-17  **3**   correct?

06:31:38    **4**     **A.**   Yes, I did.

-08:-54:-17  **5**     **Q.**   So there was no doubt about who you were?

-08:-54:-17  **6**     **A.**   Correct.

-08:-54:-17  **7**     **Q.**   In fact, in terms of being an FBI agent?

-08:-54:-17  **8**     **A.**   Correct.

-08:-54:-17  **9**     **Q.**   And you informed Mr. Amawi that he was under arrest?

-08:-54:-17  **10**    **A.**   Uh-huh.

06:31:50    **11**    **Q.**   That's "yes"?

-08:-54:-17  **12**    **A.**   Yes.

06:31:52    **13**    **Q.**   And he was going to be taken to the United States to

-08:-54:-17  **14**  face federal charges, correct?

-08:-54:-17  **15**    **A.**   Correct.

06:32:00    **16**    **Q.**   Now, one of your purposes when you had Mr. Amawi was to

-08:-54:-17  **17**  arrest him and also to interview him, correct?

-08:-54:-17  **18**    **A.**   Yes.

06:32:09    **19**    **Q.**   And you read Mr. Amawi what's commonly -- we see on TV

06:32:15    **20**  every day -- known as his Miranda rights, correct?

-08:-54:-17  **21**    **A.**   Correct.

-08:-54:-17  **22**    **Q.**   Those Miranda rights indicate if Mr. Amawi chooses not

-08:-54:-17  **23**  to talk, he doesn't have to, correct?

-08:-54:-17  **24**    **A.**   Correct.

-08:-54:-17  **25**    **Q.**   You can't coerce him or force him to talk, can you?

-08:-54:-17 **1**   **A.**   No.

06:32:29 **2**   **Q.**   And -- or he can decide if he wants to waive that right

-08:-54:-17 **3**   and go ahead and talk to you if he chooses to, correct?

06:32:38 **4**   **A.**   Exactly.

-08:-54:-17 **5**   **Q.**   Now, the form that you showed Mr. Amawi when you do the

06:32:45 **6**   Miranda rights is called a -- and let me get it.   I want to use

-08:-54:-17 **7**   the right FBI lingo.  A 395?

06:32:54 **8**   **A.**   That's correct.

-08:-54:-17 **9**   **Q.**   That 395 is actually a written form that explains the

06:32:58 **10**   rights you're going to read to him, right?

-08:-54:-17 **11**   **A.**   Right.

-08:-54:-17 **12**   **Q.**   And after those rights are read, and I think the

-08:-54:-17 **13**   government showed it in direct examination, the person who's

06:33:08 **14**   going to be interviewed, in this case Mr. Amawi, can sign it if

-08:-54:-17 **15**   he wishes to waive his rights and to go ahead and talk, correct?

06:33:16 **16**   **A.**   Correct.

-08:-54:-17 **17**   **Q.**   And one of the things that this does is it shows that --

-08:-54:-17 **18**   it kind of backs up or supports the fact that an individual has,

-08:-54:-17 **19**   in fact, read their rights and is willing to talk?

-08:-54:-17 **20**   **A.**   Yes.

-08:-54:-17 **21**   **Q.**   And it also spells out so there's no misunderstanding

-08:-54:-17 **22**   what rights you're giving up?

-08:-54:-17 **23**   **A.**   Exactly.

-08:-54:-17 **24**   **Q.**   It says before you answer any questions, you must

-08:-54:-17 **25**   understand your rights, correct?

-08:-54:-17 **1**     **A.**   Correct.

-08:-54:-17 **2**     **Q.**   You tell them you have the right to remain silent,

-08:-54:-17 **3** correct?

-08:-54:-17 **4**     **A.**   Right.

-08:-54:-17 **5**     **Q.**   You tell them anything that you say can be used against

06:33:48 **6** you in court?

-08:-54:-17 **7**     **A.**   Right.

06:33:49 **8**     **Q.**   You have the right to a lawyer, correct?

06:33:52 **9**     **A.**   Right.

-08:-54:-17 **10**     **Q.**   And as a matter of fact, in this particular situation,

-08:-54:-17 **11** there was no lawyer provided for Mr. Amawi on the plane,

-08:-54:-17 **12** correct?

-08:-54:-17 **13**     **A.**   Not at that time.

-08:-54:-17 **14**     **Q.**   And Mr. Amawi made an ambiguous statement that at first

-08:-54:-17 **15** that he was going to kind of wait if there was no attorney

06:34:10 **16** aboard, correct?

-08:-54:-17 **17**     **A.**   He said I'm going to wait.   I then asked -- may I

06:34:15 **18** explain?

06:34:16 **19**     **Q.**   Well, he made that comment, right?

06:34:19 **20**     **A.**   He made that comment.

-08:-54:-17 **21**     **Q.**   I don't mean to cut you off but I think I'm going to go

-08:-54:-17 **22** where you don't think I'm going to go.

06:34:26 **23**          And Mr. Amawi, after you explained this, he decided

-08:-54:-17 **24** that, you know, he was going to go ahead and talk, right?

-08:-54:-17 **25**     **A.**   Yes.

-08:-54:-17 **1**      **Q.**   And, in fact, at no time was it clear to you that Mr.

06:34:40 **2**   Amawi was not going to waive his rights and talk to you,

-08:-54:-17 **3**   correct?

06:34:44 **4**            MR. HERDMAN:  Your Honor, I object to the form of

-08:-54:-17 **5**   that question.   It's a double negative.

06:34:49 **6**            THE COURT:  Why don't you rephrase.   Did you

06:34:53 **7**   understand the question?

06:34:55 **8**            THE WITNESS:  If he could rephrase it that would be

-08:-54:-17 **9**   good, Your Honor.

06:35:06 **10**           THE COURT:  I will let him answer the question.

-08:-54:-17 **11**           I believe the question was at no time did he

-08:-54:-17 **12**   indicate he did not want to talk.

06:35:14 **13**   BY MR. IVEY:

-08:-54:-17 **14**      **Q.**   You have testified about this issue before in court,

-08:-54:-17 **15**   correct?

-08:-54:-17 **16**      **A.**   Yes.

-08:-54:-17 **17**      **Q.**   And when you testified about it --

-08:-54:-17 **18**           THE COURT:  Excuse me.   Mr. Ivey, did you want an

-08:-54:-17 **19**   answer to the question?  I overruled the objection.   And I

-08:-54:-17 **20**   believe the question was at no time --

-08:-54:-17 **21**   BY MR. IVEY:

-08:-54:-17 **22**      **Q.**   At no time was it clear that Mr. Amawi would not speak

06:35:31 **23**   to you without a lawyer?

-08:-54:-17 **24**      **A.**   That's correct.   Up until the very -- the very end,

06:35:41 **25**   5:15 p.m., even then it was an ambiguous.

06:35:46 **1**     **Q.**   But it was your -- it was definitely your impression he

-08:-54:-17 **2** was willing to speak to you?

-08:-54:-17 **3**     **A.**   Absolutely.

-08:-54:-17 **4**     **Q.**   He went ahead after being advised of this, after he read

-08:-54:-17 **5** the part or you read to him, I've read this statement of my

06:36:00 **6** rights and I understand what my rights are.   At this time I'm

06:36:03 **7** willing to answer?

-08:-54:-17 **8**          THE COURT:   A little slower.

06:36:05 **9** BY MR. IVEY:

06:36:05 **10**     **Q.**   "I have read this statement of my rights and I

-08:-54:-17 **11** understand what my rights are.   At this time I am willing to

06:36:12 **12** answer questions without a lawyer present."   Correct?

-08:-54:-17 **13**     **A.**   Correct.

-08:-54:-17 **14**     **Q.**   You pointed that out to Mr. Amawi?

-08:-54:-17 **15**     **A.**   I did.

-08:-54:-17 **16**     **Q.**   And he signed it, did he not?

-08:-54:-17 **17**     **A.**   Yes, he did.

06:36:26 **18**     **Q.**   Now, despite Mr. Amawi being taken into custody and

06:36:32 **19** placed on this plane, he was still willing to talk, correct?

-08:-54:-17 **20**     **A.**   Yes.

06:36:36 **21**     **Q.**   Even when he found out that he was being taken from

-08:-54:-17 **22** Jordan and brought to the United States, he was willing to talk,

-08:-54:-17 **23** wasn't he?

06:36:44 **24**     **A.**   Yes.

06:36:46 **25**     **Q.**   Despite enduring that physical exam I mentioned earlier,

-08:-54:-17 **1** he was still willing to talk, correct?

-08:-54:-17 **2**   **A.**   Yes.

06:36:59 **3**   **Q.**   Now, he didn't show any real reluctance to talk to you,

-08:-54:-17 **4** did he?

06:37:05 **5**   **A.**   No.

06:37:08 **6**   **Q.**   Now, you did all the questioning of Mr. Amawi, correct?

-08:-54:-17 **7**   **A.**   Yes, I did.

-08:-54:-17 **8**   **Q.**   And you conducted that interview in a very

06:37:17 **9** conversational tone, didn't you?

-08:-54:-17 **10**   **A.**   Correct.

-08:-54:-17 **11**   **Q.**   And you indicated in direct examination that the Hostage

-08:-54:-17 **12** Response Team was there present when you were questioning for

06:37:28 **13** safety concerns, correct?

-08:-54:-17 **14**   **A.**   Hostage Rescue Team?

-08:-54:-17 **15**   **Q.**   Hostage Rescue Team.

-08:-54:-17 **16**   **A.**   One member present.

-08:-54:-17 **17**   **Q.**   But that Hostage Rescue person, either one of them,

-08:-54:-17 **18** never had to jump up and restrain Mr. Amawi or anything?   He

-08:-54:-17 **19** didn't act hostile or violent, did he?

-08:-54:-17 **20**   **A.**   No.

-08:-54:-17 **21**   **Q.**   You were friendly with Mr. Amawi, correct?

06:37:47 **22**   **A.**   Yes.

-08:-54:-17 **23**   **Q.**   And he was cordial back to you --

06:37:50 **24**   **A.**   Yes.

-08:-54:-17 **25**   **Q.**   -- correct?

06:37:52 **1**                    It was a non-confrontational style when you were

06:37:56 **2** questioning him, correct?

-08:-54:-17 **3**    **A.**   Correct.   It was, correct, up until maybe the end.

06:38:03 **4**    **Q.**   And it was in a friendly manner up until the very end,

-08:-54:-17 **5** right?

-08:-54:-17 **6**    **A.**   Yes.

-08:-54:-17 **7**    **Q.**   You didn't have to threaten Mr. Amawi?

-08:-54:-17 **8**    **A.**   No.

06:38:11 **9**    **Q.**   You never had to shout, yell, or raise your voice at Mr.

06:38:15 **10** Amawi?

06:38:15 **11**    **A.**   No.

06:38:17 **12**    **Q.**   You don't recall Mr. Amawi ever appears tired of talking

-08:-54:-17 **13** with you?

-08:-54:-17 **14**    **A.**   No.

06:38:25 **15**    **Q.**   And, in fact, he said things throughout the interview

-08:-54:-17 **16** that indicated to you his willingness to continue to talk with

-08:-54:-17 **17** you, didn't he?

-08:-54:-17 **18**    **A.**   Yes.

-08:-54:-17 **19**    **Q.**   He said he always speaks his mind, didn't he?

-08:-54:-17 **20**    **A.**   He did.

06:38:39 **21**    **Q.**   Now, during the initial part of Mr. Amawi's interview,

-08:-54:-17 **22** he was in restraints, correct?

06:38:47 **23**    **A.**   Yes.

06:38:48 **24**    **Q.**   And you put him in restraints because you wanted to see

06:38:52 **25** what his demeanor was going to be like before releasing him,

-08:-54:-17 **1** correct?

-08:-54:-17 **2**     **A.**   Yes.

-08:-54:-17 **3**     **Q.**   Then at a certain point into the interview you decided

-08:-54:-17 **4** that he was not going to be combative and you released those

-08:-54:-17 **5** restraints, didn't you?

06:39:05 **6**     **A.**   We released one hand restraint.

-08:-54:-17 **7**     **Q.**   One hand restraint.   Now, you talked about up until the

-08:-54:-17 **8** end.   But this interview was conducted on the flight back from

06:39:18 **9** Jordan to the United States, correct?

-08:-54:-17 **10**     **A.**   Yes.

06:39:21 **11**     **Q.**   And the plane took off around 7:20, did you say?

-08:-54:-17 **12**     **A.**   We left Jordan at approximately 7:45.

-08:-54:-17 **13**     **Q.**   That's Eastern Standard Time?

-08:-54:-17 **14**     **A.**   Yes.

06:39:34 **15**     **Q.**   Then it arrived in the United States around what time? .

06:39:38 **16**             MR. HERDMAN:  I object on relevancy grounds at this

-08:-54:-17 **17** point.

-08:-54:-17 **18**             MR. IVEY:  The duration of the interview.

-08:-54:-17 **19**             THE COURT:  The interview ended at some point,

-08:-54:-17 **20** didn't it?

-08:-54:-17 **21**             THE WITNESS:  It did.

-08:-54:-17 **22**             THE COURT:  What time did it end?

06:39:51 **23**             THE WITNESS:  4:15 Eastern Standard.

06:39:51 **24** BY MR. IVEY:

-08:-54:-17 **25**     **Q.**   There were parts in the interview where Mr. Amawi would

-08:-54:-17  **1**  eat and sleep, use the restroom?

-08:-54:-17  **2**      **A.**   Yes, there was time for that and he also took a nap.

-08:-54:-17  **3**      **Q.**   The total actual interview time was about four and a

-08:-54:-17  **4**  half hours; is that fair?

-08:-54:-17  **5**      **A.**   I think that's fair.

06:40:10  **6**      **Q.**   Now, of that four-and-a-half-hour interview, you shared

-08:-54:-17  **7**  with the ladies and gentlemen of the jury the items that I

06:40:17  **8**  mentioned at the beginning that you asked Mr. Amawi if he had --

-08:-54:-17  **9**  if he acknowledged ownership of the two computer towers, the

-08:-54:-17  **10**  Sony Vaio, the satellite phone, 75 to 100 discs, and the

-08:-54:-17  **11**  personal papers, correct?

-08:-54:-17  **12**      **A.**   Yes.

-08:-54:-17  **13**      **Q.**   But you talk about a lot more than just those items in

-08:-54:-17  **14**  his interview, didn't you?

-08:-54:-17  **15**          MR. HERDMAN:  Your Honor, I object.  Can we

-08:-54:-17  **16**  approach?

-08:-54:-17  **17**          THE COURT:  Sure.

06:40:42  **18**          (Whereupon the following discussion was had at the

06:42:11  **19**  bench outside the hearing of the jury:)

06:42:11  **20**          MR. HERDMAN:  My objection is based on what we've

-08:-54:-17  **21**  already decided, what Your Honor's already decided in terms of

-08:-54:-17  **22**  the statement that the government was intending to offer, and

-08:-54:-17  **23**  the fact that there was no -- to the extent that counsel had any

-08:-54:-17  **24**  rule of completeness objections with respect to that statement.

-08:-54:-17  **25**          THE COURT:  Where are you going with this?

-08:-54:-17 **1**      MR. IVEY:  I'm not going to ask him anything Mr.

-08:-54:-17 **2** Amawi said.   I think it's critical for this jury to know this

-08:-54:-17 **3** interview encompassed more than this, just this; that he was

-08:-54:-17 **4** cooperating.   I'm not going to ask him what he said.   I'm not

-08:-54:-17 **5** going to ask him what he said about it other than the point I

-08:-54:-17 **6** brought out.

-08:-54:-17 **7**      MR. SOFER:  That's fine, Judge, but that opens the

-08:-54:-17 **8** door to behavior in which he was not cooperative on the plane.

-08:-54:-17 **9** If that's what they want to do…   I think they've already done

-08:-54:-17 **10** it.

-08:-54:-17 **11**      MR. IVEY:  I was about done with this topic.

-08:-54:-17 **12**      (End of side-bar discussion.)

06:42:16 **13**      THE COURT:  You may continue.

06:42:22 **14** BY MR. IVEY:

06:42:28 **15**   **Q.**   I think you answered the question, but I'm just going

-08:-54:-17 **16** to -- there are other matters -- without saying what they are,

-08:-54:-17 **17** there were other matters that were discussed during this four

-08:-54:-17 **18** and a half hours other than whether or not Mr. Amawi

06:42:44 **19** acknowledged ownership of those items, correct?

-08:-54:-17 **20**   **A.**   Correct.

-08:-54:-17 **21**   **Q.**   Just one, I wanted to kind of bring out here was --

06:42:51 **22**      MR. HERDMAN:  Objection.

06:42:54 **23**      THE COURT:  Well, let's ask the question.

06:42:58 **24**      MR. IVEY:  This is what we've already --

06:43:00 **25**      THE COURT:  Ask the question.   And then if there's

-08:-54:-17  **1**  an objection don't answer.

-08:-54:-17  **2**  BY MR. IVEY:

-08:-54:-17  **3**      **Q.**    You testified in direct examination that Mr. Amawi

06:43:11  **4**  indicated he was going to give one of the computer towers to

-08:-54:-17  **5**  someone, correct?

-08:-54:-17  **6**      **A.**    Yes.

06:43:19  **7**      **Q.**    I just want to be clear about this.   Mr. Amawi

06:43:22  **8**  indicated that he was going to give this tower to a friend named

06:43:28  **9**  Ajlony, A-j-l-o-n-y, correct?

-08:-54:-17  **10**      **A.**    That sounds correct.

-08:-54:-17  **11**      **Q.**    And this person, he indicated, was a teacher and a

-08:-54:-17  **12**  historian who was in some financial need and needed a computer,

-08:-54:-17  **13**  correct?

06:43:42  **14**      **A.**    I believe that's correct.

-08:-54:-17  **15**      **Q.**    It was not -- so we're clear, it was not he was going to

06:43:48  **16**  give it to some Syrian contact?

-08:-54:-17  **17**              MR. HERDMAN:  I object, Judge.

-08:-54:-17  **18**              THE COURT:  Well, that -- the testimony -- the

-08:-54:-17  **19**  statement by Mr. Amawi can be offered and considered as a

-08:-54:-17  **20**  statement that was made by him, not whether it's true or not.

06:44:04  **21**  That is what the agent was told.

-08:-54:-17  **22**      **A.**    That's what he told me.

06:44:14  **23**              MR. IVEY:  Thank you, Agent Gubanich.   I have

-08:-54:-17  **24**  nothing else.   I think Mr. Rich has a question or two.

06:44:29  **25**                              - - -

5047

06:44:29  1        STEVEN GUBANICH, CROSS-EXAMINATION

06:44:31  2  BY MR. WITMER-RICH:

06:44:31  3      Q.   Good afternoon.   I want to ask you a little bit about

-08:-54:-17  4  the CDs.   We've seen various CDs here that have been discussed

-08:-54:-17  5  this afternoon?

-08:-54:-17  6      A.   Okay.

06:44:50  7      Q.   I'm going to ask about Government's Exhibit 49.   Do you

06:44:54  8  have some -- can we bring up 49-1?

06:45:19  9             Can you remind us, if you know, what -- the origin

-08:-54:-17  10  of this CD?

06:45:31  11     A.   I believe this is a disc that was given to Darren

06:45:38  12  Griffin from Mohammad Amawi.

06:45:41  13     Q.   And do you know if this CD was one of the ones that had

-08:-54:-17  14  a star on it or not?

-08:-54:-17  15     A.   I don't know the answer to that.

06:45:51  16     Q.   This CD, you testified about certain -- you highlighted

-08:-54:-17  17  certain files that you reviewed on this CD, correct?

-08:-54:-17  18     A.   Yes.

06:46:03  19     Q.   Did you review all of the files on this CD?

-08:-54:-17  20     A.   I believe I did.

06:46:09  21     Q.   And you had testified earlier you gave a number -- I

06:46:12  22  forget what it was, but it's quite a few files on this

-08:-54:-17  23  particular CD?

-08:-54:-17  24     A.   Over 500 files.

06:46:18  25     Q.   For example, if we highlight 49-1, A-1 A-3, is this part

-08:-54:-17  **1**  of the file that contains links to a particular website?

-08:-54:-17  **2**      A.   I believe that is a link, yes.

-08:-54:-17  **3**      Q.   And this one is a link entitled:  Job Opportunity?

-08:-54:-17  **4**      A.   Correct.

-08:-54:-17  **5**      Q.   Did you click that link and see where it took you?

-08:-54:-17  **6**      A.   I did.

06:46:48  **7**      Q.   Do you recall where it took you?

-08:-54:-17  **8**      A.   I think it was -- I'm going off memory -- I think it was

-08:-54:-17  **9**  a job for a security guard or something to that effect.

06:47:02  **10**      Q.   If we could move on to the next page.   And highlight

06:47:12  **11**  A1E2.   Is this another link to a website?  We're on page 2 now.

06:47:32  **12**      A.   I don't recall.

06:47:34  **13**      Q.   Do you recall that this CD either contained links or

06:47:38  **14**  files containing Arabic poetry?

06:47:42  **15**      A.   I believe it did.

-08:-54:-17  **16**             MR. WITMER-RICH:  Can we move to the next page and

06:47:57  **17**  highlight the area around A-1I?   And if you could highlight

-08:-54:-17  **18**  everything below that.

06:48:11  **19**  BY MR. WITMER-RICH:

06:48:11  **20**      Q.   Do you recall if this was a file that contained

-08:-54:-17  **21**  information about the Qur'an, Qur'an?

-08:-54:-17  **22**      A.   I recall there were files on the disc that contained

06:48:24  **23**  information on the Qur'an.

06:48:26  **24**      Q.   At least in this sub folder there are -- well, A-1I is a

06:48:34  **25**  folder name; is that correct?

-08:-54:-17  **1**   **A.**   I believe that's correct.

06:48:37    **2**   **Q.**   And the folder name is Q-U-R-A-A-N?

-08:-54:-17  **3**   **A.**   Correct.

-08:-54:-17  **4**   **Q.**   And within that there are on this page 21 files within

-08:-54:-17  **5**   that folder labeled Qur'an; is that correct?   Well, I'm looking

-08:-54:-17  **6**   at this page.   How many total in that, if you can tell?

-08:-54:-17  **7**   **A.**   There appear to be 33 in that directory.

-08:-54:-17  **8**   **Q.**   So there appear to be 33 files within the directory

06:49:06    **9**   labeled Qur'an?

**10**   **A.**   Files or web links.

-08:-54:-17  **11**           MR. WITMER-RICH:  If we could move to the next

-08:-54:-17  **12**   page.  Let's move to the next page, A-1N.   I think it's on the

-08:-54:-17  **13**   next page.   If you could, highlight that and several of the

-08:-54:-17  **14**   files below it.

06:49:47    **15**   BY MR. WITMER-RICH:

06:49:47    **16**   **Q.**   Do you recall a number of files that were related to the

-08:-54:-17  **17**   Bible there on the CD?

06:49:52    **18**   **A.**   I do.

06:50:19    **19**           MR. WITMER-RICH:  A-1I and several of the files

-08:-54:-17  **20**   below it.   That's fine.

-08:-54:-17  **21**   BY MR. WITMER-RICH:

-08:-54:-17  **22**   **Q.**   Do these appear to be either files or links to

06:50:31    **23**   additional files that related to the Bible or Christian

-08:-54:-17  **24**   theology?

06:50:34    **25**   **A.**   Possibly.

5050

06:50:36 **1**    **Q.**    Did you look at these materials, at least glance at

-08:-54:-17 **2** them?

06:50:40 **3**    **A.**    I'm sure I did.  I don't recall exactly on this one.

06:50:49 **4**    **Q.**    Down further on that page at A-1AN.  Do you recall that

-08:-54:-17 **5** there was a file or link called:  Cartoon Stars?

-08:-54:-17 **6**    **A.**    I recall seeing it.

06:51:10 **7**    **Q.**    You didn't pursue that one?

-08:-54:-17 **8**    **A.**    No.

06:51:13 **9**    **Q.**    To the next page, if you could look at A1BN.

-08:-54:-17 **10**       Do you recall or a file or web link entitled:  Sea

-08:-54:-17 **11** and Sky Pulsars?

-08:-54:-17 **12**    **A.**    I don't recall what it was.

-08:-54:-17 **13**    **Q.**    Do you recall looking at photographs of astronomy sorts

-08:-54:-17 **14** of things?

-08:-54:-17 **15**    **A.**    I don't recall.

06:51:50 **16**    **Q.**    Finally A-1BU.  Do you recall that there was a link to

-08:-54:-17 **17** a Turbo Tax website?

06:52:05 **18**    **A.**    There may have been.

06:52:07 **19**    **Q.**    Okay.  I said finally.  Take that back.  Sorry.

06:52:12 **20**       MR. WITMER-RICH:  A couple pages ahead to A-3. We

06:52:44 **21** skipped too far.  We should be in the As.  It's on page 1014 of

-08:-54:-17 **22** the document I have.  Could we highlight A-3 and everything

-08:-54:-17 **23** below it?

-08:-54:-17 **24** BY MR. WITMER-RICH:

06:53:00 **25**    **Q.**    Do you recall a folder that was labeled Paltalk?

-08:-54:-17  **1**  **A.** Yes.

-08:-54:-17  **2**  **Q.** Did you review any of the documents within that file?

-08:-54:-17  **3**  **A.** I reviewed some Paltalk files.

-08:-54:-17  **4**  **Q.** Were those in English or Arabic or both; do you recall?

06:53:15  **5**  **A.** Some were a mix.

06:53:17  **6**  **Q.** Did you have an Arabic translator assist you in

06:53:21  **7**  translating some of the Arabic files?

-08:-54:-17  **8**  **A.** In some cases, yes.

-08:-54:-17  **9**  **Q.** Do you recall the substance of what those Paltalk

06:53:29  **10**  conversations consisted of?

-08:-54:-17  **11**  **A.** Not these in particular.  I did review Paltalk

06:53:35  **12**  conversations.

06:53:36  **13**  **Q.** And do you recall that there were quite a number of

-08:-54:-17  **14**  Paltalk conversations saved within this file, say more than ten?

06:53:49  **15**  **A.** I don't recall that.

-08:-54:-17  **16**  **Q.** Okay.  So to sum up what I think is obvious, this CD

06:54:02  **17**  contained an extraordinarily wide range of materials on all

06:54:06  **18**  sorts of topics; is that correct?

06:54:09  **19**  **A.** There was a variety of topics.

06:54:24  **20**  **Q.** If you recall, do you recall the date on which Exhibit

06:54:31  **21**  49 was said to have been obtained by Darren Griffin?

06:54:37  **22**  **A.** I don't recall a date but I believe it's in the record.

06:54:49  **23**  **Q.** Of these exhibits -- excuse me for just one moment.

06:55:12  **24**  You received some materials from Darren Griffin

06:55:18  **25**  after the arrests took place in this case; is that correct?

06:55:22 **1**    **A.**   Yes.

06:55:24 **2**    **Q.**   And you received at least three computer discs some

-08:-54:-17 **3** weeks or months after the arrest in this case?

-08:-54:-17 **4**           MR. HERDMAN:  Your Honor, I'm going to object to

-08:-54:-17 **5** form with respect to the word "you".

-08:-54:-17 **6**           THE COURT:  That's fair.  You being you

-08:-54:-17 **7** individually or others working with you on the investigation?

-08:-54:-17 **8** BY MR. WITMER-RICH:

-08:-54:-17 **9**    **Q.**   Do you recall if you or others working with you on this

06:55:52 **10** investigation received three computer discs from Darren Griffin

06:55:55 **11** some weeks at least after the arrests took place?

-08:-54:-17 **12**    **A.**   I recall the FBI did receive some computer discs after

-08:-54:-17 **13** the arrests.  I don't recall how many.

06:56:09 **14**    **Q.**   Do you know whether any of the discs that you testified

06:56:21 **15** about were discs that were received after the arrests?  Did you

-08:-54:-17 **16** follow that question?

-08:-54:-17 **17**    **A.**   Um --

-08:-54:-17 **18**    **Q.**   If you know.

06:56:36 **19**    **A.**   Yes, with an explanation.

-08:-54:-17 **20**    **Q.**   Go ahead.

-08:-54:-17 **21**    **A.**   A lot of these files I've seen multiple places.  Some

06:56:44 **22** on several different discs, on several different hard drives.

06:56:48 **23** So to answer your question, I did review some discs received

-08:-54:-17 **24** after the arrests, but these files were also other places.

-08:-54:-17 **25**    **Q.**   And you received a little thumb drive or a portable

06:57:02 **1** drive.   Did the FBI receive that after the arrests in this case

06:57:07 **2** from Darren Griffin?

-08:-54:-17 **3**     **A.**   I don't recall when we received that.

06:57:24 **4**          MR. WITMER-RICH:  Thank you.

06:57:24 **5**                - - -

06:57:24 **6**          STEVEN GUBANICH, CROSS-EXAMINATION

06:57:35 **7** BY MR. BOSS:

06:57:35 **8**     **Q.**   Hello, Mr. Gubanich.

06:57:37 **9**     **A.**   Hello.

-08:-54:-17 **10**     **Q.**   How are you?

06:57:39 **11**     **A.**   Fine, thank you.  How are you?

-08:-54:-17 **12**     **Q.**   I'm fine.   The numerous items that Mr. Ivey went

-08:-54:-17 **13** through with you confirming that they had not been found in Mr.

-08:-54:-17 **14** Amawi's house, am I correct that likewise with regard to

06:57:52 **15** Mr. El-Hindi, there weren't explosive devices and other items

06:57:57 **16** that Mr. Ivey went through with you on a list; is that correct?

-08:-54:-17 **17**     **A.**   Yes.

06:58:04 **18**     **Q.**   Now, we went through quite a number of exhibits that you

-08:-54:-17 **19** had reviewed, more or less like a chain of custody to say, hey,

-08:-54:-17 **20** I received these things and I reviewed them, and here's what

06:58:18 **21** they are.   And we had Exhibit Number 27 that had, as I recall,

06:58:23 **22** 89 files or directories.  And it had a number of things that you

-08:-54:-17 **23** spoke of.   Number 27 or item 27, that was from Mr. Amawi,

-08:-54:-17 **24** correct?

06:58:39 **25**     **A.**   Yes, that's correct.

-08:-54:-17 **1**   **Q.**   Likewise, number 48, those items were all from Mr.

-08:-54:-17 **2**  Amawi, correct?

06:58:54 **3**   **A.**   I believe that's correct.

-08:-54:-17 **4**   **Q.**   Just specifically -- pardon me, that was number 48, if I

-08:-54:-17 **5**  said 47.

06:59:01 **6**   **A.**   Believe you said 48.

-08:-54:-17 **7**   **Q.**   Thank you.   Number 48 we spoke about or you described

06:59:07 **8**  several of the particular files as lessons, lesson on athletic

-08:-54:-17 **9**  court from mujahid, and signal weapons, on urban warfare,

-08:-54:-17 **10**  guerilla warfare, and so forth.   None of those items were found

06:59:23 **11**  on Mr. El-Hindi's computer?

-08:-54:-17 **12**   **A.**   None of them were.

-08:-54:-17 **13**   **Q.**   To the best of your knowledge Mr. El-Hindi had no

06:59:28 **14**  awareness of these matters; you have no knowledge whatsoever

-08:-54:-17 **15**  that he had ever been aware of these?

-08:-54:-17 **16**   **A.**   Of these particular files?

06:59:35 **17**        MR. HERDMAN:  I object based on the form of that

-08:-54:-17 **18**  question.

06:59:39 **19**        MR. BOSS:  May I rephrase?

-08:-54:-17 **20**  BY MR. BOSS:

-08:-54:-17 **21**   **Q.**   Do you have any evidence that Mr. El-Hindi was aware of

06:59:43 **22**  these items?

-08:-54:-17 **23**   **A.**   I do not.

06:59:45 **24**   **Q.**   Thank you.   And the same I take it is true of

-08:-54:-17 **25**  Plaintiff's 49, the various websites that you referred to there,

-08:-54:-17 **1** these were all from Mr. Amawi's computer, not Mr. El-Hindi's?

07:00:04 **2**    **A.**    Yes.

07:00:08 **3**    **Q.**    And the same is true of Plaintiff's Exhibit Number 60 in

-08:-54:-17 **4** all of its parts?

07:00:17 **5**    **A.**    It was from Mr. Amawi's.

07:00:19 **6**    **Q.**    Thank you.   And 120, all of that was from Mr. Amawi's

-08:-54:-17 **7** as well?

07:00:29 **8**    **A.**    I believe that was the thumb drive.

-08:-54:-17 **9**    **Q.**    Okay.  You weren't sure where that came from?

07:00:34 **10**    **A.**    Not exactly.

-08:-54:-17 **11**    **Q.**    We'll set that aside.

07:00:38 **12**         Plaintiff's 124.   That was the laptop that was

07:00:42 **13** recovered.  That Sony Vaio laptop that was recovered in Jordan,

-08:-54:-17 **14** that was Mr. Amawi's laptop?

-08:-54:-17 **15**    **A.**    Yes, it was.

-08:-54:-17 **16**    **Q.**    You're not a computer forensic person?

-08:-54:-17 **17**    **A.**    I understand we'll be hearing from one as we go.

07:00:55 **18**    **Q.**    Do you have personal knowledge as to whether these items

-08:-54:-17 **19** were downloaded to that laptop?

-08:-54:-17 **20**    **A.**    I do not.

-08:-54:-17 **21**    **Q.**    Okay.  And likewise, that laptop was exclusively Mr.

07:01:10 **22** Amawi's so it was not in Mr. El-Hindi's possession; is that

-08:-54:-17 **23** correct?

-08:-54:-17 **24**    **A.**    It was not.

07:01:17 **25**    **Q.**    Now, the same is true of 139, is that correct, and all

07:01:24 **1** those exhibits?   Those are photos?

07:01:31 **2**     **A.**   139 Bravo.

07:01:33 **3**     **Q.**   130-B, yes.   Those were from Mr. Amawi; is that

-08:-54:-17 **4** correct?

-08:-54:-17 **5**     **A.**   Yes, they were.

-08:-54:-17 **6**     **Q.**   And 139-A.   Those were also Mr. Amawi's matters?

07:01:43 **7**     **A.**   I believe they were.

07:01:46 **8**     **Q.**   Thank you.   Now, you did touch on a few things

07:01:50 **9** pertaining to Mr. El-Hindi.   Those were regarding what you

-08:-54:-17 **10** identified or has been identified as Plaintiff's Exhibit 76 and

-08:-54:-17 **11** 77, correct?

07:02:01 **12**     **A.**   Correct.

-08:-54:-17 **13**     **Q.**   Now, that was pertaining to two computers that

-08:-54:-17 **14** Mr. El-Hindi had that were seized and examined by you, correct?

07:02:09 **15**     **A.**   In part.

-08:-54:-17 **16**     **Q.**   Reviewed by you?

07:02:12 **17**     **A.**   Yes.

07:02:15 **18**     **Q.**   And I will be the first to admit that I am not the guy

07:02:19 **19** to be talking about computer forensic matters, so you don't have

-08:-54:-17 **20** to worry about that from me.   But you sat down, I take it, and

-08:-54:-17 **21** had what, a mirror image of these two computers and you pulled

-08:-54:-17 **22** up file after file to see what they were?

-08:-54:-17 **23**     **A.**   That's roughly correct.

-08:-54:-17 **24**     **Q.**   And when you did so -- let me direct your attention to

-08:-54:-17 **25** one of the exhibits, 76-1.   That was, as I understand it, a

1  Word document from an e-mail list, 2004, 2005 from EMSS

2  students; is that correct?

3      A.   I'm sorry, there should be a sub exhibit.

4      Q.   Pardon me?

5           THE COURT:  A little slower.  I'm sorry, I

6  couldn't hear you.   If you could speak a little more into the

7  microphone and a little more slowly.

8  BY MR. BOSS:

9      Q.   76-1AD.

10          MR. BOSS:  Are you able to pull it up?

11  BY MR. BOSS:

12

13      Q.   I believe you testified this was a list of some of the

14  students that had been sent to the European medical schools by

15  Mr. El-Hindi's medical company?

16      A.   I think I said that was the heading, was EMSS students,

17  2004, 2005.

18      Q.   And it lists students, the first on the list you

19  reported was Yasmeen Ahmed with that e-mail address, night

20  sniper, but we have others there, too, with other e-mail

21  addresses, all of them; is that correct?

22      A.   Yes.

23      Q.   Now, this apparently was the year 2004, 2005.  To your

24  knowledge, based on the investigation, when did Mr. El-Hindi go

25  to Egypt to retrieve Yasmeen's brother and her cousin; do you

| | | |
|--|--|--|
| 07:04:27 | **1** | remember? |
| 07:04:27 | **2** | **A.**  I believe it was 2004. |
| 07:04:31 | **3** | **Q.**  Apparently she was already a student.  And based on your |
| 07:04:35 | **4** | investigation was it indeed the case that Mr. El-Hindi met the |
| 07:04:38 | **5** | Ahmeds through Yasmeen being recruited as a medical student? |
| -08:-54:-17 | **6** | MR. HERDMAN:  Objection on several grounds. |
| 07:04:45 | **7** | THE COURT:  I'll sustain it because I'm not sure |
| -08:-54:-17 | **8** | there's any foundation, if he knows any of that. |
| -08:-54:-17 | **9** | **Q.**  To the best of your knowledge this e-mail address is one |
| -08:-54:-17 | **10** | that she provided as her regular e-mail address as the other |
| 07:04:57 | **11** | students; is that correct? |
| -08:-54:-17 | **12** | MR. HERDMAN:  Objection. |
| -08:-54:-17 | **13** | THE COURT:  Sustained.  There's no way he would |
| -08:-54:-17 | **14** | know. |
| 07:05:01 | **15** | BY MR. BOSS: |
| 07:05:01 | **16** | **Q.**  Mr. Gubanich, to the best of your knowledge, this |
| 07:05:05 | **17** | investigation, EMSS, the European Medical Student Services, |
| 07:05:11 | **18** | that's a legitimate business, isn't it? |
| 07:05:13 | **19** | MR. HERDMAN:  Objection. |
| 07:05:15 | **20** | THE COURT:  Sustained. |
| 07:05:17 | **21** | MR. HARTMAN:  May we approach? |
| 07:05:20 | **22** | (Whereupon the following discussion was had at the |
| 07:11:09 | **23** | bench outside the hearing of the jury:) |
| 07:11:09 | **24** | THE COURT:  I don't think you can ask him do you |
| -08:-54:-17 | **25** | know if it's a legitimate business.   I think you can ask him -- |

-08:-54:-17  **1**  turn it back around.   Do you have or are you aware of others in

-08:-54:-17  **2**  the FBI who have knowledge or reason to believe that it's

-08:-54:-17  **3**  engaged in unlawful activities?   That's a classic example.   If

-08:-54:-17  **4**  you don't know the answer, I'm not sure you want to ask it.

-08:-54:-17  **5**  But who knows?

-08:-54:-17  **6**              MR. HERDMAN:  Your Honor, if I can just remind the

-08:-54:-17  **7**  Court what the question was about.  This exhibit was essentially

-08:-54:-17  **8**  shown to Agent Gubanich and there was no request that he amplify

-08:-54:-17  **9**  on any of the information other than the name Yasmeen Ahmed.

-08:-54:-17  **10**  There was nothing about EMSS on his direct examination.   It's

-08:-54:-17  **11**  in the document.   The document, I would say that Mr. Boss is

-08:-54:-17  **12**  limited to the four corners of this particular document.   If

-08:-54:-17  **13**  he's going to start asking questions…   He essentially just

-08:-54:-17  **14**  testified what EMSS is in several of his questions, which I

-08:-54:-17  **15**  object.

-08:-54:-17  **16**              THE COURT:  Which was stricken.

-08:-54:-17  **17**              MR. SOFER:  Should be stricken.

-08:-54:-17  **18**              MR. HARTMAN:  The way I would respond --

-08:-54:-17  **19**              THE COURT:  I think it's fair for him to -- EMSS is

-08:-54:-17  **20**  going to be in the case or is in the case already.   I think

-08:-54:-17  **21**  it's fair for you to ask that kind of question.   Beyond that --

-08:-54:-17  **22**  if that's what you're trying to do.

-08:-54:-17  **23**              MR. BOSS:  It is in part.   And whether any money

-08:-54:-17  **24**  that was generated from it, to his knowledge, would have been

-08:-54:-17  **25**  misdirected to a Jihadist activity.   They're alleging that Mr.

-08:-54:-17 **1** Griffin is the money man -- not Mr. Griffin, Mr. El-Hindi, and

-08:-54:-17 **2** that is part of it.   The whole exhibit -- I asked earlier

-08:-54:-17 **3** whether they're offering the entire exhibit.   This entire

-08:-54:-17 **4** exhibit contains subparts.   Many of which deal with the EMSS

-08:-54:-17 **5** operation.   If they're going to be putting it into evidence,

-08:-54:-17 **6** then we have, I believe, an opportunity and right to examine on

-08:-54:-17 **7** it.

-08:-54:-17 **8**          MR. HERDMAN:  Then the appropriate way to

-08:-54:-17 **9** cross-examine is to direct the special agent's attention to

-08:-54:-17 **10** those particular exhibits.

-08:-54:-17 **11**          MR. BOSS:  Then I will.

-08:-54:-17 **12**          MR. HERDMAN:  Then you don't get to ask him these

-08:-54:-17 **13** general questions about what his understanding of the operation

-08:-54:-17 **14** was.   If you have specific exhibits I would say, Your Honor,

-08:-54:-17 **15** Mr. Boss should direct the agent's attention to those specific

-08:-54:-17 **16** exhibits.

-08:-54:-17 **17**          MR. SOFER:  Also there's not one allegation in the

-08:-54:-17 **18** entire indictment that says that EMSS somehow was connected to

-08:-54:-17 **19** the conspiracy.   Not one.   And this goes back to the:  I've

-08:-54:-17 **20** always gone 25 miles an hour kind of thing.

-08:-54:-17 **21**          THE COURT:  Why don't you simply say you have no

-08:-54:-17 **22** basis for concluding there's any connection between EMSS and any

-08:-54:-17 **23** unlawful acts attributed to the defendants.

-08:-54:-17 **24**          MR. SOFER:  Just keep in mind, that's a different

-08:-54:-17 **25** question because EMSS has its own financial issues and all the

-08:-54:-17 **1** rest of that.   So any illegality may be venturing into

-08:-54:-17 **2** dangerous territory.

-08:-54:-17 **3**                 MR. HARTMAN:  Also, if I may, they asked about

-08:-54:-17 **4** e-mail addresses for two people that are heavily involved in

-08:-54:-17 **5** EMSS, didn't ask about the subject, made it sound like it was

-08:-54:-17 **6** this nefarious thing, then moved on and didn't talk about the

-08:-54:-17 **7** subject.

-08:-54:-17 **8**                 MR. HERDMAN:  It's a possession issue, Your Honor.

-08:-54:-17 **9**                 THE COURT:  There is a suggestion through the

-08:-54:-17 **10** connection with the exhibit that somehow there's some connection

-08:-54:-17 **11** with EMSS and unlawful activity by one or more of the

-08:-54:-17 **12** defendants.   I think that's what you're trying to examine.

-08:-54:-17 **13**                 MR. BOSS:  They've shown a photograph of Dr. Yousef

-08:-54:-17 **14** El-Hindi in Egypt with two boys and Mr. Marwan El-Hindi.

-08:-54:-17 **15** They've shown a series of e-mails --

-08:-54:-17 **16**                 MR. SOFER:  Actually, men, not boys.

-08:-54:-17 **17**                 MR. BOSS:   -- with Dr. Yousef and Dr. Atul Kaushal

-08:-54:-17 **18** that are involved in EMSS.   I simply want to ask him about it

-08:-54:-17 **19** just briefly.

-08:-54:-17 **20**                 THE COURT:  I'm going to let you.  In terms of his

-08:-54:-17 **21** knowledge of whether it's a legitimate business, which is what

-08:-54:-17 **22** brought us up here, I don't think he can testify.   He can

-08:-54:-17 **23** testify what he knows based upon his investigation or that of

-08:-54:-17 **24** others.

-08:-54:-17 **25**                 MR. HERDMAN:  Your Honor, I might add also, I don't

-08:-54:-17 **1** know what Agent Gubanich is going to say, but more importantly,

-08:-54:-17 **2** I don't know how he's going to respond to this question in the

-08:-54:-17 **3** sense that if, for instance -- I'm not saying this is the case,

-08:-54:-17 **4** but if we were talking about it, if we're talking about an

-08:-54:-17 **5** organization or entity that's currently under investigation by

-08:-54:-17 **6** the FBI, he may not feel comfortable answering that question.

-08:-54:-17 **7**      THE COURT:  Then he can say he can't answer.

-08:-54:-17 **8**      MR. HERDMAN:  I'm just saying that to point out

-08:-54:-17 **9** where we're going with this.

-08:-54:-17 **10**      (End of side-bar discussion.)

07:11:14 **11**      THE COURT:  You may continue.

07:11:16 **12**      MR. BOSS:  Thank you, Your Honor.

-08:-54:-17 **13** BY MR. BOSS:

-08:-54:-17 **14**   Q.   Moving on from the list of e-mail addresses that

-08:-54:-17 **15** contained Yasmeen Ahmed, you were shown a couple of e-mails, or

-08:-54:-17 **16** lists I think, an inbox.  This was 76-1AO.

07:11:37 **17**      MR. BOSS:  Can you pull that up, please?  If we can

-08:-54:-17 **18** scroll down and finding again the same section we were looking

07:11:54 **19** at.

07:11:54 **20** BY MR. BOSS:

-08:-54:-17 **21**   Q.   At the bottom there, it pointed out -- I believe the

-08:-54:-17 **22** prosecuting attorney pointed out Dr. Atul Kaushal,

-08:-54:-17 **23** K-a-u-s-h-a-l, and says Dr. Yousef at EuropeanMSS.com.   Are you

-08:-54:-17 **24** familiar with those names?

-08:-54:-17 **25**   A.   Roughly.

-08:-54:-17  **1**  **Q.** Were you -- as a result of the investigation you

07:12:21  **2** participated in or those who you work with, were you aware that

-08:-54:-17  **3** Dr. Kaushal and Dr. Yousef El-Hindi are involved in the European

07:12:32  **4** Medical Student Service business?

-08:-54:-17  **5**  **A.** Yes.

07:12:35  **6**  **Q.** Do you have any reason to believe that they were engaged

-08:-54:-17  **7** in any illegal activity?

07:12:40  **8**  **A.** I wouldn't have any knowledge of that.

07:13:16  **9**  **Q.** Nothing you're aware of with regard to this case, no

07:13:19  **10** illegal activity with EMSS, Dr. Kaushal and Dr. Yousef El-Hindi?

07:13:24  **11**  MR. HERDMAN:  Your Honor, I object.

-08:-54:-17  **12**  THE COURT:  Let's move on.   Sustained.

07:13:37  **13** BY MR. BOSS:

-08:-54:-17  **14**  **Q.** The exhibits we spoke about, you reviewed, actually, a

-08:-54:-17  **15** large number of materials from the computer of Marwan El-Hindi.

07:13:46  **16** Among them, there were items that were not brought up, I think.

07:13:52  **17** Did you find a mission statement from something called

07:13:57  **18** U-M-M-A-H, Ummah?

-08:-54:-17  **19**  **A.** I believe I did.

-08:-54:-17  **20**  **Q.** If I could direct your attention to your chart there,

-08:-54:-17  **21** 76-1BU I believe it is.

07:14:24  **22**  What was that, did you investigate that?

07:14:27  **23**  **A.** Did I investigate it?

-08:-54:-17  **24**  **Q.** Did you determine what this ummah was supposed to be?

07:14:32  **25**  MR. HERDMAN:  Your Honor, I object.

-08:-54:-17 **1**           THE COURT:  What it was supposed to be?   Sustained

07:14:39 **2** at least with regard to the form of the question.

-08:-54:-17 **3** BY MR. BOSS:

-08:-54:-17 **4**     **Q.**   Do you remember whether ummah was an entity that

07:14:44 **5** Mr. El-Hindi and Mr. Griffin discussed setting up as a business

07:14:48 **6** opportunity?

-08:-54:-17 **7**           MR. HERDMAN:  Your Honor, I object.

07:14:50 **8**           THE COURT:  I think he can answer it, or if they

07:14:54 **9** discussed it, does he know that.

07:14:56 **10**     **A.**   I recall they did discuss an organization named ummah.

07:15:01 **11** I don't know whether it was this or related.

07:15:08 **12** BY MR. BOSS:

07:15:08 **13**     **Q.**   Why don't we move to Plaintiff's Exhibit 77, the other

-08:-54:-17 **14** set of matters that you reviewed on Mr. El-Hindi's computer.

07:15:29 **15**           MR. BOSS:  77-AK, please.

07:15:36 **16** BY MR. BOSS:

07:15:36 **17**     **Q.**   Do you recall this document?   At the top it says:

07:15:42 **18** Technical Description?

-08:-54:-17 **19**     **A.**   Yes, I recall.

07:15:45 **20**     **Q.**   What did you understand that to be, if anything?

07:15:48 **21**     **A.**   I understood it to be a description of the trailer.

07:15:52 **22**     **Q.**   A trailer?

07:15:53 **23**     **A.**   Yes.

07:15:54 **24**     **Q.**   Did you do any investigation to follow up on this in any

07:15:59 **25** way?

5065

| | | |
|---|---|---|
| 07:15:59 | **1** | MR. HERDMAN: Objection. Relevance. |
| 07:16:04 | **2** | THE COURT: I'll let him answer. |
| 07:16:06 | **3** | **A.** Not on this particular item, no. |
| 07:16:09 | **4** | BY MR. BOSS: |
| 07:16:09 | **5** | **Q.** On anything related to it? |
| 07:16:19 | **6** | **A.** No. |
| 07:16:20 | **7** | **Q.** "No"? |
| 07:16:21 | **8** | **A.** No. |
| -08:-54:-17 | **9** | **Q.** We heard testimony ever so briefly about some camps in |
| 07:16:25 | **10** | Egypt. Did you investigation that at all, or the people that |
| 07:16:29 | **11** | you worked with, to your knowledge? |
| -08:-54:-17 | **12** | MR. HERDMAN: Your Honor, I object. It's beyond |
| -08:-54:-17 | **13** | the scope. |
| -08:-54:-17 | **14** | THE COURT: I tend to agree. I'm going to |
| -08:-54:-17 | **15** | sustain. |
| 07:16:40 | **16** | **Q.** Did you also find in item 771-H a picture of an animal |
| -08:-54:-17 | **17** | trailer? |
| -08:-54:-17 | **18** | **A.** I believe there were several. |
| -08:-54:-17 | **19** | **Q.** Several animal trailers? Did you pursue any |
| 07:16:59 | **20** | investigation with regard to that? |
| -08:-54:-17 | **21** | **A.** No. |
| 07:17:11 | **22** | **Q.** If we could go back to the list of phone numbers, I |
| -08:-54:-17 | **23** | believe item 78 from the Plaintiff's exhibit list. |
| 07:17:39 | **24** | MR. HARTMAN: 78-A. |
| 07:17:46 | **25** | BY MR. BOSS: |

5066

07:17:46  **1**      **Q.**    78-A.    I'm sorry.    A couple names are pointed out on

07:17:50  **2**  the list, but there are actually quite a large number of people

07:17:55  **3**  appearing on there as well; is that correct?

-08:-54:-17  **4**      **A.**    Yes.

-08:-54:-17  **5**      **Q.**    It included, among other things, travel agencies?

-08:-54:-17  **6**      **A.**    It appears to be.

-08:-54:-17  **7**      **Q.**    At the bottom of this first page I see a name I

-08:-54:-17  **8**  recognize, Charles Sallah, an attorney in town.

-08:-54:-17  **9**      **A.**    Yes.

-08:-54:-17  **10**     **Q.**    I take it merely having your name on this list doesn't

-08:-54:-17  **11**  necessarily mean that there's a problem?

07:18:16  **12**            MR. HERDMAN:  Objection.

-08:-54:-17  **13**     **A.**    I would agree.

-08:-54:-17  **14**  BY MR. BOSS:

-08:-54:-17  **15**     **Q.**    In the course of this investigation you agree Marwan --

07:18:37  **16**  you knew Marwan had gone to bring back Zubair and Khaleel?  You

-08:-54:-17  **17**  saw a series of photos of Marwan El-Hindi in Egypt with Zubair

-08:-54:-17  **18**  and Khaleel and also with Zubair's father, Mr. Ahmed?

07:18:51  **19**     **A.**    Mohammad Ahmed, yes.

-08:-54:-17  **20**     **Q.**    Mohammad Ahmed.

07:19:11  **21**            MR. BOSS:  77-N1, please.

07:19:19  **22**  BY MR. BOSS:

07:19:19  **23**     **Q.**    Now, this photograph presumably is from Egypt, right?

-08:-54:-17  **24**     **A.**    Presumably.

07:19:24  **25**     **Q.**    And we have four people in this photo.   Zubair Ahmed

| | | |
|---|---|---|
| 07:19:29 | **1** | and Khaleel Ahmed along with Marwan El-Hindi, and also the |
| -08:-54:-17 | **2** | father of Zubair and Khaleel, right? |
| 07:19:36 | **3** | A.    The father of Zubair Ahmed. |
| 07:19:39 | **4** | Q.    I'm sorry.   And the uncle of Khaleel? |
| -08:-54:-17 | **5** | A.    Correct. |
| 07:19:43 | **6** | Q.    Now, to your knowledge, the father, Mr. Ahmed, got |
| -08:-54:-17 | **7** | Marwan involved to go to Egypt to bring the boys back? |
| -08:-54:-17 | **8** | A.    I believe that's what Mr. El-Hindi told Mr. Griffin. |
| 07:19:56 | **9** | Q.    Do you have any reason to disbelieve that? |
| 07:19:59 | **10** | MR. HERDMAN:  Your Honor, I object at this point. |
| -08:-54:-17 | **11** | THE COURT:  I would agree.  Sustained. |
| 07:20:11 | **12** | MR. BOSS:  If I could have just a moment, Judge. |
| 07:20:51 | **13** | BY MR. BOSS: |
| -08:-54:-17 | **14** | Q.    During the course of your investigation were you aware |
| -08:-54:-17 | **15** | of the fact Mr. Ahmed and his wife, Mrs. Ahmed, went to the |
| -08:-54:-17 | **16** | police and reported that the boys had gone to Egypt? |
| -08:-54:-17 | **17** | A.    I believe that's correct. |
| -08:-54:-17 | **18** | Q.    And they thought perhaps it was to go commit some Jihad? |
| 07:21:06 | **19** | A.    It was to -- I believe the statement said to get |
| -08:-54:-17 | **20** | involved in the war in some way, but it's not a direct quote. |
| -08:-54:-17 | **21** | Q.    In your investigation did you learn it was thereafter |
| 07:21:15 | **22** | that Mr. El-Hindi was contacted by Mr. Ahmed and together they |
| -08:-54:-17 | **23** | went to Egypt to bring the boys back? |
| 07:21:21 | **24** | A.    That's what he told Mr. Griffin. |
| 07:21:24 | **25** | Q.    Now, the Arabic -- we've tossed around the phrase |

| | |
|---|---|
| -08:-54:-17 | **1** Wingdings.  I don't think that's a technical phrase, but it does |
| -08:-54:-17 | **2** just fine for me.   As I understand it, that is -- if a |
| -08:-54:-17 | **3** computer -- and correct me if I'm wrong.  If a computer doesn't |
| -08:-54:-17 | **4** have the ability to read or, I guess, interpret Arabic language |
| -08:-54:-17 | **5** script, it instead puts up some other symbol, correct? |
| 07:21:53 | **6**     **A.**   I'm not an expert.   That's my impression. |
| -08:-54:-17 | **7**     **Q.**   Do you know if Mr. El-Hindi's computer, at the time it |
| -08:-54:-17 | **8** received e-mails that were demonstrated to the jury, had Arabic |
| 07:22:06 | **9** capacity on it? |
| -08:-54:-17 | **10**           MR. HERDMAN:  Objection. |
| -08:-54:-17 | **11**           THE COURT:  Sustained. |
| 07:22:12 | **12** BY MR. BOSS: |
| 07:22:12 | **13**     **Q.**   Do you know at all whether Mr. El-Hindi's computer had |
| 07:22:15 | **14** Arabic capacity on it at any time? |
| 07:22:17 | **15**           MR. HERDMAN:  Objection. |
| 07:22:18 | **16**           THE COURT:  If he knows, based on his own |
| 07:22:21 | **17** examination, not what he learned from somebody else. |
| 07:22:26 | **18**     **A.**   I'm not the right person to ask. |
| 07:22:28 | **19**           MR. BOSS:  Thank you so much.   Could I have just |
| -08:-54:-17 | **20** one moment? |
| 07:22:35 | **21**           THE COURT:  Sure. |
| 07:22:36 | **22**           (Discussion had off the record.) |
| 07:22:45 | **23**           MR. BOSS:  Thank you.   Nothing further. |
| -08:-54:-17 | **24**           MR. HELMICK:   No questions, Your Honor. |
| 07:22:51 | **25**           THE COURT:  Any redirect?   Do you want to take a |

-08:-54:-17 **1** moment?

07:22:56 **2** MR. HERDMAN:  I think we'd actually ask to approach

-08:-54:-17 **3** briefly.

-08:-54:-17 **4** THE COURT:  Okay.

-08:-54:-17 **5** (Whereupon the following discussion was had at the

07:28:26 **6** bench outside the hearing of the jury:)

07:28:26 **7** MR. HERDMAN:  Your Honor, my concern is based on

-08:-54:-17 **8** some of the questions that Mr. Ivey raised to the witness with

-08:-54:-17 **9** respect to the length of the interview and the topics that were

-08:-54:-17 **10** discussed.  I would be -- I would be willing to redirect Special

-08:-54:-17 **11** Agent Gubanich as to whether the interview was ever terminated

-08:-54:-17 **12** at any point in time and what the reason for that termination

-08:-54:-17 **13** was.

-08:-54:-17 **14** THE COURT:  I don't think you should.   If you

-08:-54:-17 **15** start getting into suggestion of comment on the exercise of

-08:-54:-17 **16** right to counsel, I think it lasted and there came a time when

-08:-54:-17 **17** it ended.   If you want to say, suggest to him, that Mr. Amawi

-08:-54:-17 **18** at most requested, fine.   Something neutral.   And we're

-08:-54:-17 **19** beginning to get on thin ice, and it potentially could introduce

-08:-54:-17 **20** a complication on appeal.

-08:-54:-17 **21** MR. SOFER:  That's exactly the issue we were

-08:-54:-17 **22** worried about.   That's why we approached.   The problem, Judge,

-08:-54:-17 **23** is that the implication by Defense Counsel's questions were

-08:-54:-17 **24** that -- a lot of questions, he was read his rights, he was

-08:-54:-17 **25** offered a chance to have his attorney and he was friendly and

-08:-54:-17 **1** happy and he was great about responding to all these questions.

-08:-54:-17 **2** Well, as soon as they turned up the heat a little bit on him he

-08:-54:-17 **3** went the other way.

-08:-54:-17 **4**          THE COURT:  I'm going to ask Mr. Ivey whether they

-08:-54:-17 **5** would object to them saying the interview ended at Mr. Amawi's

-08:-54:-17 **6** request.   Whatever.   It just -- you know, there may be an

-08:-54:-17 **7** Edwards issue lurking in there.   I just don't see why we need

-08:-54:-17 **8** to bring it in.

-08:-54:-17 **9**          MR. SOFER:  I think it's important to us to ask not

-08:-54:-17 **10** that he asked for an attorney, obviously, but what was being

-08:-54:-17 **11** asked of him at the time that he decided he didn't want to keep

-08:-54:-17 **12** talking anymore because what -- I think you may recall from the

-08:-54:-17 **13** hearing, there was a long conversation about a lot of topics.

-08:-54:-17 **14** When the agents began to question Mr. Amawi about his behavior

-08:-54:-17 **15** in this case and some of the allegations in this case, this was

-08:-54:-17 **16** the testimony in hearing, that's when Mr. Amawi said the line

-08:-54:-17 **17** that he did, which ended the interview.   The implication --

-08:-54:-17 **18** again, what we're left with is we're in a dangerous situation.

-08:-54:-17 **19**          I understand what the Court's saying, too.  That's

-08:-54:-17 **20** why we asked to approach.   But we're left with the jury

-08:-54:-17 **21** thinking this guy was perfectly happy to talk about anything,

-08:-54:-17 **22** but that's not the truth.   That's not what really happened.

-08:-54:-17 **23** When the questions became more pointed, Mr. Amawi was no longer

-08:-54:-17 **24** the cooperative, happy, nice person that the jury's been lead to

-08:-54:-17 **25** believe he was.

-08:-54:-17  **1**  MR. IVEY:  I think that's very untrue.   I have

-08:-54:-17  **2**  numerous examples in that statement where Mr. Amawi talks about

-08:-54:-17  **3**  the bomb vest video, many things, shooting, Griffin, all kinds

-08:-54:-17  **4**  of things that are a basis for these charges.   So if they are

-08:-54:-17  **5**  allowed to create the impression the minute we start talking

-08:-54:-17  **6**  about the case, we cut the interview off, then we should be able

-08:-54:-17  **7**  to go into all those statements Mr. Amawi made about the bomb

-08:-54:-17  **8**  vest video, about shooting with Griffin, about admitting looking

-08:-54:-17  **9**  at the videos.   And I didn't bring up topics.   I just said it.

-08:-54:-17  **10**  I purposely said that.  So we didn't get into that:  The topic

-08:-54:-17  **11**  that the Court let me go into for the rule of completeness.   So

-08:-54:-17  **12**  if they want to do that, then we should be able to talk about

-08:-54:-17  **13**  anything Mr. Amawi said in that statement.

-08:-54:-17  **14**  MR. SOFER:  Our position basically is simply that I

-08:-54:-17  **15**  think the jury's been left with an erroneous impression.   I'm

-08:-54:-17  **16**  not sure we really can fix it without getting dangerously close.

-08:-54:-17  **17**  THE COURT:  I'm not sure it's necessary to fix it.

-08:-54:-17  **18**  I am suggesting I'll permit you to ask, unless there's a

-08:-54:-17  **19**  strenuous objection then I'll hear further, the interview ended

-08:-54:-17  **20**  at Mr. Amawi's request.   He concluded he didn't want to talk

-08:-54:-17  **21**  anymore.   It ended, period, end of discussion.   Or even say,

-08:-54:-17  **22**  did the interview, your conversation, with him end when he

-08:-54:-17  **23**  indicated that he didn't want to talk to you anymore, period,

-08:-54:-17  **24**  end of discussion.   Okay.  I think that indicates there came a

-08:-54:-17  **25**  time when he said:  Time out, guys, end of it.   I -- candidly,

-08:-54:-17  **1**  I just don't think it's --

-08:-54:-17  **2**          MR. HERDMAN:  Your Honor, I'd just ask for an

-08:-54:-17  **3**  opportunity to discuss, all the lawyers on the prosecution team.

-08:-54:-17  **4**          THE COURT:  Sure.

-08:-54:-17  **5**          (End of side bar.)

07:29:43  **6**          MR. HERDMAN:  Your Honor, we have no questions.

07:29:49  **7**          THE COURT:  You may step down.

07:30:06  **8**          I think, ladies and gentlemen, we'll adjourn for

-08:-54:-17  **9**  the evening.  We'll begin tomorrow morning hopefully at 8:30.

-08:-54:-17  **10**  Drive safely home.   Keep an open mind.   Don't talk about the

-08:-54:-17  **11**  case.

07:30:17  **12**          (Jury out.)

07:31:10  **13**          THE COURT:  Tomorrow what will we be starting off

-08:-54:-17  **14**  with?

07:31:14  **15**          MR. SOFER:  That will be the government's proposal.

-08:-54:-17  **16**          THE COURT:  What I would propose doing, if

07:31:21  **17**  agreeable with everybody, is have a copy of it given to them so

-08:-54:-17  **18**  they can read along.   Then I will tell them if they want, they

-08:-54:-17  **19**  can keep them under their chairs.

-08:-54:-17  **20**          MR. SOFER:  We would ask, Your Honor -- I think we

-08:-54:-17  **21**  made this request the first time -- that the jury then be given

07:31:43  **22**  an opportunity now to read it, meaning -- I don't know how long

-08:-54:-17  **23**  the average person would take to go through this; probably about

-08:-54:-17  **24**  20 minutes maybe.

-08:-54:-17  **25**          THE COURT:  I was going to read it to them.

5073

-08:-54:-17  1          MR. SOFER:  Even better.

-08:-54:-17  2          THE COURT:  I was going to read it to them and

07:31:57  3   leave it in their hands.

-08:-54:-17  4          MR. SOFER:  That brings up another point that

07:32:00  5   relates to another witness that is coming up that Mr. Miller is

07:32:05  6   going to call.  I don't know what the Court's position is on

-08:-54:-17  7   this.  When we put the translations in and we publish them to

-08:-54:-17  8   the jury, the translation of various documents or other kinds of

07:32:17  9   evidence, ordinarily somebody would actually read and publish

-08:-54:-17  10  those English portions to the jury.  I think that was the

07:32:31  11  method that Your Honor was suggesting, which was to publish the

07:32:36  12  translations to the jury and to actually read them as we go

-08:-54:-17  13  through them, or maybe all together at some other time.  I

-08:-54:-17  14  don't remember.  But what I was going to ask the Court was

-08:-54:-17  15  whether you object to us bringing in a sort of -- either having

07:32:50  16  another member of the team read, actually read them, the

07:32:55  17  witness -- it will require the witness otherwise to read and

-08:-54:-17  18  read and read, and we think it might take a little bit of --

-08:-54:-17  19          THE COURT:  This is the translator?

07:33:04  20          MR. SOFER:  The translator.

07:33:07  21          THE COURT:  Translation of what --

07:33:08  22          MR. SOFER:  Translation of all, so I'll let Mr.

-08:-54:-17  23  Miller…

07:33:12  24          MR. MILLER:  A couple weeks ago I think we talked

-08:-54:-17  25  about this at sidebar.  It's essentially Mr. Antoon is going to

-08:-54:-17  **1**  testify to a variety of areas including translations of the

-08:-54:-17  **2**  video clips that are in evidence, which are -- we're going to

-08:-54:-17  **3**  briefly show a very short clip so they can remember which one it

-08:-54:-17  **4**  is and the jury can remember it, and then we have the

07:33:33  **5**  translation of that clip. Similarly for Arabic documents, we

-08:-54:-17  **6**  have translations of these documents. Then the last thing would

-08:-54:-17  **7**  be based on testimony today to show him some of the computer

-08:-54:-17  **8**  file exhibits and for him to recognize these translation

-08:-54:-17  **9**  columns. That's essentially the overall universe.

07:33:51  **10**  THE COURT: Your question is how the jury learns

07:33:55  **11**  the content of translation?

07:33:59  **12**  MR. MILLER: Correct, Your Honor.

07:34:00  **13**  THE COURT: Whether he reads it or the alternatives

-08:-54:-17  **14**  are?

-08:-54:-17  **15**  MR. MILLER: The alternative would be we'd have

07:34:10  **16**  some member of the team essentially designated as the reader to

-08:-54:-17  **17**  read the particular translation to the jury for each document

-08:-54:-17  **18**  or, in the case of the video, the video clip. And I think Your

07:34:23  **19**  Honor actually suggested having this read to the jury about a

-08:-54:-17  **20**  week or two ago at sidebar when I was going to preview this

-08:-54:-17  **21**  issue with Mr. Antoon.

07:34:32  **22**  THE COURT: Is there any reason you wouldn't have

-08:-54:-17  **23**  the translator just do it?

07:34:35  **24**  MR. MILLER: We could do that, Your Honor, but I

-08:-54:-17  **25**  think it would just require the witness to essentially be

| | | |
|---|---|---|
| 07:34:39 | 1 | reading and reading and reading as opposed to -- for breaking up |
| -08:-54:-17 | 2 | the flow of it and everything, for the jury and everybody else. |
| -08:-54:-17 | 3 | THE COURT:  You want him to testify:  Yes, I |
| -08:-54:-17 | 4 | examined that video, and Government's Exhibit whatever is a fair |
| -08:-54:-17 | 5 | and accurate translation of the content of the video that's |
| -08:-54:-17 | 6 | already been viewed by the jury or whatever? |
| 07:35:07 | 7 | MR. MILLER:  Correct, Your Honor.   Then I'll move |
| -08:-54:-17 | 8 | that into evidence. |
| 07:35:10 | 9 | THE COURT:  Do you people care? |
| 07:35:12 | 10 | MR. MILLER:  One exception, Your Honor -- a couple |
| 07:35:15 | 11 | of exceptions.  We're not going to have the bomb vest video or, |
| -08:-54:-17 | 12 | I believe, the Egyptian trader video which has already been |
| -08:-54:-17 | 13 | given to the jury or one or two other documents relating to, I |
| -08:-54:-17 | 14 | believe, the explosive cookbooks that went to the experts.   The |
| 07:35:32 | 15 | multi-page documents that go on, pages and pages, we're not |
| 07:35:36 | 16 | intending to have read to the jury. |
| -08:-54:-17 | 17 | MR. HARTMAN:  I can tell you, Judge, with respect |
| -08:-54:-17 | 18 | to the El-Hindi team the only thing we care about is the |
| -08:-54:-17 | 19 | government establish the video was watched or the document was |
| -08:-54:-17 | 20 | read before the translation would be entered into evidence. |
| -08:-54:-17 | 21 | THE COURT:  But my question is:  Do you care |
| 07:35:58 | 22 | whether the translator is the one who presents the text of the |
| 07:36:06 | 23 | translation to the jury or simply have somebody else so the |
| 07:36:15 | 24 | translator doesn't have to read…   I guess that's what we're |
| -08:-54:-17 | 25 | talking about. |

5076

| | | |
|---|---|---|
| -08:-54:-17 | **1** | MR. HARTMAN:  No, I don't care who does it. |
| -08:-54:-17 | **2** | THE COURT:  Do you guys care? |
| 07:36:27 | **3** | MR. BOSS:  No. |
| -08:-54:-17 | **4** | THE COURT:  Let the record show Mr. Doughten and |
| 07:36:31 | **5** | Mr. Helmick are shaking their heads side to side, which I |
| 07:36:37 | **6** | interpret to mean no. |
| 07:36:39 | **7** | Mr. Amawi's team, do you care? |
| 07:36:43 | **8** | MR. BRYAN:  No. |
| -08:-54:-17 | **9** | THE COURT:  If you change your mind overnight, give |
| 07:36:47 | **10** | them a head's up. |
| 07:36:48 | **11** | Does that answer that question?   Anything else we |
| 07:36:50 | **12** | have to talk about this evening? |
| 07:36:51 | **13** | MR. SOFER:  No, Your Honor -- Mr. Herdman. |
| -08:-54:-17 | **14** | MR. HERDMAN:  Your Honor had asked for a list of |
| 07:36:56 | **15** | the evidence that we went through with Agent Gubanich.   And if |
| 07:37:00 | **16** | you don't mind, I'm going to make a record because I don't know |
| -08:-54:-17 | **17** | that I offered all of this into evidence, so I just would like |
| -08:-54:-17 | **18** | to do it all at once.   27-1, 48-1, 49-1, 59-1, 60-1, 75-1, |
| 07:37:25 | **19** | 76-1, 77-1, 128-C1.   128-D1, 120-1, 124-1, 136-1, 139-A1, |
| 07:37:47 | **20** | 130-B1, and 78-A1.   All of those the government would offer |
| -08:-54:-17 | **21** | into evidence.   And with respect to all of those exhibits with |
| -08:-54:-17 | **22** | the exception of 75, there's also an Exhibit -2.   So, for |
| 07:38:04 | **23** | example, 27-2.   I won't reread the list.   But all of them -2, |
| -08:-54:-17 | **24** | which is the translated list.   Again, 75 is the only one of |
| -08:-54:-17 | **25** | those that doesn't have that.   Also 78-A1 does not have a -2. |

07:38:20    **1**   We would offer, subject to connection, all of those exhibits as

07:38:28    **2**   well.

-08:-54:-17   **3**          THE COURT: Any objection?

07:38:30    **4**          MR. HARTMAN: Just to, I believe -- just to those

07:38:37    **5**   derivative -- those exhibits that were derivative of Exhibit 79.

-08:-54:-17   **6**   In other words, 79 we have no objection to that coming in. The

-08:-54:-17   **7**   ones that were changed from -- where the text was changed from

-08:-54:-17   **8**   what they call the Wingdings to then Arabic to then English, we

-08:-54:-17   **9**   have an objection to the admission of that one because we don't

-08:-54:-17   **10**   think there was any foundation that that ever happened or that

-08:-54:-17   **11**   any of the -- that any of the defendants, particularly ours, saw

-08:-54:-17   **12**   it when it was in Arabic. And I think unless they can

-08:-54:-17   **13**   establish that he saw it in Arabic rather than the Wingding, I

-08:-54:-17   **14**   don't think it should be allowed in at all.

-08:-54:-17   **15**          MR. HERDMAN: We offer 79 at this point. We can

07:39:26    **16**   offer that subject to connection, Your Honor.

07:39:28    **17**          THE COURT: Okay. I'll reserve on the other ones.

07:39:44    **18**          MR. HARTMAN: There may be one more. Sorry.

07:40:00    **19**          (Discussion had off the record.)

07:40:01    **20**          MR. HARTMAN: Can I have a moment, Judge?

07:40:03    **21**          THE COURT: Of course.

07:40:04    **22**          (Discussion had off the record.)

07:40:38    **23**          MR. HARTMAN: I guess we would have the same

07:40:41    **24**   objection to what I believe was Exhibit 76-1AQ, which is the one

-08:-54:-17   **25**   with the demonstration from Wingdings to Arabic without the

| | | |
|---|---|---|
| 07:40:51 | 1 | foundation that it was seen in Arabic before that.   We would |
| -08:-54:-17 | 2 | object.   So subject to them connecting that, we have an |
| 07:40:58 | 3 | objection. |
| -08:-54:-17 | 4 | MR. HERDMAN:  Again, that one's a little bit |
| -08:-54:-17 | 5 | different only because the exhibit, at least for purposes of the |
| -08:-54:-17 | 6 | record, is actually an electronic exhibit.   So to the extent we |
| 07:41:10 | 7 | used it demonstratively, it really shouldn't be offered subject |
| -08:-54:-17 | 8 | to connection because it exists as electronic data at a certain |
| 07:41:19 | 9 | point.   So I'm -- they are different because one was a |
| -08:-54:-17 | 10 | printed-out version of an e-mail that had already been encoded. |
| 07:41:27 | 11 | And the AQ exhibit that Mr. Hartman just referenced consists as |
| -08:-54:-17 | 12 | data that can be put upon a computer screen.   That's my |
| -08:-54:-17 | 13 | understanding.   That is to say, there weren't two separate |
| 07:41:42 | 14 | exhibits that were offered to the jury.   There's one exhibit |
| -08:-54:-17 | 15 | that was electronically transformed into -- it's the same |
| -08:-54:-17 | 16 | exhibit.   It's just there was something that was done to it. |
| 07:41:53 | 17 | MR. HARTMAN:  But my understanding was the exhibit |
| -08:-54:-17 | 18 | was in Wingdings, then it was changed on the stand to show what |
| 07:41:58 | 19 | the Arabic is, then later you're going to have it translated to |
| -08:-54:-17 | 20 | show what it says, right? |
| -08:-54:-17 | 21 | MR. HERDMAN:  I think that will actually be done on |
| -08:-54:-17 | 22 | the stand by the interpreter. |
| 07:42:07 | 23 | THE COURT:  But your objection is, to the extent |
| -08:-54:-17 | 24 | that the exhibit exists in Wingdings, in indecipherable |
| -08:-54:-17 | 25 | incomprehensible format, you don't believe that the translation |

| | | |
|---|---|---|
| 07:42:31 | 1 | into Arabic or the conversion into Arabic -- |
| 07:42:35 | 2 | MR. HARTMAN: Correct. |
| 07:42:36 | 3 | THE COURT: -- or the conversion into English |
| -08:-54:-17 | 4 | should be submitted to the jury at all or as to your client? |
| -08:-54:-17 | 5 | Are you objecting on behalf of Mr. El-Hindi? |
| -08:-54:-17 | 6 | MR. HARTMAN: Well, I'm objecting on behalf of |
| -08:-54:-17 | 7 | El-Hindi, whether the other teams join is up to them. But I |
| -08:-54:-17 | 8 | think if -- unless the government can establish they were seen |
| -08:-54:-17 | 9 | in Arabic and English, then the only version they can offer is |
| -08:-54:-17 | 10 | what it is, which is Wingdings. |
| 07:43:06 | 11 | MR. HERDMAN: Again, Your Honor, we're going to tie |
| 07:43:08 | 12 | all this up tomorrow. |
| -08:-54:-17 | 13 | THE COURT: I'll reserve ruling. |
| -08:-54:-17 | 14 | MR. HERDMAN: My only point was it's just different |
| -08:-54:-17 | 15 | in kind, that particular exhibit. But that's fine, we'll |
| -08:-54:-17 | 16 | reoffer it tomorrow. |
| 07:43:19 | 17 | MR. BRYAN: Our objection is the same objection we |
| 07:43:22 | 18 | had with our Motion in Limine. |
| 07:43:24 | 19 | THE COURT: I'll confirm my prior ruling. |
| 07:43:27 | 20 | MR. SOFER: Lastly, I'm hoping by tomorrow Counsel |
| -08:-54:-17 | 21 | will tell the government whether or not we have an agreement on |
| 07:43:37 | 22 | the substance of and the publishing of proposed evidentiary |
| 07:43:42 | 23 | stipulations, apart and aside from the definitional -- |
| 07:43:48 | 24 | definitions that Your Honor has. |
| 07:43:49 | 25 | THE COURT: Chain of custody? |

1           MR. SOFER:  It's mostly foundation, chain of

2 custody kind of things.   Obviously as we approach the very end

3 of our case, if it turns out we can't get those things in hand

4 and get them published to the jury, we're going to have to call

5 in a bunch of other witnesses.

6           THE COURT:  I understand.   Does anybody presently

7 anticipate a problem in that regard?

8           MR. BRYAN:  No.

9           MR. HARTMAN:  I haven't reviewed the list

10 carefully.   Frankly, I haven't had time.   But what I did see

11 of it, I didn't see anything that was a big problem.

12           MR. SOFER:  That doesn't give me the level of

13 confidence I was hoping for, Your Honor.

14           THE COURT:  I doubt that Mr. Hartman, at the end of

15 the day, is going to give us all cause to change the conclusion

16 most of us have had since law school, probably the singlemost

17 useless class was that laborious, lays a foundation of something

18 to which there's absolutely no dispute of any kind whatsoever,

19 or even imaginable.   I think all you're saying is:  Look, I'll

20 let you know; but right now there's nothing that you're aware of

21 to say:  Wait a minute, no, no, no, when what you claim was

22 drugs taken from the evidence locker six months ago, or

23 whatever.   Okay.

24           Timetable.  How's it look in terms of going home a

25 little early on Friday?   I'd like to tell the jurors.

07:45:28   **1**              MR. HERDMAN:  Based on the length of Agent

-08:-54:-17   **2**  Gubanich's testimony today, I think that Mr. Corrigan could

07:45:34   **3**  approach, although I think it will be less than Agent Gubanich's

07:45:39   **4**  testimony, but we could be in for actually a full day tomorrow,

-08:-54:-17   **5**  or thereabouts, depending on how long cross-examination is.

07:45:47   **6**  Certainly past lunch with Mr. Corrigan, I think.   Then we

-08:-54:-17   **7**  have --

07:45:52   **8**              MR. MILLER:  Mr. Antoon, who's a translator.   That

07:45:55   **9**  also might take a bit of time just because of the numerous

07:45:58   **10**  documents and logistics, but I don't expect it to take hours and

-08:-54:-17   **11**  hours on direct.

07:46:03   **12**              THE COURT:  Is he then your last witness before Mr.

07:46:06   **13**  Kohlmann?

07:46:08   **14**              MR. MILLER:  Correct.

-08:-54:-17   **15**              THE COURT:  Do you think we'll be done by noon on

-08:-54:-17   **16**  Friday with Mr. --

07:46:17   **17**              MR. MILLER:  It depends on the length of

-08:-54:-17   **18**  cross-examination of Mr. Corrigan.

07:46:25   **19**              MR. HERDMAN:  Best guess, I would say if everything

-08:-54:-17   **20**  goes the way that I'm anticipating it will go, we could be done

-08:-54:-17   **21**  by early afternoon on Friday.

07:46:34   **22**              THE COURT:  Okay.

07:46:38   **23**              MR. HARTMAN:  We will -- we are still going to have

-08:-54:-17   **24**  to cover, Your Honor, the subject -- permissible subject of Mr.

-08:-54:-17   **25**  Kohlmann's testimony.   That was never made clear.   So at some

-08:-54:-17  **1**  point we're going to have to do that.

07:46:49  **2**  MR. HERDMAN:  I think it was made very clear by

-08:-54:-17  **3**  Your Honor.

07:46:52  **4**  THE COURT:  We will resolve that before we leave on

07:46:57  **5**  Friday.  I just want to let the jurors know.  Okay.

-08:-54:-17  **6**  Anything else from defense at all?

07:47:08  **7**  Okay.  See you guys in the morning.

**8**  - - -

**9**

**10**  C E R T I F I C A T E

**11**

**12**  I certify that the foregoing is a correct transcript from the

**13**  record of proceedings in the above-entitled matter.

**14**

**15**  /s Tracy L. Spore_____        _____

**16**  Tracy L. Spore, RMR, CRR                Date

**17**

**18**

**19**

**20**

**21**

**22**

**23**

**24**

**25**

1                        I N D E X
2 DAVID BARNES, DIRECT EXAMINATION      4871
3 BY MR. HERDMAN:
4 DAVID BARNES, CROSS-EXAMINATION       4882
5 BY MR. BRYAN:
6 DAVID BARNES, CROSS-EXAMINATION       4889
7 BY MR. BOSS:
8 STEVEN GUBANICH, DIRECT EXAMINATION 4896
9 BY MR. HERDMAN:
10 STEVEN GUBANICH, CROSS-EXAMINATION 5024
11 BY MR. IVEY:
12 STEVEN GUBANICH, CROSS-EXAMINATION 5047
13 BY MR. WITMER-RICH:
14 STEVEN GUBANICH, CROSS-EXAMINATION 5053
15 BY MR. BOSS:
16
17
18
19
20
21
22
23
24
25