1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3    UNITED STATES OF AMERICA,     )  Docket No. 3:06-CR-719

4            Plaintiffs,           )  Toledo, Ohio

5               v.                 )  May 21, 2008

6    MOHAMMED AMAWI, ET AL.,       )

7            Defendants.           )

8    ------------------------------

9            TRANSCRIPT OF JURY TRIAL, VOLUME 54
              BEFORE THE HONORABLE JAMES G. CARR
10              UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:    Gregg N. Sofer
                            David I. Miller
14                          Jerome J. Teresinski
                            U.S. Department of Justice
15                          10th & Constitution Avenue, NW
                            Washington, DC 20530
16                          (202) 353-3464

17                          Thomas E. Getz
                            Justin E. Herdman
18                          Office of the U.S. Attorney
                            801 Superior Avenue, W
19                          Cleveland, Ohio 44113
                            (216) 622-3840
20
     For the Defendant      Timothy Ivey
21   Amawi:                 Edward Bryan
                            Amy Cleary
22                          Jonathan Whitmer-Rich
                            Office of the Federal Public Defender
23                          750 Skylight Office Tower
                            1660 West Second Street
24                          Cleveland, Ohio 44113
                                    (216) 522-4856
25

```
 1                           Elias Muawad
                             Muawad & Muawad
 2                           Suite 209
                             36700 Woodward Avenue
 3                           Bloomfield Hills, Michigan 48304
                             (248) 594-4700
 4    For the Defendant
      El-Hindi:             Charles M. Boss
 5                          Boss & Vitou
                            111 West Dudley Street
 6                          Maumee, Ohio 43537
                            (419) 893-5555
 7
                            Stephen D. Hartman
 8                          Kerger & Kerger
                            Suite 201
 9                          33 South Michigan Street
                            Toledo, Ohio 43602
10                          (419) 255-5990

11                          Alek H. El-Kamhawy
                            Raslan, El-Kamhway & Pla
12                          Suite 3FE
                            1700 East 13 Street
13                          Cleveland, Ohio 44114
                            (216) 928-1500
14
      For the Defendant     David L. Doughten
15    Mazloum:              4403 St. Clair Avenue
                            Cleveland, Ohio 44103-1125
16                          (216) 361-1112

17                          Jeffrey J. Helmick
                            Helmick & Hoolahan
18                          2nd floor
                            1119 Adams Street
19                          Toledo, Ohio 43624-1508
                            (419) 243-3800
20

21                          Mohammed Abdrabboh
                            1620 Ford Avenue
22                          Wyandotte, MIchigan 48192
                            (734) 283-7000
23

24
      Court Reporter:       Angela D. Nixon, RPR, CRR
25                          1716 Spielbusch Avenue
                            Toledo, Ohio 43624
```

1                              (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Okay.  I think the issues are what is

2     it that the government proposes to have Mr. Kohlmann

3     testify about.  And in other words, what do you want him to

4     tell the jury and why do you want him to do so?  And to the

5     extent that there's a different meaning about the Ekhlaas

6     issue, what is that about and how the parties think I

7     should decide that?

8          And then there's this proposed Exhibit 209 and

9     what is that and how does that work into everything else?

10    I think that's what we're here about this morning.  If I

11    misstated it, let me know.

12         MR. HERDMAN:  With respect to the first issue,

13    which is what the government is proffering with

14    Mr. Kohlmann's testimony this morning, my understanding was

15    we covered that on Friday afternoon.

16         THE COURT:  I want to kind of confirm that so

17    there's clarity and certainty as we head down that road.

18         MR. HERDMAN:  Happy to do that.

19         THE COURT:  Go ahead.  How does 209 fit in and so

20    forth and so on?

21         And Amy, why don't you tell the jurors it's going

22    to be 9:00.

23         COURTROOM DEPUTY:  That's what time they're

24    supposed to be here.

25         MR. HERDMAN:  First area of testimony that --

1            THE COURT:  Excuse me.

2            Go ahead, Mr. Herdman.

3            MR. HERDMAN:  Well, obviously, the first section

4    of his testimony deals with his background, his

5    qualifications.  I'm going to try to move fairly briskly

6    through that, Your Honor.  The bulk of his testimony,

7    again, which is not extensive by any means, but what is

8    basically broken down to about five parts.

9            The first portion of his testimony deals with the

10   webpage known as Muntada Al-Ansar, M-U-N-T-A-D-A, second

11   ward is A-L, third word is A-N-S-A-R.  And when we

12   discussed this on Friday, Your Honor, I told The Court that

13   I would essentially lead Mr. Kohlmann through a description

14   of what that forum is.  In other words, to prevent any X,

15   Y, and Z temporaniazed, I don't know if that's a word.

16           THE COURT:  It probably fits.  It's as good as

17   any I can think of.

18           MR. HERDMAN:  I will lead him, essentially,

19   through the following facts:  That this website served as

20   the primary and initial distribution point for video

21   releases by Al-Qaeda in Iraq in late 2004 and early 2005,

22   that this webpage was password protected, required a

23   registration after May of 2004, and it required users to

24   have a log in and password.

25           And then there are a number of consensual

1    recordings that have already been played.  We've trimmed

2    those down so that I think the longest consensual -- the

3    longest segment that we'll be playing is about 3 minutes,

4    but most of them about a minute.  And essentially, it's

5    just segments where the defendants are talking about this

6    particular website.

7                THE COURT:  And you say "the defendants," which

8    ones?

9                MR. HERDMAN:  That would be Mr. Amawi and

10   Mr. El-Hindi.

11               THE COURT:  Okay.

12               MR. HERDMAN:  And the I provided to counsel the

13   actual clips that we'll be playing, as well as -- they got

14   that about 8:00 last night -- but prior to that, I provided

15   them with a list of the kind of overall segment from which

16   the clips were going to be playing were derived.

17               THE COURT:  I'm sorry, I'm -- okay.  Go ahead.

18               MR. HERDMAN:  And all of the clips that will be

19   played for Mr. Kohlmann, Your Honor, have already been

20   played in the government's direct case, primarily through

21   Mr. Griffin.  And those -- the dates that -- the dates that

22   deal with the Muntada Al-Ansar webpage.

23               THE COURT:  That's okay.  Why don't you move on?

24               MR. HERDMAN:  Okay.  Happy to.

25               The second area of testimony deals with the

1    Ekhlaas webpage, and there are actually no consensual

2    recordings that will be played with respect to this block

3    of testimony.

4            Can you pull up Exhibit 213?

5            This is where I think Mr. Hartman had a desire to

6    voir dire Mr. Kohlmann with respect to one of our exhibits.

7    This is -- yesterday I provided counsel with what the

8    government will offer through Mr. Kohlmann with respect to

9    213.  If you remember on Friday, Mr. Antoon testified as to

10   the translation he had made of Exhibit 213.  The -- the

11   exhibit that was put up that was marked as 213 on Friday

12   actually contained -- inadvertently contained some of what

13   I think was Mr. Antoon's translated work.  This is the

14   actual untranslated thread from the Ekhlaas webpage.

15           If you can scroll down through that.

16           And I should say this is a copy of that, Your

17   Honor.  Because this -- this is an actual living, breathing

18   webpage.  We had to print it off out of our U.S. Attorney's

19   Office computers in order to sticker it and provide it here

20   in court.  So you see at the bottom there's a -- there's an

21   actual, what appears to be a file path, and it has my name

22   on it.  That's because I printed off this document.  And

23   I -- somehow that ended up on the document.

24           THE COURT:  That can be deleted.

25           MR. HERDMAN:  And I can make it clear that this

1   is -- that it's a copy of that actual webpage, Your Honor.

2           THE COURT:  And what is the purpose of showing

3   this exhibit?

4           MR. HERDMAN:  The purpose of showing this exhibit

5   is that, essentially, Your Honor, this is a copy of the

6   webpage that Marwan El-Hindi and Darren Griffin viewed on,

7   I believe it was February 18th, 2005.  And this is sort of

8   the last leg in the government's proof that this is, in

9   fact, the webpage, that they were viewing the translation.

10  And that consensual recording of that, I don't need to go

11  through that with Mr. Kohlmann.  All I need to do is,

12  essentially, introduce this exhibit.  Through his research,

13  he's been able to acquire this particular exhibit.

14          THE COURT:  And he can testify with a reasonable

15  degree of certainty that this is a duplicate of how it

16  appeared then?

17          MR. HERDMAN:  Yes, Your Honor.

18          THE COURT:  In content and appearance?

19          MR. HERDMAN:  Yes.

20          THE COURT:  Even though it's, I guess -- even if

21  I logged on there, that's what I would see?

22          MR. HERDMAN:  Actually, this is still up on the

23  Ekhlaas webpage.  But the threads are all dated.  That's

24  how he's able to determine that hasn't changed at all since

25  then.  There's some other exhibits with respect to Ekhlaas.

```
1    Would you like me to go through those again, Your Honor?

2    There's Exhibit 73, page 3.

3              THE COURT:  Okay.

4              MR. HERDMAN:  That's the handwritten Ekhlaas

5    thread which Exhibit 213 relates.  There's Exhibit 74.

6              Zero in on the to line there.

7              And that's an e-mail that was sent to Darren

8    Griffin from -- essentially, Mr. Kohlmann can confirm that

9    that is the e-mail address of the Ekhlaas webpage.  There

10   are a number of --

11             THE COURT:  Who sent that?

12             MR. HERDMAN:  I'm sorry, Your Honor.

13             THE COURT:  Just remind me who sent that e-mail.

14             MR. HERDMAN:  That was sent to Darren Griffin

15   from the -- testimony right now is it's from

16   Ekhlaas@hotmail.com.

17             THE COURT:  Okay.

18             MR. HERDMAN:  And there are a number of cookies

19   that were on Marwan El-Hindi's computer that were already

20   testified to with respect to Ekhlaas.  AlEklhaas.net,

21   Ekhlaas.com.

22             THE COURT:  And are those exhibits or is this --

23             MR. HERDMAN:  The cookie history is Exhibit

24   165A-1B.

25             THE COURT:  Okay.
```

1           MR. HERDMAN:  And I should say, Your Honor --

2    this is going back to the previous topic, the Muntada

3    Al-Ansar webpage.  There was some cookie history that dealt

4    with that, that particular webpage as well, Muntada

5    Al-Ansar.

6           THE COURT:  Yeah.

7           MR. HERDMAN:  And then the next block of

8    testimony deals with a website known as "Ansar Jihad."

9           Can you pull up Exhibit 62?

10          And this is a printout of the Ansar Jihad webpage

11   that was provided to Darren Griffin on February 16th, 2005.

12          THE COURT:  By?

13          MR. HERDMAN:  By Marwan El-Hindi.  And

14   Mr. Kohlmann's testimony here would be that the Ansar

15   Jihad, this webpage was not password protected to get to

16   this particular webpage; however, to link to the videos

17   from this page, many of them would be password protected.

18   And the only reason that that's relevant is because

19   Mr. Amawi, on November 23rd, 2004 discusses a website where

20   they had videos relating to Afghanistan and Palestine, and

21   he tries to go to one of the videos and finds out that it's

22   password protected.  And Mr. Kohlmann's opinion is that he

23   actually accessed the Ansar Jihad webpage and is trying to

24   go to one of those external sites that links off Ansar

25   Jihad, but for some reason that external site is password

1   protected.

2          THE COURT:  And why does that matter?

3          MR. HERDMAN:  It matters because, again, this is

4   a -- this is a website that all of the defendants are aware

5   of and discuss amongst themselves.  And this is Mr. Amawi

6   actually attempting to link to another website from Ansar

7   Jihad on November 23rd, 2004, which is a little less than

8   two months prior to the date when Mr. Griffin is handed

9   this printout from the webpage by Mr. El-Hindi.

10         And then if you can bring up Exhibit 77-1AD?

11         MR. BOSS:  Mr. Herdman, can I interrupt for a

12   moment?

13         Was that testimony regarding Exhibit 62 that this

14   was a document given to Mr. Griffin by Mr. El-Hindi, I

15   thought that was pertaining to 61?

16         THE COURT:  Two things:  Can you stand up and can

17   you speak up?

18         MR. BOSS:  Beg your pardon.

19         THE COURT:  I'm not sure Angela heard everything,

20   but go ahead.

21         MR. BOSS:  I beg your pardon.  I was asking

22   Mr. Herdman if this, indeed, was the testimony.  It was my

23   recollection that that was pertaining to document --

24   Government's Exhibit 61 that was purportedly delivered to

25   Mr. Griffin by Mr. El-Hindi, not document 62.

1          MR. HERDMAN:  My recollection is the testimony

2    was that Mr. Griffin was given the Ansar Jihad webpage from

3    Mr. El-Hindi on February 16th, and in fact, you can

4    actually hear this document printing out on Mr. El-Hindi's

5    computer.

6          MR. HARTMAN:  And Judge, their expert testified

7    there was no evidence whatsoever that this page was visited

8    by Marwan El-Hindi's computer on the 16th.  Whatever was

9    heard printing out it wasn't this.  Their expert,

10   Mr. Corrigan, testified to that.

11         MR. HERDMAN:  That is true.

12         THE COURT:  Pardon?

13         MR. HERDMAN:  That is true.

14         THE COURT:  So what proof do you have that he was

15   mistaken?

16         MR. HERDMAN:  If I may finish, Your Honor.  I'm

17   going to link this all up, hopefully.

18         Can you bring up 77-1AD?

19         This document was obtained from Marwan El-Hindi's

20   Compaq laptop computer, and there was testimony on Friday

21   that the actual translations --

22         If you can put -- Kevin, if you can put Exhibit

23   62A on the left-hand side -- and 77-1AD-1 on the right-hand

24   side?  And scroll down to the first page.

25         These are the translations, Your Honor, of both

 1   those documents we just viewed.  And I think if you

 2   remember that there was testimony that the movies that are

 3   listed on both these exhibits are -- they're duplicative in

 4   certain spots.  And I remind you that the document on the

 5   right-hand side was actually dated January 3rd, 2006, I

 6   believe, was the testimony of Mr. Corrigan, and the

 7   document on the left was about a year prior to that.  So it

 8   looks like the one on the right is an updated version of

 9   the same information that is in the Ansar Jihad webpage.

10          And on the right-hand side -- or actually on the

11   left-hand side, can you scroll down to the next page?

12   77-1AD-1.

13          Now, Your Honor, on this second page, this is the

14   translation of the Ansar Jihad webpage.  You see there's a

15   movie called *Russian Hell Part One.* It's on the lower half

16   of that -- that document there.  On February 16th, 2005,

17   all three defendants and Mr. Griffin go into one of Marwan

18   El-Hindi's rooms where they sit on a computer and they

19   watch certain videos.  Mr. Kohlmann was able to determine

20   that *Russian Hell Part One* is actually playing in the

21   background of one of those segments on February 16th, 2005.

22          THE COURT:  Because of what he could hear?

23          MR. HERDMAN:  *Yes, Your Honor.  In addition,*

24   *there's computer evidence that Russian Hell Part One* has

25   many different file names.  One of the file names is

```
 1   Jahesteshm1.
 2            THE COURT:  How do you spell that?
 3            MR. HERDMAN:  J-A-H-E-S-T-E-S-H-M, the digit one.
 4   There's evidence on Mr. El-Hindi's computer that
 5   Jahesteshm1 was playing on February 16th, 2005.  And
 6   Mr. Kohlmann was able to acquire a copy of Russian Hell
 7   Part One and match up about three minutes of that
 8   particular video with what's going on in the background of
 9   the February 16th discussion.
10            And I -- I actually have prepared data for The
11   Court.  I wasn't able to get a copy of it until yesterday
12   so counsel hasn't seen it yet, but it's about -- the block
13   you want to play is about 3 minutes long.  I'd be happy to
14   do that now.
15            THE COURT:  No, that's okay.  We'll wait.
16            MR. HERDMAN:  In addition, Your Honor, you'll see
17   there's another video here called Operation Mujahideen
18   Entering Dagestan. In addition to Russian Hell video,
19   there's also evidence that there's a video called Dagestan,
20   D-A-G-E-S-T-A-N, 1 that was playing on Mr. El-Hindi's
21   computer about the same time that Russian Hell was playing,
22   although we weren't able to find that particular video.
23            THE COURT:  The evidence being?
24            MR. HERDMAN:  The evidence is the Real Player
25   history of Marwan El-Hindi's computer.
```

```
1              THE COURT:  Okay.

2              MR. EL-KAMHAWEY:  Your Honor, respectfully, what

3    is the government trying to achieve from all of --

4              THE COURT:  We'll get to that in a moment.

5              MR. HERDMAN:  And finally, Your Honor.

6              THE COURT:  I assume, Mr. Herdman, you're headed

7    in that direction.

8              MR. HERDMAN:  Yes -- well, just by way of

9    explanation.  Obviously, there's proof that Mr. Griffin was

10   given a printout of that particular webpage on

11   February 16th.  There's further proof that videos that can

12   be linked to from this webpage were, in fact, playing on

13   February 16th.  And all three of the defendants were

14   present when one of these videos was playing and the actual

15   segment itself talks about the way that the Chechnyans are

16   attacking the Russian convoy, sort of tactics that are used

17   in attacking the convoy.  So again, it's -- it's all tied

18   together in terms of the aims of the conspiracy, the intent

19   of the defendants, and the actual -- it correlates the

20   actual physical evidence in this case.

21             And finally, with respect to the Ansar Jihad

22   webpage.  The Ansar Jihad webpage and the Muntada Al-Ansar

23   webpage and the Ekhlaas webpage, they all three experience

24   operational problems.  They're taken offline at various

25   points in spring of 2005.  And there are conversations
```

```
 1   between and among the defendants where they talk about the

 2   fact that these websites are no longer accessible, and they

 3   talk about different ways to access the same information.

 4   And in fact, Mr. Kohlmann, by reviewing the cookie history

 5   on Marwan El-Hindi's computer was able to determine that in

 6   early April of 2005, Mr. El-Hindi was accessing websites

 7   that were substantially replicating what was available on

 8   all three of these websites.

 9           THE COURT:  You say "substantially replicating,"

10   what do you mean?

11           MR. HERDMAN:  For instance, the Muntada Al-Ansar

12   forum, when it went offline, the information that was

13   available on the Muntada Al-Ansar forum was taken wholesale

14   and placed onto another domain, what was called Inn4news,

15   I-N-N, the numeral four, news.

16           And there's evidence that Mr. El-Hindi went to

17   that website on April 2nd, 2005, along with two other

18   websites, each of which aimed -- because Muntada Al-Ansar,

19   Ansar Jihad, had been taken offline, people had put up

20   these other websites that had the same information that was

21   available on those Muntada Al Ansar or Ansar Jihad webpage

22   and put them online.  And the defendants talk about how

23   they can't get onto certain websites, and there's some

24   discussion about how this one is closed, but there's

25   another website that's available that's open.
```

1           The next block of testimony deals with the

2   Islamic Army of Iraq -- and again, Your Honor, I'm going to

3   lead Mr. Kohlmann through this.  He has -- he has a vast

4   knowledge of the Islamic Army of Iraq, but I'm going to

5   keep it very narrow and just have him, essentially, say

6   that he's familiar with this group, because it's defined on

7   our stipulations.  I won't have him elaborate on that at

8   all.  The only thing I'll have him do is have him state

9   that this particular group goes by the initials IAI and

10  that they run -- the group also ran at certain points in

11  2004 and 2005 -- and I think still today -- he doesn't need

12  to testify to that -- a mailing list.  People can subscribe

13  to a mailing list, and they would be provided with updates

14  from the Islamic Army of Iraq.  And that one of these --

15  one of these electronic mailing lists was run through Yahoo

16  Groups.

17          And go to Exhibit 73.  And just focusing on the

18  address line on that e-mail.

19          Then I will direct Mr. Kohlmann's attention to

20  Exhibit 73.  And you'll see, Your Honor, in the subject

21  line of this e-mail there's IAI Iraq in brackets.  And that

22  signifies that this particular e-mail, at some point, was

23  sent to the IAI Yahoo group because it has in the subject

24  line the actual bracketed portion of that -- that is the

25  Yahoo group name for this particular group.

```
 1              And if you go to Exhibits 79 and just focus in on
 2      the -- one of the subject lines.
 3              And then with respect to Exhibit 79, it would be
 4      the same testimony, Your Honor, that there's -- actually,
 5      there are two Yahoo groups that are implicated in this
 6      subject line.  Both of which Mr. Kohlmann subscribed to.
 7      By the way, one of them is ALafghan-ALarab,
 8      A-L-A-F-G-H-A-N, dash, A-L-A-R-A-B.  Sorry about that.  And
 9      then the second would be the IAI Iraq, as well.
10              But I think the testimony will be with respect to
11      Mr. El-Hindi, that it was only apparent that he actually
12      subscribed to the IAI Iraq group.  It looks like this
13      particular e-mail was forwarded from someone who subscribed
14      to the ALafghan-ALarab Yahoo group and then forwarded that
15      e-mail to the IAI Iraq group.
16              THE COURT:  And then it went to Mr. El-Hindi?
17              MR. HERDMAN:  And then it went to Mr. Griffin,
18      yes.
19              THE COURT:  Via Mr.?
20              MR. HERDMAN:  Mr. El-Hindi, yes, Your Honor.  And
21      Mr. Sofer just reminded me, this is the subject of, I
22      believe, Count 4.
23              MR. HARTMAN:  Six.
24              MR. HERDMAN:  Count 6.  Count 6 in the
25      indictment.
```

1           And then finally, Your Honor, the last block of

2    testimony deals with the Masada webpage.

3           If you'll bring up Exhibit 61, please.  And this

4    is Exhibit 61.  This is -- this is -- this is the -- an

5    actual printout from the Masada webpage.  Mr. Kohlmann is

6    familiar with the Masada webpage.  It's -- it's a

7    password-protected and registration-required webpage.  If

8    you are subscriber to this webpage, you will -- you would

9    receive actual e-mail updates from the webpage.  If there

10   was something posted that were new or if the webpage was

11   going to change locations -- and there will be some

12   testimony about the fact that, especially with respect to

13   this particular webpage in early 2005 what the former --

14   the further domain name of the Masada webpage,

15   ALM2-SDA.net.  And in early 2005 that domain went down and

16   Masada had to move over to just a straight IP address,

17   that's the 66.148.  That's visible on this actual printout

18   here on the bottom, left-hand corner.  And Mr. Kohlmann can

19   testify that this webpage is, in fact, the same as at Al

20   Masada webpage that's spelled A-L-M-2-D-A.  And this

21   particular webpage is described by Mr. Amawi.  He gives the

22   domain to Mr. Amawi on April 13th 2005, and it's also

23   discussed specifically by Mr. El-Hindi, I think, on

24   February 8th, 2005.  He says *Muntada Al Masada,* which is

25   the Masada forum.  In addition, there's evidence from

1    Mr. El-Hindi's --

2              THE COURT:  That was April 8th?

3              MR. HERDMAN:  No.  February 8th Mr. El-Hindi

4    talks about it.  April 13th, Mr. Amawi talks about it.

5    There's further evidence in Mr. El-Hindi's computer that he

6    actually was a subscriber to this e-mail or this website

7    because he received an e-mail.  There's a preserved inbox

8    in Mr. El-Hindi's computer that had an e-mail from Al

9    Masada.net, as well as some cookie history that would

10   indicate that he had visited this webpage as well.

11             And that, I think, is it, Your honor.

12   Mr. Sofer's -- well -- and obviously, with respect to

13   Mr. Kohlmann, the point all along, Your Honor, has been

14   that none of this would be clear without Mr. Kohlmann or

15   testimony with respect to these specific items.

16             And again, I've been as specific as I think I can

17   be pointed exhibits, pointed actual clips that we intend to

18   play.  This is, by no means, going to be some sort of wide

19   ranging by Mr. Kohlmann; it's very narrow.

20             THE COURT:  And the ultimate relevance and so

21   forth is related to, what?

22             MR. HERDMAN:  It's related to all the -- all of

23   the defendants' intent, especially with respect to that

24   *Russian Hell* video and discussion.  As well as the

25   existence of a conspiracy, the fact that --

1          THE COURT:  It shows what was under discussion at

2     that time?

3          MR. HERDMAN:  Correct.

4          THE COURT:  As to that --

5          MR. HERDMAN:  Correct.  And well, and especially,

6     Your Honor --

7          THE COURT:  -- the two items that were under

8     discussion --

9          MR. HERDMAN:  Correct.

10          THE COURT:  -- being viewed or at least being

11     played in their presence.

12          MR. HERDMAN:  And also the fact that a it

13     corroborates to a great deal.  It corroborates a great deal

14     of the physical evidence as it relates to Mr. Griffin, to

15     the extent that's at issue.  There is a core objective

16     effect on Mr. Kohlmann's testimony, and I think the

17     government's entitled to offer that testimony with respect

18     to the physical evidence in this case.

19          THE COURT:  Okay.

20          MR. HERDMAN:  And Mr. Sofer, once again, reminds

21     me that this is also directly related to the actual

22     distribution of explosive information counts.

23          THE COURT:  And the dispute about his accessing

24     the Al-Ekhlaas website, in light of their expert's

25     statement on cross-examination, how does that get resolved?

 1          MR. HERDMAN:  I guess I don't understand -- I

 2     don't know what the actual dispute is with respect to that

 3     exhibit.  I'm not sure -- Mr. Hartman said on Friday he

 4     wanted to voir dire Mr. Kohlmann.  I think it was probably

 5     based on the fact that what we had given as Exhibit 213

 6     actually included some of Mr. Antoon's translation.

 7          THE COURT:  What I'm talking about is the

 8     statement on cross-examination that there was --

 9          If I misstate it, Mr. Hartman, tell me, please.

10          I remember the testimony, but that there was no

11     evidence, no computer evidence, no evidence that the

12     website had been accessed.  What exactly did he say?

13          MR. HARTMAN:  About Exhibit 61 and 62, that there

14     was no computer evidence that those were ever accessed

15     by -- on Mr. El-Hindi's computer.

16          THE COURT:  And your response to that is?

17          MR. HERDMAN:  With respect to Exhibit 61, Your

18     Honor, remember there was only Internet history that was

19     saved on Mr. El-Hindi's computer for one day on

20     February 6th of 2005.  On February 6th, 2005 there was

21     evidence -- significant evidence, in fact, that

22     Mr. El-Hindi went to the Masada webpage, although not this

23     particular thread that is portrayed here in Exhibit 61.  So

24     there is -- and there's also cookie evidence of that, and

25     there's also -- there's also some evidence that a file that

1   was accessible through the Masada webpage was viewed on

2   February 5th, 2005.  So the government's issue is not that

3   there's no actual Internet history, browsing history that

4   Mr. El-Hindi went to --

5           THE COURT:  But there is, however, indirect

6   circumstantial evidence.

7           MR. HERDMAN:  Correct.  And there's also indirect

8   evidence as to Exhibit 62, the Ansar Jihad webpage.  Again,

9   there was no -- there was no Internet browsing history for

10  February 16th that was preserved.  However, the Real Player

11  history indicates that videos that were accessible through

12  the Ansar Jihad webpage were viewed on Mr. El-Hindi's

13  computer on February 16th, as well as the fact that we

14  actually have a document, that a witness has testified to,

15  that this is printed off on February 16th and given to him

16  by Mr. El-Hindi, and it's dated February 16th.

17          MR. HARTMAN:  That was printed off on the 16th.

18          MR. HERDMAN:  Exhibit 62.

19          MR. HARTMAN:  And their expert said that was not

20  visited on Mr. El-Hindi's computer.  If a witness says this

21  was printed off on Mr. El-Hindi and given to him on

22  February 16th, it's directly contradicted by their own

23  expert.

24          THE COURT:  I think that ultimately goes to the

25  weight, and I think they're entitled to look to the

```
 1    evidence as most favorable to them and to build on that.
 2    And if it's contradicted, then that's argument to the jury.
 3              MR. HARTMAN:  With all due respect to Your Honor,
 4    I think the fact that they qualified him as an expert --
 5              THE COURT:  I agree.  And --
 6              MR. HARTMAN:  Okay.
 7              THE COURT:  -- and admittedly, it was, quite
 8    candidly, well done cross-examination.  It was a smart and
 9    straightforward kind of favorable answer to you, and you
10    sat down, and it hung there in midair.  And that's
11    something that the government will have to deal with.  Were
12    that -- were that preclusive because there was nothing else
13    in which they could base the testimony that they want to
14    offer, then fine, door will be closed.  But that was the
15    question that I had coming in this morning.  Let's find out
16    where directly relate the point to say, look, Judge, this
17    is what we have, and this is our foundation in effect for
18    the testimony.
19              MR. HARTMAN:  Understood.
20              THE COURT:  I'm inclined to let -- that's my
21    answer to that issue.  Okay.
22              Now, your response, too.
23              MR. HARTMAN:  My response is, I'd like about 30
24    seconds to talk to my computer expert.
25              THE COURT:  No, that's fine.  Sure, of course.
```

1        MR. HARTMAN:  If I stumble a little bit, I

2   apologize.  That's a lot to take in at once.  But the first

3   thing, Exhibit 213, I indicated to the government and The

4   Court that I wanted to voir dire Mr. Kohlmann on exactly

5   what that was and how it came to be.  Since then, we

6   received a different version of Exhibit 213 that has

7   different content on it that is not translated at all.

8   They're simply different content, and I would like to ask

9   Mr. Kohlmann about that as well, because of what we believe

10  Exhibit 213 to be, which is a cut and paste of a bulletin

11  board, and I don't think there's any evidence that it comes

12  from --

13        THE COURT:  Okay.  I'll let you --

14        MR. HARTMAN:  Okay.  I appreciate that.  As I

15  recall, Your Honor was going to allow Mr. Kohlmann to

16  testify about things that wouldn't -- that would be

17  self-evident from the evidence and the video.  The five

18  parts of the -- that Mr. Herdman said that Mr. Kohlmann was

19  going to testify about, first, was the Muntada Al-Ansar

20  website is -- just was going to testify about what it is

21  and it's the primary and initial distribution point for

22  Al-Qaeda in Iraq.  And I believe, based on what Your Honor

23  said when we talked about this last, if they can't show

24  that the defendants knew that fact, then it's not relevant.

25  You said the collection of the videos itself was not

1     probative unless the defendants knew where it was coming

2     from and what it was.  And I don't think there's any

3     evidence that they did know that this was, in fact, the

4     primary and initial distribution point for Al-Qaeda in

5     Iraq.

6            I think Your Honor used -- used the analogy, if I

7     go see a movie I like, it doesn't matter if Warner Brothers

8     made it or Fox, if you're not aware of that.  The second

9     point --

10           THE COURT:  That's as to that evidence or

11    testimony or are you moving on down the list?

12           MR. HARTMAN:  I'm moving on down the list.

13           THE COURT:  Okay.  Go ahead.

14           MR. HARTMAN:  The defendants do talk about -- at

15    some point, the government contends they talk about that

16    website, but before that's allowed -- Mr. Kohlmann's

17    allowed to testify in front of jury, I think Your Honor

18    should be satisfied that the conversation shows that they

19    know that it's the primary and initial distribution point

20    for IAI Iraq, because if the conversation they had doesn't

21    show that, then I don't think it's relevant.  That's all I

22    have about that, if you'd like to hear from Mr. Herdman.

23           THE COURT:  And I do recall having discussed that

24    view.  So --

25           MR. HERDMAN:  Which view, Your Honor?

```
 1              THE COURT:  Well, in terms of, so what if that's

 2    what Al-Qaeda used as its distribution point?  And even if

 3    the defendants discuss that website and/or access it or

 4    whatever, why do we tell the jury the nature of the

 5    sponsors, if they don't know?

 6              MR. HERDMAN:  Mr. Amawi seems to know it, Your

 7    Honor, and the way he seems to know it is that on

 8    November 23rd of 2004, he plays a video and he says, This

 9    is Al-Qaeda.  And that actual video was released --

10    initially, it was only released on Muntada Al-Ansar forum,

11    which was about two weeks prior to when Mr. Amawi actually

12    viewed this video.

13              THE COURT:  I do remember that.

14              MR. HERDMAN:  And so there is -- there is some

15    evidence that --

16              THE COURT:  Is that video -- is that one of the

17    video --

18              MR. HERDMAN:  It was Exhibit 23.  It's the video

19    of a white car driving down the road and --

20              THE COURT:  I mean, was -- was that one of the

21    videos taken by Griffin?

22              MR. HERDMAN:  No, it's not, Your Honor.  It's an

23    audio and video recording.  But I wouldn't say there is

24    actual video.  There is a video captured by Mr. Griffin

25    who's wearing a video recorder that shows Mr. Amawi
```

1  navigating to the Muntada Al-Ansar webpage.

2       THE COURT:  But it's your representation that the

3  evidence shows, at least to Mr. Amawi, while there's a

4  nexus between this particular webpage and Amawi's reference

5  to Al-Qaeda.

6       MR. HERDMAN:  That's correct, Your Honor.  What I

7  can do to put counsel and The Court at ease, I can save

8  that with respect to the nature of Muntada Al-Ansar, at

9  least with respect to the groups that used it as a primary

10  distribution points, I can save that until the very end so

11  you can see the actual evidence that establishes Mr. Amawi

12  and Mr. El-Hindi's knowledge of what this website is.  And

13  then I can ask the question at the at the end of that block

14  of testimony.

15       THE COURT:  Let me hear -- proceed, Mr. Bryan?

16       MR. BRYAN:  Your Honor, whether or not you know

17  the movie was made by Fox or Warner Brothers isn't relevant

18  to you watching the movie either.  And so I don't think

19  whether or not even the government has evidence that

20  Mr. Amawi knew that it was coming from Al-Qaeda is relevant

21  to the fact that he's watching a movie that he knows the

22  sources of the movie.

23       THE COURT:  Fair question.

24       MR. HERDMAN:  It's certainly not apparent to

25  Darren Griffin, based on your skills, that actual video is

1   in Arabic so Mr. Amawi can tell by the logo that's on there

2   that this is an Al-Qaeda in Iraq video and tells that to

3   Mr. Griffin by explanation, oh, this is an Al-Qaeda video.

4   And it's certainly relevant with respect to Mr. Amawi's

5   knowledge with what he was looking at and his intent in

6   actually pursuing these types of videos.

7           This isn't a video that was released by some --

8   by, for instance, Al Jazeera.  This is a video that was

9   released directly from Al-Qaeda in Iraq.

10          MR. HARTMAN:  But, Judge, the fact that he knew

11  that this video was from Al-Qaeda doesn't mean he knows

12  what the website is or why it was put up or who put it up.

13  And these videos are there to find.  He watched the video.

14  If he talks about the video, they can play that transcript

15  for the jury to see what he said about the video.  But it

16  doesn't mean that an expert should come in and say, well,

17  he talked about the video and it's from a website that was

18  put up for this -- by these people.

19          MR. WHITMER-RICH:  And I would add that, you

20  know, the fact that Mr. Amawi says this is Al-Qaeda, we've

21  seen all these videos that have these logos on them, you

22  can tell when a video is an Al Jazeera video because it has

23  a logo on it of that, and they talk on the tapes about

24  Al-Qaeda logos and things, so that's evident from the

25  tapes.  And then the fact that the logo is on the tape

```
 1   shows that there's, you know -- the tape claims some

 2   affiliation or the conduct on the tape is, you know,

 3   purports to be an Al-Qaeda operation or something like

 4   that.

 5           THE COURT:  And why is this redundant?  I'm

 6   concerned that the whole Al-Qaeda -- even though it's -- I

 7   mean, first of all, as they point out, is in the case

 8   already.  It is evident as to some of those videos with the

 9   particular logo, and why, as Mr. Hartman said, why don't we

10   just -- in closing argument, I assume you'll be showing the

11   clip and it's there.  So why do we need Mr. Kohlmann to

12   tell us, by the way, folks, this stuff is collected and

13   distributed by Al-Qaeda?

14           MR. WHITMER-RICH:  Well, we're missing a link in

15   order for the government to be able to make any kind of

16   argument based on the importance of when this video was

17   available.  This is one particular video that there is

18   Mr. Amawi discussing -- Mr. Amawi provides this video to

19   Mr. Griffin.  And this is -- again, this discussion's on

20   November 23rd, 2004 which is in very close proximity to the

21   actual release date of that video, and it's a suicide

22   bombing video that was only the second -- and

23   Mr. Kohlmann's not going to testify to this, this is just

24   for The Court's knowledge.  It's only the second suicide

25   bomb video that was released by Al-Qaeda in Iraq, and the
```

```
 1   only place it was released, on its initial release, I
 2   believe, was November 7th of 2004 was the Muntada Al-Ansar
 3   forum.
 4            And the only question I'm going to ask
 5   Mr. Kohlmann with respect to this video is what is that
 6   video released on the Muntada Al-Ansar website in early
 7   November of 2004.  That's it.
 8            MR. BRYAN:  Your Honor, if I understand
 9   correctly, immediately upon its release, it was picked up
10   by Al Jazeera and played by Al Jazeera.
11            THE COURT:  You can ask Mr. Kohlmann whether he
12   knows whether that's so.
13            MR. BRYAN:  To me, I'm not even sure it's a
14   relevant question.  This timing aspect that, you know, he
15   has a video soon after it's released.  Why is that relevant
16   to Mr. Amawi's intent?
17            THE COURT:  Do we need to know in terms of --
18            MR. HERDMAN:  Do I --
19            THE COURT:  -- its availability elsewhere?
20            MR. HERDMAN:  I think that that's -- that's an
21   overstatement at best.  This entire video was never
22   played -- my understanding was never played on Al Jazeera
23   in its entirety.  This was a video that shows a dead U.S.
24   Marine at the end of it.  I don't think this entire thing
25   was played on Al Jazeera from start to finish.  Portions of
```

1   it may have been.  I don't know that.

2          But again, Your Honor, this goes back to the

3   website.  The website's what's important here.  The website

4   is something that was accessed by both Amawi and

5   Mr. El-Hindi and discussed between the two of them.  They

6   talk about this particular website, and more importantly,

7   they talk about it in Arabic.  So these aren't even

8   conversations that involve Mr. Griffin.  He's there, he's

9   present, but there is Mr. Amawi and Mr. El-Hindi talking

10  about this particular website.

11         That's -- that's what I'm trying to get back to

12  here, is that this came from a particular website.  That's

13  important to this case because that website was important

14  to both of these defendants, Mohammed Amawi and

15  Mr. El-Hindi.

16         MR. HARTMAN:  And if that's he -- I mean, if

17  that's the allegation, I think The Court should look at

18  what the conversation was and the conversation was, hey,

19  this is the Muntada Al-Ansar, and it's what, IAI Iraq, and

20  it's what Al-Qaeda uses for their primary distribution

21  point.  This is where we can get our videos for training,

22  then fine.  I mean, if that's what they say.  I don't think

23  that's what the evidence is going to show.  And if -- and

24  if the --

25         THE COURT:  Well, let's -- I do agree we'll put

```
 1    this at the end, and before we -- we'll recess or whatever,

 2    you know, let them show that to me and see --

 3            MR. HERDMAN:  I should caution The Court, of

 4    course, they're never that explicit about this.

 5            THE COURT:  I understand.  I think it's a fair

 6    request.

 7            MR. HERDMAN:  I'm happy to do that.  I can ask

 8    the question at the end.  It'll be something I can wait

 9    until the end.

10            THE COURT:  And as I say, I'll take a recess and

11    look at that.  So let's put that on the one side to pick up

12    later.

13            MR. BRYAN:  Your Honor, if I may, as it relates

14    to playing these clips, in general.  These clips are in

15    evidence.  These clips are already in evidence, Your Honor,

16    and I think -- and not only that, but some of these

17    clips -- as I was going through them with Mr. Amawi, some

18    of the clips are not even discussing the actual websites.

19    I think this is basically an effort just to rehash evidence

20    that's already in --

21            THE COURT:  I disagree.  I think that because --

22    and tell me if I'm wrong Mr. Herdman -- but the point of

23    this is to connect so that the jury knows what it is

24    Mr. Kohlmann's talking about.  Simply saying it's flashing

25    on the screens --
```

```
 1              MR. HERDMAN:  Correct.
 2              THE COURT:  So the entire thing, if we sat
 3    through the entire video --
 4              MR. HERDMAN:  And again, Your Honor, I've been --
 5              THE COURT:  I understand.  That's fine.
 6              MR. HERDMAN:  I'm going to be very careful.
 7              THE COURT:  I'm overruling that objection.
 8              MR. BRYAN:  But as it relates to specific clips,
 9    Your Honor, it's my understanding, by going through some of
10    these with Mr. Amawi, that some of these clips don't even
11    have a direct reference to these websites that Mr. Herdman
12    is alluding to.  The one clip -- one of the earliest clips
13    is the EK2269185-1A1, actually begins with a mistranslation
14    which is coming back to haunt us again.  And it has
15    Mr. Amawi, where he is most of this case, sitting in front
16    of his computer.  He says, Have a seat, brother, I was
17    about to sign in to see the site -- is how the government's
18    transcript is.  Our transcript says, I was about to sign in
19    to see this guy.
20              And then Mr. El-Hindi says, Which website is it?
21    And you hear Mr. Amawi typing on his keyboard.  And then
22    Mr. Griffin starts talking about Mr. El-Hindi being a good
23    brother, and then they go on for quite a while.  And
24    Mr. Amawi, basically, is on Paltalk at the same time as
25    having a conversation with Mr. El-Hindi and Mr. Griffin
```

1   about different types of software that they used to

2   navigate the Internet.  But nowhere do they discuss --

3   they're talking about Skype and all these different types

4   of software that they use and Yahoo and MSN to navigate the

5   Internet, but nowhere did they specifically talk or chat --

6   or for chats and not for movies, actually, and nowhere did

7   they talk about -- and this goes on for several pages, Your

8   Honor.

9           This isn't a short clip, where they discuss

10  Muntada Al-Ansar, or whatever, but I think they believe

11  that since they're mistranslation says Mr. Amawi says, I

12  was about to get onto the, quote, site.  That generically,

13  he was referring to one of these sites, but there's no

14  evidence in the clip that he's actually at one of the

15  sites.  So I think there's some problems with some of the

16  clips that they've chosen to play.  And I see this as

17  basically a way to be redundant and to reamplify certain

18  conversations that they think are -- are important to their

19  case.

20          Mr. Amawi acknowledges that some of the other

21  sites that they clearly are talking about Al Ansar, some of

22  these sites, and he's not disputing that fact.  But

23  especially the first one that I pointed out, there's no

24  discussion of the site at all.

25          And then there's a discussion, Mr. Amawi and

1  Mr. Griffin, where he's apparently trying to register

2  Mr. Griffin so that Mr. Griffin can be a registered user

3  and somehow receive things off the particular sites.  But

4  there's no evidence that Mr. -- although Mr. Amawi said he

5  was doing that for Mr. Griffin, there's no evidence that

6  Mr. Griffin actually became a registered user based upon

7  that and he started to receive -- and it also doesn't refer

8  to what website.  He just talks about, you know,

9  registering him for a website.  But the clip, itself,

10  doesn't say which website it is and -- in that.

11       But I think more important to that, it sorts of

12  leaves with you with this, Mr. Griffin was discussing being

13  registered to a website, and the government presented no

14  evidence that he, in fact, was.  I think to the contrary,

15  this is just another example of Mr. Amawi pretending to do

16  something that he didn't actually do, which is lead

17  Mr. Griffin to believe that he was going to start receiving

18  a bunch of videos on his own so he didn't have to bug

19  Mr. Amawi for them.

20       So that's -- I mean, there's multiple concerns

21  that we have about the clips themselves.  I just mention

22  those two.  There's other clips that there just isn't any

23  mention of this specific website.

24       The clip beginning EK-48- -- EK-48-69185-3-A3,

25  it's a relatively short clip, but it begins with Darren

 1   Griffin saying, So what do you want to know, what --

 2            THE COURT REPORTER:  Mr. Bryan, please slow down

 3   when you're reading.

 4            THE COURT:  You better restate that because she

 5   missed it.

 6            MR. BRYAN:  I apologize.

 7            It begins with Mr. Griffin.  He says, So what do

 8   you want to know, what the --

 9            Mr. Amawi said, You know, just to start knowing

10   how to make it.

11            Then there's an unintelligible response by

12   Mr. Griffin.

13            And then Mr. Amawi says, Just to know how to make

14   it.

15            And Mr. Griffin says, oh, the IED?

16            Mr. Amawi says, I mean, IDD.

17            Mr. Griffin says, Okay.

18            Mr. Amawi says, This is the new one.  If you want

19   to add it, they just opened it today.

20            It doesn't mention the name of the website.  He

21   just refers to, quote, if you want to add it, they just

22   opened it today.

23            Mr. Griffin says, Okay.

24            Mr. Amawi says, You see the number?

25            Mr. Griffin says, ah, it's the numbers --

```
 1    laughs -- says, Whatever God wills.  And then goes to
 2    another page and says -- Mr. Griffin says, Brothers are so
 3    smart.  Do you have to be -- can anybody go in or do you
 4    have to have a password?
 5              And then Mr. Amawi says, We have it on record.
 6              But the whole first part of that is them trying
 7    to replay for the jury about Mr. Amawi asking Mr. Griffin
 8    about making IEDs, and that has nothing to do with -- with
 9    Mr. Amawi telling Mr. Griffin about this, quote, new
10    website.
11              And not only that, it doesn't say which website
12    it is, it doesn't say Al Ansar.  I consider that a blatant
13    attempt on the Government's part to be playing negative
14    testimony concerning Mr. Amawi.  Obviously, the IED
15    conversation has absolutely nothing to do with taking Mr.
16    Amawi or helping Mr. Griffin or talking to Mr. Griffin
17    about, quote, new one.
18              And if this is a new one, that doesn't even say
19    he's referring to a site necessarily.  It just be -- this
20    is a new movie.  This is a new video.  They just opened
21    this video.
22              And again, we don't know -- I don't know why Evan
23    Kohlmann would need to hear that clip at all to testify.
24    So I -- I -- I don't want to call it dirty tricks, but I'm
25    having a tough time seeing how that IED conversation has
```

```
 1   anything to do with Evan Kohlmann.

 2           MR. HERDMAN:  With respect to the segment that

 3   Mr. Bryan was just referring to, this is one of those clips

 4   where Mr. Griffin was wearing a video recorder, and the

 5   reason that this particular clip is important is that

 6   Mr. Amawi navigates to the Masada webpage, and you can

 7   actually see it on the screen.  Mr. Kohlmann is going to

 8   testify that he recognizes that as a Masada webpage.  And

 9   that this -- if -- if you remember, Your Honor, there was

10   testimony from Mr. Corrigan that the Masada webpage was

11   added to Darren Griffin's web favorites on April 13th,

12   2005.  And you can see it all unfold right on the computer

13   screen.  Mr. Kohlmann is the witness who's capable of

14   saying actually what's on the screen.  Right there on this

15   clip, that's the Masada webpage, that's what he's going to

16   testify to with respect to this particular segment.

17           And with respect to the segment Mr. Bryan

18   discussed first, I think it was the one dealing with, I was

19   about to sign in to this site.  That's actually in English.

20   So it's not a translation issue.  That's --

21           THE COURT:  Transcription.

22           MR. BRYAN:  -- transcription.

23           MR. HERDMAN:  He said translation.  I just want

24   to make that clear for The Court.

25           THE COURT:  I understand.
```

```
 1        MR. HERDMAN:  And it is a longer clip.  I think

 2   it might actually be one of the longest ones.  In fact,

 3   throughout most of it, they are talking about Paltalk and

 4   Skype, things that the government does not contend were

 5   related at all to any of the Jihadist material.  However,

 6   at the end the Ansar -- Ansar.net website, which is the

 7   Muntada Al-Ansar forum, is brought up at the end of that

 8   conversation.  But the beginning is important to the

 9   government and the end of that conversation is important to

10   the government.

11        And what's in between, I think that's just right

12   for cross-examination for the defense counsel to go into

13   that, Skype and the Paltalk, but we're not contending this

14   instance that the Skype and Paltalk were somehow related to

15   what Mr. Kohlmann's going to testify to.  It just happens

16   to be wedged in between the two portions of the

17   conversation that are important to the government.  So it

18   wasn't done with any kind of nefarious purpose.  It's just

19   in terms of presenting the entire conversation we had to

20   troll through the rest of that.

21        And I forget what the other one that Mr. Bryan

22   brought up that I can respond to.  What was the other clip

23   that you brought up?

24        Your Honor, I'm sorry, Mr. Sofer reminds me,

25   if -- if, again, with respect to several of these
```

 1  conversations, it's a -- it's an involving conversation.

 2  So this, on the particular date I was just discussing,

 3  whether it is February 2nd, 2005, this is the first

 4  instance where the -- the Muntada Al-Ansar forum is

 5  discussed, but it's also discussed later on in the

 6  conversation.  The government intends to play those clips

 7  as well.  It helps put in perspective what's discussed

 8  later in the conversation, the fact that this particular

 9  site, as Mr. Amawi calls it, along with the Ansar.net web

10  address that's given in this segment, those are discussed

11  much more explicitly later on in the same conversation.

12            THE COURT:  Okay.

13            MR. BRYAN:  Your Honor, if I may very briefly, as

14  it relates to the beginning conversation between Mr. Amawi

15  and Mr. Griffin about Mr. Amawi asking Mr. Griffin

16  apparently how to make an IED, I -- Mr. Herdman never

17  responded to why that portion of the clip is relevant to --

18            THE COURT:  Let's hear it.

19            MR. HERDMAN:  Because they're sitting at the

20  computer, Your Honor, and Mr. Amawi's typing in, navigating

21  to the Masada webpage during the entire conversation.  They

22  sit down -- they're sitting next to the laptop computer

23  together, and it's actually not what's being said -- they

24  do talk about a website, though, during that conversation

25  which is important, but far more important is the actual

1  video that's playing, or that's being recorded by

2  Mr. Griffin.

3          THE COURT:  I understand.

4          MR. BRYAN:  I just don't know why the video can't

5  start where Mr. Amawi says, This is a new one.  If you want

6  to add it, I just opened it today.

7          THE COURT:  Because that would eliminate a

8  portion of video that was being played?

9          MR. HERDMAN:  Correct, it's the whole navigation

10  process.

11          THE COURT:  I understand.

12          MR. BRYAN:  And also Your Honor, just a general

13  objection to all of this, is that we're not disputing that

14  Mr. Amawi visited these websites.  We're not disputing that

15  he knew about these websites.  We're not disputing that the

16  source of these websites -- although I don't believe that

17  it's relevant for the jury to know that Al-Qaeda in Iraq

18  was using their websites as their distribution point and

19  all that kind of stuff.  I think that has a tendency to

20  prejudice the process rather than provide assistance to the

21  jury.  It's very clear that Al-Qaeda in Iraq were the --

22  were responsible for the -- a lot of videos that were

23  viewed in this case, just based upon the symbol.

24  Mr. Griffin himself even testified that this was a symbol

25  and Mr. Amawi taped saying this is from Al-Qaeda.  So when

1  they bring in an expert to basically, I guess, put window

2  dressing around that testimony, I think it adds a sense of

3  importance that -- that the evidence doesn't deserve.

4      The fact that Mr. Amawi has the ability to

5  navigate these sites, in large measure, is due to his

6  ability to speak Arabic and that he's from that part of the

7  world where these sites are being created.

8      If Mr. Kohlmann is out -- allowed to emphasize,

9  basically, by the government, he's allowed to come in and

10  emphasize, again, that the producers of these videos and

11  everything else in how these videos made it onto the net, I

12  don't think that, clearly, is the reason why we sought

13  expert assistance to begin with, to be able to sort of

14  rebut that notion, to show that, at least in the Middle

15  East, in the Muslim communities in the Middle East, young

16  men like Mr. Amawi access this material very frequently,

17  and in great amounts, to put it all in prospective.

18      Sitting here in the United States with the jury

19  that's 100 percent American, none of them, if I recall

20  correctly, had any -- any experience at all with that at

21  least.  It makes it sound like Mr. Amawi, Mr. El-Hindi and

22  everybody who looked at this stuff is somehow part of the

23  Al-Qaeda network.

24      THE COURT:  I think you can ask Mr. Kohlmann

25  that.  Say, look, gang, access to this stuff wasn't that

1  tough, was it?  And in fact, at that time you gained

2  access, anybody can gain access.  So I think that -- that's

3  how that point can be addressed.

4        MR. BRYAN:  Well, I did reread the -- I did

5  reread the Daubert hearing transcript of Mr. Kohlmann where

6  I did ask him those exact questions, Your Honor.  And

7  Mr. Kohlmann, I think, somewhat disingenuously made it seem

8  like it's next to impossible to access this stuff unless

9  you're a direct follower of Al-Qaeda or someone like him to

10 sign in to see a direct -- a direct video of Al-Qaeda.

11       THE COURT:  That's not my --

12       MR. BRYAN:  That's not a question I'm going to

13 ask Mr. Kohlmann because I have any confidence that he'll

14 answer the way that I believe that the true evidence is,

15 that these things are easily accessible, and it's --

16 they're commonly accessed in the Middle East.  He's not

17 going to answer that question.

18       THE COURT:  One of the reasons I made my initial

19 decision was because he said, contrary to the initial

20 impression I had about the difficulty to get some of this

21 stuff and kind the way that would evaporate all those

22 instantaneously once it was out there somewhere, quite

23 saying it would be up for a couple of weeks, or whatever.

24 Password protected means, simply, you've got to, quote,

25 register.  Anybody can do that, he did it himself, and so

```
1   there was no real -- to that.  And that I think -- that's

2   your call.  And how you make that call, I don't think is --

3   should preclude the testimony.

4           MR. HARTMAN:  Judge, I don't want to take much

5   more of your time.

6           THE COURT:  That's okay.  I get paid no matter

7   what I do.  This is very important.

8           MR. HARTMAN:  Well, as to the Ansar Jihad

9   webpage, I don't know -- which exhibit is that?

10          MR. HERDMAN:  Sixty-two.

11          MR. HARTMAN:  That was not password protected.

12  The links to the videos were password -- were password

13  protected.  Those links didn't tell you where they were

14  going to take you.  There's no evidence that any of those

15  links were clicked at all, so I don't think that he should

16  be able to testify that the links that appeared on the page

17  were password protected when nobody tried to go there

18  because the page itself wasn't password protected.

19          MR. HERDMAN:  Well, first of all, Your Honor, the

20  page very clearly says, Click here to see this movie at the

21  top of the column there.  Moreover, there is -- there is

22  evidence that these videos were accessed on February 16th,

23  2005 when we have a recording made with one of these videos

24  playing in the background.

25          THE COURT:  Those two videos?
```

```
 1          MR. HERDMAN:  Only one of them you can hear

 2   playing in the background.  There is computer evidence that

 3   at least two of the videos from this page were accessed on

 4   that date.

 5          THE COURT:  Then the evidence is there.

 6          MR. HARTMAN:  I don't believe that's what the

 7   evidence will show, but that's for argument.  I understand

 8   that.  The -- I mean, for example, one of the things is the

 9   Russian Hell, I mean, that was available in many different

10   formats under many different names, and, you know, just

11   because we're able to match up three minutes of that video

12   doesn't mean it came from a link that was clicked on this

13   website, because there was no testimony from an expert that

14   the link was clicked from this website, which I think is

15   very important, because that goes to the password issue.

16          THE COURT:  Mr. Herdman?

17          MR. HERDMAN:  Well, with respect to our expert's

18   testimony, Your Honor, he did testify there was no evidence

19   in the computer that this particular website had not been

20   visited, but he never said that he could confirm that it

21   wasn't visited, just that the browsing history, that date

22   doesn't exist anywhere.  So --

23          THE COURT:  This is the same circumstantial

24   evidence.

25          MR. HERDMAN:  That's correct.
```

```
 1          MR. HARTMAN:  But -- so where does the evidence

 2   come from that the videos were watched?  Is that the Real

 3   Player history?

 4          MR. HERDMAN:  The Real Player history which is

 5   Exhibit 165-F-1.

 6          MR. HARTMAN:  I still don't think that's enough

 7   to say these were taken from password-protected sites

 8   because there's no evidence.  Maybe they can argue that

 9   there's just no evidence.

10          MR. HERDMAN:  He's not -- he's not going to

11   testify that this particular video Jahesteshm1 came from a

12   password-protected website.

13          THE COURT:  Okay.

14          MR. HARTMAN:  As to Exhibit 73 --

15          Can you put 73 up on the screen, if you don't

16   mind?

17          Judge, this is -- this is a forward that somebody

18   put the subject line in, IAI Iraq, anybody can cut and

19   paste anything into a subject line.  I don't think that

20   it's proper for Mr. Kohlmann to come in and say that, you

21   know, unless -- unless they can tie that HR Just Jeans

22   group to IAI Iraq specifically, I don't think it's proper

23   for them to say that this is a response from IAI Iraq,

24   unless they have evidence that they can specifically tie

25   those two together.  Because it's not from IAI Iraq, it's
```

```
 1  from this Just Jeans group.  And unless they can, you
 2  know -- do you understand what I'm saying?
 3          THE COURT:  I do.
 4          MR. HERDMAN:  And I think Mr. Hartman's actually
 5  partially right about that.  We would not seek to introduce
 6  that this e-mail came from IAI Iraq.  What it does
 7  indicate, however, is that this was an e-mail that was sent
 8  to that distribution, links the IAI Iraq Yahoo group of
 9  which Mr. El-Hindi was apparently a subscriber to, because
10  he received this e-mail.
11          So this is to say, if you're a member of this
12  group, you can e-mail the whole group and say essentially
13  what's in this e-mail, which is about a jeans company,
14  okay, the actual content of the e-mail is not what's
15  significant here.  What's significant is the subject line
16  which indicates that Mr. El-Hindi is a recipient of this
17  e-mail was a subscriber to the Islamic Army of Iraq's Yahoo
18  group.
19          MR. HARTMAN:  And I don't think that's true.  If
20  that was in the from line, that would be the case.  That's
21  the subject line.  You can put anything in the subject
22  line, from is the sender.
23          MR. HERDMAN:  I think the testimony will be that
24  if -- if Jim was a subscriber to the Yahoo groups an he
25  e-mailed the entire Yahoo groups, and then e-mail was
```

1   received by Joe, that would indicate Jim was in the from

2   line, Joe would be in the to line, but the subject line

3   would indicate, in brackets, that the IAI Iraq group is

4   used to distribute this particular e-mail.

5            THE COURT:  It's like forwarding something?

6            MR. HERDMAN:  In a sense, yes.

7            THE COURT:  I agree.  I'm going to permit that

8   testimony.

9            MR. HARTMAN:  Well -- okay.

10           THE COURT:  And you've made your record, and if

11  there's a conviction I'm sure we'll hear in the

12  Sixth Circuit as to whether my decision represents a

13  partial retraction of repudiation of my earlier opinion is

14  correct.

15           MR. HARTMAN:  Can -- can --

16           THE COURT:  Because I think that nexus is being

17  established for what the evidence has developed during the

18  course of trial.

19           MR. HARTMAN:  Can we put up Exhibit 79, please?

20           I understand what you're saying, Judge.

21           THE COURT:  And I didn't have that during the

22  Daubert proceeding and when I wrote that opinion.  I abide

23  by what I said -- much of what I said in that opinion about

24  the -- much of it -- his proposed opinions as not being

25  relevant to this case.  It's been carved down and distilled

1   down, I have, substantially, according to what the

2   government tells me.  And if it starts to ooze out of other

3   directions, I will contain it.

4          MR. HARTMAN:  And I believe -- I believe you

5   will, Judge.  I'm going to sit down after I just say that I

6   think it's very important that we be very careful because I

7   think it was, you know, it's -- it's what the defendants

8   said and did that establishes the crime, not -- not the

9   source of the material that they got.  And -- and I mean, I

10  think it was Thurgood Marshall that said, If the First

11  Amendment means anything, it says that a state has no

12  business telling a man sitting in his own house what books

13  he can read and what films he can watch.  It's the actions

14  and the speech of the defendants that matters.

15         THE COURT:  I understand.  But on the other hand,

16  I think that this, ultimately, is relevant on the issue of

17  intent.  And I think that's what it's being offered for.

18         MR. HERDMAN:  That's correct, Your Honor.

19         THE COURT:  That, and I think that it is

20  relevant.  I think we have enough of a nexus, and my desire

21  is to see to it that the evidence is contained and limited.

22  And Mr. Herdman has assured me that he has undertaken to

23  instruct Mr. Kohlmann, and Mr. Kohlmann wants to get loose

24  of the rains, I'm sure you will object.  And if that's

25  what's happened, I will make very clear that it's not to

 1 | occur.

 2 |       MR. HARTMAN:  Thank you, Judge.

 3 |       THE COURT:  And I have ways of making clear to a

 4 | jury that I'm not happy with a witness.

 5 |       MR. HERDMAN:  My only response is I've had

 6 | extensive discussions with Mr. Kohlmann.

 7 |       THE COURT:  I know you have, and I know from what

 8 | you tell me, but I don't doubt that you have.

 9 |       MR. HERDMAN:  The only thing I can say is, I

10 | can't predict what's going to be asked on

11 | cross-examination, so just a note of caution, I don't know

12 | what questions are going to be asked.

13 |       THE COURT:  If they call for a yes or no answer,

14 | that should do the trick or be a device to do the trick, if

15 | necessary.

16 |       MR. BOSS:  Judge, may I briefly revisit the

17 | question about Exhibit 62?  The government earlier

18 | referenced that this document purportedly was printed out

19 | in Mr. El-Hindi's house on February 16th, 2005 and handed

20 | to Mr. Griffin.  I did not recall that.  I reviewed the

21 | transcript clips as this -- this discussion has been

22 | unfolding and found no reference to that.  I'm wondering if

23 | the government may direct me or my attention to wherein

24 | those clips there seems to be evidence of that having

25 | happened.

1              MR. HERDMAN:  I believe it may be heard in the

2     clip I'm going play today, Your Honor.  If not, it's -- I

3     can get that for Mr. Boss.  It's either clip 15A, 16A, or

4     17A.

5              THE COURT:  Okay.

6              MR. SOFER:  But, Your Honor, Mr. Griffin also

7     testified, I believe, in the trial transcript that he

8     received that this document on or about February 16th from

9     Marwan El-Hindi.

10             THE COURT:  That's my recollection.

11             MR. EL-KAMHAWEY:  Your Honor, with regard to the

12    Exhibit 61, I just want to tell Your Honor the exchange

13    between Steve and Mr. Corrigan calls -- and despite the

14    fact whatever else you might have for on the computer --

15             THE COURT:  Time out.  You've got to rewind the

16    tape and a bit slower, please.

17             MR. EL-KAMHAWEY:  Mr. Hartman asking

18    Mr. Corrigan:  And the fact is, that despite whatever else

19    may have been on the computers, this URL is -- does not

20    exist anywhere on the computers that were examined that

21    were owned by Marwan El-Hindi; is that correct?

22             The answer:  This specific thread, is that what

23    you mean?  Yes.  Did not --

24             Mr. Corrigan says, Did not appear on Internet

25    history.

 1            Mr. Hartman follows up and says, And you examined

 2   the Internet history?

 3            And the answer was:  Correct.

 4            THE COURT:  Okay.  And that's there and that can

 5   be argued to the jury.  So -- that's my ruling on that

 6   issue.

 7            Mr. Ivey and Mr. Bryan?

 8            MR. IVEY:  Thank you, Your Honor.  I just have

 9   one, seeing is that The Court does seem inclined to allow

10   this testimony, my concern, particularly -- and since the

11   defense is going to be precluded from presenting expert

12   testimony to reflect some implications of Mr. Kohlmann's

13   testimony -- is that, particularly some of our less than

14   computer-savvy jurors get the impression from this, even

15   without being said, somehow, because it's difficult to get

16   these websites or links or whatever, and the defendants did

17   this somehow, they are members of Al-Qaeda or there's a

18   connection between Al-Qaeda and --

19            THE COURT:  No.  And if you want --

20            MR. IVEY:  My request is simply that I think in

21   all fairness, since we can't call an expert to rebut, that

22   The Court instruct the jury that there is no such

23   connection between these defendants and --

24            THE COURT:  You read my mind.

25            MR. IVEY:  Thank you.

1          THE COURT:  At the appropriate time, I'll remind,

2    say, I remind, ladies and gentlemen, that this is not a

3    case about Al-Qaeda.  This is not a case where there's any

4    evidence that somehow either Al-Qaeda or terrorist group

5    sought out these individuals or in turn sought them out.

6    And I gather that's the instruction you'd like me to make.

7          MR. IVEY:  Yes.

8          THE COURT:  And I think, you know, and I will, if

9    I remember, I will say, I remind you because -- I think we

10   went into that, I think I explained that to all the jurors

11   during voir dire.  In fact, that's my recollection.  I

12   wanted to, and I think I have said that during the course

13   of the trial, and it's an entirely fair request.

14         MR. SOFER:  And Judge, all the government would

15   ask is that you be precise about that instruction, because

16   I know, obviously, there's no allegation here that these

17   defendants were sought out by Al-Qaeda.  We are not

18   alleging in any way that they interacted, communicated

19   with, or otherwise interacted with Al-Qaeda members or

20   leaders, per se.  However, to say that there is no

21   connection between the defendants and Al-Qaeda is isn't

22   accurate.  This is the connection between these defendants

23   and Al-Qaeda.  They know it.  They talk about it on the

24   tapes, and I'm not asking you to say that either.  But

25   what -- what I just ask The Court is, to be precise about

```
 1   that statement so that we don't overstate that either
 2   because --
 3             THE COURT:  Why don't I say there's no
 4   evidence -- I remind you that there's no evidence that
 5   either Al-Qaeda or any other foreign terrorist group sought
 6   out these defendants or that they, in turn, sought out any
 7   such group?
 8             MR. WHITMER-RICH:  Or as Mr. Sofer said, there
 9   was any communication between those groups.  I mean, the
10   connection that they now --
11             THE COURT:  That's fine.  That's fine.
12             MR. WHITMER-RICH:  The connection they now have
13   is the same connection that Mr. Kohlmann has to Al-Qaeda
14   and that many other people have to Al-Qaeda and that anyone
15   that visits any website has to -- it's not a meaningful
16   connection.  So --
17             MR. BRYAN:  And Your Honor, I may add, on behalf
18   of Mr. Amawi -- who wants me to say this for the record --
19   a lot of the clips that he saw for the first time, he
20   received even from Christians in his Paltalk.
21             THE COURT:  Well, but that's --
22             MR. BRYAN:  But during his Paltalk conversations
23   where they would send him a link about Muslim's, about
24   peace, or Islam, is about these, you know, with this, and
25   then they would send a link, maybe a beheading video that
```

 1   was from Al-Qaeda in Iraq and Zarqawi's group and things

 2   like that.  So the fact that these individuals viewed these

 3   videos, sir, and the fact that they discussed these

 4   particular websites, I think is already in the record and

 5   is relevant for whatever the government can argue, that it

 6   goes to the defendant's intent, but the source of the

 7   information, quite frankly, is completely irrelevant, and

 8   that's, I believe, all Mr. Kohlmann's going to testify

 9   about is that the source of this information is from these

10   various groups.

11          And I think this goes back to Your Honor's

12   original concerns about this, and I'm not sure, I thought

13   that this Evan Kohlmann thing became reconsidered by Your

14   Honor because of the issues concerning the El-Hindi team

15   and some of these specific exhibits and where these

16   exhibits were from and things like that.  But it seems like

17   Your Honor's willingness to give the government this inch

18   is causing them to take several more inches in an effort to

19   bring in other stuff that Your Honor originally thought was

20   not relevant.  So --

21          MR. HERDMAN:  Again, Your Honor, I've stated this

22   I don't know how many times, but this is -- it's -- it's

23   important to the government to tie what Mr. Kohlmann's

24   going to testify to the audio specific exhibits, and

25   specific --

1          THE COURT:  I understand and I agree.  Provided

2     that's what happens, I will permit him to testimony.  I

3     think the defendants have made a very full and complete

4     record, and the record is clear that I have withdrawn from

5     the opinion somewhat, to a slight extent, by no means

6     completely from the opinion that I wrote after the hearing

7     with Mr. Kohlmann.  And I'm going to let him testify in a

8     way that I consider and view, and that the government

9     expects, will be narrow and focused and limited exclusively

10    to the evidence in this case.  Okay?

11         MR. HERDMAN:  Your Honor, before we proceed, just

12    two quick things.  First, can I have an opportunity to

13    speak to Mr. Kohlmann just to kind of highlight some of the

14    things we talked about here?

15         THE COURT:  Sure.

16         MR. HERDMAN:  And secondly, we were going to make

17    Mr. Kohlmann available to The Court to discuss two of the

18    videos that were -- government offered into evidence last

19    week but The Court did not admit.  Those videos feature

20    Mr. Amawi's mother.  We were going to offer Mr. Kohlmann,

21    just by way of, essentially, voir dire with respect to

22    those particular exhibits.  We were going to do that this

23    morning, but I realize we've pushed --

24         THE COURT:  We'll do that at some point before he

25    leaves.

```
 1              MR. HERDMAN:  I just wanted to highlight that.

 2              THE COURT:  And Mr. Ivey, go ahead.

 3              MR. IVEY:  I just wanted to --

 4              THE COURT:  I do not propose to revisit that

 5     ruling, by the way.  I'm not going to permit that

 6     testimony, the cell phone.

 7              MR. IVEY:  No.  I -- I'm not going to be asking

 8     you that.  I just wanted as to -- I want to lobby, again,

 9     for my no connection language because there is -- the

10     connection really isn't -- from the government's

11     prospective, there's a commonality of viewpoint but not

12     membership.

13              THE COURT:  What I propose saying:  Ladies and

14     gentlemen, I want to remind you that there's no evidence in

15     this case that Al-Qaeda or any other foreign terrorist

16     organization sought out or communicated with the

17     defendants, or in turn, any of them sought out or

18     communicated with any foreign terrorist organization.  I

19     think that the record is -- and then each of you can argue

20     about the significance of watching videos, et cetera.

21              MR. IVEY:  That sounds good.

22              THE COURT:  And you were reading my mind in that

23     regard when you stood up.  I think it's important that I do

24     that.  I think I've -- okay.

25              And you wanted a few minutes?
```

```
 1            MR. HERDMAN:  If I could, Your Honor.

 2            THE COURT:  Why don't we take a very brief

 3    recess?

 4            MR. HARTMAN:  I know you don't want to keep the

 5    jury waiting any longer.  If the government wants to begin

 6    its testimony and then later on take a break and not

 7    introduce 209 or 213, and then later at the break, we can

 8    voir dire him on that if The Court prefers, that's fine.

 9            MR. HERDMAN:  I think that would work.  I think I

10    have probably about at least 45 minutes of testimony before

11    we get to that point.  So I'll stop before we get to it in

12    any event.

13            THE COURT:  Yeah.  Okay.  About 15 minutes, you

14    think?

15            MR. HERDMAN:  That's more than enough.

16            THE COURT:  As soon as you can.

17                 (Jury entered the courtroom.)

18            THE COURT:  As always, thank you for your

19    patience.  We've had a number of things we've been working

20    on since shortly after 8:00 this morning.  I thought we'd

21    be ready to go by now, and we just completed the work in

22    that regard so here we are.

23            Your next witness is?

24            MR. HERDMAN:  Your Honor, United States calls

25    Evan Kohlmann.
```

1          THE COURT:  Okay.  If you'll swear the witness,

2    please.

3                    EVAN F. KOHLMANN,

4          Was herein, called as if upon examination, was

5    first duly sworn, as hereinafter certified, and said as

6    follows:

7          THE COURT:  You may be seated.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Will you tell the ladies and

10   gentlemen your name, please?

11         THE WITNESS:  Yes, Your Honor.  My name is Evan

12   F. Kohlmann, K-O-H-L-M-A-N-N.

13         THE COURT:  And Mr. Kohlmann, your community of

14   residence?

15         THE WITNESS:  I'm based in New York City.

16         THE COURT:  And is that where you work as well?

17         THE WITNESS:  That's correct, yes.

18         THE COURT:  And how old are you?

19         THE WITNESS:  I am 29 years old.

20         THE COURT:  And do you have college education?

21         THE WITNESS:  Yes, Your Honor, I do.

22         THE COURT:  And what -- where and what were your

23   major areas of study?

24         THE WITNESS:  I have an undergraduate degree from

25   the Edmund A. Walsh School of Foreign Service at Georgetown

1    University in Washington, D.C.  My main degree from

2    Georgetown was in international politics.  I also have a

3    certificate from the Center for Muslim Christian

4    Understanding from CMCO, the Georgetown University, a

5    certificate is in Islam and Muslim Christian understanding.

6            THE COURT:  Okay.  And it is my understanding

7    that from a period of time you have been interested in and

8    have accessed websites relating to various kinds of

9    terrorist organizations and insurgency groups and their

10   activities; is that correct?

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  And when did that start?

13           THE WITNESS:  I started studying this in

14   approximately 1998.

15           THE COURT:  And were you in high school at that

16   time?

17           THE WITNESS:  No.  No, Your Honor.  I was

18   actually at college in Georgetown University.

19           THE COURT:  Ten years, okay.  That's fine.

20   And -- okay.  Excuse me, just one other question.  Do you

21   speak Arabic?

22           THE WITNESS:  I don't speak it fluent, Your

23   Honor, no.

24           THE COURT:  Can you read Arabic?

25           THE WITNESS:  I can read some characters, but my

1    understanding of Arabic is primarily based on audio or

2    oral.  I have listened to many audiotapes and videotapes,

3    and I've spent time with many Arabic speakers.  I can read

4    translated Arabic as in Arabic characters when they're put

5    into Arabic characters, but I have trouble reading the --

6              THE COURT:  The script?

7              THE WITNESS:  Yes, I guess you could say I'm a

8    student of Arabic.

9              THE COURT:  Primarily self-taught?

10             THE WITNESS:  No.  Primarily the Arabic that was

11   taught to me at the Center for Arabic and Christian

12   Understanding, the Center of Arts is the one at Georgetown.

13             THE COURT:  And you have continued to develop

14   your familiarity and understanding of the Internet and

15   what's available out there relative to terrorism,

16   terroristic groups?

17             THE WITNESS:  That's correct, Your Honor.

18             THE COURT:  Is that principally or primarily what

19   you do and --

20             THE WITNESS:  That's a large part of what I do.

21   I study communications, recruitment, and financing of

22   terrorist organizations, so a large part of that has to do

23   with the Internet.

24             THE COURT:  How is that activity supported

25   financially?

1          THE WITNESS:  How is terrorist activity

2  supported?

3          THE COURT:  No, your work.

4          THE WITNESS:  My activities are supported, number

5  one, because I work for a non-profit foundation known as

6  the 9-11 Finding Answers Foundation, NEFA.  I also work for

7  NBC News, MSNBC as an on-air analyst, and I guess you'd

8  call it a source of information for their stories.  I also

9  work on behalf of various international governments, law

10 enforcement agencies, and others, even private clients.  I

11 provide consulting services with regards to background

12 information, again, regarding communication, financing, and

13 recruitment by international terrorist organizations.

14         THE COURT:  As you understand your testimony

15 your -- what you learn and what you believe, correct?

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  And ladies and gentlemen, in a

18 moment, Mr. Herdman will question Mr. Kohlmann, but I want

19 to remind you -- and I think I did this earlier as when we

20 first met one another during voir dire -- I think I tried

21 to express to you that there would be no evidence in this

22 case and there -- it still is and I expect will be -- that

23 Al-Qaeda or any other foreign terrorist organization -- and

24 I expect Mr. Kohlmann may refer to some of those in his

25 testimony -- but I want to remind you and emphasize to you

```
 1    that there's no evidence that any of these defendants

 2    sought out, communicated with any such organization, or on

 3    the other hand, that any such organization sought them out

 4    or undertook to communicate with them at any time

 5    whatsoever.  And please keep that in mind, not only

 6    throughout the course of the trial, but also this morning,

 7    and perhaps even this afternoon when Mr. Kohlmann's

 8    testifying.

 9              Mr. Herdman, you may proceed?

10                      DIRECT EXAMINATION

11    BY MR. HERDMAN:

12    Q.        Good morning, Mr. Kohlmann.

13    A.        Thank you.

14    Q.        I just noticed I don't know if it's the New

15    Yorker or what it is, but you have a tendency to speak very

16    quickly, so I just ask you to be conscious of that, and I

17    may have to stop you at certain points if you speak too

18    quickly.

19    A.        Please do.

20              MR. HERDMAN:  Kevin, could you put up Exhibit

21    172?

22    BY MR. HERDMAN:

23    Q.        Mr. Kohlmann, do you recognize what's on the

24    screen there?

25    A.        There's a copy of my resume.
```

1    Q.        I know you told Judge Carr about a little bit

2    about your educational background.  With respect to --

3              MR. HERDMAN:  Kevin can you focus on the area at

4    the top that says, Education there?

5    BY MR. HERDMAN:

6    Q.        And then just quickly here, with respect to your

7    undergraduate work at Georgetown, did you -- did you focus

8    on any particular topics while you were a student at

9    Georgetown?

10   A.        Yes, I focused largely on dissident movements in

11   the Muslim world, particularly modern dissident movements

12   in Afghanistan, Saudi Arabia, and North Africa, primarily

13   groups that were based on Islam or their organization or

14   ideology is based on Islam.

15   Q.        I may be missing a couple of words that I'm

16   saying.  If I don't do this, I know Judge Carr will, so if

17   you point the microphone right at your mouth?

18   A.        No problem.

19   Q.        Did you say "dissident movements"?

20   A.        Yes, dissident, as in groups that seek to oppose

21   governments or seek to overthrow governments in the region.

22   I was studying the reasons for those -- their -- their

23   interest in overthrowing those governments, the history of

24   those countries, the history of movements themselves, the

25   people that run these organizations that have founded these

1    organizations, and what other goals these organizations and

2    groups might have.

3    Q.        And did you focus on any particular area of the

4    world in your undergraduate work?

5    A.        Yes, my -- my undergraduate work is almost

6    absolutely focused on the Muslim world, primarily, again,

7    North Africa, Persian Gulf, Afghanistan, particular areas

8    where we had what are known as "Mujahideen," which are holy

9    movements of holy warriors, people that consider themselves

10   the Muslim holy warriors.

11             MR. HARTMAN:  Objection, Judge.  I think we've

12   stipulated to a definition.  I just don't want to confuse.

13             THE COURT:  I think that's correct.  In other

14   words, ladies and gentlemen --

15             Thank you, Mr. Hartman.

16             I remind you that you've been provided with a

17   definition of the term "Jihad" that you are to use in your

18   deliberations and anything inconsistent that you may hear

19   with that term throughout the case is to be disregarded by

20   you.

21             Go ahead.

22   BY MR. HERDMAN:

23   Q.        Mr. Kohlmann, and you received a certificate

24   while you were at Georgetown University?

25   A.        Yes, I did.

1    Q.        And that was in -- at the center for Muslim

2    Christian and Understanding, you received that certificate?

3    A.        That's correct.

4    Q.        Okay.  Then you went to law school after you were

5    done at Georgetown?

6    A.        That's correct.

7    Q.        All right.  By the way, while you were at

8    Georgetown, did you complete any longer written papers,

9    "thesis," as they're called?

10   A.        Yes, I applied and wrote a honors thesis on the

11   subject of the Arab Afghans in Afghanistan, in other words,

12   individuals who had gone from outside countries to fight in

13   Afghanistan.  I also wrote another paper, a --

14            THE COURT:  A little slower Mr. Kohlmann.

15            THE WITNESS:  Excuse me, Your Honor.

16   A.        I also wrote a paper titled "The Bitter Harvest,"

17   which analyzed the Soviet invasion of Afghanistan during

18   the 1980s analyzing how that invasion had led to the

19   subsequent rise of the Taliban movement in Afghanistan.

20            I also wrote another thesis for my CMCU work, at

21   the Center for Muslim Christian Understanding, my thesis

22   for the CMCU was on early religious and political modern

23   sayings in the 20th century Afghanistan.  So in other

24   words, I was basically doing most of my paperwork on,

25   again, Afghanistan, the Persian Gulf, North Africa.

1   Q.        While you -- okay, so then you finished

2   Georgetown and went to University of Pennsylvania Law

3   School?

4   A.        That's right.

5   Q.        And you received a law degree there?

6   A.        That's correct.

7   Q.        And did you -- did you take any graduate -- or

8   continue your -- did you continue your interest in

9   Afghanistan at that point?

10  A.        Yes, I did.  Yes, I did, sorry.

11  Q.        I'd like to direct your attention now --

12            MR. HERDMAN:  If we can go back out, Kevin, to

13  your work experience?  If you could -- Kevin, if you could

14  focus on -- not there, but at the bottom, the -- The

15  Investigative Project?

16  BY MR. HERDMAN:

17  Q.        While you were a student at Georgetown, did you

18  work for an organization called The Investigative Project?

19  A.        Yes, I did.

20  Q.        And can you just briefly describe for the jury

21  what The Investigative Project is?

22  A.        Yes, The Investigative Project is a

23  counterterrorism research think tank, or an organization

24  that conducts research in terrorism, terrorist groups,

25  terrorist financing, which was found in 1995 by a former

1    CNN journalist.  It's a non-profit organization.  The

2    purpose is to promote non-profit counterterrorism research.

3    Q.        You said you were a seen or terrorism consultant.

4    You didn't start off as a senior terrorism consultant?

5    A.        No.  I worked for them for a number of years.

6    Q.        That was your title when you left The

7    Investigative Project?

8    A.        That was my last title, yes.

9    Q.        What did you do -- in order to complete your

10   research at The Investigative Project, what was the process

11   that you went through in order to collect or analyze the

12   information?

13   A.        Well, our research was really based on what are

14   known as "open sources."  And "open sources" are material

15   that is not classified.  In other words, we weren't looking

16   for intelligence reports, we weren't looking for classified

17   information.  What we were looking to find is information

18   that's out there, in general -- it's out there and can be

19   gotten at, in other words, interviews with particular

20   individuals, open interviews, video recordings, audio

21   recordings, the kind of material that, if you're diligent

22   enough to research and find it, it's there to be found, but

23   it's not classified.

24        So what we would do is take different pieces of

25   information from different open sources, be it interviews

 1    with particular individuals, be it video recordings, audio

 2    recordings, even going into secondary sources like

 3    magazines and reports by other academics, and we would take

 4    this information and then try to distill it down into

 5    memorandum, documents, analyzing particular aspects of

 6    terrorist financing, terrorist recruitment, and then

 7    preparing these documents for others to read.

 8    Q.        And what were those others that you prepared the

 9    documents for?

10    A.        It was primarily for academics, policy makers and

11    law enforcement.

12    Q.        While you were -- one of the ways that you

13    collected this information with respect to these groups,

14    did you use the Internet at all in collecting that

15    information?

16    A.        Yes, one -- I mean, being a relatively young

17    person, one of the main areas that I found that was

18    unexplored and that had a lot of information to be

19    exploited in this area, particularly with regards to open

20    source information, was the Internet.

21    Q.        And were you -- at some point in time, you left

22    The Investigative Project?

23    A.        That's correct.

24    Q.        And what have you been doing since you left The

25    Investigative Project?

```
1    A.         I've been working as a private counterterrorism
2    consultant, again, on behalf of academics, policy makers,
3    law enforcement, and others.
4    Q.         You mentioned to Judge Carr that you're a
5    consultant with the 9-11 Finding Answers Foundation?
6    A.         That's correct.
7    Q.         Can you just briefly describe what that
8    particular organization is?
9    A.         Yes, the NEFA Foundation was started after 2001
10   with the hopes of providing a venue for nonprofit
11   counterterrorism research, again, similar to the kind of
12   work that I had done previously, only this is very very
13   focused here on areas that are particularly important to
14   the United States government and other governments who are
15   engaged right now in a campaign, in a military and
16   political campaign.
17            The purpose of this is to provide, again, the
18   actual information, raw information that policymakers and
19   academics and others lack so that informed decisions can be
20   made based upon the real information, the true facts that
21   are on the ground directly from the people that are making
22   these facts.
23   Q.         Do you continue to use the Internet as a research
24   tool in your work for the 9-11 Finding Answers Foundation?
25   A.         Yes.
```

```
 1   Q.        And do you provide any consulting to any
 2   private-sector clients?
 3   A.        Yes.
 4   Q.        Can you just describe generally what kind of
 5   private-sector clients we're talking about here?
 6   A.        I have done consulting work on behalf of private
 7   law firms.  I'm currently engaged in a year-long project on
 8   behalf of the RAND Corporation, R-A-N-D, in California.
 9   It's writing several -- a series of papers for them based
10   upon my analysis of particular events going on in Iraq and
11   Afghanistan and North Africa.
12             I've done work for a variety of different --
13   Q.        Have you offered opinion testimony in any civil
14   cases?
15   A.        Yes.
16   Q.        What about law enforcement?  You mentioned that
17   you work with certain law enforcement entities.  Can you
18   name some of those organizations?
19   A.        Yes, I have worked on a consistent basis with
20   Scotland Yard, SO15 Counterterrorism Command, the Federal
21   Bureau of Investigation, the Australian Federal Police, the
22   Office of the High Representative in Bosnia-Herzegovina,
23   and the United Nations, a variety of different law
24   enforcement and security apparatus around the world.
25   Q.        If I can direct your attention to this portion of
```

```
 1   your resume here it says, Founder president
 2   globalterroralert.com?
 3   A.        Uh-huh.
 4   Q.        And can you just briefly describe for the jury
 5   what that -- that is.
 6   A.        Sure.   In January of 2004 after I left The
 7   Investigative Project, I founded this website in order to
 8   serve as an information clearinghouse.  I felt that the
 9   real facts about terrorism, the real information that was
10   critical for people to be making decisions upon was not out
11   there.  It wasn't being seen or read by the people who
12   needed to see it.  So the purpose of starting this website
13   was, again, to form an information clearinghouse for
14   information, key information, the raw information for
15   academics, policymakers, and others with a specific
16   interest in counterterrorism.
17   Q.        Now, have you personally been featured in any
18   videos or any documents that have been produced by foreign
19   terrorist organizations?
20   A.        Yes, I have.
21   Q.        Can you give an example of one of those to the
22   jury?
23   A.        Yes.  Recently Al-Qaeda's official media released
24   a video of the deputy commander of Al-Qaeda, an individual
25   who goes by the name Dr. Ayman Al-Zawahari,
```

```
1    Z-A-W-A-H-A-R-I, Dr. Al Zawahari in this video recording

2    was addressing the purpose of Al-Qaeda in releasing

3    particular video recordings.

4              MR. HARTMAN:  Objection.

5              THE COURT:  I agree.  I don't think that's

6    relevant.  Jury will disregard that.

7              MR. HERDMAN:  Your Honor, may I approach briefly

8    on this issue?

9                   (A sidebar conference was had on the

10                  record.)

11             MR. HERDMAN:  Your Honor, I understand the basis

12   for the objection.  I understand you're sustaining the

13   objection.  I think the issue I'm trying to get at here is

14   that Mr. Kohlmann has been cited by Al-Qaeda, itself, as an

15   expert of sorts and --

16             THE COURT:  I don't think so.  I don't think so.

17             MR. HERDMAN:  Okay.

18             THE COURT:  All right.

19                  (Sidebar conference concluded.)

20             THE COURT:  Okay.  I sustained the objection.

21   The prior question as previously said to jury.

22             You may continue.

23

24   BY MR. HERDMAN:

25   Q.        I believe you stated earlier, Mr. Kohlmann,
```

1  you're also a consultant to NBC News?

2  A.        That's correct.

3  Q.        What kind of services do you provide to NBC News?

4  A.        I do two different things.  First of all, I

5  provide on-air analysis on both NBC Nightly News, and also

6  MSNBC, with regard to various terrorism issues.  I also

7  provide NBC with access to the raw information that goes

8  into their stories about terrorism.  In other words, if

9  they do a particular story about a terrorist organization,

10  I will provide a video for that organization, I will

11  provide them background about that organization.  I will

12  tell them the history of that organization.  Sometimes I

13  can even provide them exclusive information that no one

14  else has about a particular terrorist group or a terrorist

15  cell, and then that goes into a production for a story.

16  Q.        Now, with respect to this particular case, do you

17  remember how long you've been retained as a consultant in

18  this case?

19  A.        Yes, approximately early 2006.

20  Q.        And do you have any video, computer files, or

21  other documents that you reviewed in connection with this

22  particular case?

23  A.        It's a significant number.  It's in the

24  thousands.

25  Q.        And do you have any idea actual hours of work

```
 1   you've put into this particular case?
 2   A.        It's many hours.  It's been -- it's been quite a
 3   job.
 4   Q.        Have you -- for your work provided as a
 5   consultant in this case thus far, have you received any
 6   payment from the United States?
 7   A.        Yes, I have.
 8   Q.        Do you know approximately how much?
 9   A.        I believe so far over the space of two years,
10   I've gotten paid approximately $49,000.
11   Q.        I want to direct your attention now to some field
12   experience that you've conducted.  Have you ever
13   interviewed actual terrorist recruiters or facilitators?
14   A.        Yes, I have.
15   Q.        And maybe we'll just pick one, Sheikh Abu Hamza
16   Al-Masri, who is that individual?
17   A.        Sheikh Abu Hamza Al-Masri is currently in prison
18   in the United Kingdom.  He was convicted under the United
19   Kingdom Terrorist Act about a year ago.  Sheikh Abu Hamza
20   Al-Masri is a former -- the Finsbury Park, F-I-N-S-B-U-R-Y,
21   Mosque in London, and Sheikh Abu Hamza Al-Masri has been
22   associated with such individuals as Zacarias Moussaoui,
23   who's allegedly involved in the 9-11 conspiracy.
24             MR. HARTMAN:  Objection.
25             THE COURT:  I'm not sure we need to go into all
```

```
 1   this in terms of the testimony that I expected to be

 2   offering today.  I'm going to instruct the jury to

 3   disregard that.

 4             MR. HERDMAN:  I'll just ask a very pointed

 5   question, Your Honor, with respect to interviews.

 6             THE COURT:  Okay.

 7   BY MR. HERDMAN:

 8   Q.        Have you, in fact, done field interviews of

 9   individuals who might have been convicted of terrorism

10   crimes or are suspected of some terrorism crime?

11   A.        Yes.

12   Q.        Is that both abroad and in the United States?

13   A.        Yes.

14   Q.        What about -- have you conducted any interviews

15   exclusively over the Internet with certain terrorist and

16   terrorist facilitators?

17   A.        Yes.

18   Q.        And is that part of your ongoing research into

19   this field?

20   A.        Yes.

21   Q.        Have you conduct the any interviews with family

22   members of terrorists or individuals who executed suicide

23   attacks?

24   A.        Yes.

25   Q.        Okay.  And what -- just very briefly, what was
```

1    the purpose of your interviews with all of these particular

2    individuals?

3    A.        To try to get all of the facts, to try to get all

4    of the facts together.  The most comprehensive picture of

5    the kind of information that I was looking.

6    Q.        And have you conducted any field -- field work in

7    Bosnia-Herzegovina?

8    A.        Yes.

9              MR. HERDMAN:  And I'm going to move onto -- if

10   you can go to the third page of this document.  Okay.

11   BY MR. HERDMAN:

12   Q.        In addition to your work as a consultant, do you

13   also publish various academic works or journals or

14   articles?

15   A.        Yes.

16   Q.        Have you written any books?

17   A.        Yes.

18   Q.        What's the title of it your book?

19   A.        Al-Qaeda -- *Al-Qaeda's Jihad in Europe - The*

20   *Afghan-Bosnian Network*.

21   Q.        When was that book published?

22   A.        That was published in September of 2004?

23   Q.        Who's the primary audience for that particular

24   book?

25   A.        It's a pretty thick book.  The primary audience

1   is academics, law enforcement.  People with a very specific

2   interest in the very highly detailed facts of this

3   situation.

4   Q.      If I can direct your attention to the screen, I

5   see it's used as a text in certain courses?

6   A.      Yeah, it's not -- it's not a common interest

7   book.  It's more like it's a book for universities and

8   college classes.

9   Q.      And it's -- I see here Kennedy School of

10  Government at Harvard and the School of Advanced

11  International Studies at John's Hopkins University, that's

12  your course -- or your book is used in courses at those

13  schools?

14  A.      That's correct, yes.

15  Q.      Has this book been cited in any particular

16  government publications?

17  A.      Yes, it has.

18  Q.      And which one was that?

19  A.      The final report of the bipartisan Congressional

20  9-11 Commission.

21  Q.      With respect -- with respect to articles or

22  papers that you published -- direct your attention to this

23  portion of your CV here -- can you just estimate

24  approximately how many papers or articles you've actually

25  published on certain topics?

1  A.        Many.  I mean, I write -- primarily, right now I

2  write longer, scholarly-style pieces for journals like

3  *Foreign Affairs*.  However, I also write blogs, I also

4  sometimes write editorials.  There's numerous, numerous

5  documents, not to mention the fact that some of the papers

6  that I work are not for public dissemination.  They're for

7  private dissemination.  I would say in a given year, I

8  write anywhere between ten to 15 papers.

9  Q.        And I see you mentioned *Foreign Affairs*.  I see

10 here you published an article in *Foreign Affairs?*

11 A.        That's correct, yes.

12 Q.        What is *Foreign Affairs,* by the way?

13 A.        *Foreign Affairs* is the official journal of the

14 Counsel on Foreign Relations, CFR, which is another

15 organization that promotes international studies and

16 international relations.

17 Q.        And I see you've published in a journal called

18 *The Sentinel?*

19 A.        That's correct.

20 Q.        What -- who published *The Sentinel?*

21 A.        *The Sentinel* is the official journal of West

22 Point -- excuse me, it's the official publication of the

23 West Point Combating Terrorism Center, which is in the U.S.

24 Military Academy at West Point.

25 Q.        And do some of your articles or papers that

 1   you've published, do they deal with the use of the Internet

 2   by specific terrorist groups?

 3   A.        Yes, they do.

 4   Q.        What about conferences, do you attend conferences

 5   on a regular basis?

 6   A.        Yes.

 7   Q.        And most recently, did you just attend a couple

 8   in Washington, D.C.?

 9   A.        I just attended two back-to-back in Washington,

10   D.C., yes.

11   Q.        What was the focus of those particular

12   conferences?

13   A.        The focus of those conferences were U.S.

14   government intelligence -- U.S. -- excuse me, U.S.

15   government intelligence agencies bringing together small

16   groups of academics to discuss particular issues which are

17   of immediate importance to what the United States

18   government is doing.

19   Q.        And finally, with respect to this area, have you

20   published any testimony that was presented to the United

21   States Congress?

22   A.        Yes.

23   Q.        And just -- if you can explain it to the jury

24   what's the difference between writing testimony and

25   actually going in and testifying at Congress?

1  A.        I co-authored testimony with a colleague of mine

2  from The Investigative Project back in 2003 on particular

3  ways that terrorists were working banks and charities to

4  finance themselves.  It was my colleague who actually went

5  to the Congress and presented it; however, it's

6  co-authored, my name is on the document.  We wrote the

7  document together.

8  Q.        I'd like to talk a little bit about the actual

9  research methodology that you employ.  Specifically, with

10 respect to your use of the Internet, can you briefly

11 describe for the jury how it is that you go about

12 researching and utilizing information that you collect off

13 the Internet?

14 A.        Yeah.  Essentially, what I do is I -- first of

15 all, I track websites, particular organizations.  Now for

16 me, I'm interested in getting insurgent or terrorist

17 organizations.  The first thing I look to see if -- does

18 this organizations have an official website.  Do they have

19 an official e-mail address, an official mailing address?

20 If they do, what I will do is, first of all, download

21 copies of that website, study it, translate it.  I will

22 subscribe to their mailing list so that if they send out

23 e-mail blasts, I will receive all their latest news in my

24 own e-mail box.  Sometimes I will contact them by e-mail to

25 see what the response is, to see what they're looking for,

```
 1   to see what their goals are.  But sometimes organizations,
 2   particularly like Al-Qaeda, doesn't have its own official
 3   website, doesn't have its own official AlQaeda.com.  So
 4   what these organizations do is, they collectively put all
 5   their stuff together into one shared website, which is
 6   usually designed like a forum, a chat forum.
 7   Q.        Mr. Kohlmann, I'm going to stop you right there.
 8   A.        Excuse me, sorry.
 9   Q.        When you go to these particular sites or forums,
10   what is the kind of material that you're checking as a
11   researcher?
12   A.        I am collecting primarily video recordings, audio
13   recordings, text communiques, and magazines.  These are the
14   four most common pieces of multimedia you will encounter on
15   the Internet relating to terrorist organizations.
16   Q.        After you've collected this stuff, these
17   documents or videos or audios, what do you actually do with
18   those files?
19   A.        I save all these files into a database.  I save
20   each file in a very specific main format by date, by
21   source, by rough subject title.  And then if it comes from
22   a particular Internet forum where a webpage has a numeric
23   ID, a unique numeric, almost like a telephone number, I
24   save that number as well, so if I ever need to recall this
25   file, not just for my own data, but if I need to recall it
```

```
 1   from the Internet, I can actually plug in this unique
 2   number, and it will pull up this particular document live.
 3   Q.        Now, specifically with respect to Iraq, the
 4   insurgent groups or terrorist groups that are operating in
 5   Iraq that have issued material on the Internet, can you
 6   estimate, roughly, what percentage of that total amount
 7   that's been issued you have actually collected and
 8   maintained in your database?
 9   A.        I don't pretend to say exactly 100 percent
10   because it's possible I might have missed one.  But to -- I
11   have spent enormous amount of time exhaustively attempting
12   to collect every single, last communique, every single,
13   last video, every single, last audio recording, and then
14   juxtaposing my knowledge of what's out there with the
15   knowledge of others to see whether or not I've missed
16   anything, if there is anything out there I've missed.  And
17   I would estimate that I have probably over 99 percent of
18   what's been released in the last three years.
19   Q.        And do you have any convenient way for us to
20   understand how much material you've actually collected?
21   A.        To give the -- a rough idea, my database of all
22   the material that I've collected over the years is
23   approximately 1.3 terabytes in size.  That's
24   1300 gigabytes.
25             Now, one gigabyte of space alone can store
```

1  hundreds and thousands and millions of pages of documents.

2  Now, naturally a video -- one video recording can take up

3  much more room than a document.  But even a video recording

4  doesn't take up more than 50 or 60 megabytes, so you can

5  fit literally hundreds of video recordings into one

6  gigabyte, and then there's thousands of gigabytes, so

7  you're talking millions of documents, audio recordings,

8  videos, magazines.  All of which is indexed on a searchable

9  index.  I can search by particular words just like any --

10  any database, I guess.

11  Q.        And then with all this material that you've

12  collected and placed into your database, do you use that as

13  a basis for your actual research?

14  A.        Yes, I mean, that's the large part of what I do.

15  I either recall particular documents offhand, or if I don't

16  recall them, I can run searches through my database with

17  key words.  I can look for take dates.  I can look for

18  particular organizations.  I have everything sorted out so

19  that whenever I'm looking for a particular organization or

20  a particular date, a source, it's very easy to find this

21  information quickly.

22  Q.        Now, with respect to these documents or audio or

23  video files, what language are most of the files that are

24  in your database, what language with those in?

25  A.        Most of them are in Arabic.

```
1   Q.         Do you speak any language fluently?
2   A.         Well, obviously English, I also speak French
3   fluently.
4   Q.         And I think you testified -- or you told the
5   judge, at least, about your knowledge of Arabic.  What is
6   the method that you use in order to translate or have
7   translated documents, audio or video files that are in your
8   database?
9   A.         I use a technique that is known as "information
10  triage."  What I do is, when I have information that comes
11  into me, let's say it's in Arabic, what I'll do is first,
12  use my own basic knowledge of Arabic, along with online
13  translation tools which can automatically translate Arabic
14  into very rough English.  And what I do here is, I
15  determine from this very kind of rough translation which
16  particular documents are most importance to my research,
17  which particular documents I think have value.  If I find a
18  particular document that I think would have value, I then
19  hand them over to translators, native translators from the
20  region who work for me.
21          I do this because of the fact that I feel that a
22  number of these documents, really, in order to translate
23  this properly, you have to be a native speaker.  You can't
24  be a second language.  So I use primarily Palestinians,
25  actually.
```

```
 1   Q.        Just briefly about your -- your prior
 2   qualifications and your ability to render opinion evidence
 3   support.  Have you -- have you been retained as a
 4   consultant by the government in any other cases other than
 5   this one?
 6   A.        Yes.
 7   Q.        Can you approximate how many?
 8   A.        I've been retained in approximately two dozen
 9   cases.
10   Q.        Two dozen?
11   A.        Total, yes.
12   Q.        And in about how many of those cases did you
13   actually testify in court?
14   A.        I've actually testified in court, I believe, ten
15   times.
16   Q.        And on how many of those occasions did you --
17   were you qualified to offer opinion testimony?
18   A.        I believe all but one.
19   Q.        And were all of those cases in federal -- in U.S.
20   federal court?
21   A.        That's correct.
22   Q.        Now, have you ever testified in any foreign or
23   international courts?
24   A.        Yes, I have.
25   Q.        And can you briefly describe which courts those
```

```
 1   would be for the jury?

 2   A.          Yes.  In the United Kingdom, I testified before

 3   the Old Bailey twice, which is one of the higher courts in

 4   the United Kingdom.  I also testified at Welsh Crown Court,

 5   Snaresbrook Crown Court.  And aside from the United

 6   Kingdom, in Denmark I've testified in the High Court

 7   Copenhagen, capital of Denmark.  I've also testified

 8   Supreme Court Bosnia-Herzegovina as an expert witness in

 9   Sarajevo, which is the capital of --

10             MR. HERDMAN:  At this point in time, I move to

11   qualify Evan Kohlmann as a witness able to render opinion

12   testimony on the use of the Internet and specific websites

13   for the designation of material related to terrorism or

14   material support for terrorism.

15             THE COURT:  It will be allowed, and you may

16   proceed.

17   BY MR. HERDMAN:

18   Q.          Mr. Kohlmann, with respect to the evidence in

19   this case, are you familiar with a website known as Muntada

20   Al-Ansar?

21   A.          Yes.

22   Q.          And I'll spell that, M-U-N-T-A-D-A, second word

23   is A-L, third word is A-N-S-A-R; is that correct?

24   A.          That's correct, yes.

25   Q.          Was this particular webpage, was it actually
```

1   password protected?

2   A.        It was for a particular point in time, yes, at a

3   particular point in time.

4   Q.        So at some point in time, it was not password

5   protected?

6   A.        The website began in approximately 2003.  By

7   roughly the late spring, early summer of 2004, the website

8   was password protected with the sense that in order to

9   access, you had to have a log in and password, otherwise

10  you had no idea what was on there.

11  Q.        And if you didn't have a log in and a password

12  after May of 2004, you couldn't get into this particular

13  website?

14  A.        For a short period, they offered what is known as

15  a new registration.  In other words, anyone with a valid

16  e-mail address could go on there and put their name and

17  their e-mail address in and they could join.  However,

18  because of the fact that this forum wanted relatively

19  discreet number of people on there, and they were a little

20  bit suspicious --

21          THE COURT:  I'm going to tell the jury to

22  disregard about the, quote, forum.  There's no basis for

23  that testimony.

24  BY MR. HERDMAN:

25  Q.        Mr. Kohlmann, in essence, in May 2004 the website

 1 | became password protected?

 2 | A.        Yes.  And shortly thereafter, they closed

 3 | registration.

 4 | Q.        So at certain points after May of 2004, a website

 5 | would reopen the registration process?

 6 | A.        Briefly, for about -- usually, for about two

 7 | days.  It wouldn't be advertised that they would do it.

 8 | Q.        I'm going to direct your attention to some

 9 | specific audio recordings that were made in this case.

10 |           MR. HERDMAN:  So if I could just have the jurors

11 | get their headphones ready.  And the first clip is from

12 | November 23rd, 2004.  It's clip EK-12-69185-3-A-1.

13 |           MR. BOSS:  What was the date again, please?

14 |           MR. HERDMAN:  November 23rd, 2004.

15 |                (Audio playing.)

16 | BY MR. HERDMAN:

17 | Q.        Okay.  Mr. Kohlmann, on the audio recording

18 | there, did you hear something that was familiar to you

19 | playing in the background?

20 | A.        Yes, there was a individual clip in the

21 | background.

22 | Q.        I'm going to show you just a few minutes from

23 | Government Exhibit 23.

24 | A.        These aren't -- I don't think these are on right

25 | now.  Are they supposed to be?  No.  I don't think they're

```
 1   on right now.
 2           THE COURT:  What clip are you playing?
 3           MR. HERDMAN:  This is Exhibit 23, I'm just going
 4   play probably about the first 45 seconds of this.
 5                   (Video playing.)
 6   BY MR. HERDMAN:
 7   Q.       Okay.  Mr. Kohlmann, is that the video that you
 8   said that you recognized in the background of that segment?
 9   A.       Yes.
10   Q.       Okay.  That particular video that was just
11   played, Exhibit Number 23, was that --
12           THE COURT:  You're picking up speed, so pause,
13   rewind.  Start over.
14           MR. HERDMAN:  Yes, Your Honor.  Thank you.
15   BY MR. HERDMAN:
16   Q.       Exhibit 23, the video that was just played, was
17   that particular video released initially on the Muntada
18   Al-Ansar webpage?
19   A.       Yes, it was.
20   Q.       And do you know approximately what date that
21   video was released on Muntada Al-Ansar webpage?
22   A.       I believe the end of first week of November of
23   2004.
24   Q.       So -- and the -- or the audio clip that we heard
25   played was made on November 23rd of 2004?
```

```
 1   A.        That's correct.
 2   Q.        So, that was within three weeks of the release of
 3   that particular video?
 4   A.        Yeah, between two and three weeks.
 5   Q.        And at the time that that video that is depicted
 6   in Exhibit 23 was released, was the Muntada Al-Ansar
 7   webpage password protected at that point in time?
 8   A.        Yes, it was.
 9   Q.        I'd like to now direct your attention to
10   January 10th, 2005.
11             MR. HERDMAN:  This is EK146-9185-9A-2.
12               (Audio playing.)
13   BY MR. HERDMAN:
14   Q.        Mr. Kohlmann, with respect to that segment right
15   there, Mohammed Amawi was discussing the volume of material
16   that was being released at that time.  Were you -- were you
17   similarly trying to collect as much information as came out
18   in January of 2005?
19   A.        Yes.
20   Q.        And were you going on the Muntada Al-Ansar
21   webpage at that point in time?
22   A.        That was one of my primary sources, yes.
23   Q.        And was your experience similar to that described
24   by Mr. Amawi in that clip, with respect to the volume of
25   videos that were being released in January of 2005?
```

1   A.          I think his characterization is spot on.  I think

2   that's exactly right.

3   Q.          And so on the Muntada Al-Ansar webpage, there

4   were numerous videos that were being released every single

5   day as of early 2005?

6   A.          Yeah, it was literally between ten and 20 a day,

7   so much so that you had to be on there on a constant basis

8   or you might lose something.

9   Q.          Are you familiar with a file named *Martyrdom* or

10  *Hero Operation Vest Preparation*?

11  A.          Yes.

12  Q.          And was that the particular video or file, was

13  that originally released on Muntada Al-Ansar?

14  A.          Yes, it was.

15  Q.          When -- approximately, when was that file first

16  released on Muntada Al-Ansar?

17  A.          It was the last week of December, 2004.

18  Q.          And was Muntada Al-Ansar, at that point in time

19  that *Martyrdom Operation Vest Preparation* video was

20  released on Muntada Al-Ansar, was the Muntada Al-Ansar

21  webpage password protected at that point in time?

22  A.          Yes, it was.

23  Q.          I'd like to play you another clip from

24  January 10th, 2005.  This one is designated

25  EK-14-69185-12A.

1               (Audio playing.)

2    BY MR. HERDMAN:

3    Q.        With respect as to that clip that was just

4    played, are you able to offer any opinion to the webpage

5    that Mohammed Amawi was referring to?

6    A.        Yes.

7    Q.        What is that page?

8    A.        Muntada Al-Ansar.

9    Q.        What did you base that on?

10   A.        At the particular point in time when this

11   recording was made, Muntada Al-Ansar, this Internet forum,

12   was the official place where different, numerous Al-Qaeda

13   forces and Mujahideen groups were releasing material from

14   Iraq and elsewhere.

15             MR. BOSS:  Objection.

16             THE COURT:  I'm going to disregard to the, quote,

17   official place.  It was a source where one could go to to

18   get that kind of material; is that correct?

19             THE WITNESS:  No.  Your Honor, it was -- they --

20   they issued official statements, Your Honor.

21             MR. BOSS:  Objection.

22             THE COURT:  Well, I'm going to -- jury will

23   disregard that.  In terms of -- he can testify about that

24   time period and that location as a source for whatever.

25

1   BY MR. HERDMAN:

2   Q.        I direct your attention to specifically what was

3   said in that segment, Mr. Kohlmann.  Mr. Amawi talked about

4   the website for the Mujahideen and that website being

5   password protected?

6   A.        Uh-huh.

7   Q.        And also that segment talked about an actual

8   bomb-making video?

9   A.        That's right.

10  Q.        Do all three of those things taken together form

11  the basis of your opinion that he was talking about the

12  Muntada Al-Ansar webpage at that point in time?

13  A.        Yes.

14  Q.        Let's me play another clip from January 15th of

15  2005.  And this one is designated --

16          THE COURT:  One second.  I do want to instruct

17  the jury to disregard any reference to, quote, official

18  website, because that has nothing to do with this case in

19  terms of, quote, official nature.

20          Go ahead.

21          MR. HERDMAN:  Play another clip from January

22  10th, 2005.  The designation from this is EK-14-69185-24A.

23                  (Audio playing.)

24  BY MR. HERDMAN:

25  Q.        Mr. Kohlmann, did you hear Mr. Amawi name the

1  website that he was on at that point in time?

2  A.          Yes.  He said, Muntada Al-Ansar.

3  Q.          And in the brackets there, it says, Al Ansar

4  Forum.  Could you explain what your understanding of the

5  difference is there?

6  A.          It's -- it's just Arabic.  *Muntada* in Arabic

7  means "forum."  So if you say in Arabic, it's *Muntada*

8  *Al-Ansar*, you say it in English, it's the Ansar Forum.

9  It's the translated version.

10              MR. HERDMAN:  We can continue with this clip.

11                  (Audio playing.)

12  BY MR. HERDMAN:

13  Q.          Mr. Kohlmann, did you just hear what sounded like

14  a keyboard in the background?

15  A.          Yes.

16  Q.          Would that typing, would that be consistent with

17  the action someone would have to go through in order -- to

18  go through in order to log into the Muntada Al-Ansar

19  webpage?

20  A.          Yes.

21              MR. HERDMAN:  Please continue.

22                  (Audio playing.)

23  BY MR. HERDMAN:

24  Q.          Now, at the end of that clip Mr. Kohlmann, there

25  was a discussion of, I think it was, like *Al Da'wa* Forum,

1  Al-Ansar forum.  Does -- were those particular chat rooms

2  or discussion groups that were available on the Muntada

3  Al-Ansar webpage?

4  A.       Yes.  There was separate, there was rooms within

5  the Ansar webpage, and I believe that's what he's referring

6  to.

7  Q.       Once you log into the Muntada Al-Ansar, webpage

8  those discussions --

9            MR. HARTMAN:  Objection.  Can we approach?

10            THE COURT:  Sure.

11                (A sidebar conference was had on the

12                record.)

13            MR. HARTMAN:  Maybe we should have thought about

14  this before, but he's talking about a lot of terms that are

15  in the definitions.  Maybe we should just give them the

16  definitions, because if he -- if he talks about the terms

17  in a different way than they're in the definition, we're

18  going have a very big issue, either for us or him or

19  some -- it might be a problem.

20            MR. HERDMAN:  Which definition, Steve?

21            MR. HARTMAN:  Just a lot of terms like *Al Ansar*,

22  *Al Da'wa*.  I mean, we've described all these groups,

23  organizations, and institutions that he's talked about, and

24  I know he's going to mention more.

25            MR. HERDMAN:  He's not going to define any of

1  those terms, Your Honor.  It's just I directed his

2  attention to that particular chat room.  I didn't have him

3  define what his understanding of Dawa was.

4        THE COURT:  If he does, I think the way to handle

5  it is simply say, Judge, please remind the jury that any

6  understanding about the definition of the term that he in

7  turn defines, or whatever, characterizes, that they're to

8  follow that definition.  Let's wait if there's specific

9  instances where that's happening or you're concerned about,

10  call it to my attention and I'll remind them.

11        MR. HARTMAN:  Okay.

12        THE COURT:  I mean, I think that otherwise we're

13  going to -- we don't know what, if anything, he's going to

14  say.  Let's find out.  If he says something that might

15  conflict, then I'll tell them not to pay any attention to

16  it.

17        MR. HARTMAN:  When he -- when he equates *Al Da'wa*

18  with the Muntada Al-Ansar website, it -- it gives a whole

19  different meaning to the definition of Dawa that we gave

20  the jury.  And it seems to -- it seems to --

21        MR. WHITMER-RICH:  We define the term --

22        THE COURT:  I knew that, but Al-Da'wa website is

23  not telling -- he's not giving the definition of that.

24  It's just a designation of a website.  He's not going to

25  say -- if he says Dawa means a political allegiance or

```
 1   something like that, the difference in that, I'll say no.

 2           MR. HERDMAN:  I'm not going to ask him that.

 3           MR. SOFER:  Judge, just one thing, we can --

 4   people in the back have already told me --I brought this to

 5   the attention of Mr. Whitmer-Rich, hopefully they can calm

 6   him.  Do you know?  If not, we're going to object in front

 7   of jury if they can't keep him quiet.  I noticed even the

 8   jurors are --

 9           THE COURT:  I haven't myself, but if he does --

10   just tell him that that's been called to my attention, and

11   he's not only jeopardizing himself and his interest by

12   making comments that are audible or conduct that's visible

13   to anybody who can hear it.  If necessary -- timeout.

14           If necessary, I'll take a brief adjournment and

15   I'll communicate that to him myself, I don't pretend to, at

16   this point --

17           MR. SOFER:  I don't want to --

18               (A sidebar conference was concluded.)

19           THE COURT:  And you may continue.

20   BY MR. HERDMAN:

21   Q.      So Mr. Kohlmann, I think your testimony was that

22   those forums that were being discussed at the end of that

23   last segment, those were actual chat rooms or discussion

24   rooms that were accessible once someone had logged into the

25   Muntada Al-Ansar webpage?
```

```
 1   A.        Yeah, by various subject, yeah.

 2   Q.        If I could direct your attention now to

 3   January 27th of 2005?

 4            MR. HERDMAN:  And this is clip -- clip

 5   EK-18-69185-4A.

 6                 (Video playing.)

 7   BY MR. HERDMAN:

 8   Q.        Mr. Kohlmann, do you recognize what Mohammed

 9   Amawi was talking about right there?

10   A.        Yes.

11   Q.        Is that actually the website address for Muntada

12   Al-Ansar webpage in, roughly, January of 2005?

13   A.        Yes, that's how you get to Muntada Al-Ansar.

14   Q.        And it's Ansarnet.ws/vb?

15   A.        That's correct.

16   Q.        Now, at that point in time on January 27th of

17   2005, was the Muntada Al-Ansar webpage password protected?

18   A.        Yes.

19   Q.        It required a user name and password to get on?

20   A.        Yes.

21   Q.        And that website that Mr. Amawi was referring to,

22   the Muntada Al-Ansar website, did he also refer to it as

23   the Mujahideen website in that clip?

24   A.        Yes, he did.

25   Q.        All right.  Now, I'd like to direct your
```

```
 1   attention to February 2nd of 2005.

 2            MR. HERDMAN:  And this clip is designated

 3   EK-22-691185-1A-1.

 4                 (Video playing.)

 5   BY MR. HERDMAN:

 6   Q.       And Mr. Kohlmann, in that clip, do you hear

 7   mention of the Ansarnet?

 8   A.       Yes.

 9   Q.       Directing your attention to the next clip.

10            MR. HERDMAN:  This is designated as

11   EK-22-69185-2-A-1.

12            THE COURT:  Same date?

13            MR. HERDMAN:  I'm sorry, Your Honor?

14            THE COURT:  Same date.

15            MR. HERDMAN:  Yes, same date.  It's February 2nd,

16   2005.

17            MR. BOSS:  Your Honor, may we approach?

18            Judge, I withdraw my objection.  Apologize.

19            MR. HERDMAN:  And again, this is clip

20   EK-22-69185-2-A-1.  It's on February 2nd, 2005.

21                 (Video playing.)

22   BY MR. HERDMAN:

23   Q.       And again, Mr. Kohlmann, in that portion there,

24   it's translated as "Al Ansar Forum," could you hear

25   Mr. Amawi say *Muntada Al-Ansar*?
```

1    A.        Yes, I did.

2              (Video playing.)

3    BY MR. HERDMAN:

4    Q.        Mr. Kohlmann, I realize that maybe the picture of

5    the video wasn't that great.  Were you able to tell by

6    looking at the computer screen?

7              THE COURT:  I cannot hear you.

8    BY MR. HERDMAN:

9    Q.        I realize that the -- the quality of the video

10   recording wasn't that great.  Were you able to tell by

11   looking at the computer screen what website Mr. Amawi was

12   in fact --

13   A.        It does appear to resemble --

14             MR. HARTMAN:  Objection.  If we can approach --

15   but I don't think you could see it at all.

16             THE COURT:  I think that the jury will be able to

17   determine that and you can cross-examine.

18             You may answer the question.

19   A.        The structure of the pages is somewhat unique.

20   It's difficult to tell for sure, but it appears to me to be

21   Muntada Al-Ansar.

22   BY MR. HERDMAN:

23   Q.        Was there something specific that led you to

24   believe that?

25   A.        The logo at the top, you can see at one point a

1  image at the top of the screen which appears to be the logo

2  that was at the top of the Muntada Al-Ansar forum.  Again,

3  I should say it's difficult to tell with the quality.

4  Q.      Did you hear -- in that segment, did you hear

5  further discussion of a website address Ansarnet.ws?

6  A.      That's correct, yes.

7          MR. HERDMAN:  And if we could finally play

8  February 2nd, 2005, a clip designated EK-22-69185-9A-1.

9              (Video playing.)

10 BY MR. HERDMAN:

11 Q.      Mr. Kohlmann, in that particular clip you heard

12 Marwan El-Hindi say, *Ansar Al Islam,* did you have any

13 opinion with respect to whether or not he was referring to

14 the Muntada Al-Ansar webpage when he said that?

15 A.      Yes.

16 Q.      And what do you base that on?

17 A.      I base it on the fact that if you logged into the

18 Muntada Al-Ansar webpage, when you immediately logged in,

19 first thing it said to you was the Ansar Islam Forum.  It

20 actually said, *Ansar Islam,* in English means the

21 "supporters of Islam," and that's exactly what it said at

22 the top of the page when you logged in.  So it would be

23 very easy to understand if someone was logging into Muntada

24 Al-Ansar, they would, as a synonym, call this equally the

25 "Ansar Al Islam Forum."

```
 1  Q.        And on February 2nd, 2005, that webpage was
 2  password protected, it required registration to access it?
 3  A.        That's correct, yes.
 4            MR. BOSS:  Which one would that be, Judge,
 5  please.  I'm sorry.  Okay.
 6            MR. HERDMAN:  I didn't watch that, Your Honor.
 7            THE COURT:  Do you want to approach?
 8            MR. BOSS:  Yes, thank you.
 9                 (A sidebar conference was had on the
10                 record.)
11            THE COURT:  On the real time, you asked a
12  question.
13            MR. HERDMAN:  Yes, and that was password --
14                 (Question read back.)
15            MR. BOSS:  Immediately before that, the witness
16  testified that it could have been one page or it could have
17  been another, suggesting that it was the second page which
18  was password protected.  The question is, are they both
19  password protected?  He said he wasn't certain which page
20  it was, it could have been one or the other.
21            MR. HERDMAN:  I don't -- I believe his testimony
22  was that when you logged into the Muntada Al-Ansar webpage,
23  the first things that came up was Al Ansar Forum.  Muntada
24  Al-Ansar -- or Al Islam, I'm sorry, thank you, Your Honor.
25            THE COURT:  And that equals "Survivors of Islam,"
```

 1  which is a synonym for Al --

 2          MR. BOSS:  I thought he was referring to it could

 3  have been one webpage or another.

 4          THE COURT:  No, he was saying they were the same.

 5          MR. BOSS:  My mistake.

 6              (Sidebar conference concluded.)

 7          THE COURT:  No problem.  Okay.

 8          The question and answer may stand.

 9          And you may continue.

10  BY MR. HERDMAN:

11  Q.      So again, Mr. Kohlmann, on February 2nd, 2005,

12  the Muntada Al-Ansar webpage was password protected and

13  required registration?

14  A.      That's correct, yes.

15  Q.      And the domain name or the web address that was

16  associated with the Muntada Al-Ansar webpage was

17  Ansarnet.ws/vb?

18  A.      At that point in time, yes, that's correct.

19  Q.      I'd like to direct your attention to Exhibit

20  165A-1B.  This is the -- the Internet cookie history from

21  one of Marwan El-Hindi's computers.

22          MR. HERDMAN:  If you can go to page 148, please?

23  If you can focus in on this part right there?

24  BY MR. HERDMAN:

25  Q.      Mr. Kohlmann, do you recognize what's listed

1   there on the URL line?

2   A.        Yes, I do.

3   Q.        And what -- what is that, to your knowledge?

4   A.        That is the domain name for the Muntada Al-Ansar

5   web forum.

6   Q.        Okay.  And according to this particular cookie,

7   this website was accessed on February 9th of 2005?

8   A.        That's correct, yes.

9   Q.        And you agreed that was the date after February

10  2nd, 2005?

11  A.        That's correct, yes.

12  Q.        And if I could direct your attention to page 144

13  of this same document.  And if you could focus in on this

14  one here, you see the URL line, do you see something

15  familiar to you there?

16  A.        Yes, I do.

17  Q.        And can you just read that for the jury?

18  A.        Yes.  Ansarnet.ws.

19  Q.        And this is spelled differently than the previous

20  Ansarnet; is that correct?

21  A.        That's correct.

22  Q.        Can you explain for the jury what your

23  understanding is of the difference in spelling between this

24  particular Ansarnet and the one that we referred to on page

25  148?

1   A.        In order to make sure there was always a domain

2   active, that someone reached the forum, in case one domain

3   got shut down or whatnot, there would be multiple very,

4   very similar sounding names in order to access this

5   website, so you'd have Ansarnetws, Ansarnet.ws.  And every

6   so often, they would change the name just slightly so it

7   would be very similar, but it would be one character

8   different, and it would be very difficult if anyone was

9   chasing it, to find it.

10          MR. HARTMAN:  I'm going to object and ask that

11  that be stricken.  He's talking about the purpose of

12  people, I mean, what?  Come on.

13          THE COURT:  I'll let the answer stand.  I think

14  it was clarified by the last comment.

15  BY MR. HERDMAN:

16  Q.        And Mr. Kohlmann, this -- this particular

17  spelling of Ansarnet, is this consistent with the Muntada

18  Al-Ansar webpage in February of 2005?

19  A.        Yes.  I accessed this webpage in February of

20  2005, and I accessed the Muntada Al-Ansar forum as a

21  result.

22  Q.        And at this point in time, February 9th of 2005

23  or February 11th of 2005, was the Muntada Al-Ansar webpage

24  password protected?

25  A.        Yes, it was.

```
1   Q.        Did it require registration?

2   A.        Yes, it was -- yes, it did, excuse me.

3   Q.        Okay.  Now, was there -- are you aware of, at

4   some point in time in the spring of 2005, did the Muntada

5   Al-Ansar webpage come down off the Internet, for lack of a

6   better term?

7   A.        Yeah, more than once, yes.

8   Q.        Okay.  And it was essentially inoperable,

9   inaccessible on the Internet?

10  A.        Yes, for two fairly long periods of time, yes.

11  Q.        And right after the Muntada Al-Ansar webpage came

12  down off the Internet, were there other websites that

13  replicated the material that was available on the Muntada

14  Al-Ansar webpage?

15  A.        Yes, there was a scramble to get on the other

16  forums which emulated the Muntada Al-Ansar forum.

17  Q.        I'd like to direct your attention now to

18  March 31st of 2005, a recording made on that date.

19            MR. HERDMAN:  And this is designated as

20  41-69185-7A.

21                 (Audio playing.)

22  BY MR. HERDMAN:

23  Q.        Just immediately prior to this, Mr. Amawi said,

24  The new Ansar is gone.  What is your opinion as to which

25  webpage that refers to?
```

1   A.        I believe he's likely referring to Muntada

2   Al-Ansar.

3                  (Audio playing.)

4   BY MR. HERDMAN:

5   Q.        Now, during conversation, it was on March 31st of

6   2005, was that time period consistent with what you just

7   described as to the Muntada Al-Ansar forum being

8   inaccessible on the Internet?

9   A.        Yes, that's exactly what it corresponds.

10  Q.        And you said there were other websites that tried

11  to duplicate what was on the Muntada Al-Ansar forum?

12  A.        That's correct.

13  Q.        And that's also what they were talking about in

14  that segment?

15            MR. HARTMAN:  Objection to the form.

16            THE COURT:  As to -- sustained as to what they

17  were talking about.

18  BY MR. HERDMAN:

19  Q.        Did you hear reference to websites moving around

20  in that last segment, Mr. Kohlmann?

21  A.        Yes, I did.

22  Q.        I'd like to direct your attention back to

23  165A-1B.  This is the Internet cookie history from Marwan

24  El-Hindi's computer.  And direct you to page 100.  And if

25  you can focus on this one here.  Mr. Kohlmann, do you see

 1  there in the URL, do you see a website that's spelled

 2  F-I-R-D-A-W-S, dot, N-O, dash, IP, dot, B-I-Z?

 3  A.      Yes.

 4  Q.      And according to this particular cookie, it says

 5  it was accessed on April 5th of 2005?

 6  A.      Yes, that's correct.

 7  Q.      Are you familiar with that URL -- first of all,

 8  did you see .noIP.biz?

 9  A.      Yes, I did.

10  Q.      Is that one of those websites you described that

11  arose after the Muntada Al-Ansar webpage came down?

12  A.      Yes, it's the Al Firdaws forum.

13          THE COURT:  I'm sorry, the what?

14  A.      Al Firdaws, F-I-R-D-A-W-S, Firdaws.

15  BY MR. HERDMAN:

16  Q.      Okay.  And with respect to this date here,

17  April 5th of 2005, is that date consistent with time period

18  when the Muntada Al-Ansar webpage was inaccessible on the

19  Internet?

20  A.      Yes, that is.

21  Q.      All right.

22          MR. HERDMAN:  If you can take us to page 101,

23  please?  And focus on this one here.  Okay.

24  BY MR. HERDMAN:

25  Q.      Do you recognize the name of the website in the

```
 1   URL here, this is on page 101?

 2   A.        Yes.

 3   Q.        And it's www.al-qaylah.com?

 4   A.        That's correct, Al Qayla.

 5   Q.        And this particular cookie was, according to

 6   this, was accessed on April 3rd of 2005?

 7   A.        That's correct.

 8   Q.        Now, with respect to this website, is this the

 9   same as Firdaws in that it -- it was -- it was duplicating

10   some of the information that was on the Muntada Al-Ansar

11   webpage after that Muntada Al-Ansar webpage went down?

12   A.        Yeah, it wasn't as exhaustive as Al Firdaws, but

13   you could find some of the same items on there as well.

14   Q.        And again, this April 3rd, 2005 date is

15   consistent with the time period when the Muntada Al-Ansar

16   webpage was inaccessible?

17   A.        That's correct, yes.

18   Q.        Okay.  Finally, I'd like to direct your attention

19   to page 102 of this same exhibit.

20            MR. HERDMAN:  And starting if you, can just

21   focusing on these last three here.  Okay.

22   BY MR. HERDMAN:

23   Q.        Mr. Kohlmann, do you recognize those three URLs

24   that are on the screen right now?

25   A.        Yes, I do.
```

```
 1   Q.        Let's take the first one, which is

 2   O-B-L-C-R-E-W.net.  Is this similar to the Firdaws and the

 3   Al Qayla websites?

 4   A.        No.  This is different.

 5   Q.        Was it done in the light of Muntada Al-Ansar

 6   becoming inaccessible?

 7   A.        That was one of the reasons that spurred the --

 8             MR. HARTMAN:  Objection.

 9             THE COURT:  Sustained for the reasons.  He may

10   answer the question asked.

11   BY MR. HERDMAN:

12   Q.        Let me ask you this question, Mr. Kohlmann:  The

13   dates that are -- the dates this particular cookie was

14   accessed, April 3rd of 2005, is that time period consistent

15   with Muntada Al-Ansar being inaccessible via the Internet?

16   A.        Yes.

17   Q.        And I'll take you to this last one, again.  It's

18   spelled -- the URL is spelled A-L-Q-A-3-E-D-A-H, dot,

19   N-E-T-F-R-E-S-T-E-S-H-H-O-S-T-com.  Are you familiar with

20   that URL?

21   A.        Yes, I am.

22   Q.        Is that similar to the other URLs we've just

23   discussed with respect to their relation to the Muntada

24   Al-Ansar webpage?

25   A.        Particularly to OBLcrew.net.  They're fairly
```

1   similar.

2   Q.        And again, the date there is April 2nd of 2005?

3   A.        Yes.

4   Q.        And that date is consistent with the time period

5   in which Muntada Al-Ansar webpage was inaccessible?

6   A.        That's correct, yes.

7   Q.        And finally, the second one here is in4news.net.

8   Are you familiar with that URL?

9   A.        Yes, I am.

10  Q.        And was that particular URL, did that duplicate

11  what was on the Muntada Al-Ansar webpage after the Muntada

12  Al-Ansar webpage became inaccessible?

13  A.        It actually was the Muntada Al-Ansar webpage.  It

14  went up online again briefly, and then got shut down again,

15  so this was one of the domains they used during that period

16  of time.

17  Q.        And when you say that period of time, that would

18  include the April 2nd, 2005 date that the cookie was

19  accessed?

20  A.        I believe so, yes.

21  Q.        And that date, again's, consistent with the

22  Muntada Al-Ansar webpage, at least the Ansarnet.ws webpage

23  being inaccessible on the Internet?

24  A.        That's correct.

25            MR. HERDMAN:  And finally, Your Honor, with

 1    respect to this, I'd like to direct the witness' attention

 2    to May 25th of 2005.  This is clip 6A-69185-6A.

 3                    (Audio playing.)

 4    BY MR. HERDMAN:

 5    Q.        And with respect to that clip, did you hear

 6    Mr. Amawi say, Muntada Al-Ansar.

 7    A.        Yes.

 8    Q.        And in May -- on May 25th of 2005, was the

 9    Muntada Al-Ansar webpage Ansarnet.ws?

10    A.        I'm sorry, what was the date again?

11    Q.        May 25th, 2005, was the Muntada Al-Ansar webpage

12    available online?

13    A.        I don't think so, no.  I don't think it was

14    online on that particular date.

15    Q.        And in that general time period, was the Muntada

16    Al-Ansar webpage still -- when it was up, was it password

17    protected, was a log in required?

18    A.        Yes.  Yes.

19              MR. HERDMAN:  Your Honor, may I approach briefly?

20              THE COURT:  Uh-huh.

21                    (A sidebar conference was had on the

22                    record.)

23              MR. HERDMAN:  Two things, Your Honor.  I'm now

24    prepared to ask the witness whether the Muntada Al-Ansar

25    forum was the primary and initial distribution point for

1   video releases by Al-Qaeda in Iraq.  I told you I would ask

2   that at the end of this particular block of testimony.  So

3   I'm prepared to ask that question.  I just wanted to raise

4   that for The Court.

5           Secondly, the next block of testimony deals with

6   Ekhlaas, and I understand Mr. Hartman wanted to voir dire

7   Mr. Kohlmann with respect to that exhibit.

8           THE COURT:  Why don't we take a short break for

9   all of us?  When you're ready to go again, let's do that.

10  I'm -- I'm inclined not to get into the primary forum

11  issue.  We have -- we saw all the clips, and there's

12  reference themselves by the defendants.  That's the best

13  evidence you have.

14          MR. SOFER:  And Judge, actually, I think

15  that's -- I don't agree with it, but I understand The

16  Court's point.  The only thing I would say is, because

17  counsel now has begun to over and over say Mr. Amawi is

18  lying to Mr. Griffin, I believe we are beginning to see the

19  defense that Mr. Amawi's likely to present.  If that

20  continues, it seems to me, then, a number of these issues

21  like this, and this one in specific about whether, in fact,

22  Mr. Amawi's lying to Mr. Griffin, it would raise its head

23  just mentioning it now, because I think it's an important

24  point.

25          THE COURT:  That's fair.  I think at this point

1    that's the way we'll leave it.  We'll go from there.

2           And Angela, when you're ready to go and get this

3    time.  And then we'll voir dire Mr. Kohlmann on that, and

4    then --

5           So I'm going to tell the jury it will probably be

6    about 11:30 at the earliest before we're ready to go.  How

7    much longer total for the direct?  I ought to adjourn.

8    I've got a meeting at 12:15.  I have something else at

9    11:45, but I'll strike that.

10          MR. HERDMAN:  I hope to be done within an hour.

11   This was --

12          THE COURT:  About 12:30 or so?

13          MR. HERDMAN:  Yes, this was the --

14          THE COURT:  I'll tell him it will take us to

15   about 11:30 or so, we have some things to tend to, and then

16   I expect about an hour, and then direct, and we'll break

17   for lunch about 12:30.

18          MR. HARTMAN:  There won't be much cross.

19          THE COURT:  That's why I pointed to you guys.

20   Well, in terms of cross, can we go straight into it or

21   break for lunch?  You probably would rather break for

22   lunch.

23          MR. WHITMER-RICH:  Why don't you ask us at the

24   time and see what we say.

25          MR. HARTMAN:  That's a good idea.

```
 1            THE COURT:  I mean, the jury's going to be

 2   ordering lunch, so whatever, it's up to you guys.

 3            MR. SOFER:  If he has an hour, Judge, we're

 4   looking at 12:30 any way.

 5            THE COURT:  Okay.  How long do you expect this

 6   voir dire to be?

 7            MR. HARTMAN:  Five minutes.

 8                 (Sidebar concluded.)

 9            THE COURT:  Ladies and gentlemen, we're going to

10   take a recess until about 11:30.  I hope we can resume

11   then.  There are a couple of things we have to still tend

12   to, some loose ends I have to tie up.  And I expect that

13   the completion of the direct testimony of Mr. Kohlmann will

14   take about an hour or so, and then I will consult with

15   counsel in terms of how long they expect the cross to take.

16   If it looks like it may be somewhat longer than half-hour

17   or whatever, I think we're going to adjourn for lunch.

18   Although what I might try to do is wind it all up so that

19   then you can either eat your lunch or take your lunch or

20   leave, but this will be the only witness today.  And

21   actually, I think we might anticipate adjourning once

22   Mr. Kohlmann is done.  Okay.

23            Sorry to be so indefinite about the timetable,

24   but it looks as though by early afternoon, we'll be in

25   adjournment and ready to go tomorrow, because I expect that
```

1   this is the government's last witness.  And then we've got

2   some matters of exhibits and things like that to take care

3   of.  So rather than having you sitting around perhaps

4   getting delayed and be late in the afternoon getting

5   started, I think that makes a better breaking point.  We'll

6   see, but 11:30, 11:35.

7                    (Jury out.)

8              MR. SOFER:  Judge, while we're here in terms of

9   scheduling for -- in terms of scheduling for today, then

10  the next -- the government wants to rest after we've dealt

11  with these other exhibits in front of the jury.  Ideally,

12  since we're stipulating to a bunch of documents and other

13  kind of evidence, the jury would -- actually, we'd publish

14  that to the jury in some way shape or form.  It's up to

15  Your Honor how he wants to do that, but assuming we don't

16  have a lot of bumps on the road on the stipulations any --

17  from what I understand we don't -- it would be our request

18  to have the jury --

19             THE COURT:  You can rest tomorrow.

20             MR. SOFER:  But I think it might take an hour or

21  so for them to look through and view the evidence that's

22  coming in via the stipulations, so --

23             MR. HARTMAN:  We're not ready -- I, frankly, just

24  haven't had time, I don't think we're going to have a lot

25  of bumps in the road, I don't know if these guys have.

1          THE COURT:  Maybe we'll take a lunch break then

2    and do it then, and we'll go from there.

3          MR. SOFER:  I think we could use the rest of

4    today to the extent that The Court has the time certainly

5    to deal with that, and then if the jury's still here, they

6    could sort of -- again, if it takes a half-hour to work it

7    out, and they can take an hour of time to read through the

8    stuff, then they can get the defense case going.

9          THE COURT:  If they don't get to go home early,

10   then I'll blame me.

11         MR. HARTMAN:  That's what we do.

12              (Brief recess.)

13              (All counsel present in courtroom.  Jury not

14              present.)

15         MR. HERDMAN:  Your Honor, would you like me to go

16   through the foundation with that particular exhibits and

17   allow Mr. Hartman to ask questions?  I'm not sure how you

18   want me to proceed.

19         THE COURT:  Why don't we do this, as you were

20   coming in, he asked if he should go through a foundation,

21   and I think that makes sense, so if you can respond to what

22   that's about.

23         MR. HARTMAN:  That's fine.

24         THE COURT:  Okay.

25              (Voir dire conducted)

1   BY MR. HERDMAN:

2   Q.        Mr. Kohlmann, I'd like to direct your attention

3   to 213 that's on the screen here.

4   A.        Yes.

5   Q.        And if you can scroll through the first couple of

6   pages of this.  I think there's 12 pages in all.  Okay.  Do

7   you recognize Exhibit 213, Mr. Kohlmann?

8   A.        Yes, I do.

9   Q.        What is that?

10  A.        This is a document which I saved from the Ekhlaas

11  forum several weeks ago, actually.

12            MR. HERDMAN:  And can you -- can you pull up 73,

13  page 3.  Okay.

14  BY MR. HERDMAN:

15  Q.        Do you recognize what's written in handwriting on

16  that piece of paper there?

17  A.        Yes, I do.

18  Q.        And is that a particular thread that is available

19  on the Ekhlaas.com website?

20  A.        There are two typos in this, but they're kind of

21  obvious ones.  Forum's missing a slow -- and slow thread is

22  read show thread, but this is referring to a particular

23  thread or message on the Ekhlaas forum, and the number

24  appears that the unique identification number for that

25  message appears to be 6181.

1    Q.        And based on this, you were presented with this

2    website address that's depicted there on Exhibit 73?

3    A.        That's correct.

4    Q.        After you corrected the typo -- corrected for the

5    typos, were you able to navigate to the Ekhlaas webpage and

6    go to this particular thread here ending 6181?

7    A.        Yes, the database of the Ekhlaas forum is

8    essentially the exact same as it was back then, just has

9    new messages, but archived stuff from back in 2004 and 2005

10   was still there.  As long as you have the unique numeric

11   number, the 6181, all you have to do is plug in 6181, where

12   it says "show thread" and it will immediately bring up the

13   message -- any message from all the way to when Ekhlaas was

14   started.

15        MR. HERDMAN:  And if you can go back to Exhibit

16   213.  And go down to about the maybe the third, the third

17   page, please.  Okay.

18   BY MR. HERDMAN:

19   Q.        And I just want to direct your attention briefly

20   to this portion of that exhibit right there.  It says

21   PM10:59.

22        MR. HERDMAN:  Can you zoom in on that, Kevin?  I

23   can hardly read it.  All right.

24   BY MR. HERDMAN:

25   Q.        It says, PM10:59, comma, 2005-02-10.  Are you --

1   are you familiar with the way that the Ekhlaas webpage

2   dates and time stamps a particular post for that page?

3   A.       Yes, the first obviously p.m. is at night,

4   10:59 p.m. on a 12-hour time clock; 2005 is the year; 02

5   stands for February; ten, February 10th of 2005 at

6   10:59 p.m.

7   Q.       Is that date -- is that nomenclature consistent

8   throughout Exhibit 213?

9   A.       Yes and throughout the entire Ekhlaas website.

10          MR. HERDMAN:  All right, Your Honor.  I'll allow

11  Mr. Hartman to ask questions.

12  BY MR. HARTMAN:

13  Q.       Mr. Kohlmann, I am going to use the ELMO here, I

14  hope.  I'm going to put up, first of all, this page here,

15  and see if I can zoom in on this.

16          THE COURT:  And for the record have you marked

17  that for identification?

18          MR. HARTMAN:  For the record, this is exhibit --

19  was delivered as Government's Exhibit 213.

20  BY MR. HERDMAN:

21  Q.       Now that says 110310-2-2005.

22  A.       That's correct.

23  Q.       So you're saying that's when that message was

24  posted?

25  A.       That's correct.  Well, I should say it depends,

1   because in terms of time, the actual 11:43 p.m., it depends

2   what your time settings are as a user.  You can change to

3   the Greenwich Mean Time or Eastern Standard Time, and it

4   will automatically adjust the clock, but it shouldn't have

5   any impact on the dates on the clock.

6           MR. HERDMAN:  Let me put --

7           Your Honor, my question is what -- that the FBI

8   document that Mr. Hartman has on the ELMO is this

9   Government's Exhibit 213 that was just displayed on the

10  screen.

11          MR. HARTMAN:  I'm telling you, it was what was

12  handed to me as Government's Exhibit 213.  There, right

13  there.

14          MR. HERDMAN:  When was -- when was that given to

15  you, Mr. Hartman?

16          MR. HARTMAN:  I don't know.  When did you give me

17  213?

18          MR. HERDMAN:  Last week.  What I'm saying is, the

19  document your directing the witness' attention to is the

20  213 I just directed his attention to.

21          MR. HARTMAN:  Okay.

22          MR. HERDMAN:  As long as it's clear, have no

23  objection.  I just continue to make that clear.

24          MR. HARTMAN:  Okay.  I believe this was the first

25  213.

1          THE COURT:  And what -- why are you examining off

2     of that document rather than the one that that was -- that

3     the government intends to offer -- and realizing you had a

4     different one, whether you were misled or whatever, that's

5     a different issue, but I mean, are you not prepared --

6     where are you going with this?  I'm kind of puzzled.

7          MR. HARTMAN:  The first document that we were

8     offered as Exhibit 213 --

9          THE COURT:  That you were provided.

10         MR. HARTMAN:  That we were provided as Exhibit

11    213 --

12         THE COURT:  Of which the jury hasn't seen.

13         MR. HARTMAN:  -- which the jury hasn't seen, has

14    different content than the second document we were provided

15    as 213.

16         THE COURT:  And so I realize your question is to

17    be addressed to government counsel instead of Mr. Kohlmann.

18         MR. HARTMAN:  He was the one who apparently went

19    and got this, though.

20         THE COURT:  Why don't you show him -- why don't

21    you mark the 213 that was provided to you as whatever

22    El-Hindi exhibit would be next so that everybody knows

23    you're talking about something different.

24         THE WITNESS:  Your Honor, I may be able to help,

25    excuse me.

```
 1            THE COURT:  Do you see what I'm saying?

 2   Otherwise, not only am I not going to understand, the Court

 3   of Appeals in this case, if it winds up getting there,

 4   won't have a clue either.  Or you can mark it as El-Hindi

 5   Exhibit 101, or whatever, if you're not sure where you are,

 6   or 201.

 7   BY MR. HARTMAN:

 8   Q.        Okay.  This is -- was originally proffered as

 9   Government's Exhibit 213 and has now been marked as

10   Defendant's Exhibit EH5.  There is handwriting at the top

11   that was written by defense counsel.  So, that was not

12   there when the government offered this.  My point is that I

13   was trying to show -- and I showed you that the FBI

14   posting, Mr. Kohlmann.

15   A.        Right.

16   Q.        With this date and time?

17   A.        Right.

18   Q.        And in what has now been offered as Government's

19   Exhibit 213, there is a posting of a similar date and time,

20   do you see that?

21   A.        Yes, I do.

22   Q.        Then why would the content of the two different

23   Exhibit 213s be different?

24   A.        Actually, the content was the exact same when it

25   was given to the government.  I noticed because I actually
```

1  gave them the exact same file both times, and it was

2  contained within a compressed zip file, so the files

3  themselves are the same.

4          THE COURT:  I'm sorry.  Pause rewind, slow down,

5  please.

6          THE WITNESS:  I'm sorry, me or --

7          THE COURT:  You.

8          THE WITNESS:  I'm sorry.

9  A.      The original file itself was the same file.  It

10  was compressed within a zip file, which is basically what

11  takes all the information and compresses it so it can't be

12  altered.  The same zip file was given to the government

13  both times.  I don't know what happened in terms of the

14  printing, how it printed out.  I don't know, but if you'd

15  like, I can provide you exactly with what I provided them

16  in the original digital format.  It's -- it's -- I don't

17  know why it's different here, but I gave them the exact

18  same thing.

19  Q.      Well, I'm not just talking about the printout

20  being different.  Do you see this on the first page?  Do

21  you see this picture here of the -- it's hard to tell what

22  it is?

23  A.      That's an image from an Al-Qaeda in Iraq film.

24  Q.      Okay.  And do you see that on the first page of

25  Government Exhibit 213?

1    A.        I believe it's the image that's right below the

2    image of Dr. Ayman Al-Zawahiri right here.  What it is -- I

3    should probably explain.  These are what are known as gifs,

4    all right?  They are not as animated gifs.

5              THE COURT:  And how do you spell that?

6              THE WITNESS:  Sure, G-I-F, which means that it's

7    an image that is not just one image, it's like a

8    mini-movie, so that if you load up this webpage, it's like

9    an animated graphic, so it shows the logo of the group,

10   then it shows a couple of screen shots from the video, and

11   it keeps cycling through.

12             Now, depending on when you hit print, if you hit

13   print when it's on one frame, it'll print showing you that

14   one frame, whereas if you hit print a couple seconds later,

15   it'll show you a different frame for the same animated gif,

16   but it's the same file.  It can -- it's like I said, what

17   it is, is it's like a little movie playing, but it's a

18   graphic movie.

19             MR. HERDMAN:  So the first --

20             THE COURT:  In other words, if I can -- in other

21   words, when you go to the website, newspaper or whatever,

22   there'll be advertising that shows movement of some kind

23   and will be repeated.  And if I understand what you're

24   saying is, if you want to make a copy of what's on your

25   screen, make it at one moment that segment of it might

```
 1  differ than if you make the copy a second moment.
 2           THE WITNESS:  A print, when you say --
 3           THE COURT:  Print.
 4           THE WITNESS:  Yeah.
 5           THE COURT:  If you want to print out a copy,
 6  whatever is being recycled, you'll get one thing depicted
 7  the first time, and even though immediately afterwards, as
 8  fast as your hand can move, you print -- printout another,
 9  quote, copy, closed quote, you would have a different --
10  something different depicted on that part or portion of the
11  page.
12           THE WITNESS:  That's dead on, Your Honor.  Yes,
13  exactly.
14  BY MR. HARTMAN:
15  Q.        And you said you printed this off a few weeks
16  ago?
17  A.        No.  I saved the file.  I never printed it.  I
18  saved it as an HTML file, and I saved all the images
19  individually, so if I gave you the raw digital version I
20  have, it would appear the same no matter when you opened
21  it.  You would actually see the images moving if you opened
22  it electronically.  Now, my understanding is that the
23  government may have printed out versions of this
24  afterwards, after I gave it to them, but I didn't actually
25  print the document.  I gave them the raw digital content.
```

1    Q.       So you saved it as an HTML file?

2    A.       Yes.

3    Q.       Not as a PDF?

4    A.       I can if you'd like, but if I save it as a PDF,

5    the gifs won't be animated.

6    Q.       When you saved this -- first of all, when did you

7    save it?

8    A.       I believe I saved this on March 31st, 2008.

9    Q.       Okay.  So based on the movie aspect that you just

10   told us about, we have no idea what was on the front page

11   of this when these postings were made back in 2005?

12   A.       No, we do.  I have all this -- again, I have all

13   those images saved, I can give them all to you.  I have a

14   digital version of this webpage saved, an exact digital

15   replica.  In other words, if you open this digital replica

16   up, it would look exactly as if you opened it up on the

17   actual website itself.

18           However, when you print out a document or you

19   make it into a PDF, it makes it from a dynamic page where

20   there's dynamic content into a static page, where there's

21   no dynamic page, static.  So at that point, there's no

22   movement.  So if you want to see the original version with

23   all the graphics and what not, I mean, I can give you all

24   the graphics.  I can give you exactly as it appeared, but

25   it would have to be in digital format, and it couldn't be

```
 1   in PDF, it would have to be in HTML.

 2   Q.        When did you --

 3            MR. HARTMAN:  Will you put up page 3 of Exhibit

 4   73.

 5   BY MR. HARTMAN:

 6   Q.        When did you use this to go to this archived

 7   website?

 8   A.        Well, again, you say "used" this --

 9            MR. HERDMAN:  Your Honor.

10   BY MR. HARTMAN:  I mean, what's being shown, page 3 of

11   Exhibit 73, when did you take that to go get what was

12   represented as Government's Exhibit 213.

13            MR. HERDMAN:  And Your Honor, I object to this.

14   At this point this is irrelevant, and I think that whatever

15   confusion there was with respect to these two exhibits, I

16   think the witness has just cleared that up.  I don't see

17   any further reason for any questioning on this.

18            THE COURT:  I would agree.  Where are we headed?

19   He's explained why the graphic would be different.

20            MR. HARTMAN:  What I'm trying to get at is when

21   the digital file was saved.  That's all I want to know.

22   When he saved it.  Did he save it back in 2005 or did he

23   save it three weeks ago?

24            THE COURT:  And I think he said he'd saved it

25   three weeks ago; is that correct?
```

1          THE WITNESS:  I believe March 31st, 2008.  It's

2    actually on the printout.

3          THE COURT:  If I understand the testimony, it is

4    that he accessed this webpage, and then went looking for

5    that thread and in effect, he went digging into what used

6    to be a newspaper morgue to find the particular webpage of

7    that thread as of the date that it was made; is that

8    correct?

9          THE WITNESS:  That's exactly on.

10          THE COURT:  In other words, it's as if I go down

11    to the public library and say, I want the Toledo Blade for

12    December 12th, 1933, and page 10, I find it on the

13    microfilm and print it out, that's what is there, under

14    that date and designation.

15          MR. HARTMAN:  I understand, but they're going to

16    have the same front page, and these two Exhibits 213,

17    though, he has explained that now?

18          THE COURT:  Right.

19          MR. HARTMAN:  I would like to talk to my computer

20    expert for 10 seconds.

21          THE COURT:  Absolutely.  Sure.  Sure.

22    BY MR. HARTMAN:

23    Q.        I understand why the front pages are different,

24    but just to be clear, if you type that in, you're not going

25    to get to what's represented as Government's 213, correct?

```
 1   A.        Again, there are obvious typos in here.  There's

 2   no such thing as show the read, show thread, this is a

 3   standard piece of Internet software.

 4             THE COURT:  I'm breathless trying to follow you.

 5   Please speak a little more slowly.

 6   BY MR. HARTMAN:

 7   Q.        And let me just ask this:  If you type that in,

 8   you're not going to get to what's shown as Exhibits 213?

 9   A.        If you type that in verbatim, you would not get

10   to that, no.

11             MR. HARTMAN:  I have nothing further, Judge.

12             THE COURT:  Okay.

13             MR. HERDMAN:  Your Honor, just briefly, Mr. Sofer

14   brought this to my attention, with respect to 213.

15             If you bring that up really quickly.

16             I intend to ask the witness whether he

17   identify -- whether he knows -- I'm used to being up there

18   now -- the individual that's depicted on there, Your Honor,

19   I intend to ask the witness what that person's name is.

20   Obviously, without any further description or anything like

21   that, just putting, essentially, a name with a face.  As

22   well as on Exhibit 61, there are --

23             Can you zoom in on this part here?  On the

24   photos.

25             There are three individuals that are depicted on
```

1   here, Your Honor, right here, and here, right here and I

2   believe right here, although it's faint.  Oh, and here.  I

3   intend to ask the witness whether he identifies those

4   individuals, and I would say, with respect to this page,

5   that several of those individuals are referenced by name in

6   an actual 1D segment with respect to this page.

7        MR. HARTMAN:  And in response, I would say as to

8   the person on 213, we have no way of knowing if that was on

9   the screen at the time anyone visited it in 2005 because as

10  Mr. Kohlmann said, it was a moving picture.  I don't think

11  it's appropriate to say that person's name.

12       I would also move to strike Exhibit 213

13  altogether, unless there is some evidence that one of the

14  defendants fixed the same typos that Mr. Kohlmann fixed in

15  order for him to get there.  Otherwise, there's not --

16  evidence they went there.

17       MR. HERDMAN:  I think the evidence -- or at least

18  the testimony, as I understood it, was that there were

19  certain images that were dynamic in that page.  I don't

20  believe the photograph of Mr. Zawahiri is one of them.  I

21  can ask the witness right now if you'd like to confirm

22  that.

23       THE COURT:  Well, I think that there's sufficient

24  circumstantial evidence to connect that handwritten Ekhlaas

25  shred to this exhibit, and I think the objection goes to

1  the weight and not to the admissibility of the exhibit, and

2  I will permit the witness to identify those individuals if

3  he's able to do so.

4  　　　　　MR. HERDMAN:  Again, just by name, Your Honor.

5  　　　　　THE COURT:  I understand.

6  　　　　　So the objection as to both of those bits of

7  testimony has been made and preserved.  I overrule it.

8  Okay.

9  　　　　　While Amy's getting the jury, why don't we do

10  this, and I will tell them this, we'll complete the direct

11  examination.  It's going to take maybe about an hour.

12  They'll have their lunch.  We'll come back.

13  　　　　　What is it you want to do, Mr. Sofer, in front of

14  the jury?

15  　　　　　MR. SOFER:  Well, we've sent out the --

16  　　　　　THE COURT:  After cross, of course.

17  　　　　　MR. SOFER:  -- we've dubbed them "evidentiary

18  stipulations."  This relates to a number of documents and

19  other kinds of photographic documentary evidence.  We've

20  not yet heard back, I don't think, a definitive word about

21  what the issues are there.  So that obviously, should not

22  be done in front of the jury.  However, if we can resolve

23  that in ten or 15 minutes or even a half an hour, then

24  we'll be prepared to move our last pieces of evidence in

25  and also, then rest.

```
 1            In addition to moving them in, obviously, we'd
 2    like to publish them to the jury.  Some -- some of these
 3    are long.  We're not asking to sit here and read 500 pages
 4    of telephone records, but at least to show the jury the
 5    basis of what it is that the government's moved into --
 6            THE COURT:  Let's do this:  When we adjourn for
 7    lunch, you people talk, let me know if there's a serious
 8    problem.  I'll try to come in after about a half-hour
 9    break, or less, if you're ready to talk about it.  We'll
10    see if Angela's available, and I'll try to rule on it then,
11    and we'll try to let you do that this afternoon if we can.
12    We'll -- then we'll excuse the jury -- whatever time that
13    may be, I hope it's before 4:30 -- but that's just what I
14    just told them.  And we'll --
15            MR. SOFER:  We're prepared to do all that, Judge.
16            MR. HARTMAN:  Judge, I need to make a quick
17    correction to the record on the 29th of April.
18            THE COURT:  Why don't you do that and just let
19    Angela know -- or Amy, actually.
20                  (Jury brought in at 11:49.)
21            THE COURT:  Ladies and gentlemen, just to try to
22    give you a bit of a heads up in terms of timing, to the
23    extent that I'm about to speak with a foreign tongue, I
24    apologize, because there may actually be some more items to
25    present to you once Mr. Kohlmann's completed, in terms of
```

1  documentary evidence, tangible evidence of one kind or

2  another that, in turn, can depend a bit upon resolving a

3  couple issues relating to that evidence.

4      I think Mr. Kohlmann will be on the stand

5  probably until maybe noon, for an hour on direct, and we'll

6  see about the cross-examination.  We'll take our break for

7  lunch then.  In any event, I don't believe the

8  cross-examination is going to be particularly lengthy, but

9  that's never to be predicted, and also on behalf of

10  redirect, of course.

11      My point is, during the noon hour, counsel and I

12  will try to resolve the odds and ends and issues as to the

13  final chunk of the government's case.  If we're able to do

14  that, then what I will like to do and counsel -- depends on

15  where we are in terms of time -- that maybe we can wind

16  that up this afternoon as well.  All of which is to say we

17  may be putting a bit fuller day or even full day, contrary

18  to what I told you half-hour or so.

19      So I appreciate your patience, and I hope that

20  you all understand that, really, we're trying to go back

21  and compress our work and my work, the kinds of things I

22  have to do as a judge, in a way that inconveniences --

23  inconveniences you the least.  If, however, any of you have

24  made changes to your own personal schedule that would make

25  it difficult for you to sit for the normal time, let Amy

```
 1   know over the lunch hour, and she'll let us know.  I
 2   apologize for the back and forth, but it's just the way
 3   things develop sometimes in the course of trial.
 4              In any event, Mr. Kohlmann, you remain under
 5   oath.
 6              And Mr. Herdman, you may inquire.
 7              MR. HERDMAN:  Thank you, Your Honor.
 8   BY MR. HERDMAN:
 9   Q.        Mr. Kohlmann, I'd like to direct your attention
10   to Government's Exhibit 73.  This is a printout that was
11   given to Darren Griffin by Marwan El-Hindi on
12   February 18th, 2005.  And direct your attention to the
13   third page of this document.  Are you familiar with what is
14   written here?
15   A.        Yes, I am.
16   Q.        And is -- are you familiar with a webpage called
17   "Ekhlaas"?
18   A.        Yes, I am.
19   Q.        Was that particular webpage password protected?
20   A.        It was for the large part.  It has been, I should
21   say, for the large part of its existence, since probably
22   early 2005.
23   Q.        In February of 2005 was this particular webpage
24   password protected?
25   A.        Yes.
```

```
 1   Q.        Did it require a registration in order to access

 2   the content?

 3   A.        Yes, it did.

 4   Q.        And the user of the Ekhlaas.com webpage, would

 5   they have a log-in name and password?

 6   A.        Yes, they would.

 7   Q.        Now, by the way, in this -- in this particular --

 8   the web address that I've underlined here, do you see any

 9   typos when you look at this, do you see any particular

10   typos in that line there?

11   A.        Yeah, there's nothing wrong with the site name,

12   but where it says "form," that should actually be "forum."

13   There should be a U between the R and the M.  And it says

14   "show the read," that's a typo.  It should say "show

15   thread," S-H-O-W-T-H-R-E-A-D.

16   Q.        Despite those two typos, were you able to

17   determine whether this was an actual thread that was

18   available on the Ekhlaas webpage in February of 2005?

19   A.        Yes, I was.

20   Q.        Okay.  And were you able to obtain an archived

21   version of this particular thread?

22   A.        Yes, I went to the current version of the Ekhlaas

23   website.  I took the numer -- unique numeric identifier for

24   this particular message.  I entered it in, and I recovered

25   the archived version of this message as it was originally
```

 1 | posted.

 2 | Q.        And I'm going to direct your attention to 213,

 3 | Government's Exhibit 213.

 4 |           MR. HERDMAN:  If you can zoom down through those

 5 | pages.

 6 | BY MR. HERDMAN:

 7 | Q.        And Government's Exhibit 213, is that a printout

 8 | of the webpage, the archived webpage you were able to

 9 | obtain from the Ekhlaas.com webpage?

10 | A.        Yes, it is.

11 | Q.        And specifically, this is the thread ending in

12 | 6181?

13 | A.        That's correct, this is the new -- the unique

14 | numeric identifier 6181.

15 |           MR. HERDMAN:  Your Honor, at this point in time

16 | the government would offer Exhibit 213 into evidence.

17 |           THE COURT:  It will be admitted.

18 | BY MR. HERDMAN:

19 | Q.        If I could direct your attention to, I believe,

20 | the third page of this exhibit, Mr. Kohlmann?

21 |           MR. HERDMAN:  And Kevin, if you can just zoom in

22 | on this portion here?

23 | BY MR. HERDMAN:

24 | Q.        By the way, this -- what we're looking at here,

25 | is this a posting that somebody put on this particular

1  webpage?

2  A.       It's a thread.  So it's an initial message that

3  someone posted, along with responses posted by other

4  Ekhlaas.com users.

5  Q.       And I see on here, underlining a portion of the

6  text that begins with PM10:59.  Can you explain for the

7  jury what that indicates to you?

8  A.       Yes.  This is the time date stamp that's on each

9  message that's posted on Ekhlaas letting you know when this

10  was first put online.  If you notice, obviously the first

11  part's pretty easy PM, indicating in the evening, 10:59.

12  And then after that you see 2005, which is the year it was

13  posted; 02, which stands for February, and ten, so it's

14  February 10th, 2005 at 10:59 p.m.

15  Q.       So that ten is the day of the month, not the

16  month itself?

17  A.       No.  Again, the month is the 02, February.

18  Q.       All right.

19           MR. HERDMAN:  If you could go back to the first

20  page of this, Kevin?  All right.

21

22  BY MR. HERDMAN:

23  Q.       Circling a photograph of a person on the first

24  page of this exhibit, do you know who that person is?

25  A.       Yes.

```
 1  Q.       And what is that person's name?

 2  A.       Dr. A-Y-M-A-N, Al-Zawahiri. A-L, dash,

 3  Z-A-W-A-H-I-R-I.

 4           THE COURT:  How do you pronounce that?  2.

 5           THE WITNESS:  Dr. Ayman Al-Zawahiri.

 6  BY MR. HERDMAN:

 7  Q.       And Mr. Kohlmann, if I can direct your attention

 8  now to Exhibit 74.  And have you look --

 9           MR. HERDMAN:  Have you zoom in on the date to

10  subject from area.  Okay.

11  BY MR. HERDMAN:

12  Q.       Do you recognize this e-mail that I'm underlining

13  right here?  Begins with E-K-H-L-A-A-S-E, for the record.

14  A.       Yes, I do recognize that e-mail address.

15  Q.       How do you recognize that e-mail?

16  A.       I received e-mails from that e-mail address.

17  Q.       What is that e-mail address?

18  A.       In this point in 2005, that was the e-mail

19  address used by the administrators of the Ekhlaas forum.

20  Q.       And what would be the reason that you would

21  receive an e-mail from the administrators of the Ekhlaas

22  website?

23           MR. HARTMAN:  Objection.

24           THE COURT:  One moment, please.  Can you maybe

25  rephrasing the question?  Are you asking why does he get
```

1    that?

2           MR. HERDMAN:  I'll rephrase.

3    BY MR. HERDMAN:

4    Q.      What were some of the reasons that you received

5    e-mail from the --

6           THE COURT:  That was the objection, Mr. Hartman,

7    the form of the question.

8           MR. HARTMAN:  I mean, I think we should approach.

9           THE COURT:  Okay.

10              (A sidebar conference was had on the

11               record.)

12          MR. HARTMAN:  First of all --

13          THE COURT:  In other words, it's not why he gets

14   stuff.  We already know what he --

15          MR. HARTMAN:  Yeah, that's part of it, and second

16   of all, there's no -- there's no foundation for where it

17   comes from.  I mean, the fact that he says he got e-mails

18   from this website doesn't tell us anything.  We don't know

19   who that person is or what it is or --

20          THE COURT:  Well, but he just testified to sort

21   of sign up and get e-mails.  Isn't that in the record?

22   Maybe not from him, but somebody.

23          MR. HERDMAN:  What I anticipate he's going to say

24   is, there was an update on the webpage.  In fact, this

25   lands back to the actual website, this administrator, and

1  say there's something new that's been posted, he would then

2  go to the Ekhlaas.com webpage so it all links up.

3         THE COURT:  I thought it was to the form of the

4  question, that's why.

5         MR. HARTMAN:  Well --

6         THE COURT:  But I think -- I think asking him why

7  you would get it leads to them as a predicate to asking

8  what he would get and -- it makes sense.

9         MR. HARTMAN:  I would just -- while we're here, I

10  would object to him trying to tie that reason to this

11  e-mail, since he can't read anything in this e-mail except

12  for the --

13         MR. HERDMAN:  I'm not going to do that.

14         MR. HARTMAN:  That's fine.

15         (Sidebar conference concluded.)

16         THE COURT:  You may proceed, and you may -- you

17  may re-- why don't you just renew the question.

18  BY MR. HERDMAN:

19  Q.     Mr. Kohlmann, what were some of the reasons that

20  you received e-mails from this -- this e-mail address here?

21  A.     Well, when you register as a user on Ekhlaas, one

22  of the options when you registered was checking a box

23  saying I would like to receive e-mail from administrators

24  of this forum.  And the reason for that is just in case the

25  website would go offline or in case a major title was

 1  released on the website or something big happened that the

 2  administrators wanted to direct your attention to.  This

 3  would be a way for them to get in contact with you

 4  directly, even though it was a mass mail list, basically,

 5  but yeah.

 6  Q.       Did you receive e-mails from this particular

 7  address that directed you to the Ekhlaas.com webpage?

 8  A.       I believe so, yes.

 9  Q.       I'd like to direct your attention now to Exhibit

10  165A-1D, which is the Internet cookie history from Marwan

11  El-Hindi's computer.

12          MR. HERDMAN:  And Kevin, if you can take us to

13  page 141?  And if you can zero in on this portion here?

14  BY MR. HERDMAN:

15  Q.       Mr. Kohlmann, are you familiar with the website

16  address that's depicted in URL for this exhibit?

17  A.       Yes, I am.

18  Q.       Okay.  Is that the same website that you obtained

19  the archived version of the thread ending 6181?

20  A.       Www.Ekhlaas.com, yes.

21  Q.       Is this particular URL, is that consistent with

22  the location of the Ekhlaas webpage in February and March

23  of 2005?

24  A.       That's correct.

25  Q.       And during that time period, was the Ekhlaas

```
 1  webpage password protected?

 2  A.       Yes, it was.

 3  Q.       Did it require a user name and password to log

 4  in?

 5  A.       That's correct, yes, it did.

 6  Q.       If I could direct your attention up one page to

 7  page 140?

 8           MR. HERDMAN:  This portion here, Kevin, if you

 9  can zoom in on that?

10  BY MR. HERDMAN:

11  Q.       Do you recognize what's in that URL,

12  Mr. Kohlmann?

13  A.       Yes, I do.

14  Q.       Is that -- how is that related to the

15  www.Ekhlaas.com that we just viewed?

16  A.       It's identical.

17  Q.       Was this -- were there two -- were there multiple

18  domain names that were associated this particular webpage

19  Ekhlaas?

20  A.       Yeah, just like your Muntada Al-Ansar, Ekhlaas

21  had several, and continues to have several different

22  similarly sounding domain names which all point back to the

23  same website.

24  Q.       Was this particular URL or domain name, was that

25  consistent with the Ekhlaas webpage in March and -- March
```

1    and February of 2005?

2    A.        Yes, it was.

3    Q.        If I can direct your attention to page 24 of the

4    same exhibit.  All right.  Do you recognize the URL that's

5    depicted in this portion of the exhibit?

6    A.        Yes, I do.

7    Q.        Okay.  And this one is www.alekhlaas.net?

8    A.        That's correct.

9    Q.        And do you see the date here?  And the last date

10   that this particular cookie was accessed was February 3rd

11   of 2006?

12   A.        That's correct.  Yes.

13   Q.        Was this particular domain name alekhlaas.net,

14   was that consistent with the Ekhlaas webpage in early 2006?

15   A.        That's correct, yes.

16   Q.        Even though this was a different -- different

17   domain name than the Ekhlaas.com?

18   A.        Yeah, they're a synonym.  In different points in

19   time, one points to it, and then one will expire, and

20   there'll be another one, but it's the same underlying

21   website.  It's just the name for it, that's all.

22            MR. HERDMAN:  If we can move on another website.

23   You can take this out.

24   BY MR. HERDMAN:

25   Q.        Mr. Kohlmann, are you familiar with a website

 1 | known as Ansar Jihad?

 2 | A.        Yes.

 3 | Q.        Was that website password protected?

 4 | A.        No, it was not.

 5 | Q.        Did it require any kind of registration?

 6 | A.        It didn't require it, but it offered that option.

 7 | Q.        And if -- if one were to register with the Ansar

 8 | Jihad webpage, what would that enable one to do?

 9 | A.        The purpose of registering with Ansar Jihad was

10 | that you would put in your e-mail address and then Ansar

11 | Jihad would then send you each day copies of the most

12 | important videos, communiques from insurgent groups, from

13 | Mujahideen organizations, mostly Arabic, but would download

14 | links, et cetera, so it would be delivered directly to your

15 | e-mail box.

16 | Q.        I'm going to direct your attention to Exhibit 62.

17 | Do you recognize this?

18 | A.        Yes.

19 | Q.        And what does this appear to be?

20 | A.        This is the actual website for Ansar Jihad.

21 |           MR. HERDMAN:  And just for the record, Your

22 | Honor, this is a printout that was given to Darren Griffin

23 | by Marwan El-Hindi on February 16th of 2005.

24 |           MR. EL-KAMHAWEY:  Objection, Your Honor.  There's

25 | no testimony to that.

```
 1              THE COURT:  I will let you answer -- well, why

 2    don't you just --

 3              MR. HERDMAN:  Okay.

 4              THE COURT:  Disregard that, and the jury will

 5    recall what the evidence is in that regard and counsel, of

 6    course, can argue about it.  Okay.

 7    BY MR. HERDMAN:

 8    Q.         If I can direct your attention to the bottom

 9    portion here of this website, Mr. Kohlmann.

10    A.         Yeah.

11              MR. HERDMAN:  If we can zoom in on that?  No, the

12    whole bottom half of that piece of paper right there.

13    Okay.

14    BY MR. HERDMAN:

15    Q.         Now, Mr. Kohlmann, do you see a date here which

16    is February 16th of 2005?

17    A.         Yes.

18    Q.         And then you see what appears to be a web address

19    or URL?

20    A.         That's correct.

21    Q.         Okay.  Is that URL, is that consistent with the

22    location of the Ansar Jihad webpage on February 16th, or

23    thereabouts, of 2005?

24    A.         Yeah, at that point in time that's where the

25    website was located.
```

1    Q.        And if I can show you --

2              MR. HERDMAN:  If you can go back up there?  If I

3    can show you Exhibit 62A?  Scroll down.  And this is a

4    translation of Exhibit 62.  Go to the third page.

5    BY MR. HERDMAN:

6    Q.        Do you recognize any of the files on this third

7    page of Exhibit 62A?

8    A.        Yes, I do.

9    Q.        Okay.  Now, specifically, I'd like to direct your

10   attention to two files.  The first one I'm marking right

11   there.  Can you just name that file for the jury?

12   A.        Yes, in English the title is *Russian Hell.*  In

13   Arabic it is known as *Jahesteshm,* J-A-H-E-S-T-E-S-H-M.

14   *Al-Rusjah.*  A-L, dash, R-U-S-J-A-H.  *Jahesteshm Al-Rusjah*

15   means "Russian Hell" in Arabic.  It's, again, a video

16   recording.

17   Q.        And with respect to what I'm marking now, it says

18   *Operation of Mujahideen Entering Dagestan.*  Are you

19   familiar with a file that goes by that name?

20   A.        Yes, I am.

21   Q.        Are you familiar with one of the file names of

22   that particular video is?

23   A.        Yes, *Dagestan 1.*

24   Q.        I don't know if you said this or not, *Russian*

25   *Hell* was actually more than one part, several parts?

 1   A.        It's actually -- they've released several.  It's

 2   a sequel, so they released part one and then part two a

 3   couple years later, and then each year they release a new

 4   version.  It's kind of like *Rambo* or *Rocky.*

 5   Q.        And for *Russian Hell Part One,* the -- what would

 6   be -- I don't know if you said this or not, but there

 7   were -- was there a file name called *Jahesteshm* 1 that's

 8   associated with *Russian Hell Part One*?

 9   A.        Yeah, frequently, when it comes to individuals

10   who are Arabic speakers, when they're dealing with files,

11   with this particular file, instead of being named *Russian*

12   *Hell,* they'll name it *Jahesteshm Al-Rusjah* or something

13   with *Jahesteshm* because that's -- *Jahesteshm,* just means

14   "hell."

15   Q.        Okay.

16             MR. HERDMAN:  And if -- Kevin, if you can put

17   Exhibit 62A on the left-hand side of the screen?  And then

18   on the right-hand side of the screen, can you bring up

19   Exhibit 77-1AD, which is a document that was obtained from

20   Marwan El-Hindi's laptop computer?  I'm sorry, on the

21   left-hand side, could you put up Exhibit 62?

22   BY MR. HERDMAN:

23   Q.        Mr. Kohlmann, directing your attention to these

24   two documents that are on the screen.  Do these appear to

25   be similar to you in any way?

```
1   A.      Yes.

2           MR. HERDMAN:  And if I could bring up now --

3   actually on the one on the right, 77-1AD.  Kevin, if you go

4   down to the third page of that document?  Okay, and you can

5   zoom in on this portion here.

6   BY MR. HERDMAN:

7   Q.      Do you see a URL or web address on that?

8   A.      Yes, I do.

9   Q.      Are you familiar with that URL or web address?

10  A.      Yes, Al-Ansar.tk.

11  Q.      Is that URL or web address, is that consistent

12  with the Ansar Jihad webpage at a particular point in time?

13  A.      That's correct.  Subsequent to this other

14  website, they moved the website and hosted it on this

15  domain name here.

16  Q.      Was this particular domain, www.Al-Ansar.tk,

17  would that host the Ansar Jihad webpage in early 2006?

18  A.      Yes, it did.

19  Q.      All right.

20          MR. HERDMAN:  If I could bring up on the

21  left-hand side, Kevin, 62-A, and on the right-hand side

22  77-1AD-1?  There's two translations of those documents.

23  And if you can go to the second page of each document

24  Kevin?  Okay.  If you can zoom in a little bit on the one

25  on the right?
```

1   BY MR. HERDMAN:

2   Q.      Mr. Kohlmann, I ask you to take a couple seconds

3   and compare what's visible in both of these documents here.

4   Do you see any similarities between these two documents?

5   A.      Yes.

6   Q.      Is it -- is it based on the movie names, as

7   they're called on here?

8   A.      Yeah, these movies that are listed here, they're

9   unique movies that I recognize and I have copies of.  It

10  appears that the page on the right is the updated version

11  of the page on the left.  In other words, the same content

12  plus extra movies that have been added over time.

13  Q.      You said before that you recognize that video

14  that was entitled *Russian Hell Part One*?

15  A.      Russian Hell in Chechnya.

16  Q.      And that video was available on the Ansar

17  Jihad --

18          THE COURT REPORTER:  Say that again?

19  BY MR. HERDMAN:

20  Q.      That video*, Russian Hell*, was available on the

21  Ansar Jihad webpage in February of 2005?

22  A.      That's correct.

23  Q.      And specifically, it was available off the

24  webpage on February -- February 16th of 2005?

25  A.      That's correct.

1    Q.       Now let's direct your attention to a clip from

2    that date, February 16th, 2005.

3              MR. HERDMAN:  And this is 28-69185-17A.

4                  (Audio playing.)

5    BY MR. HERDMAN:

6    Q.       Now, Mr. Kohlmann, you've listened to that audio

7    recording before?

8    A.       Yes.

9    Q.       And other than that train noise that was in the

10   background, were you able to identify anything that was

11   taking place in the background, other than the defendants

12   and Mr. Griffin talking?

13   A.       Yeah, actually, there's a video playing in the

14   background that I recognize.

15   Q.       And were you able to recognize which video that

16   was?

17   A.       Yes.

18   Q.       Was it *Russian Hell Part One?*

19   A.       It was a particular scene from *Russian Hell Part*

20   *One,* yes.

21   Q.       Before we get to that I'd just like to direct

22   your attention, again, to -- actually, for the first time

23   today, direct your attention to Exhibit 165F-1.  This is

24   the Real Player history from Marwan El-Hindi's computer.

25             MR. HERDMAN:  And if you can take us to page 85?

1   And if you can focus in on this, here?

2   BY MR. HERDMAN:

3   Q.       I believe, Mr. Kohlmann, you testified earlier

4   that *Russian Hell Part One,* one of the file names for that

5   video is *Jahesteshm*1?

6   A.       Yes, Hell1.

7   Q.       Okay.  And is that what you see on the screen

8   here?

9   A.       Yes, it is.

10  Q.       And based on this -- this created date for this

11  link here, which is February 16th, 2005, is that consistent

12  with *Russian Hell Part One* being played on February 16th,

13  2005?

14  A.       Yes, it is.

15  Q.       Now, were you -- were you able to obtain a copy

16  of *Russian Hell Part One* to play in court here today?

17  A.       Yes, I was.

18          MR. HERDMAN:  And I'll just direct counsel's

19  attention to this, Your Honor, before I proceed with this.

20          THE COURT:  You may.

21          MR. HERDMAN:  May I approach the witness, Your

22  Honor?

23          THE COURT:  Yes.

24  BY MR. HERDMAN:

25  Q.       And that's Government's Exhibit 214, do you

```
1    recognize Government's Exhibit 214?

2    A.         Yes, I initialed it and put the date.

3    Q.         What is contained on that CD?

4    A.         This is a high resolution copy of Jahesteshm

5    Al-Rusjah, Hell in Chechnya Part One.

6               MR. HERDMAN:  And Your Honor, with The Court's

7    permission I'd ask it to be played.

8               THE COURT:  How long is this going to take?

9               MR. HERDMAN:  It's a three-minute portion.

10              THE COURT:  I may have to step down.  I'm missing

11   a meeting.  I may have to stop, call them, and tell them

12   why.  I'll literally just call in and tell them.  About a

13   two or three-minute break.

14              MR. HERDMAN:  Your Honor, we chose the wrong

15   player here.

16                   (Video playing.)

17   BY MR. HERDMAN:

18   Q.         Now, Mr. Kohlmann, a portion we just heard

19   included a song?

20   A.         Uh-huh.

21   Q.         You didn't hear that song playing in that

22   particular segment, did you?

23   A.         No.  No.

24   Q.         Do you -- do you recognize this person that's

25   depicted on the screen right here with a sort of gray
```

```
 1  camouflage on?

 2  A.        This person right --

 3  Q.        What's that person's name?

 4  A.        His real name is Samir, S-A-M-I-R, Al-Suwailem.

 5  A-L, dash, S-U-W-A-I-L-E-M.  He's more -- he's better known

 6  as -- Ibn-Ul-Khattab, I-B-N, dash, U-L, dash, K-H-A-T-T-A-B

 7  also sometimes just said as Khattab.

 8            This is him again right here.

 9            (Video playing.)

10  A.        This is Khattab.

11            (Video playing.)

12            MR. HERDMAN:  And Your Honor, for the record, we

13  pause that at the 10 minute, 30-second mark.  Do you want

14  me to wait, Your Honor?

15            THE COURT:  Go ahead.

16  BY MR. HERDMAN:

17  Q.        All right.  Now, you mentioned earlier --

18            MR. HERDMAN:  Can we go back to Exhibit 165F-1.

19  Can you try to put 165F on the left-hand side, and on the

20  right-hand side, can you put Exhibit 62A, and go down to

21  the third page of 62-A?  And on the left-hand side, Exhibit

22  165F, can you go to page -- I believe it's page 660, 55.

23  Go up one page.  Go up to page 50, I'm sorry.  One more

24  page down, page 49.

25            I apologize, Your Honor.
```

```
 1              THE COURT:  No problem.

 2              MR. HERDMAN:  One more.  Kevin, if you can focus

 3    in at the one the -- on the bomb?

 4    BY MR. HERDMAN:

 5    Q.        You testified before with respect to this video

 6    here, the Operation of Mujahideen Entering Dagestan, you

 7    mentioned that one of the file names associated with that

 8    particular video was Dagestan1?

 9    A.        Yeah, it was divided into two parts Dagestan1 and

10    Dagestan2.

11    Q.        So the left-hand side, that's the Real Player

12    history from Mr. El-Hindi's computer.  Does that indicate

13    that Dagestan1 was played on February 16th, 2005, as well?

14    A.        Yes, that's correct.

15    Q.        Mr. Kohlmann, are you familiar with a group known

16    as the Islamic Army of Iraq?

17    A.        Yes, I am.

18    Q.        Does that go by its initials, IAI?

19    A.        Yes.

20    Q.        Did this particular group, during the period

21    2004, 2005, did it run any electronic mailing lists?

22    A.        Yes, it had a subscription mailing list.

23    Q.        Are you familiar with the concept of Yahoo

24    Groups?

25    A.        Yes, I am.
```

1   Q.        Is that a way of getting onto a mailing list, an

2   electronic mailing list?

3   A.        It's actually a service that offers people, for

4   free, the ability to set up their own mailing list, their

5   own electronic mailing list.

6   Q.        Does it require an individual to actually

7   subscribe to that particular mailing list?

8   A.        I mean, in order to set it up or in order to

9   receive the e-mails from the list?

10  Q.        In order to receive the e-mails from the list.

11  A.        If you want to join a Yahoo group list and get

12  the e-mails from it, you have to enter a valid e-mail

13  address and you have to, literally, subscribe.

14  Q.        Are you familiar with whether or not the Islamic

15  Army of Iraq had a mailing list?

16  A.        Yes, this --

17  Q.        Was that through Yahoo Groups?

18  A.        Yes.

19  Q.        Were you a subscriber through that particular

20  mailing list?

21  A.        Yes.

22  Q.        What were the steps you had to go through?

23  A.        First of all, you had to know it existed, but

24  once you knew it existed, you could go to a particular

25  location on the Yahoo Groups website, which was the home

 1 │ page for their group.  At that point, they would basically

 2 │ ask you for your e-mail address.  You put in your e-mail

 3 │ address.  You hit a button, then that sends an e-mail to

 4 │ your e-mail address saying, Do you confirm that you want to

 5 │ be subscribed to this e-mail list?  If you hit "confirm,"

 6 │ that's it, you're done.  As soon as they send out a

 7 │ message, you will be one of the recipients.

 8 │ Q.        What was the reason that you subscribed to the

 9 │ Islamic army of Iraq mailing list on Yahoo Groups?

10 │ A.        It was a good way of getting copies of their

11 │ official statements.

12 │         MR. HARTMAN:  Your Honor, I'm going to object on

13 │ official statements.

14 │         THE COURT:  I would agree.  Good way of getting

15 │ material from that source.

16 │ BY MR. HERDMAN:

17 │ Q.        With respect to -- I'll actually direct your

18 │ attention to Exhibit 73, Mr. Kohlmann.

19 │         MR. HERDMAN:  Okay, and Kevin, if you can zero in

20 │ on the address portion at the top there?  Okay.

21 │ BY MR. HERDMAN:

22 │ Q.        Just focusing on the subject line here,

23 │ Mr. Kohlmann, say you were a subscriber to the Islamic Army

24 │ of Iraq's mailing list.

25 │ A.        That's correct.

1  Q.       Does this particular subject line tell you

2  anything with respect to any of the individuals who might

3  have received this particular e-mail?

4  A.       Yeah.  This message, if you look at brackets in

5  the subject line, you'll see an opening bracket, then IAI

6  Iraq, and closed bracket, that is -- that is contained in

7  every subject line of the message sent over the Islamic

8  Army of Iraq's mailing list, so if you receive an e-mail

9  from them or you receive an e-mail from their mailing list,

10  first thing will say in brackets is, The subject is,

11  bracket, IAI Iraq, closed bracket.

12          Now, this here, if you notice says, for IAI Iraq,

13  it says R-E, what this means is that someone replied to a

14  message that was originally posted on IAI Iraq, replied to

15  it directly.  And so this is a -- this -- excuse me, this

16  is, in essence, a conversation that is taking place based

17  upon something that was posted on the IAI Iraq mailing

18  list.

19  Q.       And would this person here in the to line, would

20  that person have to be a subscriber to this mailing list in

21  order to receive this message, in your opinion?

22  A.       Yeah.  Yes.

23  Q.       If I could direct your attention now to a clip

24  from February 25th of 2005?

25          MR. HERDMAN:  This is designated as

```
 1   EK-10-69440-4A-1.

 2                  (Audio playing.)

 3   BY MR. HERDMAN:

 4   Q.        Mr. Kohlmann, do you have any opinion as to what

 5   Marwan El-Hindi was describing in that clip?

 6   A.        Yes.

 7   Q.        What is that opinion?

 8   A.        The IAI Iraq mailing list, how to subscribe to

 9   it.

10   Q.        And that was on the Yahoo Groups, again?

11   A.        Yeah, that was hosted on Yahoo Groups, exactly.

12   Q.        If I could direct your attention to Exhibit 79A?

13             THE COURT:  And I have to step down.  It'll be

14   just for a moment.

15                  (Brief recess.)

16             THE COURT:  You may be seated and you may resume.

17   And I apologize for the delay.

18   BY MR. HERDMAN:

19   Q.        When we left off, Mr. Kohlmann, I think we were

20   talking about the Islamic Army of Iraq's Yahoo Groups

21   electronic mailing service.  I'd like to direct your

22   attention to 79A.

23             MR. HERDMAN:  And if you can just focus in on the

24   top half of the page here?

25   BY MR. HERDMAN:
```

1  Q.       Mr. Kohlmann, if you can just take a moment to

2  look at this exhibit.  And then if I can direct your

3  attention to this particular subject line, here?

4  A.       Sure.

5  Q.       What does that -- when you compare that subject

6  line that is marked on top with the subject line on the

7  bottom that I'm marking?

8  A.       Yes.

9  Q.       What does that indicate to you with respect to

10 this e-mail and whether or not any of the users here were a

11 subscriber to the Islamic Army of Iraq electronic mailing

12 service?

13 A.       Sure.  This message was -- originally, when it

14 was first posted on another Yahoo E-group called

15 "ALafghan-ALarab," then that message was forwarded from

16 that news group onto the IAI mailing list, and then it was

17 forwarded out to all the IAI subscribers as well.

18        If you look there, you can see IAI in bracket,

19 and after that, you'll see RE, and then a colon,

20 ALafghan-ALarab, what that tells us is that this was

21 forwarded from one group to another to all the recipients

22 of that group.  In order to receive this message, you would

23 you would most likely, or would certainly have to be a

24 subscriber to IAI Iraq because this message wasn't saved

25 from ALafghan-ALarab, it was saved from IAI Iraq.

```
 1   Q.        And the date of this particular e-mail was
 2   February 25th, 2005?
 3   A.        That's correct, yes.
 4   Q.        And that's the same date of the segment that we
 5   just listened to?
 6   A.        That's correct, yes.
 7   Q.        All right.  Mr. Kohlmann?
 8             MR. HERDMAN:  Oh, Your Honor, by the way, before
 9   I move on Exhibit 214, I forgot to offer it into evidence.
10   That was the compact disc containing a copy of Russian Hell
11   Part One.
12             THE COURT:  It will be admitted.
13   BY MR. HERDMAN:
14   Q.        Okay.  And Mr. Kohlmann, this is the final sort
15   of block of testimony, I guess.  Are you familiar with the
16   website known Al Masada?
17   A.        Al Masada, yes.
18             THE COURT:  And about how long do you think this
19   be?
20             MR. HERDMAN:  Probably half-hour, charitably.
21             THE COURT:  Then why don't we break for lunch.
22             (A brief recess was taken for lunch.)
23             THE COURT:  Mr. Kohlmann, you remain under oath.
24             And Mr. Herdman, you may continue.
25             MR. HERDMAN:  Thank you, Your Honor.
```

1

2    BY MR. HERDMAN:

3    Q.      Mr. Kohlmann, when we left off, I had asked you

4    whether you were familiar with a website known as Masada.

5    A.      Yes, I am.

6    Q.      And is that in late 2004 and in the spring of

7    2005, was that Masada webpage, was that password protected?

8    A.      Yes, initially when it started off, there was

9    open registration and it quickly closed.

10   Q.      And when did that Masada webpage start off?

11   A.      I believe it started in late 2004, early 2005,

12   I'm not sure of the exact date.

13   Q.      But at some point in time, it became closed to

14   registration?

15   A.      Eventually, yes.

16   Q.      And was it possible to -- just like you testified

17   to with respect to some other websites, was it possible to

18   receive e-mail updates from the administrator of the Masada

19   webpage?

20   A.      Yeah, it's the standard software, so it doesn't

21   really matter what forum it is.  It always offers you that

22   option if you click in the check box to receive e-mails

23   from administrators.

24   Q.      And did the Masada webpage, similar to the

25   Ekhlaas webpage, or the Muntada Al-Ansar webpage, did the

```
 1    Masada webpage ever have to move actual domains that were

 2    hosting it on the Internet?

 3    A.        Yeah, for a brief period of time, they lost their

 4    domain name.

 5    Q.        And let me direct your attention now to Exhibit

 6    61.

 7              MR. HERDMAN:  And Kevin, if you can focus in on

 8    the lower, left-hand corner there?

 9    BY MR. HERDMAN:

10    Q.        Do you recognize this portion of Exhibit 61?

11    A.        Yes, I do.

12    Q.        And what is that?

13    A.        This is a URL or a -- the address of a particular

14    message thread posted on the Al Masada webpage during the

15    time that they lost their domain.

16              MR. HERDMAN:  Can you go back out to the overall

17    exhibit?

18    BY MR. HERDMAN:

19    Q.        Just looking at this what's depicted there in

20    Exhibit 61, do you recognize Government's Exhibit 61 as the

21    Masada webpage?

22    A.        Yes.

23    Q.        And what is it that you recognize?  Is there

24    something distinctive about the way it appears?

25    A.        In this early version of the Masada webpage,
```

```
 1   you'll notice the logo at the top.  The logo consists --
 2   it's a unique logo that they put in themselves where they
 3   took pictures of various different individuals at the head
 4   of the Mujahideen organizations, so you have, Abu Musab,
 5   A-B-U, M-U-S-A-B, Al-Zarqawi, A-L, dash, Z-A-R-Q-A-W-I.
 6   Q.      Let me stop you for a second.
 7           MR. HERDMAN:  Kevin, can you focus in on the
 8   photo portions?
 9   BY MR. HERDMAN:
10   Q.      Do you recognize Abu Musab Al-Zarqawi in this
11   portion of the exhibit?
12   A.      Yes, I do.
13   Q.      Could you please point on the monitor to that
14   individual?
15   A.      There are actually two photos in this.  The first
16   is right here.  Right there, that's him, and then this is
17   also him right here.
18   Q.      Okay.  And do you recognize -- do you recognize
19   the photograph of Osama bin Laden?
20   A.      Once again, there are actually two photos of him.
21   Here, the one is a little bit difficult to see.  Here he's
22   walking down a mountain, and he's also here in the center.
23   Q.      And do you recognize the picture of who you
24   testified before, Ayman Al-Zawahiri?
25   A.      Yeah, Doctor Ayman Al-Zawahiri.  Again, same
```

1    deal, there are two photos of him here.  First, one at the

2    top, right here, and then you'll see right below, right

3    there.

4    Q.        Okay.  So this Masada webpage, there was a period

5    of time where it was available at this -- the web address

6    that's in the lower, left-hand corner here, which is

7    starting 66.148; is that correct?

8    A.        That's correct, yes.

9    Q.        Was there a regular domain name with this address

10   number that was associated this Masada webpage?

11   A.        Actually, two different ones, yes.

12   Q.        What were those -- what were the domain names?

13   A.        AlMasada.com and .net, but had a very specific

14   spelling.  A-L-M-2-S-D-A.net or A-L-M-2-S-D-A.com, C-O-M.

15   Q.        If I could direct your attention now to

16   Government's Exhibit 76-1AQ?  It's a computer exhibit.  And

17   this is an e-mail inbox.  Do you recognize this bottom

18   e-mail here?

19   A.        Yes, I do.

20   Q.        What do you recognize about that e-mail?

21   A.        That is the e-mail address of the administrators

22   of the Al Masada forum.

23   Q.        And you said it was the domain name was normally

24   either A-L-M-2-S-D-A.net?

25   A.        Yes or .com.

```
 1            MR. HERDMAN:  So can you put this on the
 2     left-hand side of the screen?  And then if you can put
 3     Exhibit 61 on the right-hand side of the screen?  Don't
 4     worry about it, just put Exhibit 61.  There we go.
 5     BY MR. HERDMAN:
 6     Q.        Now, there's been testimony Mr. Kohlmann that
 7     this A-L-M-2-S-D-A.net, in fact, is the Masada webpage
 8     that's depicted here in Government's Exhibit 61?
 9     A.        Yes, it's identical.  The only difference is the
10     one in 61 doesn't have a domain name, but it's the same
11     exact website.
12            MR. HARTMAN:  Objection.
13            THE COURT:  First of all, I did not hear the
14     answer, so are you objecting to the answer or the question?
15            MR. HARTMAN:  Well, I'm objecting to both, I
16     guess.  It just -- to the extent we can differentiate
17     between the website and the whole thread.
18            THE COURT:  Why don't you ask it differently?
19            MR. HERDMAN:  I guess just to be clear, Kevin, if
20     he can focus in on this lower, left-hand corner here?  All
21     right.
22     BY MR. HERDMAN:
23     Q.        Is it your understanding, Mr. Kohlmann, that this
24     portion, that is to say, part of 66.148.85.35/BB, that that
25     is, in fact, a domain name of the Masada webpage?
```

1  A.        Well, it's the IP address of the Masada webpage.

2  It's like telephone number.  Instead of typing in a name,

3  you type in a phone number, but it's identical against the

4  exact same website.

5  Q.        And this portion here, which says

6  "showthread.php?T=7821," that would direct you to a

7  particular thread on that webpage?

8  A.        Exactly, a message and then various responses

9  that had been posted by other users to that.

10          MR. HERDMAN:  And if you can go back up to 611 on

11  the left, Kevin?

12  BY MR. HERDMAN:

13  Q.        And is it your testimony, Mr. Kohlmann, that this

14  was depicted in Government's Exhibit 61, here?  That is to

15  say, the content of the Masada webpage, that that was on

16  the same webpage as this Al Masada.net that's depicted on

17  the right-hand side?

18  A.        Yeah, it's all one forum.  It's Al Masada.

19  Q.        Now, you see on the right-hand side here, there's

20  a, what appears to be an e-mail with a subject line.  Were

21  you a subscriber to the Al Masada webpage?

22  A.        Yes, I was.  Although I'm not sure if I was on

23  this particular date.

24  Q.        What would be some of the reasons that you

25  received e-mails from the Al Masada webpage?

```
 1              MR. HARTMAN:  Objection.

 2              THE COURT:  I'm sorry.  Basis?

 3              MR. HARTMAN:  Well, this goes to the intent.

 4              THE COURT:  Again, I think that it is same

 5    ruling.  They're his view.

 6              MR. EL-KAMHAWEY:  Your rulings were prior that

 7    he.

 8              MR. HARTMAN:  Wait, wait, we should approach.

 9              THE COURT:  Why don't you approach?

10                   (A sidebar conference was had on the

11                    record.)

12              THE COURT:  What was the question?  What were

13    your reasons --

14              MR. HERDMAN:  What were some of the reasons that

15    you received an e-mail from the Al Masada webpage?

16              MR. HARTMAN:  What would be -- what were the

17    reasons he sent you the e-mail.

18              THE COURT:  That's how I understood the question,

19    but if you want to rephrase it, that's fine.

20              MR. HERDMAN:  It's the same question I asked with

21    respect to, I believe it was Ekhlaas, Your Honor.

22              THE COURT:  I guess so, that's why I was a little

23    startled by -- I couldn't think of what the problem was.

24    Sorry about that.

25              MR. HARTMAN:  That's all right.
```

```
 1              THE COURT:  Why don't you rephrase.

 2                   (Sidebar concluded.)

 3              THE COURT:  Why don't you just rephrase the

 4   question.  I'll sustain the objection, but it's to the form

 5   of the question.

 6   BY MR. HERDMAN:

 7   Q.         Mr. Kohlmann, I think you just testified that

 8   you, at one point in time, you were a subscriber to the

 9   Masada webpage?

10   A.         That's correct, yes.

11   Q.         And you received e-mails from the administrator

12   of the Masada webpage?

13   A.         That's right.

14   Q.         And did the address you received them from look

15   similar to what's depicted in Government's Exhibit 76-1AQ?

16   A.         The only possible difference would be -- I'm

17   sorry -- the only possible difference would be if it said

18   .com instead of .net as they change their domain over time,

19   but yeah, that's the address.

20   Q.         And what were some of the e-mails that you

21   received -- what were some of -- what were some of the

22   reasons that were indicated within the content of those

23   e-mails that you receive those e-mails, what was in those

24   e-mails?

25   A.         If the website was changing domain, if there was
```

1   a particular item that had been added, a new video or

2   particularly important new communique that had been added

3   to the website that administrators want to draw attention

4   to, but usually had to do with administrative matters, if

5   the account was suspended or if the website moved to a

6   different domain, to tell you where to go.

7   Q.       And now I'd like to direct you're attention once

8   again, to Exhibit 165A-1B, which is the Internet cookie

9   history on Marwan El-Hindi's computer.

10          MR. HERDMAN:  If you go to page 138?  165A-1B and

11  go to page 138.  And it's this portion here.

12  BY MR. HERDMAN:

13  Q.       And do you see what's listed in the URL there,

14  Mr. Kohlmann?

15  A.       Yes.

16  Q.       Is that consistent with the IP address that was

17  used by the Masada webpage?

18  A.       Yes, for a particular period of time in early

19  2005, yes.

20  Q.       And I'd like to direct your attention to page 149

21  of the same exhibit.  And do you recognize what's in the

22  URL portion of this portion of the exhibit?

23  A.       Yes, I do.

24  Q.       And what is that?

25  A.       This is the actual domain of the AlMasada.net

1    website A-L-M-2-S-D-A.net.

2    Q.       All right.

3            MR. HERDMAN:  And Kevin, can you put that on the

4    left-hand side, and then on the right-hand side put Exhibit

5    61 back up?  And if you can zoom in on this portion down

6    here?

7    BY MR. HERDMAN:

8    Q.       So again, Mr. Kohlmann, your testimony is, with

9    respect this portion of the address there, that's depicted

10   in Exhibit 61, that's actually the same website as what's

11   visible in Exhibit 165A-1B, the cookie related to

12   AlMasada.net?

13   A.       That's correct, yes.

14   Q.       And I'm going to direct your attention now to,

15   Mr. Kohlmann, to February 8th of 2005.

16           MR. HERDMAN:  And I have a couple recordings here

17   that I'm going to play.  The first is designated as

18   EK-769440-1A-1.

19                   (Audio playing.)

20           MR. HERDMAN:  And can you please put Exhibit 61

21   back up?

22   BY MR. HERDMAN:

23   Q.       And based on that description by Mr. El-Hindi of

24   the webpage, Mr. Kohlmann, do you believe he was referring

25   to this Masada webpage?

```
 1              MR. BOSS:  Objection, Your Honor.

 2              MR. HARTMAN:  Objection.

 3              THE COURT:  Come up for a moment.

 4                   (A sidebar conference was had on the

 5                   record.)

 6              THE COURT:  I think so, it probably speaks for

 7    itself.  It's a little hard, arguably, circumstantially,

 8    the evidence, that might be what he's talking about, but

 9    are you going to argue that?

10              MR. HERDMAN:  If I can, I'm just going to, again,

11    ask him whether it's Osama bin Laden's picture on this

12    Ansar query.

13              THE COURT:  Okay.  That's all.

14              MR. HERDMAN:  I'll move on.

15              THE COURT:  We've already seen the double

16    pictures on these.

17              MR. HERDMAN:  I can move on.  Thank you.

18                   (Sidebar conference concluded.)

19              THE COURT:  Ladies and gentlemen, I'm sustaining

20    the objection to the last question and you will be able to

21    disregard it, and it's up to you to interpret the evidence.

22              You may proceed.

23    BY MR. HERDMAN:

24    Q.        And now I'd like to direct your attention to

25    another recording that was made on February 8th of 2005.
```

```
 1            MR. HERDMAN:  This is designated as
 2   EK-7-69440-2A.
 3                  (Audio playing.)
 4   BY MR. HERDMAN:
 5   Q.         And did you hear Mr. El-Hindi say, Muntada Al
 6   Masada?
 7   A.         Yes.
 8   Q.         Is that the Masada webpage in your opinion?
 9   A.         Again, Muntada just means "forum," so the Al
10   Masada forum, it's the same thing.
11            MR. HERDMAN:  If you go to Exhibit 61, page 2?
12   And if you could try to zoom in on this?  It's hard to
13   read, but if you can zoom in on that portion right there?
14   Okay.
15   BY MR. HERDMAN:
16   Q.         Can you see that on the monitor there
17   Mr. Kohlmann?
18   A.         Not really.
19            MR. HERDMAN:  Why don't we go to 61A, the second
20   page.
21
22   BY MR. HERDMAN:
23   Q.         Do you recognize the name of any files that are
24   depicted on the screen?
25   A.         Yes.
```

1   Q.          And is that "martyr domination" or "hero

2   operation vest preparation"?

3   A.          That's correct, yes.

4   Q.          Based on your experience with this website, the

5   way that this "martyr domination" or "hero operation vest

6   preparation" appears on the screen there, how would a user

7   go about actually accessing that particular file?

8   A.          Sure.  These forums don't have enough space to

9   hold large volumes of video on their own server, so they

10  put this video or audio recording, whatever large file it

11  is, onto another server like a free file hosting service,

12  any free service that will allow them to temporarily host a

13  file on there.  Then what they do, they get that address,

14  when that file is now posted on that free server, and they

15  post a link to it on the forum.  So if you don't have a

16  link to that file on some free server, you probably

17  wouldn't be able to find it because a cabin name that

18  strikes immediately, 195.zip, doesn't say what's in there,

19  but by going on the forum, you can find the link to reach

20  the file which is hosted on another location.

21          And if you look at these two addresses right

22  here, tinburg dot -- excuse me, tinbird, T-I-N-B-I-R-D,

23  .dip.jp, and wansan, W-A-N-S-A-N, .ddo.jpo.jp, these are

24  two servers that are actually located Japan.

25          And again, what the idea behind the these

```
 1    information servers are this is a free place for anyone to
 2    temporarily host a large file for others to download.  And
 3    these two were frequently used on forums like the Masada
 4    forum by users on the Masada forum, by users on similar
 5    forums.
 6    Q.        And would the same be true -- although, would the
 7    same be true, these two URLs located down here, one
 8    beginning with the word "sniper" and one beginning with
 9    www.1km?
10    A.        Exactly, yeah.
11    Q.        Finally, I'd like to direct your attention to
12    April 13th 2005 to some recordings made on that date.
13              MR. HERDMAN:  If you can go to the clip that's
14    designated as EK-48-69185-3A-3?
15                   (Video playing.)
16    BY MR. HERDMAN:
17    Q.        Can you see what's on the computer screen there,
18    Mr. Kohlmann?
19    A.        It appears that someone is logging out of a Yahoo
20    mail screen.
21              THE COURT:  Out of a Yahoo?
22    A.        A Yahoo e-mail log in.  It looks like someone's
23    logging out of a Yahoo e-mail log in or logging in, I
24    should say.
25                   (Video playing.)
```

```
 1   BY MR. HERDMAN:

 2   Q.        Mr. Kohlmann, when Mohammed Amawi said something

 3   about numbering --

 4   A.        Uh-huh.

 5   Q.        -- and he point towed a portion of the screen

 6   that was in that sort of upper, left-hand corner, the

 7   computer screen, what part of the computer would that -- if

 8   there's a webpage that's up, what part of the computer

 9   would he be pointing to there?

10   A.        That's the address bar.  That shows the location

11   of where you're at.  So in other words

12   http://Microsoft.com, 1.1.1.1, whatever the location is you

13   are on the Internet, it would appear in that address bar at

14   the top of the screen.

15           MR. HERDMAN:  And zoom in a little bit.

16   BY MR. HERDMAN:

17   Q.        So if an IP address consisted of numbers,

18   Mr. Kohlmann, that would appear in the upper, left-hand

19   corner of that particular computer screen?

20   A.        That's correct, yes.

21   Q.        And do you recognize the webpage that's depicted

22   on the computer right there?

23   A.        Yes.  Not right now, but several seconds later,

24   if you keep playing this -- if you want to keep playing it

25   a few seconds.
```

1          MR. HERDMAN:  Yeah, why don't we keep playing it.

2               (Video playing.)

3   A.        If you pause right there.  Right there, you'll

4   see right in the middle of the screen, there's an image on

5   the screen, inside there, there's a circle.  Shortly after

6   you saw this page from the Al Masada forum right here -- I

7   don't know what Exhibit Number is offhand.

8   Q.        Exhibit 61 on the right-hand side.

9   A.        Shortly after this webpage March of 2005, the Al

10  Masada webpage was redesigned and they added a new logo,

11  the logo that they added, the official Al Masada logo, the

12  circle you see right there in the middle of the screen.

13          MR. HERDMAN:  And finally, if you can bring up on

14  the left-hand side, Kevin, can you bring up the recording

15  designated as EK-48-69185-4A-1?  And on the right-hand

16  side, can you bring up Exhibit 165A-1B page 149?

17          MR. HARTMAN:  Can you get those exhibit numbers

18  again, Mr. Herdman?

19          MR. HERDMAN:  On the left-hand side, it's

20  EK-48-69185-4A-1.

21          MR. HARTMAN:  And that date is?

22          MR. HERDMAN:  That's from April 13th, 2005.

23          MR. HARTMAN:  Okay.

24          MR. HERDMAN:  And on the right, it's Exhibit

25  165A-1B, page 149.

1          MR. HARTMAN:  Thanks.

2          MR. HERDMAN:  And ask Mr. Baker to zoom in on the

3   second URL down from the top there.

4          And if you'll put the head phones on for the

5   clip.

6               (Audio playing.)

7   BY MR. HERDMAN:

8   Q.       Mr. Kohlmann, finally, the -- do you have an

9   opinion as to whether the webpage that Mr. Amawi just

10  spelled out for Darren Griffin is the same as the webpage

11  that's depicted on the right-hand side of the screen, which

12  is from the cookie history of Marwan El-Hindi's computers?

13  A.       I believe it's the same.

14         MR. HERDMAN:  I have nothing further, Your Honor.

15         THE COURT:  Okay.  Cross-examination?

16         MR. BRYAN:  Thank you for your testimony

17  Mr. Kohlmann.  We have no questions for Mr. Kohlmann.

18         MR. HARTMAN:  We'd like to approach for a moment

19  if we can.

20               (A sidebar conference was had on the

21               record.)

22         MR. HARTMAN:  Given the inflammatory nature of

23  what Mr. Kohlmann has testified to, which I think Your

24  Honor acknowledged in the original opinion, although you

25  decided that he could testify as to videos that were seen

1  and what not, I would ask The Court to give a preliminary

2  First Amendment instruction so the jury understands what

3  they saw, in themselves, is not illegal, in and of itself.

4  I mean, the government's using it, and they will argue it

5  for how they want to use it and that's fine, but I would

6  just ask for a preliminary First Amendment instruction so

7  the jury understands.

8          THE COURT:  I think every single juror was told

9  during voir dire.

10         MR. HARTMAN:  I know that the vast majority of

11  them were.

12         THE COURT:  Well, do you care?

13         MR. HERDMAN:  I do, Your Honor.  I think

14  Mr. Kohlmann is a living, breathing example of someone

15  who's made a living out of this particular line of

16  research.  He has a reason for doing it.

17         THE COURT:  I think the request is, look, ladies

18  and gentlemen, neither acquiring nor watching the materials

19  that are alluded to, you may have seen, is itself a crime.

20  It may be offered as evidence of intent.

21         MR. SOFER:  My argument is muddy these --

22         THE COURT:  I agree.  I agree.  I'm not going to

23  grant the request.

24         MR. HARTMAN:  Okay.

25         THE COURT:  I'll consider it in the course of

1 | jury instructions, but not now.

2 | (Sidebar concluded.)

3 | MR. HARTMAN:  Your Honor, we have no questions.

4 | Thank you, Mr. Kohlmann.

5 | THE COURT:  Okay.

6 | MR. HELMICK:  Thank you, Mr. Kohlmann.  No

7 | questions for Mr. Kohlmann.

8 | THE COURT:  Thank you, Mr. Kohlmann.  You may

9 | step down.

10 | MR. HERDMAN:  Thank you very much, Your Honor.

11 | THE COURT:  And if I understand correctly, we

12 | have some matters to take care of ourselves with regard to

13 | some final exhibits that may be offered on behalf of the

14 | government.

15 | MR. SOFER:  Yes, Your Honor.

16 | THE COURT:  And that given the hour and that time

17 | that might take just to put all that together, we'll

18 | adjourn for the day or --

19 | MR. SOFER:  That's fine with us, Your Honor, if

20 | that's what Your Honor wishes.

21 | MR. HARTMAN:  Can you hang on one second, Judge?

22 | No objection to that.

23 | THE COURT:  Okay.  Ladies and gentlemen, well

24 | begin tomorrow morning at 8:30 and it may take about an

25 | hour or so for the government to wrap up its case, and then

1    the case will be with the defense, if they wish to start

2    off with any evidence.  So for them, they don't have to.

3    Each defendant has a right to put the government to its

4    proof and let it go at that, and we'll see.  Okay.

5         Safe trip.  Don't talk about the case, keep an

6    open mind, and we'll see you in the morning.

7              (Jury excused at 2:25 p.m.)

8         THE COURT:  Okay.  So where are we and what do we

9    need to do?

10        MR. SOFER:  Again, I think, Your Honor, the

11   government and defense counsel have worked out a

12   stipulation.  I think there's one issue counsel for the

13   defense wanted to --

14        THE COURT:  And I'm sorry, stipulations as to

15   what?  You may have told me once in the past and I've

16   forgotten.

17        MR. SOFER:  There are a series of pieces of

18   evidence.  They include phone records, that kind of

19   material.  There are some other --

20        THE COURT:  Phone records, you mean like toll

21   records?

22        MR. SOFER:  Toll records or local call detail

23   from cell phones.  There are a number of other items that

24   were recovered in searches of the defendant's homes,

25   residences.  Instead of calling the people who actually

1   executed the search warrants, we would just ask for -- we

2   have asked, and I believe the defense has agreed to

3   stipulations that these items were found in certain places

4   and certain locations.

5        I think the only thing that I'm left -- and I'm

6   sure counsel will tell me if I'm wrong about this -- but

7   the only thing that's left that has any controversy to it

8   are the swords and knives, which were the subject of a

9   previous motion in limine, I believe, by counsel for Marwan

10  El-Hindi, which I believe counsel for Mohammed Amawi

11  joined.  I believe Your Honor denied, I believe -- my

12  recollection is, it was so long ago now, I believe Your

13  Honor denied that request, but the government also agreed

14  that we would not bring in the actual swords and knives

15  themselves and would only show the jury photographs,

16  essentially, that have been loaded into the computer.

17  98 percent of this stuff, if not 100 percent of it is

18  already loaded into our trial presentation software and

19  that's how we would propose publishing it to the jury.

20            THE COURT:  And so take about a half-hour.

21            MR. SOFER:  I think somewhere between a half --

22            THE COURT:  Everything you're talking about, all

23  the subjects and everything?

24            MR. SOFER:  Between a half-hour and an hour to

25  just show it to everyone.  We'd ask The Court to also read,

1    obviously, the fact that the parties have stipulated to

2    this.  And in this context, the formal definition of what a

3    stipulation is may be appropriate as well.

4          THE COURT:  Why don't you try to give me whatever

5    it is you want -- you, collectively, come up with what you

6    want me to say, that's fine.

7          MR. SOFER:  I believe it's already been drafted

8    into the document which we can give The Court a copy of it

9    early tomorrow morning or e-mail it to Your Honor if you'd

10   like.

11         THE COURT:  Tomorrow morning's fine.

12         MR. SOFER:  And that's it.  As soon as those

13   items are published to the jury, the government will

14   formally rest, and we can begin whatever defense case there

15   may be.  In that regard, I have a number of issues I wanted

16   to bring to The Court's attention.

17         THE COURT:  I noticed a bunch of e-mails in

18   reference to defense witnesses.  I haven't been able to

19   look at that stuff.  I've been out of town all day

20   yesterday and here all day today.

21         MR. SOFER:  Let me give you the basis of the

22   government's concern.  We remain, at least as until the

23   government rests, by agreement with counsel for Marwan

24   El-Hindi, the government remain walled off, formally walled

25   off from DOJ counsel, Department of Justice counsel, who

1   have been working to try to get the witnesses that Marwan

2   El-Hindi had listed into the United States.  That's my

3   understanding.  Obviously, I know nothing about the details

4   of that.  I don't know where we sit with that.  I'm not

5   asking to know where we sit with that, except that as we've

6   indicated to The Court when this whole issue about bringing

7   witnesses in by television set essentially came up, I think

8   the government should be entitled, particularly in a

9   situation like this to have a sum, I'll call it pedigree

10  information, for lack of a better word, about the

11  individuals that the defense wishes to call.  As a

12  practical matter, in order for us to conduct any kind of

13  investigation as to whether these people even are who they

14  claim to be on the television set.

15          THE COURT:  Whether there is a Tom Jones living

16  in --

17          MR. SOFER:  Just even on that -- that's the first

18  cut.  It's not formerly what we do when a defense witness

19  gets on the stand.  There's more exhaustive investigation

20  of those individuals, for instance, to find out it they

21  have a criminal record or something of that nature.  Here,

22  we are handicapped in a number of different ways, which I

23  won't bore The Court with now, other than to say, contrary

24  to counsel's previous representations that we get on

25  airplanes and we fly wherever we want, it's actually quite

1    the opposite.  In order for the government to go travel to

2    a foreign country, enlist the help of the local

3    authorities, et cetera, there's -- you can imagine, there

4    are forms that would -- that pile up on the desk, there are

5    mutual legal assistance treaties between countries as to

6    how this kind of interaction can take place.  It's often

7    regulated by --

8            THE COURT:  I would gather, one might take

9    exception to persons affiliated with another law

10   enforcement agency's wandering.

11           MR. SOFER:  One might even think that one could

12   be arrested and placed in jail for doing that, so

13   absolutely, Your Honor is correct.

14           THE COURT:  They can offer a ticket.

15           MR. SOFER:  As long as they have the bail men to

16   get me out of --

17           THE COURT:  Actually, I hadn't thought about

18   that.  I did get a confirmation from our IT people that

19   they've tried the video hookup, and it seems to be working

20   okay.

21           MR. HARTMAN:  We -- we have, and I believe I sent

22   this to government counsel, I might not have copied Greg on

23   it.  We have five foreign witnesses, one of whom we've made

24   arrangements for them to come so they'll testify in person.

25   Two have been scratched and two the DOJ wall counsel is

```
 1    working through the Emlattes, and I think he probably --
 2    Greg's probably underestimated the amount of forms and
 3    paperwork and stuff like that.  Frankly, we don't have any
 4    idea what's going to happen if they're -- if we're going to
 5    be able to get them here or on the video link or not, so we
 6    don't know --
 7               THE COURT:  Certainly, in terms of --
 8               MR. HARTMAN:  -- but they know who they are, too.
 9               THE COURT:  But in it terms of making whatever
10    arrangements, if the arrangements to get them here in
11    person cannot be completed by the time you will be resting
12    your case and moving onto Mr. Amawi's case, I have no
13    objection, if you can give me the representation, Judge, we
14    understand that they can be available within whatever time
15    frame defendant anticipates they can be available in
16    person, if you can find that out separately or jointly.  In
17    other words, saying we'll interrupt your case too, in that
18    fashion.  And if that doesn't work, then we'll have to go
19    to whatever fall back of the video presentation.  Okay?
20               I'm -- all I'm saying, to everybody, I'm willing
21    to let the schedule be scrambled a tad, it looks as though
22    it's simply a matter of running the last lap or two for
23    them to get on an airplane to get off in Detroit and come
24    down here.
25               MR. HARTMAN:  Appreciate that.
```

```
 1            THE COURT:  Keep everybody posted.

 2            MR. SOFER:  And for the El-Hindi witnesses, Your

 3   Honor, because we entered into this agreement and because

 4   the government -- not us, but some other counsel in

 5   Washington -- has been dealing with these witnesses at

 6   least, we're confident that somebody has collected sort of

 7   the most basic information about these individuals.  If it

 8   was -- if only to determine whether they were eligible to

 9   come into the United States.  What we're asking counsel for

10   is -- and of course they don't have to do this, but I'd ask

11   The Court to consider weighing in on this as well -- is to

12   drop the wall now, which is a couple days prior to -- it's

13   actually only one day prior to us resting, which is what

14   the agreement actually says, so we can now pierce that veil

15   and take a look at this information and make sure that

16   whatever information has been collected can be acted upon,

17   and we can conduct our investigation; that is, the trial

18   team can conduct the investigation so that we may

19   adequately cross-examine these witnesses.

20            MR. HARTMAN:  And I would respond that I will

21   give the -- I have no problem giving the basic information

22   for the person who's coming in person to testify live, but

23   as to the two people we don't know yet, it is so delicate

24   bureaucratically that I'm not willing to drop that wall

25   because if the government on the other side gets involved,
```

```
 1    it's going to be even more difficult for us to try to get

 2    these witnesses.  They're Egyptian police officers.

 3            MR. SOFER:  Here --

 4            MR. HARTMAN:  Which makes it very difficult for

 5    the Department of Justice to use the Emlattes to try to get

 6    them over here.  And frankly, I don't think we're going to

 7    have any success at all.  I think we're going to hit a

 8    stone wall, and we're going to find out in about 48 hours

 9    that Egypt said no, forget it.

10            THE COURT:  Forget it.

11            MR. HARTMAN:  They're not coming, they're not

12    going to testify via video.  They're not going to do

13    anything, which they have a right to do under the treaty.

14            THE COURT:  Let me also say, let's -- in other

15    words, your saying you presently expect that by the end of

16    the week, Friday, which is about 48 hours, right, you

17    anticipate you're going to know what the deal is?

18            MR. HARTMAN:  Yes.

19            THE COURT:  And I will say to you that once we

20    see what the deal is, if these witnesses are coming, then

21    if you need a bit of additional time, again, if you can

22    work it out in terms of their arrival and departure, but if

23    you need some additional time to confirm that there is an

24    Egyptian police force and these guys are employed by it,

25    and these are the ranges, and these are their jobs, and so
```

1  forth and so on.

2          MR. SOFER:  I'm sorry, Your Honor, I'm not

3  worried about that so much with these witnesses as a

4  result, again, as of the fact that the government -- U.S.

5  government has been involved in this on some level.  I

6  assume government to government, although I don't know.

7          And -- and as a practical matter, if Mr. --

8  Mr. Hartman is unwilling to give us this information today,

9  we'll get it tomorrow by virtue of the agreement that we

10  entered into with Mr. Hartman and counsel, because the

11  letter that we entered into says, on the day the government

12  rests, the wall falls down.  So tomorrow -- I asked for an

13  extra day so we can do what we have to do.  If he's

14  unwilling to do that, we'll catch up tomorrow.  But

15  tomorrow, by virtue of -- by operation of the agreement

16  that we entered into with defense counsel, that wall comes

17  down.  It says when the government rests its case, this

18  information will be transmitted from walled counsel to

19  trial counsel so that we can begin conducting that

20  investigation.

21          THE COURT:  Okay.  And then all I would ask is

22  that do Mr. Hartman and Mr. Boss and their clients, and

23  ultimately all of us, the courtesy of, before anything is

24  done that might jeopardize whatever is going on, just talk

25  to each other and say, look, this is our understanding that

1   somebody goes knocking on the door in Egypt for legal

2   attache from the Cairo office, or whatever, if there is

3   one, goes and knocks on the police commissioner door, do

4   you have any idea for district 12 precinct 3, we're going

5   to lose any chance of a witness.  That, in turn, has all

6   kinds of problems.

7           You people talk to each other.  I know you don't

8   want to interfere with their ability to call a witness.  On

9   the other hand, I think it's fair to say that you don't

10  want to interfere with, A, complying with the agreement

11  you've reached, and B, their ability to be able to

12  cross-examine.

13          MR. HARTMAN:  Frankly, we'll meet with the

14  government and tell them exactly what I expect these

15  witnesses to say.

16          THE COURT:  Okay.

17          MR. HARTMAN:  And they can -- and they are -- I

18  mean the background check won't be hard if we get the

19  approval for this to happen, they're cops.  So I -- I don't

20  intend to try to get in the way of their opportunity to

21  cross-examine.  I do need to protect my ability -- these

22  are such vital witnesses to our defense, we really need to

23  protect, to the extent we can.

24          THE COURT:  I understand.  And I will suggest to

25  you that you might let them know exactly the nature and

1   delicacy, if you choose to do so.

2           MR. HARTMAN:  I will do that today.

3           THE COURT:  That's all.

4           MR. SOFER:  Now, Your Honor, this same problem is

5   multiplied times two when it comes to the Amawi witnesses.

6   And the reason for that is, again, as far as I know, there

7   was an e-mail traffic about this.  We've been walled off so

8   I don't know whether -- whether and to what extent the

9   Amawi team has dealt with walled counsel.  My understanding

10  was -- I thought that they had not.  Counsel Hassink

11  corrected me and said there has been some interaction.  To

12  the extent that it's a lesser interaction and Washington

13  has even less information about these witnesses, and we've

14  been told, I believe, that there are nine of these

15  witnesses testifying from Jordan, it just exacerbates the

16  problem.

17          So again, what we've done is, we've requested

18  from counsel at least some very basic information about

19  these individuals, their dates of birth, their country ID

20  number, if the country issues an ID number, their place of

21  residence, again, just so we can -- when the screen opens

22  up and there's some person sitting there, whether we can

23  have any confidence that at least that this is even the

24  person who the defense claims the person to be.

25          So far, we've received no indication whatsoever

```
 1    that they'd be willing to do that.  Again, I'm hoping to

 2    appeal to counsel and The Court.  What we don't want to do

 3    is get --

 4            THE COURT:  Let me hear from them.  What's the

 5    deal there?

 6            MR. WHITMER-RICH:  We have been in communication

 7    with walled-off counsel and pursued the process of

 8    attempting to have witnesses, who would be able to appear,

 9    testify live in court.  That was our strong preference to

10    have in-court witnesses.  It appears to us and has appeared

11    for a little bit of time now to walled-off counsel, that we

12    aren't even close to that being able to happen, just given

13    our time constraints.  In light of that, we are proposing

14    at this point that those witnesses would testify via video

15    conference.

16            The list -- we provided our witness list on

17    Friday and then we supplemented in response yesterday,

18    stating of those, these are the ones that are overseas.

19    And I think Mr. Sofer represented there may have been nine

20    of those.  I think four of them are members of Mr. Amawi's

21    immediate family.  And so I would assume the government

22    knows who those people are.  I don't --

23            THE COURT:  Have you listed them?

24            MR. WHITMER-RICH:  Yes.  Yes.  They're on the

25    witness list.
```

1          THE COURT:  That's what I mean, you've identified

2    them?

3          MR. WHITMER-RICH:  Correct.  And you know, we

4    also are facing considerable challenges in trying to

5    coordinate this testimony and communicate with these people

6    and so forth.  I think we feel like we've met our

7    obligations in terms of disclosing the identity of our

8    witnesses.

9          THE COURT:  What about the five who are not

10   family members, what have you told the government about

11   them?

12         MR. WHITMER-RICH:  We've given their names and

13   the fact that they'll testify.

14         THE COURT:  Addresses?

15         MR. WHITMER-RICH:  We have -- to the extent

16   that --

17         THE COURT:  Other contact information, whatever?

18         MR. WHITMER-RICH:  We have shared that

19   information with walled-off counsel in pursuit of that

20   process.  And to the extent the same rule applies, then I

21   presume that information will be delivered to government

22   tomorrow.

23         MR. SOFER:  I guess, again, I was not aware of

24   the level of involvement between Amawi team and walled

25   counsel.  Tomorrow and when the government rests, well,

1  then, according to our agreement with the El-Hindi team,

2  and I think, I hope that counsel for Amawi will -- they

3  sort of glommed onto this -- and so I assume that they will

4  agree that that to the extent that there is any agreement,

5  that it would apply to them as well.  We -- when we pierce

6  that veil, so to speak, we'll look at the information.

7  That may -- we may have all we need, I don't know, and

8  we'll come back to The Court if tomorrow --

9          THE COURT:  Well, if it is not, in other words,

10 if you get -- if what you are given is the equivalent of

11 Tom Smith, Anytown, USA, then let counsel know what kind of

12 further information you think you need.  Candidly, you

13 know, in terms of basic contact information and even some

14 sense of who a witness is, and if nothing else, at least,

15 generally, the topic that the witness is generally likely

16 to testify about.  I think you should provide it.  It's

17 part of the deal when I put the kind of pressure that I

18 know I do on the government in every case that I do, that I

19 have, open your file up and let them see beforehand.

20 That's the fair thing to do and that's the right thing to

21 do.  And it works both ways.  That's all.  But again, the

22 initial veil is going to get lifted tomorrow.

23          MR. SOFER:  Yes.

24          THE COURT:  And once it does, you talk with each

25 other and when one of you is unhappy with the other one

1  because the other one is being obtuse and obdurate, come

2  see me, and I'll do what I can to shred the veil, if

3  necessary, we'll shove it back down whichever direction.

4          MR. SOFER:  Understood, Your Honor.

5          THE COURT:  I really do hope that these are

6  problems that can be resolved by professionally cooperative

7  attitude you've all displayed all along any way.  So --

8  okay.  So -- and if you can, you know, sometime tomorrow

9  once you find out, talk to each, and we'll go from there.

10         MR. SOFER:  We'll update The Court tomorrow after

11  we've learned whatever information we've learned.

12         In the same vein, Your Honor, to the extent that

13  counsel for any of the defendants are planning on playing

14  recordings much like the government did, we'd ask for the

15  designations of those recordings again, so that we are

16  capable of determining whether the translations are

17  accurate, the transcriptions are -- and the audibility

18  issues are all taken care of so that we don't end up --

19  which we have done, I think, a fairly good job of

20  together --

21         THE COURT:  I agree.

22         MR. SOFER:  During the course of the government's

23  case, having to stop the proceeding and say, well, wait a

24  second, we never heard this, we don't know if we can hear

25  that, and having audibility hearings in the morning and

1   trial in the afternoon --

2           THE COURT:  The audibility is in the evening and

3   nighttime.  The trial in the morning and afternoon.

4           MR. SOFER:  That's fine, except when the

5   witnesses are testifying seven hours ahead, my guess is

6   it's going to modify our calendar a little bit.

7           THE COURT:  Let me just start with you guys.  Do

8   you have any clips that you anticipate?

9           MR. HELMICK:  No, Your Honor, we do not.

10          MR. HARTMAN:  Yes, well -- and they were all

11  provided to the government beforehand.  They're all in the

12  same series that we gave.

13          MR. SOFER:  Well, we have probably, I'm going to

14  estimate three, 4-inch notebooks full of clips that were

15  provided to us by counsel.

16          THE COURT:  Yeah, so when do you think you can

17  sort of designate with a greater degree of specificity what

18  you're going to be sifting out, because that's very fair.

19  We all expect --

20          MR. HARTMAN:  I understand.  When do I think I

21  might be able to do that?  I would guess Monday at the

22  latest.

23          THE COURT:  Monday morning, but you're going to

24  be starting the case --

25          MR. HARTMAN:  On Friday.

```
1              THE COURT:  When are you going to start playing

2    the recordings?

3              MR. HARTMAN:  If I'm going to play any on Friday,

4    we'll let the government know tonight --

5              THE COURT:  Okay.

6              MR. HARTMAN:  -- what we're going play on Friday.

7              THE COURT:  By 11:59 p.m. EDT?

8              MR. HARTMAN:  Tonight, by the time the sun goes

9    down.

10             THE COURT:  Okay.  Before the grid iron show

11   curtain goes up.

12             MR. HARTMAN:  I'll be working, I'm not going.

13             THE COURT:  Okay.

14             MR. HARTMAN:  And then for Monday.

15             THE COURT:  You'll let them know by about 7:00 or

16   9:00.

17             MR. HARTMAN:  Yes.  They're -- they're

18   certainly -- I mean, in some ways, I can't say because we

19   don't know what our --

20             THE COURT:  I understand, but -- but my question

21   is, do you at least have a smaller universe of which you're

22   likely to be selecting what you, in fact, may be doing?

23             MR. HARTMAN:  I believe we do.  I don't know if

24   we gave that to the government before we started to cross

25   Griffin or not.  There's a list that I can give them that's
```

```
 1   going to make it smaller than those binders.  I can at
 2   least do that.
 3           THE COURT:  Good.  And then, if you can, as I
 4   say, this evening, you can do it by about 7:00.  If you
 5   tell them, let's say, 8:00 at the latest, but they've got
 6   to sit down and do a lot of homework, too.
 7           MR. HARTMAN:  There won't be much on Friday, and
 8   we'll tell them exactly what it is by tonight.
 9           THE COURT:  Okay.
10           MR. SOFER:  And Judge --
11           THE COURT:  Likewise, if by -- if you can do it
12   by, let's say, Saturday noon, get them the rest that you
13   anticipate, again, if you have to over guess, that's fine
14   so they know the universe which you're likely to be
15   drawing, to the extent it's gotten more constricted as
16   things evolved.
17           MR. HARTMAN:  I can't promise The Court I can do
18   it by Saturday at noon, but I will promise The Court I will
19   do it as soon as we can.
20           THE COURT:  Okay.  Because, you know, if they
21   come to me and say, Judge, we've got a lot more to do than
22   we expect to do, I'm likely to say, well, we'll have to
23   take a day off and let them do it.  And that's not an
24   invitation to you.  I'm not trying to be strict.
25           MR. HARTMAN:  Nor would that be what I ask for,
```

1    but we have decisions on which witnesses we're going to

2    call that are on our list, and until those decisions are

3    made, I don't know.

4           THE COURT:  I understand.

5           MR. HARTMAN:  All right.  Thanks.

6           MR. SOFER:  The reason that we need to see them

7    or want to see them is not just the question about their

8    audibility and translation and transcription, I think --

9    and I'll have to remind The Court, the government objects

10   to the introduction of certain recordings if they, in fact,

11   are self-serving hearsay, if they are, in fact, are another

12   crack at cross-examination.  And we often, I think we -- I

13   mean, the lawyers are often bringing Your Honor issues

14   without seeing the actual instances of this.  We want to

15   see the meat of this issue so we can properly object.

16          THE COURT:  Well, he said by Monday.  He said by

17   Monday at 5:00 everything that you expect to play during --

18   and how long do you think your case is going to take to

19   present, your best guess?  I know it's -- you won't know

20   until you say no further questions, we've called our last

21   witness, we've offered all our exhibits.  I understand

22   that.

23          MR. HARTMAN:  Judge, to be perfectly honest with

24   you, it could end on Friday and it could go for two weeks.

25          THE COURT:  Okay.

1          MR. HARTMAN:  And I understand what Mr. Sofer's

2     saying, but, you know, I'm not -- I'm not going to point

3     out the evidentiary reasons that I want to put clips in for

4     him to object beforehand.  I mean, that's what we do when

5     we get here.  The same way we did with the government.

6          MR. SOFER:  Actually, Judge, that's exactly what

7     we need --

8          THE COURT:  I tend to agree with you.  Now, I'm

9     expecting an open book at some point and earlier rather

10    than later.  That's all.

11         MR. HARTMAN:  As soon as possible.

12         MR. SOFER:  In the same regard for the El-Hindi

13    team, at least, we noticed that of their 16 witnesses, five

14    of them, I believe -- could be off by one -- are government

15    witnesses that they're seeking to recall.  As we've debated

16    this, again, I don't pretend to debate this issue in a

17    vacuum either, I've stated for The Court, the government

18    does not disagree with a concept that a defense team can

19    recall a government witness, but the fact that five, that's

20    more than a third of the witnesses that we call -- or

21    approximately a third of the witness we call, are on the

22    defense witness list, I think supports at least my concern

23    at what we're going to do here is relitigate a whole bunch

24    of things and recross people who have already been -- who

25    have already testified.  So in the same vein, Your Honor,

1  much as the government was asked to do, we would just ask

2  for some kind of offer of proof here so that we can frame

3  out these issues.  We don't inconvenience people either,

4  have them fly back or drive all the way here simply to sit

5  for a debate about whether or not they can or should

6  testify.

7        And again, what -- what I object to in this time

8  line is, sure things change during a trial, but they --

9  it's been two-plus years here, Judge.  I have a very

10  difficult time accepting the notion that we can't at least

11  get to these big issues without -- and clear the defense's

12  whole play cards tight to their vest, which they're

13  entitled to do.  I think what we're going to end up buying

14  is a giant delay and that's what we're hoping to avoid

15  particularly because if it turns out that the defense

16  recalls a third of the Government's witnesses in this case,

17  and The Court allows that, and it's going to -- it's going

18  to require then the government's rebuttal case to be much

19  longer.  And we don't think that's the right way of doing

20  it.

21        We think we've talked about it a lot.  The

22  government just doesn't -- yes, Your Honor has the power,

23  certainly, under the rules to control how evidence is

24  brought out, order of witnesses, et cetera, but the way

25  that is shaping up, I think, rather than being more

 1  efficient and less confusing and less than a waste of time,

 2  we are headed down a road which we have great concerns

 3  about.  Again, I don't want to debate this now, litigate it

 4  now, we're just asking, show us, show us something of what

 5  you have so at least we can articulate our objections if we

 6  have any about it.

 7         MR. HARTMAN:  I guess my first response with --

 8  to that would be that the objections that the government

 9  made to the things that we did during cross-examination

10  were, this is more appropriate for the case in chief,

11  Judge, you can't let them do this during cross.

12         THE COURT:  Well, I -- I plan on Friday to do as

13  is my custom, to ask you as of Tuesday, who your witnesses

14  will be and what do you expect them to testify about.  And

15  on Tuesday, I will ask you the same about Wednesday at the

16  close of business.  And I will expect you to be, you know,

17  we're going to play these clips and these are the general

18  areas of inquiry, and these are the exhibits I intend to

19  offer or have the witness testify about.  And I assume that

20  that will give Mr. Sofer a somewhat, well, not a fully

21  three-dimensional topographical map, it will be a lot more

22  than he has now and enough to raise --

23         MR. HARTMAN:  I can tell The Court right now that

24  some of the government witnesses who can testify because

25  they reviewed those recordings, will be reviewing clips

1   that weren't played during the government's case in chief,

2   that the government objected to us playing on cross because

3   it was too much, and so that's some of what we'll do with

4   some of those witnesses is, we'll --

5            THE COURT:  We'll wait and see.  It doesn't make

6   much sense to keep talking about this now because nobody

7   knows what we're talking about, including yourself.

8            MR. HARTMAN:  Heck, I might squat, Judge.

9            THE COURT:  Okay, Steve.

10           MR. SOFER:  Lastly -- I'm sorry, Judge.

11           THE COURT:  No, go ahead.  No, you go.  Let's get

12  the last out of you.  It's a step in the right direction.

13           MR. SOFER:  I think you're trying to say I have a

14  difficult problem closing my mouth.

15           THE COURT:  Not at all.  I just simply have

16  whatever's on your mind now so we can go --

17           MR. SOFER:  You don't want to hear everything

18  that's on my mind, Judge, that much I can assure you.

19           The last sort of piece of this is simply other

20  discovery matters, which include reciprocal Jencks

21  materials and those materials which are to be provided

22  under Rule 16(b(A),  which includes physical or other

23  evidence which the defense contends to introduce.  We have

24  received some of these materials from the El-Hindi team,

25  just a few in terms of books and binders.  We received

1   nothing else, as far as I'm aware of, from any counsel for

2   any defendant, and we're requesting those materials

3   formerly now, Judge.

4           THE COURT:  Okay.  Let's start in the back of the

5   room and work forward.  Do you have any evidence that you

6   plan to offer, physical or tangible evidence or exhibits

7   that you plan to or that are not already into evidence?

8           MR. HELMICK:  Not at this time, Your Honor.  If

9   that changes, it's only because just -- we try to get some

10  telephone records, and what we said was not -- what we got

11  is not what we asked for, so there's always a chance that

12  that could arise.  Right now, I have nothing that we would

13  offer to provide to the government.  If that changes, I'll

14  let them know immediately.

15          THE COURT:  Okay.

16          MR. HARTMAN:  We did give the government some

17  materials, and we also brought -- they came over to our

18  office to look over all the evidence, and we copied it for

19  them, everything that they wanted copies, I believe.  If

20  you guys think there's nothing else that --

21          MR. SOFER:  That is accurate.  We're just, again,

22  trying to narrow -- likewise, the government had provided a

23  long time ago --

24          MR. HARTMAN:  Right.

25          MR. SOFER:  -- access to all of our evidence, but

1    before trial we had to create an exhibit book.  That's

2    essentially what we're saying now is tell us what of that

3    giant pile you actually seek to produce.

4         MR. HARTMAN:  If there's anything we're going to

5    introduce on Friday -- which I don't know if there is --

6    we'll try to get that done by tonight, tomorrow morning at

7    the latest.  And then the rest of it over the weekend.

8         THE COURT:  Okay.

9         MS. CLEARY:  Judge, we would hope to be able to

10   get the exhibits electronically to the government Friday,

11   no later than Saturday evening.

12        THE COURT:  And Mr. Ivey, you stood up, and we

13   shoved you back down.

14        MR. IVEY:  My colleagues, they persuaded me that

15   I should first discuss my issue with the El-Hindi team, and

16   if it's necessary, I'll bring it to The Court's attention

17   in the morning.

18        THE COURT:  Okey dokey.  Hearing no objection to

19   the --

20        MR. HARTMAN:  Actually, Judge, there's one issue

21   that I need to correct for the record.  On April 29th

22   Mr. Boss played a recording.  It was 1D81 and 66747.  He

23   referenced that as being from July 14th of 2004, and I

24   believe it was actually from July 15th of 2004.  He just

25   had the date wrong, and I wanted to correct the record.

1          MR. SOFER:  We don't object to a correction of

2     the record, Judge.

3          One -- one last thing of scheduling is the

4     whatever -- I assume there will be a Rule 29 motion, and we

5     also saw just today the Masloum team filed another motion

6     to dismiss the case notice based on Rule 29, I believe.

7     We'd like on some guidance from Your Honor about A, when

8     you want us to be prepared to do that, given the way things

9     are progressing, and B, how -- how detailed a -- a

10    presentation you want from both sides in this regard?  I

11    know different judges do this different ways, and we just

12    don't -- I don't want to prepare three hours of talking if

13    it turns out Your Honor wants to hear 10 minutes.

14         THE COURT:  I greatly -- prefer it greatly your

15    streamlined version.  What I would suggest, quite candidly,

16    I rarely take argument on it, and most commonly, I simply

17    note it and take it under advisement, unless I am persuaded

18    really without any question that dismissal is appropriate.

19    And in 14 years I don't think I've been so persuaded.

20    Seriously, at the close of the Government's case and at

21    this basis, quite candidly, that the point what I've seen,

22    and I doubt whether I'd be inclined to do that for the

23    first time.  I tried to listen quite carefully and take

24    note of what's been going on and make notes and pay

25    attention, and so I would expect that the presentations

1  will be primarily for the record and that doesn't take a

2  whole lot to make that.

3          I will say, however, that also it will be

4  inappropriate for me to say, counsel -- say Rule 29 motion

5  and sit down.  If you really think there's something that,

6  hey, Judge, they didn't prove this element.  There is no

7  evidence.  This is the element of this charge, and it is

8  nowhere in the record.  And if I turn to you guys and say,

9  oh yeah, where is it.  But it's pretty bare bones.

10          And certainly, given the length of the trial and

11  the length yet to come, I'm very unlikely to say we're

12  going to spend tomorrow from 10:00 in the morning until

13  5:00 in the afternoon on Rule 29.  It would be more like

14  from 10:00 to 10:15.  That's my custom and that's my

15  practice.

16          At the conclusion of whatever, I'm likely to say,

17  counsel, take it under advisement.  Call your first

18  witness.  Okay.

19          Anything else?

20          MR. SOFER:  No, Judge.

21          MR. HARTMAN:  No, Your Honor.

22          THE COURT:  Okay.  You guys are ready to go

23  tomorrow?

24          MR. HELMICK:  Correct, Your Honor.  We'll do

25  opening statement first, and then just three or four

```
 1   witnesses.
 2            THE COURT:  Okay.  And do they know who the
 3   witnesses are likely to be?
 4            MR. HELMICK:  Absolutely.
 5            MR. SOFER:  And I will note for the record the
 6   Masloum team did provide us with the very basic information
 7   about their local witnesses as well.  We make that same
 8   request, not just for the foreign witnesses, but for the
 9   local witnesses, at least we have a date of birth and a
10   location.  We can determine whether these individuals have
11   a criminal history.
12            THE COURT:  You can find the FBI number on your
13   own?
14            MR. SOFER:  We can figure it out from there,
15   Judge.
16            THE COURT:  For Amawi?
17            MR. BRYAN:  We're set, Your Honor.
18            THE COURT:  Okay.  Fine.  I'll see you guys in
19   the morning.
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    s:/ Angela D. Nixon

7    --------------------------              -----------

8    Angela D. Nixon, RPR, CRR              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **I N D E X**

2

3   <u>**WITNESS**</u>                              <u>**PAGE**</u>

4   Evan Kohlmann                          5610

5   (Direct Examination)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25