1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF OHIO
2                 WESTERN DIVISION

3   UNITED STATES OF AMERICA,    )  Docket No. 3:06-CR-719

4          Plaintiffs,           )  Toledo, Ohio

5              v.                 )  April 28, 2008

6   MOHAMMED AMAWI, ET AL.,      )

7          Defendants.           )

8   ------------------------------

9          TRANSCRIPT OF JURY TRIAL, VOLUME 38
           BEFORE THE HONORABLE JAMES G. CARR
10             UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13  For the Plaintiffs:    Gregg N. Sofer
                          David I. Miller
14                        Jerome J. Teresinski
                          U.S. Department of Justice
15                        10th & Constitution Avenue, NW
                          Washington, DC 20530
16                        (202) 353-3464

17                        Thomas E. Getz
                          Justin E. Herdman
18                        Office of the U.S. Attorney
                          801 Superior Avenue, W
19                        Cleveland, Ohio 44113
                          (216) 622-3840
20
    For the Defendant     Timothy Ivey
21  Amawi:                Edward Bryan
                          Amy Cleary
22                        Jonathan Whitmer-Rich
                          Office of the Federal Public Defender
23                        750 Skylight Office Tower
                          1660 West Second Street
24                        Cleveland, Ohio 44113
                                     (216) 522-4856
25

```
 1                             Elias Muawad
                               Muawad & Muawad
 2                             Suite 209
                               36700 Woodward Avenue
 3                             Bloomfield Hills, Michigan 48304
                               (248) 594-4700
 4      For the Defendant
        El-Hindi:              Charles M. Boss
 5                             Boss & Vitou
                               111 West Dudley Street
 6                             Maumee, Ohio 43537
                               (419) 893-5555
 7
                               Stephen D. Hartman
 8                             Kerger & Kerger
                               Suite 201
 9                             33 South Michigan Street
                               Toledo, Ohio 43602
10                             (419) 255-5990

11                             Alek H. El-Kamhawy
                               Raslan, El-Kamhway & Pla
12                             Suite 3FE
                               1700 East 13 Street
13                             Cleveland, Ohio 44114
                               (216) 928-1500
14
        For the Defendant      David L. Doughten
15      Mazloum:               4403 St. Clair Avenue
                               Cleveland, Ohio 44103-1125
16                             (216) 361-1112

17                             Jeffrey J. Helmick
                               Helmick & Hoolahan
18                             2nd floor
                               1119 Adams Street
19                             Toledo, Ohio 43624-1508
                               (419) 243-3800
20

21                             Mohammed Abdrabboh
                               1620 Ford Avenue
22                             Wyandotte, MIchigan 48192
                               (734) 283-7000
23

24
        Court Reporter:        Angela D. Nixon, RPR, CRR
25                             1716 Spielbusch Avenue
                               Toledo, Ohio 43624
```

1                    (419) 260-5259

2

3    Proceedings recorded by mechanical stenography, transcript

4    produced by notereading.

1          THE COURT:  Okay.  We can just speak loudly until

2   we can get some microphones.

3          But where are we on the stipulations/definitions?

4          MR. TERESINSKI:  Your Honor, we've given defense

5   counsel and Your Honor a copy of what we had worked out in

6   Washington.  And if we can give them the chance to look at

7   that, there's some minor modifications, I don't think

8   they're that big, I really don't.  So I guess we'll have a

9   chance to talk about that after they've had a chance to

10  digest that.  But I think we're on the right track, at

11  least I don't think we're that far off.

12         THE COURT:  Good.  Okay.  Well, perhaps tomorrow

13  morning, if you'll let me know, communicate with each other

14  and --

15         MR. TERESINSKI:  I can speak to a representative

16  or member of each defendant, so if it's you, John, is it?

17         MR. HARTMAN:  Probably if -- we'll just go with

18  those guys.

19         MR. TERESINSKI:  I'll talk to Jeff.  I'll check

20  with Jeff and Jonathan Whitmer-Rich.

21         THE COURT:  Good.  Okay.  The next matter I

22  gather would be on transcripts and all that.

23         MR. SOFER:  Yes, Judge, we spent a wonderful four

24  plus hours with the El-Hindi team on Sunday, like watching

25  a football game -- losing, that's as much joy as I got out

1    of it.  Nevertheless, I think it may -- oh -- I'll let

2    counsel correct me if I'm wrong -- significant progress in

3    framing out of the issues.  We can do this however The

4    Court wants.  We basically -- we basically went through --

5    there are now 20 transcripts/audio/videos that counsel has

6    an interest in using for cross-examination.

7            The government has -- counsel outlined the

8    reasons that they were interested in using these, and the

9    government explained its reasons and objections for either

10   limiting its use or barring its use or not.  There were

11   occasions when I think we were in all agreement.

12           Basically, Judge, this continues to be the same

13   issues.  These are concrete examples -- we can go through

14   each of them if you'd like -- they tend to be repetitive in

15   the sense that the issues are similar.

16           THE COURT:  Okay.

17           MR. SOFER:  But just to outline problems, to the

18   extent that there are problems, the government's position

19   remains that while playing the audio and/or video may be

20   appropriate in some cases, it sort of depends what the --

21   for lack of a better word, predicate questions are of the

22   witness.  If the witness is asked questions relating to

23   these transcripts, and either denies or doesn't recall

24   things, then another step can be taken.  It's -- it

25   should -- our position is, it should be no different than

1    cross examining a witness with a document or any other kind

2    of evidence.  And counsel, for the most part, agrees with

3    that.

4         We did find two -- there are two instances of

5    videos that counsel wants to play.  One of the videos, the

6    government did not play on its direct take, but was

7    planning on playing at a future time and I'm --

8         THE COURT:  You mean in the direct examination of

9    Griffin?

10        MR. SOFER:  That's what I meant, I'm sorry, I --

11   Judge -- and might well have played it in our redirect of

12   Mr. Griffin or at some future time in the case.  I am

13   perfectly happy to have it played now, so long as counsel

14   doesn't argue to the jury that we were trying to hide it or

15   something.  And --

16        THE COURT:  Alternatively, unless there's

17   strenuous objection, if you would feel a tad more

18   comfortable starting off things tomorrow by saying, ladies

19   and gentlemen, The Court -- play video -- to play another

20   video for Mr. Griffin, that's up to you guys.

21        MR. SOFER:  I think we've worked this out, I'm

22   not sure, but a logistical problem.  Logistical problem,

23   not surprisingly, the government and the defense is blocked

24   off different portions of this video.

25        My objection, my second broad objection is this

 1   notion of completeness.  I think if we're going to say

 2   certain things have to be complete for the defense, then

 3   they also have to be complete for the government.  And

 4   so -- and this one's a good example where defense wants to

 5   play little pieces.  I want them to play our pieces, too,

 6   to put the whole thing in sort of context.

 7          What we're doing now is trying to figure out

 8   whether we can play their pieces and then our pieces, the

 9   way we did with the Amawi people one instance or whether

10   sometimes our pieces might overlap with their pieces, which

11   would not be unusual.  So we're in the midst of doing that

12   now.

13          We sent to the defense our pieces that I've seen

14   theirs.  One way or another, we're going to try to play

15   most of -- of, I think, our agreement.  And again, this was

16   subject to counsel's objections, but I think what we worked

17   out yesterday is we're going to play most of this video for

18   the jury.  It's a video which audio has already been

19   introduced.  It's the audio of the February 16th meeting

20   inside Marwan El-Hindi's home.  The other video that falls

21   into a similar category.

22          THE COURT:  This is a Griffin video?

23          MR. SOFER:  Yes, Judge.  And that's all we're

24   talking about here.  We haven't even talked at all about

25   any videos or other matters not related to the transcripts

```
 1    that we have.

 2            The other video is a video that was played -- a

 3    video that was already played for the jury, and I think

 4    we've also said we'd be willing to let that play again.

 5    The first video I described from February 16th is 76

 6    minutes long.  I don't know that when you add our pieces

 7    plus the defense pieces, you're going to get all 76

 8    minutes.  I'm hopeful that you won't be because some of

 9    them will probably -- both sets of counsel.

10            Anyway, so for those two pieces of evidence, I

11    don't think we have an objection or problem playing what

12    amounts to a large chunk of -- of a recording.  One of

13    which is in evidence, the other one I think we'll have a

14    stipulation that should go into evidence.  And as I said,

15    the government -- planned on putting this into evidence at

16    a later time.

17            So that leads us, then, to the specific example,

18    Judge, and I think as with everything, it's a lot clearer

19    when you actually see this stuff.  And I don't know that

20    all the other counsel have to be that -- here for that.

21            We have a little logistical issue of our own

22    team.  Justin Herdman has been -- has a matter that he has

23    to take -- had to take care of in Cleveland, and I believe

24    he's in route as we speak.  I don't know exactly what time

25    he hopes to get here, but before we discuss Evan Kohlmann,
```

1    I'd like to give him an opportunity to be here.  If it's an

2    emergency, I can handle it.

3              THE COURT:  No problem at all.

4              MR. SOFER:  And we're, as I said on Friday, the

5    government is keenly interested on getting a decision from

6    The Court on the expert witness portion of the case just so

7    we can plan to go forward.  Obviously, that's linked to

8    some extent with the stipulations, and we recognize that.

9    And so I understand that could make things a little bit

10   more complicated, but I think our position remains with

11   respect to some of the experts, at least that some of the

12   things we've discussed -- and I don't remember, I don't

13   think we finished on Friday a discussion of the second

14   Amawi expert.  I could be wrong about that.  But my

15   understanding was we hadn't quite finished that discussion.

16   I'd like to have Mr. Herdman here for that also if

17   possible.

18             THE COURT:  No problem.

19             MR. SOFER:  It won't take us four hours to go

20   through this.  We know what the arguments are.  It's up to

21   Your Honor how you want to proceed.

22             THE COURT:  Well, I don't have the transcripts

23   with me.  I can get them here in three minutes or five

24   minutes.  They're down in the car.  Do you think I need

25   them or not?

1        MR. SOFER:  I don't even really know that that's

2   necessary.  I think for the most part between government

3   and counsel, we'd be able to put things up on the ELMO, if

4   we can turn that on.

5        Let me make this clear, Judge.  I don't know that

6   this is really -- I think we found that there was a lot of

7   agreement when we actually sat down.  And we probably

8   should have started with that on the notion of what I

9   described before, which is, we have no objection to

10  questions being asked of Mr. Griffin.  Vigorous

11  cross-examination, obviously, is something the defense is

12  going to be entitled to.  And we have no objection to using

13  transcripts to cross-examine Mr. Griffin.  And asking him

14  questions didn't this happen, didn't this happen, didn't

15  you say this, wasn't this -- didn't this take place this

16  way, and then using the transcripts, possibly, to impeach

17  him or refresh his recollection, that is the -- I think,

18  the preferred mechanism of doing this.

19       The problem the government has is in the outright

20  playing of these things.  I don't think counsel plans to do

21  any more other than the ones we discussed.  And I have some

22  issues about, on occasion, when the defense has identified

23  portions we have completeness problems with this now, and I

24  also have issues occasionally, but not very much, with the

25  defense essentially not using this really for cross.  What

1    they're really trying to do is get another point across.

2    And I don't believe that they can do that in this matter

3    through this witness.  There are other ways of doing it.

4    We can debate that when we get there, I think.

5           But, you know, for instance, there are just times

6    when essentially what the defense are trying to do, put in

7    here, say, to support some other kind of argument.  And

8    again, the government will object strenuously to recalling

9    Mr. Griffin in the middle of the defense case.  I don't

10   think that's appropriate either.  So I'm not suggesting

11   that they should get another crack at him later on.  That

12   would be highly inappropriate.  But there are other ways of

13   them introducing transcripts, and we might stipulate to the

14   introduction of certain transcripts, if The Court were to

15   find that they were admissible for some purpose.

16          What we basically did -- and I credit counsel for

17   going through this with us -- at least they told us why

18   they wanted to put it in.  We told them why it is we

19   thought they couldn't, where those issues existed.  But I

20   think counsel has said about half, and I think it's

21   probably about right.  If they're willing to go through the

22   rules of evidence in the way that they're using them, at

23   least with half of these, we have zero issue on that.

24          MR. HARTMAN:  I think that's accurate.  I think

25   the issues that will come up are more along the lines of

1    the -- the hearsay issues and things like that are the ones

2    that we want to play.  I think the government will have --

3    we worked most of it out and said, look at a certain clip,

4    and we said, okay, what we'll do is we'll ask him X, Y, and

5    Z, and if he says, yes, we made our point, then we put this

6    aside.  And if he says, no, we'll use the transcript.  And

7    some of the times we said we want to play the clip, and

8    some of those have been put in -- some of those are in

9    evidence already.

10          THE COURT:  Are you all telling me -- excuse

11   me -- that maybe the easier, if not the only way, to do

12   this is just wait?

13          MR. HARTMAN:  I don't know if they all are, but I

14   think I am.

15          THE COURT:  I don't really care one way or the

16   other.  Whatever's going to reduce the time spent waiting

17   for the jury sitting around chatting in the box while we're

18   chatting in the corner.

19          MR. SOFER:  If you want to reduce that time, then

20   we should go through these one by one, Judge.  I don't

21   think it's going to be if -- you know, but I think if it

22   turns out we don't have problems with half of them, we're

23   talking about ten of these transcripts for Your Honor to

24   look at --

25          THE COURT:  Okay, we'll take a look at --

```
 1              MR. SOFER:  -- and try to resolve the issues or

 2   at least be in a position to know what we're talking about

 3   so we don't have to, for the first time, do this at

 4   sidebar.

 5              THE COURT:  I agree.  I may not be able to rule.

 6   Now, of those ten or so, can you cluster them in into types

 7   or should we start with number one and go through them?

 8   Whatever is easier, okay.  That's the benchmark.

 9              MR. SOFER:  For us, Judge, I have the same pile

10   we had yesterday with counsel.  I'm happy to go through

11   them they're in chronological order; that's the best way to

12   do it.

13              THE COURT:  Okay.

14              MR. SOFER:  And again, maybe that as we go

15   through these we'll come to more agreement, I don't know.

16   But we're prepared to go forward now.

17              THE COURT:  Okay.

18              Mr. Hartman, what about yourself?

19              MR. HARTMAN:  If that's what The Court wants to

20   do, that's fine.

21              THE COURT:  So at least I know what's going on,

22   sort of.  Why don't you tell me where we are, what it is,

23   and what the problem is.

24              MR. SOFER:  Just so we're clear what we're

25   talking about, I don't have the government exhibit numbers,
```

1    but this is from January 28th, 2004, 1D62.

2              It's a little blurry.  Unfortunately I didn't

3    choose this, Your Honor, but the defense picked blue and we

4    picked --

5              THE COURT:  That's better.

6              MR. SOFER:  -- and we have red, so it's sort of

7    psychodelic at some point.  So here just -- Your Honor, is

8    an example of what the defense is seeking to use, and I'll

9    proffer instead -- it's up to you, counsel, what you want

10   to say, but I'll proffer why I believe counsel wants to use

11   this.

12             THE COURT:  Why don't I ask them?  What's your --

13   why don't you tell me what your objection is?

14             MR. SOFER:  I have no objection to this being

15   used to cross-examine the defendant.  Meaning -- I mean,

16   I'm sorry -- Mr. Griffin -- if it turns out that

17   Mr. Griffin doesn't recall this event because, after all,

18   it happened on January 28th of 2004, then I believe that

19   counsel can show this particular transcript to the witness.

20   If he doesn't -- that is, if he doesn't remember, he denies

21   making.

22             Now, frankly, Judge, this conversation takes

23   place five months -- five months before the charges in this

24   case are alleged to have begun.  And so I think I told

25   counsel also, to the extent that there is a large volume of

 1   material prior to the crime being committed here, I think

 2   that would be inappropriate.  But given what counsel has

 3   said about the reason I think that they're putting this in,

 4   we don't have a problem with them cross-examining the

 5   witness with this one.

 6          Now, playing it is another matter.  That we would

 7   object to.

 8          THE COURT:  Okay.

 9          MR. SOFER:  But I think we've agreed that that's

10   not what counsel plans.

11          THE COURT:  Cindy, is there anything we can do to

12   make this a little more visible?

13          MR. SOFER:  Anyway, I don't think we have a

14   problem with this; is that right, counsel?

15          MR. HARTMAN:  I don't think we have a problem.  I

16   mean, as to the -- as to playing things before the charges,

17   I think that door was opened by Mr. Getz in his opening

18   statement.  And number two, if it's material to our

19   defense, I think we can do it anyway.

20          So whether it's five months before the official

21   conspiracy was supposed to have started, I don't think

22   matters, but, yeah, I agree.  We're going to ask him and --

23   and if we don't -- I mean, we're going to ask him a lot of

24   things about what he said and did with our client at

25   certain times and certain dates, and if he tells the truth,

 1    then there's no reason to use any of this.

 2              THE COURT:  Okay.

 3              MR. HARTMAN:  And if he doesn't, then we'll say

 4    look at this.

 5              THE COURT:  And what is the purpose for which you

 6    will be asking him those things?

 7              MR. HARTMAN:  To impeach him and to show his

 8    methods of operating with our client.

 9              MR. SOFER:  And Judge, I guess on a broad

10    scale -- I've used this analogy, I think, before -- but if

11    there are particular methods that are being used, that's --

12    we're back to this sort of Dr. Shy stuff about how people

13    do things without even knowing it, and I don't really know

14    that that is appropriate.

15              THE COURT:  Well, I -- I don't have a problem

16    with him developing factual predicate.  I have continuing

17    problems and actually spent a good part of the weekend in

18    trying to look, too, and I ran out of time to tend to the

19    Kohlmann stuff, so I'll need a sort of primer when

20    Mr. Herdman shows up with that.  Depending upon how you

21    frame your questions and predicate, I don't know how to do

22    it, okay.  So whatever example I give is sort of

23    blindfolded in the dark.

24              MR. HARTMAN:  Well, I can --

25              THE COURT:  Have you tried to, Mr. --

1   Mr. Griffin, you would interject subjects to training or

2   similar subjects into the conversation?

3          MR. HARTMAN:  That's a good example.

4          THE COURT:  Yeah.  And you would do so during

5   many, if not most of the conversations that you had with

6   whomever, yes.

7          And about -- and in that case, I think we kind of

8   shut -- approximately how many conversations, with what

9   sort of frequency, how often do you recall doing that?  Do

10  you recall doing that on month, day, whatever, talking to

11  Mr. El-Hindi?  No, I don't.

12         I show you what's been marked government exhibit,

13  whatever, transcript pages from here to there, and I'll ask

14  you to read to yourself.  And on reading that, do you now

15  recall that you were asked -- you -- Mr. El-Hindi, in a

16  couple sentences here, there, and move on down the road.

17         I think that's the most you can do.

18         MR. SOFER:  And Judge --

19         THE COURT:  Or even that might be unacceptable to

20  Mr. Sofer.

21         MR. SOFER:  No, I accept that.  And I -- I think

22  that is a perfectly appropriate way of cross-examining a

23  witness.

24         Again, I think we've worked this out.  This one's

25  a good example, though, Judge, because this is the outer

1   edge of that concept.  This is a conversation that takes

2   place -- that's the outer edge of this concept.  This

3   conversation takes place five months before the charges in

4   this case.

5          I assume what counsel will say that for five

6   months, maybe a year, two years, Mr. Griffin was sort of

7   working this defendant towards this conspiracy, maybe

8   that's their argument, which is why I have not objected

9   specifically perhaps to this one.  This one, also, the word

10  "recruiting" is used, so I think we've talked about this.

11  Counsel does not hide the ball.  Counsel wants to say that

12  they talked about recruiting in other -- in other contexts,

13  some of them innocent contexts, which I would probably

14  stipulate under the circumstances, this one probably is.

15  I'm not stipulating, I'm just saying I probably would

16  stipulate.

17         The question is, at what point does become -- and

18  I use this analogy with counsel yesterday -- when ten

19  mobsters are sitting around the table and they are having a

20  four-hour-long conversation about the food that they were

21  going to eat, and then there's four minutes of conversation

22  about killing somebody for the sake of the conspiracy, I

23  think it is objectionable, and this may be.

24         THE COURT:  To spend a whole lot of time on the

25  meat balances.

1           MR. SOFER:  Indeed, the meat balances are fluff.

2   In this case, there's more bread than meat.

3           THE COURT:  But it seems to me that so far, much

4   of your exam -- frequently, in your examination and thus

5   far on cross-examination, Mr. Griffin would carry various

6   thrusts, or in your case, sort of elaborate or explain what

7   he's doing as quote "information gathering."  And he would

8   be asked, yes, I was gathering information.

9           And it seems to me -- and tell me if this is what

10  you're about or not -- but one of the things, for example,

11  with a piece like this.  I misunderstood this.  I thought

12  they were talking about something to do with what brings us

13  here, but apparently not.  But it seems to me that it is

14  appropriate to ask Mr. Griffin, you say you were, quote,

15  gathering information, what do you mean by gathering

16  information?

17          And that may be a risky question on cross, I

18  don't know.  I'm glad I sit up here, okay.  The mistakes I

19  make, I find about two years later from Cincinnati.

20          And you know, tells you and -- and was the,

21  quote, gathering information to talk about recruitment, to

22  talk about shooting, I mean, just -- and then, Mr. Griffin,

23  do you recall talking about this subject or that, was that,

24  quote, gathering information?

25          I honestly think I'm being entirely open with

1  this.  He quite clearly is trying to define or cabin what

2  he was about in a way that was such -- he was out there,

3  ears open, paying attention, finding out what's going on.

4  And of course, in the defense prospective, he's out there

5  not tossing just folks, but nets into the water, and I have

6  no idea if that's what you're about or not.

7          You help me.  It's your cross-examination that

8  we're trying to have me, in effect, permit the more

9  expansive, Mr. Sofer, and I agree that I don't think you

10  can -- clearly, you can't put your case in, but --

11          MR. SOFER:  But before we --

12          THE COURT:  The other thing is, this is outside

13  the scope of direct examination.

14          MR. SOFER:  But again, I don't want to -- I don't

15  want to undermine what we did yesterday.  I am agreeing

16  that this is, under the circumstances, given the connection

17  here, that is the concept of recruiting which is -- which

18  is something that the government has alleged that this

19  defendant did, in fact, recruit two individuals.  Now, they

20  didn't come from this --

21          THE COURT:  -- conversation.

22          MR. SOFER:  -- this conversation.  The government

23  has not alleged that.  The government's also put

24  Mr. Griffin on the stand and elicited from him that he

25  engaged in other business activities with Mr. El-Hindi.  Is

1  some of them, you know, I don't want to call it

2  necessarily, I don't know, legitimate, but they certainly

3  weren't necessarily terrorism related either.

4       And then, again, I think Mr. Griffin has

5  testified contrary to what, Your Honor -- I think where you

6  were headed, that he did spend time with these defendants

7  and in some -- and did other things with them as part of,

8  you don't walk -- as he said, you don't walk in and say,

9  hi, I'm with the FBI, I'm collecting information on you.

10  You have to build some sort of relationship.  An undercover

11  police officer or civilian does.  I don't think we have to

12  talk about -- I'm using this as an example because I think

13  it begins -- it's not so much an issue for the

14  cross-examination per se.  This is the outside limit of

15  what I was willing to go ad hoc with.

16       THE COURT:  Okay, I misunderstood.

17       MR. SOFER:  And under the circumstances, again,

18  it's five months prior to the charges.  I'm just trying to

19  orient, Your Honor, where I think we are.  What I'm saying

20  is, to the extent that the cross-examination goes beyond

21  this kind of thing or it ends up using a more voluminous

22  examples of this kind of thing, the government would object

23  under the theory that at some point, this does become the

24  meatball analogy where we have moved beyond showing what

25  Mr. Griffin might be doing to try to show what Mr. El-Hindi

1    was thinking when he wasn't thinking about the charges in

2    this case, and that's not -- that's not relevant.  We are

3    going to get to some of those examples, which is why I am

4    raising this issue.  Nevertheless --

5              THE COURT:  Yeah, I would agree that that --

6              MR. SOFER:  -- nevertheless, we've already talked

7    about this, and I already told counsel, go ahead, have at

8    him, and we'll --

9              THE COURT:  So when do we get to the ones that

10   you are disagreeing with?

11             MR. SOFER:  We're going.  I promise it won't be

12   this long.  I think it's important The Court understand

13   where we are in the big picture so we can go through the --

14   second one.  The defense, as I understand it, wants to use

15   three clips -- also outside the time frame of the

16   conspiracy -- and they relate to -- I'll put it up on

17   the ELMO here.  Here's one and -- and the government's

18   also --

19             THE COURT:  Just what day?

20             MR. SOFER:  This is from February 3rd, 2004.

21   It's 1D63.  Again -- and this goes for, I think, all three

22   of these, but I'd have to look.  Again, I have no problem

23   so long as we're in agreement that this is going to be done

24   via the rules of evidence we've discussed.  If, on the

25   other hand -- for this and a number of others like it -- if

```
 1    what counsel's going to do ultimately is try to play this

 2    for the witness or the jury, then I have a problem with the

 3    rule of completeness, because, basically, if you look, you

 4    can see that they've taken two lines out of something that,

 5    you know, obviously is very long.  If it's -- and I think

 6    that's an unfair position to put the witness in.

 7            Likewise, if they're going to cross-examine him,

 8    I'd ask that they be asked to show him at least a little

 9    bit of text before and a little bit of text afterwards, if

10    they're going to show him a transcript, so he knows what

11    they're talking about.  He can't just take these segments

12    out.

13            MR. HARTMAN:  And we don't intend to play the

14    vast majority of these unless Griffin flat out lies about

15    what happens after we show him the transcript.

16            THE COURT:  So then what's the problem here?

17            MR. HARTMAN:  I don't have one.  I don't mean to

18    be flip, but I agree with what Mr. Sofer is saying.

19            THE COURT:  Time out.  Time out.  You presently

20    anticipate, to the extent that you can, you'll ask

21    Mr. Griffin, on occasion, you talked about, quote, business

22    plans with Mr. El-Hindi; is that correct?  Yeah.  And do

23    you recall doing so on February 4th -- whatever that date

24    was -- 2004?  I don't know, maybe.  May I show you, dah,

25    dah, dah, read it to yourself.  I ask you again, now do you
```

1    recall having talked about business plans?  Yes.  You read

2    line X to Y.  Sure, that's --

3            MR. HARTMAN:  Let me show The Court an example

4    you were just talking about.  This is from that date, too,

5    and this is talking about -- they're talking about a

6    business idea to get a building, do a halfway house, get

7    grants for that, yeah, we can fill that place, and then --

8    and then Griffin interjects, so let's go back to your

9    recruiting with him.

10           And that's an example, we believe, of Griffin

11   injecting the concept of recruiting.  And we'll ask him did

12   you do that on the regular basis?  We have a -- we have a

13   chart we don't intend to use with him, but we may try to

14   use in closing.  There are 15 to 18 different definitions

15   of training in conversations between Griffin and El-Hindi.

16   We're going to ask him about the fact that sometimes when

17   they spoke training, they were actually talking about

18   El-Hindi's children playing soccer.  They were talking

19   about all sorts of different things when they use the word

20   "training."

21           THE COURT:  How do you propose to get that chart

22   in if you don't get Griffin on the stand?

23           MR. HARTMAN:  If I don't get Griffin on the

24   stand?

25           THE COURT:  Mr. Sofer said that the government

1  objects to your recalling Griffin, but what -- why would

2  you -- I'm asking Mr. Sofer -- why couldn't -- and this is

3  a very good example, it seems to me, that -- that -- I

4  mean, I'm just trying to think, you've got a chart -- let's

5  say you've got a chart of 18 excerpts, training and

6  contacts, whatever, before you put the chart in, it seems

7  to me you've got to get a foundation laid somehow, and it

8  does seem to me that the only other speaker was

9  Mr. El-Hindi, and as he's absolutely entitled to do, he

10  elected not to take the stand.  It seems to me you've to

11  got to get -- got to recall Griffin to prove up those

12  excerpts and then to play them for the jury.  And I thought

13  I heard you ten minutes ago say that you would object to

14  them recalling Griffin to the stand.

15            MR. SOFER:  Absolutely, Judge.  Again, this is

16  not -- I don't think it's the government's problem, is the

17  way I would describe it in one sense.  The -- if they want

18  to put in transcripts, we're back to -- again, we're back

19  to this concept of what people understood.  And I thought

20  out of the pile of things that we have here is the

21  opportunity for the defense to ask Mr. Griffin, it's

22  exactly why I did not object to the recruiting one that I

23  just put up there.  If they want to ask him, didn't you

24  talk about recruiting in another context, I think he's

25  going to concede that.  I mean, I think, I think for the

1    most part, the tapes speak for themselves.

2         If, I mean, you have to -- again, you can't talk

3    about this in a vacuum.  If there are 18 different examples

4    of training and one of them took place a year before the

5    conspiracy, I don't think that 18th one comes in.  I mean,

6    so what.  There could be a -- again, if you take up the mob

7    case example, if people are sitting around talking about --

8    or in a drug case example, would probably be more

9    appropriate -- if I think -- and Your Honor may have

10   brought this up -- and you say I need 15 1/2 shirts, when

11   they're talking about a large quantity of cocaine, and it

12   turns out there's also a laundry business involved, then I

13   believe that this is the defense's opportunity to ask about

14   those definitions in terms that are relevant here, and I

15   don't object to that.  Again, as long as it's done --

16         THE COURT:  I mean, I may, in all candor, be

17   ignorant of something really fundamental, but it's always

18   been my understanding that there's no such thing as a

19   government -- that a party doesn't own a witness.  And if

20   the party wants to call a witness called by the other

21   party -- taking the Fifth Amendment out -- let's say, you

22   know, that they're going to call whomever the guy is in

23   Cleland's, and they've subpoenaed the guy at Cleland's.

24   You have them.  You learn about the subpoena.  You figure

25   it out, you go out and talk to Mr. Cleland.  Alternatively,

1    they call a guy at Cleland's in -- that's imaginary on my

2    part -- they call in the case in defense, they subpoenaed

3    him.  I think you can stand up at the end of your

4    cross-examination and say Mr. Cleland, Judge, I want

5    Mr. Cleland instructed that he remains under subpoena.  On

6    rebuttal, call Mr. Cleland.  I don't think they can stand

7    up and say wait a minute, Judge, I'm sorry, I'm confused.

8            MR. SOFER:  I'm not suggesting, Your Honor, that

9    we own the witness in that sense and that somebody couldn't

10   call a government witness in the defense case.  I think the

11   orderly flow of trial usually dictates that to the extent

12   that during the cross-examination of a witness you can

13   accomplish what you would have during the direct

14   examination of a witness that formerly -- that's what's

15   done.  You don't, then, essentially, have all the

16   government witnesses come in and testify and then have them

17   all recalled in the defense case for a certain purposes.

18           I also think, Your Honor, that, again, let's take

19   the training definitions as an example.  When, for

20   instance, let's say there are five definitions of training

21   from 2001 to 2002, and then there are a bunch of

22   definitions of training that relate to the conspiracy and

23   then -- and the defense wants to say, well, you know, he

24   was confused or whatever, the witness is really

25   purposefully making this ambiguous so that there's not

1    an -- I just think --

2            THE COURT:  There's training at the range,

3    there's training Saturday morning at the soccer field.

4            MR. SOFER:  That's right.  The issue about what

5    the witness was trying to do, which is, I think, what

6    they're getting at here over and over again, it seems to be

7    what Dr. Shy conclusion was, among other things, and

8    certainly the basis among all his research and testimony in

9    a lot of other cases is that this shows -- Mr. Hartman has

10   said this -- this shows that -- that Griffin was trying to

11   do something.

12           Your Honor's example suggested on

13   cross-examination, it's Griffin trying to do so.  That

14   portion of his testimony, that portion of the argument by

15   defense is the proper subject of cross-examination, what

16   was Griffin trying to do.  I think I would assume that

17   you'd much rather cross him and direct him there anyway.

18           And all I'm saying, Judge, is simply that,

19   obviously, I don't know fully what the defense is, so I'm

20   not going to sit here -- and so there's no circumstance

21   under which Mr. Griffin could not be recalled.

22           I don't -- I think there are other avenues for

23   getting in the evidence that you're describing.  One of

24   them would be as easily as the government's stipulation to

25   say, look, that this conversation took place.  You're going

 1   to call Mr. Griffin to say that this conversation took

 2   place.  I don't -- I don't necessarily think that having

 3   him called in the defense case is the appropriate way of

 4   doing that.

 5           THE COURT:  I disagree because I think,

 6   certainly, with some frequency, counsel in a criminal case

 7   will say, Judge, come up to the bench, Judge -- during

 8   cross-examination -- like him much to go out outside the

 9   scope like the right to recall the witness.  Normally, it

10   would be considered okay, go ahead, but I disagree with

11   you, and maybe I'm missing something fundamental, but I

12   don't think there's anything that precludes or prohibits a

13   party that has cross-examined on a subject or set of

14   subjects from then, in a sense, using cross-examination

15   sort of as a predicate, saying, look, jurors, you are

16   using -- when you were talking about training in the

17   afternoon before you went to Cleland's, what were you

18   talking about training?  Talking about learning how to

19   shoot.  Fine.

20           MR. SOFER:  I'm sorry to interrupt, Your Honor,

21   but -- and I think this is -- I think the point I'm trying

22   to make is your -- what we're trying to -- part of the

23   conspiracy charge and part of what's happening is it's --

24   it's a definition and a term.  "Training" is a good term as

25   an example.  And you have two people, one of them -- and

```
 1    there's sort of a number of ways to figure out what they
 2    meant.  One is just a substance of what they said.  I don't
 3    disagree that the substance of what is being said could be
 4    brought out later perhaps through Mr. Griffin.  Every time
 5    I ask Mr. Griffin, though, what he meant by something, Your
 6    Honor objected sua sponte or granted the defense objection
 7    of a -- occasionally -- I say every time, I'm probably
 8    exaggerating -- a number of instances where I asked what
 9    you meant by that or more importantly, what did he -- what
10    did he mean when he said --
11              THE COURT:  Those I remember objecting to.
12              MR. SOFER:  I can go back through the record and
13    look for this, but I think properly what's dangerous here,
14    what I'm -- and this is why I object to what I think is
15    coming.  Now we're arguing about something that is in the
16    future.  I don't know that it's necessary to do that.  But
17    what I objected to is trying to use Mr. Griffin as a
18    surrogate for what it is that the defendant is doing.
19              THE COURT:  I agree completely.
20              MR. SOFER:  I think that's where -- that's --
21    maybe I may have not articulated it very well.  But that is
22    essentially my point, which is, when you call a government
23    witness to bring -- you can bring out the substance of that
24    conversation, but you can't -- you can't manipulate this in
25    a way that ultimately says that, well, when he says
```

1    training, he thinks something else.

2           THE COURT:  I agree with you --

3           MR. SOFER:  So --

4           THE COURT:  -- but you can create a predicate for

5    then arguing that at the very least, having used the word

6    "training" this way, that way, another way, before and

7    after the crucial set the conversation.  I think that they

8    can then argue that the reasonable inference, the way the

9    subject came up in this conversation, the reference is --

10    is a -- ladies and gentlemen -- and Mr. El-Hindi didn't

11    pick up on it.

12           What he understood, on the other hand, the

13    government has to prove beyond a reasonable doubt that

14    there was a meeting of the minds.  And that what they were

15    doing when they were talking about training, then, on the

16    afternoon before they went shooting or in a car or wherever

17    it was, they both knew what they were talking about and

18    were talking about inference.

19           So I don't recall saying -- you know, cutting you

20    off, maybe I did.  I won't take an oath on that.  But keep

21    in mind as well, that if that's where this winds up on

22    cross, it's very fair for you to say, Judge, you let

23    Mr. Hartman ask him that Saturday morning at the soccer

24    field, you were talking -- that Saturday morning at the

25    soccer field, you were talking about the training in the

1   context of Mr. El-Hindi's child learning to play soccer.

2   Well, I'll call your attention to the afternoon when they

3   went shooting, what were you talking about, and you refer

4   to training, talking about teaching him how to shoot.

5          MR. SOFER:  Understood, Your Honor.

6          THE COURT:  If I did say -- I can't recall that,

7   but I'll take your word for it.

8          MR. SOFER:  And I want to look at the record

9   before I state my point either, Judge.

10          THE COURT:  But again, I don't -- it seems to me

11   that, number one, the first example you show --

12   technically, when the judge, outside the scope of direct

13   examination, the next is to say -- this isn't completeness,

14   I'm not even sure it's impeachment, depends upon his

15   answer, but I think that it's -- Mr. Hartman or any counsel

16   want to allude to an issue -- when you were talking about

17   training here, you were talking about -- correct, yes, and

18   then come in if there's 17 other conversations in which

19   training has to do with going to cooking school or has to

20   do with basketball or whatever, fine.

21          MR. SOFER:  I don't disagree with that, Judge.

22   And again, that's one of the reasons the government

23   conceded that it was a proper avenue for cross-examination.

24          I am -- I continue to be concerned, based on what

25   I have seen and what I think has become, because they're

1  already having questions asked of Mr. Griffin, and so and

2  so didn't pick up on it, did he?  And you know, I don't

3  think that's a fair question.  I don't think you can -- you

4  can make that argument in summation.  You can show the jury

5  here's a transcript that's obvious, take a look at it,

6  ladies and gentlemen, he didn't pick up on it.

7        THE COURT:  Yeah, I tend to agree with you, that

8  kind of conclusory, he didn't pick up it, and what did he

9  say after that, it's on the record, mop on down the road.

10        I would tend to agree that's the phrasing you

11  just used, and I think what it was used for is not

12  appropriate.  That's argument.  And also, what's into

13  Mr. El-Hindi's mind which we have no -- no peephole, as it

14  were.

15        MR. SOFER:  And finally, Judge, again, I just ask

16  The Court to keep in mind as we go through this, not just

17  now, but later at some point, we do get close -- closer at

18  least, to this issue of putting in a volume of innocent

19  conversations as a defense to things that are clearly not

20  innocent.

21        I would concede, based on my knowledge of the

22  first -- of the transcript that we put up, that there was:

23  A, there's no charge related to that; B, there's no

24  illegality or no national security illegality necessarily

25  connected to that conversation.

```
1            And we're not going to argue -- we are not -- I
2    think maybe counsel thought we were coming into the case, I
3    don't know, that somehow this conversation is some
4    nefarious way of recruiting terrorists connected to the
5    case.  We're not going to make that argument.  I'm just
6    saying at some juncture, if you open this door too wide,
7    you end up with a whole bunch of spurious information that
8    doesn't have anything to do with the case.
9            THE COURT:  Again, I agree absolutely with the
10   fact that he was recording for, what, two years.
11           MR. SOFER:  More than that, Judge.
12           THE COURT:  However -- more than two years.  And
13   that the jury will see the equivalent, perhaps, of two
14   weeks worth of recordings.  The fact -- it doesn't matter.
15   It's not relevant.  It wasn't introduced, it's not
16   evidence.
17           And I agree completely that we cannot sit here
18   and play two-plus years worth of recordings in order to
19   develop the inference that they never agreed to do that
20   which the government agreed.  That agreement could have
21   occurred in a single conversation.
22           MR. SOFER:  That's right, Judge, and at the very
23   least it wouldn't have occurred within the confines of the
24   indictment.  So again, I'm -- I'm telling The Court,
25   we're -- I think we've got to the end of the road to some
```

1  extent.  You -- I wanted to show The Court the outside of

2  where the government is sort of willing to go because I

3  think it's illustrative of something we're going to get to.

4  I didn't mean to start a whole conversation of what's going

5  to happen in the defense case, and I'm really not prepared

6  to go into that in detail.

7         But for cross-examination purposes at least, I'll

8  concede that a conversation five months before the

9  beginning of this conspiracy, under the limited

10 circumstances there, is an appropriate question to ask.  I

11 just want us to do it the right way, that's all.

12         MR. HARTMAN:  Judge, I think I agree.  Again, I

13 agree with the vast majority of what Mr. Sofer is saying

14 with the exception of a couple of things.  Number one,

15 we're going to ask The Court for an entrapment instruction.

16 And showing innocent conversation that happens shortly

17 before Mr. Griffin -- in the many, many, many ways that he

18 does -- tries to get Mr. El-Hindi to talk about things, do

19 things, and agree to things is completely proper in --

20 under those circumstances.

21         We're not playing stuff that doesn't mean

22 anything.  The last thing we want to do is bore the jury.

23 We're going to play as little as we can to still show what

24 we want to show.  But the first recording -- there's a

25 recording very early on in 2003, and Mr. Griffin says to

1   Mr. El-Hindi almost out of the blue, "I've really become

2   more militant, I wish I was in Iraq running a training

3   camp."  I mean, there's -- there's no predicate

4   conversation by Mr. El-Hindi at all.  And he spent three

5   years doing this.  And I think it's appropriate for the

6   jury to understand exactly what happened.

7           THE COURT:  And I would agree that that would be

8   so, certainly in your case.

9           MR. HARTMAN:  Right.

10          THE COURT:  And all I'm talking about is getting

11  through the rest of the week, okay.

12          MR. HARTMAN:  Yeah, but can I get some

13  conversation about the fact that I'm going to be able to

14  call Mr. Griffin in our case in chief?

15          THE COURT:  I -- I mean, if the government has

16  some rule of evidence or procedure that would preclude

17  that, let me know.  But I think, certainly, the suggestion

18  that defense would somehow be precluded from calling a

19  government witness or precluded from examining that

20  witness, and under the hostile witness provision, which I

21  think probably would apply, but I'm not ruling on that, at

22  least in terms of the ability to lead and impeach, that

23  somehow the fact that the defendant had touched upon

24  certain subjects but not exhausted them on cross, we have a

25  preclusive -- I'm totally unfamiliar with that, maybe it's

```
 1    just the back waters of the Maumee.

 2            MR. SOFER:  Judge, I think we'll certainly do the

 3    research with respect -- like with a lot of things.  I

 4    think sort of depends on what's happened in the trial up

 5    until this point and what the purposes of recalling the

 6    witness are.  As you say, we're on the first witness of a

 7    multi-witness trial trying to get through tomorrow.  I'm

 8    not -- I am not adequately prepared to fully make that

 9    argument.

10            THE COURT:  I'm just letting you know that that

11    caught my attention when you --

12            MR. SOFER:  Understood.

13            THE COURT:  -- when you mentioned that, and I was

14    going to say if you're counting on me to say, okay, you're

15    right, Mr. Sofer, tough luck, Mr. Hartman, you know, okay.

16    It's contrary to my understanding.  Of course, ultimately,

17    it's the -- it's the trial process equivalent 403, the rule

18    cross mode and conduct of the examination, so --

19            MR. SOFER:  Understood, Judge.

20            THE COURT:  But anyway, so where does that leave

21    us with all the transcripts?

22            MR. SOFER:  We were on number three.  All -- I'm

23    going to try to move this along much faster.  I'm going to

24    walk over to counsel see if it's one we agreed on, if it's

25    not, I'll put it up.
```

1          Maybe the better way to do this, Judge, is not to

2     have me try to say what defense counsel wants to do in

3     their cross, but sit down and have them explain which of

4     these tapes they're looking to play --

5          THE COURT:  Okay.

6          MR. SOFER:  -- because I think that would be, I

7     think, the more appropriate way of doing it.

8          MR. BOSS:  Judge, when we departed the U.S.

9     attorney's office yesterday, it was my distinct impression

10    we had come to an agreement about element, if not all of

11    these various segments that we had provided.  We are not

12    intending to simply carte blanche attempt to play the

13    recordings.  We are intending to go through and examine

14    Mr. Griffin.  If Mr. Griffin is not willing to concede that

15    certain things were said that were on the tape, then of

16    course we would seek to play the recording.

17         THE COURT:  And I -- I anticipate that that will

18    be a moot issue because once you throw in the transcript,

19    after he either denies having said something, are far more

20    likely.  It seems to me say, I can't recall and say, read

21    it, have you read it?  Yes.  And would you just read it for

22    the jury, you were asked this and what did you say.  I said

23    that.  Thank you very much.

24         Now turning your attention to, also on the

25    subject of X, do you recall on or about whatever the

1    conversation with whomever having said something to the

2    effect.  And you don't have to accept, by the way, that if

3    you say so.  Answer, okay.

4            I think the witness has to say yes, no, or I

5    don't remember.  And if he says, yes, assuming he read it

6    verbatim, that's fine.  If he says, no, or don't remember,

7    you show it to him.  I think that's the way it works.

8            MR. SOFER:  That's basically all we've been

9    asking for throughout this, Judge.

10           THE COURT:  Yeah.  If I have anything to say

11   about it, that's what I hope it --

12           MR. BOSS:  We're attempting at this moment to

13   compile for The Court a list of dates of the recordings

14   that we felt it was important to attempt to play.  I

15   believe that we discussed this with the government for the

16   most part.

17           MR. SOFER:  We did.  And I think we came up

18   with -- I just want to clarify and make sure that we -- I

19   think we agreed on four -- was the -- we agreed on

20   yesterday or that counsel was unable to discuss a couple of

21   these which they were still working with, but I think we

22   agreed on four; two videos I referred to previously and the

23   government said -- even though my younger days, we might

24   have thought about this -- I think we concede that two of

25   these, even though the rule of completeness time has ended,

1    and I don't know that this really is the rule of

2    completeness anyway -- I'm getting old and tired, Judge --

3    and we said we'd let them play two more, as long as they

4    then abided by the government's concerns of that rule of

5    completeness.  I think we ended up with four, and I just

6    want to confirm that's where we are at, and we can turn to

7    the next group of issues, Judge.

8            MR. BOSS:  I don't know that our list is exactly

9    four, but there was -- they've already been played a number

10   of recordings by the government.  It's -- it's my

11   impression that as a part of the evidence, there would be

12   little evidence reason not to commence the ability -- they

13   have played with our ability to punctuate the questions to

14   the witness.

15           THE COURT:  As long as that was fairly broad

16   scope with the appropriate cross-examination, I would

17   agree.  I mean, obviously, the worst cross-examination is

18   the one who gets the witness to repeat his testimony.  You

19   know that.  That's not what you're going to be about.

20           MR. BOSS:  I hope not.

21           MR. HARTMAN:  I think -- I think there were --

22   there were the two videos, and then there were about four

23   or five recordings, most of which we said, I mean, we

24   have -- I don't think he's going to get on the stand and

25   make the denials that are going to allow us to play it.  So

```
 1    I don't think it's going to be an issue.

 2            THE COURT:  I don't either.  As far as I can tell

 3    so far, you have -- have to flat out caught him in a dead

 4    bang, oh, no, I never said that, absolutely not.  Read

 5    this.  Were you under oath, not under oath, I guess, but --

 6            MR. SOFER:  And I think you can watch the witness

 7    testify.  He's -- when you have two, three years of tapes,

 8    I think he's appropriately and honestly explained what he

 9    remembers and what he doesn't.  And I think the tapes are

10    the tapes, Judge.

11            THE COURT:  And I can't remember having sua

12    sponte objected and say you can't ask him what he meant and

13    say -- my point is, that was a week ago, okay, and I can't

14    remember.  I understand all that.

15            So what -- are all -- is all of this anticipatory

16    worst case set of squabbles that we've been talking about?

17            MR. HARTMAN:  Yes.  I don't think -- I really

18    don't -- I don't expect many problems and not many

19    sidebars.

20            THE COURT:  If you can take the end from away

21    from the word "many," that might be as perfect.

22            MR. HARTMAN:  We'll probably have a couple of

23    disputes.

24            THE COURT:  Do you know what they are?

25            MR. HARTMAN:  No, I don't.
```

1          THE COURT:  All right.  So what's next?

2          MR. SOFER:  Well, I think if -- we're now told

3    Mr. Herdman will be here at 4:00, and the only things that

4    are left are the stipulations and the experts.  They are

5    interlinked.

6          THE COURT:  Right.

7          MR. SOFER:  Counsel just got the stipulations, so

8    I would expect them necessarily to have turned around and

9    give us their position on it, although that would be --

10   you'll notice, Your Honor, that a substantial preamble has

11   been placed in front which we'd ask the court to read.

12   That was something that the Justice Department was

13   specifically interested in making sure whatever we agreed

14   to in this case is not thrown back in the government's case

15   in some other case in the future.  And in particular, this

16   relates to the -- you can imagine -- we're actually

17   defining whole religions, and paragraph that has two or

18   three sentences in it.  And I think those concerns are --

19   are legitimate in some cases.  And so I don't know if

20   counsel's gotten to look at least at the preamble, they're

21   still -- they're still are called "stipulations," but

22   they're stipulations that are very carefully limited and

23   the record should reflect that we can only do this if

24   they're very carefully limited to this case and only this

25   case.  And so I don't -- again, we can have a discussion

 1  with that, what counsel thinks about that, but that's

 2  certainly government's intention of putting that preamble

 3  in.

 4          And then we did make some modifications to some.

 5  If anything, I think for the most part we compressed, not

 6  added, and I don't know if counsel have objections or

 7  issues that they want to discuss at this point.

 8          THE COURT:  Well, what if -- what if we -- I

 9  recess until Mr. Herdman's here.  I'll get to reading the

10  Kohlmann stuff, which I haven't done yet.  You can either

11  take a break while they look at it or you can --

12          Mr. Teresinski, did you do the stipulations, or

13  who?

14          MR. TERESINSKI:  Your Honor, yes, I -- I had --

15  back in Washington.  I can speak with both counsel.

16          THE COURT:  Yeah, if you can just say, look,

17  guys, here are the changes and this is why we did them.

18          MR. TERESINSKI:  Right.

19          THE COURT:  And my only question is, is the

20  government insistent on my reading that, do represent

21  policy positions of the U.S. government to the jurors or

22  simply making an affirmative ruling on that effect on the

23  record?

24          MR. SOFER:  No.  We'd ask that in addition to

25  the -- to ruling that this is an acceptable way to go

1   forward in terms of the process of the trial.

2           THE COURT:  In this case?  An acceptable way to

3   me in this case?  Because how I'm trying to contain this

4   case as narrowly as I can to trial of the element of the

5   charges brought against the defendants and in due course,

6   in fact, one or more of them advances an entrapment defense

7   to contain the case within the confines of that defense and

8   not let it kind of spill over into all kinds of other areas

9   that may have some ancillary significance, undeniable

10  significance, but I consider it to be ancillary and outside

11  the scope of this criminal prosecution.

12          MR. SOFER:  And that's -- I think the

13  government's been fairly consistent about that as well.

14          THE COURT:  I'm just saying, I don't have a

15  problem reading it.  It seems -- but that's the price the

16  government wants to move things along, and if it's

17  acceptable to the defendants, it certainly is fine with me.

18          MR. SOFER:  Let me just comment on one thing:

19  You mentioned an entrapment defense, this is the first

20  time --

21          THE COURT:  I noticed that.

22          MR. SOFER:  -- has announced their intention to

23  proceed with an entrapment defense.  I would just note,

24  Your Honor, that with respect to that defendant then -- and

25  we're talking about Mr. El-Hindi here -- essentially, I

1    believe the case law supports this -- I'm going to brutally

2    simplify this -- essentially throws rule 404(b) out the

3    window, and it's a free-for-all in terms of what else the

4    government might have.  As I say, I'm butchering this to

5    some extent to show predisposition.

6          I will tell you this, Judge, Mr. El-Hindi, in

7    particular of all of these defendants, has engaged in -- in

8    a number of different activities.  This should be nothing

9    new to defense counsel or The Court, but it's something

10   that counsel's mentioned over and over again, he's trying

11   to make money a lot of different ways, trying to do a lot

12   of things a lot of different ways.  We're aware of some of

13   the ways he's done that, and I believe that, that as of

14   this moment, the government should be free to not only

15   present that evidence, but present it in a way that

16   specifically undermines an entrapment defense.

17         THE COURT:  Wouldn't it be procedurally tidier to

18   wait until they've rested at whatever point that is and

19   then to come back and enjoin the issue in that way, because

20   otherwise the jury's going to think what in the world --

21         MR. SOFER:  I don't necessarily disagree with

22   that in terms of when, and again, I -- we've obviously

23   anticipated this issue to some extent.  It's another issue

24   that I'd like a little more time to explore in terms of the

25   specifics of it.  But I do know enough to know because I

1   have -- I have litigated these issues in the past, that

2   when an entrapment defense is interposed, it does change

3   the nature of what was admissible, not necessarily when

4   it's admissible, per se, but certainly what is ultimately

5   admissible.

6          THE COURT:  And also I don't think I've ever

7   tried an entrapment case, I'm pretty sure I haven't.  It

8   requires the defendants to admit commission of acts charged

9   or no?  What -- what's that all about?

10         MR. SOFER:  I -- I would like to take a longer

11  look at the law here in the Sixth Circuit.  There are --

12  they're usually -- there are two elements to -- two major

13  elements to the entrapment defense, as I understand it.

14  One is whether the particular defendant was induced by

15  government action and then the next concept is whether --

16  it depends -- depends -- you've got to look at the

17  instructions -- we've looked at it -- for someone who

18  specializes in this moment, not me obviously.  And the next

19  question is, did it overbear the defendant's will or was he

20  predisposed to commit this crime anyway.  And those are the

21  two big pieces of it.

22         I don't think, and I don't want -- I want to be

23  clear, I don't know this for certain, but I don't think it

24  requires a defendant to admit that he's committed the

25  crime.  Somebody said that one day.  That's not my

1    understanding of the law.

2              MR. CZARNECKI:  I think it used to, it doesn't

3    anymore.

4              MR. HARTMAN:  In state court it does.

5              THE COURT:  I will try to be apt and eager,

6    willing and attentive to --

7              MR. HARTMAN:  I also.

8              THE COURT:  -- or any one of those.

9              MR. HARTMAN:  I also would remind The Court that

10   with -- he did talk about this before and you did tell the

11   government that if we got to the end of our case and

12   rested, and then all of a sudden ask for it, you'd let them

13   reopen to do -- and we're aware of that.  And we haven't

14   made a final determination anyway.

15             MR. SOFER:  Wait a second.  I understood

16   counsel -- maybe I'm wrong to have just said today -- that

17   they're going to ask The Court.

18             THE COURT:  That's -- my two ears heard as well.

19             MR. HARTMAN:  I meant to say we may ask The

20   Court.  I don't believe a notice is required, quite

21   frankly.

22             THE COURT:  I agree.  And if I misspoke, that's

23   fine.  I think that it's at least the government's on

24   notice that that's a fair -- which probably is not much

25   news at all.

1           Okay.

2           MR. HELMICK:  Judge, the matter that we discussed

3    in camera last Friday, might we have a brief discussion

4    about that now?

5           THE COURT:  Who all is present in the courtroom?

6    That young man is a St. John's student, he's okay.

7           MR. SOFER:  Everybody here is with the

8    government.

9           THE COURT:  Then why don't we just talk about it

10   here.

11          MR. HARTMAN:  Is there a feed to the media room?

12          THE COURT:  No.

13          MR. HARTMAN:  Do you want me to tell the deputy

14   to close --

15          THE COURT:  If somebody walks in, we'll stop

16   them.  I don't -- we can leave the doors open.

17          MR. HELMICK:  Your Honor, it's my understanding

18   from what the government said to The Court and the parties

19   by way of e-mail that the government is suggesting that The

20   Court handle the matter with just a general curative

21   instruction, I guess.

22          THE COURT:  I'm disinclined to do that.  I'm

23   inclined to do -- I will do what I suggested last week.  I

24   just think it's too risky in terms of waking up in two

25   years and being told you knew you had -- you had the

1   opportunity.  There was nothing urgent or compelling about

2   times when the jury was in the middle of deliberations and

3   this came up during recess between the time they reached

4   the verdict and coming back into court, you know.  It's

5   very early on in trial, and I do propose to -- I propose to

6   conduct the inquiry on my own, and make it very brief and

7   limited.

8           If you hear -- did you hear a conversation -- you

9   were in the car and somebody approached the car and asked

10  an inquiry -- or in the vicinity of the car and asked one

11  of the deputy marshals something, did you hear that

12  question?  That's what -- what did you hear?  What happened

13  after that -- the conversation, yes, and anything that you

14  heard or said or anyone else heard or said in any way

15  affect your judgment.

16          You understand that -- you understand you

17  shouldn't speculate whether one or more of the defendants

18  is in custody and that because if he is, that's -- doesn't

19  signify anything and certainly does not affect the

20  presumption of innocence with which you must cloak him

21  throughout these proceedings.  And to do so would be

22  unfair.  And people say, yes, I understand it.

23          I think we've already seen one of the jurors -- I

24  think the compelling candor with which she responds to

25  things -- and you'd be surprised if the other one -- which

```
 1   I will refrain from mentioning at this time -- I'd be
 2   surprised if she didn't respond.
 3            I think we have a very good jury.  I think we
 4   have a jury that understands and is honest with The Court
 5   and understands with counsel and understands how important
 6   that is, so -- but that's how I propose to handle it.
 7            MR. HELMICK:  Judge, I assume, tentatively, that
 8   we're all certainly hoping this did not happen, but that
 9   you would also ask whether or not they discussed it with
10   anyone outside the --
11            THE COURT:  I'll try to remember that.
12            MR. HELMICK:  -- four jurors as well.  Obviously,
13   we hope that's not the case, but to the event they
14   discussed it with anyone else.
15            The other thing, Judge, is we'd like The Court to
16   consider -- at least as part of your general instruction --
17   afterwards, you're not to speculate and so forth, maybe
18   something to the effect of, in fact, if you were to
19   speculate, you might, in fact, be wrong --
20            THE COURT:  Okay.
21            MR. HELMICK:  -- in this case or words to that
22   effect.  Otherwise, I think it's kind of unfair to
23   Mr. Masloum.
24            THE COURT:  Let me do this:  If you folks want to
25   e-mail me a little bullet point sort of topic, just one- or
```

1  two-word topic list, I will consider it.  I'll make it a

2  part of the record under seal, and I will consider it.  But

3  that's an excellent point.  And there's one else that was

4  made.

5          MR. SOFER:  I think I had suggested, Your Honor,

6  that it might -- since it's not clear on the issue, you can

7  tell the jurors that there are a lot of defendants --

8          THE COURT:  Yeah, that's -- there are other

9  defendants in and out of this building, and you shouldn't

10  presume that the reference was to anybody here.  You

11  understand that?  I mean, it's -- just a little -- send it

12  to me this evening, so I get a chance to look at that time,

13  and I'll try to put something like that.  I'll try to.

14          U.S. MARSHALL:  Judge, I would say actually the

15  other day, the jury was on a break, and I was going to

16  Judge Katz's courtroom and I had a prisoner with me, so I

17  don't think -- it's a courthouse, there's other judges in

18  the courthouse and the jury.  So I went to Judge Katz's

19  courtroom, and I can tell from my experience even as a

20  deputy marshal, I've been to other offices and done trials,

21  I did a large scale trial in Miami, and the defendants --

22  it was a violent gang and they were actually in ankle irons

23  during the entire trial.  And they brought that to the

24  juror's attention to include -- the defense did -- and said

25  basically what the judge said, you shouldn't draw any

 1   inferences, you know, it's a issue and everybody knows

 2   about bonds and --

 3          THE COURT:  Thank you.

 4          MR. HELMICK:  Judge, there was also the matter of

 5   Mr. Masloum's waiver of his presence last Friday, and you

 6   asked us to remind you to put that on the record.  I don't

 7   know if you'd like to inquire of him briefly now or not.

 8          THE COURT:  Mr. Masloum, you know we had a number

 9   of matters to tend to on Friday?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And you weren't here?

12          THE DEFENDANT:  Yes.

13          THE COURT:  And do you know you had the absolute

14   right to be here?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And did you have a chance to talk to

17   your lawyers about whether or not you would be here before

18   we started on Friday?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And was it your decision upon talking

21   with them to tend to other matters rather than coming to

22   court?

23          THE DEFENDANT:  Yes, Judge.

24          THE COURT:  Nobody made any threats or promises

25   to you?

```
1              THE DEFENDANT:  No.

2              THE COURT:  Very good.  All right.

3         Well, let's --

4              MR. HARTMAN:  Judge, if I may, one more quick

5    thing, I know that the agent, whoever made the comment,

6    wasn't somebody who's been in the courtroom, I just want to

7    confirm that that person's not on the government's witness

8    list?

9              MR. SOFER:  I'll have to take a look at our

10   witness list, but I would be surprised if he was.  My

11   understanding is, he's relatively new here in town, and --

12   give me one second.  We don't, as we sit here, think that

13   he's related to the case in any way, shape, or form.

14             THE COURT:  Just check it.  I would have a

15   problem if he were to be called as a witness.  So just to

16   be -- I suppose he could be.  There's technically no

17   reason, but it looks like that's not a problem.  We can

18   hope for small --

19             Okay.  Why don't you guys talk about the

20   stipulations and whatever else you have to talk about.  And

21   I'm going to go back and read -- the thing is, let me -- I

22   think the problem I had, I was told in the e-mail that sent

23   this to me, there's a reference to the highlighted portions

24   and in the text of the report, I didn't see any

25   highlighted -- maybe in the transmission --
```

1              MR. SOFER:  Well, Judge, I had -- I'll show them

2    to defense counsel with me, what I believe are those

3    highlighted portions --

4              THE COURT:  Why don't you give it to them and

5    give it to me?

6              MR. SOFER:  I think, also, came with that, is a

7    particular page, I'm not sure, a web page, did you get

8    that?

9              THE COURT:  Yeah, that I couldn't read.

10             MR. SOFER:  That you could not read at all

11   because it's in Arabic?

12             THE COURT:  Yes.

13             MR. SOFER:  The report is not in Arabic, and I do

14   think I have a highlighted section.

15             THE COURT:  Good.  Why don't you show it to them?

16             MR. SOFER:  And I would note, Your Honor, once

17   again, that this, if The Court is going to allow the

18   testimony of the defense witnesses, I don't think you can

19   make the decision about Mr. Kohlmann's testimony in a

20   vacuum.  Essentially, one is connected.

21             THE COURT:  I understand that.  And most of the

22   way through an opinion with regard to the defense experts.

23   That's exactly how I was -- but when I picked up what had

24   been sent to me, I didn't see anything that's highlighted.

25             MR. SOFER:  I have the highlighted versions.  I

1    just ask that -- that if Mr. Herdman has further

2    highlighted versions with him, Your Honor, understand that

3    this is what I brought to court is what I understood, but

4    they came from Mr. Herdman.  And he knows better than I

5    exactly what he highlighted, but I'm fairly certain this is

6    the final version.

7            Judge, unless you say otherwise, we're going ask

8    our audio visual person to take our computer and go back,

9    given the fact that we've appeared to have resolved in

10   other pile of information.  So I'm going to let him go,

11   with your permission.

12           THE COURT:  Good.  Thanks.

13           How disruptive would it be if I were to adjourn

14   at 2:00 on Thursday?  There's a meeting in Cleveland that I

15   really ought to go to at 4:00.

16           MR. SOFER:  Are we -- that's something we can

17   discuss also, Judge.  It would be helpful for the

18   government to understand when we need to be ready with our

19   next, either, redirect -- redirect of Mr. Griffin, and also

20   possibly calling another witness.  Are we adjourning --

21   tomorrow we're going to have to deal with a juror issue in

22   the morning.

23           THE COURT:  Right.

24           MR. SOFER:  That's going to take an hour or so

25   perhaps.

```
 1              THE COURT:  I hope a half hour.

 2              MR. SOFER:  We no longer have a full day

 3    tomorrow; is that correct?

 4              THE COURT:  No, we do.  I may adjourn around

 5    4:00.  Probably wouldn't be before 4:00.  The funeral home

 6    and so forth out in Pemberville is about a half hour.  The

 7    visitation is from 3:00 to 7:00, and the funeral is at

 8    7:00, so we may even go until 4:30.

 9              MR. SOFER:  So almost a full day tomorrow, your

10    Honor.  Suggesting 2:00 on Thursday, perhaps, and Friday

11    would be another full day?

12              THE COURT:  Yeah, and also the one thing about

13    tomorrow -- let me see, Wednesday -- full day tomorrow.

14    Wednesday, I'm doing naturalization in the noon hour, so

15    I'll adjourn probably about a quarter -- no, no, no, forget

16    that.  I'm in the wrong week.  Tomorrow is a full day.

17    Wednesday from about 2:15 to 2:30 time, we'll take our

18    mid-afternoon break.  The director of the marshal service

19    is coming from Cleveland, and I'm going to be participating

20    with that.  Thursday, I have that 4:00 meeting, but I also

21    have a Law Day luncheon.  So -- and Friday, I'm going out

22    of town at some point.  I can't remember -- no.  I'll find

23    out when I'm going out of town.  I think I've got about a

24    6:00 or 6:30 flight, so I'll want to leave about 4:00 on

25    Friday.
```

1          MR. SOFER:  Judge, I guess the question is --

2          THE COURT:  Let me say this:  We have our -- I'm

3   sorry, our Law Day luncheon at the bar association is at

4   noon.  That always runs until about 1:30, and then if I'm

5   going to go to Cleveland, I should leave about 2:00.  So

6   maybe what we should do is do a half day on Thursday unless

7   that is a serious problematic for everybody.

8          MR. BOSS:  Half day Thursday, you say, Judge?

9          THE COURT:  Yeah.  Does that cause --

10         MR. SOFER:  From talking to Mr. Boss, I am of the

11  impression that he's looking at sort of two, two-and-a-half

12  full days on cross, somewhere in that neighborhood.

13         MR. BOSS:  Probably.

14         THE COURT:  In other words, this week you should

15  be done, right?

16         MR. HARTMAN:  Yes.

17         MR. SOFER:  I'm just trying to figure out, we're

18  going to want -- I don't know what Your Honor will do,

19  I'm -- certainly, in many courts where the judge says,

20  okay, redirect the witness now or call your next witness.

21         THE COURT:  And but, but, but, but is not a good

22  answer.  We'll --

23         MR. SOFER:  Wasn't a good answer when I tried

24  occasionally.

25         THE COURT:  Let's see how things go.  Perhaps the

1    thing we should shoot for is try to finish Griffin this

2    week, if we can.  And if we get done, if we get done with

3    Griffin this week, you'd still be more or less ahead of the

4    timetable or on the timetable.

5              MR. SOFER:  Oh, yes.

6              THE COURT:  Why don't we concentrate on doing

7    Griffin this week, and then your next witness why don't we

8    start next Tuesday?

9              MR. SOFER:  My issue is simply --

10             THE COURT:  Is that okay?

11             MR. SOFER:  I'd like a little bit of time.  We'll

12   be prepared -- Agent Coats is likely it be our next

13   witness.  We're ready to call him right now.  I'm just

14   being facetious about that.

15             THE COURT:  You've previously been sworn, haven't

16   you, Agent?  Since the jury isn't here, we'll just go --

17             MR. SOFER:  We can read it back.  The -- I'm

18   going to want a little bit of time between cross and

19   redirect to have our witness back so that we can talk to

20   him a little bit.

21             THE COURT:  With any luck, maybe Mr. Boss will

22   finish by noon on Thursday and that should give you time.

23             MR. SOFER:  That would be perfect.

24             THE COURT:  And then we'll just have to wait and

25   see.  He won't be done before then.  If he does, we'll just

 1  adjourn then with whatever we've got.

 2          Do you think you can get done by noon on

 3  Thursday?

 4          MR. BOSS:  I hope so, Judge, I'm not sure.

 5          MR. IVEY:  Your Honor, what Mr. Sofer said is

 6  what is the court's rules, if any, with respect to recross?

 7  I mean, I don't want to this Ping-Pong game going on too

 8  long, but I just want to know what we should be expecting.

 9          THE COURT:  It's generally my practice, if you

10  have something that's within the scope of redirect, it's

11  supposed to, at some point, come to a point, okay, where

12  there are no more questions that can be asked, but I do not

13  say redirect, end of it, go home, call your next witness.

14  I will say any redirect and any re, re, re-- redirect and

15  any re, re, re-- but at some point, the jury sits there and

16  you've lost them.  That's a lot more dangerous for you than

17  it is for me.

18          MR. SOFER:  Understood, Judge.  And we'll do what

19  we can to minimize.

20          THE COURT:  I understand, but why don't we plan

21  to -- we'll plan to go until shortly before noon on

22  Thursday, and then I will be able to tend to my obligations

23  in Cleveland.  Thank you.

24               (A brief recess was taken.)

25          THE COURT:  Where are you with the

1  stipulations/definitions?

2       MR. TERESINSKI:  Your Honor, I think if I can

3  speak for both counsel that we talked about things they

4  would like to illuminate about it, I guess, overnight.

5  We're not -- I think we're in decent shape in explaining

6  why some of the changes were made and the like, and so I

7  think I'm going to wait to hear back from them overnight

8  and then tomorrow.  I think we'll -- hopefully, we'll put

9  this to rest.  But again, a lot of it -- some of it enters

10  upon, I think, some of the things that will come out of the

11  discussion about the experts.

12       MR. SOFER:  Mr. Helmick brought up an issue which

13  I think is a good one.  We'd like to think about it a

14  little, too, but assuming that there is an agreement

15  amongst all parties on how to get this to the jury and then

16  how they should be digesting it, if you will, Mr. Helmick

17  brought up a good point:  If you just give it to them, put

18  it in their books, they don't necessarily get a chance to

19  really read through it here in the courtroom certainly.  So

20  I don't know if The Court could suggest a way of dealing

21  with it or we might be able to say here are these

22  definitions, we could retire for a while and at least read

23  them.

24       THE COURT:  What if we gave them to them on

25  Thursday close of business since -- suggested that they

1  take an hour to do homework, shouldn't discuss them, but

2  they should simply each read them carefully.

3          MR. SOFER:  We would send them home?

4          THE COURT:  No, no, no, I mean here.

5          MR. SOFER:  Here, work?

6          THE COURT:  Here, work.

7          MR. SOFER:  Understood.

8          THE COURT:  Something -- but I think that's a

9  good point.  That might be -- or even -- I'll talk with

10 them and what I may do is say, ladies and gentlemen, we may

11 be giving you -- about however many the number is -- of

12 definitions that the parties have stipulated as they agree

13 apply to various terms in this case, and they are to be

14 used in this case, and will probably take you about a half

15 hour to an hour to read them.  I wouldn't want you

16 discussing them, and I can't let you take them home, but

17 you know, you tell me when would be a good time, for use in

18 the jury room.  Okay?  I didn't -- do you mind if I keep

19 your --

20         MR. HERDMAN:  I thought I had E-mailed that.

21         THE COURT:  You did, but at least mine didn't --

22 I looked and I didn't see highlighting.

23         MR. HERDMAN:  I apologize.  It works on mine.  I

24 don't know if I have a different version of .pdf.

25         THE COURT:  My question is, do you -- does some

```
 1   of these -- does some of this material relate to videos

 2   that we're not seeing or will be seen by the juror, are

 3   they all videos that the jury either has or will see?

 4           MR. HERDMAN:  Some of the highlighted portions do

 5   relate to videos that were not played and will not be

 6   played for the jurors.  And the reason that we had proposed

 7   those particular discussions and not necessarily

 8   demonstration of those videos is that -- at least I was

 9   cognizant of the fact that Mr. Ivy was cross-examining

10   Mr. Griffin, there was much made of the training aspect of

11   some of these videos.  And all along, Your Honor, the

12   government has asserted that these videos played a number

13   of different roles.  They're used as propaganda to recruit

14   individuals, they're used as propaganda in order to acquire

15   certain support from other people who can't actively

16   participate themselves, and finally, they're used as actual

17   training devices for those individuals who cannot go to a

18   stand-alone physical camp somewhere.  And the fact of the

19   matter is that Mr. Amawi had a tremendous -- tremendous

20   amount of this material in his possession.  And we're not

21   trying to introduce any evidence of the size of that

22   collection or any evidence of maybe Mr. -- Mr. Kohlmann's

23   opinion as to what the size of that collection would

24   indicate, but what we do think is important is that some of

25   these materials -- for instance, there are three that I can
```

1    think of off the top of my head that relate to Al-Qaeda and

2    Saudi Arabia.  And I know one of them is called "Martyrs of

3    the Confrontations."  This is a 45 minute -- literally, a

4    feature-length film which includes a lecture by leader of

5    Al-Qaeda in Saudi Arabia to assemblage of trainees where he

6    lectures about the most important aspects of certain

7    operations that should be undertaken.

8         Now, we would never seek to play a 45-minute

9    video for this jury; however, I do think to the extent that

10   Mr. Ivy's already made some issue out of training quality

11   of some of these videos -- these are videos, by the way,

12   which most of which were provided to Darren Griffin in one

13   form or another.  That it is important that the government

14   be allowed to discuss, not necessarily to show, but at

15   least to discuss, say, on one disc that was given to

16   Mr. Griffin, there were 20 videos that showed various forms

17   of rocket impacts.  There was one, 45-minute video that he

18   showed a lecture at a camp, a Al-Qaeda -- there were 15

19   videos that depicted sniper attacks or IED attacks.

20        And I don't know that Mr. Kohlmann necessarily is

21   the person that has to testify to that.  However, I do

22   think that there are certain videos that have particular

23   significance because of what they are about.  And those

24   very few examples that I've just given to Your Honor, the

25   "Martyrs of the Confrontation," -- and I forget what the

1    other one is, it might be the Battle of Badr al-Riyadh.

2    Those are very discreet examples of the -- and by no means

3    do they make up the bulk of what we would propose

4    Mr. Kohlmann would testify to at this stage, in an

5    immediate sense.

6            I put this item in there because I thought this

7    was right after Mr. Ivy finishes his cross-examination of

8    Mr. Griffin, and I thought they might be important,

9    something that the government will view.

10           THE COURT:  What's the connection again?

11           MR. HERDMAN:  The connection between?

12           THE COURT:  Mr. Ivy and how many --

13           MR. HERDMAN:  Mr. Ivy, if you'll remember, Your

14   Honor, he played certain videos that were shown to the

15   jury, and the one I'm thinking of in particular starts off

16   with a map of the United States, and there are a number of

17   Christian crosses that are all across the map.  And then

18   the United States blows up.

19           Well, actually in that video, that video depicts

20   the wills and the last testaments of certain operatives of

21   Al-Qaeda and Saudi Arabia immediately prior to them

22   engaging in an Operation Riyadh where they attacked an

23   embassy compound.  I believe it was in 2003.  And that's

24   actually -- one is out of the series of videos that were

25   produced by Al-Qaeda and Saudi Arabia.  We didn't play the

1   entire video for the jury mostly because of the part of the

2   video that was playing for Mr. Griffin was condensed.  It

3   was only a couple minutes, but the entire video is about 15

4   to 16 minutes.  And it does have a real significance.

5           By the way, this video was provided to

6   Mr. Griffin by Mr. Amawi.  It does have real significance

7   in terms of the actual content.

8           THE COURT:  Okay.  As to that, I'm inclined to

9   let you play it.  I mean, the reason on -- one of the

10  problems I have is the fact that it was downloaded doesn't

11  mean that it was ever viewed.  And the same, quite

12  candidly, with the list of favorites.  I probably have 50,

13  40 different blogs and newspapers, the same number of which

14  routinely I look at two or three.  I mean, lots of them

15  that I've seen at some point, bookmarked it, add it to my

16  list, and never looked at it again.  And -- and so absent

17  some basis for believing that Mr. Amawi, in fact, looked at

18  this, I just don't -- it's a "so what."

19          I mean, the other analogy I thought of is I will

20  often have ten or 15 or 20 books in the library.  I mean, I

21  may at some point get around to reading three or four of

22  them and take the rest back which has created an inference,

23  because I had the book out maybe two or three months, that

24  I read it.

25          But as I say, it's -- there's clearly evidence

1    that a segment of that video was shown.  And I would much

2    prefer to let the jury see it.  It is what it is and you

3    can argue whatever inference it is.  I think there's an

4    adequate basis in the record to conclude that he gave a

5    copy to Mr. Griffin, more likely than not knew what was in

6    it, therefore, he saw it and that's fine.

7           But with some of this other stuff -- and the

8    other thing -- and that leads to the second issue -- and

9    I'm sorry to jump around -- so there's a list of favorites,

10   there are videos not yet shown to the jury to basis to

11   whether Mr. Amawi, in fact, viewed them.  And then there is

12   the -- oh, and as to any of the videos, why do we need

13   Mr. Kohlmann to tell us?

14          Again, this is the same problem we've had in the

15   past, the original source and origin.  I mean, again, I

16   have no problem with an Arabic translation where it's in

17   Arabic.  I have no problem with the jury seeing and having

18   a translation, either scroll or read while it's being

19   viewed, even if it's lengthy and it's gruesome.  But absent

20   the connection -- absent the basis for believing that

21   Mr. Amawi viewed them and therefore knew their contents or

22   other evidence of knowledge of contents talking about a

23   particular video.  We may not have other evidence playing,

24   but nonetheless, if we talk about something that you are

25   familiar with its contents.  So maybe three different --

1          MR. HERDMAN:  And as to much of what Your Honor

2    just said, we don't disagree with you, we wouldn't be

3    proffering Evan Kohlmann as somebody to come in and testify

4    about videos that were either in Mr. Amawi's possession or

5    were handed off to Mr. Griffin.  In fact, I think at the

6    very beginning as to those three things that I can think of

7    off the top of my head, constitute a very small percentage

8    of these smaller percentage of limited testimony that we're

9    proffering as to Mr. Kohlmann right now, your Honor.

10         THE COURT:  Maybe -- what I'm trying to say is, I

11   don't think it would be appropriate that Mr. Kohlmann

12   essentially provide a catalog absent, you know, proof that

13   Mr. -- Mr. Amawi was aware of the contents.  And if he is,

14   then let's go ahead and show the video itself and a

15   translation, because as I think I've indicated earlier, I

16   don't think the fact that something is initially produced

17   by Al-Qaeda, Al-Qaeda in Iraq, whatever it is, has any

18   particular significance, because I'm persuaded, in light of

19   Mr. Kohlmann's testimony, that it's at least as likely as

20   not that this stuff was contained in some other source.

21         And because, if I recall his testimony -- I think

22   I do pretty clearly -- although he described it as being

23   quite difficult, it was apparent to me, based upon his

24   testimony -- which is the only basis I have for knowing

25   anything about the difficulty -- because somebody that logs

1    in every couple days or two or three days to check certain

2    websites could probably get this stuff.  And it's not so

3    even he is sent that I think any particular -- the jury

4    should hear or any inference could be drawn with the

5    difficulty accessing this, much less the size of the

6    collection.

7           So I just want to say where it's --

8    Mr. Kohlmann's testimony is either appropriate or necessary

9    to communicate to the jury, it can be presented to it by

10   looking at the material itself.

11          MR. HERDMAN:  If I can just back up and just talk

12   about the -- the particular nuggets of evidence that I

13   think we're proffering Mr. Kohlmann for at this point.  In

14   fact, if I can use the screens, do you know if these are up

15   and ready to go here?

16          THE COURT:  Of course.  That's why Cindy's here.

17          MR. HERDMAN:  The first -- and all these relate

18   to particular exhibits that have either -- that are either

19   in evidence or the defense counsel's objected for some

20   reason.  They're pending admission at this point before The

21   Court.

22          The first -- and this is the one that we've had

23   issues with in terms of the visibility with it, but I've

24   provided who's asked for it with a better copy of this.

25   The first is Government Exhibit Number 61.  And this

1   particular piece of evidence here was given by Marwan

2   El-Hindi -- two pages were given by Marwan El-Hindi to

3   Darren Griffin, I believe, on February 6th of 2005.  This

4   webpage is called the Masada webpage.  And Mr. Kohlmann is

5   familiar with this webpage.  He's familiar, in particular,

6   if you look in the lower, left-hand corner.

7              THE COURT::  How do you spell that?

8              MR. HERDMAN:  M-A-S-A-D-A-H, {sic} I believe.

9              Now, if I can direct your, of course, attention

10  to this lower corner of this exhibit here, you'll see

11  there's an actual IP address there, Internet protocol

12  address.  And Mr. Kohlmann is also familiar with this

13  particular Internet protocol address as a hosting site for

14  the Masada webpage.

15             So this is the first page here, and then if we go

16  to the second page, and the second page, Your Honor, that

17  was provided to Mr. Griffin, based on the Internet protocol

18  address in the lower, left-hand corner, appears to be from

19  the same website, Masada webpage.  And you'll see here,

20  there's a Martyrdom Operation vest preparation, and below

21  that you'll see some other what are essentially hyperlinks,

22  that hyperlink particular zip files.

23             Now, the reason that -- the reason that this is

24  important is because this particular webpage -- you can't

25  see it on your screen, I apologize.

1             THE COURT:  No, I can.

2             MR. HERDMAN:  The reason that this particular

3   exhibit and webpage are important is that the Masada

4   webpage, in fact, is one that both Mr. El-Hindi and

5   Mr. Amawi discuss with Darren Griffin.  In fact, in a

6   consensual recording, Mr. Amawi provides the website

7   address of the Masada webpage to Darren Griffin.  And he

8   does that, I believe, on the 13th of April.

9             THE COURT:  I'm sorry, who did that?

10            MR. HERDMAN:  Mr. Amawi provides the Masada

11  webpage address to Mr. Griffin, and Mr. El-Hindi provides

12  these particular pages to Mr. Griffin.

13            MR. BOSS:  What date was that, please,

14  April 13th?

15            MR. HERDMAN:  I think it was April 13th of 2005

16  that Mr. Amawi gave the address to Mr. Griffin.

17            Now, the value of Mr. Kohlmann for this

18  particular exhibit, Your Honor, is very -- it's very

19  narrow.  What he can say is, this is, in fact, the Masada

20  webpage, and the Masada webpage used this particular

21  Internet protocol address, that www.Masada, didn't always

22  necessarily take you to www.Masada.  It may have taken you

23  to a different Internet protocol address.

24            And it's very important particularly for counsel

25  to deal with the Operation Martyrdom vest, the bomb vest

1    video, because if you'll remember in the recording, there's

2    much discussion with about where it's available, and it's

3    available for a limited period of time.  There's much

4    discussion about where this video is actually available.

5           It turns out that what the Masada webpage did was

6    it linked to assorted copies of this bomb vest video, and

7    it is spread out all over the Internet, and there's what

8    all these links are on the second page, here.  And in fact,

9    Mr. Griffin was actually able to access at least two of

10    these copies.  And in fact, Your Honor, we -- there is

11    forensic evidence that one of the defendants accessed one

12    of these copies as well.

13           So this particular page, in effect, brings

14    together -- at least as to the bomb vest video -- brings

15    together the conspiracy, because this is a site and a

16    resource that is accessed by at least two defendants in

17    terms of finding this information and providing it to

18    Mr. Griffin.  And I don't know that it's something that for

19    a forensic -- that a forensic computer expert can testify

20    to only because that computer expert is going to be limited

21    to the evidence as it currently exists in the electronic

22    evidence with which that expert's being presented.

23           THE COURT:  Okay.  Let me -- let's address that

24    first, okay.

25           MR. WHITMER-RICH:  I would -- I guess I would say

1  that this -- the evidence establishes a lot of this from

2  what's -- from what I've heard, the evidence to the jury so

3  far.  I believe that the evidence has shown that this video

4  was viewed in an -- by Mr. Amawi and Mr. Griffin together.

5  I believe that unless there's evidence to come, that there

6  will not be evidence that Mr. Amawi ever provided a disc

7  that actually had a copy of this that was -- government was

8  able to open and that they had him with doing so because I

9  don't think they were able to open it.

10       The charge on count, I believe, three, is the

11  viewing of it and that's already in evidence.  The charge

12  of Count 4 for Mr. Amawi relates to another piece of

13  material, not the vest video, if I understand it.  So I

14  don't think that the government's proof, the proof that

15  Mr. Amawi got it from this particular website, I'm not sure

16  what that has to do with anything.  And --

17       THE COURT:  What's the pertinence of displaying

18  this to the jury and forming of that?

19       MR. HERDMAN:  The purpose of this, Your Honor,

20  are those hard copies of those webpages was given to

21  Mr. Griffin by one conspirator and an alternate way to

22  access this website was given to Mr. Griffin by another

23  conspirator.  And in that --

24       THE COURT:  I gather that that is relevant on the

25  distribution charges even though the mode of distribution

1   may differ, because if you look at the video and you say

2   here's where you --

3          MR. HERDMAN:  That's correct and those defendants

4   are charged separately in those distribution counts, but

5   this is -- I'll address this later, but I actually think

6   that -- first of all, defense counsel have already argued

7   to The Court and have objected to certain of these exhibits

8   coming in.  But they've argued to The Court that there are

9   two separate bomb vest videos that came into evidence.

10  They argue to The Court that Mr. Griffin never actually got

11  some of these documents from Mr. El-Hindi and, in fact, I

12  know with this particular exhibit, I would anticipate that

13  they will attack the chain of custody of this particular

14  exhibit.  And --

15         THE COURT:  You say that they will?

16         MR. HERDMAN:  I anticipate that they will.

17         THE COURT:  Of 61 or --

18         MR. HERDMAN:  Yes, Your Honor.  This was the

19  document that was scanned into a 302.  So to that extent,

20  Mr. Griffin's credibility has already been called into

21  question numerous times, not only on cross-examination, but

22  on his direct examination in terms of some of the

23  accusations that have been leveled as to particular items

24  of evidence.  And the government should be entitled to

25  corroborate Mr. Griffin's testimony with respect to this

1    entire chain of events that led up to the acquisition of

2    these bomb vest videos.

3              MR. HARTMAN:  Your Honor, if I may, a couple of

4    things.  Number one, this -- everything that has just been

5    argued was addressed in your decision, precisely the same

6    reasons that you decided these things weren't relative or

7    their probative value was outweighed was in your decision.

8    I will say, Mr. Herdman is correct that we'll challenge the

9    chain of custody on this because we've challenged its

10   submission because there's no origin on this.

11             Number two, I don't think they should be able to

12   do anything with this until a forensic computer specialist

13   can say that this came from Mr. El-Hindi's computer because

14   ours is going to say he didn't visit that website on the

15   5th.  There are a lot of technical issues about this before

16   we ever get to whether or not Kohlmann's testimony is

17   relevant.

18             THE COURT:  Well, I -- I disagree to this extent,

19   I think if I heard Mr. Herdman correctly, and I don't think

20   I covered this, at least not this precise point because I

21   didn't realize -- maybe I've been told, but I didn't

22   realize those were links to the bomb vest video, at least

23   that's not what I was thinking about when I wrote that

24   opinion.  I wasn't conscious of that at the time.  That I

25   do think that this is relevant to the separate charges as

1    to each of -- certainly as to Mr. El-Hindi, perhaps to

2    each.  And that is that it's probably admissible -- because

3    it's a statement made by a co-conspirator and, of course,

4    in furtherance of the conspiracy.

5            This is a statement.  It's in Arabic, and none of

6    us can understand it.  The defendants can, but none of us

7    who don't speak Arabic can understand it, but nevertheless,

8    it is a statement.  And the act of the utterance where it's

9    offered for the truth of the matter, asserted or not, has

10   independent evidentiary significance in light of

11   Mr. Griffin's testimony that it was given to him by

12   Mr. El-Hindi.

13           And I think that testimony as to the Internet

14   protocol address and the links, I believe Mr. Kohlmann is

15   competent to testify in a sense that he knows what he's

16   talking about, perhaps voir dire a little bit specifically

17   outside the hearing of the jury as to precisely those links

18   and get confirmation as to he does have a basis for that

19   testimony either firsthand or other reliable, but I think

20   it's admissible with regard to the charge, at least with

21   Mr. El-Hindi.  It's not a conspiracy charge on the

22   distribution; those are separate.

23           MR. HERDMAN:  They are separate counts, Your

24   Honor.

25           THE COURT:  I think -- I think it would be

1    admissible only to Mr. El-Hindi.

2              MR. HERDMAN:  Your Honor, they are separately

3    alleged overt acts within the conspiracy.

4              THE COURT:  I'll try to untangle those threads

5    for the jury, but with regard to -- and I think we're

6    talking principally about the distribution of

7    how-to-make-a-bomb information.  I really think it is

8    admissible as to Mr. El-Hindi.  And why would it be as to

9    Mr. Amawi?

10             MR. HERDMAN:  Mr. Amawi, if I'm correct there's

11   some discussion with both the website while this is being

12   launched, Your Honor.

13             MR. HERDMAN:  On the 13th of April, 2005

14   Mr. Amawi and Mr. Masloum come over to Darren Griffin's

15   apartment.  That's when Darren Griffin has the chart, the

16   drawings on the easel there, and if you remember,

17   Mr. Amawi's actually going to websites.

18             THE COURT:  Right.

19             MR. HERDMAN:  And he mentions during that, while

20   he's searching for certain items, he says you should go to

21   Masada webpage.  And if my recollection is correct, he

22   actually goes to that website.  You can see it on the

23   camera that Mr. Griffin was wearing.  But he says the

24   actual -- he spells the actual URL for Mr. Griffin.  And it

25   just so happens that the webpage that Mr. Amawi is now

1  directing Darren Griffin to go to is the same webpage that

2  Mr. El-Hindi had directed Darren Griffin to go to.  And

3  then this also --

4          THE COURT:  Okay.  I -- I agree.  I think in

5  light of what you're telling me, it does seem to me to be

6  admissible.  Because absent that, it doesn't -- absent

7  elaborations through testimony and Mr. Kohlmann, it has no

8  evidentiary significance.

9          MR. HERDMAN:  There's one additional point I want

10  to make that implicates a second piece of evidence, which

11  is the Muntada Al-Ansar forum.  I know Your Honor is

12  familiar with this because Mr. Kohlmann addressed it in his

13  direct testimony, and it's also highlighted in his report.

14  The Muntada Al-Ansar forum was actually the original

15  distribution point --

16          THE COURT:  I've got a conference call that I've

17  got to take.  It's going to be probably 20 minutes or so.

18  I apologize.  My office just reminded me.

19          MR. HERDMAN:  I don't know, sitting here, how

20  long these particular clips are.  I've identified clips

21  that are relevant.  It could be 15 minutes or it could be

22  two minutes.  I'm not --

23          THE COURT:  I'm going to ask her to stay as a

24  back up.

25          MR. HERDMAN:  Your Honor, just to illustrate,

```
 1     this relates to --
 2             THE COURT:  By the way, I apologize to everybody.
 3     I had totally forgotten that.
 4             MR. HERDMAN:  If you'll see on your screen, I
 5     pulled up the particular clip where Mr. Amawi gives the
 6     website to Mr. Griffin.  If you're interested in listening.
 7                     (Audio playing.)
 8             THE COURT:  Do you have any sound?
 9             MR. WHITMER-RICH:  Is this 46 or 47?
10             MR. HERDMAN:  This is one D48 of 49185.  Clip 4A.
11     And it's Exhibit 4-42.  And I don't know why I'm not
12     getting any sound.
13                     (Audio playing.)
14             MR. HERDMAN:  And Your Honor, that portion
15     actually is important when you look at the actual URL, the
16     Mott -- it's actually in -- it doesn't say Masada the way I
17     spelled it for The Court.  It's M-A-S-A-D-A, I believe.  So
18     he actually spells it exactly for Mr. Griffin.
19                     (Audio playing.)
20             MR. HERDMAN:  And Your Honor, just say the
21     conversation in the proceeding clips, Mr. Griffin's asking
22     specifically about the bomb vest video, and again, saying
23     you never -- he never gave me a copy of it, and this kind
24     of leads up to this.
25             THE COURT:  No.  Always, I said, I understand
```

1    what it is.  This is pertinent, too, and I disagree with

2    the defendants as to the propriety of the evidence that was

3    explained to the jury, the significance of that, and its

4    probative value of that exhibit.  And I do think you need

5    somehow to have it connected, and I think obviously

6    Mr. Griffin cannot.

7              MR. HERDMAN:  And Your Honor, I brought up again

8    here -- this is the second page of Exhibit 61.  It's very

9    hard to read, it looks like, on your screen.  I'll try to

10   zoom it in.

11             THE COURT:  Sure.  It's legible.

12             MR. HERDMAN:  So what you see there when you look

13   at these hyperlinks, here, is you see a link to the

14   Martyrdom Operation vest preparation.  That particular

15   version of this video was first released on the Muntada

16   Al-Ansar forum.  The Muntada Al-Ansar forum is a website

17   that Mr. Amawi, in particular, discusses quite a bit

18   throughout the consensual recordings.

19             THE COURT:  I remember that.

20             MR. HERDMAN:  He uses different names for it but

21   all of them focus around Al-Ansar.  And he talks about

22   Al-Ansar Al-Qaeda.  He talks about Muntada Al-Ansar being

23   an Al-Qaeda website.  And it's actually a website that he

24   discusses specifically with Mr. El-Hindi when they meet.

25             I think I have an exact date when they actually

 1   discuss it.  I believe it's in 1D22.  Exhibit 4-28, clip

 2   2-A.  And -- and the entire conversation there is about

 3   this particular website, and Mr. El-Hindi, with

 4   reference -- they're talking about the bomb vest video in

 5   this clip.

 6            MR. HARTMAN:  What's the date on that?

 7            MR. HERDMAN:  The date on that is -- I think it's

 8   January 31st or March -- no, it's January.  This is the one

 9   thing I didn't recognize the dates.  It's --

10            MR. WHITMER-RICH:  I believe it's February 2nd,

11   2005.

12            MR. HERDMAN:  Thank you, Mr. Whitmer-Rich.

13            And in that conversation, I believe this is one

14   where Mr. El-Hindi says, do they have the ones for

15   manufacturing as well.  And that whole conversation centers

16   around the actual production of this bomb vest video and

17   the availability of it.

18            Now, Mr. Amawi references the Muntada Al-Ansar

19   forum in a number of different contexts, but what you can

20   see when you link up Exhibit 61 to Mr. Amawi's

21   conversations about Muntada Al-Ansar is that the -- the

22   bomb vest videos that were available on Exhibit 61 were

23   created because the Muntada Al-Ansar forum stopped offering

24   these videos at a certain point in time, and you actually

25   couldn't link to that continuing version of it anymore.  So

1    what the Muntada did was provide all the different places

2    where this video was available on the web.  You'll see one

3    of them has a wansan.jp address.  This particular URL is

4    discussed on a consensual recording between Mr. El-Hindi

5    and Mr. Griffin.  And I think this sniper.zive.net is also

6    mentioned during that same conversation.  So what you can

7    see is, again, it's a progression from a particular website

8    that Mr. Kohlmann can explain.

9         And when the defendants talk about Muntada

10   Al-Ansar or Al-Ansar, it's not clear exactly what it is

11   that they're talking about.  Mr. Kohlmann will come in,

12   again, for the very limited purpose of saying this was a

13   particular website.  This website was password protected.

14   You had to register.  In fact, the defendants talk about

15   that, having to register for a particular website.  So

16   Mr. Kohlmann can confirm that what the defendants are

17   talking about is, in fact, true, and that the information

18   that they're giving to Mr. Griffin is, in fact, true.  And

19   they've given it to him in a number of different ways.

20        But just standing alone, it's not apparent from

21   some of these -- they're only audio recordings, some of the

22   discussions are in video recording, but it's not like the

23   video shows them typing in the URL, going to that

24   particular website.  It's not necessarily a step-by-step.

25        And Mr. Kohlmann will come in -- and this will be

```
 1    very short, this particular testimony, but he will just

 2    explain that there was a website called Muntada Al-Ansar.

 3    That website was required a registration after a certain

 4    point in time.  It was password protected and this website

 5    served as a distribution point for certain videos.  One of

 6    which was Operation Martyrdom vest preparation.

 7            And the discussion about Muntada Al-Ansar leads

 8    all the way up to January 10th when Mr. Amawi is discussing

 9    with Mr. Griffin the actual bomb vest video and plays it

10    for him.

11            This discussion Muntada Al-Ansar, though, by

12    Mr. Amawi, starts back in November, and he discusses it all

13    the way back to January and talks about new videos that are

14    available.

15            And if I can have just a moment, I can point you

16    to one clip in particular.  This is from 1D18, 69185, clip

17    4A.  And this is Exhibit 4-23.

18            MR. IVEY:  Mr. Herdman, what's the date on this?

19            MR. HERDMAN:  This one is -- I'm sorry, we'll get

20    it, I just have to -- I don't have it easily searchable.  I

21    believe it's January 21st.

22            MR. IVEY:  You said January, what?

23            MR. HERDMAN:  Twenty-first, 2005.

24            MR. WHITMER-RICH:  I think it's the 27th, maybe.

25            MR. HERDMAN:  Yeah, you're right.  It's the 22nd.
```

```
 1              MR. WHITMER-RICH:  Twenty-seventh.

 2              MR. HERDMAN:  Twenty-seventh, okay, the 27th.

 3              MR. WHITMER-RICH:  That's what I think.

 4              MR. HERDMAN:  Yeah, that's correct.

 5              So 1D18, Exhibit 4-23, clip 4A.

 6                   (Audio playing.)

 7              MR. HERDMAN:  Your Honor, what is going on there

 8     is they're actually -- Muntada Al-Ansar, when you type in

 9     the URL is Ansar.net/vb.  And the reason.

10              THE COURT:  BB as in baseball, baseball.

11              MR. HERDMAN:  Victor Bravo.  And the reason that

12     that's important is because that particular website does

13     appear in Mr. Amawi's web favorites, and Mr. Kohlmann,

14     again, will explain that that actual URL corresponds to the

15     Muntada Al-Ansar forum.  Otherwise, it's just standing

16     alone, and there's no actual evidence of any linkage

17     between all of these different elements.

18              The fact that Muntada Al-Ansar was located that

19     the particular URL, and there was -- and he may have great

20     interest in this case that was available on Muntada

21     Al-Ansar before it was available anywhere else, and -- oh,

22     and that's the kind of thing that Mr. Kohlmann will be --

23     again, a very limited, narrow sense regarding this Muntada

24     Al-Ansar forum.

25              MR. WHITMER-RICH:  I don't think there's a
```

1    dispute in this case that Mr. Amawi downloaded a copy of

2    the vest video and had it on his computer.  And that he's

3    visiting Ansar or there's talk of Al-Ansar and so forth.

4              THE COURT:  Is that in the definition?

5              MR. WHITMER-RICH:  It -- there's a proposed --

6    the government's most recent proposed stipulation strips

7    out all of the websites.

8              MR. HERDMAN:  We're having trouble agreeing on

9    language.

10             MR. WHITMER-RICH:  I think we'd probably be able

11   to reach agreement on those.  But I think that we can

12   identify for the jury that it's a popular align Jihadist

13   forum, for example.  That was one definition that was

14   coming to my mind that was proposed at one point.

15             THE COURT:  Does it have a particular sponsor,

16   closed quote?

17             MR. HERDMAN:  I believe this is the website, Your

18   Honor, that is discussed in the report regarding Irabby

19   007; again, we wouldn't be getting into that kind of

20   detail, though.

21             But this was Muntada Al-Ansar was used by

22   Al-Qaeda in Iraq was their first distribution point on the

23   web for any video production that they wanted to put out

24   there.  Again, I don't know that we necessarily need to get

25   into that level of detail.  I just think it's important to

1    have Mr. Kohlmann come in and explain to the jury the fact

2    that all of this does, in fact, tie together and not just

3    in a way that's in a stipulation.

4              MR. HARTMAN:  He didn't -- he didn't say that

5    this is where the video came from, right?

6              MR. HERDMAN:  He doesn't in this clip.

7              MR. HARTMAN:  When he was on the stand, he

8    couldn't say where.

9              THE COURT:  He, being Kohlmann?

10             MR. HARTMAN:  Yeah, Kohlmann couldn't say where

11   they --

12             THE COURT:  -- where this copy came from?

13             MR. HARTMAN:  Correct.

14             THE COURT:  Well --

15             MR. WHITMER-RICH:  I'm not sure how -- why that

16   matters so much.  We had a copy of it and he -- and the

17   government alleges purported gave a copy to Mr. Griffin and

18   failed to do so.  They viewed a copy together and then

19   there's some evidence related to Mr. El-Hindi in all of

20   this.  I -- I think that evidence speaks for itself.  We're

21   not pretending that this copy didn't exist on Mr. Amawi's

22   computer.  I'm not sure that it adds what source it came

23   from.

24             MR. HERDMAN:  Your Honor.

25             THE COURT:  There are basically two sources being

```
 1    suggested, one direct and the Ansar.  I think for the jury

 2    to understand the nature of the website and what was

 3    available on it, I'm not sure the sponsor, closed quote,

 4    is -- is necessary, but just the kinds of thing one would

 5    find, and perhaps even then, for instance, materials

 6    produced by Al-Qaeda in Iraq.

 7            I don't want to make a big deal out of that, just

 8    saying, look, I can tell the jury these defendants are no

 9    connection, this simply is being shown so you understand

10    the kinds of site -- the kind of site that this was.  And

11    the other one was Masada website, which an -- as I

12    understand it -- is sort of an entry portal, once the video

13    is no longer available on Al-Ansar or to be taken down from

14    there.

15            Simply saying, these are sources accessed by

16    Mr. Amawi and from either of which the video could have

17    come, period, end of discussion, which I think is what

18    you're --

19            MR. HERDMAN:  Correct, Your Honor.

20            THE COURT:  -- connecting those dots.

21            MR. HERDMAN:  The fact that Mr. Kohlmann has much

22    more information about Muntada Al-Ansar, I don't think we

23    really need to get into about that.  And the only thing I

24    would say with respect to Muntada Al-Ansar in his response

25    or is Mr. Amawi himself says that is Al-Ansar Al-Qaeda.
```

1          THE COURT:  I remember that.

2          MR. HERDMAN:  There's some evidence suggesting

3     that this website that he's talking about, specifically on

4     this date, is the website that he discusses back in

5     November or December of 2004 and acknowledges knowing that

6     it's sponsored by Al-Qaeda.  Now, that's the only

7     connection of Al-Qaeda that we would ever allege in this

8     case.

9          MR. HARTMAN:  Then why does an expert need to

10    satisfy that if the defendant's understanding is what is

11    important, then, the defendant's intent?

12         THE COURT:  I'm saying I'm not totally opposed to

13    it.  I don't really care one way or the other.  I think it

14    is important to say, if you go to this website, these are

15    the kinds of things you're going to see.

16         MR. WHITMER-RICH:  Your Honor, I believe that we

17    will be able to reach a stipulation that will accomplish

18    that purpose.

19         THE COURT:  So far you haven't and that's the

20    point I made earlier.  And in any event, I'm going to

21    permit Mr. Kohlmann to testify with regard to Exhibit 61.

22    And that will permit him to testify both as to giving the

23    61, Mr. El-Hindi, which has the source of the bomb vest

24    video, and there was another reason.

25         MR. HERDMAN:  The IP address on Exhibit 61, Your

1    Honor.

2              THE COURT:  Right.

3              MR. HERDMAN:  The fact that Mr. Amawi spelled out

4    the Masada webpage for Mr. Griffin.

5              THE COURT:  Was that also in his list of

6    favorites?

7              MR. HERDMAN:  I don't believe that it was, but

8    I -- I'm not positive about that.  I know that it was

9    somewhere, but I can't remember where it was.

10             MR. HARTMAN:  Your Honor, I would just ask that

11   The Court require the government to lay a factual

12   foundation for Exhibit 61 prior to allowing any testimony

13   about it and when --

14             THE COURT:  Go ahead.

15             MR. HARTMAN:  I'm sorry.

16             THE COURT:  No, go ahead.

17             MR. HARTMAN:  Particularly in -- because, I mean,

18   that's what the forensic computer examiners do, which

19   Mr. Kohlmann said he can't do.  And particularly in light

20   of the fact that they have no original, there is --

21             THE COURT:  And can -- what will the testimony be

22   in terms of admitting --

23             MR. HERDMAN:  I'm sorry, Your Honor.

24             THE COURT:  What will the foundation be for

25   admitting the duplicate --

```
1          MR. HERDMAN:  We've told --

2          THE COURT:  -- of 61?

3          MR. HERDMAN:  We've told counsel that whatever

4    was given to Darren Griffin, that is all that is left is

5    what was scanned into that 302.

6          THE COURT:  And where did that come from?

7          MR. HERDMAN:  It was -- the testimony from Darren

8    Griffin was that El-Hindi handed that to Mr. Griffin, and

9    then Mr. Griffin gave that to FBI agents.

10         THE COURT:  And Mr. Griffin can testify that is a

11   duplicate so far as he's aware.

12         MR. HERDMAN:  Yes, he says -- he did testify, in

13   fact, that those were what he was given.

14         THE COURT:  Yeah, I remember.  I honestly think

15   that's sufficient.

16         MR. BOSS:  Your Honor, if I may add, I think that

17   among the things that we need to address is the computer

18   forensic foundation before the Kohlmann testimony comes in.

19   And the reason for that is we do believe -- and

20   Mr. Herdman, please correct me if I'm wrong -- that there

21   is no evidence of that document imprinted on any -- or ever

22   having resided on any of the El-Hindi computers.

23         MR. HERDMAN:  Your Honor, counsel has a copy of

24   Mr. Corrigan's forensic report, and.

25         THE COURT:  A copy of --
```

1          MR. HERDMAN:  Counsel has a copy of

2    Mr. Corrigan's forensic report.

3          THE COURT:  Corrigan --

4          MR. HERDMAN:  Joseph Corrigan, our forensic

5    computer expert, and I would say that Mr. Boss is wrong.

6          THE COURT:  He is?

7          MR. HERDMAN:  He is wrong.

8          THE COURT:  Well, that evidence is what it is.

9    It doesn't matter where it came from.  It could have been

10   given by some third party.  So the fact that Mr. El-Hindi

11   didn't -- his computer doesn't show that he accessed it and

12   obtained it himself doesn't matter, I don't think.  What

13   matters is, he gave that document containing that

14   information to Mr. Griffin.  And that information is

15   related to the bomb vest video charge and distribution.

16          And also, I'm not -- taking a quick look at the

17   rule of evidence, but a thousand and one, or whatever it

18   is, about copies and duplicates, my understanding that the

19   standard is really quite relaxed.  Duplicates is the Rule

20   10-3:  Duplicate is admissible to the same extent as an

21   original unless the genuine question is raised as to the

22   authenticity of the original or in the circumstances -- or

23   not circumstances, it would be unfair to admit the

24   duplicate in lieu of the original.

25          Always been my understanding it takes no more to

```
 1    admit a duplicate than somebody says that's it, it hasn't

 2    been changed.  I don't know where the original is, I have

 3    no idea.  And the lack of the original goes to weight

 4    rather than admissibility.  And it's -- and in the 18th

 5    century it made more difficult to get a duplicate, but

 6    that's before the age of Xerox.

 7               MR. HERDMAN:  And again, Your Honor, the Exhibit

 8    61 --

 9               THE COURT:  And again, I think that in terms of

10    the extent to which there is proof -- as I gather that

11    there is -- I think looking at the vestige report, there's

12    no evidence Mr. El-Hindi accessed it, then it's a matter of

13    credibility in cross-examining Griffin or trying to impeach

14    his veracity and his claim that he got it from

15    Mr. El-Hindi, and that's a matter for the jury to sort out.

16               MR. HERDMAN:  And just in terms of order, Your

17    Honor, if you're concerned about this at all, I do

18    anticipate that Mr. Corrigan, a forensic computer expert,

19    will testify this is the way we've had to go about this

20    anyway, but Mr. Corrigan testified in advance of

21    Mr. Kohlmann, so it would be -- I think there's significant

22    foundation.

23               THE COURT:  And what will Corrigan say?

24               MR. HERDMAN:  He will say a number of things,

25    Your Honor.
```

1         THE COURT:  About this?

2         MR. HERDMAN:  With respect to this particular --

3    I'm sorry, we're talking about Exhibit 61?

4         THE COURT:  Right.

5         MR. HERDMAN:  His -- his report reflects the fact

6    that there is evidence that, one, Mr. El-Hindi's computers

7    did access this specific IP address.

8         MR. BOSS:  On what date?

9         MR. HERDMAN:  It's in the report.  All of this is

10   in the report.

11        THE COURT:  It's in the report.

12        MR. BOSS:  Pardon me, I think that the reason

13   it's important is that that alleged access is after the

14   date that that document was printed.  And that's the

15   problem, if I'm not mistaken.

16        MR. HERDMAN:  Again, Mr. Boss is mistaken, but

17   I'm not going to sit here and testify -- there is an

18   explanation for all of this, Your Honor.

19        THE COURT:  And as I say, if there is, there is;

20   and if there isn't, there isn't.  Doesn't matter what we

21   have a witness who says I recognize it.  I've got it.  I

22   don't know if he says when he got it.  I can't recall.

23   This is what I got.  This is from whom I got it and this is

24   what I did with it.  And if we need a further chain of

25   custody, we'll have someone from the bureau testify or

1   probably outside the hearing of the jury and say we don't

2   know where it is, I suppose.

3          Does an agent recall getting this item?

4          MR. HERDMAN:  Yes, especially in light of the

5   fact that it's scanned into the 302 of the documents

6   received.

7          THE COURT:  Okay.  I think that even adds to the

8   foundation and the fact that the -- that it got scanned is

9   a commonplace enough exercise doesn't raise any doubt in my

10  mind that this is a genuine duplicate.

11         MR. HERDMAN:  Your Honor, the Exhibit 61, I

12  brought up the Muntada Al-Ansar forum because they are

13  linked in some way because these are both distribution

14  points for this bomb vest video.  And again, this sort of

15  search among the conspirators and with Mr. Griffin for

16  these bomb vest videos goes on for at least a month,

17  perhaps a month-and-a-half or two months.  But there's --

18  on almost a daily basis Mr. Griffin's expressing his

19  frustration of not being able to obtain --

20         THE COURT:  I recall that.

21         MR. HERDMAN:  -- a copy of the video.  And

22  Muntada Al-Ansar serves as the starting point, if you will,

23  the Masada webpage takes what Muntada Al-Ansar forum --

24         THE COURT:  Again, I've already indicated I think

25  it's permissible for Mr. Kohlmann to say this is what could

1   be located at the various times on these particular

2   websites and have either of the defendants, and perhaps

3   according to your evidence, both either accessing or

4   providing information about either or both of those

5   websites.

6          And I think that at least the bomb vest video

7   charge, and as Mr. Sofer said with regard to the overt

8   acts, I think -- I think that this is admissible.  And I

9   don't know an other source of having it for -- and I

10  realize that you have a foot in the door and a -- agree to

11  stipulations, but that's the way it goes.  If you can

12  stipulate, terrific.

13             MR. WHITMER-RICH:  I believe we can, Your Honor.

14             THE COURT:  Okay.  If you can, he can.

15             What else as to Mr. Kohlmann?

16             MR. HERDMAN:  If I take Your Honor and counsel to

17  Exhibit 62, this is another webpage that was Mr. Griffin's

18  testimony moves this -- this three-page document related to

19  the Ansar Jihad webpage was given to Mr. Griffin by

20  Mr. El-Hindi on or about the 16th of February, which is the

21  date that's printed in the lower, right-hand corner of this

22  exhibit.

23             Now, the reason that this particular exhibit

24  requires some --

25             THE COURT:  Who printed that?

1          MR. HERDMAN:  Who printed it?

2          THE COURT:  216.

3          MR. HERDMAN:  I believe there's circumstantial

4    evidence that Mr. El-Hindi printed it.

5          THE COURT:  The date on there just -- just --

6    it's on the original document so whoever originally printed

7    that document off.

8          Okay.

9          MR. HERDMAN:  Now, the reason that this

10   particular document is important -- if I bring up the

11   translation -- and the reason it requires some explanation

12   by Mr. Kohlmann is, again, Mr. Kohlmann is familiar with

13   Ansar Jihad, and I will tell you frankly that Mr. Kohlmann

14   will say this is not one of these elite forums, much like

15   Muntada Al-Ansar or Ekhlaas, which I'll discuss in just a

16   moment.

17          Ansar Jihad was basically the equivalent of a guy

18   running a mechanics shop out of his garage.  It was kind of

19   an amateur issue effort to collect a bunch of videos

20   together -- but the reason that this particular document is

21   important -- and we just zeroed in here on a series of

22   videos that relate to operations by Chechnyan Mujahideen

23   against the Russians either in Chechnya or somewhere in the

24   Caucuses.

25          Now, if you'll remember, on the 16th of February,

1  that's the date when all three defendants and Mr. Griffin

2  went over to Mr. El-Hindi's home and they actually viewed a

3  video at some point in time.  And that video, when you

4  listen to it, you can tell -- and actually they're talking

5  about this, that the fact that it relates to Chechnyans

6  attacking the Russian convoy.

7         Mr. Kohlmann is familiar with all of these

8  Russian Hell videos, and I anticipate that his testimony

9  will be -- and again, I have not played this exact clip for

10 him so I can't say this will be the case -- but I

11 anticipate that his testimony will be that the sounds of

12 them that are playing in the background are consistent with

13 one of these four versions of Russian Hell, and the fact

14 that that's important is because Mr. Griffin walks out of

15 that meeting with this particular document linking him to

16 these movies.

17        And the government's position is that the viewing

18 of those videos and the actual instruction that's being

19 given during the viewing of those videos are very important

20 to proving our charges in this case.

21        Mr. Kohlmann adds something that no other witness

22 can bring into this, which is familiarity with these four

23 videos, familiarity with the audio portion of those four

24 videos, and familiarity with the Ansar Jihad.  He has all

25 three things that he can bring together.  And again, this

1    would be a simple matter of showing him this document,

2    playing the pertinent portion of the clip for him, and then

3    asking him if he has an opinion as to where these

4    particular exhibits might link up.

5            MR. HARTMAN:  Where's the instruction?  What's

6    the instruction part of this?

7            THE COURT:  Rather than that -- I mean, I gather

8    what you're saying is he would be able to describe for the

9    jury what was being viewed while the conversation was

10   occurring?

11           MR. HERDMAN:  That's correct.  And I should say

12   that these particular videos, Russian Hell, were not

13   recovered off any computer.

14           THE COURT:  You anticipated my next question.  So

15   it's a little like a duplicate in a sense?

16           MR. HERDMAN:  In a sense and only the audio

17   portion.

18           MR. WHITMER-RICH:  And as an alternative,

19   Mr. Griffin could have described what the video was while

20   they were watching it.

21           MR. HERDMAN:  My only -- my position on this

22   would be if you're not a person who watches these videos,

23   literally hundreds of times like Mr. Kohlmann has.

24           THE COURT:  I do think that unless there was some

25   conversation when this document was given to Mr. Griffin,

1    linking it directly to a particular video and -- which

2    would explain the connection between the two.  I can't

3    recall whether there was or not.

4         MR. HERDMAN:  There wasn't, with respect to this

5    document, but again, this is circumstantial evidence.

6         THE COURT:  I understand.  Again, my point --

7    they're not being -- if it were the government's evidence

8    that someone said if you want to get another look at this

9    video of this attack occurring, here's where you go.  If

10   there was something of that sort recorded in evidence, then

11   I would say, hey, you already know we'll introduce this,

12   we're not going to talk about what the video was, but I

13   agree with you that I think to link up this exhibit with

14   what was being viewed, absent the video itself, I think

15   it's appropriate to have somebody acknowledge, say, there

16   is no duty of certainty, I believe, that this is one of the

17   videos that's being watched.

18        And also, again, I don't recall you indicated if

19   those conversations that the government will contend was

20   instructional or, quote, training, and I will rely on that

21   subject to -- to it being disputed by the defendants.  But

22   that also seems to me to make the significance of the

23   conversation as relevant because it helps prove that and

24   that's a fact in issue.

25        MR. HERDMAN:  Next is -- I think we're almost --

1    almost to the end, Your Honor.

2              THE COURT:  Of this segment or everything?

3              MR. HERDMAN:  Of everything.  We have a couple

4    more to go here.  And 73, page 3.

5              THE COURT:  And what is -- back up for a moment.

6    On 62, what -- I mean, what else is on there?  What's the

7    significance of that?  In other words, is that a catalog

8    that came from the website or is it simply something that

9    was typed up?

10             MR. HERDMAN:  It actually appears to be a

11   printout.  That's the other thing, Your Honor, is that

12   Mr. Kohlmann can say that this appears to be a printed

13   version of what was on the website around or about that

14   particular time.  Otherwise, you're right.

15             THE COURT:  That was my question.

16             MR. HERDMAN:  It looks like it might be an Excel

17   spread sheet that somebody made up.  Here's the translation

18   of it.  You can see here's the name of the movie, and it

19   says, click here -- which is essentially the hyperlink

20   version of it.

21             THE COURT:  Now, what is this?

22             MR. HERDMAN:  I'm sorry --

23             THE COURT:  This isn't the same thing is it?

24             MR. HERDMAN:  This is a translation of the first

25   page of the Ansar Jihad.

1              THE COURT:  Okay.  And what was the other thing,
2      the thing we just looked at with the Russian Hell.
3              MR. HERDMAN:  That was the third page.
4              THE COURT:  Okay, it was all part of the same
5      exhibit.
6              MR. HERDMAN:  Correct.
7              THE COURT:  Okay, I didn't understand that.
8              MR. HERDMAN:  We're going to discuss Exhibit 73
9      now.  This is Exhibit 73.  This is the Just Jeans e-mail.
10     And this relates to -- this is the document actually
11     printing out in this particular 1D that relates to this,
12     it's 1D -- 1D8 of 69440, it's Exhibit 4-76.  And it's one
13     or more clips where Mr. El-Hindi first talks about the
14     Islamic Army of Iraq at Yahoo groups
15     IAIIraq@Yahoogroups.com, goes through a particular e-mail
16     that was -- it's in evidence and I'll get to that in a
17     moment, but before he does that -- or after he does that,
18     I'm sorry, he talks about this particular Just Jeans
19     e-mail.  He prints it off, and then there's Mr. El-Hindi
20     and Mr. Griffin are sitting side by side reading off of the
21     computer screen.  Mr. El-Hindi's translating Arabic for
22     Mr. Griffin off of the computer screen.
23             And if you go to the third page of this exhibit,
24     you see there's a handwritten thread.  This is the thread
25     that Mr. Kohlmann actually can recreate.  And the

1    archived -- I've provided a version of it.  It wasn't the

2    most legible version, unfortunately.  For some reason, it's

3    shrunk down, I'll try to get a better copy of it.  But when

4    you go to that thread, the archived version of that thread

5    and compare it to this thread and you compare it to the

6    conversation that's going on in the background, it's very

7    clear that what Mr. El-Hindi was reading to Darren Griffin

8    is the actual webpage that Mr. Kohlmann is able to

9    recreate.  For instance, there's specific language in there

10   relating to the closing date of the website's registration,

11   and I think Mr. El-Hindi says, oh, this is the last day,

12   you have to register today; it's going to close tomorrow.

13   The website actually says that, although it's in Arabic.

14            THE COURT:  And why is this --

15            MR. HERDMAN:  The Ekhlaas website has the

16   registration process that was in place where you could

17   receive either basic training or there were more advanced

18   courses.  I think one of them was something like battle

19   field medicine or some sort of Jihadist medicine that was

20   available, first aid that was available.  And so --

21            THE COURT:  Is there any proof that any of the

22   defendants accessed that and got that?  I remember Ekhlaas

23   was --

24            MR. HERDMAN:  This -- to some extent, Your Honor,

25   this is our proof that they accessed this website.  When

1   you can compare the actual document that was the website

2   and compare that -- and again this is an archived version,

3   it's essentially like photocopying the website at the time

4   it existed -- you compare that document to what's going on

5   in the consensual recording and then link it up with this

6   particular thread that Mr. Griffin wrote or Mr. El-Hindi

7   wrote down -- I don't remember what the evidence was as to

8   who wrote it down -- Mr. Griffin wrote it down.  Those

9   three things put together, the fact that Mr. El-Hindi very

10  clearly viewed this website with Mr. Griffin on this

11  particular date.  And Ekhlaas website is one of these

12  websites that run through this case.  Mr. Amawi talks about

13  the Ekhlaas website.

14          THE COURT:  Right, I remember that.

15          MR. HERDMAN:  So again, it's one of these

16  websites that we have circumstantial proof that it was

17  visited by these defendants and more importantly than that,

18  particular parts of that website Mr. Griffin was directed

19  to go to by these defendants.

20          THE COURT:  And so what -- what else do you want

21  Mr. Kohlmann to tell us about either Ekhlaas or what the

22  evidence shows the defendants did or accessed?

23          MR. HERDMAN:  We would need Mr. Kohlmann to

24  confirm that this thread that was written down by him

25  actually did exist as a webpage.  We would have to present

```
 1    the archived version of that webpage, and we would have.

 2              THE COURT:  Which would be what, this --

 3              MR. HERDMAN:  No, Your Honor.  The archived

 4    version -- I can pull up.  Actually, it's on my computer.

 5              THE COURT:  Whatever.  What is it, just tell me?

 6              MR. HERDMAN:  It's a .pdf, the version that I

 7    have an is a .pdf, Adobe Acrobat version.  It's about a 11

 8    pages, maybe.  I can hand it up to The Court.  And I think

 9    counsel has this.

10              THE COURT:  In Arabic?

11              MR. HERDMAN:  It is in Arabic.

12              MR. SOFER:  I think this is -- Judge this is the

13    part you can't see.

14              MR. HERDMAN:  The typing on this, unfortunately,

15    is very small.  Again, it's very small, Your Honor.

16              I'll try to get a -- that was the best -- the

17    only way I could actually print it is the way you actually

18    have it there.

19              THE COURT:  Okay.  In other words, this is what

20    you get when you go to that?

21              MR. HERDMAN:  Sorry, Your Honor.

22              THE COURT:  This is what you get when you go to

23    the Ekhlaas --

24              MR. HERDMAN:  Correct.  Of course it doesn't

25    exist anymore.
```

```
 1              THE COURT:  Right.  That's what was gotten.  And

 2   this was obtained by Mr. Kohlmann --

 3              MR. HERDMAN:  Correct.

 4              THE COURT:  -- this document?  Has this been

 5   marked as an exhibit?

 6              MR. HERDMAN:  No, it has not.  It's not been

 7   presented yet.

 8              THE COURT:  And this is what -- according to your

 9   anticipated testimony was being translated by Mr. El-Hindi

10   for Mr. Griffin, and I don't remember what was it, what is

11   it?

12              MR. HERDMAN:  It -- it starts off saying -- it

13   talks about a particular training course that's available

14   online through this webpage and the registration

15   procedures.  There's a link there, and there's a basic

16   course, there's a more advanced course.

17              Mr. El-Hindi explains what kinds of courses are

18   available and informs Mr. Griffin that he has to hurry to

19   register for this particular site because it closes the

20   next day.

21              MR. SOFER:  Judge, this interface is what we're

22   talking about this morning.  Counsel is going to talk about

23   the 18 definitions of training while the government needs

24   to be able to respond to that.

25              THE COURT:  I understand.
```

1              MR. SOFER:  I don't know if you can see on there.

2    But if you can look at that particular website, if you look

3    at what's on that website, that page at least, it's fairly

4    clear what kind of training we're talking about.  And this

5    is not training for soccer.  This is not training -- in

6    other words, without -- without that document, without

7    being able to show --

8              THE COURT:  I understand.  I'm inclined to let it

9    in.

10             MR. HERDMAN:  And Your Honor, I think the

11   testimony from Mr. Kohlmann would also be that to access

12   this thread, you would have to be a registered user who has

13   a password, because this Ekhlaas was another one of these

14   password-protected, registration-required websites.

15             THE COURT:  Counsel, I'm inclined to let this in

16   in light of the representations that are being made.

17             MR. HARTMAN:  Judge, I think the recordings from

18   that date says you don't need a password when you talk

19   about that website.

20             THE COURT:  Again, it's fuzzy in my mind, but

21   both Mr. Kohlmann -- and also I think maybe there was a

22   period of time there was no password required, but then you

23   had to get a password at some point.  They drew up the draw

24   bridge or at some point they -- a barrier that you can only

25   access by password.

1          MR. HARTMAN:  Are you saying you're -- you're

2     inclined to admit that now?

3          THE COURT:  No.  No.  I'm talking about

4     Mr. Kohlmann's testimony.

5          MR. HARTMAN:  Oh.  Well --

6          THE COURT:  And I think that it's -- I think,

7     again, to understand what it is that's being discussed, we

8     have to have some testimony from somebody, and the

9     significance of it, I think, this is probative,

10    particularly in light of what Mr. Sofer just said.  Even

11    absent that, I think it's probative.

12         MR. HARTMAN:  I guess, Judge, I still think, I

13    mean, the defendants -- if what the government says is true

14    about the tapes, the defendants talking about getting

15    training and watching people getting shot, killed, and

16    blown up -- and I mean, that speaks for itself.  And you

17    hear Mr. Griffin, like Mr. Griffin just said begging -- not

18    begging -- bugging for a month to get a copy of this thing.

19         I think the -- I think, frankly, the way you said

20    it in your order before about the fact that it would be so

21    prejudicial to have an expert come in and explain all these

22    things when they really speak for themselves as to the

23    intent of the defendants.

24         THE COURT:  But as to these three or four things,

25    I think that these have a probative value and details that

1   can be relatively few in number.  And I expect his

2   testimony to be very pinpointed precisely to what the

3   government's offering, which is explanatory, and in this

4   instance, this is what was being described.  He was

5   getting -- if I understand correctly -- the Ekhlaas --

6   printed Ekhlaas on the back of the prior exhibit would get

7   you this; is that correct?

8            MR. HERDMAN:  Correct, Your Honor.

9            THE COURT:  Now, are these -- are these or do

10  they have links to particular, quote, training materials

11  and/or slash videos?

12           MR. HERDMAN:  Well, that's what the online course

13  that Ekhlaas was offering -- there's a -- I believe it's a

14  hyperlink that from within that original document that was

15  on the Internet, you hit a button to register for the basic

16  or more advanced courses.

17           I have pulled up here, this is Exhibit 74, which

18  is the -- a confirmation e-mail that Mr. Griffin received

19  and you see there it says, Ekhlaas@hotmail.com.

20           Again, it's all -- this all fits together in that

21  this goes to prove that Ekhlaas actually was a

22  registration-required, password-protected website, because

23  Mr. Griffin himself registered for this thing, and that's

24  how we have the e-mail that he received as confirmation

25  that he was then registered with Ekhlaas.

1          MR. HARTMAN:  And again, I don't see any evidence

2     that this is a confirmation e-mail.  It's an e-mail.

3     It's -- it's -- it doesn't say anything.  I mean, you can

4     see -- yes, you can see the website and the date and time

5     and everything else, but --

6          THE COURT:  But I recall him testifying that

7     that's what he understood it was.  And if you have the

8     printing here, again, I think that goes to weight not

9     admissibility.  I think I recall his testimony about this,

10    and I think it established a foundation that it is what the

11    government contends it is.

12         MR. BOSS:  Judge, I don't recognize the language,

13    the printing.  I'm wondering, can I see some handwriting on

14    there, user pointing under Ekhlaas hyphen Jihad one?  Did

15    it arrive like that?

16         MR. HERDMAN:  Your Honor, if you remember,

17    defense counsel objected to this particular exhibit going

18    in based on the fact that this is language of an

19    undeterminate -- this isn't really a language that -- a

20    font that's on their subject line, font line, and large

21    portions of text.  I believe the testimony was that

22    Mr. Griffin wrote that on there himself as an -- as an

23    explanation to the agent that handed to -- he handed it to

24    and as a reminder to himself as to what his password was.

25         THE COURT:  That is my understanding or recall.

1   So I think there's mention to Griffin and that it is what

2   he contended he can testify it was or is.

3          But again, the -- the -- this is probative

4   because it informs the jury the significance of what it was

5   that was being viewed when they otherwise not be likely to

6   understand it.  This is different than the videos of the

7   roadside bomb going off of people being shot.  They

8   communicate themselves, the entire message that I think is

9   probative and admissible.

10         But with regard to this, and once again,

11  particularly in light of what Mr. Sofer commented, I think

12  that this is admissible.  And I think it's quite apparent

13  the only way it will make any sense to the jury is to have

14  the evidence of what it is and where it comes from.  And

15  Mr. Kohlmann is what's being proffered.

16         Anything else?

17         MR. HERDMAN:  The next thing that's on the screen

18  here for Your Honor is the -- this is the IAI Iraq at -- it

19  says.

20         THE COURT:  Does this have an Exhibit Number?

21         MR. HERDMAN:  Seventy-three, Your Honor.

22         THE COURT:  I see, okay.

23         MR. HERDMAN:  And this is the e-mail that -- the

24  Ekhlaas webpage was written on the back of one of these

25  pages.  And again, you'll see in the subject line,

brackets, it says, IAI Iraq, and then it says Just Jeans at

JJH.com.au to Marwan El-Hindi@Yahoo.com on Friday the 18th

of February.

This fits in in two different ways.  First of

all, the Just Jeans group just based on this e-mail

alone -- Mr. Kohlmann, we proffered him to come in and say

that he's familiar with this particular IAI Iraq word

because it relates directly to a Yahoo group by the same

name, IAI Iraq which was used as a mailing list, which

Mr. Kohlmann was a member of, and he would receive regular

e-mails that related to video releases and most

specifically to this case, the IED e-mail that Mr. El-Hindi

forwarded to Mr. Griffin.  And we would really --

Mr. Kohlmann would briefly just say, yes, there was Islamic

Army of Iraq and explain briefly what that group is.  My

understanding is Mr. Amawi's team is not willing to

stipulate to any of the groups that we had posed.  We had

talked about this.

MR. WHITMER-RICH:  I think we probably can reach

a stipulation on those matters.

THE COURT:  Okay.  Let him finish up.

MR. WHITMER-RICH:  Just tossing in my 2 cents.

MR. HERDMAN:  As of last week, my understanding

was they weren't going to stipulate to any of these groups.

But nonetheless, the Islam Army group that has conducted

 1   terrorist attacks, terroristic type attacks in Iraq.  And

 2   it ran a particular mailing list in 2004 and 2005,

 3   subscribers to which would receive e-mails that provided

 4   updates on the group's activities and certain information.

 5   And again, Mr. Kohlmann, as a member of that Yahoo group,

 6   he's familiar with the Islamic Army of Iraq which also

 7   carries video releases -- some of which will be played for

 8   the jury -- and he will be able to say that this particular

 9   designation here in brackets relates to that Yahoo groups,

10   the IAIIraq@Yahoogroups.

11            THE COURT:  I didn't hear --

12            MR. HERDMAN:  IAIIraq@Yahoogroups.  And what

13   we're trying to do here, Your Honor, is -- I have to show a

14   link here.  Is that -- we're --

15            THE COURT:  I couldn't hear you.

16            MR. HERDMAN:  I have to show the lay in

17   testimonies of our proof so you know where we're coming

18   from with this.  Is that this e-mail from Just Jeans

19   purports to be something completely nonsinister, something

20   that's a regular business venture.  It's only in the

21   subject line that the true nature of what this -- this

22   particular website is actually comes to light.

23            And when you take this e-mail, Just Jeans

24   confirmation e-mail, and you compare that with the e-mail

25   that Mr. El-Hindi forwarded to Mr. Griffin from

1   IAIIraq@Yahoogroups, it's clear that this Just Jeans

2   website or e-mail is working in some way to advance this

3   IAIIraq@Yahoogroups.com mailing list.  And that's -- and

4   all of this proof kind of goes together.

5           But most importantly, we actually have an e-mail

6   from the mailing list that Mr. Griffin was forwarded by

7   Mr. El-Hindi.  And Mr. Sofer just reminded me that's

8   actually a distribution account in the government's

9   indictment, that Mr. El-Hindi forwarded the descriptive

10  device or bomb-making information to Mr. Griffin.  And

11  obviously, the fact that -- the fact that this e-mail was

12  forwarded is proof, but it's much more important where that

13  e-mail originated from.  The fact that it came from a

14  mailing list that was linked to Islamic Army of Iraq is

15  important in not only the information itself, but it's

16  important in testimonies of Mr. El-Hindi's knowledge of

17  what it was that he was forwarding to Mr. Griffin.

18          THE COURT:  Again, I would tend to agree.  But I

19  don't want to spend a whole lot of time on the IAI --

20  AIAI -- if that's the correct -- yeah.  I think that he can

21  testify that this is a mailing list, that one can register

22  to get periodic e-mail transmissions, and I think he can

23  probably say of the general kind or sort and that the

24  simply the -- what the -- according to his understanding,

25  the Islamic Army in Iraq -- that's the correct term?

```
1              MR. HERDMAN:  Yes.

2              THE COURT:  -- is without a great deal of

3    elaborations.  But this is a source for various kinds of

4    videos and that this one came from there and make those

5    connections and that's it.

6              But again, I think that, once again, it is

7    probative, and I think properly and objectively

8    presented --

9              MR. SIEVE:  Your Honor, if I may.  As it relates

10   to not only, especially Mr. Amawi, but Mr. El-Hindi, my

11   concern with Mr. Kohlmann coming in and giving his

12   expertise about what these proofs are, Judge, is just that.

13   That's Mr. Kohlmann's expertise.  I'm afraid that there's

14   going to be some transfer answer of his expertise to our

15   clients.  As somehow our clients knew what Mr. Kohlmann was

16   doing with these sites.  And I would expect that

17   Mr. El-Hindi knew nothing of what Mr. Kohlmann is going to

18   say something about these sites, just something that he

19   stumbled across when he was on the Internet.

20             As I was reminded by my client just now, if

21   someone's looking at pornography on the Internet and the

22   pornography comes from one particular site and someone

23   knows who created that site and what it's all about, as

24   compared to -- and then, you know, they get it from that

25   site on the Internet and go somewhere else and they find it
```

1   there, the person looking at the pornography cares very

2   little how it got there, they're just interested in looking

3   at the pornography.  That's the same for our clients,

4   unless they can prove that our clients had the same expert

5   knowledge about these things that Mr. Kohlmann has about

6   these things.

7           THE COURT:  And I'm trying to draw that line.

8   I'm saying persons who were signed up for this e-mail

9   service could, during this period of time, receive

10  materials of this sort, and the group that provided them

11  was the Islamic Army in Iraq.  And it was an organization

12  that was part of the insurgency, period, end of discussion.

13  And I think that that bit of description is appropriate.  I

14  don't think that it's prejudicial value is -- is --

15  substantially outweighs the probative value.

16          Clearly, in cross-examination, and in particular

17  to Mr. Kohlmann, because he obviously wouldn't have a clue,

18  you don't know whether Mr. El-Hindi opened those e-mails.

19  You have no idea to the extent of his knowledge of any as

20  to what the Islamic Army in Iraq is or was and so forth.

21          Again, this is -- I suspect all of you was are

22  signed up for various kinds of e-mail services and

23  sometimes we open them and sometimes we don't.  And -- but

24  with regard to the one that was forwarded, I think it's

25  more likely than not that its contents were known to

```
 1   Mr. El-Hindi, and I think the government can at least argue
 2   that it -- his circumstantial groups, that he was familiar
 3   with the contents of at least that transmission, and also
 4   argue that the fact that you forward something doesn't
 5   necessarily mean that you opened it up.  But I think it's a
 6   fair inference the parties can argue about.  So I think
 7   that this is admissible.
 8           But again, I don't know how many times I can
 9   emphasize, I don't want, you know, the 40 pages of
10   Mr. Kohlmann's report about all these different groups and
11   origins and the terrible things that they've done and how
12   long they've been in existence and who all the principles
13   are.  No.
14           I'm talking about the stuff that came into the
15   hands and passed through the hands of one or more of the
16   defendants, that were viewed by one or more of the
17   defendants in Mr. Griffin's company.  And the purpose is to
18   let the jury understand the significance in terms of both
19   substantive elements, particularly of the bomb vest video
20   and the overt acts and also the intent.  And to some
21   limited extent, I believe, probably relative to the common
22   understanding, and therefore -- and it's at least -- may at
23   least be indirect proof of that.
24           So I think that for those reasons, it does have
25   pertinency, relevance, materiality, probative value, which
```

```
 1   are not substantially outweighed about the risk of unfair,

 2   undue prejudice.

 3          I think I made clear in my opinion I was

 4   concerned with the lack of nexus as I saw at the time

 5   between the stuff that I understood Mr. Kohlmann was going

 6   to be saying, things that he was going to be saying, stuff

 7   that he was going to talk about, and any of these

 8   defendants.  And I think that the government has responded

 9   to those concerns.  And all I can do is I can assure the

10   defendants that if Mr. Kohlmann tries to wonder off the

11   reservation and outside the corral, in trying to see that

12   he's contained within, I'll make very clear to the jury,

13   it's not --

14          MR. HERDMAN:  And Your Honor, just to briefly

15   review an item that we first started talking about, this

16   notion that Mr. Amawi had a large collection of videos.

17   Again, Your Honor, our intent is not to have Mr. Kohlmann

18   come in and testify about all of those individuals.

19          However, we do have witnesses prepared to come in

20   and say, I viewed -- a nonexpert witness -- a witness who's

21   prepared to come in and say I viewed certain videos.  And

22   the fact that they're on certain directories is quite

23   important to us.  For instance, Mr. Amawi, you'll hear him

24   reference in numerous recordings the fact that he wants to

25   catalog his CDs, he says that numerous times.  In fact, we
```

1  do have evidence that Mr. Amawi did go about cataloging

2  some of these videos at one point in time.  And he did that

3  in a manner that makes it very clear that he had extensive

4  knowledge about the individuals that Mr. Kohlmann addresses

5  in his report.

6          THE COURT:  Mr. Kohlmann coming before or after

7  that witness?

8          MR. HERDMAN:  He would becoming after, probably,

9  all the witnesses that we would call.

10          THE COURT:  Then why don't I reserve judgment as

11  to that and see what the witness says just to see what you

12  have shown me this afternoon.

13          MR. HERDMAN:  Thanks.

14          THE COURT:  I will better be able to evaluate the

15  propriety.  I certainly would not want Mr. Kohlmann to

16  testify that his -- it's the largest collection aside from

17  his own that he's ever seen.

18          MR. SIEVE:  Your Honor, if Mr. Kohlmann's going

19  to testify at all about Mr. Amawi's collection that hasn't

20  been presented through Darren Griffin or any other witness,

21  but just focus on his computer that goes right to the heart

22  of our expert's testimony -- and that is Islam -- who will

23  testify about sort of this Jihadist movement and around the

24  world are videos and collect them for other reasons other

25  than becoming part of the Mujahideen.

1          THE COURT:  I continue to have -- have a nexus

2    between Mr. Amawi and that sort of purpose of accessing

3    these videos.  The fact that others engage in sort of

4    customary practice, I don't think is proof that somebody,

5    all be it similarly situated, does so as well.  I really

6    think there's a logical fallacy there.

7          MR. SIEVE:  Then the government shouldn't be

8    permitted to create the inverse of that.

9          THE COURT:  Well, part of my concern about -- I'm

10   trying to restrict Mr. Kohlmann's testimony about any of

11   these videos to circumstances in which it is reasonable to

12   conclude that they were viewed, that their contents were

13   known.  This is said, at the outset of the session this

14   afternoon, at least when I came back, I've got lots of

15   favorites and I've got lots of stuff, e-mail and otherwise,

16   probably a fraction of it I have any direct knowledge of

17   its contents.  I may know the title or whatever, but for

18   lots of reasons, I don't become cognizant of the contents.

19   And absent proof that Mr. Amawi was cognizant of the

20   contents, the fact that the stuff came in, he downloaded

21   it, that is some proof that something happened thereafter.

22   And.

23          Mr. Herdman has said, Judge, we have a witness

24   who's going to come in and say -- will tell you about how

25   actions were taken relative to the downloaded stuff.  And

 1   that's about all I've heard.  I'm going to wait and see

 2   what this person says before proceeding further into that

 3   request on the part of the government.

 4           I think it's important that the record, that the

 5   evidence show a connection that cognizant -- that something

 6   was done with this material that made one or more of the

 7   defendants cognizant of its contents.  The mere collecting

 8   of it, I don't think has any probative value.  Or certainly

 9   its probative value is outweighed by the substantial risk

10   of prejudice.  But once there's reason to believe that the

11   defendant became cognizant of it, he, then -- I think it's

12   appropriate to permit proof as to what it was for most of

13   this stuff.  That proof is the video itself.

14           For some of it this afternoon, I've indicated

15   Mr. Kohlmann can tell us, tell the jury, what it was

16   because there's no other proof of it, but as to that issue

17   we'll wait and see.

18           MR. HERDMAN:  Your Honor, the last thing is -- I

19   guess we addressed this a little bit with the Islamic Army

20   of Iraq.  There were a number of groups that were

21   originally on that list of stipulations.  My understanding

22   was, Mr. Amawi was unwilling to stipulate to the proposals

23   that we had come to regarding some of these groups, and

24   Your Honor had said last week that Mr. Kohlmann will be

25   free to testify should be there be no stipulation.

```
 1            THE COURT:  Sure.  If there's no stipulation, I
 2    think the jury's entitled to be told very briefly, you
 3    know, so and so, so and so, it is according to
 4    Mr. Kohlmann's understanding, based upon the work that he's
 5    done, was a Lieutenant in the whatever, and he was killed
 6    by coalition forces on whenever, or he accepted
 7    responsibility for whatever.  One sentence, two sentences,
 8    real thumbnailed biography, so that when the jury recalls
 9    the evidence -- or as I expect, a fair portion of it may be
10    replayed to it and for it -- it will have some
11    understanding of what -- what that reference means.
12            MR. HERDMAN:  And again, groups that we would
13    have Mr. Kohlmann testify to are by and large -- I can't
14    think of an exception to this -- there are groups that have
15    actually produced the videos that are going to be played
16    for the jury, so it's just a matter of identifying insignia
17    and explaining a sentence or two of what this group is.
18            THE COURT:  And I will remind the jury that
19    they're not to draw any inference of any connection to any
20    of these defendants, any of those groups, from the fact
21    that those groups produced them.  Just like I don't have
22    any connection with Warner Brothers when I rent one of
23    their movies.
24            MR. WHITMER-RICH:  And Your Honor, if I can
25    briefly explain, we have taken the position in the past
```

1    that we are not inclined to stipulate as to certain matters

2    because we were proposing certain experts who would testify

3    about the phenomenon of these videos, generally.  And it

4    was -- as a strategic matter, is not clear to us why

5    stipulating to all of those would be in our interest, our

6    client's interest.  To the extent that, Your Honor, for

7    whatever reasons, disallowed, for reasons I tried to

8    explain -- disallows our expert testimony, then that

9    strategic reason is no reason --

10            THE COURT:  I'm very strongly --

11            MR. WHITMER-RICH:  -- and I'm simply explaining

12   why it may appear that we were flip-flopping here, giving

13   inconsistent positions; that the landscape is shifting for

14   us and we're responding accordingly.

15            THE COURT:  I understand.  I understand

16   completely.  Excuse me.  Just so you understand, I spent a

17   lot of time this weekend reviewing stuff and thinking about

18   it, and I'm it's highly unlikely I'm going to allow Mr --

19            MR. WHITMER-RICH:  Alterman.

20            THE COURT:  -- Alterman to testify.  You should

21   anticipate that I'm not going to, largely for the reasons

22   that I've already discussed.

23            MR. HARTMAN:  Judge, can I clarify something?

24   When you were talking about the groups that produced the

25   videos, did that mean all the videos that were watched or

1   just the ones that they showed?

2           THE COURT:  The stuff that we're talking about

3   right now.

4           MR. HARTMAN:  Okay.

5           THE COURT:  No.  I don't expect -- I haven't

6   heard a request to go through and link up every single

7   video, and I would say, no, those videos, see a tank or

8   check point or whatever is being blown up, it speaks for

9   itself.

10          MR. HARTMAN:  Okay, got it.

11          MR. BOSS:  Could we go off record for just a

12  moment?

13              (A brief discussion was had off the record.)

14          MR. SOFER:  Judge, just for clarification

15  purposes because I'm not clear about this either now, with

16  respect to the groups, we're going to try to get a

17  stipulation from counsel about all the groups that are

18  mentioned or can be seen on the videos, whatever's been

19  played to the jury to fill in these gaps.  We cannot get a

20  stipulation on those groups, or what is it that Your Honor

21  believes you'll allow Mr. Kohlmann to testify as to that?

22  Now I'm not clear what we're left with.

23          THE COURT:  Let's wait and see.  I can't --

24  again, it's the type.  I'd rather deal with reality rather

25  than if this, then that; on the other hand, if this, minus

1    one, then that, plus two, and so forth.

2            MR. SOFER:  Well, we'll see what we work out with

3    counsel if anything, and we'll take it from there.

4            THE COURT:  Yeah.

5            MR. SIEVE:  Your Honor, if I may just very

6    briefly.  If I may, just to be blunt for a moment, as it

7    relates to this Evan Kohlmann matter -- and I'm not even

8    ashamed to put some of this on the record.  There was a lot

9    of concerns amongst the defense attorneys collectively

10   about us trying to present expert witnesses in this case

11   because of the fear that, quote, we would open the door to

12   Evan Kohlmann, and I said bluntly to others that -- and

13   I'll clean up what I said -- but what I said in the general

14   was that I was not going to wet my pants over Evan Kohlmann

15   because I felt this, our experts could respond to his

16   absurd nature, the manner in which he twists this

17   information in a way that's favorable to the government,

18   that it would blow him out of the water.

19           But if we're not going to be permitted to call

20   our experts in response to Mr. Kohlmann, then I agree with

21   the other attorneys in this case that he's dangerous,

22   because he's a loose cannon.  There's no way that we can

23   control him even to the extent that Your Honor's going to

24   control him.  So we're prepared --

25           THE COURT:  If that happens, then I will deal

1  with that when it happens.  I think -- I cannot know -- I

2  do not know how I can more strongly communicate to the

3  government that it's up to it to see to it that he

4  understands the limited range of subjects that he's going

5  to be permitted to testify.  And indeed, think about this,

6  to the extent that we permit the government to lead him so

7  he says yes or no, rather than going on as a device to

8  control him, I think he will understand the cautionary

9  instructions that he'll be given.

10          If not, I certainly will -- he won't look good in

11  the eyes of the jury by the time I get done with him.  If

12  he sits there and ignores my instructions, they will be

13  given with increasing vigor.  They'll start out polite and

14  quiet, which is my style.  But I'm not opposed to making

15  real clear to the witness that he's not paying attention.

16          MR. SIEVE:  The point I'm trying to make, Your

17  Honor, if we're not permitted to call witnesses in response

18  to the testimony that he will present, and Your Honor's

19  going to narrow his testimony to the extent that he's just

20  going to be providing definitions for the jury, I believe

21  that we can --

22          THE COURT:  He'll do more than that.  He'll be

23  making some connections that the government represents are

24  proper for him to make in light of the charges I agree with

25  the government.  It is relevant evidence, and it is

1   probative of facts and issues.  I think we've got four or

2   five chunks, which would probably amount to four or five

3   pages of the 80 or 90 pages that we've all read.

4   So again, as I said, you know, the government

5   could have waited until it rested and then moved in limine

6   to strike your witnesses.  I think the way we are going

7   about it is proper, because although the landscape is

8   changing, and that is a commonplace occurrence in every

9   trial, I am trying to cast as much light as I can on what

10  lies ahead.  And I do not deny any party the opportunity to

11  present evidence that it thinks is probative materially.

12  And to be sure, I can sit back and say, fine, we'll let it

13  all in.  What do I care?  The government loses, they can't

14  appeal, big deal.  It's not.

15  MR. SIEVE:  I understand, Your Honor.  And I

16  understand that Your Honor's consideration goes to our

17  effort to present evidence that we believe is appropriate

18  material as well.

19  THE COURT:  Absolutely.  And no doubt, if there

20  is a conviction of anyone, that will be without question an

21  issue on appeal.

22  MR. SIEVE:  In essence, what -- in response to

23  Mr. Kohlmann, we believe that these witnesses will -- were

24  tentum -- were tantamount to us being able to present a

25  defense of the types of things that we anticipated that he

 1   may say based upon what he said earlier.

 2            THE COURT:  And to the extent that you're right,

 3   that it is a rejoinder to much of what he was saying, I

 4   think that I continued to make clear that that sort of

 5   stuff isn't going to come into this courtroom.

 6            MR. SIEVE:  Understood, Your Honor.

 7            THE COURT:  I said all along this case is not a

 8   capital T terrorism.  It's about the criminal charges,

 9   allegations conspiring to provide material support in

10   furtherance of -- and also, quite candidly, I don't think

11   this case is about capital I Islam.  And either -- sure

12   there are threads and connections, but that's not what

13   this -- this is a criminal case.

14            And we sit and look at the elements of the

15   charge, and if evidence is probative of one of those

16   elements or of the defense, it comes in.  If it's not, it

17   doesn't.

18            Chuck, go ahead.  And good luck to you.

19            MR. BOSS:  Thank you, Judge I'm waiting on my

20   ride.

21            MR. HARTMAN:  That's me.

22            THE COURT:  Anything further?

23            MR. SOFER:  No, Your Honor.

24            THE COURT:  Okay.  We'll start at 8:30 in the

25   morning.

1                     C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     s:/ Angela D. Nixon

7     ---------------------------                    -----------

8     Angela D. Nixon, RPR, CRR                      Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25