IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                                   Case No. 3:06CR719

               Plaintiff

     v.                                                          ORDER

Mohammed Zaki Amawi,

               Defendant

This is a criminal case in which the defendant was charged and convicted of conspiring to provide material support to terrorism overseas, conspiring to kill or maim Americans overseas, unlawful distribution of a "bomb vest" video and unlawful distribution of an "Explosives Cookbook."

Pending is the defendant's motion for a new trial. [Doc. 920]. The grounds for the new trial motion are: 1) denial of a continuance; 2) exclusion of testimony by two defendant experts; 3) conduct of proceedings under the Classified Information Procedures Act, 18 U.S.C. App. III [CIPA], and the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801, *et seq.* [FISA]; and 4) noncompliance with *Brady v. Maryland*, 373 U.S. 83 (1963).

For the reasons that follow, the motion shall be denied.

## 1. Denial of Continuance

Initially following return in February, 2006, of the indictment, I appointed the Federal Public Defender to represent the defendant. After seven months, the Defender moved in October, 2006, to

withdraw. The basis of the motion was that the defendant did not trust the Defender because he was an employee of the same government that was prosecuting him.

Before granting the motion, I made clear to the defendant that *any* lawyer who would be representing him would be being paid by the government. He insisted on getting new counsel. So I appointed two private Toledo attorneys, including as lead counsel one of our area's foremost defense attorneys.

The defendant began complaining about the representation being provided by these attorneys. To some extent it appeared that cultural differences may have been impairing communication. So I appointed an Arabic-speaking attorney from Detroit as additional counsel for the defendant.

This responded to, but did not resolve the problems between counsel and the defendant. Principally he complained about infrequent contact and unwillingness on the part of counsel to consider his views and demands. They, in turn, without going into detail, indicated that they believed that they were proceeding appropriately to meet the government's case and provide a defense and thus were providing fully capable representation. They suggested that any differences and difficulties were amplified by the place and conditions of the defendant's pretrial detention at Milan Federal Detention Center, about twenty-five miles from Toledo.[1]

---

[1] In light of the nature of the charges against him, the defendant was not held within the general detainee population. After some delay, he was able to have most or all of the extensive materials provided by the government to defense counsel, and a computer to access materials on disc. Prior to trial, the Marshals Service relocated him to the Lucas County Jail, which is adjacent to the federal courthouse in Toledo. There, too, he had access to his legal materials and use of his computer.

After several sessions seeking to resolve the defendant's complaints with his appointed counsel, I allowed them to withdraw. I next appointed an attorney who had recently represented Jose Padilla in his trial in Miami. Though that lawyer assured me he could and would actively represent the defendant, he failed to become active on his behalf.

This led the defendant to request reappointment of the Federal Public Defender. That office agreed to resume representing the defendant. On January 15, 2008, four attorneys from that office filed their notices of appearance.[2] On January 18, 2008, the Defender's Office filed a motion to continue the trial for ninety days. Further motions for continuance were filed on February 15, 2008, and March 3, 2008.

The government took an essentially neutral position in response to the defendant's motions for continuance. The codefendant El-Hindi vigorously objected to granting the motion, and insisted on a separate trial if Amawi's motions were granted. Like the defendant, El-Hindi had been detained since his arrest immediately following return of the indictment.

I denied the defendant's motions to continue the trial, concluding that, under all the circumstances his attorneys had sufficient time to prepare for trial.

_____

[2] According to the defendant's motion, the "Federal Public Defender, three Assistant Federal Public Defenders, two Research and Writing Specialists, one investigator, and numerous support staff members" were, after that office returned to the case, assigned to assist in trial preparation. [Doc. 920, at 19].

3

*Voir dire* began on March 4, 2008, and was completed on March 18, 2008.[3] On March 14, 2008, the defendant filed another motion to continue the start of the trial until April 1, 2008. That motion was granted, and the government began presenting its evidence on that date.

The defendant claims to be entitled to a new trial on the basis that I abused my discretion and denied his right to effective assistance of counsel by denying his motions for continuance. His counsel contend that the ten week interval between their appearance and the start of the government's proof was not enough for them to prepare.

I disagreed then, and I disagree now. My reasons for doing so were stated on the record. I will, though, here repeat the most salient reasons for not postponing the trial.

Despite the hiatus in representation, the Defender's Office had received substantial amounts of discovery before withdrawing. This was largely an open file discovery case. Once the Defender's Office resumed representation, it had in hand most of what the government itself had.

This was, moreover, a case built primarily on three sources of evidence: 1) testimony by Darren Griffin, an undercover informant, who, among other things, had recorded 300 hours of encounters with the defendants; 2) videos and other materials downloaded, principally by Amawi, but to some extent the codefendant El-Hindi as well from the internet; and 3) government witnesses who, in essence, testified about the evidence provided by Griffin and obtained from the defendants' computers.

---

[3] On January 23, 24, and 25, 2008, the United States Magistrate Judge had presided at sessions at which prospective jurors were informed about the general nature of the case and its anticipated length and required to fill out a lengthy questionnaire.

To be sure, there was additional evidence and testimony. But most of what the government was ultimately to offer was contained in Griffin's recordings and the videos and other materials found on Amawi's computer.

To the extent not provided before that office withdrew, additional discovery was made available promptly upon their return to the case.

Had the attorneys who tried the case not had codefendants' counsel in the case, and had their office not previously been actively involved and in possession of much of the discovery, ten weeks to prepare would have posed greater difficulties. But counsel for the codefendants had been actively engaged in preparing for trial. Those attorneys had received preliminary transcripts of the audio and video recordings from the government; they had had those transcripts, or at least a substantial portion of them reviewed and had been working on alternative transcripts. They had sought and been given very extensive investigative resources; and each of the two attorneys provided to the codefendants had worked essentially full time on the case. Each of the two codefendants had, as well, Arabic speaking co-counsel for several months prior to the trial date.

The defendant does not contend that his trial counsel, once back in the case, did not benefit from the work of the codefendants attorneys. Nor could he: the recordings were the same recordings; the videos, etc., were the same videos. His lawyers were not, in a word, flying solo as they got up to speed, especially regarding the Griffin recordings and transcripts thereof and the videos and other materials obtained from the defendants' computers. It was no secret to anyone that those two sets of materials were to be the core of the government's case against the defendants.

In addition to having provided essentially open file discovery to all counsel, the government complied with my request that it provide all *Jencks* material well before its witnesses testified. In

5

addition, during the trial I followed my customary practice of asking counsel at the close of each day's session to state who the next day's witnesses and what the next day's exhibits were to be. If counsel anticipated making objections to any part of the testimony or exhibits, they were given the opportunity so to indicate, so that their anticipated objections could be heard and, if at all possible, I could rule on those objections. Any suggestion of surprise in what was forthcoming is not well founded.

I simply cannot accept the defendant's contention that, under all the circumstances, his lawyers did not have ample time to prepare and present a more a capable and competent defense. More time to do so would no doubt have been welcome; no doubt it would have eased the strain and, perhaps, to some extent have enabled them to do a somewhat better job. But the tightness of time did not, I am convinced, adversely affect their ability to provide a capable and adequate defense. There is no reason to believe that, had more time been available, the outcome of the trial would have been any different.

Finally, I note, as I did during proceedings relating to the defendant's motions for continuance, that the defendant himself was responsible for the hiatus in the involvement of the Federal Public Defender. He knew, but simply refused to accept the fact, that the Defender's employment by the United States government would have no impact on the quality of representation that office would afford to him. More than a year after I accommodated his unreasonable viewpoint, he asked for, and got the same lawyers back that he had asked me earlier – entirely without acceptable cause – to dismiss.

I turn now to the defendant's specific contentions about the impact on his attorneys of the refusal to continue the trial date.

6

### A. Electronic Data

The defendant correctly points out that the government had procured a massive amount of electronically stored information from the computers of Amawi and his codefendant El-Hindi. The vast majority of that data came from Amawi's computer.[4]

The defendant contends that his attorneys did not have enough time to review this material, or have it reviewed by a forensic expert, which left them unprepared to file motions *in limine* to seek its exclusion. As a result, according to the defendant, many of the videos and other computer-derived evidence were improperly admitted in violation of Fed. R. Evid. 401, 402 and 403.

The defendant's argument notes, but ignores some significant facts that undercut his contentions about the computer-derived evidence: 1) his attorneys had every one of the government's anticipated trial exhibits in their hands well before trial began; 2) the government, as noted, was routinely asked to specify which exhibits it would be offering; 3) codefendants' counsel had filed a motion *in limine* seeking exclusion of much of that evidence; and 4) and I had written an opinion in which I reviewed, analyzed and rejected the arguments raised in such motion.

Nonetheless, the defendant's new trial motion contends that "[i]t was only *after* the government played these videos for the jury that counsel were able to ascertain the irrelevance and prejudicial effect of those videos." [Doc. 920, at 8]. The defendant also notes that I had set a February 29, 2008, deadline for motions *in limine*.

---

[4] The government's terrorism expert, Evan Kohlmann, testified that he has for more than a decade been collecting *jihadist* and similar extremist materials from the internet. He believes he has the world's largest private collection of such materials. He also testified that, so far as he is aware, Amawi's collection of such material was second only to his own in its extent.

Regarding that contention, I note that the defendant's attorneys did not request an extension of that deadline. Had they done so, it is likely that I would have given them additional time to file motions *in limine*.

In any event, a motion *in limine* is hardly the only means for objecting to potentially prejudicial evidence. Such motions are simply a judge-crafted device for avoiding disruption and delay during trial: even if counsel felt constrained about filing motions *in limine* after the deadline, they remained fully able to object before the government's evidence came before the jury.

They did not do so. And under no circumstance can they reasonably contend or even plausibly suggest that they were unaware of what the specific videos and other materials showed *before they were offered*. For them to argue, as they do in their motion, that my failure to continue the trial left them unable to object to the videos and other evidence from the defendants' computers simply is not so.[5]

### B. Transcripts of Audio and Video Recordings

The defendant contends that his attorneys had insufficient time to review the Griffin recordings and transcripts, including that relatively small portion in Arabic, and to obtain translations and transcripts of Arabic language videos and written materials provided by the government. The defendant contends as well that the government's decision to offer only about ten percent of the 300 hours worth of recordings, coupled with the inability of the defendant *after* trial to have access to his legal materials made and continues to make meaningful review of the

---

[5] The defendant's new trial motion does not point to any of the computer-derived data that the government did not offer that, in the defendant's view would have been favorable to his defense. Ample time certainly has existed since return of the guilty verdicts on June 13, 2008, for the defendant's attorneys to have reviewed the computer-derived evidence and call my attention to any such favorable evidence.

recordings impossible. Compounding these problems, according to the defendant, is the fact that his attorneys do not speak Arabic, so they have had to rely – they assert – on translators to enable them to understand what was said or written in that language.

Here, again, the defendant ignores some pertinent facts: 1) before the government offered the recordings, no defendant asked for an audibility hearing – which suggests that there is "no there there" as to any complaint about the accuracy of the transcripts made available to the jury;[6] 2) the defendants were the recorded speakers; therefore, they could and no doubt did tell their lawyers what they had said; 3) likewise, regarding the demand for outside translators of statements in Arabic, I finally concluded that those demands were spurious, given the fact that all three defendants are native speakers of Arabic, and, as well, are fluent in English – they knew better than any third party what they and others were saying; 4) and they were likewise fully able to translate any statements on the videos or contained in other materials obtained from their computers.

That the defendant has not had access to the recordings, transcripts or evidence in the case since the trial doesn't matter. If really necessary after the trial, counsel could have obtained the assistance of translators. They could also have completed their review of the recordings that the government did not offer into evidence. Anything favorable to the defense that they had not been unable to uncover prior to trial could now be called to my attention, and provide a basis for showing actual prejudice from the denial of more time to prepare.

---

[6] In a couple of instances during the trial, the defendants challenged the accuracy of a small portion of the transcripts. In each instance, I listened to the recording, compared it with the transcript, and ruled. Otherwise no one objected to the accuracy of the transcripts that finally came before the jury.

To be sure, there was considerable delay in the government's production of the final version of the transcripts. But that fact did not prejudice Amawi or any other defendant, given their lack of objection to the transcripts actually viewed by the jurors.

What matters at this point is whether the defendant can point to *anything* different, relevant and material that would have come, or should have come before the jury had they had the time before trial to conduct the review that they claim they couldn't conduct, due to lack of time, before trial.

At most and alone, the defendant points to an omitted portion of his internet conversation, recorded by Griffin, with an unidentified Arabic speaker in Syria. [Doc. 920, at 16-17, n.6]. He claims that the omitted material would have been material to his defense that he did not intend to do anything illegal.

That the transcript, as offered by the government, did not include this segment doesn't matter: Amawi himself could and should have pointed out the additional statements and translated them for his attorneys. In any event, if for any reason that could not have occurred – despite Amawi's participation in the conversation and possession of substantial portions of the government's discovery well before trial began – inclusion of this material would not have affected the outcome of the trial.

The defendant also ignores the fact that he, apparently, otherwise did not point out any putative inaccuracies in either the transcription of his English language recorded statements or the translation of h is recorded Arabic language statements as those transcriptions and translations came before the jury. It was, after all, *his* words that had been transcribed, and translations from a language in which he was fluent of materials that, for the most part, had come from *his* computer that the government offered.

The defendant did not call his attorneys' attention to mistakes in transcription or translation before or during trial. His attorneys have not shown anything material that either was wrong about

the transcripts or translations seen by the jury. Nor have they submitted anything material uncovered by post-trial review of the Griffin recordings or anything else.

In sum, there is no merit to the defendant's complaints about the lack of time available to his attorneys to prepare to meet the Griffin recordings and evidence derived from the defendants' computers.

### C. Inability to Conduct Additional Investigation, File Additional Motions, Obtain Additional Witnesses and Otherwise Prepare Meaningfully for Trial

After outlining what his attorneys were able to accomplish before trial, the defendant claims "there was much more investigation and preparation that needed to occur that simply could not occur in the six-week window available to counsel." [Doc. 920, at 19]. Except for renewing the complaint about problems reviewing the electronic data, the defendant does not elaborate on just what else his lawyers would, could and should have done to prepare for trial, much less how the outcome might have been affected.

Simply put: simply asserting that "[t]he bottom line was that much more work needed to be conducted in this case prior to trial on Mr. Amawi's behalf but there was not enough time to do so" [*id.*] does not, without more, justify crediting that contention – much less finding in it a basis for granting a new trial.

### 2. Exclusion of Defense Expert Testimony

The defendants wanted to introduce testimony of three experts: 1) Dr. Roger Shuy, a forensic linguist; 2) Jon Alterman, an expert in Arabic usage and "Middle Eastern" views; and 3) Reza Aslan, an expert on international geopolitical movements and Islam. I granted the government's motion *in*

*limine* to exclude the testimony of these witnesses on the basis of lack of relevance. *U.S. v. Amawi*, 552 F. Supp. 2d 669 (N.D.Ohio 2008).

The defendant seeks a new trial on the basis that my rulings as to Alterman and Aslan were erroneous and prejudicial. In addition, the defendant claims that my decision, after initially granting the defendants' motion *in limine* as to the government's terrorism expert, Evan Kohlmann, *U.S. v. Amawi*, 541 F. Supp. 2d 945, N.D.Ohio 2008), I subsequently permitted that expert to testify. That testimony was, however, limited, and did not encompass most of what the government had wanted Kohlmann to tell the jury.

I have reviewed my decisions regarding expert testimony in light of the defendant's contentions about my rulings. I find no error in those rulings, and certainly no reason to grant the defendant's new trial motion on the basis of those rulings.

### 3. CIPA and FISA

In accordance with the provisions of CIPA, I held a series of *ex parte* hearings with the government relating to classified material. Some of that material derived from orders obtained under FISA.

Contrary to the defendant's contentions in his new trial motion, I believe that the proceedings, how I conducted them and my rulings in those proceedings conformed with CIPA and FISA. I remain of that view, now that I have taken into account the defendant's contentions about those proceedings and the applicable law.

I will, however, respond, albeit briefly, to the defendant's specific contentions regarding the classified evidence made known to me *ex parte*.

12

The defendant claims that the fact that his attorneys did not participate in *ex parte* sessions held with defense counsel prejudiced my ability adequately to conduct the *ex parte* CIPA proceedings. At those *ex parte* sessions with defense counsel, I was apprised of certain defense theories of the case, so that my review of classified materials would be informed about and attentive to those theories. I conducted my *ex parte* review with the prosecutors accordingly.

Defender counsel never asked to meet *ex parte* for the same purpose, either before or during trial.

The defendant's new trial motion contends that my lack of insight into the theories of his defense left me unable adequately to assess any classified information relating to the defendant's contacts with the Syrian whose internet conversation with Amawi Griffin recorded.

As the defendant's motion indicates, the government referenced that conversation from opening argument on. But the defendant does not explain why his lawyers did not ask during the trial to meet with me for the purposes that they now claim were so crucial.

The defendant cannot now complain about something I didn't do with and for his attorneys that they failed to ask me to do when I could have done it.

In any event, I have undertaken a review of the classified information presented *ex parte* in light of the defendant's contentions in his new trial motion. Nothing was disclosed there that, by hindsight, should have been disclosed to defense counsel. Here, again, there is "no there there."

The same is true with regard to the delay in providing security clearances to the defendant's attorneys. With or without those clearances, they could not have participated in the *ex parte* proceedings regarding classified information. Nothing in CIPA opens the door to such proceedings simply because a defendant's attorney has been cleared to see classified information.

13

CIPA governs whether counsel, even with clearance, can see such information. Unless the statute's predicates for permitting access are met, counsel cannot have access to any classified information. At the time of my *ex parte* sessions, I concluded that those predicates had not been met. I confirm that conclusion in light of the defendant's arguments in his new trial motion.

### 4. *Brady*

Finally, the defendant suggests at the outset of his motion that the government failed to comply with its *Brady* obligations. I perceive no basis for that contention for several reasons. First, as noted, this was essentially an open file case. Nothing presented at trial was not available well beforehand to the defense.

Second: the need for translators and experts to analyze the accuracy of transcripts was overstated. As noted, Griffin's recordings, which were the foundation on which the government's case rested, were of the defendants themselves. Whatever it was they had said, and in whatever language, they did not need independent transcribers or translators to enable their lawyers to prepare to meet the government's proof. That being so, any suggestion that the government's delay in providing its final transcripts contravened *Brady* is unfounded.

Third: it is my impression and assumption that the government's delay in being itself ready for trial resulted from a review of FISA materials to ascertain whether those materials contained *Brady* material. I am confident that, to the extent such review, if it occurred, uncovered *Brady* material, the government would have disclosed such material.

Nothing of which I am aware contains, or reasonably could be deemed to have contained material covered by *Brady*. I am, moreover, confident that government counsel did not cheat in any

14

way whatsoever. To the contrary, I am equally confident that government counsel was aware of its *Brady* obligations and undertook in good faith to comply with those obligations.

If for no other reason [and it is not the only reason], my confidence regarding *Brady* rests on the fact that almost everything the government offered into evidence came from materials that the defense had in their entirety – the Griffin recordings and the computer-derived videos and other materials. The government didn't just show its cards – the whole deck was face up before the dealing began. And nothing in the classified materials constituted either a wild card or joker. There was nothing that gave me any pause whatsoever when it came time to discard that material.

### Conclusion

To be entitled to a new trial under Fed. R. Crim. P. 33, the defendant must show either newly discovered evidence under Rule 33(b)(1) or, under Rule 33(b)(2) that the "jury's verdict was against the manifest weight of the evidence." *U.S. v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).

Being filed concurrently herewith is an order denying the defendant's motion for judgment of acquittal under Rule 29. That order has the effect of overruling any contention that the defendant is entitled to a new trial on the basis that his conviction was contrary to the manifest weight of the evidence.

With regard to Rule 33(b)(1), to obtain a new trial based on newly discovered evidence, a defendant must establish that the evidence: 1) was discovered after trial; 2) could not have been discovered earlier with due diligence; 3) is material and not merely cumulative or impeaching; and 4) would likely produce an acquittal. *U.S. v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982).

The defendant has met none of these conditions. Though he claims that his team of attorneys did not have enough time to review and analyze the material made available to it by the government,

he has not shown anything substantial or material that his lawyers have uncovered in the many months they have had since the trial to prepare their post-trial motions. Certainly, even to the modest extent that they argue that what they knew about the Syrian connection was insufficient, they have not shown any reason to believe that the outcome would have differed had they known otherwise prior to trial.[7]

There is no merit to the defendant's new trial motion. It is, accordingly,

ORDERED THAT the defendant's motion for a new trial [Doc. 920] be, and the same hereby is denied.

So ordered.

<u>s/James G. Carr</u>
James G. Carr
Chief Judge

---

[7] I note that, in any event, the defendant's attorneys had in hand the recording of the defendant's conversation with the Syrian, and they were fully able to ascertain whether the government's transcript was accurate or complete, or needed supplementation under the rule of completeness. Nothing was hidden from them, even if they were not given an accurate or complete translation and/or transcript of the defendant's conversation with the Syrian.

16