IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                                             Case No. 3:06CR719

          Plaintiff

v.                                                                                        ORDER

Marwan El-Hindi,

          Defendant

This is a criminal case in which the defendant was convicted of conspiracy to provide material support to terroristic acts overseas and related offenses. Pending are his post-trial motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29 [Doc. 925] and a new trial. [Doc. 926]. The government opposes the motions [Doc. 935], which shall be denied.

**Background**

Darren Griffin, an informant for the Toledo office of the Drug Enforcement Administration, was "passed off" by the D.E.A. to the F.B.I. Griffin was a former member of the U.S. Army's Special Forces and purported to be a convert to Islam. The F.B.I. decided to send him looking for terrorists in Toledo. Mr. Griffin began doing so at a small mosque which he attended.

He first encountered the defendant El-Hindi. By September, 2002, El-Hindi asked Griffin about kidnaping Israeli soldiers and (presumably) U.S. politicians. (Tr. 20: 2277:24-2278:4). He also

stated that, if Griffin knew something which might help the "brothers" overseas, specifically in Iraq, then he should share it. (*Id*., 2278:18 - 2279:3). El-Hindi knew that Griffin was a former Special Forces soldier and "Islamic extremist," (*id*., 2278:5-16) and was interested in heavy weapons and had an anti-tank rocket. (Tr. 39:3703:3-19; 42:3934:12-3935:7).

During the 2004 July 4th weekend El-Hindi arranged for two cousins, Khaleel and Zubair Ahmed, to travel from their homes in Chicago to attend an Islamic conference in Cleveland.[1] The Ahmeds discussed their interest in becoming trained in the use of weapons and *jihad*. After El-Hindi referred to snipers, Khaleel endorsed a  "[f]ocus on sniping," to which Zubair responded, "Not me. I wanted to use... I told you, right, .50 cal."

Griffin captured these and other statements, and El-Hindi's presence nearby as they were conversing with Griffin, on video. The jury could reasonably infer from the circumstances – especially in view of the fact that the Ahmeds were in Cleveland at El-Hindi's request – that he and they shared a common objective: namely, to have Griffin train them in military tactics to engage in *jihad* overseas.

The Ahmed cousins had no further contact with Griffin thereafter. He, though, frequently asked El-Hindi to contact them for the purpose of coming to Toledo to participate in the paramilitary training that Griffin was claiming he could and would provide. At one point El-Hindi called Khaleel to encourage him to begin *jihad* training. He also suggested to Griffin that the Ahmeds get materials relating to violent *jihad*.

---

[1] El-Hindi had traveled to Egypt earlier in 2004 at the request of Khaleel Ahmed's family, which was concerned that Khaleel and Zubair were headed to Afghanistan to join the forces resisting the American campaign in that country. El-Hindi successfully persuaded the cousins to return home to Chicago.

At no point did El-Hindi tell Griffin that either he or the Ahmeds had decided that they weren't interested in what Griffin was talking about. Indeed, he expressed his awareness of and concurrence in what Griffin had in mind in a conversation with Griffin on October 8, 2004: El-Hindi told Griffin that they had to be careful with the Ahmeds, to which Griffin noted the need to have them "reeled in," because they weren't talking about "candy," but "about stuff that is going to take us away from our kids." "Yes, yes, that is what I'm saying," El-Hindi responded; to which Griffin replied, "You know. So we have to be very security conscious and we have to stay in constant communication, you know, if we're going to do this thing. . . . [W]e have to be on the same sheet of music." El-Hindi replied, "I understand."

Later that day, Griffin told El-Hindi, who periodically interspersed, "Hmm" and "That's true,"

> [W]e can do up to squad operations and everything . . . because what I want to teach is how the U.S. does things. . . . So they can understand what's gonna happen if they go up against that force. How they are gonna react, you know, and then counter, and you know and so on and so forth. And that's the best way because if you know what they're gonna do, then you can counter-react and all that other good stuff too so.

As Griffin observed, "you have to understand your enemy," El-Hindi interjected, "to fight your enemy is to know their strategy. . . . [and] "if we go by the {Sunnah}. . . . We can't lose."

El-Hindi and Griffin returned to the training theme on December 16, 2004, in another conversation recorded by Griffin, who stated: "my focus right now are brothers that are gonna be usin' this in Jihad, you know, and that's the whole, that is the whole thing about it." To which El-Hindi replied, "I understand."

**Discussion**

3

## I. Motion for Judgment of Acquittal

The defendant seeks acquittal under Fed. R. Crim. P. 29. That rule provides that a court "must enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Contrary to the defendant's contentions, there was enough evidence on which the jury could find him guilty as charged beyond a reasonable doubt.

The defendant also argues entitlement to acquittal on the basis of entrapment. He waived any right he may have had to assert this contention when he expressly declined to seek a jury instruction on entrapment.

### A. Counts of Conviction

### 1. Count 1: Conspiracy

Under the circumstances, in context and in light of the record as a whole, the jury could conclude that during these conversations El-Hindi was expressing a desire, despite the Ahmeds having apparently distanced themselves from the project, to obtain the benefit of Griffin's para-military training with the objective of engaging in foreign *jihad*, and to do so with others.

This is so, even if, as the defendant argues in his Rule 29 motion, that the jury could have reached a different conclusion about El-Hindi's purposes and intent, or that he was simply of a "go along/get along" mindset while listening to someone whose views he did not, in fact share. The issue is not what other interpretations they jury might have discerned, but whether, viewed most favorably to the government, the evidence supports the verdict.

On February 2, 2005, El-Hindi and the codefendant Mohammad Amawi came together for the first time. They talked about jihadist attacks on U.S. military forces, manufacturing explosives,

and government surveillance of the internet. El-Hindi suggested that he and Amawi spend additional time together, inviting Amawi to come to his residence.

On February 8, 2005, El-Hindi played a video and provided a web link through which Griffin was able to access a lengthy Arabic-language guide for making a suicide bomb vest.[2]

Evidence confirming the existence of agreement between El-Hindi, Amawi and Mazloum to obtain training to prepare for overseas *jihad* arose during the course of a supper meeting, videorecorded by Griffin, at El-Hindi's residence on February 16, 2005.

Shortly after Griffin arrived, El-Hindi described a website being reconstructed as a source for *jihadist* videos. Griffin asked Mazloum if he had seen the Ansar Al Sunna website, which Griffin touted as "a good website, we're gettin' a lot of uh information on there and uh, the brothers of the Mujahidin, they're sending videos of their operations and everything too, really good, it's really good."[3]

Griffin then talked about how

> brothers come to me and ask me for the training just like you guys have asked me you know, come and ask me for the training. And you know. And I wanna, this is what I wanna do, you know, Allah called me to Islam, {praise be to God}, you know and uh we been uh brothers for I don't know how many years now we can uh trust each other uh, you know up and down so, but um, so I'm always, I'm always gonna be security conscious with this, you know. But uh, {praise be to God}, you know I have a security company that we can cloak everything. We'll train for jihad, {God willing}, but we'll cloak it with my security company. So like if somebody asks you questions or anything like that, then what are you doing with uh Bilal or Darren Griffin or anything like that. Say, oh, you know you're thinkin' about doing some

---

[2] This led to El-Hindi's conviction on a count charging his with unlawful distribution of information relating to manufacture of an explosive or destructive device in violation of 18 U.S.C. § 842(p)(2)(A). The fact that Griffin could not read Arabic does not relieve El-Hindi of culpability for distributing that material.

[3] The government introduced evidence of the *jihadist* nature of the Ansar website.

security work with me because you know {Arabic} you know and all these other things. As a matter of fact, you have one of my cards too.

Less there be any doubt about what he was proposing, Griffin continued,

we have to be careful what brothers we invite. You know because we don't need someone from the FBI or CIA, you know, and what, what I'm, will be teaching you is exactly how you know sheikh Osama and, and how the brothers train, the Mujahidin and the Hamas and the Hizballah, how they do things with a twist of what the U.S. does with their tactics. So, when we do, {God willing}, if we uh go {as a martyr} or we go join the brothers overseas or when we go train and all these things, you'll know exactly what to do. You know, you'll be uh, you'll be a help to them and not a hindrance you know, {praise be to God}, so. But uh, so cloakin' it with the security company is the perfect way, so, that's [IA]

.

Later during the meeting El-Hindi commented about fear on the part of U.S. military personnel of snipers. This was followed by a discussion between El-Hindi, Amawi and Mazloum in Arabic about a *jihadist* video of the beheading of an Egyptian "traitor." This, in turn, was followed by viewing, *via* El-Hindi's computer of online *jihadist* videos.

After the February 16, 2005, meeting, the defendant undertook various actions that the jury could reasonably find were in furtherance of an agreement between him, Amawi and Mazloum to obtain training for the shared purpose of going overseas to engage in *jihad* supportive of terrorists:

- On February 18, 2005, he translated for an online jihadist training course for Griffin.

- On February 25, 2005, he forwarded an email to Griffin from the Islamic Army of Iraq's mailing list showing emplacement of improvised-explosive devices and destruction of a U.S. military vehicle.

- On February 25, 2005, he noted that getting money in and out of Iraq was very important.

- On March 20, 2005, he stated to Mr. Griffin that they needed to make some money to support training.

- On March 31, 2005, he met with Amawi and Griffin and discussed with them jihadist websites, videos, and providing materials to Zubair Ahmed.

- On April 4, 2005, he went with Griffin to meet an accountant in Dearborn, Michigan, to establish an organization to apply for and receive federal grants.[4]

- On May 25, 2005, he met with Amawi and Griffin, telling Griffin that they had been "blacklisted" at the mosque for engaging in training activities; he and Amawi also discussed jihadist websites.

There was thus sufficient evidence from on the basis of which the jury could find that the defendant knowingly and voluntarily conspired with Amawi and Mazloum to 1) provide material support in support of overseas terrorism; and 2) murder or maim a person or persons outside the United States.

The defendant's principal argument is that the jury mis-interpreted the evidence, and that it neither could nor should have found that he agreed with anyone – either the Ahmeds, Amawi or Mazloum – to commit any unlawful acts. That, of course, is not the Rule 29 standard.

In addition, the defendant repeats, in effect, a principal contention from his attorney's closing argument: namely, that without Griffin, no conspiracy would have arisen. Indeed, perhaps, the three defendants might never have become acquainted. Even if so, it does not provide a defense to what the defendant and others did before, during and after they met one another. That Griffin and the F.B.I. found an attentive and responsive audience for what he was projecting does not overcome the evidence he acquired, or undercut the jury's conclusions about that evidence.

The defendant's contention that he could not be found guilty of having joined the conspiracy because he did not "follow up" on any conspiratorial agreement is without merit. Once having agreed with its unlawful purposes, he became culpable for the acts of others in furtherance of that agreement and those purposes.

---

[4] This meeting resulted in a false statement charge under 18 U.S.C. § 1001 against the accountant, who was deported to Syria after being convicted of that charge.

7

Defendant renews his challenge to admission of several videos. For reasons stated during the course of the trial, I overruled the defense objections to the videos, even though many of them depicted, *inter alia*, homicides, including the deaths of civilians and American soldiers, and the destruction of a helicopter and American armored vehicles. Under all the circumstances, and contrary to the defendant's contentions, the videos were material on the issue of his intent and that of his codefendants.[5]

I am also confident that voir dire prepared the jurors for what they were to see on the videos, thereby diminishing significantly the risk of prejudice that might otherwise have arisen from their nature and what they showed.

Contrary to the defendant's arguments, the government introduced evidence that the defendant took steps to obtain grants for government monies to be used to support the jihad training that was the principal purpose of the conspiracy according to the government. He and Griffin had a preliminary meeting about grant applications with Jihad Dhabi. In addition, they had discussions about providing financial support for a project in Egypt to train young mujahedeen, whether the mujahadeen need money, weapons or manpower most, and getting money in and out of Iraq.

I conclude that the jury could rationally have concluded that the defendant, despite his argument to the contrary, in fact "followed up" in furtherance of the conspiracy.

Among the defendant's other contentions, only one – lack of sufficient interaction with his codefendants – merits comment. Neither joinder nor participation in a conspiracy involve more than a single act manifesting agreement and furthering the conspiracy's goals. Though, without a doubt,

---

[5] The defendant's contention about exclusion of the three defense experts is out of place in a Rule 29 motion. I address this contention in discussing his motion for a new trial.

there were periods, some protracted, during which the defendants did not have contact with one another, such intervals did not dissolve the conspiracy or the defendant's status as a conspirator. That's what the jury found, in any event. There was enough evidence for it to have done so.

The evidence sufficed to enable the jury to find the defendant guilty of the conspiracy charge beyond a reasonable doubt.

### 2. Count 5: Bomb-Making Video

The jury could likewise conclude that the evidence sufficed regarding the defendant's conviction for distributing the "Martyrdom Operation Vest Preparation" video. The defendant argues that there is insufficient evidence to show it was his intent that Griffin use the video in furtherance of a crime. As I noted in overruling a similar content by the defendant Amawi,

> Giving of information "by any means" about making an explosive can occur as effectively from having someone watch a video as by having him read a manual or reciting for him the steps orally. The statute contains no requirement that the person receiving the information also get an electronic or paper copy. What matters is giving the proscribed information to someone else.

(Doc. 655, at 6).

The defendant located the video on the internet, played it for Griffin and provided a link and access password to the video's website. The jury could find in the defendant's awareness of Griffin's jihadist statements and sentiments and his statement he wanted the video to train others an adequate basis for concluding that the defendant intended that Griffin use the video for violent criminal purposes. It could also find that the defendant's acts constituted distribution of the video.

### 3. Count 6: IED Video

The jury also had sufficient evidence to find the defendant guilty of Count 6, relating to a video portraying emplacement of an improvised explosive device [IED]. The jury could have found

that the defendant anticipated and intended that Griffin would use the IED e-mail to promote a federal crime of violence in light of its origin, the Islamic Army of Iraq, Arabic subject line – "The Mujahadin in Iraq and the art of planting explosive charges," and his comment, after showing the material to Griffin, "ah, well, they're teaching you." The defendant also asked Griffin where to obtain batteries used in the explosive device.

Here, again as well, the jury could find that the defendant distributed these materials.

The evidence sufficed for conviction as to this count.

### B. Entrapment

The seeks acquittal on the basis that he was entrapped. He waived this defense when he asked at the conclusion of the trial that no entrapment instruction be given to the jury.

In any event, there was a sufficient basis in the record for the jury to have found – had it been given the chance to do so – that the defendant was not entrapped.

Entrapment requires a proof of: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. U.S.*, 485 U.S. 58, 63 (1988). Though entrapment is an issue of fact, a trial court can find entrapment as a matter of law where: 1) the testimony and facts are undisputed; and 2) the evidence demonstrates a 'patently clear' absence of predisposition. *U.S. v. Clark*, 957 F.2d 248, 250-51 (6th Cir. 1992).[6] When assessing entrapment as a matter of law, a court views the evidence in the light most favorable

---

[6] Neither the parties nor I have found a case with the same procedural circumstances with regard to a post-verdict claim of entrapment. Assuming that somehow I have to consider the merits of defendant's contention despite his clear and unambiguous waiver, reviewing his contention under the strict standard of review applicable to consideration of entrapment as a matter of law seems appropriate.

to the government and draws all reasonable inferences in the government favor. *U.S. v. McLernon*, 746 F.2d 1098, 1111 (6th Cir. 1984).

Without question, the government sent Griffin on a quest for undetected terrorists. That fact offers the strongest support for defendant's claim of entrapment. Whether there was enough provocation on Griffin's part to constitute inducement need not, however, be addressed. Even if there were, it does not mean that defendant's claim could prevail. He must also show lack of predisposition.

As to that element, he clearly fails: there was sufficient evidence of predisposition, including:

- inquiries of Griffin about kidnapping Israeli soldiers and American politicians;

- asking about providing help to the brothers in Iraq;

- causing the Ahmeds to travel to Cleveland and introducing them to Griffin as recruits;

- speaking with Griffin frequently and often at length about explosives, violence, and, once, a desire to die in Iraq;

- a willingness to talk *jihad* and weapons with the co-defendants and a lack of any indication of disassociation from such discussions or their subjects;

- expressing willingness to recruit others from Michigan and to find locations for training;

- providing materials, including materials about explosives.

Had it been given a chance to do so, the jury could have found that the evidence was insufficient to acquit the defendant on the basis that he was entrapped.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT the defendant's motion for judgment of acquittal [Doc. 925] be, and the same hereby is denied.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge
