1               UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF OHIO
2                    WESTERN DIVISION

3  UNITED STATES OF AMERICA,    - Docket No. 3:06-CR-719
                                -
4      Plaintiff,               - Toledo, Ohio
                                - March 31, 2009
5          v.                   - Oral Arguments
                                -
6  MOHAMMAD ZAKI AMAWI, et al.,-
                                -
7      Defendants.              -
   -------------------------------

8
                   TRANSCRIPT OF ORAL ARGUMENTS
9            BEFORE THE HONORABLE JAMES G. CARR
             UNITED STATES DISTRICT CHIEF JUDGE
10
   APPEARANCES:
11
   For the Plaintiffs:   United States Attorneys' Office
12                        By:   Thomas E. Getz
                                Justin E. Herdman
13                        801 Superior Avenue, W
                          Cleveland, OH 44113
14                        (216) 622-3840

15                        Office of the U.S. Attorney- Austin
                          By:   Gregg N. Sofer
16                        816 Congress Avenue
                          Austin, TX 78701
17                        (512) 916-5858

18 For the Defendant Amawi: Office of the Federal Public
                          Defender - Cleveland
19                        By: Edward G. Bryan
                              Timothy C. Ivey
20                        750 Skylight Office Tower
                          1660 West Second St.
21                        Cleveland, OH 44113
                          (216) 522-4856
22
   For the Defendant      Kerger & Kerger
23 El-Hindi:              By:  Stephen D. Hartman
                          Suite 201
24                        33 South Michigan Street
                          Toledo, OH 43602
25                        (419) 255-5990

```
 1                              Boss & Vitou
                                By:  Charles M. Boss
 2                              111 West Dudley Street
                                Maumee, OH 43537-2140
 3                              (419) 893-5555

 4     Court Reporter:          Tracy L. Spore, RMR, CRR
                                1716 Spielbusch Avenue
 5                              Toledo, Ohio 43624
                                (419) 243-3607
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     Proceedings recorded by mechanical stenography,
       transcript produced by notereading.
25
```

08:37:26  1          (Commenced at 8:39 a.m.)

08:39:02  2          THE COURT:  How do you want to proceed?  I'd

08:39:04  3   like to be completed, by the way, by about 10:00, if not

08:39:08  4   sooner.  I've got a trial this afternoon, some things I

08:39:13  5   have to get done.

08:39:14  6          MR. SOFER:  If it's acceptable to the Court,

08:39:16  7   the government has a few preliminary remarks, then I

08:39:19  8   assume defense counsel will want to make argument on

08:39:22  9   their motion, then we'll respond.  If it's acceptable

08:39:30  10  with the Court, that would be our preference.

08:39:34  11         MR. HARTMAN:  Judge, I would imagine some

08:39:36  12  responses probably in response to the government's would

08:39:39  13  be appropriate.  We were prepared to let the Amawi team

08:39:43  14  go first since they were first named in the indictment.

08:39:47  15         THE COURT:  That's fine.

08:41:50  16         Mr. Sofer, go ahead.

08:41:52  17         (Defendant El-Hindi enters the courtroom.)

08:41:53  18         MR. SOFER:  Basically, Judge, I think it's

08:41:55  19  the government's position -- obviously we've briefed

08:41:58  20  this extensively, and Your Honor has no doubt read and

08:42:02  21  seen all the papers in the case -- that essentially

08:42:10  22  these motions, there's nothing new.  That would be the

08:42:15  23  government's main position throughout this.  They're

08:42:19  24  essentially an attempt to relitigate the issue of guilt

08:42:22  25  in the case or to commence some sort of argument related

08:42:25  1    to sentencing.   And I would just ask the Court to pay

08:42:32  2    heed to the following concepts and issues as we go

08:42:36  3    through this.   And we're prepared, if Your Honor

08:42:39  4    wants -- we will be prepared; if counsel wants, we will

08:42:43  5    be prepared to rebut the specific factual statements

08:42:46  6    inside a lot of these motions.   But our basic position

08:42:50  7    is the following, Your Honor: On the Rule 29 motion,

08:42:55  8    Your Honor's more familiar than I with the legal

08:42:59  9    standard.   I'm not here to try to brief Your Honor on

08:43:01  10   the law.   But I would say if you look at these motions,

08:43:07  11   every issue raised, every issue raised has been decided

08:43:11  12   previously at a time when the Court was -- had just

08:43:18  13   heard all the evidence, had just seen all the witnesses,

08:43:22  14   had just seen all the exhibits, had just heard much of

08:43:25  15   the argument in the case.   Of course, the government

08:43:29  16   concedes that these motions are properly made, renewed

08:43:32  17   under the rule, but we believe that the case law shows

08:43:38  18   that post-verdict the defense has an even higher burden

08:43:46  19   in some senses.

08:43:49  20          THE COURT:   Well, obviously the inferences

08:43:52  21   are drawn in your favor at this stage.

08:43:55  22          MR. SOFER:   Correct, Your Honor.   If you

08:43:57  23   read counsel's motion, and I assume they'll make

08:44:00  24   argument based on that as well, they do the exact

08:44:05  25   opposite many times, and that is the interplay.   They

08:44:08  1   apply the wrong standard.   They state the standard in

08:44:11  2   the beginning of their motions, but they go on

08:44:13  3   throughout their motion to essentially apply a standard

08:44:16  4   in which the inferences that can be drawn are drawn in

08:44:19  5   the defense's favor, not the government's favor, which

08:44:23  6   is not the law.

08:44:24  7            I mean, there are a number of examples of

08:44:28  8   this, and we tried to point that out, I think, in our

08:44:31  9   motion responses that there were cases where, for

08:44:36  10  instance, they said there was no evidence; all we have

08:44:38  11  is the testimony of Darren Griffin.   Well, that is the

08:44:42  12  evidence in some cases, was the testimony of Darren

08:44:44  13  Griffin.   It may have been uncorroborated.   They may

08:44:48  14  think that Darren Griffin did not have credibility on

08:44:50  15  that issue.   The jury obviously found otherwise.

08:44:54  16            As Your Honor well knows, on a Rule 29

08:44:56  17  motion the Court is not to examine the credibility of a

08:44:58  18  witness.   Again, I think that all -- if you go through

08:45:05  19  it item by item by item by item, there's nothing Your

08:45:10  20  Honor hasn't seen; there's nothing you haven't

08:45:12  21  considered before the first time that you heard these

08:45:15  22  motions, and we'd ask you to obviously rule the same way

08:45:20  23  you did the first time the Rule 29 motion was made.

08:45:24  24            THE COURT:   Is there anything specifically

08:45:25  25  with regard to Mr. Amawi that you would comment on?

08:45:30  1          MR. SOFER:  You're asking the government,

08:45:31  2    Your Honor?

08:45:31  3          THE COURT:  Yeah.

08:45:32  4          MR. SOFER:  Both Mr. Herdman and Mr. Getz

08:45:35  5    are here to respond specifically to the facts.  And I'd

08:45:39  6    like to hear what counsel wants to argue first, if

08:45:43  7    that's okay.

08:45:43  8          THE COURT:  Okay.

08:45:44  9          MR. SOFER:  On the Rule 33 motion, Your

08:45:47  10   Honor, again, there's the two bases upon which to bring

08:45:50  11   this motion; the first is new evidence.  There's

08:45:52  12   absolutely no new evidence proposed or put forward by

08:45:58  13   these motions; none.

08:46:00  14          Instead, I think they rely much more on the

08:46:03  15   interest of justice prong of Rule 33.  And here

08:46:08  16   basically, again, it's an attempt, in the government's

08:46:14  17   opinion, to relitigate the issues in the case.  They

08:46:18  18   essentially are questioning the conduct of the trial,

08:46:21  19   the rulings of the Court, and the jury's behavior in the

08:46:25  20   case.  Again, every decision, every significant issue

08:46:33  21   that they brought up in this case was fully and fairly

08:46:37  22   litigated.

08:46:39  23          THE COURT:  Understand.  I would agree with

08:46:41  24   that.

08:46:41  25          MR. SOFER:  And there was extensive

08:46:44  1   briefing, extensive argument, extensive thought by the

08:46:48  2   Court.   The Court sometimes took a significant period

08:46:50  3   of time even after argument had been made to consider

08:46:54  4   these things.  We compromised many times.   There were

08:46:58  5   well thought out decisions written about the case.

08:47:01  6   None of this, none of this was an off-the-hip sort of

08:47:06  7   quick decision by Your Honor.  And the government can

08:47:15  8   see it was all well-reasoned and appropriately decided.

08:47:18  9            On the jury's behavior, I think we all

08:47:20  10  conceded -- and I find it sort of odd at this juncture

08:47:24  11  there's some question even as to this -- that this was

08:47:26  12  really an amazing jury.   I think both the prosecution,

08:47:30  13  the government, the defense, and Your Honor, and anyone

08:47:35  14  who watched this trial got to see that.   It was a

08:47:39  15  fairly amazing demonstration of a group of people who

08:47:43  16  were listening carefully, paid a lot of attention, and

08:47:46  17  did everything they could to try the case fairly.   And

08:47:49  18  the notion that they did something in this case, they

08:47:53  19  were rogue and they were unable to sort out issues and

08:47:57  20  unable to discern that which was a political issue or an

08:48:04  21  emotional issue from the facts of the case, or did

08:48:07  22  anything remotely inappropriate, given all the

08:48:09  23  instructions that they got -- and they got many, many of

08:48:12  24  them -- I believe is just an untenable argument.

08:48:15  25            In any event, Your Honor, my preliminary

08:48:18   1   remarks are intended to say, in many senses these

08:48:23   2   motions are nothing new.  And I understand why the

08:48:28   3   defense would want to relitigate all these issues, but

08:48:31   4   we've done this already; we've been here; we've done

08:48:35   5   this.  They want to appeal.  We're obviously ready for

08:48:38   6   that.  We anticipate a vigorous appellate brief from all

08:48:42   7   the defendants in this case.  And that's what they

08:48:45   8   should do.  But this is not the right vehicle to do

08:48:47   9   that.

08:48:48   10            THE COURT:  Okay.

08:48:50   11            MR. BRYAN:  Your Honor, if I could take the

08:48:52   12   podium.

08:48:52   13            THE COURT:  Sure.

08:48:56   14            MR. BRYAN:  Your Honor, it's certainly not

08:48:59   15   my intention here today to retry the case.

08:49:03   16            THE COURT:  Let me ask some questions that I

08:49:06   17   think you should address.

08:49:12   18            With regard to whatever difficulties Mr.

08:49:15   19   Amawi has encountered since conviction, if I calculate

08:49:21   20   correctly, there are four and a half months -- five and

08:49:30   21   a half months that elapsed since return of the verdict

08:49:34   22   and the filing of a new trial motion.  I believe I

08:49:38   23   granted every request for an extension in that regard.

08:49:43   24   And I don't recall, I may be mistaken, but I don't

08:49:47   25   recall except quite vaguely one instance perhaps where

08:49:52  1   some concern was raised about Mr. Amawi's situation and

08:49:59  2   problems that he may have been encountering up at Milan

08:50:04  3   in terms of access to materials.   That's question one.

08:50:09  4          And question 2, quite candidly, I don't see

08:50:12  5   an answer to the question that I raised in the midst of

08:50:15  6   the proceedings.  Candidly, I think I should have raised

08:50:19  7   it a lot sooner.  This whole business about translators,

08:50:23  8   if I understand correctly, practically every

08:50:27  9   conversation in which Arabic was used involved the use

08:50:33  10  of Arabic by one of the defendants.   There may have

08:50:36  11  been a couple others: the one over the computer with the

08:50:41  12  person in Syria or wherever or believed to be in Syria.

08:50:45  13  But why do you need translators to tell you what your

08:50:50  14  own clients meant when they used a particular Arabic

08:50:55  15  phrase?  It's my understanding that all three of them

08:50:57  16  are fluent in Arabic.   And Mr. Amawi at one point was

08:51:03  17  contacted by somebody about possibly being a translator,

08:51:08  18  and he declined to do so; he wanted nothing to do with

08:51:14  19  helping the American forces in Iraq.   So candidly, I

08:51:20  20  see the whole thing about translating and the time

08:51:26  21  required and the difficulty and the expense and all of

08:51:29  22  that as simply being way off the mark.   I really do.

08:51:37  23  I'm fairly fluent in German, far from perfect.   But if

08:51:42  24  I were to say something in German, rather than turning

08:51:45  25  to somebody, a native speaker, to tell you what I meant

08:51:49  1    to say in German, ask me.

08:51:55  2            MR. BRYAN:  Your Honor, I understand what

08:51:57  3    Your Honor is saying; that is that the defendants, since

08:51:59  4    they speak Arabic, they could translate for the defense

08:52:02  5    attorneys that which was spoken in Arabic.

08:52:06  6            It should be noted at the outset, however,

08:52:08  7    that the government provided transcripts.  Much of when

08:52:11  8    it got to the Arabic portion of the transcript, it would

08:52:15  9    say "Male speaking in Arabic," and it didn't translate.

08:52:18  10            On at least one or two occasions, one that

08:52:21  11   was actually pointed out to Your Honor at the end of

08:52:24  12   trial when we were trying to present our case, there was

08:52:26  13   information in there that we would have considered

08:52:28  14   exculpatory that the Arabic translator said:  "Man

08:52:33  15   speaking in Arabic."  That occurred on January 27, 2005

08:52:36  16   in the presence of Darren Griffin with Mohammad Amawi

08:52:39  17   online with another individual.  And the translator

08:52:42  18   from the government said "Man speaking in Arabic."  And

08:52:45  19   when we get the translation of what was said, and

08:52:49  20   admittedly Mohammad Amawi was one of the persons who was

08:52:51  21   able to give that to us, but we didn't have

08:52:53  22   independent -- we didn't have independent translator

08:52:58  23   verification of that.

08:53:00  24            THE COURT:  Of the statements attributed to

08:53:02  25   a third person?

08:53:04    1          MR. BRYAN:  Statements attributed to the

08:53:06    2    third person.  Those statements were a gentleman

08:53:08    3    speaking on the computer to Mr. Amawi saying:  I don't

08:53:11    4    care if the person sitting next to you is recording

08:53:13    5    everything that I'm saying.  I'm speaking only the

08:53:16    6    truth of Allah, so let him hear the truth of Allah.

08:53:23    7          THE COURT:  If I recall correctly -- and if

08:53:25    8    I don't, tell me -- but the third-party Arabic

08:53:32    9    statements, spoken statements, were but a small fraction

08:53:42   10    of the recorded Arabic conversations.  The vast

08:53:45   11    majority was one or more of the -- I can't recall; I

08:53:51   12    think Mr. Mazloum may have been recorded a little teeny

08:53:56   13    bit about Insallah or whatever.  But in terms of the

08:54:00   14    actual conversation, I think it was Mr. Amawi with a

08:54:06   15    fair amount from Mr. El-Hindi, as well as from Mr.

08:54:12   16    Mazloum.

08:54:12   17          MR. BRYAN:  Your Honor, as far as -- I'm not

08:54:15   18    sure I understand.

08:54:16   19          THE COURT:  I'm being very candid with you.

08:54:19   20    That's something I interjected kind of in the midst of

08:54:22   21    the thing.  I have no doubt when you get down to

08:54:24   22    Cincinnati they're going to want an answer to that

08:54:26   23    question, and I don't see it in your brief, and I think

08:54:29   24    it's crucial because you spent a lot of time about how

08:54:32   25    you were impaired by what you consider to be an

08:54:36  1   ultimately brief period of time for preparation.

08:54:39  2   Candidly, I think that is a fair and plausible argument

08:54:42  3   to address to the Circuit.   I considered your

08:54:47  4   circumstances.   I tried to express the reasons for

08:54:52  5   insisting upon the trial date that I did.   Your record

08:54:55  6   is ample in terms of your objection.   I don't think the

08:55:00  7   government could stand up with a straight face down in

08:55:05  8   Cincinnati in front of a panel and say:  They didn't

08:55:08  9   preserve that issue.   Clearly it is, and it's a crucial

08:55:11  10  issue.   And I may have made a mistake.   I don't know.

08:55:14  11  But I don't think I did.   And I thought about it very

08:55:19  12  deliberately.   And it may have been error of me to have

08:55:25  13  taken into consideration the fact that the shuffle in

08:55:30  14  counsel was due to two things:  one, Mr. Amawi's refusal

08:55:38  15  to abide by what the facts in the law were that there

08:55:44  16  was no conflict of interest because Mr. Terez was paid

08:55:48  17  by the government, none, zero.   It may have been error

08:55:55  18  for me to have been as accommodating as I was.   But I

08:56:00  19  tried to insure he would have counsel that he would have

08:56:03  20  absolute confidence in.   And again, those are issues

08:56:06  21  fairly and well preserved in the record.   And I can see

08:56:13  22  that reasonable men can differ as to the decision, and

08:56:16  23  that two more judges down there might say to me I've

08:56:23  24  abused my discretion; I even violated a constitutional

08:56:27  25  right.   No one would be less happy than I about that.

08:56:34  1   I don't think I did.   But on the other hand --

08:56:38  2              MR. BRYAN:  Your Honor, of course we've

08:56:40  3   never alleged or asserted bad faith in this matter from

08:56:43  4   Your Honor.

08:56:44  5              THE COURT:  I understand that.

08:56:44  6              MR. BRYAN:  But what we've tried to do

08:56:46  7   through the pleadings is tried to reveal to Your Honor

08:56:49  8   the case from our perspective, and not withstanding the

08:56:52  9   fact that Mr. Terez was involved in the case for eight

08:56:54  10  months preceding at the very beginning of this case.

08:56:58  11             THE COURT:  I'm willing to accept that there

08:57:00  12  is very little that was in his locker, so to speak,

08:57:06  13  that's going to be much use to you.  I understand that.

08:57:09  14             MR. BRYAN:  I think everyone would agree the

08:57:11  15  initial stages of this case the transcripts were still

08:57:13  16  being prepared, things were still being discovered,

08:57:19  17  things were being looked at for the first time.  We all

08:57:22  18  realize this case involved a tremendous amount of

08:57:26  19  discovery that involved information that took place over

08:57:29  20  two-plus years.   The problem that we saw in this case

08:57:31  21  is Your Honor was viewing Mr. Amawi's representation as

08:57:34  22  seamless because he always had counsel.  But the problem

08:57:37  23  that we had when we came into the case in mid January,

08:57:40  24  2008, is that which took place in the 15 months prior to

08:57:44  25  that.   And I'm not here to cast dispersions on counsel

08:57:47  1   in the interim, but there was a 15-month period of time

08:57:53  2   where the record -- if it's not clear now will become

08:57:56  3   clear at a later proceeding, very little was done.   And

08:57:58  4   Mr. Amawi raised those concerns to Your Honor on

08:58:01  5   numerous occasions ex parte which -- not ex parte, but

08:58:05  6   in camera, which eventually led to our office becoming

08:58:08  7   involved in the case again.

08:58:09  8              And so here we are coming back involved in

08:58:12  9   the case.   One of the first things that I chastised

08:58:16  10  everybody about was the lack of a complete

08:58:18  11  defense-created transcript.   And Mr. Doughten came up to

08:58:23  12  me after I lost my cool back in that room and said,

08:58:26  13  Where's the transcript?   Where's the transcript?   The

08:58:28  14  government, they don't have to give you the transcript;

08:58:30  15  they just have to give you the tape.   You've had these

08:58:34  16  tapes for years.   Where's the defense-created

08:58:37  17  transcript?   Mr. Doughten came up --

08:58:40  18             THE COURT:   I don't want you to -- to some

08:58:44  19  extent, if I recall correctly, it was sort of a defunct

08:58:48  20  joint defense approach.   I don't want any doors opened.

08:58:52  21             MR. BRYAN:   Just to suggest his client was

08:58:55  22  involved and everyone was involved in a lot less

08:58:57  23  transcript than the other two defendants in this matter.

08:59:00  24  And Mr. Amawi was involved in volumes more transcript

08:59:03  25  than Mr. El-Hindi in different conversations.   In fact,

08:59:06  1  the only time they were all together was on that

08:59:07  2  February 16 -- all three of them were together was on

08:59:10  3  the February 16 meeting.  So what we were left with for

08:59:13  4  Mr. Amawi was basically the lack of the tools to begin

08:59:17  5  representing him in this case.

08:59:18  6          THE COURT:  Again, I don't recall.  I mean,

08:59:21  7  either you or Mr. Sofer can simply make a

08:59:24  8  representation.  But by the time you came into the

08:59:29  9  case, it's my recollection that a very substantial

08:59:33  10  portion of the transcripts, a very substantial

08:59:39  11  percentage of the recordings at least that the

08:59:45  12  government intended to use had been transcribed and

08:59:49  13  provided.  Maybe not everything.  I know there was a

08:59:55  14  fair amount of delay along the way.

08:59:57  15          MR. SOFER:  Absolutely.  I think the record

08:59:59  16  will reflect Your Honor pushed us pretty hard to be

09:00:02  17  producing those things early.  They may not have been

09:00:05  18  perfect.  And we went through numerous iterations of

09:00:07  19  them.  But we're not talking about changing massive

09:00:11  20  portions of them.

09:00:12  21          THE COURT:  I understand.

09:00:13  22          MR. BRYAN:  Your Honor --

09:00:15  23          THE COURT:  The other thing that I recall in

09:00:19  24  that regard is that during the trial there were about a

09:00:29  25  handful of instances where there was a squabble over the

09:00:35  1   accuracy of the translation either in English or in

09:00:38  2   Arabic, but certainly in English due to audibility or

09:00:42  3   other problems.   I recall the one instance that you

09:00:45  4   alluded to that I didn't hear which you thought I should

09:00:49  5   hear, and there may have been a couple others like that.

09:00:53  6   But that's the way it works with transcripts, that if

09:00:57  7   there is a dispute -- because after all, as the jury is

09:01:03  8   always instructed, what they hear is what the evidence

09:01:06  9   is, at least in terms of English; and the transcript is

09:01:12  10  simply an aid or a guide.   And the law is also quite

09:01:17  11  clear where the parties -- where there's a disagreement,

09:01:20  12  it's up to me to sit down and either make a decision to

09:01:23  13  let the jury hear both versions, read both versions of

09:01:26  14  the transcript, and go from there.

09:01:31  15          So again, I know that was a large volume,

09:01:34  16  but at the end of the day I look back and say:  Wait a

09:01:38  17  minute; it doesn't seem to me, and in the record as it

09:01:41  18  now exists I don't think there is a vast pile of

09:01:49  19  transcripts where the contention is being raised by the

09:01:54  20  defense that's a whole jumble that's wrong; it's not

09:01:59  21  what's being said, so forth so on.

09:02:02  22          MR. BRYAN:  As it relates to what the

09:02:04  23  government prepared for trial, I believe it's even said

09:02:07  24  on the record that they presented ten percent of what

09:02:10  25  they actually had as far as all of the tape recorded

09:02:12  1    conversations.   I don't know how much of all of the

09:02:15  2    tape recorded conversations they actually transcribed.

09:02:19  3    They had preliminary transcripts of things they may use

09:02:22  4    during trial, and they pared it down even more.   And

09:02:25  5    the late hour that we got into the case, we were trying

09:02:28  6    to familiarize ourselves with the case with the

09:02:30  7    assistance of our client, with the assistance of Mr.

09:02:34  8    Muawad, who hung over, with the assistance of Mr. Terez

09:02:37  9    from his past experience.   Quite frankly we weren't in

09:02:40  10   a position to challenge a lot of transcripts that were

09:02:43  11   being played by the government because, quite frankly,

09:02:46  12   Mr. Ivey and I made the comment we were hearing the

09:02:49  13   stuff for first time.   There wasn't enough time in the

09:02:52  14   day in an effort to try to prepare for the case to even

09:02:56  15   hear the tapes.   In fact, the government submitted

09:02:58  16   their final transcripts the day before the trial began,

09:03:00  17   their final transcripts that were trial prep ready, the

09:03:03  18   ones that they believed were cleaned up as much as they

09:03:06  19   could.

09:03:07  20           We're not here submitting to Your Honor that

09:03:08  21   we didn't have the -- that that which was played was

09:03:13  22   inaccurate or there was a lot of problems with it.

09:03:15  23   What we're submitting to Your Honor is there was a lot

09:03:18  24   more transcript that we didn't have the ability to even

09:03:20  25   review and see.

09:03:21  1                And what the government ended up doing in

09:03:23  2      the end was quite a cut-and-paste job.   And I don't

09:03:27  3      blame them in the sense they were trying to present the

09:03:29  4      case in an expeditious manner.   They didn't want to put

09:03:33  5      in a bunch of irrelevant stuff.

09:03:35  6                But at the same time the government was

09:03:36  7      presenting this, we were given assurances by the Court

09:03:39  8      that, well, you have the government's entire case to

09:03:42  9      continue to prepare your defense transcript.   And then

09:03:46  10     when you have, in essence, a couple of months before the

09:03:50  11     government rests --

09:03:52  12               THE COURT:   It seems to me in order to have

09:03:59  13     perfected the record, but at least to be in a position

09:04:02  14     to argue persuasively either to me or to the Court of

09:04:05  15     Appeals that you were somehow prejudiced by this, and I

09:04:09  16     believe that's the standard, that you've had, what, nine

09:04:17  17     months -- eight months, nine months to sit down and say,

09:04:20  18     Judge, either this is all the stuff they didn't show, or

09:04:25  19     some of this stuff; or, Judge, this is what they gave

09:04:28  20     us, and it was wrong; or, Judge, this is what the jury

09:04:32  21     was allowed to read, and it was wrong.   I mean, again,

09:04:41  22     there's -- I just don't see the transcript issue being

09:04:45  23     viable.   I really don't.   It's something I think the

09:04:54  24     Court of Appeals -- you can address in your arguments

09:04:58  25     there.   I do think you've got to show somehow,

09:05:01   1    somewhere there was some prejudice, that the jury got to

09:05:03   2    look at something that adversely and substantially

09:05:09   3    affected your client's right to a fair trial that it

09:05:12   4    should have never seen.

09:05:13   5              I don't believe that there's a

09:05:18   6    constitutional right even to get a transcript.  I'm not

09:05:21   7    sure.  I certainly favor it.  I think it's the right

09:05:24   8    thing to do.  But where -- what is being played, even

09:05:36   9    if you are, in fact, appearing that morning or that

09:05:38   10   afternoon for the very first time, if the transcript

09:05:41   11   accurately portrays what that is, then it's a huge "so

09:05:49   12   what," I think.

09:05:50   13             MR. BRYAN:  We even argued this to the jury,

09:05:52   14   that the transcript was a cut-and-paste and that it

09:05:55   15   wasn't accurate because a lot of the stuff was taken out

09:05:58   16   of context.  And we were able to demonstrate some

09:06:01   17   issues of that.  But what we weren't able to do

09:06:04   18   adequately is demonstrate all the issues of that.

09:06:07   19             THE COURT:  That's fine.  But where have

09:06:09   20   you demonstrated that?  That's my whole point.  I'd be

09:06:14   21   a lot more persuaded if you'd come in and give me a

09:06:17   22   stack of transcripts and say:  Judge, you know, we

09:06:21   23   just -- we missed it, Judge; we didn't have time before

09:06:25   24   this recording was played to look at the chunk that Mr.

09:06:28   25   Sofer left out and dumped in the trash can, and this is

09:06:33  1    what it says.

09:06:33  2                MR. BRYAN:  We raised a couple issues.

09:06:36  3    I've already alluded to the one --

09:06:39  4                THE COURT:  My point is when you have

09:06:40  5    several dozen hours of recording, I think you're going

09:06:43  6    to have to do more than say there's a couple instances

09:06:47  7    where it may have been misleading in the way it was

09:06:49  8    presented by the government, and we weren't able to

09:06:51  9    catch it at the time.  I mean, there were instances I

09:06:55  10   do recall when you requested and I granted the request

09:07:03  11   to have segments that had been omitted from the

09:07:06  12   government's portion presented to the jury.

09:07:09  13               My point simply is, it's been nine months

09:07:12  14   since the verdict.  And I look at these motions, and I

09:07:14  15   don't see the beef, as it were, in terms of this whole

09:07:21  16   issue.

09:07:22  17               MR. BRYAN:  To be honest, Your Honor, this

09:07:23  18   is still an ongoing process and our ability to even

09:07:28  19   still at this time and date to get a grasp of a

09:07:30  20   completed transcript based upon all the tapes, it's

09:07:34  21   still an ongoing process.  It may even be the subject

09:07:37  22   matter of a later pleading, or maybe even a

09:07:39  23   postconviction pleading.  So I think we could sort of

09:07:43  24   transition, to the other concerns that we had that are

09:07:46  25   raised in the brief as it relates to this not having

09:07:50  1   sufficient time to prepare.   It's our belief that a

09:07:54  2   significant amount of irrelevant, prejudicial, or at

09:07:58  3   least 403 evidence that was much more prejudicial than

09:08:00  4   probative was able to come into the ears and eyes of the

09:08:05  5   jury without our ability to defend in kind with each one

09:08:10  6   of these individual things.   And we've laid those --

09:08:13  7           THE COURT:   I think you're alluding to the

09:08:17  8   motions in limine.

09:08:19  9           MR. BRYAN:   And there was -- thankfully

09:08:21  10  there was a broad motion in limine requesting most of

09:08:24  11  this stuff be kept out.   But if we had more time to

09:08:27  12  prepare, Your Honor, and had actually time to view some

09:08:29  13  of these videos, we would have had more persuasive

09:08:34  14  arguments why I say the Madrid train bombing shouldn't

09:08:39  15  have been played, and the London suicide bomb shouldn't

09:08:42  16  have been played, and the 9-11 conspiracy videos that

09:08:45  17  showed the towers blowing up again and again, and the

09:08:50  18  beheading video, even though that involved the Iraq war,

09:08:54  19  I think it was too gruesome to be part of this trial

09:08:57  20  because there was no evidence our clients were going to

09:09:00  21  engage in like --

09:09:01  22          THE COURT:   I think those arguments are

09:09:03  23  properly raised in the Court of Appeals.

09:09:12  24          Let me address the contention about motions

09:09:15  25  in limine.   Those are a convenience; they're not a

09:09:17  1   necessity.  You can look through all the myriads of

09:09:22  2   rules that have been written, civil and criminal

09:09:26  3   evidence, and you won't find a provision on motions in

09:09:29  4   limine.  It's a judicially created, common sense

09:09:32  5   approach to resolving issues before trial so that the

09:09:37  6   jury can be in the -- if it's in the building, it can be

09:09:41  7   in the box, we're not wasting a lot of time, so you can

09:09:45  8   see what's coming down the pike and form your responses

09:09:49  9   appropriately so you know what evidence may or may not

09:09:53  10  be coming in.  But, you know, I know of no situation

09:09:57  11  with which a refusal of a Court to allow motions in

09:10:05  12  limine, for whatever reason, somehow is erroneous.

09:10:15  13  Until 20 years ago, 25 years ago, nobody heard a motion

09:10:20  14  in limine.  It got invented and spread, sensibly.  And

09:10:25  15  what that meant was it was up to counsel as the evidence

09:10:29  16  was being proffered to stand up and say, "Objection."

09:10:32  17  And there was lots of that.  And again, I don't see the

09:10:38  18  specific examples of where pretrial consideration --

09:10:50  19  accepting your contention that you didn't have time to

09:10:55  20  develop what you think of, to investigate, to research,

09:11:02  21  to write and file motions in limine, I don't see

09:11:05  22  specific examples where you can say, Judge, here it is;

09:11:09  23  right in the middle of trial, this happened.  This

09:11:13  24  specific tape or whatever, had we had chance to argue

09:11:22  25  this to you, this is the ruling that you would

09:11:27  1  necessarily have reached because this is what's wrong

09:11:29  2  with the ruling that you made.

09:11:33  3      If memory serves, I believe every bit of

09:11:40  4  videographic evidence was presented, at least to me, by

09:11:45  5  the government -- am I right, Mr. Sofer -- to look at

09:11:51  6  before voir dire.

09:11:52  7      MR. SOFER:  That's right, Your Honor.  Your

09:11:53  8  Honor saw this list, went through all of this video,

09:11:56  9  limited what it is the government was going to be

09:12:01  10  permitted to put in.  The government limited itself

09:12:04  11  also further from the larger list that we initially put

09:12:08  12  in.  Your Honor gave the jury a cautionary instruction

09:12:11  13  on numerous occasions about these videos.

09:12:15  14      THE COURT:  It was a key proposition during

09:12:17  15  voir dire.

09:12:20  16      MR. SOFER:  They were extensively discussed

09:12:22  17  during voir dire.  There was extensive warning and

09:12:26  18  cautionary instruction given to them about the reason

09:12:29  19  that they were being introduced, being admitted as the

09:12:34  20  intent for specific defendants.  And again, we're not

09:12:38  21  talking about the hope -- and I think what was missing

09:12:41  22  from the brief from counsel is particularly they cite to

09:12:45  23  a new case that came out of the Eastern District of New

09:12:48  24  York in the Second Circuit.  That case is much

09:12:50  25  different.  We distinguished that case in our brief.

09:12:53   1   The critical piece here is these videos were being

09:12:57   2   discussed by the defendants with Mr. Griffin during the

09:13:04   3   course of the consensual recordings.   And there were

09:13:08   4   numerous times when this would occur, particularly with

09:13:13   5   Mr. Amawi.   And so when the defense attacks Darren

09:13:18   6   Griffin's credibility, which they did vociferously; and

09:13:23   7   when they argue that somehow Darren Griffin entrapped

09:13:25   8   their client, which they did without formally offering

09:13:29   9   that evidence, but nevertheless; when they argue that he

09:13:32  10   was tricking Darren Griffin and suckering him into

09:13:36  11   giving him money and all this, all of these things which

09:13:40  12   they did ultimately argue, ultimately go back to that

09:13:43  13   intent issue, which was a major issue.

09:13:45  14           THE COURT:  I understand.   The main thing

09:13:47  15   was in terms of the videos, it wasn't as though they

09:13:51  16   sprung it on you in the midst of trial.

09:13:55  17           MR. SOFER:  No.   Like I said before, Judge,

09:13:57  18   this and all these issues Your Honor spent a tremendous,

09:14:01  19   as I recall -- my memory may be faulty, but we spent a

09:14:05  20   lot of time talking about this.   This was not an

09:14:09  21   off-the-cuff decision by the Court.

09:14:11  22           THE COURT:  Go ahead.

09:14:12  23           MR. BRYAN:  I want to back up and address

09:14:13  24   the legal standards a little bit and comment on what Mr.

09:14:18  25   Sofer said in opening.

09:14:19  1      Rule 29, written motion for acquittal, the

09:14:23  2  rule provides for that within seven days we can request

09:14:26  3  for an extension of time.  Also Rule 33, motions for new

09:14:30  4  trial.  The reason we have those things is to give the

09:14:34  5  trial court the opportunity to address what may be --

09:14:41  6          THE COURT:  Sure, it's a second look.  Say,

09:14:43  7  time out, Judge, before we take the time to go down to

09:14:47  8  Cincinnati, we genuinely believe that there's a fair

09:14:52  9  chance of reversal.  There was this ruling or that

09:14:55  10  decision or whatever that now that we've all had time to

09:15:05  11  look at it at arm's length and in a quieter, more

09:15:12  12  contemplative setting of one's office rather than the

09:15:16  13  courtroom, respectfully, Judge, you blew it; you made a

09:15:23  14  mistake.  Admit it.  Let's go back, unfortunately, and

09:15:27  15  start all over.  And I understand it.

09:15:33  16          MR. BRYAN:  I understand.  In addition --

09:15:35  17          THE COURT:  If nothing else, if you persuade

09:15:37  18  a Judge that that's true, everybody's better off, even

09:15:40  19  though the party that prevailed, in a criminal case the

09:15:44  20  government, is disappointed and distressed because if it

09:15:48  21  agrees, we go back and try the case over; we avoid that

09:15:51  22  error, and we reach a final decision sooner rather than

09:15:55  23  later.

09:15:56  24          MR. BRYAN:  Ultimately, Your Honor, I think

09:16:00  25  it's about the interest of justice.  And justice

09:16:03   1    delayed is justice denied.   So if we have the

09:16:06   2    opportunity to fix something earlier than the Court of

09:16:08   3    Appeals has the opportunity to fix something, we, by all

09:16:11   4    means, should do that.   I think that's why the rules

09:16:13   5    are there.   Not only that, but Your Honor sits as a

09:16:16   6    13th juror when it comes to Rule 29.   The law is very

09:16:19   7    clear on that.   If Your Honor believes that the jury's

09:16:22   8    verdict is irrational on any one of these counts because

09:16:25   9    there's not just the absence of evidence, but not

09:16:28   10   sufficient evidence to prove the defendant's guilt

09:16:30   11   beyond a reasonable doubt, that's --

09:16:32   12          THE COURT:   Rational trier of fact beyond a

09:16:35   13   reasonable doubt.

09:16:35   14          MR. BRYAN:   That's correct.   I don't want

09:16:36   15   to get away from the motion for new trial because there

09:16:38   16   is a critical issue that I want to discuss with Your

09:16:40   17   Honor, and that concerns CIPA.

09:16:42   18          But just quickly to address the Rule 29, I

09:16:45   19   would like to address in reverse order the four counts

09:16:49   20   that Mr. Amawi was convicted of.

09:16:50   21          The first one is -- in Count 4, which I'm

09:16:54   22   addressing first, is the transfer of the explosives

09:16:59   23   cookbook.   This was the -- in essence on a disk that

09:17:03   24   the government discovered long after they even initially

09:17:07   25   indicted the case.   In fact, this count only came in

09:17:10   1   the superseding indictment well after the original

09:17:13   2   indictment was made.

09:17:15   3            THE COURT:   That's the printed material in

09:17:17   4   Arabic rather than the bomb vest video?

09:17:20   5            MR. BRYAN:   That's correct, Your Honor.

09:17:21   6   This is Government's Exhibit 59, which was the disk that

09:17:24   7   that information was located upon.   On that disk was

09:17:29   8   106 files, the vast majority of them actually in Arabic;

09:17:34   9   there's some that are in English as well.   And the one

09:17:37  10   in question actually, Your Honor, is subject T, and it

09:17:45  11   says "Zip" in front of it, but then there's something

09:17:48  12   written in Arabic.   And the actual file, in essence, is

09:17:52  13   multiple pages of this, which is a bunch of Arabic.

09:17:57  14            There used to be a no evidence standard when

09:17:59  15   it came to sufficiency of evidence.   If there was no

09:18:02  16   evidence of guilt on a particular case, then the Court

09:18:06  17   should issue a ruling in favor of the defendant

09:18:09  18   acquitting him of that.   I think Your Honor, as it

09:18:11  19   relates to Count 4, we may be as close to and "no

09:18:14  20   evidence" standard as I've ever been in a case, and that

09:18:17  21   is because of over 300 hours of audiotape, of over five

09:18:22  22   weeks of Darren Griffin testifying on the witness stand,

09:18:25  23   not one time did anybody ever make mention of this --

09:18:31  24   this file that was found on this disk that was received

09:18:33  25   purportedly from Darren Griffin, from Mohammad Amawi to

09:18:38   1   Darren Griffin.   And we don't squabble with the

09:18:42   2   standards.   We understand Your Honor has to view the

09:18:46   3   evidence in a light most favorable to the government.

09:18:49   4   But viewing the evidence in a light most favorable to

09:18:52   5   the government, you can't reach evidentiary conclusions

09:18:54   6   that don't exist.   The intention is to show that

09:18:57   7   Mohammad Amawi transferred this item with the intent

09:19:00   8   that Darren Griffin use it in a crime of violence.   And

09:19:02   9   the government's argument is, well, because he intended

09:19:06   10  Darren Griffin to assist in committing Jihad abroad,

09:19:11   11  anytime he gave him anything, he intended to do that.

09:19:13   12  But if that were the case, as it relates to this

09:19:15   13  particular item, there should be some other evidence

09:19:18   14  that either Mohammad Amawi discussed it with Darren

09:19:20   15  Griffin and he intended to interpret it for him --

09:19:23   16           THE COURT:  You're saying the transmission

09:19:25   17  from one to the other in this form and format --

09:19:29   18           MR. BRYAN:  -- is not sufficient evidence to

09:19:32   19  prove beyond a reasonable doubt to any rational trier of

09:19:36   20  fact.

09:19:37   21           THE COURT:  Can you do me the favor -- and

09:19:39   22  I'll give you a couple weeks to do it, or a week or

09:19:43   23  whatever -- list for me the transcript pages where this

09:19:52   24  item was under -- where there's testimony about this

09:19:57   25  item.   Because I can't recall with any degree of

09:20:02  1    specificity.

09:20:03  2          MR. BRYAN:  We can do that.  But Darren

09:20:04  3    Griffin didn't -- he testified about receiving the disk

09:20:06  4    but never testified about actually viewing this document

09:20:10  5    or Mohammad Amawi translating it for him, or anybody for

09:20:14  6    that matter translating for him, or Mohammad Amawi

09:20:16  7    telling him:  Hey, there's an Arabic document --

09:20:19  8          THE COURT:  Again, give it to somebody

09:20:22  9    except for the FBI.

09:20:24  10          MR. BRYAN:  Right.  Then the FBI, when

09:20:26  11    they're translating this months after the fact, they

09:20:29  12    find what appears to be, quote, the explosives cookbook,

09:20:35  13    which is instructions in Arabic for how someone could

09:20:37  14    make chemical explosives.  Then they come back, and

09:20:40  15    they supersede the indictment and say ah-ha; he

09:20:44  16    transferred this for the damage it would --

09:20:48  17          THE COURT:  If you could compile for me and

09:20:50  18    simply submit that segment of the transcript in which

09:20:55  19    any and all evidence as to that count is found.

09:21:02  20          MR. BRYAN:  We will do that, Your Honor.

09:21:05  21          Moving on now to Count 3, in reverse order.

09:21:09  22          MR. SOFER:  I don't know if you want us to

09:21:12  23    wait until the end.

09:21:13  24          THE COURT:  I'll wait.

09:21:15  25          MR. BRYAN:  Count 3 is the alleged

09:21:18  1    distribution, or apparently since he was convicted, the

09:21:21  2    distribution of the bomb vest video with the intent Mr.

09:21:26  3    Griffin was going to use that for furtherance of a crime

09:21:29  4    of violence.  What's important is the evidence in the

09:21:32  5    case as it related to this distribution because we all

09:21:35  6    know that the evidence is clear that there was not an

09:21:37  7    actual distribution, that is, a physical handing over of

09:21:41  8    this video from Mr. Amawi to Mr. Griffin.  The best

09:21:45  9    that the government has in that regard is Mr. Amawi

09:21:48  10   giving a disk to Mr. Griffin purportedly and saying:

09:21:51  11   Oh, yeah, the video is on there.  But the forensic

09:21:54  12   evidence is clear the video was not on there.  So

09:21:57  13   they're relying now, viewing of that video --

09:21:59  14          THE COURT:  I think I've already ruled on

09:22:01  15   that.  In fact, I ruled before trial.  In my view,

09:22:07  16   showing it on the screen, even if you don't give him a

09:22:09  17   disk, that counts as distribution.

09:22:11  18          MR. BRYAN:  Again, Your Honor, and we don't

09:22:12  19   dispute the distribution finding of that.  What we're

09:22:15  20   arguing is that again --

09:22:18  21          THE COURT:  At least not now.

09:22:19  22          MR. BRYAN:  Well, we did argue that before,

09:22:21  23   and I apologize for that.

09:22:22  24          THE COURT:  That's fine.

09:22:23  25          MR. BRYAN:  But again, with the intent that

09:22:25   1    by viewing that video, Mr. Amawi was trying to transfer

09:22:29   2    to Darren Griffin the knowledge so that he could go out

09:22:33   3    and use it for a crime of violence, that intent also,

09:22:38   4    again, is missing.  We would ask Your Honor to review

09:22:40   5    the testimony concerning the January 10 viewing of that

09:22:43   6    video because on that same date and time, this was what

09:22:46   7    I call the marathon video viewing party that Darren

09:22:50   8    Griffin and Mohammad Amawi had, we begin on January 10

09:22:54   9    and heading over into January 11 where they watched

09:22:59  10    multiple hours of videos and had multiple discussions

09:23:02  11    concerning the topics that were on these videos.

09:23:06  12            These videos included the conversation of a

09:23:08  13    young woman who -- it was basically Mr. Amawi showing

09:23:13  14    Mr. Griffin everything that was on his computer of a

09:23:15  15    woman who purportedly died during sex because she was

09:23:18  16    sinning against God, and she died during sex.

09:23:21  17            There was a discussion concerning a French

09:23:25  18    Barbie doll that was pregnant, and how offensive it was

09:23:28  19    to Mohammad that the French would allow a French Barbie

09:23:31  20    doll that is pregnant and has a little baby, but they

09:23:33  21    won't allow a Barbie doll that's wearing the Muslim

09:23:38  22    hajib or the veil.  So there were discussion about the

09:23:41  23    veil.

09:23:41  24            They were basically having religious

09:23:43  25    discussions.  On this same date and time Mr. Amawi was

09:23:46  1   talking on Pal Talk to the people in his chat room and

09:23:49  2   discussing with Darren Griffin what they were talking

09:23:51  3   about.

09:23:52  4          What they didn't discuss, what is clear and

09:23:54  5   what is missing from the evidence, is Mr. Amawi saying

09:23:56  6   to Mr. Griffin, I'm showing you this video so that you

09:24:01  7   can go make this bomb vest and go out and blow people

09:24:05  8   up.  Again, government wants us to infer that that's

09:24:07  9   what Mr. Amawi intended by showing Darren Griffin that

09:24:10  10  video.  But again, viewing the evidence, even the

09:24:13  11  evidence in the light most favorable to the government,

09:24:15  12  what you have at most is speculation that that could be

09:24:19  13  used for that purpose as well, but no specific evidence.

09:24:22  14          THE COURT:  For that purpose or some more

09:24:24  15  general purpose in terms of providing the training and

09:24:29  16  getting them prepared to do what the government contends

09:24:33  17  they wanted to do, which was to metastasize a bunch of

09:24:39  18  cells or go overseas or whatever.

09:24:41  19          MR. BRYAN:  Well, the training says that the

09:24:43  20  material has to be transferred with the intent that the

09:24:46  21  material is going to be used in a crime of violence.

09:24:48  22  So if the government is submitting that that was going

09:24:51  23  to be used to train people to go kill and maim, I would

09:24:56  24  want to deny that that would satisfy that element if

09:24:58  25  that was the evidence at that time.  But the evidence

| | | |
|---|---|---|
| 09:25:01 | 1 | based upon this meeting on that date in question, when |
| 09:25:04 | 2 | you look at it in its proper context, this is a marathon |
| 09:25:08 | 3 | video viewing.   What Darren Griffin was trying to do -- |
| 09:25:11 | 4 | THE COURT:  My problem with that, quite |
| 09:25:12 | 5 | candidly, is I think that tends to take that session and |
| 09:25:16 | 6 | try to isolate it and encapsulate it and view it as |
| 09:25:25 | 7 | though it had no connection or relationship to what went |
| 09:25:28 | 8 | before or after.   I assume that's the government's |
| 09:25:32 | 9 | contention. |
| 09:25:32 | 10 | MR. BRYAN:  Well, what went before -- again, |
| 09:25:35 | 11 | this is before February 16 when the three got together. |
| 09:25:39 | 12 | It was after a couple times that Wassim Mazloum was |
| 09:25:44 | 13 | introduced to Darren Griffin, who was introduced in, I |
| 09:25:47 | 14 | believe, November for the first time to Darren Griffin. |
| 09:25:51 | 15 | But again, I don't believe you can take it out of the |
| 09:25:53 | 16 | context in which the video was transferred.   What the |
| 09:25:56 | 17 | government, I think, through their agents at the time |
| 09:25:58 | 18 | were trying to do was to clean up this count by having |
| 09:26:02 | 19 | Darren Griffin request Mr. Amawi to give it to him |
| 09:26:05 | 20 | again, saying they never got it, that I need you to copy |
| 09:26:08 | 21 | it; I need you to give it to me. |
| 09:26:10 | 22 | Again, we argued to the jury -- and again, I |
| 09:26:13 | 23 | agree with Mr. Sofer that Your Honor doesn't have to |
| 09:26:15 | 24 | accept our representation, in fact, Your Honor can't. |
| 09:26:19 | 25 | Your Honor has to view the evidence in the light most |

09:26:22   1   favorable to the government that maybe Mr. Amawi just

09:26:24   2   couldn't or failed in his ability to be able to do the

09:26:27   3   simple task of transferring this video onto a disk for

09:26:31   4   Darren Griffin.   It's our -- considering Mr. Amawi's

09:26:34   5   computer savvy, there's no reasonable belief that that

09:26:37   6   could have been the case.   But even if Your Honor

09:26:39   7   assumes that, the focus has to be on what was happening

09:26:42   8   on January 10 and not all of this stuff afterwards

09:26:46   9   because there was never a transfer afterwards.

09:26:49   10         And in the element -- the two elements don't

09:26:51   11  meet; transfer with the intent don't meet.   And you

09:26:53   12  can't give a future or a future intent, can't relate

09:26:58   13  back to what happened at the time of the transfer.   And

09:27:01   14  that's what we argued in our brief and our reply brief

09:27:04   15  to the government's response.   And I'd ask Your Honor

09:27:06   16  to reread our reply to the government's response or

09:27:09   17  reread that issue in that regard; that, in essence, what

09:27:12   18  the government is saying is they could demonstrate the

09:27:16   19  intent from what happened after the fact.   But it's our

09:27:18   20  argument that you can only look to intent of what was

09:27:21   21  happening either on that day, or admittedly maybe before

09:27:24   22  that day to see what kind of history they had together

09:27:27   23  before viewing this video.   But I think the evidence is

09:27:31   24  overwhelming that all they were doing was viewing videos

09:27:34   25  like they were viewing the Barbie videos and everything

09:27:37  1  else, and it wasn't being viewed with the criminal

09:27:40  2  intent that it be used in some future purpose.

09:27:42  3        Transitioning now to the main counts against

09:27:45  4  Mr. Amawi, which are the conspiracy count, what we're

09:27:48  5  arguing is that the government failed to prove beyond a

09:27:50  6  reasonable doubt not only an agreement, but an intent to

09:27:56  7  kill or maim at any time that wasn't supported by --

09:28:01  8  that wasn't in addition to just a general desire to

09:28:04  9  learn self-defense techniques.

09:28:06  10        And we briefed quite a bit in our brief

09:28:09  11  about D.C. v. Heller, the Supreme Court's decision on

09:28:13  12  the Second Amendment, saying that's an individual right

09:28:16  13  and not a state's right or not a right for the states to

09:28:19  14  maintain a militia.  That goes back to the natural

09:28:23  15  right of self-preservation.

09:28:25  16        We believe the evidence is overwhelming that

09:28:26  17  the government doesn't have any problem proving that Mr.

09:28:29  18  Amawi and others wanted to learn how to defend

09:28:32  19  themselves, learn how to fight, or maybe even learn how

09:28:35  20  to use combat tactics.  But what this case is missing,

09:28:39  21  Your Honor, is an agreement to do anything specific at

09:28:42  22  any time in any place.  There is no condition present

09:28:45  23  that would take this general desire, which is protected

09:28:49  24  by the Second Amendment, to learn how to defend oneself,

09:28:54  25  and even the First Amendment, the desire to learn, how

09:28:57  1   to learn to research and learn how bombs are created and

09:29:00  2   how they're made and all that stuff, and to put that

09:29:03  3   into play sometime.  It doesn't have to -- I'm not

09:29:06  4   saying they have to have a specific time, but there had

09:29:09  5   to have been a definite intent on the participant's part

09:29:13  6   to put that into play in a criminal manner; that is to

09:29:16  7   kill or maim American citizens, people abroad, or to

09:29:20  8   provide material support.  And I don't think there's

09:29:24  9   any evidence that there was an agreement amongst any of

09:29:27  10  the defendants, that there was an intent or an agreement

09:29:29  11  to go out and kill anybody, notwithstanding the fact

09:29:33  12  that they wanted to learn how to fight if the situation

09:29:37  13  ever presented itself.

09:29:38  14          What if we're ever back in Lebanon, for Mr.

09:29:42  15  Mazloum, or back in our home in Jordan; people start

09:29:45  16  pulling us out of our houses; how do we defend

09:29:49  17  ourselves?  In light of what happened in the world at

09:29:51  18  that time, there's a lot of conversation about not being

09:29:54  19  able to fight.  They wouldn't know how to use a gun to

09:29:56  20  protect their mother.  They'd have to throw the gun

09:29:59  21  down and pick up a kitchen fork or knife.  So you can't

09:30:03  22  separate that desire to learn how to fight with a goal.

09:30:07  23  There was no articulated goal.  And all that was within

09:30:14  24  the power of the government to do because they were the

09:30:17  25  ones, through Darren Griffin, who were in essence

09:30:20   1    creating this cell, creating this conspiracy.  They

09:30:23   2    could have been less equivocal about it.  He could have

09:30:26   3    made it clear.  He could have said, well, we're going

09:30:28   4    to do this today, then we're going to do this tomorrow.

09:30:31   5    We're going to go kill American soldiers tomorrow.  I

09:30:34   6    believe it was left purposely vague because they wanted

09:30:37   7    to be able to carry on the investigation as long as they

09:30:41   8    did.  If Darren Griffin stepped forward and he said:

09:30:43   9    Well, we're going to go tomorrow to Iraq and put our

09:30:46  10    training to use; or, we're going to go to the Middle

09:30:48  11    East tomorrow and join up with our brothers and become

09:30:51  12    involved in an Al-Qaeda training center -- they could

09:30:55  13    have done all those things, and they chose to keep it

09:30:58  14    purposely vague.

09:30:59  15           So what we have is people engaged in

09:31:03  16    otherwise protected activity of the Arabic descent,

09:31:07  17    Muslim descent, showing, admittedly, cheerleading for

09:31:10  18    the other side, our enemy across seas, and learning how

09:31:14  19    to fight.  But without the specific plan, I don't

09:31:17  20    believe the government can prove the essential elements

09:31:19  21    of the agreement and conspiracy.

09:31:20  22           As it relates to material support, the

09:31:23  23    government was allowed to -- in their briefing there's

09:31:26  24    discussion on the -- on the 16th, February 16th, about

09:31:30  25    what do they need?  What do the brothers need in Iraq?

09:31:34  1   Well, someone said they need fighters.   Someone said

09:31:36  2   they don't need fighters; they need weapons.   Someone

09:31:39  3   said they don't need fighters or weapons; they need

09:31:43  4   money.  So they discuss what the people they're cheering

09:31:46  5   for in Iraq need.   But what is lacking from that

09:31:48  6   discussion is a plan on their part how they're going to

09:31:52  7   then go about doing it.

09:31:53  8           The government doesn't have to prove that

09:31:55  9   they did it; they don't have to prove that they sent a

09:31:59  10  red cent, but they have to prove they had a plan to

09:32:01  11  either provide a weapon or provide whatever support in

09:32:07  12  the manner of training, even to provide material support

09:32:10  13  to people abroad.

09:32:11  14          That's where the government responds:  The

09:32:14  15  Syrian.   In their motion, their reply brief to our

09:32:18  16  motion for acquittal, they say, Well, we have something

09:32:21  17  more than general talk; we have Mr. Amawi communicating

09:32:24  18  with the Syrian brother, talking about trying to get him

09:32:27  19  Astrolite through Darren Griffin.

09:32:29  20          For Rule 29 purposes I will comment that the

09:32:31  21  evidence is clear from the record, the government never

09:32:33  22  established that Mr. Amawi did, in fact, put this person

09:32:36  23  from -- this purported person from Syria in contact with

09:32:41  24  Mr. Griffin, their supplier.   The evidence was that

09:32:43  25  they were trying to swap e-mail addresses and things

09:32:46  1   like that.   The government never presented any evidence

09:32:49  2   whatsoever that that occurred.   But they implied that

09:32:51  3   it occurred.   And the government, in response to our

09:32:55  4   motion for new trial, somehow tries to say that somehow

09:32:59  5   we injected the Syrian in the case through Mr. Ivey's

09:33:03  6   cross-examination.   Nothing could be further from the

09:33:06  7   truth.   From the opening statement the government

09:33:07  8   injected the Syrian into this case.

09:33:10  9              My transition now, Your Honor, is I'm going

09:33:13  10  away from judgment of acquittal as it relates to this,

09:33:16  11  and now I'm going to relate it the motion for a new

09:33:19  12  trial.   And that relates to what I think is the

09:33:21  13  critical issue that if Your Honor is considering the

09:33:24  14  interest of justice, that maybe not just Your Honor and

09:33:28  15  the government, maybe we all didn't get it right the

09:33:31  16  first time around, and that is as to how the Court and

09:33:35  17  how the government dealt with classified information

09:33:39  18  using CIPA and the Classified Information Procedures

09:33:42  19  Act.   There's no doubt in my mind, although I have to

09:33:47  20  say -- admit that this is a little bit of speculation,

09:33:50  21  that the government's CIPA evidence concerned this

09:33:53  22  purported Syrian in Iraq because the government would be

09:33:57  23  derelict in their duty if they wouldn't have followed up

09:34:01  24  on that lead, and whether through the State Department

09:34:03  25  or through the CIA or through Syrian intelligence

09:34:06  1   themselves tried to find out who this individual was,

09:34:09  2   determine if this individual was a serious insurgent or

09:34:12  3   insurgent backer and to try to stop him in his tracks

09:34:18  4   from doing anything that would harm our soldiers abroad.

09:34:21  5   They would be derelict if they didn't do that.   So we

09:34:23  6   have good reason to believe they investigated the heck

09:34:27  7   out of the Syrian lead and, in fact, did so long before

09:34:29  8   the case began, and they had available to them things

09:34:33  9   concerning this Syrian that we were never able to get

09:34:36  10  through independent means.   And we tried.   And the

09:34:39  11  Court is well aware that we tried on numerous occasions

09:34:42  12  not only through Brady motions to compel discovery, but

09:34:45  13  also through our own investigative tools through

09:34:48  14  subpoenaing internet service provider records that Your

09:34:51  15  Honor denied our request to get those records through

09:34:53  16  the power of subpoena saying that we didn't fit under

09:34:56  17  the statute as a government act --

09:34:59  18       THE COURT:  I think what you're doing is

09:35:01  19  saying essentially in these sessions -- the record is as

09:35:09  20  it is.   Again, I think it's an argument to be addressed

09:35:13  21  to the Court of Appeals.   I know there were a lot of

09:35:15  22  them.   That's all I can say about them.

09:35:20  23       MR. BRYAN:  I think what we did, Your Honor,

09:35:21  24  and at the time I don't blame the defense as much as I

09:35:25  25  would respectfully blame the government in this regard,

09:35:29   1   CIPA means it's classified information.   And what that

09:35:32   2   means is the government can't have their cake and eat it

09:35:35   3   too.   They can't inject some evidence concerning other

09:35:38   4   evidence that they know to be classified and try to get

09:35:41   5   the benefit of that, at the same time withholding our

09:35:45   6   opportunity to investigate it completely.   And our

09:35:48   7   argument in our pleadings -- and I believe it even

09:35:52   8   stronger now -- that totally undermines the adversarial

09:35:55   9   system of justice because they're privy to information

09:35:58  10   we don't have the ability to be privy too, even though

09:36:00  11   we're trying.   We even had Mr. Terez on the border of

09:36:04  12   Syria the last time he went over there in an effort to

09:36:07  13   see if he could make contact with whose telephone number

09:36:10  14   appeared to be a Syrian number.

09:36:12  15          Husamtarsha@hotmail.com [phonetically], I

09:36:20  16   sent him e-mails trying to interact with this person who

09:36:23  17   was purportedly the person Mr. Amawi had interacted

09:36:26  18   with.   I think by the time we became involved in this

09:36:29  19   case, Husam Tarsha had already been dealt with, and the

09:36:32  20   matter of Husam Tarsha had been dealt with by the

09:36:35  21   government.   But I don't have a problem with them for

09:36:37  22   national security interest withholding classified

09:36:40  23   information from the public and from the jury.   What I

09:36:43  24   do have a problem with is that we weren't able to be

09:36:45  25   part of the process.

09:36:48  1          THE COURT:  Again, I'm not sure that those

09:36:51  2  are arguments properly addressed to me because I believe

09:36:54  3  that I acted properly within the constraints of the

09:36:57  4  statute and the system as we have it.   And again,

09:37:03  5  reasonable men will disagree about the application of

09:37:06  6  CIPA, which was invented in response to graymail to

09:37:14  7  every scrap of information that the government stamps

09:37:18  8  classified on, and there we are.   I think that's an

09:37:22  9  argument that has to be addressed to the Sixth Circuit

09:37:25  10  and perhaps ultimately Congress.

09:37:27  11          MR. BRYAN:  One of the issues we raised,

09:37:29  12  Your Honor, was the ability of the defense to

09:37:30  13  participate in it.   Classified information doesn't

09:37:33  14  necessarily have to be kept from defense attorneys.

09:37:36  15          THE COURT:  I understand that.

09:37:37  16          MR. BRYAN:  We have to demonstrate a need to

09:37:39  17  know.   And that still doesn't mean that we're going to

09:37:41  18  publish it to the public.   We have to demonstrate a

09:37:44  19  need to know.   We needed to know in this case because

09:37:46  20  the government chose to use evidence regarding the

09:37:49  21  Syrian against Mohammad Amawi.   We needed to know.   We

09:37:52  22  needed to be part of the process.   We needed to be able

09:37:55  23  to come into chambers with Your Honor under the

09:37:58  24  Classified Information Procedures Act because there's

09:38:01  25  nothing in that Act that says defense attorneys don't

09:38:03   1    have a right to know.

09:38:04   2         THE COURT:  Let me ask you this:  What if,

09:38:06   3    hypothetically, there was nothing in any of those

09:38:12   4    sessions that had anything to do with anybody from Syria

09:38:17   5    or Astrolite or bomb making or whatever?

09:38:20   6         MR. BRYAN:  Well, then I don't think I

09:38:22   7    really have much of an argument, Your Honor, to be

09:38:24   8    honest with you.

09:38:25   9         THE COURT:  Okay.  And the record is as it

09:38:27   10   is, and the Court of Appeals will be able to look at

09:38:30   11   that record and determine whether that's an accurate

09:38:33   12   statement or not.  I'm not trying to say it is one way

09:38:35   13   or the other.  I'm asking purely hypothetically.

09:38:38   14        MR. BRYAN:  And I would acknowledge

09:38:40   15   hypothetically that unless there's other evidence that

09:38:45   16   doesn't touch upon anything that the government

09:38:48   17   introduced -- what I'm arguing as it related to the

09:38:52   18   Syrian is that became a matter in this trial.  If it

09:38:54   19   didn't become a matter in this trial, and if there was

09:38:57   20   other evidence and it was in some way exculpatory to Mr.

09:39:00   21   Amawi, like I know they were listening to Amawi's cell

09:39:03   22   phone conversations; they were also listening to his

09:39:06   23   satellite phone conversation.  If on those satellite

09:39:10   24   phone conversations Mr. Amawi is saying Darren Griffin

09:39:12   25   is working for the government, and I'm just trying to

| | | |
|---|---|---|
| 09:39:14 | 1 | rip him off, I'm going to take him as far as I can and |
| 09:39:18 | 2 | get as much money from him as I can, if the government |
| 09:39:22 | 3 | is privy to that, that would be exculpatory under Brady. |
| 09:39:26 | 4 | But if they say it's classified, so we're not going to |
| 09:39:29 | 5 | reveal it to you, then Your Honor has to make a |
| 09:39:33 | 6 | balancing act.   Personally I think the interest of |
| 09:39:35 | 7 | justice trumps that. |
| 09:39:36 | 8 | THE COURT:   What I'm saying, Mr. Bryan -- |
| 09:39:39 | 9 | we're going to have to wind this up fairly soon -- the |
| 09:39:42 | 10 | record is as it is.   It will be reviewed by the Court of |
| 09:39:46 | 11 | Appeals.   And I have no doubt that they will review it |
| 09:39:49 | 12 | with a careful and cautious eye.   And if they conclude |
| 09:39:53 | 13 | that anything was disclosed in the course of those |
| 09:39:56 | 14 | proceedings which I should not have kept from you, I |
| 09:40:04 | 15 | should not have kept from you in the version -- in its |
| 09:40:08 | 16 | raw state rather than its filtered state, if that |
| 09:40:10 | 17 | happened, they'll make that decision. |
| 09:40:14 | 18 | MR. BRYAN:   Understood, Your Honor. |
| 09:40:17 | 19 | Just in response to something Mr. Sofer said |
| 09:40:20 | 20 | earlier, this is a new argument that hasn't been raised |
| 09:40:23 | 21 | before the Court before as it relates to this motion for |
| 09:40:25 | 22 | new trial.   It was raised for the first time in a motion |
| 09:40:28 | 23 | for new trial that it's our interpretation of CIPA that |
| 09:40:31 | 24 | the government should take an alternate approach.   And |
| 09:40:35 | 25 | that is if they believe certain evidence should be |

09:40:37  1    classified, they shouldn't be able to release any

09:40:39  2    evidence or introduce any evidence related -- directly

09:40:42  3    related to that classified evidence.  If they want to

09:40:45  4    keep it classified, we could have tried this case

09:40:47  5    without the reference to the Syrian, without any

09:40:51  6    reference to Astrolite.  We could have tried -- and the

09:40:53  7    case against Mr. Mazloum and Mr. El-Hindi went forward.

09:40:57  8            THE COURT:  That's not my understanding how

09:40:59  9    the CIPA process works.  That's not my understanding of

09:41:06 10    how it works.  I think I made clear, and I think the

09:41:14 11    government would concur that I was very uncomfortable

09:41:17 12    with any ex parte communication.  It's not the way I

09:41:20 13    was brought up as a common law lawyer.  But that's the

09:41:26 14    system that Congress has created.  My discomfort with

09:41:36 15    ex parte proceedings, all of which was, in fact, on the

09:41:41 16    record, every word of which was on the record, may even

09:41:51 17    exceed yours.  But I can't allow that discomfort to

09:41:54 18    displace my understanding of what I was required to do

09:41:58 19    when presented with that choice.

09:42:02 20            MR. BRYAN:  I understand, Your Honor.

09:42:03 21    Inasmuch as it may have been Your Honor's interpretation

09:42:05 22    of what Congress wanted you to do, then my problem is

09:42:08 23    with CIPA itself, is that it undermines the adversarial

09:42:14 24    process.  That is --

09:42:15 25            THE COURT:  I don't think in light of the

09:42:18   1   rulings that are out there on CIPA I can ignore the

09:42:26   2   system as it is.   Those are arguments for the Sixth

09:42:31   3   Circuit, perhaps the Supreme Court.

09:42:32   4            MR. BRYAN:  Just to finish, Your Honor, the

09:42:35   5   classified nature of CIPA can be satisfied by defense

09:42:39   6   attorneys who participate with security clearances.

09:42:41   7   That's how we're litigating Guantanamo.   The defense

09:42:45   8   attorneys have just as much right to see the classified

09:42:47   9   information as the government.   That puts them on equal

09:42:50  10   footing with the government when it comes to making

09:42:52  11   their arguments.

09:42:53  12            THE COURT:  Candidly, if I were designing

09:42:55  13   the system, I would design the system a lot different

09:42:58  14   than the one Congress did.   I would say, fine, go get

09:43:01  15   the clearance.  And indeed, I would say, if I could, by

09:43:07  16   the way, a declination of clearance, you're going to

09:43:12  17   have to show me cause as to why you turned that person

09:43:16  18   down, and I'm going to independently review that and see

09:43:20  19   whether I think he's trustworthy even though whatever or

09:43:23  20   why ever.   I agree with you there; you can trust

09:43:32  21   counsel.   But again, that's not the system that I found

09:43:36  22   I was dealing with or that I could do anything about.

09:43:42  23   I may be wrong, in which case candidly I wouldn't be too

09:43:48  24   distressed to hear.   But that's neither here nor there.

09:43:52  25            MR. BRYAN:  Well, if Your Honor's

09:43:54  1    interpretation is correct, I think the system does

09:43:58  2    undermine notions of fairness that are within the due

09:44:01  3    process clause.

09:44:02  4            THE COURT:  I think it has consequences that

09:44:04  5    are not desired.   But I don't think that I can, in

09:44:10  6    accordance with my oath, shrug my shoulders and say I'm

09:44:15  7    not going to abide by what I understand I have to abide

09:44:19  8    by.   And if anything, that kind of gesture and response

09:44:25  9    of the Judge, I think, would be far more dangerous than

09:44:29  10   the limited incursion into the integrity of the

09:44:34  11   adversary process that CIPA does have.   That was how I

09:44:40  12   viewed what was going on.   And I believe Mr. Sofer and

09:44:44  13   you will have a chance to talk to the Sixth Circuit

09:44:46  14   about that.

09:44:47  15            MR. BRYAN:  Thank you.

09:44:47  16            THE COURT:  Let me just say a couple things

09:44:49  17   before you sit down.   On the replaying of the

09:44:57  18   recordings, I think to some extent there were no

09:45:04  19   concurrent objections, in which case that's waived.

09:45:12  20   And otherwise I think I tried to be as attentive as

09:45:15  21   possible to the sort of double or triple barreled impact

09:45:20  22   that that can have.   I actually expressed elsewhere a

09:45:26  23   concern with that, as other courts have had, but I don't

09:45:30  24   see any error in that.

09:45:37  25            The other issue is that at the request of

09:45:47  1   the defense, as you pointed out, to inform me and to

09:45:55  2   inform my review of the classified material, counsel did

09:46:02  3   meet with me and laid out then what were their

09:46:07  4   perceptions of the case and how they were trying to

09:46:10  5   formulate their response and prepare for it.   And I

09:46:19  6   assume you're aware that I'd done that, and there could

09:46:22  7   have been but was not a request to do likewise once you

09:46:26  8   were in the case or to go back and review those

09:46:32  9   sessions, which I could have done, could have had a

09:46:36  10  transcript prepared or whatever, with an eye to

09:46:45  11  reconsidering my decision to accept what the government

09:46:50  12  was doing in light of whatever perspective you had on

09:46:55  13  the case.   And candidly, by hindsight it doesn't seem

09:47:01  14  to me that what happened ultimately varied from what had

09:47:09  15  been rejected by the defense.   It varied to some extent,

09:47:17  16  but the variance was not such that necessitated a

09:47:24  17  reconsideration of my rulings on CIPA.

09:47:28  18            MR. BRYAN:   Your Honor, just briefly as it

09:47:31  19  relates to waiver on the other issues, I believe if it

09:47:34  20  wasn't our counsel, I think Mr. Boss raised a continuing

09:47:39  21  objection to that in his motion in limine.   And I

09:47:43  22  believe -- so I don't believe that --

09:47:45  23            THE COURT:   I hope it's preserved in the

09:47:47  24  record.

09:47:47  25            MR. BRYAN:   I believe it is.

09:47:49  1          THE COURT:  I really try to make sure

09:47:54  2   anything possible is preserved in the record.  I don't

09:47:58  3   like the situation where counsel -- again, the battle in

09:48:07  4   the courtroom gets distracted and fails to preserve an

09:48:10  5   objection.  I would rather have counsel -- there have

09:48:14  6   been times when I have actually said -- have undertaken

09:48:18  7   sua sponte to preserve something for the record so that

09:48:21  8   if I made a mistake, fine.

09:48:24  9          MR. BRYAN:  That's clearly our perception as

09:48:26  10  well, Your Honor.

09:48:27  11          As it relates to our ability to convey to

09:48:30  12  Your Honor the theory of our defense so that Your Honor

09:48:34  13  would be privy to that when you're viewing CIPA

09:48:37  14  material, it is true, and I think the record needs to be

09:48:42  15  clear, we weren't part of that original meeting.

09:48:44  16          THE COURT:  I know you weren't.

09:48:46  17          MR. BRYAN:  And as it related to our failure

09:48:48  18  to request an additional meeting, I would just chalk

09:48:51  19  that up to again coming into the case at a late hour and

09:48:53  20  trying to get caught up to speed.  I do recall several

09:48:56  21  times during the course of trial instead of

09:49:01  22  challenging -- instead of challenging it on the basis of

09:49:04  23  CIPA or under the CIPA statute, standing up and arguing

09:49:10  24  Brady arguments not only during the government's case,

09:49:12  25  but before.  I remember the specific instance, but

09:49:15  1  before we began our case in chief, making another <u>Brady</u>

09:49:18  2  request on the record outlining the information that I

09:49:22  3  believe that the government had at that time that we

09:49:24  4  believed was helpful to the defense.  And that, I

09:49:28  5  think, is clear for the record as well.  Thank you,

09:49:30  6  Your Honor.

09:49:34  7         THE COURT:  Mr. Sofer, why don't you take a

09:49:37  8  couple minutes to respond.

09:49:38  9         MR. SOFER:  I'll be very brief, to the

09:49:40  10  extent I'm capable of that, Your Honor.

09:49:44  11         Again, going back to where we started, none

09:49:47  12  of this is new.  It disturbs me a little bit, Your

09:49:51  13  Honor, that you're willing to take further transcripts,

09:49:54  14  for instance, on the passing of the explosives cookbook,

09:49:58  15  which we called it.  I'd ask that we be permitted to

09:50:02  16  make a response to that as well.

09:50:04  17         THE COURT:  Of course.

09:50:05  18         MR. SOFER:  I recall this specifically.

09:50:07  19  This was argued at the time, argued in front of the

09:50:10  20  jury.  This is not new either.

09:50:11  21         THE COURT:  My recollection isn't that firm,

09:50:14  22  and I'd rather look -- I'd rather rely upon the printed

09:50:21  23  word to refresh my recollection rather than kind of say,

09:50:25  24  oh, yeah, it's okay in the record.

09:50:26  25         MR. SOFER:  Absolutely fair.  But I guess

09:50:28    1   what I'd like to say is we argued to you and to this

09:50:31    2   jury that the passage, for instance, of these disks, you

09:50:36    3   cannot look at it in a vacuum.   Your Honor said that

09:50:38    4   with respect to the bomb vest video in response to

09:50:41    5   defense counsel's argument.   The same is true of all of

09:50:44    6   this.   It's just not fair to try to take one of these

09:50:47    7   things out and say:   Here are all the times that it's

09:50:50    8   mentioned.   You have to look at the context of the

09:50:53    9   case.   We could also submit transcript sections, but

09:50:57   10   then we'd be submitting to Your Honor the whole case

09:50:59   11   again.   I don't want to go back and relitigate it.

09:51:02   12           THE COURT:   I just -- maybe I'll give them

09:51:05   13   until a week from this Friday to give me the excerpts,

09:51:12   14   and then I don't want you to bring me a wheelbarrow full

09:51:19   15   of transcripts, but say, Judge, here are other

09:51:23   16   instances.   Very brief.   And primarily, as I say, so I

09:51:28   17   can make my mind up about that aspect of the argument.

09:51:33   18           MR. SOFER:   I think we can point Your Honor

09:51:35   19   to part of the trial transcript where you made this

09:51:38   20   decision the first time and what your rationale was,

09:51:40   21   which we obviously agreed with at the time.

09:51:45   22           The crux ultimately of much of this argument

09:51:49   23   is -- goes back to this notion that counsel did not have

09:51:52   24   enough time to prepare for the case.   And we are very

09:51:56   25   confident that the record in this case supports what

09:51:58   1    Your Honor did.

09:51:59   2             THE COURT:  Not only that, but the law --

09:52:04   3    there are countless instances of rather astonishingly

09:52:09   4    brief periods of time in very serious cases, even in

09:52:13   5    capital cases where what the Court did, the trial court,

09:52:23   6    I think most of us lawyers are troubled and astonished,

09:52:27   7    yet the appellate courts say -- what I did and why I did

09:52:35   8    it, I tried to lay it all out for the record.

09:52:38   9             MR. SOFER:  I don't want to rehash that,

09:52:40  10    Your Honor.  What the government, though -- I think the

09:52:43  11    record is incomplete in one way.  And that's what I

09:52:47  12    want to get at.  As you say, Your Honor, the record is

09:52:49  13    there for any appellate court to look at.  We're very

09:52:52  14    confident.  If you juxtapose us against the kind of

09:52:58  15    cases you're describing, nothing could be further than

09:53:00  16    those kind of cases, where a big trial is forced to try

09:53:04  17    in 90 days; no evidence, no transcripts are turned over

09:53:08  18    by the government.  There are all kind of examples.

09:53:11  19    I'm not going to go through that.  This man was

09:53:13  20    accommodated time after time after time, sometimes over

09:53:16  21    the government's objection.  He also was a tremendous

09:53:19  22    and continues to this day to be a tremendous

09:53:22  23    disciplinary problem inside the facilities that he's

09:53:27  24    been housed in.

09:53:28  25             THE COURT:  I wouldn't go there.

09:53:29  1            MR. SOFER:  I would request, Your Honor,

09:53:31  2     that the government be able to supplement this record

09:53:33  3     with that disciplinary record of the defendant in jail,

09:53:36  4     at least put it on the record so when an appellate court

09:53:39  5     takes a look at this, they can see that part of the

09:53:41  6     problem here, this whole notion that he's not able to

09:53:43  7     have access to material, not able to interact with his

09:53:46  8     lawyers, not able to get along with some of his lawyers,

09:53:49  9     this is all supported in part by his behavior in jail as

09:53:53  10    well, which, as I say, continues to this day.  We

09:53:56  11    believe that it is only appropriate that it be made part

09:53:59  12    of the record.  My concern is it's not really made part

09:54:02  13    of the record.  When these disputes about the fact that

09:54:06  14    a laptop's been destroyed or the iPod's been tampered

09:54:10  15    with, I know that's come to Your Honor's attention.

09:54:13  16    But there is a litany of assaultive behavior and other

09:54:17  17    kinds of behavior that's taken place in the facilities

09:54:20  18    that this man has been held in which I think only fairly

09:54:23  19    should be before the appellate court trying to examine

09:54:26  20    whether this problem -- which arguably it's the crux of

09:54:30  21    everything, they're saying -- was self-made.

09:54:33  22            THE COURT:  I really don't want -- I will

09:54:43  23    grant you leave to submit whatever you want in that

09:54:46  24    regard under seal.  And I don't intend to look at it.

09:54:49  25            MR. SOFER:  Fair enough.

09:54:51   1          THE COURT:  Because as I say, after nine

09:54:54   2   months, I don't see anything.   That's a major problem.

09:54:57   3          MR. SOFER:  We just want it to be part of

09:54:59   4   the record.

09:55:00   5          THE COURT:  That's fine.   If they want to

09:55:02   6   open up, peek in it, that's fine.   Again, if they think

09:55:06   7   the approach I've taken to that situation is

09:55:10   8   inappropriate, then I think they can also say -- at the

09:55:14   9   very least they can send it back and say, Judge, you

09:55:17  10   should take this into consideration when assessing the

09:55:22  11   sufficiency of the contention that he's been unable to

09:55:29  12   participate in a meaningful way with his attorney at

09:55:32  13   this critical stage of the proceedings, which I believe

09:55:35  14   is the gist of the argument, that it's ultimately a

09:55:39  15   Sixth Amendment argument, inability to work easily and

09:55:44  16   effectively with a client who was, in a sense,

09:55:50  17   sequestered from working with the material and therefore

09:55:52  18   working with counsel.

09:55:56  19          MR. SOFER:  Mr. Getz has a few things to

09:55:58  20   say, then I'll sit down.

09:56:01  21          MR. GETZ:  In light of the comments you

09:56:04  22   made, I would ask the Court to refer to our brief in

09:56:08  23   response.   But there are some matters that because of

09:56:10  24   the government's disadvantage in regards to the

09:56:15  25   communications and the reasons for the various counsel

09:56:19  1   changes, because those, of course, were ex parte, and

09:56:21  2   for necessary reasons and understandable reasons the

09:56:24  3   government's not involved in that, but we can only go by

09:56:27  4   what's on the docket.   The docket shows that there was

09:56:32  5   an attorney, Elias Muawad, who was appointed

09:56:36  6   approximately nine months before the trial to represent

09:56:39  7   Mr. Amawi.   He stayed on the trial team.   He was

09:56:42  8   seated at the table all through the trial.   We can only

09:56:45  9   surmise, and I think there's something at one point in

09:56:48  10  one of the pleadings or transcript that indicates that

09:56:53  11  Elias speaks Arabic.   And that may have been one of the

09:56:57  12  reasons why he was appointed.   Obviously the government

09:56:59  13  doesn't know that.   But in looking at the defendant's

09:57:02  14  brief, there's no mention made of his representation.

09:57:04  15  In fact, there's a point at which it specifically says

09:57:07  16  that Mr. Amawi was only represented by four attorneys.

09:57:11  17  We're somewhat confused by that because the docket

09:57:13  18  doesn't seem to reflect that.

09:57:15  19           THE COURT:   That's a fair point.

09:57:17  20           MR. GETZ:   So we want the record to be clear

09:57:19  21  on that.   So if there's any clarification we need, we

09:57:22  22  would like to know what that is.

09:57:24  23           THE COURT:   No.

09:57:25  24           MR. GETZ:   In regard to comments that were

09:57:27  25  made about what was or wasn't done by attorneys prior to

09:57:30　1　the public defender's office coming back into the case,

09:57:33　2　I would ask the Court to make reference to the

09:57:36　3　transcript of the pretrial conversation or conference

09:57:39　4　that took place on December 17 of 2007 where there was

09:57:45　5　reference made to comments that His Honor apparently

09:57:49　6　made -- again this must have been at a conference at

09:57:51　7　which the government was not present -- as to the

09:57:53　8　enormous amount of work that those attorneys had done on

09:57:56　9　the case and acknowledgment by Mr. Swore that that was

09:57:59　10　his understanding as well.

09:58:00　11　　　　　In that conference as well there's a

09:58:03　12　reference to the fact that the defendant, Mr. Amawi, was

09:58:08　13　seeking in December of 2007, he was seeking to have the

09:58:12　14　trial go forward as quickly as possible.  And we would

09:58:16　15　like the Court to make note of that.

09:58:18　16　　　　　Also during this period of time, and frankly

09:58:22　17　throughout most of the post-indictment period in

09:58:25　18　preparation for trial, this Court clearly made it clear

09:58:28　19　that any motions that were made on behalf of one

09:58:31　20　defendant were considered for all defendants.  And

09:58:34　21　that's basically how they were also responded to by the

09:58:37　22　government.  So this notion that no substantive motions

09:58:41　23　were made on Mr. Amawi's behalf is really clearly a

09:58:44　24　misrepresentation of what the record really is in this

09:58:48　25　matter.

09:58:48   1            And finally, another point, because of the

09:58:51   2   government's lack of participation, and so we're a

09:58:55   3   little bit at a loss, the docket seems to reflect that

09:58:59   4   when the public defender's office came back in,

09:59:02   5   initially Mr. Terez was appointed, and then he was -- he

09:59:06   6   withdrew about a day later.   Now, obviously we don't

09:59:09   7   know the reason for that, but we're again a little

09:59:16   8   concerned about this notion that somehow Mr. Terez's

09:59:22   9   representation in that very critical eight-month period

09:59:25   10   immediately following the indictment when a majority of

09:59:28   11   the discovery was provided, and most of the very

09:59:31   12   preliminary motions were being filed, that --

09:59:35   13            THE COURT:   -- should be disregarded?

09:59:38   14            MR. GETZ:   Yes.

09:59:40   15            And that he was not available to them to

09:59:41   16   discuss various theories of the case, what kind of

09:59:44   17   decisions had been made by the defense team, and so

09:59:46   18   forth.   So we want the Court to consider that as well,

09:59:49   19   particularly in regards to the motion for new trial as

09:59:52   20   it relates to this representation issue and the denial

09:59:56   21   of the continuance.   That's all.   Thank you.

10:00:03   22            MR. BOSS:   Judge, would the Court wish to

10:00:07   23   take a brief -- Mr. Hartman and I will be very brief.

10:00:16   24            THE COURT:   Let's take about a 15-minute

10:00:21   25   recess.   I may be able to take care of this other stuff

| | | |
|---|---|---|
| 10:00:25 | 1 | during that period. |
| 10:31:17 | 2 | (Recess taken.) |
| 10:31:21 | 3 | THE COURT:  Mr. Boss. |
| 10:31:24 | 4 | MR. GETZ:  Your Honor, if I may, quickly. |
| 10:31:27 | 5 | Mr. Terez informed me, my reference to his withdrawal |
| 10:31:33 | 6 | that was on the docket, the Court's docket, was |
| 10:31:36 | 7 | apparently a clerical error.   Apparently he had not |
| 10:31:39 | 8 | been withdrawn from the case.   So to correct the |
| 10:31:44 | 9 | record, I guess I'll inform the Court of that. |
| 10:31:48 | 10 | MR. TEREZ:  The first time -- the clerical |
| 10:31:53 | 11 | error occurred when our group got reappointed, Your |
| 10:31:56 | 12 | Honor.   For some reason my name was missing.   That's |
| 10:31:59 | 13 | all. |
| 10:32:04 | 14 | THE COURT:  Mr. Boss. |
| 10:32:06 | 15 | MR. BOSS:  Thank you, Judge. |
| 10:32:08 | 16 | THE COURT:  Let me also distract you from |
| 10:32:11 | 17 | the argument that you spent time preparing. |
| 10:32:14 | 18 | I really do think that you waived any claim |
| 10:32:17 | 19 | of entrapment.   I remember Mr. Hartman quite |
| 10:32:23 | 20 | specifically disclaiming any desire to have an |
| 10:32:26 | 21 | entrapment instruction, so none was given, and I think |
| 10:32:30 | 22 | to argue now that entrapment occurred can't occur.   The |
| 10:32:39 | 23 | government says that it hasn't found a case in which |
| 10:32:43 | 24 | this has happened one way or the other.   I haven't |
| 10:32:46 | 25 | tried to look.   So anyway, that's how I view that. |

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
| 10:32:53 | 1  | MR. BOSS:  Judge, I'll defer to Mr. Hartman |
| 10:32:56 | 2  | on any argument he wants to make since that was a |
| 10:32:59 | 3  | portion of the briefing he has taken care of. |
| 10:33:01 | 4  | THE COURT:  I don't think you can revive it, |
| 10:33:03 | 5  | once waived.   And that was for the jury to decide.   And |
| 10:33:11 | 6  | having prevented them from doing so, I don't think you |
| 10:33:14 | 7  | can go back and have me revisit. |
| 10:33:17 | 8  | Okay.  Go ahead. |
| 10:33:19 | 9  | MR. BOSS:  Speaking of revisiting, I've had |
| 10:33:22 | 10 | ample opportunity since the trial to reflect back on the |
| 10:33:25 | 11 | trial proceedings from beginning to end.   And |
| 10:33:30 | 12 | hindsight's 20/20.   Had we known before trial when we |
| 10:33:35 | 13 | were making our motion in limine regarding the video |
| 10:33:38 | 14 | evidence and the transcripts and the names of the |
| 10:33:42 | 15 | terrorists and terrorist organizations, had we known how |
| 10:33:46 | 16 | those were to be employed, we certainly would have |
| 10:33:50 | 17 | argued it differently. |
| 10:33:51 | 18 | THE COURT:  I'm sorry? |
| 10:33:53 | 19 | MR. BOSS:  Had we known the use that the |
| 10:33:55 | 20 | government was intending to put those pieces of evidence |
| 10:33:59 | 21 | and how they were intending to throw all of Mr. Amawi's |
| 10:34:04 | 22 | videos into a blender of evidence and have that |
| 10:34:09 | 23 | presented uniformly against the defendants in their |
| 10:34:13 | 24 | closing arguments without the focus on Mr. El-Hindi, I |
| 10:34:17 | 25 | can assure you that what I would have done at that time, |

| | | |
|---|---|---|
| 10:34:22 | 1 | and what I'm going to direct the Court's attention to |
| 10:34:25 | 2 | now that is different in this motion, is to consider a |
| 10:34:28 | 3 | separate trial for Marwan El-Hindi.  This new trial |
| 10:34:32 | 4 | motion, when we look at all of the elements, when we |
| 10:34:36 | 5 | look at the ample evidence that was all against Mr. |
| 10:34:42 | 6 | Amawi of these videos, the very highly prejudicial and |
| 10:34:46 | 7 | inflammatory materials that were translated and read to |
| 10:34:49 | 8 | the jury that were all -- that were all from Mr. Amawi's |
| 10:34:54 | 9 | evidence, had nothing to do with Mr. El-Hindi.  Mr. |
| 10:34:59 | 10 | El-Hindi got tarred by the brush that was really Mr. |
| 10:35:02 | 11 | Amawi's evidence. |
| 10:35:03 | 12 | There may arguably be some meat on the |
| 10:35:06 | 13 | government's bones of evidence regarding Mr. Amawi and |
| 10:35:09 | 14 | Mr. Mazloum.  There's that gun training, both with Mr. |
| 10:35:14 | 15 | Griffin, and maybe going to Clelands.  There's the |
| 10:35:18 | 16 | evidence, to whatever extent you want to look at it, |
| 10:35:21 | 17 | that had to do with the Syrian fellow.  There's the |
| 10:35:25 | 18 | Astrolite napkin.  None of that, which is the only |
| 10:35:29 | 19 | substantive evidence here about anything being done, had |
| 10:35:33 | 20 | anything whatsoever to do with Marwan El-Hindi.  All of |
| 10:35:40 | 21 | these things now in hindsight are so clear.  When I |
| 10:35:44 | 22 | think back to the -- |
| 10:35:46 | 23 | THE COURT:  Basically what you're contending |
| 10:35:51 | 24 | is there's a failure of proof as to agreement because if |
| 10:35:53 | 25 | you've got the conspiratorial agreement, then -- |

10:35:58   1          MR. BOSS:  I'm contending also there's been

10:36:02   2   a miscarriage of justice because when the best juror, a

10:36:06   3   rational juror is subjected to this imagery of

10:36:10   4   beheadings, and the most cursed person since Hitler,

10:36:16   5   this Osama bin Laden and others of his ilk, when they're

10:36:21   6   shown that information, even the most rational juror, I

10:36:24   7   think, becomes tainted.

10:36:27   8          Now, what I'm suggesting to the Court is to

10:36:30   9   do justice here, and that is what we're talking about,

10:36:35  10   whether this conviction should stand, be allowed to

10:36:38  11   stand, whether it's a miscarriage of justice to allow it

10:36:42  12   to do so.  I'm suggesting to the Court that not only

10:36:45  13   should Marwan El-Hindi's conviction not stand, but he

10:36:49  14   should get a new trial where this evidence that had

10:36:52  15   nothing to do with him is not permitted to be

10:36:55  16   introduced.

10:36:56  17          Now, Your Honor, we talk about the extensive

10:37:00  18   voir dire of the jury, and there was that.  And it was

10:37:03  19   the most, frankly, marvelous voir dire process I've ever

10:37:07  20   participated in.  But even with that, we had an

10:37:13  21   experience when this juror number 5 that we all remember

10:37:17  22   that didn't follow the instructions that came in and

10:37:19  23   apparently, to whatever degree, sought to influence the

10:37:22  24   other jurors.  What influence that had, we'll never

10:37:26  25   know.  But the point is that no voir dire is perfect.

| | | |
|---|---|---|
| 10:37:29 | 1 | THE COURT:  I think we do.  I found and I'm |
| 10:37:32 | 2 | actually convinced of the accuracy of the finding that |
| 10:37:34 | 3 | it had no impact.  Go ahead. |
| 10:37:38 | 4 | MR. BOSS:  The point I'm making is he was |
| 10:37:40 | 5 | allowed to slip through the cracks at the beginning. |
| 10:37:43 | 6 | No voir dire is perfect, even though we attempted to. |
| 10:37:46 | 7 | THE COURT:  Well, the answer to that is to |
| 10:37:48 | 8 | forego the jury system.  We can't do that. |
| 10:37:52 | 9 | MR. BOSS:  I'm not suggesting we do. |
| 10:37:54 | 10 | THE COURT:  One of the things that candidly |
| 10:37:56 | 11 | aggravates me about the assault in various political |
| 10:38:00 | 12 | quarters on the American jury system is the premise that |
| 10:38:04 | 13 | it's acceptable only if it's perfect.   It's a human |
| 10:38:10 | 14 | institution, and like all human institutions, it is |
| 10:38:13 | 15 | fallible.  We do the best we can to guard against such |
| 10:38:20 | 16 | fallibility.   Who knows what happened with that guy. |
| 10:38:23 | 17 | We were all fortunate that the information came forward. |
| 10:38:29 | 18 | And as I say, I'm convinced that the response that I was |
| 10:38:34 | 19 | able to make after giving ample opportunity to inquire |
| 10:38:39 | 20 | was correct. |
| 10:38:40 | 21 | MR. BOSS:  I'm not suggesting it wasn't for |
| 10:38:42 | 22 | a moment.   What I'm reflecting on is the -- when I |
| 10:38:45 | 23 | think back to this trial, the imagery that I have that |
| 10:38:48 | 24 | stands out most profoundly for me is the video imagery |
| 10:38:54 | 25 | on the screens of these bombs exploding and the |

10:38:59  1   beheadings and that stuff.    And when I think about the

10:39:03  2   impact that that had on the jury, and it wasn't related

10:39:09  3   to Mr. El-Hindi, I'm convinced that he didn't get a fair

10:39:12  4   trial.    Those videos that were played, by my count 34

10:39:20  5   of them, 29 had absolutely no nexus to Marwan El-Hindi,

10:39:26  6   no evidence he ever saw them, never heard of them, never

10:39:29  7   spoke of them, didn't possess them, nothing.    Of the

10:39:32  8   remaining five, two of them he simply spoke of and said

10:39:36  9   he was aware of them.    One of them he saw together with

10:39:39  10  Griffin when it was played by Mr. Amawi.    And the last

10:39:43  11  one, the martyrdom operation vest video, was a cookie

10:39:49  12  found on Mr. El-Hindi's computer to show it had, at

10:39:54  13  least at one time, transferred over to his computer.

10:39:56  14  That's a heck of a lot different than the imagery that

10:39:59  15  we all remember when we think back to this trial because

10:40:02  16  that imagery is what was on Mr. Amawi's computer and not

10:40:06  17  El-Hindi's.    For Mr. El-Hindi, unlike the little bit of

10:40:14  18  meat on the bone perhaps for Amawi and Mazloum, where is

10:40:17  19  the beef?    I don't mean to be trite about it.

10:40:21  20            THE COURT:  I know.

10:40:23  21            MR. BOSS:  But there isn't any.    Here is an

10:40:25  22  innocent man convicted because he went to trial in this

10:40:28  23  conspiracy case with his co-defendants and got tarred by

10:40:31  24  the brush of their evidence.

10:40:39  25            Judge, hindsight is 20/20.    I'm sorry to go

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:40:42 | 1  | there, but I love our system of justice, and I love          |
| 10:40:48 | 2  | everything about it.  And it troubles me that a man who      |
| 10:40:52 | 3  | has done so little wrong in this case has now been           |
| 10:40:56 | 4  | convicted.  And to set that straight, the Court should       |
| 10:41:02 | 5  | order a new trial.                                           |
| 10:41:13 | 6  | MR. HERDMAN:  I'd like to respond.                           |
| 10:41:15 | 7  | THE COURT:  Why don't we hear from Mr.                       |
| 10:41:21 | 8  | Hartman.                                                     |
| 10:41:21 | 9  | MR. HARTMAN:  Judge, briefly, I think what                   |
| 10:41:24 | 10 | we're asking the Court to do is something I think the        |
| 10:41:27 | 11 | jury wasn't able to do.  I agree that juries can be          |
| 10:41:32 | 12 | fallible.  I think they got this one wrong as to Marwan      |
| 10:41:35 | 13 | El-Hindi.                                                    |
| 10:41:35 | 14 | To piggyback on what Chuck was saying,                       |
| 10:41:42 | 15 | everything El-Hindi did, I believe, fit squarely within     |
| 10:41:49 | 16 | the ambit of jury instruction 19, which is proof that a     |
| 10:41:54 | 17 | defendant knew about a conspiracy or was present at          |
| 10:41:56 | 18 | times or associated with members of the group is not        |
| 10:41:59 | 19 | enough, even if he approved of what was happening or did    |
| 10:42:03 | 20 | not object to it.  In other words, if he didn't run         |
| 10:42:07 | 21 | away.  Similarly, because the defendant may have done        |
| 10:42:10 | 22 | something that happened to help a conspiracy does not        |
| 10:42:12 | 23 | necessarily make him a conspirator.  These are things       |
| 10:42:16 | 24 | that can be considered in deciding whether the              |
| 10:42:18 | 25 | government has proved the defendant joined the              |

10:42:22   1   conspiracy.   Without more, they are not enough.   And I

10:42:25   2   think that's what we have with El-Hindi because the case

10:42:28   3   against him is remarkably different than the case

10:42:31   4   against Amawi or Mazloum.   The case against El-Hindi

10:42:35   5   started back in 2002.   And we're asking the Court to

10:42:40   6   acknowledge that the cases are different.   And because

10:42:45   7   of conspiracy law -- I mean, they call it the

10:42:49   8   prosecutor's darling for a reason; they can bring them

10:42:52   9   all in the room together.   The government put it

10:42:56   10  together effectively, an incredible presentation,

10:42:59   11  particularly in their closing and rebuttal closing, that

10:43:04   12  mixed this evidence up so much that it was hard to tell

10:43:07   13  what came from where and who was present when which

10:43:10   14  conversations were had.   And I don't think that it's

10:43:13   15  fair to allow that to stand when you evaluate what

10:43:17   16  El-Hindi did.

10:43:19   17           Now, my evaluation of the evidence in the

10:43:22   18  briefs, which will stand on its own, is that there was

10:43:26   19  nothing there that he did, whether it be the Ahmed

10:43:30   20  cousins or anything else.   The reason that we ask the

10:43:37   21  Court to find entrapment as a matter of law --  and I

10:43:39   22  respectfully disagree that the Court can't find it

10:43:44   23  because we didn't put on a defense.   The fact that we

10:43:46   24  didn't ask for an entrapment instruction I don't believe

10:43:50   25  means that we didn't argue the fact.   And I believe the

10:43:53  1  Court can look at the evidence in total and say, you

10:43:57  2  know what, as matter of law, based on what did come in,

10:44:01  3  this is entrapment.   And that's what Rule 29 is for, I

10:44:06  4  believe.   And I believe this case defines entrapment

10:44:13  5  based on the evidence that came in at trial.   And I

10:44:16  6  won't comment on what the evidence was because we all

10:44:18  7  sat through it.   But suffice it to say that I think

10:44:25  8  that's why we have Rule 29.   And I think the fact that

10:44:28  9  the Court recognized that the jury system can be

10:44:31  10  fallible is exactly why these motions are appropriate

10:44:34  11  for El-Hindi because it's so much different for him, the

10:44:40  12  case is so much different.

10:44:41  13       The contact period, the timeframe of

10:44:44  14  contacts, the quality, if you will, of the evidence, the

10:44:52  15  government had to go to things against Mr. El-Hindi that

10:44:59  16  weren't there against the two co-defendants because of

10:45:01  17  what wasn't there against him because he didn't make

10:45:04  18  those comments about killing Americans, the direct

10:45:09  19  comments that I think the other co-defendants made.

10:45:12  20  The government had to bring the Ahmeds into this case.

10:45:15  21  And when the Court evaluates the evidence, what really

10:45:18  22  happened with the Ahmeds, here are two kids on their way

10:45:21  23  to go commit an act of terrorism, admittedly on their

10:45:24  24  way to go commit an act of terrorism, and he stopped

10:45:28  25  them.   And whatever he might have said after they came

```
10:45:30   1   back, they didn't ever do anything because of him,
10:45:34   2   whatever he might said.   Was he a talker?  Whatever was
10:45:44   3   talked about, what happened, and then after February 16,
10:45:50   4   this conversation that he wasn't an active participant
10:45:55   5   in, but admittedly, as the government points out, never
10:45:58   6   changed the subject, and he didn't run away.  And if
10:46:01   7   that's what it takes to convict somebody, fine, then
10:46:04   8   this conviction should stand.   But if not, then the
10:46:07   9   Court should evaluate the year after that.   What did
10:46:12  10   El-Hindi do in the year after February 16 that had
10:46:15  11   anything to do with terrorism?   Nothing.
10:46:20  12           I think it's appropriate for the Court to
10:46:23  13   look at the big picture, as you said, to step back under
10:46:27  14   the ambit of Rule 29, and to evaluate this and say, as a
10:46:32  15   matter of law the government proved a conspiracy.  We're
10:46:38  16   not contending they didn't, but they didn't prove that
10:46:41  17   El-Hindi joined it.   Everything he did was either
10:46:44  18   protected by the First Amendment, by freedom from
10:46:47  19   association, or it fits squarely within the ambit of
10:46:51  20   jury instruction 19.   And I think the Court should
10:46:57  21   recognize that and enter a motion for acquittal, and I
10:46:59  22   think the Court can do so on sufficiency of the evidence
10:47:02  23   as to that element of agreement to join the conspiracy,
10:47:08  24   and I think it can do so on entrapment as matter of law.
10:47:18  25   It's our position that it should.
```

| | | |
|---|---|---|
| 10:47:26 | 1 | MR. HERDMAN:  First of all, the question |
| 10:47:28 | 2 | raised at the outset of entrapment as matter of law. |
| 10:47:32 | 3 | The government has not been able to find a case where |
| 10:47:34 | 4 | the Court has granted a motion for entrapment as a |
| 10:47:37 | 5 | matter of law or made a finding of entrapment as a |
| 10:47:40 | 6 | matter of law where the defendant did not make a jury |
| 10:47:42 | 7 | instruction prior to the jury rendering a verdict.  So |
| 10:47:46 | 8 | I just wanted to make that clear.  There was some |
| 10:47:50 | 9 | question raised in counsel's reply as to what the |
| 10:47:53 | 10 | authority was for it, but nowhere have I been able to |
| 10:47:56 | 11 | find a case where the defense did not make a request for |
| 10:48:00 | 12 | an instruction and then raise it. |
| 10:48:02 | 13 | THE COURT:  Candidly, it makes no sense to |
| 10:48:04 | 14 | me that they should be able to do that.  It seems to me |
| 10:48:08 | 15 | an issue for the jury, just the government being able to |
| 10:48:11 | 16 | offer predisposition evidence. |
| 10:48:13 | 17 | MR. HERDMAN:  There is the possibility we |
| 10:48:14 | 18 | could have offered additional evidence for this defense |
| 10:48:20 | 19 | raised -- |
| 10:48:22 | 20 | THE COURT:  Candidly -- that is correct, |
| 10:48:24 | 21 | that not presented the opportunity when it should have |
| 10:48:29 | 22 | been presented to you because an instruction was |
| 10:48:32 | 23 | requested, who knows. |
| 10:48:40 | 24 | MR. HERDMAN:  There is a case I cited to; |
| 10:48:42 | 25 | it's a little convoluted, but a similar intent was made, |

10:48:47  1  and the Sixth Circuit found that was an inappropriate

10:48:50  2  argument to be making.

10:48:51  3       THE COURT:  My point is it simply subverts

10:48:55  4  the jury system.  It's up to the jurors to make that

10:48:57  5  decision, not up to me.  And again, I want to make that

10:49:01  6  very clear.  And sitting up here and thinking, well,

10:49:05  7  maybe I should accept the invitation being presented to

10:49:10  8  me by Mr. Hartman to go ahead and to sua sponte comb the

10:49:17  9  record and determine whether or not he was entrapped,

10:49:23  10  but as I sit here, I'm strongly inclined not to do that

10:49:26  11  and to put it squarely in the lap of the Sixth Circuit.

10:49:30  12  Say, look, you tell me if that's what I should do, I and

10:49:34  13  every other district Judge in the country should be

10:49:38  14  doing where a defendant deliberately with thoroughly

10:49:42  15  competent, capable counsel makes a deliberate decision

10:49:46  16  not to request an instruction, and then comes back and

10:49:54  17  tries to play the game over, having that opportunity

10:50:02  18  when I think it was appropriate.

10:50:06  19       MR. HERDMAN:  Your Honor, that same standard

10:50:08  20  applies to this insufficiency of the evidence argument

10:50:11  21  that Mr. Hartman made, which is that these arguments

10:50:13  22  that were made to the jury, these are the same arguments

10:50:16  23  he made in his closing argument.  He's now asking this

10:50:19  24  Court to apply a standard different than that required

10:50:21  25  under Rule 29 in reviewing the evidence.  And in the

10:50:25  1   government's response to the Rule 29 motion for

10:50:29  2   acquittal, there are laid out specific instances -- it's

10:50:33  3   not exclusive, but there are specific instances that are

10:50:36  4   laid out, factually derived from the evidence in this

10:50:38  5   case, that establish that Mr. El-Hindi did, in fact,

10:50:41  6   join this conspiracy.

10:50:42  7            And just one example of that, again, Mr.

10:50:46  8   Hartman said that the government brought the Ahmeds into

10:50:48  9   this case.  Mr. El-Hindi brought the Ahmeds into this

10:50:50  10  case.  Mr. El-Hindi is the one that brought the Ahmeds

10:50:54  11  to the attention of Darren Griffin.  Darren Griffin had

10:50:55  12  no idea who the Ahmeds were before Mr. El-Hindi

10:50:58  13  introduced them as brothers who were willing to train.

10:51:00  14  That's just one small example, but it is at the outset

10:51:03  15  of the charged conspiracy in this case.  And I just

10:51:06  16  raise it for the Court now because it's important to

10:51:08  17  what happened at trial; it's important to the evidence

10:51:11  18  that went in at trial; it's important to the arguments

10:51:14  19  that were made to the jury, and it runs through what the

10:51:17  20  government has presented in our response in terms of the

10:51:19  21  evidence.  And I won't go through it all.  But it's

10:51:22  22  there.  It takes up about five, six pages of our

10:51:25  23  response, specific dates, instances.

10:51:27  24            And I would also point out instances and

10:51:29  25  dates after February 16, 2005 where Mr. El-Hindi,

| | | |
|---|---|---|
| 10:51:34 | 1 | there's evidence that he participated in this conspiracy |
| 10:51:36 | 2 | willingly, voluntarily, and intentionally, that he knew |
| 10:51:39 | 3 | what the objectives were, and that he joined this |
| 10:51:42 | 4 | conspiracy with his coconspirator.  All that is laid |
| 10:51:45 | 5 | out in the government's response.  I don't think I need |
| 10:51:47 | 6 | to belabor it any more than I have. |
| 10:51:50 | 7 | Now, with respect to Mr. Boss, there was |
| 10:51:59 | 8 | some allusion made that the defense was not aware of the |
| 10:52:07 | 9 | videos the government was going to play for the jury. |
| 10:52:09 | 10 | Nothing could be farther from the truth.  Well in |
| 10:52:12 | 11 | advance of trial, I looked back over the docket, I know |
| 10:52:14 | 12 | there's a specific date that's indicated on there, March |
| 10:52:17 | 13 | 21, 2008, I brought to the Court a disk containing not |
| 10:52:23 | 14 | only videos that were going to be played, but the number |
| 10:52:25 | 15 | of consensual recording to which those videos related, |
| 10:52:29 | 16 | as Your Honor had requested. |
| 10:52:31 | 17 | THE COURT:  Not requested, instructed. |
| 10:52:34 | 18 | MR. HERDMAN:  Instructed, yes.  And that |
| 10:52:36 | 19 | was in light -- that was provided to defense counsel as |
| 10:52:40 | 20 | well, but it was also provided in the context of a |
| 10:52:43 | 21 | pending motion in limine that had been filed by Mr. |
| 10:52:45 | 22 | El-Hindi.  And that disk contained every video that was |
| 10:52:50 | 23 | ultimately played for the jury.  It also contained |
| 10:52:54 | 24 | videos that the government elected not to play for the |
| 10:52:56 | 25 | jury.  But it essentially pinpointed where in the |

| | | |
|---|---|---|
| 10:53:00 | 1 | government's evidence those videos were found. |
| 10:53:02 | 2 | Now, keep in mind that the defense had |
| 10:53:05 | 3 | already been provided with revised transcripts by the |
| 10:53:08 | 4 | government, that we had indicated the actual portions of |
| 10:53:12 | 5 | the consensual recordings we were going to play.  It's |
| 10:53:15 | 6 | very clear from those consensual recordings where a |
| 10:53:19 | 7 | video is playing.  Keep in mind an exhibit list had |
| 10:53:23 | 8 | already been provided to defense that delineated these |
| 10:53:26 | 9 | videos.  So the notion that Mr. Boss had no idea what |
| 10:53:30 | 10 | videos were going to be played is simply not the case. |
| 10:53:32 | 11 | Moreover with respect to the notion that |
| 10:53:34 | 12 | there were terrorists' names, organizations, terrorists' |
| 10:53:37 | 13 | names that were presented to the jury that were so |
| 10:53:40 | 14 | offensive that Mr. El-Hindi could not have received a |
| 10:53:42 | 15 | fair trial, many of those names and organizations came |
| 10:53:46 | 16 | off of a list of them that were stipulated to by defense |
| 10:53:49 | 17 | counsel.  And those were agreed to.  So for them to |
| 10:53:52 | 18 | object to that now is -- I find perplexing, but |
| 10:53:56 | 19 | nonetheless, it's in their motion. |
| 10:53:59 | 20 | One thing that Mr. Boss didn't say, which I |
| 10:54:01 | 21 | find interesting, is that those conversations where Mr. |
| 10:54:06 | 22 | Amawi's speaking to Mr. Griffin and in which a video is |
| 10:54:10 | 23 | played, it's very clear Mr. El-Hindi wasn't present.  In |
| 10:54:16 | 24 | fact, Mr. Boss didn't object to consensual recordings |
| 10:54:20 | 25 | between Mr. Griffin and Mr. Amawi.  And some of the |

10:54:24  1  things Mr. Amawi says in those consensual recordings

10:54:26  2  could be perceived as far more prejudicial than the

10:54:29  3  actual videos.  It was very clear, this point was made

10:54:32  4  by the Court repeatedly, that the videos that were

10:54:35  5  played pursuant to consensual recordings made by Mr.

10:54:40  6  Griffin of Mr. Amawi were to be considered with respect

10:54:43  7  to Mr. Amawi's intent only.  And that instruction was

10:54:47  8  given to this jury.  I pointed that out in our

10:54:50  9  response.  It's very clear that the jury was instructed

10:54:52  10  with respect to those videos.  So there can't really be

10:54:58  11  a question that Mr. El-Hindi was somehow tarred by this

10:55:00  12  brush of Mr. Amawi's videos.  It was delineated both in

10:55:03  13  the evidence and in the instructions what the jury was

10:55:06  14  to consider with respect to those videos.

10:55:10  15         As to videos that Mr. El-Hindi did have

10:55:14  16  access to, those videos are very important.  There are

10:55:17  17  only five of them that were in the government's evidence

10:55:19  18  that touched upon Mr. El-Hindi.  But in some ways those

10:55:21  19  five are perhaps the most critical videos that were

10:55:24  20  played for the jury, and, in fact, one of them, which

10:55:27  21  was the only beheading video that was played for the

10:55:33  22  jury, each defendant displayed an independent knowledge

10:55:36  23  of this video, of the purpose of the video, the fact

10:55:38  24  that this Egyptian trader had been working for the U.S.

10:55:42  25  military, had been planting sensors in locations, and

| | | |
|---|---|---|
| 10:55:47 | 1 | had contributed to the deaths of Muslims as well as |
| 10:55:51 | 2 | women, I believe, was also referred to, and he did it |
| 10:55:54 | 3 | for money.   This is something that defendants all |
| 10:55:56 | 4 | discussed on February 16.  And importantly, they |
| 10:55:59 | 5 | discussed it in Arabic.   It was a conversation Mr. |
| 10:56:03 | 6 | Griffin really had nothing to do with.  He was present, |
| 10:56:06 | 7 | but it was in a language he really didn't understand. |
| 10:56:08 | 8 | It was a conversation all three of these defendants had |
| 10:56:11 | 9 | with respect to that one beheading video.   So that |
| 10:56:14 | 10 | video is important from the government's perspective. |
| 10:56:16 | 11 | It's important in proving our conspiracy.   And again, |
| 10:56:18 | 12 | I'm not going to go through all the reasons why these |
| 10:56:21 | 13 | videos were relevant and material, why they were |
| 10:56:23 | 14 | properly admitted.   That's in our motion.   There's, I |
| 10:56:26 | 15 | think, nine theories under which they were admitted, |
| 10:56:29 | 16 | nine theories to which the defense objected and did |
| 10:56:33 | 17 | object and theories that the Court took into |
| 10:56:36 | 18 | consideration when this evidence was properly admitted |
| 10:56:38 | 19 | at trial. |
| 10:56:40 | 20 | And that's essentially all I have.  Mr. Boss |
| 10:56:43 | 21 | didn't address all the issues that were raised in his |
| 10:56:46 | 22 | Rule 33 motion, but again, we responded to those on |
| 10:56:52 | 23 | paper as well. |
| 10:56:54 | 24 | MR. HARTMAN:   I'm going to reply very, very |
| 10:56:56 | 25 | briefly before Chuck has a chance to do so. |

| | |
|---|---|
| 10:56:57 | 1 |
| 10:57:00 | 2 |
| 10:57:06 | 3 |
| 10:57:10 | 4 |
| 10:57:12 | 5 |
| 10:57:16 | 6 |
| 10:57:21 | 7 |
| 10:57:24 | 8 |
| 10:57:26 | 9 |
| 10:57:30 | 10 |
| 10:57:33 | 11 |
| 10:57:37 | 12 |
| 10:57:39 | 13 |
| 10:57:42 | 14 |
| 10:57:45 | 15 |
| 10:57:48 | 16 |
| 10:57:52 | 17 |
| 10:57:55 | 18 |
| 10:57:58 | 19 |
| 10:58:02 | 20 |
| 10:58:06 | 21 |
| 10:58:08 | 22 |
| 10:58:11 | 23 |
| 10:58:13 | 24 |
| 10:58:14 | 25 |

            I think the question for the Court is would

the Court have had the authority to grant a judgment of

acquittal based on entrapment as a matter of law at the

close of the government's case.   And I think if the

answer to that question is yes, then the Court can still

do so now.  We didn't put on a defense.   It wasn't

sandbagging.  The fact that we didn't actually ask for

the instruction wouldn't have foreclosed the Court from

deciding as a matter of law all the evidence the

government put in is entrapment at the close of their

case.   The Court could have done it then.   And, in

fact, I believe when we made our motion for judgment of

acquittal at the close of the government's case, the

Court said it's not going to grant anything now; we can

brief those when the trial's over.   I believe --

            THE COURT:  Mr. Herdman, what do you think?

That kind of makes sense to me.   Couldn't I have taken

the government's -- and I can't recall whether I was

asked to do so.   If I wasn't then, again, I think you

have the same problem.   But if I was asked to do so --

            I mean, it's still a waiver issue, isn't it,

Mr. Hartman?

            MR. HARTMAN:  I don't remember if I

specifically asked the Court to do that.

            THE COURT:  I don't think you did.   I'm

| | |
|---|---|
| 10:58:16 | 1 |
| 10:58:23 | 2 |
| 10:58:29 | 3 |
| 10:58:30 | 4 |
| 10:58:37 | 5 |
| 10:58:45 | 6 |
| 10:58:50 | 7 |
| 10:58:55 | 8 |
| 10:59:01 | 9 |
| 10:59:15 | 10 |
| 10:59:20 | 11 |
| 10:59:23 | 12 |
| 10:59:26 | 13 |
| 10:59:30 | 14 |
| 10:59:34 | 15 |
| 10:59:37 | 16 |
| 10:59:39 | 17 |
| 10:59:42 | 18 |
| 10:59:46 | 19 |
| 10:59:48 | 20 |
| 10:59:54 | 21 |
| 10:59:56 | 22 |
| 10:59:59 | 23 |
| 11:00:02 | 24 |
| 11:00:04 | 25 |

quite certain you didn't.  And that certainty is reinforced by the fact that you have waived any request for the instruction.

You raise a very interesting point, and you may and probably -- may be correct that where I am asked to exercise authority at the completion of the government's case, you can renew that request in a Rule 29 motion.  But I don't -- not having been called upon then to exercise it, I don't think that I can de novo exercise that authority at this stage.

MR. HARTMAN:  And I think what Rule 29 says, at least since it was amended in 2005, I don't recall about beforehand, but at least since 2005 it says the motion need not be made before in order to be made after the jury's verdict.  So you put those two things together, I don't think you have a waiver issue.  I think we can ask the Court to look at it in exactly the same light that it would have looked at it in -- at the close of the government's case.  In particular in this case because we didn't put on a defense.

MR. HERDMAN:  There's the two issues in play here.  The first is that the original Rule 29 motion that was made by Mr. El-Hindi, my memory is somewhat faulty on this, but I have reviewed it recently; there was no mention made of an entrapment defense at this

11:00:07  1   point in time.

11:00:08  2              THE COURT:  I'm sure that that's correct.

11:00:11  3              MR. HERDMAN:  So putting aside that issue,

11:00:13  4   Your Honor, the fact that a motion is able to be made,

11:00:16  5   or that motion not -- not having been able to be made

11:00:21  6   prior to the verdict being rendered, it doesn't get

11:00:24  7   around the notion that I raised in the motion, which is

11:00:27  8   that this is a rebuttable defense.  The government is

11:00:30  9   entitled to present evidence of predisposition if that

11:00:36  10  is a necessary element here.  And it is.  This is a

11:00:39  11  two-element defense.  If we even concede inducement,

11:00:43  12  which I don't do so, but --

11:00:46  13             THE COURT:  If you concede?

11:00:48  14             MR. HERDMAN:  -- inducement, Your Honor.

11:00:54  15             For the defense to effectively foreclose any

11:00:57  16  presentation of evidence on a fairly critical issue,

11:01:00  17  then to submit it to the jury, then after we have no

11:01:03  18  chance to present additional evidence to come back to

11:01:06  19  this Court and ask for a finding like that when they

11:01:09  20  didn't ask for the instruction is -- it's just

11:01:11  21  fundamentally unfair to the government in terms of the

11:01:14  22  presentation of evidence that we would have been allowed

11:01:16  23  to proceed with were this raised properly at trial.

11:01:21  24             MR. HARTMAN:  Again, I could point to the

11:01:23  25  fact it can be done at the close of the government's

| | | |
|---|---|---|
| 11:01:25 | 1 | case.    I'll let Chuck -- |
| 11:01:27 | 2 | MR. BOSS:  I have nothing further. |
| 11:01:33 | 3 | MR. BRYAN:  If I may, briefly. |
| 11:01:36 | 4 | MR. HARTMAN:  Unless the Court has questions |
| 11:01:38 | 5 | for us. |
| 11:01:38 | 6 | THE COURT:  That's okay. |
| 11:01:39 | 7 | MR. BRYAN:  My comments were triggered |
| 11:01:44 | 8 | listening to Mr. Boss, Mr. Boss' argument.  There is |
| 11:01:47 | 9 | something I neglected to mention during my allotted |
| 11:01:50 | 10 | time.  Mr. Boss triggered my memory of this in the |
| 11:01:54 | 11 | sense he was talking about the fact that the vast |
| 11:01:56 | 12 | majority of materials involved in this case, especially |
| 11:01:59 | 13 | as it related to Jihadist videos and things of that |
| 11:02:10 | 14 | nature, were possessed and found within the possession |
| 11:02:14 | 15 | of Mr. Amawi.  Obviously we heard it during the |
| 11:02:18 | 16 | consensually monitored tapes, Mr. Amawi and Mr. Griffin |
| 11:02:23 | 17 | viewing these materials together; not only that, but all |
| 11:02:26 | 18 | the materials that were found on Mr. Amawi's computer. |
| 11:02:29 | 19 | And again, Mr. Sofer argued in closing |
| 11:02:32 | 20 | argument they were not unlawful to possess.  There was |
| 11:02:36 | 21 | maybe an instruction.  These matters were not unlawful |
| 11:02:40 | 22 | to possess.  But the jury could consider it as it |
| 11:02:44 | 23 | related to the defendants' intent, not whether he |
| 11:02:47 | 24 | sympathized with the Jihadist movement, but had the |
| 11:02:50 | 25 | intent to join the Jihadist movement by violating the |

| | | |
|---|---|---|
| 11:02:54 | 1 | law in this case. |
| 11:02:55 | 2 | What memory that triggered in me is also we |
| 11:02:58 | 3 | raised in our motion for a new trial was the denial of a |
| 11:03:02 | 4 | defense that we present expert witnesses. |
| 11:03:04 | 5 | THE COURT: Actually, I was going to mention |
| 11:03:06 | 6 | that. Let me simply say I -- in light of your argument |
| 11:03:10 | 7 | I've revisited in my mind's eye those rulings. And I |
| 11:03:18 | 8 | once again find no problem with them. Again, I do |
| 11:03:21 | 9 | think, though, that's something properly to urge upon |
| 11:03:26 | 10 | the Court of Appeals. And it may be something that |
| 11:03:34 | 11 | reasonable people can disagree on. But I made the |
| 11:03:36 | 12 | decisions for the reasons I did, both with regard to the |
| 11:03:41 | 13 | three defense witnesses and to allowing Mr. Kohlmann to |
| 11:03:49 | 14 | come in and testify when I did and as he did. So I |
| 11:03:53 | 15 | have considered that on the papers. It's good that you |
| 11:04:01 | 16 | remind me or at least you be satisfied that I have |
| 11:04:05 | 17 | thought of that. |
| 11:04:06 | 18 | MR. BRYAN: Just sort of to supplement the |
| 11:04:09 | 19 | record with my argument that the jury in this case was |
| 11:04:12 | 20 | able to view the evidence through the prism of their |
| 11:04:16 | 21 | experience being United States citizens after 9/11. |
| 11:04:20 | 22 | But what denied us the opportunity to present our expert |
| 11:04:23 | 23 | witnesses then was to not allow the jury to view the |
| 11:04:28 | 24 | evidence through the prism of our clients as Middle |
| 11:04:33 | 25 | Eastern Muslims, especially as it related to our |

| | | |
|---|---|---|
| 11:04:36 | 1 | client's views of the Iraqi war.  Both altered -- |
| 11:04:42 | 2 | THE COURT:  I'll simply say again, if I |
| 11:04:44 | 3 | recall that evidence was presented, and I believe I |
| 11:04:50 | 4 | responded to it.  And certainly hearing it again today, |
| 11:04:58 | 5 | I simply don't think that that testimony has a |
| 11:05:03 | 6 | sufficient nexus to these individuals to have been |
| 11:05:07 | 7 | admissible.  I mean, I believe that was the position I |
| 11:05:10 | 8 | took before.  I'm looking -- |
| 11:05:14 | 9 | MR. SOFER:  Yes, Your Honor.  Slightly more |
| 11:05:18 | 10 | verbiage, but that was basically it. |
| 11:05:22 | 11 | THE COURT:  Again, I don't think that the |
| 11:05:28 | 12 | record and the proposed testimony had a connection to |
| 11:05:43 | 13 | these individuals.  Any that's what I ruled and why I |
| 11:05:50 | 14 | did, as I recall. |
| 11:05:57 | 15 | I'll give you until Friday to supplement the |
| 11:06:00 | 16 | record, the Government until the following Friday.  The |
| 11:06:05 | 17 | matter is under advisement.  I will try to get a |
| 11:06:09 | 18 | decision out very promptly. |
| 11:06:12 | 19 | MR. BRYAN:  Mr. Terez advises me that Friday |
| 11:06:15 | 20 | will be Good Friday. |
| 11:06:17 | 21 | THE COURT:  Let's do it Friday.  If the |
| 11:06:19 | 22 | record is as you suggest, it should take a couple hours |
| 11:06:23 | 23 | to sort it out. |
| 11:06:24 | 24 | MR. SOFER:  Actually, there should be |
| 11:06:26 | 25 | nothing if what counsel is saying is true. |

11:06:31  1            THE COURT:  That will conclude these

11:06:32  2   proceedings.

3                (Concluded at 11:06 a.m.)

4                       - - -

5

6                  **C E R T I F I C A T E**

7

8      I certify that the foregoing is a correct transcript

9   from the record of proceedings in the above-entitled

10   matter.

11

12   /s Tracy L. Spore_____          _____

13   Tracy L. Spore, RMR, CRR                 Date

14

15

16

17

18

19

20

21

22

23

24

25