IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:06CR719 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Chief Judge James G. Carr |
| v. | ) | |
| | ) | |
| MOHAMMAD ZAKI AMAWI, | ) | GOVERNMENT'S SENTENCING |
| MARWAN OTHMAN EL-HINDI, and | ) | MEMORANDUM |
| WASSIM I. MAZLOUM, | ) | |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through its undersigned counsel,

Steven M. Dettelbach, United States Attorney for the Northern District of Ohio, Assistant United

States Attorneys Thomas E. Getz, Justin E. Herdman, Gregg N. Sofer, and David I. Miller, and

Department of Justice Trial Attorney Jerome J. Teresinski, and respectfully submits this

Sentencing Memorandum,[1] which summarizes the United States' position that all three

defendants should be sentenced to a term of life imprisonment.

The United States Pretrial Services and Probation Office (hereinafter, "the Probation

Office") has prepared separate Presentence Investigation Reports (hereinafter, "PSIRs") for each

defendant.  Using the November 1, 2008 edition of the United States Sentencing Guidelines

---

[1] This Memorandum is being filed both electronically and manually with the Court and
counsel.  The version filed manually contains a set of electronic exhibits referenced herein.  Due
to the constraints of the ECF system, these exhibits could not be filed on the electronic docket.

Manual (hereinafter, "the Guidelines" or "U.S.S.G."), the Probation Office calculated each defendant's sentence at life imprisonment.  In this Memorandum, we explain why this Court should sentence Mohammad Amawi (hereinafter, "Amawi"), Marwan El-Hindi (hereinafter, "El-Hindi"), and Wassim Mazloum (hereinafter, "Mazloum") to life imprisonment, which is in fact the properly-calculated advisory Guidelines sentence for each defendant.  We first outline a brief history of the case.  We then address counts of conviction, including a brief discussion of the terrorism enhancement, and how it appropriately applies to each defendant's case.  Finally, we address the defendants' Guidelines range as properly calculated in the PSIRs, and explain why a sentence of life imprisonment is reasonable and consistent with the statutory sentencing factors set forth in 18 U.S.C. § 3553.

I.    <u>**Case History**</u>

On June 13, 2008, all three defendants were convicted by a jury of the following two offenses charged in the superseding indictment:

> Count One: Title 18, United States Code, Section 956(a)(1) - Conspiring to kill, kidnap, maim or injure another person outside of the United States; and

> Count Two: Title 18, United States Code, Section 2339A - Conspiring to provide material support to terrorists.

In addition, defendants Amawi and El-Hindi[2] were, individually and separately, convicted of two counts each of the following offense:

> Counts Three and Four (Amawi): Title 18, United States Code, Section 842(p)(2)(A) - Distribution of information relating to explosives, destructive devices, and weapons of mass destruction; and

---

[2] El-Hindi was also convicted, following a bench trial, in Case No. 3:07CR00074, of Conspiracy to Defraud the Government, Theft of Public Funds, and multiple counts of Wire Fraud.  Sentencing in that case is also currently pending and is addressed further herein.

Counts Five and Six (El-Hindi): Title 18, United States Code, Section 842(p)(2)(A) - Distribution of information relating to explosives, destructive devices, and weapons of mass destruction.

The jury agreed that the objects of the conspiracy charged in Count One included both murdering and maiming persons overseas.  On May 15, 2009, the Court denied both Amawi's and El-Hindi's Fed. R. Crim. P. 29 and 33 motions.  (Orders, May 15, 2009, Document Nos. 948-51).

On April 1, 2009, the Probation Office prepared and submitted PSIRs for each defendant. Having reviewed these documents, the United States submits that the PSIRs correctly determine the applicable Guideline ranges at life imprisonment for each defendant and properly include Guideline enhancements for terrorism for each defendant.

## II.    Counts of Conviction

### A.    Statutory Penalties

#### 1.    Count One: 18 U.S.C. § 956(a)(1)

As noted above, the jury returned special verdicts as to each defendant concerning Count One of the superseding indictment, unanimously finding that the object of the conspiracy was to both: "*Murder* persons in another country," and "*Maim* persons in another country."  (Jury Verdict Forms, June 13, 2008, Document Nos. 802-04) (emphasis added).

The statutory punishment for this offense as set forth in 18 U.S.C. § 956(a)(2) is as follows:

(a)    imprisonment for any term of years or for life if the offense is conspiracy to murder or kidnap; and

(b)    imprisonment for not more than 35 years if the offense is conspiracy to maim.

3

Pursuant to the jury's verdicts, both provisions apply to these defendants.

It is important to note that 18 U.S.C. § 956 is expressly a conspiracy statute.  It is comprised of two prongs, the first criminalizing conspiracies to victimize persons, and the second dealing with conspiracies to destroy or damage certain types and classes of property.

As noted, the prescribed maximum potential penalties for offenses under the statute are substantial.  It is self-evident that a terrorist who is prevented from carrying out a violent attack should not benefit from the government's successful disruption of that act.  For that very reason, federal criminal law treats one who conspires with others to commit an offense the same as one who completes the criminal act.  Especially in terrorism cases, waiting for the criminal act to reach fruition before commencing to prosecute the criminals is not a viable option.

> [S]eeking to maximize early intervention in terrorism cases entails plausible and significant benefits.  The sooner that one moves to incapacitate a potential terrorist, the less risk one runs that the person will slip surveillance or otherwise get into position to commit a harmful act before officials can intervene.  Even if the risk enhancement associated with delay is relatively small, the magnitude of the harm to be averted in the terrorism context – from the perspective of both the individuals who may be subjected to violent acts and society – may be such that any appreciable risk enhancement should be avoided if at all possible.

Prof. Robert M. Chesney, *Beyond Conspiracy? Anticipatory Prosecution and the Challenge of Unaffiliated Terrorism,* 80 S. Cal. L. Rev. 425, 433-34 (2007).

Moreover, that was clearly Congress' reasoning in creating terrorism conspiracy statutes, a fact which is further demonstrated by the attendant formulation of a Guidelines sentencing scheme that includes a significant enhancement for terrorism-related crimes including, specifically, 18 U.S.C. § 956, (as will be discussed further, herein below).

4

Every day, counter-terrorism agents, law enforcement officers, federal prosecutors, and other government officials traverse an increasingly fine, often subtle, and potentially deadly tightrope between allowing a conspiracy to continue for intelligence and evidence gathering purposes, or taking affirmative action to intercede and apprehend the conspirators before they can fully achieve their goal.  While premature disruption can result in lost investigative opportunities, belated action will likely result in death and/or destruction.  These defendants should not be afforded any benefit at sentencing due to the fact that their terrorist acts were disrupted before they were able to actually injure or kill someone.

### 2.    Count Two: 18 U.S.C. § 2339A

The statutory penalty for the 18 U.S.C. § 2339A violation, conspiring to provide material support to terrorists, includes a term of imprisonment of up to 15 years.

Count Two of the superseding indictment charged the defendants with conspiring "to provide material support and resources, *knowing and intending* they were to be *used in preparation for and in carrying out* a violation of Title 18, United States Code, Section 2332 (killing of United States nationals)."  (Emphasis added).

### 3.    Counts Three through Six: 18 U.S.C. § 842(p)(2)(A)

For violations of 18 U.S.C. § 842(p)(2)(A), as charged in Counts Three though Six, the statutory penalty, pursuant to Title 18, U.S.C. § 844(a)(2), includes a term of imprisonment of up to 20 years for each such offense.[3]

---

[3] As noted above, Mazloum was charged and convicted only of the offenses in Counts One and Two of the superseding indictment.

5

**B.**     **Terrorism Enhancement**

The prosecutions following the 1993 bombing of the World Trade Center ultimately led

Congress to drastically overhaul federal counterterrorism law in 1996.  Before that

Congressional overhaul, the criminal code actually penalized law enforcement for success by

prescribing severe penalties if terrorists were successful in carrying out bombings and other

murders, but significantly lower terms if law enforcement effectively prevented the terror attack

and were able to charge, as a result, an inchoate offense.  As noted below, Congress repeatedly

has addressed the need for substantial sentences for those engaged in terrorist activity or

supporting terrorist activity, and has made its intentions clear each time, culminating in the

current terrorism statutes and the terrorism enhancement in the Guidelines.  It is clear that the

intended punishments in such cases are now designed to contain terrorists for life, or for

substantial portions of their remaining lives, not just to penalize their conduct, but to serve as

notice to others regarding the United States' resolve in combating terrorism.

**1.**     **U.S.S.G. Section 3A1.4**

Part A of Chapter Three of the U.S.S.G. provides for "Victim-Related" adjustments to the

Guidelines offense level.  U.S.S.G. § 3A1.4 is a victim-related upward adjustment for terrorism,

first inserted into the Guidelines on November 1, 1995 (prior to the September 11, 2001 terrorist

attacks), as part of the Violent Crime Control and Law Enforcement Act of 1994 (VCCA).  Pub.

L. 103-322.  The primary sentencing provision related to "terrorism" offenses before that time

was found at U.S.S.G. § 5K2.15 (November 1, 1989).  That section permitted the sentencing

court to increase the sentence above the authorized guideline range if the offense was committed

"in furtherance of a terroristic action."  The terms "terrorism" and "terroristic action" were not

6

defined.  In passing the VCCA in 1994, Congress directed the Sentencing Commission to "amend its sentencing guidelines *to provide an appropriate enhancement for any felony*, whether committed within or outside the United States, *that involves or intended to promote international terrorism . . .* " Pub. L. 103-322 § 120004 (1994) (emphasis added).  In response, the Sentencing Commission adopted § 3A1.4, which read, in pertinent part:

> (a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> (b) In each such case, the defendant's criminal history category from Chapter Four . . . shall be Category VI.

Shortly thereafter, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132 (1996).  Among other things, AEDPA directed the Sentencing Commission to further amend the Guidelines so that the Chapter 3 adjustment relating to international terrorism only applies to "federal crimes of terrorism," as defined in 18 U.S.C. § 2332b(g).  Thus, the current version of U.S.S.G. § 3A1.4 provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense is less than level 32, increase to level 32.
>
> (b) *In each such case*, the defendant's criminal history category . . . *shall be Category VI.* (Emphasis added).

The Application Notes to Section 3A1.4 were amended to their current form after enactment of the USA PATRIOT Act in 2001.  The current version of U.S.S.G. § 3A1.4 consists of four Application Notes which are viewed as "part of the Guidelines themselves and not mere commentary on them."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

7

Viewed in the aggregate, these amendments reflect an understanding by both Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and difficulty of deterring and rehabilitating the criminal, and thus that *terrorists and their supporters should be incapacitated for a longer period of time*." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added) (stating application of § 3A1.4 increasing both the offense level and criminal history did not violate due process rights where defendant was convicted of conspiring to provide material support to terrorists).

> a.    *Application Note 1*

Application Note 1 to § 3A1.4 states that the term "Federal Crime of Terrorism" is defined at 18 U.S.C. § 2332b(g)(5); the term means an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is one of a series of specifically enumerated violations.  As discussed below, the crimes of which the defendants stand convicted in this case were clearly calculated to influence and affect the conduct of government by intimidation and coercion, as well as to retaliate against government conduct.  In addition, both 18 U.S.C. § 956(a)(1) and 18 U.S.C. § 2339A are enumerated offenses.

> b.    *Application Note 2*

Application Note 2 deals with "Harboring, Concealing and Obstruction Offenses." Under this application note, a defendant is deemed to promote a federal crime of terrorism when he or she harbors or conceals a terrorist who committed one of the enumerated offenses found in 18 U.S.C. § 2332b(g)(5)(B)(1), *or* when he or she engages in conduct that obstructs a federal

8

terrorism investigation.  In other words, the terrorism enhancement is even intended to be applied to a "non-terrorist" who merely "runs interference" for a person engaged in terrorist activity.

        c.     *Application Note 3*

Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that the enhancement does not require a prerequisite criminal history Category VI for its application. It provides for the automatic increase of criminal history to Category VI "in each such case."

The Second Circuit noted in *Meskini* that Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4, "because even *terrorists* with no prior criminal behavior are *unique among criminals* in the likelihood of *recidivism, the difficulty of rehabilitation*, and *the need for incapacitation*." 319 F.3d at 91. (emphasis added).

        d.     *Application Note 4*

Application Note 4 is a standalone provision that applies in cases, unlike this one, where the defendant's actions do not meet the statutory definition of "federal crime of terrorism." Application Note 4, therefore, provides an upward departure for offenses that "involve terrorism but do not otherwise qualify" for the predetermined increases of offense level and criminal history category that are applicable to § 3A1.4's Application Notes 1 through 3.

As will be discussed herein, in regards to the offenses charged in Counts Three through Six, U.S.S.G. § 3A1.4 can be, and has been, applied to cases where the defendant is not convicted of an offense enumerated as a "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5). *See, e.g.*, *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001).  Accordingly, the § 3A1.4

enhancement for terrorism is clearly applicable to these three defendants for all of the Counts of which they stand convicted.

### C. Each Count of Conviction Implicates a Specified Federal Statute that Supports the Terrorism Enhancement

As noted in the PSIRs, each count of conviction triggers the terrorism enhancement.  *See* Presentence Investigation Report, April 1, 2009, at 20-22.

#### 1. Count One: 18 U.S.C. § 956(a)(1)

Title 18, United States Code, Section 956(a)(1) is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5).  Therefore, the terrorism enhancement in U.S.S.G. § 3A1.4 applies, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to each of the defendants.

#### 2. Count Two: 18 U.S.C. § 2339A

Title 18, United States Code, Section 2339A is an enumerated offense within the definition of "federal crimes of terrorism" in 18 U.S.C. § 2332b(g)(5).  For the reasons discussed above, the terrorism enhancement in U.S.S.G. § 3A1.4 also applies to this offense, thereby increasing the offense level by 12 levels, and applying a criminal history category of VI to each defendant.

#### 3. Counts Three through Six: 18 U.S.C. § 842(p)(2)(A)

As noted above, the application of § 3A1.4 may be appropriate even if the offense of conviction was not among the list of enumerated offenses in § 2332b(g)(5)(B) – so long as the underlying crime was among those listed.  *See, e.g., Graham*, 275 F.3d at 515-16; *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004).  With respect to the instant case, 18 U.S.C. §

10

842(p)(2)(A) itself is not listed among the enumerated offenses that could support the terrorism enhancement.  However, the offenses charged in Counts Three through Six are felonies, and each involved or was intended to promote a "federal crime of terrorism," as that term is defined in 18 U.S.C. § 2332b(g)(5).  Indeed, as charged in the superseding indictment, the underlying substantive offenses for Counts Three through Six include 18 U.S.C. § 2332(a), (the killing of a United States national outside of the United States) and § 1114 (the killing of an officer or employee of the United States).  18 U.S.C. § 2332b(g)(5) expressly identifies both 18 U.S.C. § 2332(a) and § 1114 as offenses supporting the 12-level terrorism enhancement.

> ### D.    The Defendants' Conduct was Calculated to Influence or Affect the Conduct of the Government by Intimidation and Coercion and to Retaliate Against Government Conduct

The trial evidence in this case leaves no question that the conduct of these three defendants was focused on the U.S. government's military involvement in Iraq and Afghanistan.[4] The evidence also leaves no question that the defendants' commitment to training themselves, and others, in methods to violently engage U.S. troops was, in fact, "calculated to influence [and] affect the conduct of the government... [and] to retaliate against government conduct."

Specifically, the defendants spent considerable time and effort in acquiring, viewing, and distributing material from jihadist websites.  This material predominantly featured videos

---

[4] In his own Sentencing Memorandum, Amawi concedes that his activities in this case – and presumably those of his co-defendants, as well – were a product of the United States government's decision to go to war in Iraq.  "In considering the nature and circumstances of the offenses of conviction and the history and characteristics of [Amawi], it is important to recognize that there would be no case without the United States' invasion of Iraq and the reaction Arab Muslims had to this invasion.  The facts of this case do not take place in a vacuum.  The facts of this case take place during the most volatile times of the war in Iraq."  (Sentencing Memorandum of Defendant Amawi, Doc. 984, at 5).

showing the violent deaths of American troops in suicide bombings, IED attacks, sniper fire, rockets, and other methods.  Yet the material also included propaganda that decried alleged atrocities committed by U.S. troops against the Muslim community.  The defendants discussed among themselves – notably during the February 16, 2005 meeting at El-Hindi's residence – how best to support the efforts of the mujahedeen against the U.S. military.

The defendants' crimes were not motivated solely by some personal animus against individual soldiers, but by a larger desire to act out against U.S. foreign policy.  Accordingly, all of the criteria for the terrorism enhancement are met in this case.  The Court should thus adopt the PSIRs on this issue, and sentence each defendant to life imprisonment.

## III.  Imposition of Sentence

The Probation Office employed a three-step analysis in developing each defendant's PSIR.  First, the appropriate guideline range was determined.  Second, any possible guideline departures were identified.  Third, it was determined whether a variance should be considered, pursuant to 18 U.S.C. § 3553(a).  Presentence Investigation Report, April 1, 2009, at 28-29.

### A.  Guidelines Range

The district court's task is to impose a sentence that is sufficient, but "not greater than necessary" to comply with the factors set forth in 18 U.S.C. § 3553(a)(2).  18 U.S.C. § 3553(a). In achieving this task, district courts are to consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a).  *See United States v. Booker*, 543 U.S. 220, 246 (2005). Although advisory, the Guidelines "should be the starting point and the initial benchmark" in all sentencing proceedings.  *United States v. Gall*, 128 S. Ct. 586, 596 (2007); *United States v. Anderson*, 526 F.3d 319, 329 (6th Cir. 2008).  *See also United States v. Griffin*, 530 F.3d 433,

12

439 (6th Cir. 2008) (district court must properly calculate and consider the advisory Guidelines); *United States v. Brattain*, 539 F.3d 445, 447 (6th Cir. 2008) (same).  Indeed, a sentence may be considered unreasonable when the court "fails to consider the applicable Guidelines range . . . ." *United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (internal quotations omitted).  In fact, the Sentencing Guidelines are generally considered to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  The Sentencing Guidelines "seek to embody the § 3553(a) considerations, both in principal and in practice." *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).  "For even though the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 128 S.Ct. 586, 594 (2007).  "The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *United States v. Anderson*, 526 F.3d 319, 329 (6th Cir. 2008) (*quoting Gall v. United States*, 128 S.Ct. 586, 596 n. 6 (2007)).

Since *Booker*, the Sixth Circuit has "reaffirmed the doctrine that district judges in determining defendants' sentences may consider facts that they find under a preponderance-of-the-evidence standard" so long as the statutory maximum is not thereby misused.  *United States*

13

*v. Klups*, 514 F.3d 532, 537 (6th Cir. 2008). *See also United States v. Goosby,* 523 F.3d 632, 639 (6th Cir. 2008); *United States v. Mayberry*, 540 F.3d 506, 516 (6th Cir. 2008). However, when sentencing a defendant under the Guidelines, district courts "cannot rely on a finding that directly conflicts with the jury's verdict." *United States v. Cockett*, 330 F.3d 706, 711 (6th Cir. 2003).

> **1.      The PSIR Properly Calculates the Advisory Guidelines Range at Life Imprisonment**

With respect to Count One of the superseding indictment, the PSIRs calculated a base offense level of 33, and added 12 levels pursuant to U.S.S.G. § 3A1.4(a) – making the adjusted offense level 45 for each defendant. The total offense level for Count One thus amounts to 43.[5] Coupled with a Criminal History Category VI,[6] the Guideline sentence is life imprisonment for each defendant.

As noted above, Count One carries a statutory maximum penalty of life imprisonment. Count Two has a statutory maximum punishment of 15 years imprisonment. Counts Three and Four each have a statutory maximum punishment of 20 years imprisonment.

Accordingly, as a result of the conviction on Count One, the properly calculated advisory Guidelines range is life imprisonment for each defendant.

---

[5] Pursuant to U.S.S.G. Chapter 5, Pt. A, Application Note 2, an offense level greater than 43 is to be treated as an offense level 43.

[6] As noted above, pursuant to U.S.S.G. § 3A1.4(b), if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the defendant's criminal history category shall be Category VI.

14

### B.    Departures

"The defendant bears the burden to prove by a preponderance of the evidence that the circumstances of his or her case warrant a downward departure." *United States v. Holz*, 118 Fed.Appx. 928, 931-32 (6th Cir. 2004) (*quoting United States v. Lipman*, 133 F.3d 726, 730 (9th Cir. 1998)). *See also United States v. Bostic*, 371 F.3d 865, 874 (6th Cir. 2004) (defendant bears burden of proving a downward departure is warranted).  A Guidelines-based departure is, of course, conceptually distinct from a non-Guidelines variance. *United States v. Grams*, 566 F.3d 683, 686-87 (6th Cir. 2009).  Whereas departures are grounded in Guidelines provisions, variances flow from the court's analysis of the § 3553(a) factors. *Id.*

If the Court is contemplating a departure "from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission," it must give the parties "reasonable notice."  Fed. R. Crim. P. 32(h); *United States v. Erpenbeck*, 532 F.3d 423, 443 (6th Cir. 2008). *See also Irizarry v. United States*, 128 S. Ct. 2198, 2203 (2008) ("Rule 32(h) remains in effect today . . . .").  Accordingly, it should be noted that the Probation Office did not "identif[y] any factors that may warrant a departure outside of the advisory guideline range of imprisonment" in any of the PSIRs.  Presentence Investigation Report, April 1, 2009, at 29.

When determining whether a Guidelines-based departure is justified, a district court must consider the following factors:

> (1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case? (2) Has the Commission forbidden departures based on those features? (3) If not, has the Commission encouraged departures based on those features? (4) If not, has the Commission discouraged departures based on those features?

15

*Erpenbeck*, 532 F.3d at 440 (*citing Koon v. United States*, 518 U.S. 81, 95 (1996)).

Additionally, only certain grounds for departure are permissible.  Pursuant to U.S.S.G. §

5K2.0(d)(1), the Court may not depart from the applicable Guideline range for a number of

factors, including the defendant's national origin, religion, socio-economic status, or his/her

disadvantaged upbringing.  Moreover, while a defendant's role in the offense is relevant in

determining the applicable guideline range, it is *not* a basis for departing from that range.  *See*

U.S.S.G. § 5K2.0(d)(3).

The Guidelines also identify a number of discouraged factors for granting a departure.  A

departure under these factors may be granted - but only under extraordinary circumstances.  *See*

U.S.S.G. Chapter 5, Part H (Specific Offender Characteristics).  These factors include, *inter alia*,

age, mental and emotional conditions, and family ties and responsibilities.  *Id.*

### 2.  No Guidelines Departure is Warranted

Accordingly, no downward departure should be granted, and the advisory Guidelines

range of life imprisonment should be imposed.

### C.  18 U.S.C. § 3553(a)

As noted above, the sentencing court is required to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth" in § 3553(a)(2), including "the

need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect

for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to

16

provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

In fashioning a sentence that is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2), the Court must also consider: "the nature and circumstances of the offense and the history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1); "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines" under 18 U.S.C. § 3553(a)(4)(A); "any pertinent policy statement . . . issued by the Sentencing Commission . . . " under 18 U.S.C. 3553(a)(5)(A); and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." under 18 U.S.C. § 3553(a)(6).

While it is not necessary for the district court to "engage in a ritualistic incantation of the § 3553(a) factors," its reasoning should be "sufficiently detailed to reflect the considerations listed in § 3553(a) and to allow for meaningful appellate review." *Moon*, 513 F.3d at 539 (internal quotations and citation omitted). Simply stated, a sentencing judge is not required to "expressly state each of these factors at sentencing." *Mayberry*, 540 F.3d at 518. However, if the district court determines that "an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is *sufficiently compelling* to support the degree of the variance." *Erpenbeck*, 532 F.3d at 437 (*quoting Gall*, 128 S. Ct. at 597) (emphasis added). A variance "based on a policy disagreement with the Guidelines . . . may be entitled to less respect" and be "suspect" on appeal. *Spears v. United States*, 128 S.Ct. 586, 599 (2007); *see United States v. Herrera-Zuniga*, 571 F.3d 568, 585-86 (6th Cir. 2009).

17

### 1.      No Variance is Warranted

Indeed, as will be demonstrated below, the § 3553(a) factors support a sentence within the advisory guidelines range for each defendant.   The defendants stand convicted of conspiring to murder and maim persons outside the United States, as well as conspiring to provide material support to terrorists.  A sentence of life imprisonment reflects the seriousness of these offenses, as Congress and the Sentencing Commission have made clear.

It is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law."  *Gall v. United States*, 128 S.Ct. 586, 599 (2007); *see* 18 U.S.C. § 3553(a)(2)(A).

Moreover, appropriately reflecting the seriousness of these offenses in turn promotes deterrence and protects the public from further harm from these individuals and others who share their extreme and violent ideology.

Finally, a sentence of life imprisonment imposes a reasonable and fair punishment in light of other similarly situated defendants.

Taking these factors into account, the defendants should receive terms of life imprisonment, as their properly-calculated Guidelines suggest.

### IV.      Additional PSIR Points to Consider

### A.      Not All "Disputed Factors" Need Be Addressed

As noted in the Government's Memorandum Regarding Sentencing Procedures (August 3, 2009, Doc. No. 971), not every "disputed factor" requires a Court ruling.  Indeed, Rule 32(i)(3)(B) allows the Court to skirt any factual resolution on a disputed issue if the fact at issue would not, or could not, affect the ultimate sentence.

18

**B.**     **Defendants Cannot Re-litigate Trial Evidence under the Guise of PSIR Objections**

The jury's verdicts contained absolutely no skepticism of the government's allegations, either as set forth in the superseding indictment, or as proven at trial.  Therefore, the defendants do not now have the latitude to seek a lower sentence based on a view of isolated pieces of evidence or of the case in general that is inconsistent with the guilty verdicts.

**V.**     **Trial and Guilty Verdicts**

During the course of the criminal case, this Court gave all three defendants the fairest possible trial and the fullest opportunity to litigate all aspects of the charges against them.  At the outset of the trial, the Court implemented a comprehensive *voir dire* process to empanel a fair and impartial jury.  Where any question or doubt surfaced regarding a juror's, or prospective juror's, impartiality, the juror at issue was excused.  The defendants cumulatively had the benefit of nearly a dozen attorneys and a professional jury consultant in the extensive jury selection process.  The Court placed strict limitations on courthouse security visibility, as well as juror access to news media and other non-case related materials and information.

Following a lengthy trial during which the jury heard and reviewed an extensive amount of evidence, much of it recordings of the defendants' own words and actions, the jury returned unanimous guilty verdicts on all of the charges in the indictment, including special findings that the three defendants conspired to "murder" and to "maim" persons outside of the United States.

During the nearly ten weeks of trial, the jurors also personally observed the three defendants and heard testimony on behalf of defendants Amawi and Mazloum.  Still, the jury

19

adopted the government's theory of the case and determined that the evidence proved the defendants guilty beyond a reasonable doubt on every charge.

### A.   The Defendants

#### 1.   Mohammad Zaki Amawi

Amawi was born at Walter Reed Hospital in Washington, D.C., in 1980.  His immediate family is from Jordan, and his parents and some siblings reside in Amman, although his mother makes extended visits to the United States.  Amawi is reasonably well-educated, and has been schooled and employed in the United States at various times in his life.  After returning from an extended trip to Jordan in 2004, Amawi had obviously undergone a personal transformation, outwardly becoming more radical in his appearance, behavior and expression of his beliefs. Amawi stated that he had attempted to enter Iraq from Jordan in order to engage in violent jihadist activities against the United States military, but was prevented from doing so by his family.  As a result, he then returned to the United States.  At this time, Amawi began amassing a collection of violent jihadist videos and materials (which  witness Evan Kohlmann described as "world class" in quantity and quality) from extremist web sites and other internet sources. Amawi also began researching the acquisition of weapons and manuals related to bomb-making, explosives, and other violent activities.

Amawi spent a substantial amount of his time on the computer and regularly communicated with others through the computer, including *via* email and "PalTalk".  Amawi identified one of his computer contacts as a Syrian jihadist with direct connections to the mujahadeen.  During the undercover investigation, Amawi attempted to acquire, with the aid of Darren Griffin, an explosive substance – astrolite – requested by the Syrian.  Amawi's Syrian

20

associate was not known to Griffin; however, Amawi did introduce Griffin to a number of his

other overseas associates when they travelled together to Jordan.

### 2.    Marwan El-Hindi

El-Hindi was born in Palestine in 1963.  He traveled to the United States in 1984 on a

student visa and married a U.S. citizen in 1987.  They had no children and divorced 4 years later.

He became a naturalized U.S. citizen in Syracuse, New York in 1999.

El-Hindi has been married three times and has several children.  He has supported

himself through numerous and varied business enterprises.  As demonstrated herein, many of

these "business" ventures were fraudulent by nature and/or in practice and some were premised

on defrauding the government.  El-Hindi has moved frequently within the United States,

including residing at times in Dearborn, Chicago and Syracuse, as well as Toledo.  El-Hindi was

a friend and business associate of Dr. Rafil Dhafir, currently in federal prison serving a 22-year

sentence for material support to terrorism and related fraud and tax charges.  El-Hindi testified,

pursuant to a grand jury subpoena, in the criminal investigation of Dhafir in Syracuse.  As part of

pre-trial discovery in this case, the government obtained and provided to El-Hindi, at his request,

a copy of the transcript of his sworn testimony in that investigation.  Based upon that transcript,

his prior discussions and activities with Darren Griffin, and his conversation with Griffin upon

his return from New York (he had asked Griffin to pick him up at the airport), it is clear that El-

Hindi was intentionally deceitful in his testimony about his knowledge of, and involvement in,

paramilitary training and Griffin's "VIP" security company.  As with Amawi, El-Hindi actively

demonstrated interest in jihadist activities before his connection to Darren Griffin.  El-Hindi

displayed substantial familiarity with significant jihadist internet sites and the anti-American

videos featured there.  El-Hindi had even attempted to recruit Mikail Al Mozrei and other

attendees of the mosque to go to a jihad training camp in Afghanistan.

El-Hindi also had associates in Michigan wholly independent of Darren Griffin.  These

included the now-convicted and deported accountant, Jihad Dahabi, and unnamed individuals El-

Hindi offered to recruit into his cell to receive training from Griffin.  El-Hindi eventually took

Griffin to meet with Dahabi to facilitate a government fraud.  As will be further detailed herein

below, this was not the only fraud in which El-Hindi solicited Griffin to participate.

### 3. Wassim Mazloum

Mazloum was born in Lebanon in 1981 and is not a U.S. citizen.  Mazloum entered the

United States in 2000 with his mother and siblings, including his younger brother, Bilal.

According to his mother, Mazloum, as a teenager in Lebanon, witnessed Israeli air attacks on his

village and in the region by F-16 fighter planes furnished by the United States, which had a

powerful impact upon him.  The defendant is a high school graduate and has taken some

computer and engineering courses at the University of Toledo.

Wassim Mazloum had no relationship with Darren Griffin until Amawi recruited him into

his cell for training and introduced him to Griffin.  Mazloum then invited his brother, Bilal, to

accompany him, Amawi and Griffin in a firearms training exercise on at least one occasion.[7]

On several occasions, Mazloum implored Griffin to accelerate the training, and expressed

great interest in learning how to construct Improvised Explosive Devices, or "IED's," the deadly

---

[7] Bilal Mazloum later lied to federal law enforcement agents about the defendants' association with Darren Griffin and the co-defendants, their training activities, and his own involvement in the firearms training.  Bilal eventually pleaded guilty to making material false statements and has been sentenced.

22

weapon most often employed against the U.S. military in Iraq and Afghanistan.  Mazloum also

participated with Amawi in a training session devoted to learning and practicing how to train

others in handgun marksmanship, specifically in Arabic.  When Griffin returned from his travel

to Jordan with Amawi, who remained overseas, Mazloum asked Griffin if the two had made

contact with the mujahadeen while there.  During the course of the investigation, Mazloum not

only had frequent telephone communication with Amawi, who had recruited him, but he had

well over a dozen telephone contacts with El Hindi after the February 16, 2005 meeting at El

Hindi's residence, where the "Amawi cell" and the "El Hindi cell" came together.  As the Court

described in its Order overruling Amawi's post-trial acquittal motion, the undercover video

recording of that meeting:

> [S]howed that the defendants agreed with [the] objectives and actions being
> discussed between the three of them and Griffin.  Those objectives included
> recruiting others, maintaining security, initially acquiring small arms training,
> creating a "cell," the need for money, manpower and weapons in Iraq, and
> the need according specifically to Amawi, "to know explosives these days"
> as the best way for "making damage."

(Order, May 15, 2009, Document No. 948, pp. 4-5).

**B.**    **The Investigation**

Darren Griffin, a Toledo native, was a decorated former member of the U.S. Army's

Special Forces who had served in Operations Desert Storm and Iraqi Freedom.  For a short time,

he was employed as an informant by the Toledo office of the Drug Enforcement Administration

(DEA). [8]  After the World Trade Center attacks in 2001, the DEA introduced Griffin to the FBI's

---

[8] In his Sentencing Memorandum, Amawi wrongly asserts that Griffin's work for the
DEA resulted from an arrest for selling narcotics.  (Sentencing Memorandum of Defendant
Amawi, Doc. 984, at 10).

23

Joint Terrorism Task Force.  The FBI then hired Griffin to immerse himself into the Toledo community to try to uncover terrorist plots and activities.  As a cover story, Griffin held himself out as a former U.S. Army Special Forces soldier who had become a radical convert to Islam and was able to provide training for violent jihad.  During the course of Griffin's service as an undercover operative for the FBI, from roughly 2002 up until he testified at trial, he had to keep his informant status secret from even his own family members.  He was "in service" every day, all day, and thus unable to hold any other employment.  Importantly, Griffin was not originally tasked with targeting these specific defendants until their statements and actions brought them to his, and consequently the FBI's, attention.

Of these three defendants, Griffin first encountered El Hindi.  As early as September 2002, El Hindi asked Griffin about kidnapping politicians and Israeli soldiers.  El-Hindi had also implored Griffin to share with the "brothers" overseas any intelligence information that he might have about the United States' strategic plans in Iraq.

Independently, Griffin became aware of Amawi and separately engaged with him in discussions about jihad training.  While maintaining his associations with Amawi and El Hindi, Griffin continued his efforts to identify others in the Toledo community who shared the defendants' extremist ideology.  Griffin asked Amawi and El Hindi, respectively, to identify others who might be open to joining their training activities.  Amawi recruited Mazloum for the training.  In turn, Mazloum invited his younger brother, Bilal, to participate in at least one training event, despite his expressed doubts  about Bilal's commitment and trustworthiness.

Following a trip to Cairo in order to prevent them from travelling to Afghanistan, El-Hindi introduced Griffin to Zubair Ahmed (hereinafter, "Zubair") and Khaleel Ahmed

24

(hereinafter, "Khaleel") (collectively, "the Ahmeds"), cousins from Chicago, who El-Hindi personally recruited for the military-style training.  Unable to successfully facilitate the Ahmeds' travel to Toledo to join in training activities, El-Hindi suggested, repeatedly, that training videos be copied onto CDs and delivered to the two cousins to encourage their participation.  As the Ahmeds have admitted in court pleadings, they were also in communication with a (now-convicted) terrorist in Atlanta, Georgia and with individuals from overseas about efforts to travel for jihad against American troops.  El-Hindi also advised Griffin of a number of unnamed "brothers" in Michigan he hoped to recruit.

On February 2, 2005, Griffin and El-Hindi visited Amawi's residence, where they watched jihadist videos of attacks on U.S. military forces, and shared their mutual and respective knowledge of mujahadeen web sites.  Amawi and El-Hindi carried on some conversation between themselves in Arabic and El-Hindi invited Amawi to come to his home.

The three defendants and Griffin rendezvoused at El-Hindi's residence two weeks later, on February 16, 2005, in the secretly recorded meeting previously described in the Court's order.

Following that meeting, one or more of the defendants:  sought specific types of weapons and explosives training from Griffin; viewed, shared and preserved jihadist videos and materials from the internet (including the "bomb vest video"); engaged in weapons training; practiced teaching others the training they were receiving; attempted to get others (e.g., Zubair and Khaleel) actively involved; and attempted to provide computers and explosives to mujahadeen fighters overseas.  In addition, the defendants discussed possible and/or permissible targets for their violent jihad, ultimately concurring that they should specifically target U.S. military troops in Iraq and Afghanistan.  The specifics of these activities, which were intended to further the

25

defendants' jihadist designs, will be addressed in greater detail in other sections of this Memorandum.

As discussed elsewhere in this Memorandum, Amawi had developed a Syrian contact online who had requested an explosive chemical.  At least in part to follow up on this lead, while Amawi was in Jordan during the fall of 2005, Griffin made two trips overseas.

With concern mounting about Amawi's intentions while overseas, in February 2006, with Amawi still in Jordan, the FBI's undercover operation ultimately had to be concluded and all three defendants were taken into custody.

In the following sections, the government will set out its analysis of the factors listed in Title 18, United States Code, Section 3553 as they apply, individually, to each convicted defendant.

IV.     **Title 18, United States Code, Section 3553 Factors**

      **A.  Mohammad Zaki Amawi**

            **1.  Title 18, United States Code, Section 3553(a)(1)**
                 **Nature and Circumstances of the Offense**

It is hard to imagine more serious crimes than the ones of which the defendant was convicted.  The nature and circumstances of these offenses, along with Amawi's particular role in each, provide a compelling, if not irrefutable, rationale to impose the sentences recommended by the U.S.S.G. and the Probation Office.  The trial evidence proved that for a period of not days nor months, but years, Amawi expressed commitment to going to Iraq to engage in violent jihad. Amawi told Griffin that Amawi had previously attempted to go to Iraq to engage in jihad, but was prevented from doing so by his family.  Then, as early as June 30, 2004, Amawi told Griffin

26

that he was still interested in going to Iraq to engage in violent jihad. [**SM-84-67131-3a-1**].  This was not an emotional whim or a casual or passing phase.  This dedication was demonstrated on October 5, 2005 when Amawi and Griffin had a telephone conversation while Amawi was in Jordan.  [**104-69185-1**].  Indeed, as late as December 2005 and while still in Jordan, Amawi continued to express his interest in entering Iraq to engage in violent jihad. [**Trial Transcript, Vol. 29, 4/16/2008, at 2883:1-20**].

There is no ambiguity in the record as to what "jihad" means to Amawi.  He clearly expressed a consistent and long-term interest in killing other human beings in Iraq and elsewhere: as a sniper [**77-69185-2a-1**]; a trainer [**1-69185-9A**] and [**48-69185-3a**]; a fighter amongst the U.S. soldiers - shooting at them [**SM-13-69185-3a-3**]; or as a jihadist who could utilize explosives and slip away to fight another day. [**SM-48-69185-3a-5**]. Amawi was also consistent in his desire to die as a martyr in the course of this jihad.  [**SM-10-69185-2a-2**].  Indeed, Amawi explained to Griffin and others that his desire to learn how to do the maximum damage possible, to kill as many members of the armed forces of the United States and others, was one of the only factors delaying his travel to join the jihad in Iraq.  [**1-69185-9a**] and [**SM-13-69185-3a-1**].

Amawi's personal interpretation of jihad was indicated through a particular brand of contempt towards his intended victims, who were apparently subhuman and worthy of slaughter in his eyes.  Amawi laughed at the deaths of American soldiers, a particularly ironic twist, given the fact that he was born in an American military hospital.  Amawi also laughed as he listened to the narrative of an Iraqi sniper who killed a soldier and then killed another soldier when that soldier came to retrieve the body of his fallen comrade.  [**SM-13-69185-4a-1**].  He again laughed

27

at the pieces of what he believed was a U.S. soldier as they flew through the air after the soldier's vehicle was attacked with an improvised explosive device. [**SM-12-69185-3a-2**]. Amawi and Marwan El-Hindi excitedly celebrated the death of what they believed to be forty U.S. soldiers in a video depicting the downing of a military transport plane. [**SM-22-69185-9a-3**]. Amawi scoffed at American pain regarding the deaths of September 11, 2001 victims at the Pentagon. [**SM-10-69185-6a-1**]. In a particularly twisted remark, Amawi chuckled as he stated "Look mom I'm flying" as what appear to be the bodies of U.S. soldiers are blown into the air during an IED attack on an armored personnel carrier. [**SM-12-69185-6a-1**].[9] Frighteningly, time after time, Amawi celebrates the death of others, welcomes his own death and mocks anyone who fears death. [**SM-13-69186-2a-2**]. Moreover, Amawi mocked those followers of Islam who do not believe in violent jihad or his other extremist beliefs. [**5-69185-4a**].

It cannot be emphasized enough that the soldiers whose death Amawi celebrated and mocked were real people, indeed real heroes. Unfortunately, all of the death and destruction evident throughout the trial tends to dehumanize their sacrifice and the sacrifice of their families. They were the sons and fathers of Americans leading law-abiding lives and hoping that their loved ones would return home safely. For instance, in one of the videos where Amawi mocks a U.S. Marine killed in combat, [**SM-12-69185-3a-1**]; [**Exhibit 23**]; and [**Exhibit 23a**], the government was able to identify the Marine and his family. During his viewing of the video, Amawi specifically mentioned the parents of the deceased Marine, who is Private First Class

---

[9] These same examples go to the characteristics of Amawi under Title 18, United States Code, Section 3553(1).

Moises Langhorst.  As indicated by Private First Class Langhorst's father, his family and fellow

Marines truly did consider him a hero.  [**Letter of George Langhorst**].[10]

The government does not intend to re-litigate the defendant's guilt.  The jury's verdict is

clear and unambiguous.  The attempts by the defendant to argue his lack of intent are specious

and unavailing.  Amawi played a lead role in bringing Mazloum into the criminal conspiracy.

[**1-69185-11a**].  There is no question that he willfully and knowingly joined the criminal

conspiracies and that his actions in furtherance of these conspiracies were significant.  As

described above, it is ridiculous to assert that the government should have to wait for terrorists to

conduct attacks before it can act to prevent them; that is at the very heart of why Congress has

passed conspiracy laws and why there are such stiff penalties associated with the violation of

terrorist conspiracy statutes.

### 2. Title 18, United States Code, Section 3553(a)(1) History and Characteristics of the Defendant

Amawi has demonstrated utter contempt for the United States, its laws, its soldiers, its

justice system and its people.  One need look no further than his behavior in jail to learn of his

true character.  Despite the significant efforts of the Court to accommodate his, and his

attorneys' many specific demands, Amawi has exhibited extraordinary violence, contempt,

lewdness, and disrespect while incarcerated.   Attached is a summary of his disciplinary history

during the course of his time in jail. [**Chart of Amawi BOP Violations**].  He has damaged

---

[10] As indicated by Evan Kohlmann, this video was originally released on November 7, 2004 through Al Qaeda in Iraq's web presence on "Muntada Al Ansar."  [**Expert Report 7_Evan Kohlmann**].  The government submits that Amawi's access of this video, from a website that the trial evidence firmly established was among his favorites, in such close proximity to its release date is further proof that Amawi actively sought out such jihadist material on a frequent and routine basis.

property, attacked staff and regularly verbally abused the staff at the Milan Federal Detention Facility. According to the Deputy Warden of the facility, Amawi's behavior ranks amongst the worst the facility has seen. It should be noted that he has tampered with the very electronic devices (e.g., a laptop computer and Ipod) this Court has provided to him in order to allow for the best and most vigorous defense possible. Additionally, on numerous occasions throughout the trial, he could be seen laughing and could be heard commenting inappropriately about the proceedings, often in front of the jury. Finally, the defendant's reaction to the jury's verdict was captured in a photograph taken by the press. It shows clearly that he does not take the case, the proceedings or the verdict seriously. [**Toledo Blade Photograph**].

Further evidence of Amawi's character is replete in the government's evidence at trial. His role models are the likes of Usama Bin Laden, Abu Musab Al Zarqawi and other depraved killers of innocent men, women and children. [**SM-14-69185-25a-1**] and [**SM-14-69185-3a-1**]. In addition to the examples described above, Amawi also laughed as he watched one of the worst terror attacks on civilians in history, the bombing of the Atocha Train Station in Madrid, Spain on March 11, 2004. [**SM-13-69185-2a-2**]. Again, this sociopathic behavior is not sporadic or whimsical. It is heartfelt and expressed over a significant period of time and to more than just one person.

Finally, there is nothing in Mohammad Amawi's background indicating poverty, abuse or illness that would mitigate, in any way, his criminal behavior. The evidence introduced at trial indicates a supportive family that tried to guide him away from his violent jihadist ideals. He did not lack for money, was capable of working, possessed valid U.S. citizenship and significant computer skills and was certainly capable of living a productive and law abiding life. Instead of

appreciating the opportunities given to him *via* his birth at a U.S. military hospital, Amawi believed that, like Moses against the Pharaoh, Griffin would be able to assist him in destroying the United States from within.  [**SM-10-69185-6A-1**].

### 3. Title 18, United States Code, Section 3553(b)(2)(B) Adequate Deterrence (Specific Deterrence)

Unfortunately, any sentence of incarceration imposed by the Court will guarantee that the staff of whatever facility to which the defendant is sent will be exposed to danger and abuse. Amawi has a demonstrated record of assaultive and abusive behavior.  He has also threatened to kill a prison guard. [**54-69185-3A**].  Respectfully, the evidence before this Court, taken together, establishes that there is no sentence, other than a Guidelines-recommended sentence of life in prison without parole, that will deter Amawi from continuing on his quest to engage in violent jihad.  Indeed, with respect to Amawi, the government submits that there is *no sentence at all that this Court can impose that will deter him*.

### 4. Title 18, United States Code, Section 3553(b)(2)(C) To Protect the Public from Further Crimes of the Defendant

This is perhaps the single most important factor that this Court should consider as it determines whether or not to impose the sentence recommended by the Guidelines.  As described above, this defendant has demonstrated a long-term, heartfelt, consistent, committed and serious desire to attack and kill Americans, and to support, in numerous ways, others who share his commitment to this goal.  His entire involvement with this criminal conspiracy centered around gathering and receiving the knowledge and skills necessary to carry out and/or assist others in carrying out violent activities against the perceived enemies of Islam – specifically  U.S. troops in Iraq.  The evidence establishes that he collected and maintained, *via* the internet, a "world-

31

class" collection of violent jihadist propaganda, terrorist training materials, extremist doctrine and videos recording the torture and killing of human beings in the name of Islam.  Standing alone, the amount of time that Amawi spent watching, collecting, sharing and discussing these materials constitutes convincing evidence of his commitment to this ideology – an ideology that clearly calls for the killing of those who do not share Amawi's beliefs and also justifies death, suicide and murder.  It is also clear from the evidence before the Court that during the course of the government's lengthy investigation, Amawi spent an alarming percentage of his time focused on these materials.  He clearly memorized the *nashids* (mujahadeen battle songs) that were playing in the background of videos depicting suicide attacks, murder, and attacks on U.S. soldiers. [**79-69185-2a-1**].  Importantly, Amawi did not keep his views to himself.  Amawi regularly expressed and explained his ideological position to others and attempted to persuade others to adopt his jihadist vision of the world. [**1-69185-1a**].  Most were frightened or alienated by his positions, to include his own family, [**1-69185-9a**], but at least two individuals were not – and Amawi was the lynchpin that brought El-Hindi and Mazloum into the criminal conspiracy.

Importantly, Amawi's support of terrorists was not limited to his interaction with El-Hindi, Mazloum, and Griffin.  Amawi was also in contact with other like-minded jihadists in the Middle East.  The evidence at trial proves that he was in contact with an individual in Syria who was interested in acquiring explosives.  [**45-69185-1A-1**].  The evidence also established that it was Amawi who, independent of the government's cooperating witness, made contact with and conspired with this person to acquire this high explosive material (astrolite).  [**43-69185-3a**].

The significance of these facts should not be minimized.  Amawi presents an extraordinary danger to the people of the United States.  The Court should not, and cannot ignore

32

the fact that U.S. soldiers serving abroad are part of the community that should be considered when analyzing Amawi's danger to the public.  Indeed, this Court has clearly stated on numerous occasions that, along with jury duty, serving in the military during a time of combat is the most significant responsibility that any citizen of the United States can undertake.  [**Trial Transcript, Vol. 1, 3/4/08, at 89:12-19**]; [**Trial Transcript, Vol. 3, 3/5/08, at 65:18-20**]**; [Trial Transcript, Vol. 3, 3/5/08, at 80:4-9**]; [**Trial Transcript, Vol. 5, 3/6/08, at 427:18-25**]; [**Trial Transcript, Vol. 6, 3/6/08, at 512:16-21**]**; [Trial Transcript, Vol. 6, 3/6/08, at 529:2-6**]; [**Trial Transcript, Vol. 8, 3/7/08, at 652:23 to 653:2**]; [**Trial Transcript, Vol. 10, 3/11/08, at 872:15-19**]**; [Trial Transcript, Vol. 10, 3/11/08, at 896:25 to 897:3**]; [**Trial Transcript, Vol. 15, 3/14/08, at 1763:7-10**]; [**Trial Transcript, Vol. 16, 3/14/08, at 1855:2-4**]; and [**Trial Transcript, Vol. 66, 6/13/08, at 7025:23 to 7026:2**].

Simply put, the evidence in this case clearly establishes that to ever release Amawi is, at the very least, to endanger the members of the United States military.  He has clearly said as much to at least one soldier directly. [**CRB-SM-95-69185-5a-1**].  The government respectfully submits that consideration of this factor alone calls for the imposition of a life sentence.

Amawi was also clear about what methods he was interested in employing in his quest to kill.  Amawi was particularly intent on learning about the use and manufacturing of explosives. In addition to the bomb vest video [**Exhibit 36a**] which depicted the building of a suicide bomb vest, Amawi collected several manuals and guides describing military tactics, bomb and artillery use, poison and other tools of destruction and death. [**Exhibit 124-1-b**]; [**Exhibit 124-1-c**]; [**Exhibit 124-1-d**]; [**Exhibit 124-1-t**]; [**Exhibit 124-1-u**]; [**Exhibit 124-1-v**]; and [**Exhibit 124-**

**1-w**].  The recorded conversations  also reveal that Amawi was intent on learning how to acquire, make and use explosives. [**SM-32-69185-1a-2**]; [**SM-32-69185-1a-1**]; and [**SM-48-69185-3a-5**].

As if this combination of factors is not worrisome enough, throughout his interaction with the government's cooperating witness, Amawi demonstrated that he was obsessed with death and martyrdom.  He stated on numerous occasions that he wanted to die a martyr. [**SM-10-69185-2a-2**].  He also expressed his fervent belief that the true life is the afterlife, [**SM-13-69185-3a-3**], and that he wanted to die as a "mujaheed" or holy warrior. [**91-69185-1a-1**].  Amawi idealizes those who die "shaheed," to include suicide bombers. [**79-69185-6a-1**]; [**Exhibit 117**]; and [**Exhibit 117a**].  Indeed, Amawi actually believes that even the blood of long-dead suicide bombers smells like perfume.

Finally, the images recovered in this case, depicting Amawi, wearing what appears to be a white martyr's covering and lying in a coffin or coffin-like box are an indication of just how far along Amawi was in his desire to die a martyr in the name of his extremist beliefs. [**Exhibit 124-1-as**]; [**Exhibit 124-1-at**]; [**Exhibit 124-1-au**]; and [**Exhibit 124-1-av**].  The only rational explanation for these images – there is no celebration of Halloween in Jordan – is that Amawi was preparing for his own glorious end – an end that would, according to his beliefs, grant him access to heaven.  There is a striking similarity between these images of Amawi and those of famed suicide bombers and other martyrs who have been celebrated by terrorists around the world.  [**Exhibit 139b-1E-22**]; [**Exhibit 139b-1E-23**]; [**Exhibit 139b-1E-24**]; [**Exhibit 139b-1E-25**]; [**Exhibit 139b-1E-28**]; [**Exhibit 139b-1E-30**]; [**Exhibit 139b-1E-31**]; and [**Exhibit 139b-1E-32**].

There is ample evidence that Amawi was, and is, capable of expanding his list of worthy targets beyond U.S. soldiers serving in Iraq.  The evidence introduced at trial proves that Amawi considered the plausibility of attacking targets both within the United States and other civilian targets outside the United States.  While these plans were not central to the government's trial evidence, they are illustrative of the danger this defendant presents, and thus the danger of imposing any sentence other than the sentence suggested by the  Guidelines.  Amawi discussed killing a sergeant at a local military base.  [**SM-32-69185-1a-2**].  In yet another chilling statement, he stated that upon reflection, attacking targets within the United States was not forbidden by Islamic law and that blowing up buildings in the U.S. would be a valuable project, in that it would show the American people that it could be done.  [**SM-12-69185-4a**].  Amawi stated that if he could get to an embassy in Jordan, it "would be gone." [**SM-10-69185-5a**].  He also said he was interested in assassinating the presidents of Arabic countries. [**SM-29-69185-1dc-5**].  Finally, Amawi made specific threats to the President of United States, a charge that was severed by the Court and subsequently dismissed by the government after Amawi's conviction, but that can, and should, be considered by the Court for sentencing purposes [**1-69185-10a**] and [**9-69185-1a**].

In summary, this defendant has demonstrated a firm and longstanding commitment to his violent beliefs, he has recruited others to be trained to conduct attacks on American soldiers, he has spent countless hours attempting to acquire training for himself in order to conduct violent attacks, he made a serious and actual attempt to enter Iraq in order to kill Americans, he has made contact with and attempted to assist other jihadists in the Middle East in acquiring explosives to be used to kill U.S. forces, he has attempted to learn how to acquire the materials

35

for and build improvised explosive devices, he has consistently expressed his desire to die a martyr in pursuit of violent jihad, he has gone so far as to prepare photographs of his martyred body in what appears to be a coffin, and he has contemplated attacks within the United States, including but not limited to shooting a soldier in the Toledo area.  The government respectfully submits that there is no sentence, other than the life sentence that is being recommended by the Probation Office and the Guidelines, that will protect the lives of Americans who are serving our military as well as others who Mohammad Amawi believes should be attacked and killed in furtherance of his extremist views.  He has stated, quite convincingly, that he interrupted his quest to fight jihad and be a martyr because he wanted to learn how to be a more efficient killer.  [**SM-13-69185-3a-1**]. Perhaps most importantly, Mohammad Amawi's own words are the best evidence of the danger he poses to the public.  On January 10, 2005, Amawi stated that he will never stop his quest to engage in violent jihad until he is dead. [**SM-14-69185-4a-1**]  To allow him the freedom to carry out his life's mission would be to expose American families like the Langhorsts to untold pain and suffering.  The government strongly urges the Court to impose the life sentence recommended under the Guidelines and the Probation Office.

**B.  Marwan El-Hindi**

1.  **Title 18, United States Code, Section 3553(a)(1)**
    **Nature and Circumstances of the Offense – Terrorism Charges**
    **and**
    **Title 18, United States Code, Section 3553(a)(1)**
    **History and Characteristics of the Defendant**

Like his co-defendants, El-Hindi stands convicted of extremely serious crimes that stem

from a long-term dedication to participating in, and providing support for, violent jihad.  The

evidence proved that El-Hindi was devoted to perpetrating violent jihad, especially against Israel

and the United States.  Among other activities in this case, El-Hindi recruited two younger, much

more impressionable individuals (Zubair Ahmed and Khaleel Ahmed) for military training;

independently acquired and distributed bomb-making materials, including a suicide vest video

and a slideshow depicting the proper placement of an improvised explosive device (IED) against

U.S. soldiers.  In addition, El-Hindi bragged about his ability to defraud the very United States

government he sought to attack in order to fund training activities.  An examination of the nature

of these crimes must lead this Court to one inescapable conclusion – the only sentence that

adequately reflects the extreme severity of these offenses is the one recommended by the USSG

and the Probation Office: a term of imprisonment for life.

El-Hindi's dedication to the use of violence as a response to United States and Israeli

foreign policy dates back to at least September 2002.  In that month, El-Hindi asked Griffin

about kidnapping Israeli soldiers and U.S. politicians.  [**Trial Transcript, Vol. 20, 4/2/2008, at**

**2277:24 to 2278:4**].  El-Hindi also told Griffin that if he knew something that might help the

brothers overseas, specifically in Iraq, then Griffin should share it.  [**Id., at 2278:18 to 2279:3**].

These requests occurred in the run-up to the Iraq war and indicate that even prior to the

37

beginning of the war, El-Hindi considered violence to be an appropriate reaction to U.S. foreign policy.

This background is also important in that it provides the context to El-Hindi's later decision to introduce the Ahmeds to Griffin. As a general matter, El-Hindi was aware of Griffin's cover story as a former U.S. Army Special Forces soldier and self-professed "Islamic extremist," [**Trial Transcript, Vol. 20, 4/2/2008, at 2278:5-16**] and even would later refer to Griffin as a "jihadi." [**SM-68-69185-3a-1**]. From early on, El-Hindi also knew that Griffin harbored an interest in heavy weaponry, including possession of an anti-tank rocket, [**Trial Transcript, Vol. 39, 4/29/2008, at 3703:3-19**] and [**Trial Transcript, Vol. 42, 5/2/2008, at 3934:12 to 3935:7**], and discussed with Griffin the use of mortars and rockets (which El-Hindi referred to as "Howns"), [**SM-22-69185-9a-1**] and [**Joint Stipulation of Terms, Names, and Events at 7**], and sniper tactics employed against U.S. and Israeli troops. [**SM-26-69185-3a-1**]; [**SM-28-69185-12A-2**]; and [**SM-7-69440-1a-2**].

El-Hindi then sought to connect the Ahmeds' desire to kill American soldiers in Afghanistan and Griffin's desire to provide military training for those wishing to do so. Of course, El-Hindi travelled to Egypt with the knowledge that the Ahmeds had secretly departed the United States in order to fight in Afghanistan. [**SM-81-66747-1a-1**] and [**Factual Stipulation**]. Despite his understanding that the Ahmeds had left the United States as merely the first step in a plan to kill American troops, El-Hindi was quite eager to help the Ahmeds acquire military training, so much so that he told Griffin about them a little more than a week after returning from Egypt. [**73-66747-1a**]. El-Hindi again discussed the Ahmeds – with no prompting from Griffin – on June 29, 2004. [**76-66747-1a**]. As these two conversations make

38

clear, El-Hindi provided the vital link between the Ahmeds' self-perceived religious obligation to kill American soldiers and Griffin's ability to train them towards that end.

At the meeting between the Ahmeds and Griffin on July 4, 2004, El-Hindi was entirely aware of what type of training the Ahmeds desired. He even advised Griffin that the Ahmeds "want to be professional snipers." [**SM-77-66747-5a-1**]. In this same conversation, Griffin told the Ahmeds that he was in the process of purchasing a .50 caliber sniper rifle, to which El-Hindi replied that the group needed to start something in Chicago. El-Hindi was even aware that Zubair Ahmed's younger sister Yasmeen – a recent high school graduate who would soon be studying in medical school through El-Hindi's placement service – also had developed a fascination with sniping. [**SM-77-66747-3a-3**]. El-Hindi could not have helped but notice Yasmeen Ahmed's interest in sniping, as she even used the email address "nightsniper18@hotmail.com" in her correspondence with El-Hindi. [**Trial Transcript, Vol. 50, 5/14/2008, at 5012:9-22**] and [**Ex 76-AD**].

Perhaps most troubling about this interaction is the wholesale surrender by an older mentor (El-Hindi) of two impressionable young men (the Ahmeds) to an avowed jihadist with a fully-developed expertise in killing people (Griffin). Obviously, the Ahmeds' family was aware of the hazard posed by El-Hindi's sway over the young men – El-Hindi himself would admit that Zubair Ahmed's mother believed he was "dangerous." [**SM-90-66747-2a-2**]. Additionally, the actions of Zubair Ahmed's father, Mohammed Ahmed – the same individual who went to such lengths to prevent his son from reaching the battlefield – would later be described as "bullshit" by El-Hindi while he was in the midst of urging Khaleel Ahmed to report to Toledo for training. [**SM-90-66747-10a-1**]. This did not stop El-Hindi from dangling the Ahmeds as potential

recruits, as he continually suggested Zubair Ahmed as a potential fundraiser for the conspiracy, [**SM-7-69440-2a-1**] and [**SM-22-69185-9a-4**]; referred to Zubair Ahmed's interest in firing heavy machine guns, [**SM-28-69185-12a-1**]; expressed a desire to travel to Chicago in order to meet with the Ahmeds, [**4-69440-4a**] and [**41-69185-8a**]; and proposed sending CDs to the Ahmeds containing video depictions of the killing of U.S. soldiers – a goal that he was fully aware they had great interest in accomplishing. [**SM-7-69440-2a-1**] and [**SM-22-69185-9a-4**]. Indeed, El-Hindi's understanding of Zubair Ahmed's passion for violent jihad went so deep that he knew a Chechen jihadist, Khattab, was a hero to the younger man.  [**SM-28-69185-17a-1**] and [**Joint Stipulation of Terms, Names, and Events at 7**].

       The trial evidence demonstrated that El-Hindi viewed the Ahmeds as "boys" who did not fully appreciate the serious nature of what he and Griffin were proposing.  If anything, El-Hindi's interaction with Zubair and Khaleel sheds light on his own violent intent and jihadist ideology independent of his actions with respect to the Ahmeds.  One purpose of providing the Ahmeds with jihadist videos on CD was to focus the young men on the need to start the training. As El-Hindi stated, "Zubair, Zubair, here is what's goin' on?... Are you with us or not."  [**SM-7-69440-2a-1**].  It is important to note that by this statement, El-Hindi indicates that he belongs to another group – the group that ultimately included himself, Amawi, and Mazloum – which excluded the Ahmeds.  As indicated by his self-avowed membership in this other group, El-Hindi was occasionally frustrated with the Ahmeds' disinterest in the military training, stating that he wanted "them to move." [**7-69440-2a-1**].  El-Hindi even stressed that the Ahmeds – unlike himself and Griffin – viewed violent jihad as a "game" and not a serious undertaking. [**SM-2-69440-4a-1**].  When Griffin reiterated that the training was for jihad, El-Hindi replied, "I

40

understand." Thus, El-Hindi viewed the younger Ahmeds' understanding of violent jihad as uninformed and naïve – in contrast to his own more mature and serious beliefs. El-Hindi's status as a respected elder was also on display with Amawi, who referred to him by the Arabic honorific "Sheikh." [**SM-27-69185-2a-2**] and [**Joint Stipulation of Terms, Names, and Events at 4**]. A quotation provided by El-Hindi – "to fight your enemy is to know their strategy" – was also cited approvingly in a discussion that Griffin and Amawi had about jihad. [**1-69185-10a**].

The fact that El-Hindi hosted Amawi and Mazloum on February 16, 2005 is all the more disturbing when their respect for him is taken into account. At this meeting, the defendants all spoke in Arabic (thereby excluding Griffin) about the beheading of an Egyptian "traitor." [**RD-29-69185-4a**]. As this clip demonstrates, El-Hindi did little to extinguish the younger men's enflamed passions; instead, he said of the "traitor" – "I mean his family, his family, when they see him, they would say, 'Yes. Let him be slaughtered.'" During the same conversation, El-Hindi steered Amawi and Mazloum away from the idea of merely providing money to the Iraqi insurgency, instead imploring them that "manpower" was needed there. [**SM-29-69185-4dc-2**]. Again, this conversation was entirely in Arabic and only between the three defendants. Following these conversations and other jihad discussions, El-Hindi then invited the other defendants into a backroom where he played jihadist videos, including one entitled "Russian Hell," which depicted the ambush of a Russian convoy in Chechnya and the murder of a Russian soldier by Khattab. [**28-69185-16a**]; and [**Trial Transcript, Vol. 54, 5/21/2008, at 5692:22 to 5703:14 (Testimony of Evan Kohlmann)**].

Throughout the course of the conspiracy, El-Hindi repeatedly betrayed the confidence placed in him by younger, more impressionable individuals by steering them towards, instead of

41

away from, extreme violent jihad.  He should have been encouraged by the Ahmeds turn towards

school and work; instead, he complained that they were not serious, insulted family members

who were attempting to prevent them from engaging in violent jihad, and suggested additional

methods to further involve them in the conspiracies underway in Toledo.  Closer to home, he

made every effort to urge on his co-defendants – both of whom were younger and respectful of

El-Hindi's authority – during their repeated, quite explicit objectives to obtain military training

and kill individuals overseas.  Far from dissuading Amawi and Mazloum, El-Hindi offered to

help fund their quest to engage in violent jihad and provided detailed, step-by-step bomb-making

instructions to the conspiracy's explosives expert.

> **2.  Title 18, United States Code, Section 3553(a)(1)
>       Nature and Circumstances of the Offense – Fraud Offense
>       and
>       Title 18, United States Code, Section 3553(a)(1)
>       History and Characteristics of the Defendant**

While El-Hindi's dedication to violence became known in September 2002, the fraud

scheme he planned to use to fund that violence was a *redeux* of a fraud scheme carried out from

2000 through 2002.  That scheme, to set up "ESFS," a fraudulent Low Income Tax Clinic

(LITC), with co-conspirator Ashraf Zaim, and use federal grant money for personal gain, was a

tactic that he attempted to revisit.  The 2000-2002 fraud was not directly tied to his later

terrorism activities, but the lessons learned from this scheme (the basis for Case No.

3:07CR00074) were apparent when he discussed avenues of funding potential jihad activities just

a few years later.

In the 2000-2002 fraud, it is clear that El-Hindi and Zaim sought to extract the greatest

potential sum available from the government.  In the original LITC application, $100,000 was

42

requested,[11] with the co-defendants seeking the award to be renewable for the maximum three-year period, [**Exhibit 3**], despite neither defendant having any significant experience providing tax advice or operating a not-for-profit organization.

As argued at trial, El-Hindi's fraudulent intent and knowledge was evidenced by the completeness of the grant application and El-Hindi's control over the awarded grant funds. Further evidence of the fraudulent nature of his scheme offered at trial included El-Hindi's resume in the original grant application stating he had worked for ESFS, the LITC company, since August of 2000, [**Exhibit 3**], long before it even existed.  Moreover, El-Hindi created ESFS from EISS, a sham corporation he had registered under his mother's name and without her knowledge. [**Exhibit 24(a)**].

Obviously, El-Hindi knew the importance of presenting an application that, at least superficially, appeared to bear the hallmarks of a legitimate entity.  His attention to detail was furthered by his intentionally false representation that ESFS was a non-profit organization formed under 28 USC 501(c)(3). [**Exhibit 3**].  When El-Hindi did eventually apply for 501(c)(3) status to further the appearance of legitimacy, he admitted that as of April, 2002, ESFS had received $33,000 in grant money, [**Exhibit 25(a)**], demonstrating he knew of the accrued finances of ESFS and thus was more than a mere minor player in the fraud scheme.

---

[11] The Presentence report's calculation of an intended loss amount of $100,000 should be adopted.  The most compelling and clear manifestation of El-Hindi's intended gain is, in fact, his request for $100,000.  The fact that ESFS was awarded only $40,000 is of no consequence, as the final award amount was made independent of, and without input from, El-Hindi.  Therefore, it is specious for El-Hindi to suggest now that he should be punished for only the theft of $40,000; essentially, he is asking the Court to consider only the amount he successfully stole, not the amount he wished to steal, and would have, but for oversight from the LITC committee.

43

Having this attention to detail also worked against El-Hindi.  At no time did ESFS file any of the required reports or updates, despite the clear and unequivocal requirement to do so. [**Trial Transcript, Vol. 11/4/2008, at 106:9-18**].  The failure to comply with that requirement demonstrates an intentional and knowing attempt to evade detection of the fraud.

Further proof that El-Hindi had operational knowledge of securing and dispersing the grant funds was the construction and control of ESFS's bank accounts.  As the evidence demonstrated, ESFS used two linked bank accounts.  The first account received wire transfers of grant funds from the government.  Fund transfers were then made to the second account and spent. [**Exhibit 6b**].  Tellingly, El-Hindi was the sole signatory for the first account; therefore he had exclusive control over the funds as they arrived from the government and only he could direct how those funds could be transferred or dispersed.  Additionally, the first bank account was registered to his own P.O. Box. [**Exhibit 6a**].

On at least three occasions, monies in the first account were spent under circumstances that, as manager of the account, he had to tacitly approve.  Three checks were issued for the personal benefit of El-Hindi: one went to an associate to whom El-Hindi owed money; one was issued in his wife's name, which she testified she never received and for work she never performed; and the third check was signed by El-Hindi and used to repay another of his debts. [**Exhibit 10(e)**]; [**Exhibit 10(a)**]; and [**Exhibit 14(g)**].

In fashioning a sentence for El-Hindi, it is tempting to let the fraud conviction remain in the shadow of the terrorism conviction.  To do so would be a mistake.  The grant fraud scheme provided El-Hindi with instruction for his later attempts to use government grants as a funding mechanism for terrorism-related activities.  Emboldened by his apparent success with ESFS, he

44

suggested to Amawi and Mazloum that they use such a scam to fund jihad.  Rather than characterize his experience with ESFS as a circumstance where he was led astray by an unscrupulous partner, he instead willingly offered his co-conspirators this expertise in securing funds through defrauding government grant programs.  Therefore, while these two crimes are separate, his later efforts to secure grants to fund jihad activities and training are a  logical evolution of his original scheme to defraud.

Information provided by El-Hindi to the Probation Office establishes that, like Amawi and Mazloum, no economic deprivation, childhood abuse or other personal limitations exist to "explain" or "excuse" his criminal acts.  He advised that he had "a good childhood in Jordan," with "favorable childhood memories."  PSIR, p. 44, para. 267.  El-Hindi's father was a businessman, involved in the export/import industry, who frequently travelled to the United States.  El-Hindi himself arrived on U.S. shores at the age of 21 and first settled in Syracuse, New York, where his mother's family lived.  In fact, El-Hindi's uncle is an extremely successful and wealthy businessman in Syracuse.  Among his siblings, El-Hindi counts one brother who is an engineer, one that is a physician, and one that is also in business.  Prior to his arrest on these charges, El-Hindi had remained in regular communication with them.  He is in good physical condition.  El-Hindi has attended colleges in Jordan and New York.  El-Hindi has been engaged in various business activities of his own, as previously noted.  He has not been prevented from acquiring licenses, registering corporations, or obtaining loans and grants.  His past business ventures have included the export/import trades, the travel industry, the communications business, the medical school recruiting company EMSS, and the purported non-profit "tax

45

education and assistance" organization, ESFS, the activities of which are the subject of El-Hindi's fraud convictions.

El-Hindi's efforts to steal from the government were not limited to the ESFS grant fraud, however.  Count Nine of the superseding indictment in this case, which was severed from the terrorism trial and later dismissed by the government subsequent to El-Hindi's convictions on the other charges, related to his scheme to "use" his children as a device to illegally obtain government benefits.  He even solicited Griffin's participation in the fraud, inducing him to corroborate El-Hindi's false claim that he was paying Griffin to babysit El-Hindi's minor children.

Despite the legitimate opportunities and disadvantages this government, and this country, afforded El-Hindi to live peacefully, engage in business, and support a family, his response has consistently been to repay the United States and its citizens with theft, fraud, and deceit.  There is no reason to anticipate any different conduct or attitude from El-Hindi in the future.

### 3.  Title 18, United States Code, Section 3553(b)(2)(B)  Adequate Deterrence (Specific Deterrence)

Only a sentence of life imprisonment is adequate to provide specific deterrence to El-Hindi, who displayed the same sense of zeal and ardor for violent jihad as a group of men nearly half his age.  There simply is no sentence, other than life imprisonment, that would serve to deter a man who invited his two young sons into the conspiracy's most explicit conversation about its criminal objectives.

Perhaps nothing illustrates El-Hindi's true devotion to the killing of U.S. soldiers and others more than his own posts to the "Ekhlass" web page.  As was demonstrated at trial, Ekhlass

46

is a website that offered online jihadist training and featured, among other items, a photograph of

Al Qaeda leader Ayman Al Zawahiri on its banner.  [**Exhibit 213**].  El-Hindi was a registered

user of the Ekhlass website, possessing both a user ID and a password in order to access certain

portions of the site.  [**Trial Transcript, Vol. 54, 5/21/2008, at 5683:16 to 5692:21 (Testimony**

**of Evan Kohlmann)**].  The specific "user ID" assigned to El-Hindi was "4343."

[**parent_ekhlaas[2].txt**] and [**Expert Report 6_Evan Kohlmann**].  This very same "user ID" –

with the name "Al Filasteny", or "the Palestinian" (El-Hindi is Palestinian by birth) – was used

to post numerous messages advocating violent jihad, including:  wishing death upon an

individual who has made insults to Islam, [**Ekhlass forum_Thread 5225_Arabic**]; asking that

God "kill Jews and Americans" in response to a posted video link depicting the manufacture of a

rocket launcher and an attack on a U.S. base in Iraq, [**Ekhlass forum_Thread 6313_Arabic**]

and [**Ekhlass forum_Thread 6313_English**]; declaring repeatedly "I am a terrorist," [**Ekhlass**

**forum_Thread 6708_Arabic**] and [**Ekhlass forum_Thread 6708_English**]; imploring that

God punish an individual who wrote "Allah" on a pair of tennis shoes, [**Ekhlass forum_Thread**

**6882_Arabic**].  This window into the mind of El-Hindi is all the more troublesome in light of his

recorded conversations and independent research into violent jihad – a more crystal clear

statement of his own intent ("kill Jews and Americans") could hardly be demanded.

      Unfortunately, the Ahmeds were not the only people to whom El-Hindi was an authority

figure and were presented with his unfiltered beliefs on the killing of U.S. soldiers and civilians.

El-Hindi's children were present on several occasions when El-Hindi discussed violent jihad.

[**SM-2-69440-4a-1**] and [**SM-29-69185-1dc-2**].  El-Hindi even allowed one of his children to

watch as Amawi openly discussed his wish to kill leaders in the Arab world.  [**SM-29-69185-**

**1dc-5**].  When Amawi expressed a desire to drink an Iraqi policeman's blood, [**SM-22-69185-3a-1**], El-Hindi warmly invited Amawi over to his family home.  [**SM-22-69185-11A-1**].  It is no surprise, then, that El-Hindi did not keep his views on violent jihad from his minor children and even encouraged his young wife to view videos of beheadings and battlefield deaths.  [**SM-22-69185-2a-3**]; [**SM-26-69185-3a-4**]; [**RD-29-69185-4a**]; and [**7-69440-1a**].

### 4.   Title 18, United States Code, Section 3553(b)(2)(C)
### To Protect the Public from Further Crimes of the Defendant

During the course of the crimes of which he is convicted, El-Hindi made extraordinary efforts to locate individuals for jihad training, to fund the training activities through the use of fraudulent grants, and to locate training materials (including explosives instructions) for the group's bomb-making expert.  All of El-Hindi's efforts to assist his fellow defendants in achieving their violent aims makes clear a simple fact – it would be a grave mistake for the Court to conclude that El-Hindi would not have acted as he did but for the involvement of Griffin.

El-Hindi's independent research into methods by which he and his co-conspirators could wage violent jihad is especially troubling.  Not content to rely entirely on Griffin to provide instruction in bomb-making, El-Hindi took it upon himself to seek out the very same video featuring construction of an explosive suicide vest that Amawi had also located, also on his own.  [**SM-7-69440-1a-1**]; [**Trial Transcript, Vol. 25, 4/9/2008, at 2602:17 to 2610:2 (Testimony of Darren Griffin)**]; [**Trial Transcript Vol. 51, 5/15/2008, at 5143:10 to 5146:2**]; [**Trial Transcript, Vol. 51, 5/15/2008, at 5147:7 to 5156:22 (Testimony of Joseph Corrigan)**]; [**Trial Transcript Vol. 52, 5/15/2008, at 5214:14 to 5228:2**]; [**Trial Transcript, Vol. 52, 5/15/2008, at 5234:21 to 5236:6 (Testimony of Joseph Corrigan)**]; [**Trial Transcript Vol. 53, 5/16/2008,**

**at 5376:2 to 5379:11**]; [**Trial Transcript, Vol. 53, 5/16/2008, at 5398:4 to 5399:12**]; [**Trial Transcript, Vol. 53, 5/16/2008, at 5452:1 to 5454:7 (Testimony of Robert Antoon)**]; and [**Trial Transcript Vol. 54, 5/21/2008, at 5709:14 to 5723:10**]; [**Trial Transcript, Vol. 54, 5/21/2008, at 5726:8-13 (Testimony of Evan Kohlmann)**].  As if providing the suicide vest video to Griffin were not enough, El-Hindi went on to reassure Amawi that Griffin's military background made the mixing of the explosives in proper quantities a mere formality for the conspirators.  [**SM-26-69185-6a-1**].  Tellingly, this last conversation was entirely in Arabic and between Amawi and El-Hindi alone.

El-Hindi also secured a step-by-step guide to the placement of an IED against U.S. soldiers through his membership on the Islamic Army of Iraq (IAI) email list.  [**Exhibit 79a**] and [**Exhibit 79a-1**].  As the evidence showed at trial, the IAI is a group devoted to staging mass-casualty attacks in western Iraq – in short, a terrorist group.  [**Joint Stipulation of Terms, Names, and Events at 5**].  El-Hindi benefited from his membership on the IAI's mailing list to receive the IED "slideshow", entitled "The Mujahidin in Iraq and the art of planting explosive charges," which he promptly provided to Griffin.  Judging by the damage inflicted on the U.S. vehicle in the document, it would be no surprise to learn that one (or several) members of the U.S. military died in the attack.  Instead of removing the file from his computer, El-Hindi instead forwarded the email to Griffin, who was clearly interested in training others to commit the very same acts depicted in the attack.  As El-Hindi himself acknowledged, the slideshow was to teach prospective jihadists how to kill U.S. soldiers.  [**SM-10-69440-4a-2**].  El-Hindi's interest in the IED placement ran so deep, in fact, that he inquired of Griffin about the batteries used to detonate the explosion.  [**SM-10-69440-4a-2**].

49

Further demonstrating El-Hindi's dangerousness is that he did not limit his jihadist activities to Griffin or his co-defendants.  Testimony from Mikael Al Mouzrei established that El-Hindi solicited the witness – with no apparent prompting – to gauge his interest in attending a training camp in Afghanistan.  [**Trial Transcript, Vol. 47, 5/8/08, at 4546:21 to 4547:14**]. This independent affirmation of El-Hindi's jihadist intent and possible terrorist connections outside the cell in this case is extremely troubling and an additional reason to impose the maximum possible punishment.

As outlined above, El-Hindi displayed an ability to locate both people who wished to engage in violent jihad and internet materials that would enable them to do so.  This combination, along with the other factors enumerated elsewhere in this memorandum, make it incumbent upon this Court to impose a life sentence on El Hindi in order to ensure the future protection of the public from harm.

### C.  Wassim Mazloum

#### 1.  Title 18, United States Code, Section 3553(a)(1) Nature and Circumstances of the Offense

The involvement of Mazloum in the charged conspiracies was both long-term and committed.  During the fifteen month span of Mazloum's participation in the cell, he repeatedly indicated that his own personal objective was to obtain training in the construction of explosives and the setting of ambushes.  He also made very clear his intention to join the fighting against the U.S. military in Iraq.  As if this were not enough, Mazloum repeatedly sought information on contributing money to the jihadis killing U.S. soldiers in Iraq, going so far as to offer his used car

business as a cover.  Above all, Mazloum made clear that he intended to find, cultivate, and ultimately exploit any connection to the mujahadeen in Iraq in order to fight alongside them.

As early as October 14, 2004, Mazloum was suggested as a potential recruit to the conspiracy by Amawi, who described Mazloum as a "man" and someone who has "always been with us."  [**1-69185-11a**].  The very fact that Amawi – a man who did not trust his own brother with the purposes, or even the existence, of the group's firearms training – would select Mazloum as a trusted confidante should confirm the nature of Mazloum's commitment, dedication, and beliefs.

Not long after being suggested by Amawi, Mazloum actively joined the cell.  On November 5, Amawi suggested that Griffin meet Mazloum at the mosque on that same day.  [**9-69185-3a**].  Not content to wait for a face-to-face meeting, Amawi then telephoned Mazloum in the presence of Griffin on this date.  [**9-69185-6a**].  As this telephone conversation made clear, Amawi and Mazloum had already discussed Griffin and the purpose of the training – why else would Amawi refer obliquely to the "subject I talked to you about that time."  Indeed, why else would Mazloum know exactly what "subject" Amawi was referring to unless the purpose of the training and the transparent unlawfulness of it were not already made perfectly clear to these jihadists.

On November 17, 2004, Mazloum arrived at Amawi's home for the pre-arranged meeting to vet Mazloum for security purposes.  The meeting was already underway when Griffin arrived; Amawi and Mazloum were in the midst of watching jihadist videos on the computer.  [**10-69185-1a**].  Amawi had clearly been discussing with Mazloum the purpose of the training.  As this clip demonstrates, to Griffin and in the presence of Mazloum, Amawi said, "But the thing {brother}

51

is-is uh *whoever dies from our side for us*, {by God}, I was telling him.  In death there is peace."  (Emphasis added).  The fact that these words were spoken at the same time that images of violent attacks in Iraq were playing in the background shows clearly and unequivocally that Mazloum was committed to the objectives of the training and the ultimate employment of these tactics in Iraq.  Mazloum himself confirmed the serious purpose of the training and his own violent intent by stating, "We should have a goal it's not just going there for fun."  [**SM-10-69185-2a-1**].  In fact, Mazloum made very clear the fact that he felt that members of the U.S. military serving in Iraq were legitimate targets – a fact that squares exactly with Count One of the Indictment.  [**SM-10-69185-2a-1**].  Nor did Mazloum express any other purpose for this training other than the prospect of martyrdom.  [**SM-10-69185-2a-1**].  He also offered his brother, Bilal Mazloum, to the conspiracy as a recruit, [**SM-10-69185-2a-1**], and offered to find others as well.  [**SM-10-69185-9a-1**].

On this same date – a day on which Amawi and Mazloum discussed Griffin's ability to teach them how to make bombs – Mazloum first offered financial assistance to the group.  [**SM-10-69185-6a-1**].  Mazloum also suggested that the conspirators carry hunting weapons in order to disguise the true purpose of their training, [**SM-10-69185-7a-1**], and cautioned against filming any of the training.  [**SM-10-69185-9a-2**].  Above all, Mazloum was eager to start the training – a theme that would continue throughout his interactions with Amawi, Griffin and eventually El-Hindi.  [**SM-10-69185-9a-2**].  Thus, from even this earliest opportunity, Mazloum repeatedly asserted himself by offering money, *recommending additional recruits and providing training suggestions to the group* .

Over the next several months, Amawi and Griffin included mention of Mazloum on the occasions when they discussed training for jihad.  Examples of such conversations occurred on November 23, 2004 [**12-69185-1a**] and [**12-69185-7a**]; January 10, 2005 [**14-69185-13a**]; January 27, 2005 [**17-69185-7a**] and [**18-69185-1a**]; February 4, 2005 [**23-69185-3a**]; February 6, 2005 [**24-69185-7a**] and [**24-69185-10a**]; February 9, 2005 [**26-69185-9a**]; and February 14, 2005 [**27-69185-2a**].   These conversations firmly indicate that Mazloum was in touch with Amawi with respect to the training.  Moreover, they demonstrate that Mazloum remained a committed and trusted member of the training cell over the course of those three months.

On February 16, 2005, Mazloum attended a meeting at El-Hindi's home, at which Mazloum's participation in the cell was reaffirmed and apparently re-energized.  Mazloum's arrival at the February 16, 2005 meeting was arranged entirely by Amawi.  [**27-69185-2a**] and [**28-69185-1a**].  Upon being welcomed by El-Hindi, Mazloum had a discussion with him about a website offering jihadist videos.  [**28-69185-5a**]. Not one second of this jihad-themed introduction was apparently remarkable, frightening, or even unexpected to Mazloum.  After a series of prefatory remarks from Griffin that could have left no doubt as to the purpose of the training, Mazloum once more offered his brother as a recruit and expressed that he had only two concerns – to train in secrecy and to learn correctly.  [**SM-29-69185-1dc-3**].  Mazloum then stated that he would like to use any training he acquired in one of two places – Iraq or Al-Sham. [**Joint Stipulation of Terms, Names and Events at 3**] and [**SM-29-69185-1dc-5**].

During the February 16 meeting, Mazloum also continued to explore his desire to provide financial support to jihad, both to the conspiracy then fully developed in Toledo, [**SM-29-69185-4dc-1**], and to those fighting against the United States in Iraq.  [**SM-29-69185-4dc-2**].  As to

providing financial support to Iraq, Mazloum was clear that he desired to provide money in order to get weapons into the hands of those fighting.

At times, Mazloum was the most eager of the defendants to begin the actual hands-on training, stating that "Time...time is...time is gold," [**SM-29-69185-6dc-1**], and even offering to take a vacation day in order to train. [**SM-29-69185-6dc-2**].  On February 16, Mazloum also offered to use his car business as a method of providing money to the mujahadeen in Iraq, again emphasizing his desire to "move this up a little bit."  [**RD-28-69185-1**].  In fact, Mazloum unequivocally stated that he was willing to travel to Iraq (and specifically Iraq), but that he wanted to train prior to making such a trip.  There is no other explanation for this other than the simplest – Mazloum wanted to be of the most possible use to the mujahadeen in their fight against the United States.[12]

Of course, Mazloum was an active participant in the training that Griffin ultimately offered.  On two occasions, Mazloum went to the shooting range with both Griffin and Amawi, even bringing along his brother (as promised) during one such session.  Mazloum also attended the "table top" session offered by Griffin.  Mazloum approached the training with such enthusiasm that he eventually purchased a paintball set.  [**Exhibit 164**].  This paintball set was clearly for use in the training proposed by Griffin, [**48-69185-2a**], but ultimately went unused

---

[12] As set forth elsewhere in this Memorandum, under no circumstance should this Court consider any arguments by the defendants that, because they sought to target members of the U.S. military or other individuals outside the United States, they are somehow less dangerous. The fact that the defendants never specifically targeted civilian targets within the United States should – and must – be deemed irrelevant to this Court's sentencing determinations on these charges.

54

when Griffin (through the FBI) declined to instruct the conspirators on the art of conducting ambushes.

**2.  Title 18, United States Code, Section 3553(a)(1)
History and Characteristics of the Defendant**

There is nothing in the history or characteristics of Mazloum that merits any mitigation at sentencing.  He has demonstrated a capability to obtain an education and to run a business, thus, the turn towards criminal conduct was not predicated upon any mental deficiency or financial burden.  As for the hardship that he has set out – the turbulent circumstances of his childhood in Lebanon – these serve only to introduce a motive for his violent actions, not an excuse that should weigh in his favor at sentencing.

As stated above, Mazloum explained that he would like to use any training he acquired in one of two places – Iraq or Al-Sham.  These two locations are quite important, as explained by Mazloum himself.  On previous occasions, Mazloum had stated that he felt combat on behalf of Islam was worthy only in the "lands of the Army" [**SM-10-69185-2a-1**] or the "fields of Jihad." [**10-69185-5a**].  As adduced at trial, Mazloum grew up in Lebanon and throughout his childhood, he was traumatized by the repeated invasion of Lebanon by the Israeli military, including a bombing of his village by American-made, Israeli F-16s.  [**Trial Transcript, Vol. 57, 5/27/2008, at 6095:18 to 6099:21**]; [**Trial Transcript, Vol. 57, 5/27/2008, at 6102:6 to 6107:1**]; [**Trial Transcript, Vol. 57, 5/27/2008, at 6128:7 to 6132:15 (Testimony of Salwa Elkechen)**].  This background is supplemented by his self-professed familial connection to Hezbollah fighters in Lebanon, some of whom died presumably while fighting against the Israeli military.  [**29-69185-12a**].  Hezbollah, of course, is a U.S. designated Foreign Terrorist Organization.  [**FTO**

55

**List_7_7_2009**].  The fact that Mazloum would later indicate a willingness to engage in jihad in those areas that were deemed occupied by the militaries of the United States or Israel, then, is completely in line with the objectives of the conspiracies – to murder and maim individuals outside the United States, including American service members.

Since being detained following his conviction, Mazloum has also continued to demonstrate his loyalty to this criminal conspiracy and his likeminded cohorts over those of society at large.  On August 6, 2009, Mazloum called the family of Amawi in Jordan in order to circumvent the BOP's revocation of phone privileges due to Amawi's repeated violations. [**Transcript of August 6, 2009 Telephone Call**].  Mazloum obviously lied to his BOP monitor in order to place this call – "I told the man, you are my friend long time ago, so he approved to let me talk to you."  [**Transcript of August 6, 2009 Telephone Call, at 2**].  Even though he was speaking in Arabic, Mazloum also continued this ruse by asking to speak with the father of Malek (one of Amawi's brothers).  [**Transcript of August 6, 2009 Telephone Call, at 4**]. While acknowledging that he was "forbidden" to provide any information about Amawi [**Transcript of August 6, 2009 Telephone Call, at 2**], Mazloum then proceeded to do just that – telling both Amawi's brother and mother that Amawi had been brought into Mazloum's unit. [**Transcript of August 6, 2009 Telephone Call, at 3**] and [**Transcript of August 6, 2009 Telephone Call, at 5**].  The obvious implication is that if Mazloum had been honest about the purpose and recipient of this call, then it would not have been allowed.  Furthermore, the purpose of Mazloum's call was clearly not to convey information about Amawi, but to ensure that Amawi's family was fine and then report that news back to Amawi.  Regardless of the purpose, Mazloum quite transparently evaded a BOP regulation in order to do a favor for Amawi.  The

56

fact that he would do so – and risk punishment himself – for the very individual who recruited

him into the conspiracy is a troublesome indication of Mazloum's continued dedication to his co-

conspirators.

> ### 3. Title 18, United States Code, Section 3553(b)(2)(B)
> ### Adequate Deterrence (Specific Deterrence)
> ### and
> ### Title 18, United States Code, Section 3553(b)(2)(C)
> ### To Protect the Public from Further Crimes of the Defendant

Mazloum's single-minded determination to participate in violent jihad in Iraq establishes

two facts:  like his co-defendants, he is incapable of being specifically deterred by any sentence

other than life imprisonment; and, again like his co-defendants, only a sentence of life

imprisonment can ensure the protection of the public.

Perhaps most crucially, Mazloum expressed an interest in weaponry that went well

beyond firearms training.  During the February 16 meeting, while El-Hindi discussed sniper

attacks against the U.S. military, Mazloum interjected by asking Griffin if he could teach them to

make bombs out of household ingredients, such as sugar. [**RD-29-69185-7a**].  Notably, El-Hindi

provided Griffin with materials related to the construction of IEDs and their employment against

U.S. soldiers just a few days after this meeting.

This request – learning how to manufacture explosives – was so important that Mazloum

followed up on it more than two months later, when he and Amawi discussed the construction of

IEDs and ambushes in a conversation about killing American soldiers.  [**SM-48-69185-3a-5**].

As made clear during these conversations, the sole purpose for learning to build these bombs was

to conduct ambushes with explosives and, as a necessary result, murder and maim members of

the U.S. military.  That Mazloum would repeatedly request this training belies any argument that

he is not dangerous because he opposed killing civilians within the United States.  To the

contrary, his intent was quite clear – to murder U.S. soldiers serving in Iraq with explosive

devices hidden in ambushes.

Mazloum also made unequivocally clear his desire to cultivate ties with the mujahadeen

in Iraq.  This topic would be referred to repeatedly by Mazloum and, as a result, proves that his

interest in training was derived solely from his desire to fight the U.S. military in Iraq as opposed

to defending himself if he ever returned to Lebanon.  During the February 16 meeting, Mazloum

raised Iraq as a prospective destination for himself and his finances. [**SM-29-69185-4dc-2**].  On

the same day, Mazloum urged his co-conspirators to cultivate ties with the mujahadeen in Iraq.

[**SM-28-69185-19a-3**]. Nearly two months later, Mazloum once again stressed the importance of

developing connections to Iraq.  [**SM-48-69185-3a-3**].  Then, in the fall of 2005, Mazloum again

– unsolicited and independently – asked about the mujahadeen in Iraq. [**103-69185-2a**]. This

particular conversation critically displays Mazloum's knowledge of the conspiracy's objective

and, despite the passage of many months, his single-minded dedication to developing those

connections.  Finally, as late as January 2006, Mazloum was still asking about the conspiracy's

connections with the mujahadeen in Iraq. [**SM-115-69185-2a-1**].  These conversations

demonstrate an obvious truth – Mazloum's participation in the conspiracy was predicated upon

his desire to engage in jihad in Iraq.  In fact, the only time Mazloum mentioned a potential trip to

Lebanon, it was in order to obtain military training that he could then use in advance of jihad.

[**29-69185-7a**].

VII.    **Additional 18 U.S.C. Section 3553 Factors**

    A.    **The Need for the Sentence to Afford Adequate Deterrence**

Unlike drug traffickers, bank robbers, and members of organized crime syndicates, these defendants were motivated in their crime by a strong, core ideology that totally skews the risk/benefit assessment pertinent to deterrence from future conduct.  For example, a prospective bank robber may decide that the speculative monetary rewards of a heist may not be worth the risk of spending 15 years in prison, while still in the prime of his life; but, if he believes he is only risking five years of incarceration, the potential gain may become comparatively more attractive to him.

According to their own statements, however, the defendants in this case are compelled by their beliefs to violently retaliate against American troops, who they perceive as "invaders" in Iraq and Afghanistan.  They have explained their acts of terrorism, therefore, as a matter of obligation to be rewarded by a higher power.  Thus, a sentence of a severity "sufficient" to deter these defendants from future violence is unfathomable.  To the extent any deterrence can be accomplished through the sentencing of these defendants, it is only to the extent that other young recruits to their extreme and violent ideology will be dissuaded, perhaps by their family or friends, from embarking on a similar path that may lead them to spend their remaining years in a maximum-security federal correctional institution.

These defendants have shown no indication that they have disavowed, abandoned, or otherwise disengaged from the beliefs that have led them to this point.  Their post-conviction behavior and communications indicate that their terrorist aims remain intact, thereby representing a very real, very deadly danger to the community at large.  Indeed, the trial evidence

established that each of these defendants will continue to recruit  others to their terrorist pursuits and share with these new recruits the knowledge and experience they have gleaned over these past several years.

In a case of this nature, the only "adequate deterrence to criminal conduct" is complete deterrence – and complete deterrence is accomplished only by a sentence of life imprisonment, as recommended by the Guidelines.

### B.      The Need to Protect the Public

As discussed above, Congress and the Sentencing Commission proposed a sentencing scheme, resulting in the terrorism enhancement in the Guidelines, which reflected the understanding that convicted terrorists, such as these defendants, represent a uniquely serious and challenging class of offenders.  As the Court reflected in the *Meskini* case, these defendants represent a "particularly grave threat because of *the dangerousness of the crime* and *difficulty of deterring and rehabilitating the criminal*."  *Meskini*, at 92.  (Emphasis added).  That Court warned that "terrorists *and their supporters* should be incapacitated for a longer period of time." *Id*.  (Emphasis added).

It would be both a dangerous and erroneous method of analyzing the appropriate sentence in this case by focusing on whether the defendants are, or were, directly linked to Al Qaeda or some other designated foreign terrorist organization.  While there was no evidence introduced at trial that any of these defendants were "card-carrying members" of al Qaeda, the dangerousness of their conduct is by no means lessened given the emerging decentralization of the violent global jihad movement, as explained below.

60

In his 2006 speech to the City Club of Cleveland, FBI Director Robert Mueller addressed this concern:

> [T]he convergence of globalization and technology has created a new brand of terrorism. Today, terrorist threats may come from smaller, more loosely-defined individuals and cells who are not affiliated with al Qaeda, but who are inspired by a violent jihadist message. These homegrown terrorists may prove to be as dangerous as groups like al Qaeda, if not more so.
>
> We have already seen this new face of terrorism on a global scale in Madrid, London, and Toronto. We have also witnessed this so-called "self-radicalization" here at home.

Robert S. Mueller, III, Dir., FBI, "Remarks at the City Club of Cleveland" (June 23, 2006).

Professor Robert Chesney offers further insight into this threat:

> In the past, the limited nature of communication technologies imposed significant limits on the threat that could be posed by truly decentralized or leaderless movements. First, it was difficult for such movements to spread their ideology given their lack of access to mass media (a problem that contributed to their desire to resort to terrorism as a form of propaganda). Second, even for those who already were duly inspired, it was difficult to identify like-minded individuals with whom to cooperate in carrying out an attack. Unfortunately, the emergence of internet communications coupled with encryption technology has significantly reduced these natural barriers. Ideology can be spread and inflamed on a global scale with relative ease through the online posting of various media. Contacts are made in chat rooms and email exchanges, opening the door to in-person cooperation at a later stage. Advice and expertise on technical issues, ranging from only security to the construction of improvised explosive devices are just a click away.

Robert Chesney, *supra*, pp. 439-40.

The evidence in this case does demonstrate that these defendants did idealize Al Qaeda, collected its propaganda and training materials, followed its leaders, and were in the process of effectuating its tactics and strategies. The dangers posed by these defendants are inescapable:

- Their respective beliefs and unanimous agreements that violent jihad against American "invaders" and "crusaders" is not only justified, but an obligation, has been well-established through their own words and acts;

61

- Their desire and intent to learn how to construct explosive devices, (such as IED's and suicide bomb vests), military strategy, sniper techniques, and the use of mortars was clearly and repeatedly expressed;

- Their designs to recruit and train others in the furtherance of the violent jihad activities were not only discussed, but acted upon;

- Their associations with other dangerous individuals, such as Dr. Dhafir, the Ahmeds, and the unnamed Syrian, underscore the breadth and scope of their support network;

- Defendants Mazloum and Amawi trained together in firearms use, and practiced training others;

- El-Hindi and Amawi provided Griffin information on explosives to be used for training purposes;

- Amawi attempted to secure an explosive compound for his Syrian associate whom he claimed was connected to the mujahadeen fighting our U.S. troops overseas;

- All three defendants recruited others, whom they believed to be like-minded and trustworthy, to participate in their activities.

Since their convictions, these defendants have openly demonstrated their disdain for our judicial system and law enforcement authorities.  One need only look at the post-trial newspaper photographs of the smirking Amawi and grinning El-Hindi as they were being lead from the courthouse after their guilty verdicts to be reminded of the unyielding mind set of these men, their absence of concern over their prospective punishment, and, importantly, their obvious continued solidarity.  This solidarity of belief, purpose and association has continued even during their post-trial detention, as they continue to communicate with one another and with each

other's families.  Of course, Amawi's behavior while incarcerated has been well-documented, and speaks volumes.

Given the defendants' long-term dedication to engage in violent action to advance their beliefs – not to mention their willingness to lie, cheat, and steal in order to conceal their activities in this case – the threat posed by Amawi, El-Hindi, and Mazloum cannot be contained. Therefore, to believe that the public will be safe from any of these men during their respective lifetimes has to be premised on the sheer hope that the defendants will undergo such a profound rehabilitation that they would cease seeking to recruit others to their ideology and fully abandon their own individual and joint efforts to engage in violent jihad.  History and experience, and everything we know about these defendants, tells us that such a metamorphosis is chimerical.

63

## VIII.  <u>Conclusion</u>

For the foregoing reasons and those to be presented at the sentencing hearing, the Court

should impose a sentence of life imprisonment for each defendant.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:     /s/Thomas E. Getz
        Thomas E. Getz
        Assistant U.S. Attorney
        Reg. No. 0039786
        801 West Superior Avenue
        Cleveland, Ohio  44113
        Tel. No.:  (216) 622-3840
        Fax No.:  (216) 685-2378
        E-mail:   thomas.getz@usdoj.gov

By:     /s/Justin E. Herdman
        Justin E. Herdman
        Assistant U.S. Attorney
        Reg. No. 0080418
        801 West Superior Avenue
        Cleveland, Ohio  44113
        Tel. No.:  (216) 622-3965
        Fax No.:  (216) 685-2378
        E-mail:   justin.herdman@usdoj.gov

By:     /s/Gregg N. Sofer
        Gregg N. Sofer
        Assistant U.S. Attorney
        Registration No. 106209 (NY)
        816 Congress Avenue, Frost Bank Plaza
        Austin, Texas 78701
        Tel. No.: (512) 916-5858
        Fax No:  (512) 916-5854
        E-mail: gregg.sofer@usdoj.gov

By:     /s/Jerome J. Teresinski
          Jerome J. Teresinski
          Trial Attorney
          Registration No. 66235 (PA)
          U.S. Department of Justice
          Counterterrorism Section
          10th & Constitution Avenue, N.W.
          Washington, DC  20530
          Telephone: (202) 514-7146
          Facsimile:  (202) 514-8714
          E-mail: jerome.teresinski@usdoj.gov

By:     /s/David I. Miller
          David I. Miller
          Assistant U.S. Attorney
          Registration No. 2959369
          One St. Andrews Plaza
          New York, NY  10007
          Tel. No.: (212) 637-2200
          E-mail: david.miller@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 5th day of October, 2009, a copy of the foregoing *Government's Sentencing Memorandum* was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

In addition, a compact disc containing this motion and the herein-referenced exhibits was filed with the Court.  This compact disc was also served upon counsel for the defendants *via* overnight delivery.

<u>/s/ Thomas E. Getz</u>
Thomas E. Getz
Assistant U. S. Attorney

66